# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SYNGENTA SEEDS, INC., | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | C.A. No.: 04-908-SLR |
| | ) | |
| v. | ) | |
| | ) | |
| MONSANTO COMPANY and | ) | **JURY TRIAL DEMANDED** |
| MONSANTO TECHNOLOGY LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## SECOND AMENDED COMPLAINT

Plaintiff Syngenta Seeds, Inc. ("Syngenta"), by and through its undersigned attorneys, demands a trial by jury and alleges on knowledge as to itself and its own acts and on information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.     This case arises from defendants Monsanto Company and Monsanto Technology LLC's (together "Monsanto") improper and illegal monopolization and attempted monopolization in the supply chain for biotechnology corn seed used by farmers throughout the United States.  Since the 1990s, Monsanto has maintained and increased its monopoly power in multiple markets through a series of coercive tactics and exclusive dealing arrangements designed to keep out all competitors.  Monsanto's illegal and improper efforts have increased dramatically since May 2004, when Syngenta's affiliate publicly announced its acquisition of key technology and other assets that facilitated Syngenta's entry into these markets in competition with Monsanto for the 2005 selling season.  Immediately following that announcement, Monsanto launched a scorched-earth campaign to cut off Syngenta's access to

the market and destroy key assets that would facilitate Syngenta's entry and ability to compete effectively. This attempt to thwart Syngenta's entry unlawfully maintains and attempts to create monopolies in multiple markets in violation of Section 2 of the Sherman Act.

2.      Monsanto's domination and control of the corn seed supply chain begins with Monsanto's monopolies in the markets for biotechnology "traits." Through the use of biotechnology, it is possible to introduce new genetic characteristics, or traits, into seeds in order to add desirable characteristics to crops. For example, biotechnology seed traits permit farmers to grow corn or soybeans tolerant to a leading non-selective herbicide, glyphosate. This "glyphosate-tolerant" trait allows growers to spray glyphosate herbicide over the entire crop, and kill all weeds, without risking any damage to the corn or soybean crop. Other biotechnology seed traits permit farmers to plant corn that is resistant to certain pervasive insects that are harmful to the crops, such as corn rootworm and the European corn borer.

3.      Monsanto is a monopolist in the markets for every biotechnological corn trait available in the United States market. Over the past several years, Monsanto has controlled 100% of the market for the glyphosate-tolerant corn trait, 100% of the market for the corn rootworm-resistant corn trait, and at least 84% of the market for the European corn borer-resistant trait. Although Syngenta has recently attempted to enter in competition with Monsanto, Syngenta's efforts have been impeded by Monsanto's anticompetitive acts, with the result that Monsanto maintains at least 99% of the market for the glyphosate-tolerant corn trait, 100% of the market for the corn rootworm-resistant corn trait, and at least 80% of the market for the European corn borer-resistant trait. Monsanto also controls 100% of the market for the glyphosate-tolerant soybean trait.

4.      Monsanto has maintained its monopoly power through a long-running series of exclusionary and unlawful practices. Monsanto has denied seed companies access to these traits unless the seed companies agree to enter restrictive licenses designed to prevent competition. These licenses impede the seed companies' ability to deal in the competitive traits of any other company, including Syngenta. The licenses impose massive financial penalties on seed companies unless a very high percentage of seeds they sell contain Monsanto traits, making it impossible for Syngenta and other potential competitors to enter and compete effectively in the trait markets.

5.      Monsanto also has unlawfully maintained and enhanced its monopoly power through its "bundling" agreements. As a result of these agreements, any seed company that sells a meaningful amount of seeds containing a single trait provided by any company other than Monsanto faces significant penalties from Monsanto across all traits licensed by Monsanto. For example, many seed companies grow and sell glyphosate-resistant corn seeds, rootworm-resistant corn seeds, European corn borer-resistant corn seeds and glyphosate-resistant soybean seeds. If a seed company does not sell a minimum percentage of seeds containing Monsanto traits for *each and every* one of those product lines, it will lose discounts (known in the industry as "seed service fees") for *all* Monsanto traits. Monsanto thus has used its monopoly power in several markets to create a virtually impenetrable barrier to entry for any competitor seeking to enter any one of those trait markets.

6.      In addition to unlawfully maintaining its monopolies in the markets for corn traits, Monsanto has unlawfully attempted to monopolize the market for "foundation" corn seed. In order for a trait  – such as the glyphosate-tolerant corn trait – to be included in seeds planted by corn growers, the trait must first be introduced into a foundation seed or "inbred" seed line.

Foundation seed lines may contain one or more biotechnology traits as well as other desirable seed characteristics. Two foundation seed lines are then crossed to create "hybrid" seeds, which are the finished seeds planted by growers to produce the corn crop. Because traits cannot be introduced into the hybrid seeds planted by growers unless they are first introduced into inbred or foundation seeds, access to foundation seed is critical for successful production and marketing of corn traits. Similarly, because of the importance of traits to corn growers and seed companies, access to traits is critical for successful marketing of foundation seed.

7.    Today Monsanto controls 45% of the foundation corn seed produced in the United States and 70% of the foundation corn seed sold or licensed to independent seed companies. Monsanto has attempted to monopolize the foundation corn seed market by, among other things, limiting or denying foundation seed companies' access to traits necessary for the foundation seed companies to compete in the sale of foundation seed.

8.    Although Monsanto has engaged in unlawful conduct over many years, its conduct has increased drastically since May 2004. On May 12, 2004, Syngenta's affiliate announced that it acquired intellectual property rights to "GA21," a glyphosate-resistant corn trait. Syngenta's affiliate also announced its intent to acquire the corn and soybean seed businesses of Garst Seeds and the Golden Harvest Group. As a result of these acquisitions, Syngenta poses a substantial competitive threat to Monsanto's monopoly positions. Absent Monsanto's unlawful and anticompetitive conduct, Syngenta would have been able to compete effectively with a substantial alternative source of corn seed containing the glyphosate-tolerant trait and other key traits.

9.    Since learning of Syngenta's imminent entry into the glyphosate-tolerant trait market, Monsanto has launched a wide-ranging attack designed to delay and obstruct Syngenta's entry.  Monsanto's new unlawful tactics include:

- filing two baseless patent infringement lawsuits;

- misrepresenting Syngenta's ability to commercialize GA21 to discourage seed companies from dealing with Syngenta;

- misrepresenting its rights and intimidating seed companies to cease all GA21 production and destroy GA21 inbred inventories;

- accelerating the withdrawal of GA21 seeds from the market and engaging in other tactics to remove GA21 seeds from distribution channels; and

- pressuring foundation seed companies, seed companies, and brokers to deal exclusively with Monsanto and not do business with Syngenta, particularly with respect to inbreds containing the GA21 trait.

10.    By its conduct, Monsanto seeks to maintain its monopoly in key corn traits.  If permitted to enter and compete on a level playing field, Syngenta would be the first alternative source for the glyphosate-tolerant corn trait, and the first competitive source for the European corn borer-resistant corn trait stacked with a glyphosate tolerant trait.  Syngenta also would develop its foundation corn seed business to challenge Monsanto's market power in that market.

11.    The antitrust laws flatly prohibit Monsanto's anticompetitive conduct and the resulting antitrust injury to plaintiff, seed companies, farmers and consumers.  Syngenta brings this action in order to remove the artificial and unlawful barriers erected by Monsanto, permit Syngenta to compete fully and fairly in the corn traits and foundation seed markets, and to obtain compensation for the injuries caused by Monsanto's illegal acts.

## JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction under 28 U.S.C. § 1337 (commerce and antitrust regulation) and 28 U.S.C. § 1331 (federal question), as this action arises under Section 2

of the Sherman Act (15 U.S.C. § 2), Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26) and Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).

13.    This Court has personal jurisdiction under Section 12 of the Clayton Act (15 U.S.C. § 22).  Monsanto Company and Monsanto Technology LLC are both inhabitants of and may be found in this district.  Both companies are organized and existing under the laws of the State of Delaware.

14.    Venue is proper because Monsanto Company and Monsanto Technology LLC reside within this judicial district as provided in 28 U.S.C. § 1391(b) and (c) and as provided in Sections 4 and 12 of the Clayton Act (15 U.S.C. §§ 15 and 22).

## THE PARTIES

15.    Plaintiff Syngenta Seeds, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 7500 Olson Memorial Highway, Golden Valley, Minnesota 55427.  Syngenta Seeds, Inc. is a producer of commercial seeds, including field crop seeds, vegetable seeds and flower seeds.

