# EXHIBIT A

LEXSEE 2004 US DIST LEXIS 4991

STEPHEN J. DiLORENZO, derivatively on behalf of dELiA*S CORP. and ALLOY, INC., Plaintiff, v. CHRISTOPHER EDGAR, GERALDINE KARESTKY, STEPHEN I. KAHN, EVAN GUILLEMIN, dELiA*S CORP., and ALLOY, INC., Defendants.

Civ. No. 03-841-SLR

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2004 U.S. Dist. LEXIS 4991

March 24, 2004, Decided

**DISPOSITION:** [*1] Defendants' motions to dismiss denied.

**LexisNexis(R) Headnotes**

**COUNSEL:** For STEPHEN J. DILORENZO, plaintiff: Theodore J. Tacconelli, Ferry, Joseph & Pearce, P.A., Wilmington, DE.

For CHRISTOPHER EDGAR, GERALDINE KARETSKY, STEPHEN I. KAHN, EVAN GUILLEMIN, defendants: Allen M. Terrell, Jr., Richards, Layton & Finger, Wilmington, DE.

For DELIA*S CORP., ALLOY INC., defendants: Jon E. Abramczyk, Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

**JUDGES:** Sue L. Robinson, United States District Judge.

**OPINIONBY:** Sue L. Robinson

**OPINION:**

## MEMORANDUM ORDER

At Wilmington, this 24th day of March, 2004, having reviewed the motions of defendants to dismiss (D.I. 10, 13), and the memoranda submitted therewith;

IT IS ORDERED that defendants' motions (D.I. 10, 13) to dismiss are **denied** for the reasons that follow:

1. Plaintiff filed this derivative action on August 27, 2003 alleging violations of § 16(b) of the Securities Exchange Act of 1934, codified at *15 U.S.C. § 78p(b)*. (D.I. 1) The suit is brought on behalf of dELiA*s Corporation ("dELiA*s") and Alloy, Inc. ("Alloy"), and seeks to recover short-swing profits obtained by defendants Christopher Edgar, Geraldine Karetsky, Stephen [*2] Kahn and Evan Guillemin ("Former Director defendants"). On October 16, 2003, the defendants filed motions to dismiss pursuant to *Fed. R. Civ. P. 12(b) 1 and 12(b)(6)*. (D.I. 10, 13)

2. During the relevant time period, the Former Director defendants were directors of dELiA*s. Kahn was the Chief Executive Officer and Chairman of the Board. Edgar was the Executive Vice President and Vice Chairman. Guillemin was the Chief Financial Officer and Treasurer. On or about May 12, 2003, the Former Director defendants purchased in aggregate 7,297,298 shares of dELiA*s common stock at a price of $ 0.37 per share for a total of $ 2.7 million. (D.I. 1, P 12) Of this amount Kahn purchased 4,054,054 shares; Karetsky purchased 2,702,703 shares; Edgar purchased 337,838 shares; and Guillemin purchased 202,703 shares. Further, dELiA*s issued to the Former Director defendants a total of 600,000 warrants to purchase shares at $ 0.37 a share.

3. On July 30, 2003, dELiA*s entered into an agreement with Alloy to conduct a tender offer for all of the publicly held shares of dELiA*s. At that time, Karetsky and Kahn entered into an agreement to support the merger and tender [*3] their shares. Kahn, Edgar and Guillemin each received employment agreements with Alloy upon the effective date of the merger. (Id., P 10, 15)

4. On August 6, 2003, Dodger Acquisition Corp., a direct wholly owned subsidiary of Canal Park Trust and an indirect wholly owned subsidiary of Alloy, commenced a tender offer for 100% of dELiA*s shares at a price of $ .0928 per share. (Id., P 25; D.I. 12, at ex. 1) Plaintiff contends that the Former Director defendants obtained short-swing profits in violation of *§ 16(b)* as a result of an August 6, 2003 tender-offer by Alloy to

dELiA*s shareholders for a cash-out merger between the corporations.

5. During the offer period, plaintiff commenced the present action but did not tender his shares. On September 7, 2003, the merger closed and plaintiff, along with other nontendering shareholders, was cashed-out and his shares canceled. Canal Park Trust is now the sole shareholder of dELiA*s stock. (D.I. 12)

6. Plaintiff was a dELiA*s shareholder at the time of the filing of the complaint. Plaintiff also contends that at the time of the transaction he was an Alloy shareholder and has maintained that interest. Plaintiff seeks a disgorgement [*4] of $ 4,071,892 in profits received by the Former Director defendants as a result of the transaction. Plaintiff also seeks $ 334,800 related to the acquisition of the 600,000 warrants.

7. Defendants' motions to dismiss contend that plaintiff's complaint fails for a lack of standing because he is no longer a shareholder of dELiA*s and because he failed to make demand upon the corporation's board of directors.

8. **Standard of Review.** In analyzing a motion to dismiss pursuant to *Rule 12(b)(6)*, the court must accept as true all material allegations of the complaint and it must construe the complaint in favor of the plaintiff. See *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc., 140 F.3d 478, 483 (3d Cir. 1998)*. "A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." Id. Claims may be dismissed pursuant to a *Rule 12(b)(6)* motion only if the plaintiff cannot demonstrate any set of facts that would entitle him to relief. See *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)* [*5] The moving party has the burden of persuasion. See *Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991)*.

