EXHIBIT 13

**John Ramsay**          Syngenta AG              Tel:    +41-61-323'53'62
Group Financial Controller   Schwarzwaldallee 215     Fax:    +41-61-323'65'33
                         CH-4058 Basel            john.ramsay@syngenta.com
                         Switzerland
                         www.syngenta.com

**CL 71**

For the attention of Kimberley Crook, Project Manager

International Accounting Standards Board
30 Cannon Street
London EC4M 6XH
GREAT BRITAIN

7 March 2003

**Exposure draft ED2 Share based payments**

Dear Sirs

In response to your invitation to comment, and as a preparer of accounts under International Financial Reporting Standards, I am pleased to attach our comments on the above mentioned exposure draft.

Yours faithfully,

John Ramsay
Group Financial Controller
Syngenta AG

## A. General Comments

1. We accept the need to reflect the fair value of goods or services in the income statement if shares, options or other equity financial instruments are issued to employees or others in exchange for those goods or services.   However, we would welcome further work or arguments to relate the recognition of expense related to share based payment transactions more closely to the definitions of an expense in the IASB Framework, especially paragraphs 70 (b), 78 and 94 of the Framework, and, if necessary, to clarify those definitions.  This is important, because otherwise there would remain relevant arguments to oppose recording an expense in the income statement for goods or services received under equity-settled share based payment arrangements.

2. The exposure draft and basis for conclusions focus mainly on the income statement. As regards the balance sheet, we would welcome further arguments in the basis for conclusions to support the proposed gradual recognition of the fair value of the shares or options within shareholders' equity over the vesting period (rather than immediate recognition at grant date together with the recognition of an asset for fair value of employee services to be received over the vesting period), and to define the date that the shares or options are regarded as having been issued. In particular, we would like clarification within the proposed standard and basis for conclusions on whether the grant of shares or options is considered to be the issue of an equity instrument, and, if it is so considered, how the proposed requirement to measure the related expense in terms of the actual units of employee service subsequently received is consistent with the principle that no gain or loss can be recorded in the income statement for changes in an entity's own equity instruments after they have been issued.

3. We would welcome specific comments in the proposed standard about the accounting effects of business restructuring activities which materially reduce the number of employees to whom unvested shares or options have been issued. Paragraph 29 of the ED does deal with cancellation of a grant of shares or options, but does not deal specifically with business restructuring, which may or may not be associated with modifications of the terms of a grant for the employees whose service is ending as a result of the restructuring.

4. We believe that disclosure requirements should be limited to information which is needed, and will be used, by users of the financial statements. Although we accept that users of an entity's financial statements do need certain information about that entity's share based payment schemes, we would urge you to limit the proposed disclosure requirements to the information for which there is a proven and justifiable need. If this principle is not followed, we believe that the cost to the entity of providing the required disclosures will outweigh the benefits to users of the financial statements. We note that the proposed disclosures in the ED are significantly greater than those currently required under US GAAP. Also, we do not understand what user need many of the disclosures would serve. Therefore, it seems to us that certain of the proposed disclosure requirements are excessive and are not relevant.

5   We would welcome comments in the standard on when disclosure of a share based payment arrangement can be omitted due to immateriality. We would not expect any quantitative guidance; however, share based payment arrangements are a sensitive issue, and in the absence of guidance, auditors may take the view that full disclosure should be given for all share based payment arrangements. We do not believe that financial statements would be enhanced if the full proposed disclosures are required even for those arrangements where the fair value of shares or options granted is immaterial both to the entity's financial statements and to the total remuneration for the relevant period of the employees who participate in the arrangement.

6.   We believe that the proposed standard should apply prospectively to share based payment transactions which occur after the standard is first applied, especially for equity-settled share based payment transactions.


## B. Answers to the IASB's Specific Questions


### Question 1

Paragraphs 1-3 of the draft set out the proposed scope of the IFRS. There are no proposed exemptions, apart from transactions within the scope of another IFRS.

Is the proposed scope appropriate? If not, which transactions should be excluded and why?

### Response

We agree that the proposed scope is appropriate.


### Question 2

Paragraphs 4-6 of the draft IFRS propose requirements for the recognition of share-based payment transactions, including the recognition of an expense when the goods or services received or acquired are consumed.

Are these recognition requirements appropriate? If not, why not, or in which circumstances are the recognition requirements inappropriate?

### Response

We agree with the proposals for the timing of recognising an expense in the income statement for goods or services received.

However, we request clarification of the proposal for the timing of recognising in equity the fair value of shares, options, or other equity instruments issued. Are they deemed to be issued at grant date (as defined in the Glossary) or when the services are rendered? If they are deemed to be issued at grant date, on what grounds can their fair value at that date be recognised in equity at a later date (over the period services are rendered)? If they are deemed to be issued at grant date and their fair value is recognised at that date, can the value of services not yet rendered qualify for recognition as an asset in accordance with paragraph 5 of the ED?

## Question 3

For an equity-settled share-based payment transaction, the draft IFRS proposes that, in principle, the entity should measure the goods or services received, and the corresponding increase in equity, either directly, at the fair value of the goods or services received, or indirectly, by reference to the fair value of the equity instruments granted, whichever fair value is more readily determinable (paragraph 7). There are no exemptions to the requirement to measure share-based payment transactions at fair value. For example, there are no exemptions for unlisted entities.

Is this measurement principle appropriate? If not, why not, or in which circumstances is it not appropriate?

### Response

We agree with the proposal.

## Question 4

If the fair value of the goods or services received in an equity-settled share-based payment transaction is measured directly, the draft IFRS proposes that fair value should be measured at the date when the entity obtains the goods or receives the services (paragraph 8).

Do you agree that this is the appropriate date at which to measure the fair value of the goods or services received? If not, at which date should the fair value of the goods or services received be measured?

### Response

We agree with the proposal as currently it is normal accounting practice not to recognise firm commitments for the purchase of goods or the rendering of services from third parties until at least one of the parties has performed under the agreement (e.g. a fixed asset is only recognised in the transaction system once it has been delivered to the company concerned).

## Question 5

If the fair value of the goods or services received in an equity-settled share-based payment transaction is measured by reference to the fair value of the equity instruments granted, the draft IFRS proposes that the fair value of the equity instruments granted should be measured at grant date (paragraph 8).

Do you agree that this is the appropriate date at which to measure the fair value of the equity instruments granted? If not, at which date should the fair value of the equity instruments granted be measured? Why?

### Response

We agree that the fair value of equity instruments should be recognised at grant date. However, we request clarification of how this requirement will interact with the recognition requirements (see our response to question 2 above). If the equity instruments are deemed to be issued when services are rendered, on what grounds can they be measured at an earlier date (grant date)?

## Question 6

For equity-settled transactions with parties other than employees, the draft IFRS proposes a rebuttable presumption that the fair value of the goods or services received is more readily determinable than the fair value of the equity instruments granted (paragraphs 9 and 10)

Do you agree that the fair value of the goods or services received is usually more readily determinable than the fair value of the equity instruments granted? In what circumstances is this not so?

### Response

We agree with the proposal.

### Question 7

For equity-settled transactions with employees, the draft IFRS proposes that the entity should measure the fair value of the employee services received by reference to the fair value of the equity instruments granted, because the latter fair value is more readily determinable. (paragraphs 11 and 12).

Do you agree that the fair value of the equity instruments granted is more readily determinable than the fair value of the employee services received? Are there any circumstances in which this is not so?

### Response

We agree with the proposal.

### Question 8

Paragraphs 13 and 14 of the draft IFRS propose requirements for determining when the counterparty renders service for the equity instruments granted, based on whether the counterparty is required to complete a specified period of service before the equity instruments vest.

Do you agree that it is reasonable to presume that the services rendered by the counterparty as consideration for the equity instruments are received during the vesting period? If not, when are the services received, in your view?

### Response

We agree with the proposal.

However, we strongly suggest that the new IFRS also clarify that where part of the grant can clearly be demonstrated to relate to past services, then paragraph 13 would be applicable and where the balance of the grant relates to future services, then paragraph 14 would be applicable.

### Question 9

If the services received are measured by using the fair value of the equity instruments granted as a surrogate measure, the draft IFRS proposes that the entity should determine the amount to attribute to each unit of service received, by dividing the fair value of the equity instruments granted by the number of units of service expected to be received during the vesting period (paragraph 15).

Do you agree that if the fair value of the equity instruments granted is used as a surrogate measure of the fair value of the services received, it is necessary to determine the amount to attribute to each unit of service received? If not, what alternative approach do you propose?

If an entity is required to determine the amount to attribute to each unit of service received, do you agree that this should be calculated by dividing the fair value of the equity instruments granted by the number of units of services expected to be received during the vesting period? If not, what alternative method do you propose?

## Response

We believe that the above two proposals are consistent with deeming the equity instruments to be issued over the period in which services are received. However, if the equity instruments are deemed to be issued at grant date, we disagree with the proposals. In our view, this would imply that the entity will recognise a greater or lesser expense as a result of remeasuring the equity instruments after their issue. Our understanding is that that would not be consistent with the conceptual framework. There are also clear practical advantages for preparers of the entity's financial statements if the fair value of the grant is set at grant date and it is that value which is systematically recorded in the income statement over the vesting period (e.g. on a straight line basis), without the need for additional work to track the units of service actually received. For both conceptual and practical reasons, we would be strongly in favour of using that method, rather than the proposed units of service method.

## Question 10

In an equity-settled share-based payment transaction, the draft IFRS proposes that having recognised the services received, and a corresponding increase in equity, the entity should

make no subsequent adjustment to total equity, even if the equity instruments granted do not

vest or, in the case of options, the options are not exercised (paragraph 16). However, this requirement does not preclude the entity from recognising a transfer within equity, i.e. a transfer from one component of equity to another.

Do you agree with this proposed requirement? If not, in what circumstances should an adjustment be made to total equity and why?

## Response

We agree with the proposal.

## Question 11

The draft IFRS proposes that the entity should measure the fair value of equity instruments granted, based on market prices if available, taking into account the terms and conditions of the grant (paragraph 17). In the absence of a market price, the draft IFRS proposes that the entity should estimate the fair value of options granted, by applying an option pricing model that takes into account various factors, namely the exercise price of the option, the life of the option, the current price of the underlying shares, the expected volatility of the share price, the dividends expected on the shares (where appropriate) and the risk-free interest rate for the life of the option (paragraph 20). Paragraph 23 of the proposed IFRS explains when it is appropriate to take into account expected dividends.

Do you agree that an option pricing model should be applied to estimate the fair value of options granted?  If not, by what other means should the fair value of the options be estimated?
Are there circumstances in which it would be inappropriate or impracticable to take into account any of the factors listed above in applying an option pricing model?

**Response**

We agree with the proposal.

## Question 12

If an option is non-transferable, the draft IFRS proposes that the expected life of an option rather than its contracted life should be used in applying an option pricing model (paragraph 21). The draft IFRS also proposes requirements for options that are subject to vesting conditions and therefore cannot be exercised during the vesting period (paragraph 22).

Do you agree that replacing an option's contracted life with its expected life when applying an option pricing model is an appropriate means of adjusting the option's fair value for the effects of non-transferability?  If not, do you have an alternative suggestion?

Is the proposed requirement for taking into account the inability to exercise an option during the vesting period appropriate?

**Response**

Yes, we believe that replacing an option's contracted life with its expected life when applying an option pricing model is an appropriate means of adjusting the option's fair value for the effects of non-transferability.

Yes, we agree that the proposed requirement of taking into account the inability to exercise an option during the vesting period is appropriate.

## Question 13

If a grant of shares or options is conditional upon satisfying specified vesting conditions, the draft IFRS proposes that these conditions should be taken into account when an entity measures the fair value of the shares or options granted.  In the case of options, vesting conditions should be taken into account either by incorporating them into the application of an option pricing model or by making an appropriate adjustment to the value produced by such a model (paragraph 24).

Do you agree that vesting conditions should be taken into account when estimating the fair value of options or shares granted?  If not, why not?

Do you have any suggestions for how vesting conditions should be taken into account when estimating the fair value of shares or options granted?

**Response**

Yes, we agree that vesting conditions should be taken into account when estimating the fair value of options or shares granted.

## Question 14

For options with a reload feature, the draft IFRS proposes that the reload feature should be taken into account, where practicable, when an entity measures the fair value of the options granted.  However, if the reload feature is not taken into account in the measurement of the fair value of the options granted, then the reload option granted should be accounted for as a new option grant (paragraph 25).

Is this proposed requirement appropriate?  If not, why not?  Do you have an alternative proposal for dealing with options with reload features?

### Response

Yes, we agree that where the reload feature is not taken into account in the measurement of the fair value of the options granted, then it should be accounted for as a new option grant.

## Question 15

The draft IFRS proposes requirements for taking into account various features common to employee share options, such as non-transferability, inability to exercise the option during the vesting period, and vesting conditions (paragraphs 21-25).

Are there other common features of employee share options for which the IFRS should specify requirements?

### Response

The following is a common feature of employee share options or share plans which the IFRS should also specify requirements for:
Shares which are granted to an employee and which vest immediately upon payment but for which there is a certain blocked period (e.g. two years) during which the employee is unable to sell the shares; however, should the employee leave the employ of the company before the end of the blocked period, the shares will be transferred to his account upon on his departure.

## Question 16

The draft IFRS does not contain prescriptive guidance on the estimation of the fair value of options, consistently with the Board's objective of setting principles-based standards and to allow for future developments in valuation methodologies.

Do you agree with this approach?  Are there specific aspects of valuing options for which such guidance should be given?

### Response

We agree with the proposed approach.

We also believe that more guidance should be provided as to what exactly constitutes an option feature without, of course, this resulting in any form of prescriptive guidance. For example, whether an option feature should be considered where an employee has the right to buy shares at a predetermined strike price for a period, of say, 31 days. For practical reasons,  SFAS 123 para. 240 would consider this as a disqualifying option feature, which in our view, makes perfect sense.

## Question 17

If an entity reprices a share option, or otherwise modifies the terms or conditions on which equity instruments were granted, the draft IFRS proposes that the entity should measure the incremental value granted upon repricing, and include that incremental value when measuring the services received. This means that the entity is required to recognise additional amounts for services received during the remainder of the vesting period, i.e. additional to the amounts recognised in respect of the original option grant. Example 3 in Appendix B illustrates this requirement. As shown in that example, the incremental value granted on repricing is treated as a new option grant, in addition to the original option grant. An alternative approach is also illustrated, whereby the two grants are averaged and spread over the remainder of the vesting period.

Do you agree that the incremental value granted should be taken into account when measuring the services received, resulting in the recognition of additional amounts in the remainder of the vesting period?

If not, how do you suggest repricing should be dealt with? Of the two methods illustrated in Example 3, which is more appropriate? Why?

### Response

We agree with the proposal that the incremental value granted upon repricing of an option should be taken into account when measuring the services received, resulting in the recognition of additional amounts for the remainder of the vesting period. The rationale for this is that at grant date the entity did not presume the option would be repriced (and impractical to measure anyway).

We believe that the first example is normally the more appropriate method of accounting for a repricing, but we believe that both methods should be permitted.

## Question 18

If an entity cancels a share or option grant during the vesting period (other than a grant cancelled by forfeiture when the vesting conditions are not satisfied), the draft IFRS proposes that the entity should continue to recognise the services rendered by the counterparty for the remainder of the vesting period, as if that grant had not been cancelled. The draft IFRS also proposes requirements for dealing with any payment made on cancellation and/or a grant of replacement options, and for the repurchase of vested equity instruments.

Are the proposed requirements appropriate? If not, please explain why not and provide details of your suggested alternative approach.

### Response

1.    Cancellation of non-vested shares or options to be replaced with a new option grant

We agree with the proposal that where an entity cancels a share or option grant during the vesting period (other than a grant cancelled by forfeiture when the vesting conditions are not satisfied), an entity should still continue to recognise the services rendered by the counterparty for the remainder of the vesting period as if that grant had not been cancelled if the new option grant is identified as replacement options for the cancelled options. The rationale for this is that replacement option grant is in substance identical to a repricing of the original share option (see question 17 above) and the accounting should be consistent.

2.    Settlement of non-vested shares or options with cash

We disagree with the proposal that where an entity settles a share or option grant with cash during the vesting period (other than a grant cancelled by forfeiture when the vesting conditions are not satisfied), an entity should still continue to recognise the services rendered by the counterparty for

the remainder of the vesting period, as if that grant had not been cancelled because the entity has, in effect, vested the award. In our opinion, if all rights under the grant have been cancelled in exchange for a cash settlement, then the entity will not receive any further value in relation to the employee services associated, or deemed to be associated, with the grant, and should not record any further expense. We believe that cash settlements should be accounted for under the method required by SFAS 123 paragraphs 37-38, which would have the additional advantage of US GAAP convergence.

3.  We believe that, if an option grant is cancelled without compensation to the holders of the option, and new options are granted to those holders, there should be a presumption that the new options granted are a replacement for the cancelled options. If options are settled in cash and cancelled, there should be a presumption that new options granted are not a replacement and should be accounted for as a new grant.

4.  We agree with the proposal that where an entity repurchases an equity interest (whether vested or non-vested), it should be accounted for as a deduction from equity except to the extent that the payment exceeds the fair value of the equity instruments repurchased, measured at the repurchase date. Any such excess shall be recognised as an expense.

## Question 19

For cash-settled share-based payment transactions, the draft IFRS proposes that the entity should measure the goods or services acquired and the liability incurred at the fair value of the liability. Until the liability is settled, the entity should remeasure the fair value of the liability at each reporting date, with any changes in value recognised in the income statement.

Are the proposed requirements appropriate? If not, please provide details of your suggested alternative approach.

### Response

We agree with the proposal.

## Question 20

For share-based payment transactions in which either the entity or the supplier of goods or services may choose whether the entity settles the transaction in cash or by issuing equity instruments, the draft IFRS proposes that the entity should account for the transaction, or the components of that transaction, as a cash-settled share-based payment transaction if the entity has incurred a liability to settle in cash, or as an equity-settled share-based payment transaction if no such liability has been incurred. The draft IFRS proposes various requirements to apply this principle.

Are the proposed requirements appropriate? If not, please provide details of your suggested alternative approach.

### Response

We agree with the proposal.

## Question 21

The draft IFRS proposes that an entity should disclose information to enable users of financial statements to understand:

the nature and extent of share-based payment arrangements that existed during the period,

how the fair value of the goods or services received, or the fair value of the equity instruments granted, during the period was determined, and

the effect of expenses arising from share-based payment transactions on the entity's profit or loss.

Are these disclosure requirements appropriate?  If not, which disclosure requirements do you suggest should be added, deleted or amended (and how)?

## Response

- We support the disclosure principles set out in paragraphs 45, 47, 49, 50 and 51.

- We agree with the detailed disclosure requirements in paragraph 46.

- We agree with the detailed disclosure requirements in paragraph 48 (a) (i) and 48 (b) and (d).

- It seems to us that the requirements of 48 (a) (ii) to (iv), and the comparison of grant date vesting and exercise assumptions with actual outcome in paragraph 48 (e) (f) respectively, would, in their proposed form, be of value only to a user who wished to reestimate the fair value of options granted using his or her own assumptions. Also, in our view, the comparisons of grant date vesting and exercise assumptions with actual outcome are not relevant to financial statements prepared under the proposed accounting model, because the expense recorded is not affected by the actual outcome, but only by the initial assumptions about these matters. We accept that some sensitivity analysis of the most critical assumptions used to calculate fair values of grants might be appropriate in the financial statements of entities where the related expense is a significant proportion of total costs and of net income, and where those assumptions would be key measurement assumptions under paragraph 110 of the exposure draft of revised IAS 1. However, to require these disclosures in their present proposed form for all entities seems to us both inappropriate and excessive. If the IASB insists on this requirement, then we would welcome specific comments on the reason for it.

- We agree with the detailed disclosure requirements in paragraph 52 (a).

- We believe that it is not relevant to give the analyses into debt and equity components of the fair value and expense related to cash settled share-based payment arrangements proposed in paragraphs 48 (c) and 52 (b). The amount of the liability for such arrangements at the balance sheet date would, in our view, be a more relevant disclosure than a notional analysis of the expense and fair value into debt and equity components. If the IASB insists on this requirement, then we would welcome specific comments on the reason for it.

- We believe that any requirement to disclose the values of assumptions made with regard to vesting conditions would be unfairly prejudicial to both the entity and the holders to whom it has granted the shares or options. We strongly believe the proposed standard should make it clear that an entity is not required publicly to quantify to what extent it expects holders will satisfy service, performance and other vesting conditions.

## Question 22

The draft IFRS proposes that an entity should apply the requirements of the IFRS to grants of equity instruments that were granted after the publication date of this Exposure Draft and had not vested at the effective date of the IFRS. It also proposes that an entity should apply retrospectively the requirements of the IFRS to liabilities existing at the effective date of the IFRS, except that the entity is not required to measure vested share appreciation rights (and similar liabilities) at fair value, but instead should measure such liabilities at their settlement amount (i.e. the amount that would have been paid on settlement of the liability had the counterparty demanded settlement at the date the liability is measured).

Are the proposed requirements appropriate? If not, please provide details of your suggestions for the IFRS's transitional provisions.

### Response

We disagree with the proposal, and strongly believe that it would be more appropriate if the IFRS be applied prospectively to transactions after the date of initial application of the new standard - and not before. This is particularly true of equity-settled arrangements. Entities should be allowed, if they wish, to disclose additional information about the amounts which would have been recorded in previous periods if the proposed standard had been applied retrospectively.

## Question 23

The draft IFRS proposes a consequential amendment to IAS 12 (revised 2000) Income Taxes to add an example to that standard illustrating how to account for the tax effects of share-based payment transactions. As shown in that example, it is proposed that all tax effects of share-based payment transactions should be recognised in the income statement.

Are the proposed requirements appropriate?

### Response

We agree with the proposal.

## Question 24

In developing the Exposure Draft, the Board considered how various issues are dealt with under the US standard SFAS 123 Accounting for Stock-Based Compensation, as explained further in the Basis for Conclusions. Although the draft IFRS is similar to SFAS 123 in many respects, there are some differences. The main differences include the following:

a) Apart from transactions within the scope of another IFRS, the draft IFRS does not propose any exemptions, either from the requirement to apply the IFRS or from the requirement to measure share-based payment transactions at fair value. SFAS 123 contains the following exemptions, none of which are included in the draft IFRS:

  ➢     employee share purchase plans are excluded from SFAS 123, provided specified criteria are met, such as the discount given to employees is relatively small;

  ➢     SFAS 123 encourages, but does not require, entities to apply its fair value measurement

method to recognise transactions with employees; entities are permitted to apply instead the intrinsic value measurement method in Accounting Principles Board Opinion No. 25 Accounting for Stock Issued to Employees (paragraphs BC70-BC74 in the Basis for Conclusions give an explanation of intrinsic value); and

> unlisted (non-public) entities are permitted to apply the minimum value method when estimating the value of share options, which excludes from the valuation the effects of expected share price volatility (paragraphs BC75-BC78 in the Basis for Conclusions give an explanation of minimum value)

(b) For transactions in which equity instruments are granted to employees, both SFAS 123 and the draft IFRS have a measurement method that is based on the fair value of those equity instruments at grant date. However:

> under SFAS 123, the estimate of the fair value of an equity instrument at grant date is not reduced for the possibility of forfeiture due to failure to satisfy the vesting conditions. whereas the draft IFRS proposes that the possibility of forfeiture should be taken into account in making such an estimate.

> under SFAS 123, the transaction is measured at the fair value of the equity instruments issued. Because equity instruments are not regarded as issued until any specified vesting conditions have been satisfied, the transaction amount is ultimately measured at the number of vested equity instruments multiplied by the fair value of those equity instruments at grant date. Hence, any amounts recognised for employee services received during the vesting period will be subsequently reversed if the equity instruments granted are forfeited. Under the draft IFRS, the transaction is measured at the deemed fair value of the employee services received. The fair value of the equity instruments granted is used as a surrogate measure, to determine the deemed fair value of each unit of employee service received. The transaction amount is ultimately measured at the number of units of service received during the vesting period multiplied by the deemed fair value per unit of service. Hence, any amounts recognised for employee services received are not subsequently reversed, even if the equity instruments granted are forfeited.

(c) If, during the vesting period, an entity settles in cash a grant of equity instruments, under SFAS 123 those equity instruments are regarded as having immediately vested, and therefore the amount of compensation expense measured at grant date but not yet recognised is recognised immediately at the date of settlement. The draft IFRS does not require immediate recognition of an expense but instead proposes that the entity should continue to recognise the services received (and hence the resulting expense) over the remainder of the vesting period, as if that grant of equity instruments had not been cancelled.

(d) SFAS 123 does not specify a measurement date for transactions with parties other than employees that are measured at the fair value of the equity instruments issued. Emerging Issues Task Force Issue 96-18 Accounting for Equity Instruments That Are Issued to Other Than Employees for Acquiring, or in Conjunction with Selling, Goods or Services requires the fair value of the equity instruments issued to be measured at the earlier of (i) the date a performance commitment is reached or (ii) the date performance is complete. This date might be later than grant date, for example, if there is no performance commitment at grant date. Under the draft IFRS, the fair value of the equity instruments granted is measured at grant date in all cases (indirect method).

(e) SFAS 123 requires liabilities for cash-settled share appreciation rights (SARs) to be measured using an intrinsic value measurement method. The draft IFRS proposes that such liabilities should be measured using a fair value measurement method, which includes the time value of the SARs, in the same way that options have time value (refer to paragraphs BC70-BC81 of the Basis for Conclusions for a discussion of intrinsic value, time value and fair value).

(f) For a share-based payment transaction in which equity instruments are granted, SFAS 123 requires realised tax benefits to be credited direct to equity as additional paid-in capital, to the extent that those tax benefits exceed the tax benefits on the total amount of compensation expense recognised in respect of that grant of equity instruments. The draft IFRS, in a consequential amendment to IAS 12 (revised 2000) Income Taxes, proposes that all tax effects of share-based payment transactions should be recognised in profit or loss, as part of tax expense.

For each of the above differences, which treatment is the most appropriate? Why? If you regard neither treatment as appropriate, please provide details of your preferred treatment.

**Response**

We believe that the IASB proposed treatment is more appropriate in the above cases, except for the difference discussed under paragraph (c) above. Please therefore refer to question 18, point 2 for our preferred accounting treatment.

**<u>Question 25</u>**

Do you have any other comments on the Exposure Draft?

**Response**

1.  We would welcome additional guidance, either in ED2 or in ED 3 "Business combinations", on the treatment of the effect of a business combination on the share based payment arrangements of an acquired company, when the change of control of the acquired company makes it impossible for pre-existing unvested equity instruments to vest.

2.  Although in our view it is uncontroversial, we would welcome some reference in the proposed standard to payments made to the entity by employees for shares, options or other equity instruments granted under equity-settled share based payment arrangements, and the accounting effect of such payments.

# EXHIBIT 14

| | |
|---|---|
| **From:** | Walker Graham CHBS |
| **Sent:** | Thursday, October 16, 2003 10:22 AM |
| **To:** | Kostiuk Marshall USGV; Klevorn Thomas USGV |
| **Subject:** | RE: GA21 GT Corn Analysis |

Marshall,

Thanks for the quick response

We should consider licensing options  I could have worded it a bit better to make this obvious

1) my first 5% retail share assumes that NK (approx) doubles in size

2) my first 5% license share assumes that we get third party licensees equal to 5% market share

I'm assuming a difference in profitability between retail and license models due to Seedco Service fees which we would have to pay to third parties. I recognise that that we will have to incentivise NK, but this is "in house" money passing between 2 pockets

I would assume that GA21 is "free" but for additional parent seed production, introgression etc and ongoing registration costs  GA21 won't of course be free but by making it so we can clearly see the differences in NPV and hence what we can afford

Cheers,

Graham

**Graham J Walker**
Financial Controller, Plant Science
Syngenta
WRO-1001 P.34
CH-4002 Basel
Phone:   +41 61 323 72 23
Fax:      +41 61 323 55 68
e-mail: graham.walker@syngenta.com

-----Original Message-----
| | |
|---|---|
| **From:** | Kostiuk Marshall USGV |
| **Sent:** | 16 October 2003 16:11 |
| **To:** | Walker Graham CHBS; Klevorn Thomas USGV |
| **Subject:** | RE: GA21 GT Corn Analysis |

Graham,

The scenarios that you are asking for are fairly do-able, I can have them prepared by end of day, sent back to you in excel format, and if you'd like, we can review over the phone tomorrow morning (GV time).

In response to the question regarding GA21 royalty rates, the analysis assumes the worst case (stand alone value of the trait)

I have a couple of comments/questions before proceeding though

1) Agree, our "base line" is an aspirational target based on many things happening ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

2) Why would we not consider any 3rd party licensing? or are we, I've just missed it?

Redacted

EXHIBIT 15

Westlaw.

```
D&B Completed Analysis:    04-21-2005
Database Last Updated:     04-26-2005
Source:                    Copyright &#169; 2005 by Dun & Bradstreet,
                           Inc.
Current Date:              05/18/2005
```

### COMPANY INFORMATION

```
DUNS:                      79-978-1625   (Click for List of Available
                           D&B Reports.)
Name:                      ADVANTA USA INC
Address:                   2369 330TH
City/State:                SLATER, IA 50244
County:                    STORY
Telephone:                 515-685-5288
Year Started:              2001
```

### EXECUTIVE(S) INFORMATION

```
1.    Executive Name:     WALKER, GRAHAM
      Executive Title:    PRINCIPAL
2.    Executive Name:     HANSEN, MARCY
      Executive Title:    PRINCIPAL
3.    Executive Name:     SIMS, ROBERT A
      Executive Title:    PRINCIPAL
4.    Executive Name:     SECOMMBE, COLINE
      Executive Title:    PRINCIPAL
5.    Executive Name:     EDLIN, JOHN
      Executive Title:    OPERATIONS
```

### BUSINESS DESCRIPTION

```
Line of Business:        SEED COMPANY
Industry Group:          AGRICULTURE, FORESTRY, FISHING
Primary SIC:
0181                     ORNAMENTAL NURSERY PRODUCTS, NSK
01810303                 SEEDS, VEGETABLE: GROWING OF
Business Is A:           SINGLE LOCATION
                         CORPORATION

END OF DOCUMENT
```

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 16

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT 17

David Nevill                                  Syngenta International AG
Head of Plant Science Development and
Chair of Technical Review Committee

Roger Kemble                                  Syngenta Biotechnology, Inc.
Head of Crop Genetics Research
Member of Technical Review Committee



December 22, 2004

**Re: Project List at Close of 2004 and Project Management in 2005**

We are quickly approaching the end of the first year of the Technical Review Committee and we hope you share our belief that project reviews have become more streamlined and straightforward while at the same time maintaining the rigor necessary for on-time product delivery. But as we close the year we recognize that there is a desire in Business Development, reinforced by the recent Voice of Syngenta results, for even more transparency and better communications between the project teams, the TRC and the Business Development Leadership Team. With that desire in mind we have taken two steps to improve how we operate in 2005 – one immediate and one that will be phased in during Quarter 1.

Attached you will find the 2004 Business Development/Plant Science Project List. This list was assembled collaboratively by the TRC, R&T and the Business Team leaders to provide a high-level overview of all the projects currently in the Business Development/Plant Science pipeline. Here you will find the name, leader and the stage of the project categorized by Business Team for simple reference. This list will change as projects are reviewed throughout 2005, particularly in corn and soya when the new Seeds responsibilities will be exercised through a review of the needs of the enhanced field crops platform. It is hoped that doing this at the end of each year will give everyone a snapshot of what we have in research and in development. Although two projects – ECB control in corn (3243M) and long shelf life banana (StayRipe) – have recently been terminated because of complications in the latter stages of development, this list demonstrates clearly the breadth and depth of our portfolio overall.

In the early part of 2005 we will also institute a new, simplified system for increasing the communication and transparency between the project teams and the BDLT itself. Monthly BDLT meetings must focus on critical commercial issues, yet there is a need for greater visibility for certain projects at that level before they reach the "commercial" stage. While it is neither efficient nor practical for them to get detailed insight into each of our more than 50 projects, the BDLT would like to keep a consistent, high-level view. At the same time, it has not always been clear to the teams themselves how projects are evaluated at the BDLT level.

# RESTRICTED CONFIDENTIAL

SYN 022904

To address this, each project team next year will create simple, one-page Quarterly Project Status Reports (QPSR) on their projects, which will be updated every three months. The project managers will be responsible for initiating all activities, describing their project and defining and proposing milestones. In addition to the overall product concept the QPSR will outline:

* ❖  The key risks of the project and top-line action plans for addressing
* ❖  The critical decision points and criteria for passing them
* ❖  The key project targets – the critical path the project must follow to stay on track
* ❖  Targets achieved or not achieved over the previous quarter
* ❖  And finally, links to essential project documents to reinforce elements of the QPSR

People are already doing this at many levels. But by formalizing it, we believe this simple and efficient tool will increase the transparency of decision-making in our organization by ensuring that we have consistent criteria and processes at all stages of research and development. At the same time, it will clarify and make more predictable for the project teams how their projects will be considered both technically and commercially and facilitate greater dialogue between project managers and senior decision-makers overall.

We recognize the need to fit this seamlessly into our current project governance process (e.g. TRC reviews) and we are committed to making this a helpful tool for everyone. Therefore in January and February, members of the TRC will visit the major sites within Business Development/Plant Science to hold face-to-face meetings to explain more fully how this will work in practice and to solicit your input on how it might function best. Please look for a follow up communication after the holidays that will provide more details on the times and locations of those meetings.

As we all know, it takes more than great science to deliver a product to market, it takes excellent project management and a flexible, open and cooperative organization. The project management skills in Business Development/Plant Science have been improving continuously and it is hoped that this will be another step in the right direction. We look forward to discussing this more with you in the new year.

Regards,

David Nevill
Head of Plant Science Development
Chair of Technical Review Committee

Roger Kemble
Head, Crop Genetics Research
Member of Technical Review Committee

2/2

RESTRICTED CONFIDENTIAL

**Business Development/Plant Science Project List 2005**

**Biopharma Business Team**

| Project | Status | Project Leader(s) |
|---|---|---|
| DVT Antibody (ABC 48) | Research | Colin Bird |
| I L 4 Ac | Research | Eric Boudreau |
| Lymphoma tandab (CD19/CD3) | Research | Eric Boudreau |
| COPD Thioredoxin | Research | Trish Malarkey |
| RSV antibody | Research | David Patton |
| Antimicrobials-LG- Biopharma | Research | Fergus Earley |
| Clostridium protease | Research | Colin Bird |
| DHA-LG Biopharma | Research | Bernard Vernooij |
| Safflower Transformation and Antibody Expression | Research | David Patton |
| Safflower field and manufacture and oil-body technology | Research | Colin Bird |
| Cystic Fibrosis Therapy-Thioredoxin-Ecoli | Development | Trish Malarkey |
| Psoriasis Therapy Thioredoxin-E coli | Product Candidate | Trish Malarkey |
| CNS | Research | Kim Travis |

**Enzymes Business Team**

| | Status | Project Leader(s) |
|---|---|---|
| Carotenoids | Research | Simon Warner |
| Microbial Coarse Grain | Research | Scott Betts |
| Glucose from Dry Grind -Maize- Glucoamylase | Research | Aron Silverstone |
| High Starch- Embryoless | Research | Aron Silverstone |
| Improved Silage-maize-Low Lignin Cob | Research | Mi Lee |
| Low Temp Starch Hydrolysis Maize (Raw Starch) | Research | Aron Silverstone |
| Seed Fiber Hydrolysis-LG Maize ( Corn Seed Fiber) | Research | Eric Chen |
| Skatole | Research | Mi Lee |
| Ethanol Production-Maize- Amylase (STEEP) | Development | Carol Wolf |
| Improved Feed-Maize-Phytase | Development | Peter Williams |
| Improved Feed-microbial- xylanase-Zymetrics-(Small Grain Feed) | Development | Peter Street |
| Improved Feed-Phytase-Zymetrics-Quantum | Product | Peter Street |
| Phosphorylated starch -Maize- R1 (starch derivatisation) | Research | Mi Lee |
| Ruminant Enzymes | Research | Simon Warner |

**Other Crops**

| | Status | Project Leader(s) |
|---|---|---|
| Fusarium HB Resistance-TD Wheat | Lead Generation | Fermin Azanza |
| Fusarium HB Resistance-Wheat-TriR /Tri101 | Development/prod candidate | Geoff Townshend |
| Flame Retardant-Cotton (evaluate) | Research | Rene Quadt |
| Lep Resistance-Cotton-Marker-Free Vip3A | Development | David Negrotto |
| Lep Resistance-Cotton-Vip3A-VipCot | Development | Dave Negrotto |
| Stacked Cotton Traits | Development | Dave Dickerson |
| Lep Resistance-Cotton-FLCry1Ab | Product Candidate | David O'Reilly |
| TT cotton | Research | Jane Cayley |

*List subject to change. For more information/questions contact Roger Kemble, Ian Jepson, David Nevill or Xun Wang*

# RESTRICTED CONFIDENTIAL

SYN 022906

| Cotton Transformation Technology | Research | Dong Fang Chen |

**Corn Business Team**

| Stable Yield-LG Maize | Research | Mike Nuccio (GM)/ John Arbuckle (non-GM) |
|---|---|---|
| Herbicide Tolerance-Maize-GA21 | Product | Rob Wilde |
| Lep Resistance-Maize-Vip3A-MIR162 | Development | Rob Wilde |
| Rootworm Resistance-Maize-modCry3A-604MIR | Development | Rob Wilde |
| Stacked Maize Traits | Development | Rob Wilde |
| Lep Resistance-Maize-Vip3E | Product Candidate | Eric Chen |
| Rootworm Resistance-Maize-modCry3A/Cry1Ab | Product Candidate | Eric Chen |
| Stable Yield-Maize-TPP RNAi | Product Candidate | Mike Nuccio |
| Maize Transformation Technology- Public Access | Research | Lynn Senior |
| Gene Targeting Technology-Verdia | Research | Qiudeng Que |
| Nitrogen Utilization | Research | Mike Nuccio |
| Fungal Resistance Maize – Pyrolnitrin | Research | Eric Chen |
| Lep Resistance-Maize-trCry1Ab | Research | Eric Chen |
| Lep Resistance Maize – Cry1Ab/Vip3a | Product Candidate | Eric Chen |
| Nematode Resistance -LG soybean Protein Leads | Research | Katrina Mackay |
| Allelic Diversity Technology- Maize | Research | John Arbuckle |

**Other Seeds Projects**

| Tomato Fruit Quality | Research | Ian Puddephat |
|---|---|---|
| Applied Genomics Platform | Research | John Salmeron/ Gilles Gay - sponsors |

**Food Ingredients**

| New Horizon Projects - Taste Receptor | Research | Ian Evans |
|---|---|---|
| New Horizon Projects | Research | Steve Goff |

# RESTRICTED CONFIDENTIAL

SYN 022907

# EXHIBIT 18

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT 19

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 20

THIS EXHIBIT HAS BEEN
REDACTED IN ITS ENTIRETY

# EXHIBIT 21

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT 22

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

EXHIBIT 23

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT 24

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

EXHIBIT 25



Print This Page 

## Alumna Feature
## Syngenta Job Takes Alumna Around the World



Alumna Ioana Tudor (IMBA '97) is a perfect embodiment of the international business program. A native of Romania, she entered the IMBA-Vienna program in 1996, studying for seven months in Vienna, Austria, followed by eight months in Columbia. She interned with a small South Carolina movie production company, evaluating opportunities for business expansion in the UK. At graduation, she went to work for the British company Zeneca Agrochemicals, at its USA headquarters in Wilmington, Delaware. When that company merged with Novartis to form Syngenta, the largest agribusiness company in the world, she ended up in Basel, Switzerland. first as Head of Business Strategy and then holding various roles in Plant Science, the biotech unit of Syngenta. Now she has relocated back to the United States, to Minneapolis, and will split her time between there, Basel, and the company's R&D office in Raleigh, North Carolina as Global Head of Corn, Cotton and Soya Traits. Can you say "international"?

"Switzerland was a fantastic country to live in," Tudor says. She enjoyed skiing on weekends and taking long European-style vacations in places like Egypt and Mauritius. And, she delighted in the exposure to different cultures offered through her work. "There are people from all over the world working at Syngenta, and English is the common language." Tudor thinks her graduate education helped prepare her to deal with cultural diversity. "The ability to shift from one culture to another, from one way of doing business to another, that's one of the things I learned from the business school because the IMBA-Vienna program was so international."

Tudor also credits her IMBA experience for giving her a good foundation to manage people and work in teams, skills that have served her well through her many roles. "The industry is changing at a very, very fast pace, and I've changed jobs several times," says Tudor. "In the biotech division, where I am now, I'm working with the research and development group, the regulatory people, the patents people, lawyers, the commercial group, and a whole range of other functions... trying to bring genetically modified products to market... it's a fairly complicated and long research and development process."

"Working in biotechnology is exciting, challenging, and rewarding," says Tudor. "This is a source of major controversy between the U.S. and Europe, the subject of several World Trade Organization disputes, and an area where science and consumer perceptions have difficulty harmonizing; many believe biotech will be the next major revolution after information science with even greater impact on global economy, and I am one of these believers."

If Tudor is an example of the new international citizen, then her husband and three daughters might complete the image of a global family. Husband John owns an import-export business helping U.S. firms that want to do business in Romania, and splits his time between Washington, D.C., and Romania. He was born in Romania, but grew up in the United States. Daughters Alexandra, 7, Ana, 4, and Amalia, 1½, are trilingual – speaking English, Romanian, and Swiss-German. "The family has always lived on a commuting basis... now it's going to be easier with the move back to the U.S.," Tudor says. "My oldest daughter is excited about coming back because she remembers the U.S. She was only three when she left." Tudor jokes she has one regret: "I will be moving from downhill skiing to ice fishing for a winter sport."

### Staying Connected

Each year Tudor has helped arrange for one or more Moore students to be placed in internships at Syngenta. She thinks it's the best way for alumni to help—"rather than just donate money."

She has also been a strong supporter within the graduate alumni network. She took on the role of vice president in the MIBS Alumni Europe (MAE) organization soon after she moved to Switzerland and became its president in mid-2003. During her tenure, she was involved with organizing MAE events, and mobilizing alumni participation in the MAE network. Perhaps the most notable event was a four-day Halloween excursion in Romania, touring old castles and sightseeing in Transylvania, which took place in October 2003.

There is no alumni group in Minneapolis where Tudor now lives. She may try to start one, if there is interest and if her job and personal demands will allow her the time. She thinks the recent efforts to broaden the business alumni network led by GAIN (Graduate Alumni International Network) are a good idea, but it will take time. "The more people you have, the better chance for a strong network," she says.

Tudor and her husband just bought a 100-year-old house in downtown Minneapolis, which they plan to remodel. "It's going to be quite interesting to live here ... it's very historic and has somehow a European flavor," Tudor says.

"I really like the area and the company," she adds. "I think I'm on the right track, career-wise. I'd like to continue to move up in the company... to stay in the U.S. a few years, and then move back to Switzerland possibly."

From her vantage point, Tudor offers one word of advice for students coming out of the graduate program—"It's important to choose something that interests you... spend time researching. For me, it was almost by accident when I got selected by Zeneca at an international career fair. But I went through a thorough and long interview process... going through that, I managed to learn about the company and was able to make an informed decision about the industry I was going to join. And I've never regretted it. So if there is an opportunity to learn more about the field, it's worthwhile to take the time—this is as important as the position and salary level."

—*Gail Crouch*

# EXHIBIT 26

THIS EXHIBIT HAS BEEN
REDACTED IN ITS ENTIRETY

# EXHIBIT 27

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 28

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT 29

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 30

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 31

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 32

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY