# EXHIBIT 33

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 34

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 35

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 36



# NAFTA Corn & Soya Organization

NAFTA FTE's
As is: 3
To be: 3
Change: -

Administrative Assistant
tbd

Integration: D Lehmann

Legal: S Griffith

Finance: G Suarez

Human Resources: M Shope

Strategic Marketing: T Kroenke

Product Development
R Riley

Supply Chain
M Hollands

Business Development
T Dickinson

Traits Development
I Tudor

Garst Brand
Head: D Witherspoon

NK Brand
Head: T Klevorn

Golden Harvest Brand
Integration Head: T Kroenke
Operating Heads:
R Robinson, J Sommer

syngenta

1



Syngenta Seeds, Inc.

# Syngenta Seeds, Inc.

Head, Product Development
Ray Riley
Budget: US20RZA623
Position: 00007294
(1)

Scientist IV (Field)
Scott Kelly
Budget: US72R01302
Position: 00006363
(123)

Head, PD Northern Area
Dwight Bostwick
Budget: US72R01302
Position: 00006360
(103)

Principal Scientist (Field)
Dave Mies
Budget: US72R01302
Position: 00006367
(125)

Dir. Research Services*
Denny Steele
Budget: US20RZA300
Position: 00007203
(145)

Dir. Self Pollinated Crops*
John Thorne
Budget: US26RZA310
Position: 00007200
(128)

Principal Scientist (Field)
Brent Delzer
Budget: US72R01302
Position: 00006368
(126)

Dir. Maize Genetic Development
Ron Ferriss
Budget: US20RZA623
Position: 00007209
(125)

Head, Western PD
Bernard Hable
Budget: 914612
Position: 00008112
(158)

Dir. Global PEA
Thomas Francis
Budget: CA12R01325
Position: 00007398
(126)

Dir. Maize Germplasm
Manny Logrono
Budget: US20RZA623
Position: 00007658
(151)

Shown head count: 11    Open positions: 0    Planned: 11

102

Syngenta Seeds, Inc.

# Syngenta Seeds, Inc.



Shown head count: 7    Open positions: 0    Planned:    7

Date/Time: 05/25/2005

Syngenta Seeds, Inc.

# Syngenta Seeds, Inc.



**Head. Supply Chain Ops-NAFTA**
Edward Herlein
Budget:    US20PZA001
Position:    00007918
(195)

**Head. Corn & Sorghum Ops**
Dan Briggs
Budget:    US20PZA001
Position:    00006592
(218)

**Head. Prod Res Prmt Seed&Qlty**
Mark Wall
Budget:    US20PZA001
Position:    00006504
(243)

**Quality Assurance Lab Tech**
Carol Crawford
Budget:
0101103B0901000125
Position:    00007965

**Head. Soybean Operations**
Michael Bielenberg
Budget:    US20PZA001
Position:    00008121
(254)

Syngenta Seeds, Inc.



**Head, Business Development**
Travis Dickinson
Budget: US20M8A733
Position: 00008848
(1)

**Unit Head, AgriSure Traits**
Jack Bemens
Budget: US20M8A733
Position: 00006331
(273)

**Exec Administrative Assistant**
Linda Melhak
Budget: US20M8A733
Position: 00006334

**Mgr. AgriEdge, Agronomic Sites**
Jim Elliott
Budget: US20M8A733
Position: 00008865

**Mgr. Brand AgriEdge Promotions**
Rex Wichert
Budget: US20M8A733
Position: 00008866

**Brand Mgr. AgriEdge Promotions**
Jon Scharingson
Budget: US20M8A733
Position: 00007651

**Head, Greenleaf Gntcs Bus Unit**
Ron Wulfkuhle
Budget: US20M8A733
Position: 00007801
(276)

Shown head count: 7    Open positions: 0    Planned:    7

272

Syngenta Seeds, Inc.

Syngenta Seeds, Inc.

273



# Syngenta Seeds, Inc.

(272)

**Unit Head, AgriSure Traits**
Jack Bernens
Budget:    US20M8A733
Position:    00006331

**Mgr. Marketing AgriSure Traits**
Marshall Kostiuk
Budget:    US20M8A733
Position:    00006253

**Dir. New Product Market Dev**
Gary Powell
Budget:    US20MZA702
Position:    00006335
(274)

**Mgr. Stewardship AgriSure Trts**
Linda Stellmach
Budget:    US20M8A733
Position:    00006338
(276)

Shown head count: 4    Open positions: 0    Planned:    4

Syngenta Seeds, Inc.

# Syngenta Seeds, Inc.



**272**
Head, Greenleaf Gntcs
Bus Unit
Ron Wulfkuhle
Budget:    US20M8A733
Position:    00007901

Mgr, Customer Serv &
Key Acct
Brenda Scanlan
Budget:    US20M8A733
Position:    00006477

**277**
Mgr, Area Product
Development
Chris Perry
Budget:    US20RZA307
Position:    00006415

Mgr, Supply Chain
Greg Kegler
Budget:    US20M8A733
Position:    00006332

Mgr, Bus/Key Accounts
Vahid Aldun
Budget:    US20M8A733
Position:    00006249

Mgr, Area Product
Development
Richard Hall
Budget:    US20M8A733
Position:    00008903

Syngenta Seeds, Inc.

Date/Time: 5/25/2005

# Syngenta Seeds, Inc.



**Head Strategic Mktg**
(TKroenke)
Open position
Position:    00008974

**Mgr. Marketing Information**
Kevin Macken
Budget:    US20MZA761
Position:    00006275

**Head, Soybean Products**
Mark Schmidt
Budget:    US20MZA761
Position:    00006339

**Head, Corn Products**
Kevin Turnblad
Budget:    US20MZA761
Position:    00007800

**Head, Marketing Services**
Jon Blasing
Budget:    US20MZA761
Position:    00007948

**Head, Planning & Business Dev**
Bruce Howison
Budget:    US20MZA761
Position:    00008847

**Head, Communications**
Tom Gahm
Budget:    US20MZA761
Position:    00008949

Shown head count: 6    Open positions: 1    Planned:    7

381

382



Syngenta Seeds, Inc.

311

Syngenta Seeds, Inc.

342

# Syngenta Seeds, Inc.



Shown head count: 2    Open positions: 1    Planned:    3

Date/Time: 05/25/2005

Syngenta Seeds, Inc.

343

# Syngenta Seeds, Inc.



**Joint Operating Head**
James Sommer
Budget:       6150025000
Position:     00008053
(342)

**Controller**
Garold Burkholder
Budget:       6150025000
Position:     00008054
(352)

**Head Eastern Sales**
**Division**
Kevin O'Connor
Budget:       6150023300
Position:     00008060
(353)

**Head National**
**Communications**
Douglas Robinson
Budget:
0101107500901000720
Position:     00007938
(351)

**Head Western Sales**
**Division**
David Dam
Budget:
0101105000101000120
Position:     00007915
(344)

**Receptionist**
Jo Ann Neville
Budget:       6140025000
Position:     00008074

Shown head count: 8    Open positions: 0    Planned:    6

Syngenta Seeds, Inc.

# Syngenta Seeds, Inc.

302



**Co-Head, Golden Harvest Seeds**
Rob Robinson III
Budget:
0101107500901000720
Position:     00008584
(342)

**Head, Product Management**
Dennis Bracht
Budget:
0101105920101000110
Position:     00007821
(353)

**Head, Marketing**
Charles Lee
Budget:
0101105700901000110
Position:     00007903
(366)

**Mgr, Sales Recruiting**
James Emanuel
Budget:
0101105700901000110
Position:     00007904
(360)

**Head, Marketing Services**
Lyn Ramsey
Budget:
0101105700901000110
Position:     00007905
(370)

**Mgr, Research Station**
Ben Ford
Budget:
0102083200101000110
Position:     00007910
(374)

**Mgr, Research Station**
Theron Roundy
Budget:
0102083200101000110
Position:     00007911
(375)

**Research Op Coordinator**
Al Grunst
Budget:
0102083200101000110
Position:     00007914
(376)

**JOH Administrative Assistant**
Connie Elliott
Budget:
0102083200101000110
Position:     00008003
(370)

**GH Brand Controller**
John Young
Budget:
0101107400901000110
Position:     00008842
(380)

Shown head count: 10     Open positions: 0     Planned:     10

Syngenta Seeds, Inc.

Syngenta Seeds, Inc.



**Head, NK Brand**
Tom Klevorn    US20MZA803
Budget:
Position:        00000849
(1)

**Controller, Corn and Oilseeds**
Dane Bogaard    US20AZA004
Budget:
Position:        00006251
(283)

**Head, Area Sales North-Central**
Kevin Kimm    US00MZA840
Budget:
Position:        00006326
(286)

**Head, Area Sales East/South**
Jeff Taber    US00MZA836
Budget:
Position:        00006327
(292)

**Head, Technical Services**
Bob Navratil    US00MZA758
Budget:
Position:        00006340
(297)

**Head, Marketing NK Brand**
Doug Knight    US20MZA700
Budget:
Position:        00006341
(301)

**Exec Administrative Assistant**
Chris McGovern    US20MZA803
Budget:
Position:        00006430
(286)

**Head, NK Brand Operations**
David Borgmeier    US20MZA803
Budget:
Position:        00007783
(305)

Shown head count: 8    Open positions: 0    Planned:    8

305

# Syngenta Seeds, Inc.



**Head, NK Brand Operations**
David  Borgmeier
Budget:    US20MZA803
Position:    00007783

(282)

**Mgr. NK Brand Supply Chain**
Tim  Hufnagel
Budget:    US20MZA901
Position:    00007310

(309)

**Mgr. Customer Care**
Kurt  Harries
Budget:    US20MZA803
Position:    00006669

(307)

**Exec Administrative Assistant**
Susanne  Plash
Budget:    US20MZA803
Position:    00006423

**Mgr. Strategic Business**
Rob  Wilde
Budget:    US20MZA803
Position:    00006281

(306)

**Mgr. IS Relationship**
Cory  Jones
Budget:    US20MZA803
Position:    00008593

Shown head count: 6    Open positions: 0    Planned:    6

# EXHIBIT 37

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT 38

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 39

## BILL OF SALE AND ASSIGNMENT

THIS BILL OF SALE AND ASSIGNMENT OF ASSETS is executed and delivered effective this 5th day of February, 2004, by Bayer CropScience S.A. ("Bayer") to Syngenta Participations AG ("Syngenta").

WHEREAS, Syngenta and Bayer have entered into an Acquisition Agreement Relating to Certain Corn Assets of Bayer CropScience S.A. and License Agreement between Bayer CropScience S.A. as Seller and Syngenta Participations AG as Purchaser, dated as of January 9, 2004 (the "Agreement"), providing for the purchase by Syngenta of certain assets of Bayer;

NOW, THEREFORE, pursuant to the Agreement and subject to its terms, and for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Bayer hereby grants, bargains, sells, delivers, endorsements, sets over, assigns and conveys to Syngenta and its successors and assigns, free and clear of any and all liens, claims or encumbrances of any kind, the business assets and property of Bayer which are listed or described on Schedule A attached hereto and made a part hereof (the "Purchased Assets");

TO HAVE AND TO HOLD the Purchased Assets unto Syngenta and its successors and assigns, to its and their own use and benefit forever.

Bayer hereby covenants and agrees with Syngenta that it will duly execute and deliver all such deeds, bills of sale, endorsements, assignments, certificates, drafts, checks, and other instruments of transfer as may be necessary or helpful more fully to sell, transfer, assign and convey to and to invest in Syngenta, all and singular, the Purchased Assets hereby sold, transferred, assigned and conveyed by this Bill of Sale and Assignment.

The transfer evidenced by this Bill of Sale and Assignment of Assets is made subject to and upon all of the terms, covenants, conditions, representations and warranties set forth in the Agreement, and all of which terms, covenants, conditions, representations and warranties are incorporated herein by reference, and shall survive the delivery of this Bill of Sale and Assignment.

All of the terms and provisions of this Bill of Sale and Assignment shall be binding upon Bayer and its respective successors and assigns, and shall inure to the benefit of the Syngenta and its successors and assigns.

1

SYN 112721

IN WITNESS WHEREOF, Bayer has caused the due execution of this Bill of Sale and Assignment of Assets, under seal, as of the day and year first above written.

ATTEST:                                    BAYER CROPSCIENCE S.A.
                                           Signature :

                                           Mrs. Inge Bastelcurs
                                           Senior Counsel
                                           (by special power of attorney)


                                           (SEAL)

2

RESTRICTED CONFIDENTIAL                                   SYN 112722

## SCHEDULE A to BILL OF SALE AND ASSIGNMENT

1.   All such rights as Bayer CropScience S.A. may have in or to practice the corn transformation event comprised in seed deposited at ATCC number 209033 and characterized by comprising an OTP and a DMMG (also referred to as event H177).

2.   The agreements listed in Exhibit 1.1.4. to the Agreement.

3

RESTRICTED CONFIDENTIAL

SYN 112723

# EXHIBIT 40

ACQUISITION AGREEMENT

RELATING TO CERTAIN CORN ASSETS OF

BAYER CROPSCIENCE S.A.

AND LICENSE AGREEMENT BETWEEN

BAYER CROPSCIENCE S.A.

AS SELLER

AND

SYNGENTA PARTICIPATIONS AG

AS PURCHASER

JANUARY 9, 2004

RESTRICTED CONFIDENTIAL

SYN094336

## TABLE OF CONTENTS

ARTICLE 1.  DEFINITIONS .................................................................................................4

ARTICLE 2.  SALE AND PURCHASE ................................................................................7

ARTICLE 3.  LICENSES .......................................................................................................9

ARTICLE 4.  PRICE AND PAYMENT OF THE PRICE......................................................13

ARTICLE 5.  REPRESENTATIONS AND WARRANTIES OF THE SELLER....................13

ARTICLE 6.  REPRESENTATIONS AND WARRANTIES OF THE PURCHASER.............15

ARTICLE 7.  CONDITIONS PRECEDENT TO THE OBLIGATIONS OF THE PURCHASER ...........15

ARTICLE 8.  CONDITIONS PRECEDENT TO THE OBLIGATIONS OF THE SELLER ...........16

ARTICLE 9.  INDEMNIFICATION ......................................................................................16

ARTICLE 10. CLOSING .......................................................................................................18

ARTICLE 11. CO-OPERATION – CONFIDENTIALITY - COMMUNICATION ....................18

ARTICLE 12. GOVERNING LAW - ARBITRATION............................................................19

ARTICLE 13. MISCELLANEOUS ........................................................................................22

RESTRICTED CONFIDENTIAL

SYN094337

**THIS AGREEMENT** is made on January 9, 2004 (the "EFFECTIVE DATE"),

**BY AND BETWEEN**

1. **BAYER CROPSCIENCE S.A.**, a company organized under the laws of France, having its registered office at 16 Rue Jean-Marie Leclair, 69009 Lyon, FRANCE, represented for the purpose of the present AGREEMENT by Messrs. Gerhart Marchand and Vincent Turries, hereinafter referred to as the "SELLER", on the one part;

**AND**

2. **SYNGENTA PARTICIPATIONS AG**, a company organized under the laws of Switzerland, having its registered office at 215, Schwarzwaldallee, 4058 Basel, SWITZERLAND, hereinafter referred to as the "PURCHASER", on the other part;

the SELLER and the PURCHASER hereinafter collectively referred to as the "PARTIES";

**WITNESSETH**

**WHEREAS,** the SELLER has decided to divest the ASSET and to grant certain licenses and options, as hereinafter described, all in the field of GA21 CORN and GLYPHOSATE TOLERANT CORN (capitalized terms as hereinafter defined);

**WHEREAS,** the PARTIES have effective October 7, 2003 executed a mutual secrecy agreement covering their discussions regarding the above transaction,

**WHEREAS** the PURCHASER wishes to purchase the ASSET and obtain certain licenses and options, as hereinafter described, all in the field of GA21 CORN and GLYPHOSATE TOLERANT CORN, having had conducted a due diligence investigation, in which PURCHASER has had access to the SELLER's representatives on the topic (including to SELLER's outside counsel) and has had the opportunity to ask and receive a reply to questions raised regarding ASSET;

**WHEREAS,** in consideration of the mutual covenants, agreements and warranties herein contained, the SELLER is willing to sell, transfer, assign, license and/or grant an option to, as hereinafter described, the ASSET, the LICENSED PATENTS, LICENSED RIGHTS, GA21 INFORMATION-1, GA21 INFORMATION-2 and LICENSED TOOLS to the PURCHASER, who is willing to purchase, license and/or obtain an option from the SELLER, upon the terms and conditions hereinafter set forth.

3/34

RESTRICTED CONFIDENTIAL

SYN094338

**NOW THEREFORE, IN CONSIDERATION OF THE COVENANTS AND AGREEMENTS SET FORTH HEREIN THE PARTIES HAVE AGREED AS FOLLOWS**

## ARTICLE 1.  DEFINITIONS

1.1.    Unless otherwise defined herein, the following terms shall have the following meanings for all purposes of this AGREEMENT :

"**AFFILIATE**" means, except as otherwise defined in this AGREEMENT, any company controlled by, or under common control with, or controlling a PARTY. "Control" means in this context the direct or indirect ownership of at least fifty per cent (50 %) of the voting stock/shares of a company, or the power to nominate at least half of the directors, or the power otherwise to determine the policy of a company.

"**AGREEMENT**" means this acquisition agreement for acquisition of the ASSET and the grant of the licenses and options as further specified herein and as the same may be amended, modified and/or restated from time to time.

"**ASSET**" means such rights as the SELLER may have in or to practice all of the GA21 EVENT and GA21 LEGAL ASSETS .

"**CLAIM NOTICE**" means the document described in Article 9.3.

"**CLOSING**" means, except as otherwise provided in this AGREEMENT,  (i) the complete effectuation of the transfer of the ASSET by the SELLER to PURCHASER and (ii) the confirmation of all steps and formalities provided for in this AGREEMENT on the CLOSING DATE,.

"**CLOSING DATE**" means January 30, 2004 (or such later date as agreed between the PARTIES).

"**CORN**" means *Zea mays*, including sweet corn and popcorn varieties

"**DAMAGES**" means all damages of any kind, arising out of, relating to, or in connection with, any liability, whether in tort, statutory or contractual, including damages for the failure to perform any and all obligations (including, but not limited to, any and all obligations to take an affirmative act and damages resulting from claims from third parties), penalties, deficiencies, losses, taxes, investigations, proceedings, judgments, costs and expenses (including, but not limited to, costs and expenses incurred in connection with performing obligations, interest payments, appellate costs and attorneys' fees and disbursements) but excluding consequential and exemplary damages.

"**DMMG**" means a modified maize EPSPS gene encoding an EPSPS protein having isoleucine at relative position 102 and serine at relative position 106.

"**DMMG PATENTS**" means any PATENT owned by SELLER or its AFFILIATES in any country of the world, claiming or having claimed priority of patent application

4/34

RESTRICTED CONFIDENTIAL

FR 9508979 filed on July 19, 1995, including but not limited to the PATENTS listed in **Exhibit 1.1.1**.

"**EFFECTIVE DATE**" means the date as defined above.

"**EXPLOIT**" and "**EXPLOITATION**" mean to make, breed, produce, condition, market, offer, sell, import, export, stock, use, lease or otherwise dispose of (or offer to do or have done any or all of the foregoing).

"**GA21 CORN**" means CORN containing the GA21 EVENT.

"**GA21 EVENT**" means the CORN transformation event comprised in seed deposited at ATCC number 209033 and characterized by comprising an OTP and a DMMG (also referred by the SELLER as event H177).

"**GA21 INFORMATION-1**" means all data and information generated by or for SELLER or its AFFILIATES solely (i) by tests or other research activities conducted exclusively in NON SHAH COUNTRIES with GA21 CORN or any GLYPHOSATE TOLERANT CORN, and/or (ii) by tests or other research activities that relate solely to DMMG (but not to the GA21 EVENT or other glyphosate tolerant corn events made by SELLER or its AFFILIATES), all as listed in **Exhibit 1.1.2**. The term "GA21 INFORMATION-1" does not include any information or data relating to CORN generated by activities in any SHAH COUNTRY.

"**GA21 INFORMATION-2**" means the data and information generated by or for SELLER or its AFFILIATES by activities with GA21 CORN that have been produced at least partly in SHAH COUNTRIES, as exhaustively listed in **Exhibit 1.1.3**.

"**GA21 INVENTORSHIP LITIGATION**" means the claim in the currently-pending action by the SELLER in the United States Federal District Court for the Middle District of North Carolina, Civil Action No 1:97CV01138, in which SELLER asserts that certain of the SELLER's former or current employees are co-inventors of the subject matter claimed in the 497 PATENT and the 798 PATENT.

"**GA21 LEGAL ASSETS**" means, the 497 PATENT, the 798 PATENT, the STIPULATION AND AGREEMENT, and those agreements listed in **Exhibit 1.1.4.** (as these have been amended or will be amended prior to the CLOSING to be limited to NON-SHAH COUNTRIES only).

"**GLYPHOSATE TOLERANT CORN**" means CORN, other than GA21 CORN, in which a transgene containing an EPSPS gene encoding an EPSPS protein and conferring tolerance to a glyphosate herbicide has originally been introduced by genetic engineering methods.

"**INTELLECTUAL PROPERTY RIGHTS**" means any PATENT, patent application, plant variety protection right, trademark, trade name, trade secret, know-how, or any other form of intellectual property in any country of the world.

"**LICENSED PATENT(S)**" means the (i) OTP PATENTS and the (ii) DMMG PATENTS.

RESTRICTED CONFIDENTIAL

SYN094340

"LICENSED RIGHTS" means licenses to or immunity from suit from PATENTS of third parties obtained by the SELLER, for so long as these are available to the SELLER, by virtue of the agreements attached in **Exhibit 1.1.5.**

"LICENSED TOOLS" means the detection tools developed by or on behalf of the SELLER as further described in **Exhibit 1.1.6.**

"NON-SHAH COUNTRY" means any country that is not a SHAH COUNTRY.

"OTP" means an optimized transit peptide as described and claimed in the OTP PATENT(S)

"OTP PATENTS" means any PATENT owned by SELLER or its AFFILIATES in any country of the world, claiming or having claimed priority of patent application FR 9102872 filed on March 5, 1991, including but not limited to the PATENTS listed in **Exhibit 1.1.7.**

"PATENT(S)" means any pending patent application(s) and unexpired patent(s) existing as of the EFFECTIVE DATE, and any unexpired patent that subsequently issues upon any patent application existing as of the EFFECTIVE DATE, and including all patents that issue on all divisions, continuations, continuations-in-part, reissues, reexaminations, extensions, supplementary protection certificates, and divisional applications  which have not been adjudicated to be invalid or unenforceable in an unappealable or unappealed decision of the applicable patent office or court of competent jurisdiction.

"PRICE" means the price as defined in Article 4 of the present AGREEMENT.

"REPRESENTATIONS AND WARRANTIES" means the representations and warranties made in Article 5 by the SELLER or in Article 6 by the PURCHASER.

"SHAH PATENT(S)" means the United States Patent Nos 4,940,835 and 5,188,642, and any and all PATENTS claiming a priority date based upon any of the above-referenced patents or priority patent applications thereof.

"SHAH COUNTRY" means any country in which the SHAH PATENT(S) exist.

"STIPULATION AND AGREEMENT" means the agreement entitled "Stipulation and Agreement" by and between DEKALB Genetics Corporation and Rhône Poulenc Agro S.A. (which is the name of the SELLER prior to several name changes), also signed by Monsanto Company, dated May 26, 1999, as amended by First Amendment of April 5, 2000, Second Amendment of April 2, 2001 and Third Amendment of April 8, 2002.

"497 PATENT" means US PATENT No 6,040,497 issued on March 21, 2000, and assigned on its face to DeKalb Genetics Corporation.

"798 PATENT" means US PATENT No 5,554,798 issued on September 10, 1996, and assigned on its face to DeKalb Genetics Corporation.

1.2.  Unless otherwise provided herein, all references to a fixed time of a day shall mean Paris, France time as in effect on such day and references to a "day" shall mean a

SYN094341

business day.  For the calculation of a period of time, a period shall start the day after the day of sending and include the day of receipt.

## ARTICLE 2.  SALE AND PURCHASE

### 2.1.  GENERAL

2.1.1.  Subject to the terms and conditions set forth in this AGREEMENT, the SELLER hereby sells, transfers and/or assigns all of its right, title and interest in and to the ASSET to the PURCHASER, who purchases the ASSET as of the CLOSING, with such rights to EXPLOIT the ASSET as SELLER owns or controls and can sell, transfer or assign, provided however that:

2.1.1.1.  SELLER shall not transfer and/or assign to PURCHASER its rights to the 497 PATENT or the 798 PATENT prior to entry of the judgment of the District Court confirming (or reversing) the advisory jury verdict dated September 1, 2000 in the GA21 INVENTORSHIP LITIGATION.  Timing of the transfer and/or assignment of the SELLER's rights, title and interest to the 497 PATENT and the 798 PATENT after entry of the judgment of the District Court in the GA21 INVENTORSHIP LITIGATION shall be at the PURCHASER's sole discretion.

2.1.1.2.  SELLER shall assign to PURCHASER, by written assignment agreement, its rights in and to the STIPULATION AND AGREEMENT on March 1, 2004. Between the EFFECTIVE DATE and the date of assignment of the STIPULATION AND AGREEMENT, SELLER agrees not to amend the STIPULATION AND AGREEMENT. The PURCHASER agrees to be bound as of the date of such assignment by all the terms of the STIPULATION AND AGREEMENT and the SELLER shall as of the date of such assignment retain no rights whatsoever under the STIPULATION AND AGREEMENT. The PURCHASER shall be responsible for notifying the other parties to the STIPULATION AND AGREEMENT of the above assignment.

### 2.2.  CONTRACTS

2.2.1.  The SELLER shall use reasonable efforts to obtain written confirmation or agreement for the transfer or assignment to PURCHASER of all contracts or agreements included within the ASSET, to the extent requested by PURCHASER.

2.2.2.  Should the provisions of a contract or agreement included within the ASSET cause it to be non-assignable or non-transferable without the agreement of the other party to the contract or agreement, such contract or agreement shall be assigned or transferred only upon the agreement of the other party.  If the other party to the contract or agreement refuses to agree to any transfer or assignment, SELLER shall make available to PURCHASER all benefits under such contract or agreement as SELLER shall be able to make available under the terms of such contract or agreement.

2.2.3.  STIPULATION AND AGREEMENT

2.2.3.1.  The PURCHASER shall pay or cause to be paid to the SELLER on May 15, 2004, August 15, 2004, November 15, 2004 and February 15, 2005 an amount equal to

RESTRICTED CONFIDENTIAL

SYN094342

sixty (60%) percent of the amount paid to SELLER under the STIPULATION AND AGREEMENT for each corresponding quarter of 2003 (the reports for the relevant period to be made available to the PURCHASER at its first written request). The PURCHASER shall provide the SELLER such reasonable assistance as may be required to obtain payment of the royalty amounts due prior to the assignment.

## 2.3. LITIGATIONS REGARDING THE ASSET

2.3.1. The SELLER shall remain responsible for the GA21 INVENTORSHIP LITIGATION until receipt of the judgment of the District Court confirming (or reversing) the advisory jury verdict dated September 1, 2000 in the GA21 INVENTORSHIP LITIGATION.

2.3.2. The PURCHASER shall be solely responsible for any appeal (whether as an appellant or appellee) of the above judgment in the GA21 INVENTORSHIP LITIGATION, provided, however, in the event the District Court or Court of Appeals holds that PURCHASER does not have standing to pursue the appeal (whether as appellant or appellee), then SELLER agrees to continue the appeal on PURCHASER's behalf with PURCHASER controlling and funding the appeal. SELLER undertakes to provide the PURCHASER, at the PURCHASER's written request, with the following additional assistance:

(i)    SELLER will provide to the PURCHASER all pleadings and relevant documents in the GA21 INVENTORSHIP LITIGATION, to the extent that providing such pleadings or documents does not violate any confidentiality or protective Order of a Court,

(ii)   SELLER shall use reasonable efforts to amend any confidentiality or protective order to enable PURCHASER and/or its counsel access to the full record on appeal;

(iii)  SELLER will authorize SELLER's outside counsel in the GA21 INVENTORSHIP LITIGATION to provide assistance or representation to the PURCHASER, provided that the PURCHASER agrees in writing with SELLER and the outside counsel to waive any conflict of interest and any right to seek disqualification of the outside counsel from any representations on behalf of SELLER or any other client of the outside counsel, which may otherwise arise as the result of outside counsel providing any such assistance or representation to the PURCHASER; and,

(iv)   The SELLER will grant to the PURCHASER reasonable access to such employees of the SELLER or its AFFILIATES (for as long as they remain employees of the SELLER or its AFFILIATES) as are mentioned in the GA21 INVENTORSHIP LITIGATION as co-inventors to the 497 or 798 PATENT, subject to agreement between the SELLER and the PURCHASER on the reimbursement of all reasonable costs and expenses incurred by SELLER in providing such access.

2.3.3. Except as otherwise provided in this AGREEMENT, the PURCHASER shall have the full right to conduct any and all other legal actions with respect to such rights as SELLER has (as assigned under this AGREEMENT) in the foreign counterparts of the 497 and 798 PATENTS, at its own discretion and cost. The SELLER may, at its sole discretion and at the PURCHASER's written request, make available to the

RESTRICTED CONFIDENTIAL

SYN094343

PURCHASER such assistance as described in Article 2.3.2. so long as the assistance does not relate to any third party patents other than the 497 or 798 PATENTS or their equivalents outside the United States, or as otherwise agreed between the PARTIES.

## 2.4. TRANSFER OF THE ASSET

2.4.1. Following execution of this AGREEMENT by both Parties and until the date of actual transfer as set out in Article 2.1, SELLER shall use reasonable efforts to preserve and protect the ASSET and the GA21 INFORMATION-2 so that the quality of the ASSET and the GA21 INFORMATION-2 is not diminished after the EFFECTIVE DATE. Notwithstanding the foregoing, the PARTIES accept that the SELLER may cause termination of activities by third parties with GA21 CORN and GLYPHOSATE TOLERANT CORN in SHAH COUNTRIES.

2.4.2. Except as otherwise provided in this AGREEMENT, SELLER shall transfer the ASSET to PURCHASER's designated agent in Switzerland as soon as reasonably possible, but not later than sixty (60) days after the CLOSING For the avoidance of doubt, no biological material shall be transferred under this Article 2.4.

2.4.3. The transfer of the ASSET in accordance with Article 2.4 shall be in compliance with all relevant federal, state and municipal laws and regulations.

2.4.4. SELLER shall prepare documents appropriate to transfer the ASSET to PURCHASER and shall deliver such documents, properly executed, to PURCHASER on the CLOSING or as soon as possible thereafter. PURCHASER shall be responsible for recording such documents with the relevant governmental agencies.

2.4.5. All expenses related to the transfer of the ASSET under this Article 2.4 shall be borne by SELLER.

## ARTICLE 3. LICENSES

### 3.1. LICENSE AND OPTION GRANTS

3.1.1. In addition to the transfer of certain rights in the 497 and 798 PATENTS as part of the ASSET, the SELLER hereby grants to the PURCHASER (i) a worldwide, fully paid-up, exclusive license – with the right to grant sublicenses - under the LICENSED PATENTS and the LICENSED TOOLS, (ii) a sublicense under the LICENSED RIGHTS (to the extent that these are sublicensable in connection with the subject matter of the licenses granted by SELLER to the PURCHASER hereunder) and (iii) an immunity from suit under the LICENSED RIGHTS to the PURCHASER, its AFFILIATES, collaborators, distributors and customers (to the full extent the SELLER is permitted to extend such immunity from suit) to EXPLOIT the GA21 EVENT. If, for any reason, SELLER is contractually precluded from granting an exclusive license under the LICENSED PATENTS or LICENSED TOOLS on the EFFECTIVE DATE, SELLER hereby grants to PURCHASER all rights that SELLER can convey and hereby grants the contemplated exclusive license upon expiration,

RESTRICTED CONFIDENTIAL

SYN094344

waiver or amendment of the contractual restriction. Consequently, from the EFFECTIVE DATE the SELLER acknowledges that it will not grant any new rights nor extend any existing rights under the LICENSED PATENTS to any third party with respect to the GA21 EVENT.

3.1.2. The SELLER further grants the PURCHASER a worldwide, fully paid-up, non-exclusive license - with the right to grant sublicenses but solely with respect to transformation events made by or for the PURCHASER – under the OTP and DMMG PATENTS to EXPLOIT transgenes conferring glyphosate tolerance in GLYPHOSATE TOLERANT CORN.

3.1.3. Without limiting Article 3.5.2., the SELLER for itself and its AFFILIATES, agrees that the SELLER and its AFFILIATES shall not grant to any third party any license rights under the LICENSED PATENTS for GLYPHOSATE TOLERANT CORN events made before the EFFECTIVE DATE.

3.1.4. The SELLER hereby grants to the PURCHASER a worldwide, fully paid-up, sole (i.e. exclusive except for SELLER) license - with the right to grant sublicenses - under the GA21 INFORMATION-1, solely in the field of CORN to EXPLOIT GA21 CORN and GLYPHOSATE TOLERANT CORN, provided the SELLER retains the right to use the GA21 INFORMATION-1 either (i) outside the field of CORN or (ii) in CORN but then only and strictly related to reply to requests from a competent authority relating to activities of the SELLER in CORN prior to the CLOSING DATE.

3.1.5. Subject to the terms and conditions set forth in this AGREEMENT, the SELLER grants the PURCHASER the option to obtain a sole (i.e. exclusive except for SELLER) license, under the same conditions as set out in Article 3.1.4 above, to the GA21 INFORMATION-2 for the total price of one Dollar US ($1.00 USD) for each country, with the right to EXPLOIT such as the SELLER may license, such option being effective and exercisable upon written demand by the PURCHASER for each country on the attached Exhibit 1.1.3. as of the date specified in the Exhibit, under the condition precedent that the GA21 INFORMATION-2 has been effectively released by the trustee appointed by the SELLER in execution of its obligations. SELLER shall take all reasonable steps necessary to secure release of the GA21 INFORMATION-2 by the trustee on the dates specified in Exhibit 1.1.3.

3.1.6. Except as provided herein, the SELLER for itself, its AFFILIATES, and its/their successors and assigns, agree that the PURCHASER, its AFFILIATES, their sublicensees, distributors and customers shall have the right of quiet enjoyment and immunity from suit under any PATENT claim owned by the SELLER (and its AFFILIATES) which 1) would prevent the PURCHASER from using the GA21 EVENT or 2) which relates directly to the OTP and DMMG in transgenes conferring glyphosate tolerance in GLYPHOSATE TOLERANT CORN, solely with respect to the rights granted in Article 3.1.1. SELLER further agrees to impose by written contract the terms of this Article 3.1.6. on any third party to whom SELLER hereafter may assign any such PATENT claim and to indemnify and hold harmless the PURCHASER for SELLER's failure to comply with this sentence.

3.1.7. For the avoidance of doubt, the licenses described in Articles 3.1.1 and 3.1.2. and the quiet enjoyment and immunity from suit provided in Article 3.1.6. do not grant the PURCHASER any explicit or implied license to any INTELLECTUAL PROPERTY RIGHTS owned, controlled or licensed in by the SELLER or its AFFILIATES with regard to any other trait, event or technologies in GA21 CORN or GLYPHOSATE

10/34

RESTRICTED CONFIDENTIAL

TOLERANT CORN, other than the GA21 EVENT (for GA21 CORN) or other than OTP or DMMG in transgenes conferring glyphosate tolerance in GLYPHOSATE TOLERANT CORN (so that in this respect promoters, transit peptides per se and other regulatory sequences, transformation methods etc. are excluded from the above licenses or quiet enjoyment and immunity from suit).

3.1.8. None of the rights granted herein supersede the LICENSE AND SETTLEMENT AGREEMENT between AVENTIS CROPSCIENCE GMBH AVENTIS CROPSCIENCE N.V., NOVARTIS SEEDS A.G. and NOVARTIS SEEDS INC. dated 31 March 2000, with the sole exception of section 2.5 (c) of such License and Settlement Agreement, which is hereby amended to permit the PURCHASER to stack Bt-11 CORN with the GA21 EVENT. All other terms and conditions of such License and Settlement Agreement (including but not limited to the volume commitments) remain in full force and effect.

## 3.2.    PATENT PROSECUTION, DEFENSE AND ENFORCEMENT

3.2.1. The SELLER will retain the sole right to protect and manage the OTP and DMMG PATENTS and will have the right to file, prosecute, maintain and defend, in its own name and at its own cost, PatentS in accordance with its own best judgment. The PURCHASER shall grant such reasonable assistance regarding the ASSET or the OTP and DMMG PATENTS as may be required by the SELLER for this purpose. However, if SELLER decides not to prosecute or maintain or have prosecuted or maintained any of the LICENSED PATENTS, SELLER shall forthwith notify PURCHASER in writing of such decision and PURCHASER, at its sole discretion and expense, may prosecute or maintain such LICENSED PATENTS. If PURCHASER decides to prosecute or maintain any of the LICENSED PATENTS, SELLER shall provide such cooperation and assistance to PURCHASER as may be required to enable PURCHASER to prosecute and maintain the LICENSED PATENTS.

3.2.2. The PURCHASER will immediately inform the SELLER in writing of any claim of a third party relating to the OTP and DMMG and of any infringement by a third party of the OTP and DMMG PATENTS, which may come to its knowledge. With respect to the OTP PATENTS and solely for infringements that relate to the GA21 EVENT, the PURCHASER will have the first right, but not any obligation, at its sole initiative, to enforce at its own cost the OTP PATENTS against infringement by third parties, but solely with respect to the GA21 EVENT. The SELLER will have the first right, but not any obligation, at its sole initiative, to defend at its own cost and discretion, the OTP or DMMG PATENTS against any claims of unpatentability, invalidity or unenforceability. In the event a PARTY elects not to exercise the rights provided under this section, that PARTY shall forthwith notify the other PARTY in writing of such decision and that other PARTY may then, at its own discretion and expense, exercise such right. In such case, the PARTY that has elected not to exercise its right, shall provide such cooperation and assistance to the other PARTY as may be reasonably required, to the extent permitted by law, court order or agreement. The PARTY bringing an action for patent infringement of an OTP PATENT may retain any damage recovery. In case claims of patent infringement, unpatentability, invalidity and/or unenforceability of the OTP PATENTS and/or the DMMG PATENTS are brought in a single action, and neither PARTY has elected to exercise its right granted under this Article 3.2.2, both PARTIES shall meet and negotiate in good faith on

11/34

how to manage such action, including choice of external counsel and sharing of costs.

3.2.3. For the avoidance of doubt, with respect to any other infringements of any other PATENTS of the SELLER (including but not limited to the OTP PATENTS with regard to transformation events other than the GA21 EVENT or with regard to the DMMG PATENTS for CORN), the SELLER has the sole right, but not the obligation to enforce and defend these at its own cost.

## 3.3.    QUIET ENJOYMENT AND IMMUNITY FROM SUIT

3.3.1. The PURCHASER, for itself, its AFFILIATES, and its/their successors and assigns agree that the SELLER, its AFFILIATES, sublicensees, distributors, customers successors and assigns shall have the right of quiet enjoyment and immunity from suit under any PATENT claim owned or controlled by the PURCHASER or its AFFILIATES that covers OTP or DMMG in plant transformation events other than the GA21 EVENT and for uses other than CORN. For the avoidance of doubt such right of quiet enjoyment and immunity from suit does not grant the SELLER any explicit or implied license to any PATENT claims owned, controlled or licensed in by the PURCHASER or its AFFILIATES with regard to any other trait, event or technologies other than OTP and DMMG (such as promoters, transit peptides per se and other regulatory sequences, transformation methods etc.). PURCHASER further agrees to impose by written contract the terms of this Article 3.3.1. on any third party to whom PURCHASER hereafter may assign any such PATENT claim and to indemnify and hold harmless the SELLER for PURCHASER's failure to comply with this sentence.

## 3.4.    TRANSFER OF DOCUMENTATION RELATING TO THE LICENSES

3.4.1. The SELLER shall transfer a copy of all GA21 INFORMATION-1 to PURCHASER's designated agent in Switzerland as soon as reasonably possible, but not later than sixty (60) days after the CLOSING. For the avoidance of doubt, no biological material shall be transferred under this AGREEMENT, except that biological material for the LICENSED TOOLS may be provided to the PURCHASER.

3.4.2. Where a laboratory notebook constituting GA21 INFORMATION-1 is devoted exclusively to projects that are subject to transfer in accordance with this AGREEMENT, SELLER shall transfer the original notebook, and may retain a copy. Where a laboratory notebook is not so devoted, SELLER may elect to transfer a copy of the relevant pages of the notebook as long as the copy is legible and, in such event, SELLER shall retain the original notebook and make it reasonably available to PURCHASER where the original document is required as evidence. Any information that is attached to and is detachable from such an original notebook retained by SELLER, such as photographs, chromatograms, spectrograms and the like, shall be detached from the notebook and transferred to PURCHASER in its original form. SELLER may retain copies of such detached information.

3.4.3. In addition to the foregoing transfer of GA21 INFORMATION-1 PURCHASER may request further consultation with SELLER and/or additional existing documents in the nature of GA21 INFORMATION. The consultations may be either by telephone or in person at the offices of SELLER or of PURCHASER or of a designated agent. Any such request must be made within one (1) year of the EFFECTIVE DATE of this AGREEMENT. Such requests for consultation or for additional existing documents

RESTRICTED CONFIDENTIAL

SYN094347

shall be, where reasonably possible and to the extent allowed by law, court order or agreement, honored by SELLER, and shall be responded to as soon as possible, but in the case of consultation, not later than thirty (30) days after the request is received and, in the case of additional existing documents, not later than sixty (60) days after the request is received. All reasonable travel and living expenses associated with requests in accordance with this Article 3.4.3 shall be borne by PURCHASER.

**3.5.    SELLER MADE GLYPHOSATE TOLERANT CORN EVENTS**

3.5.1. For the avoidance of doubt, it is specified that the SELLER will not – except as required by law or court order - deliver, either to the PURCHASER or to any third party, the GA21 EVENT, GA21 CORN or any other GLYPHOSATE TOLERANT CORN events made by or for the SELLER prior to the EFFECTIVE DATE.

3.5.2. SELLER for itself and its AFFILIATES, agrees for a period of five (5) years from the EFFECTIVE DATE not to directly or indirectly commercialize or sell or in any other way aid third parties to commercialize any GLYPHOSATE TOLERANT CORN events made by or for the SELLER before the EFFECTIVE DATE.

**ARTICLE 4.   PRICE AND PAYMENT OF THE PRICE**

4.1     In full consideration of the acquisition of the ASSET, the licenses to the LICENSED PATENTS, the GA21 INFORMATION-1, LICENSED RIGHTS and LICENSED TOOLS and the option to GA21 INFORMATION-2 from the SELLER, and other covenants by SELLER contained herein, the PURCHASER shall pay to the SELLER the PRICE of twenty-five million US Dollars (25,000,000 US$).

4.2     On or before the CLOSING DATE, the PURCHASER shall transfer the PRICE to the SELLER.

4.3     The payment of the amount as stated under this Article 4, will be effectuated through a transfer to the account of the SELLER identified by written notice to the PURCHASER at least five (5) days prior to the CLOSING DATE.

**ARTICLE 5.   REPRESENTATIONS AND WARRANTIES OF THE SELLER**

The SELLER represents and warrants to the PURCHASER that the following representations and warranties are true and correct:

5.1     The SELLER is a corporation incorporated and validly existing under the laws of France.

5.2     This AGREEMENT is valid, binding upon the SELLER and enforceable by the PURCHASER against the SELLER in accordance with its terms.

5.3     The SELLER is the claimant in the GA21 INVENTORSHIP LITIGATION, in which the advisory jury by verdict of September 1, 2000, decided that certain of the SELLER's former or current employees are co-inventors of the subject matter claimed in the 497 PATENT and the 798 PATENT.

5.4     Except as disclosed in Exhibit 5.4:

13/34

RESTRICTED CONFIDENTIAL

5.4.1   No person or entity has made any claim or asserted any challenge to SELLER's use of ATCC Accession number 209033.

5.4.2   SELLER is the sole and exclusive owner of the LICENSED PATENTS and is entitled to license the LICENSED PATENTS to PURCHASER in accordance with this AGREEMENT and, further, there are no encumbrances upon the right to license the LICENSED PATENTS.

5.4.3   SELLER is not aware that either the execution or delivery of this Agreement or the performance by SELLER of its obligations hereunder will violate or conflict with any provisions of any other agreement, commitment or undertaking entered into by SELLER. If this AGREEMENT is rendered void and PURCHASER is denied the material benefit of this AGREEMENT as a result of a final unappealable court decision because of the sole fact that SELLER did not have the right to execute or deliver this Agreement or to perform its obligations under this AGREEMENT, then the sole and exclusive remedy of either PARTY shall be that (a) this AGREEMENT shall be rescinded and (b) the consideration provided by either PARTY shall be restored to the providing PARTY to the extent reasonably possible with SELLER's obligation being limited to the reimbursement of the PRICE (without interest or charges) to the PURCHASER. Neither PURCHASER nor SELLER nor any of their AFFILIATES shall take any action designed to lead to such court decision or cooperate in any way with any third party challenging either SELLER's or PURCHASER's right to enter into this AGREEMENT or to provide the consideration of this AGREEMENT to the other PARTY. The limitations of this Article do not apply in case of fraud or willful misconduct by the SELLER.

5.4.4   SELLER will not become a party to any contract, agreement or understanding that conveys rights in a manner inconsistent with the rights granted herein.

5.4.5   Except as disclosed pursuant to Article 6.3 or with regard to Civil Action No 1:97CV01138 pending in the Middle District of North Carolina and the French litigation (Bayer CropScience S.A. v. Monsanto Company et al, Role n° 98/6779 pending in the Regional court of Paris, 3rd Division, 2nd Section, SELLER is not aware of any pending litigation with regard to the GA21 EVENT, GA21 INFORMATION-1, OTP and DMMG PATENTS or the LICENSED TOOLS on the EFFECTIVE DATE.

THE SELLER MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, EITHER IN FACT OR BY OPERATION OF LAW, REGARDING:

(I)    THE VALIDITY, ENFORCEABILITY OR SCOPE OF ANY OF THE 497 PATENT OR THE 798 PATENTS OR THE OTP OR DMMG PATENTS, OR THAT SELLER HAS IN FACT OR IN LAW ANY RIGHTS TO THE 497 PATENT OR THE 798 PATENT ON THE GROUNDS THAT ANY OF SELLER'S EMPLOYEES OR ASSIGNORS WERE IN FACT OR IN LAW CO-INVENTORS OF THE EITHER OF THE PATENTS, OR THE OUTCOME OF THE GA21 INVENTORSHIP LITIGATION; AND/OR

(II)   THE GA21 EVENT, GA21 INFORMATION-1 AND –2, GA21 LEGAL ASSETS, OTP, DMMG, GA21 CORN, GLYPHOSATE TOLERANT CORN AND/OR THE LICENSED TOOLS, INCLUDING, WITHOUT LIMITATION, PERFORMANCE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR THE NON-

14/34

SYN094349

INFRINGEMENT BY THE GA21 EVENT, GA21 INFORMATION-1 AND –2, GA21 LEGAL ASSETS, OTP, DMMG, GA21 CORN, GLYPHOSATE TOLERANTCORN AND/OR THE LICENSED TOOLS OF THIRD PARTY INTELLECTUAL PROPERTY RIGHTS; AND/OR

(III)   SPECIFICALLY, THE SELLER MAKES NO REPRESENTATIONS OR WARRANTIES THAT THE RIGHTS GRANTED TO THE PURCHASER HEREUNDER MAY BE EXERCISED WITHOUT INFRINGING ANY THIRD PARTY INTELLECTUAL PROPERTY RIGHTS IN ANY COUNTRY IN THE WORLD; OR THAT NO OTHER LEGAL ACTIONS (WHETHER KNOWN OR UNKNOWN AND WHETHER PRESENT OR THREATENED) MAY EXIST WITH RESPECT TO ANY THIRD PARTY INTELLECTUAL PROPERTY RIGHTS OR THAT IT HAS OBTAINED ANY REGULATORY APPROVAL FOR THE GA21 EVENT OR RELATING TO OTP, DMMG, GA21 CORN OR GLYPHOSATE TOLERANT CORN.

## ARTICLE 6.  REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

6.1     The PURCHASER represents and warrants to SELLER that it is a corporation incorporated and validly existing under the laws of Switzerland.

6.2     This AGREEMENT is valid, binding upon the PURCHASER and enforceable by the SELLER against the PURCHASER in accordance with its terms.

6.3     PURCHASER has reviewed the documents listed in Exhibit 6.3, and has had full opportunity to conduct its due diligence investigation of the subject matter of this AGREEMENT, including an opportunity to interview such persons as may have knowledge of the GA21 INVENTORSHIP LITIGATION and access to such information regarding the GA21 INVENTORSHIP LITIGATION as are not protected by a confidentiality or protective Order of a Court.

6.4     PURCHASER will not become a party to any contract, agreement or understanding that conveys rights in a manner inconsistent with the rights granted under Article 3.3.1

## ARTICLE 7.  CONDITIONS PRECEDENT TO THE OBLIGATIONS OF THE PURCHASER

The obligations of the PURCHASER pursuant to the provisions of this AGREEMENT are subject to the fulfillment upon CLOSING of the following:

–   All consents of any third party or any authority, and all filings or notices required in connection with the CLOSING, if any, and the transactions contemplated thereby shall have been made or obtained.

–   The necessary approvals for the consummation of this transaction shall have been given by the Board of Directors of the SELLER and the ultimate parent company of the SELLER, BAYER AG.

–   All REPRESENTATIONS AND WARRANTIES of the SELLER made in or pursuant to this AGREEMENT shall be true and correct on the CLOSING, with the same force and effect as if made on the CLOSING.

15/34

This AGREEMENT shall not enter into force in the event that not all the conditions precedent ultimately at CLOSING have been fulfilled, unless PURCHASER then declares it waives any of these conditions.

## ARTICLE 8.   CONDITIONS PRECEDENT TO THE OBLIGATIONS OF THE SELLER

The obligations of the SELLER pursuant to the provisions of this AGREEMENT are subject to the fulfillment upon CLOSING of the following:

– All consents of any third party or any authority, and all filings or notices required in connection with the CLOSING, if any, and the transactions contemplated thereby shall have been made or obtained

– The necessary approvals for the consummation of this transaction shall have been given by the Board of Directors of the PURCHASER.

– The necessary approvals for the consummation of this transaction shall have been given by the Board of Directors of the ultimate parent company of the SELLER, BAYER AG.

– All REPRESENTATIONS AND WARRANTIES of the PURCHASER made in or pursuant to this AGREEMENT shall be true and correct on the CLOSING, with the same force and effect as if made on the CLOSING.

This AGREEMENT shall not enter into force in the event that not all the conditions precedent ultimately on the CLOSING DATE have been fulfilled, unless SELLER then declares it waives any of these conditions.

## ARTICLE 9.   INDEMNIFICATION

### 9.1     Indemnification by the SELLER

The SELLER agrees to indemnify, hold harmless and defend PURCHASER, any of its AFFILIATES, and any of their employees, officers, directors or agents from and against all DAMAGES arising out of any breach of any representation or warranty of the SELLER contained in Article 5 to the extent the subject matter of the DAMAGES were not disclosed to the PURCHASER pursuant to Article 6.3, up to a aggregate maximum of forty (40%) percent (i.e. ten (10) million US$) of the PRICE and provided that any claim has to be introduced in accordance with Article 9.3 no later than one (1) year after the CLOSING DATE.

FOR THE AVOIDANCE OF DOUBT, THIS ARTICLE 9.1 DOES NOT APPLY TO ARTICLE 5.4.3.

### 9.2     Indemnification by the PURCHASER

As of the CLOSING DATE, the PURCHASER agrees to indemnify, hold harmless and defend the SELLER, any of its AFFILIATES, and any of their employees, officers, directors or agents from and against any and all DAMAGES arising out of any of the following :

(i)     any breach of any representation or warranty of the PURCHASER contained herein; or

16/34

SYN094351

(ii)    any claims which may be brought by third parties in connection with the EXPLOITATION of the ASSET, GA21 INFORMATION-1 and 2, GLYPHOSATE TOLERANT CORN, GA21 CORN, the LICENSED RIGHTS, the LICENSED PATENTS, the LICENSED TOOLS and/or of any related information by the PURCHASER, its AFFILIATES, and/or by anyone having had or continued to have access to the ASSET (or any part thereof), GA21 INFORMATION-1 and 2, GLYPHOSATE TOLERANT CORN, GA21 CORN, the LICENSED RIGHTS, the LICENSED PATENTS and/or the LICENSED TOOLS through the PURCHASER or its AFFILIATES.

## 9.3    METHOD OF ASSERTING CLAIMS

All claims by a PARTY or its AFFILIATES under this Article 9 shall be asserted and resolved as follows :

(i)    In the event a PARTY or its AFFILIATES should have a claim against the other PARTY which does not involve a claim or demand being asserted against or sought to be collected by a third party, the PARTY or its AFFILIATES shall as promptly as practical send a claim notice to the other PARTY, specifying the nature of and basis for the claim and the estimated amount of DAMAGES attributable thereto to the extent estimation is then feasible (which estimate shall not be conclusive of the final amount of such claim) (a "CLAIM NOTICE"); provided, however, that any delay in giving such notice will not result in the waiver or reduction of rights except to the extent the rights of the indemnifying PARTY are actually prejudiced by such failure or delay. If the indemnifying PARTY fails to notify the PARTY or its AFFILIATES seeking indemnification within sixty (60) days of receipt of such CLAIM NOTICE that it disputes such claim, the amount of such claim shall be conclusively deemed a liability of the indemnifying PARTY hereunder and shall be paid to the PARTY or its AFFILIATES seeking indemnification immediately.    If the indemnifying PARTY disputes such claim, the PARTIES shall use reasonable business efforts to resolve such dispute and, in the absence of such resolution, such dispute shall be resolved by arbitration in the manner provided in Article 12 of the AGREEMENT.

(ii)    In the event that any claim or demand is asserted by a third party against any PARTY or its AFFILIATES, which claim or demand could result in a PARTY being liable hereunder, said PARTY or its AFFILIATES shall within fifteen (15) days after its discovery of such claim or demand send a CLAIM NOTICE to the indemnifying PARTY; provided, that any delay in giving a CLAIM NOTICE will not result in the waiver by the PARTY or its AFFILIATES of any of its rights except to the extent the rights of the indemnifying PARTY are actually prejudiced by such failure or delay. If the indemnifying PARTY disputes that such claim or demand falls within the scope of its indemnification duty, the PARTIES shall use reasonable business efforts to resolve such dispute and, in the absence of such resolution, such dispute shall be resolved by arbitration in the manner provided in Article 12 of the AGREEMENT. The indemnifying PARTY may at its sole discretion decide to take over the prosecution and defense regarding such claim or demand. In case the indemnifying PARTY elects not to take over, the indemnified PARTY or its AFFILIATE may defend against the claim or demand as they see fit, except that no claim or demand which would result in an indemnifying PARTY being liable hereunder may be settled without the consent of the indemnifying PARTY, which consent shall not be unreasonably withheld. Subject to the terms of this AGREEMENT, the indemnifying PARTY shall be liable for the total amount of the DAMAGES awarded by a final unappealable judgment that are attributable to the breach of a REPRESENTATION OF

17/34

RESTRICTED CONFIDENTIAL

WARRANTY granted by the SELLER pursuant to Article 5 or by the PURCHASER pursuant to Article 6.

(iii)    In the event that DAMAGES are paid by an indemnifying PARTY pursuant to this Article 9.3 and all or any portion of such DAMAGES are, or may be, recovered by the indemnified PARTY or any of its AFFILIATES via whatever way (including but not limited to an insurance contract, or from a third party) the indemnified PARTY or its AFFILIATES shall use its best efforts to obtain such recovery and shall reimburse such recovered amounts to the indemnifying PARTY as promptly as possible.

## ARTICLE 10.        CLOSING

10.1.  The CLOSING shall occur at the offices of the SELLER at 10:00 a.m. on the CLOSING DATE, or at such other location or time as the Parties may agree.

10.2.  At the CLOSING, SELLER shall deliver or cause to be delivered to the PURCHASER the following:

(i)     A bill of sale and assignment executed by SELLER selling, transferring and/or assigning to PURCHASER the ASSET; and

(ii)    A written confirmation that the licenses granted under Article 3 enter into effect as of the CLOSING DATE;

10.3.  After the CLOSING, SELLER and PURCHASER agree to take all other action that may be necessary or appropriate to complete the transactions contemplated by this AGREEMENT and to vest PURCHASER with such title to the ASSET as described in this AGREEMENT.

## ARTICLE 11.        CO-OPERATION – CONFIDENTIALITY - COMMUNICATION

### 11.1    CO-OPERATION BY THE SELLER AND ITS AFFILIATES

From the EFFECTIVE DATE to the CLOSING, the SELLER shall,

(i)     co-operate in good faith with the PURCHASER to ensure the smooth transfer of the ASSET and implementation of the licenses granted herein either at CLOSING or as promptly as possible thereafter;

(ii)    provide such access to the facilities, records and documents regarding the ASSET (but to the extent limited in this AGREEMENT) as well as to such persons (including the employees and the attorneys) as the PURCHASER reasonably considers necessary;

provided that such cooperation will not constitute a breach or violation of any confidentiality obligations to any third party or of any protective Order issued by any Court.

### 11.2    CO-OPERATION BY THE PARTIES

The PARTIES acknowledge that certain computation, exchange and notification of information and other actions may be required from time to time with respect to this AGREEMENT even after the date of CLOSING. The PARTIES and their respective representatives shall use their best efforts to co-operate with one another in the expeditious completion of all such computations, notifications and actions required.

RESTRICTED CONFIDENTIAL

SYN094353

## 11.3    CONFIDENTIALITY OBLIGATIONS OF THE PARTIES

The PARTIES agree to hold in confidence both the terms and conditions of this AGREEMENT as well as its existence:

(i)    unless disclosure is required by an order of a competent court or authority, in which case the PARTY receiving such order shall promptly (and to the extent possible before disclosure) consult with the other PARTY in order to minimize the scope of disclosure, and/or

(ii)    except that the SELLER may disclose such information regarding this AGREEMENT as is necessary to implement its obligations under this AGREEMENT, and/or

(iii)    except that the PURCHASER may disclose such information regarding this AGREEMENT as is necessary in order to EXPLOIT the ASSET, provided this does not allow the PURCHASER to communicate a copy of this AGREEMENT or parts thereof to any third party.

## 11.4    COMMUNICATION

All announcements, releases, statements and communications by the SELLER and/or PURCHASER to third parties relating to this AGREEMENT shall be made only at such time and in such manner as may be agreed upon by the PARTIES, unless otherwise required by law or contract. To the greatest extent practicable, the SELLER and the PURCHASER shall discuss with each other the form, timing and substance of such announcements, releases, statements and communications prior to the dissemination thereof.

## ARTICLE 12.    GOVERNING LAW - ARBITRATION

12.1    This AGREEMENT shall be governed by and construed in accordance with the laws of the state of Delaware without regard to any choice of law principles or rules.

12.2    Any claim, dispute, difference or controversy between the PARTIES arising out of, or relating to, this AGREEMENT, which cannot be settled by mutual understanding between the Parties (a "DISPUTE") shall be submitted within thirty (30) days of such DISPUTE to a panel consisting of a senior executive nominated by each PARTY (the "PANEL"). Such PANEL shall meet and use reasonable efforts to resolve said DISPUTE.

12.3    If the DISPUTE cannot be resolved within thirty (30) days of submission to the PANEL, then the DISPUTE shall be finally settled by binding arbitration in accordance with this Article 12 and the commercial arbitration rules of the American Arbitration Association as in effect on the EFFECTIVE DATE (the "AAA Rules"). In the event of any conflict between this Article 12 and the AAA Rules, this Article 12 shall control. Place of arbitration shall be New York, New York, unless agreed otherwise between the PARTIES.

12.4    The Arbitration Panel will consist of three wholly neutral arbitrators, one arbitrator to be appointed by the SELLER and the other by the PURCHASER in accordance with the AAA Rules, and a third arbitrator, who will serve as Chairperson, appointed by the two arbitrators appointed by the Parties. The arbitrators shall have no personal or financial interest, direct or indirect, in the PARTIES or in the outcome of

19/34

their deliberations, provided that it shall not constitute a violation of this provision for the arbitrators to own publicly traded common stock of the PARTIES having a combined total value of $10,000 or less.

12.5    Upon notice from either PARTY that the services of an arbitration Panel are required under the provisions of this AGREEMENT, the arbitrators shall be selected as described herein and meet to conduct the arbitration at a time and place selected by the arbitrators upon input of the PARTIES. The arbitrators shall conduct the arbitration in accordance with the rules hereinafter set forth, except as such rules may be modified for the purpose of the arbitration with the written consent of both Parties.

i.      The PARTY desiring arbitration (the "CLAIMANT") shall so notify the other PARTY (the RESPONDENT") by written notice (the "ARBITRATION NOTICE"), which ARBITRATION NOTICE shall contain a written statement of CLAIMANT'S position on the subject matter of the arbitration. The ARBITRATION NOTICE shall be transmitted by overnight courier service or transmitted by facsimile or other means of electronic data transmission, which transmission shall be confirmed by overnight courier service.

ii.     Upon serving the ARBITRATION NOTICE, the CLAIMANT shall identify one or more persons who may act as its appointed arbitrator. Within twenty (20) days after the ARBITRATION NOTICE is received, the RESPONDENT shall identify one or more persons who may serve as its appointed arbitrator.  The Parties shall agree upon the arbitrators within forty-five (45) days after receipt by RESPONDENT of the ARBITRATION NOTICE. If either Party fails to designate potential arbitrators within thirty (30) days after the ARBITRATION NOTICE is received by RESPONDENT, then the AAA will designate an arbitrator for each PARTY who fails to designate, and the two arbitrators designated by the PARTIES and/or AAA will select the third arbitrator. If the arbitrators appointed by or for the Parties cannot agree upon the third arbitrator within forty-five (45) days after RESPONDENT received the ARBITRATION NOTICE, then the PARTIES shall have the AAA appoint the third arbitrator. The arbitrators shall be compensated for his/her services at the average of their normal hourly billing rates.

iii.    If the CLAIMANT or RESPONDENT have a substantial need for discovery in order to prepare for the ARBITRATION, the PARTIES shall attempt in good faith to agree on a minimum plan for strictly necessary, expeditious discovery. Should the PARTIES fail to reach agreement, discovery shall be allowed pursuant to the Federal Rules of Civil Procedure and as the ARBITRATION PANEL determines appropriate under the circumstances.

iv.     At the request of either PARTY, to protect confidential information and any other matter that either PARTY would normally not reveal to third parties, the ARBITRATION PANEL shall enter a protective order in such form as the PARTIES shall stipulate or as the ARBITRATION PANEL shall determine is suitable. Among other things the protective order shall stipulate that the ARBITRATION PANEL shall receive any information designated as "confidential" solely for purposes of assessing the facts for purposes of resolving the controversy, and shall not otherwise use or disclose

20/34