## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MONSANTO COMPANY and MONSANTO TECHNOLOGY LLC, ) ) ) | |
| Plaintiffs, ) | |
| v. ) ) | |
| SYNGENTA SEEDS, INC. SYNGENTA BIOTECHNOLOGY, INC., et al., ) ) ) ) | C. A. No. 04-305 SLR (Lead Case) |
| Defendants. ) | |

| | |
|---|---|
| DEKALB GENETICS CORPORATION, ) ) | |
| Plaintiff, ) | |
| v. ) ) | |
| SYNGENTA SEEDS, INC., SYNGENTA BIOTECHNOLOGY, INC., et al. ) ) ) | |
| Defendants. ) | |

## PLAINTIFFS' OPENING CLAIM CONSTRUCTION BRIEF

OF COUNSEL:

Susan K. Knoll
Thomas A. Miller
Melinda Patterson
Stephen E. Edwards
Steven G. Spears
HOWREY LLP
1111 Louisiana, 25th Floor
Houston, TX 77002
(713) 787-1400

Dated:  January 11, 2006

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE  19801
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys For Monsanto Company,*
*Monsanto Technology LLC, and*
*DEKALB Genetics Corporation*

## TABLE OF CONTENTS

I.    INTRODUCTION ............................................................. 1

    A.   Many Terms Of The 'Lundquist Patent Have Previously Been
        Construed Based On The Intrinsic Evidence .............................. 1

    B.   The Shah Patent Has Previously Been Construed, But  The Court
        Erred In Its Construction Of Two Terms ................................. 3

    C.   Syngenta Improperly Reads Limitations From The Specification
        Into The Asserted Claims And Relies On Extrinsic  Evidence For
        Its Claim Construction Proposals ....................................... 4

II.   THE LAW OF CLAIM CONSTRUCTION ............................................ 4

III.  THE LUNDQUIST PATENTS ..................................................... 6

    A.   Background ............................................................. 6

    B.   Argument .............................................................. 9

        1.   "herbicide resistance" (claim 1 of the '880 patent) ................... 10

            a.   The Claim Language ...................................... 11

            b.   The Specification ....................................... 12

            c.   The Prosecution History ................................. 13

        2.   "glyphosate resistance" (claim 1 of the '863 patent) ................. 15

        3.   "progeny" (claim 1 of the '880 patent) and the progeny
            plants obtained in claims 4-9 of the '880 patent ..................... 15

            a.   The Claim Language ...................................... 16

            b.   The Specification ....................................... 18

            c.   The Prosecution History ................................. 19

        4.   "a process comprising obtaining progeny from  a fertile
            transgenic plant obtained by the  process of claim 1"
            (claim 4 of the '880 patent) .......................................... 20

            a.   The Claim Language ...................................... 20

            b.   The Specification ....................................... 21

           c.       The Prosecution History ................................................... 21

IV.    THE SHAH PATENT ........................................................................... 22

      A.      Background ............................................................................... 22

      B.      Argument ................................................................................. 23

           1.       "chloroplast transit peptide" ....................................... 24

                a.       The Claim Language ....................................... 24

                b.       The Specification ............................................ 25

           2.       "chloroplast transit peptide/5-enolpyruvylshikimate- 3-phosphate synthase fusion polypeptide"..................................... 30

                a.       The Claim Language ....................................... 31

                 b.       The Specification ............................................ 33

                 c.       The Prosecution History ................................. 35

           3.       "enhance the glyphosate resistance of a plant cell" ..................... 37

                 a.       The Claim Language ....................................... 37

                 b.       The Specification ............................................ 38

            4.       Syngenta's Proposed Constructions For Certain Functional Language in Claim 1 ................................................. 39

    V.    CONCLUSION.................................................................................... 40

# TABLE OF AUTHORITIES

**CASES**                                                                                   **PAGE**

*Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*,
   132 F.3d 701 (Fed. Cir. 1997). ................................................................7

*Bell Atlantic Network Srvs., Inc. v. Covad Communications Group, Inc.*,
   262 F.3d 1258 (Fed. Cir. 2001) ................................................6, 31

*Biovail Crop. V. Andrx Pharms. Inc.*,
   239 F.3d 1297 (Fed. Cir. 2001) ................................................16

*Cordis Corp. v. Boston Sci. Corp.*,
   No. 03-027-SLR, 2005 WL 1331172 (D. Del. June 3, 2005) ................2

*Digital Biometrics, Inc. v. Identix, Inc.*,
   149 F.3d 1335 (Fed. Cir. 1998) ................................................6

*Elkay Mfg. v. Ebco Mfg.*,
   192 F.3d 973 (Fed. Cir. 1999) ................................................7

*Genentech, Inc. v. Chevron Corp.*,
   112 F.3d 495 (Fed. Cir. 1997) ................................................33

*Glaxo Group Ltd. v. Apotex, Inc.*,
   376 F.3d 1339 (Fed. Cir. 2004) ................................................14

*Hoechst Celanese Corp. v. BP Chemicals Ltd.*,
   78 F.3d 1575 (Fed. Cir. 1996). ................................................5

*Hoganas Ab v. Dresser Indus., Inc.*,
   9 F.3d 948 (Fed. Cir. 1993) ................................................5

*Medtronic Vascular, Inc. v. Boston Sci. Corp.*,
   No. 98-478-SLR, 2005 WL 89960 (D. Del. Jan. 5, 2005) ................2

*Nazomi Communications, Inc. v. Arm Holdings, PLC*,
   403 F.3d 1364 (Fed. Cir. 2005) ................................................17

*Pfizer, Inc. v. Teva Pharm. USA, Inc.*,
   429 F.3d 1364 (Fed. Cir. 2005) ................................................5, 36

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) ................................................passim

*Praxair, Inc. v. ATMI, Inc.*,
   No. 03-1158-SLR, 2005 WL 2989767 (D. Del. Nov. 8, 2005) ................3, 5, 14

*Research Plastics, Inc. v. Federal Packaging Corp.*,
   421 F.3d 1290 (Fed. Cir. 2005). ........................................................................6

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996) ...........................................................................6

## **RULES**

Fed. R. Civ. P. 26(a) ........................................................................................16

Fed. R. Civ. P. 37(c) ........................................................................................16

## I.     INTRODUCTION

Plaintiffs Monsanto Company and Monsanto Technology LLC (collectively "Monsanto") and Plaintiff DEKALB Genetics Corporation ("DEKALB") submit this claim construction brief to assist the Court in construing the disputed terms of the patent claims asserted against Defendants Syngenta Seeds, Inc., et al. (collectively "Syngenta").

Monsanto/DEKALB are technological leaders in the field of plant biotechnology, having developed crops such as corn, soybean, and cotton with valuable new traits provided by foreign genes inserted in the plants.  This case is about corn genetically engineered with a gene that provides resistance to a herbicide called glyphosate and the patented technologies developed by Monsanto and DEKALB that made that corn product possible.  With the development of glyphosate resistant corn, farmers are now able to spray glyphosate over an entire field to reduce weeds without damaging their corn crops.

There are three patents-in-suit, and they fall into two unrelated families.  The Lundquist patents, U.S. Patent Nos. 5,538,880 and 6,013,863, claim methods for producing fertile trangenic corn plants containing DNA which imparts herbicide resistance ('880 patent) or glyphosate resistance ('863 patent).  The Shah patent, U.S. Patent No. 4,940,835, claims a chimeric plant gene that encodes a polypeptide which includes a chloroplast transit peptide ("CTP") and an EPSPS protein.  The CTP causes the transport of the polypeptide into a chloroplast in the plant cell.  When expressed, the chimeric plant gene enhances the glyphosate resistance of a plant cell.

### A.     Many Terms Of The '880 Lundquist Patent Have Previously Been Construed Based On The Intrinsic Evidence

In 1996, DEKALB brought a patent infringement suit in the U.S. District Court for the Northern District of Illinois ("the Illinois litigation") against several major seed

companies, including Pioneer, Mycogen and two of Syngenta's predecessors, Ciba-Geigy and Northrup King. One of the patents-in-suit was the same '880 patent at issue here. DEKALB asserted infringement by Ciba's insect resistant corn. The parties ultimately settled, and Ciba took a license under the '880 and other patents. In 1999, the Illinois court assigned a Special Master to resolve all outstanding claim construction issues. At Ciba's suggestion, the court selected Robert Harmon to be the Special Master.[1]

The Illinois litigation is significant here because the Illinois court construed the claims of the '880 patent following a four day *Markman* hearing in which Ciba and Northrup King fully participated. After the *Markman* hearing, the Special Master submitted a report setting forth his decisions on claim construction. The Illinois court adopted the Special Master's claim construction in its entirety. The Illinois court's Order on claim construction ("the Illinois Order") is attached as Ex. 1. The Illinois Order made clear that the court's claim construction was based only on the intrinsic evidence:

> The parties called six highly articulate and qualified experts in biological science. . . . The parties have submitted ***extensive extrinsic evidence***, and the SM has been willing, within reason, to consider all such evidence. In the end, however, apart from whatever benefit this evidence may have provided in gaining an understanding of the technology at hand, ***it has not been relied upon*** in construing the claims. All potential ambiguities in the claim language itself were resolvable by reference to the ***intrinsic*** patent documents.

[*Id.* at 4, emphasis added] That is the proper approach to claim construction, as this Court recognizes. *Praxair, Inc. v. ATMI, Inc.*, No. 03-1158-SLR, 2005 WL 2989767 at *1 (D. Del. Nov. 8, 2005) (citing *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005)

---

[1] Mr. Harmon is the editor of the well known patent law treatise PATENTS AND THE FEDERAL CIRCUIT. *See Cordis Corp. v. Boston Sci. Corp.*, No. 03-027-SLR, 2005 WL 1331172, at *5 n.9 (D. Del. June 3, 2005)(citing the Harmon treatise); *Medtronic Vascular, Inc. v. Boston Sci. Corp.*, No. 98-478-SLR, 2005 WL 89960, at *6 n. 6 (D. Del. Jan. 5, 2005)(same).

("Because the intrinsic evidence at bar is not ambiguous, the extrinsic evidence identified by defendants is entitled to no weight")). The Illinois court's claim construction should be adopted in the instant case. The '880 patent claim terms and their constructions provided in the Illinois Order are attached as Ex. 2.

**B.    The Shah Patent Has Previously Been Construed, But The Court Erred In Its Construction Of Two Terms**

In 2001, Monsanto brought a patent infringement suit in the U.S. District Court for the Eastern District of Missouri ("the Missouri litigation") against Bayer CropScience LP. One of the patents-in-suit was the '835 patent. The case progressed as far as a *Markman* hearing before the parties settled. That case is significant because the court construed many of the terms that are disputed by the parties here. With two notable exceptions, the Missouri court construed the claim terms in dispute by properly relying on the intrinsic evidence and that construction should be adopted here, but for those two exceptions.[2]  [Ex. 3, Missouri Order]

Plaintiffs believe that the court erred in the construction of "chloroplast transit peptide" and "chloroplast transit peptide/5-enolpyruvylshikimate-3-phosphate synthase fusion polypeptide" by relying on extrinsic evidence and impermissibly reading extraneous limitations into the claims. Since the Missouri court's claim construction, the Federal Circuit's *en banc* decision in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) has made clear that patent claims should be interpreted based on the intrinsic evidence. The '835 patent claim terms and their constructions provided in the Missouri Order with the extraneous limitations shown in brackets are attached as Ex. 5.

---

[2] The Missouri court announced its claim construction from the bench at the conclusion of the *Markman* hearing, attached as Ex. 4.

C.    **Syngenta Improperly Reads Limitations From The Specification Into The Asserted Claims And Relies On Extrinsic Evidence For Its Claim Construction Proposals**

Syngenta's proposed claim constructions should be rejected because they read into the claims additional limitations that are not supported by the claim language or the intrinsic evidence. This is impermissible under Federal Circuit authority. Syngenta also improperly seeks to bolster its proposals by relying on extrinsic evidence, including expert testimony, to contradict the unambiguous meaning of the claim terms which may be determined from the intrinsic evidence alone. The Federal Circuit in *Phillips* has re-affirmed the principle that claims are construed, whenever possible, using only the intrinsic evidence. Accordingly, Syngenta's claim construction proposals should be rejected as a matter of law.

## II.    THE LAW OF CLAIM CONSTRUCTION

This Court is familiar with the legal framework for interpreting patent claims from its experience in handling numerous patent cases, including those involving biotechnology. This Court is also familiar with the Federal Circuit's recent *en banc* decision on claim construction, *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005). *See Praxair, Inc. v. ATMI, Inc.*, No. 03-1158-SLR, 2005 WL 2989767 (D. Del. Nov. 8, 2005). Plaintiffs provide the following discussion of the law of claim construction to focus only on the cases that are particularly relevant to the facts and circumstances of the present case.

"It is improper for a court to add 'extraneous' limitations to a claim, that is, limitations added wholly apart from any need to interpret what the patentee meant by particular words or phrases in the claim." *Hoganas Ab v. Dresser Indus., Inc.*, 9 F.3d 948, 950 (Fed. Cir. 1993) (citation omitted). The Federal Circuit has repeatedly

4

cautioned that, although the specification must be consulted by the court to construe the claims, "limitations from the specification may not be read into the claims." The Federal Circuit reiterated this rule in its recent *Phillips* decision. 415 F.3d at 1323.

"A claim construction that excludes a preferred embodiment … is rarely, if ever, correct." *Pfizer, Inc. v. Teva Pharm. USA, Inc.*, 429 F.3d 1364, 1374 (Fed. Cir. 2005). That is because "it is unlikely that an inventor would define the invention in a way that excluded the preferred embodiment, or that persons of skill in this field would read the specification in such a way." *Hoechst Celanese Corp. v. BP Chemicals Ltd.*, 78 F.3d 1575, 1581 (Fed. Cir. 1996).

When looking at the patent specification, a court should determine whether the inventors have used any terms in a manner inconsistent with their ordinary meaning. *Phillips*, 415 F.3d at 1316; *Bell Atlantic Network Srvs., Inc. v. Covad Communications Group, Inc.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001). If so, the inventor's lexicography governs. *Phillips*, 415 F.3d at 1316; *see also Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("The specification acts as a dictionary . . . when it defines terms by implication.").

Claim terms are presumed to be used consistently throughout the patent, such that the usage of a term in one claim can often illuminate the meaning of the same term in other claims. *Research Plastics, Inc. v. Federal Packaging Corp.*, 421 F.3d 1290, 1295 (Fed. Cir. 2005). The prosecution history must be reviewed because it may contain contemporaneous exchanges between the PTO and the applicant about what the claims mean. *Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1344 (Fed. Cir. 1998).

"The court may receive extrinsic evidence to educate itself about the invention and the relevant technology, but the court may not use extrinsic evidence to arrive at a claim construction that is clearly at odds with the construction mandated by the intrinsic evidence." *Elkay Mfg. v. Ebco Mfg.*, 192 F.3d 973, 977 (Fed. Cir. 1999). Expert testimony should not be allowed to "inject a new meaning into terms that is inconsistent with what the inventor set forth in his or her patent and communicated, first to the patent examiner and ultimately to the public." *Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701, 706 (Fed. Cir. 1997). Thus, a court should accord no weight to "expert testimony that is inconsistent with unambiguous intrinsic evidence." *Id.*

## III.    THE LUNDQUIST PATENTS

### A.    Background

Plaintiffs assert that Syngenta's GA21 corn products infringe claims 4-9 of the '880 patent and claims 5 and 6 of the '863 patent. The asserted claims are directed to methods for producing fertile transgenic progeny corn plants that have herbicide resistance ('880 patent) or glyphosate resistance ('863 patent). The technology underlying the Lundquist patents is described in the Illinois Order. [Ex. 1 at 12-16]

One of the roadblocks to achieving herbicide (or glyphosate) resistant corn was the development of a method to insert into the corn DNA a foreign gene providing the desired trait. That process is referred to as "transformation." Although scientists were able to "transform" dicot plants such as tobacco and tomato by the mid-1980s, transformation of the important cereal crops (e.g., corn, wheat, and rice, all monocots) proved to be much more difficult. Many plant biotechnology research organizations (including Pioneer, Stauffer, Monsanto, DEKALB, Ciba-Geigy, Northrup King, and the USDA) were trying to discover a way to produce fertile transgenic corn. [Ex. 6, Christou

Tr. 47:3-18]  That hurdle was cleared in late 1989 by inventors Lundquist and Walters.[3]

Syngenta's expert, Dr. Christou, admits that Lundquist and Walters were the first in the

world to achieve fertile transgenic corn plants.  [Ex. 6, Christou Tr. 52:7-14]  The real

key was obtaining *fertile* transgenic corn plants because without fertility, no progeny

plants with the new trait were possible.  Lundquist and Walters' fertile transgenic corn

plants were able to pass the trait to progeny plants.

The specification of the '880 and '863 patents[4] generally discloses a method for

producing fertile transgenic corn plants containing a foreign gene that provides a desired

trait.  The steps of transformation, selection, and regeneration are  generally depicted

below, and are the subject of claim 1 of the '880 and '863 patents.



---

[3] Lundquist and Walters made the invention of their patents at a small company, Plant Science
Research Inc. (PSRI), which was not a part of either Monsanto or DEKALB at the time.  DEKALB
acquired PSRI in 1991.  Monsanto acquired DEKALB in 1998.

[4]  The specifications are essentially identical.  Plaintiffs will refer to the '880 specification herein.

The process begins by introducing DNA containing the foreign gene into corn cells by a technique called microprojectile bombardment.  Very small metal particles are coated with DNA having the gene of interest.  Then the coated particles are accelerated—essentially fired from a gun—toward the corn cells.  [*See* '880 patent, col. 5, l. 15-col. 9, l. 32][5]  The corn cells that have the foreign DNA incorporated into their own DNA are considered "transformed" cells.

The next task is to separate, or "select," the corn cells that are transformed. The introduced DNA will include a selectable marker gene, which gives the transformed corn cell the ability to resist the harmful effects of an otherwise toxic chemical agent.  [*Id.*, col. 9, l. 36-col. 10, l. 50]   Thus, the transformed cells will survive the selection procedure, and the untransformed corn cells—those that do not have the foreign DNA incorporated into their own DNA—will die.  Finally, the surviving transformed tissue is regenerated into plants through tissue culture techniques.  [*Id.*, col. 10, l. 56-col. 11, l. 9]

Further generations, or progeny (the subject of asserted claims 4-9 of the '880 patent and asserted claims 5 and 6 of the '863 patent), are obtained from the seed of the original regenerated plants through breeding techniques, as depicted below.

---

[5] All references to the patents-in-suit and numbered prosecution histories are to those jointly submitted by the parties.



As shown above, the term "R0" is commonly used to refer to the original plants regenerated from the transformed tissue, and the term "R1" is commonly used to refer to the generation of immediate descendent plants of the R0 plants. "R2" is commonly used to refer to "grand-children" of the R0 plants, i.e., the generation of immediate descendents of the R1 plants, and so on. Progeny herbicide resistant corn plants may be placed into a breeding program to develop commercial hybrid corn seed that can be sold to farmers and then used to grow herbicide resistant corn crops. [*Id.*, col. 11, ll. 33-67] Syngenta's infringing GA21 corn products are examples of such commercial hybrid corn seed.

**B.    Argument**

Plaintiffs' proposed claim construction of the disputed terms is fully supported by the intrinsic evidence. Syngenta's is not. Instead, Syngenta properly reads limitations into the claims that are unsupported by the claim language and relies heavily on extrinsic evidence to contradict the intrinsic evidence.

The parties dispute the construction of the following limitations in the asserted claims of the Lundquist '880 and '863 patents:

9

(1)    "herbicide resistance" ('880 patent claim 1);

(2)    "glyphosate resistance" ('863 patent claim 1);

(3)    "progeny," and in particular, the plants resulting from the processes recited in claims 4-9 of the '880 patent; and

(4)    "a process comprising obtaining progeny from a fertile transgenic plant obtained by the process of claim 1" ('880 patent claim 4).

Two of the disputed terms, "progeny" and "herbicide resistance," were construed by the Illinois court, which as already noted properly relied only on the intrinsic evidence.  Syngenta repeats here the same arguments about the meaning of "progeny" and "herbicide resistance" and again ignores the intrinsic evidence.  Having lost those arguments in Illinois, Syngenta should not be permitted to re-litigate the meaning of terms that have already been properly construed by the Illinois court based on the intrinsic evidene.

### 1.    "herbicide resistance" (claim 1 of the '880 patent)

**Plaintiffs' proposed construction:**  "herbicide resistance" means that the plant has more resistance to an agent having herbicidal activity, when applied to plant material, than the same plant that does not have the transgene under the same conditions of application and plant material.  It is not limited to resistance to agents used as commercial herbicides. [Ex. 1, Illinois Order at 44-46]

Syngenta argues that "herbicide" means a chemical agent employed to kill or inhibit the growth of weeds and excludes antibiotics.  This construction, which essentially limits "herbicide" to commercial herbicides sold to farmers to control weeds, repeats the same arguments made (and lost) in the prior Illinois litigation:

The term "herbicide resistance" in the '877 and '880 patents should be construed to mean (i) herbicide resistance of whole plants (rather than plant cells or callus), and *(ii) resistance to herbicides that are agronomically useful to control weeds (rather than various "toxic agents" with herbicidal properties that are not known or used as herbicides)*.

[Ex. 7, Ciba's Post-Markman Hearing Memorandum at 10-11, emphasis added]   Ciba also argued, as Syngenta does here, that "herbicide" should be construed to exclude antibiotics such as hygromycin.  [*Id.* at 13]  The Illinois court rejected those arguments:

> The claim language is clear and unambiguous, and nothing in the patent specifications or prosecution histories limits the construction that it should receive.  The claims plainly do not require that the herbicide be a chemical that is sold to farmers for that purpose….   These conclusions are confirmed by the statement in the Lundquist patents that "the transgenic plants may have many uses in research or breeding."   [E.g., '880 patent, col. 12, ll. 34-35]
> . . .
>    Defendants argue that the claims must exclude antibiotics such as hygromycin because they are not chemicals sold to farmers for herbicidal use. . . .
>
> ***The prosecution histories support the conclusion that antibiotics, such as hygromycin, that exhibit herbicidal activity, are among the agents contemplated by the term "herbicidal resistance."***

[Ex. 1, Illinois Order at 44-45, emphasis added]    The Illinois court came to that conclusion based on the intrinsic evidence alone.[6]

Syngenta does not propose a separate construction for herbicide "resistance."  Accordingly, Plaintiffs' proposed construction for herbicide "resistance," which is based on the Illinois court's construction, should be adopted.

### a.      The Claim Language

While claim 1 of the '880 patent requires herbicide resistance, it plainly does not require resistance to chemicals sold commercially as herbicides to farmers.  There is no recitation of "commercial" herbicide resistance in the claim or any other potential basis in the claim language for limiting the scope of that term.

------

[6] This construction is also consistent with the ordinary dictionary meaning of herbicide, "an agent used to destroy or inhibit plant growth." [Ex. 8, Webster's New Collegiate Dictionary at 530 (1981)]

### b.     The Specification

The specification includes a description of a working example (Example I) using the HPT gene to obtain progeny of fertile transgenic corn that resist the herbicidal effects of hygromycin.  ['880 patent, col. 12-18]  That example explains how Lundquist and Walters proved resistance by performing two assays.  [*Id*. at col. 17, l. 53-col. 18, l. 45]

One assay demonstrated that when the inventors applied hygromycin to the roots of their transgenic progeny plants, the roots had abundant root hairs and root branches while the non-transgenic plants did not.  [*Id*. at col. 18, ll. 3-26]  The other assay demonstrated that leaves from transgenic progeny plants were greener after being treated with hygromycin than the hygromycin-treated non-transgenic corn leaves.  [*Id*. at col. 18, ll. 27-45]  Example I thus demonstrates that hygromycin had a herbicidal effect in progeny corn plants and that Lundquist and Walters' fertile transgenic corn plants resisted those effects better than the non-transgenic corn.

The specification states that "[a] preferred selectable marker gene is the hygromycin B phosphotransferase (HPT) coding sequence."  ['880 patent, col. 7, ll. 10-12]  Thus, Syngenta's proposed construction that excludes hygromycin resistance from the scope of "herbicide resistance" violates the Federal Circuit's admonition that "claims should rarely, if ever, be construed to exclude a preferred embodiment."  *Glaxo Group Ltd. v. Apotex, Inc.*, 376 F.3d 1339, 1347 (Fed. Cir. 2004).

One reason why Syngenta's proposal that "[t]he term 'herbicide' as used in the '880 patent excludes antibiotics" is wrong is because the specification uses the terms "herbicide" and "antibiotic" interchangeably and without making a distinction between them for the purposes of the patent.  *See Praxair, Inc. v. ATMI, Inc.*, No. 03-1158-SLR, 2005 WL 2989767, at *1 (D. Del. Nov. 8, 2005) ("Defendants argue that tanks, according

to definitions found in extrinsic evidence, are larger than cylinders and defendants ask the court to read into the claims the limitation that a pressurized tank means a storage container that is larger than a cylinder. . . . ***The patent specifications use the terms 'tank' and 'cylinder' interchangeably and make no distinction*** in size or otherwise between a tank and a cylinder"). For example, the specification states that "selection generally entails the use of some toxic agent, e.g. herbicide or antibiotic." ['880 patent, col. 2, ll. 53-54] Also, "[u]seful selectable markers are well known in the art and include, for example, antibiotic and herbicide resistance genes." ['880 patent, col. 7, ll. 8-10]

Nothing in the remainder of the specification excludes the hygromycin resistance provided by the preferred HPT gene from the meaning of "herbicide resistance." No statement in the specification limits the claims to commercial herbicide resistance. Instead, Example I teaches that hygromycin can be used as a herbicide to practice the claimed method.

### c.    The Prosecution History

Whether the term "herbicide" encompasses hygromycin was fully vetted during prosecution of the '880 patent. The examiner, Dr. Gary Benzion, made the same argument that Syngenta makes now, i.e., that hygromycin resistance was not "herbicide resistance." By the conclusion of prosecution, however, the Examiner withdrew that argument.

The Examiner initially rejected the "herbicide resistance" claims for lack of enablement:

> The specification teaches the transformation and expression of . . . hygromycin B phosphotransferase, B-glucuronidase, and luciferase. . . . With the exception of the genes noted above, **which are not considered to be genes that confer resistance to art recognized "herbicides**," the specification is silent as to a gene which when expressed would impart said herbicide resistance.

[SM0000699, emphasis added] In response, the Applicants pointed out that the Examiner was taking an inconsistent position to one he had taken in the Applicants' co-pending PCT application, in which he expressly stated:

> it is the Examiner's opinion that: "**[t]he selectable marker[s kanamycin, hygromycin and methotrexate] employed [in the prior art] all possess herbicidal properties.**"

[SM0000712, emphasis added] Eventually, the Examiner agreed that the example of hygromycin resistance in the specification provided support for "herbicide resistance" in the claims, and allowed the claims, stating in his Reasons for Allowance:[7]

> **Exemplified in the specification** … [are] R0 plants transformed with DNA encoding hygromycin ß-phosphotransferase (HPT) …. R1 progeny evaluated by root elongation bioassay, etiolated leaf bioassay, and Southern blot assay confirm that the primary regenerants and segregating progeny were genetically transformed with non-native DNA. These plants affected a new non-native plant phenotype corresponding to hygromycin resistance. … **The above example [of hygromycin resistance]**, … and the general discussion of art known and available DNA sequences, including herbicide resistance as a type of selectable or screenable marker, **provides a sufficient written description of whole plants produced by the claimed process**

[SM0000858, emphasis added] Pending claim 48 recited herbicide resistance:

> Claim 39: A process for producing a fertile transgenic *Zea mays* plant comprising the steps of (i) establishing a regenerable

---

[7] Although the Examiner submitted his Reasons for Allowance in connection with the prosecution of the related, but different, Lundquist '877 patent, due to the similarity of the claims of the '880 and '877 patents, those reasons have the same effect when construing the claims of the '880 patent. *Biovail Crop. V. Andrx Pharms. Inc.*, 239 F.3d 1297, 1301 (Fed. Cir. 2001) ("When multiple patents derive from the same initial application, the prosecution history regarding a claim limitation in any patent that has issued applies with equal force to subsequently issued patents that contain the same claim limitation." (citation omitted)).

embryogenic callus culture from a *Zea mays* plant to be transformed, (ii) transforming said culture by bombarding it with DNA-coated microprojectiles, (iii) identifying or selecting a transformed cell line, wherein said DNA is chromosomally integrated, and (iv) regenerating a fertile transgenic *Zea mays* plant therefrom wherein said DNA is transmitted through a complete sexual cycle of said transgenic plant to its progeny.

Claim 47: The process of claim 39 wherein the DNA comprises a selectable marker gene or a reporter gene.

Claim 48: The process of claim 47 wherein said selectable marker gene imparts herbicide resistance to said fertile transgenic *Zea mays* plant.

[SM0000808-809] Syngenta's proposal that "herbicide resistance" be construed to exclude hygromycin resistance violates Federal Circuit law holding that "the meaning of [the claim term] must also be broad enough to encompass the reasons for allowance." *Nazomi Communications, Inc. v. Arm Holdings, PLC*, 403 F.3d 1364, 1370 (Fed. Cir. 2005).

## 2.   "glyphosate resistance" (claim 1 of the '863 patent)

**Plaintiffs' proposed construction:**   "glyphosate resistance" means that the plant has more resistance to glyphosate, when applied to plant material, than the same plant that does not have the transgene under the same conditions of application and plant material.

The meaning of "glyphosate resistance" should be consistent with the meaning of "herbicide resistance" in the '880 patent.  Syngenta does not propose a construction for this term.

## 3.   "progeny" (claim 1 of the '880 patent) and the progeny plants obtained in claims 4-9 of the '880 patent

**Plaintiffs' proposed construction:**   "progeny" means the R1 and succeeding generations.  [Ex. 1, Illinois Order at 43]

"Progeny" is used in the asserted claims according to its plain and ordinary meaning of any and all generations of lineal descendants.  Syngenta's proposed

15

construction, that claims 4-9 of the '880 patent are limited to the **R1, R2, and R3 progeny,** is wholly unsupported by the evidence and improperly reads "R1, R2, and R3" into the claims.  It is nothing more than a transparent attempt to avoid infringement, even though Syngenta is engaging in the exact kind of breeding program contemplated by the '880 patent.[8]  Moreover, as the Illinois court correctly concluded, the intrinsic evidence flatly contradicts Syngenta's proposal.

In the Illinois litigation, Syngenta's predecessor Ciba-Geigy made the same argument about the meaning of the '880 patent claim term "progeny" that Syngenta makes now in construing claims 4-9 of the '880 patent to be limited to the R1, R2, and R3 generations—that "progeny" means "the immediate offspring of a particular cross." [Ex. 9, Ciba's Initial Markman Hearing Memorandum at 97]  The Illinois court rejected Ciba's argument, concluding that "progeny" means "any generation but R0, and is certainly not limited to R1" [Ex. 1, Illinois Order at 39], with the caveat that the earliest generation covered by claims 4-9 of the '880 patent depends on the particular claim.  [*Id.* at 43]  The court found that "[n]either the claims nor the specification provide any real support for [Ciba's] position."  [*Id.* at 39][9]

### a.     The Claim Language

Claim 4 recites "obtaining progeny."   Here, "progeny" means the R1 and succeeding generations, no matter how they are obtained from the R0 plant of claim 1.

---

[8]  The only issue that Syngenta's proposed construction of "progeny" could possibly be relevant to is non-infringement.  In its contentions, however, Syngenta did not assert that it does not infringe claims 4-9 of the '880 patent on the basis that its activities with GA21 corn are not activities with "progeny."  Accordingly, Syngenta should be precluded from making its "progeny" argument during claim construction and from arguing that it does not infringe the asserted claims because its GA21 corn lines are not "progeny."  *See* Fed. R. Civ. P. 26(a) and 37(c).

[9]  Plaintiffs' proposed construction is also consistent with the dictionary definition of progeny, "descendants, children."  [Ex. 8, Webster's New Collegiate Dictionary at 912 (1981)]

[Ex. 1, Illinois Order at 39]  Nothing in the language of claim 4 indicates that "progeny" is limited to immediate offspring of the R0 plants.  The claims do not recite R1, R2, or R3.  "Progeny" as used in claims 5-9 means the same as in claim 4, but with the additional limitations stated in each claim.  The claims simply carve out progressively smaller and smaller sub-sets of progeny by removing the earliest generation of progeny from coverage.  The following claim chart illustrates how the claim scope changes from claim to claim:

| Claim | Limitations | Generations of Progeny Plants Encompassed by the Claim |
|---|---|---|
| 4 and 5 | …obtaining progeny… | R1 and later |
| 6 and 7 | …obtaining seed from said progeny and **obtaining further progeny plants**…from said seed" | R2 and later |
| 8 and 9 | …seeds are obtained from said further progeny plants and **plants … are recovered from said seed**. | R3 and later |

Had the Applicants wanted to draft claims with a scope limited to the immediate next generation of offspring, they could have done so using explicit language.  In fact, the Applicants did draft such claims in their related U.S. Patent No. 5,484,956.  Claim 5 of the '956 reads:

> 5.  An R1 transgenic Zea mays plant derived from the plant of claim 1 wherein said R1 plant expresses said heterologous DNA so that the R1 plant exhibits said phenotypic characteristics.

[Ex. 10, '956 patent, claim 5]  Claim 5 clearly recites the **R1** generation, which is the immediate offspring of the initial R0 fertile transgenic corn plant recited in claim 1.  Thus, when the Applicants intended to restrict their claims to cover only the immediate

next generation, they used explicit language to do so.  Claims 4-9 of the '880 patent do not use R1, R2, or R3 limiting language.

### b.    The Specification

The specification uses the term "progeny" to mean any and all lineal descendants:

> The present invention is directed to the production of fertile transgenic plants and seeds of the species *Zea mays* and to the plants, plant tissues, and seeds derived from such transgenic plants, as well as the ***subsequent progeny*** and products derived therefrom.

['880 patent, col. 4, ll. 50-54, emphasis added]

> The invention further relates to regenerated fertile mature maize plants from transformed embryogenic tissue, transgenic seeds produced therefrom, and R1 and ***subsequent generations***.

['880, col. 3, ll. 64-67, emphasis added]

The need for multiple generations of descendants beyond the R3 generation is explicitly described in the specification in the context of the breeding programs used to develop commercial hybrids:

> Generally, the commercial value of the transformed corn produced herein will be greatest if the heterologous DNA can be incorporated into many different hybrid combinations. . . .  As such, it is necessary to incorporate the heterologous DNA into a large number of parental lines so that many hybrid combinations can be produced containing the desirable heterologous DNA. This may conveniently be done by breeding programs in which a conversion process (backcrossing) is performed by ***crossing the initial transgenic fertile plant* [R0]** *to normal elite inbred lines* **[to obtain an R1]** *and then crossing the progeny back to the normal parent* **[to obtain an R2]**. The progeny from this cross will segregate such that some of the plants will carry the heterologous DNA whereas some will not. The plants that do carry the DNA are then ***crossed again* [to obtain an R3]** to the normal plant resulting in progeny which segregate once more. ***This crossing is repeated* [resulting in R4 and later progeny]** until the original normal parent has been converted to a genetically engineered line containing the heterologous DNA and also possessing all other important attributes originally found in the parent.

['880 patent, col. 11, ll. 33-64, emphasis added]  Thus, the specification describes that repeated generations of backcrossing beyond the R3 generation are necessary to generate commercial corn.

Limiting the scope of claims 4-9 to only three generations of transgenic plants, as Syngenta suggests, would serve to strip the '880 patent of any meaningful value.  As the Illinois court acknowledged, the intent of the invention "is to incorporate the transgene into hybrid corn lines through a conventional breeding program, a process that will take several generations. . . .  [This is] clearly inconsistent with any limitation of the claim scope to only two or three generations."  [Ex. 1, Illinois Order at 40]  The Illinois court agreed with the arguments made by DEKALB that "[n]o patentee would limit claims to transgenic plants of potential commercial value to a single generation of transformant." [*Id*. at 40-41]

### c.    The Prosecution History

The prosecution history of the '880 patent is consistent with Monsanto's proposed construction.  For example, in the Supplemental Amendment that added the "progeny" claims to the application, the Applicants noted that application claims 32-35, which eventually became '880 patent claims 6-9, were "supported by … pages 19-20 of the specification, which set forth methodologies for obtaining *R2 and higher generation progeny* plants from the initial R0 transgenic plants."  [SM0001047, emphasis added] Pages 19-20 of the application contain the text that became column 11, lines 33-64 of the '880 patent specification, quoted above, regarding the repeated crossing involved in a breeding program.

Plaintiffs' proposed construction of the plants covered by claims 4-9 is amply supported by the intrinsic evidence. Accordingly, "progeny" should be construed to mean any and all generations of lineal descendents.

### 4. "a process comprising obtaining progeny from a fertile transgenic plant obtained by the process of claim 1" (claim 4 of the '880 patent)

**Plaintiffs' proposed construction:** claim 4 covers the step of obtaining progeny using the fertile transgenic plant produced by the process of claim 1 as a starting material. The claimed process does not include the steps recited in claim 1.

Claim 4 of the '880 patent covers a process of producing progeny plants using the fertile transgenic plant of claim 1 as the starting material. The plain language of the claim and the other intrinsic evidence supports this construction and refutes Syngenta's proposed construction that claim 4 be interpreted as another step added to the process of claim 1.

### a. The Claim Language

The language of claim 4 confirms that Plaintiffs' proposed construction is correct:

4. *A process comprising obtaining progeny* from a fertile transgenic plant obtained by the process of claim 1 which comprise said DNA.

Claim 4 does not claim "the process of claim 1" and then add further steps or limitations. Claim 4's language contrasts, for example, with that of claim 5 of the '863 patent, which recites "the process of claim 1" and then adds the further step of obtaining progeny plants:

5. *The process of claim 1 further comprising* obtaining transgenic glyphosate resistant progeny plants of subsequent generations from said fertile transgenic plant.

Claim 5, unlike '880 patent claim 4, refers back to the process of claim 1 in its preamble and recites that the claimed process "further" comprises an additional step. The

differences in language between claim 4 of the '880 patent and claim 5 of the '863 patent demonstrate that claim 4 covers using the plant of claim 1 as the starting material to make progeny.

### b.     The Specification

The specification states that a method of obtaining progeny derived from the original R0 transgenic plant is part of the invention.  For example:

> The present invention is directed to **the production of** fertile transgenic plants and seeds of the species *Zea mays* and to the plants, plant tissues, and seeds derived from such transgenic plants, as well as **the subsequent progeny and products derived therefrom**.

['880 patent, col. 4, ll. 50-53, emphasis added]  "Therefrom" refers back to the original fertile transgenic plants.  Thus, the invention described in the specification also includes production of progeny and products obtained using the R0 transformed plant as a starting material.

### c.     The Prosecution History

The prosecution history is consistent with the claim language and specification. The predecessor of claim 4, claim 30 of the '458 application read:

> 30.  **The process of claim [1] further comprising** (iv) obtaining progeny from said fertile transgenic plant of step (iii), which comprise said DNA.

[SM0001046, emphasis added]  Like claim 5 of the '863 patent, claim 30 referred back to the process of another claim in the preamble and specified that the claimed method "further" comprises another step.  The Applicants, however, amended application claim 30 to its final form as claim 4 of the '880 patent.  [SM0001083]  Plaintiffs' proposed construction gives effect to the amendment while Syngenta's proposal ignores it.

## IV.  THE SHAH PATENT

### A.  Background

The '835 patent is a pioneering patent that describes genes that allow the production of glyphosate resistant plants. The '835 patent was recognized in *IP Worldwide* in 2002 as one of the "10 Patents that Changed the World, for the pioneering work in genetically engineered crops that it represents." [Ex. 11] Indeed, the '835 patent was described as having "spurred other genetic modifications, including techniques that boost the nutritional content of foods, or allow them to grow better in hostile environments (a boon in many areas plagued by famine)." [*Id.*]

Plaintiffs assert that Syngenta's GA21 corn products infringe claims 1, 5 and 6 of the '835 patent. These claims are directed to chimeric plant genes that confer glyphosate resistance in plant cells. In the early to mid-1980s, when the invention of the '835 patent was conceived and developed, genetic modification of plants was relatively new. There was extensive debate about the site of glyphosate activity in plant cells: was it in the cytoplasm, the chloroplast, or both? The inventors discovered and demonstrated that glyphosate tolerance can be achieved by transforming plants with a single EPSPS gene that directed cells to produce an EPSPS enzyme. The plant cell would transport the EPSPS enzyme from the cytoplasm into the chloroplast, a subcompartment of the cell located inside the cytoplasm.

The '835 patent describes and claims chimeric plant genes comprising: a promoter; a coding sequence for a polypeptide comprising a chloroplast transit peptide ("CTP") that is responsible for the chloroplast transport and an EPSPS protein; and a 3' non-translated region, as depicted below.



Such genes were shown to confer glyphosate tolerance on plant cells.

### B.    Argument

Plaintiffs' proposed claim construction of the disputed terms is fully supported by the intrinsic evidence, whereas Syngenta's construction improperly reads limitations into the claims that are unsupported by the claim language and the rest of the intrinsic evidence.

The parties dispute the construction of the following limitations in claim 1 of the '835 patent:

(1)    "chloroplast transit peptide [CTP]";

(2)    "chloroplast transit peptide/5-enolpyruvylshikimate-3-phosphate synthase [CTP/EPSPS] fusion polypeptide";

(3)    "enhance the glyphosate resistance of a plant cell".

Terms (1) and (2) were construed by the Missouri court in 2003.  [Ex. 3, Missouri Order]  Plaintiffs' proposed constructions of the disputed terms are based on the language of claim 1 and the other intrinsic evidence.  They are consistent with the Missouri court's constructions, with two exceptions.  Plaintiffs believe that the court's construction of "chloroplast transit peptide" added unnecessary limitations and that the construction of "chloroplast transit peptide/5-enolpyruvylshikimate-3-phosphate synthase fusion polypeptide" did not properly accord the intrinsic evidence from the specification and

prosecution history the weight it deserved in relation to the dictionary or lay meaning of the term "fusion," as mandated by the Federal Circuit's recent decision in *Phillips*.

### 1.    "chloroplast transit peptide"

**Plaintiffs' proposed construction:** This phrase means a series of amino acids that causes the transport of a polypeptide into a chloroplast, regardless of the cleavage step.

The phrase "chloroplast transit peptide" ("CTP") as used in the claims of the '835 patent means a series of amino acids that causes the transport of a polypeptide into a chloroplast. The parties agree that a chloroplast transit peptide includes a "series" (Plaintiffs) or "chain" (Syngenta) of amino acids that "causes the transport of" (Plaintiffs) or "directs" (Syngenta) a polypeptide to a chloroplast. However, Syngenta's proposed construction that the CTP be a "naturally occurring chain of amino acids," that it be "located at the N-terminal portion of a nuclear encoded polypeptide" (a construction rejected by the Missouri court), and that it be "cleaved (or removed) from the EPSPS polypeptide" seeks to introduce claim limitations that are not present in the claims and not supported by the intrinsic evidence.[10]

### a.    The Claim Language

The term "chloroplast transit peptide" when considered with the language in claim 1 that specifically describes its function, i.e., "permits the fusion polypeptide to be imported into a chloroplast of a plant cell," defines itself. Thus, the term chloroplast transit peptide is a peptide that directs a polypeptide, of which it is a part, to be imported or transported from the cytoplasm into a chloroplast in a plant cell. Nothing in the claim

---

[10] Plaintiffs' proposed construction is consistent with the glossary definition of chloroplast transit peptide, "a transit peptide that, when fused to a protein, acts to transport that protein into chloroplasts in a plant." [Ex. 13]

language requires the CTP to be a "naturally occurring chain of amino acids" or to be "located at the N-terminal portion of a nuclear encoded polypeptide."

Similarly, there is nothing in the patent claim that requires the chloroplast transit peptide to be cleaved from "a nuclear encoded polypeptide" as Syngenta's proposed construction requires. The word "cleaved" and the concept of "cleavage" appear nowhere in the patent claims. In fact, the functional language in claim 1, i.e., "permits the fusion polypeptide *to be imported into a chloroplast of a plant cell*," focuses on transporting the polypeptide into a chloroplast. Thus, so long as the chloroplast transit peptide performs its function of permitting the fusion polypeptide to be imported into a chloroplast of a plant cell and the chimeric gene is capable of enhancing the glyphosate resistance of a cell transformed with the gene, no more is required.

### b. The Specification

The '835 patent teaches that in plants, the coding sequence for a given EPSPS will include a CTP. The specification states that suitable CTPs for use in the present invention may be obtained from various sources, most preferably, from the endogenous EPSPS gene of the subject plant to be transformed. [*Id.*, col. 4, ll. 35-38] The patent provides numerous examples of such CTPs. Example 1 describes the isolation of the native or wild-type coding sequence for the EPSPS of petunia. Numerous other examples describe the isolation of other EPSPS genes, including their associated CTPs, from cotton (Example 5), flax (Example 7), *Arabidopsis thaliana* (Example 15), tomato (Example 16), and *Brassica napus* (Example 6 and 17). Example 19 discloses a hybrid CTP made by combining a portion of the CTP from petunia EPSPS with a portion of a CTP from another gene, ssRuBisCO.

In addition, the specification provides that non-homologous CTPs, i.e., a CTP associated with a protein other than the EPSPS protein with which it occurs in nature, may function in particular embodiments. [*Id*., col. 4, ll. 40-44] Thus, the '835 patent discloses numerous CTPs specifically and by implication that are suitable for use in the claimed invention. In addition to those teachings, the specification also discloses that suitable CTP sequences can be identified by assaying the chloroplast uptake of an EPSPS polypeptide comprising the CTP of interest as described in detail in Example 18. [*Id*., col. 4, ll. 44-48]

Syngenta's attempt to introduce the requirement that a CTP be defined as a "naturally occurring chain of amino acids" reads a limitation into the term "chloroplast transit peptide" that is simply not there. Although the patent directs one skilled in the art to sources for CTPs that are from plants or from natural sources and not to synthetic substances [Ex. 4, Missouri Hearing Tr. at 166-67], that does not mandate a conclusion that a CTP may not contain amino acid additions or substitutions and still be recognized by those of skill in the art as a CTP. CTPs having coding sequences that are not all "natural" are specifically contemplated by the '835 patent but would be excluded from a literal definition of a "naturally occurring" chain of amino acids, a result that is disfavored in the law.

Moreover, Syngenta's apparent definition of "naturally occurring" contradicts the literal meaning of the term "naturally occurring." Syngenta's definition of "naturally occurring" would itself allow some amino acid changes to the CTP but not others. Introduction of the "naturally occurring" requirement into the definition of "chloroplast transit peptide" would thus introduce impermissible ambiguity into the plain meaning of

the claim language.  For example, in Example 19, a hybrid CTP comprising the first 66 amino acids of the petunia EPSPS CTP and the last 6 amino acids of an ssRuBisCO CTP was used to demonstrate that the CTP could target a heterologous protein to the chloroplast.  [Id., col. 30, l. 45-col. 31, l. 15]  Thus, the "natural" coding sequence of the CTP of the petunia EPSPS was changed through genetic engineering so that the resulting hybrid sequence was not one that would be found in nature, i.e., it was not "naturally occurring."  In order to avoid excluding specifically contemplated CTPs from the claims but still retaining the "naturally occurring" requirement, Syngenta has apparently adopted a definition of the phrase "a naturally occurring chain of amino acids" to mean a chain of amino acids that may have some changes made to the amino acid chain but not others.

Syngenta would thus apparently consider the chloroplast transit peptide in Example 19 to be "naturally occurring" even though 8% of the amino acids differ from those occurring in the naturally occurring CTP.  [*See also* Ex. 12, Bruce Report at ¶ 21] Syngenta's attempt to insert the "naturally occurring" requirement into the definition of chloroplast transit peptide, yet read it out where it suits Syngenta's purposes, renders what is a rather straightforward claim term "chloroplast transit peptide" hopelessly vague.

Nor is there any support for Syngenta's requirement that the chloroplast transit peptide must be "located at the N-terminal portion of a nuclear encoded polypeptide." This added limitation is confusing and ambiguous as to the identification of the "nuclear encoded polypeptide" being referred to.  To the extent that this limitation is intended by Syngenta to impose a requirement that the chloroplast transit peptide must be "located at the N-terminal portion of a 5-enolpyruvylshikimate-3-phosphate synthase polypeptide in a chimeric gene construct," as discussed further below, that interpretation was rejected by

the Missouri court when it held that the CTP need not be "directly adjacent" to the EPSPS polypeptide and defined the fusion as having "at least two parts." In addition, also as discussed below, the limitation would be redundant to Syngenta's attempt to introduce the term "consisting of" into the definition of chloroplast transit peptide/5-enolpyruvylshikimate-3-phosphate synthase fusion polypeptide. To the extent that the "located at the N-terminal portion" limitation is merely a recitation of a location in a gene from which a chloroplast transit peptide may be obtained, it is unnecessary.

Syngenta's proposed construction requiring that the CTP be necessarily cleaved from the EPSPS is also not in keeping with the language in the specification, which distinguishes between transport and cleavage. Specifically, the specification distinguishes "importing" (the word used to describe the function of the CTP in claim 1) from cleavage.

> The CTP leader sequence causes the polypeptide to be **imported** into chloroplasts, **and** the CTP leader sequence encoded by the plant-derived EPSPS gene is believed to be **removed** from the remainder of the polypeptide so that an active portion of the EPSPS polypeptide exists and functions inside the chloroplast.

['835 patent, col. 4, ll. 28-34]

Other passages of the specification describe the transport function of the CTP without mentioning cleavage:

> …a chloroplast transit peptide which allows the polypeptide…to be **transported** from the cytoplasm of the plant cell into a chloroplast in the plant cell…

[*Id*., col. 2, ll. 24-28]

> The EPSPS gene encodes a polypeptide which contains a chloroplast transit peptide (CTP), which enables the EPSPS polypeptide (or an active portion thereof) to be **transported** into a chloroplast inside the plant cell.

[*Id.*, col. 2, l. 66-col. 3, l. 2]

> The EPSPS gene is transcribed into mRNA in the nucleus and the mRNA is translated into a precusor [sic] polypeptide (CTP/mature EPSPS) in the cytoplasm. The precusor [sic] polypeptide (or a portion thereof) is ***transported*** into the chloroplast.

[*Id.*, col. 3, ll. 19-24]

Accordingly, the specification is consistent with the claim language. The claimed CTP performs an importing function, not a cleavage function. Although cleavage may occur during or after transport—this is an issue that is not required by the plain language of the claim which defines the function of the CTP. The specification makes this clear, stating "EPSPS genes which encode an enzyme with a functional chloroplast transit peptide (which is ***preferably*** removed from the mature EPSPS polypeptide) also provide useful selectable marker genes. . . ." [*Id.*, col. 5, ll. 41-44] Cleavage, whether it be at a certain time, position in the gene, or even at all, is not required by the plain language of the claims so long as the chloroplast transit peptide causes transport into the chloroplast and expression of the CTP/EPSPS fusion polypeptide is sufficient to enhance glyphosate resistance.

Plaintiffs' proposed definition is also in keeping with the Missouri Court's understanding of what the specification considered to be the function of a chloroplast transit peptide. In addressing this issue, the Missouri court stated:

> "Permits" means allows. "To be imported" means for something to be carried into some place. That's what the words mean, and that's the function of the CTP. It permits a polypeptide to be imported into a chloroplast. That's what the words say and that's what they mean . . . .

[Ex. 4, Missouri Hearing Tr. 170:14-18] Syngenta's attempt to read a specific cleavage limitation into the claims is inappropriate and should be rejected.

Thus, Syngenta's proposed construction of the term "chloroplast transit peptide" is self-contradictory and confusing, excludes Example 19, and is directly contradicted by the specification and portions of the Missouri court's claim construction. Furthermore, it amounts to nothing more than an impermissible attempt to read limitations into the claim. *Bell Atlantic*, 262 F.3d at 1258; *Innovad Inc.*, 260 F.3d at 1332 (The "interpretative process forbids importing limitations from the specification into the defining language of the claims.").

> **2.    "chloroplast transit peptide/5-enolpyruvylshikimate-3-phosphate synthase fusion polypeptide"**

**Plaintiffs' proposed construction:**  This phrase means a polypeptide that has at least two parts, which must include a chloroplast transit peptide (as defined above) joined to an EPSPS, where such chloroplast transit peptide need not be directly adjacent to the EPSPS.

Plaintiffs' definition of the phrase "chloroplast transit peptide/5-enolpyruvylshikimate-3-phosphate synthase fusion polypeptide" ("CTP/EPSPS") is a polypeptide that has at least two parts, which must include a chloroplast transit peptide joined to an EPSPS.[11]  Plaintiffs' definition does not require that the chloroplast transit peptide needs to be directly adjacent to the EPSPS.[12]

---

[11] The specification and prosecution history clearly establish that the term "fusion" was being used in its generic sense and, not in the limited sense that Syngenta will urge as the "ordinary meaning."

[12] To avoid confusion, it should be noted that the naturally occurring EPSPS gene encodes a protein that has the CTP encoded by the EPSPS gene attached to the portion of the EPSPS protein that has enzymatic activity.  It is undisputed that the "EPSPS" part of the fusion polypeptide in the claim term is the portion of the EPSPS protein that has enzymatic activity (also called the "mature EPSPS" protein).

In contrast, Syngenta argues that this phrase means "a chain of amino acids *consisting of* a chloroplast transit peptide fused to an EPSPS, *where the chloroplast transit peptide and EPSPS are not found together in nature*. Syngenta attempts to insert "consisting of" language into the claim term (a construction rejected by the Missouri court) and a requirement that the CTP and the EPSPS not be found together in nature. Each is addressed separately below. When the claim language and the intrinsic evidence is properly considered, the term "fusion" as used in the asserted claims means two or more different things (here, a CTP and an EPSPS) joined together in a unified whole construct, whether they are directly adjacent or found together in nature or not.

### a.    The Claim Language

Syngenta has indicated that the phrase "consisting of" in its proffered definition is intended to be interpreted in the manner in which it is used as a transitional phrase in a claim, i.e., to limit the claim term from including any elements other than the CPT and EPSPS.    Syngenta's proposed construction of "chloroplast transit peptide/5-enolpyruvylshikimate-3-phosphate synthase fusion polypeptide" to limit the claim term to "a chain of amino acids *consisting of*" a CTP and an EPSPS construction is plainly at odds with the fundamental legal principal that "comprising" claims, such as claim 1, are open-ended and may include elements other than those specifically set forth in the claims. *Genentech, Inc. v. Chevron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997)("comprising" is a term of art used in claim language which means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim).

The Missouri court construed "chloroplast transit peptide/5-enolpyruvylshikimate-3-phosphate synthase fusion polypeptide" to mean "a polypeptide that has at least two parts, which include a chloroplast transit peptide (as defined above)

joined to an EPSPS.  [Ex. 3, Missouri Order at 1-2]  The court specifically rejected a proposed construction limiting this term to only the CTP and EPSPS by inserting "that has at least two parts," and rejected defendant's attempt to require that CTP and EPSPS be "directly adjacent" to one another.  [Ex. 4, Missouri Hearing Tr. at 169:20-24]

An additional focus for the construction of the phrase "chloroplast transit peptide/5-enolpyruvylshikimate-3-phosphate synthase fusion polypeptide" is on the meaning of the term "fusion polypeptide."  The word "fusion" is used as an adjective modifying "polypeptide" and thus describes a "polypeptide" comprised of two or more different portions (here, at least a CTP and an EPSPS peptide).  The word "fusion" is not used as a verb describing the act of joining dissimilar things together.  Therefore the claim language does not require that humans perform the act of joining; the CTP and EPSPS could have been joined together by nature or by humans.  A "fusion polypeptide" as used in the asserted claims means two or more dissimilar peptides, e.g., a CTP and an EPSPS, that have been joined together to create a polypeptide, whether those elements are found together in nature ("a homologous fusion" or "naturally occurring fusion") or are two elements that do not occur together in nature ("a heterologous fusion").

Syngenta's construction of the phrase "CTP/EPSPS fusion polypeptide" improperly reads the word "heterologous" into the claim language, i.e., *"heterologous* chloroplast transit peptide/5-enolpyruvylshikimate-3-phosphate synthase fusion polypeptide."  Had the inventors intended to specify that the CTP and EPSPS come from different sources, they would have used the term "heterologous" in the claim as they did later in claim 1 in describing the promoter:

the promoter being *heterologous* with respect to the coding sequence and adapted to cause sufficient expression of the fusion polypeptide to enhance the glyphosate resistance of a plant cell transformed with the gene.

"Heterologous," however, was not used in connection with the CTP/EPSPS fusion polypeptide. Thus, the CTP may or may not be heterologous to the EPSPS.

Although the Missouri court also required that the fusion polypeptide contain a heterologous CTP and EPSPS, that decision occurred prior to the Federal Circuit's decision in *Phillips,* holding that the specification and prosecution history must be the primary source for construing the claims. As explained below, in this case, both the specification and the prosecution history mandate a conclusion that the term CTP/EPSPS fusion polypeptide be given the construction advanced by Monsanto—a polypeptide that has at least two parts which must include a chloroplast transit peptide and an EPSPS.

### b. The Specification

A close examination of the specification clearly establishes that those of skill in the art would understand that the Monsanto scientists were using the term "CTP/EPSPS fusion polypeptide" to encompass both homologous and heterologous fusions. According to the specification, "This invention involves…a gene which encodes 5-enolpyruvylshikimate-3-phosphate synthase (EPSPS) polypeptide which, when expressed in a plant cell contains a chloroplast transit peptide…" [*Id.*, col. 2, ll. 21-25] The '835 patent contemplates a number of different potential constructs that are considered to be embodiments of that EPSPS gene. The majority of these are homologous (i.e., naturally occurring) fusions. The specification describes homologous plant CTP/EPSPS fusions in Examples 1-7 and 10-17. Only Examples 8 and 9 describe a heterologous plant CTP/bacterial EPSPS construct.

Syngenta's proposed construction excludes from the scope of the claims all of the Examples that describe naturally-occurring CTP/EPSPS coding sequences. Specifically, Example 1 describes the creation of pMON546, a vector which utilizes a coding sequence for a chloroplast transit peptide and EPSPS both from petunia. ['835 patent, col. 6-16] Examples 2 and 3 describe creating glyphosate resistant petunia cells and tobacco cells, respectively, using pMON546. [*Id.*, col. 16-17] Examples 5-7 describe the use of plant transformation vectors similar to pMON546, except that the CTP/EPSPS coding sequences are obtained from cotton, oil seed rape, and flax, respectively. Examples 10-17 describe other work with naturally occurring homologous fusions.

The specification also clearly indicates that the CTP/EPSPS fusion encompassed by the claims can be either homologous or heterologous. The specification states that "The EPSPS gene of the present invention encodes an [sic] CTP/EPSPS fusion polypeptide." [*Id.,* col. 4, ll. 23-24] The specification then goes on to state: "[O]ne may find that ***non-homologous*** CTP's may function ***in particular embodiments***." [*Id.,* col. 4, ll. 43-45] As admitted by both of Syngenta's experts, a "non-homologous CTP" is the same as a heterologous fusion, and the only thing that "a non-homologous CTP" would exclude would be the situation where the CTP occurs with the same EPSPS with which it is found in nature. [Ex. 14, Ward Tr. 123:19-22; Ex. 15, Bruce Tr. 97:6-13, 98:1-8]

Accordingly, the specification clearly contemplates ***both*** embodiments as being within the scope of the claimed invention. Yet Syngenta's construction of "fusion" would render the specification's unequivocal statement that non-homologous CTPs represent only "particular embodiments" to be entirely meaningless.

Further, homologous fusions are described as being preferred.  For example, the specification states that "Figure 1 depicts the major steps used in one preferred embodiment of this invention."  [*Id.,* col. 2, ll. 41-42]  And, it is uncontroverted that the steps used in that "preferred embodiment" resulted in the production of a homologous fusion—an EPSPS gene that contained the CTP fused to the EPSPS with which it occurs in nature.  Examples 1-7 are included as "preferred embodiments of this invention."  [*Id.,* col. 6, ll. 10-11]   Syngenta's proposed construction excludes these preferred embodiments, a result which is rarely if ever correct.  *See Pfizer*, 429 F.3d at 1374.

### c.      The Prosecution History

The prosecution history also supports Plaintiffs' construction.   Syngenta's argument that the term fusion requires heterology between the CTP and EPSPS relies heavily on the following statement from the specification:

> The EPSPS gene of the present invention encodes an [sic] CTP/EPSPS fusion polypeptide. After the CTP/EPSPS polypeptide from a gene of this invention is translated from mRNA in the cytoplasm of the transformed plant cell, *it is believed to be processed in the same manner as the natural EPSPS polypeptide*.

['835 patent, col. 4, ll. 23-28]

Syngenta has argued that this statement in the specification distinguishes a chimeric gene that encodes a heterologous fusion from one that encodes a homologous fusion, which would produce what Syngenta would refer to as "the natural EPSPS polypeptide."  [*See* Ex. 12, Bruce Report at ¶ 29]  But, examination of the file history belies Syngenta's reading of this sentence.   The originally filed patent application included the following statement:

> After the EPSPS polypeptide from a gene of this invention is translated from mRNA in the cytoplasm of the transformed plant

cell, it is believed to be processed in the same manner as the natural EPSPS polypeptide.

[Serial No. 06/763,482 at 0005012]   The chimeric gene exemplified in the original application was a fusion of the CTP and EPSPS isolated from the EPSPS gene of petunia (i.e., a homologous fusion), which was a preferred embodiment.   [*Id*. at 0005006, 0005038-041, 0005044-046]   When the version of the application that resulted in the issued patent was filed, the sentence "The EPSPS gene of the present invention encodes an CTP/EPSPS fusion polypeptide" was added ['835 patent, col. 4, ll. 23-24] in front of the sentence that appeared at page 10 of the original specification.   That original sentence was revised to substitute the term "CTP/EPSPS polypeptide" for the term "EPSPS polypeptide."   The change was obviously a matter of minor clarification to spell out two required portions of the gene—the CTP and the EPSPS portions.   The meaning of the sentence from the original application remained unchanged.   Thus, the "gene of this invention" referred to in this sentence includes all chimeric genes encoding CTP/EPSPS fusions, whether or not the CTP and EPSPS are found together in nature and distinguishes such constructs "of this invention," not from each other, but from the EPSPS gene endogenous to the non-transformed plant.

Syngenta's definition of "fusion" also goes against the actions of the inventors during prosecution.   For example, the final patent application added descriptions of heterologous CTP/EPSPS constructs, notably Examples 8 and 9, but also included the same petunia CTP/EPSPS constructs as in the first and second patent applications and added others describing native or wild-type CTP/EPSPS coding sequences, including Examples 5-7, 10, and 14-17.   [*Id*., 0005204-270]   If the inventors had intended to exclude all embodiments describing homologous, CTP/EPSPS fusion constructs by

adding the term "fusion polypeptide" in the final patent application, as Syngenta claims, why would they also carry forward the examples from the first and second patent applications and add Examples 5-7, 10, and 14-17, all of which describe homologous CTP/EPSPS constructs?

Similarly, during prosecution, inventor Shah provided a declaration directed to his cloning of the naturally occurring CTP/EPSPS gene from petunia to establish certain facts concerning the invention date at a time when the claims recited a "CTP/EPSPS fusion polypeptide."  [0005357-62]  Had the claims required a heterologous fusion as Syngenta claims, why would such a declaration have been relevant or accepted by the PTO?  Syngenta's position should be rejected because it is based upon extrinsic evidence directed to lay meanings of the term "fusion" and is inconsistent with the specification and file history of the patent.

### 3.    "enhance the glyphosate resistance of a plant cell"

**Plaintiffs' proposed construction:** This phrase means that the plant cell has more resistance to glyphosate, when applied to plant material, than the same plant cell that does not have the transgene under the same conditions of application and plant material.

### a.    The Claim Language

The phrase "enhance the glyphosate resistance of a plant cell" has its plain and ordinary meaning, that is, it means that the plant cell has more resistance to glyphosate, when applied to plant material, than the same plant cell that does not have the transgene under the same conditions of application and plant material.  Nothing in the claim language or intrinsic evidence suggests that "resistance" in this term should be construed differently than "resistance" in the claims of the '880 and '863 patents.

b.        **The Specification**

Syngenta's proposed definition of "to enhance the glyphosate resistance of a plant cell" as requiring that "the plant cell will survive application of glyphosate at a concentration sufficient to ***select*** a transformed plant cell from a non-transformed plant cell" (emphasis added) is unclear because it is uncertain exactly what Syngenta means by the term "select" in this context.  To the extent that Syngenta is purporting to require that the chimeric gene must be shown to function as a selectable marker—i.e., be employed in the initial selection protocol with a selection of transformed tissue on a medium containing glyphosate – this construction would import a limitation into the claim that is not consistent with the specification or the examples.

Many of the glyphosate resistant plants and plant cells set forth in the examples were selected by first culturing the transformed cells on a medium containing another herbicide, kanamycin, to kill the plant cells that had not been transformed.  Transformed plant cells were regenerated and leaf tissue from the transformed plant was then tested to demonstrate the glyphosate resistance.  For example, Example 6 at col. 20, ll. 24-44, describes selection of transformed plant tissue by culturing on kanamycin to produce transgenic plant shoots followed by testing of leaf tissue from the transgenic shoots for resistance to glyphosate at 3-6 weeks after the initial selection.  A similar procedure is set forth in at least Examples 7, 9 and 12, all of which specifically describe selection on kanamycin, followed by a demonstration of glyphosate resistance by subsequent culture of transformed plant tissue on medium supplemented with glyphosate, and detection of resistance by a difference in the growth characteristics of the transformed tissue as compared to a non-transformed control.   Similarly, Example 11 describes a demonstration of resistance by spraying regenerated plants with glyphosate.

Given the explicit disclosure of selection on kanamycin followed by a demonstration of glyphosate resistance by subsequent culture on medium containing glyphosate or by spraying with glyphosate at the transformed plant level, Syngenta's proposed construction is contradicted by many of the examples in the specification and should be rejected.

### 4. Syngenta's Proposed Constructions For Certain Functional Language in Claim 1

Syngenta provides claim constructions for the following four terms:

(1)    "a promoter sequence which function in plant cells;"

(2)    "chloroplast transit peptide permits the fusion polypeptide to be imported into a chloroplast of a plant cell;"

(3)    "which functions in plant cells to cause the addition of polyadenylate nucleotides to the 3'end of the mRNA;" and

(4)    "the promoter being … adapted to cause sufficient expression of the fusion polypeptide to enhance glyphosate resistance of a plant cell transformed with the gene."

For each of these terms, Syngenta's claim construction includes the statement that "this language constitutes a necessary limitation of the claim."  In so doing, Syngenta improperly puts undue emphasis on these claim terms.  This part of Syngenta's proposed constructions should not be adopted.

## V.    CONCLUSION

For the reasons stated, Plaintiffs respectfully request that the Court adopt Plaintiffs' proposed construction of the disputed claim terms, which are consistent with the intrinsic evidence.

Respectfully submitted,

OF COUNSEL:

POTTER ANDERSON & CORROON LLP

Susan K. Knoll
Thomas A. Miller
Melinda Patterson
Stephen E. Edwards
Steven G. Spears
HOWREY LLP
1111 Louisiana, 25th Floor
Houston, Texas 77092
Telephone (713) 787-1400

By: _/s/ David E. Moore_
     Richard L. Horwitz (#2246)
     David E. Moore (#3983)
     Hercules Plaza, 6th Floor
     1313 N. Market Street
     Wilmington, DE  19801
     Telephone (302) 984-6000
     rhorwitz@potteranderson.com
     dmoore@potteranderson.com

Dated:  January 11, 2005

*Attorneys for Plaintiffs*

714603

40

# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

## <u>CERTIFICATE OF SERVICE</u>

I, David E. Moore, hereby certify that on January 11, 2006, the attached document

was hand-delivered to the following persons and was electronically filed with the Clerk

of the Court using CM/ECF which will send notification of such filing(s) to the following

and the document is available for viewing and downloading from CM/ECF:

John W. Shaw
Karen E. Keller
Young Conaway Stargatt & Taylor, L.L.P.
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE  19801

I hereby certify that on January 11, 2006, I have Federal Expressed the

foregoing document(s) to the following non-registered participants:

Richard F. Schwed
Stephen Fishbein
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY  10022-6069

Michael J. Flibbert
Don O. Burley
Howard W. Levine
Finnegan, Henderson, Farabow,
   Garrett & Dunner, L.L.P.
901 New York Ave., NW
Washington, DC  20001-4413

  */s/ David E. Moore*
Richard L. Horwitz
David E. Moore
Potter Anderson & Corroon LLP
Hercules Plaza – Sixth Floor
1313 North Market Street
Wilmington, DE  19801
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com