# EXHIBIT 1

Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Philip G. Reinhard | Sitting Judge If Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 96 C 50112 | **DATE** | 9/17/1999 |
| **CASE TITLE** | DeKalb Genetics Corp. vs. Pioneer Hi-Bred Int'l Inc. | | |

**MOTION:**  [In the following box (a) indicate the party filing the motion, e.g. plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1)  ☐  Filed motion of [ use listing in "Motion" box above.]

(2)  ☐  Brief in support of motion due _____.

(3)  ☐  Answer brief to motion due_____. Reply to answer brief due_____.

(4)  ☐  Ruling/Hearing on _____ set for _____ at _____.

(5)  ☐  Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6)  ☐  Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7)  ☐  Trial[set for/re-set for] on _____ at _____.

(8)  ☐  [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9)  ☐  This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
  ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10)  ■  [Other docket entry]  The court hereby adopts all of the findings in the special master's Report and Recommendation as the findings of the court. Pioneer's request for an oral hearing on the issue of claim construction is denied.

(11)  ■  [For further detail see order on the reverse side of the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court | |
| | No notices required. | number of notices |
| | Notices mailed by judge's staff | |
| | Notified counsel by telephone | date docketed |
| | Docketing to mail notices | |
| | Mail AO 450 form | docketing deputy initials |
| | Copy to judge/magistrate judge | |
| SW | courtroom deputy's initials | date mailed notice |
| | Date/time received in central Clerk's Office | mailing deputy initials |

(Reserved for use by the Court)

## ORDER

Seven patent infringement suits, in which DeKalb Genetics Corporation is the plaintiff, were referred on January 4, 1999, to Special Master Robert L. Harmon, who was approved by all the parties, pursuant to Fed. R. Civ. P. 53. The order of reference specified that the special master would "report to this court and the parties his conclusions, and the reasons for them, regarding the meaning of any disputed term in any allegedly infringed claim of the following patents: U.S. Patent Nos. 5,484,956; 5,489,520; 5,538,877; and 5,538,880." Order of Reference, ¶ 3, DeKalb Genetics Corp. v. Pioneer Hi-Bred Int'l, Inc., 96 C 50112 (N.D. Ill. Jan. 4, 1999). The special master held an evidentiary hearing on May 25-28, 1999, in which six expert witnesses testified and extensive attorney argument was heard. The parties filed extensive briefs both before and after the hearing. The special master's lengthy and comprehensive Report and Recommendation regarding claim construction was received by the court on June 30, 1999. All parties have filed objections to various aspects of the Report and Recommendation, but it is not necessary for the court to specifically address each objection. Suffice it to say, all counsel for all parties are knowledgeable and have been very thorough in presenting their arguments to the court.

The court, not the jury, has the power and obligation to construe as a matter of law the meaning of language used in patent claims. Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995) aff'., 517 U.S. 370 (1996). This court has reviewed de novo the thorough Report and Recommendation, the objections thereto filed by the parties, the transcripts of the evidentiary hearing and the patents and their prosecution histories. The court hereby adopts all of the findings in the special master's Report and Recommendation as the findings of the court. See Fed. R. Civ. P. 52.

Mycogen and Pioneer's requests for oral hearings on the issue of claim construction are denied as neither seek to submit additional evidence, but rather to argue legal positions already clear to the court.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

DEKALB GENETICS CORPORATION,               )      Civil Actions   96 C 50112
                                           )                      96 C 50114
          Plaintiff,                       )                      96 C 50159
                                           )                      96 C 50239
     v.                                    )                      96 C 50241
                                           )                      96 C 50284
PIONEER HI-BRED INTERNATIONAL, INC ,       )                      98 C 50186
MYCOGEN CORPORATION, including its         )
Operating subsidiaries AGRIGENETICS, INC. and )   Judge Philip G. Reinhard
MYCOGEN PLANT SCIENCES, INC.,              )      Magistrate P Michael Mahoney
CIBA-GEIGY CORPORATION, and NORTHRUP )           Special Master Robert L. Harmon
KING CO (formerly Sandoz Seeds Co ),       )
                                           )      Transgenic Corn Patent Litigation
          Defendants.                      )
                                           )

---

### REPORT AND RECOMMENDATION
### OF SPECIAL MASTER
### REGARDING CLAIM CONSTRUCTION

**DOCKETED**

JUL 0 1 1999

    These seven civil actions are related by the fact that each involves an assertion of

infringement of one or more of four United States patents owned by plaintiff DeKalb Genetics

Corporation (DeKalb). The patents are in the field of genetic engineering and address the

production of transgenic corn The four principal defendants are Pioneer Hi-Bred International,

Inc. (Pioneer), Northrup King Co (NK), Ciba Geigy Corporation (Ciba), and Mycogen

Corporation (Mycogen)

    In an Order of Reference dated January 4, 1999, the Court appointed the undersigned as

Special Master (SM) in these cases pursuant to Rule 53, FRCP. The specific purpose of the

reference was to have the SM provide a recommended construction of the claims of the patents

in suit Under the express terms of the Order, the SM has "all of the powers described in Rule 53

of Fed R Civ P , to conduct an evidentiary hearing on the record to hear and recommend to the

Court the resolution of all issues of interpretation of the claims of the patents-in-suit, as provided

for in *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370,

116 S.Ct. 1384 (1996)," and "is not limited by any prior rulings of Judge Reinhard or Magistrate

Mahoney."

A four-day hearing was held in Chicago, Illinois on May 25-28, 1999. Live witness

testimony was received from six expert witnesses, each with a Ph.D. in biological science and

each with substantial experience and achievement in technical areas pertinent to the technology

of the patents in suit. Their testimony was helpful in assisting the SM to acquire sufficient

understanding of that technology to inform and enable the claim construction exercise. In

addition, counsel explained the prosecution histories of the patents and attempted to demonstrate

how the transactions reflected there supported their positions on claim interpretation. Extensive

attorney argument was entertained throughout the hearing. Massive written submissions were

filed preceding and subsequent to the hearing. Upon full consideration of all matters raised

during those proceedings, this report is respectfully submitted in response to the Court's directive

to recommend a construction of the claims of the patents in suit.


# GOVERNING LEGAL PRINCIPLES

## The Legal Framework for Claim Construction

Proper claim construction necessarily precedes a determination of whether the claims

read on the accused devices or methods for infringement purposes.[1] Indeed, claim construction

---

[1] E.g., Fonar Corp. v. Johnson & Johnson, 821 F.2d 627, 3 USPQ2d 1109, 1112 (Fed. Cir. 1987)

will normally control the remainder of the decisional process,[2] for it is axiomatic that the claims

must be construed in the same way for infringement that they are for determining validity.[3]

In the Markman case, supra, the Supreme Court held that interpretation of patent claims

is a question for the court, while application of properly construed claims to determine

infringement is a question for the finder of fact, in this case the jury. As a starting point, the

words in a patent claim should be given their ordinary and customary meaning unless it appears

from the specification that the patentee defined them otherwise.[4] Nonetheless, when technical or

scientific terms in the claims require definition or explanation or understanding in the course of

deciding whether the claims are infringed, it is the court's responsibility to undertake that task.[5]

In discharging its Markman responsibility, the court must inevitably decide what the scope

of the underlying evidentiary inquiry will be. The Federal Circuit explained this decisional

process in Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 39 USPQ2d 1573 (Fed. Cir.

1996). Ordinarily, the court should confine itself, if possible, to an examination of the intrinsic

patent documents: the patent itself and its prosecution history. In most situations, an analysis of

the intrinsic evidence alone will resolve any ambiguity in a disputed claim element. In those

cases where the public record unambiguously describes the scope of the patented invention,

reliance on any extrinsic evidence is improper. Only if there is still some genuine ambiguity in

the claims, after consideration of all available intrinsic evidence, should the court resort to

extrinsic evidence such as expert testimony. And even if the judge decides to hear all possible

evidence before construing the claims, expert testimony inconsistent with the intrinsic evidence

---

[2] Panduit Corp. v. Dennison Mfg. Co., 810 F.2d 1561, 1 USPQ2d 1593, 1597 (Fed. Cir. 1987).
[3] E.g., Intervet America, Inc. v. Kee-Vet Labs., Inc., 887 F.2d 1050, 12 USPQ2d 1474, 1476 (Fed. Cir. 1989). It is recommended that the jury be so instructed.
[4] E.g., York Prods. Inc. v. Central Tractor F&F Center, 99 F.3d 1568, 40 USPQ2d 1619, 1622 (Fed. Cir. 1996). Statements in the prosecution history are also pertinent; for example, a clear disavowal of claim coverage can limit the construction of the claim. Id. at 1624.
[5] Fromson v. Anitec Printing Plates Inc., 132 F.3d 1437, 45 USPQ2d 1269, 1271 (Fed. Cir. 1997).

should be accorded no weight. Extrinsic evidence in general, and expert testimony in particular,

may be used only to help the court come to the proper understanding of the claims; it may not be

used to vary or contradict the claim language. Nor may it contradict the import of other parts of

the specification. Nor may the inventor's subjective intent as to claim scope, when unexpressed

in the patent documents, have any effect.

As indicated, the parties called six highly articulate and qualified experts in biological

science. In considering the evidence adduced through these witnesses, the SM was constantly

mindful of the Federal Circuit's clear direction in Bell & Howell Doc. Man. Prod. Co. v. Altek

Sys., 132 F.3d 701, 45 USPQ2d 1033, 1038 (Fed. Cir. 1998):

> Once a dispute over claim construction arises, "experts" should also not be heard to inject
> a new meaning into terms that is inconsistent with what the inventor set forth in his or her
> patent and communicated, first to the patent Examiner and ultimately to the public.
> Patents should be interpreted on the basis of their intrinsic record, not on the testimony of
> such after-the-fact "experts" that played no part in the creation and prosecution of the
> patent. * * * Use of expert testimony to explain an invention may be useful. But reliance
> on extrinsic evidence to interpret claims is proper only when the claim language remains
> genuinely ambiguous after consideration of the intrinsic evidence, *Vitronics*, 90 F.3d at
> 1584, 39 USPQ2d at 1578, i.e., when the intrinsic evidence is "insufficient to enable the
> court to construe disputed claim terms." Id. at 1585, 39 USPQ2d at 1579. Accordingly,
> any expert testimony that is inconsistent with unambiguous intrinsic evidence should be
> accorded no weight. * * *

These admonitions have conditioned the methodology employed in this proceeding. The

parties have submitted extensive extrinsic evidence, and the SM has been willing, within reason,

to consider all such evidence. In the end, however, apart from whatever benefit this evidence

may have provided in gaining an understanding of the technology at hand, it has not been relied

upon in construing the claims.[6] All potential ambiguities in the claim language itself were

resolvable by reference to the intrinsic patent documents.

---

[6] See Mantech Environmental Corp. v. Hudson Environmental Serv. Inc., 152 F.3d 1368, 47 USPQ2d 1732, 1737
(Fed. Cir. 1998), where the Federal Circuit held that "the district court was legally correct both in admitting and

The SM is also mindful of the admonition of the Federal Circuit that "claim construction is

not an obligatory exercise in redundancy," and that it is unnecessary to repeat or restate every

claim term in order to comply with the <u>Markman</u> directive that claim construction is a matter for

the court [7]  Such an approach would carry the very real potential of confusing rather than

enlightening the jury.[8]  Thus, where terms are expressly defined in the patent specification, it is

sufficient simply to refer the jury to that definition; the court can decide at the time of trial

whether explanatory technical testimony would be necessary or, indeed, helpful at all  And

where a term is not defined or used in a special way in the specification, and is otherwise

unambiguous, the jury should be instructed to give the term its ordinary meaning and will

presumably require no additional assistance.

It is also important to understand that claim construction is an obligation of the court that is

independent of the views asserted by the adversary parties.[9]  Among them, the parties have

requested consideration and construction of many, but not all, of the elements of the claims of

the patents in suit  The SM has considered each claim as a whole, and each element of each

claim, and has recommended a specific interpretation of those terms and phrases, and only those

terms and phrases, that require construction.  Accordingly, to the extent various claim elements

are not addressed in this report, it may be assumed that the SM is recommending that they be

---

accepting the testimony of the parties' expert witnesses 'for the purpose of background in the technical area at issue,'
* * * and then basing its claim construction solely upon intrinsic evidence. Although this information always may
be admitted by the trial court to educate itself about the patent and the relevant technology, the claims and the
written description remain the primary and more authoritative sources of claim construction. Thus, they always must
be considered and where clear must be followed." See also <u>Key Pharm. Inc. v. Hercon Labs. Corp.</u>, 161 F.3d 709,
48 USPQ2d 1911 (Fed. Cir. 1998).

[7] <u>United States Surgical Corp. v. Ethicon, Inc.</u>, 103 F.3d 1554, 41 USPQ2d 1225, 1236 (Fed. Cir. 1997).

[8] For example, repeatedly instructing a jury that an ordinary English word does not really mean what they think it
does, but instead has the meaning of some synonym, can only cause confusion. If they meant not the one but the
other, why did the inventors and their attorneys not use the other? This is a question no jury should have to concern
itself with.

[9] <u>Exxon Chem. Patents Inc. v. Lubrizol Corp.</u>, 64 F.3d 1553, 35 USPQ 1801, 1802 (Fed. Cir. 1995).

grouped in the category of claim elements that need no construction, and that would be subject to a general jury instruction concerning application of ordinary English usage. Similarly, this report is not to be viewed as reflecting an acceptance or endorsement by the SM of any proposed construction of either party, unless it expressly so states. Once again, if the report is silent as to a particular element, that means only that the SM is suggesting that no construction is necessary, regardless of what a party may have offered as a proposed construction.

## The Timing of the Inquiry

There is a threshold question in the claim construction analysis that requires some consideration. It is the person of ordinary skill in the field of the invention through whose eyes the claims are construed. Such person is deemed to read the words used in the patent documents with an understanding of their meaning in the field, and to have knowledge of any special meaning and usage in the field. The inventor's words that are used to describe the invention – the inventor's lexicography – must be understood and interpreted by the court as they would be understood and interpreted by a person in that field of technology. Thus the court starts the decisionmaking process by reviewing the same resources as would that person, viz., the patent specification and the prosecution history. These documents have legal as well as technological content, for they show not only the framework of the invention as viewed by the inventor, but also the issues of patentability as viewed by the patent Examiner.[10]

But this does not resolve the timing of the inquiry. An important question remains. as of what date must the court step into the shoes of the person skilled in the art? To put it another way, what is the state of knowledge, viewed chronologically, possessed by such a person when the claim construction exercise is performed? Surprisingly, the law on this seemingly

---

[10] Multiform Desiccants Inc. v. Medzam Ltd., 133 F 3d 1473, 45 USPQ2d 1429, 1432 (Fed. Cir. 1998).

fundamental point is not crystal clear. In <u>Markman</u>[11] itself, the Federal Circuit said "the focus is

on the objective test of what one of ordinary skill in the art at the time of the invention would

have understood the term to mean." But it is not clear that this was intended to define a rigid

time frame for conducting the analysis. In a more recent case the court remarked that an inventor

cannot "by later testimony change the invention and the claims from their meaning at the time

the patent was drafted and granted."[12] Even more recently, the court observed that "the literal

meaning of a claim is fixed upon its issuance."[13] In point of fact, it does not appear that the

Federal Circuit has ever squarely addressed the proper timing of the claim construction inquiry in

a context where the answer might be outcome-determinative.

It makes a certain amount of sense to use the issue date, or perhaps even the filing date, as

the chronological viewing post in determining the understanding of the hypothetical person of

ordinary skill in the art. After all, the give and take of prosecution has not taken place as of the

date of filing or date of invention. The ultimate language of the issued claims usually has not

even been formulated until some prosecution has taken place – sometimes not until late in the

prosecution. Indeed, as of the actual date of invention, claims and claim language are not part of

the picture. Certainly it would not seem unreasonable, for purposes of claim construction, to

permit the hypothetical person of skill to be regarded as possessing prior art information that

could be acquired at least during the period between actual invention and the filing of the patent

application.

---

[11] <u>Markman v. Westview Instr., Inc.,</u> 52 F.3d 967, 34 USPQ2d 1321, 1335 (Fed. Cir. 1995).

[12] <u>Voice Tech. Group Inc. v. VMC Sys. Inc.,</u> 164 F.3d 605, 49 USPQ2d 1333, 1341 (Fed. Cir. 1999). A pair of recent cases from the District of Kansas has also used the issue date as the pertinent time for determining what the claims would have meant to a person of ordinary skill in the art. <u>KCJ Corp. v. Kinetic Concepts, Inc.,</u> 30 F.Supp.2d 1319, 1323 (D. Kan. 1998); <u>Hay & Farage Indus. v. New Holland North Am. Inc.,</u> 25 F.Supp.2d 1170, 1173 (D. Kan. 1998).

[13] <u>Al-Site Corp. v. VSI Int'l Inc.,</u> --- F.3d ---, 50 USPQ2d 1161, 1168 (Fed. Cir. 1999).

Nonetheless, the SM has concluded that, given the importance of the date of invention in other assessments of the knowledge of one skilled in the art,[14] it would not be prudent to brush aside Markman's focus upon that date as mere dictum  Clearly, prosecution history is an important source of intrinsic evidence in interpreting claims because it is a contemporaneous exchange between the applicant and the Examiner.  The public has the right to rely on an applicant's remarks made in seeking allowance of claims.[15]  But the prosecution history can be given full play by simply viewing it as would a hypothetical person of ordinary skill in the art who, though reading it later, was basing an understanding of it upon knowledge of the scope and content of the prior art as it existed at the time of invention.

This conclusion, however, raises another consideration, viz.: what is the date of invention and, if it is demonstrated to precede the filing date, does that time difference matter in construing the claims?  Mycogen suggests (Mycogen's Memorandum Regarding the Date of Claim Construction, handed up during the hearing) that "it would seem prudent to resolve the proper date of invention prior to any construction of the claims in this case."  In its post-hearing memorandum, Ciba says that it "does not propose that the SM determine, as a factual matter, the actual dates of invention, such as for purposes of Section 102(g)."  Pioneer, who asserts that the invention date is the appropriate vantage point, but that the filing date may sometimes be used as an approximation, does not comment on whether the date of invention needs to be decided at this juncture.  (Pioneer's Brief Regarding the Proper Date for Evaluating Claim Construction)

---

[14] E g , Sensonics, Inc. v. Aerosonic Corp., 81 F.3d 1566, 38 USPQ 1551, 1554 (Fed. Cir. 1996) (obviousness under 35 U.S.C. §103)  But inquiries under §112 tend to focus upon the filing date.  E.g., Amgen, Inc. v. Chugai Pharm. Co., 927 F.2d 1200, 18 USPQ2d 1016, 1024 (Fed. Cir. 1991) (best mode); Vas-Cath Inc. v. Mahurkar, 935 F.2d 1555, 19 USPQ2d 1111, 1119 (Fed. Cir. 1991) (§112¶1 generally); Hybritech Inc. v. Monoclonal Antibodies, Inc., 802 F.2d 1367, 231 USPQ 81, 94 (Fed. Cir. 1986) (enablement).

[15] Desper Prods. Inc. v. Qsound Labs. Inc., 157 F.3d 1325, 48 USPQ2d 1088, 1096-97 (Fed. Cir. 1998).

DeKalb, who contends that the filing date is the only appropriate date, is likewise silent on the subject.

Clearly, the record is not sufficiently developed at this point to permit an informed and reasoned decision on the actual date of invention for the several inventions claimed in the patents in suit. Moreover, any such effort, if it involved fact-finding (which it surely must), would invade the province of the jury with respect to matters such as prior invention under 35 U.S.C §102(g) and antedating prior art under §§102(a) and (e).[16] However, Ciba points out that, during the prosecution of the Lundquist patents, the applicants submitted affidavits under Rule 131,[17] seeking to antedate certain prior art by establishing an earlier date of invention. The earliest date in question was May 1989, and the Rule 131 showing was simply directed at establishing a date of invention sometime prior to that date. Accordingly, it would seem reasonable to select, as a date upon which to assess the knowledge of one of ordinary skill in the art, the time frame just prior to May of 1989. Although no similar showing was made during prosecution of the Adams '520 patent, the technology is so similar, and the chronology so close (Lundquist originally filed in January of 1990 and Adams in April of 1990), that it is not unreasonable under the circumstances to use that date for the '520 patent as well.

The claim construction analysis in this report has been conducted, therefore, by seeking to understand what the claims would have meant to a person of ordinary skill in the art, having knowledge of the art as it existed as of May 1989.

---

[16] Priority of invention is a question of law to be determined based upon underlying factual determinations. E.g., Innovative Scuba Concepts, Inc. v. Feder Indus., Inc., 26 F.3d 1112, 31 USPQ2d 1132, 1134 (Fed. Cir. 1994).

[17] Rule 131 (37 C.F.R. §1.131) provides an ex parte mechanism whereby a patent applicant may antedate subject matter in a reference, even if the reference describes the same invention that is claimed by the applicant, provided that the same invention is not claimed in the reference when the reference is a United States patent. The disclosure in a reference United States patent does not fall under 35 U.S.C. §102(g) but under 35 U.S.C. §102(a) or (e), and thus can be antedated in accordance with Rule 131. But when the subject matter sought to be antedated is claimed in the reference patent, Rule 131 is not available and an interference must be had to determine priority. In re Zletz, 893 F.2d 319, 13 USPQ2d 1320, 1322-23 (Fed. Cir. 1989).

## The Written Description Requirement

A general observation regarding defendants' positions on some of the claim construction

questions addressed in this report seems to be in order. In several instances, they appear to be

suggesting nothing more nor less than a straightforward importation of limitations from the

specification into the claim. This is, of course, forbidden.[18] Although the specification may well

indicate that certain embodiments are preferred, particular embodiments appearing in the

specification will not be read into the claims when the claim language is broader than such

embodiments.[19] If everything in the specification were required to be read into the claims, or if

structural claims were to be limited to devices operated precisely as a specification-described

embodiment is operated, there would be no need for claims. Nor could an applicant, regardless

of the prior art, claim more broadly than that embodiment.[20]

But defendants' fundamental argument does raise concerns that may have to be addressed

outside the strict context of claim construction. What they seem truly to be suggesting is that, in

some instances, there is no support in the patent specification for the claimed invention. In other

words, the argument is that DeKalb is claiming more broadly (or even differently) than its patent

disclosures permit. This argument cannot be lightly dismissed.

The first paragraph of 35 U.S.C. §112 contains what has become known as the "written

description" requirement. This provision, which is distinct from the enablement and best mode

requirements, serves to ensure that the inventor had possession, as of the filing date of the

application, of the specific subject matter later claimed. Put another way, the applicant must

---

[18] E g. Intervet, supra note 3, 12 USPQ2d at 1476.

[19] Electro Med. Sys. S.A. v. Cooper Life Sciences, Inc., 34 F.3d 1048, 32 USPQ2d 1017, 1021 (Fed. Cir. 1994).

[20] SRI Int'l v. Matsushita Elec. Corp., 775 F.2d 1107, 227 USPQ 577, 585 (Fed. Cir. 1985)

convey with reasonable clarity to those skilled in the art that he or she was in possession of the

invention claimed.[21]

The Federal Circuit appears to be in the early stages of development of a doctrine resting

upon the principle that when the preferred embodiment is fairly described in the specification as

the invention itself, the claims are not necessarily entitled to a scope broader than that

embodiment.[22] The recent decision of the Federal Circuit in <u>Gentry Gallery, Inc. v. Berkline</u>

<u>Corp.</u>, 134 F.3d 1473, 45 USPQ2d 1498 (Fed. Cir. 1998), is the latest clear exemplar of this

doctrinal trend.[23] As the court put the matter in <u>Gentry</u>, 45 USPQ2d at 1503:

> It is a truism that a claim need not be limited to a preferred embodiment.
> However, in a given case, the scope of the right to exclude may be limited by a narrow
> disclosure. * * *
> In sum, the cases * * * do not stand for the proposition that an applicant can
> broaden his claims to the extent that they are effectively bounded only by the prior art.
> Rather, they make clear that claims may be no broader than the supporting disclosure,
> and therefore that a narrow disclosure will limit claim breadth.

At first glance, this language would seem to provide some support for defendants' position on

construction of some claim elements. But one must be careful to observe precisely what it was

that the court actually did about the perceived discrepancy between disclosure and claim in

<u>Gentry.</u> Rather than treat the matter as a claim construction issue, or even an infringement issue,

the court there analyzed it as a question of compliance with the written description requirement

of 35 U.S.C. §112¶1. And properly so, for the evaluation of claim breadth versus fullness of

disclosure has no determinative role to play in a claim construction exercise. It is of course true

that claims should be construed, where possible, to preserve their validity.[24] But it is equally true

---

[21] E.g., <u>In re Alton</u>, 76 F.3d 1168, 37 USPQ2d 1578, 1581 (Fed. Cir. 1996).

[22] See <u>Modine Mfg. Co. v. United States ITC</u>, 75 F.3d 1545, 37 USPQ2d 1609, 1612 (Fed. Cir. 1996)

[23] See also <u>Fromson v. Anitec Printing Plates Inc.</u>, 132 F.3d 1437, 45 USPQ2d 1269, 1274-75 (Fed. Cir. 1997);
<u>Vehicular Tech. Corp. v. Titan Wheel Int'l, Inc.</u>, 141 F.3d 1084, 46 USPQ2d 1257 (Fed. Cir. 1998).

[24] E.g., <u>Modine</u>, supra note 242 37 USPQ2d at 1617. Indeed, the purpose of restricting the scope of claims through
the reverse doctrine of equivalents (a doctrine somewhat akin to the one under consideration) often is to preserve the

that it is improper to attempt to avoid invalidity by importing claim limitations from narrower

claims or even from the specification.[25] The courts will not save claims by redrafting them with

extraneous limitations.[26]

That being the case, the real <u>Gentry</u> issue that may emerge here is not whether the patent

claims must be construed as limited to the materials and techniques actually disclosed, but

whether the inventors of the patents provided a written description adequate to convey to a

skilled artisan that they had possession of a broader or different invention than that.[27] Such a

question, however, is one of validity, a topic that is beyond the scope of this report.

## THE PATENT TECHNOLOGY

The technology at hand is genetic engineering. Only the most rudimentary understanding

of high-level principles of molecular biology is required in order to analyze the claim

construction issues presented in this case.

Each of the thousands of different protein molecules that characterize a complex

organism is a precise sequence of amino acids. There are approximately twenty naturally

occurring amino acids. Deoxyribonucleic acid (DNA), which contains the genetic information

for living things, is found in the chromosomes of cells. The DNA molecule is an enormous

structure built from sequential combinations of four smaller molecules (bases) linked together to

form the DNA chain. It is the sequencing of these bases along the DNA strand that encodes the

---

validity of claims with respect to their original intended scope. <u>Texas Instr., Inc. v. United States ITC,</u> 846 F.2d 1369, 6 USPQ2d 1886, 1889 (Fed. Cir. 1988).

[25] E.g., <u>Environmental Designs, Ltd. v. Unocal</u>, 713 F.2d 693, 218 USPQ 865, 871 (Fed. Cir. 1983); <u>Kalman v. Kimberly-Clark Corp.</u>, 713 F.2d 760, 218 USPQ 781, 788 (Fed. Cir. 1983).

[26] E.g., <u>Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.</u>, 868 F.2d 1251, 9 USPQ2d 1962, 1966 (Fed. Cir. 1989).

[27] In a very recent case, the Federal Circuit indicated that <u>Gentry</u> "considers the situation where the patent's disclosure makes crystal clear that a particular (i.e., narrow) understanding of a claim term is an 'essential element

genetic information required to produce a particular sequence of amino acids and, thereby, a

particular protein. Thus, a gene may be thought of as a segment of DNA that encodes for a

particular protein. Each protein performs a unique biological function and confers on the

organism the traits that distinguish it from other organisms.[28]

It may immediately be seen that it might be desirable to incorporate genetic information

encoding a protein that confers a useful or beneficial trait in one organism into another organism

that does not naturally include that gene. This has become a reality in the rapidly-advancing

field of genetic transformation. The specific aspect of that field addressed by the patents in suit

is the production of transgenic corn. The patents and the testimony of the witnesses at trial

reveal some of the significant problems faced by early researchers in the field. Taken together,

the pose the complex question: How to get the non-native or heterologous DNA into the corn and

ensure that it expresses as a heritable trait? The complex story of how these problems were

overcome, and by whom, while it may become important at the plenary trial of these cases, need

not be recounted here. The specific technology necessary to enable construction of the claims

can be described adequately by reference to the preferred techniques employed by the inventors

of the patents in suit.[29]

In general, the heterologous DNA is introduced into the target corn cells by a

microprojectile bombardment process, also referred to as a biolistic process. In this technique,

very small particles of a biologically inert material, such as tungsten or gold, are coated with the

DNA of interest. When the coated particles are accelerated toward the target cells, some

---

of [the inventor's] invention.'" <u>Johnson Worldwide Assoc. Inc. v. Zebco Corp.</u>, --- F 3d ---, 50 U S P Q 2d 1607, 1613 (Fed Cir 1999).

[28] The '520 patent defines "genotype" as the genetic complement of an organism, and "phenotype" as traits exhibited by an organism resulting from the interaction of genotype and environment. (C13L13, 31-32)

[29] It must be kept in mind, of course, that claims can be, and often are, broader than the preferred embodiment. See notes 18-27 and accompanying text, supra.

Case 1:04-cv-00305-SLR    Document 203-2    Filed 01/11/2006    Page 17 of 65

Report and Recommendat    ecial Master Regarding Claim Construction    Page 14
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

particles are able to enter the cells, releasing the DNA so that it has a chance to integrate with the native DNA. ('956 patent, C10L38-57; '520 patent, C10L24-47) Although the patents acknowledge other techniques for transferring heterologous DNA, e.g. Agrobacterium infection, electroporation, and polyethylene glycol-mediated transformation ('956 patent, C4L8-12; '520 patent, C10L13-23), all of the patents clearly identify microprojectile bombardment as the preferred technique.

As will be seen, one of the large issues of claim construction has to do with the target of the bombardment. In the preferred embodiment, a culture is initiated using immature corn embryos. These are placed, embryo axis down, in a conventional solid culture medium containing a hormone such as 2,4-D. Under appropriate conditions, the corn embryo cells begin to dedifferentiate into a proliferating mass of cells or tissue called "callus." The callus forms on an area of the upper side of the embryo called the "scutellum." The goal is to produce a friable, fast growing, embryogenic callus capable of differentiating into somatic embryos.

Once suitable callus tissue is obtained, it is subjected to the bombardment process. During this process, some cells will not receive any of the heterologous DNA, some will be destroyed by the microprojectiles, and some will be transformed. The next task is to separate, or "select" the transgenic cells or tissues for further processing. This is preferably accomplished by introducing into the target cells during transformation a "selectable marker gene" that enables selection of those target cells and tissues that also contain the heterologous DNA of interest. For example, the so-called "bar" gene (originating in Streptomyces species) encodes for phosphinothricin acetyl transferase (PAT), which inactivates the active ingredient in the herbicide bialaphos. Exposure of post-bombardment callus to the herbicide will enable separation of the successfully transformed cells from those that are unchanged. In other words,

Case 1:04-cv-00305-SLR    Document 203-2    Filed 01/11/2006    Page 18 of 65

Report and Recommendati.    .ecial Master Regarding Claim Constructio.    Page 15
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

the transgenic cells, being resistant to bialaphos, continue to proliferate, while the unchanged cells die

The final step is regeneration of the transformed cell lines into plants. Using conventional techniques, transformed callus can be regenerated into corn plants by placing it in suitable regeneration media under conditions that promote tissue differentiation and ultimate plantlet growth. The resultant plants, if they are stably transformed and fertile, can then be used in a conventional breeding program to obtain hybrid seed.

The patents provide preferred examples of heterologous DNA that can be introduced to transform corn for beneficial purposes. The '956 patent postulates a transformation scheme using a DNA sequence originating in *Bacillus thuringiensis* (BT) which encodes for an insecticidal endotoxin. The same patent also discloses the use of a gene from *E. coli* that confers resistance to the antibiotic hygromycin. The '520 teaches transformation with the bar gene to obtain PAT expression to inactivate bialaphos and other herbicides. The latter two examples illustrate the fact that a single transgene may find utility in more than one context, i.e., as a selectable marker gene in the transformation process itself, and as a gene expressing a beneficial trait, such as resistance to herbicides, in the corn plant.

The patents in suit fall into two groups. One, the so-called "Lundquist" (after one of the two joint inventors) family of patents, comprises United States Patents No. 5,484,956 (issued January 16, 1996), No. 5,538,877, and No. 5,538,880 (both issued July 23, 1996). Each of the three Lundquist patents traces its lineage back to an original Lundquist application filed January 22, 1990, and they accordingly have essentially identical specifications. The "Adams" (after the first-named of thirteen joint inventors) family includes No. 5,489,520 (issued February 6, 1996), which traces back to an original Adams application filed April 17, 1990.

In general, the '880 and '877 patents claim methods for producing fertile corn plants that contain transgenic DNA which imparts insect or herbicide resistance. The '877 patent also claims a method for producing such a plant in which the DNA includes a selectable marker or reporter gene. The '956 patent claims a fertile transgenic corn plant that contains heterologous DNA encoding BT endotoxin. The '520 patent claims a process for producing a fertile corn plant that contains transgenic DNA which includes a selectable marker gene encoding for PAT.

## DISCUSSION

Claim construction begins, as it must, with the words of the claims[30] The claims of the four patents in suit are set out in the attached Appendix. In the discussion that follows, certain claim terms or elements may be common to different claims, sometimes in different patents. It may be assumed, unless expressly stated otherwise, that the discussion applies to all occurrences of such terms or elements.

### Terms Well-Defined in the Patents

The term *Zea mays* occurs in all of the claims of the patents in suit. The Lundquist patents (e.g., '956 patent, C4L48-54) define that species of plant as corn, including field corn, popcorn, sweet corn, flint corn, and dent corn. The Adams '520 patent uses the term consistently with that definition. It is recommended that the jury be instructed that *Zea mays* means corn of all types, including but not limited to field corn, popcorn, sweet corn, flint corn, and dent corn.[31]

The claims of the '520 and '877 patent use the term "gene." Both families of patents use the word throughout as synonymous with "DNA sequence," and it is recommended that the jury be so instructed.

---

[30] Vehicular Tech. Corp. v. Titan Wheel Int'l, 141 F.3d 1084, 46 USPQ2d 1257, 1260 (Fed. Cir. 1998).

[31] It is also suggested that the jury be instructed that dependent claim 3 of the '956 patent does not change the meaning of *Zea mays*, but rather expressly narrows the kinds of corn to "field corn, popcorn, sweet corn, flint corn and dent corn." This would provide an apt illustration of claim dependency.

The word "transgenic" appears in the claims of each patent. Both families of patents make it clear that the key element underlying this term is genetic engineering. For example, the '520 patent says that the DNA sequences are 'incorporated into recipient cells by genetic engineering methods rather than classical reproduction or breeding techniques." (C3L53-56) The Lundquist patents expressly define the term "transgenic" to include "any cell, cell line, callus, tissue, plant part or plant, the genotype of which has been altered beneficially by the presence of heterologous DNA that was introduced into the genotype by a process of genetic engineering." (E.g., '956 patent, C4L55-59) "Heterologous DNA" is defined in the Lundquist patents (see, e g '956 patent, C6L30-52) as a DNA segment that is synthetic, semi-synthetic, or biologically derived, and includes non-plant genes such as those from bacteria, yeasts, animals, or viruses, as well as modified genes and portions of genes.[32] The heterologous DNA is not limited to non-plant sources, however, and can be from another *Zea mays* genotype, or even the same genotype into which it is to be introduced. The '520 patent similarly defines transgenic plants as "plants that have incorporated exogenous genes or DNA sequences, including but not limited to genes or DNA sequences which are perhaps not normally present, genes not normally transcribed and translated ('expressed') in a given cell type, or any other genes of [sic "or"] DNA sequences which one desires to introduce into the non-transformed plant, such as genes which may normally be present in the non-transformed plant but which one desires to have altered expression." (C33L40-50) Accordingly, it is recommended that the jury be instructed that, in the claims of each of the patents, a "transgenic" corn plant is one that includes a DNA sequence resulting from genetic engineering.

---

[32] The parties have raised the larger issue of the meaning of "heterologous DNA" as actually employed in the claims; this is dealt with separately later in this report.

The claims of the '520, '877, and '880 patents employ the word "comprising." It is recommended that the jury be instructed that "comprising," in the parlance of patent claims, is synonymous with "including," and does not exclude the presence of additional elements [33]

The claims of the '956 patent make reference to the R0 and R1 generations of corn plants. Although there is no dispute as the meaning of these designations, they play a large role in the construction of the term "progeny," as it is much more convenient to set out a formal construction of that term using such designations. Accordingly, it is recommended that the jury be instructed that a plant of the R0 generation is the regenerated plant; a plant of the R1 generation is a plant that has been grown from seed of the R0 plant harvested after that R0 plant has been fertilized by pollen from a different corn plant (crossed), its own pollen (self mated), or pollen of a sibling plant (sib mated); a plant of the R2 generation is one that has been grown from seed harvested from a crossed, selfed or sibbed R1 plant, etc.[34]

**Process Steps**

The claims of the '887, '880, and '520 patents are directed to processes, each comprising a number of steps. In each instance, the next step builds upon the proceeding step, in logical fashion. Thus, in this case, as in Mantech Environmental Corp. v. Hudson Environmental Serv. Inc., 152 F.3d 1368, 47 USPQ2d 1732, 1739 (Fed. Cir. 1998), the sequential nature of the claim steps is apparent from the plain meaning of the claim language and nothing in the written description suggests otherwise. It is recommended, therefore, that the jury be instructed that the

---

[33] Hewlett-Packard Co. v. Repeat-O-Type Stencil, 123 F.3d 1445, 43 USPQ2d 1650, 1655 (Fed. Cir. 1997). So, too, with the word "comprises."

[34] The Lundquist patents teach that "plants regenerated from the transformed callus are referred to as the R0 generation or R0 plants. The seeds produced by the various sexual crosses of the R0 generation plants are referred to as R1 progeny or the R1 generation. When R1 seeds are germinated, the resulting plants are also referred to as the R1 generation." (E.g., '880 patent, C11L.14-15)

process claims of the patents in suit require the method steps to be performed sequentially, in the order set forth in the claim

The independent process claims of the '520, '887, and '880 patents each contain the following language: "wherein said DNA is transmitted through a complete sexual cycle of said transgenic plant to its progeny." The independent product claim of the '956 patent is similar, except it uses the phrase "complete normal sexual cycle." Such language does not constitute a process step or limitation; rather, it defines a characteristic of the R0 plant that is the subject of the '956 claims and that is produced by the process of the independent claims of the other patents. Nor does the language in any way exclude human intervention in the reproductive process It is clear that "normal sexual cycle" referred to is the fundamental corn reproductive process whereby genetic material is passed to progeny through either pollen or egg cells. Corn breeding and hybrid seed production systems obviously involve, almost invariably, human intervention in that process, e.g., detasseling in crossing blocks to ensure cross-pollination, hand pollination, etc It is recommended that the jury be instructed that this language does not define a necessary step in the process of the independent process claims, and merely requires that the R0 plant be capable of passing the transgene to progeny through either pollen or egg cells, without or without human intervention.

## Product-by-Process[35]

The claims of the '956 patent are directed to a corn plant having heterologous DNA that encodes for BT endotoxin Each claim, however, contains a phrase that can only be described as a method limitation: "wherein said DNA is introduced into said plant by microprojectile

---

[35] This is the only topic upon which defendant NK took a position Accordingly, except for the discussion of this topic, the use of the collective term "defendants" should be understood to exclude NK, unless the context indicates otherwise.

Case 1:04-cv-00305-SLR    Document 203-2    Filed 01/11/2006    Page 23 of 65

Report and Recommendation of Special Master Regarding Claim Construction          Page 20
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

bombardment of *Zea mays* callus cells " Despite this clear language, DeKalb contends that these

claims must be construed as not limited to plants that are transformed by the biolistic technique.

Rather, it says, these claims are so-called "product-by-process" claims, and therefore must be

construed to cover the recited corn plant, no matter what technique was used to introduce the

heterologous DNA.

This contention may seem somewhat remarkable given the Federal Circuit's unswerving

adherence to the proposition that each limitation of a claim is material and essential, and that in

order for a court to find infringement, the patent owner must show the presence of every

limitation or its substantial equivalent in the accused product.[36] What DeKalb is contending –

nothing more and nothing less – is that the microprojectile bombardment language is not a

limitation at all, and may be safely ignored in deciding both infringement and validity.

DeKalb is quick to point out that there is perfectly good authority for what may seem on

the surface to be a rather strange proposition: that a claim may be – indeed, must be – read and

interpreted as though it did not contain what is some rather explicit language. For this it cites

Scripps Clinic & Res. Found. v. Genentech, Inc., 927 F.2d 1565, 18 USPQ2d 1001, 1016 (Fed.

Cir. 1991), for the statement that "the correct reading of product-by-process claims is that they

are not limited to product prepared by the process set forth in the claims." The claim in Scripps

was in the following format: "Highly purified and concentrated human or porcine VIII:C

prepared in accordance with the method of claim 1." A similar format was at issue in a case

decided the following year, Atlantic Thermoplastics Co. v. Faytex Corp., 970 F.2d 834, 23

USPQ2d 1481 (Fed. Cir. 1992): "The molded innersole produced by the method of claim 1 "

[36] E g., Lemelson v. United States, 752 F.2d 1538, 224 USPQ 524, 533 (Fed. Cir. 1985); Perkin-Elmer Corp. v. Westinghouse Elec. Corp., 822 F.2d 1529, 3 USPQ2d 1321, 1325 (Fed. Cir. 1987). See generally, Pennwalt Corp. v. Durand-Wayland, Inc., 833 F.2d 931, 4 USPQ2d 1737 (Fed. Cir. 1987)

But despite what appears to be a classical product-by-process claim in each case, the difference in outcome in the two cases is startling.

The panel decision in <u>Atlantic Thermoplastics</u> did not purport to overrule <u>Scripps.</u> Instead, it conducted a detailed analysis of Supreme Court and other precedent and concluded that "process terms in product-by-process claims serve as limitations in determining infringement." This holding, not surprisingly, provoked a request for rehearing in banc. Although the request was ultimately denied, it was not without controversy  See the dissenting opinions of Judges Nies, Rich, Lourie, and Newman, 974 F.2d 1979, 23 USPQ2d 1801, and the concurring opinion of Judge Rader, 974 F.2d 1299, 24 USPQ2d 1138.

In the present litigation the Court has already had occasion to consider the apparent conflict between <u>Scripps</u> and <u>Atlantic Thermoplastics</u>  Defendant NK moved, in Civil Action No. 96 C 50169, for summary judgment of noninfringement of the '956 patent on the ground that it employed a substantially different process to transfer heterologous DNA. Instead of using microprojectile bombardment, according to NK, it uses passive protoplast uptake. DeKalb responded by pointing out that, under <u>Scripps,</u> NK should not be able to escape liability simply because its used a different technique for gene transfer. In a Memorandum Opinion and Order dated August 14, 1997, this Court found that there was a direct conflict between the panel decisions in <u>Scripps</u> and <u>Atlantic Thermoplastics.</u> Applying the Federal Circuit's conflict rule,[37] this Court honored the <u>Scripps</u> rule  That led to a denial of NK's summary judgment motion.

---

[37] The Federal Circuit has adopted the rule that prior decisions of a panel of the court are binding precedent on subsequent panels unless and until overturned in banc. Where there is direct conflict, the precedental decision is the first. E.g., <u>Newell Cos. v. Kenney Mfg. Co.</u>, 864 F.2d 757, 9 USPQ2d 1417, 1423 (Fed. Cir. 1988)  The <u>Atlantic Thermoplastics</u> panel apparently felt that it had found a way around the in banc rule, noting that a "decision that fails to consider Supreme Court precedent does not control if the court determines that the prior panel would have reached a different conclusion if it had considered controlling precedent." 23 USPQ at 1485n.2. However, as pointed out in one of the dissents from the denial of rehearing, 23 USPQ at 1816, that "merely states a reason why <u>Scripps</u> was wrongly decided with respect to the product-by-process issue."

The SM does not recommend that the Court revisit its resolution of the <u>Scripps/Atlantic</u>

<u>Thermoplastics</u> dilemma  If the direct conflict rule has meaning, it would seem to obligate bench

and bar to follow <u>Scripps</u> until the Federal Circuit tells us otherwise.  But that does not mean that

the claims of the '956 patent are to be construed as though the words "wherein said DNA is

introduced into said plant by microprojectile bombardment of *Zea mays* callus cells" were

missing.  Let us look again at the <u>Scripps</u> rule: "the correct reading of product-by-process claims

is that they are not limited to product prepared by the process set forth in the claims "  The

question immediately arises, are the claims of the '956 patent product-by-process claims?  The

answer to that question resolves the matter of claim construction.

That a process limitation appears in a claim does not convert it to a product-by-process

claim.[38]  It appears that in connection with NK's motion for summary judgment, the parties

simply treated independent claim 1 as a product-by-process claim, without controversy.[39]  But

that does not alone resolve the matter, in view of the obligation of a court to construe claims

independent of the views of the adversary parties[40]

The precedent of the Federal Circuit itself does not provide much direct guidance on the

matter, with the exception of Judge Newman's opinion dissenting from the denial of rehearing in

banc in <u>Atlantic Thermoplastics.</u>  In that opinion, reported at 974 F.2d 1979, 23 USPQ 1801,

1802-1816, she does an exhaustive analysis of the cases, and concludes that true product-by-

process claims are those in which the product cannot be properly defined and discriminated from

---

[38] <u>Fromson v. Advance Offset Plate, Inc.,</u> 720 F.2d 1565, 219 USPQ 1137, 1141 (Fed. Cir. 1983).

[39] In the Court's Memorandum Opinion and Order, p.3n.2, the Court said "The parties here both treat claim 1 of the '956 patent as a product-by-process claim rather than a pure product or a pure process claim.  The court has no reason to question that assessment."

[40] See note 9. supra. and accompanying text.

prior art otherwise than by reference to the process of producing it. This is in contrast to a product claim that merely includes a process limitation.

The claims of the '956 patent yield quite readily to such an approach. Without the language reciting microprojectile bombardment, claim 1 parses out, rather simply, to (1) a fertile R0 corn plant that (2) contains the BT gene, wherein (3) the BT gene expresses to confer insect resistance, while (4) that expression is not present in a plant not containing the gene, and (5) wherein the gene can be transmitted to the R1 generation through a complete normal sexual cycle of the plant. This provides a complete and adequate definition of the product – a corn plant – regardless of the process by which the BT gene is introduced. It also adequately discriminates from the prior art described in the '956 patent. As the patent recites it, prior attempts to produce transgenic corn were characterized by failure in several respects. Although certain types of corn cells had been successfully transformed, the resulting cells "either could not be regenerated into corn plants or the corn plants produced were sterile." (C2L6-7) On the other hand, although certain types of corn cells had been regenerated to produce fertile plants, no stable transformation of such cells had been achieved. (C2L11-17)

The product limitations of claim 1 address each of these alleged shortcomings of the prior art – regenerability, fertility, and stability – and thus differentiate the claimed corn plant over prior corn plants. The limitation of a "fertile transgenic *Zea mays* plant of the R0 generation" requires that the plant be one that was regenerated and is fertile. The requirement that the gene be "transmitted through a complete normal sexual cycle of the R0 plant to the R1 generation" addresses both fertility and stability. And the limitation that the gene be "expressed so that the plant exhibits resistance to an insect, wherein said expression is not present in said plant not containing" the gene, likewise addresses stability. The further recital of microprojectile

bombardment is not necessary to complete this definition and differentiation. A corn plant

having the product characteristics of claim 1 would be distinguishable from the prior art

described in the patent whether the BT gene had been introduced by microprojectile

bombardment or some other technique. Thus, the '956 claims are not product-by-product claims

and do not fall within the very limited exception – ostensibly embraced by <u>Scripps</u> – to the

elementary patent law rule that every limitation in a patent claim is material.[41]

Nonetheless, even if by some stretch the '956 claims could be regarded as subject to the

<u>Scripps</u> ruling, the prosecution history reveals ample basis for construing the claims as they are

written. During prosecution the Examiner rejected the pending claims on grounds of lack of

enablement. (SM163)[42] The Examiner's position was that the specification enabled only biolistic

transformation. In an amendment, application claim 25 was added, with a limitation to the

biolistic process. (SM177) The Examiner continued to reject all claims except 25 for lack of

enablement. (SM211) In a final office action (SM275), the Examiner maintained the rejection of

all claims but claim 25 on the grounds of lack of enablement, and indicated that claim 25 would

be allowable if rewritten in independent form. The Examiner's comments are illuminating

(SM276):

> * * * Note that at page 2 of the previous Office Action the Examiner indicated
> that the rejection was based on the lack of enablement (i e , a section 112, first paragraph
> rejection) for plant produced by a process other than that disclosed, that is to maize plants
> produced by the biolistic process. This process, and only this process, is evidenced by
> available art to overcome prior art attempts to produce the claimed invention.
> Furthermore evidence existed in the art that transgenic plants produced by prior art
> processes are essentially different. The fact that the biolistic process appears to be
> essential to overcome plant sterility and/or chromosome integration and heritability of a
> transgene only provides guidance to the practitioner in the art as to how to apply the
> exemplified process to produce the claimed invention. While the recitation of limitations
> in product claims to fertile transgenic plants in which the transgene is both

---

[41] E g , <u>Glaxo, Inc. v. Novopharm, Ltd.,</u> 110 F 3d 1562, 42 USPQ2d 1257, 1261 (Fed. Cir. 1997).

[42] The prosecution histories of the patents in suit, as submitted by the parties, have been sequentially numbered with the prefix SM followed by the page number.

Case 1:04-cv-00305-SLR    Document 203-2    Filed 01/11/2006    Page 28 of 65

Report and Recommendation of Special Master Regarding Claim Construction          Page 25
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

chromosomally integrated and heritable may overcome rejections based on 35 USC § 102 or 103, neither novelty nor obviousness are considerations under section 112, first paragraph. Accordingly, as Applicants have failed to rebut the Examiner's evidence that the process is essential to the claimed product the rejection is still warranted and is maintained.

What the Examiner was telling the applicants here is quite clear. He was pointing out that, while

the product limitations of the claims might well be sufficient to distinguish over the prior art (for

purposes of novelty and nonobviousness), the lack of a recital of microprojectile bombardment

(in all claims save claim 25) meant that the specification was not sufficient to enable the practice

of those claims, inasmuch as it disclosed only microprojectile bombardment in an enabling

fashion. Indeed, what the Examiner was actually doing here was attempting to avoid the very

patentability/validity problem that the Federal Circuit was addressing in the Gentry case [43] In his

view, based upon the evidence that he had before him, the biolistic process was "essential to the

claimed product," and the written description did not adequately support broader claims than

that.

The applicants responded by amending the claims so that all of them recited

microprojectile bombardment. (SM285) Their comments to the Examiner in this respect are

revealing:

This amendment is in accord with the amendment which the Examiner indicated would overcome the 35 U.S.C. §112(1) rejection based on the alleged failure of the specification to enable claims other than those directed to "genetically engineered plants produced via biolistic transformation" in the Office Action dated November 30, 1990. As amended, claim 1 is enabled by the specification, since it is directed to those fertile transgenic Zea mays plants which are produced by microprojectile bombardment, or "biolistics." (SM286)

Here, they were telling the world that the addition of the microprojectile bombardment limitation

was to obviate the nonenablement rejection. They went on to argue vigorously that the properties

---

[43] See notes 18-27. supra. and accompanying text.

Case 1:04-cv-00305-SLR    Document 203-2    Filed 01/11/2006    Page 29 of 65

Report and Recommendation ... Special Master Regarding Claim Construction          Page 26
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

of the transgenic plant, as recited in the claims, distinguished over the prior art even without the

biolistic process limitation. They complained that it "is well settled that it is improper to require

an Applicant to insert process limitations into a product claim <u>unless</u> the compositional features

which distinguish the product from the art cannot otherwise be recited in the claim." (SM287;

emphasis present) They even cited <u>Scripps</u> for the proposition that they were entitled to a

product claim that would encompass transgenic corn plants produced by microprojectile

bombardment, as well as by "any other process achieving the same result." (SM288) But in the

end, they conceded:

> Nonetheless, in order to advance the prosecution of the present application, claim 1 has been amended to recite that the recited transgenic <u>Zea mays</u> plant is one which is produced by microprojectile bombardment.
> Therefore, it is respectfully submitted that the amended claims are fully in accord with 35 U.S.C. §112, and withdrawal of this rejection is respectfully requested. (SM289)

Here, they were clearly telling the world that, although they believed they might be entitled to a

product claim that covered transgenic corn regardless of the transformation mechanism, they

were no longer pursuing such a claim in this application.

In his Reasons for Allowance of the '956 patent, the Examiner stated that the "invention

is drawn to fertile transgenic *Zea mays* plants comprising heterologous DNA encoding *Bacillus*

*thuringiensis (Bt)* endotoxin which was produced by the process of microprojectile bombardment

of *Zea mays* callus cells followed by plant regeneration." (SM510) As was their right, the

applicants filed comments on the reasons for allowance (SM527), stating that the claims were

"intended to cover any fertile, transgenic R0 *Zea mays* plants comprising a Bt toxin gene that is

prepared by transformation with heterologous DNA, whether it be by microprojectile

bombardment or some other transformation methodology." The process language concerning

microprojectile bombardment was said to have been introduced "simply as a means of addressing

any possible §101 "Product of Nature" concerns, in order to demonstrate that the claimed plant is

a product of man rather than a product of nature." Finally, they flatly stated that their intention is

"that this language not be construed as limited to plants prepared by microprojectile

bombardment," citing Scripps.

These self-serving statements represent nothing more than a belated, afterthought attempt

to patch up a position that simply will not hold water. First, and most importantly, the applicants

had made their intention clear in the amendment after final rejection (SM285) when they

acquiesced in the Examiner's §112 rejection by amending the claims. If they intended to seek a

product claim without the biolistic limitation, they should have done it at that point. The

suggestion that they could insert the process language to escape a rejection of the claims, and

then later be permitted to escape the limitation that the language establishes, offends every adult

notion of fair play. The public is entitled to rely upon what a patent applicant actually does with

the claims during prosecution, rather than be bound by what that applicant later says its

intentions were.[44] A patent applicant cannot disclose and claim an invention narrowly and then,

in the course of an infringement suit, argue effectively that the claims should be construed to

cover that which is neither described nor enabled in the patent.[45]

Moreover, the reason asserted in the comments for having added the biolistic language –

to avoid a possible "product of nature" problem, simply does not ring true. As previously

indicated, a "transgenic" corn plant is one that includes a DNA sequence resulting from genetic

engineering. This would seem more than adequate to identify the claimed plant as a product of

---

[44] The prosecution history limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance. Standard Oil Co. v. American Cyanamid Co., 774 F.2d 448, 227 USPQ 293, 296 (Fed. Cir. 1985). The relevant inquiry is whether a competitor would reasonably believe that the applicant had surrendered the particular subject matter. Cybor Corp. v. FAS Tech., Inc., 138 F.2d 1448, 46 USPQ2d 1169, 1175 (Fed. Cir. 1998).
[45] North Am. Vaccine Inc. v. American Cyanamid Co., 7 F.3d 1571, 28 USPQ2d 1333, 1337 (Fed. Cir. 1993).

Case 1:04-cv-00305-SLR    Document 203-2    Filed 01/11/2006    Page 31 of 65

Report and Recommendation ... Special Master Regarding Claim Construction          Page 28
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

man as opposed to a product of nature. And if not, it would have been a simple matter to insert a

limitation to genetic engineering, or some other definition that would have excluded a product of

nature and not limited the transformation technique to biolistic processes. It also bears noting

that, at the time the microprojectile bombardment limitation was added to the claims, there was

no outstanding rejection based upon product of nature concerns.

Finally, consideration should be given to the rule that claims should be construed, where

possible, to preserve their validity.[46] DeKalb cautions that this rule should not be accorded too

broad a sweep. It argues that if claims were always to be construed to preserve validity, a court

could never determine that a claim was invalid. But no case suggests that the rule be taken to

that extreme. Indeed, the Federal Circuit has made it clear that it is improper to attempt to avoid

invalidity by importing claim limitations from narrower claims or even from the specification.[47]

The courts will not save claims by redrafting them with extraneous limitations.[48] However, the

application of the rule in the present case does not involve importing a limitation – just the

opposite. The concern is that, were the microprojectile bombardment limitation to be read out of

the '956 claims, the very invalidity defense of enablement that the Examiner felt was cured by

the addition of that limitation would be back in play. Giving effect to the limitation to avoid that

problem is a far cry from importing an extraneous limitation into the claim. It amounts to nothing

more than honoring the express language of the claim so as to avoid invalidity.[49]

---

[46] E.g., Modine, supra note 20, 37 USPQ2d at 1617.

[47] E.g., Environmental Designs, Ltd. v. Unocal, 713 F.2d 693, 218 USPQ 865, 871 (Fed. Cir. 1983); Kalman v. Kimberly-Clark Corp., 713 F.2d 760, 218 USPQ 781, 788 (Fed. Cir. 1983).

[48] E.g., Corning Glass Works v. Sumitomo Elec. U.S.A., Inc., 868 F.2d 1251, 9 USPQ2d 1962, 1966 (Fed. Cir. 1989).

[49] If a claim is susceptible to a broader and a narrower meaning, and the narrower one is clearly supported by the intrinsic evidence while the broader one raises questions of enablement, the narrower of the two should prevail. Digital Biometrics, Inc. v. Identix, Inc., 149 F.3d 1335, 47 USPQ2d 1418, 1424 (Fed. Cir. 1998).

It is recommended that the jury be instructed that the claims of the '956 patent are not infringed unless the accused plant was produced using microprojectile bombardment or its substantial equivalent.

## Target of the Microprojectile Bombardment

As already indicated, the microprojectile bombardment limitation of the product claims of the '956 patent cannot be ignored  Each of the process claims of the remaining three patents contains a step calling for bombardment with DNA-coated microprojectiles  The question at hand here is, what is the target of this biolistic process?

In claiming the target, each patent defines it a little differently:

> '520 patent – "a regenerable culture from a *Zea mays* plant"

> '880 patent – "intact regenerable *Zea mays* cells"

> '956 patent – "*Zea mays* callus cells"

> '877 patent – "regenerable embryogenic callus culture from a *Zea mays* plant"

In the '520 and '877 patents, the first step of the claims calls for "establishing" the culture, which is then transformed by bombardment  The '956 and '880 patent claims respectively call for bombardment of "callus" cells and "intact regenerable" cells, without any preceding establishment step.

All of the patents make it clear that the preferred target of the bombardment is a so-called Type II callus, which is defined in the '520 patent as a "friable, fast growing embryogenic callus " (C13L1)  What the parties hotly dispute is whether the claims must be construed to require that the target of the bombardment be a Type II callus.

In arguing their side of the question, the defendants rely heavily upon the prosecution histories of the patents, and rightly so, for this undisputed public record of proceedings in the

Case 1:04-cv-00305-SLR    Document 203-2    Filed 01/11/2006    Page 33 of 65

Report and Recommendation ... Special Master Regarding Claim Construction                    Page 30
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

PTO is of primary significance in understanding the claims   Markman, supra, 34 USPQ2d at

1330  However, although the prosecution history can and should be used to understand the

language used in the claims, it cannot enlarge, diminish, or vary the limitations in the claims.

Id.  Only where an applicant, through statements made during prosecution, may commit to a

particular meaning for a patent term is that meaning then binding in litigation.[50]

        In relying on the prosecution histories of the patents, defendants have tended not to

discriminate the prosecution of one patent from another  Instead, they have tended to point to

transactions in the prosecution of one patent as supporting their proposed construction of the

claims of another  This is dangerous.  The Federal Circuit recently explored this problem in

Abtox Inc. v. Exitron Corp., 122 F 3d 1019, 43 USPQ2d 1545, 1551, opinion modified at 46

USPQ2d 1735 (Fed  Cir. 1997)  The teaching of Abtox is that, while it may be permissible to

rely upon statements made during prosecution of other patents in a chain of related applications,

it is important to confine the statements to their proper context in terms of the claims actually

being prosecuted there.[51]  That is the methodology employed in this report  Thus, only if

statements made during prosecution of, say, the '877 patent are directly relevant, by reason of

identity or close similarity in the terms actually used in the claims, are those statements

considered in connection with construction of the claims of, say, the '880 patent.

        Establishing a regenerable embryogenic callus culture.  The '877 claims call out the step

of "establishing a regenerable embryogenic callus culture" to be transformed by bombardment  A

"callus" is defined in the '520 patent (C12L63) as a "proliferating mass of cells or tissue in vitro,"

and no party seems to take issue with that definition as a general proposition.  Certainly the term

---

[50] CVI/Beta Ventures, Inc. v. Tura LP, 112 F 3d 1146, 42 USPQ2d 1577, 1585 (Fed  Cir. 1997)
[51] Sextant Avionique, S.A. v. Analog Devices Inc., ---F 3d ---, 49 USPQ2d 1865 (Fed  Cir. 1999) is not to the
contrary

Case 1:04-cv-00305-SLR    Document 203-2    Filed 01/11/2006    Page 34 of 65

Report and Recommendation ... Special Master Regarding Claim Construction                Page 31
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

is used throughout the Lundquist patents consistently with that definition, although the emphasis

is on a particular type of callus, namely Type II. But the '877 patent goes on to say that:

> Although successful transformation and regeneration has been accomplished herein with
> friable, embryogenic callus, this is not meant to imply that other transformable
> regenerable cells, tissue, or organs cannot be employed to produce the fertile transgenic
> plants of this invention. The only actual requirement for the cells which are transformed
> is that after transformation they must be capable of regeneration of a plant containing the
> heterologous DNA following the particular selection or screening procedure actually used.
> (C5L55-63; emphasis added)

DeKalb's position is that this statement establishes the only essential condition on the target, i.e.,

the transformed cells must after transformation be capable of regeneration of a plant containing

the transgene. Thus, if the claim calls for "callus cells," those callus cells must exhibit that

property. Using this approach, the term "callus cells" would be construed to mean a proliferating

mass of cells or tissue in a culture medium that comprises cells which are regenerable at some

point after transformation.

The defendants contend that this language requires a Type II callus as the target, or at

least a callus culture that contains cells that can be regenerated at the time of transformation, and

excludes immature embryos. In addition, they assert special significance for the term

"establishing." Ciba says establishing means:

> culturing the cells to a state where they are a regenerable embryogenic callus meeting the
> test set out in the '877 patent at col. 5, l. 17-21. "Establishing" should be given its
> ordinary meaning of making stable or permanent and does not mean initiating. The
> clause should be construed as having a regenerable embryogenic callus culture in hand.

Mycogen argues that it means:

> initiating a regenerable callus culture, e.g., from an immature embryo, propagating the
> culture, and maintaining it through subculture to provide a target for biolistic
> transformation * * *

Pioneer's contention is somewhat more convoluted:

> Pioneer agrees with DeKalb's interpretation of "establishing," as "placing corn material in
> culture conditions that will allow a callus to develop." However, Pioneer maintains that
> **the callus culture must be established prior to the bombardment step,** and
> accordingly the bombardment of immature embryos that have been placed on callus
> induction media does not fall within the scope of the claims.

For its part, DeKalb says that this language refers to taking any corn cells, tissues or organs

which are capable of forming somatic embryos and regenerating a plant, placing them on or in

callus initiation medium, and beginning cellular division.

An attempt to restate the contentions of the parties in understandable fashion seems in

order here. DeKalb is urging that the claim language requires only that corn cells, which (1)

have the capacity to form somatic embryos and (2) are capable of regeneration at some time after

transformation, be (3) placed on callus initiation media, so that (4) cellular division begins prior

to bombardment. The defendants contend that the language requires more. They urge that the

language means that the target, at the time of bombardment, must be something that a person of

ordinary skill in the art would recognize as (1) a callus culture, not just immature embryos, and

(2) comprising cells that are, at the time of bombardment, regenerable.

With this restatement as a focus, it becomes possible to analyze the differences between

the positions of the parties. They are definitely at odds on the matter of whether the target cells

must be regenerable at the time of bombardment. Defendants contend, as Mycogen puts it, that

the cells of the culture must have "a present capacity to give rise to regenerated plants." This

restrictive definition must be understood for what it is: an undisguised effort to limit the claims

of the '877 patent to the target disclosed in the examples described in the specification.

Inasmuch as neither the actual language of the claims nor the import of the specification taken as

a whole compels such a construction,[52] justification for such a limitation must be found, if at all,

---

[52] Indeed, the language quoted above in the text, from column 6, lines 18-27 of the '956 patent, teaches just the
contrary. that the invention is not limited to Type II callus.

in the prosecution history  Thus, the question is whether prosecution history compels a

construction that requires that the intact corn cells be regenerable at the time of bombardment,

contrary to the statement in the patent that "the only actual requirement for the cells which are

transformed is that after transformation they must be capable of regeneration of a plant."

(Emphasis added.)

The SM has been directed to no transaction in the '877 prosecution history that would

even support this construction, much less compel it.[53] Only if the phrase "regenerable embryonic

callus culture" were to be construed as limited to Type II callus would this result obtain.

The parties seem agreed that "embryogenic" means material that can form somatic

embryos  Thus the remaining crucial point of difference between the parties is the meaning of

the phrase "establishing a * * * callus culture."  Again, defendants' position is not compelled by

either the claim language or the specification  The prosecution history, however, does provide

some support.

During the prosecution of the '877 patent, the Examiner rejected the claims over the Klein

Bio/Technology publication  (SM662)  In response, the applicants pointed out that in Klein

"callus is not mentioned as a possible target in this paragraph, which clearly refers to the use of

intact embryos as targets.  In contrast to this methodology, Applicants' claim recites that friable

embryogenic callus cultures were bombarded."  (SM674)  In a later response, the applicants

again distinguished Klein on the ground that it identified the scutellum of cultured immature

embryos as the bombardment target.  (SM770-71)  DeKalb concedes (at page 15 of its post-

hearing brief) that "regenerable friable embryogenic callus culture" (which was indeed the

---

[53] As will be seen below, the Klein reference was distinguished on the basis that the transformation target was
scutellum of immature embryos, not callus (SM674, 713, 770-71), rather than on any argument that the pending
claims required the target cells to be regenerable at the time of bombardment.

language in the claims being prosecuted at that time) refers to a Type II callus culture. But it also points out that the term "friable" was later removed from the claims.

It may well be that the elimination of the word "friable" would negate the conclusion that the phrase "regenerable embryogenic callus culture" is limited to Type II callus, but the fact remains that the applicants were telling the PTO, and the world, that the target of the bombardment step was different from the scutella of immature embryos that were apparently bombarded in Klein. Thus, the phrase must be interpreted to require a different target than Klein used. At the same time, it must be understood that these statements in no way constitute an unequivocal concession that the claims are limited to a transformation target of Type II callus or exclude immature embryos from the definition of "callus." What the statements say is that bombarding the scutellum of cultured immature embryos is distinguishable from bombarding callus cells that can be regenerated after transformation. But this simply tees up a fundamental infringement issue and not a claim construction issue. The infringement issue is the factual question of whether bombardment of whatever the defendants may have bombarded amounts to bombardment of a "callus culture." If the target was merely the scutellum of cultured immature embryos, then the construction of the claims prohibits a finding of infringement. It seems reasonable to expect that at trial there may be any amount of expert technical testimony, pro and con, on the question of whether the particular scutella that served as the target did not already comprise a "callus culture" as that term is used in the claims, or whether it was the same as the target disclosed in Klein.

Adding the word "establishing" to the mix does not alter this construction. Plain English and logic tells us that one cannot have a "callus culture" to bombard until it has been established to some extent. Merely setting up the conditions under which callus initiation can take place

does not, at that instant, produce a "callus culture." On the other hand, it may produce a callus culture very quickly. Again, expert testimony will undoubtedly be forthcoming at trial on this question. But the jury needs no instruction on the meaning of the word "establishing." It is used in the claims in its ordinary meaning.

Accordingly, it is recommended that the jury be instructed that "regenerable embryogenic callus culture" means that the target of the bombardment step must be a proliferating mass of embryogenic cells or tissue in a culture medium, and that the mass must comprise cells or tissue which are regenerable after transformation, and must not be merely the immature embryo scutellum that was used as a target in the Klein reference.

Callus cells. The '956 patent claims require bombardment of "callus cells." Ciba contends that "callus cells" should be interpreted to exclude immature embryos placed on callus initiation medium. Pioneer and Mycogen agree, and Mycogen offers a positive definition as well, i.e., "cells in a regenerable callus culture that has been propagated and maintained through subculture, the cells of the culture having a present capacity to give rise to regenerated plants." DeKalb urges that the term means "cells which form when any corn cell, tissue or organ has been placed on or in callus initiation medium and cellular division has begun." Although it concedes that regeneration is implied in the claims (post-hearing brief, p.11), it again argues that there is no basis in the specification or prosecution history for any construction that the callus cells must be capable of regenerating a corn plant either before or immediately after bombardment. The same language quoted above in connection with the '877 patent also appears in the '956 patent (C6L18-27) and also supports DeKalb's position on both counts. The prosecution history, however, reveals the same set of transactions with respect to the Klein reference.

During the prosecution of the '956 patent, the Examiner rejected the claims over Klein.

(SM170) In response, the applicants pointed out that Klein contained a "suggestion to transform

scutellum and then to generate callus from the transformed cells" and "not a suggestion that

callus of any sort should be the target of biolistic transformation." (SM189) In a later response,

the applicants again distinguished Klein on the ground that it identified the scutellum of cultured

immature embryos as the bombardment target. (SM249-51) Once again, these statements in no

way constitute an unequivocal concession that the claims are limited to a transformation target of

Type II callus or exclude immature embryos from the definition of "callus." But what the

statements do say is that bombarding the scutellum of cultured immature embryos is

distinguishable from bombarding callus cells that can be regenerated after transformation. The

applicants clearly differentiated the callus cells that are the subject of the bombardment in the

'956 claims from the scutellum of immature embryos that was the Klein bombardment target.

It is therefore recommended that the jury be instructed that "callus cells" means a

proliferating mass of cells in a culture medium, and that the mass must comprise cells which are

regenerable after transformation, and must not be merely the immature embryo scutellum that

was used as a target in the Klein reference.

Intact regenerable cells. The '880 claims call for bombardment of "intact regenerable *Zea*

*mays* cells." Here the term "callus" is not used. The defendants assert that this language must be

construed essentially identically to the construct they contended for the '956 patent, i.e., cells that

have a present capacity to give rise to regenerated plants, to the exclusion of cells of an immature

embryo. DeKalb again urges, as it did for the '956 patent, that the term means any corn cells that

are capable of being regenerated into a mature corn plant at the time regeneration is initiated.

Again, the language at column 6, lines 10-18 of the '880 patent, tends to support DeKalb's

proposed construction

The prosecution of the '880 patent is similar to the '956 and '877 in this respect. The

applicants argued that the Klein reference was distinguishable because it taught bombardment of

scutellum rather than callus. (SM1038) This is not pertinent to the issue at hand, because the

claims of the '880 patent do not require callus. They simply require corn cells that are

"regenerable." Beyond question, it is clear that in the preferred embodiment described in the

Lundquist patents, the target was a Type II callus comprising cells that were regenerable at the

time of bombardment. But the patents make it clear that this was not required, and nothing in the

prosecution history demonstrates that the applicants committed to a different meaning for the

term "regenerable."

Again, there may be complex infringement issues generated by the term "regenerable."

But these are questions of infringement, not claim construction. It is recommended that the jury

be instructed that "intact regenerable *Zea mays* cells," as the target of bombardment in the '880

claims, means corn cells that, after transformation, must be capable of regeneration of a plant

containing the transgene.

Establishing a regenerable culture. The teaching of the '520 patent, like that of the

Lundquist patents, is that the invention is not limited to the use of Type II callus. It contains the

following statement (C9L56-67):

> Other recipient cell targets include, but are not limited to, meristem cells, Type I and II
> calli and gametic cells such as microspores and pollen. Pollen, as well as its precursor
> cells, microspores, may be capable of functioning as recipient cells for genetic
> transformation, or as vectors to carry foreign DNA for incorporation during fertilization.
> Direct pollen transformation would obviate the need for cell culture. Meristematic cells
> (i.e. plant cells capable of continual cell division and characterized by an undifferentiated
> cytological appearance, normally found at growing points or tissues in plants such as root
> tips, stem apices, lateral buds, etc.) may represent another type of recipient plant cell.

The '520 claims recite the steps of "establishing a regenerable culture" and then transforming the culture by bombarding it  The defendants argue for essentially the same construction as the other patents  Pioneer neatly summarizes its position, in the context of this claim language, as an immature embryo "is not a culture "  DeKalb asserts that the language means any corn cell, tissue or organ which is capable of regenerating into a mature plant and has been grown or is growing on or in a culture medium  The plain language of the claims and the specification of the '520 patent are consistent with DeKalb's position.

Moreover, nothing in the prosecution history of either the '520 patent or its parent application compels a contrary construction  Although the Klein reference was cited in a rejection against the parent, there was no effort to distinguish the pending claims on the basis of either "regenerable" or "culture."  Klein was not made the basis for a rejection in the '520 prosecution.

It is recommended that the jury be instructed that "regenerable culture" means that the transformation target in the second step of the '520 claims is any corn cell, tissue or organ that is capable of regenerating into a mature plant and has been grown or is growing on or in a culture medium  As with the '877 patent, the jury needs no instruction as to the word "establishing "

**Meaning of the Term "Progeny"**

All claims of the patents in suit employ the word "progeny," except for the '956 patent, which uses the term only in dependent claim 6  The parties hotly contest the meaning of the word as used in the claims  DeKalb construes progeny to mean any and all generations of

descendants from a transgenic plant  Basically, defendants argue that the term refers to the

immediate offspring of a particular sexual cross of the transformed plant.[54]

Neither the claims nor the specification provide any real support for defendants' position

The logical, grammatical construction of the claim language itself is that, unless used in a

specifically different context (see discussion of '880 claims below), "progeny" can refer to any

generation but R0, and is certainly not limited to R1  The specifications do not alter this

conclusion  Often, when the term is used, it is apparent that the reference is to the R1 generation,

but that is because the experiments exemplified in the patents had only been carried to the R1

generation  At other times, however, it is clear that the usage of the word is much broader  For

example, the Lundquist patents state:

> The present invention is directed to the production of fertile transgenic plants and
> seeds of the species *Zea mays* and to the plants, plant tissues, and seeds derived from
> such transgenic plants, as well as the subsequent progeny and products derived therefrom.
> (E.g., '956 patent, C4L48-52)

Similarly, in the Adams '520 patent:

> Furthermore, it would be of particular significance to provide novel approaches to
> monocot transformation, such as transformation of maize cells, which would allow for
> the production of stably transformed, fertile corn plants and progeny into which desired
> exogenous genes have been introduced  (C3L14-19)

---

[54] Claim scope is determined without regard for the accused product or process  E.g., Young Dental Mfg. Co. v. Q3
Special Prods., Inc., 112 F.3d 1137, 42 USPQ2d 1589, 1592 (Fed. Cir. 1997)  Nonetheless, one might wonder what
the fuss is about  As Ciba points out, under defendants' proposed construction of "progeny," "DeKalb could
preclude anyone from making R0 and R1 plants with the claimed methods – and therefore any new plant products –
during the patent term." (Post-Markman Hearing Memorandum, p. 10)  Apparently, however, some of the accused
activity involves descendants of R0 plants that pre-date the patents' issuance  This circumstance may present a nice
question of infringement, but it does not invoke claim construction  As the Federal Circuit took pains to point out in
SRI, supra note 20, 227 USPQ at 583, "claims are not construed 'to cover' or 'not to cover' the accused device  That
procedure would make infringement a matter of judicial whim  It is only after the claims have been construed
without reference to the accused device that the claims, as so construed, are applied to the accused device to
determine infringement." (Emphasis present.)

This varied use of a term in the written description demonstrates its breadth rather than providing

a limited definition.[55]

More importantly, it is clear from the patents that there was no intention to limit the

invention to plants of the R1 generation. Indeed, the intent was expressed to the contrary. The

Lundquist patents expressed it this way:

> Fertile, transgenic plants may then be used in a conventional maize breeding
> program in order to incorporate the introduced heterologous DNA into the desire lines or
> varieties. Conventional breeding programs employ a conversion process (backcrossing).
> Methods and references for convergent improvement of corn are given by Hallauer et al.,
> (1988) incorporated herein by reference. Briefly, conversion is performed by crossing
> the initial transgenic fertile plant to normal elite inbred lines. The progeny from this
> cross will segregate such that some of the plants will carry the heterologous DNA
> whereas some will not. The plants that do carry the DNA are then crossed again to the
> normal plant resulting in progeny which segregate once more. This backcrossing process
> is repeated until the original normal parent has been converted to a line containing the
> heterologous DNA and also possessing all other important attributes originally found in
> the parent. Generally, this will require about 6-8 generations. A separate backcrossing
> program will be generally used for every elite line that is to be converted to a genetically
> engineered elite line. (E.g., '956 patent, C13L43-62; emphasis added)

There is no mistaking the import of this passage. The intention is to incorporate the transgene

into hybrid corn lines through a conventional breeding program, a process that will take several

generations. That message is also clear in the '520 patent, which hypothesizes that "the

development of these and other techniques for the preparation of stable genetically transformed

monocots such as maize could potentially revolutionize approaches to monocot breeding."

(C3L22-25) These statements are clearly inconsistent with any limitation of the claim scope to

only two or three generations. As DeKalb correctly summarized the matter (Post-Markman

Hearing Brief, pp 34-35):

> Defendants have asserted that under DEKALB's construction of "progeny" as
> meaning any and all generations of descendants, it would never be possible to
> demonstrate that the claimed subject matter was enabled, since there would always be
> future generations of progeny to which transmission of the foreign gene had not yet been

---

[55] Johnson Worldwide Assoc. v. Zebco Corp., supra note 27, 50 USPQ2d at 1611.

demonstrated. Such an argument is unrealistic. No patentee would limit claims to transgenic plants of potential commercial value to a single generation of transformant. No matter how a claim is worded, any language that was not limited to a single generation of descendent must have a scope similar to DEKALB's construction of progeny. Defendants' argument implies that a patentee could never draft a valid claim covering more than one generation of descendant, or alternatively must wait for many years after production of the R0 transformant to file a patent application which demonstrated transmission to as many generations of descendants as were claimed. This would present an insurmountable barrier to any patents directed to production of transgenic progeny.

Accordingly, if defendants' restrictive interpretation is to rule, it must be mandated by some clear and unequivocal transaction in the prosecution histories.

During prosecution of the '880 patent, the Examiner rejected application claims 33 and 35 as indefinite on the grounds that they were substantial duplicates of claim 31. (SM10-52) These claims correspond to claims 5(31), 7(33), and 9(35) of the '880 patent. In response, the applicants pointed out that the claims were not duplicative, in that claim 31 results in an R1 progeny, claim 33 an R2 progeny, and claim 35 an R3 (SM1055) Defendants seize upon this transaction as representing a concession on the part of the applicants that the claims were <u>limited</u> <u>to</u> those generations. This, in the opinion of the SM, is not a fair assessment of the transaction. It is much more likely that a person of ordinary skill in the art, having read and understood the '880 patent, and having gained an appreciation that the intent of the applicants was to establish a transgenic line through a conventional breeding program, would have reached a different conclusion. Such a person would, in the opinion of the SM, have understood that the applicants were merely pointing out how the claims <u>differed</u>, rather than attempting to define their complete scope. The differences were correctly noted: claim 33 did not cover R1 and claim 35 did not cover R1 and R2. But to transmute that showing into a concession that claim 31 covered <u>only</u> R1 and claim 33 <u>only</u> R2 and claim 35 <u>only</u> R3, is more than the language or circumstances can support.

Pioneer points out that, in claim 5 of the '956 patent, an R1 plant is said to be "derived

from" the R0 plant. It argues from this that claim 6, which recites a progeny plant "derived from

the plant of claim 5," must likewise be limited to the R2 generation. But claim 6, unlike claim 5,

does not expressly call out an R2 plant. Indeed, unless the phrase "derived from" is narrowly

interpreted to cover only a single generation derivation, this claim structure supports DeKalb's

interpretation of progeny. But "derived from" cannot be read that narrowly. During the '956

prosecution, application claim 16 as originally filed was "The R1 and subsequent generations

derived from the plant of claim 1." (SM74) This clearly supports a broader reading of "derived

from." Later, new claims 36 and 37 were submitted as corresponding to claim 16, and the term

"progeny" was used in place of "subsequent generations." This transaction provides strong

support for DeKalb's position that progeny means the R1 and subsequent generations.

Pioneer also argues that, under this interpretation of "progeny," claims 4-9 and 13-18 of

the '880 patent are "non-sensical and duplicative." It argues that there "would be no need for

claims 5-9 and 11[sic:14]-18 if progeny covered all generations." (Post-*Markman* Hearing Brief,

p. 11) This argument seems to misapprehend the fundamental purpose of multiple claims,

particularly dependent claims that successively narrow the claimed invention. For example, a

necessarily narrower dependent claim may be valid when the broader claim from which it

depends is not.[56] Thus there might very well be a "need" for narrower claims, and patent

applicants routinely – almost invariably – submit and pursue such claim programs. Moreover,

claims are not presumed to have an identical scope merely because they can cover the same

accused product or process. As the Federal Circuit explained in <u>Tandon Corp. v. United States</u>

<u>ITC,</u> 831 F.2d 1017, 4 USPQ2d 1283, 1288 (Fed. Cir. 1987):

---

[56] <u>Wahpeton Canvas Co. v. Frontier Inc.,</u> 870 F.2d 1546, 10 USPQ2d 1201, 1207n.10 (Fed. Cir. 1989).

Case 1:04-cv-00305-SLR    Document 203-2    Filed 01/11/2006    Page 46 of 65

Report and Recommendation of Special Master Regarding Claim Construction    Page 43
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

There is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims. To the extent that the absence of such difference in meaning and scope would make a claim superfluous, the doctrine of claim differentiation states the presumption that the difference between claims is significant. D.M.I., 755 F.2d at 1574, 225 USPQ at 239; Autogiro, 384 F.2d at 404, 155 USPQ at 708. At the same time, practice has long recognized that "claims may be multiplied . . . to define the metes and bounds of the invention in a variety of different ways." Bourns, Inc. v. United States, 537 F.2d 486, 492 (Ct. Cl. 1976), 187 USPQ 174, 178 (Ct. Cl. 1975), aff'd per curiam, 199 USPQ 256 (Ct. Cl. 1976). Thus two claims which read differently can cover the same subject matter.

There is no doubt that claims 4-9 and 13-18 are of differing scope, even employing the proper definition of progeny. However, in view of the apparent misunderstanding, at least on the part of one defendant, it may be that the Court will wish to consider instructing the jury on exactly how the dependency and interrelationship of these claims is to be sorted out. To that end, the following analysis of claims 4-9 could provide the framework for such an instruction (claims 13-18 mirror 4-9 and would be read the same way).

> Claim 4 covers the R1 and succeeding generations, no matter how they are obtained from the R0 plant of claim 1

> Claim 5 covers the R1 and succeeding generations, which must be obtained by crossing the R0 plant of claim 1 with an inbred line

> Claim 6 covers the same plants as claim 4 except for R1 plants

> Claim 7 covers a plant obtained by back crossing a plant covered by claim 5 with the inbred line used in claim 5 and thus does not cover R1 plants

> Claim 8 covers the same plants as claim 4 except for R1 and R2 plants

> Claim 9 covers a plant obtained by back crossing a plant covered by claim 7 with the inbred line used in claim 5 and thus does not cover R1 or R2 plants

It is recommended that the jury be instructed that, in all other occurrences of the term "progeny" in the claims of the patents in suit, it means the R1 and succeeding generations.

### Insect or Herbicide Resistance

The claims of the Lundquist patents all require, in one fashion or another, that the heterologous DNA confer herbicide resistance or insect resistance to the regenerated plant or its progeny. Ciba and Pioneer take issue with DeKalb's construction of these terms.

Herbicide resistance. Independent claim 1 of the '877 patent requires that the R0 plant be capable of imparting herbicide resistance to its progeny. So, too, with independent claim 1 of the '880 patent. The dependent claims of that patent that address the production of progeny then require that characteristic to be expressed in the progeny plants.

Ciba and Pioneer urge that "herbicide resistance" be construed to mean (1) resistance at the plant level rather than the cellular level, and (2) resistance to chemicals sold to farmers for weed control at the concentrations and levels of application in which they are used to kill whole plants (Ciba) or applied at real-world levels under field conditions (Pioneer). DeKalb's position is that herbicide resistance is phenotypic trait of a transgenic corn plant which allows the cells of the plant to survive or grow in the presence of a herbicide which could kill or stunt the growth of nontransgenic plant cells; any herbicide will do, and field conditions are not required.

In the opinion of the SM, the claim language is clear and unambiguous, and nothing in the patent specifications or prosecution histories limits the construction that it should receive. The claims plainly do not require that the herbicide be a chemical that is sold to farmers for that purpose, nor do they require that it resistance to the herbicide be assessed under field conditions. These conclusions are confirmed by the statement in the Lundquist patents that the "transgenic plants may have many uses in research or breeding." (E.g., '877 patent, C11L62-63)

The claims also plainly require that progeny corn plants (and not merely the callus cells from which they were derived) exhibit the trait in question, but they do not exclude evaluation of

this condition by assessment at some level other than a whole plant growing in the field or greenhouse. Indeed, various techniques were employed in the Lundquist patents for evaluating the presence of the hygromycin resistance trait in R0 and R1 plants: direct testing by Southern blot in both R0 and R1, and root elongation bioassay and etiolated leaf bioassay for R1. (E.g., '880 patent, C17L39-C18L57) None of these involved application of a herbicide at "real-world levels under field conditions."

Defendants argue that the claims must exclude antibiotics such as hygromycin because they are not chemicals sold to farmers for herbicidal use. But this argument allows no room for the fact that the '880 and '877 patents also disclose and claim transformation with selectable marker genes, such as the "hygromycin B phosphotransferase (HTP) coding sequence, which may be derived from *E. coli*." (E.g., '877 patent, C6L54-56) Claim 4 of the '877 patent specifies that the heterologous DNA includes a selectable marker gene and claim 5 requires that the claim 4 gene impart herbicide resistance to the R0 plant. This claim program supports the conclusion that claim 1 would be satisfied by transformation with a selectable marker gene that imparts herbicide resistance. The examples described in the specification are all concerned with hygromycin resistance gene transformations.

The prosecution histories support the conclusion that antibiotics, such as hygromycin, that exhibit herbicidal activity, are among the agents contemplated by the term "herbicidal resistance." During the prosecution of the '956 patent (which does not claim herbicidal resistance), the applicants asserted (SM137) that the term "herbicide resistance" is art-recognized, and referred to a list of herbicides in the specification (C9L20) that included methotrexate, a metabolic inhibitor that was characterized as a human drug by defendants' expert, Dr Goodman (Tr. 1035) In the prosecution of the '877 patent, the Examiner at one point

indicated that "it may be nothing more than a matter of semantics as to whether hygromycin can be considered a herbicide," although he was troubled by the lack of evidence that the expression of hygromycin, as taught in the specification, would satisfy the limitation of herbicide resistance in a corn plant (SM724) In his reasons for allowing the patent, however, the Examiner concluded that the hygromycin example in the patent, and the "general discussion of art known and available DNA sequences, including herbicide resistance as a type of selectable or screenable marker, provides a sufficient written description of whole plants produced by the claimed process " (SM858) In the prosecution of the '520 patent, the same Examiner remarked that the '877 application was directed to expression of the hygromycin gene "which similarly confers herbicide resistance to the plants and the progeny produced of that methodology " (SM1332) In short, the prosecution histories support the conclusion that "herbicide" is not limited to chemicals sold to farmers as herbicides, but simply means agents that exhibit herbicidal activity against corn cells.

Resistance is required, however. Neither the claims nor the specification specify how much resistance is required, and it is clear that the term is used qualitatively. It is logical to conclude that more resistance is required, when evaluated against the same herbicidal agent in the same context (be it as a selectable marker gene or an agriculturally beneficial characteristic of a corn plant growing in a farmer's field), than the same plant without the transgene. It is recommended that the jury be instructed that "herbicide resistance" means that the plant has more resistance to an agent having herbicidal activity, when applied to plant material, than the same plant that does not have the transgene under the same conditions of application and plant material

Insect resistance. The claims of the '956 patent specify a R0 plant containing DNA

encoding BT endotoxin, wherein the DNA "is expressed so that the plant exhibits resistance to

an insect and wherein said expression is not present in said plant not containing" the DNA. This

language, by its very terms, requires that the R0 plant, which is required to be fertile and

transgenic, exhibit the phenotypic characteristic of insect resistance. The claims of the other

Lundquist patents are somewhat different. Independent claim 6 of the '877 patent requires only

that the R0 plant be capable of imparting insect resistance to its progeny. So, too, with

independent claim 10 of the '880 patent. Again, the dependent claims of that patent that address

the production of progeny require that characteristic to be expressed in the progeny plants.

Ciba and Pioneer urge that "insect resistance" be construed to mean (1) resistance at the

plant level rather than the cellular level, and (2) resistance to insect pests of corn rather than just

any insect. Pioneer goes further and argues that the plants must "kill actual corn pests, namely,

the European corn borer, under field conditions." DeKalb's position is that any insect will do,

and that field conditions are not required; that the term requires insect resistance to be assessed

when insects consume cells of the plant.

Again, the claim language is clear and unambiguous, and nothing in the patent

specifications or prosecution histories impacts the construction that it should receive. The claims

plainly require that corn plants exhibit the trait in question, not just callus cells from which the

plants were derived. The claims just as plainly do not require that the insect be a European corn

borer, or any other generally recognized corn pest. Nor do they require assessment of resistance

under field conditions. The latter conclusions are confirmed by the statement in the Lundquist

patents that the "transgenic plants produced herein are expected to be useful for a variety of

commercial and research purposes." (E.g., '956 patent, C14L18-19)

Case 1:04-cv-00305-SLR    Document 203-2    Filed 01/11/2006    Page 51 of 65

Report and Recommenda⌐ a of Special Master Regarding Claim Constr⌐ction    Page 48
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

What the claims do require, however, is "resistance," and although the claims,

specifications, and prosecution histories do not require insect death, there must be some

benchmark against which to assess that trait. Again, the most logical construct is to compare the

transgenic plant with the same plant that does not contain the heterologous DNA. Accordingly,

it is recommended that the jury be instructed that "insect resistance" means that the plant has

more resistance to an insect, when the insect consumes or otherwise attacks plant material, than

the same plant that does not have the transgene, under the same conditions.

## Heterologous DNA Encoding BT Endotoxin

The claims of the '956 patent call for the use of "heterologous DNA encoding *Bacillus*

*thuringiensis* endotoxin. Pioneer contends that this language is limited to a native BT gene from

one of the 40,000+ strains of *Bacillus thuringiensis*. It says that the language cannot be read to

cover plants containing DNA that is chemically manipulated,[57] truncated, or shortened, or DNA

that merely encodes fragments of the full-length, native BT endotoxin.

This suggested construction is not supported by the intrinsic evidence. To the contrary,

the '956 specification makes it clear that heterologous DNA encompasses "synthetic, semi-

synthetic, or biologically derived DNA," including "modified genes" and "portions of genes."

(C6L45-52) Moreover, the claim language itself does not require native DNA from *Bacillus*

*thuringiensis*, but rather <u>any DNA that encodes BT endotoxin</u>. Reading the claim as a whole, in

light of the specification, compels the conclusion that BT endotoxin means a protein that a

person of ordinary skill in the art would recognize as a BT endotoxin, in terms of substantial

---

[57] For example, so-called "codon-optimized" DNA, which involves the rewriting of the DNA sequence of a gene derived from a foreign source, such as a bacterium, so that it can be better utilized by the cellular machinery of the recipient plant. (Tr. 914-16)

similarity both of structure and of insecticidal activity.[58]   The prosecution history does not

contain any transactions that would tend to contradict this interpretation.

It is recommended that the jury be instructed that "heterologous DNA encoding *Bacillus*

*thuringiensis* endotoxin" means any DNA that encodes for an endotoxin that a person of ordinary

skill in the art would recognize as a BT endotoxin, in terms of substantial similarity both of

structure and of insecticidal activity.

## Said DNA

All of the patent claims use the phrases "said DNA" or "said heterologous DNA" where

appropriate to refer to further plant characteristics or process steps. Pioneer urges that this

phraseology be construed to require that any progeny plant must contain the identical DNA

sequence originally used in the bombardment process or found in the R0 transformant. DeKalb

argues that this restrictive interpretation would not allow for any structural or sequential changes

caused by the DNA insertion process or by natural processes occurring within the cell.

Again, Pioneer's interpretation appears to be at odds with the patent specifications. The

'520 patent discloses the possibility of changes in structure or sequence following bombardment

and chromosomal integration, noting that "intact sequences will not always be present,

presumably due to rearrangement or deletion of sequences in the cell." (C12L50-52) The '956

patent similarly explains that the foreign gene is not present in the callus as the intact or

nonchromosomal plasmid used to bombard the callus (C20L12-14) and that Southern blot

technology indicated either incomplete digestion or that multiple rearranged copies were present

(C25L48-49).

---

[58] It is clear that identity of structure and function is not required with respect to the endotoxin. The fact that the specification teaches that modified genes and portions of genes may be used allows for the possibility of differences in the encoded protein.

Pioneer argues (Opening Brief, p. 54) that the patents "do not enable or provide a written description for a method in which the heterologous DNA in a transgenic progeny plant is modified or changed during the breeding process." If this is so, then Pioneer may have identified a <u>Gentry</u> issue,[59] or some other issue, that could provide a defense under 35 U.S.C. §112¶1. But that argument does not compel Pioneer's suggested claim construction. The patents make it clear that an important goal is to incorporate the beneficial transgene into a breeding program, and if the gene is altered by natural processes during that program, that result is certainly contemplated by the patents. The key requirement is that a person of ordinary skill in the art be able to recognize the genetic material for what it originally was. If so much alteration or modification has occurred that this is no longer possible, then there will, at that stage, no longer be literal infringement. It is recommended that the jury be instructed that "said DNA" refers to the DNA that was inserted into the transformed cells, even if altered by the insertion process or by later natural processes, so long as a person of ordinary skill can recognize it as the inserted DNA.

**Chromosomal Integration**

The claims of the Adams '520 patent require that the transgene be "chromosomally integrated." Pioneer contends that this limitation should be read into the Lundquist patents as well. (Opening Brief, pp. 72-82) As best the SM can understand this argument, it addresses a pure <u>Gentry</u> issue[60] rather than one of claim construction. If Pioneer can establish that the Lundquist patents teach chromosomal integration as an essential element of the invention there disclosed, it may have identified a problem concerning the adequacy of the written description for claims that are not so limited. But it still will not have justified an interpretation of the claims that would supply that missing element.

---

[59] See notes 18-27, supra, and accompanying text.
[60] Id.

**Report and Recommend**_ _ **of Special Master Regarding Claim Const**_ _**tion**          **Page 51**
**Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)**

Respectfully submitted,

Robert L. Harmon

Special Master

# APPENDIX

## Claims of U.S. Patent 5,484,956 (issued to Lundquist *et al.*)

1. A fertile transgenic *Zea mays* plant of the R0 generation containing heterologous DNA encoding *Bacillus thuringiensis* endotoxin, wherein said DNA is expressed so that the plant exhibits resistance to an insect, wherein said expression is not present in said plant not containing said DNA, and wherein said DNA is transmitted through a complete normal sexual cycle of the R0 plant to the R1 generation, and wherein said DNA is introduced into said plant by microprojectile bombardment of *Zea mays* callus cells.

2. The transgenic plant of claim 1 wherein said DNA comprises a promoter.

3. The transgenic plant of claim 1 which is selected from the group consisting of field corn, popcorn, sweet corn, flint corn and dent corn.

4. A seed produced by the transgenic plant of claim 1 which comprises a replication of said heterologous DNA.

5. An R1 transgenic *Zea mays* plant derived from the plant of claim 1 wherein said R1 plant expresses said heterologous DNA so that the R1 plant exhibits said phenotypic characteristics.

6. A progeny transgenic *Zea mays* plant derived from the plant of claim 5 wherein said progeny plant expresses said heterologous DNA so that the progeny plant exhibits said phenotypic characteristics.

## Claims of U.S. Patent 5,538,877 (issued to Lundquist *et al.*)

1    A process for producing a fertile transgenic *Zea mays* plant comprising the steps of (i) establishing a regenerable embryogenic callus culture from a *Zea mays* plant to be transformed, (ii) transforming said culture by bombarding it with DNA-coated microprojectiles, (iii) identifying or selecting a transformed cell line, and (iv) regenerating a fertile transgenic *Zea mays* plant therefrom, wherein said DNA is transmitted through a complete sexual cycle of said transgenic plant to its progeny and imparts herbicide resistance thereto

2.    The process of claim 1 wherein the callus culture subjected to bombardment is in clumps of about 30 to 80 mg per clump.

3.    The process of claim 1 wherein said callus is initiated on solid media.

4.    The process of claim 1 wherein the DNA comprises a selectable marker gene or a reporter gene.

5.    The process of claim 4 wherein said selectable marker gene imparts herbicide resistance to said fertile transgenic *Zea mays* plant.

6.    A process for producing a fertile transgenic *Zea mays* plant comprising the steps of (i) establishing a regenerable embryonic callus culture from a *Zea mays* plant to be transformed, (ii) transforming said culture by bombarding it with DNA-coated microprojectiles, (iii) identifying or selecting a transformed cell line, and (iv) regenerating a fertile transgenic *Zea mays* plant therefrom, wherein said DNA is transmitted through a complete sexual cycle of said transgenic plant to its progeny, and imparts insect resistance thereto

7.    The process of claim 6 wherein the callus culture subjected to bombardment is in clumps of about 30 to 80 mg per clump

8.    The process of claim 7 wherein said callus is initiated on solid media.

9.    The process of claim 6 wherein the DNA comprises a selectable marker gene or a reporter gene

10. The process of claim 9 wherein said selectable marker gene imparts herbicide resistance to fertile transgenic *Zea mays* plant.

## Claims of U.S. Patent 5,538,880 (issued to Lundquist *et al.*)

1. A process for producing a fertile transgenic *Zea mays* plant comprising the steps of (i) bombarding intact regenerable *Zea mays* cells with DNA-coated microprojectiles, (ii) identifying or selecting a population of transformed cells, and (iii) regenerating a fertile transgenic plant therefrom, wherein said DNA is transmitted through a complete sexual cycle of said transgenic plant to its progeny, and imparts herbicide resistance thereto.

2. The process of claim 1 wherein the fertile transgenic *Zea mays* plant is regenerated from transformed embryogenic tissue.

3. The process of claim 1 wherein the cells are derived from immature embryos.

4. A process comprising obtaining progeny from a fertile transgenic plant obtained by the process of claim 1 which comprise said DNA.

5. The process of claim 4 wherein said progeny are obtained by crossing said fertile transgenic plant with an inbred line.

6. The process of claim 4 comprising obtaining seed from said progeny and obtaining further progeny plants comprising said DNA from said seed.

7. The process of claim 5 wherein the progeny obtained are crossed back to the inbred line, to obtain further progeny which comprise said DNA.

8. The process of claim 6 wherein seeds are obtained from said further progeny plants and plants comprising said DNA are recovered from said seed.

9. The process of claim 7 wherein said further progeny are crossed back to the inbred line to obtain progeny which comprise said DNA.

10. A process for producing a fertile transgenic *Zea mays* plant comprising the steps of (i) bombarding intact regenerable *Zea mays* cells with DNA-coated microprojectiles, (ii) identifying or selecting a population of transformed cells, and (iii) regenerating a fertile transgenic plant therefrom, wherein said DNA is transmitted through a complete sexual cycle of said transgenic plant to its progeny, wherein the DNA imparts insect resistance thereto.

11. The process of claim 10 wherein the fertile transgenic *Zea mays* plant is regenerated from transformed embryogenic tissue.

12. The process of claim 10 wherein the cells are derived from immature embryos.

13. A process comprising obtaining progeny from a fertile transgenic plant obtained by the process of claim 10, which comprise said DNA.

14. The process of claim 13 wherein said progeny are obtained by crossing said fertile transgenic plant with an inbred line.

15. The process of claim 13 comprising obtaining seed from said progeny and obtaining further progeny plants comprising said DNA from said seed

16. The process of claim 14 wherein said progeny obtained are crossed back to the inbred line, to obtain further progeny which comprise said DNA.

17. The process of claim 15 wherein seeds are obtained from said further progeny plants and plants comprising said DNA are recovered from said seed.

18. The process of claim 16 wherein said further progeny are crossed back to the inbred line to obtain progeny which comprise said DNA.

## Claims of U.S. Patent 5,489,520 (issued to Adams *et al.*)

1. A process for producing a fertile transgenic *Zea mays* plant comprising the steps of (i) establishing a regenerable culture from a *Zea mays* plant to be transformed, (ii) transforming said culture by bombarding it with DNA-coated microprojectiles, wherein said DNA comprises a selectable marker gene encoding for phosphinothricin acetyl transferase, (iii) identifying or selecting a transformed cell line and (iv) regenerating a fertile transgenic *Zea mays* plant therefrom, wherein said DNA is transmitted through a complete sexual cycle of said transgenic plant to its progeny, wherein said progeny comprises said selectable marker gene encoding phosphinothricin acetyl transferase, and wherein said gene is chromosomally integrated

2. The method of claim 1, wherein the gene encoding phosphinothricin acetyl transferase is the bar gene of *Streptomyces hygroscopicus*.

3. The method of claim 1, wherein the gene encoding phosphinothricin acetyl transferase is the bar gene of *Streptomyces viridochromogenes*.

4. The method of claim 1, further comprising obtaining progeny of said fertile, transgenic *Zea mays* plant, wherein said progeny is a fertile, transgenic *Zea mays* plant that comprises the gene encoding for phosphinothricin acetyl transferase.

5. The method of claim 4, further comprising breeding said progeny with a non-transgenic maize plant, to prepare a fertile, transgenic *Zea mays* plant that comprises the gene encoding for phosphinothricin acetyl transferase.

6. The method of claim 4, further comprising breeding said progeny with a second transgenic maize plant to prepare a fertile, transgenic *Zea mays* plant that comprises the gene encoding for phosphinothricin acetyl transferase.

7. The method of any one of claims 1 through 6, further comprising preparing seed from one or more fertile, transgenic *Zea mays* plants that comprises the gene encoding for phosphinothricin acetyl transferase, wherein said seed contains the gene encoding for phosphinothricin acetyl transferase.

8. The method of claim 7, further comprising cultivating said seed to prepare a fertile, transgenic *Zea mays* plant that comprises the gene encoding for phosphinothricin acetyl transferase

# EXHIBIT 2

**EXHIBIT 2**

**'880 PATENT TERMS CONSTRUED BY THE ILLINOIS COURT**

1.    "comprising" means including, and does not exclude the presence of additional elements. [Illinois Order at 18]

2.    "*Zea mays*" means corn of all types, including but not limited to field corn, popcorn, sweet corn, flint corn, and dent corn. [Illinois Order at 16]

3.    "intact regenerable *Zea mays* cells" means corn cells that, after transformation, must be capable of regeneration of a plant containing the transgene. [Illinois Order at 36-37]

4.    "transgenic" means a corn plant that includes a DNA sequence resulting from genetic engineering. [Illinois Order at 17]

5.    "said DNA" in claim 1 refers to the DNA that was inserted into the transformed cells, even if altered by the insertion process or by later natural processes, so long as a person of ordinary skill can recognize it as the inserted DNA. [Illinois Order at 49-50]

6.    "wherein said DNA is transmitted through a complete sexual cycle of said transgenic plant to its progeny" in claim 1 of the '880 patent does not define a necessary step of the claimed process, and merely requires that the R0 plant be capable of passing the transgene to progeny through either pollen or egg cells, with or without human intervention. [Illinois Order at 19]

7.    "herbicide resistance" means the plant has more resistance to an agent having herbicidal activity, when applied to plant material, than the same plant that does not have the transgene under the same conditions of application and plant material, and is not limited to resistance to agents used as commercial herbicides. [Illinois Order at 44-46]

8.    "progeny" means the R1 and succeeding generations. Thus,

    Claim 4 covers the R1 and succeeding generations, no matter how they are obtained form the R0 plant of claim 1.

Claim 5 covers the R1 and succeeding generations, which must be obtained by crossing the R0 plant of claim 1 with an inbred line.

Claim 6 covers the same plants as claim 4 except for R1 plants.

Claim 7 covers a plant obtained by back crossing a plant covered by claim 5 with the inbred line used in claim 5 and thus does not cover R1 plants.

Clam 8 covers the same plants as claim 4 except for R1 and R2 plants.

Claim 9 covers a plant obtained by back crossing a plant covered by claim 7 with the inbred line used in claim 5 and thus does not cover R1 or R2 plants.

[Illinois Order at 38-43]

# EXHIBIT 3

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

FILED

᠃ H    2 2003

U. S. DISTRICT COURT
EASTERN ᠃᠃ ᠃᠃  OF ᠃

| | |
|---|---|
| MONSANTO COMPANY, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | )    Case No. 4:01CV1825  CDP |
| | ) |
| BAYER CROPSCIENCE LP, | ) |
| | ) |
| Defendant. | ) |

## CLAIMS CONSTRUCTION ORDER

Having considered the parties' filings and heard their arguments, and for the

reasons stated in open court,

**IT IS HEREBY ORDERED** that the disputed terms, as used in the claims

at issue, are construed as follows:

The term "chimeric gene" means a gene that is comprised of parts that do

not occur together in nature.

The term "chimeric plant gene" means a chimeric gene that is expressible in

a plant.

The term "chloroplast transit peptide" means a naturally occurring series of

amino acids that causes the transport of a polypeptide into a chloroplast.

The term "chloroplast transit peptide/5-enolpyrulvylshikimate-3-phosphate

synthase [EPSPS] fusion polypeptide" means a polypeptide that has at least two



parts, which must include a chloroplast transit peptide (as defined above) joined to an EPSPS, where the chloroplast transit peptide and EPSPS are not found together in nature.

The term "permits the fusion polypeptide to be imported into a chloroplast of a plant cell" means the function of a chloroplast transit peptide (as defined above).

These definitions apply to the use of these terms each time they appear in each of the claims at issue, and will be incorporated into the jury instructions.

**IT IS FURTHER ORDERED** that a telephone conference will be held with all counsel on **Friday, August 1, 2003** at **11:00 a.m.** to discuss any modifications to the Case Management Order in this case necessitated by my granting the parties' request to delay resolution of these issues. Counsel for Bayer is responsible for placing the call and assuring that all necessary counsel are included, and I expect counsel to confer in advance and attempt to reach agreement on any proposed modifications.

CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 2nd day of July, 2003.

- 2 -