# EXHIBIT 4

1               IN THE UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF MISSOURI

3

4

   MONSANTO COMPANY,

5

            Plaintiff,

6
                                        No. 4:01-CV-1825 CDP
        vs.

7

   BAYER CROPSCIENCE LP,

8

            Defendant.

9

   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

10
   PRESENT:    The Honorable Catherine D. Perry, Presiding

11
   ATTORNEYS FOR PLAINTIFF: John F. Lynch, Susan K. Knoll, Steven

12 G. Spears and Joseph P. Conran

13 ATTORNEYS FOR DEFENDANT: George Pazuniak, Francis DiGiovanni
   and John H. Quinn, III

14

15

16

17

18
                        Markman Hearing

19                     July 1 and 2, 2003

20

21

22

23                  TERI HANOLD HOPWOOD
                   Registered Merit Reporter
24              Thomas F. Eagleton Courthouse
            111 South Tenth Street, Room 3.348
25               St. Louis, Missouri  63102

1   July 2, 2003

2           THE COURT:  We're here in the case of Monsanto

3   Corporation versus Bayer Cropscience LP, 01-CV-1825.  The

4   first thing we're going to do is I'm going to ask Ms. Kirkland

5   to hand you all each a copy of this order, and the other

6   copies can be for Josh and Teri.  This is my order construing

7   the claims, and I'm passing this out, and it regards the

8   disputed terms as framed by the parties' statements of

9   disputed issues, their briefs and their arguments.  What I am

10  stating orally now are my reasons for those decisions, and

11  there will not be any additional written opinion.

12          As you can see from the order we have just handed you,

13  I did not accept entirely or reject entirely either party's

14  arguments, although I suspect one party will be happier with

15  my order than the other one.

16          In reaching my decision, I am mindful of the claim

17  construction rules that have been handed down by the Federal

18  Circuit, and I'll sort of briefly cite what those are so you

19  know I paid attention to them.

20          Claim construction is a matter of law.  The Court must

21  look first to the intrinsic evidence of the record, that is

22  the claims language most importantly, additionally the

23  specification and the prosecution history, if it's in

24  evidence, as it is in this case.  Intrinsic evidence is the

25  most significant source of the legally-operative meaning of

1   the disputed claim language.  The appropriate starting point

2   is always the language of the claim itself, and the words of

3   the claim are generally given their ordinary and customary

4   meaning, and I believe I have done that here.

5        There are cases where a patentee may act as his or her

6   own lexicographer and assign a special definition to a word so

7   long as that definition is clearly stated in the patent

8   specification or in the prosecution history.

9        The Federal Circuit has held that it's appropriate for

10  courts to consult dictionaries to determine ordinary and

11  customary meanings of disputed claims terms, as those sources

12  are considered unbiased reflections of common understanding.

13  Other sorts of extrinsic evidence is generally not to be

14  consulted if the intrinsic evidence is unequivocal, but the

15  Federal Circuit has held that it is entirely appropriate for a

16  Court to consult trustworthy extrinsic evidence to ensure that

17  the claims construction is not inconsistent with clearly

18  expressed -- the plainly apposite and widely-held

19  understanding in the pertinent technical field.

20        I have applied these rules to my decisions here today,

21  and although yesterday I did hear testimony from the parties'

22  expert witnesses, I am considering that testimony as nothing

23  more than arguments of lawyers on the legal issues presented,

24  along, of course, with the necessary technical explanation of

25  the basic science at issue in this case.

1        I note particularly that the scientists did not
2   disagree at all with one another when they were discussing
3   science.  Their only disagreement is when they became
4   advocates and tried to help or not help the lawyers, so I give
5   that sort of testimony the weight it deserves and consider it
6   as part of the argument, not as extrinsic evidence.

7        The science of the invention is not disputed, and was
8   received as background so I could understand the disputes.  I
9   will add that I do appreciate the basic science lessons, both
10  those delivered yesterday, which were quite helpful, and those
11  in the briefs.  I needed it, and I think that both parties'
12  submissions were very helpful on the scientific issues.

13       There was one issue, however, the import issue, that I
14  actually didn't understand the dispute until I heard the
15  presentations and saw the animations yesterday, so that
16  presentation certainly helped, although one party may now
17  regret teaching me that issue, and on that issue the science
18  was not disputed, I don't believe, either, in any way that
19  affects the decision.

20       My reasons for the specific rulings are as follows:
21  The first term at issue was "chimeric plant gene," and the
22  order contains two paragraphs as the parties had because the
23  term is actually used in some claims as "chimeric gene" and in
24  others as "chimeric plant gene."  The definition I have
25  adopted is, "The term chimeric gene means a gene that is

1  comprised of parts that do not occur together in nature," and

2  the term "chimeric plant gene" means a "chimeric gene that is

3  expressible in a plant."

4      I'll point out that this construction contains a

5  grammatical error, since we all know that under the rules of

6  grammar, the whole comprises the parts and is not comprised of

7  the parts, but you all agreed on this grammatical error and

8  agreed that this was the proper definition so far as it went,

9  so I'm sticking with it because you both asked for it.

10      Now the parties' submissions did show some disagreement

11  as to the term "chimeric plant gene," but this disagreement

12  was really minor.  Monsanto argued that I should add a

13  sentence stating that the gene in Claim 1 is chimeric because

14  the promoter is heterologous with respect to the coding

15  sequence, and although this is a correct statement of fact as

16  far as it goes, it is not a proper statement to include in the

17  claim construction as a matter of law.  It is not a proper

18  limitation on the term "chimeric plant gene" because the gene

19  in Claim 1 could be chimeric for other reasons as well.

20      Additionally, the last clause of Claim 1 states,"the

21  promoter being heterologous with respect to the coding

22  sequence," and if I defined "chimeric plant gene" to include

23  this statement, it would make that portion of the claim

24  language redundant.

25      The parties' briefs also revealed a dispute about

1    whether the term should be "expressible" versus "expressed,"
2    but the arguments yesterday also revealed that this was not a
3    serious dispute, and in any event, I agree with Bayer that it
4    makes sense not to speak in the past tense with something
5    intended to be part of a living and reproducing organism, and
6    so "expressible" seemed appropriate to me.

7         The second issue was "chloroplast transit peptide," and
8    I have ruled that the term "chloroplast transit peptide" means
9    "a naturally occurring series of amino acids that causes the
10   transport of a polypeptide into a chloroplast."  As it turns
11   out, I believe that this term presented the hardest issue and
12   is the closest call.  I have accepted Bayer's argument that
13   the CTP must be naturally occurring because I believe, reading
14   the claim language and the patent as a whole, and giving due
15   consideration to the prosecution history, that at the time of
16   this invention, a chloroplast transit peptide under the
17   widely-held understanding in the pertinent technical field,
18   meant something found to naturally occur in a plant, or as I
19   understand it, in green algae, since they also have
20   chloroplasts, but naturally occurring is appropriate.

21        The references in the patent specification to sources
22   for CTP all point to plants or naturally occurring substances,
23   not to synthetic substances.  At the time of this patent
24   application, the state of the knowledge of CTPs was such that
25   I do not believe that the patent contemplated that this term

1   would include anything that might ever be invented that would

2   function like a CTP.  The language of the patent just doesn't

3   justify saying that anything ever invented that functions like

4   a CTP must be one, and I think the CTP in this patent has to

5   be naturally occurring because that's what the words meant at

6   the time they were used.

7        I am not applying a validity/invalidity standard to

8   make this decision.  I'm basing this on what I believe the

9   words mean as a matter of claims construction.

10       I do want to point out that I am not buying into

11  Bayer's arguments that this is some kind of a

12  means-plus-function term.  It is not.  A series of amino acids

13  is a description of a structure, although it is further

14  defined by the transit function included in it, but I don't

15  believe that the addition of a functional adjective makes this

16  a means-plus-function term.

17       To the extent that example 19 is inconsistent with this

18  interpretation, and I'm not convinced that it is, but if it

19  is, then an example in the specifications cannot vary the

20  claims, and the law does not require that every example be

21  within the scope of all the claims.

22       In this case, both scientists agree that example 19 is

23  not within the scope of all of the claims because it is a test

24  tube thing and there was no action within the plant cell, but

25  even if it is inconsistent, I believe the claim language is

1   clear, and that the interpretation I have given it is correct.

2        The third term which I will have trouble pronouncing,

3   but I will try, is "chloroplast transit peptide/

4   5-enolpyruvylshikimate-3-phosphate synthase" -- I'll call

5   that EPSPS from now on -- "fusion polypeptide." This term

6   means "a polypeptide that has at least two parts which must

7   include a chloroplast transit peptide as defined already

8   joined to an EPSPS where the chloroplast transit peptide and

9   EPSPS are not found together in nature."

10       I thought this issue was going to be the hardest one to

11  decide, but as I just discussed, I don't think it was. I

12  don't think this was that close a call, but it is somewhat

13  difficult to explain. To put it as simply as possible,

14  "fusion" in this patent means what most people think it means.

15  Lay people like me think fusion means putting different things

16  together. Scientists in this field think it means putting

17  different things together. The dictionary thinks "fusion

18  polypeptide" or "fusion protein" means a protein created out

19  of two genetically different things, in other words, a protein

20  created in a non-natural process, i.e. fused, which contains

21  amino acid sequences from distinct proteins. Even Monsanto's

22  expert witness agrees that that's what it normally means.

23       Monsanto more or less argues that it was being its own

24  lexicographer here, or it was using the term in a very special

25  way, and although I recognize that a patent can use a word in

1   other than its normal meaning, it's supposed to be very clear
2   when it does that, and here it certainly is not clear, and I
3   don't believe that it's even implicit in the language or the
4   history.

5        I have carefully reviewed the patent and the patent
6   prosecution history, and I don't think there is anything there
7   that shows that "fusion polypeptide" meant something other
8   than its normal meaning.

9        Monsanto, not the patent examiner, first used the term
10  in the original application, and when Monsanto used it the
11  first time, it used it with the plain and ordinary meaning of
12  the definition I've adopted here.  Everyone agrees that a
13  naturally occurring EPSPS has a CTP, and nobody refers to
14  those naturally occurring things as fusion polypeptides.

15       This patent teaches putting different things together.
16  It did not just describe what naturally occurs in all plant
17  cells, so I think the CTP/EPSPS fusion polypeptide referred to
18  in these claims is something created from a CTP and an EPSPS
19  that do not occur together in nature.

20       Now, I'm not including Bayer's urged language that they
21  have to be directly adjacent to one another, as I don't
22  believe there is anything in the claim language or anywhere
23  else that provides that restriction, and so that is not
24  included in the construction I've adopted.

25       That brings us to the fourth term, the term "permits

1    the fusion polypeptide to be imported into a chloroplast of a
2    plant cell means the function of a chloroplast transit peptide
3    as previously defined."  Upon reflection, once I understood
4    the science of this, this was actually easy.  This is not a
5    close call at all.  Again, I want to point out that there was
6    no scientific dispute about this, only a legal one.

7        Actually, although the decision is easy, the term is
8    somewhat hard to define, and the definition I have adopted,
9    which was proposed by Monsanto, is a little awkward.  I think
10   there is a normal reason for that, and that's because this
11   term really does just mean what it says.  If ever there was a
12   plain and ordinary meaning, this one has one, and further
13   definition seems a little silly.

14       "Permits" means allows.  "To be imported" means for
15   something to be carried into some place.  That's what the
16   words mean, and that's the function of the CTP.  It permits a
17   polypeptide to be imported into a chloroplast.  That's what
18   the words say and that's what they mean, and although I have
19   stated that the definition above will be used in my jury
20   instructions and am adopting it, I question whether you will
21   really want me to do that because I'm not sure that any
22   further definition is needed of what are really very plain
23   words.  But since Bayer has challenged it, I do have to rule
24   on it, and I'm adopting Monsanto's definition because I
25   believe it's correct, although as I stated, I'm not sure it's

1    really necessary.

2        I will tell you definitely that Bayer's attempt to add

3    the requirement that the entire CTP/EPSPS fusion gene be

4    transported intact completely across the chloroplast envelope

5    membranes and the requirement that they attempt to impose that

6    all of the parts stay together until it is all inside the

7    chloroplast simply isn't anywhere in the patent language, its

8    specification, or its prosecution history.  Yes, I have heard

9    Bayer's argument that Monsanto set up two alternatives and

10   then picked one, but I don't believe that it did.  I don't

11   think these are necessarily alternatives.  Rather, they are

12   descriptions of a process that was not well understood at the

13   time, and still isn't, according to the agreement of the

14   scientists.

15       I think when the patent is read as a whole, it is clear

16   that Monsanto was claiming the process of getting this fusion

17   gene into the chloroplast, and whichever of the two ways it

18   worked, once it began to enter the chloroplast, both are

19   covered, and the important thing is the business gets in, not

20   the timing of the cleavage of the CTP from the EPSPS, and

21   that's really what this issue is about.  It's not about

22   importing.  It's really an issue about when does cleavage

23   occur, and nothing in the word "importing" suggests that

24   that's an issue covered by the patent.

25       The timing of when the CTP is separated from the EPSPS

1    simply is not a part of this patent, and construing this

2    language as Bayer urges would be reading something into the

3    language that simply isn't there.

4         So those are my reasons for my rulings.  As you can see

5    from the order I handed out, I will hold a telephone

6    conference on August 1st at 11:00 and I'll expect, Mr. Quinn,

7    Bayer to set up that telephone conference.  During the call,

8    we'll establish schedules for this case, as well as for the

9    other two that I have already set a conference call in.  It

10   will be one conference call to discuss all three cases because

11   all the same counsel are involved and the same parties.

12        In the other case, I've required a joint scheduling

13   plan, but in this case I've not done that.  I'm simply asking

14   that you meet and confer and attempt to resolve any issues and

15   hope you propose something that you can agree on because we

16   already had a schedule in this case, and it just needs to be

17   modified because of the delay that we had because of the

18   ongoing settlement discussions between the parties.

19        I also at that conference do want to talk to you all

20   about settlement.  I realize that you have bigger issues in

21   these cases, and that your clients have bigger issues, but I

22   want to talk to you about using a mediator for one or more of

23   the cases assigned to me, and I want to discuss these three

24   cases because they are the ones that I am concerned with, even

25   though I know your clients have bigger concerns.

1          Your clients haven't been able to reach a global

2    settlement, and apparently they can't agree on what "global"

3    means, but you have three cases in front of me involving two

4    patents, and we ought to talk about settling these cases, even

5    if you cannot settle globally.

6          One of the questions I'm going to ask you at that

7    meeting is what is really going on in these cases.  I'm very

8    curious.  It looks like I ended up with the afterthought

9    cases.  I thought your clients were cleaning out your closets

10   and said, "Is there anything we haven't sued each other on?

11   Let's throw in a new lawsuit," and that's what happened in

12   January, and I'm not sure it happened about this case, but I

13   want to know what's really going on, and I want to talk

14   seriously about if there is any way to resolve these cases,

15   and you'll have a month to think about my Markman rulings, and

16   see if that makes resolution of this case in particular any

17   easier, and then as I told you, as you all know, I don't know

18   much about the other cases because they are still so new, and

19   we were dealing with personal jurisdiction issues.

20         So we'll talk about all of that stuff in August.  I

21   want everybody here by telephone.  I don't want to see any of

22   you in person.  Not that I don't like you, but I don't need

23   you all here in person, and I don't need 20 lawyers on the

24   phone call, although you are free to have 20 lawyers on the

25   phone call if you want to.  Just be sure that whoever is there

1    has sufficient knowledge and authority to do what we need to

2    do on the phone call, but I'm not offended if everybody isn't

3    there all the time, as I know probably both of you know

4    because you have both been in front of me before.  Those are

5    my rulings.  Court is in recess.

6                       (A recess was taken.)

7

8

9

10

11

12                    REPORTER'S CERTIFICATE

13         I, TERI HANOLD HOPWOOD, RMR, Official Court Reporter

14    for the United States District Court for the Eastern District

15    of Missouri do hereby certify that the foregoing is a true and

16    correct transcript of the proceedings had in this cause as

17    same appears from my stenotype notes made personally during

18    the progress of said proceedings.

19

20    *Teri Hanold Hopwood, RMR*

21                    TERI HANOLD HOPWOOD, RMR

22                    Official Court Reporter

23

24

25

# EXHIBIT 5

# EXHIBIT 5

## '835 PATENT TERMS CONSTRUED BY THE MISSOURI COURT

Listed below are the '835 patent terms that were construed by the Missouri court. The material in **[brackets]** shows the extraneous limitations that the Missouri court erroneously added to the claim terms.

1.      "chimeric gene" means a gene that is comprised of parts that do not occur together in nature.

2.      "chimeric plant gene" means a chimeric gene that is expressible in a plant.

3.      "chloroplast transit peptide" means a **[naturally occurring]** series of amino acids that causes the transport of a polypeptide into a chloroplast.

4.      "chloroplast transit peptide/5-enolpyruvylshikimate-3-phospate synthase (EPSPS) fusion polypeptide" means a polypeptide that has at least two parts, which must include a chloroplast transit peptide (as defined above) joined to an EPSPS**[,where the chloroplast transit peptide and EPSPS are not found together in nature]**.

5.      "permits the fusion polypeptide to be imported into a chloroplast of a plant cell" means the function of a chloroplast transit peptide (as defined above).

# EXHIBIT 6

## Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - -x

MONSANTO COMPANY AND MONSANTO.

TECHNOLOGY LLC.                  :

    Plaintiff.        : Civil Action Number

    vs.                : 04-305-SLR

SYNGENTA SEEDS. INCORPORATED :

and SYNGENTA BIOTECHNOLOGY. :

INCORPORATED                     :

    Defendant.         :

- - - - - - - - - - - - - - -x

DEKALB GENETICS CORPORATION. :

    Plaintiff.        : Civil Action Number

    vs.                : 1:05 CV 355-SLR

SYNGENTA SEEDS. INCORPORATED :

and SYNGENTA BIOTECHNOLOGY. :

INCORPORATED.                    :

    Defendants.        :

- - - - - - - - - - - - - - -x

RESTRICTED CONFIDENTIAL VIDEO DEPOSITION OF

PAUL CHRISTOU

Washington, DC

Friday, December 9, 2005

REPORTED BY: CARMEN SMITH

Job No. 54927

## Page 2

1    Restricted Confidential Video Deposition of PAUL

2  CHRISTOU. called for examination pursuant to notice

3  of deposition. on Friday. December 9, 2005. in

4  Washington. DC, at the offices of Finnegan,

5  Henderson. Farabow. Garrett & Dunner. 901 New York

6  Avenue NW. at 8:58 a.m., before CARMEN SMITH. a

7  Notary Public within and for the District of

8  Columbia, when were present on behalf of the

9  respective parties:

10

11        THOMAS MILLER, ESQ.

12        Howrey LLP

13        1111 Louisiana, 25th Floor

14        Houston. Texas 77002-5242

15        713-787-1483

16        On behalf of Plaintiffs

17

18        JENNIFER A. JOHNSON, Ph.D., ESQ.

19        MICHAEL FLIBBERT. ESQ.

20        SANYA SUKDUANG. ESQ.

21        Finnegan Henderson Farabow Garrett & Dunner

22        901 New York Avenue NW

23        Washington. DC 20001-4413

24        202-408-4377

25        On behalf of Defendants

## Page 3

1             P R O C E E D I N G S

2         VIDEO OPERATOR: On the record with tape

3  number 1 of the videotaped deposition of Paul

4  Christou. taken on behalf of the plaintiff in the

5  matter of Monsanto Company and Monsanto Technology    08:57:29

6  LLC versus Syngenta Seeds. Incorporated and Syngenta

7  Biotechnology. Incorporated. Civil Action Number

8  04-305-SLR. and in the matter of DeKalb Genetics

9  Corporation versus Syngenta Seeds. Incorporated and

10  Syngenta Biotechnology, Incorporated. Civil Action    08:57:58

11  Number 1:05 CV 355-SLR. in the United States

12  District Court for the District of Delaware.

13         This deposition is being held at the law

14  offices of Finnegan Henderson. located at 901 New

15  York Avenue. Northwest. in Washington. D.C., on      08:58:23

16  December 9, 2005 at approximately 8:58 a.m.

17         My name is T.J. O'Toole. I am the

18  certified legal video specialist. representing

19  Sunbelt Reporting and Litigation Services. The

20  court reporter is Carmen Smith.                      08:58:43

21         Will counsel please identify themselves

22  and indicate which parties they represent.

23         MR. MILLER: Tom Miller with Howrey, and

24  I'm representing plaintiffs Monsanto and DeKalb.

25         MR. SUKDUANG: Sanya Sukduang, with          08:58:58

## Page 4

1  Finnegan Henderson. representing defendant Syngenta

2  Seeds and Syngenta Biotechnology.

3         MS. JOHNSON: Jennifer Johnson of Finnegan

4  Henderson. also representing defendants.

5         VIDEO OPERATOR: Thank you. Will the        08:59:09

6  court reporter please swear in the witness.

7         Whereupon.

8                  PAUL CHRISTOU

9  was called as a witness and. having first been duly

10  sworn. was examined and testified as follows:       08:59:21

11                  EXAMINATION

12         BY MR. MILLER:

13    Q    Could you tell us your full name and your

14  current residence address. please.

15    A    My name is Paul Christou. and I reside in   08:59:25

16  the city of Lleida. Spain.

17    Q    I'm going to hand you. to begin the

18  deposition. what I've marked as Exhibits 1 and 2.

19         (Christou Exhibits 1 and 2 identified.)

20         THE WITNESS: Thank you.                     08:59:43

21         BY MR. MILLER:

22    Q    Are those copies of the expert reports

23  that you have submitted in this case. Dr. Christou?

24    A    Yes. they are.

25         MR. SUKDUANG: And Tom. before we go on. I   08:59:50

Pages 1 to

RESTRICTED CONFIDENTIAL VIDEO DEPOSITION OF
PAUL CHRISTOU

## Page 45

1  with that. for the reason that I stated already, and
2  I'll restate it again perhaps in different words.
3         There are two points I would like to make
4  in this context.  Number one, in general, for
5  transformation to take place would require          09:58:50
6  selection, and number two, if we are to look at EPSP
7  synthase, at the time in order to accomplish what
8  the claim states, there was no gene available that
9  could be used to do the selection in corn.
10         This is what I'm trying to say.              09:59:11
11  BY MR. MILLER:
12  Q    Are you saying there's no EPSPS gene or
13  there's no EPSPS gene or any other gene either?
14  Which are you saying?
15         MR. SUKDUANG:  Objection; vague.             09:59:24
16         THE WITNESS:  I'm referring to the fact
17  that at the time, according to the documents I
18  reviewed, I did not come across evidence to make me
19  believe that an EPSPS synthase gene was available
20  that would work in corn.                            09:59:41
21  BY MR. MILLER:
22  Q    Okay.  Now, can you point to me language
23  that's in claim 1 that says that the EPSPS gene and
24  glyphosate is used for selection?
25         MR. SUKDUANG:  Objection; asked and          09:59:57

## Page 46

1  answered.
2         THE WITNESS:  I believe I am -- I answered
3  this twice already, and I'm looking at the language
4  in (c) -- I'm sorry. at the end of the claim. where
5  we're looking at functional language.              10:00:20
6         So it does not mention explicitly
7  selection using EPSPS.
8         MR. SUKDUANG:  We've been going about an
9  hour.  Is now a good time for a break?
10         MR. MILLER:  That's fine.  I'm going to be   10:00:41
11  moving on to a different topic.
12         VIDEO OPERATOR:  The time is 10 a.m. and
13  23 seconds.  Off the record.
14         (Recess.)
15         VIDEO OPERATOR:  On the record.  The time    10:09:33
16  is 10:09:21.
17         MR. SUKDUANG:  I'd like to note the
18  presence of Michael Flibbert of Finnegan Henderson
19  representing defendants.
20  BY MR. MILLER:                                      10:09:47
21  Q    Dr. Christou. we're going to change to
22  another subject now. corn transformation work that
23  was going on in the 1980s.
24  A    Okay.
25  Q    That's a subject that you're familiar          10:09:56

## Page 47

1  with; correct?
2  A    That is correct.
3  Q    In the 1980s, transgenic corn was a major
4  goal of the plant molecular biology community; is
5  that right?                                         10:10:11
6  A    That is correct.
7  Q    And there were a number of groups
8  throughout the world for which that goal was a very
9  high priority; right?
10  A    I believe so.                                  10:10:20
11  Q    Can you name some of those groups?
12  A    Yes. I can.
13  Q    Go ahead.
14  A    DuPont. Pioneer. Monsanto. Ciba.
15  Novartis -- Ciba. DeKalb. Agracetus. Agrigenetics.  10:10:37
16  Calgene. PGS. Anichem.
17         This is what comes to mind.  I'm sure
18  there are others.
19  Q    You mentioned Ciba.  They were a
20  predecessor company of Syngenta; right?             10:10:55
21  A    That is correct.
22  Q    And during the 1980s, you were working for
23  Agracetus. another of the companies you mentioned;
24  right?
25  A    That is correct.                               10:11:03

## Page 48

1  Q    And the reason for that interest in
2  transgenic corn was because of the high economic
3  significance of corn in agriculture; is that right?
4  A    That is correct.
5  Q    It's a major worldwide agricultural crop;      10:11:16
6  right?
7  A    That is correct.
8  Q    What pieces of technology were needed in
9  order to achieve the goal of transgenic corn?
10         MR. SUKDUANG:  Objection; vague.             10:11:32
11         THE WITNESS:  In general terms?
12  BY MR. MILLER:
13  Q    In general terms.
14  A    Okay.  In my mind. there were two major
15  pieces of technology that needed to come into play.  10:11:48
16  One was the ability to put foreign DNA that would be
17  stably integrated into the genome of corn. and the
18  other major piece of technology was the ability to
19  recover intact fertile plants from transgenic cells.
20         And of course, there are lots of            10:12:19
21  components that come under these two umbrellas that
22  are listed.
23  Q    Let's look at the first umbrella.  One of
24  the things you need in order to transfer foreign DNA
25  and stably integrate it into corn cells is that you  10:12:36

Pages 45 to 48

RESTRICTED CONFIDENTIAL VIDEO DEPOSITION OF
**PAUL CHRISTOU**

## Page 49

1  need a certain kind of corn cells; right?

2     A    Could you please repeat that question?

3     Q    You need -- you need target corn cells for

4  the foreign DNA; right?

5     A    For the transformation process?   10:12:53

6     Q    Yes.

7     A    Of course, yes.

8     Q    And that's referred to sometimes as tissue

9  culture, but the types of cells that you needed were

10 ones that could be transformed and subsequently   10:13:03

11 regenerated; right?

12    A    To recover fertile transgenic corn, yes.

13    Q    Okay.  And you also needed a method to

14 transfer the DNA into those cells; right?

15    A    Correct.   10:13:20

16    Q    Okay.  Now, is there anything else that

17 was needed from a technology standpoint for input of

18 foreign DNA stably into corn cells?  That was your

19 first umbrella.

20    A    Uh-huh.   10:13:35

21    Q    Anything else that was needed?

22         MR. SUKDUANG:  Objection: vague.

23         THE WITNESS:  Of course.  Of course.

24         BY MR. MILLER:

25    Q    What else?   10:13:40

## Page 50

1     A    Appropriate genes, both selectable markers

2  and genes of interest that would encode for a gene

3  product that would be useful.  So initial selection.

4     Q    Okay.  And anything else for the

5  transformation piece that you mentioned?  Any other   10:14:07

6  technology pieces that you needed?

7     A    Well, transformation vectors, which would

8  include all the elements that are required for

9  expression of an input gene, like promoters and

10 terminators and enhancers and everything else that   10:14:23

11 goes in creating an optimal transformation vector.

12    Q    Okay.  And then anything else that was

13 needed for the transformation piece that you

14 mentioned initially?

15         MR. SUKDUANG:  Objection; vague.   10:14:41

16         THE WITNESS:  Well, we mentioned the DNA

17 method -- the DNA delivery method, the selection,

18 the target tissue, the genes, the vectors.  I

19 believe this should do it.

20         BY MR. MILLER:   10:14:56

21    Q    Okay.  Then the other umbrella piece that

22 you mentioned was recovering transgenic plants.

23 fertile transgenic plants.  What technology pieces

24 did you need for that?

25         MR. SUKDUANG:  Objection; vague.   10:15:06

## Page 51

1          THE WITNESS:  Essentially, I would use the

2  term "tissue culture and regeneration procedures."

3  And again, I would use that in an all-encompassing

4  sense.

5          BY MR. MILLER:   10:15:30

6     Q    Do you agree that the specification of

7  the '880 and '863 patents discloses a method for

8  making fertile transgenic corn?

9     A    May I refer to the patents?

10    Q    Sure.   10:15:44

11    A    Please.  And may I take my jacket off?

12    Q    If you wish.

13    A    Thank you.

14         (Christou Exhibits 10 and 11 identified.)

15         THE WITNESS:  Thank you.   10:16:22

16         BY MR. MILLER:

17    Q    Exhibits 10 and 11 are the '880 and '863

18 patents respectively.  My question was do you agree

19 that the specification of those patents discloses a

20 method for making fertile transgenic corn.   10:16:42

21         MR. SUKDUANG:  Dr. Christou, please feel

22 free to review any portions of Christou Exhibit 10

23 you find necessary.

24         THE WITNESS:  In general terms, I agree.

25         BY MR. MILLER:   10:16:55

## Page 52

1     Q    Okay.  It's a method that worked; right?

2     A    It's --

3          MR. SUKDUANG:  Objection; vague.

4          THE WITNESS:  It's a method that resulted

5  in fertile transgenic corn.   10:17:04

6          BY MR. MILLER:

7     Q    Okay.  Are you aware of anyone anywhere in

8  the world who obtained a fertile transgenic corn

9  plant before the inventors of the '880 and the '863

10 patent, Lundquist and Walters?   10:17:21

11    A    The question refers to fertile transgenic

12 corn.

13    Q    Correct.

14    A    No. I'm not aware of anybody else.

15    Q    Are you aware of anyone who initiated a   10:17:30

16 experiment that resulted in a fertile transgenic

17 corn plant before Lundquist and Walters initiated

18 their bombardment experiment on February 3, 1989?

19    A    Again, if we refer to recovery of fertile

20 transgenic corn, I'm not aware of anybody else, no.   10:17:55

21    Q    Okay.  Now, let's go back again into the

22 1980s, when you were at Agracetus.  We were doing

23 work on transformation of soybean; is that right?

24    A    Amongst other things.

25    Q    Okay.  Did you work with soybean before   10:18:13

Pages 49 to 52

# EXHIBIT 7

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| DEKALB GENETICS CORPORATION, | ) | Civil Action Nos. |
| | ) | 96 C 50114 |
| Plaintiff, | ) | 96 C 50241 |
| | ) | |
| v. | ) | |
| | ) | |
| CIBA-GEIGY CORPORATION, | ) | JURY TRIAL REQUESTED |
| MYCOGEN CORPORATION, including its | ) | |
| operating subsidiaries AGRIGENETICS, | ) | |
| INC. (d.b.a. MYCOGEN SEEDS) and | ) | |
| MYCOGEN PLANT SCIENCE, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## MYCOGEN CORPORATION'S POST *MARKMAN* HEARING BRIEF

## TABLE OF CONTENTS

**PAGE**

I.    INTRODUCTION ................................................................................................ 1

II.   PROPOSED CLAIM CONSTRUCTIONS ........................................................ 1

    A.    Transformation Target ............................................................................... 1

        1.    The Cells or Culture to be Bombarded Must Be Regenerable ........ 5

            a.    The term "regenerable" is expressly stated in the claims of the '877, '880, and '520 patents ........................................... 5

            b.    The term "regenerable" is fairly implied in the claims of the '956 patent .................................................................................. 5

        2.    Regenerative Capacity Defined ....................................................... 5

        3.    The Claim Language And Specifications Of All Four Patents Evidence That The Transformation Process Must Be Carried Out By Bombarding Cells That Are In A Regenerable State ................ 6

            a.    Claim Language .................................................................... 6

                i.    The Claims of the '880 and '956 Patents Expressly Require Bombarding A Regenerable Target ........... 6

                ii.    The Claims of the '877 and '520 Patents Require that "Said Culture", Which Is a Regenerable Culture, Be Transformed by Bombardment ............. 6

            b.    The Specifications Require that the Cells or Culture to Be Bombarded Must Be Regenerable ....................................... 7

                i.    Lundquist, *et al.* ....................................................... 7

                ii.    Adams, *et al.* ............................................................ 8

        4.    The Prosecution Histories Of The Patents-In-Suit Make Clear That Immature Embryos On Callus Initiation Medium Are Not Within The Scope Of The Claims ................................................................ 8

            a.    Klein, *et al.* Discloses the Bombardment of Immature Embryos Placed on Callus Initiation Medium ..................... 9

            b.    Klein, *et al.* Was Distinguished During the Prosecution of Each of the Patents-in-suit .................................................. 10

                                i.       Prosecution of the '877 Pa. ............................... 10

                                ii.      Prosecution of the '880 Patent ............................... 11

                                iii.     Prosecution of the '956 patent ............................... 11

                                iv.      Prosecution of the '520 Patent ............................... 12

      B.       PROGENY.......................................................................... 13

                1.      The Claim Language Read According To The Basic Rules of Grammar Requires That Progeny Be Given Its Art Recognized Meaning And Cannot Mean All Lineal Descendants for All Time ................................................................................................ 13

                        a.     '956 Patent.......................................................... 13

                        b.     '877 Patent.......................................................... 13

                        c.     '880 Patent.......................................................... 13

                        d.     '520 Patent.......................................................... 14

                2.      "Progeny" is Art Recognized and Refers to the Immediate Offspring of a Particular Cross ...................................... 14

                        a.     Dr. Dudley's Testimony...................................... 14

                        b.     Dr. Walker's Testimony...................................... 15

                3.      The Specifications Use Progeny to Mean the Offspring of a Particular Cross and Not All Subsequent Generations ................. 15

                        a.     When DeKalb Wanted to Refer to All Subsequent Generations, They Used that Term, not Progeny; When DeKalb Wanted to Refer to a Specific Generation, it Used the Modifer R1 or R2.......................................... 16

                4.      Prosecution History.................................................... 16

III.    CLAIM 1 OF THE '956 PATENT IS A PRODUCT CLAIM WITH A PROCESS LIMITATION THAT MUST BE GIVEN EFFECT ........................................... 16

IV.    CONCLUSION.................................................................................... 20

Lundquist, *et al.*'s representations to the contrary in the specifications of the '956, '877, and '880 patents.

        **b.**    **Klein, *et al.* Was Distinguished During the Prosecution of Each of the Patents-in-suit**

               **i.**    **Prosecution of the '877 Patent**

❑ In the 12/7/90 First Office Action, the Examiner rejected claims under § 103 over Klein, *et al.* Bio/Technology. '877 PH, Tab 10, SM 656-666 at SM 662.

❑ Lundquist, *et al.* argued that Klein, *et al.* does not mention callus as a possible target, and instead refers to the use of intact embryos as targets. '877 File History, 6/7/91 Amendment, Tab 14, SM 668-683 at SM 674.

> " . . .the Examiner asserts that the disclosure at page 562 in the following paragraph indicates that 'the stable transformation of maize callus via the disclosed technique is evident,' callus is not mentioned as a possible target in this paragraph, which clearly refers to the use of intact embryos as targets. In contrast to this methodology, Applicants' claim recites that friable embryogenic callus cultures were bombarded." '877 File History, June 7, 1991 Response, Tab 12, SM 668-683, at SM 674.

❑ The Examiner maintained the rejection over Klein. 8/20/91 Second Office Action, Tab 14, SM 698-707 at SM 701-703.

❑ Lundquist, *et al.* continued to assert that Klein made "a suggestion to transform scutellum [of immature embryo] and then to generate callus from the transformed cells", ('877 File History, 2/24/92 Response, Tab 16, SM 711-722, at p. 3, SM 713), but not "a suggestion that callus of any sort should be the target...," (*id.* at p. 3, SM 713):

> "Although the Examiner maintains that the right column of page 562 of Klein et al. (Bio/Technology) discloses "stable transformation of maize callus via the disclosed technique" no stably transformed callus is disclosed in the cited paper. Rather, Klein et al. disclose that because embryogenic callus can be generated from the surface of maize scutellum, maize scutellum 'will be a prime target for future attempts to deliver selectable markers with the particle gun' This is a suggestion to transform scutellum and then to generate callus from the transformed cells that can hopefully be regenerated into transgenic plants, which hopefully will be fertile, etc. It is not a suggestion that callus of any sort should be the target of biolistic transformation as called for in the present claims." (p. 3, SM 713).

❑ Lundquist, *et al.* filed a file wrapper continuation application Ser. No. 974,379. Tab 22, SM 754-758. In a Preliminary Amendment Lundquist, *et al* again argued that Klein clearly suggests transforming the scutellum of immature embryos, not callus. 3/4/93 Preliminary Amendment, Tab 24, SM 765-776, at SM 770-771. Lundquist, *et al.* refer to and resubmit the Phillips Declaration. 3/4/93 Preliminary Amendment, Tab 24, SM 765-776, at SM 771-772; Phillips Declaration at Tab 24C, SM 788-795.

❑ The Examiner withdrew the rejection based on Klein, *et al.* 8/31/93 Fifth Office Action, Tab 26, SM 803-807, at SM 806.

### ii.    Prosecution of the '880 Patent

❑ The '880 patent was filed on May 26, 1994 as a continuation application of the application leading to the '877 patent. Klein, *et al.* (Bio/Technology) was cited as prior art to the "species" claims of the '877 patent as well as to the "genus" claims of the '880 patent. Statements made to (1) characterize the Klein, *et al.* Bio/Technology paper which was prior art to both the "genus" claims of the '880 patent and the "species" claims of the '877 patent, and (2) distinguish the claims of the '877 patent are also relevant to the interpretation of the claims of the '880 patent. *E.g., Jonsson v. Stanley Works*, 903 F.2d 812, 818 (Fed. Cir. 1990); *Mark I Mktg. Corp v. R. R. Donnelley & Sons Co.*, 66 F.3d 285, 291-92 (Fed. Cir. 1995); *cf. Sextant Avionique, S.A. v. Analog Devices Inc.*, 49 U.S.P.Q.2d (BNA) 1865, 1868 (Fed. Cir. 1999).

❑ In the 9/28/94 First Office Action in USSN 249,458, the Examiner rejected the claims under 35 U.S.C. § 103 over Klein et al. Bio/Technology, Tab 4, SM 1027-1032, at SM 1030.

❑ In response, Lundquist, *et al.* argued that Klein clearly suggests transforming the scutellum of immature embryos, not callus, and referred to and quoted the Phillips Declaration, first submitted during the prosecution of the '956 patent. Tab 5, SM 1033-1040, at SM 1038-39.

❑ In the 3/28/95 Second Office Action, the Examiner withdrew the rejection over Klein. Tab 6, SM 1041-1044, at SM 1043.

### iii.    Prosecution of the '956 patent

❑ In the 5/16/91 Second Office Action, the Examiner rejected the claims over Klein, *et al.* Bio/Technology, '956 File History, Tab 11, SM 163-173, at SM 170.

❑ Lundquist, *et al.* argued that " . . .Klein et al. disclose that because embryogenic callus can be generated from the surface of maize scutellum, maize scutellum 'will be a prime target for future <u>attempts</u> to deliver

## B.    PROGENY

Mycogen contends that the term "progeny" in the claims of the '956, '877, '880,

and '520 patents is properly construed as the immediate offspring of a particular cross.

### 1.    The Claim Language Read According To The Basic Rules of Grammar Requires That Progeny Be Given Its Art Recognized Meaning And Cannot Mean All Lineal Descendants for All Time

#### a.    '956 Patent

❑  Claim 5 of the '956 Patent recites: "An R1 transgenic Zea mays plant <u>derived from</u> the plant of claim 1 wherein said R1 plant expresses said heterologous DNA so that the R1 plant exhibits said phenotypic characteristics." (emphasis added)

❑  Claim 6 of the '956 Patent recites: "A progeny transgenic Zea mays plant <u>derived from</u> the plant of claim 5 wherein said progeny plant expresses said heterologous DNA so that the progeny plant exhibits said phenotypic characteristics" (emphasis added)

#### b.    '877 Patent

❑  Claims 1 and 6 of the '877 Patent recite: "A process for producing a fertile transgenic Zea mays plant . . . wherein said DNA is transmitted through a complete sexual cycle of said transgenic plant to its progeny and imparts . . . resistance thereto."

#### c.    '880 Patent

❑  Claims 1 and 10 of the '880 Patent recite: "A process for producing a fertile transgenic *Zea mays* plant . . . wherein said DNA is transmitted through a complete sexual cycle of said transgenic plant to its progeny, and imparts . . . resistance thereto."

❑  Claims 4 and 13 of the '880 Patent recite "A process comprising obtaining progeny from a fertile transgenic plant obtained by the process of claim 1 [or 10] which comprise said DNA.

❑  Claims 5 and 14 of the '880 Patent recite: "The process of claim 4 [or 13] wherein said progeny are obtained by crossing said fertile transgenic plant with an inbred line.

❑  Claims 6 and 15 of the '880 Patent recite: "The process of claim 4 [or 13] comprising obtaining seed from said progeny and obtaining further progeny plants comprising said DNA from said seed."

❑  Claims 7 and 16 of the '880 Patent recite: "The process of claim 5 [or 14] wherein the progeny obtained are crossed back to the inbred line, to obtain further progeny which comprise said DNA."

❑  Claims 8 and 17 of the '880 Patent recite: "The process of claim 6 [or 15] wherein seeds are obtained from said further progeny plants and plants comprising said DNA are recovered from said seed."

❑  Claims 9 and 18 of the '880 Patent recite: "The process of claim 7 [or 16] wherein said further progeny are crossed back to the inbred line to obtain progeny which comprise said DNA."

### d.    '520 Patent

❑  Claim 1 of the '520 patent recites 'regenerating a fertile transgenic *Zea mays* [R0] plant . . . wherein said DNA is transmitted through a complete sexual cycle of said transgenic [R0] plant to its progeny."

## 2.    "Progeny" is Art Recognized and Refers to the Immediate Offspring of a Particular Cross

### a.    Dr. Dudley's Testimony

❑  Dr. Dudley testified that the term "progeny" as used in the claims of the patents-in-suit refers to the offspring of a particular cross.

❑  '520 claim 1 - progeny is offspring of the regenerated transgenic plant. MH Tr. at 765:10-766:65

❑  '880 claim 1 - progeny is the immediate offspring of the $R_0$ plant. MH Tr. at 787:3-787:20.

❑  '880 claim 4 - progeny is the $R_1$ plant. MH Tr. at 787:21-788:10.

❑  '880 claim 5 - progeny is the $R_1$ plant. MH Tr. at 790:4-8.

❑  '880 claim 6 - progeny is the $R_2$ plant. MH Tr. at 790:22-791:25.

❑  '956 claim 6 - progeny is the $R_1$ plant. MH Tr. at 791:23-793:15.

### 4.    The '520 Patent

The claims of the '520 patent, which recite the phrase "(i) establishing a regenerable culture [and] (ii) transforming said culture by bombarding it with DNA-coated microprojectiles . . ." require that step (i), "establishing a regenerable culture" be completed before the bombarding step (ii) is performed, and that the "regenerable culture" has the present capacity to regenerate into plants, i.e. to survive and form plantlets if placed directly onto regeneration media. In view of statements made by Adams, et al. during prosecution of the '520 patent and related applications, and statements made by Lundquist, et al. during prosecution of the '877, '880, and '956 patents to distinguish prior art by Klein, et al., the claims of the '520 patent cannot be construed to cover the bombarding of immature embryos placed on a callus initiation medium.

The term "progeny" recited in claim 1 of the '520 patent refers to the immediate offspring of a particular cross.

Respectfully submitted,

LYON & LYON LLP
A Partnership Including Professional Corporations

By: _Vicki G Norton_

Douglas E. Olson
Allan W. Jansen
Vicki G. Norton
ORRICK HERRINGTON & SUTCLIFFE LLP
Daniel J. Thomasch
Robert M. Isackson
Lauren J. Elliot
Attorneys for Defendants
MYCOGEN PLANT SCIENCE,
INCORPORATED and AGRIGENETICS
INCORPORATED d/b/a MYCOGEN PLANT
SCIENCE, INC.

I am employed in the County of San Diego, State of California. I am over the age of 18 and not a party to the within action. My business address is 4225 Executive Square, Suite 800, La Jolla, California 92037

On June 11, 1999, I served the foregoing document described as **MYCOGEN CORPORATION'S POST *MARKMAN* HEARING SUBMISSION** on each interested party, as follows:

I served a true copy of the foregoing document on each interested party as set forth above via facsimile and by messenger. I placed the sealed envelope(s) for collection and delivery to the Express Network messenger by following the ordinary business practices of Lyon & Lyon, La Jolla, California. I am readily familiar with Lyon & Lyon's practice for collecting and processing of Express Messenger correspondence, said practice being that in the ordinary course of business, Express Messenger correspondence is to the Express Network messenger for next day delivery the same day as Express Network correspondence is placed for collection.

|  |  |
|---|---|
| Charles De La Garza<br>**ARNOLD, WHITE & DURKEE**<br>4850 U.S. Bank Place<br>601 Second Avenue South<br>Minneapolis, MN 55402-4320<br>Fax: (612) 321-9600 | John J. Holevas<br>**WILLIAMS & MCCARTHY**<br>321 West State Street<br>P.O. Box 219<br>Rockford, IL 61105-0219<br>FAX: (815) 968-0019 |

(BY FACSIMILE ONLY) I served a true copy of the foregoing document on each interested party as set forth above via facsimile.

|  |  |
|---|---|
| David L. Parker<br>Mark Wilson<br>**ARNOLD, WHITE & DURKEE**<br>1900 One American Center<br>600 Congress Avenue<br>Austin, TX 78701<br>FAX: (512) 474-7577 | Dimitrios T. Drivas<br>William P. DiSalvatore<br>**WHITE & CASE**<br>1155 Avenue of the Americas<br>New York, NY 10036-2787<br>FAX: (212) 354-8113 |
| David C. Van Dyke<br>**CASSIDAY, SCHADE & GLOOR**<br>20 N. Wacker Dr.<br>Suite 1040<br>Chicago, Illinois 60606-2903<br>Fax: (312) 444-1669 | Ronald M. Wawrzyn<br>**FOLEY & LARDNER**<br>777 East Wisconsin Avenue<br>Milwaukee, Wisconsin 53202-5367<br>Fax: (414) 297-4900 |
| Craig D. Diviney<br>**DORSEY & WHITNEY LLP**<br>Pillsbury Center South<br>220 South Sixth Street<br>Minneapolis, MN 55402-1498<br>Fax: (612) 340-8800 |  |

Executed on June 11, 1999, at La Jolla, California. I declare under penalty of perjury that the foregoing is true and correct.

_____
D.Y. Higa
(Name)

_____
(Signature)

# EXHIBIT 8



# WEBSTER'S
# New
# Collegiate
# Dictionary

Copyright © 1981 by G. & C. Merriam Co.

Philippines Copyright 1981 by G. & C. Merriam Co.

Library of Congress Cataloging in Publication Data
Main entry under title:

Webster's new collegiate dictionary.

  Editions for 1898–1948 have title: Webster's collegiate dictionary.
  Includes index.
  1. English language—Dictionaries.
PE1628.W4M4  1981  423  80-25144
ISBN  0-87779-408-1
ISBN  0-87779-409-x (indexed)
ISBN  0-87779-410-3 (deluxe)

Webster's New Collegiate Dictionary principal copyright 1973

COLLEGIATE trademark Reg. U.S. Pat. Off.

*All rights reserved. No part of this work covered by the copyrights hereon may be reproduced or copied in any form or by any means—graphic, electronic, or mechanical, including photocopying, recording, taping, or information storage and retrieval systems—without written permission of the publisher.*

ɔ

Made in the United States of America

5049484746RMcN8281

**hence-forth** \'hen(t)s-,fō(ə)rth, -,fó(ə)rth, hen(t)s-\ *adv* : from this point on

**hence-for-ward** \hen(t)s-'fȯr-wərd\ *adv* : HENCEFORTH

**hench-man** \'hench-mən\ *n* [ME *hengestman* groom, fr. *hengest* stallion (fr. OE) + *man;* akin to OHG *hengist* gelding] **1** *obs* : a squire or page to a person of high rank   **2 a** : a trusted follower : a right-hand man   **b** : a political follower whose support is chiefly for personal advantage   **c** : an unscrupulous often violent member of a gang

**hen-deca-syl-lab-ic** \,()hen-,dek-ə-sə-'lab-ik\ *adj* [L *hendecasyllabus,* fr. Gk *hendeka* eleven (fr. *hen-, heis* one + *deka* ten) + *syllabē* syllable — more at SAME, TEN] : consisting of 11 syllables or composed of verses of 11 syllables — **hendecasyllabic** *n* — **hendeca-syl-la-ble** \hen-'dek-ə-,sil-ə-bəl, ()hen-,dek-ə-'\ *n*

**hen-di-a-dys** \hen-'dī-əd-əs\ *n* : the expression of an idea by two independent words connected by *and* (as *nice* and *warm*) instead of the usual combination of independent word and its modifier (as *nicely warm*)

**he-ne-quen** \'hen-i-kən, ,hen-i-'ken\ *n* [Sp *henequén*] : a strong yellowish or reddish hard fiber obtained from the leaves of a tropical American agave chiefly in Yucatan and used esp. for binder twine; *also* : a plant (*Agave fourcroydes*) that yields henequen

**Hen-le's loop** \'hen-lēz-\ *n* : LOOP OF HENLE

**¹hen-na** \'hen-ə\ *n* [Ar *hinnā'*]   **1** : an Old World tropical shrub or small tree (*Lawsonia inermis*) of the loosestrife family with small opposite leaves and auxiliary panicles of fragrant white flowers   **2** : a reddish brown dye obtained from leaves of the henna plant and used esp. on hair

**²henna** *vt* : to dye (as hair) with henna

**hen-nery** \'hen-ə-rē\ *n, pl* **-ner-ies** : a poultry farm; *also* : an enclosure for poultry

**heno-the-ism** \'hen-ə-()thē-,iz-əm\ *n* [G *henotheismus,* fr. Gk *hen-, heis* one + *theos* god — more at SAME] : the worship of one god without denying the existence of other gods — **heno-the-ist** \-,thē-əst\ *n* — **heno-the-is-tic** \,hen-ə-thē-'is-tik\ *adj*

**hen party** *n* : a party for women only

**hen-peck** \'hen-,pek\ *vt* : to subject (one's husband) to persistent nagging and domination

**hen-ry** \'hen-rē\ *n, pl* **henrys** *or* **henries** [Joseph *Henry*] : the practical mks unit of inductance equal to the self-inductance of a circuit or the mutual inductance of two circuits in which the variation of one ampere per second results in an induced electromotive force of one volt

**hent** \'hent\ *vt* [ME *henten,* fr. OE *hentan* — more at HUNT] *archaic* : SEIZE

**hen track** *n* : an illegible or scarcely legible mark intended as handwriting — called *also hen scratch*

**¹hep** \'hep, 'hēp, 'hā-\ *interj* [origin unknown] — used to mark a marching cadence

**²hep** \'hep\ *var of* HIP

**hep-a-rin** \'hep-ə-rən\ *n* [ISV, fr. Gk *hēpar* liver] : a polysaccharide sulfuric acid ester that is found esp. in liver, that prolongs the clotting time of blood, and that is used medically

**hep-a-rin-ize** \-rə-,nīz\ *vt* **-ized; -iz-ing** : to treat with heparin

**hepat-** *or* **hepato-** *comb form* [L, fr. Gk *hēpat-, hēpato-,* fr. *hēpar, hēpar*]   **1** : liver (*hepatectomy*) (*hepatotoxic*)   **2** : hepatic and (*hepatobiliary*)

**hep-a-tec-to-my** \,hep-ə-'tek-tə-mē\ *n, pl* **-mies** : excision of the liver or of part of the liver — **hep-a-tec-to-mize** \-,mīz\ *vt*

**¹he-pat-ic** \hi-'pat-ik\ *adj* [L *hepaticus,* fr. Gk *hēpatikos,* fr. *hēpat-, hēpar;* akin to L *jecur* liver] : of, relating to, or resembling the liver

**²hepatic** *n* : LIVERWORT

**he-pat-i-ca** \hi-'pat-i-kə\ *n* [NL, genus name, fr. ML, liverwort, fr. L, fem. of *hepaticus*] : a plant of a genus (*Hepatica*) of herbs of the buttercup family with lobed leaves and delicate flowers

**hep-a-ti-tis** \,hep-ə-'tīt-əs\ *n, pl* **-tit-i-des** \-'tit-ə-,dēz\ : inflammation of the liver; *also* : a condition marked by such inflammation

**he-pa-to-cel-lu-lar** \,hep-ə-tō-'sel-yə-lər, hi-,pat-ə-'sel-\ *adj* : of or involving hepatocytes (~ jaundice)

**he-pa-to-cyte** \hi-'pat-ə-,sīt, 'hep-ət-ə-\ *n* : an epithelial parenchymatous cell of the liver

**hepa-to-ma** \,hep-ə-'tō-mə\ *n* [NL] : a usu. malignant tumor of the liver

**hep-a-to-pan-cre-as** \,hep-ət-ō-'pan-krē-əs, hi-,pat-ə-'pan-, -'pan-\ *n* : a glandular structure (as of a crustacean) that combines the digestive functions of the vertebrate liver and pancreas

**hep-a-top-a-thy** \,hep-ə-'täp-ə-thē\ *n, pl* **-thies** : an abnormal or diseased state of the liver

**hep-a-to-tox-ic** \,hep-ət-ō-'täk-sik, hi-,pat-ə-'täk-\ *adj* : capable of causing injury to the liver (~ drugs)

**hep-a-to-tox-ic-i-ty** \-täk-'sis-ət-ē\ *n*   **1** : a state of toxic damage to the liver   **2** : a tendency or capacity to cause hepatotoxicity

**hep-cat** \'hep-,kat\ *n* : HIPSTER

**He-phaes-tus** \hi-'fes-təs, -'fēs-\ *n* [L, fr. Gk *Hēphaistos*] : the Greek god of fire and metalworking — compare VULCAN

**hepped up** \'hep-'təp\ *adj* : ENTHUSIASTIC

**Hep-ple-white** \'hep-əl-,hwīt, -,wīt\ *adj* [George *Hepplewhite*] : of, relating to, or imitating a style of furniture originating in late 18th century England

**hepta-** *or* **hept-** *comb form* [Gk, fr. *hepta* — more at SEVEN]   **1** : seven (*heptameter*)   **2** : containing seven atoms, groups, or equivalents (*heptane*)

**hep-ta-chlor** \'hep-tə-,klō(ə)r, -,klȯ(ə)r\ *n* [*hepta-* + *chlorine*] : a persistent cyclodiene chlorinated hydrocarbon pesticide $C_{10}H_5Cl_7$

**hep-tad** \'hep-,tad\ *n* [Gk *heptad-, heptas,* fr. *hepta*] : a group of seven

**hep-ta-gon** \'hep-tə-,gän\ *n* [Gk *heptagōnos* heptagonal, fr. *hepta* + *gōnia* angle — more at -GON] : a polygon of seven angles and seven sides — **hep-tag-o-nal** \hep-'tag-ən-ᵊl\ *adj*

**hep-tam-e-ter** \hep-'tam-ət-ər\ *n* : a line of verse consisting of seven metrical feet



heptagons

**hep-tane** \'hep-,tān\ *n* : any of several isomeric hydrocarbons $C_7H_{16}$ of the methane series; *esp* : the liquid normal isomer occurring in petroleum and used esp. as a solvent and in determining octane numbers

**hep-tar-chy** \'hep-,tär-kē\ *n* : a hypothetical confederacy of seven Anglo-Saxon kingdoms of the 7th and 8th centuries

**Hep-ta-teuch** \'hep-tə-,t(y)ük\ *n* [LL *heptateuchos,* fr. Gk, fr. *hepta* + *teuchos* book — more at PENTATEUCH] : the first seven books of the canonical Jewish and Christian Scriptures

**hep-tose** \'hep-,tōs, -,tōz\ *n* : a monosaccharide $C_7H_{14}O_7$ containing seven carbon atoms in the molecule

**¹her** \()hər, ,hər\ *adj* [ME *hire,* fr. OE *hiere,* gen. of *hēo* she — more at HE] : of or relating to her or herself esp. as possessor, agent, or object of an action (~ house) (~ research) (~ rescue) — compare ¹SHE

**²her** \ər, ()hər\ *pron.* objective case of SHE

**³her** *abbr* heraldry

**He-ra** \'hir-ə, 'hē-rə\ *n* [Gk *Hēra, Hērē*] : the sister and consort of Zeus — compare JUNO

**Her-a-cles** \'her-ə-,klēz\ *n* [Gk *Hēraklēs*] : HERCULES

**her-ald** \'her-əld\ *n* [ME, fr. MF *hiraut,* fr. an (assumed) Gmc compound whose first component is akin to OHG *heri* army, and whose second is akin to OHG *waltan* to rule — more at HARRY, WIELD]   **1 a** : an official at a tournament of arms with duties including the making of announcements and the marshaling of combatants   **b** : an officer with the status of ambassador acting as official messenger between leaders esp. in war   **c** (1) : OFFICER OF ARMS (2) : an officer of arms ranking above a pursuivant and below a king of arms   **2** : an official crier or messenger   **3 a** : HARBINGER   **b** : one that conveys news or proclaims : ANNOUNCER ⟨it was the lark, the ~ of the morn —Shak.⟩   **c** : one that supports or advocates : SPOKESMAN   *syn* see FORERUNNER

**²herald** *vt*   **1** : to give notice of : ANNOUNCE   **2** : to greet esp. with enthusiasm : HAIL

**he-ral-dic** \he-'ral-dik, hə-\ *adj* : of or relating to heralds or heraldry — **he-ral-di-cal-ly** \-i-k(ə-)lē\ *adv*

**her-ald-ry** \'her-əl-drē\ *n, pl* **-ries**   **1** : the practice of devising, blazoning, and granting armorial insignia and of tracing and recording genealogies   **2** : an armorial ensign; *broadly* : INSIGNIA   **3** : PAGEANTRY

**herb** \'(h)ərb\ *n, often attrib* [ME *herbe,* fr. OF, fr. L *herba*]   **1 a** : a seed-producing annual, biennial, or perennial that does not develop persistent woody tissue but dies down at the end of a growing season   **2** : a plant or plant part valued for its medicinal, savory, or aromatic qualities — **herb-like** \'(h)ər-,blīk\ *adj* — **herby** \'(h)ər-bē\ *adj*

**her-ba-ceous** \,(h)ər-'bā-shəs\ *adj*   **1 a** : of, relating to, or having the characteristics of an herb   **b** *of a stem* : having little or no woody tissue and persisting usu. for a single growing season   **2** : having the texture, color, or appearance of a leaf

**herb-age** \'(h)ər-bij\ *n*   **1** : herbaceous vegetation (as grass) esp. when used for grazing   **2** : the succulent parts of herbaceous plants

**¹herb-al** \'(h)ər-bəl\ *n*   **1** : a book about plants esp. with reference to their medical properties   **2** *archaic* : HERBARIUM 1

**²herbal** *adj* : of, relating to, or made of herbs

**herb-al-ist** \'(h)ər-bə-ləst\ *n*   **1** : one that collects or grows herbs   **2** : HERB DOCTOR

**her-bar-i-um** \,(h)ər-'bar-ē-əm, -'ber-\ *n, pl* **-ia** \-ē-ə\   **1** : a collection of dried plant specimens usu. mounted and systematically arranged for reference   **2** : a place that houses an herbarium

**herb doctor** *n* : one who practices healing by the use of herbs

**her-bi-cide** \'(h)ər-bə-,sīd\ *n* [L *herba* + ISV *-cide*] : an agent used to destroy or inhibit plant growth — **her-bi-cid-al** \,(h)ər-bə-'sīd-ᵊl\ *adj* — **her-bi-cid-al-ly** \-ᵊl-ē\ *adv*

**her-bi-vore** \'(h)ər-bə-,vō(ə)r, -,vȯ(ə)r\ *n* [NL *Herbivora,* group of mammals, fr. neut. pl. of *herbivorus*] : a plant-eating animal; *esp* : UNGULATE

**her-biv-o-rous** \,(h)ər-'biv-ə-rəs\ *adj* [NL *herbivorus,* fr. L *herba* grass + *-vorus* -vorous]   **1** : feeding on plants   **2** : having a stout body and a long small intestine : ENDOMORPHIC — **her-biv-o-rous-ly** *adv*

**herb Rob-ert** \,(h)ər-'räb-ərt\ *n* [prob. fr. *Robertus* (St. Robert) †1067 F ecclesiastic] : a sticky low geranium (*Geranium robertianum*) with small reddish purple flowers

**Her-cu-le-an** \,hər-kyə-'lē-ən, ,hər-'kyü-lē-\ *adj*   **1** : of, relating to, or characteristic of Hercules   **2** *often not cap* : of extraordinary power, size, or difficulty

**Her-cu-les** \'hər-kyə-,lēz\ *n* [L, fr. Gk *Hēraklēs*]   **1** : a mythical Greek hero fabled for his great strength and esp. for performing 12 labors imposed on him by Hera   **2** [L (gen. *Herculis*)] : a northern constellation between Corona Borealis and Lyra

**Her-cu-les'-club** \,hər-kyə-,lēz-'kləb\ *n*   **1** : a small prickly eastern U.S. tree (*Aralia spinosa*) of the ginseng family — called *also angelica tree*   **2** : a prickly shrub or tree (genus *Zanthoxylum,* esp. *Z. clava-herculis*) of the rue family

**¹herd** \'hərd\ *n* [ME, fr. OE *heord;* akin to OHG *herta* herd, Gk *korthys* heap]   **1 a** : a number of animals of one kind kept together under human control   **b** : a congregation of gregarious wild animals   **2 a** : a group of people usu. having a common bond ⟨entered the troop with the midwinter ~ of tenderfeet —MacKinlay Kantor⟩   **b** : the undistinguished masses : CROWD ⟨isolate the individual prophets from the ~ —Norman Cousins⟩ — **herd-like** \-,līk\ *adj*

**²herd** *vi*   **1** : to assemble or move in a herd   **2** : to place oneself in a group : ASSOCIATE   ~ *vt*   **1 a** : to keep or move (animals) together   **b** : to gather, lead, or drive as if in a herd ⟨seventy-five boys and girls were ~ed by six or eight teachers —W. A. White⟩   **2** : to place in a group

**herd-er** \'hərd-ər\ *n* : one that herds; *specif* : HERDSMAN

**her-dic** \'hərd-ik\ *n* [Peter *Herdic* †1888 Am inventor] : a small 19th century American horse-drawn cab having side seats and an entrance at the back

pro·fes·so·ri·at \ˌprō-fə-ˈsōr-ē-ət, ˌpräf-ə-, -ˈsòr-, -ē-ˌat\ or pro·fes·so·ri·ate \-ət, -ˌāt\ n [modif. of F professorat, fr. professeur professor, fr. L professor, fr. profassus] 1 : the body of college and university teachers at an institution or in society 2 : PROFESSORSHIP

pro·fes·sor·ship \prə-ˈfes-ər-ˌship\ n : the office, duties, or position of an academic professor

¹prof·fer \ˈpräf-ər\ vt prof·fered; prof·fer·ing \-(ə-)riŋ\ [ME proffren, fr. AF profrer, fr. OF poroffrir, fr. por- forth (fr. L pro-) + offrir to offer — more at PRO:] : to present for acceptance : TENDER, OFFER

²proffer n : OFFER, SUGGESTION

pro·fi·cien·cy \prə-ˈfish-ən-sē\ n 1 : advancement in knowledge or skill : PROGRESS 2 : the quality or state of being proficient

pro·fi·cient \prə-ˈfish-ənt\ adj [L proficient-, proficiens, prp. of proficere to go forward, accomplish, fr. pro- forward + facere to make — more at PRO-, DO] : well advanced in an art, occupation, or branch of knowledge — proficient n — pro·fi·cient·ly adv
syn PROFICIENT, ADEPT, SKILLED, SKILLFUL, EXPERT shared meaning element : having or manifesting the knowledge and experience needed for success in a trade or profession

¹pro·file \ˈprō-ˌfīl\ n [It profilo, fr. profilare to draw in outline, fr. pro- forward (fr. L) + filare to spin, fr. LL— more at FILE] 1 : a representation of something in outline; esp : a human head or face represented or seen in a side view 2 : a sectional view or representation in sharp relief : CONTOUR 3 : a side or sectional elevation: as a : a drawing showing a vertical section of the ground b : a vertical section of a soil exposing its various zones or inclusions 4 : a set of data often in graphic form portraying the significant features of something ⟨a corporation's earnings ~⟩; esp : a graph representing the extent to which an individual exhibits traits or abilities as determined by tests or ratings 5 : a concise biographical sketch syn see OUTLINE

²profile vt pro·filed; pro·fil·ing 1 : to represent in profile or by a profile : produce (as by drawing, writing, or graphing) a profile of 2 : to shape the outline of by passing a cutter around — pro·fil·er n

¹prof·it \ˈpräf-ət\ n, often attrib [ME, fr. MF, fr. L profectus advance, profit, fr. profectus, pp. of proficere] 1 : a valuable return : GAIN 2 : the excess of returns over expenditure in a transaction or series of transactions; esp : the excess of the selling price of goods over their cost 3 : net income usu. for a given period of time 4 : the ratio of profit for a given year to the amount of capital invested or to the value of sales 5 : the compensation accruing to entrepreneurs for the assumption of risk in business enterprise as distinguished from wages or rent — prof·it·less \-ləs\ adj

²profit vi 1 : to be of service or advantage : AVAIL 2 : to derive benefit : GAIN ~ vt : to be of service to : BENEFIT

prof·it·a·ble \ˈpräf-ət-ə-bəl, ˈpräf-tə-bəl\ adj : affording profits : yielding advantageous returns or results syn see BENEFICIAL
ant unprofitable — prof·it·abil·i·ty \ˌpräf-ət-ə-ˈbil-ət-ē\ n — prof·it·able·ness \ˈpräf-ət-ə-bəl-nəs\ n — prof·it·ably \-blē\ adv

profit and loss n : a summary account used at the end of an accounting period to collect the balances of the nominal accounts so that the net profit or loss may be shown

prof·it·eer \ˌpräf-ə-ˈti(ə)r\ n : one who makes what is considered an unreasonable profit esp. on the sale of essential goods during times of emergency — profiteer vi

profit sharing n : a system or process under which employees receive a part of the profits of an industrial or commercial enterprise

profit system n : FREE ENTERPRISE

prof·li·ga·cy \ˈpräf-li-gə-sē\ n : the quality or state of being profligate

¹prof·li·gate \ˈpräf-li-gət, -lə-ˌgāt\ adj [L profligatus, fr. pp. of profligare to strike down, fr. pro- forward, down + -fligare (akin to fligere to strike); akin to Gk thlibein to squeeze] 1 : completely given up to dissipation and licentiousness 2 : wildly extravagant : PRODIGAL — prof·li·gate·ly adv

²profligate n : a person given to wildly extravagant and usu. grossly self-indulgent expenditure syn see SPENDTHRIFT

pro·flu·ent \ˈpräf-ˌlü-ənt, ˈprōf-; prō-ˈflü-\ adj [ME, fr. L profluent-, profluens, prp. of profluere to flow forth, fr. pro- forth + fluere to flow — more at PRO-, FLUENT] : flowing copiously or smoothly

pro for·ma \(ˌ)prō-ˈfòr-mə, -ˈfór-\ adj 1 : made or carried out in a perfunctory manner or as a formality 2 : provided in advance to prescribe form or describe items ⟨pro forma invoice⟩

¹pro·found \prə-ˈfaund, prō-\ adj [ME, fr. MF profond deep, fr. L profundus, fr. pro- before + fundus bottom — more at PRO-, BOTTOM] 1 a : having intellectual depth and insight b : difficult to fathom or understand 2 a : extending far below the surface b : coming from, reaching to, or situated at a depth : DEEP-SEATED ⟨a ~ sigh⟩ 3 a : characterized by intensity of feeling or quality b : all encompassing : COMPLETE ⟨~ sleep⟩ syn see DEEP ant shallow — pro·found·ly \-ˈfaun-(d)lē\ adv — pro·found·ness \-ˈfaun(d)-nəs\ n

²profound n, archaic : something that is very deep; specif : the depths of the seas

pro·fun·di·ty \prə-ˈfən-dət-ē\ n, pl -ties [ME profundite, fr. MF profundité, fr. L profunditat-, profunditas depth, fr. profundus] 1 a : intellectual depth b : something profound or abstruse 2 : the quality or state of being very profound or deep

pro·fuse \prə-ˈfyüs, prō-\ adj [ME, fr. L profusus, pp. of profundere to pour forth, fr. pro- forth + fundere to pour — more at FOUND] 1 : pouring forth liberally : EXTRAVAGANT ⟨~ in their thanks⟩ 2 : exhibiting great abundance : BOUNTIFUL ⟨a ~ harvest⟩ — pro·fuse·ly adv — pro·fuse·ness n
syn PROFUSE, LAVISH, PRODIGAL, LUXURIANT, LUSH, EXUBERANT shared meaning element : giving or given out in great abundance ant spare, scanty, scant

pro·fu·sion \-ˈfyü-zhən\ n 1 : lavish expenditure : EXTRAVAGANCE 2 : the quality or state of being profuse 3 : lavish display

¹prog \ˈpräg\ vi progged; prog·ging [origin unknown] chiefly dial : to search about; esp : FORAGE

²prog n. chiefly dial : FOOD, VICTUALS

pro·ga·mete \ˌprō-gə-ˈmēt, (ˈ)prō-ˈgam-ˌēt\ n [ISV] : a cell giving rise to gametes: a OOCYTE b : SPERMATOCYTE

pro·gen·i·tor \prō-ˈjen-ət-ər, prə-\ n [ME, fr. MF progeniteur, fr. L progenitor, fr. progenitus, pp. of progignere to beget, fr. pro- forth + gignere to beget — more at KIN] 1 a : an ancestor in the direct line : FOREFATHER b : a biologically ancestral form 2 : PRECURSOR, ORIGINATOR ⟨~s of socialist ideas —Times Lit. Supp.⟩

prog·e·ny \ˈpräj-(ə-)nē\ n, pl -nies [ME progenie, fr. OF, fr. L progenies, fr. progignere] 1 a : DESCENDANTS, CHILDREN b : offspring of animals or plants 2 : OUTCOME, PRODUCT 3 : a body of followers, disciples, or successors

pro·ges·ta·tion·al \ˌprō-jes-ˈtā-shnəl, -shən-ᵊl\ adj : preceding pregnancy or gestation; esp : of, relating to, inducing, or constituting the modifications of the female mammalian system associated with ovulation and corpus luteum formation ⟨~ hormones⟩

pro·ges·ter·one \prō-ˈjes-tə-ˌrōn\ n [progestin + sterol + -one] : a steroid progestational hormone $C_{21}H_{30}O_2$

pro·ges·tin \-ˈjes-tən\ n [pro- + gestation + -in] : a progestational hormone; esp : PROGESTERONE

pro·ges·to·gen \-tə-jən\ n [progestational + -ogen (as in estrogen)] : any of several progestational steroids (as progesterone)

pro·glot·tid \(ˈ)prō-ˈglät-əd\ n [NL proglottis] : a segment of a tapeworm containing both male and female reproductive organs — pro·glot·ti·dean \-ˌglät-ə-ˈdē-ən, ˌprō-glä-ˈtid-ē-\ adj

pro·glot·tis \(ˈ)prō-ˈglät-əs\ n, pl -glot·ti·des \-ˈglät-ə-ˌdēz\ [NL proglottid-, proglottis, fr. Gk proglottis tip of the tongue, fr. pro- + glōtta tongue — more at GLOSS] : PROGLOTTID

prog·na·thic \präg-ˈnath-ik, -ˈnā-thik\ adj : PROGNATHOUS

prog·na·thism \ˈpräg-nə-ˌthiz-əm, präg-ˈnā-\ n : prognathous condition

prog·na·thous \-thəs\ adj : having the jaws projecting beyond the upper part of the face

prog·no·sis \präg-ˈnō-səs\ n, pl -no·ses \-ˌsēz\ [LL, fr. Gk prognōsis, lit., foreknowledge, fr. progignōskein to know before, fr. pro- + gignōskein to know — more at KNOW] 1 : the prospect of recovery as anticipated from the usual course of disease or peculiarities of the case 2 : FORECAST, PROGNOSTICATION

prog·nos·tic \präg-ˈnäs-tik\ n [ME pronastique, fr. MF, fr. L prognosticum, fr. Gk prognōstikon, fr. neut. of prognōstikos foretelling, fr. progignōskein] 1 : something that foretells : PORTENT 2 : PROGNOSTICATION, PROPHECY — prognostic adj

prog·nos·ti·cate \präg-ˈnäs-tə-ˌkāt\ vt -cat·ed; -cat·ing 1 : to foretell from signs or symptoms : PREDICT 2 : FORESHOW, PRESAGE syn see FORETELL — prog·nos·ti·ca·tive \-ˌkāt-iv\ adj — prog·nos·ti·ca·tor \-ˌkāt-ər\ n

prog·nos·ti·ca·tion \(ˌ)präg-ˌnäs-tə-ˈkā-shən\ n 1 : an indication in advance : FORETOKEN 2 a : an act, the fact, or the power of prognosticating b : FORECAST

pro·grade \ˈprō-ˌgrād\ adj [L pro- forward + gradi to go — more at PRO, GRADE] : being or relating to orbital or rotational motion of a body that is in the same direction as that of another celestial body ⟨~ orbit of a satellite⟩

¹pro·gram or pro·gramme \ˈprō-ˌgram, -grəm\ n [F programme agenda, public notice, fr. Gk programma, fr. prographein to write before, fr. pro- before + graphein to write] 1 [LL programma, fr. Gk] : a public notice 2 a : a brief usu. printed outline of the order to be followed, of the feature or features to be presented, and the persons participating (as in a public exercise, performance, or entertainment) b : the performance of a program; esp : a performance broadcast on radio or television 3 : a plan or system under which action may be taken toward a goal 4 : CURRICULUM 5 : PROSPECTUS, SYLLABUS 6 a : a plan for the programming of a mechanism (as a computer) b : a sequence of coded instructions that can be inserted into a mechanism (as a computer) or that is part of an organism 7 : matter for programmed instruction

²program also programme vt -grammed or -gramed; -gram·ming or -gram·ing 1 a : to arrange or furnish a program of or for : BILL b : to enter in a program 2 : to work out a sequence of operations to be performed by (a mechanism) : provide with a program 3 : to insert a program for (a particular action) into or as if into a mechanism — pro·gram·ma·bil·i·ty \ˌprō-ˌgram-ə-ˈbil-ət-ē\ n — pro·gram·ma·ble \ˈprō-ˌgram-ə-bəl\ adj

program director n : one in charge of planning and scheduling program material for a radio or television station or network

pro·gram·mat·ic \ˌprō-grə-ˈmat-ik\ adj 1 : relating to program music 2 : of, resembling, or having a program — pro·gram·mat·i·cal·ly \-i-k(ə-)lē\ adv

pro·grammed or pro·gramed \ˈprō-ˌgramd, -grəmd\ adj 1 : of or relating to learning by means of programmed instruction 2 : produced in the form of programmed instruction

programmed instruction n : instruction through information given in small steps with each requiring a correct response by the learner before going on to the next step

pro·gram·mer also pro·gram·er \ˈprō-ˌgram-ər, -grə-mər\ n : one that programs as: a : one that prepares and tests programs for mechanisms b : a person or device that programs a mechanism

pro·gram·ming or pro·gram·ing \-ˌgram-iŋ, -grə-miŋ\ n : the planning, scheduling, or performing of a program

program music n : music intended to suggest a sequence of images or incidents

¹prog·ress \ˈpräg-rəs, -ˌres, chiefly Brit ˈprō-ˌgres\ n [ME, fr. L progressus advance, fr. progressus, pp. of progredi to go forth, fr. pro- forward + gradi to go — more at PRO, GRADE] 1 a (1) : a royal journey marked by pomp and pageant (2) : a state procession b : a tour or circuit made by an official (as a judge) c : an expedition, journey, or march through a region 2 a : forward or onward movement (as to an objective or to a goal) : ADVANCE 3 : gradual betterment; esp : the progressive development of mankind — in progress : going on : OCCURRING

²pro·gress \prō-ˈgres\ vi 1 : to move forward : PROCEED 2 : to develop to a higher, better, or more advanced stage

pro·gres·sion \prə-ˈgresh-ən\ n 1 : a sequence of numbers in which each term is related to its predecessor by a uniform law 2

# EXHIBIT 9

IN THE UNITED STATES DISTRICT COURT
FOR NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

------------------------------------x

DEKALB GENETICS CORPORATION,          :

      Plaintiff,                      :

      v                               :

CIBA-GEIGY CORPORATION,               :    Civil Action Nos.   96-C50114
                                      .                          96-C50241
      and                             :

MYCOGEN CORPORATION, including its    :    District Judge Philip G. Reinhard
operating subsidiaries AGRIGENETICS, INC  :
(d.b.a. MYCOGEN SEEDS) and MYCOGEN    :
PLANT SCIENCE, INC.,                  :

      Defendants                      :

------------------------------------x


## CIBA'S INITIAL MARKMAN HEARING MEMORANDUM

Dimitrios T. Drivas
William P. DiSalvatore
WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York  10036

David C. Van Dyke
CASSIDAY SCHADE & GLOOR
20 North Wacker Drive
Suite 1040
Chicago, Illinois  60606-1289

Attorneys for Defendant
Ciba-Geigy Corporation

RECEIVED
A.W. & D.
AUSTIN
APR 2 0 1999
new york 417846

TABLE OF CONTENTS

Page

I.    INTRODUCTION ............................................................................................. 1

II.   SUMMARY OF THE ARGUMENT ..................................................... 3

III.  BACKGROUND ............................................................................................. 5

      A.    THE CORN SEED INDUSTRY .......................................................... 5

            1.    The Industry Has Been Revolutionized By Insect Resistant *Bt* Corn ... 7

      B.    CORN TRANSFORMATION ............................................................. 8

            1.    The Early Attempts to Transform Corn .................................. 8
            2.    The Use of Markers In Plant Transformation ....................... 9
            3.    Fertile Corn Had Been Successfully Regenerated From Culture By
                  The Mid-1980's ...................................................................... 12
            4.    The Prior Art on Direct Gene Transfer .................................. 13
            5.    The Gene Gun Breakthrough ................................................. 14
            6.    Regenerable Cultures As Gene Gun Targets ......................... 16
            7.    Simultaneous Independent Invention ..................................... 17
            8.    The Development of Insecticidal *Bt* Corn ........................... 18
            9.    The Patents-in-Suit and Their Relationships ........................ 20
            10.   DeKalb and Not the Patent Office Determined Who Was the First To
                  Invent as Between Adams et al. and Lundquist et al. ............ 21

      C.    THE PROSECUTION OF THE PATENTS-IN-SUIT ........................... 23

            1.    The Lundquist et al. Prosecution ........................................... 24

                  a.    The 467,983 application (abandoned) ......................... 24
                  b.    The 974,379 (FWC) Application Which Issued As the '877
                        Patent ......................................................................... 29
                  c.    The 249,458 application Which Issued As The '880 Patent .... 36
                  d.    The 508,045 Application Which Issued As The '956 Patent ... 39

            2.    The Adams et al. Work and Their File Histories ................... 56

                  a.    The Original Filing - Ser. No. 07/392,176 - Abandoned and
                        Not Claimed for Priority ............................................ 56
                  b.    The First Priority Application Ser. No. 07/513,298
                        (Abandoned) ............................................................... 57
                  c.    Serial No. 07/565,844 Which Issued as The '318 Patent ..... 58

d    The 233,067 Application Which Issued as The '520 Patent .... 62

IV    APPLICABLE LAW FOR CLAIM CONSTRUCTION ..................... 66

    A    PRINCIPALS OF CLAIM CONSTRUCTION. ......................... 66

    B    EVIDENCE TO BE CONSIDERED IN CLAIM CONSTRUCTION ........... 66

        1    Intrinsic Evidence .......................................... 66
        2    Intrinsic Evidence and the Narrowing of Claims ............. 67
        3    Extrinsic Evidence ......................................... 68

V    ARGUMENT .................................................... 69

    A    U S  Patent No  5,484,956 ................................... 69

        1    "containing heterologous DNA encoding *Bacillus thuringiensis* endotoxin,
            wherein said DNA is expressed so that the plant exhibits resistance to
            an insect" ................................................. 70
        2    "wherein said DNA is transmitted through a complete
            normal sexual cycle of the R0 plant to the R1 generation" .. 74
        3    "wherein said DNA is introduced into said plant by
            microprojectile bombardment of *Zea mays* callus cells" ..... 75
        4    "An R1 transgenic *Zea mays* plant derived from the plant of claim 1"
            (Claim 5) .................................................. 77
        5    "so that the R1 plant exhibits said phenotypic characteristics"
            (Claims 5 and 6) ........................................... 77
        6    "progeny" .................................................. 78

    B    U S  Patent No  5,538,877 .................................. 82

        1    "establishing a regenerable embryogenic callus culture from a *Zea*
            *mays* plant to be transformed" ............................ 83
        2    "identifying or selecting a transformed cell line" ......... 85
        3    "wherein said DNA is transmitted through a complete
            sexual cycle of said transgenic plant to its progeny" ...... 86
        4    "imparts herbicide resistance thereto" ..................... 87
        5    "said DNA comprises a selectable marker gene or reporter gene" .. 90
        6    "said selectable marker gene imparts herbicide resistance
            to said fertile transgenic Zea mays plants" ................ 91
        7    "imparts insect resistance thereto" ........................ 91

    C    U S  Patent No  5,538,880 .................................. 91

        1    "bombarding intact regenerable *Zea mays* cells with DNA-coated
            microprojectiles" ......................................... 93
        2    "identifying or selecting a population of transformed cells" .. 95

    3.    "cells are derived from immature embryos" ............................... 96
    4.    "obtaining progeny from a fertile transgenic plant
          obtained by the process of claim 1" .................................... 97
    5.    "progeny" ................................................................ 97

    D.    U.S. Patent No. 5,489,520 ..................................................... 98

        1.    "establishing a regenerable culture from a *Zea mays* plant to be
              transformed" ............................................................ 100
        2.    "gene encoding for phosphinothricin acetyl transferase" .............. 101
        3.    "identifying or selecting a transformed cell line" ...................... 102
        4.    "progeny" ............................................................ 103
        5.    "wherein said gene is chromosomally integrated" ...................... 104
        6.    "obtaining progeny" .................................................. 105
        7.    "preparing seed" ...................................................... 105

VI.    CONCLUSION ............................................................................. 106

4      "obtaining progeny from a fertile transgenic plant
obtained by the process of claim 1"

Claims 4 and 13 expressly contain a step of obtaining progeny from the plant produced in

claim 1  The "obtaining progeny" step must be interpreted as making a sexual cross of the plant

made by claim 1.  This further supports the interpretation of clause (iii) of claim 1 and 10 and

therefore clause (iv) of claims 1 and 6 of the '877 patent as not being directed to a sexual crossing

step under the doctrine of claim differentiation   Clause (iii) refers merely to a characterization of

the capabilities of the transformed DNA while the subject term is an actual process step.

5      "progeny"

The term "progeny" as used in the claims of the '880 patent has the conventional meaning

as discussed above for the '877 patent, the immediate offspring of a particular cross   The claims

are in conformity with this definition as they recite that the DNA is transmitted through "a," i.e,

one, sexual cycle to progeny.  This means that the DNA is transmitted to the immediate offspring

(R1 generation) of a particular cross (with the R0 generation plant of claim 1 or 10).

If this were not the case then numerous claims would be substantially overlapping, and

thus superfluous.  If progeny were read to mean all generations, the claims 5 and 7; claims 14 and

16; claims 7 and 9, claims 16 and 18; claims 6 and 8; and claims 15 and 17 would all cover the

same generations of transgenic corn.

The meaning of the term "progeny" as the immediate offspring of a sexual cross is

strongly supported by the explanation DeKalb provided on the scope of claims 50-55 added in a

supplemental amendment dated March 28, 1995 (U.S. Application Serial No. 08/249,458).  These

claims ultimately issued as claims 4-9 of the '880 patent.  The Examiner rejected the claims in a

Final Rejection dated April 26, 1995 as indefinite and duplicative.  (SM 1052).  In its May 31,

1995, Response Under 37 C.F.R. § 1.116 - Expedited Examining Procedure - Group 1803,

new york 417846 v2

DeKalb explained that the claims were not duplicative but distinct. DeKalb relied on the conventional meaning of "progeny" used in the specification as the offspring of a sexual cross (SM 1055). (See discussion in the related '956 and '880 patents). DeKalb specifically identified each use in the claims of the term progeny to the specific sexual cross generation, e.g., R2, R3. (SM 1055). Claim 6 would be rendered totally incomprehensible by any other definition of the term. DeKalb committed to a particular meaning in the specification or during prosecution, so that meaning is then binding here. CVI/Beta, 112 F.3d at 1158-59.

The term "obtaining seed from said progeny" in claims 6 and 8 is also ambiguous. It would literally mean collecting seed from the plant. This would not be possible unless the progeny plant of the preceding claim were sexually crossed and pollinated. Thus an additional sexual crossing step must be implied in these process claims with each instance of the term "progeny" referring specifically to the offspring of each such preceding sexual cross.

D.    U.S. Patent No. 5,489,520

DeKalb and its counsel determined that the Adams et al. inventors were not the first to invent a method of making herbicide resistant corn by microprojectile bombardment and the claims reflect that determination. The claims do not call for conferring herbicide resistance and are limited to a selectable marker gene encoding phosphinothricin acetyl transferase. Otherwise, the claim interpretation issues here are largely the same as those for the '877 patent whose claim format and terms were the basis of the claims here.

The asserted claims of the '520 patent are set out below with the disputed claim terms underlined:

1.    A process for producing a fertile transgenic <u>Zea mays</u> plant comprising the steps of

(i)    establishing a regenerable culture from a Zea mays plant to be transformed,

-98-

VI    CONCLUSION

For all the foregoing reasons, Ciba requests that the Special Master recommend and the

Court accept and adopt the construction of the claims as set forth above

Respectfully submitted,

Dated.  April 19, 1999

Dimitrios T  Drivas
William P  DiSalvatore
WHITE & CASE LLP
1155 Avenue of the Americas
New York, NY  10036
Telephone.  (212) 819-8200

David C  Van Dyke
CASSIDAY, SCHADE & GLOOR
20 North Wacker Drive, Suite 1040
Chicago, IL  60606-3100
(312) 444-2451

Attorneys for Defendant
Ciba-Geigy Corporation

<u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that true and correct copies of CIBA'S INITIAL

MARKMAN HEARING MEMORANDUM were served on April 19, 1999, as follows:

<u>BY FEDEX</u>

Robert L. Harmon, Esq.
174 Columbus Drive
Islamorada, Florida 33036

Charles H. DeLaGarza
ARNOLD, WHITE & DURKEE
4850 U.S. Bank Place
601 Second Avenue South
Minneapolis, MN 55402-4320

David L. Parker, Esq.
ARNOLD, WHITE & DURKEE
1900 One American Center
600 Congress Avenue
Austin, TX 78701-3248

Allan W. Jansen, Esq.
LYON & LYON
3200 Park Center Drive, Suite 1200
Costa Mesa, California 92626

Daniel J. Thomasch, Esq.
ORRICK, HERRINGTON & SUTCLIFFE,
LLP
666 Fifth Avenue
New York, New York 10103

Craig Diviney, Esq.
DORSEY & WHITNEY, LLP
220 S. Sixth Street
Minneapolis, Minnesota 55402

Sharon R. Barner, Esq.
FOLEY & LARDNER
Suite 330, One IBM Plaza
330 North Wabash Avenue
Chicago, IL 60611-3608

John J. Holevas, Esq.
WILLIAMS AND McCARTHY
321 West State Street
Rockford, IL 61101