# EXHIBIT 11



# THE YEAR IN IP

## ALMANAC 2002

### FROM THE EDITORS OF IP WORLDWIDE

#### FEATURING THE LEADING IP FIRMS AND THE HOTTEST IP MARKETS

MGA0087434



MGA0087435

The patent system has always been a sort of balancing act between public and private benefits. Inventors receive the exclusive right to market and profit from their discoveries. The public learns how the inventions work and can use them for free after the patents expire.

Last year, when we picked the most valuable patents ["Patent Plums," August 2001], we looked at the incentive part of the equation. Now it's time to look at what society gets in return. Instead of picking patents that have made big bucks, we picked patents that have made a big difference—shaking up society for better or worse. As we did last year, we only look at active patents—you won't find the polio vaccine or Cohen-Boyer gene-splicing patents on our list.

Some patents swing two ways. They have both affected society and enriched their owners. For example, Johnson & Johnson's cardiac stent patents, which revolutionized heart surgery, made our list last year, and are on this year's list, too.

Settling on only ten patents wasn't easy. For one thing, a whole lot of patents have saved lives, or revolutionized an industry, or changed business or legal landscapes. And there are no numbers to show definitively which have done it best. Further, few patents are islands unto themselves. Behind advances in

# These ten patents have saved lives, created controversy, and fueled innovation. By Alan Cohen

biotechnology, agriculture, and public health there is often a group of interlocking and dependent patents. Finally, there tends to be startlingly little consensus among patent attorneys and scientists on the social significance of inventions.

Is our list subjective? Sure. Are there other patents worthy of inclusion? You bet. But here are ten—listed in the order they were issued and with the firms that prosecuted and litigated the patents on behalf of their owners—that certainly deserve a turn in the spotlight.

THIS ARTICLE ORIGINALLY APPEARED IN THE AUGUST 2002 ISSUE OF *IP WORLDWIDE*.

MGA0087436



**10 patents that changed the world**

# The Squishy Patent

**U.S. Patent No. 4,558,302**
**LZW Compression**
**Issued:** December 1985 to Terry Welch
**Assigned to:** Initially to Sperry Corporation;
now held by Unisys Corporation
**Prosecuted by:** In-house at Sperry Corporation

When this patent expires next year, so too will one of the Internet's longest-running love-hate relationships. This is the patent that spurred the growth of the Web from a little-known medium used by techies for sending files to a worldwide phenomena. The LZW algorithm provides a fast, elegant way to compress and decompress data. It is the trick that allows Web users to view photos and animations without waiting hours for them to download. Every time you call up CNN.com, Yahoo, or just about any other Web site, you're looking at LZW compression in action.

Inadvertently, the patent spotlighted the tension between the open environment of the Web and its commercial potential. When inventor Terry Welch published a paper describing LZW compression in 1984, he didn't mention the pending patent, and when developers used the technique to create a compression standard known as GIF, they were unaware that they were treading onto protected territory. Unisys, which holds the patent, was unaware, too, for it remained silent for years, as GIF use exploded. Finally, in late 1994, the company announced that it would begin charging licensing fees, creating an uproar on the Net. Developers railed against paying to use a technique that all along had been free and open. LZW became known as the "submarine patent," and the fees as the "Unisys tax." (The patent survived a re-exam in 1993.)

Since 1995, Unisys has entered into almost 2,500 licensing agreements, most of them low-cost. Unisys has negotiated one-time fees, pay-as-you-go schemes, and companies like Microsoft Corporation and AOL Time Warner Inc. have negotiated their own rates.

The LZW controversy also encouraged the development of alternative compression algorithms—including the PNG standard and the JPEG format used extensively in digital photography—proving that even the "dark" side of this patent spurred progress.

# Copying DNA

**U.S. Patent Nos. 4,683,195; 4,683,202; 4,889,818; 4,965,188**
**The Polymerase Chain Reaction (PCR)**
**Issued:** Four key patents: two in July 1987 to Kary Mullis;
one in December 1989 to David Gelfand and others;
one in October 1990 to Kary Mullis
**Assigned to:** Initially to Cetus Corporation;
now held by Hoffman La-Roche
**Prosecuted by:** In-house at Cetus Corporation
**Litigated by:** San Francisco's Orrick Herrington & Sutcliffe;
Barbara Caulfield and Denise Alter, lead partners.
Newark's Crummy, Del Deo, Dolan, Griffinger & Vecchione;
John Ridley, lead partner. New York's Pennie & Edmonds;
Todd Wagner and Scott Familant, lead partners.

Think of the polymerase chain reaction as a Xerox machine for DNA. The process enables scientists to take a minute amount of genetic material and multiply it exponentially—increasing the sample millions of times over in just a few hours. It is the crucial process in fields like forensic research, where the material that scientists have at hand to work with—a strand of hair from a crime scene, for example—is, by itself, often insufficient for testing. "Before PCR, you were flat out of luck if you didn't have enough DNA," says Lisa Haile, an attorney at Gray Cary Ware & Freidenrich. "That's why it's only recently that you've seen [genetic testing] in court."

PCR's uses go far beyond DNA fingerprinting. The process has revolutionized drug research and medical diagnostics by enabling researchers to find faulty genes and identify viruses. It has also allowed scientists to map the human genome and ushered in the technology behind cloning.

PCR patents have also ushered in some lengthy litigation. The validity of Mullis's first two patents were challenged by

## Some patents achieve their notoriety in the marketplace mouse grabbed headlines the day it was granted.

MGA0087437



E.I. du Pont de Nemours and Company in 1990. The company contended that the PCR process was made obvious by the earlier work of H. Gobind Khorana, a professor at the Massachusetts Institute of Technology and a Nobel laureate. But in February 1991, a federal jury upheld the patents, finding that Khorana's work did not anticipate the PCR technology.

The bigger legal stir was caused by the 1989 patent, which covers the key Taq polymerase enzyme used to carry out PCR. Hoffman-La Roche, which had acquired the PCR patents in 1992 from Cetus Corporation, sued Promega Corporation later that year for what it claimed was a breach of a licensing agreement. Promega countersued, questioning the validity of the Taq patent. In 1999 a San Francisco federal court found that Cetus had committed fraud by intentionally omitting material information from its patent application, and invalidated the patent. Hoffman-La Roche appealed to the U.S. Court of Appeals for the Federal Circuit, which held a hearing in May 2001, but has yet to make a ruling.

## Mighty Mouse

**U.S. Patent No. 4,736,866**
**Transgenic Animals**
**Issued:** April 1988 to Philip Leder and Timothy Stewart
**Assigned to:** Harvard University
**Prosecuted by:** Fish & Richardson
**Litigated by:** Ottawa office of Toronto's Smart & Biggar;
David Morrow and Steven Garland, lead partners

**Some patents achieve their notoriety** in the marketplace, others in the courtroom; the Harvard mouse grabbed headlines the day it was granted. This was the first patented transgenic animal, a mouse that contained genes from another species. These particular genes, called oncogenes, trigger cancer growth. By inserting them into a mouse, researchers can study the effects of cancer-fighting drugs and suspected carcinogens without human testing. Researchers can explore potential treatments—and cures—more effectively, and more safely than otherwise possible.

Harvard's patent was particularly broad, covering any nonhuman mammal that had an oncogene inserted. The discovery led other sci-



# others in the courtroom. The Harvard

MGA0087438



# ten that changed the world

## Some question whether people should have an exclusive right to patent an animal—even a genetically altered one.

entists to develop—and patent—their own transgenic animals, using all sorts of genes. Yet from day one, the patent, and the science behind it, have been extremely controversial. Some question whether people should have an exclusive right to an animal—even a genetically altered one. Others argue that genetically altering nature is in itself troublesome.

Initially the Patent Office rejected the Harvard mouse application on the ground that animals were not a category of patentable subject matter, says Paul Clark, now a name partner at Boston's Clark & Lebling, who prosecuted the patent. Clark visited the examiner to argue against the decision, but to no avail. Shortly after that, however, Clark's luck changed. The Patent Office had approved a controversial patent on an oyster, lifting the ban on animals and saving the mouse.

In Canada, Harvard's mouse has been the subject of a decadelong legal battle, stemming from the Canadian Patent Office's refusal, in August 1993, to award it a patent, holding that the mouse was mainly the work of nature, not man. That decision was reversed by an appellate court in August 2000, but the Canadian Supreme Court has agreed to hear the matter.

## Killing Hepatitis
**U.S. Patent No. 4,710,463; 4,769,238; 6,096,879**
The Hepatitis B Vaccine
**Issued:** Three patents: one in December 1987 to (now Sir)
Kenneth Murray of the University of Edinburgh; a founding member of Biogen, Inc.; one in September 1988 to William Rutter and others; one in August 2000 to Pierre Tiollais and others
**Assigned to:** Biogen (Murray patent); the Regents of the University of California (Rutter patent);
Institute Pasteur (Tiollais patent)
**Prosecuted by:** Ciotti & Murashige (Rutter patent); Finnegan, Henderson, Farabow, Garrett & Dunner (Tiollais patent); Fish & Neave (Murray patent)

**Hepatitis B is a killer.** The infection leads to more than 1 million deaths a year, according to the World Health Organization, and is also the leading cause of liver cancer. In

the United States, the hepatitis death rate has fallen to 5,000 deaths a year, largely because of an effective vaccine that has become a childhood inoculation in the past decade and a half.

The high-tech vaccine is the first produced using genetic engineering. Kenneth Murray's patent, one of several that have been crucial to conquering the disease, covers the so-called "intermediates" that are useful in the production of hepatitis B virus antigens. Intermediates are substances that trigger the production of disease-fighting proteins known as antibodies. By developing these antibodies prior to exposure, the body creates a defensive barrier, preventing hepatitis B infections.

Prior to Murray's work the antigens were extremely hard to develop in the lab. By using genetic engineering techniques, Murray was able to create antigens in great quantities—paving the way for readily available vaccines, and for tools to detect hepatitis B infection. Today, every one of these vaccines implicates the patent—and puts licensing fees in Biogen's coffers (licensing rates are confidential). The global market for the hepatitis B vaccine now exceeds $1 billion a year, and is expected to grow as more countries adopt World Health Organization recommendations for the vaccination of newborns, teenagers, health care workers, and other at-risk populations.

## Surgery in a Heartbeat
**U.S. Patent Nos. 4,739,762; 5,195,984**
Cardiac Stents
**Issued:** Two main patents: one issued April 1988 to Julio Palmaz; the other March 1993 to Richard Schatz
**Assigned to:** Initially to Expandable Grafts Partnership; now held by Johnson & Johnson/Cordis
**Prosecuted by:** Ben Tobor (now a partner at Bracewell & Patterson)
**Litigated by:** Patterson, Belknap, Webb & Tyler;
Gregory Diskant and William Cavanaugh, lead partners
**Cardiac stents are revolutionary** not so much for what they do—repair clogged arteries—but for how they do it. Before

MGA0087439

# Despite reassurances from the U.S.D.A., consumers are wary about genetically altered foods.

stents were introduced in 1994, the gold standard was open-heart surgery, a procedure that saved countless lives but subjected patients to long hospital stays, the risk of infection, and long recovery times. The stent procedure, which requires just a small incision, can be done on an outpatient basis, making it far less expensive than open-heart surgery—good news if your time is as precious as Dick Cheney's, who had a stent inserted in 2001.

Palmaz's patent covers the key invention. It envisions a narrow metal "cage" that sits on top of a balloon catheter. The balloon and cage are threaded through the artery until they come to the blockage, at which point the balloon is inflated. This also causes the metal cage to expand, pushing out plaque and opening the artery. Schatz's patent covers a major improvement: the ability to use more than one length of stent, connected by flexible connectors. Stents have proven so popular that a number of companies have obtained patents on various improvements, leading to an even bigger number of lawsuits. Johnson & Johnson has more than ten suits active, according to Jeffrey Lewis, a partner at New York's Patterson, Belknap, Webb & Tyler. Complicating matters is that while all of the cases charge infringement of the basic Palmaz-Schatz patents, no two stents look alike, so each case revolves around different nuances of the invention, or different patent claims. Johnson & Johnson won two huge verdicts in late 2000—$324.4 million against Boston Scientific and $271.1 million against Medtronic. But the awards were set aside and new trials ordered after the judge hearing both cases changed her interpretations of the claims at issue. That decision, Lewis says, will be appealed.

## Frankenfoods

U.S. Patent Nos. 4,940,835; 5,188,642; 5,484,956
Genetically engineered crops
Issued: Three key patents: Two issued to Dilip Shah and others, one in July 1990 and one in February 1993; one issued January 1996 to Ronald Lundquist and David Walters
Assigned to: Monsanto Corporation (Shah patents);

Dekalb Genetics Corp. (Lundquist patent)
Prosecuted by: In-house at Monsanto (Shah patents); Minneapolis's Schwegman, Lundberg & Woessner (Lundquist patent)

The idea of genetically engineered crops may still seem futuristic (if not a little bit frightening), but genetically altered corn, cotton, soybeans, and more have already invaded the fields, the factories, and, chances are, your dinner table. In short—you've eaten the stuff. By inserting specific genes into plants, scientists can make crops that do all sorts of newfangled things, like fight off pests and tolerate herbicides that kill weeds. The technology has been embraced by American farmers—genetically altered soybeans now account for 74 percent of the crop, and modified corn 32 percent, according to the U.S. Department of Agriculture.

The Monsanto Company's patents cover a technology used in roughly 80 percent of all genetically engineered crops. The technology makes seeds resistant to the weed killer glyphosate, marketed—also by Monsanto—under the brand name Roundup. The modification allows farmers to kill weeds without killing their crops, as well.

Monsanto's patents did more than spur sales of weed killer; they spurred other genetic modifications, including techniques that boost the nutritional content of foods, or allow them to grow better in hostile environments (a boon in many areas plagued by famine). Ronald Lundquist's patent gives us corn that contains a gene from Bacillus thuringiensis (Bt), a soil bacterium that makes a toxin deadly to corn-eating insects. That means less corn for the bugs, more corn for us.

Despite reassurances from the U.S. Department of Agriculture that biotech foods are safe for human consumption, many consumers remain wary, labeling the technology "genetic pollution," and arguing that its long-term effects, haven't been adequately studied. The European Union halted biotech product approvals in 1998. Moreover, the poorest farmers—those most in need of the bionic crops—are often unable to afford the patented seeds. As the use of modified seeds increases, so too will the debate.

MGA0087440



**tents that changed the world**

# Business-Method Revolution

**U.S. Patent No. 5,193,056**
**Mutual Fund System**
**Issued:** March 1993 to R. Todd Boes
**Assigned to:** Signature Financial Group, Inc.
**Prosecuted by:** Pennie & Edmonds
**Litigated by:** Philadelphia's Dilworth, Paxson, Kalish & Kauffman (now Dilworth Paxson); Steven Friedman, lead partner

Pity poor Signature Financial Group. First its patent is challenged. Then it is invalidated. Then, even after that ruling is overturned, the patent is forever known as the State Street Bank patent—named, ironically, after the folks who brought the challenge. Perhaps this is appropriate, for it is not the patent itself that is important, but the case it spawned—*State Street Bank & Trust Co. v. Signature Financial Group Inc.* (1998).

Signature's patent covers a way to organize mutual funds using computer software. The district court determined that the invention couldn't be patented as it fell under the so-called "business method" exception to patentable subject matter. On appeal, the U.S. Court of Appeals for the Federal Circuit ruled that the business-method exception was a bad idea that it was getting rid of. That saved Signature's patent, but also sparked a flurry of controversy and confusion. Shortly after the Federal Circuit's ruling in the State Street case, Amazon.com sued barnesandnoble.com over its one-click patent, the über–business method patent. (That case has settled.)

The true importance of *State Street* is the message—and incentive—it provides inventors whose work falls outside the traditional subject matter of patents. Securities trading, insurance underwriting, or perhaps even the practice of law were all fair game. "It means that whatever the next new area is where people say, 'Can you patent this?' *State Street Bank* says you probably can," says Donald Steinberg, a partner specializing in intellectual property at Hale and Dorr.

# The Aids Drug

**U.S. Patent No. 5,413,999**
**HIV Protease Inhibitors**
**Issued:** May 1995 to Joseph Vacca and others
**Assigned to:** Merck & Co., Inc.
**Prosecuted by:** In-house at Merck

Protease inhibitors aren't a cure for HIV infection, but they can keep the disease manageable—and have helped to drastically reduce the number of deaths from AIDS. Approved for use in 1995, the inhibitors have shown a remarkable ability to suppress HIV viral loads, particularly when taken in a "triple cocktail" with two other drugs called reverse transcriptase inhibitors. By inhibiting the virus's protease enzyme, the drugs prevent viral replication—in essence, holding the virus in check and keeping it from developing into full-blown AIDS. It didn't take long for these drugs to work their magic, either. In 1997 the number of AIDS-related deaths in the U.S. dropped by 47 percent, according to the Food and Drug Administration.

Protease inhibitors have also called attention to a major criticism of the patentability of life-saving drugs: Manufacturers, using patents, can set prices so high the drugs cannot be obtained by many of the people who need them. Merck's Crixivan, the most widely used protease inhibitor, costs over $6,000 a year in the United States. But the vast majority of HIV-infected individuals live in the world's most impoverished nations, particularly in southern Africa, where over 250,000 people died of AIDS in 2000.

Under pressure to provide greater access to medication, Merck announced last year that it would cut the price of Crixivan in developing nations to $600 a year—a level, the company says, at which it will make no profit. But even that price is too high for most patients, who must rely on charities and relief groups to buy the drugs for them.

## The importance of State Street is the message and incentive it provides nontraditional inventors.

MGA0087441

# *Embryonic stem cells are as undecided as a college freshman, but they pick their major pretty quickly.*

## Not Quite the Bionic Man

U.S. Patent No. 6,171,610
Tissue Engineering
Issued: January 2001 to Charles Vacanti, Joseph Vacanti, and Martin Vacanti
Assigned to: University of Massachusetts;
Children's Medical Center Corporation
Prosecuted by: Fish & Richardson

Growing new tissue to replace a failed spinal cord, pancreas, liver, or retina sounds like science fiction. But in the last five to ten years, visible strides have been made in tissue engineering—even if we're not quite building the bionic man yet. Among the pioneers are the Vacanti brothers (Charles and Martin at the University of Massachusetts; Joseph at Harvard), whose patent covers a technique that has already shown promise in treating spinal cord injuries in rats.

You may need a Ph.D. to understand the patent, but any 5-year-old can appreciate the results. The Vacanti brothers removed an entire chunk of a rat's spine, guaranteeing that the spinal cord would not regenerate on its own, and leaving the rat without the use of its hind legs. Into this gap they applied a sponge-like scaffolding filled with a special hydrogel containing adult stem cells. The cells then grew into nerve cells for the spine, regenerating the missing tissue and creating their own scaffolding (replacing the sponge, which is designed to dissolve over time).

"The treated rats regained 90 percent use of their hind limbs," says Peter Fasse, the Fish & Richardson attorney who prosecuted the patent. Next up: tests in larger animals and, within the next ten years, humans.

## Frosh Cells

U.S. Patent No. 6,200,806
Primate Embryonic Stem Cells
Issued: March 2001 to James Thomson
Assigned to: Wisconsin Alumni Research Foundation
Prosecuted by: Quarles & Brady

Litigated by: Heller Ehrman White & McAuliffe;
John Skilton, lead partner

Embryonic stem cells are as undecided as a college freshman. They can become heart muscle, bone, skin—virtually any type of human tissue. But stem cells pick their major pretty quickly, roughly a week after an embryo is created. James Thomson's breakthrough is in finding a way to isolate and maintain stem cells to keep them from differentiating. Thomson's cells can reproduce indefinitely in the laboratory, producing a limitless supply of stem cells.

The potential is enormous. By figuring out how to direct their differentiation, researchers can help stem cells become blood cells to boost dwindling supplies, skin to replace that lost by burn victims, or heart muscle damaged by disease. Specialized cells can also enable drug researchers to screen new compounds more quickly. Research in these areas is well under way. The stem cell controversy has been enormous, too. Many worry that cells may come from aborted embryos, or from embryos produced for the sole purpose of harvesting them. Swayed by the potential of stem cell research, the Bush Administration lifted the ban on federal funding for stem cells last year for a limited number of stem cell lines.

It was the lack of funding that led Thomson, a University of Wisconsin researcher, to seek private support for his work. The source of those funds—biotechnology company Geron Corporation—later obtained an exclusive license to six cell types created from Thomson's research. But after the Bush's announcement, the Wisconsin Alumni Research Foundation (WARF), which held the patent, worried that Geron could stifle the flood of competing research the new federal funding would enable. In August 2001, WARF filed suit to take back, or at least limit, Geron's exclusivity. The two parties settled in January 2002. Geron relinquished exclusivity in three of the six cell types, and agreed to nonexclusive rights on any future cell types, thus paving the way for more research by other scientists.

*Alan Cohen is a freelance writer based in New York City.*
*E-mail: alanc31@yahoo.com*

MGA0087442

# EXHIBIT 12

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MONSANTO COMPANY and<br>MONSANTO TECHNOLOGY LLC,<br><br>Plaintiffs,<br><br>v.<br><br>SYNGENTA SEEDS, INC.,<br>SYNGENTA BIOTECHNOLOGY, INC., <br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 04-305-SLR<br>(lead case) |
| DEKALB GENETICS CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>SYNGENTA SEEDS, INC.,<br>SYNGENTA BIOTECHNOLOGY, INC., <br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 1:05cv355-SLR<br><br>**CONTAINS RESTRICTED<br>CONFIDENTIAL<br>INFORMATION SUBJECT TO<br>PROTECTIVE ORDER** |

### RULE 26(a)(2) EXPERT REPORT OF BARRY BRUCE, Ph.D.

I, Barry D. Bruce, Ph.D., submit the following expert report on behalf of Defendants

Syngenta Seeds, Inc., Syngenta Biotechnology, Inc., Golden Harvest Seeds, Inc., Garwood Seed

Co., Golden Seed Company, L.L.C., Sommer Bros. Seed Company, Thorp Seed Co., JC

Robinson Seeds, Inc., and Garst Seed Company, Inc. (collectively "Syngenta").

### I.    BACKGROUND

1. I have been working in the field of chloroplast biogenesis, including protein transport

into chloroplasts, for more than twenty years. My Curriculum Vitae is attached as Exhibit A,

1

19. Although in 1985-1986 it was widely accepted that CTPs were responsible for the targeting of nuclear-encoded proteins to the chloroplast, the mechanism was unknown, and there was not sufficient information to *a priori* identify chloroplast transit peptides, nor was it considered possible to design a chloroplast transit peptide from first principles. As such, a person of ordinary skill in the art would not have contemplated the use or design of a synthetic, artificial, or non-naturally occurring element, that when fused to a protein, would direct the protein into the chloroplast, thus functioning as a chloroplast transit peptide.

20. In the art at that time, there were only 4 known CTP classes and 14 known CTP sequences. Karlin-Neumann and Tobin, *Transit peptides of nuclear-encoded chloroplast proteins share a common amino acid framework*, EMBO J., 5:9-13 (1986) ("Karlin-Neumann"), at pp. 11, 13. There were no synthetic constructs considered to be chloroplast transit peptides. The only entities considered "chloroplast transit peptides" were naturally occurring chains of amino acids that are naturally located at the N-terminal portion of nuclear-encoded polypeptides, targeting the polypeptides to chloroplasts.

21. That the "chloroplast transit peptide" must be naturally-occurring is demonstrated by the use of the term in the '835 patent itself. Every reference to a CTP in the '835 patent is a naturally occurring CTP. *See* '835 patent. The inventors state:

> Suitable CTP's for use in the present invention may be *obtained from* various sources. Most preferably, the CTP is *obtained from* the endogenous EPSPS gene of the subject plant to the transformed. Alternately, one may often use a CTP *from* an EPSPS gene of another plant.

---

(*Hordeum vulgare*). *Light-induced appearance of mRNA coding for the apoprotein of the light-harvesting chlorophyll a/b protein*, Eur. J. Biochem. 85:581-588 (1978); Bennett, *Sic transit peptide*, TIBS 7:8 (1982); Comai et al., *Chloroplast transport of a ribulose bisphosphate carboxylase small subunit-5-enolpyruvyl 3-phosphoshikimate synthase chimeric protein requires part of the mature small subunit in addition to the transit peptide*, J. Biol. Chem. 263:15104-15109 (1988); Della-Cioppa et al., *Targeting a herbicide-resistant enzyme from Escherichia coli to chloroplasts of higher plants*, Bio/Technology 5:579-584 (1987) ("Della-Cioppa"), at p. 580.

*Id.* at col. 4, lines 35-40. The inventors' use of "*obtained from*" and "use a CTP *from*" indicates that one is to utilize a naturally occurring CTP from a plant gene.

22. Throughout the '835 patent, the inventors made a clear distinction between something that must be naturally-occurring and something that can be mutated, modified, or altered. For example, when describing promoters, the inventors state that mutant and various forms of promoters may be modified or altered by various processes. *Id.* at col. 3, line 45 to col. 4, line 12. Similarly, the inventors state that mutant and various forms of the coding sequence for EPSPS may be made by various processes. *Id.* at col. 5, lines 1-3. No similar language exists with respect to CTP sequence, again indicating that the CTP is to be obtained from a known genomic source, and thus it is naturally occurring.

23. Furthermore, the only CTP actually disclosed in the '835 patent is the naturally occurring petunia EPSPS CTP. Its DNA and amino acid sequences are disclosed in Figures 3 and 4 of the '835 patent. This was confirmed by Dr. Shah, who stated that: "Looking at . . . [the '835] patent, I only see the transit peptide sequence of the petunia EPSPS." October 7, 2005, Deposition Transcript of D. Shah ("Shah Transcript"), at p. 135, lines 8-9.

24. As I understand it, the Shah '835 patent is a continuation-in-part of Application No. 792,390 ("the '390 application"), filed October 29, 1985, which is itself a continuation-in-part of Application No. 763,482 ("the '482 application"), filed August 7, 1985. The use of the term CTP in the '835 patent as a naturally-occurring element stems from these prior applications leading to the patent. For instance, the '482 application describes obtaining a CTP by removing it from a larger polypeptide: "EPSPS genes which encode an enzyme with a functional chloroplast transit peptide (which is preferably removed from the mature EPSPS polypeptide) . . . ." '482 application, at p. 10, lines 24-27. This same language also appears in

the '390 application. *See* '390 application, at p. 10, lines 24-27. This language indicates that the CTP must be a naturally occurring sequence.

25. Accordingly, I agree with the Eastern District of Missouri's prior claim construction in *Monsanto v. Bayer CropScience, LP*, that "the term 'chloroplast transit peptide' means 'a naturally occurring series of amino acids that causes the transport of a polypeptide into a chloroplast.'" E.D. Mo., Oral Opinion, at p. 166. I also agree that "at the time of this invention, a chloroplast transit peptide under the widely-held understanding in the pertinent technical field, meant something found to naturally occur in a plant . . . ." *Id.* Furthermore, I agree that "[t]he references in the patent specification to sources for CTP all point to plants or naturally occurring substances, not to synthetic substances." *Id.*

## 2. "chloroplast transit peptide/5-enolpyruvylshikimate-3-phosphate synthase fusion polypeptide"

26. To a person of ordinary skill in the art, this phrase means a chain of amino acids consisting of a chloroplast transit peptide (as defined above) fused to an EPSPS, where the chloroplast transit peptide and EPSPS are not found together in nature.

27. Implicit in my definition above is that this phrase requires a chain of amino acids comprising two or more distinct elements, at least two of which do not occur together in nature, that are engineered such that the elements are now fused together via one or more peptide bonds. The terms "fusion polypeptide" and "fusion protein" mean the same thing.

28. The '835 patent uses the term "fusion" in the way ordinarily used by those skilled in the art. Every time the word "fusion" is used in the '835 patent, it refers to the combination of two elements that do not occur together in nature. Thus, the use of the term "fusion" in the '835 patent is consistent with the definition above.

9

29. For example, the '835 patent states: "The EPSPS gene of the present invention encodes an CTP/EPSPS *fusion polypeptide*. After the CTP/EPSPS polypeptide from a gene of this invention is translated from mRNA in the cytoplasm of the transformed plant cell, it is believed to be processed in the same manner as the *natural* EPSPS polypeptide." '835 patent, at col. 4, lines 23-28 (emphasis added). Thus the inventors draw a distinction between the naturally occurring EPSPS polypeptide having its native CTP and a "CTP/EPSPS fusion polypeptide."

30. Another way to understand the term "fusion polypeptide" is that a fusion polypeptide refers to the combination of two "heterologous" components that are joined together artificially. By heterologous, I mean that the two components do not occur together in nature, in that they could be derived from either two different genes or, alternatively, from homologous genes from different organisms. In every instance where the inventors use the term "fusion," it refers to the combination of two heterologous components.

31. Example 19 describes how the 72 amino acid transit peptide from petunia EPSPS was "fused" to the mature ssRubisco from wheat. *Id.* at cols. 30-31. This description is clearly consistent with the requirement for the elements to be heterologous to one another since the CTP and the ssRubisco are from both different gene products and, in this instance, different organisms. Likewise, Example 19, uses the term "fusion protein" to describe the polypeptide produced from a construct containing the CTP from petunia EPSPS with an engineered Rubisco cleavage site adjacent to the wheat ssRubisco protein. *Id.* at col. 31, lines 3-8.

32. Consistent with the typical definition of "fusion polypeptide," the '835 patent does not describe the native petunia CTP/EPSPS as a fusion polypeptide because these two elements are not heterologous. They derive from the same gene and the same organism. *See id.*, col. 3, lines 19-22.

10

83. Alternatively, the skilled artisan could create a CTP/EPSPS fusion polypeptide construct as taught by Van den Broeck (such as the CTP sequence for petunia EPSPS fused to the mutant EPSPS gene reported by Comai).

Dated ___10/26/2005___                    Respectfully submitted,

                                           _Barry D. Bruce_

                                           Dr. Barry D. Bruce

## CERTIFICATE OF SERVICE

I, Adam W. Poff, hereby certify that on October 27, 2005, copies of the foregoing

document were caused to be served upon the following:

### BY E-MAIL & HAND DELIVERY

Richard L. Horwitz, Esquire
Potter Anderson & Corroon LLP
Hercules Plaza
1313 North Market Street
Wilmington, DE 19899-0951

### BY E-MAIL & FEDERAL EXPRESS

Peter E. Moll, Esquire
Howrey Simon Arnold & White, LLP
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004

Susan Knoll, Esquire
Howrey Simon Arnold & White, LLP
1111 Louisiana, 25th Floor
Houston, TX 77002-5242

Kenneth A. Letzler, Esquire
Arnold & Porter LLP
555 12th Street, N.W.
Washington, D.C. 20004

Adam W. Poff (No. 3990)

# EXHIBIT 13



# Principles and Practice of Novel Food Safety Assessment

Part No. AGBNFSAM-01-099A

Agriculture and Biotechnology Strategies (Canada) Inc.

Copyright © 2001
Agriculture & Biotechnology Strategies
(Canada) Inc

P.O. Box 475
111 Colborne St East
Merrickville, Ontario
Canada K0G 1N0

Tel: (613) 269-7966
Fax: (613) 269-4367
http://www.agbios.com

# Contents

Glossary ............................................................................................................................... 4

Preface ................................................................................................................................. 7
   Disclaimer ........................................................................................................................ 8
   A Note on Quality Standards for Documentation ........................................................... 8

Concepts and Principles ..................................................................................................... 10
   Substantial Equivalence ................................................................................................. 11
   Limitations of Substantial Equivalence ......................................................................... 14
   Unexpected Effects ........................................................................................................ 14
   Safety Considerations .................................................................................................... 15
   References ...................................................................................................................... 17

The Host Organism ............................................................................................................ 18
   MON 810 Case Study .................................................................................................... 18
      *Origins* .................................................................................................................. *18*
      *Maize as a Human Food Source* ........................................................................... *19*
      *Maize and Animal Nutrition* .................................................................................. *19*
      *Production of Harmful Physiologically Active Substances* .................................... *20*
      *Allergenicity* ......................................................................................................... *20*
      *Safe Consumption* ................................................................................................. *20*
      *The Recipient Maize Material* ............................................................................... *20*
      *Exposure and Consumption Patterns* .................................................................... *20*
   References ...................................................................................................................... 21

The Donor Organism .......................................................................................................... 23
   MON 810 Case Study .................................................................................................... 23
      *The Donor Genes* .................................................................................................. *23*
      *Potential Pathogenicity of the Donor Organism* .................................................. *25*
   References ...................................................................................................................... 26

The Transformation System ............................................................................................... 28
   Agrobacterium-Mediated Transformation ..................................................................... 28
   Microprojectile Bombardment ....................................................................................... 30
   MON 810 Case Study .................................................................................................... 32
      *Description of the Transformation Method* ........................................................... *32*
      *The Constructs* ...................................................................................................... *33*
   References ...................................................................................................................... 35

Molecular Characterization of the Inserted DNA ............................................................. 39
   MON 810 Case Study .................................................................................................... 40
      *Materials and Methods* .......................................................................................... *40*
      *Results* ................................................................................................................... *41*
      *Conclusions* ........................................................................................................... *44*
   References ...................................................................................................................... 44

Genetic Stability of the Introduced Trait ................................................................. 45
   MON 810 Case Study ................................................................................... 45
       Segregation Analysis of MON 810 .......................................................... 45
       Integron Stability ....................................................................................... 46
   References ................................................................................................... 47

Expressed Material / Effect ................................................................................... 48
   MON 810 Case Study ................................................................................... 49
       Field Trials ................................................................................................ 49
       Western Immunoblot Analysis .................................................................. 51
       Equivalence of Plant and Bacterial Expressed Cry1Ab Protein ............... 56
   References ................................................................................................... 59

Toxicity ................................................................................................................. 61
   In Vitro Studies ............................................................................................. 62
   Animal Studies .............................................................................................. 63
   MON 810 Case Study ................................................................................... 64
       Digestion of Cry1Ab protein in simulated gastric and intestinal fluids ... 64
       Acute mouse gavage study with Cry1Ab protein ..................................... 66
       Lack of homology of Cry1Ab protein to known protein toxins ................ 66
       Conclusion ................................................................................................ 67
   References ................................................................................................... 67

Allergenicity ......................................................................................................... 69
   MON 810 Case Study ................................................................................... 73
       Amino Acid Sequence Homology ............................................................. 73
       Degradation in Simulated Gastric Fluids ................................................ 73
       History of Safe Exposure .......................................................................... 74
       Conclusion ................................................................................................ 74
   References ................................................................................................... 75

Nutritional Data ................................................................................................... 78
   MON 810 Case Study ................................................................................... 79
       Proximate Analysis of MON 810 Maize Grain ........................................ 80
       Amino Acid Composition .......................................................................... 82
       Fatty Acid Composition ............................................................................ 83
       Inorganic Components of MON 810 Maize Grain .................................... 84
       Levels of Antinutrients ............................................................................. 85
       Proximate Analysis of MON 810 Forage ................................................. 86
       Conclusion ................................................................................................ 86
   Supporting Study: MON 801 Catfish Feeding Study .................................... 86
       Methods .................................................................................................... 87
       Results ...................................................................................................... 88
       Conclusion ................................................................................................ 89
   References ................................................................................................... 89

# Glossary

**antisense**

A strand of DNA that is of the complementary sense to messenger RNA.

**chloroplast transit peptide**

A transit peptide that, when fused to a protein, acts to transport that protein into chloroplasts in a plant.

**concatemers**

A series of covalently linked transgenes.

**copy number**

The number of transgene copies integrated into the host genome.

**cytosine methylation**

The attachment of a methyl group to cytosine residues of eukaryotic DNA to form 5-methylcytosine.

**EMBL**

European Molecular Biology Laboratory has many computational resources, including amino acid alignment and protein structure databases http://www.embl-heidelberg.de/Services/index.html

**enhancer**

a cis-acting sequence that increases the utilization of (some) eukaryotic promoters, and can function in either orientation and in any location (upstream or downstream) relative to the promoter

**epigenetics**

The study of the mechanism that produces phenotypic effects from gene activity during differentiation and development.

**GenBank**

The National Centre for Biotechnology Information has

public databases, including protein databases. The protein database contains sequence data from the translated coding regions from DNA sequences in GenBank, EMBL and DDBJ as well as protein sequences submitted to PIR, SWISSPROT, PRF, Protein Data Bank (PDB) (sequences from solved structures). http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?db=Protein

**integron**
   That part of a construct that is integrated into the host genome

**isogenic**
   A group of lines that are genetically identical

**left and right borders**
   25-bp direct repeats that flank the left and right sides of the T-DNA fragment and which act as a *cis* element signal for the transfer apparatus.

**PIR**
   International Protein Sequence Database contains information concerning all naturally occurring, wild-type proteins whose primary structure (the sequence) is known. http://www-nbrf.georgetown.edu/pirwww/dbinfo/pirpsd.html

**plasmid backbone sequences**
   Plasmid DNA sequences that lie outside of an open reading frame and which are not translated to become part of a protein.

**polyadenylation**
   The addition of a sequence of polyadenylic acid to the 3' end of a eucaryotic mRNA after its transcription (post-transcriptional).

**promotor**
   A DNA sequence that is located in front of a gene and controls gene expression. Promoters are required for binding of RNA polymerase to initiate transcription.

**SwissProt**
   SWISS-PROT is an annotated protein sequence database established in 1986 and maintained collaboratively by the Swiss Institute for Bioinformatics (SIB) and the European Bioinformatics Institute (EBI). http://www.ebi.ac.uk/swissprot/

### T-DNA

A DNA segment of the tumor-inducing (Ti) plasmid of *Agrobacterium tumefaciens* which is transferred into the nucleus of infected cells where it is integrated into the host genome and transcribed.

### tocopherols

Any of the alcohols that make up dietary vitamin E; found in such foods as wheat germ oil, cottonseed oil, lettuce, spinach, and egg yolks.

EXHIBIT 14

RESTRICTED CONFIDENTIAL VIDEO DEPOSITION OF
ERIC WARD

## Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - -x

MONSANTO COMPANY and        :  04-305(SLR)
MONSANTO TECHNOLOGY LLC,     :
        Plaintiffs,          :
    vs.                      :
SYNGENTA SEEDS, INC.,        :
SYNGENTA BIOTECHNOLOGY, INC.,:
ET AL.,                      :
        Defendants.          :

- - - - - - - - - - - - - - -x

DEKALB GENETICS CORPORATION, :
        Plaintiff,           :  Civil Action Number
    vs.                      :  05-355-SLR
SYNGENTA SEEDS, INC.,        :
SYNGENTA BIOTECHNOLOGY, INC.,:
ET AL.,                      :
        Defendants.          :

- - - - - - - - - - - - - - -x

RESTRICTED CONFIDENTIAL VIDEO DEPOSITION OF
ERIC WARD
Washington, DC
Wednesday, December 14, 2005
REPORTED BY: CARMEN SMITH
Job No. 54929

## Page 2

1  Restricted Confidential Video Deposition of ERIC
2  WARD, called for examination pursuant to notice of
3  deposition, on Wednesday, December 14, 2005, in
4  Washington, DC, at the offices of Finnegan, Henderson,
5  Farabow, Garrett & Dunner, 901 New York Avenue NW, at
6  9:14 a.m., before CARMEN SMITH, a Notary Public within
7  and for the District of Columbia, when were present on
8  behalf of the respective parties:
9
10         HELINDA PATTERSON, ESQ.
11         Howrey LLP
12         1111 Louisiana, 25th Floor
13         Houston, Texas 77002-5242
14         713-787-1483
15         On behalf of Plaintiffs
16
17         MICHAEL FLIBBERT, ESQ.
18         SANYA SUKDUANG, ESQ.
19         Finnegan Henderson Farabow Garrett & Dunner
20         901 New York Avenue NW
21         Washington, DC 20001-4413
22         202-408-4377
23         On behalf of Defendants
24
25                      -- continued --

## Page 3

1  APPEARANCES (Continued):
2
3         HEATHER KAFELE, ESQ.
4         Shearman & Sterling
5         801 Pennsylvania Avenue NW
6         Washington, DC 20004-2634
7         202-508-8000
8         On behalf of Syngenta Defendants
9
10
11
12
13
14
15
16
17
18
19
20
21
22  ALSO PRESENT:
23         JONATHAN PERRY, Videographer
24
25                                          08:58:08

## Page 4

1          P R O C E E D I N G S
2          VIDEO OPERATOR: This is tape number 1 of the
3  videotaped deposition of Eric Ward, taken in the
4  matter of Monsanto Company et al, versus Syngenta
5  Seeds, Incorporated, et al., Case Number 04-305-SLR,    09:14:11
6  and in the matter of DeKalb Genetics Corporation
7  versus Syngenta Seeds, Incorporated, et al., Case
8  Number 105 CV 355 SLR, in the U.S. District Court for
9  the District of Delaware.
10         Today's date is December 14, 2005. The time    09:14:34
11  on the video screen is currently 9:15:13 a.m.
12         This deposition is being held at the offices
13  of Finnegan Henderson, 901 New York Avenue, Northwest,
14  Washington, D.C. My name is Jonathan Perry. I am the
15  videographer here on behalf of Sunbelt Reporting and    09:15:00
16  Litigation Services. The court reporter is Carmen
17  Smith, also with Sunbelt Reporting.
18         Will counsel present please introduce
19  themselves and state who they represent.
20         MS. PATTERSON: Melinda Patterson for          09:15:11
21  Monsanto Company and DeKalb Genetics Corporation.
22         MR. FLIBBERT: Michael Flibbert of Finnegan
23  Henderson, and with me is Heather Kafele of Shearman
24  and Sterling on behalf of the Syngenta Defendants.
25         VIDEO OPERATOR: Will the reporter swear in     09:15:31

RESTRICTED CONFIDENTIAL VIDEO DEPOSITION OF
ERIC WARD

## Page 121

1 experiment. that's right.

2    Q    Right. You wouldn't launch off and do a

3 massive site-corrected mutagenesis with the hopes of

4 hitting on one?

5    A    But that's not the point that I was trying to    13:47:52

6 make by saying that. My point. again. was the only

7 way one could ensure that one had. in fact. made the

8 same mutation that's described in only a limited sense

9 in Example 8 would be. in fact. to carry out that

10 effectively impossible number of experiments. The    13:48:12

11 math is -- it's a big number.

12    Q    The nucleic acid sequence of the E. coli

13 EPSPS gene was known at the time that the '835 patent

14 was filed. was it not?

15    A    I don't know that.    13:49:38

16    Q    Is that something you looked at in order to

17 formulate the opinions set forth in your report?

18    A    No.

19    Q    Okay. Did you look to the literature to see

20 how many DNA sequences of EPSPS genes were known in    13:49:58

21 the art at the time that the '835 patent was filed?

22    A    I am generally familiar with the literature.

23 and I believe the salmonella sequence was known from

24 the Calgene work. There may be others. but I'm not

25 aware of them.    13:50:26

## Page 122

1    Q    Okay. So you didn't undertake to find out

2 just how widely known the EPSPS sequence was from

3 various species in formulating the opinions set forth

4 in your report?

5    A    I didn't specifically undertake it. I have a    13:50:41

6 general knowledge of the literature from that time

7 period. And my understanding is that the salmonella

8 sequence was available.

9    Q    Okay. But you don't know if the E. coli

10 sequence was available?    13:50:56

11    A    That's correct.

12    Q    Do you know of any other sequence that was

13 available?

14    A    Not offhand. no. There may have been another

15 bacterial species. but I don't know that.    13:51:07

16    Q    You would have to speculate?

17    A    Yeah. which I'm unwilling to do.

18    Q    So the number of EPSPS genes that were known

19 in the literature at the time that the application

20 that led to the patent in suit was filed was not    13:51:38

21 something that you took into account in formulating

22 your opinions that are set forth in your report?

23    A    Not specifically. no.

24    Q    Do you have any expertise in chloroplast

25 transit peptides?    13:52:14

## Page 123

1    A    I wouldn't say that I have any specific

2 expertise in that area. Again. I've got a general

3 familiarity with the literature in that area.

4    Q    Let me ask you to turn back to the '835

5 patent. if you would. And specifically. I'll ask you    13:52:52

6 to turn to column 4.

7         And I'll call your attention to the sentence

8 that reads. "Although there is little homology between

9 the CTP sequences of the EPSPS gene and the ssRU-BISCO

10 gene. one may find that nonhomologous CTPs may    13:53:37

11 function in particular embodiments." Do you see that?

12    A    I guess you're referring to around line 40?

13    Q    Yeah.

14    A    Yes. I see it.

15    Q    Do you have an understanding of what the term    13:54:01

16 "nonhomologous CTPs" means in that sentence?

17    A    I believe I do.

18    Q    And what is your understanding?

19    A    I think it -- in this case it means that -- a

20 nonhomologous CTP would be a CTP that is not a CTP    13:54:32

21 that is associated with the coding sequence that it's

22 normally associated with. So it's from another gene.

23    Q    Okay. So it would be -- that's good enough.

24    A    I'm just taking that from context. given that

25 there's a discussion of ssRU-BISCO there. which is    13:54:56

## Page 124

1 another gene.

2    Q    Let's turn to the Lundquist patents. And

3 I'll ask you to look at paragraph 22 -- pages 22 and

4 23 of your report.

5         First I'll ask your opinion as to whether the    13:55:32

6 process that is set forth in paragraph 72 of your

7 report. that is. "(i) bombarding intact regenerable

8 Zea mays cells with DNA-coated microprojectiles. (ii)

9 identifying or selecting a population of transformed

10 cells. and (iii) regenerating a fertile transgenic    13:56:00

11 plant therefrom." whether that process was used by

12 anybody to make the GA21 corn line.

13    A    I haven't rendered an opinion with respect to

14 that. but my general understanding is that yes.

15 someone did do that.    13:56:40

16    Q    Okay. And is it your understanding that in

17 the GA21 corn line. the DNA that was bombarded into

18 the corn is transmitted through a complete sexual

19 cycle of the corn plant to progeny plants?

20    A    So you're asking me whether the GA21    13:57:06

21 construct -- or whatever the RPA number for that gene

22 that led to the DeKalb construct. which then was put

23 in using this process by DeKalb. then went through a

24 sexual cycle: yes. that's my understanding.

25    Q    Okay. And that gene imparts herbicide    13:57:28

Sunbelt Reporting & Litigation Services
361 882-0763 Corpus   713 667-0763 Houston   214 747-0763 Dallas

# EXHIBIT 15

RESTRICTED CONFIDENTIAL VIDEO DEPOSITION OF
BARRY D. BRUCE

---

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - -x

MONSANTO COMPANY and         : 04-305(SLR)
MONSANTO TECHNOLOGY LLC.,     :
          Plaintiffs,        :
     vs.                      :
SYNGENTA SEEDS. INC.,         :
SYNGENTA BIOTECHNOLOGY, INC.,:
ET AL.,                       :
          Defendants.         :

- - - - - - - - - - - - - - -x

DEKALB GENETICS CORPORATION. :
          Plaintiff.          : Civil Action Number
     vs.                      : 05-355-SLR
SYNGENTA SEEDS. INC.,         :
SYNGENTA BIOTECHNOLOGY. INC..:
ET AL.,                       :
          Defendants.         :

- - - - - - - - - - - - - - -x

RESTRICTED CONFIDENTIAL VIDEO DEPOSITION OF
BARRY D. BRUCE
Washington. DC
Friday. December 16. 2005
REPORTED BY: CARMEN SMITH
Job No. 54931

---

Page 2

1   Restricted Confidential Video Deposition of
2  BARRY D. BRUCE, called for examination pursuant to
3  notice of deposition. on Friday. December 16. 2005.
4  in Washington. DC. at the offices of Finnegan.
5  Henderson. Farabow. Garrett & Dunner. 901 New York
6  Avenue NW. at 9:04 a.m.. before CARMEN SMITH. a
7  Notary Public within and for the District of
8  Columbia. when were present on behalf of the
9  respective parties:
10          MELINDA PATTERSON. ESQ.
11          Howrey LLP
12          1111 Louisiana. 25th Floor
13          Houston. Texas 77002-5242
14          713-787-1483
15          On behalf of Plaintiffs
16
17          SANYA SUKDUANG. ESQ.
18          JARED S. COHEN. ESQ.
19          Finnegan Henderson Farabow Garrett & Dunner
20          901 New York Avenue NW
21          Washington. DC 20001-4413
22          202-408-4377
23          On behalf of Defendants
24
25  ALSO PRESENT: JONATHAN PERRY. Videographer

---

Page 3

1            P R O C E E D I N G S
2          (Bruce Exhibit 1 identified.)
3          VIDEO OPERATOR:  This is tape number 1 of
4  the videotaped deposition of Barry Douglas Bruce,
5  taken in the matter of Monsanto Company. et al..       09:02:59
6  versus Syngenta Seeds. Incorporated. et al.. Case
7  Number 04-305-SLR. and in the matter of DeKalb
8  Genetics Corporation versus Syngenta Seeds.
9  Incorporated. et al.. Case Number 05-355-SLR. in the
10  U.S. District Court for the District of Delaware.     09:03:24
11          Today's date is December 16. 2005.  Time
12  on the video screen is currently 9:04:10 a.m.
13          This deposition is being taken at the
14  offices of Finnegan Henderson. 901 New York Avenue
15  Northwest. Washington. D.C.                           09:03:45
16          My name is Jonathan Perry.  I am the
17  videographer here on behalf of Sunbelt Reporting and
18  Litigation Services.  The court reporter is Carmen
19  Smith. also with Sunbelt Reporting and Litigation
20  Services.                                             09:04:00
21          Will counsel present please introduce
22  themselves and state whom they represent.
23          MS. PATTERSON:  Melinda Patterson of
24  Howrey for Monsanto and DeKalb Genetics.
25          MR. SUKDUANG:  Sanya Sukduang from         09:04:10

---

Page 4

1  Finnegan Henderson representing Syngenta Seeds.
2  Syngenta Biotechnology, Defendants.
3          MR. COHEN:  Jared Cohen from Finnegan
4  Henderson. representing Syngenta.
5          Whereupon.
6                 BARRY D. BRUCE
7  was called as a witness and. having first been duly
8  sworn. was examined and testified as follows:
9                 EXAMINATION
10  BY MS. PATTERSON:                                    09:04:35
11     Q    Dr. Bruce. could you please state your
12  name and present position for the record.
13     A    My name is Barry Douglas Bruce. and my
14  present employment is with the University of
15  Tennessee in Knoxville. where I am an associate      09:04:52
16  professor of biochemistry. cellular and molecular
17  biology.
18          MR. SUKDUANG:  Just as a preliminary
19  matter. we would like to mark this transcript as
20  restricted confidential. subject to the protective   09:05:03
21  order.
22          BY MS. PATTERSON:
23     Q    Dr. Bruce. I have placed before you a
24  document that's been marked as Bruce Exhibit 1.
25  Could you take a look at that and identify it for     09:05:20

Pages 1 to

Page 97

```
 1  answered.
 2           THE WITNESS:  I -- as I just said, I gave
 3  you an example where that would be slightly
 4  different, but they were taken from the same gene.
 5           BY MS. PATTERSON:                          11:36:47
 6       Q   Okay.  And my question is, isn't it
 7  correct that the only thing that a nonhomologous CTP
 8  would exclude would be the situation where the EPSPS
 9  and the CTP are from the same gene?
10           MR. SUKDUANG:  Objection; asked and        11:37:10
11  answered.
12           THE WITNESS:  I'm going -- you know,
13  that's certainly not going to be included, yes.
14           BY MS. PATTERSON:
15       Q   Okay.  And that's the only thing that you  11:37:20
16  can think of that wouldn't be included; correct?
17           MR. SUKDUANG:  Objection; asked and
18  answered.
19           THE WITNESS:  I think my vocabulary is
20  clear on what are the terms to constitute an         11:37:28
21  EPSPS -- a CTP/EPSPS fusion polypeptide, and the
22  concept of heterologousness is clear.  And the
23  endogenous gene with its naturally occurring CTP
24  would not be included in that fusion polypeptide.
25           BY MS. PATTERSON:                          11:37:47
```

Page 98

```
 1       Q   Okay.  And you can't think of anything
 2  else that would not be included within nonhomologous
 3  CTP with respect to a given EPSPS gene; is that
 4  correct?
 5           MR. SUKDUANG:  Objection; asked and        11:37:57
 6  answered.
 7           THE WITNESS:  I couldn't think of an
 8  example that would not fit that, no.
 9           BY MS. PATTERSON:
10       Q   Now, let's turn to example 19.  Does       11:38:17
11  example 19 of the patent --
12       A   Not tab 19.
13       Q   Example 19 at column 30.
14       A   Okay.
15       Q   Does example 19, does a transit peptide in 11:38:36
16  example 19 meet your criteria of a chloroplast
17  transit peptide?
18       A   Does the chloroplast transit peptide
19  described that -- you're asking is the CTP of
20  petunia EPSPS synthase a chloroplast transit peptide 11:39:09
21  in this example?
22       Q   My question is whether or not the
23  chloroplast transit peptide specifically in
24  pMON6242, which contains the petunia EPSPS CTP with
25  an engineered cleavage side for RUBISCO, does that   11:39:33
```

Page 99

```
 1  construct contain a chloroplast transit peptide
 2  within your understanding of the term?
 3           MR. SUKDUANG:  Objection; mischaracterizes
 4  the document.
 5           THE WITNESS:  So my understanding of this  11:39:53
 6  is that this cloning exercise utilized a mutation
 7  that introduced a new enzyme known as the SphI
 8  restriction enzyme.  And this was placed in such a
 9  way that it was in frame with the rest of the
10  sequence, coding sequence, such that it enabled the  11:40:14
11  inventors to perform I guess it would be called a
12  molecular biological trick known as CTP switching
13  that allowed them to move transit peptides between
14  the small subunit of RUBISCO and the EPSPS.
15           And in this particular case, they took the 11:40:41
16  petunia EPSPS and placed it in front of the wheat
17  small subunit, if I recall.  Yes.
18           So it would be a petunia-derived CTP.
19           BY MS. PATTERSON:
20       Q   Okay.  So the fact that it has been        11:41:04
21  engineered to contain the cleavage site from RUBISCO
22  doesn't change your --
23       A   I don't know what you're referring to.
24  The --
25       Q   Okay.  Okay.  The construct --             11:41:17
```

Page 100

```
 1       A   You said something about a cleavage site.
 2       Q   Right.
 3       A   They said that they -- they introduced a
 4  change to add this SphI restriction enzyme, and they
 5  were quite clear that that is done to allow CTP      11:41:30
 6  switching.  What is this you're referring to a
 7  cleavage site?
 8       Q   Yeah, construct pMON6242 at line 59.
 9       A   Uh-huh.  59.
10       Q   All right.  So I'm saying is it your       11:41:45
11  opinion that the -- does the chloroplast transit
12  peptide in pMON6242 meet your description or
13  definition of a chloroplast transit peptide?
14       A   I -- what they have done is they have
15  swapped out the petunia EPSPS coding sequence for    11:42:10
16  the 72 amino acid transit peptide and they fused it,
17  as they say at the top, to the mature small subunit
18  RUBISCO.
19           Now, the role of that CTP has to be shown
20  that it has -- you know, that's where it was from,   11:42:32
21  okay.  They do a small experiment to try to
22  implicate that that CTP from petunia was able to
23  transport the protein into the chloroplast, and
24  their assay is a relatively, I don't know, crude
25  assay.  They look to see if the protein has changed  11:42:56
```

Pages 97 to 100