## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MONSANTO COMPANY and<br>MONSANTO TECHNOLOGY LLC,<br><br>      Plaintiffs,<br>   v.<br><br>SYNGENTA SEEDS, INC.<br>SYNGENTA BIOTECHNOLOGY, INC., et al.,<br><br>      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)   C. A. No. 04-305 SLR<br>)      (Lead Case)<br>)<br>)<br>) |
| DEKALB GENETICS CORPORATION,<br><br>      Plaintiff,<br>   v.<br><br>SYNGENTA SEEDS, INC.,<br>SYNGENTA BIOTECHNOLOGY, INC., et al.<br><br>      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## JOINT CLAIM CONSTRUCTION STATEMENT

John W. Shaw
YOUNG CONAWAY STARGATT & TAYLOR, L.L.P.
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600

Attorneys for Defendants

OF COUNSEL:
Michael J. Flibbert
Don O. Burley
Howard W. Levine
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
901 New York Ave., NW
Washington, DC 20001-4413
(202) 408-4000

Dated: January 11, 2006

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
(302) 984-6000

Attorneys Plaintiffs

OF COUNSEL:
Susan K. Knoll
Thomas A. Miller
Melinda Patterson
Stephen E. Edwards
Steven G. Spears
HOWREY LLP
1111 Louisiana, 25th Floor
Houston, TX 77002
(713) 787-1400

**Monsanto Company et al. v. Syngenta Seeds, Inc. et al. No. 04-305 (SLR)**

JOINT CLAIM CONSTRUCTION STATEMENT -- January 11, 2006

| U.S. Patent No. 5,538,880 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| 1. A process for producing a fertile transgenic *Zea mays* plant comprising the steps of | **"comprising"**<br><br>**Proposed Construction:** This phrase means including, and does not exclude the presence of additional elements. | No construction is necessary. |
| (i) bombarding intact regenerable *Zea mays* cells with DNA-coated microprojectiles | **"Zea mays"**<br><br>**Proposed Construction:** This phrase means corn of all types, including, but not limited to, field corn, popcorn, sweet corn, flint corn, and dent corn. | No construction is necessary. |
| | **"intact regenerable *Zea mays* cells"**<br><br>**Proposed Construction:** This phrase means corn cells that, after transformation, must be capable of regeneration of a plant containing the transgene. | No construction is necessary. |

| U.S. Patent No. 5,538,880 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| (ii) identifying or selecting a population of transformed cells, and | No construction is necessary. | No construction is necessary. |
| (iii) regenerating a fertile transgenic plant therefrom | **"transgenic"**<br><br>**Proposed Construction:** This phrase means a corn plant that includes a DNA sequence resulting from genetic engineering. | No construction is necessary. |
| wherein said DNA is transmitted through a complete sexual cycle of said transgenic plant to its progeny, and imparts herbicide resistance thereto. | **"said DNA"**<br><br>**Proposed Construction:** This phrase means the DNA that was inserted into the transformed cells, even if altered by the insertion process or by later natural processes, so long as a person of ordinary skill can recognize it as the inserted DNA.<br><br>**"wherein said DNA is transmitted through a complete sexual cycle of said transgenic plant to its progeny"**<br><br>**Proposed Construction:** This phrase does not define a necessary step of the claimed process, and merely requires that the R0 plant be capable of passing the transgene to progeny through either pollen or egg cells, with or without human intervention. | No construction is necessary. |

January 11, 2006
DM_US\829658.v1

| U.S. Patent No. 5,538,880 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | **"herbicide"**<br><br>**Proposed Construction:** This phrase means a chemical agent capable of killing plant cells.<br><br>See intrinsic evidence cited in support of Plaintiffs' construction of "herbicide resistance," below. | **"herbicide":** means a chemical agent employed to kill or inhibit the growth of weeds. The term "herbicide" as used in the '880 patent excludes antibiotics.<br><br>**INTRINSIC EVIDENCE**<br><br>**Specification**<br><br>"However, selection generally entails the use of some *toxic agent, e.g. herbicide or antibiotic*, which can effect [*sic*, affect] either the regenerability or the resultant plant fertility." '880 patent, col. 2, lines 53-55 (emphasis added); *see also* '880 patent, col. 10, lines 5-22 (using the phrase "toxic agent" three times to refer to the selection agent).<br><br>"Useful selectable markers are well known in the art and include, for example, *antibiotic and herbicide resistance genes*. . . . Other selectable markers known in the art include . . . the antibiotics kanamycin, neomycin, and G418, as well as those genes which code for resistance or tolerance to [the herbicides] glyphosate, . . . imidazolinones, sulfonylureas, bromoxynil, dalapon, and the like. Those selectable marker genes which confer herbicide resistance or tolerance are also of commercial utility in the resulting transformed plants." '880 patent, col. 7, lines 8-22 (emphasis added). |

| U.S. Patent No. 5,538,880 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | | **Prosecution History**<br><br>Preliminary Amendment dated Nov. 12, 1996 (DeKalb's submission of separate application claims directed to *"herbicide resistance"* (e.g., claims 56, 62, 64-66) and *"antibiotic resistance"* (e.g., claims 68-72)). '695 appl. PH at 2456-62 (emphasis added).<br><br>Response to Restriction Requirement dated Aug. 21, 1997 ("Applicants provisionally elect with traverse a selectable marker gene encoding *antibiotic resistance* wherein the gene encodes resistance to bleomycin, encodes resistance to *hygromycin*, is the *htp* gene, encodes resistance to neomycin, kanamycin or G418, is the *nptII* gene, or is the *npt1* gene.") '695 appl. PH at 2557-58 (emphasis added).<br><br>Office Action dated Aug. 23, 1991 (stating that the hygromycin B-phosphotransferase, B-glucuronidase, and luciferase genes disclosed in the specification *"are not considered to be genes that confer resistance to art recognized 'herbicides'"*). '983 appl. PH at 699 (emphasis added).<br><br>Office Action dated May 13, 1992:<br><br>"While it may be nothing more than a matter of semantics as to whether hygromycin can be considered a herbicide, it remains a fact that the only compound that may have such properties exemplified in the instant specification was hygromycin. However, |

| U.S. Patent No. 5,538,880 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | | *there is no evidence that the expression of hygromycin,* as taught in the specification, imparts properties that satisfy the claim limitation to: |
| | | . . . *imparts herbicide resistance* to said fertile transgenic Zea mays plant. |
| | | Clearly Applicants have not demonstrated the above limitation." '983 appl. PH at 724 (emphasis added). |
| | | Office Action dated July 27, 1994 (distinguishing the gene exemplified in the specification, which provides "hygromycin resistance," from "art known and available DNA sequences," which provide "herbicide resistance"). '379 appl. PH at 858. |
| | **"herbicide resistance"**

**Proposed Construction:** This phrase means that the plant has more resistance to an agent having herbicidal activity, when applied to plant material, than the same plant that does not have the transgene under the same conditions of application and plant material, and is not limited to resistance to agents used as commercial herbicides. | **"herbicide resistance"**

No construction of the claim term "herbicide resistance" is necessary apart from construction of the term "herbicide" as set forth above. |

January 11, 2006
DM_US\829865 8.v1

| U.S. Patent No. 5,538,880 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | **Specification** | |
| | "A preferred selectable marker gene is the hygromycin B phosphotransferase (HPT) coding sequence." | |
| | ['880 patent, col. 7, ll. 11-13] | |
| | Example I uses the hygromycin B phosphotransferase (HPT) coding sequence to obtain progeny of fertile transgenic corn that resist the herbicidal effects of hygromycin. | |
| | ['880 patent, col. 12-18] | |
| | Example I, root elongation bioassay: | |
| | "After the seed had germinated, approximately 1 cm of the primary root tip was excised from each seedling and plated on MS salts, 20 g/l sucrose, *50 mg/l hygromycin*, 0.25% Gelrite, and incubated in the dark at 26° C for 4 d. | |
| | Roots were evaluated for the presence or absence of abundant root hairs and root branches. *Roots were classified as transgenic (hygromycin resistant) if they had root hairs and root branches, and untransformed (hygromycin sensitive) if they had limited numbers of branches.*" | |
| | ['880 patent, col. 18, ll. 16-26 (emphasis added]] | |

| U.S. Patent No. 5,538,880 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | Example I, etiolated leaf bioassay: | |
| | "After the root tips were excised as described above, the seedlings of one PHI ear and one control ear were transferred to moist vermiculite and grown in the dark for 5 d. At this point 1 mm sections were cut from the tip of the coleoptile, surface sterilized 10 seconds, and plated on MS basal salts, 20 g/l sucrose, 2.5 g/l Gelrite with either 0 (control) or *100 mg/l hygromycin* and incubated in the dark at 26 C° for 18 hr. | |
| | They were then incubated in a light regimen of 14 hours light 10 hours dark at 26° C for 48 hr, and rated on a scale of from 0 (all brown) to 6 (all green) for the percent of green color in the leaf tissue. *Shoots were classified as untransformed (hygromycin sensitive) if they had a rating of zero and classified as transformed (hygromycin resistant) if they had a rating of 3 or greater.*" | |
| | *[Id.* at col. 18, ll. 27–45 (emphasis added)] | |
| | **Prosecution History** | |
| | The Examiner initially rejected the claims that recited "herbicide resistance" for lack of enablement: | |
| | "[The pending claim reciting herbicide resistance is] rejected under 35 U.S.C. § | |

| U.S. Patent No. 5,538,880 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | 112, first paragraph, as the disclosure is enabling only for claims limited to the transformation and expression of a selectable marker or reporter gene . . . ." <br><br> The specification teaches the transformation and expression of . . . hygromycin B phosphotransferase, B-glucuronidase, and luciferase. . . . With the exception of the genes noted above, *which are not considered to be genes that confer resistance to art recognized "herbicides,"* the specification is silent as to a gene which when expressed would impart said herbicide resistance." <br><br> [SM000699, Office Action, dated Aug. 23, 1991, at p. 2, '983 application (emphasis added)] <br><br> In their response, the Applicants stated: <br><br> [T]he Examiner is respectfully requested to consider that this position is inconsistent with his position taken with respect to the herbicide resistance claim (9) of Applicants' corresponding PCT Application . . . . As taken from the Written Opinion mailed November 18, 1991, it is the Examiner's opinion that: *"[t]he selectable marker[s kanamycin, hygromycin and methotrexate] employed [in the prior art] all possess herbicidal properties,"* | |

January 11, 2006
DM_US\8298658.v1

| U.S. Patent No. 5,538,880 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | [SM000071l-12, Response To Office Action, dated Feb. 24, 1992, at p. 1-2, '983 application (emphasis added)] | |
| | The Examiner maintained the rejection, but stated: | |
| | "While it may be nothing more than a matter of semantics as to whether hygromycin can be considered a herbicide, it remains a fact that the only compound that may have such properties exemplified in the instant specification was hygromycin." | |
| | [SM000724, Office Action, dated May 13, 1992, at p. 2, '983 application] | |
| | In his reasons for allowance, the Examiner agreed that the example of hygromycin resistance in the specification provided support for "herbicide resistance." | |
| | *Exemplified in the specification, ... [are]* R0 plants transformed with DNA encoding hygromycin β-phosphotransferase (HPT) .... R1 progeny evaluated by root elongation bioassay, etiolated leaf bioassay, and Southern blot assay confirm that the primary regenerants and segregating progeny were genetically transformed with non-native DNA.  These plants affected a new non-native plant phenotype corresponding to hygromycin resistance. ... *The above example [of hygromycin* | |

| U.S. Patent No. 5,538,880 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | *resistance],* ... and the general discussion of art known and available DNA sequences, including herbicide resistance as a type of selectable or screenable marker, *provides a sufficient written description of whole plants produced by the claimed process.*<br><br>[SM0000858, Examiner's Statement Of Reasons For Allowance, dated July 27, 1994, at p. 2, '379 application (emphasis added)] | |
| | **"progeny"**<br><br>**Proposed Construction:** This phrase means the R1 and succeeding generations, no matter how they are obtained from the R0 plant of claim 1.<br><br>**Claim Language**<br><br>The term "progeny" has the same meaning in claims 1 and 4-9. Other words in claims 6-9 merely restrict the earliest of the generations of progeny plants covered by those claims.<br><br>Claim 1 covers the R0 generation, which are the initial regenerated plants. The immediate offspring of the R0 plants are called R1 plants. The immediate offspring of the R1 plants are called R2 plants, and so on. | **"progeny":** means the R1 progeny.<br><br>See intrinsic evidence cited in support of 'progeny' in claim 4, below. |

| U.S. Patent No. 5,538,880 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | **Specification** | |
| | "The present invention is directed to the production of fertile transgenic plants and seeds of the species *Zea mays* and to the plants, plant tissues, and seeds derived from such transgenic plants, as well as the *subsequent progeny* and products derived therefrom." | |
| | ['880 patent, col. 4, ll. 50-54 (emphasis added)] | |
| | "The invention further relates to regenerated fertile mature maize plants from transformed embryogenic tissue, transgenic seeds produced therefrom, and R1 and *subsequent generations*." | |
| | ['880, col. 3, ll. 64-67 (emphasis added)] | |
| | "The transgenic plants produced herein are expected to be useful for a variety of *commercial and research purposes.* Transgenic plants can be created for use in traditional agriculture to possess traits beneficial to the grower (e.g. agronomic traits such as pest resistance or increased yield), beneficial to the consumer of the grain harvested from the plant (e.g. improved nutritive content in human food or animal feed) or beneficial to the food processor (e.g. improved processing traits)." | |
| | ['880 patent, col. 12, ll. 1-10 (emphasis | |

| U.S. Patent No. 5,538,880 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | added)] | |
| | "Only if the DNA introduced into the corn is heritable can the corn be used in *breeding programs* as required for successful commercialization of transgenic corn." | |
| | ['880 patent, col. I, ll. 50-53 (emphasis added)] | |
| | "Some of the plants of this invention may be produced from the transgenic seed produced from the fertile transgenic plants using conventional crossbreeding techniques to develop commercial hybrid seed containing heterologous DNA." | |
| | ['880 patent, col. 5, ll. 7-10] | |
| | Generally, the commercial value of the transformed corn produced herein will be greatest if the heterologous DNA can be incorporated into many different hybrid combinations. . . . As such, it is necessary to incorporate the heterologous DNA into a large number of parental lines so that many hybrid combinations can be produced containing the desirable heterologous DNA. This may conveniently be done by breeding programs in which a conversion process (backcrossing) is performed by *crossing the initial transgenic fertile plant* [R0] *to normal elite inbred lines* [to obtain an R1] *and then crossing the progeny back to the normal parent* [to obtain an R2]. The progeny from this cross will | |

| U.S. Patent No. 5,538,880 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | segregate such that some of the plants will carry the heterologous DNA whereas some will not. The plants that do carry the DNA are then *crossed again* [to obtain an R3] to the normal plant resulting in progeny which segregate once more. *This crossing is repeated* [resulting in R4 and later progeny] until the original normal parent has been converted to a genetically engineered line containing the heterologous DNA and also possessing all other important attributes originally found in the parent. A separate backcrossing program will be used for every elite line that is to be converted to a genetically engineered elite line. . . . Corn breeding and the techniques and skills required to transfer genes from one line or variety to another are well-known to those skilled in the art.<br><br>['880 patent, col. 11, ll. 33-64 (emphasis added)]<br><br>**Prosecution History**<br><br>In the Supplemental Amendment that added the claims to the application that became patent claims 4-9, the Applicants stated:<br><br>"Claims 32-35 [patent claims 6-9] are supported . . . at pages 19-20 of the specification, which set forth methodologies for obtaining *R2 and higher generation progeny* plants from the initial R0 transgenic plants." | |

| U.S. Patent No. 5,538,880 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | [SM0001047, Supplemental Amendment, dated Mar. 28, 1995, at p. 2, '458 application (emphasis added)]<br><br>Pages 19-20 of the application contain the text that became column 11, lines 33-64 of the '880 patent specification, quoted above.<br><br>[SM0000986-87, Specification of the '458 application, at p. 19-20] | |
| 4.  A process comprising obtaining progeny from a fertile transgenic plant obtained by the process of claim 1 which comprise said DNA. | **"progeny"**<br><br>**Proposed Construction:**  This phrase means the R1 and succeeding generations, no matter how they are obtained from the R0 of claim 1.<br><br>**Claim Language**<br><br>The term "progeny" has the same meaning in claims 1 and 4-9.  Other words in claims 6-9 restrict the earliest of the generations of progeny plants covered by those claims, but no words in claims 4-9 restrict the latest generation of progeny covered.<br><br>See intrinsic evidence cited in support of Plaintiffs' construction of "progeny" in claim 1, above.<br><br>**Additional Prosecution History**<br><br>In response to the Examiner's rejection on the basis that "the claims are viewed as substantial | **"progeny":** means the R1 progeny.<br><br>**INTRINSIC EVIDENCE**<br><br>**Claim Language**<br><br>The term "progeny" is used consistently in claims 4-7 and should have the same meaning in each of those claims.<br><br>Claim 4 states that "progeny" are obtained "from a fertile transgenic plant obtained by the process of claim 1," i.e., from an "R0" plant produced by the process of claim 1.  Sexual crosses of R0 generation plants are known in the art as "R1" progeny.<br><br>In addition, claim 5 refers to "said progeny" of claim 4, which confirms that the term "progeny" in claims 4 and 5 has the same meaning. |

| U.S. Patent No. 5,538,880 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | duplicates" [SM0001052, Office Action, dated April 26, 1995, at p. 3, '458 application], the Applicants demonstrated the *differences* between the generations of progeny claimed: "claim 31 recites that in step (iv), 'R1' progeny of the "R0" plant of step (iii), are obtained by crossing the R0 plant with an inbred line. Claim 33 effectively recites step (iv), obtaining 'R1' progeny; (v) crossing the 'R1' progeny with the inbred line, and (vi) obtaining further 'R2' progeny. Step 34 recites that (vii) the 'further (R2) progeny" are crossed back to the inbred line to obtain further 'R2' progeny." [SM0001055, Response Under 37 C.F.R. § 1.116 dated June 5, 1995, at 1, '458 application] There was no time to emphasize the *similarities* between the claims, i.e., that they covered subsequent generations. The Examiner then withdrew his rejection, stating "[a]ll claims are allowable." [SM0001075, Suspension Of Prosecution, dated Sept. 6, 1995, '458 application] | **Specification** "The plants regenerated from the transformed callus are referred to as the R0 generation or R0 plants. The seeds produced by various *sexual crosses of the R0 generation plants are referred to as R1 progeny or the R1 generation.* When R1 seeds are germinated, the resulting plants are also referred to as the R1 generation." '880 patent, col. 11, lines 14-19 (emphasis added). **Prosecution History** Response Under 37 C.F.R. § 1.116 dated June 5, 1995 (DeKalb argued that application claim 31 (which issued as patent claim 5) recited that, "in step (iv), *'R1' progeny* of the 'R0' plant of step (iii), are obtained by crossing the R0 plant with an inbred line.") '880 patent PH at 1055 (emphasis added). |
| | "A process comprising obtaining progeny from a fertile transgenic plant obtained by the process of claim 1" **Proposed Construction**: This phrase means that the claimed process comprises the step of | "obtained by the process of claim 1": means that claim 4 is a dependent claim that requires the performance of steps (i)-(iii) of claim 1. Whether or not expressly construed to be a dependent claim, claim 4 requires the |

15

| U.S. Patent No. 5,538,880 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | obtaining progeny using the fertile transgenic plant produced by the process of claim 1 as a starting material. The claimed process does not include the steps recited in claim 1.<br><br>**Specification**<br><br>The present invention is directed to *the production of* fertile transgenic plants and seeds of the species *Zea mays* and to the plants, plant tissues, and seeds derived from such transgenic plants, as well as *the subsequent progeny* and products *derived therefrom.*<br><br>['880 patent, col. 4, ll. 50-53 (emphasis added)]<br><br>**Prosecution History**<br><br>The predecessor of claim 4—claim 30 of the '458 application—read:<br><br>30. *The process of claim [1] further comprising* (iv) obtaining progeny from said fertile transgenic plant of step (iii), which comprise said DNA.<br><br>[SM0001046 Supplemental Amendment, dated Mar. 28, 1995, at p. 1, '458 application (emphasis added)] | performance of steps (i)-(iii) of claim 1 and the additional step of obtaining progeny (as defined above) from a fertile transgenic plant obtained by the process of claim 1.<br><br>**INTRINSIC EVIDENCE**<br><br>**Claim Language**<br><br>Claim 4 expressly refers to claim 1.<br><br>The phrase "said DNA" refers to the DNA of claim 1 or it would lack antecedent basis.<br><br>**Prosecution History**<br><br>Supplemental Amendment dated March 28, 1995 (application claim 30, which later issued as patent claim 4, was a dependent claim reciting, "The process of claim 23 further comprising (iv) obtaining progeny from said fertile transgenic plant of step (iii), which comprise said DNA.") '880 patent PH at 1046.<br><br>Amendment Under 37 C.F.R. § 1.312 (DeKalb amended application claim 30 and represented to the PTO that the amended claim did "not introduce new matter" and was "allowable without further search or consideration.") '880 patent PH at 1082-83 and 1085.<br><br>Response to Rule 312 Communication (The PTO entered DeKalb's Rule 312 amendment on the ground that it was "directed to *matters* |

| U.S. Patent No. 5,538,880 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| 5. The process of claim 4 wherein said progeny are obtained by crossing said fertile transgenic plant with an inbred line. | **"said progeny"**<br><br>**Proposed Construction:** This phrase means the R1 and succeeding generations, which must be obtained by crossing the R0 plant of claim 1 with an inbred line.<br><br>**Claim Language**<br><br>No words in claim 5 cut off all the generations of progeny after the R1 from being covered by the claim.<br><br>See intrinsic evidence cited in support of Plaintiffs' construction of "progeny" in claims 1 and 4, above. | *of form not affecting the scope of the invention.*") '880 patent PH at 1108 (emphasis added).<br><br>Index of Claims (identifying application claims 23 and 36 (patent claims 1 and 10) as independent claims and the remaining claims, including application claim 30 (patent claim 4), as dependent claims). '880 patent PH at 1130.<br><br>**"said progeny":** means the R1 progeny.<br><br>**INTRINSIC EVIDENCE**<br><br>**Claim Language**<br><br>The term "progeny" is used consistently in claims 4-7 and should have the same meaning in each of those claims.<br><br>In addition, claim 5 refers to "*said progeny*" of claim 4. The term "progeny" in claim 5 therefore has the same meaning as the term "progeny" in claim 4.<br><br>**Specification**<br><br>"The plants regenerated from the transformed callus are referred to as the R0 generation or R0 plants. The seeds produced by various *sexual crosses of the R0 generation plants are referred to as R1 progeny or the R1 generation.* When R1 seeds are germinated, |

| U.S. Patent No. 5,538,880 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| 6. The process of claim 4 comprising obtaining seed from said progeny and obtaining further progeny plants comprising said DNA from said seed. | **"said progeny"**<br><br>**Proposed Construction:** This phrase means the R1 and succeeding generations, no matter how they are obtained from the R0 of claim 1.<br><br>**Claim Language**<br><br>Claim 6 refers to "said progeny"—the progeny from claim 4. The progeny of claim 4 include the R1 and later generations.<br><br>See intrinsic evidence cited in support of Plaintiffs' construction of "progeny" in claims 1 and 4, above. | the resulting plants are also referred to as the R1 generation." '880 patent, col. 11, lines 14-19 (emphasis added).<br><br>**Prosecution History**<br><br>Response Under 37 C.F.R. § 1.116 dated June 5, 1995 (DeKalb argued that application claim 31 (which issued as patent claim 5) recited that, "in step (iv), *'R1' progeny* of the 'R0' plant of step (ii), are obtained by crossing the R0 plant with an inbred line.") '880 patent PH at 1055 (emphasis added).<br><br>**"said progeny":** means the R1 progeny.<br><br>**INTRINSIC EVIDENCE**<br><br>**Claim Language**<br><br>The term "progeny" is used consistently in claims 4-7 and should have the same meaning in each of those claims.<br><br>In addition, claim 6 refers to "*said progeny*" of claim 4. The term "progeny" in claim 6 therefore has the same meaning as the term "progeny" in claim 4.<br><br>**Specification**<br><br>"The plants regenerated from the transformed callus are referred to as the R0 generation or |

| U.S. Patent No. 5,538,880 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | | R0 plants. The seeds produced by various sexual crosses of the R0 generation plants are referred to as *R1 progeny or the R1 generation*. When R1 seeds are germinated, the resulting plants are also referred to as the R1 generation." '880 patent, col. 11, lines 14-19 (emphasis added). |
| | | **Prosecution History** |
| | | Response Under 37 C.F.R. § 1.116 dated June 5, 1995 (DeKalb argued that application claim 31 (which issued as patent claim 5) recited that, "in step (iv), *'R1' progeny of the 'R0'* plant of step (ii), are obtained by crossing the R0 plant with an inbred line.") '880 patent PH at 1055 (emphasis added) |
| | **"further progeny"** | **"further progeny": means the R2 progeny.** |
| | | **INTRINSIC EVIDENCE** |
| | **Proposed Construction:** This phrase means the same plants as claim 4, except for R1 plants. | |
| | | **Claim Language** |
| | **Claim Language** | The term "further progeny" is used consistently in claims 6-9 and should have the same meaning in each of those claims. |
| | As the claim 4 plants include plants from generations R1 and higher, "further progeny" must necessarily mean one generation later. Therefore, this term means the R2 and later generations. | **Prosecution History** |
| | | Response Under 37 C.F.R. § 1.116 dated June 5, 1995 (DeKalb argued that application claim 33 (which issued as patent claim 7) |
| | No words in claim 6 cut off all the generations | |

January 11, 2006
DM_US\829865\8.v1

| U.S. Patent No. 5,538,880 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | of progeny after the R2 from being covered by the claim.<br><br>See intrinsic evidence cited in support of Plaintiffs' construction of "progeny" in claims 1 and 4, above. | "effectively recites step (iv), obtaining 'R1' progeny; (v) crossing the 'R1' progeny with the inbred line, and (vi) obtaining *further 'R2' progeny*.").  '880 patent PH at 1055 (emphasis added). |
| 7.  The process of claim 5 wherein the progeny obtained are crossed back to the inbred line, to obtain further progeny which comprise said DNA. | **"the progeny"**<br><br>**Proposed Construction:  This phrase means the R1 and succeeding generations, which must be obtained by crossing the R0 plant of claim 1 with an inbred line.**<br><br>**Claim Language**<br><br>Claim 7 refers to "the progeny"—the progeny from claim 5.  The progeny of claim 5 include the R1 and later generations.<br><br>See intrinsic evidence cited in support of Plaintiffs' construction of "progeny" in claims 1 and 4, above. | **"the progeny": means the R1 progeny.**<br><br>**INTRINSIC EVIDENCE**<br><br>**Claim Language**<br><br>The term "progeny" is used consistently in claims 4-7 and should have the same meaning in each of those claims.<br><br>In addition, claim 7 refers to "the progeny" obtained from the process of claim 5.  The term "progeny" in claim 7 therefore has the same meaning as the term "progeny" in claim 5.<br><br>**Specification**<br><br>"The plants regenerated from the transformed callus are referred to as the R0 generation or R0 plants.  The seeds produced by various *sexual crosses of the R0 generation plants* are referred to as *R1 progeny or the R1 generation*.  When R1 seeds are germinated, the resulting plants are also referred to as the R1 generation."  '880 patent, col. 11, lines 14-19 (emphasis added). |

January 11, 2006<br>DM_US\829658.v1

| U.S. Patent No. 5,538,880 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | | **Prosecution History**<br><br>Response Under 37 C.F.R. § 1.116 dated June 5, 1995 (DeKalb argued that application claim 33 (which issued as patent claim 7) "effectively recites step (iv), obtaining '*R1*' *progeny*; (v) crossing the '*R1' progeny* with the inbred line, and (vi) obtaining further 'R2' progeny'". '880 patent PH at 1055 (emphasis added). |
| | **"further progeny"**<br><br>**Proposed Construction:** This phrase means a plant obtained by back-crossing a plant covered by claim 5 with the inbred line used in claim 5 and thus does not cover R1 plants.<br><br>**Claim Language**<br><br>As the claim 5 plants include plants from generations R1 and higher, "further progeny" must necessarily mean one generation later. Therefore, this term means the R2 and later generations.<br><br>No words in claim 7 cut off all the generations of progeny after the R2 from being covered by the claim.<br><br>See intrinsic evidence cited in support of Plaintiffs' construction of "progeny" in claims 1 and 4, above. | **"further progeny":** means the R2 progeny.<br><br>**INTRINSIC EVIDENCE**<br><br>**Claim Language**<br><br>The term "further progeny" is used consistently in claims 6-9 and should have the same meaning in each of those claims.<br><br>In addition, claim 7 states that the "progeny" (R1 progeny) obtained from the process of claim 5 are crossed back to the inbred line to obtain "further progeny." Crossing R1 progeny back to an inbred line would produce "R2" progeny.<br><br>**Prosecution History**<br><br>Response Under 37 C.F.R. § 1.116 dated June 5, 1995 (DeKalb argued that application claim 33 (which issued as patent claim 7) "effectively recites step (iv), obtaining 'R1' |

| U.S. Patent No. 5,538,880 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | | progeny; (v) crossing the 'R1' progeny with the inbred line, and (vi) obtaining *further 'R2' progeny*."). '880 patent PH at 1055 (emphasis added). |
| 8.  The process of claim 6 wherein seeds are obtained from said further progeny plants and plants comprising said DNA are recovered from said seed. | **"said further progeny"**<br><br>**Proposed Construction:**  This phrase means the same plants as claim 4, except for R1 plants.<br><br>**Claim Language**<br><br>Claim 8 refers to "said further progeny"—meaning the "further progeny" of claim 6.  The "further progeny" of claim 6 include the R2 and later generations.<br><br>See intrinsic evidence cited in support of Plaintiffs' construction of "progeny" in claims 1 and 4, above. | **"said further progeny"**: means the R2 progeny.<br><br>**INTRINSIC EVIDENCE**<br><br>**Claim Language**<br><br>The term "further progeny" is used consistently in claims 6-9 and should have the same meaning in each of those claims.<br><br>In addition, claim 8 refers to "*said further progeny plants*" of claim 6.  The term "further progeny" in claim 8 therefore has the same meaning as the term "further progeny" in claim 6. |
| | **"plants comprising said DNA are recovered from said seed"**<br><br>**Proposed Construction:**  This phrase means the same plants as claim 4 except for R1 and R2 plants.<br><br>**Claim Language**<br><br>This term refers to plants obtained by the seed set from the "further progeny plants" of claim | **"plants comprising said DNA are recovered from said seed"**<br><br>No construction is necessary. |

| U.S. Patent No. 5,538,880 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | 6. As the claim 6 plants include plants from generations R2 and higher, the "plants comprising said DNA…" must necessarily be one generation later. Therefore this term means the R3 and later generations.<br><br>No words in claim 8 cut off all the generations of progeny after the R3 generation from being covered by the claim.<br><br>See intrinsic evidence cited in support of Plaintiffs' construction of "progeny" in claims 1 and 4, above. | |
| 9. The process of claim 7 wherein said further progeny are crossed back to the inbred line to obtain progeny which comprise said DNA. | **"said further progeny"**<br><br>**Proposed Construction:** This phrase means a plant obtained by back-crossing a plant covered by claim 5 with the inbred line used in claim 5 and thus does not cover R1 plants.<br><br>**Claim Language**<br><br>Claim 9 refers to "said further progeny"—meaning the "further progeny" of claim 7. The progeny of claim 7 include the R2 and later generations.<br><br>See intrinsic evidence cited in support of Plaintiffs' construction of "progeny" in claims 1 and 4, above. | **"said further progeny":** means the R2 progeny.<br><br>**INTRINSIC EVIDENCE**<br><br>**Claim Language**<br><br>The term "further progeny" is used consistently in claims 6-9 and should have the same meaning in each of those claims.<br><br>In addition, claim 9 refers to "*said* further progeny" of claim 7. The term "further progeny" in claim 9 therefore has the same meaning as the term "further progeny" in claim 7. |

23

| U.S. Patent No. 5,538,880 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | | **Prosecution History**<br><br>Response Under 37 C.F.R. § 1.116 dated June 5, 1995 (DeKalb argued that application claim 35 (which issued as patent claim 9) "recites that (vii) the *'further (R2) progeny'* are crossed back to the inbred line to obtain 'R3' progeny.'") '880 patent PH at 1055 (emphasis added). |
| | **"progeny" (second occurrence)**<br><br>**Proposed Construction:** This phrase means a plant obtained by back-crossing a plant covered by claim 7 with the inbred line used in claim 5 and thus does not cover R1 or R2 plants.<br><br>**Claim Language**<br><br>The claim indicates that the "further progeny" of claim 7 are crossed back to obtain another generation of progeny. As the claim 7 plants include plants from generations R2 and higher, the progeny of those plants must necessarily be the R3 and later generations.<br><br>No words in claim 9 cut off all the generations of progeny after the R3 generation from being covered by the claim.<br><br>See intrinsic evidence cited in support of Plaintiffs' construction of "progeny" in claim 1, above. | **"progeny" (second occurrence): means the R3 progeny.**<br><br>**INTRINSIC EVIDENCE**<br><br>**Claim Language**<br><br>The claim states that the "further progeny" (R2 progeny) obtained from the process of claim 7 are crossed back to the inbred line to obtain "progeny." Crossing R2 progeny back to an inbred line would produce "R3" progeny.<br><br>**Prosecution History**<br><br>Response Under 37 C.F.R. § 1.116 dated June 5, 1995 (DeKalb argued that application claim 35 (which issued as patent claim 9) "recites that (vii) the 'further (R2) progeny' are crossed back to the inbred line to obtain *'R3'* *progeny*.'") '880 patent PH at 1055 (emphasis added). |

| U.S. Patent No. 6,013,863 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| 1. A process for producing a fertile transgenic *Zea mays* plant comprising the steps of | **"comprising"**<br><br>**Proposed Construction:** This phrase means including, and does not exclude the presence of additional elements. | No construction is necessary. |
| (i) bombarding intact regenerable *Zea mays* cells with DNA-coated microprojectiles, wherein said DNA comprises at least a selectable marker gene | **"Zea mays"**<br><br>**Proposed Construction:** This phrase means corn of all types, including, but not limited to, field corn, popcorn, sweet corn, flint corn, and dent corn. | No construction is necessary. |
|  | **"intact regenerable *Zea mays* cells"**<br><br>**Proposed Construction:** This phrase means corn cells that, after transformation, must be capable of regeneration of a plant containing the transgene. | No construction is necessary. |
| (ii) selecting a population of transformed cells expressing the selectable marker gene; and | No construction is necessary. | No construction is necessary. |
| (iii) regenerating a fertile transgenic plant therefrom, | **"transgenic plant"**<br><br>**Proposed Construction:** This phrase means a | No construction is necessary. |

| U.S. Patent No. 6,013,863 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| wherein said DNA is expressed so as to impart glyphosate resistance to said transgenic plant and is transmitted through a normal sexual cycle of said transgenic plant to progeny plants. | corn plant that includes a DNA sequence resulting from genetic engineering. | |
| | **"said DNA"**<br><br>**Proposed Construction:** This phrase means the DNA that was inserted into the transformed cells, even if altered by the insertion process or by later natural processes, so long as a person of ordinary skill can recognize it as the inserted DNA. | No construction is necessary. |
| | **"wherein said DNA is . . . transmitted through a normal sexual cycle of said transgenic plant to its progeny plants"**<br><br>**Proposed Construction:** This phrase does not define a necessary step of the claimed process, and merely requires that the R0 plant be capable of passing the transgene to progeny through either pollen or egg cells, with or without human intervention. | No construction is necessary. |
| | **"glyphosate resistance"**<br><br>**Proposed Construction:** This phrase means that the plant has more resistance to glyphosate, when applied to plant material, than the same plant that does not have the | **"glyphosate resistance"**<br><br>No construction is necessary.<br><br>Syngenta notes that the '863 patent does not define "glyphosate resistance" and the |

January 11, 2006
DM_US\8298658.v1

| U.S. Patent No. 6,013,863 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | transgene under the same conditions of application and plant material.<br><br>The phrase "glyphosate resistance" is analogous to the phrase "herbicide resistance" in claim 1 of the '880 patent. The meaning of the term "glyphosate" is undisputed. See intrinsic evidence cited in support of Plaintiffs' construction of "herbicide resistance" in claim 1 of the '880 patent, above. | examples of the patent all relate to resistance to the antibiotic hygromycin, not to resistance to glyphosate (or any other herbicide). |
| 5. The process of claim 1 further comprising obtaining transgenic glyphosate resistant progeny plants of subsequent generations from said fertile transgenic plant. | **"progeny"**<br><br>**Proposed Construction:** This phrase means the R1 and succeeding generations.<br><br>See intrinsic evidence cited in support of Plaintiffs' construction of "progeny", above. | No construction is necessary.<br><br>The parties agree that claim 5 is a dependent claim. |
| 6. The process of claim 5 further comprising obtaining seed from one of said progeny plants. | **"progeny"**<br><br>**Proposed Construction:** This phrase means the same plants as claim 5 except for R1 plants.<br><br>See intrinsic evidence cited in support of Plaintiffs' construction of "progeny", above. | No construction is necessary.<br><br>The parties agree that claim 6 is a dependent claim. |

| U.S. Patent No. 4,940,835 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| 1. A chimeric plant gene which comprises: | **"chimeric plant gene"**<br><br>**Proposed Construction:** This phrase means a chimeric gene that is expressible in a plant. | No construction is necessary. |
| | **"comprises"**<br><br>**Proposed Construction:** This phrase means includes, and does not exclude the presence of additional elements. | No construction is necessary. |
| (a) a promoter sequence which functions in plant cells | **"which functions in plant cells"**<br><br>**Proposed Construction:** This phrase describes a characteristic of the promoter and does not mean that the claim covers plant cells rather than chimeric genes as recited in the preamble.<br><br>**Specification**<br><br>"[p]romoters which are known or found to cause transcription of the EPSPS gene in plant cells can be used in the present invention."<br><br>['835 patent, col. 3, ll. 25-27] | **"a promoter sequence which functions in plant cells":** Syngenta contends that this language constitutes a necessary limitation of the claim and requires the promoter cause sufficient expression of the fusion polypeptide to enhance the glyphosate resistance of a plant cell transformed with the gene.<br><br>**INTRINSIC EVIDENCE**<br><br>**Claim Language**<br><br>The claim expressly requires that the promoter sequence must "function" (work) in plant cells. The specific function of the promoter is |

| U.S. Patent No. 4,940,835 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | "The particular promoter selected should be capable of causing sufficient expression to result in the production of an effective amount of EPSPS polypeptide to render the plant cells and plants regenerated therefrom substantially resistant to glyphosate. Those skilled in the art will recognize that the amount of EPSPS polypeptide needed to induce resistance may vary with the type of plant. The degree of expression needed may vary with the EPSPS coding sequence used."<br><br>['835 patent, col. 3, ll. 33-42]<br><br>"The 3' non-translated region contains a polyadenylation signal which functions in plants to cause the addition of polyadenylate nucleotides to the 3' end of the EPSPS mRNA."<br><br>['835 patent, col. 5, ll. 13-16]<br><br>"In cases where the EPSPS sequence is derived from a plant source one can use the 3' non-translated region naturally associated with the particular EPSPS gene."<br><br>['835 patent, col. 5, ll. 16-19]<br><br>"Examples of other suitable 3' regions are the 3' transcribed, non-translated regions containing the polyadenylation signal of the nopaline synthase (NOS) gene of the Agrobacterium tumor-inducing (Ti) plasmid or the conglycinin (7S) storage protein gene." | defined by the subsequent claim language "the promoter being . . . adapted to cause sufficient expression of the fusion polypeptide to enhance the glyphosate resistance of a plant cell transformed with the gene."<br><br>**Specification**<br><br>"The particular promoter selected should be capable of causing sufficient expression to result in the production of an effective amount of EPSPS polypeptide to render the plant cells and plants regenerated therefrom substantially resistant to glyphosate."  '835 patent, col. 3, lines 33-38.<br><br>In addition, Examples 2-13 all demonstrate either the transformation of dicot plant cells or the regeneration of dicot plants from the transformed plant cells with a gene that contains a promoter than functions to enhance glyphosate resistance.<br><br>**Prosecution History**<br><br>Examiner Interview Summary Record for Jan. 4, 1988 PTO interview ("The applicant agreed to use function[al] language in [the] claims.") '835 patent PH at 5311.<br><br>Amendment dated Jan. 25, 1988 ("In the broadest sense, a suitable promoter will be any promoter that functions in plants since this promoter would drive the chimeric gene, produce more EPSPS and as a result make the |

| U.S. Patent No. 4,940,835 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | | plant cell more resistant to glyphosate herbicide.") '835 patent PH at 5324. |
| | **"plant cells"**<br><br>['835 patent, col. 5, ll. 19-23]<br><br>**Proposed Construction:** This phrase means cells of any plant species. | No construction is necessary. |
| (b) a coding sequence which causes the production of RNA, encoding a chloroplast transit peptide/5-enolpyruvylshikimate-3-phosphate synthase fusion polypeptide, which chloroplast transit peptide permits the fusion polypeptide to be imported into a chloroplast of a plant cell; and | **"chloroplast transit peptide"**<br><br>**Proposed Construction:** This phrase means a series of amino acids that causes the transport of a polypeptide into a chloroplast, regardless of the cleavage step.<br><br><u>Claim Language</u><br><br>The function of a "chloroplast transit peptide," is defined by the claim language that specifically describes its function, i.e., "permits the fusion polypeptide to be imported into a chloroplast of a plant cell."<br><br><u>Specification</u><br><br>Non-homologous chloroplast transit peptides may function: | **"chloroplast transit peptide",** means a naturally occurring chain of amino acids that is located at the N-terminal portion of a nuclear-encoded polypeptide, which directs the polypeptide to a chloroplast and is cleaved (or removed) from the EPSPS polypeptide.<br><br><u>INTRINSIC EVIDENCE</u><br><br><u>Specification</u><br><br>The following supports Syngenta's position that the CTP must be naturally occurring:<br><br>"Suitable CTP's for use in the present invention may be obtained from various sources. Most preferably, the CTP is obtained from the endogenous EPSPS gene of the |

| U.S. Patent No. 4,940,835 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | "Suitable CTP's for use in the present invention may be obtained from various sources. Most preferably, the CTP is obtained from the endogenous EPSPS gene of the subject plant to the transformed."<br><br>['835 patent, col. 4, ll. 35-38]<br><br>"Although there is little homology between the CTP sequences of the EPSPS gene and the ssRUBISCO gene (see, e.g., Broglie (1983), one may find that non-homologous CTPs may function in particular embodiments."<br><br>['835 patent, col. 4, ll. 40-44]<br><br>"Suitable CTP sequences for use in the present invention can be easily determined by assaying the chloroplast uptake of an EPSPS polypeptide comprising the CTP of interest as described in Example 18 hereinafter."<br><br>['835 patent, col 4, ll. 44-48]<br><br>Example 19 is an example of a chloroplast transit peptide that is not one that would be found in nature:<br><br>"EXAMPLE 19: CTP of Petunia EPSPS Facilitates Chloroplast Uptake of Heterologous Protein | subject plant to the [src, be] transformed. Alternately, one may often use a CTP from an EPSPS gene of another plant." '835 patent, col. 4, lines 35-40.<br><br>In addition, Examples 2-13 all concern the use of a naturally occurring CTP.<br><br>The following supports Syngenta's position that a defining feature of the CTP is that it is cleaved or removed from the EPSPS polypeptide:<br><br>"The CTP leader sequence causes the polypeptide to be imported into chloroplasts, and the CTP leader sequence encoded by the plant-derived EPSPS gene is believed to be *removed from the remainder of the polypeptide so that an active portion of the EPSPS polypeptide exists and functions inside the chloroplast*." '835 patent, col. 4, lines 28-34 (emphasis added).<br><br>"To verify that precursor EPSPS (+CTP) is taken up and processed by chloroplasts, the total translation products containing [³⁵S]methionine-labeled pre-EPSPS were incubated with freshly isolated, intact chloroplasts from *L. sativa*. The pre-EPSPS (+CTP) was rapidly translocated into chloroplasts and *cleaved* to the mature EPSPS of M$_r$48 kDa." '835 patent, col. 29, line 67 - col. 30, line 5 (emphasis added).<br><br>"Chloroplast import assays in vitro showed |

31

| U.S. Patent No. 4,940,835 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | The following EPSPS experiments show that the CTP can target a heterologous protein to the stroma compartment. The 72-amino-acid transit peptide of EPSPS was fused to the mature ssRUBISCO from wheat. The mature wheat ssRUBISCO cDNA (Broglie et al 1983) was obtained as an SphI/PstI fragment of about 0.6 kb. This SphI/PstI fragment contains the entire mature wheat ssRUBISCO coding region of 128 amino acids (beginning at the N-Terminal methionine) and 200 bp of the 3' untranslated region. The mature ssRUBISCO cDNA fragment was fused behind the P. hybrida EPSPS CTP cDNA fragment. This fusion was done by joining an EcoRI/SphI fragment of pMON6242 with the wheat ssRUBISCO cDNA. *The construct pMON6242 is a derivative of pMON6140 and contains P. hybrida EPSPS with an engineered consensus cleavage site for ssRUBISCO. The cleavage site of pMON6140 EPSPS (ser-val-ala-thr-ala-glu/lys) was changed to gly-gly-arg-val-ser-cys/met in pMON6242. This change introduces an in-frame SphI site which allows CTP switching between ssRUBISCO and EPSPS.* The construct pMON6242 has previously been cloned into pGEM-2 and shown to give a chimeric precursor enzyme which is transported into chloroplasts in vitro and proteolytically processed in the correct fashion.

The EcoRI/SphI fragment from pMON6242 | that the chimeric protein was transported into the stroma and proteolytically *cleaved* to a final product of ~15 kD (the ssRUBISCO has a molecular weight of 15 kD)." '835 patent, col. 31, lines 8-12 (emphasis added). |

| U.S. Patent No. 4,940,835 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | was fused to the SphI site from wheat ssRUBISCO and cloned into plasmid pIBI to give pMON6149. In vitro transcription/translation of pMON6149 gave a single polypeptide of the predicted molecular weight for the fusion protein (~23 kD). Chloroplast import assays in vitro showed that the chimeric protein was transported into the stroma and proteolytically cleaved to a final product of ~15 kD (the ssRUBISCO has a molecular weight of 15 kD).<br><br>These results show that the EPSPS CTP alone confers sufficient information to target a heterologous protein to the chloroplast stroma."<br><br>['835 patent, col. 30, l. 45-col. 31, l. 15 (emphasis added)]<br><br>The specification distinguishes between transport and cleavage:<br><br>"The CTP leader sequence causes the polypeptide to be *imported* into chloroplasts, *and* the CTP leader sequence encoded by the plant-derived EPSPS gene is believed to be *removed* from the remainder of the polypeptide so that an active portion of the EPSPS polypeptide exists and functions inside the chloroplast."<br><br>['835 patent, col. 4, ll. 28-34 (emphasis | |

January 11, 2006<br>DM_US\8298658.v1

| U.S. Patent No. 4,940,835 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | added]] | |
| | Transport is required. Cleavage is not: | |
| | "...a chloroplast transit peptide which allows the polypeptide...to be *transported* from the cytoplasm of the plant cell into a chloroplast in the plant cell..." | |
| | ['835 patent, col. 2, ll. 24-28 (emphasis added]] | |
| | "The EPSPS gene encodes a polypeptide which contains a chloroplast transit peptide (CTP), which enables the EPSPS polypeptide (or an active portion thereof) to be *transported* into a chloroplast inside the plant cell." | |
| | ['835 patent, col. 2, l. 66-col. 3, l. 2 (emphasis added]] | |
| | "The EPSPS gene is transcribed into mRNA in a nucleus and the mRNA is translated into a precursor [sic] polypeptide (CTP/mature EPSPS) in the cytoplasm. The precursor [sic] polypeptide (or a portion thereof) is *transported* into the chloroplast." | |
| | ['835 patent, col. 3, ll. 19-24(emphasis added]] | |
| | "EPSPS genes which encode an enzyme with a functional chloroplast transit peptide (which is *preferably* removed from the | |

| U.S. Patent No. 4,940,835 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | mature EPSPS polypeptide)" | |
| | ['835 patent, col. 5, ll. 41-43(emphasis added)] | |
| | [*See generally*, '835 patent, Examples] | |
| | **"chloroplast transit peptide/5-enolpyruvylshikimate-3-phosphate synthase fusion polypeptide"** | **"chloroplast transit peptide/5-enolpyruvylshikimate-3-phosphate synthase fusion polypeptide":** means a chain of amino acids consisting of a chloroplast transit peptide (as defined above) fused to an EPSPS, where the chloroplast transit peptide and EPSPS are not found together in nature. |
| | **Proposed Construction:** This phrase means a polypeptide that has at least two parts, which must include a chloroplast transit peptide (as defined above) joined to an EPSPS, where such chloroplast transit peptide need not be directly adjacent to the EPSPS. | |
| | | **INTRINSIC EVIDENCE** |
| | **Claim language** | **Prosecution History** |
| | Claim 1 uses the open-ended term "comprises"; "A chimeric plant gene which *comprises* ..." | Patent Applications filed on Aug. 7, 1985 and Oct. 29, 1985 ("Although it is not known whether a *fusion peptide* comprising (1) a CTP sequence derived from *a heterologous protein* such as ssRUBISCO, coupled to (2) a mature EPSPS sequence derived from a bacterial or plant cell, might confer some degree of glyphosate resistance upon a transformed cell, removal of the CTP leader sequence from the mature EPSPS sequence is preferred.") '482 appl. PH at 5012, lines 16-23; '390 appl. PH at 5107, lines 16-23 (emphasis added). |
| | **Specification** | |
| | The CTP/EPSPS fusion polypeptide may or may not be heterologous: | |
| | "This invention involves…a gene which encodes 5-enolpyruvylshikimate-3-phosphate synthase (EPSPS) polypeptide which, when expressed in a plant cell | |

| U.S. Patent No. 4,940,835 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | contains a chloroplast transit peptide…" | **Specification** |
| | ['835 patent, col. 2, ll. 21-25] | "The EPSPS gene of the present invention encodes an CTP/EPSPS *fusion polypeptide.* After the CTP/EPSPS polypeptide from a gene of this invention is translated from mRNA in the cytoplasm of the transformed plant cell, it is believed to be processed in the same manner as the *natural* EPSPS polypeptide." '835 patent, col. 4, lines 23-28 (emphasis added). |
| | Examples 1-7 and 10-17 are non-heterologous examples: | |
| | "The following examples further demonstrate several preferred embodiments of this invention." | |
| | ['835 patent, col. 6, ll. 10-11; Examples 1-7 and 10-17] | The specification describes that the CTP/EPSPS fusion polypeptide has two parts. For the CTP, the specification describes: |
| | "The EPSPS gene of the present invention encodes a CTP/EPSPS fusion polypeptide. After the CTP/EPSPS polypeptide from a gene of this invention is translated from mRNA in the cytoplasm of the transformed plant cell, it is believed to be processed in the same manner as the natural EPSPS polypeptide." | "Suitable CTP's for use in the present invention may be obtained from various sources. Most preferably, the CTP is obtained from the endogenous EPSPS gene of the subject plant to be transformed. Alternately, one may often use a CTP from an EPSPS gene of another plant. Although there is little homology between the CTP sequences of the EPSPS gene and the ssRUBISCO gene (see, e.g., Broglie (1983), one may find that non-homologous CTPs may function in particular embodiments. Suitable CTP sequences for use in the present invention can be easily determined by assaying the chloroplast uptake of an EPSPS polypeptide comprising the CTP of interest as described in Example 18 hereinafter." '835 patent, col. 4, lines 35-48. |
| | ['835 patent, col. 4, ll. 23-28] | |
| | "[O]ne may find that *non-homologous* CTP's may function *in particular embodiments.*" | |
| | ['835 patent, col. 4, ll. 43-45 (emphasis added)] | |
| | A homologous fusion is described as being preferred. | |
| | "Figure 1 depicts the major steps used in one preferred embodiment of the | For the EPSPS, the specification describes: |

| U.S. Patent No. 4,940,835 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | invention." [835 patent, col. 2, ll. 41-42, Figure 1]  **Prosecution History**  The specification as originally filed drew a distinction between the endogenous EPSPS present in the non-transformed plant and that supplied by the transgene:  "After the EPSPS polypeptide from a gene of this invention is translated from mRNA in the cytoplasm of the transformed plant cell, it is believed to be processed in the same manner as the natural EPSPS polypeptide."  [0005012, Specification as filed on Aug. 7, 1985, at p. 10, '482 application]  Addition of the term "CTP/EPSPS fusion polypeptide" in a subsequent application did not change the nature of the distinction being drawn:  "The EPSPS gene of the present invention encodes an CTP/EPSPS fusion polypeptide. After the *CTP/EPSPS polypeptide* from a gene of this invention is translated from mRNA in the cytoplasm of the transformed plant cell, it is believed to be processed in the same manner as the natural EPSPS polypeptide." | "The sequence encoding a EPSPS polypeptide can be obtained from numerous sources. Suitable sources include bacteria, fungi and plants. EPSPS coding sequences from other sources can be obtained using the full-length petunia cDNA (see FIG. 4) or a suitable fragment thereof as a hybridization probe as described in Examples 1 and 14-17." '835 patent, col. 4, lines 49-55.  "The following EPSPS experiments show that the CTP can target a heterologous protein to the stroma compartment. The 72-amino-acid transit peptide of EPSPS was fused to the mature ssRUBISCO from wheat. . . . The mature ssRUBISCO cDNA fragment was fused behind the *P. hybrida* EPSPS CTP cDNA fragment. This fusion was done by joining an EcoRI/SphI fragment of pMON6242 with the wheat ssRUBISCO cDNA." '835 patent, col. 30, lines 45-58.  In addition, Examples 8-9 describe transforming plant cells with a construct where the CTP and EPSPS do not occur together in nature. |

| U.S. Patent No. 4,940,835 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | ['835 patent, col. 4, lines 23-28 (emphasis added). | |
| | [0005357-62, Shah Declaration dated Oct. 24, 1988, at p. 1, '814 application] | |
| | **"permits the fusion polypeptide to be imported into a chloroplast of a plant cell"** | **"chloroplast transit peptide permits the fusion polypeptide to be imported into a chloroplast of a plant cell":** Syngenta contends that this language constitutes a necessary limitation of the claim and requires the CTP to permit the fusion polypeptide to be imported into a chloroplast of a plant cell. |
| | **Proposed Construction:** This phrase means the function of a chloroplast transit peptide (as defined above) and does not mean that the claim covers plant cells rather than chimeric genes as recited in the preamble. | **INTRINSIC EVIDENCE** |
| | | **Claim Language** |
| | **Specification** | The claim expressly requires that the CTP permit the fusion polypeptide to be imported into a chloroplast of a plant cell. |
| | "Suitable CTP's for use in the present invention may be obtained from various sources. Most preferably, the CTP is obtained from the endogenous EPSPS gene of the subject plant to the transformed. Alternately, one may often use a CTP from an EPSPS gene of another plant. Although there is little homology between the CTP sequences of the EPSPS gene and the ssRUBISCO gene (see, e.g., Broglie (1983), one may find that non-homologous CTPs may function in particular embodiments." | **Prosecution History** |
| | | Examiner Interview Summary Record for Jan. 4, 1988 PTO interview ("The applicant agreed to use function[al] language in [the] claims.") '835 patent PH at 5311. |
| | | **Specification** |
| | ['835 patent, col. 4, ll. 35-44] | "The CTP leader sequence causes the polypeptide to be *imported* into chloroplasts, |

| U.S. Patent No. 4,940,835 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | [*See generally* '835 patent, Example 18] | and the CTP leader sequence encoded by the plant-derived EPSPS gene is believed to be removed from the remainder of the polypeptide so that an active portion of the EPSPS polypeptide exists and functions inside the chloroplast." '835 patent, col. 4, lines 28-34.<br><br>"To verify that precursor EPSPS (+CTP) is taken up and processed by chloroplasts, the total translation products containing [$^{35}$S]methionine-labeled pre-EPSPS were incubated with freshly isolated, intact chloroplasts from *L. sativa*. The pre-EPSPS (+CTP) was rapidly translocated into chloroplasts and cleaved to the mature EPSPS of M$_r$48 kDa." '835 patent, col. 29, line 67 - col. 30, line 5.<br><br>"Chloroplast import assays in vitro showed that the chimeric protein was transported into the stroma and proteolytically cleaved to a final product of ~15 kD (the ssRUBISCO has a molecular weight of 15 kD)." '835 patent, col. 31, lines 8-12.<br><br>In addition, Examples 2-13 show transforming dicot plant cells or the regeneration of dicot plants from the transformed plant cells with a gene that contains a CTP such that the fusion polypeptide is imported into the chloroplast and provides glyphosate resistance. |

January 11, 2006
DM_US\829658.v1

| U.S. Patent No. 4,940,835 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| (c) a 3' non-translated region which encodes a polyadenylation signal which functions in plant cells to cause the addition of polyadenylate nucleotides to the 3' end of the RNA; | **"which functions in plant cells"**<br><br>**Proposed Construction:** This phrase describes a characteristic of the 3' region and does not mean that the claim covers plant cells rather than chimeric genes as recited in the preamble.<br><br>See intrinsic evidence cited in support of Plaintiffs' construction of "which functions in plant cells" in part (a) of claim 1, above. | **"which functions in plant cells to cause the addition of polyadenylate nucleotides to the 3' end of the RNA":** Syngenta contends that this language constitutes a necessary limitation of the claim and requires the 3' non-translated region to encode a polyadenylation signal which functions in plant cells to cause the addition of polyadenylate nucleotides to the 3' end of the mRNA.<br><br>**INTRINSIC EVIDENCE**<br><br>**Claim Language**<br><br>The claim language expressly requires that the 3' non-translated region must encode a polyadenylation signal which functions in plant cells to cause the addition of polyadenylate nucleotides to the 3' end of the mRNA.<br><br>**Specification**<br><br>"The 3' non-translated region contains a polyadenylation signal which functions in plants to cause the addition of polyadenylate nucleotides to the 3' end of the EPSPS mRNA." '835 patent, col. 5, lines 13-16.<br><br>**Prosecution History**<br><br>Examiner Interview Summary Record for Jan. 4, 1988 PTO interview ("The applicant agreed to use function[al] language in [the] claims.") '835 patent PH at 5311. |

January 11, 2006
DM_US8298658.v1

| | | |
|---|---|---|
| the promoter being heterologous with respect to the coding sequence and adapted to cause sufficient expression of the fusion polypeptide to enhance the glyphosate resistance of a plant cell transformed with the gene. | **"adapted to cause sufficient expression of the fusion polypeptide to enhance the glyphosate resistance of a plant cell transformed with the gene"**<br><br>**Proposed Construction:** This phrase describes a characteristic of the promoter and does not mean that the claim covers plant cells rather than chimeric genes as recited in the preamble.<br><br>**Specification**<br><br>"[t]he particular promoter selected should be capable of causing sufficient expression to result in the production of an effective amount of EPSPS polypeptide to render the plant cells and plants regenerated therefrom substantially resistant to glyphosate."<br><br>['835 patent, col. 3, ll. 33-38] | **"the promoter being . . . adapted to cause sufficient expression of the fusion polypeptide to enhance glyphosate resistance of a plant cell transformed with the gene":** Syngenta contends that this language constitutes a necessary limitation of the claim and requires that the promoter be adapted to cause sufficient expression of the fusion polypeptide to enhance the glyphosate resistance of a plant cell transformed with the gene. The parties agree that the term "transformed" means that the chimeric plant gene is stably integrated into the genome of the plant cell.<br><br>**INTRINSIC EVIDENCE**<br><br>**Claim Language**<br><br>The claim language expressly requires that the promoter be adapted to cause sufficient expression of the fusion polypeptide to enhance the glyphosate resistance of a plant cell transformed with the gene.<br><br>**Specification**<br><br>"The EPSPS gene of the present invention is inserted into the genome of a plant by any suitable method." '835 patent, col. 5, lines 24-25.<br><br>"This confirms that the CaMV/EPSPS gene conferred glyphosate resistance upon the transformed cells." '835 patent, Ex. 2, col. 16, lines 61-63.<br><br>"The cells transformed with the CaMV/EPSPS |

gene created substantial amounts of callus tissue on 0.5 mM glyphosate, whereas the cells which did not contain that gene did not create any detectable callus tissue." '835 patent, Ex. 3, col. 17, lines 1-5.

"This confirms that the CaMV 35S/EPSPS/NOS gene conferred glyphosate resistance on the soybean cells." '835 patent, Ex. 4, col. 19, lines 58-60.

"Transformation of tobacco cells using pMON542 (construct with CTP) as previously described in Example 3 resulted in glyphosate resistance." '835 patent, Ex. 8, col. 23, lines 40-42.

"As indicated in Table 2, the control plants were killed when sprayed with 0.4 pounds/acre of glyphosate. In contrast, the petunia plants which were transformed were healthy and viable after spraying with 0.8 pounds/acre. The transformed plants are more resistant to glyphosate exposure than the non-transformed control plants." '835 patent, Ex. 11, col. 25, lines 34-40.

"After 10 days the control tobacco leaves were completely inhibited and showed no signs of callus growth; the leaves from plants transformed with the chimeric EPSPS that the chimeric petunia EPSPS gene confers glyphosate resistance to tobacco plants." '835 patent, Ex. 13, col. 26, lines 16-20.

In addition, Examples 2-13 show the transformation of a dicot plant cell or the regeneration of a dicot plant from a

43

transformed plant cell with a promoter-CTP/EPSPS gene such that the cell or plant has enhanced glyphosate resistance.

**Prosecution History**

Examiner Interview Summary Record for Jan. 4, 1988 PTO interview ("The applicant agreed to use function[al] language in [the] claims.") '835 patent PH at 5311.

**"enhance the glyphosate resistance of a plant cell":** means the plant cell will survive application of glyphosate at a concentration sufficient to select a transformed plant cell from a non-transformed plant cell.

**INTRINSIC EVIDENCE**

**Specification**

"As used herein, a EPSPS gene 'confers a substantial degree of glyphosate resistance upon a plant cell' if it allows a selectable fraction of a culture of transformed plant cells to survive a concentration of glyphosate which kills essentially all untransformed cells from the same type of plant under the same conditions." '835 patent, col. 5, lines 61-66.

"Within 10 days after transfer to the media containing glyphosate, actively growing callus tissue appeared on the periphry [sic, periphery] of all disks on the control plate containing no glyphosate. On media containing 0.1 mM

**"enhance the glyphosate resistance of a plant cell"**

**Proposed Construction:** This phrase means that the plant cell has more resistance to glyphosate, when applied to plant material, than the same plant cell that does not have the transgene under the same conditions of application and plant material.

**Specification**

[*See generally*, '835 patent, Examples, *e.g.*, Table 2, col. 25, ll. 34-41, and Examples 2-13]

| | |
|---|---|
| glyphosate, there was little detectable difference between the control disks and the transformed tissue. At 0.25 mM glyphosate, there was very little growth of callus from control disks, while substantial growth of transformed tissue occurred. At 0.5 mM glyphosate, there was no callus growth from the control disks, while a significant number of calli grew from the transformed disks. This confirms that the CaMV/EPSPS gene conferred glyphosate resistance upon the transformed cells." '835 patent, Ex. 2, col. 16, lines 51-63.<br><br>In addition, in Examples 2-13, the inventors select either dicot plant cells or plants on the basis of glyphosate resistance. | No construction is necessary. |
| **"transformed"**: means the stable integration of the chimeric plant gene in a plant cell's genome. | No construction is necessary. |
| 5. A chimeric gene of claim 1 in which the coding sequence encodes a mutant 5-enolpyruvylshikimate-3-phosphate synthase (EPSPS). | No construction is necessary. |
| 6. A chimeric gene of claim 1 in which the EPSPS coding sequence encodes an EPSPS from an organism selected from the group consisting of bacteria, fungi and plants. | No construction is necessary. |

44

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

## <u>CERTIFICATE OF SERVICE</u>

I, David E. Moore, hereby certify that on January 11, 2006, the attached document

was hand-delivered to the following persons and was electronically filed with the Clerk

of the Court using CM/ECF which will send notification of such filing(s) to the following

and the document is available for viewing and downloading from CM/ECF:

John W. Shaw
Karen E. Keller
Young Conaway Stargatt & Taylor, L.L.P.
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE  19801


I hereby certify that on January 11, 2006, I have Federal Expressed the

foregoing document(s) to the following non-registered participants:

Richard F. Schwed
Stephen Fishbein
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY  10022-6069

Michael J. Flibbert
Don O. Burley
Howard W. Levine
Finnegan, Henderson, Farabow,
    Garrett & Dunner, L.L.P.
901 New York Ave., NW
Washington, DC  20001-4413


Richard L. Horwitz
David E. Moore
Potter Anderson & Corroon LLP
Hercules Plaza – Sixth Floor
1313 North Market Street
Wilmington, DE  19801
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com