#9

27.  The plant of claim 23 wherein the heterologous DNA comprises a promoter.

28.  The plant of claim 23 selected from the group consisting essentially of field corn, popcorn, sweet corn, flint corn and dent corn.

29.  The plant of claim 23 wherein said heterologous DNA comprises a DNA sequence selected from the group consisting of a bacterial dap A gene, a BT-endotoxin gene, a protease inhibitor gene, a bacterial ESPS synthase gene, a chitinase gene, a glucan endo-1,3-β-glucosidase gene, regulatory sequence, an identification sequence and a sequence encoding antisense RNA.

30.  The plant of claim 23 wherein said heterologous DNA encodes a beneficial trait to the plant.

31.  The plant of claim 30 wherein said beneficial trait is selected from the group consisting of promoting increased food value, higher yield, reduced production cost, pest resistance, herbicide resistance and disease resistance.

32.  The plant of claim 23 which expresses a selectable marker gene or a reporter gene.

33.  The plant of claim 32 wherein the selectable marker gene confers resistance or tolerance to a compound selected from the group consisting of hygromycin, kanamycin, G418, dalapon, neomycin, glyphosate, methotrexate, imidazolinone, chlorsulfuron and bromoxynil.

-2-

SM 0000650

34. The plant of claim 33 wherein the selectable marker gene confers resistance or tolerance to hygromycin.

35. The plant of claim 32 which expresses a reporter gene.

36. The seed produced by the plant of claim 23 which has inherited the heterologous DNA.

37. The grain produced from the plant of claim 23 wherein the heterologous DNA increases the feed value or the food value of said grain.

38. The R1 and subsequent generations derived from the plant of claim 23.

39. A process for producing a fertile transgenic Zea mays plant which stably expresses heterologous DNA which is heritable, wherein the process comprises the steps of (i) establishing a regenerable cell culture from a plant to be transformed, (ii) transforming said culture by bombarding it with DNA-coated microprojectiles, (iii) identifying or selecting a transformed cell line, and (iv) regenerating a fertile transgenic plant therefrom.

40. The process of claim 39 wherein the cell culture is a friable, embryogenic callus culture.

41. The process of claim 40 wherein the callus culture subjected to bombardment is in clumps of about 30 to 80 mg per clump.

SM 0000651

-3-

42. The process of claim 41 wherein said callus is initiated on solid media.

43. A plant prepared by the process of claim 39 wherein the plant is regenerated from transformed callus.

44. A transgenic _Zea mays_ plant comprising heterologous DNA which is heritable, wherein said DNA was introduced into said plant, or an ancestor of said plant, at an embryogenic stage.

45. The transgenic _Zea mays_ plant of claim 44 wherein the heterologous DNA was introduced into said plant by microprojectile bombardment.

46. The transgenic _Zea mays_ plant of claim 45 wherein the heterologous DNA was introduced by microprojectile bombardment of a callus culture.

## In the Specification

At page 4, delete line 25 and insert --M. Bevan et al., Nuc. Acids Res., 11, 369 (1983)--.

At page 5, line 21, delete --J--.

At page 14, para. 3, line 13, delete "Swain" and insert --C. Green et al., Maize for Biological Research, Plant Mol. Biol. Assoc., 367-372 (1982)--.

At page 21, line 8, delete --vatietry-- and insert --variety--.

SM 0000652

-4-

At page 23, para. 2, line 8, delete "Chilton and Barnes" and insert --M. Bevan et al., Nuc. Acids Res., <u>11</u>, 369,--.

## Remarks

Claims 1-22 having been cancelled and claims 23-46 having been added, the claims pending in the above-identified application are claims 23-46.

Claims 23-46 are supported by the specification of the application and the originally-filed claims as follows:

SM 0000653

-5-

44

| <u>Claim</u> | <u>Supported By</u> |
|---|---|
| 23 | claim 1 |
| 24 | page 5, lines 26-27 |
| 25 | claim 3 |
| 26 | claim 2 |
| 27 | page 10, line 32 |
| 28 | claim 5 |
| 29 | claim 4; page 11, full para. 3-4 |
| 30 | page 11, line 8 |
| 31 | pg. 11, lines 7-12, 29-30; pg. 12, lines 6-8 |
| 32 | claims 9, 12 |
| 33 | claim 10 |
| 34 | claim 11 |
| 35 | claim 12 |
| 36 | claim 13 |
| 37 | claim 14 |
| 38 | claim 16, page 6, line 14 |
| 39 | claim 19 |
| 40 | claim 20; page 6, line 17; page 9, para. 2 |
| 41 | claim 20 |
| 42 | claim 22 |
| 43 | claim 19, page 10, para. 1 |
| 44 | page 6, line 13, page 8, line 14 |
| 45 | claim 19 |
| 46 | claim 19 |

SM 0000654

The specification has been amended to correct typographical errors in certain of the literature citations. The cited literature was enclosed with the Information Disclosure Statement filed August 16, 1990. No new matter is added by these amendments.

When the Examiner takes the application up for the first Office Action, consideration of the Amendments and remarks presented herein is respectfully requested.

Respectfully submitted,

RONALD C. LUNDQUIST ET AL.

By their attorneys,

MERCHANT, GOULD, SMITH, EDELL,
  WELTER & SCHMIDT, P.A.
3100 Norwest Center
90 South Seventh Street
Minneapolis, Minnesota 55402
(612) 332-5300 or 336-4622 (direct)


Dated: _August 31, 1990_    _Warren O Woessner_
                            Warren D. Woessner
                            Reg. No. 30,440


SM 0000655

-7-

UNITED STATES DEPARTMENT OF COMMERCE
Patent and Trademark Office
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| SERIAL NUMBER | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 07/467,983 | 01/22/90 | LUNDQUIST R | BIOT104 |

EXAMINER
BENZION, G

| ART UNIT | PAPER NUMBER |
|---|---|
| 184 | 10 |

DATE MAILED: 12/07/90

WARREN D. WOESSNER ESQ.
MERCHANT GOULD SMITH EDELL WELTER
& SCHMIDT,P.A.3100 NORWEST CENTER
90 SOUTH SEVENTH ST
MINNEAPOLIS,MN 55402

This is a communication from the examiner in charge of your application.
COMMISSIONER OF PATENTS AND TRADEMARKS

☑ This application has been examined ☑ Responsive to communication filed on Sept 4, 1990 ☐ This action is made final.

A shortened statutory period for response to this action is set to expire Three (3) month(s), ______ days from the date of this letter.
Failure to respond within the period for response will cause the application to become abandoned. 35 U.S.C. 133

**Part I THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:**

1. ☑ Notice of References Cited by Examiner, PTO-892. (1)
2. ☑ Notice re Patent Drawing, PTO-948.
3. ☑ Notice of Art Cited by Applicant, PTO-1449. (10)
4. ☐ Notice of Informal Patent Application, Form PTO-152
5. ☑ Information on How to Effect Drawing Changes, PTO-1474.
6. ☐ ______

**Part II SUMMARY OF ACTION**

1. ☑ Claims 23-46 are pending in the application.
   Of the above, claims 23-38 + 43-44 are withdrawn from consideration.
2. ☑ Claims 1-22 have been cancelled.
3. ☐ Claims ______ are allowed.
4. ☑ Claims 39-42 are rejected.
5. ☐ Claims ______ are objected to.
6. ☑ Claims 23-46 are subject to restriction or election requirement.
7. ☑ This application has been filed with informal drawings under 37 C.F.R. 1.85 which are acceptable for examination purposes.
8. ☐ Formal drawings are required in response to this Office action.
9. ☐ The corrected or substitute drawings have been received on ______. Under 37 C.F.R. 1.84 these drawings are ☐ acceptable; ☐ not acceptable (see explanation or Notice re Patent Drawing, PTO-948).
10. ☐ The proposed additional or substitute sheet(s) of drawings, filed on ______, has (have) been ☐ approved by the examiner; ☐ disapproved by the examiner (see explanation).
11. ☐ The proposed drawing correction, filed ______, has been ☐ approved; ☐ disapproved (see explanation).
12. ☐ Acknowledgement is made of the claim for priority under U.S.C. 119. The certified copy has ☐ been received ☐ not been received ☐ been filed in parent application, serial no. ______; filed on ______.
13. ☐ Since this application apppears to be in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under Ex parte Quayle, 1935 C.D. 11; 453 O.G. 213.
14. ☐ Other

SM 0000656

EXAMINER'S ACTION

PTOL-326 (Rev. 9-89)

#10

Serial No.    07/476983
Art Unit      184

    Claims 1-22 have been cancelled.  Claims 23-46 are newly
added.

    This application should be reviewed for errors.  For
example, at page 14, line 13, the substitution of "Green et al.
5   (1982)" for the "Swain et al." appears to be in error.  Note
this section of the specification pertains to the
implementation of instruments of transformation and not to the
process of plant regeneration as found in Green et al.  Further
errors can be found at page 11, line 27, where "sequence" is
10  misspelled and at page 21, line 10, a space should be inserted
between "other" and "molecules."  Correction and clarification
of these and all similar errors are required.

    Applicants' attention is directed to Forms PTO-948 and
1474, regarding objections to the submitted drawings and
15  necessary corrections.

    At page 2, lines 25-26, applicants' note, in reference to
reports of transformed maize plants, that "... in some cases,
it even turned out that the plants were in fact not
transformed...."  Applicants' have not, however, provided any
20  specific bibliographic citations to support this allegation.
Correction and clarification is requested.

    Restriction to one of the following inventions is required
under 35 U.S.C. 121:

    I.  Claims 23-38 and 43-46, drawn to a fertile transgenic
25  Zea mays plant, classified in Class 800, subclass 205, for
example.

SM 0000657

Serial No.    07/476983                    3 of 10
Art Unit      184

II. Claims 39-42, drawn to a process for producing a
fertile transgenic _Zea mays_ plant, classified in Class 435,
subclass 172.1, for example.

The inventions are distinct, each from the other because
of the following reasons:

Inventions II and I are related as process of making and
product made.  The inventions are distinct if either or both of
the following can be shown: (1) that the process as claimed can
be used to make other and materially different products or (2)
that the product as claimed can be made by another and
materially different process (MPEP 806.05(f)).  In the instant
case the product as claimed can be made by a materially
different process such as "Agroinfection" _in vitro_ or _in plant_
and microparticle bombardment of meristematic material _in
planta_, for example.  Further, the hybridization of disparate
_Zea mays_ plants will resulting in the introduction of DNA not
native to the plant of interest.

Because these inventions are distinct for the reasons
given above and have acquired a separate status in the art
because of their recognized divergent subject matter, fall into
different statutory classes of invention, and are separately
classified and searched, restriction for examination purposes
as indicated is proper.

During a telephone conversation with Mr. Warren D.
Woessner on October 24, 1990 a provisional election was made
with traverse to prosecute the invention of Group II, claims
39-42.  Affirmation of this election must be made by applicant
in responding to this Office action.  Claims 23-38 and 43-46

SM 0000658

are withdrawn from further consideration by the Examiner, 37
CFR 1.142(b), as being drawn to a non-elected invention.

Claims 39-42 are rejected under 35 U.S.C. 112, first and
second paragraphs, as the claimed invention is not described in
5   such full, clear, concise and exact terms as to enable any
person skilled in the art to make and use the same, and/or for
failing to particularly point out and distinctly claim the
subject matter which applicant regards as the invention.

Claim 39 fails to point out particularly and distinctly
10  claim the invention in that the phrase "heterologous DNA" —as
defined in the specification— is considered vague and
indefinite to that accepted in the art.  Heterologous DNA was
art recognized to encompass any and all DNA not native to the
host species.  Such DNA would include naturally occurring viral
15  infections in which the viral DNA is bodily incorporated into
the host species and systematically transferred from generation
to generation.  Accordingly, although applicants' are allowed
to be their own lexicographers they cannot use art accepted
terminology in ways that are repugnant to that art.
20  Furthermore, applicants' claimed process is directed to the
incorporation and expression of both native and non-native DNA
into maize (page 10, second paragraph of the specification).
Substituting this phrase by the phrase "genetically engineered
DNA" would serve to better define the instant invention and
25  obviate this rejection.  Claims 38-42 are similarly vague and
indefinite as they depend from claim 39 and fails to correct
the noted deficiency.  As the elements noted above are claimed,
but are not accurately or clearly defined in the specification,

SM 0000659

the disclosure is considered to fail to meet the requirements
of U.S.C § 112, first and second paragraphs.

        Claims 39-42 are rejected under 35 U.S.C. 112, first
paragraph, as the disclosure is enabling only for claims
5   limited the transformation of specific maize genotypes and
tissue sources in which totipotent maize callus/tissue cultures
and plant regeneration had been demonstrated as exemplified at
pages x to y of the specification.  See MPEP 706.03(n) and
706.03(z).

10        There is a large body of evidence that the successful
tissue culture initiation and regeneration of maize can only be
accomplished with cells or tissues explanted from specific
source tissues, such as immature-embryos, and from specific
inbred or hybrid lines.  In this regard applicants' attention
15   is directed to Phillips et al. (cited by applicants as
incorporated by reference) as providing enabling support only
for the successful initiation and regeneration of maize plants
from specific source tissues and genotype.  Note, for example,
at page 352, ultimate paragraph, of Phillips et al., that the
20   initiation of regenerable Type I and II callus in corn is
affected by the genotype of the immature-embryo source
material.  In addition, compare corn genotypes and explants
sources listed as nonregenerable, found at Table 5-2, with
those noted as regenerable at Table 5-3.  Furthermore,
25   applicants have only exemplify the transformation and
regeneration of plants isolated from the immature-embryo
derived culture AB12 (A188 X B73).  No evidence of the
successful culturing of the broad range of maize inbred or
hybrids or the possible transformation of other incipient
30   totipotent tissue had been demonstrated with which to provide

SM 0000660

guidance to enable and support the invention as so broadly
claimed.  Given the unpredictability inherent in the successful
culturing and regeneration of different maize lines undue
experimentation would be required by one of ordinary skill in
the art to evaluate <u>any</u> plant cell source or tissue for
totipotent structures after microprojectile transformation.
Applicants have simply <u>not</u> demonstrated that callus derived
from any other totipotent structure can be regenerated after
transformation.  Therefore as tissue culture initiation,
transformation, and regeneration is an unpredictable event and
considering the lack of guidance presented in the
specification, it would require an undue amount of
experimentation to set forth the conditions necessary to use
the claimed process with all explant tissues and genotypes.
See <u>Ex parte</u> Forman, 230 USPQ 546 (BPAI 1986) and <u>In re</u>
Angstadt 190 USPQ 215 with regard to the issue raised above.

     The following is a quotation of 35 U.S.C. 103 which forms
the basis for all obviousness rejections set forth in this
Office action:

     "A patent may not be obtained though the invention is
not identically disclosed or described as set forth in
section 102 of this title, if the differences between the
subject matter sought to be patented and the prior art are
such that the subject matter as a whole would have been
obvious at the time the invention was made to a person
having ordinary skill in the art to which said subject
matter pertains.  Patentability shall not be negatived by
the manner in which the invention was made.

     Subject matter developed by another person, which
qualifies as prior art only under subsection (f) and (g)
of section 102 of this title, shall not preclude
patentability under this section where the subject matter
and the claimed invention were, at the time the invention
was made, owned by the same person or subject to an
obligation of assignment to the same person."

SM 0000661

This application currently names joint inventors.  In
considering patentability of the claims under 35 U.S.C. 103,
the examiner presumes that the subject matter of the various
claims was commonly owned at the time any inventions covered
therein were made absent any evidence to the contrary.
Applicant is advised of the obligation under 37 CFR 1.56 to
point out the inventor and invention dates of each claim that
was not commonly owned at the time a later invention was made
in order for the examiner to consider the applicability of
potential 35 U.S.C. 102(f) or (g) prior art under 35 U.S.C.
103.

Claims 39-42 are rejected under 35 U.S.C. 103 as being
unpatentable over Klein et al. (PNAS), in view of Klein et al.
(Pl. Physiol), McCabe et al. and Phillips et al.

Klein et al. (Biotechnology, pages 559-563) reveal the
factors influencing gene delivery into maize suspension cells
via the use of high-velocity microprojectile acceleration.  In
addition, these authors teach the application of the process to
the surface of explanted maize embryos.  In particular, at page
562, right column of the penultimate paragraph, the stable
transformation of maize callus via the disclosed technique is
evident.  Thus, Klein et al. is seen to clearly teach the
application of the method of biolistic transformation to maize
tissue cultures.  Klein et al. does not teach the regeneration
of transformed maize tissue cultures, however, the regeneration
of maize from totipotent cells culture was well known in the
art.

Klein et al. (Plant Physiology, pages 440-444) teach the
stable genetic transformation of maize cells via biolistic
transformation in which transformed cells lines were identified

NPT II and GUS assays in addition to the detection of the DNA
of interest via Southern blots.  This teaching, noted in Klein
et al. (Biotechnology) as manuscript in preparation, clearly
discloses that the method of biolistic transformation produces
stable transformations in maize cultures.  McCabe et al. (pages
923-926) disclose the transformation and regeneration of
soybeans via the method of particle acceleration into excised
embryonal axes.  McCable is cited to demonstrate that
meristematic regions in plant tissue culture had been
demonstrated as susceptible to transformation in which
regenerants display the heritable presence of the transgenic
DNA.  The importance of this observation is found in the basic
nature of maize friable (Type II) cultures in that these
cultures represent the de novo multiplication of meristematic
zones, i.e. somatic embryos (see Phillips et al. section 5-
2.8).  Phillips et al. (pages 345-387) reviews the methods of
cell/tissue culture and in vitro manipulation of maize.  This
reference is cited to teach the method of explant initiation
and maintenance of a friable maize tissue culture.  Re claim
42, the use of solid or liquid culture for the initiation of
maize tissue cultures are considered routine (see Phillips et
al. section 5-1.3, for example).  Furthermore, the initiation
and superior vigor of totipotent A188 x B73 cultures or any
other culture of a superior genotype initiated on "solid"
medium (re claim 42) were well know to those of ordinary skill
in the art (page 351, for example).  These cultures were known
in the art to produce friable (Type II) in vitro growth at high
frequencies (re claim 40).  Re claim 41, the selection of
callus culture clumps of about 30 to 80 mg per clump would
appear to be the result of routine callus subculture and growth
parameters.  Accordingly, the ordinary practitioner being aware
of these art known variables would employ seek to optimize

each.  In sum, it was well within the ordinary skill in the art
to employ the claimed elements in order to obtain their known
and expected results.

5       Consequently, it would appear in the absence of any
modification of the method of Klein et al. (note page 15, first
and second paragraphs of the instant specification), with the
exception of those considered as merely routine, the use of
biolistic or particle acceleration technology to transform
totipotent maize cultures is both the logical progression from
10      Klein et al.(BIO/TECH), thus providing motivation, and the
expected result of this application, thus providing a
reasonable expectation of success.  Applicants' have failed to
establish the presence of any unexpected or unpredictable
results in the claimed method.

15      Accordingly, the modification of the method of Klein et
al. (BIO/TECH) via the stable introduction of DNA as disclosed
by both Klein et al. (BIO/TECH) and Klein et al. (Plant
Physiology) in view of the teachings of McCable regarding the
regeneration of transgenic soybeans, and the use of friable
20      totipotent maize cultures as disclosed by Phillips et al. was
well within the ordinary skill of the art at the time the
claimed invention was made.  Thus, the claimed invention as a
whole was clearly prima facie obvious in view of the
references, in the absence of sufficient, clear, and convincing
25      evidence to the contrary.

        No claim is allowed.

        Any inquiry concerning this or earlier communication from
the examiner should be directed to Gary Benzion, Ph.D whose
telephone number is (703) 308-1119.  Any inquiry of a general

Serial No.      07/476983                           10 of 10
Art Unit        184


nature or relating to the status of this application should be
directed to the Group receptionist whose telephone number is
(703) 308-0196.

5    Benzion
     October 31, 1990

Elizabeth C Weimar
ELIZABETH C. WEIMAR
SUPERVISORY PATENT EXAMINER
GROUP ART UNIT 184

SM 0000665

PTO draftsmen now review both
formal and informal drawings.
The examiner will require
submission of formal drawings
at the appropriate time.

PTO - 948
(Rev. 8-82)

GROUP 1806

U.S. DEPARTMENT OF COMMERCE
PATENT AND TRADEMARK OFFICE

ATTACHMENT TO
PAPER NUMBER  10

S.N.  467983

## NOTICE OF PATENT DRAWINGS OBJECTION

Drawing Corrections and/or new drawings may only  be
submitted in the manner set forth in the attached letter,
"Information on How to Effect Drawing Changes" PTO-1474.

A. ☑  The drawings, filed on  1/22/90 , are objected to as informal for reason(s)
checked below:

1. ☐  Lines Pale.

2. ☐  Paper Poor.

3. ☑  Numerals, Poor. *lettering small, must be at least 1/8" tall (Fig 1-6)*

4. ☑  Lines Rough and Blurred. *Fig 1-6*

5. ☐  Shade Lines Required.

6. ☑  Figures Must be Numbered. *properly & separately Fig 1, 2, 3-6*

7. ☐  Heading Space Required.

8. ☐  Figures Must Not be Connected.

9. ☐  Criss-Cross Hatching Objectionable.

10. ☐  Double-Line Hatching Objectionable.

11. ☐  Parts in Section Must Be Hatched.

12. ☐  Solid Black Objectionable.

13. ☐  Figure Legends Placed Incorrectly.

14. ☐  Mounted Photographs.

15. ☐  Extraneous Matter Objectionable. [37 CFR 1.84 (1)]

16. ☑  Paper Undersized; either 8½" x 14", or 21.0 cm. x 29.7 cm. required. *Fig 1-6*

17. ☐  Proper A4 Margins Required:
☐ TOP 2.5 cm.    ☐ RIGHT 1.5 cm.
☐ LEFT 2.5 cm.    ☐ BOTTOM 1.0 cm.

18. ☑  Other:
*- Fulltone photograph on photographic sheet or mounted on Bristol Board sheet req'd for Fig 3-6*

B. ☑  The drawings, submitted on  1/22/90 , are so informal they cannot be
corrected.  New drawings are required.  Submission of the new drawings MUST be
made in accordance with the attached letter.

SM 0000666

365-217  6P
184
#11

PATENT

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicants: Ronald C. Lundquist et al. Examiner: G. Benzion

Serial No. : 07/467,983          Group Art Unit:  184

Filed    : January 22, 1990      M&G:  8955.1-US-01

Title    : FERTILE TRANSGENIC CORN PLANTS

RECEIVED GROUP 18r

Hon. Commissioner of Patents
  and Trademarks
Washington, D.C.  20231

JUN 1 7 1991

PETITION FOR EXTENSION OF TIME

Sir:

It is respectfully requested that a three-month exten-sion of time be granted in which to respond to the Office Action mailed December 7, 1990, said response being due March 7, 1991, thereby extending the response period to June 7, 1991.

Our check in the amount of $365.00 is enclosed to cover the required fee.  Please charge any additional fees due to PTO Account No. 13-2725.

Respectfully submitted,

RONALD C. LUNDQUIST ET AL.

By their attorneys,

MERCHANT, GOULD, SMITH, EDELL,
  WELTER & SCHMIDT, P.A.
3100 Norwest Center
90 South Seventh Street
Minneapolis, MN   55402
(612) 332-5300 or 336-4622 (direct)

Date  June 7 1991          By  Warren O Woessner
                               Warren D. Woessner
                               Reg. No. 30,440

SM 0000667

F⁻CEIVED GROUP 180

IJUN 1 7 1991 PATENT

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicants: Ronald C. Lundquist et al. Examiner: G. Benzion

Serial No. : 07/467,983          Group Art Unit: 184

Filed    : January 22, 1990          Docket: 8955.1-US-01

Title    : FERTILE TRANSGENIC CORN PLANTS

RECEIVED GROUP 1ᶜ

Hon. Commissioner of Patents
  and Trademarks                    EJUN 1 7 1991
Washington, D.C.  20231

                         AMENDMENT

Sir:

     In response to the Office Action mailed December 7, 1990,
please amend the above-identified application as follows:


                      IN THE CLAIMS

     Cancel claims 1-38, 40 and 44-46, and amend as follows:


     Claim 39. (amended)  A process for producing a fertile
transgenic Zea mays plant [which stably expresses heterologous
DNA which is heritable, wherein the process comprises] comprising
the steps of (i) establishing a regenerable [cell] friable,
embryogenic callus culture from a Zea mays plant to be trans-
formed, (ii) transforming said culture by bombarding it with DNA-
coated microprojectiles, (iii) identifying or selecting a trans-

                                        SM 0000668

#12

formed cell line <u>wherein said DNA is chromosomally integrated</u>, and (iv) regenerating a fertile transgenic <u>Zea mays</u> plant there- <u>from, wherein said DNA is transmitted through a complete sexual</u> <u>cycle of said transgenic plant to its progeny</u>.

Add the following claims:

Claim 47. The process of claim 39 wherein the DNA comprises a selectable marker gene or a reporter gene.

Claim 48. The process of claim 47 wherein said selectable marker gene imparts herbicide resistance to said fertile transgenic <u>Zea mays</u> plant.

## IN THE SPECIFICATIONS

At page 2, lines 25-26, delete "or, in some cases, it even turned out that the plants were in fact not transformed".

At page 11, line <u>27</u>, delete "sequnes" and insert --sequences--.

At page 14, para. 3, line 13, delete "C. Green et al., <u>Maize</u> <u>for Biological Research</u>, <u>Plant Mol. Biol. Assoc.</u>, 367-372 (1982)" and insert --J.C. Sanford et al., <u>J. Particle Science and Tech-</u> <u>nology</u>, <u>5</u>, 27 (1987)--.

-2-

SM 0000669

At page 21, line 10, delete "othermolecules" and insert --other molecules--.

## REMARKS

Reconsideration and withdrawal of the rejection of the claims of the above-identified application is respectfully requested.

Claims 1-38, 40 and 44-46 having been cancelled, claim 39 having been amended, and claims 47-48 having been added, the claims pending in the application are claims 39, 41-43 and 47-48.

The specification has been amended to correct various typographical errors in accord with the Examiner's comments at page 2 of the Office Action. Support for the amendment to page 14 is found at page 5, line 21, as corrected by the Preliminary Amendment filed on August 31, 1990.

The amendment to claim 39 to recite that a friable, embryogenic callus culture is bombarded is supported by claim 40.

The amendment to claim 39 to recite that the DNA is chromosomally-integrated is supported at page 5, lines 26-27.

The amendment to claim 39 to recite that the DNA is transmitted through a complete sexual cycle of the transgenic plant to its progeny (e.g., is "heritable") is supported at page 7, lines 24-27.

Claims 47-48 are supported by the specification at page 11, para. 3 to page 12, para. 1.

SM 0000670

-3-

The term "transgenic" as it refers to the transformed <u>Zea</u> <u>mays</u> plants resulting from the present process has been retained, since it is art-recognized and is fully defined at page 7, lines 17-23 of the specification.

At page 4 of the Office Action, the Examiner rejected claims 39-42 under 35 U.S.C. §112, due to the use of the phrase "hetero-logous DNA." Deletion of this term from the claims moots this rejection. As pointed out by the Examiner, the claimed process is directed to the "incorporation and expression of both native and non-native DNA into maize." The claimed process is not dependent on the type of DNA which is introduced, so long as it meets the functional requirements recited in the claims.

At page 5 of the Office Action, the Examiner rejected claims 39-42 under 35 U.S.C. §112(1), alleging that the disclosure is enabling only for claims limited to the transformation of the specifically-exemplified maize tissue sources and genotypes. Insofar as this rejection may be maintained with respect to the amended claims, it is respectfully traversed.

With respect to maize tissue types, it is respectfully submitted that the amendment of claim 39 to recite that cultured friable embryogenic callus is transformed moots this aspect of the rejection.

Applicants are willing to concede the validity of the Examiner's assertion that "there is a large body of evidence that the successful tissue culture initiation and regeneration of maize can only be accomplished with cells or tissue explanted...

-4-

SM 0000671

from specific inbred or hybrid lines." However, 35 U.S.C. §112
does not require either that the claims specifically recite every
known regenerable Zea mays inbred, hybrid or other population
from which immature embryos can initiate regenerable callus (for
example, all those listed on Table 5-3 of Phillips et al.). In
re Angstadt and Griffin, 190 USPQ 214, 218 (CCPA 1976). It is
well-settled that the specification need not teach that which
would be apparent to one of skill in the art, e.g., the data on
Tables 5-2 and 5-3 of Phillips et al. In re Meyers, 161 USPQ 668
(CCPA 1969).

Furthermore, claim 39 as amended requires that a "regener-
able, friable, embryogenic callus culture" is used as the target
for transformation. The use of such functional language is
explicitly sanctioned by 35 U.S.C. §112(3) and by MPEP 706.03(c),
and would readily direct the art worker to specific lines and
callus cultures that would function in the claimed process.

Applicants also specifically dispute the Examiner's conclu-
sion that "undue experimentation would be required by one of
ordinary skill in the art to evaluate any plant cell source or
tissue for totipotent structure after microprojectile transforma-
tion." Contrary to the Examiner's assertion, Applicants are not
required to "[demonstrate] that callus derived from any other
totipotent structure can be regenerated after transformation."
This would be an impossible burden to meet.

Rather, what is required by 35 U.S.C. §112(1) is that the
specification enable the art worker to determine which callus

-5-

SM 0000672

cultures would function as starting materials in the invention and which would not, without undue experimentation. In re Angstadt and Griffin, 190 USPQ 214, 218-219 (CCPA 1976). The present specification contains detailed processing parameters, as well as a working example, that would readily enable the art worker to reproduce Applicants' results or to carry out the claimed process with other callus cultures. The fact that Applicants have not demonstrated by working examples that callus obtained from other lines can be regenerated after transformation does not mean that it would require undue experimentation to evaluate another such starting material. The fact that lengthy or complex experiments must be carried out does not render the amount of experimentation "undue" in a complex art area such as biotechnology, in which the practitioners are highly skilled. In re Wands, 8 USPQ2d 1400 (Fed. Cir. 1988).

Therefore, it is respectfully submitted that the present claims are fully in accord with 35 U.S.C. §112, and withdrawal of these rejections is respectfully requested.

At pages 6-10 of the Office Action, the Examiner rejected the claims as obvious over Klein et al., Bio/Technology, 6, 559 (1988) in view of a combination of Klein et al., Plant Physiol., 9, 440 (1989), McCabe et al., Bio/Technology, 6, 923 (1988) and the Phillips et al. review article discussed above.

Klein et al. (Bio/Technology) disclose the microprojectile bombardment of maize suspension cell cultures and the bombardment of intact immature maize embryos. Based on the evidence of GUS

-6-

expression on the surface of the scutellum of maize embryos,
Klein et al. speculate at page 562 that, "because embryos and
embryogenic callus can be generated from the surface of maize
scutellum, this tissue will be a prime target for future attempts
to deliver selectable markers with the particle gun" (emphasis
added).  Although at page 7, lines 19-22, the Examiner asserts
that the disclosure at page 562 in the following paragraph
indicates that "the stable transformation of maize callus via the
disclosed technique is evident," callus is not mentioned as a
possible target in this paragraph, which clearly refers to the
use of intact embryos as targets.  In contrast to this methodol-
ogy, Applicants' claim recites that friable embryogenic callus
cultures were bombarded.

    The Examiner concedes that "Klein et al. does not teach the
regeneration of transformed maize tissue cultures," but goes on
to state that "the regeneration of maize from totipotent cell
cultures was well known in the art."  However, the fact of the
latter assertion did not lead Klein et al. to predict that
success would be "well within the ordinary skill in the art at
the time the claimed invention was made."  In contrast, at the
end of the cited paragraph, Klein et al. recognize the need for
"continued improvements in the efficiency of the particle bom-
bardment process," and conclude that their results "[give] us
reason to believe that stable transformation of whole plants is
possible" (emphasis added).  Thus, the art worker in possession

SM 0000674

of this reference could not reasonably expect that microprojec-
tile bombardment of either maize suspension cell cultures or
immature embryos would lead to fertile transgenic corn plants.
In re O'Farrell, 7 USPQ2d 1675 (Fed. Cir. 1988) (prior art must
reveal reasonable expectation of success to support §103 rejec-
tion).

    The cited Klein et al. Plant Physiol. paper does not remedy
the deficiencies of the primary reference.  A suspension culture
of "Black Mexican Sweet" maize cells was prepared as described by
M.E. Fromm et al. (PNAS USA, 82, 5824 (1985)) and bombarded as
described in the primary reference.  Calli were selected from the
cells, some of which exhibited GUS expression and kanamycin
resistance.  At page 434, Klein et al. disclose that "with the
appropriate selectable or screenable markers, it should be
possible to recover transformed calli . . . that have the poten-
tial to develop into whole plants.  Improvement in transformation
efficiencies as a result of further refinements in the design of
microprojectiles and acceleration devices will aid in the
recovery of transformed plants of recalcitrant species."  It is
respectfully submitted that this paper would lead the art worker
to conduct further research to vary the foreign marker genes or
to refine the microprojectile technology, in order to attain "the
recovery of transformed plants of recalcitrant species," rather
than to bombard any given type of maize tissue.  Furthermore, the
discussion of the recovery of sterile plants following protoplast
electroporation of suspension cell cultures which immediately

<center>-8-</center>

SM 0000675

precedes their conclusion would also not lead one of ordinary
skill in the art to reasonably expect that the bombardment of
maize suspension cell cultures would inevitably lead to the
successful regeneration of fertile transgenic plants.

Furthermore, the Examiner is requested to consider that the
Klein et al. Plant Physiol. paper was published subsequent to
May 24, 1989 (the date that the manuscript was received "in
revised form"). Therefore, as established by the enclosed Rule
131 Declaration, which was presented in divisional application
Serial No. 07/508,045, filed April 11, 1990, it is not available
as a prior art reference against the present claims. This
Declaration establishes that the present invention was conceived
prior to May 1989 in the United States, and diligently pursued in
the United States until the filing of the present application on
January 22, 1990, which discloses the successful regeneration of
fertile transgenic Zea mays plants containing a reporter gene and
a selectable marker gene from transformed maize callus tissue.

The cited McCabe et al. paper discloses the regeneration of
chimeric soybean plants following bombardment of the meristems of
immature seeds. The Examiner asserts that the McCabe et al.
paper discloses that "meristematic regions in plant tissue
culture had been demonstrated as susceptible to transformation in
which [plant] regenerants display the heritable presence of
transgenic DNA" (emphasis added). However, the excised embryonic
axes which were bombarded by McCabe et al. were not cultured
prior to bombardment by any means, but were simply excised,

-9-

SM 0000676

plated onto target plates and bombarded. Although the Examiner
suggests that these results would lead the art worker to bombard
"maize friable (Type II cultures)," this observation can only be
based on hindsight. None of the cited art discloses particle
bombardment of this type of cultured tissue, either derived from
maize or from any other plant species.

As stated by the Examiner, the lengthy Phillips et al.
reference reviews the methods of cell/tissue cultures and in
vitro manipulation of maize, and teaches the general method of
explant initiation and maintenance of a friable maize tissue
culture. Applicants do not claim to have invented friable (Type
II) callus cultures, but to have discovered their unexpected and
possibly unique utility in the production of fertile transgenic
plants by microbombardment.

However, Phillips et al. also disclose at least seven other
broad classes of maize cell/tissue cultures, including the
suspension cell cultures employed unsuccessfully by Klein et al.
Despite the total lack of guidance in Phillips et al. with
respect to the selection of suitable cultured maize tissue for
biolistic transformation, the use of a different tissue culture
by Klein et al., and the lack of correlation between monocot nd
dicot transformation results, the Examiner nonetheless concludes
that "the use of biolistic. . . acceleration technology to
transform totipotent maize cultures is both the logical progres-
sion from [the primary references], thus providing motivation,
and the expected result of this application, thus providing a

-10-

SM 0000677

reasonable expectation of success.  It is respectfully submitted

that the Examiner's case of _prima facie_ obviousness is facially

totally conclusory, and can only be based on a hindsight, piece-

meal reconstruction of Applicants' successful process from

isolated disclosures in the prior art.  As stated by the Court of

Appeals for the Federal Circuit in <u>In re Dow Chemical</u>, 5 USPQ2d

1529, 1532 (Fed. Cir. 1988):

> The PTO presents, in essence, an "obvious to experiment"
> standard for obviousness.  However, selective hindsight is
> no more applicable to the design of experiments than it is
> to the combination of prior art teachings.  There must be a
> reason or suggestion in the art for selecting the procedure
> used, other than the knowledge learned from the applicant's
> disclosure.  _Interconnect Planning Corporation v. Feil_, 774
> F.2nd 1132, 1143, 227 USPQ 543, 551 (Fed. Cir. 1985).

Furthermore, even assuming, <u>arguendo</u>, that the Examiner has

established the <u>prima facie</u> of obviousness of the recited process

steps, it is respectfully submitted that the <u>unexpected results</u>

achieved by the process, namely, a fertile transgenic <u>Zea mays</u>

plant, are sufficient to rebut any <u>prima facie</u> case of obvious-

ness.  It is well settled that a result not suggested by the

prior art can impart patentability to a process that is <u>prima</u>

<u>facie</u> obvious from a consideration merely of the reactants, media

and steps involved.  <u>In re von Schickh</u>, 150 USPQ 300 (CCPA 1966).

The Examiner is also requested to note that, in resolving

the obviousness question, all evidence bearing on the subject

must be considered, including evidence that supports, as well as

that which negates, patentability must be fairly considered.  <u>In</u>

<u>re Dow Chemical</u>, 5 USPQ2d 1529, 1531-1532 (Fed. Cir. 1988) (copy

-11-

SM 0000678

enclosed). In this light, the Examiner is requested to consider that, subsequent to, or contemporaneously with, the cited Klein et al. and McCabe papers, at least one review article was published which contradicted any inference that might be drawn from the Klein et al. papers that success could readily be achieved using microparticle injection into maize tissue.

For example, I. Potrykus, in a review article published after the filing date of the present application (Bio/Technology, 8, 540 (June 1990)) cites the work of Klein et al. and the McCabe et al. paper. Although Potrykus discusses the apparent advantages of biolistics, he is left to ask "[w]hy then with all these advantages have no transgenic cereals been produced . . . we must assume that there are inherent problems." The author continues to discuss the problem of the low frequency of transient and integrative effects and the scarcity of competent cells in cereals. He concludes that "direct gene transfer into protoplasts should be the method of choice . . . ." Thus, Potrykus clearly teaches away from the approach employed by Applicants. Finally, in contrast to the Examiner's conclusion that the present process (including the successful production of fertile transgenic maize plants) was "well within the ordinary skill of the art at the claimed time the invention was made," Potrykus teaches the art worker:

> [C]areful and large-scale experiments with biolistic devices and microinjection into meristems and micro-spore-derived, zygotic and somatic proembryos have not yet yielded proof for the recovery of transgenic offspring. . . .

-12-                    SM 0000679

Furthermore, as pointed out in the Potrykus review, there are at least three other fundamentally different approaches which are or have been widely investigated in the attempt to solve the long-felt need for a method to transfer genes to cereal crops. These included gene transfer mediated by A. tumefaciens, free DNA transferred to protoplasts and microinjection. The Examiner is requested to consider that the prediction of imminent success by C. Rhodes in Bio/Technology, 7, 548 (June 1989) (copy enclosed) for direct DNA uptake by regenerable maize protoplasts would discourage the art worker from pursuing or expecting success via biolistic transformation.

It is also respectfully submitted that secondary considerations such as long-felt need and the failure of others to achieve success must be considered when resolving the obviousness question. Dow Chemical Co. v. American Cyanamid Co., 2 USPQ2d 1350, 1355 (Fed. Cir. 1987) (copy enclosed). With respect to both of these considerations, the Examiner is requested to consider the following summary of the art of maize transformation in 1990, published by Timothy Nelson, The Plant Cell, 2, 589 (July 1990):

> The great experimental advantages of maize for the study of development and genetics have attracted many researchers and have resulted in a huge resource of mapped genes, molecular probes, chromosomal rearrangements, and other tools (citation omitted). It has been a source of frustration to the same researchers that maize has not proved as easy to stably transform as many plants without as rich a scientific background. For many dicotyledonous plants, the Agrobacterium-mediated

-13-

SM 0000680

> construction of transgenic plants has become
> a routine and reliable experimental tool.
> Although this system may be adaptable to the
> monocot rice (citation omitted), there are no
> reports of success with maize.  [Copy
> enclosed]

Therefore, it is respectfully submitted that this evidence, which reflects the state of the art either just prior to, or subsequent to the filing of the present application, is more than sufficient to establish that Applicants' invention is unobvious, particularly when considered with the lack of success reported in the prior art which was cited by the Examiner.

Therefore, it is respectfully submitted that the claims, as amended, have been placed in condition for allowance, and notification to that effect is earnestly solicited.

PTO Form 1449 is enclosed, listing the newly discussed papers.  However, it is not conceded that any of the newly cited art is prior art to the present application.  Copies of all of the cited cases are also enclosed.

If, upon review of this Amendment and the accompanying materials, the Examiner feels that a personal interview would be helpful to resolve or clarify any of the issues presented herein, he is respectfully requested to contact the undersigned attorney for Applicants.

SM 0000681

-14-

A request for a three-month extension of time to respond to the Office Action is enclosed herewith.

<div style="margin-left: 40%;">

Respectfully submitted,

RONALD C. LUNDQUIST ET AL.

By their attorneys,

MERCHANT, GOULD, SMITH, EDELL,
  WELTER, & SCHMIDT, P.A.
3100 Norwest Center
90 South Seventh Street
Minneapolis, MN 55402
(612) 332-5300 or 336-4622 (direct)

</div>

Date _June 7, 1991_        By _Warren D Woessner_
                                     Warren D. Woessner
                                     Reg. No. 30,440

I hereby certify that this correspondence is being deposited with the United States Postal Service as first class mail in an envelope addressed to: Commissioner of Patents and Trademarks, Washington, D.C. 20231 on _June 7, 1991_
    (Date of Deposit)

_Sandra K. Amberson_
_SANDRA K. Amberson_

SM 0000682

Form 1449*

INFORMATION DISCLOSURE STATEMENT
BY APPLICANT
(Use several sheets if necessary)

Sheet 1 of 1

MAIL ROOM
JUN 10 1991
PAT. & TRADEMARK

| Atty. Docket No. 8955.1-US-01 | Serial No. 07/467,983 974379 |
|---|---|
| Applicant Ronald C. Lundquist et al. | |
| Filing Date January 22, 1990 | Group 184 |

## U.S. PATENT DOCUMENTS

| **Examiner Initial | Document Number | Date | Name | Class | Subclass | Filing Date If Appropriate |
|---|---|---|---|---|---|---|

## FOREIGN PATENT DOCUMENTS

| **Examiner Initial | Document Number | Date | Country | Class | Subclass | Translation Yes | No |
|---|---|---|---|---|---|---|---|

## OTHER DOCUMENTS
(Including Author, Title, Date, Pertinent Pages, Etc.)

**Examiner Initial

T. Nelson, _The Plant Cell_, 2, 589 (July 1990).

C. Rhodes, _Bio/Technology_, 7, 548 (June 1989).

I. Potrykus, _Bio/Technology_, 8, 540 (June 1990).

SM 0000683

| Examiner | Date Considered |
|---|---|

*Substitute Disclosure Statement Form (PTO-1449)

**EXAMINER: Initial if citation considered, whether or not citation is in conformance with MPEP 609; Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

RECEIVED GROUP 18

PATENT

JUN 1 7 1991

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | | |
|---|---|---|---|
| Applicants: | Ronald C. Lundquist and David A. Walters | Examiner: | G. Benzion |
| Serial No.: | 07/467,983 | Art Unit: | 184 |
| Filed: | January 22, 1990 | M&G: | 8955.1-US-01 |
| For: | FERTILE TRANSGENIC CORN PLANTS | | |

Hon. Commissioner of Patents
    and Trademarks
Washington, D.C.  20231

DECLARATION UNDER
37 C.F.R. § 1.131(b)

Sir:

    We, Ronald C. Lundquist and David A. Walters, declare and say as follows:

    1.   We are the named co-inventors of the subject matter claimed in U.S. patent application Serial No. 07/467,983, filed January 22, 1990.

    2.   We have read and understood the Office Action mailed December 7, 1990, the references cited therein, the Amendment filed herewith, and make this Declaration in support of the patentability of the claims of U.S. patent application Serial No. 07/467,983 as amended thereby.

    3.   I, Ronald C. Lundquist received a B.A. in biochemistry from Kansas State University in 1969 and a Ph.D. in biology from the University of Utah in 1981.  Following postdoctoral work as a

1

SM 0000684

#13

molecular biologist at the University of California-Davis in
1981-1984, I joined Molecular Genetics, Inc., Minnetonka,
Minnesota in 1984 as a Senior Scientist.  In 1989, the
agricultural biotechnology business of Molecular Genetics, Inc.
was acquired by BioTechnica International, Inc., Cambridge,
Massachusetts, the assignee of the present application, where I
am presently employed as a Senior Scientist in their Plant
Science Research, Inc. division in Minnetonka, Minnesota.  I am a
co-inventor on U.S. Patent No. 4,605,627, "Plasmid Vehicle for
Cloning in Agrobacterium Tumefaciens", and have co-authored ten
papers in the area of the genetic engineering of plant cells and
bacterial biochemistry.

    4.    I, David A. Walters, received a B.S. in genetics and
cell biology from the University of Minnesota in 1988.  I joined
Molecular Genetics, Inc. in February 1986 and am currently a
Senior Research Associate with BioTechnica International, Inc.,
at their Plant Science Research, Inc. division in Minnetonka,
Minnesota.  My primary responsibilities are to design and carry
out experiments aimed at the development of technology for the
transformation of maize by genetic engineering, including
synthesizing gene constructions, performing maize tissue culture
and analyzing transformed maize tissue for the presence and
expression of introduced genes.

    5.    Prior to May 24, 1989, the received date shown on Klein
et al., <u>Plant Physiol.</u>, <u>9</u>, 440 (1989), cited by the Examiner in

SM 0000685

2

the Office Action, we conceived of the invention as presently claimed in Serial No. 07/467,983, as filed on January 22, 1990.

6.    As factual evidence of our conception of a workable version of the claimed invention prior to May 24, 1989, attached hereto as Exhibit A and incorporated by reference herein is a copy of a laboratory notebook page (29) signed by David A. Walters and dated prior to May 1989.  This page discloses the biolistically-transformed, cultured maize callus line designated "6L", which is also referred to at page 28, line 4 of the present application.  The experiments summarized on the notebook page were carried out in the United States.

7.    As disclosed in both applications, tissue sector 6L was isolated following biolistic transformation of cultured maize callus tissue with a mixture of plasmids pHYGI1 and pBII221, which contain a selectable marker gene (HYG or HPT) and a marker gene (GUS), respectively.  As disclosed in the specification at pages 26-27, and as indicated by the abbreviation "H15-H60-F" on the notebook page, following bombardment, the callus from all of the plates treated with pHYGI1/pBII221 was transferred onto ten "round 1" plates comprising F medium containing 15mg/l hygromycin B ("H15").  After two weeks of selection, all callus from eight plates was transferred to plates that contained 60 mg/l hygromycin ("H60").  After 21 days on these "round 2 selection plates", the tissue that appeared viable was transferred to round 3 selection plates, but the round 2 plates were saved.  After 35 days, as described on the notebook page "two potentially alive

3                     SM 0000686

and growing sectors [were] found," and as described at pages 27-28 of the specification "[t]wo [viable] sectors were observed proliferating from a background of dead tissue on plates treated with pHYGI1/pBII221 . . . the second sector [was] named 6L [and] was from the round two group of plates." As noted on the notebook page, "L" stands for "leftover."

7.    As disclosed on the notebook page, and in the specification at page 28, lines 5-14, 6L was subcultured twice on "F" medium, without hygromycin, and then was transferred to F medium containing 15 mg/l hygromycin. At this point, as disclosed on the notebook page "6L's grew well", and in the specification, "[t]he line 6L . . . grew rapidly on F medium with 15 mg[/]l hygromycin . . . ." After an inhibition study, line 6L was renamed PH1, as disclosed at page 28, paragraph 4.

8.    A copy of a "Monthly Report" prepared by David A. Walters and dated prior to June 1989 is attached as Schedule B and is incorporated by reference herein. The Report also describes the results summarized on the notebook page (Schedule A) as follows:

> One HYG selection yielded 12 live clumps of
> tissue from potential positive treatments.
> In this experiment ten bombardments each were
> done on AB12 callus with the plasmids pCHN1-1
> and pHYGI1. Callus was placed directly on
> HYG 15 and after two weeks transferred to HYG
> 60. After three weeks, surviving tissue was
> transferred to HYG 60 and the plates with
> tissue not transferred were saved. No
> further subculturing was required as complete
> inhibition was obtained. At 10 weeks
> postbombardment two live sectors were
> observed, one from the H15-H60 group and one
> from the H15-2H60 group. The former grows

4

SM 0000687

> rapidly on HYG 0 and is currently plated on a
> range of HYG medias from 0-250 mg/l.

The "former" live sector is 6L (or PH1).

9.    After identifying hygromycin resistant line PH1, we diligently and continuously proceeded to reduce our invention to practice, i.e., confirm the presence of the HPT gene in PH1, regenerate PH1 into maize plants, confirm the presence of the HPT gene in the regenerated plants, pollinate the plants and to confirm that the HPT gene is transmitted from the R0 to the R1 generation of plants.  All of this work was carried out in the United States.  As factual evidence of our diligence, copies of monthly reports dated August 1989, November 4, 1989 and November/December 1989 which we prepared are attached hereto as Schedules C, D, and E, respectively, and are incorporated by reference herein.  These reports indicate the actual reduction to practice of fertile transgenic maize plants containing heritable selectable marker gene.

10.    The present patent application, containing a working example (I) disclosing the data presented in these reports, was prepared and filed on January 22, 1990 (Serial No. 07/467,983), naming us as co-inventors.

11.    We further declare that all statements made herein of our own knowledge are true, and that all statements made on information and belief are believed to be true; and further that these statements are made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the

5

SM 0000688

United States Code, and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

Dated: _June 7, 1991_                    By: _Ronald C. Lundquist_
                                             Ronald C. Lundquist

Dated: _JUNE 7, 1991_                    By: _David A. Walters_
                                             David A. Walters

SM 0000689

6

SE.T BY:PLANT SCIENCE    SEARCH: 1-24-91 : 1:45PM :              '129359614→    6123329061        :E 7

E X H I B I T   A



TITLE  FGH13  cont                              Project No._____
                                                Book No._____          29

From Page No. 247  P. 47

_____ TWO . POTENTIALY . ALIVE & GROWING . SECTORS . FOUND ____

FGH13 PHYGEI. 3AA  ___ HIS = 2H6O = F_

FGH13 PHYGEI. 6L  ___ HIS = H6O = F. _____  (L 3 LEFTOVER)

BOTH SUB₂d TO F

BOTH ABOVE PIECES SUB₂d ⇒ P.

3AA GREW A LITTLE ⇒ 1 PIECES  ___ HIS = 2H6O = 2F

6L's GREW WELL ⇒  9 PIECES  ___ HIS = 2H6O = 2F.

3AA GROWING some ⇒ 1 PIECE . HIS - 2H6O - 2F - HIS
6L GROWING WELL ⇒ 71 PIECES . HIS - H6O - 2F - HIS

FOLLOWING PIECES F/ HIS = 2H6O  PHOTO'd & SUB₂d ⇒ HIS
                        ⊥ JA
FGH13 PCHNI - I .        HIS - 2H6O - HIS   1 PIECE   ___ UNPROMISING
FGH13 PHYGEI . 3HB       HIS - 2H6O = HIS   1 PIECE   ___ "
FGH13 PHYGEI . 6WA       HIS - 2H6O - HIS   1 PIECE   ___ "
FGH13 PHYGEI . 1AA       HIS - 2H6O - HIS   3 PIECES  PROMISING
FGH13 . PHYGEI . 1GB     HIS - 2H6O - HIS   2 PIECES  PROMISING
FGH13 . PHYGEI . 2PC     HIS - 2H6O - HIS   2 PIECES  VI PROMISING
FGH13 . PHYGEI . 2DB     HIS - 2H6O - HIS   1 PIECE   ___ "
FGH13 . PHYGEI . 1MA     HIS - 2H6O - HIS   1 PIECE   UNPROMISING
FGH13 . PHYGEI . 2NA     HIS - 2H6O - HIS   1 PIECE   ___ "
FGH13 . PLUG - I . 1FB   HIS - 2H6O - HIS   1 PIECE   PROMISING

ONE ISOLATE  _ / HIS = 1H6O

FGH13 PHYGEI. 3L  ___ HIS = H6O - HIS  5 PIECES   PROMISING
                                                  C 009
                                                  To Page No. 3

Witnessed & Understood b                Intro... ____
                                        Recorded by              SM 0000690

S C H E D U L E   B


David Walters
MONTHLY REPORT


PARTICLE BOMBARDMENT

Stable Transformation

Selection for stable HYG$^R$ transformants with maize type II
callus are ongoing.  Recent selections have involved the use
of lower levels of HYG, either HYG 15 or on/off HYG 30, in
order to obtain a more gradual kill than with the previously
used HYG 30 and 60.

One HYG selection yielded 12 live clumps of tissue from
potential positive treatments.  In this experiment ten
bombardments each were done on A812 callus with the plasmids
pCHN1-1 and pHYGI1.  Callus was placed directly on HYG 15
and after two weeks transfered to HYG 60.  After three
weeks, surviving tissue was transfered to HYG 60 and the
plates with tissue not transfered were saved.  No further
subculturing was required as complete inhibition was
obtained.  At 10 weeks postbombardment two live sectors were
observed, one from the H15-H60 group and one from the H15-
2H60 group.  The former grows rapidly on HYG 0 and is
currently plated on a range of HYG medias from 0-250 mg/l.
The second is slow growing on HYG 0 and will be cultured, if
possible, on HYG 15.  At 13 weeks postbombardment an
additional 10 live clumps were observed in potential
positive treatments and one from a negative control
treatment.  These are currently on HYG 15 and some have died
off already.  For those that grow, they will be maintained
on low level selection until enough tissue is obtained for
kill curves and GUS assays.  Of the live sectors retrieved
from this experiment thus far, 11 were treated with pHYGI1
and 1 with pCHN1-1.

SM 0000691

S C H E D U L E    C

David Walters
MONTHLY REPORT
August 1989

TRANSFORMATION TECHNOLOGY

The HPT gene was detected by southern blotting in the HYG$^R$ Type II maize callus line, PH1. The signal for the expected 1 kb fragment was weak relative to reconstructions due to partial digestion of PH1 DNA as well as a weak load of DNA in general. 10 ug of undigested PH1 DNA did not show hybridization, though oddly the partial BamHI digest of PH1 shows bands at both 1 kb and high molecular weight genomic, indicating that the gene is incorporated in high molecular weight DNA.

Approximately 50 plants regenerated from PH1 are currently in soil. Most of these appear vigorous.

Four attempts have been made thus far at repeating the selection regime which resulted in PH1. None of these are far enough along to make any conlusion. Other experiments involve using low level hygromycin throughout the selection.

SM 0000692

S C H E D U L E    D

MONTHLY PROGRESS REPORT
November 4, 1989

Ron Lundquist
Dave Walters

TRANSFORMATION
    Plants regenerated from transformed callus are themselves transformed
    Having had no success using PCR to verify the presence of the hygromyin resistance gene
in plants regenerated from the transformed maize callus line PH1, a southern blot was performed
(J. Kirihara protocol).
    DNA was isolated from three plants regenerated from PH1 callus and from one plant
regenerated from the parent callus of PH1, AB12. DNA was digested with the restriction enzyme
BamHI which liberates the 1 Kb HYG$^{R}$ coding sequence from the transformants. One and three
copy reconstructions were done by digesting an appropriate quantity of the plasmid pHYGI1. The
gel of these digests was blotted onto Nytran and probed with $^{32}$P labelled fragments of the HYG$^{R}$
coding sequence. Figure 1 shows the expected 1 Kb band for the three regenerates of PH1 callus,
PH1.1, PH1.7, PH1.24, but no signal for the negative control plant LUC.4.
    The reconstructions do not show up in figure 1, and the 3 copy lane is only faintly visible
on the actual autoradiogram. It is doubtful that this indicates a copy number greater than three
for PH1 since the opposite case occured on the callus southern (PH1 came out fainter than the 1
copy control). A more foolproof determination of copy number will be done in which the promoter
and poly A elements are probed for on the BamHI digest. The result should be two discrete
bands (promoter and poly A) for each integration event. This assumes however that the promoter
or poly A elements did not insert by themselves from other plasmid copies of pHYGI1 or from the
GUS plasmid.
    65 PH1 plants are in soil, and all except one have now been pollinated. 24 LUC control
plants are in soil and all of these have been pollinated. The first ears will be harvested in late
Nov. and we are shooting for determining if the first R$_{1}$ plants have the gene by the end of Dec.

SM 0000693



SM 0000694

S C H E D U L E     E

David Walters
MONTHLY REPORT
November/December 1989

TRANSFORMATION TECHNOLOGY                                    SM 0000695

$HYG^R$ gene transmitted from the $R_0$ to the $R_1$ generation of PH1
Last month it was reported that $R_0$ plants of PH1 (plants
regenerated from cell culture) contained the $HYG^R$ coding
sequence.  The progeny of these plants (the $R_1$ generation)
were shown this month to have inherited the introduced gene.
Data from nondestructive bioassays has correlated perfectly
with southern blot data thus far.  For all plants tested
PH1.$R_0$ were the female parents.

Root elongation bioassays were performed by plating 1 cm of
primary root tip from freshly germinated seedlings onto MS
salts/sucrose, 50 mg/l hygromycin.  In the short term (1-14
d) resistant roots differ from sensitive roots by the
ability of resistant roots to branch and form roots hairs.
Sensitive roots were able to elongate and grow into the
media but had neither branches or root hairs.  Putative

resistant roots were identified on the basis of branching
and presence of root hairs 4 d post-plating.  In the longer
term ( >14 d) differences in elongation become very obvious
with the resistant roots appearing to be able to grow
indefinitely.

A second bioassay was done for one ear in which the ability
of etiolated seedling sections to form chlorophyl in the
presence of hygromycin was used to distinguish resistant and
sensitive plants.  See R.C.L. report for details.

A Southern blot was performed on leaf tissue of the plants
from two of four ears bioassayed.  As before the $HYG^R$ coding
sequence was probed for.  A signal of the expected size was
observed for each of the plants believed to be resistant in
the bioassays.  Data for PH1 progeny is summarized below.

| EAR | PLANT | ROOT ASSAY | CHLOROPHYL ASSAY | SOUTHERN BLOT |
|---|---|---|---|---|
| PH1.3 | 1 | + | | + |
| | 2 | − | | - |
| | 3 | − | | − |
| | 4 | − | | − |
| | 5 | − | | − |
| | 6 | + | | + |
| | 7 | − | | − |
| | | | | |
| PH1.10 | 1 | + | + | + |
| | 2 | + | + | + |
| | 3 | − | − | |
| | 4 | − | − | − |
| | 5 | − | − | − |
| | 6 | − | − | − |
| | 7 | − | − | − |
| | 8 | | + | + |

Blank space indicates "not done".  In no instance did
negative control plants test positive for $HYG^R$ in the
bioassays or southerns.  Bioassays for seedlings of two
additional ears were done.  Ear PH1.7 showed 1/12 resistant
in the root assay and ear PH1.4 showed a possible 1/6
resistant in the root assay.  The expected ratio for a one
copy transformant crossed with a sensitive plant would be
1:1 resistant:sensitive in the progeny.  Observed ratios are
below this except for the 3:5 resistant:sensitive observed
for ear 10.  Because seed set itself was marginal for
pollinated PH1 ears, strict interpretation of segregation
data should be postponed till the next generation when seed
set should be better.

Regeneration of $HYG^R$ transformed callus in the presence of hygromycin
Before the southern data was available on the $R_0$ plants of
PH1, an attempt to regenerate plants from PH1 callus in the

SM 0000696

presence of hygromycin was initiated in order to try and
support the fact that plants regenerated from the callus
carried the gene. PH1 and (parent) AB12 were transferred
from RM5 medium without hygromycin to R5 medium containing
0, 30, or 100 mg/l hygromycin. After five weeks the tissue
was observed. On HYG 0 both AB12 and PH1 give many plants
with AB12 giving more and larger plants. On HYG 30 AB12 and
PH1 appear about the same, both lines giving about the same
number of plants. PH1 plants were perhaps larger. On HYG
100 AB12 callus was completely dead with no greening and
gave no plantlets. PH1 callus grew much more than AB12 on
R5 HYG 100, small green shoots and roots formed but no
plantlets were obtained. Thus it was not possible to
selectively regenerate PH1 plants on R5 plates at the
hygromycin concentrations used.

The plants which did form were transfered to R5 boxes
containing 0, 30, 100 mg/l hygromycin. After 4 weeks the
plants were scored for the number of plants transplantable
to vermiculite at each HYG concentration.

|         | AB12  | PH1   |
|---------|-------|-------|
| HYG 0   | 7/8   | 16/16 |
| HYG 30  | 2/12  | 10/12 |
| HYG 100 | 0/12  | 12/12 |

Differences are seen between plantlets of AB12 and PH1 with
hygromycin at 100 mg/l appearing to be a good working
concentration. Thus the time to apply selection during the
regeneration process is not during the formation of
plantlets but after plantlets are formed and are being grown
up for transplanting. However, since most if not all
regenerate plants of PH1 appear to have the gene, based on
this experiment and southern blotting, there appears to be
no reason to regenerate in the presence of HYG.

A putative second transformed callus line recovered
A callus line which is clearly resistant to several rounds
of hygromycin at 60 mg/l has been recovered. The selection
protocol used was an attempt at repeating the protocol used
in the experiment which gave us PH1, with some minor
modifications. The line has been placed on RM5, begining
the regeneration process. A southern blot is being pursued.

SM 0000697



**UNITED STATES DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

*G.J.T.*

| SERIAL NUMBER | FILING DATE | | | | ATTORNEY DOCKET NO |
|---|---|---|---|---|---|
| 07/467,983 | 01/22/90 | LUNDQUIST | | R | BIOT104 |

EXAMINER
BENZION,G

WARREN D. WOESSNER ESQ.
MERCHANT GOULD SMITH EDELL WELTER
& SCHMIDT, P.A. 3100 NORWEST CENTER
90 SOUTH SEVENTH ST
MINNEAPOLIS, MN 55402

| ART UNIT | PAPER NUMBER |
|---|---|
| 184 | *14* |

DATE MAILED: 08/23/91

☐ This application has been examined    ☑ Responsive to communication filed on *June 10, 1991*    ☐ This action is made final

A shortened statutory period for response to this action is set to expire *three (3)* month(s), _____ days from the date of this letter
Failure to respond within the period for response will cause the application to become abandoned. 35 U.S.C. 133

**Part I    THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:**

1. ☑ Notice of References Cited by Examiner, PTO-892 *(1)*    2. ☐ Notice re Patent Drawing, PTO-948
3. ☑ Notice of Art Cited by Applicant, PTO-1449 *(1)*    4. ☐ Notice of Informal Patent Application, Form PTO-152
5. ☑ Information on How to Effect Drawing Changes, PTO-1474.    6. ☐ _____

**Part II    SUMMARY OF ACTION**

1. ☑ Claims *39, 41-42 & 47-48* _____ are pending in the application

   Of the above, claims _____ are withdrawn from consideration

2. ☑ Claims *1-38, 40 and 44-46* _____ have been cancelled

3. ☐ Claims _____ are allowed.

4. ☑ Claims *39, 41-42 & 47-48* _____ are rejected.

5. ☐ Claims _____ are objected to.

6. ☐ Claims _____ are subject to restriction or election requirement.

7. ☑ This application has been filed with informal drawings under 37 C.F.R. 1.85 which are acceptable for examination purposes.

8. ☐ Formal drawings are required in response to this Office action.

9. ☐ The corrected or substitute drawings have been received on _____. Under 37 C.F.R. 1.84 these drawings
   are ☐ acceptable; ☐ not acceptable (see explanation or Notice re Patent Drawing, PTO-948).

10. ☐ The proposed additional or substitute sheet(s) of drawings, filed on _____ has (have) been ☐ approved by the
    examiner; ☐ disapproved by the examiner (see explanation).

11. ☐ The proposed drawing correction, filed _____, has been ☐ approved; ☐ disapproved (see explanation).

12. ☐ Acknowledgement is made of the claim for priority under U.S.C. 119. The certified copy has ☐ been received ☐ not been received
    ☐ been filed in parent application, serial no. _____; filed on _____.

13. ☐ Since this application appears to be in condition for allowance except for formal matters, prosecution as to the merits is closed in
    accordance with the practice under Ex parte Quayle, 1935 C.D. 11; 453 O.G. 213.

14. ☐ Other

SM 0000698

*07/467983*

PTOL-326 (Rev 8-89)    EXAMINER'S ACTION