16.    Defendant Monsanto Company is a Delaware corporation with its principal place of business at 800 North Lindbergh Boulevard, St. Louis, Missouri 63167.

17.    Defendant Monsanto Technology (an affiliate of Monsanto Company) is a Delaware limited liability company with its principal place of business at 800 North Lindbergh Boulevard, St. Louis, Missouri 63167.

18.    Defendants Monsanto Company and Monsanto Technology (together, "Monsanto") are engaged in interstate commerce and in activities substantially affecting interstate commerce.  Monsanto is a leading supplier of agricultural products, including biotechnology traits and seeds, with sales to customers located throughout the United States.

6

Both defendants are companies organized under Delaware law and both maintain registered agents in Delaware.

## FACTUAL BACKGROUND

### A.    CORN SEEDS AND TRAITS

19.    Corn is the leading cash crop in the United States, with an annual value of over $24 billion. In 2003, approximately 79 million acres of corn were grown in the United States.

20.    Like most crops, corn production can be impaired by weeds. To control weeds, growers apply herbicides – chemical compounds that destroy or inhibit the growth of undesirable plants.

21.    "Selective herbicides" are tolerated by the crop but kill or suppress one or more undesirable weeds that infest the crop. "Non-selective herbicides" are active on all vegetation and do not distinguish between the commercial crop (such as corn) and other vegetation (such as weeds).

### 1.    Biotechnology Crop Traits

22.    Biotechnology has made it possible to introduce new genetic characteristics into plant seeds. The genetic make-up (or "genome") of a seed can be altered by transferring a transgenic "event" into the seed genome. An event contains, among other things, a specific gene that expresses a desirable characteristic in the seed.

23.    The insertion of a desirable transgenic event into a seed alters the seed's genome, conferring a desirable characteristic, or "trait," on the crops grown from the seed.

24.    Since 1996, there have been a number of commercially available biotechnology corn traits for corn seeds. One of the most common of these traits is for glyphosate tolerance. Glyphosate-tolerant corn is impervious to the effect of glyphosate, the leading non-selective

herbicide used by growers. As a result of this biotechnology, growers that plant glyphosate-tolerant corn may apply glyphosate over an entire field, killing the weeds while allowing the corn crop to survive.

25.    There are two different transgenic events that can be inserted into corn seed to create glyphosate tolerance: NK603 and GA21.

26.    Biotechnology is also used to make corn resistant to the European corn borer ("ECB") and the corn rootworm ("CRW"). The ECB-resistant corn trait and the CRW-resistant corn trait are both created by the insertion of the gene for Bacillus thuringensis (Bt) into the corn seed genome.

27.    Crop protection traits, including herbicide tolerance and insect resistance, are useful to growers because they reduce production costs and increase yield. U.S. farmers are increasingly planting genetically modified varieties of seed. It is estimated that 46% of the corn planted in the U.S. in 2004 was transgenic corn (up from 40% in 2003) and that 86% of all commercial soybeans planted were transgenic.

**2.    The Corn Seed Chain of Distribution**

28.    There typically are four levels in the corn seed chain of distribution: foundation seed companies, hybrid seed companies, dealers and retailers, and end-use growers.

29.    Inbred or foundation seed lines are developed by foundation seed companies and hybrid seed companies to exhibit desirable agronomic characteristics such as high yield, resistance to disease, high oil content or other attributes. Developers of inbred or foundation seed lines also can introduce biotechnology traits, such as glyphosate tolerance or ECB resistance, into inbred or foundation seed lines. It may take several years to develop each inbred or foundation seed line.

30.    Foundation seed companies license or sell foundation seed to hybrid seed companies (the "Seed Companies") for the production of finished, hybrid seed. Hybrid seed (or finished seed) is the seed used to grow all commercially grown corn in the United States today. Hybrid seed is created when a Seed Company crosses two unrelated foundation seed lines.

31.    Seed Companies typically sell or license hybrid seed through dealers and retailers or directly to growers (farmers). Growers plant the hybrid seed and grow the crops for cash.

## B.    MONSANTO

### 1.  Monsanto's Acquisitions of Trait and Foundation Seed Assets

32.    Since the mid 1990s, Monsanto has engaged in a series of transactions to acquire traits, technology, intellectual property, hybrid seed, and foundation seed assets.

33.    In 1996, Monsanto acquired a minority interest in DeKalb Genetics Corporation ("DeKalb"), which had a leading foundation and hybrid corn seed business. In addition, DeKalb licensed to Monsanto (i) the intellectual property rights to the GA21 (glyphosate-tolerant) event that DeKalb was developing in collaboration with Rhone-Poulenc and (ii) the intellectual property rights for ECB-resistant corn traits and for an alternative herbicide (glufosinate) resistant corn.

34.    In 1997, Monsanto began marketing an ECB-resistant corn under the YieldGard tradename.

35.    In February 1997, Monsanto acquired Asgrow, another leading soybean and corn seed company. Following the acquisition, Monsanto terminated an existing collaboration between Asgrow and AgrEvo to commercialize a herbicide-tolerant soybean trait (glufosinate tolerance) competitive with Monsanto's Roundup Ready® soybean trait.

36.    Next, in September 1997, Monsanto acquired Holden's, the leading foundation corn seed supplier.

37.    Finally, in 1998, Monsanto announced that it would acquire the remaining shares of DeKalb. Following its acquisition of Holden's and DeKalb, Monsanto caused both DeKalb and Holden's to withdraw their support for glufosinate-tolerant corn traits and otherwise impeded the commercial acceptance of glufosinate-tolerant traits.

38.    With its acquisitions of DeKalb, Holden's and Asgrow, Monsanto bought control of over approximately 45% of foundation corn seed production and 70% of the foundation corn seed sold or licensed to independent Seed Companies.

39.    By 1998, Monsanto had introduced a Roundup Ready® (glyphosate-tolerant) corn trait using the GA21 event DeKalb had developed with Rhone-Poulenc.

40.    In 1997, Rhone-Poulenc (now Bayer CropScience), owner of patents covering the GA21 event, sued DeKalb (its licensee) and Monsanto (the sublicensee), alleging that DeKalb had misappropriated Rhone-Poulenc technology by hiding successful field tests of GA21. It charged Monsanto with patent infringement, among other things.

41.    DeKalb was found to have no rights to GA21 in February 2000 in *Rhone-Poulenc Agro, S.A. v. Monsanto Co. and DeKalb Genetics Corp.*, No. 1:97CV1138, 2000 U.S. Dist. LEXIS 21330 (M.D.N.C., Feb. 8, 2000), *aff'd in relevant part*, 272 F.3d 1335 (Fed. Cir. 2001). The Federal Circuit later determined that Monsanto had no defense to Rhone-Poulenc's infringement action and lacked any rights to GA21, *see Rhone-Poulenc Agro, S.A., v. DeKalb Genetics Corp.*, 284 F.3d 1323 (Fed. Cir. 2002), which Monsanto purportedly had sublicensed to Seed Companies.

42.    Realizing that its licensed rights were lost through the Rhone-Poulenc litigation, in 2000, Monsanto required Seed Companies to which it had sublicensed GA21 to switch to NK603 (a glyphosate-tolerant event owned by Monsanto) and sign new, NK603 contracts.

43.    In 2003, Monsanto began marketing a CRW corn trait, called YieldGard

Rootworm,® and in 2004 a combination product or "stack" of ECB-resistant corn trait and the

CRW-resistant corn trait, called YieldGard Plus.® Today, Monsanto also produces a stacked

ECB-resistant and glyphosate-tolerant corn trait.

## 2.  Monsanto's Licensing Practices

44.    Monsanto has generated revenues from its traits by licensing them to foundation

seed companies, hybrid seed companies and end-use growers.  It also has generated revenue by

selling foundation and hybrid seeds containing those traits through its Asgrow, Holden's and

DeKalb subsidiaries.

45.    Over the past seven years, Monsanto's revenues from its licenses have been

derived from "Grower Fees" paid by farmers and collected by the Seed Company as agent for

Monsanto.  More recently, Monsanto collects royalties directly from Seed Companies.  A typical

Roundup Ready® corn seed grower fee ranged up to $18 per bag of seed.

46.    Monsanto's typical license with Seed Companies (the "GA21 License") for its

GA21 glyphosate-tolerant corn trait includes the following terms:

- Seed Companies may not sell GA21 corn seed except to corn growers – or through retailers to growers – that are directly licensed by Monsanto;

- Seed Companies may not sell "corn inbreds or parent lines required for the development of" GA21 corn hybrids to any other party;

- Seed Companies may not sell GA21 corn seed to any other Monsanto licensee except with Monsanto's express written consent or through Monsanto's wholly-owned subsidiary Corn States Hybrid Service, Inc.;

- Seed Companies may not sell GA21 corn seed without the express written consent of Monsanto; and

- Seed Companies must withdraw all GA21 corn seeds from the market after five years, i.e., 2005.

47.    In addition, the GA21 License typically provides substantial financial incentives for the Seed Companies to favor Monsanto's trait:

- If Seed Companies require growers that purchase Roundup Ready® seeds to sign Monsanto's grower license, Monsanto will pay the Seed Company 10% of the Grower Fee (the "Seed Services Fee");

- If the Seed Company meets certain sales targets ( i.e., if Roundup Ready® corn seeds exceed a set percentage of the Seed Company's total corn seed sales), it can make 50% more per bag; and

- If Monsanto's Roundup Ready® corn seeds constitute, for example, 85% of the Seed Company's herbicide-tolerant corn seed sales, on or before milestone dates, milestone payments owed by the Seed Companies are significantly reduced or waived altogether.

48.    Substantially similar Monsanto agreements, with varied target market shares, control the use by Seed Companies and farmers of (i) Monsanto's NK603 glyphosate-tolerant corn trait, (ii) its ECB-resistant corn trait, (iii) its CRW-resistant corn trait (iv) its glyphosate-tolerant soybean trait, and (v) products containing combinations or "stacks" of the corn traits in (i), (ii) and (iii).

49.    As Monsanto added new traits to its portfolio, it leveraged its more established traits to promote its newer traits by bundling additional financial incentives across all of its products.  At least as early as 1998, Monsanto bundled additional payments of fees and additional waivers of milestone payments across its glyphosate-tolerant soybeans, glyphosate-tolerant corn and ECB-resistant corn.  At least by 2003, Monsanto had expanded the range of products covered by its bundled incentives to cover CRW-resistant corn as well.

50.    To carry out its bundling plan, Monsanto has entered an "Amended and Restated Licensee Incentive Agreement" (the "Incentive Agreement") with Seed Companies.  Under the Incentive Agreement, Seed Companies meeting certain targets are paid an additional 5% to 10%

of the fee and receive reduced or waived milestone payments that may be due under the individual trait licenses.

51.    However, to qualify for any of these payments or waivers, the Seed Company must ensure every year that its sales of each trait are at least 70% Monsanto brand products. If the Seed Company does not maintain Monsanto's target in any product, it loses the incentives across the entire line of products and must repay previous waived fees. Thus, for example, a Seed Company may be faced with substantial financial penalties for one Monsanto product (such as glyphosate-tolerant corn) if it fails to sell enough of another Monsanto product (such as ECB-resistant corn). The Seed Company may also lose the Incentive Agreement and thus lose the upside opportunities on all traits.

52.    On information and belief, Monsanto's trait licenses, including its GA21 License and its Incentive Agreements generally run at least through 2007 and may not be voluntarily terminated. A majority of independent Seed Companies in the United States has signed Monsanto trait licenses and Incentive Agreements.

## 3. Monsanto's Strategy and Dominance

53.    In recent years, Monsanto has shifted its business strategy from a focus on Roundup® herbicide to a focus on its traits and seed businesses. Hugh Grant, Chairman, President and Chief Executive Officer of Monsanto, declared, in Monsanto's 2003 Annual Report, that:

> " . . . 2003 has been especially important for Monsanto shareowners because this was the year we saw our business make the transition from a company led by Roundup herbicide to a company based on seeds and traits. This evolution of our business was carefully planned; we've been working toward it for some time."

54.    Monsanto's acquisitions of trait and seed assets have made it the dominant provider of biotechnology traits in the U.S., the leading supplier of foundation seeds, and a

leading supplier of hybrid seeds and other crop protection products.  Monsanto estimates that its traits accounted for more than 90% of the biotechnology acres planted worldwide in 2003.  More than 300 Seed Companies in the U.S. license at least one biotechnology trait from Monsanto.

55.    On information and belief, Monsanto controls all of the commercially practicable trait licensing businesses.  Its shares of those businesses are:

| Trait | Share |
|---|---|
| Glyphosate-Tolerant Corn | at least 99% |
| European Corn Borer-Resistant Corn | at least 80% |
| Corn Rootworm-Resistant Corn | 100% |
| Glyphosate-Tolerant Soybeans | 100% |

56.    Monsanto controls approximately 45% of foundation corn seed production via its Holden's, DeKalb and Asgrow acquisitions.  Holden's is the leading commercial provider of foundation corn seeds.  Monsanto controls approximately 70% of the foundation corn seed sold or licensed to independent seed companies.

57.    Monsanto is active in the hybrid corn seed market through its wholly-owned subsidiaries, DeKalb and Asgrow.  It brokers corn seed and licenses foundation seed through its wholly-owned subsidiary, Corn States Hybrid Service LLC.

58.    Monsanto is the leading producer of glyphosate-based herbicides, accounting for at least 70% of all glyphosate sold in the United States.

## C.    SYNGENTA

59.    Syngenta develops and produces a wide range of agricultural products, including biotechnology traits, seeds and other crop protection products (such as herbicides, insecticides and fungicides).  Syngenta is also a provider of seed traits in the United States.

14

60.     Syngenta markets an ECB-resistant corn trait, Bt11, by license to other Seed Companies and through its own NK® brand corn seeds.  Its Bt11 trait is marketed under a license from Monsanto that carries a significant royalty and restrictions on sublicensing.

61.     Syngenta also sells glyphosate-tolerant soybean seeds.  Its glyphosate-tolerant soybean trait also is licensed from Monsanto with restrictions on the right to sublicense.

62.     To date, Syngenta has been able to gain a modest share only in the ECB-resistant corn trait market.

63.     In crop protection chemicals (herbicides, insecticides and fungicides), Syngenta sells a glyphosate herbicide under the Touchdown® trademark.

64.     On February 5, 2004, Syngenta's affiliate acquired the intellectual property rights to the GA21 glyphosate-tolerant corn trait from Bayer CropScience.  Syngenta now has the right to introduce and market its own GA21 product and to license others.  As part of the acquisition, Syngenta's affiliate also acquired the GA21 license from Bayer CropScience under which Monsanto and its sublicensees operate to produce GA21 corn seeds through 2004.

65.     On May 12, 2004, Syngenta's affiliate announced its intention to acquire Advanta BV, including Advanta's Garst Seeds subsidiary and its U.S. corn and soybean seed businesses. At the same time, Syngenta's affiliate publicly announced its acquisition of the GA21 rights from Bayer CropScience.

66.     Syngenta announced an agreement to acquire the Golden Harvest group of seed companies on June 25, 2004.  Golden Harvest is a producer of hybrid corn and soybean seeds.

67.     The acquisitions of Golden Harvest and Advanta were completed on August 2, 2004, and September 1, 2004, respectively.

68.     The combination of the Advanta, Golden Harvest and GA21 acquisitions has given Syngenta the necessary assets to expand its corn product offering and to offer Seed Companies and growers a full range of biotechnology input traits for corn in competition with Monsanto.  In the 2005 selling season, Syngenta introduced the GA21 corn trait as a complement to its ECB-resistant trait, both in competition with Monsanto; however Syngenta's introduction of this product was hampered and continues to be hampered by Monsanto's broad range of anticompetitive conduct.  Syngenta plans to commercialize the GA21 corn trait in NK®, Golden Harvest®, and Garst® brand seeds, and through licenses to other Seed Companies.  Syngenta plans to offer a CRW-resistant trait in 2007.

69.     Syngenta also plans to expand its distribution of ECB-resistant corn trait in foundation and hybrid seeds via the NK,® Golden Harvest®, and Garst® seed brands.

**D.      *MONSANTO'S UNLAWFUL CONDUCT AND PRACTICES TO EXCLUDE SYNGENTA FROM THE TRAITS AND FOUNDATION SEED MARKETS***

70.     As soon as it learned of Syngenta's impending entry, Monsanto launched a wide-ranging attack to disrupt and delay Syngenta's entry and preserve its own monopolies in glyphosate-tolerant and ECB-resistant corn traits, and to preclude Syngenta from competing effectively for sales of foundation seeds.

**1.  Monsanto's Efforts to Prevent Syngenta's Entry and Maintain Its Glyphosate-Tolerant Corn Trait Monopoly**

71.     Monsanto's attacks to prevent Syngenta from entering and competing effectively with GA21 have included filing two baseless patent infringement lawsuits, misrepresenting Syngenta's as well as its own patent position, wrongfully ordering Seed Companies to stop producing GA21 seeds and to destroy their GA21 inventories, attempting to enforce exclusive dealing contracts with customers, improperly bundling incentive programs to defeat or delay new entry, and impeding Syngenta's trait access to the market by hampering its access to foundation

seeds.  All of this conduct is intended to preserve Monsanto's highly profitable dominance of many aspects of the relevant businesses and to entrench itself against challengers.

### a.  *Monsanto's Baseless Patent Infringement Cases*

72.     The same day that Syngenta announced its entry, Monsanto filed a baseless patent infringement lawsuit against Syngenta.  *See Monsanto Company et al. v. Syngenta Seeds, Inc. et al.*, C.A. No. 04-305 (D. Del. filed May 12, 2004).  The lawsuit claims that Syngenta has infringed Patent No. 4,940,835 (the "Shah patent"), which allegedly covers a technique used in producing glyphosate-tolerant plants.

73.     Monsanto knew or should have known that the Shah patent is invalid or unenforceable against Syngenta with respect to the GA21 event in corn.   In fact, Monsanto or its affiliates have twice told federal courts that the technique described in its patent (and all other available techniques) would not work in corn as of the time the Shah patent was filed.  *See Plant Genetic Systems, N.V. v. DeKalb Genetics Corp.*, 175 F. Supp. 2d 246 (D. Conn. 2001), *aff'd* 315 F.3d 1335 (Fed. Cir. 2003); *Monsanto Co. v. Aventis CropScience, N.V.*, No. 4:00CV01915ERW, 2002 U.S. Dist. LEXIS 27417 (E.D. Mo. Dec. 13, 2002); *Monsanto Co. v. Bayer Bioscience NV*, 363 F.3d 1235, 1245 (Fed. Cir. 2004).  For this reason, the patent claims were not "enabled" and were invalid or unenforceable as to corn.

74.     Monsanto's attempt to switch its position and claim that Monsanto's patent was enabled for corn and that Syngenta's introduction of GA21 corn would infringe its patent is baseless in so much as no reasonable litigant could expect to prevail.

75.     On July 27, Monsanto, through its wholly-owned subsidiary, DeKalb Genetics Corporation, filed a second baseless patent infringement lawsuit in an effort to block Syngenta's entry.  *See DeKalb Genetics Corporation v. Syngenta Seeds, Inc. et al.*, C.A. No. 04C50323 (N.D. Ill. filed July 27, 2004).  Monsanto's second lawsuit alleges that Syngenta has infringed

17

Patent Nos. 5,538,880 and 6,013,863 (collectively, the "Lundquist patents"), two process patents

that claim a particular process for producing transgenic corn. As in the lawsuit on the Shah

patent, Monsanto asserts that Syngenta has infringed the Lundquist patents by making and using

glyphosate-tolerant corn. The Lundquist patent case has been transferred to this court.

76.    Syngenta has not infringed the Lundquist patents. In particular, it has not

practiced and is not practicing any process covered by them. Monsanto and its subsidiary knew

or should have known that Syngenta has not practiced the process covered by the Lundquist

patents and therefore could not have infringed those patents. Monsanto's claim of infringement

is baseless in so much as no reasonable litigant could expect to prevail.

77.    On July 28, 2004, Monsanto announced, among other things, that the Illinois

lawsuit was filed by "Monsanto via DeKalb" to enjoin Syngenta from developing, using and

selling herbicide tolerant corn seed such as corn seed based on GA21.

78.    Monsanto's intention in filing its two patent infringement cases was to maintain

its monopolies in glyphosate-tolerant and ECB-resistant corn traits and further its attempt to

monopolize the market for foundation corn seeds.

### b.    *Monsanto has Misrepresented Its Patent Position and Disparaged Syngenta's Ability to Commercialize GA21*

79.    In a press release that accompanied Monsanto's Delaware lawsuit and in various

communications to the industry, Monsanto has misrepresented its own patent position and falsely

disparaged Syngenta's patent position. Monsanto has told Seed Companies that Syngenta could

not "lawfully" commercialize GA21 in the United States, and has stated that Monsanto is

seeking to enjoin Syngenta's "unauthorized" sales of GA21 corn.

80.    Monsanto also has disparaged its (former) glyphosate corn trait, GA21, in favor of

NK603.

81. Monsanto's misrepresentations, known to be false, are made in bad faith. The misrepresentations are intended to undermine Seed Company and grower confidence in Syngenta's entry, block or hinder Syngenta's ability to commercialize GA21, mislead consumers into believing that Syngenta may not lawfully commercialize GA21, and deter Syngenta's customers from licensing Syngenta's products and thereby competing with Monsanto.

      *c.*     ***Monsanto's Attempts to Destroy GA21 Inbreds and Accelerate the Withdrawal of GA21 from the Market***

      (i)    Monsanto's Original Plan

82. Because Monsanto lost its rights to GA21 via the DeKalb license as a result of the Rhone-Poulenc litigation, Monsanto decided in 2000 to require Seed Companies to switch to the NK603 glyphosate-tolerant trait.

83. By letter to the Seed Companies on February 28, 2000, Monsanto announced its original plan to withdraw GA21 from the market. Invoking Section 3.12 of the GA21 License, Monsanto notified its customers that no GA21 corn hybrid "may be produced, sold or used" after February 28, 2005 (five years from the date of the letter, consistent with the terms of the GA21 License).

84. Thereafter, according to Monsanto's letter, Seed Companies could continue to offer a glyphosate-tolerant corn seed based on the NK603 technology if the Seed Companies signed a new NK603 license. Monsanto agreed to waive large payments due under the existing GA21 licenses only if the Seed Companies signed the NK603 license promptly.

85. Monsanto reconfirmed the 2005 cutoff for production, sale and use of GA21 by letter dated July 19, 2001.

86. In 2003, Monsanto extended the withdrawal date until June 28, 2005 in order to permit the seed companies to make a more orderly transition from GA21 to NK603.

(ii)    Monsanto and its Licensees Are Granted New GA21 Rights

87.    On March 26, 2002, the Federal Circuit held that Monsanto did not have a bona fide purchaser defense to Rhone-Poulenc's infringement case and therefore did not have rights to the GA21 technology.

88.    Thereafter, Monsanto reached a settlement with Rhone-Poulenc's successor, Aventis (now Bayer CropScience), whereby Aventis granted to Monsanto *and Monsanto's sublicensees* the right to make, produce, use and sell GA21 corn seeds through the 2004 growing season, and, thereafter, to sell any carry-over inventory of GA21 corn seed produced in 2004, *i.e.*, into 2005 and beyond.

(iii)    Monsanto Accelerated the End of GA21 Production and
Told Seed Companies to Destroy Existing Inventories

89.    When Monsanto learned that Syngenta had acquired the GA21 patent rights and was about to enter the market as a competing source of glyphosate-tolerant corn traits, Monsanto changed its plan and wrongfully accelerated the withdrawal of GA21 corn seeds by ordering Seed Companies to stop production and destroy all GA21 foundation seeds.

90.    On information and belief, Monsanto learned that Syngenta acquired the rights to GA21 at least as early as March 11, 2004. By that time, a Syngenta affiliate had submitted a GA21 planting request to an Argentinean agricultural committee that included a Monsanto representative.

91.    On March 17, 2004, Monsanto notified its GA21 licensees that, despite its earlier notices and the rights conferred on the Seed Companies by the Aventis GA21 License,

> "the final production year for event GA21 was 2003. No production of Roundup Ready Corn (Event GA21) is allowed in 2004 or thereafter. All production of Roundup Ready Corn in 2004 must be Event NK603. Accordingly, all inbred seed stock of GA21 must be destroyed." (emphasis in original).

20

92.    Monsanto's letter also reminded the Seed Companies about the June 28, 2005

cutoff for commercial activity in GA21, and then went on to demand:

>    "<u>Accordingly, after June 28, 2005, all commercial hybrids containing
>    GA21 must be destroyed.</u>"  (emphasis in original).

93.    On information and belief, this was the first time Monsanto had ever suggested to

Seed Companies that they would be required to destroy any GA21 inventory.

94.    Monsanto repeated its demand the day after Syngenta announced its acquisition of

the GA21 rights:

>    In our March 17, 2004 letter we gave notice to all GA21 licensees that the
>    last year of commercial production of GA21 Roundup Ready corn was
>    2003, and that no production would be allowed in 2004.  Additionally, the
>    March 17 letter included notification requiring your company to destroy
>    all GA21 inbred seed stock.

95.    Monsanto's acceleration of the end of GA21 production and its demand that Seed

Companies destroy GA21 inbreds and hybrids are wrongful acts intended to deny Syngenta

access to a critical asset required for swift entry and to maintain Monsanto's monopoly in

glyphosate-tolerant corn traits.  Monsanto has no legal right to demand that the Seed Companies

destroy any inventory.

96.    On information and belief, some Seed Companies have destroyed their GA21

inbreds on Monsanto's instruction.

###    d.    Monsanto's Exclusive Dealing Seed Licenses and Related
    Pressure Not To Do Business with Syngenta

97.    On May 13, 2004, the day after Monsanto filed its patent infringement lawsuit, it

notified Seed Companies that it sought to prevent any unauthorized sales of GA21 corn seeds.

Monsanto pressured Seed Companies not to deal with Syngenta and implicitly threatened to sue

the Seed Companies if they cooperated with Syngenta's entry.

98.    Monsanto's GA21 License forces Seed Companies to deal exclusively in Monsanto's GA21 and not in any other company's GA21 trait, effectively foreclosing competition in glyphosate-tolerant corn traits.  Monsanto has enforced the GA21 License to prevent Seed Companies from licensing GA21 rights from Syngenta and from selling GA21 foundation seeds or hybrid seeds except to growers or other licensees directly licensed or approved by Monsanto.

99.    Through these restrictions, Monsanto controls the outlets for corn seed and thus controls the Seed Companies' marketing.  Seed companies are wed to Monsanto, regardless of any alternative GA21 trait available in the market.  If the Seed Companies were to license GA21 from Syngenta, Monsanto would block them from bringing GA21 seeds to market, including through lawsuits, as Monsanto has made clear in its recent letters.

100.    Monsanto's threats to enforce the GA21 Licenses were made even though it had lost the rights to the underlying technology as a result of the Rhone-Poulenc litigation.

101.    On May 13, 2004, Monsanto warned the Seed Companies that:

> "Separately and independent of any patent claims Monsanto has against Syngenta . . . your Monsanto GA21 license agreement requires your company to withdraw all corn containing the GA21 event."

102.    Monsanto also claimed that its GA21 Licenses prohibit the Seed Companies from selling GA21 seed to anyone who is not licensed or approved in advance by Monsanto:

> " . . . seed containing GA21 currently in your inventory can only be sold to growers licensed by Monsanto to plant the corn as a commercial crop or be sold to another GA21 licensee via Corn States Hybrid Services brokerage department.  GA21 cannot be sold to companies not licensed by Monsanto.  Remember, all commercial activity needs to be completed by June 28, 2005."

103.    Monsanto claimed that:

> "no agreement with or intellectual property license from Syngenta or any
> other third party can change your obligation to discontinue commercial
> activity with GA21 or to withdraw and cease activity with it in the
> appointed timeframe."

104.    Monsanto then instructed the Seed Companies that if they even talked with

Syngenta about GA21, they were required to tell Monsanto.  Citing a provision of its NK603

corn license that requires Seed Companies to report any infringement of Monsanto's purported

patent rights:

> "If Syngenta or any other third party contacts you or your company to
> access from you or to offer to you any GA21 corn material, we look
> forward to hearing from you."

105.    On June 2, 2004, Monsanto reiterated its demand that Seed Companies deal only

with approved or licensed customers.  By letter, Monsanto reminded licensees of their

"obligations under Section 3.02" of the GA21 License agreement to sell only to growers directly

licensed by Monsanto (or to retailers required to do the same) and "to obtain prior written

consent from Monsanto involving any proposed transactions between yourself and another

Monsanto licensee."

106.    On information and belief, Monsanto's purpose in sending this letter was to make

sure the Seed Companies did not directly or indirectly sell any inventory to Syngenta.

107.    On information and belief, in May and June 2004, Monsanto communicated with

seed brokers regarding Syngenta's entry and has required them to agree in writing not to deal in

GA21 hybrid seeds, or their brokerage agreements would be terminated and they would risk

losing access to hybrids containing Monsanto germplasm and traits.

108.    On information and belief, Monsanto made statements to foundation seed

companies to intimidate the foundation seed companies from selling inbreds containing the

GA21 trait.

23

109.    Monsanto's intimidation of Seed Companies and foundation seed companies and attempted enforcement of the GA21 License to exclude Syngenta is wrongful conduct designed to maintain Monsanto's glyphosate-tolerant corn trait monopoly.

110.    The GA21 Licenses, even if valid, constitute illegal exclusive dealing arrangements.

### e.    Monsanto's Bundled Incentives

111.    In addition to entering into exclusive dealing agreements with its customers, Monsanto has pressured Seed Companies not to sell seeds containing a single trait provided by any company other than Monsanto through its "bundling" agreements – namely, Monsanto's GA21 License, its other trait licenses and the Incentive Agreement.  As a result of these agreements, Seed Companies are economically coerced into only selling seeds containing traits provided by Monsanto.  If any Seed Company sells a meaningful amount of seeds containing a single trait provided by any company other than Monsanto, it will face significant penalties from Monsanto across all traits licensed by Monsanto.

112.    For example, under the Incentive Agreement, for a Seed Company to qualify for certain financial incentives it must sign all applicable trait licenses and must be sure that, every year, its sales of each and every trait are at least 70% Monsanto brand products.  If the Seed Company does not maintain Monsanto's target, it will lose the incentives across Monsanto's entire line of products.  And if the Seed Company allows Monsanto's share to fall below a specified share on any product, all incremental Seed Service fees, plus interest, become due and owing to Monsanto.

113.    The effect of Monsanto's bundled incentive programs is to create insurmountable economic barriers through bundling fees and incentives across all product lines, which, in turn,

defeat or deter new entrants and foreclose a substantial portion of competition for the licensing of traits to Seed Companies.

> ### f.    Monsanto Has Attempted to Foreclose Syngenta's Trait Access to the Foundation Corn Seed Market

114.    As discussed below, *see* Section 3 ("Monsanto's Attempted Monopolization of the Foundation Corn Seed Market"), Monsanto has engaged in conduct to deny Syngenta access to the foundation corn seed market. Such conduct also has the effect of excluding Syngenta from competing effectively in the market for glyphosate-tolerant corn traits. By foreclosing Syngenta access to foundation seeds, Monsanto undermines Syngenta's ability to gain effective distribution for its corn traits.

### 2.    Monsanto's Maintenance of its European Corn Borer Trait Monopoly

115.    Currently, Monsanto's share of the ECB-resistant trait market is at least 80 %. Its ECB-resistance event is called MON810. Monsanto licenses the MON810 event for sale under the YieldGard® trademark and in a stack with its glyphosate-tolerant event, NK603.

116.    Syngenta's share of the ECB trait market is approximately 9%. Its ECB event is called Bt11. Syngenta is required to pay a royalty to Monsanto in connection with Bt11 and has restrictions on its ability to sublicense.

117.    Dow AgroSciences/Pioneer also market an ECB event, under the name Herculex®, representing approximately 11% of the ECB market. On information and belief, Dow/Pioneer's rights also are subject to a Monsanto license that carries a royalty.

118.    Between Monsanto's sales of YieldGard® and its licensing to Syngenta and Dow AgroSciences/Pioneer, Monsanto collects revenues for all ECB-resistant corn seed sold in the United States.

119. Because combinations of traits or "stacks," such as Monsanto's ECB/NK603 stack, represent significant value to growers, there is a strong trend toward ECB/glyphosate-tolerant stacks and away from ECB-only offerings. A substantial portion of ECB-resistant traits are stacked with NK603.

120. For the 2005 planting season, through its proprietary GA21 trait, Syngenta has offered stacked GA21/Bt11 products that will confer glyphosate tolerance and ECB resistance in its own seed and through licensing to other Seed Companies.

121. Monsanto's licensing restrictions have impeded and will continue to impede Syngenta's ability to offer stacked GA21/Bt11 products, putting Syngenta at a disadvantage in the marketplace.

122. Monsanto's license restrictions have prevented Syngenta from developing stacks of Bt11 and Seed Company or foundation seed company sourced GA21 or NK603. Monsanto's GA21 and NK603 licenses prevent Seed Companies and foundation seed companies from stacking GA21 or NK603 with Bt11.

123. Monsanto's restrictions have no reasonable business or scientific justification. In fact, on information and belief, Monsanto has selectively waived these restrictions to permit certain Seed Companies to produce a comparable stack.

124. As a result of Monsanto's maintenance of its glyphosate-tolerant corn trait monopoly and its unlawful contractual restrictions, Syngenta and others are unable to compete effectively in the licensing of ECB traits or the licensing of ECB traits stacked with another corn trait. Through these devices, Monsanto unlawfully maintains its monopoly in ECB traits or stacked traits and eliminates competition that would redound to the benefit of consumers.

### 3. Monsanto's Attempted Monopolization of the Foundation Corn Seed Market

125. Through its affiliates, Monsanto controls approximately 45% of foundation corn seed production and approximately 70% of foundation corn seed sold or licensed to independent seed companies. The second largest foundation seed producer, Pioneer, controls approximately 35% of the foundation corn seed production through its hybrid seed business, and has key commercial arrangements with Monsanto. Pioneer has not made its foundation seeds available for commercial sale or licensing to hybrid seed companies.

126. Monsanto has attempted to exclude competition from the foundation seed market and attempted to monopolize that market by (i) preventing Syngenta entry and expansion in key corn traits, (ii) barring foundation seed companies from stacking Monsanto's glyphosate-tolerant corn traits with Bt11, (iii) denying Syngenta access to foundation seeds, (iv) pressuring foundation seed companies or hybrid seed companies not to deal with Syngenta or provide GA21 foundation seeds to Syngenta, (v) entering into commercial arrangements with seed companies and growers that bundle discounts and incentives across product lines to provide economic barriers to entry and (vi) attempting to acquire Advanta/Garst solely to block Syngenta's entry.

127. Developers of inbred seed lines rely on the availability of biotechnology traits to compete effectively for sales of foundation seeds to Seed Companies. Blocking Syngenta's entry/expansion in GA21 and Bt11, and the resulting absence of significant competition in trait licensing, means that Monsanto is able to set the terms on which companies may compete with its owned foundation seed operations.

128. Monsanto restricts foundation seed companies from stacking its glyphosate-tolerant corn trait with competing herbicide tolerant traits. As a result, foundation seed producers lack the ability to offer a range of traited corn seed choices in competition with Monsanto. This diminished competitiveness further increases Monsanto's market power.

129.   In May 2004, Monsanto effectively terminated Syngenta's license and supply agreement with Holden's for the supply of foundation corn seeds, having failed to negotiate a renewal in good faith.  On information and belief, the Holden's agreement was terminated for the purpose of preventing Syngenta from expanding its own foundation seed business.

130.   On information and belief, in connection with Monsanto's acquisition of DeKalb, Monsanto undertook to provide Seed Companies access to Holden's foundation seeds on a non-discriminatory basis for the purpose of converting Holden's lines with third-party corn traits. Monsanto's non-discrimination undertaking will expire in December 2005.  Holden's newly offered foundation seed contracts reflect that Monsanto will not honor its non-discrimination obligations after that date.

131.   As discussed above, *see* paragraphs 82 to 110, Monsanto has enforced its GA21 License and instructed seed companies not to deal with Syngenta and not to provide Syngenta with GA21 foundation seeds.

132.   As discussed above, *see* paragraphs 111 to 113, Monsanto has entered into exclusionary bundled incentive programs.  These incentive programs have the effect of foreclosing access to customers to Syngenta and other foundation seed providers from key segments of the market.

133.   In April 2004, after learning of Syngenta's acquisition of GA21, Monsanto renewed an early effort to acquire Advanta for the purpose of blocking Syngenta.  Advanta originally was offered for sale in mid-2003.  In April 2004, Monsanto obtained exclusive negotiation rights with Advanta and eventually made an increased offer.  On information and belief, Monsanto knew of Syngenta's interest in Advanta and its acquisition of GA21 intellectual property rights from Bayer CropScience when it made its revised offer and hoped to block

Syngenta's acquisition and access to GA21 inventory at Garst. Monsanto's unlawful interference increased the cost of Syngenta's entry through an increased purchase price and other expenses.

134.     Monsanto's conduct to maintain its monopolies in glyphosate-tolerant corn traits, ECB-resistant corn traits and stacked corn traits will further its ability to control prices and exclude competitors from the market for foundation seeds.

135.     Monsanto's conduct creates the dangerous probability that it will achieve a monopoly position in the foundation corn seed market.

136.     On information and belief Monsanto has engaged in other unlawful conduct in order to prevent Syngenta's entry and maintain its monopolies in glyphosate-tolerant corn, ECB-resistant corn, and stacked corn traits, and to attempt to gain a monopoly in the market for foundation corn seed.

### 4.  Monsanto's Long-Standing History of Anticompetitive Conduct

137.     Monsanto's pattern of anticompetitive conduct dates back to the mid 1990s and has involved additional wrongful conduct, including, among other things: (i) refusing to grant Syngenta access to certain technology for its ECB-resistant corn trait (Bt11) unless Syngenta agreed to refrain from promoting or recommending the fact that its ECB-resistant corn trait contained a glufosinate-resistant trait, thereby inhibiting sales of stacked corn traits and inhibiting sales of glufosinate-tolerant traits; and (ii) refusing to grant Syngenta access to glyphosate-tolerant corn events in part because Syngenta declined to adopt Monsanto's grower license and technology fee pricing structure for Syngenta's ECB-resistant corn and/or glyphosate-tolerant soybean seed products and otherwise retaliating against Syngenta in numerous ways for such refusal. By imposing and attempting to impose such requirements, Monsanto sought, among other things, to remove a potential threat to Monsanto's competitive

dominance of its glyphosate-tolerant corn traits and otherwise entrench its monopolies in the other trait and stacked trait markets. These activities are consistent with Monsanto's current coercive practices that impede Syngenta's or any other competitor's ability to successfully enter and compete in the markets for glyphosate-tolerant corn traits, ECB-resistant corn traits, or stacked glyphosate-tolerant and ECB-resistant corn traits.

## RELEVANT MARKETS AND MONSANTO'S MONOPOLY POWER

*A.*    *Glyphosate-Tolerant and Stacked Corn Traits*

138.    The licensing of glyphosate-tolerant corn traits is a line of commerce or relevant product market within the meaning of the antitrust laws. A related relevant market or submarket is the licensing of glyphosate-tolerant corn traits stacked with another key corn trait, such as ECB-resistance.

139.    Glyphosate-tolerant corn traits provide a unique product to developers of inbred or foundation corn seed lines. There are no substitutes for glyphosate-tolerant corn traits for these customers. Glyphosate-tolerant corn traits stacked with another corn trait provide a performance bundle of traits to developers of inbred or foundation corn seed lines. There are no substitutes for stacked glyphosate-tolerant corn traits for these customers.

140.    No reasonable substitutes for glyphosate-tolerant corn traits or stacked glyphosate-tolerant corn traits are available to developers of inbred or foundation seed lines. A significant, non-transitory increase of the fees associated with the licensing of Monsanto's glyphosate-tolerant corn trait or stacked glyphosate-tolerant corn traits would not result in foundation seed companies or other customers purchasing other traits.

141.    The derived demand for the package of non-glyphosate-tolerant corn and selective herbicides does not provide adequate discipline for the package of glyphosate-tolerant corn or stacked glyphosate-tolerant corn traits and glyphosate and other pesticides. Monsanto has

charged monopoly rents in the price of glyphosate-tolerant corn traits and stacked glyphosate-tolerant corn traits. Unimpeded competition from Syngenta's entry would substantially reduce the monopoly price of both.

142. The United States is a relevant geographic market within the meaning of the antitrust laws. Before genetically modified corn can be commercialized in the United States, it must receive regulatory approval from U.S. governmental agencies. The U.S. Department of Agriculture regulates the use of biotechnology traits in crops planted in the United States. The U.S. Environmental Protection Agency regulates the use of both plant incorporated protectants and chemical herbicides in the United States. Other factors, such as the U.S. distribution system and other demand characteristics, support a U.S. geographic market.

143. Monsanto is the dominant supplier of glyphosate-tolerant corn traits and stacked glyphosate-tolerant corn traits in the United States. Monsanto possesses monopoly power in both, where its market share is at least 99%. Monsanto has the power to control prices and exclude competition in the relevant markets.

144. Substantial barriers to entry and expansion exist in the licensing of glyphosate-tolerant corn traits and stacked glyphosate-tolerant corn traits. The considerable time and expense to develop a competing corn trait and obtain the necessary regulatory approvals are strong barriers to entry. Importantly, Monsanto's anti-stacking provision and bundling of incentives provide additional barriers to entry for any competitor.

145. Monsanto's market domination and the existence of entry barriers are evidenced by its high licensing fees.

**B.    European Corn Borer-Resistant and Stacked Corn Traits**

146. The licensing of ECB-resistant corn traits is a line of commerce or relevant market within the meaning of the antitrust laws. A related relevant market or submarket is the

licensing of ECB-resistant corn traits stacked with another key corn trait, such as glyphosate-tolerance.

147.    ECB-resistant corn traits differ from other non-transgenic insect-resistant corn traits that provide protection against other crop pests. ECB-resistant corn traits offer superior performance at lower total cost versus traditional chemical insecticides. ECB-resistant corn traits stacked with another corn trait provide a performance bundle of traits to developers of inbred or foundation corn seed lines. There are no substitutes for stacked ECB-resistant corn traits for these customers.

148.    No reasonable non-transgenic insect-resistant corn trait substitutes are available to developers of inbred or foundation corn lines and to purchasers that seek the crop yield to cost value that ECB-resistant corn traits provide. A significant, non-transitory increase by Monsanto of the fees associated with the licensing of its ECB-resistant corn trait or stacked ECB-resistant corn traits would not result in customers licensing other insect-resistant corn traits.

149.    The derived demand of using non-ECB-resistant corn traits plus traditional insecticides does not provide sufficient discipline over the price of ECB-resistant corn traits.

150.    Monsanto has charged monopoly rents in the price of ECB-resistant corn traits and stacked ECB-resistant corn traits. Syngenta's expansion would substantially reduce the monopoly price of that trait or stack.

151.    The United States is a relevant geographic market within the meaning of the antitrust laws. Before genetically modified corn can be commercialized in the United States, it must receive regulatory approval from U.S. governmental agencies. The U.S. Department of Agriculture regulates the use of biotechnology traits in crops planted in the United States. The U.S. Environmental Protection Agency regulates the use of both plant incorporated protectants

and chemical insecticides in the United States.  Other factors, such as the U.S. distribution system and other demand characteristics, support a U.S. geographic market.

152.    Monsanto is the dominant supplier of ECB-resistant corn traits and stacked ECB-resistant corn traits in the United States.  Monsanto possesses monopoly power in the market for licensing of ECB-resistant corn traits and stacked ECB-resistant corn traits, where its market share is at least 80%.  Monsanto has the power to control prices and exclude competition in the relevant market.

153.    Substantial barriers to entry and expansion exist in the licensing of ECB-resistant corn traits and stacked ECB-resistant traits.  The considerable time and expense to develop a competing corn trait and obtain the necessary regulatory approvals are strong barriers to entry. Importantly, Monsanto's anti-stacking provisions and bundling of incentives provide additional barriers to entry for any competitor.

154.    Monsanto's market domination and the existence of entry barriers are evidenced by its high licensing fees.

**C.    *Foundation Corn Seeds***

155.    The license/sale of foundation corn seed is a line of commerce or relevant product market within the meaning of the antitrust laws.

156.    No reasonable substitute for foundation corn seed is available to hybrid seed companies, who need access to foundation seed in order to produce finished seeds.  A significant, non-transitory increase in the prices of foundation corn seed would not result in customers purchasing other products.

157.    Substantial barriers to entry and expansion exist in the foundation corn seed market.  The considerable time and expense to develop foundation seed lines are strong barriers to entry.  It takes several years to develop each foundation seed line.

33

158.    The United States is a relevant geographic market within the meaning of the antitrust laws, because foundation seed producers outside the United States are not a reasonable alternative source for hybrid seed producers.  There are no significant imports of foundation seeds into the United States and there is substantial regulation of imports.

159.    Monsanto is the leading producer of corn foundation seeds in the United States.  It possesses market power in the corn foundation seed market; Monsanto's share of all corn foundation seed produced is approximately 45% and its share of all corn foundation seed commercially sold or licensed is about 70%.

160.    There is a dangerous probability that Monsanto will gain monopoly power in the market for corn foundation seeds.

161.    Monsanto's market domination and the existence of entry barriers are evidenced by the increasing prices of foundation corn seed and the exclusionary practices employed.

162.    The most likely source of effective competition to Monsanto's monopoly or market power in the relevant markets is through Syngenta's unimpeded entry as a second competitor for licensing the relevant traits and producing corn foundation seeds.  Such entry would threaten to take significant revenues away from Monsanto.

## EFFECTS OF DEFENDANTS' UNLAWFUL SCHEME

### 1.    Effects on the Glyphosate-Tolerant and Stacked Corn Trait Markets

163.    Monsanto's unlawful conduct has caused and will cause substantial harm to competition in the market for the licensing of glyphosate-tolerant corn traits and stacked glyphosate-tolerant corn traits.  Absent Monsanto's exclusionary conduct and practices, Syngenta's entry would have created effective competition in the markets for the licensing of glyphosate-tolerant corn traits.  Syngenta's entry would have introduced much-needed

competition to these markets, increasing market efficiency, providing greater access to traits, and increasing choice and lower costs for Seed Companies, foundation seed companies and growers. If Monsanto is permitted to maintain its sham litigation and continue its campaign of unlawful tactics and licensing practices, Syngenta's entry and ability to compete successfully in the glyphosate-tolerant corn trait and stacked traits markets will continue to be harmed.

164.    Monsanto's wrongful acts to exclude Syngenta from glyphosate-tolerant corn trait licensing have caused injury to Syngenta's business in the form of increased expenses and delay, and adverse effects on customers as well as lost revenues. Monsanto's exclusionary conduct has adversely affected Syngenta's ability to gain market acceptance for and confidence in its entry, depriving Syngenta of potential profits.

165.    By delaying Syngenta's entry and impeding its ability to compete, Monsanto has harmed, and will continue to harm, competition and cause injury at all levels of distribution: foundation seed producers, hybrid seed producers, dealers and retailers, and end-use growers. Monsanto's wrongful acts have forced Seed Companies, foundation seed producers and growers to pay higher fees than would prevail in a competitive environment.

## 2.    Effects on the ECB-Resistant and Stacked Corn Trait Markets

166.    Monsanto's wrongful acts have also injured and will injure competition in the market for the licensing of ECB-resistant corn traits and stacked ECB-resistant corn traits. Monsanto's control of ECB-resistant corn traits licensing leaves Seed Companies and end-use growers with effectively only one source from which to license ECB-resistant corn traits or stacked traits. If Monsanto is permitted to maintain its sham litigation and continue its campaign of unlawful tactics and licensing practices, Syngenta's ability to expand its licensing of ECB-resistant traits and stacks to offer a real alternative to Monsanto will be substantially hampered.

167.    Delay of Syngenta's expansion has harmed and will continue to harm competition and cause injury at all levels of distribution: foundation seed producers, hybrid seed producers, retailers and dealers, and end-use growers.  Seed Companies, foundation seed producers and growers are deprived of a competitive alternative to Monsanto, and pay higher fees than would prevail in a competitive environment.

168.    Monsanto's wrongful acts have caused injury to Syngenta's business in the form of increased expenses and delay, as well as lost revenues.  If permitted to persist, Monsanto's exclusionary conduct will deprive Syngenta of potential profits.

**3.    Effects on the Foundation Corn Seed Market**

169.    Monsanto's wrongful acts have also injured and will injure competition in the market for foundation corn seeds.  By foreclosing competition in corn trait licensing, Monsanto reduces competition and enhances its market power in the foundation corn seed market by excluding competition from non-Monsanto-trait bearing foundation corn seeds, aiding Monsanto's attempt to monopolize the foundation seed market.  Absent Monsanto's conduct, traits not controlled by Monsanto could be licensed to foundation seed companies (and used in Syngenta's foundation seed business) to compete with Monsanto's foundation seed operations.  As a result of Monsanto's unlawful action, Seed Companies and growers are deprived of a competitive alternative to Monsanto, and pay higher fees than would prevail in a competitive environment.

170.    Monsanto's wrongful acts to foreclose competition in the foundation corn seed market caused injury to Syngenta's business in the form of lost revenues.  Monsanto's exclusionary conduct will adversely affect Syngenta's ability to distribute corn traits, thereby depriving Syngenta of lost profits.

171.    Monsanto's concerted campaign is a thinly veiled attempt to impede, hamper and delay Syngenta's entry into key corn trait markets in an attempt to cling to its monopoly positions, allowing it to charge supracompetitive prices for as long as possible at the expense of Seed Companies, growers and, ultimately, the public.  If permitted to persist in its exclusionary practices and other illegal conduct, Monsanto will only further entrench itself against Syngenta, causing substantial injury to the market and ultimately to Seed Companies and growers.

172.    Because of all the foregoing, Syngenta has suffered antitrust injury with respect to all of the relevant markets.

## CLAIMS FOR RELIEF

## COUNT ONE

### Willful Maintenance of a Monopoly of the Glyphosate-Tolerant and Stacked Corn Trait Markets In Violation of Sherman Act, Section 2

173.    Plaintiff realleges and incorporates herein by reference the allegations set forth in paragraphs 1 to 172 herein.

174.    The licensing of glyphosate-tolerant corn traits is a relevant line of commerce within the meaning of the antitrust laws.  A related relevant market or submarket is the licensing of glyphosate-tolerant stacked corn traits.

175.    The relevant geographic market is the United States.

176.    Monsanto possesses monopoly power in the relevant markets, and has maintained a market share of at least 99%.  Substantial barriers to entry and expansion exist in the relevant markets.

177.    Monsanto has the power to control market prices and exclude competition.

37

178.    Monsanto has engaged in conduct and a pattern of conduct with anticompetitive effects to unlawfully maintain and enhance its monopoly in the relevant markets and to keep prices high, stifle competition and eliminate consumer choice though exclusionary behavior designed to keep Syngenta from entering the relevant markets and competing successfully.  It has done so with the intent to monopolize the relevant markets.

179.    There is no legitimate business justification for defendants' conduct.

180.    Syngenta has suffered and will likely suffer additional antitrust injury. Defendants' wrongful conduct is material, and has impeded, hampered and delayed Syngenta's ability to enter quickly the relevant markets and has caused, and continues to cause, Syngenta to lose business and suffer damages in an amount to be proven at trial.

181.    Defendants' wrongful acts have caused and are likely to continue to cause injury to the relevant markets and have caused Seed Companies, growers and consumers to pay higher prices than they would otherwise pay in a competitive environment.

## COUNT TWO

### Willful Maintenance of a Monopoly of the ECB-Resistant and Stacked Corn Trait Markets In Violation of Sherman Act, Section 2

182.    Plaintiff realleges and incorporates herein by reference the allegations set forth in paragraphs 1 to 181 herein.

183.    The licensing of European corn borer-resistant corn traits is a relevant line of commerce within the meaning of the antitrust laws.  A related relevant market or submarket is the licensing of ECB-resistant stacked corn traits.

184.    The relevant geographic market is the United States.

185.    Monsanto possesses monopoly power in the relevant markets, maintaining a market share of at least 80%. Substantial barriers to entry and expansion exist in the relevant markets.

186.    Monsanto has the power to control market prices and exclude competition.

187.    Monsanto has engaged in conduct and a pattern of conduct with anticompetitive effects to unlawfully maintain and enhance its monopoly in the relevant markets and to keep prices high, stifle competition and eliminate consumer choice though exclusionary behavior designed to keep Syngenta from entering the relevant markets. It has done so with the intent to monopolize the relevant markets.

188.    There is no legitimate business justification for defendants' conduct.

189.    Syngenta has suffered and will likely suffer additional antitrust injury. Defendants' wrongful conduct is material, and has impeded, hampered and delayed Syngenta's ability to enter quickly the relevant markets and caused Syngenta to lose business and suffer damages in an amount to be proven at trial.

190.    Defendants' wrongful acts have caused and are likely to continue to cause injury to the relevant markets and have caused Seed Companies, growers and consumers to pay higher prices than they would otherwise pay in a competitive environment.

## COUNT THREE

### Attempted Monopolization of the Foundation Corn Seed Market In Violation of Sherman Act, Section 2

191.    Plaintiff realleges and incorporates herein by reference the allegations set forth in paragraphs 1 to 190 herein.

192.    The market for foundation corn seed is a relevant line of commerce within the meaning of the antitrust laws.

193.    The relevant geographic market is the United States.

194.    Monsanto possesses market power in the relevant market, maintaining a market share of at least 45% or higher under alternative measures. Substantial barriers to entry and expansion exist in the relevant market.

195.    There is a dangerous probability that Monsanto will acquire monopoly power in the relevant market.

196.    Monsanto has engaged in a pattern of conduct with anti-competitive effects to unlawfully attempt to monopolize the relevant market and to keep prices high, stifle competition and eliminate consumer choice though exclusionary behavior designed to keep Syngenta and others from expanding in the relevant market. It has done so with the specific intent to monopolize the relevant market.

197.    There is no legitimate business justification for defendants' conduct.

198.    Syngenta has suffered and will likely suffer additional antitrust injury. Defendants' wrongful conduct is material, and will impede, hamper and delay Syngenta's and others' ability to expand in the relevant market and cause Syngenta to lose business and suffer damages in an amount to be proven at trial.

199.    Defendants' wrongful acts are likely to cause injury to the relevant market and cause Seed Companies, growers and consumers to continue to pay higher prices than they would otherwise pay in a competitive environment.

## COUNT FOUR

### Misrepresentations and False Statements
### In Violation of Section 43(a) of the Lanham Act

200.    Plaintiff realleges and incorporates herein by reference the allegations set forth in paragraph 1 to 199 herein.

201.    Monsanto has misrepresented its own patent position and falsely disparaged Syngenta's patent position, including statements that:

- Syngenta cannot "lawfully commercialize" GA21 in the United States;

- Syngenta's sales of GA21 corn are "unauthorized"; and

- a license by Monsanto is required to "commercialize glyphosate-tolerant corn in the United States" and "Syngenta is not licensed under the intellectual property from Monsanto."

202.    These statements were made in commercial advertising (Monsanto press releases and letters sent by Monsanto to Seed Companies), are either literally or impliedly false, and were made in bad faith to impede Syngenta's ability to compete effectively for glyphosate-tolerant corn traits.

203.    Monsanto's statements are material because they are likely to influence Seed Companies' and growers' purchasing decisions. The statements have actually deceived, or have a tendency to deceive, Seed Companies and growers by causing them to believe wrongfully that Syngenta cannot lawfully commercialize GA21. Because of Monsanto's false statements, Seed Companies and growers have been less likely to purchase GA21 from Syngenta.

204.    Both Monsanto's and Syngenta's products are sold and used in interstate commerce.

205.    Monsanto's misrepresentations and false statements have irreparably harmed Syngenta by causing it to lose significant sales of GA21.

206.    Monsanto's misrepresentations and false statements violate Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).

## DEMAND FOR TRIAL BY JURY

207.    Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, PLAINTIFF PRAYS THIS COURT:

A.  Find that Monsanto is wrongfully maintaining its monopoly over the licensing of glyphosate-tolerant corn traits and stacked corn traits in violation of Section 2 of the Sherman Act and award plaintiff treble damages in an amount to be proven at trial, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a);

B.  Find that Monsanto is wrongfully maintaining its monopoly over the licensing of ECB-resistant corn traits and stacked corn traits in violation of Section 2 of the Sherman Act and award plaintiff treble damages in an amount to be proven at trial, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a);

C.  Find that Monsanto is wrongfully attempting to monopolize the market for foundation corn seed in violation of Section 2 of the Sherman Act and award plaintiff treble damages in an amount to be proven at trial, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a);

D.  Find that Monsanto has violated the Lanham Act and award plaintiff damages in an amount to be proven at trial, pursuant to 15 U.S.C. § 1125(a)(1)(B);

E.  Grant injunctive relief prohibiting defendants and all persons, firms and corporations acting on their behalf and under their direction or control from continuing violations of Section 2 of the Sherman Act, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26;

F.  Award plaintiff such other relief as is necessary or appropriate to restore and

maintain competitive conditions in the markets affected by defendants'

unlawful conduct; and

G.  Award plaintiff attorneys' fees and costs of this action.

Respectfully submitted,

YOUNG CONAWAY STARGATT &
   TAYLOR, LLP

_____
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19801
(302) 571-6600

*Attorneys for Plaintiff*

Of Counsel:

SHEARMAN & STERLING LLP
Richard F. Schwed
Stephen Fishbein
599 Lexington Avenue
New York, NY 10022-6069
Telephone:  (212) 848-4000
Facsimile:  (212) 848-7179

Heather Lamberg Kafele
801 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone:  (202) 508-8000
Facsimile:  (202) 508-8100

Dated:  August 12, 2005