9. In considering a motion to dismiss, a court may consider Securities Exchange Commission documents that are expressly relied upon in the complaint. See *In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997); Indeck Maine Energy, L.L.C. v. ISO New England Inc., 167 F. Supp. 2d 675 (D. Del. 2001)*. Further, on a motion to dismiss the court may take judicial notice of the contents of documents required by law to be filed, and actually filed, with federal or state officials. See *Oran v. Stafford, 226 F.3d 275, 289 (3d Cir. 2000); Ieradi v. Mylan Lab, Inc., 230 F.3d 594, 600 n.3 (3d Cir. 2000)* (citing *Fed. R. Evid. 201*).

10. **Standing under *Section 16(b)*.** *Section 16(b)* establishes strict liability for covered individuals who engage in the sale or purchase of a covered security. *15 U.S.C. § 78p(b)*. The right of recovery under *§ 16(b)* is held, however, solely by the issuer of the security. [*6] Id. A shareholder may bring a derivative action "in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter." Id.

11. There are three requirements for shareholder standing to bring suit under *§ 16(b)*. See *Gollust v. Mendell, 501 U.S. 115, 115 L. Ed. 2d 109, 111 S. Ct. 2173 (1991)*. First, the plaintiff must own a security within the meaning of the section. Second, the security held by the plaintiff must be a security of the issuer of the security traded by the covered individual. Third, the plaintiff must own a security of the issuer at the time the *§ 16(b)* action is instituted. *Id. at 123-24*. Unlike a typical shareholder derivative action, there is not a requirement that the plaintiff maintain continual ownership, only that he has "some continuing financial stake in the litigation" so as to satisfy minimum standing requirements imposed by the jurisdictional limitations of Article III. See *id. at 125*.

12. In the present case, plaintiff's complaint alleges that he owned shares of stock issued by dELiA*s at the time he [*7] filed the present action. Consequently, plaintiff satisfied the statutory requirements for standing at the time the suit was instituted. Defendants contend, however, that plaintiff is no longer a shareholder and lacks the requisite standing to maintain the suit. Plaintiff argues that his ownership of shares in Alloy provide a basis for his continuing financial interest in the outcome of the litigation.

13. In Gollust, the Supreme Court considered the effect of a stock-exchange merger upon the plaintiff's previously filed *§ 16(b)* action. The unanimous Court concluded that although plaintiff was no longer a shareholder of the issuer, as his stock was exchanged for stock in the new corporation, he nonetheless had the minimal financial interest in the outcome of the litigation to satisfy constitutional concerns. *Id. at 126-28*. Consequently, under *Gollust*, where a plaintiff has standing at the commencement of the suit, an involuntary change in his status as a security holder resulting from a restructuring will not affect his standing to maintain the suit so long as minimal constitutional requirements are satisfied through the presence of some financial interest [*8] in the outcome of the litigation.

14. In the present case, the major distinguishing factor is the form of restructuring. Instead of a stock-exchange merger, dELiA*s effectuated a cash-out merger. The court concludes that *§ 16(b)*'s remedial purpose should not be truncated by the legal nuances of the

corporate restructuring. A shareholder of a parent corporation has a financial interest, albeit tenuous, in the disgorgement of profits obtained by insiders of a corporate subsidiary. Although Congress did not provide statutory standing for such a party to institute a § 16(b) suit, n1 a shareholder of a parent corporation has a cognizable interest for purposes of satisfying constitutional requirements. See *Allen v. Wright*, 468 U.S. 737, 751, 82 L. Ed. 2d 556, 104 S. Ct. 3315 (1984) ("A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."). Consequently, the court concludes that plaintiff satisfies the constitutional requirements to maintain the suit.

---

n1 Where a shareholder of a parent corporation brings a suit against a subsidiary of the parent under a derivative theory, the suit is referred to as double derivative in nature. Section 16(b) suits premised upon double derivative standing have been rejected by a majority of courts. See *Lewis v. McAdam*, 762 F.2d 800, 804 (9th Cir. 1985) (concluding that standing does not exist in a cash-stock merger); *Untermeyer v. Valhi, Inc.*, 665 F. Supp. 297, 300-01 (S.D.N.Y. 1987) (concluding that standing does not exist in a cash-out merger). These cases are distinguished, however, because the Supreme Court in Gollust differentiated between standing to institute suit and a sufficient interest to maintain suit. See *Gollust*, 501 U.S. at 123-24.

---

[*9]

15. **Demand.** Defendants also contend that plaintiff does not have standing for failure to satisfy *Fed. R. Civ. P. 23.1*'s requirements for demand. It is clear, however, that *Rule 23.1* does not apply to actions brought pursuant to § 16(b). For example, unlike typical derivative actions, the decision to bring a § 16(b) enforcement action does not enjoy protection of the business judgment rule. See *Cramer v. General Telephone & Elec. Corp.*, 582 F.2d 259, 276 (3d Cir. 1978). Similarly, as discussed above, there are no requirements of continuous ownership. See *Gollust*, 501 U.S. at 124-25.

16. Where demand would have been futile, courts have excused the requirement under § 16(b). See *Berkwich v. Mencher*, 239 F. Supp. 792, 793-94 (S.D.N.Y. 1965); *Grossman v. Young*, 72 F. Supp. 375 (S.D.N.Y. 1947). On a motion to dismiss for failure to state a claim, the court must accept as true plaintiff's allegations of demand futility. *Id. at 380*.

17. In the present case, plaintiff pleads demand futility stating that he "has not made demand on dELiA*s Board of Directors [*10] because such demand would be futile in view of Alloy's acquisition of the company and defendants' control of dELiA*s Board." (D.I. 1, P 28) Plaintiff's allegations of control are supported by those documents submitted by defendants in support of their motion to dismiss. n2 (D.I. 12) Further, had plaintiff made a demand, § 16(b) would preclude him from filing suit until either sixty days had passed or the board had rejected his demand. Due to the short timing of the merger, plaintiff's shares would be canceled before he would have been permitted to bring suit. The failure of the dELiA*s board to bring suit on its own behalf after becoming aware of plaintiff's suit also supports plaintiff's futility allegations. See *Berkwich*, 239 F. Supp. at 794. Consequently, for purposes of resolving the pending motion to dismiss the court finds that plaintiff has sufficiently alleged the existence of demand futility.

---

n2 For example, the Former Director defendants represent four of the eleven members of the former dELiA*s and include three of the four former officers. (D.I. 12, ex. 2 at B-3) Collectively, the Former Director defendants owned 37.8% of the dELiA*s stock.

---

[*11]

Sue L. Robinson

United States District Judge

# EXHIBIT B

LEXSEE 2005 US DIST. LEXIS 18891

MARLAYNA G. TILLMAN, Plaintiff, v. THE PEPSI BOTTLING GROUP, INC. and TEAMSTERS LOCAL UNION 830, Defendants.

Civ. No. 04-1314-SLR

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

*2005 U.S. Dist. LEXIS 18891*

August 30, 2005, Decided

LexisNexis(R) Headnotes

COUNSEL: [*1] Jeffrey K. Martin, Esquire, and Timothy J. Wilson, Esquire, of Margolis Edelstein, Wilmington, Delaware, for Plaintiff

William M. Kelleher, Esquire, of Ballard Spahr Andrews & Ingersoll, LLP, Wilmington, Delaware, for Defendant Pepsi Bottling Group, Inc. Of Counsel: Daniel V. Johns, Esquire, and Lucretia C. cLemons, Esquire of Ballard Spahr Andrews & Ingersoll, LLP, Philadelphia, Pennsylvania.

Clifford B. Hearn, Jr., Esquire, Wilmington, Delaware. Stephen J. Holroyd, Esquire, and Marc L. Gelman, Esquire, of Jennings Sigmond, Philadelphia, Pennsylvania, for Defendant Teamsters Local Union 830.

JUDGES: ROBINSON Chief Judge.

OPINIONBY: Sue L. Robinson

OPINION:

## MEMORANDUM OPINION

Dated: August 30, 2005
Wilmington, Delaware

ROBINSON Chief Judge

## I. INTRODUCTION

On September 29, 2004, plaintiff Marlayna G. Tillman commenced this suit against defendants, Pepsi Bottling Group, Incorporated ("PBG") and Teamsters Local 830 ("Local 830"). (D.I.1) In her complaint, plaintiff asserted the following claims: (1) racial discrimination; (2) violation of *42 U.S.C. § 1981*; (3) gender discrimination; (4) sexual harassment; (5) retaliation; (6) failure [*2] to promote in violation of the *Fair Labor Standards Act* ("FLSA"); (7) violation of *Delaware's Wage Payment and Collection Act*; (8) violation of the *Equal Pay Act*; and (9) a breach of the covenant of good faith and fair dealing. (Id.) The court has jurisdiction pursuant to *28 U.S.C. § 1331*. Presently before the court is PBG's motion to dismiss plaintiff's claims for sexual harassment, retaliation, breach of the covenant of good faith and fair dealing, n1 failure to promote and all claims under the Delaware Wage Payment and Collection Act. For the reasons set forth below, the court grants in part and denies in part defendant PBG's motion. Also before the court is Local 830's motion for a more definite statement which, for the reasons set forth below, the court shall deny.

Case 1:04-cv-00305-SLR   Document 145-2   Filed 10/11/2005   Page 7 of 17

Page 2
2005 U.S. Dist. LEXIS 18891, *

> n1 The court shall grant the motion to dismiss plaintiff's claim alleging breach of the implied covenant of good faith and fair dealing, as it is unopposed. (D.I. 11 at 2)

## II. BACKGROUND n2

> n2 Given the standard for a motion to dismiss, the court considered only those facts pled in the complaint and not those additional facts alleged in the brief answering defendant PBG's motion to dismiss.

[*3]

PBG hired plaintiff on May 8, 2001, as a merchandiser in the Merchandising/Marketing/Sales department. (Id. at P 11) Plaintiff, employed in an entry level position, was paid an hourly rate of $ 10.57 per hour. (Id.) In September 2001, plaintiff was moving pallets at work when a wood chip entered her eye. (Id. at P 13) She was taken to the hospital and missed two days of work. (Id.) Plaintiff returned to work and her supervisor, Bruce Wray, informed her that she would not be paid for the missed days. (Id.) Believing that she was entitled to six paid sick days, plaintiff discussed the situation with the Human Resources Department ("HR"). (Id.) Five months later, plaintiff was assigned to the Conventional Department by Wray; because plaintiff was maintaining her responsibilities in the Merchandising/Marketing/Sales Department, she was effectively working two jobs. (Id. at PP 14,20) Plaintiff believes that the transfer was an act of retaliation for her conversation with HR regarding the unpaid sick days. (Id.)

The Conventional Department position is union-eligible. (Id. at P 15) According to Local 830's by-laws and the defendants' collective bargaining [*4] agreement, the defendants had thirty days after transferring plaintiff to either incorporate her into Local 830 or return her to her original position in the company. n3 (Id. at P 19) This procedure was not followed by defendants. (Id.) Further, plaintiff went to HR to ask for assistance in obtaining entry to Local 830, but was not permitted to join. (Id.)

> n3 The complaint does not differentiate between the defendants and, as the court must accept the facts of the complaint as true, the court will use "defendants" to refer to both PBG and Local 830 as the complaint does.

Plaintiff worked both positions for eight months, starting October 13, 2001 and ending May 28, 2002. (Id. at P 20) During this period, plaintiff did not receive overtime pay or the Union's higher weekend pay rate. (Id. at P 18) Plaintiff, an African-American female, was the only employee in the department performing union work who was not paid union wages. (Id. at P 15) Plaintiff continued to be paid at her initial hourly [*5] rate of $ 10.57 while other male employees were paid $ 16.63 per hour. (Id. at P 16) Additionally, plaintiff was supposed to be paid for a pre-determined forty hour work week but on several occasions was not compensated for the full forty hours. (Id. at P 25) On average, plaintiff worked approximately fifteen to twenty overtime hours per week without any overtime compensation. (Id. at P 26) In failing to pay plaintiff wages to which she was entitled, defendants are alleged to have violated the collective bargaining agreement between them. (Id. at PP 25, 31) Plaintiff requested back pay for the eight months that she had been working both positions and her request was denied by defendants. (Id. at P 37) Further, by not gaining admittance to Local 830, plaintiff was also denied union benefits and protection. (Id. at P 17)

Despite her repeated requests, plaintiff was not made a member of the Union. (Id.) In April 2002, plaintiff asked HR to transfer her to a union position. (Id. at P 35) On May 28, 2002, plaintiff was returned to her original position in the Merchandising/Marketing/Sales Department and was given a pay raise, making her hourly rate $ 10.86. [*6] (Id. at P 36) On July 22, 2002, HR transferred plaintiff to a union position in the Warehouse Department. (Id. at P 39) Prior to plaintiff's transfer, PBG hired (in the same capacity as plaintiff) three male employees who had no prior experience and had never worked for PBG. (Id. at P 40) The male employees were installed in union positions before plaintiff's transfer was finalized and, therefore, were able to surpass plaintiff in seniority. n4 (Id. at P 41) Plaintiff filed a complaint with HR and Local 830 because the hiring violated company policy to hire from within. (Id. at P 42)

> n4 This hiring affected plaintiff's seniority and her ability to bid for positions. (D.I. 1 at P 43)

After being transferred to the Warehouse Department, plaintiff was paid $ 12.68 per hour. The union rate, which her male colleagues received, was between $ 15.75 and $ 16.63 per hour. (Id. at P 44) In her complaint, plaintiff also alleges that, during July 2002, her new male co-workers made comments on her [*7] breast size and other inappropriate topics. (Id. at PP 45-47) A co-worker, Howard Laws, told plaintiff that she needed "to get laid" and that "[he was] just the man to do it to [her]." (Id. at P 46) On another occasion, Laws asked plaintiff if he could borrow a pen. (Id. at P 47) When plaintiff removed the pen from her shirt pocket, Laws commented "you just want me to watch you touch your breasts." (Id.) Plaintiff filed a grievance with HR alleging sexual harassment, but no action was taken. n5 (Id. at P 48) In August 2002, plaintiff asserts that the Warehouse Department supervisors began to scrutinize her more than her co-workers by singling her out for verbal discipline and threatening to place written reprimands in her file. (Id. at PP 51, 52)

> n5 Plaintiff also complained to HR and management about rumors that were circulating. (D.I. 1 at P 50) The rumors portrayed the plaintiff as sleeping with co-workers. (Id.) The complaint to HR about the rumors also went unanswered. (Id.)

[*8]

On August 28, 2002, plaintiff filed a Charge of Discrimination with the Delaware Department of Labor ("DDOL") and the U.S. Equal Employment Opportunity Commission ("EEOC"), alleging discrimination on the basis of her race and her gender. (Id. at P 53; D.I. 9, ex. 1) Plaintiff's charge states the following:

> I am a black female individual who has been employed by Respondent since 5/8/01. Respondent has denied me various promotional opportunities, particularly for Driver positions. Instead, I have been assigned to work in various departments, including, currently, the Warehousing Department, where I am subjected to disparate treatment with regard to terms and conditions of my employment. My supervisors, Glen Matthew (white male) and Tom Riley (black male) hold me to a higher standard than my white male coworkers with regard to rules and regulations. As recently as 8/27/02, I was falsely accused of leaving my shift without checking with the Supervisor on Duty. Also, I am paid lower wages than my white male counterparts, although I am expected to perform the same work as they are.
>
> I have been told that I could not get a Driver position because I am not in the Union. I [*9] believe I have been discriminated against in violated [sic] of the Civil Rights Act of 1964, as amended, and the Delaware Discrimination in Employment Act, because: I am the only female working in my classification, and I am paid lower wages than my male counterparts, denied promotional opportunities, and held to a higher standard. I have seen male coworkers who are not in the union, some with less tenure, obtain Driver positions and thereby become union members.

(D.I. 9, ex. 1) Shortly thereafter, plaintiff received a salary increase to $ 15.75 per hour. (D.I. 1 at P 54)

Plaintiff was fired, along with other members of her Department, on September 18, 2002. (Id. at P 55) All of plaintiff's co-workers were recalled to work two days later, but plaintiff was not recalled until October 21, 2002. n6 (Id. at PP 55-57) Upon her return to work, plaintiff's supervisors started a disciplinary file on her. (Id. at P 58) Every minor infraction was recorded and plaintiff was sometimes written up without her knowledge. (Id.) Prior to this time, plaintiff had never been issued a written reprimand. (Id.) In November 2002, plaintiff was singled out and verbally reprimanded [*10] for using a personal cell phone. (Id. at P 60) Plaintiff filed a grievance with Local 830, but no action was taken. (Id. at P 61)

> n6 Upon her return to work, plaintiff filed another grievance with the Local 830 regarding her layoff. (D.I. 1 at 58) This time, Local 830 demanded the company pay plaintiff for the four weeks she was laid off. (Id.) Plaintiff was paid these wages in December 2002. (Id.)

In April 2003, plaintiff heard a male supervisor, Joe Rizzo, make racial and derogatory comments about African-Americans, Hispanics and women. (Id. at P 63) Plaintiff complained to HR and was assured that an investigation would take place. (Id.) To the best of plaintiff's knowledge, no action was taken against Rizzo. (Id.) After filing the complaint with HR, plaintiff observed an immediate change in Rizzo's behavior towards her. (Id.) Plaintiff was then transferred to the Production Department of which Rizzo was supervisor. (Id.) Plaintiff requested a transfer from the Production [*11] Department on three occasions; all were denied. (Id.) On April 22, 2003, plaintiff filed an additional charge of discrimination with the DDOL against Local 830 alleging racial and sex discrimination and also retaliation. (Id. at P 64)

On November 6, 2003, plaintiff injured her leg while climbing out of a truck and was placed on short term disability. (Id. at P 65) Plaintiff did not receive her disability check for ten weeks because HR forgot to file the paperwork. (Id.) Plaintiff ultimately was paid in one lump sum and, therefore, was taxed heavily on the full amount. (Id.) Plaintiff returned to work on April 19, 2004, and was assigned to the can line filler room. (Id. at P 66) This position required plaintiff to stand for prolonged periods of time. (Id.) Plaintiff went to Rizzo and asked for accommodations or to "bump" another employee for a sitting position because she was unable to stand for long periods of time. (Id.) Rizzo informed plaintiff that her only option would be to take a short term disability leave again. (Id.) Plaintiff was not paid for the second short term disability period. (Id.)

The DDOL investigated plaintiff's Charge of [*12] Discrimination and found in favor of plaintiff. (Id. at P 67) With respect to the Charge of Discrimination filed against PBG in August 2002, the DDOL characterized the disputed facts as follows:

> 1. Charging party states that she was discriminated against by Respondent because she was not afforded the same opportunities as her male counterparts in regards to promotions such as driver positions and she is subjected to disparate treatment from management in regards to the terms and conditions of her employment.
>
> 2. Respondent states that Ms. Tillman was treated the same as her male co-workers and afforded all the same opportunities for promotions and not treated disparately by her supervisors.

(D.I. 1, ex. A) After its investigation, the DDOL resolved these issues of facts as follows:

> 1. Charging Party was able to establish that she had been treated disparately compared to her male co-workers. This was demonstrated through the documentation provided by Respondent in regards to Charging Party's attendance records and the various documentation regarding the amount of time she was late, left work early and called off of work. The same attendance records for [*13] her co-workers do not reflect the same amount of scrutiny on a regular basis as Charging Party in regards to being less than 5 minutes late to work. . . .
>
> 2. A review of the punch detail reports along with the timecard records reveals that male employees more frequently are receiving the standard number of hours in a week and are also more frequently receiving overtime hours than Charging Party. . . .
>
> * * * *
>
> 4. Charging Party provided documentation, which reflects a decreased amount of hourly wage than that of her male co-workers. . . .
>
> 5. Witnesses were contacted and asked about their schedules, the number of hours they are afforded each week, the disciplinary [sic] received or not received regarding their work schedules and the use of personal cell phones on the job. The results of these interviews clearly revealed that Charging Party's male counterparts are treated more favorably than Charging Party.

(Id.) The DDOL concluded that plaintiff had "met her burden of showing that she was discriminated against based on her gender." (Id.) Plaintiff was issued two right to sue letters from the EEOC on July 1, 2004. (Id. at P68)

Plaintiff took three [*14] weeks vacation from August 8, 2004 through August 30, 2004. (Id. at P 69) Upon returning to work, plaintiff was called into HR to discuss her complaints about the sexual harassment. n7 (Id.) On August 12, 2004, the NAACP held a press conference in which plaintiff participated. (Id. at P 70) After the press conference, plaintiff was informed that she had been awarded a transfer to the Transport Department, a position she had bid on three or four times over the last few years. (Id.) Plaintiff was awarded this position on September 17, 2004. (Id.) After transferring to the Transport Department, plaintiff was warned to "watch her back" because the company wants "to get rid of [her]." (Id. at P 71)

> n7 Plaintiff also gave HR a pornographic magazine which she had found on a clipboard inside a truck. (D.I. 1 at PP 49, 69)

## III. STANDARD OF REVIEW

In analyzing a motion to dismiss pursuant to *Rule 12 (b) (6)*, the court must accept as true all material allegations of the complaint and [*15] it must construe the complaint in favor of the plaintiff. See *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc., 140 F.3d 478, 483 (3d Cir. 1998)*. "A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." Id. Claims may be dismissed pursuant to a Rule 12 (b) (6) motion only if the plaintiff cannot demonstrate any set of facts that would entitle her to relief. See *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)*. The moving party has the burden of persuasion. See *Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991)*.

When deciding a motion to dismiss, the court also is allowed to consider any exhibits attached to the complaint as well as documents attached to the motion to dismiss which form the basis of the plaintiff's claims. See *Rossman v. Fleet Bank Nat'l Ass'n, 280 F.3d 384, 388 n.4 (3d Cir. 2002); Pryor v. NCAA, 288 F.3d 548, 559-60 (3d Cir. 2002)*; [*16] *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)* ("[A] court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on that document.").

## IV. DISCUSSION

PBG makes three separate arguments for dismissal of plaintiff's claims against it. First, PBG claims that plaintiff's sexual harassment and retaliation claims fail because she did not exhaust all available administrative remedies. (D.I. 9 at 1) Second, PBG argues that there is no legal basis for plaintiff's failure to promote claim. (Id.) Finally, PBG asserts that plaintiff's claim pursuant to the Delaware Wage Payment and Collection Act is preempted by *§ 301* of the Labor Management Relations Act. (Id.)

### A. Sexual Harassment and Retaliation Claims

PBG seeks dismissal of plaintiff's claims for sexual harassment and retaliation because she did not exhaust all her administrative remedies. (D.I. 9 at 4) Specifically, PBG contends that plaintiff's claims fail because her allegations of sexual harassment and retaliation were not included in her Charge of Discrimination. [*17] (Id.)

The jurisdictional prerequisites to a suit under Title VII are the filing of charges with the EEOC and the receipt of a Notice of Right to Sue. *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 798, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)*. The requirement that a complainant file charges with the EEOC gives that administrative agency the opportunity to investigate, mediate and take remedial action with respect to a charge of discrimination. See *Ostapowicz v. Johnson Bronze Co., 541 F.2d 394, 398 (3d Cir. 1976)*. Although preliminary requirements for a Title VII action are to be interpreted in a non-technical fashion, see *Love v. Pullman Co., 404 U.S. 522, 527, 30 L. Ed. 2d 679, 92 S. Ct. 616 (1972)*, nonetheless, "the parameters of the civil action in the district court are defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination, including new acts which occurred during the pendency of the proceedings." *Ostapowicz, 541 F.2d at 398-99*. The relevant test for determining whether plain-

Case 1:04-cv-00305-SLR    Document 145-2    Filed 10/11/2005    Page 11 of 17

Page 6
2005 U.S. Dist. LEXIS 18891, *

tiff must exhaust her administrative remedies, therefore, is "whether the acts alleged in the subsequent Title VII suit are fairly [*18] within the scope of the prior EEOC complaint, or the investigation arising therefrom." *Antol v. Perry, 82 F.3d 1291, 1295 (3d Cir. 1996)* (quoting *Waiters v. Parsons, 729 F.2d 233, 237 (3d Cir. 1984))*. Claims considered within the scope of the prior EEOC complaint either arise during the pendency of the EEOC investigation, are closely related to conduct alleged in the charge, or are explanations of the original charge. See *Waiters v. Parsons, 729 F.2d 233 (3d Cir. 1984); Ostapowicz, 541 F.2d at 398-99; Flesch v. E. Pa. Psychiatric Inst., 434 F. Supp. 963, 970 (E.D. Pa. 1977); Howze v. Jones & Laughlin Steel Corp., 750 F.2d 1208, 1212 (3d Cir. 1984).*

As evidenced by plaintiff's Charge of Discrimination filed with the DDOL and the EEOC, and the Notice of Reasonable Cause Finding issued by the DDOL, plaintiff's sexual harassment claim is not reasonably within the scope of either the claim or the investigation. The sexual harassment claim arises from a set of facts wholly distinct from plaintiff's contention of disparate treatment with respect to the terms and conditions of her employment, [*19] i.e., wages, promotional opportunities, and disciplinary record. See, e.g., *Sandom v. Travelers Mortgage Servs., Inc., 752 F. Supp. 1240, 1248 (D.N.J. 1990).* Because neither plaintiff nor the DDOL ever mentioned any of the incidents about inappropriate comments as described in plaintiff's complaint at bar, "the sexual harassment claim would, most likely, not have arisen out of a reasonable EEOC investigation of the filed claim absent a specific allegation in the charge." Id. The sexual harassment claim cannot be said to closely relate to the conduct alleged in the charge nor is it an explanation of the conduct in the charge. Additionally, the conduct did not occur during the pendency of the EEOC investigation, as the alleged sexual harassment occurred in July 2002, at least one month prior to plaintiff filing her Charge of Discrimination. (D.I. 1 at PP 45, 53) Therefore, plaintiff failed to exhaust her administrative remedies as to this claim and the motion to dismiss shall be granted in this regard.

Retaliation claims have been considered within the scope of a prior charge. See *Molthan v. Temple Univ., 778 F.2d 955, 960 (3d Cir. 1985)* (finding [*20] a retaliation claim within the scope of a prior claim filed with the EEOC alleging sexual discrimination); *Howze, 750 F.2d at 1212 (3d Cir. 1984)* (allowing a retaliation claim for failure to promote allegation within race discrimination). In this case, plaintiff's Charge of Discrimination sets forth three allegations: 1) plaintiff is paid lower wages than her male counterparts; 2) plaintiff is denied promotional opportunities; and 3) there is disparate treatment between plaintiff and her white male counterparts. (D.I. 9, ex. 1) Plaintiff filed a charge of discrimination on August 28, 2002. (D.I. 1 at P 53) Plaintiff was fired on September 18, 2002, and returned to work on October 21, 2002. (Id. at PP 55, 57) After plaintiff returned to work, her supervisors began creating a disciplinary file on her based on conduct for which other employees received no discipline. (D.I. 1 at PP 59-60) Additionally, plaintiff alleges that she was denied equal pay, benefits, and promotional opportunities in retaliation for filing her Charge of Discrimination. (D.I. 1 at PP 62, 65-66, 88(b)) Accepting the allegations contained in the administrative record as true, the motion to dismiss [*21] the retaliation claim shall be denied.

### B. Failure to Promote

PBG argues that plaintiff's failure to promote claim is not sufficiently pled because plaintiff failed to identify whether her claim was based on racial or gender discrimination or both. (D.I. 9 at 5; D.I. 13 at 3) "When deciding a motion to dismiss for failure to state a claim, 'one must read *Fed. R. Civ. P. 12(b)(6)* in conjunction with *Fed. R. Civ. P. 8(a)*, which establishes the requirements for adequately pleading a claim in federal court.'" *Relational Funding Corp. v. TCIM Servs., 2002 U.S. Dist. LEXIS 7298, No. Civ. A. 01-821-SLR, 2002 WL 655479, at *3 (D. Del. Apr. 18, 2002)* (quoting *Brunetti v. Rubin, 999 F. Supp. 1408, 1409 (D. Col. 1998))*. Rule 8(a) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Id. The statement need not contain detailed facts, but it requires that plaintiff give defendant fair notice of what the claim is and the grounds upon which it rests. *Conley v. Gibson, 355 U.S. 41, 47, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)*. A plaintiff is not required to state precisely [*22] each element of the claim. *Relational Funding Corp., 2002 U.S. Dist. LEXIS 7298, 2002 WL 655479, at *3* (discussing 5 Charles A. Wright and Arthur R. Miller, Federal Practice and Procedure § 1216 (2d ed. 1990)). "Despite that fact, a plaintiff must 'set forth factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory.'" id. (quoting *Gooley v. Mobil Oil Corp., 851 F.2d 513, 515 (1st Cir. 1988))*. The defendant bears the burden of establishing that the plaintiff's complaint fails to state a claim upon which relief can be granted. See *Gould Elecs. v. United States, 220 F.3d 169, 178 (3d Cir. 2000).*

In her complaint, plaintiff states that she is an African-American female. (D.I. 1 at P 2) As an African-American female, plaintiff is clearly a member of a protected class. *Bradley v. United States, 299 F.3d 197, 206 (3d Cir. 2002).* Given the liberal pleading requirements of *Rule 8*, the court concludes that plaintiff's statement that she is an African-American female is sufficient as it asserts factual allegations that support her claim.

Case 1:04-cv-00305-SLR   Document 145-2   Filed 10/11/2005   Page 12 of 17

Page 7
2005 U.S. Dist. LEXIS 18891, *

Additionally, PBG's [*23] inference that there is no statutory or common law basis for a failure to promote claim is without merit, as the Third Circuit has previously recognized such claims. See, e.g., *Young v. Pennsauken Township Sch. Dist.*, 47 Fed. Appx. 160, 161 (3d Cir. 2002) ("Such failure-to-promote claims are analyzed under the well known burden-shifting framework as set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)."). The court concludes that plaintiff's failure to promote claim meets the requirements of *Rule 8* and the motion to dismiss shall be denied.

C. Delaware Wage Payment and Collection Act

Plaintiff asserts that her claim under the Delaware Wage Payment and Collection Act is not dependant upon, or inextricably intertwined with, the collective bargaining agreement because her claim for lost wages is only for the time period when plaintiff was not a member of the Union. (D.I. 11 at 17) In the same paragraph, plaintiff claims that the collective bargaining agreement has "nothing to do" with her claim other than the fact that she "rightly should have been paid at the same rate of pay as those other individuals, [*24] similarly situated, who were being paid in accordance with that agreement." (Id.)

The reach of *Section 301* of the Labor Management Relations Act ("LMRA") "encompasses not only state-law claims that are directly based on a collective bargaining agreement but also all those that are 'substantially dependent upon analysis of the terms' of the agreement." *Wheller v. Graco Trucking Corp.*, 985 F.2d 108, 113 (3d Cir. 1993) (quoting *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220, 85 L. Ed. 2d 206, 105 S. Ct. 1904 (1985)); see also id. at 112 (holding that state law claims for wages allegedly due under a collective bargaining agreement are preempted by § 301 of the LMRA) ; *Phillips v. United Parcel Serv., Inc.*, No. 01-22-GMS, 2001 WL 694535, at *2-3 (D. Del. Jun. 20, 2001) (holding that claims brought pursuant to the Delaware Wage Payment and Collection Act for wages under a collective bargaining agreement are preempted by the LMRA).

Plaintiff claims that she is entitled to liquidated damages in an amount equal to unpaid overtime and wage differences pursuant to Delaware's Wage Payment and Collection Act. (D.I. 1 at P 104) Specifically, plaintiff asserts that PBG [*25] "refused to pay [her] for overtime for weeks in which she worked in excess of forty hours, as well as time and a half for Saturday hours worked and double-time for Sunday hours worked per the terms of the collective bargaining agreement." (D.I. 1 at P 31) Additionally, plaintiff asserts the collective bargaining agreement was violated when she was not admitted to Local 830 in November 2001. (Id. at P 19) To determine whether the collective bargaining agreement was violated, whether plaintiff is entitled to the higher Union wages, and whether plaintiff is entitled to overtime, the court will have to interpret the collective bargaining agreement. The court finds that this interpretation of the collective bargaining agreement will be substantially dependent upon analysis of the terms of the agreement and, therefore, plaintiff's state wage claims are preempted by the LMRA. The motion to dismiss this claim shall be granted.

**D. Motion for a More Definite Statement**

Local 830 moves the court to require plaintiff to provide a more definite statement pursuant to *Fed. R. Civ. P. 12(e)*. (D.I. 10) In this case, Local 830 contends that a more [*26] definite statement is needed because the complaint fails to "specifically delineate" the conduct performed by each defendant and that the conduct of Local 830 is only alluded to, not "specifically" pled. (D.I. 10 at 2)

A motion under *Rule 12(e)* is made to correct a pleading that is "so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading." *Fed. R. Civ. P. 12(e)*. The purpose, however, of *Rule 12(e)* is not to make it easier for the moving party to prepare its case. n8 *Symbol Techs., Inc. v. Hand Held Prods.*, 2003 U.S. Dist. LEXIS 21002, No. Civ. A. 03-102-SLR, 2003 WL 22750145, at *3 (D. Del. Nov. 14, 2003).

---

n8 The advisory committee notes to *Rule 12(e)* state: "with respect to preparations for trial, the party is properly relegated to the various methods of examination and discovery provided in the rules for that purpose." See, e.g., *Campbell v. Miller*, 836 F. Supp. 827, 832 (M.D. Fla. 1993) ("A motion for a more definite statement is not a substitute for discovery.")

---

[*27]

Consistent with *Fed. R. Civ. P. Rule 8*, the complaint states the nature of the action, the general factual background, the basis for seeking relief, and the relief sought. "This is all that is required by notice pleading under the [Federal Rules of Civil Procedure]. In these circumstances, a motion for a more definite statement should not be granted." *Marshall v*

Case 1:04-cv-00305-SLR   Document 145-2   Filed 10/11/2005   Page 13 of 17

Page 8
2005 U.S. Dist. LEXIS 18891, *

*Local 326, No. 80-181, 1980 U.S. Dist. LEXIS 16547, at *1 (D. Del. May 5, 1980).* Paragraph I of the complaint alleges that the action arises under Title VII. (D.I. 1 at 1) Among other things, the complaint alleges that the Union failed to respond to plaintiff's complaints, violated its collective bargaining agreement, and engaged in discrimination on the basis of race and sex. (D.I. 1 at 19, 31, 42, 61) In addition, the complaint demands various forms of compensation to be determined at trial. (D.I. 1) The complaint, therefore, complies with *Rule 8*'s liberal pleading requirements and provides sufficient notice to Local 830 to prepare a responsive pleading. Local 830's motion for a more definite statement shall be denied.

## V. CONCLUSION

For the reasons [*28] stated above, defendant PBG's motion to dismiss is granted as to the sexual harassment claim, the breach of implied covenant and good faith and fair dealing and the Delaware Wage Payment and Collection Act, and as to all other claims denied. Defendant Local 830's motion for a more definite statement is denied. An order consistent with this memorandum opinion shall issue.

### ORDER

At Wilmington this 30th day of August, 2005, consistent with the memorandum opinion issued this same date;

IT IS ORDERED:

1. Defendant Pepsi Bottling Group's motion to dismiss is granted as to the sexual harassment, Delaware Wage Payment and Collection Act and the breach of implied covenant and good faith and fair dealing claims and denied as to all other claims. (D.I. 8)

2. Defendant Teamsters Union Local 830's motion for a more definite statement is denied. (D.I. 10)

Sue L. Robinson

United States District Judge

# EXHIBIT C

 **United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

## Trademarks > Trademark Electronic Search System(Tess)

TESS was last updated on Fri Sep 30 04:12:45 EDT 2005

[TESS HOME] [NEW USER] [STRUCTURED] [FREE FORM] [BROWSE DICT] [SEARCH OG] [PREV LIST] [NEXT LIST] [BOTTOM] [HELP]

Logout | *Please logout when you are done to release system resources allocated for you.*

Start | List At: [    ] OR Jump to record: [    ]   **3 Records(s) found (This page: 1 ~ 3)**

Refine Search [(Agrisure)[COMB]]   Submit

Current Search: S2: (Agrisure)[COMB] docs: 3 occ: 6

| | Serial Number | Reg. Number | Word Mark | Check Status | Live/Dead |
|---|---|---|---|---|---|
| 1 | 78454969 | | AGRISURE ADVANTAGE | TARR | LIVE |
| 2 | 78421475 | | AGRISURE | TARR | LIVE |
| 3 | 76571975 | | AGRISURE | TARR | LIVE |

[TESS HOME] [NEW USER] [STRUCTURED] [FREE FORM] [BROWSE DICT] [SEARCH OG] [PREV LIST] [NEXT LIST] [TOP] [HELP]

| HOME | SITE INDEX | SEARCH | eBUSINESS | HELP | PRIVACY POLICY

 United States Patent and Trademark Office

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

**Trademarks > Trademark Electronic Search System(Tess)**

TESS was last updated on Fri Sep 30 04:12:45 EDT 2005

[TESS HOME] [NEW USER] [STRUCTURED] [FREE FORM] [BROWSE DICT] [SEARCH OG] [BOTTOM] [HELP] [CURR LIST]
[FIRST DOC] [PREV DOC] [NEXT DOC] [LAST DOC]

Logout | Please logout when you are done to release system resources allocated for you.

Start | List At: [    ] OR Jump | to record: [    ]  **Record 2 out of 3**

[TARR Status] [ASSIGN Status] [TDR Status] [TTAB Status] ( Use the "Back" button of the Internet Browser to return to TESS)

# AGRISURE

| | |
|---|---|
| Word Mark | AGRISURE |
| Goods and Services | IC 001. US 001 005 006 010 026 046. G & S: Chemical preparations for use in agriculture, namely, protein and/or enzyme trait for the treatment of corn seed; Protein which confers in-plant tolerance to glyphosate herbicides |
| Standard Characters Claimed | |
| Mark Drawing Code | (4) STANDARD CHARACTER MARK |
| Serial Number | 78421475 |
| Filing Date | May 19, 2004 |
| Current Filing Basis | 1B |
| Original Filing Basis | 1B |
| Published for Opposition | June 14, 2005 |
| Owner | (APPLICANT) Syngenta Participations AG CORPORATION SWITZERLAND Schwarzwaldallee 215 Basel SWITZERLAND CH4058 |
| Attorney of Record | James A. Zellinger |
| Type of Mark | TRADEMARK |
| Register | PRINCIPAL |

| Live/Dead Indicator | LIVE |
|---|---|



[ HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY ]