III. <u>DNA delivery process</u>

The DNA can be introduced into the regenerable maize cal-
lus cultures via a particle bombardment process. A general de-
scription of a suitable particle bombardment instrument is pro-
vided in Sanford et al. (1987), the disclosure of which is in-
corporated herein by reference. While protocols for the use of
the instrument in the bombardment of maize non-regenerable sus-
pension culture cells are described in Klein et al. (1988a,
1988b, and 1989), no protocols have been published for the bom-
bardment of callus cultures or regenerable maize cells.

In a microprojectile bombardment process, also referred
to as a biolistic process, the transport of the DNA into the
callus is mediated by very small particles of a biologically
inert material. When the inert particles are coated with DNA
and accelerated to a suitable velocity, one or more of the
particles is able to enter into one or more of the cells where
the DNA is released from the particle and expressed within the
cell. While some of the cells are fatally damaged by the bom-
bardment process, some of the recipient cells do survive, stab-
ly retain the introduced DNA, and express it.

The particles, called microprojectiles, are generally of
a high density material such as tungsten or gold. They are
coated with the DNA of interest. The microprojectiles are then
placed onto the surface of a macroprojectile which serves to
transfer the motive force from a suitable energy source to the
microprojectiles. After the macroprojectile and the micropro-
jectiles are accelerated to the proper velocity, they contact a
blocking device which prevents the macroprojectile from contin-
uing its forward path but allows the DNA-coated microprojec-
tiles to continue on and impact the recipient callus cells.
Suitable such instruments may use a variety of motive forces
such as gunpowder or shock waves from an electric arc discharge
(Swain et al. 1988). An instrument in which gunpowder is the
motive force is currently preferred and such is described and

BIOT-104 - 1/22/90          - 14 -

SM 0000981

further explained in Sanford et al. (1987), the disclosure of which is incorporated herein by reference.

A protocol for the use of the gunpowder instrument is provided in Klein et al. (1988a, b) and involves two major steps. First, tungsten microprojectiles are mixed with the DNA, calcium chloride, and spermidine free base in a specified order in an aqueous solution. The concentrations of the various componenets may be varied as taught. The currently preferred procedure entails exactly the procedure of Klein et al. (1988b) except for doubling the stated optimum DNA concentration. Secondly, in the actual bombardment, the distance of the recipient cells from the end of the barrel as well as the vacuum in the sample chamber. The currently preferred procedure for bombarding the callus entails exactly the procedure of Klein et al. (1988b) with the recipient tissue positioned 5 cm below the stopping plate tray.

The callus cultures useful herein for generation of transgenic plants should generally be about 3 months to 3 years old, preferably about 3 to 18 months old. Callus used for bombardment should generally be about midway between transfer periods and thus past any "lag" phase that might be associated with a transfer to a new media, but also before reaching any "stationary" phase associated with a long time on the same plate.

The specific tissue subjected to the bombardment process is preferably taken about 7-10 days after subculture, though this is not believed critical. The tissue should generally be used in the form of pieces of about 30 to 80, preferably about 40 to 60, mg. The clumps are placed on a petri dish or other surface and arranged in essentially any manner, recognizing that (i) the space in the center of the dish will receive the heaviest concentration of metal-DNA particles and the tissue located there is likely to suffer damage during bombardment and (ii) the number of particles reaching a cell will decrease

BIOT-104 - 1/22/90          - 15 -

SM 0000982

(probably exponentially) with increasing distance of the cell from the center of the blast so that cells far from the center of the dish are not likely to be bombarded and transformed. A mesh screen, preferably of metal, may be laid on the dish to prevent splashing or ejection of the tissue. The tissue may be bombarded one or more times with the DNA-coated metal particles.

IV. Selection process

    Once the calli have been bombarded with the DNA and the DNA has penetrated some of the cells, it is necessary to identify and select those cells which both contain the heterologous DNA and still retain sufficient regenerative capacity. There are two general approaches which have been found useful for accomplishing this. First, the transformed calli or plants regenerated therefrom can be screened for the presence of the heterologous DNA by various standard methods which could include assays for the expression of reporter genes or assessment of phenotypic effects of the heterologous DNA, if any. Alternatively and preferably, when a selectable marker gene has been transmitted along with or as part of the heterologous DNA, those cells of the callus which have been transformed can be identified by the use of a selective agent to detect expression of the selectable marker gene.

    Selection of the putative transformants is a critical part of the successful transformation process since selection conditions must be chosen so as to allow growth and accumulation of the transformed cells while simultaneously inhibiting the growth of the non-transformed cells. The situation is complicated by the fact that the vitality of individual cells in a population is often highly dependent on the vitality of neighboring cells. Also, the selection conditions must not be so severe that the plant regeneration capacity of the callus cells and the fertility of the resulting plant are precluded. Thus the effects of the selection agent on cell viability and

BIOT-104 - 1/22/90              - 16 -

SM 0000983

morphology should be evaluated. This may be accomplished by
experimentally producing a growth inhibition curve for the giv-
en selective agent and tissue being transformed beforehand.
This will establish the concentration range which will inhibit
growth.

When a selectable marker gene has been used, the callus
clumps may be either allowed to recover from the bombardment on
non-selective media or, preferably, directly transferred to me-
dia containing that agent.

Selection procedures involve exposure to a toxic agent
and may employ sequential changes in the concentration of the
agent and multiple rounds of selection. The particular concen-
trations and cycle lengths are likely to need to be varied for
each particular agent. A currently preferred selection proced-
ure entails using an initial selection round at a relatively
low toxic agent concentration and then later round(s) at higher
concentration(s). This allows the selective agent to exert its
toxic effect slowly over a longer period of time. Preferably
the concentration of the agent is initially such that about a
5-40% level of growth inhibition will occur, as determined from
a growth inhibition curve. The effect may be to allow the
transformed cells to preferentially grow and divide while inhib-
iting untransformed cells, but not to the extent that growth of
the transformed cells is prevented. Once the few individual
transformed cells have grown sufficiently the tissue may be
shifted to media containing a higher concentration of the toxic
agent to kill essentially all untransformed cells. The shift to
the higher concentration also reduces the possibility of non-
transformed cells habituating to the agent. The higher level
is preferably in the range of about 30 to 100% growth inhibi-
tion. The length of the first selection cycle may be from
about 1 to 4 weeks, preferably about 2 weeks. Later selection
cycles may be from about 1 to about 12 weeks, preferably about
2 to about 10 weeks. Putative maize transformants can general-
BIOT-104 - 1/22/90            - 17 -

SM 0000984

ly be identified as proliferating sectors of tissue among a
background of non-proliferating cells.  The callus may also be
cultured on non-selective media at various times during the
overall selection procedure.

Once a callus sector is identified as a putative trans-
formant, transformation can be confirmed by phenotypic and/or
genotypic analysis.  If a selection agent is used, an example
of phenotypic analysis is to measure the increase in fresh
weight of the putative transformant as compared to a control on
various levels of the selective agent.  Other analyses that may
be employed will depend on the function of the heterologous
DNA.  For example, if an enzyme or protein is encoded by the
DNA, enzymatic or immunological assays specific for the partic-
ular enzyme or protein may be used.  Other gene products may be
assayed by using a suitable bioassay or chemical assay.  Other
such techniques are well known in the art and are not repeated
here.  The presence of the gene can also be confirmed by conven-
tional procedures, i.e. Southern blot or polymerase chain reac-
tion (PCR) or the like.

V. Regeneration of Plants and Production of Seed

Cell lines which have been shown to be transformed must
then be regenerated into plants and the fertility of the resul-
tant plants determined.  Transformed lines which test positive
by genotypic and/or phenotypic analysis are then placed on a
media which promotes tissue differentiation and plant regenera-
tion.  Regeneration may be carried out in accordance with stan-
dard procedures well known in the art.  The procedures commonly
entail reducing the level of auxin which discontinues prolifer-
ation of a callus and promotes somatic embryo development or
other tissue differentiation.  One example of such a regenera-
tion procedure is described in Green et al. (1981).  The plants
are grown to maturity in a growth room or greenhouse and appro-
priate sexual crosses and selfs are made as described by Neuf-
fer (1981).

BIOT-104 - 1/22/90          - 18 -

SM 0000985

Regeneration, while important to the present invention, may be performed in any conventional manner. If a selectable marker has been transformed into the cells, the selection agent may be incorporated into the regeneration media to further confirm that the regenerated plantlets are transformed. Since regeneration techniques are well known and not critical to the present invention, any technique which accomplishes the regeneration and produces fertile plants may be used.

VI. <u>Analysis of R1 progeny</u>

The plants regenerated from the transformed callus are referred to as the R0 generation or R0 plants. The seeds produced by various sexual crosses of the R0 generation plants are referred to as R1 progeny or the R1 generation. When R1 seeds are germinated, the resulting plants are also referred to as the R1 generation.

To confirm the successful transmission and inheritance of the heterologous DNA in the sexual crosses described above, the R1 generation should be analyzed to confirm the presence of the transforming DNA. The analysis may be performed in any of the manners such as were disclosed above for analyzing the bombarded callus for evidence of transformation, taking into account the fact that plants and plant parts are being used in place of the callus.

VII. <u>Breeding of Genetically Engineered Commercial Hybrid Seed</u>

Generally, the commercial value of the transformed corn produced herein will be greatest if the heterologous DNA can be incorporated into many different hybrid combinations. A farmer typically grows several varieties of hybrids based on differences in maturity, standability, and other agronomic traits. Also, the farmer must select a hybrid based upon his physical location since hybrids adapted to one part of the corn belt are generally not adapted to another part because of differences in such traits as maturity, disease, and insect resistance. As

BIOT-104 - 1/22/90          - 19 -

SM 0000986

such, it is necessary to incorporate the heterologous DNA into
a large number of parental lines so that many hybrid combina-
tions can be produced containing the desirable heterologous
DNA. This may conveniently be done by breeding programs in
which a conversion process (backcrossing) is performed by cross-
ing the initial transgenic fertile plant to normal elite inbred
lines and then crossing the progeny back to the normal parent.
The progeny from this cross will segregate such that some of
the plants will carry the heterologous DNA whereas some will
not. The plants that do carry the DNA are then crossed again
to the normal plant resulting in progeny which segregate once
more. This crossing is repeated until the original normal par-
ent has been converted to a genetically engineered line contain-
ing the heterologous DNA and also possessing all other import-
ant attributes originally found in the parent. A separate back-
crossing program will be used for every elite line that is to
be converted to a genetically engineered elite line. It may be
necessary for both parents of a hybrid seed corn to be homozy-
gous for the heterologous DNA. Corn breeding and the tech-
niques and skills required to transfer genes from one line or
variety to another are well-known to those skilled in the art.
Thus introducing heterologous DNA into lines or varieties which
do not generate the appropriate calli can be readily accomplish-
ed by these breeding procedures.

VIII. Uses of Transgenic Plants

The transgenic plants produced herein are expected to be
useful for a variety of commercial and research purposes.
Transgenic plants can be created for use in traditional agricul-
ture to possess traits beneficial to the grower (e.g. agronomic
traits such as pest resistance or increased yield), beneficial
to the consumer of the grain harvested from the plant (e.g. im-
proved nutritive content in human food or animal feed), or bene-
ficial to the food processor (e.g. improved processing traits).
In such uses, the plants are generally grown for the use of
their grain in human or animal foods. however, other parts of

BIOT-104 - 1/22/90              - 20 -

SM 0000987

the plants, including stalks, husks, vegetative parts, and the like, may also have utility, including use as part of animal silage or for ornamental purposes (e.g. Indian corn). Often chemical constituents (e.g. oils or starches) of corn and other crops are extracted for food or industrial use and transgenic plants may be created which have enhanced or modified levels of such components. The plants may also be used for seed production for a ~~variety~~ *variety* of purposes.

Transgenic plants may also find use in the commercial manufacture of proteins or other molecules encoded by the heterologous DNA contained therein, where the molecule of interest is extracted or purified from plant parts, seeds, and the like. Cells or tissue from the plants may also be cultured, grown <u>in vitro</u>, or fermented to manufacture such molecules, or for other purposes (e.g. for research).

The transgenic plants may also be used in commercial breeding programs, or may be crossed or bred to plants of related crop species. Improvements encoded by the heterologous DNA may be transferred, e.g. from corn cells to cells of other species e.g. by protoplast fusion.

The transgenic plants may have many uses in research or breeding, including creation of new mutant plants through insertional mutagenesis, in order to identify beneficial mutants that might later be created by traditional mutation and selection. The methods of the invention may also be used to create plants having unique "signature sequences" or other marker sequences which can be used to identify proprietary lines or varieties.

The following non-limiting examples are illustrative of the present invention. They are presented to better explain the general procedures which were used to prepare the fertile Zea mays plants of this invention which stably express the

BIOT-104 - 1/22/90            - 21 -

SM 0000988

heterologous DNA and which transmit that DNA to progeny. All parts and percents are by weight unless otherwise specified. It must be recognized that a specific transformation event is a function of the amount of material subjected to the transformation procedure. Thus when individual situations arise in which the procedures described herein do not produce a transformed product, repetition of the procedures will be required.


### EXAMPLE I

Fertile transgenic Zea mays plants which contain heterologous DNA which is heritable were prepared as follows:

### I. Initiation and maintenance of maize cell cultures which retain plant regeneration capacity

Friable, embryogenic maize callus cultures were initiated from hybrid immature embryos produced by pollination of inbred line A188 plants (University of Minnesota, Crop Improvement Association) with pollen of inbred line B73 plants (Iowa State University). Ears were harvested when the embryos had reached a length of 1.5 to 2.0 mm. The whole ear was surface sterilized in 50% v/v commercial bleach (2.63% w/v sodium hypochlorite) for 20 min. at room temperature. The ears were then washed with sterile distilled, deionized water. Immature embryos were aseptically isolated and placed on nutrient agar initiation/maintenance media with the root/shoot axis exposed to the medium. Initiation/maintenance media (hereinafter refered to as F medium) consisted of N6 basal media (Chu 1975) with 2% (w/v) sucrose, 1.5 mg per liter 2,4-dichlorophenoxyacetic acid (2,4-D), 6 mM proline, and 0.25% Gelrite (Kelco, Inc. San Diego). The pH was adjusted to 5.8 prior to autoclaving. Unless otherwise stated, all tissue culture manipulations were carried out under sterile conditions.

The immature embryos were incubated at 26°C. in the dark.

BIOT-104 - 1/22/90          - 22 -

SM 0000989

Cell proliferations from the scutellum of the immature embryos were evaluated for friable consistency and the presence of well defined somatic embryos. Tissue with this morphology was transferred to fresh media 10 to 14 days after the initial plating of the immature embryos. The tissue was then subcultured on a routine basis every 14 to 21 days. Sixty to eighty milligram quantities of tissue were removed from pieces of tissue that had reached a size of approximately one gram and transferred to fresh media. Subculturing always involved careful visual monitoring to be sure that only tissue of the correct morphology was maintained. The presence of somatic embryos ensured that the cultures would give rise to plants under the proper conditions. The cell culture named AB12 used in this example was such a culture and had been initiated about 1 year before bombardment.

## II. Plasmids - pCHN1-1, pHYGI1, pBII221, and pLUC-1

The plasmids pCHN1-1, pHYGI1, and pLUC-1 were constructed in the vector pBS+ (Stratagene, Inc., San Diego, CA), a 3.2 Kb circular plasmid, using standard recombinant DNA techniques. pCHN1-1 contains the hygromycin B phosphotransferase (HPT) coding sequence from E. coli (Gritz et al. 1983) flanked at the 3' end by the nopaline synthase (nos) polyadenylation sequence of Agrobacterium tumefaciens (Chilton and Barnes 1983). Expression is driven by the cauliflower mosaic virus (CaMV) 35S promoter (Guilley et al. 1982), located upstream from the hygromycin coding sequence. The plasmid pHYGI1 was constructed by inserting the 553 bp Bcl-BamHI fragment containing the maize Adh1S first intron (Callis et al. 1987) between the CaMV 35S promoter and the hygromycin coding sequence of pCHN1-1. A map of pHYGI1 is provided as Figure 1.

pBII221 contains the E. Coli B-glucuronidase coding sequence flanked at the 5' end by the CaMV 35S promoter and at the 3' end by the nos polyadenylation sequence. The plasmid was constructed by inserting the maize AdhIS first intron

BIOT-104 - 1/22/90                - 23 -

SM 0000990

between the 35S promoter and the coding sequence of pBI221 (Jef-
ferson et al. 1987). A map of pBII221 is provided as Figure 2.

pLUC-1 contains the firefly luciferase coding sequence
(DeWet et al. 1987) flanked at the 5' end by the CaMV 35S pro-
moter and at the 3' end by the nos polyadenylation sequence.
This plasmid was used solely as a negative control.

Plasmids were introduced into the embryogenic callus cul-
ture AB12 by microprojectile bombardment.

III. DNA delivery process

The embryogenic maize callus line AB12 was subcultured 7
to 12 d prior to microprojectile bombardment. AB12 was prepar-
ed for bombardment as follows. Five clumps of callus, each ap-
proximately 50 mg in wet weight were arranged in a cross pat-
tern in the center of a sterile 60 x 15 mm petri plate (Falcon
1007). Plates were stored in a closed container with moist
paper towels throughout the bombardment process. Twenty six
plates were prepared.

Plasmids were coated onto M-10 tungsten particles (Biolis-
tics) exactly as described by Klein, et al (1988b) except that,
(i) twice the recommended quantity of DNA was used, (ii) the
DNA precipitation onto the particles was performed at 0°C., and
(iii) the tubes containing the DNA-coated tungsten particles
were stored on ice throughout the bombardment process.

All of the tubes contained 25 ul 50 mg/ml M-10 tungsten
in water, 25 ul 2.5 M $CaCl_2$, and 10 ul 100 mM spermidine free
base along with a total of 5 ul 1 mg/ml total plasmid content.
When two plasmids were used simultaneously, each was present in
an amount of 2.5 ul. One tube contained only plasmid pBII221;
two tubes contained both plasmids pHYGI1 and pBII221; two tubes
contained both plasmids pCHN1-1 and pBII221; and one tube con-
tained only plasmid pLUC-1.

BIOT-104 - 1/22/90          - 24 -

SM 0000991

All tubes were incubated on ice for 10 min., pelletized by centrifugation in an Eppendorf centrifuge at room temperature for 5 seconds, and 25 ul of the supernatant was discarded. The tubes were stored on ice throughout the bombardment process. Each preparation was used for no more than 5 bombardments.

Macroprojectiles and stopping plates were obtained from Biolistics, Inc. (Ithaca, NY). They were sterilized as described by the supplier. The microprojectile bombardment instrument was obtained from Biolistics, Inc.

The sample plate tray was positioned at the position 5 cm below the bottom of the stopping plate tray of the microprojectile instrument, with the stopping plate in the slot below the barrel. Plates of callus tissue prepared as described above were centered on the sample plate tray and the petri dish lid removed. A 7 x 7 cm square rigid wire mesh with 3 x 3 mm mesh and made of galvanized steel was placed over the open dish in order to retain the tissue during the bombardment. Tungsten/-DNA preparations were sonicated as described by Biolistics, Inc. and 2.5 ul was pipetted onto the top of the macroprojectiles. The instrument was operated as described by the manufacturer. The following bombardments were performed:

| | |
|---|---|
| 2 x pBII221 prep | To determine transient expression frequency |
| 10 x pHYGI1/pBII221 | As a potential positive treatment for transformation |
| 10 x pCHN1-1/pBII221 | As a potential positive treatment for transformation |
| 4 x pLUC-1 | Negative control treatment |

BIOT-104 - 1/22/90          - 25 -

SM 0000992

The two plates of callus bombarded with pBII221 were transferred plate for plate to F medium (with no hygromycin) and the callus cultured at 26°C. in the dark.  After 2 d this callus was then transferred plate for plate into 35 x 10 mm petri plates (Falcon 1008) containing 2 ml of GUS assay buffer which consists of 1 mg/ml 5-bromo-4-chloro-3-indolyl-beta-D-glu-curonide (Research Organics), 100 mM sodium phosphate pH 7.0, 5 mM each of potassium ferricyanide and potassium ferrocyanide, 10 mM EDTA, and 0.06% Triton X-100.  These were incubated at 37°C. for 3 d after which the number of blue cells was counted giving 291 and 477 transient GUS expressing cells in the two plates, suggesting that the DNA delivery process had also occur-red with the other bombarded plates.  These plates were discard-ed after counting since the GUS assay is destructive.

IV. Selection Process
    Hygromycin B (Calbiochem) was incorporated into the medi-um by addition of the appropriate volume of filter sterilized 100 mg/ml Hygromycin B in water when the media had cooled to 45°C. prior to pouring plates.

    Immediately after all samples had been bombarded, callus from all of the plates treated with pHYGI1/pBII221, pCHN1-1/-pBII221 and three of the plates treated with pLUC-1 were trans-ferred plate for plate onto F medium containing 15 mg/l hygro-mycin B, (five pieces of callus per plate).  These are referred to as round 1 selection plates.  Callus from the fourth plate treated with pLUC-1 was transferred to F medium without hygromy-cin.  This tissue was subcultured every 2-3 weeks onto nonselec-tive medium and is referred to as unselected control callus.

    After two weeks of selection, tissue appeared essentially identical on both selective and nonselective media.  All callus from eight plates from each of the pHYGI1/pBII221 and pCHN1-1/-pBII221 treatments and two plates of the control callus on se-lective media were transferred from round 1 selection plates to

BIOT-104 - 1/22/90          - 26 -

SM 0000993

round 2 selection plates that contained 60 mg/l hygromycin.
The round 2 selection plates each contained ten 30 mg pieces of
callus per plate, resulting in an expansion of the total number
of plates.

The remaining tissue on selective media, two plates each
of pHYGI1/pBII221 and pCHN1-1/pBII221 treated tissue and one of
control callus, were placed in GUS assay buffer at 37°C. to
determine whether blue clusters of cells were observable at two
weeks post-bombardment. After 6 d in assay buffer this tissue
was scored for GUS expression.

Table X

| TREATMENT | REPLICATE | OBSERVATIONS |
|-----------|-----------|--------------|
| pLUC-1 | | no blue cells |
| pHYGI1/pBII221 | plate 1 | 11 single cells |
| | | 1 four cell cluster |
| | plate 2 | 5 single cells |
| pCHN1-1/pBII221 | plate 1 | 1 single cell |
| | | 2 two cell clusters |
| | plate 2 | 5 single cells |
| | | 1 two cell cluster |
| | | 2 clusters of 8-10 cells |

After 21 d on the round 2 selection plates, all viable
portions of the material were transferred to round 3 selection
plates containing 60 mg/l hygromycin. The round 2 selection
plates, containing only tissue that was apparently dead, were
reserved. Both round 2 and 3 selection plates were observed
periodically for viable proliferating sectors.

After 35 d on round 3 selection plates both the round 2
and round 3 sets of selection plates were checked for viable

BIOT-104 - 1/22/90              - 27 -

SM 0000994

sectors of callus. Two such sectors were observed proliferating from a background of dead tissue on plates treated with pHYGI1/pBII221. The first sector named 3AA was from the round 3 group of plates and the second sector named 6L was from the round 2 group of plates. Both lines were then transferred to F medium without hygromycin.

After 19 d on F medium without hygromycin the line 3AA grew very little whereas the line 6L grew rapidly. Both were transferred again to F medium for 9 d. The lines 3AA and 6L were then transfered to F medium containing 15 mg/l hygromycin for 14 d. At this point, line 3AA was observed to be of very poor quality and slow growing. The line 6L however grew rapidly on F medium with 15 mg.l hygromycin. In preparation for an inhibition study of the line 6L on hygromycin, the line was then subcultured to F medium without hygromycin.

After 10 d on F medium an inhibition study of the line 6L was initiated. Callus of 6L was transfered onto F medium containing 0, 10, 30, 100, and 250 mg/l hygromycin B. Five plates of callus were prepared for each concentration and each plate contained ten approximately 50 mg pieces of callus. One plate of unselected control tissue was prepared for each concentration of hygromycin.

It was found that the line 6L was capable of sustained growth over 9 subcultures on 0, 10, 30, 100, and 250 mg/l hygromycin. The name of the line 6L was changed at this time from 6L to PH1 (Positive Hygromycin transformant 1).

Additional sectors were recovered at various time points from the round 2 and 3 selection plates. None of these were able to grow in the presence of hygromycin for multiple rounds, i.e. two or three subcultures.

SM 0000995

V. Confirmation of transformed callus

To show that the PH1 callus had acquired the hygromycin resistance gene, a Southern blot of PH1 callus was prepared as follows: DNA was isolated from PH1 and unselected control calli by freezing 2 g of callus in liquid nitrogen and grinding it to a fine powder which was transferred to a 30 ml Oak Ridge tube containing 6 ml extraction buffer (7M urea, 250 mM NaCl, 50 mM Tris-HCl pH 8.0, 20 mM EDTA pH 8.0, 1% sarcosine). To this was added 7 ml of phenol:chloroform 1:1, the tubes shaken and incubated at 37°C. 15 min. Samples were centrifuged at 8K for 10 min. at 4°C. The supernatant was pipetted through miracloth (Calbiochem 475855) into a disposable 15 ml tube (American Scientific Products, C3920-15A) containing 1 ml 4.4 M ammonium acetate, pH 5.2. Isopropanol, 6 ml, was added, the tubes shaken, and the samples incubated at -20°C. for 15 min. The DNA was pelleted in a Beckman TJ-6 centrifuge at the maximum speed for 5 min. at 4°C. The supernatant was discarded and the pellet was dissolved in 500 ul TE-10 (10 mM Tris-HCl pH 8.0, 10 mM EDTA pH 8.0) 15 min. at room temperature. The samples were transferred to a 1.5 ml Eppendorf tube and 100 ul 4.4 M ammonium acetate, pH 5.2 and 700 ul isopropanol were added. This was incubated at -20°C. for 15 min. and the DNA pelleted 5 min. in an Eppendorf microcentrifuge (12,000 rpm). The pellet was washed with 70% ethanol, dried, and resuspended in TE-1 (10 mM Tris-HCl pH 8.0, 1 mM EDTA).

The isolated DNA (10 ug) was digested with BamHI (NEB) and electrophoresed in a 0.8% w/v agarose gel at 15V for 16 hrs in TAE buffer (40 mM Tris-acetate, 1 mM EDTA). The DNA within the gel was then depurinated by soaking the gel twice in 0.25 M HCl for 15 min., denatured and cleaved by soaking the gel twice in 0.5 M NaOH/1.0 M NaCl 15 min., and neutralized by soaking the gel twice in 0.5M Tris pH 7.4/3M NaCl 30 min. DNA was then blotted onto a Nytran membrane (Shleicher & Shuell) by capillary transfer overnight in 6X SSC (20X SSC, 3M NaCl, 0.3M sodium citrate pH 7.0). The membrane was baked at 80°C. for 2 hrs

BIOT-104 - 1/22/90          - 29 -

SM 0000996

2𝑛

under vacuum.   Prehybridization treatment of the membrane was
done in 6X SSC, 10X Denhardt's solution, 1% SDS, 50 ug/ml dena-
tured salmon sperm DNA using 0.25 ml prehybridization solution
per $cm^2$ of membrane.   Prehybridization was carried out at 42°
C. overnight.

A 32P labelled probe was prepared by random primer label-
ling with an Oligo Labelling Kit (Pharmacia) as per the suppli-
ers instructions with 32P-dCTP (ICN Radiochemicals).   The tem-
plate DNA used was the 1055 bp BamHI fragment of pHYGI1, which
is the HPT coding sequence.   The fragment was gel purified and
cut again with PstI (NEB) before labelling.

The hybridization was performed in 50% formamide, 6X SSC,
1% SDS, 50 ug/ml denatured salmon sperm DNA (Sigma), 0.05% sodi-
um pyrophosphate and all of the isopropanol precipitated heat
denatured probe ($10^7$ CPM/50ug template).   The hybridization
was carried out at 42°C. overnight.

The membrane was washed twice in 50 ml 6X SSC, 0.1% SDS 5
min. at room temperature with shaking, then twice in 500 ml 6X
SSC, 0.1% SDS 15 min. at room temperature, then twice in 500 ml
1X SSC, 1% SDS 30 min. at 42°C., and finally in 500 ml 0.1X SSC
1% SDS 60 min. at 65°C.   Membranes were exposed to Kodak X-OMAT
AR film in an X-OMATIC cassette with intensifying screens.   As
shown in Figure 3, a band was observed for PH1 callus at the ex-
pected position of 1.05 Kb, indicating that the HPT coding se-
quence was present.   No band was observed for control callus.

VI. Plant regeneration and production of seed

PH1 callus was transferred directly from all of the con-
centrations of hygromycin used in the inhibition study to RM5
medium which consists of MS basal salts (Murashige et al. 1962)
supplemented with thiamine HCl 0.5 mg/l, 2,4-D 0.75 mg/l, su-
crose 50 g/l, asparagine 150 mg/l, and Gelrite 2.5 g/l (Kelco
Inc. San Diego).

BIOT-104 - 1/22/90          - 30 -

SM 0000997

After 14 d on RM5 medium the majority of PH1 and negative
control callus was transferred to R5 medium which is the same
as RM5 medium, except that 2,4-D is omitted.  These were cultur-
ed in the dark for 7 d at 26°C. and transferred to a light re-
gime of 14 hours light and 10 hours dark for 14 d at 26°C.  At
this point, plantlets that had formed were transferred to one
quart canning jars (Ball) containing 100 ml of R5 medium.
Plants were transferred from jars to vermiculite after 14 and
21 d.  Plants were grown in vermiculite for 7 or 8 d before
transplanting into soil and grown to maturity.  A total of 65
plants were produced from PH1 and a total of 30 plants were pro-
duced from control callus.

To demonstrate that the introduced DNA had been retained
in the Ro tissue, a Southern blot was performed as previously
described on leaf DNA from three randomly chosen Ro plants of
PH1.  As shown in Figure 4, a 1.05 Kb band was observed with
all three plants indicating that the HPT coding sequence was
present.  No band was observed for DNA from a control plant.

Controlled pollinations of mature PH1 plants were conduct-
ed by standard techniques with inbred lines A188, B73 and Oh43.
Seed was harvested 45 days post-pollination and allowed to dry
further 1-2 weeks.  Seed set varied from 0 to 40 seeds per ear
when PH1 was the female parent and from 0 to 32 seeds per ear
when PH1 was the male parent.

VII.  Analysis of the R1 progeny
      The presence of the hygromycin resistance trait was evalu-
ated by a root elongation bioassay, an etiolated leaf bioassay,
and by Southern blotting.  Two ears each from regenerated PH1
and control plants were selected for analysis.  The pollen don-
or was inbred line A188 for all ears.

      (A)  Root Elongation Bioassay
      Seed was sterilized in a 1:1 dilution of commercial
BIOT-104 - 1/22/90          - 31 -

SM 0000998

bleach in water plus alconox 0.1% for 20 min. in 125 ml Erlen-
meyer flasks and rinsed 3 times in sterile water and imbibed
overnight in sterile water containing 50 mg/ml captan by shak-
ing at 150 rpm.

After imbibition, the solution was decanted from the
flasks and the seed transferred to flow boxes (Flow Laborator-
ies) containing 3 sheets of $H_2O$ saturated germination paper.
A fourth sheet of water saturated germination paper was placed
on top of the seed. Seed was allowed to germinate 4 d.

After the seed had germinated, approximately 1 cm of the
primary root tip was excised from each seedling and plated on
MS salts, 20 g/l sucrose, 50 mg/l hygromycin, 0.25% Gelrite,
and incubated in the dark at 26°C. for 4 d.

Roots were evaluated for the presence or absence of
abundant root hairs and root branches. Roots were classified
as transgenic (hygromycin resistant) if they had root hairs and
root branches, and untransformed (hygromycin sensitive) if they
had limited numbers of branches. The results are shown in
Table 1.

(B) Etiolated leaf bioassay

After the root tips were excised as described above, the
seedlings of one PH1 ear and one control ear were transferred
to moist vermiculite and grown in the dark for 5 d. At this
point 1 mm sections were cut from the tip of the coleoptile,
surface sterilized 10 seconds, and plated on MS basal salts, 20
g/l sucrose, 2.5 g/l Gelrite with either 0 (control) or 100
mg/l hygromycin and incubated in the dark at 26° C. for 18 hr.
Each plate contained duplicate sections of each shoot. They
were then incubated in a light regimen of 14 hours light 10
hours dark at 26°C. for 48 hr, and rated on a scale of from 0
(all brown) to 6 (all green) for the percent of green color in
the leaf tissue. Shoots were classified as untransformed (hy-

BIOT-104 - 1/22/90              - 32 -

SM 0000999

gromycin sensitive) if they had a rating of zero and classified as transformed (hygromycin resistant) if they had a rating of 3 or greater.  The results are shown in Table 1.

(C) Southern Blots

Seedling form the bioassays were transplanted to soil and are growing to sexual maturity.  DNA was isolated from 0.8 g of leaf tissue after about 3 weeks and probed with the HPT coding sequence as described previously.  Plants with a 1.05 Kb band present in the Southern blot were classified as transgenic.  As shown in Figure 5, two out of seven progeny of PH1 plant 3 were transgenic as were three out of eight progeny of PH1 plant 10. The blot results correlated precisely with data from the bioassays, confirming that the heterologous DNA was transmitted through one complete sexual life cycle.  All data are summarized in Table 1.

## TABLE 1
## ANALYSIS OF PH1 R1 PLANTS

| PH1 PLANT | ROOT ASSAY | LEAF ASSAY | BLOT | | CONT. PLANT | ROOT ASSAY | LEAF ASSAY | BLOT |
|---|---|---|---|---|---|---|---|---|
| 3.1 | + | ND | + | | 4.1 | − | ND | ND |
| 3.2 | − | ND | − | | 4.2 | − | ND | ND |
| 3.3 | − | ND | − | | 4.3 | − | ND | ND |
| 3.4 | − | ND | − | | 4.4 | − | ND | ND |
| 3.5 | − | ND | − | | 4.5 | − | ND | ND |
| 3.6 | + | ND | + | | 4.6 | − | ND | ND |
| 3.7 | − | ND | − | | 4.7 | − | ND | ND |
| | | | | | 2.1 | − | ND | − |
| | | | | | | | | |
| 10.1 | + | + | + | | 1.1 | − | − | − |
| 10.2 | + | + | + | | 1.2 | − | − | ND |
| 10.3 | − | − | ND | | 1.3 | − | − | ND |
| 10.4 | − | − | − | | 1.4 | − | − | ND |

BIOT-104 - 1/22/90                    - 33 -

SM 0001000

| | | | | | | | |
|------|----|----|----|-----|----|----|----|
| 10.5 | -  | -  | -  | 1.5 | -  | -  | ND |
| 10.6 | -  | -  | -  | 1.6 | -  | -  | ND |
| 10.7 | -  | -  | -  | 1.7 | -  | -  | ND |
| 10.8 | ND | +  | +  | 1.8 | -  | -  | ND |

KEY:+ = transgenic; - = nontransgenic; ND = not done

EXAMPLE II

The procedure of Example I was repeated with minor modifi-
cations.

I. Plant lines and tissue cultures

The embryogenic maize callus line, AB12, was used as in
Example I.  The line had been initiated about 18 months before
the actual bombardment occurred.

II. Plasmids

The plasmids pBII221 and pHYGI1 described in Example I
were used.

III. DNA delivery process

Callus was bombarded exactly as in Example I except that
the DNA used in the tungsten/DNA preparations differed.  All of
the tubes contained 25 ul 50 mg/ml M-10 tungsten in water, 25
ul 2.5 M $CaCl_2$, and 10 ul 100 mM spermidine free base along
with a total of 5 ul 1 mg/ml total plasmid content.  One tube
contained only plasmid pBII221; two tubes contained only plas-
mid pHYGI1; and one tube contained no plasmid but 5 ul TE-1 (10
mM Tris-HCl pH 8.0, 1mM EDTA pH 8.0).

The following bombardments were done:

T351X

2 x pBII221 prep    For transient expression
7 x pHYGI1 prep     Potential positive treatment
3 x TE prep         Negative control treatment

BIOT-104 - 1/22/90          - 34 -

SM 0001001

After all the bombardments were performed, the callus from the pBII221 treatments was transferred plate for plate to F medium as five 50 mg pieces. After 2 d the callus was placed into GUS assay buffer as per Example I. Numbers of transiently expressing cells were counted and found to be 686 and 845 GUS positive cells, suggesting that the particle delivery process had occurred in the other bombarded plates.

IV. Selection of transformed callus

After bombardment the callus from the pHYGI1 treatments was placed onto round 1 selection plates, F medium containing 15 mg/l hygromycin, as ten 25 mg pieces per plate (different from Example I). The same was done for two of the plates bombarded with the TE preparation (selected control callus). One plate of callus bombarded with the TE preparation was placed onto F medium with no hygromycin; this callus was maintained throughout the ongoing experiment as a source of control tissue and was referred to as unselected control callus.

After 13 d the callus on round 1 selection plates was indistinguishable from unselected control callus. All of the callus was transferred from round 1 selection plates to round 2 selection plates containing 60 mg/l hygromycin. An approximate five fold expansion of the numbers of plates occurred.

The callus on round 2 selection plates had increased substantially in weight after 23 d, but at this time appeared close to dead. All of the callus was transfered from round 2 selection plates to round 3 selection plates containing 60 mg/l hygromycin. This transfer of all material from round 2 to round 3 selection differs from Example I in which only viable sectors were transferred and the round 2 plates reserved.

At 58 d post-bombardment three live sectors were observed proliferating from the surrounding dead tissue. All three lines were from pHYGI1 treatments and were designated 24C, 56A,

BIOT-104 - 1/22/90          - 35 -

SM 0001002

and 55A.

After 15 d on maintainance medium, growth of the lines
was observed. The line 24C grew well whereas lines 55A and 56A
grew more slowly. All three lines were transferred to F medium
containing 60 mg/l hygromycin. Unselected control callus from
maintenance was plated to F medium having 60 mg/l hygromycin.

After 19 d on 60 mg/l hygromycin the growth of line 24C
appeared to be entirely uninhibited, with the control showing
approximately 80% of the weight gain of 24C. The line 56A was
completely dead, and the line 55A was very close. The lines
24C and 55A were transferred again to F 60 mg/l hygromycin as
was the control tissue.

After 23 d on 60 mg/l hygromycin the line 24C again ap-
peared entirely uninhibited. The line 55A was completely dead,
as was the negative control callus on its second exposure to to
F 60 mg/l hygromycin.

At 88 d post-bombardment, a sector was observed prolifer-
ating among the surrounding dead tissue on the round 3 selec-
tion plates. The callus was from a plate bombarded with pHYGI1
and was designated 13E. The callus was transferred to F medium
and cultured for 19 d. Portions of the callus were then trans-
ferred to (i) F media containing 15 mg/l hygromycin and (ii) F
media containing 60 mg/l hygromycin. Control callus was plated
on F media with 15 mg/l hygromycin. After 14 d of culture, the
callus line 13E appeared uninhibited on both levels of hygromy-
cin. The control callus appeared to have about 80% of the
weight gain of 13E. The callus lines were transferred to fresh
media at the same respective levels of hygromycin.

V. Confirmation of transformed callus

    A Southern blot was prepared from DNA from the line 24C.
As shown in Figure 6, a band was observed for the line 24C at

BIOT-104 - 1/22/90              - 36 -

SM 0001003

the expected size of 1.05 Kb showing that the line 24C contain-
ed the HPT coding sequence.  No band was observed for DNA from
control tissue.  The name of the callus line 24C was changed to
PH2.

VI. <u>Plant regeneration and production of seed</u>

        The line 24C along with unselected control callus were
placed onto RM5 medium to regenerate plants as in Example I.
After 16 d the callus was transferred to R5 medium as in Exam-
ple I.

EXAMPLE III

        The procedure of Example II was repeated exactly except
that different plasmids were used.

        The plasmids pBII221 and pHYGI1 described in Example I
were used as well as pMS533 which is a plasmid that contains
the insecticidal Bacillus thuringiensis endotoxin (BT) gene fus-
ed in frame with the neomycin phosphotransferase (NPTII) gene.
5' of the fusion gene are located segments of DNA from the CaMV
35S and nopaline synthase promoters.  3' from the fusion gene
are segments of DNA derived from the tomato protease inhibitor
I gene and the poly A region of the nopaline synthase gene.

        Callus was bombarded exactly as in Example I except that
the DNA used in the tungsten/DNA preparations differed.  Two
tubes contained plasmids pHYGI1 and pMS533 and one tube contain-
ed no plasmid but 5 ul TE-1 (10 mM Tris-HCl pH 8.0, 1mM EDTA pH
8.0).

        The following bombardments were done:

        9 x pHYGI1/pMS533    Potential positive treatment
        2 x TE prep          Control treatment

        After bombardment the callus from the pHYGI1/pMS533 treat-

BIOT-104 - 1/22/90              - 37 -

SM 0001004

ments was placed onto round 1 selection plates, F medium con-
taining 15 mg/l hygromycin, as ten 25 mg pieces per plate. The
same was done for one of the plates bombarded with the TE prepa-
ration (selected control callus). One plate of callus bombard-
ed with the TE preparation was placed onto F medium with no hy-
gromycin; this callus was maintained throughout the ongoing ex-
periment as a source of control tissue and was referred to as
unselected control callus.

After 12 d the callus on round 1 selection plates appear-
ed to show about 90% of the weight gain of the unselected con-
trol callus. All of the callus was transferred from round 1
selection plates to round 2 selection plates containing 60 mg/l
hygromycin as ten 30 mg pieces per plate.

After 22 d of selection on round 2 selection plates, the
callus appeared completely uninhibited. All of the callus was
transferred from round 2 selection plates to round 3 selection
plates containing 60 mg/l hygromycin.

At 74 d post-bombardment a single viable sector was ob-
served proliferating from the surrounding necrotic tissue. The
callus line was from pHYGI1/pMS533 treated material and was des-
ignated 86R. The callus line 86R was transferred to F medium.

After 24 d the callus line 86R had grown substantially.
Portions of the callus were then transferred to (i) F media
containing 15 mg/l hygromycin and (ii) F media containing 60
mg/l hygromycin. Control callus was plated on F media with 15
mg/l hygromycin.

After 19 d of culture, the callus line 86R appeared to
grow rapidly and was uninhibited on both levels of hygromycin.
The control callus appeared to have only about 50% of the
weight gain of 86R. The callus lines were transferred to fresh
media at the same respective levels of hygromycin to further
BIOT-104 - 1/22/90          - 38 -

SM 0001005

test the resistance of the callus line 86R to hygromycin.

## COMPARATIVE EXAMPLE A

The basic procedures of Examples I-III have been attempted except varying the selection regime or the form of the callus. These other attempts, which are detailed in Table 2 below, were not successful. Since they were not repeated several times, it is not known whether they can be made to work. In all of the procedures, no viable sectors were observed. In the Table, "Sieved" indicates that the callus was passed through an 860 micron sieve before bombardment; the selective agent was hygromycin for each case except when pMXTI1 was the plasmid and methotrexate the selection agent.

T40(X

### TABLE 2
#### Summary of Comparative Example A

| Recip. Tissue | Plasmids | Recov. Period | Round 1 Level | Round 1 Period | Round 2 Level | Round 2 Period |
|---|---|---|---|---|---|---|
| Clumps | pCHN1-1 pBII221 | 13 | 60 | 21 | 60 | 81 |
| Clumps | pCHN1-1 pBII221 | 14 | 100 | 22 | - | - |
| Clumps | pHYGI1 pBII221 | 8 | 60 | 19 | 30 | 132 |
| Clumps | pCHN1-1 pBII221 | 0 | 30 | 22 | 60 | 109 |
| Clumps | pMTXI1 pBII221 | 8 | 3 | 103 | - | - |
| Sieved | pCHN1-1 pBII221 | 13 | - | - | - | - |

BIOT-104 ~ 1/22/90                    - 39 -

SM 0001006

WHAT IS CLAIMED IS

1. A fertile transgenic Zea mays plant containing heter-
ologous DNA which is heritable.

2. The plant of Claim 1 wherein the heterologous DNA en-
codes a protein.

3. The plant of Claim 2 wherein the heterologous DNA is
expressed.

4. The plant of Claim 1 wherein the heterologous DNA en-
codes an antisense RNA.

5. The plant of Claim 1 wherein the Zea mays plant is se-
lected from the group consisting essentially of field corn, pop-
corn, sweet corn, flint corn, and dent corn.

6. The plant of Claim 1 wherein the heterologous DNA com-
prises a gene selected from the group consisting of non-plant
genes, modified genes, synthetic genes, and genes from other
plant strains or species.

7. The plant of Claim 1 wherein said heterologous DNA en-
codes a beneficial trait to the plant.

8. The plant of Claim 7 wherein said beneficial trait is
selected from the group consisting essentially of promoting in-
creased crop food value, higher yield, reduced production cost,
pest resistance, stress tolerance, drought resistance, disease
resistance, and the ability to produce a chemical.

9. The plant of Claim 1 which expresses a selectable
marker gene.

10. The plant of Claim 9 wherein the selectable marker
BIOT-104 - 1/22/90          - 40 -

SM 0001007

gene confers resistance or tolerance to a compound selected from the group consisting of hygromycin, kanamycin, G418, neomycin, glyphosate, methotrexate, imidazolinone, chlorsulfuron, and bromoxynil.

11. The plant of Claim 9 wherein the selectable marker gene confers resistance or tolerance to hygromycin.

12. The plant of Claim 1 which expresses a reporter gene.

13. The seed produced by the plant of Claim 1 which inherit the heterologous DNA.

14. The grain produced from the plant of Claim 1 when the heterologous DNA increases the crop food value or feed value of said grain.

15. The food produced from the grain of Claim 14.

16. The R2 and higher generations of the plant of Claim 1.

17. The products derived from the Zea mays plant of Claim 1 or any part thereof.

18. The plant of Claim 1 which is produced from transgenic seed produced from a fertile transgenic plant using cross-breeding techniques.

19. A process for producing a fertile transgenic Zea mays plant which stably expresses heterologous DNA which is heritable, wherein the process comprises the steps of (i) establishing a friable embryogenic callus of a plant to be transformed, (ii) transforming said callus by bombarding it with DNA-coated microprojectiles in a microprojectile bombardment procedure, (iii) identifying or selecting a transformed callus cell, and

BIOT-104 · 1/22/90                - 41 -

SM 0001008

(iv) regenerating a fertile transgenic plant therefrom.

20. The process of Claim 19 wherein the callus subjected to bombardment is in clumps of about 30 to 80 mg per clump.

21. The process of Claim 19 wherein the callus had been initiated about 3 to 36 months before the bombardment.

22. The process of Claim 19 wherein the callus is maintained on solid induction media.



SM 0001009

08/249458

## ABSTRACT OF THE DISCLOSURE

Fertile transgenic <u>Zea mays</u> (corn) plants which stably express heterologous DNA which is heritable are disclosed along with a process for producing said plants. The process comprises the microjectile bombardment of friable embryogenic callus from the plant to be transformed. The process may be applicable to other graminaceous cereal plants which have not proven stably transformable by other techniques.

SM 0001010



For Use in
PCT and
Design Applications

MERCHANT, GOULD, SMITH, EDELL, WELTER & SCHMIDT

# United States Patent Application

† INSTRUCTIONS

## COMBINED DECLARATION AND POWER OF ATTORNEY

As a below named inventor I hereby declare that: my residence, post office address and citizenship are as stated below next to my name; that

I verily believe I am the original, first and sole inventor (if only one name is listed below) or a joint inventor (if plural inventors are named below) of the subject matter which is claimed and for which a patent is sought on the invention entitled:

Insert TITLE of invention    FERTILE TRANSGENIC CORN PLANTS

Check a or b              The specification of which

a. ☐ is attached hereto

b. ☒ was filed on_____ January 22, 1990

If "b" checked, complete    as application serial no ___ 07/467,983

and was amended on_____ (if applicable)

If PCT Application       (in the case of a PCT-filed application)

Insert Int. application
number & filing date     described and claimed in international no _____ filed_____

and as amended on_____ (if any), which I have reviewed and for which I solicit
a United States patent.

I hereby state that I have reviewed and understand the contents of the above identified specification, including the claims, as amended by any amendment referred to above.

I acknowledge the duty to disclose information which is material to the examination of this application in accordance with Title 37, Code of Federal Regulations, § 1.56(a) (Reprinted on back side).

I hereby claim foreign priority benefits under Title 35, United States Code, § 119/365 of any foreign application(s) for patent of inventor's certificate listed below and have also identified below any foreign application for patent or inventor's certificate having a filing date before that of the application on the basis of which priority is claimed:

Prior applications
Check a or b             a. ☒ no such applications have been filed.

b. ☐ such applications have been filed as follows:

| FOREIGN APPLICATION(S), IF ANY, CLAIMING PRIORITY UNDER 35 USC 119 | | | |
|---|---|---|---|
| COUNTRY | APPLICATION NUMBER | DATE OF FILING (day,month,year) | DATE OF ISSUE (day,month,year) |
|  |  |  |  |
|  |  |  |  |
| ALL FOREIGN APPLICATIONS, IF ANY, FILED BEFORE THE PRIORITY APPLICATION(S) | | | |
|  |  |  |  |
|  |  |  |  |

If "b" checked, complete

I hereby claim the benefit under Title 35, United States Code, § 120/365 of any United States and PCT international application(s) listed below and, insofar as the subject matter of each of the claims of this application is not disclosed in the prior United States application in the manner provided by the first paragraph of Title 35, United States Code, § 112, I acknowledge the duty to disclose material information as defined in Title 37, Code of Federal Regulations, § 156(a) which occurred between the filing date of the prior application and the national or PCT international filing date of this application.

SM 0001011

| | U.S. APPLICATION NUMBER | DATE OF FILING (day, month, year) | STATUS (patented, pending, abandoned) |
|---|---|---|---|
| For Continuation in Part (CIP) Applications complete | | | |
| | | | |

I hereby appoint the following attorney(s) and/or agent(s) to prosecute this application and to transact all business in the Patent and Trademark Office connected therewith:

John D. Gould, Reg. No. 18,223; Phillip H. Smith, Reg. No. 20,476; Robert T. Edell, Reg. No. 20,187; Paul A. Welter, Reg. No. 20,890; Cecil C. Schmidt, Reg. No. 20,566; John S. Sumners, Reg. No. 24,216; Alan G. Carlson, Reg. No. 25,959; Michael L. Schwegman, Reg. No. 25,816; Earl D. Reiland, Reg. No. 25,767; Charles E. Golla, Reg. No. 26,896; Douglas J. Williams, Reg. No. 27,054; Douglas A. Strawbridge, Reg. No. 28,376; Albert L. Underhill, Reg. No. 27,403; Norman P. Friederichs, Reg. No. 24,919; Michael B. Lasky, Reg. No. 29,555; Curtis B. Hamre, Reg. No. 29,165; Michael D. Schumann, Reg. No. 30,422; Michael L. Mau, Reg. No. 30,087; Mark J. DiPietro, Reg. No. 28,707; John A. Clifford, Reg. No. 30,247; Janet R. Westrom, Reg. No. 30,703; Steven W. Lundberg, Reg. No. 30,568; Warren D. Woessner, Reg. No. 30,440; Alan W. Kowalchyk, Reg. No. 31,535; Michael S. Sherrill Reg. No. 32,302; Daniel W. McDonald, Reg. No. 32,044; Timothy R. Conrad, Reg. No. 30,164; Janice L. Umbel, Reg. No. 31,201; R. Carl Moy, Reg. No. 30,725; Robert C. Freed, Reg. No. 32,569; Daniel J. Kluth, Reg No. 32,146; Wendy M. McDonald, Reg. No. 32,427; Linda M. Byrne, Reg. No. 32,404; Mark D. Schuman, Reg. No. 31,197; Randall A. Hillson, Reg. No. 31,838; John P. Sumner, Reg. No. 29,114; Brian H. Batzli, Reg. No. 32,960; David K. Tellekson, Reg. No. 32,314; John J. Gresens, Reg. No. 33,112; John L. Knoble, Reg. No. 32,287; Albin J. Nelson, Reg. No. 28,650; and Robert C. Beck, Reg. No. 28,124. **and Janice M. Mueller, P-33,975**

I hereby authorize them to act and rely on instructions from and communicate directly with the person/assignee/ attorney/firm/organization/who/which first sends/sent this case to them and by whom/which I hereby declare that I have consented after full disclosure to be represented unless/until I instruct Merchant, Gould to the contrary.

Please direct all correspondence in this case to Merchant, Gould, Smith, Edell, Welter & Schmidt at the address indicated below (or if no address is specified, the first address):

XX  3100 Norwest Center, Minneapolis, MN 55402    ☐  1000 Norwest Center, St. Paul, MN 55101
    Telephone No. (612) 332-5300                          Telephone No. (612) 298-1055

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

| | | FAMILY NAME | FIRST GIVEN NAME | SECOND GIVEN NAME |
|---|---|---|---|---|
| **201** | FULL NAME OF INVENTOR | Lundquist  *1-00* | Ronald | C. |
| | RESIDENCE & CITIZENSHIP | CITY  Minnetonka  *M N* | STATE OR FOREIGN COUNTRY  Minnesota | COUNTRY OF CITIZENSHIP  U.S.A. |
| | POST OFFICE ADDRESS | POST OFFICE ADDRESS  4901 Clear Spring Road | CITY  Minnetonka | STATE & ZIP CODE/COUNTRY  MN 55345 U.S.A. |
| **202** | FULL NAME OF INVENTOR | Walters  *2-00* | David | A. |
| | RESIDENCE & CITIZENSHIP | CITY  Bloomington  *M N* | STATE OR FOREIGN COUNTRY  Minnesota | COUNTRY OF CITIZENSHIP  U.S.A. |
| | POST OFFICE ADDRESS | POST OFFICE ADDRESS  11424 Kell Road | CITY  Bloomington | STATE & ZIP CODE/COUNTRY  MN 55437 U.S.A. |
| **203** | FULL NAME OF INVENTOR | | | |
| | RESIDENCE & CITIZENSHIP | CITY | STATE OR FOREIGN COUNTRY | COUNTRY OF CITIZENSHIP |
| | POST OFFICE ADDRESS | POST OFFICE ADDRESS | CITY | STATE & ZIP CODE/COUNTRY |

| SIGNATURE OF INVENTOR 201 | SIGNATURE OF INVENTOR 202 | SIGNATURE OF INVENTOR 203 |
|---|---|---|
| *Ronald C. Lundquist* | | |
| DATE  *Mar. 19, 1990* | DATE  *MARCH 19 1990* | DATE |

For Additional Inventors:

☐  Check box and attach sheet with same information, including date and signature.

Revised 7/12/89

SM 0001012

08/249458

FIGURE 1



SM 0001013

08/249458



FIGURE 2

A

B

SM 0001014

00/249458

## FIGURE 3.

### PHI CALLUS



SM 0001015

08/249458



PHI R₀ PLANTS



SM 0001016

08 /249458

*FIGURE 5*

## PHI R₁ GENERATION



08 /249458

FIGURE 6

## PH2 CALLUS

PROBES:

PHYGI1:



PH2 CALLUS probe diagram: 35S Pm — Adh INT — HYG — NOS, with restriction sites Bam HI, Pst I, Bam HI



1.6 Kb→

1 Kb→

SM 0001018



SM 0001019

#710    101    A

08/249458

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| DOCKET NUMBER | ANTICIPATED CLASSIFICATION OF THIS APPLICATION: CLASS    SUBCLASS | PRIOR APPLICATION |
|---|---|---|
| 950.1US02 | | EXAMINER    ART UNIT<br>G. Benzion    1804 |

CONTINUATION APPLICATION
UNDER RULE 37 C.F.R. 1.60

pre 2|A

Honorable Commissioner of
   Patents and Trademarks
Washington, D.C.    20231

Dear Sir:

      This is a request for filing a continuation application under 37
CFR § 1.60 of Serial No. _07/974,379_, filed on _November 10, 1992_
entitled _FERTILE TRANSGENIC CORN PLANTS_
by the following inventor(s) (name, address, and citizenship):

Ronald C. Lundquist                   David A. Walters
4901 Clean Spring Road                11424 Kell Road
Minnetonka, MN 55345 USA             Bloomington, MN 55437 USA
US Citizen                            US Citizen

1. __X__ Enclosed is a true and correct copy of the prior application;
         including the specification, claims, drawings, oath or
         declaration showing the applicant's signature, and any amend-
         ments referred to in the oath or declaration filed to complete
         the prior application. (It is noted that no amendments
         referred to in the oath or declaration filed to complete the
         prior application introduced new matter therein.)

2. __X__ Cancel in this application original claims _1-18_ of the prior
         application before calculating the filing fee. (At least one
         original independent claims must be retained for filing
         purposes.)

3. __X__ The filing fee is calculated below:

A

SM 0001020

| CLAIMS AS FILED | | | |
|---|---|---|---|
| NUMBER FILED | NUMBER EXTRA | RATE | BASIC FEE |
| Total Claims<br>4- 20 = | 0    X | $22.00 | 0 |
| Independent Claims<br>1- 3 = | 0    X | $74.00 | 0 |
| | | FILING FEE: | $710.00 |

_____ A Verified Statement that this filing is by a small entity (37 CFR 1.9, 1.27, 1.28) is:

_____ already filed in the parent application.

_____ attached.

4. __X__ A check in the amount of $__710.00_____ is attached.

5. __X__ The Commissioner is hereby authorized to charge any additional fees as set forth in 37 CFR 1.16 to 1.18 Section 37 CFR 1.15(b)1 which may be required by this paper or credit any overpayment to Account No. 19-0743.

6. __X__ Amend the specification by inserting before the first line the sentence: ["This is a division, of application Serial No. __07/974,379__, filed __November 10, 1992__."

7. _____ Transfer the drawings from the prior application to this application and abandon said prior application as of the filing date accorded this application. A duplicate copy of this sheet is enclosed for filing in the prior application file. (May only be used if signed by person authorized by Rule 138 and before payment of case issue fee.)

8. __X__ Informal drawings are enclosed.

9. _____ Priority of application Serial No. _____, filed on _____ in _____, is claimed under 35 U.S.C. 119.

10. _____ The certified copy has been filed in prior application Serial No. _____, filed _____.

11. __X__ The prior application is assigned of record to __DeKalb Genetics Corporation_____.

SM 0001021

2

12. __X__ The Power of Attorney in the prior application is to:

> Warren D. Woessner et al.
> Merchant, Gould, Smith, Edell, Welter & Schmidt P.A.
> 3100 Norwest Center
> 90 South Seventh Street
> Minneapolis, MN 55402-4131

13. __X__ A preliminary amendment is enclosed. (Claims added by this amendment have been properly numbered consecutively beginning with the number next following the highest numbered original claim in the prior application.) Any fee for excess claims is attached.

14. ____ A petition and fee has been filed to extend the term in the parent application until _____.

Address all future communications to:  (may only be completed by attorney or agent of record)

> SCHWEGMAN, LUNDBERG & WOESSNER, P.A.
> 3500 IDS Center
> 80 South Eighth Street
> Minneapolis, Minnesota 55402
> Attn:   Warren D. Woessner
> (Telephone:  612-339-0331)

Date:  5-26-94          Warren D. Woessner
                        Warren D. Woessner
                        Reg. No. 30,440

"Express Mail" mailing label number  TB524273464US

Date of Deposit  May 26, 1994
I hereby certify that this paper or fee is being deposited with the United States Postal Service "Express Mail Post Office to Addressee" service under 37 C.F.R. 1.10 on the date indicated above and is addressed to the Commissioner of Patents and Trademarks, Washington, D. C. 20231

____ Lisa LaBreche _____
                    printed name

_____
                    signature

**SM 0001022**

3



PATENT

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| Applicants: Ronald C. Lundquist et al. | Examiner: G. Benzion |
| Serial No.: N/A | Art Unit: 1804 |
| Filed: Herewith | Docket No.: 950.1-US-02 |
| For: FERTILE TRANSGENIC CORN PLANTS | |

Hon. Commissioner of Patents
and Trademarks
Washington, DC 20231

PRELIMINARY AMENDMENT

Sir:

Prior to the first Office Action in the above-identified application, please amend as follows:

IN THE CLAIMS

Cancel claims 19-22 and add the following claims:



23. A process for producing a fertile transgenic *Zea mays* plant comprising the steps of (i) bombarding regenerable *Zea mays* cells with DNA-coated microprojectiles, (ii) identifying or selecting a population of transformed cells wherein said DNA is chromosomally integrated, and (iii) regenerating a fertile transgenic plant therefrom, wherein said DNA is transmitted through a complete sexual cycle of said transgenic plant to its progeny.



SM 0001023

24. The process of claim 23 wherein the fertile transgenic *Zea mays* plant is regenerated from transformed embryogenic tissue.

25. The process of claim 23 wherein regenerable callus is bombarded.

26. The process of claim 25 wherein the callus subjected to bombardment is in clumps of about 30 to 80 mg per clump.

27. The process of claim 26 wherein the callus is initiated about 3-36 months before the bombardment.

28. The process of claim 27 wherein said callus is initiated on solid media.

29. The process of claim 23 wherein the cells are derived from immature embryos.

IN THE SPECIFICATION

At page 2, lines 25-26, delete "or, in some cases, it even turned out that the plants were in fact not transformed".

At page 4, delete line 25 and insert —M. Bevan et al., *Nuc. Acids Res.*, 11, 369 (1983)—.

At page 11, line 27, delete "sequnes" and insert —sequences—.

2

SM 0001024

At page 14, para. 3, line 13, delete "Swain et al. 1988" and insert —J.C. Sanford et al.,

*J. Particle Science and Technology*, 5, 27 (1987)—.

At page 21, line 8, delete "vatietry" and insert —variety—; at line 10, delete "othermolecules" and insert —other molecules—.

At page 23, para. 2, line 8, delete "Chilton and Barnes" and insert —M. Bevan et al.,

*Nuc. Acids Res.*, 11, 369,—.

## REMARKS

Claims 19-22 having been cancelled, and claims 23-29 having been added, the claims pending in the above-identified application are claims 23-29.

Claim 23 is supported by originally-filed claim 19, by claim 39 as presented in the parent application on August 31, 1990, and the specification by page 5, lines 26-27, page 7, para. 7 and page 8, full para. 1.

Claim 24 is supported by the specification at page 6, full para. 3, line 2.

Claim 25 is supported by the specification at page 8, full para. 2, by claim 43 of the parent application.

Claims 26-28 are supported by originally-filed claims 20-22.

Claim 29 is supported at page 9, full para. 1 of the specification.

The specification has been amended to correct simple typographical errors including typographical errors in certain of the literature citations. No new matter is added by these amendments.

SM 0001025

When the Examiner takes the application up for the first Office Action, consideration of the amendments and remarks presented herein is respectfully requested.

Respectfully submitted,

RONALD C. LUNDQUIST ET AL.

By their attorneys,

SCHWEGMAN, LUNDBERG & WOESSNER, P.A.
3500 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
(612) 339-0331

Date: _5-26-94_          By: _Warren D. Woessner_

Warren D. Woessner
Reg. No. 30,440

"Express Mail" mailing label no. _TB524273464_
Date of Deposit: _May 26, 1994_
I hereby certify that this paper or fee is being deposited with the United States Postal Service "Express Mail Post Office to Addressee" service under 37 CFR 1.10 on the date indicated above and is addressed to the Commissioner of Patents and Trademarks, Washington, D.C. 20231

_Lisa LaBreche_
Printed Name

_Lisa LaBreche_
Signature

4

SM 0001026



**UNITED STATE. DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington D.C. 20231

| SERIAL NUMBER | FILING DATE | FIRST NAMED INVENTOR | | ATTORNEY DOCKET NO. |
|---|---|---|---|---|

08/249,458    05/26/94    LUNDQUIST

                        18M2/0928
SCHWEGMAN, LUNDBERG & WOESSNER
ATTN: WARREN D. WOESSNER
3500 IDS CENTER
80 SOUTH EIGHTH STREET
MINNEAPOLIS, MN 55402

This is a communication from the examiner in charge of your application.
COMMISSIONER OF PATENTS AND TRADEMARKS

| | R    950.1US02 |
|---|---|
| | **EXAMINER** |
| | BENZION.G |

| ART UNIT | PAPER NUMBER |
|---|---|
| | 4 |

1804
**DATE MAILED:**
                09/28/94

☒ This application has been examined    ☒ Responsive to communication filed on _May 26 1994_    ☐ This action is made final.

A shortened statutory period for response to this action is set to expire _three (3)_ month(s), _____ days from the date of this letter.
Failure to respond within the period for response will cause the application to become abandoned. 35 U.S.C. 133

**Part I    THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:**

1. ☒ Notice of References Cited by Examiner. PTO-892. (1)    2. ☐ Notice of Draftsman's Patent Drawing Review. PTO-948.
3. ☐ Notice of Art Cited by Applicant. PTO-1449    4. ☐ Notice of Informal Patent Application. PTO-152.
5. ☐ Information on How to Effect Drawing Changes. PTO-1474.    6. ☐ _____

**Part II    SUMMARY OF ACTION**

1. ☒ Claims _23—29_ _____ are pending in the application.

   Of the above, claims _____ are withdrawn from consideration.

2. ☐ Claims _____ have been cancelled.

3. ☐ Claims _____ are allowed.

4. ☒ Claims _23—29_ _____ are rejected.

5. ☐ Claims _____ are objected to.

6. ☐ Claims _____ are subject to restriction or election requirement.

7. ☒ This application has been filed with informal drawings under 37 C.F.R. 1.85 which are acceptable for examination purposes.

8. ☐ Formal drawings are required in response to this Office action.

9. ☐ The corrected or substitute drawings have been received on _____. Under 37 C.F.R. 1.84 these drawings are ☐ acceptable; ☐ not acceptable (see explanation or Notice of Draftsman's Patent Drawing Review. PTO-948).

10. ☐ The proposed additional or substitute sheet(s) of drawings, filed on _____, has (have) been ☐ approved by the examiner; ☐ disapproved by the examiner (see explanation).

11. ☐ The proposed drawing correction. filed _____, has been ☐ approved; ☐ disapproved (see explanation).

12. ☐ Acknowledgement is made of the claim for priority under 35 U.S.C. 119. The certified copy has ☐ been received ☐ not been received ☐ been filed in parent application. serial no. _____; filed on _____.

13. ☐ Since this application appears to be in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under Ex parte Quayle. 1935 C.D. 11; 453 O.G. 213

14. ☐ Other

**EXAMINER'S ACTION**

08/249458

SM 0001027

Serial No.     08/249458
Art Unit      1804                                    2 of 5

5        This application should be examined for errors.

         This is a continuation-in-part of application serial no. 07/974,379.

         Claims 23-29 are provisionally rejected under the judicially created doctrine of
obviousness-type double patenting as being unpatentable over claim 39, 41-42 and 47-48 of
copending application serial no. 07/074379. Although the conflicting claims are not identical,
10      they are not patentably distinct from each other because the instant application is drawn to a
method to transform maize to produce fertile plants capable of heritable transferring, from one
generation to the next, DNA inserted via a process of bombarding regenerable Zea mays cells
with DNA-coated microprojectiles. The prior application is drawn to the instant method with the
limitation that the cells to be transformed be embryogenic callus. A person having ordinary skill
15      in the art would view the two methods in a genus-species relationship, in that the method of the
prior application represents a species of the broader method claimed herein and as such one
inventive concept and thus one invention.

         This is a provisional obviousness-type double patenting rejection because the conflicting
claims have not in fact been patented.

20       Claims 23-29 are provisionally rejected under the judicially created doctrine of
obviousness-type double patenting as being unpatentable over claims 61-65 of copending
application serial no. 08/233076 Although the conflicting claims are not identical, they are not
patentably distinct from each other because the instant application is drawn to a method to
transform maize to produce fertile plants capable of heritable transferring, from one generation
25      to the next, DNA inserted via a process of bombarding regenerable Zea mays cells with DNA-
coated microprojectiles. The prior application is drawn to the instant method with the limitation
that the cells to be transformed be embryogenic callus. Additionally, claims 63-65 are drawn to
specific species of transgenic DNA. A person having ordinary skill in the art would view the two
methods in a genus species relationship, in that the method of the prior application represents a
         broader method claimed herein and as such one inventive concept and thus one

SM 0001028

Serial No.     08/249458
Art Unit       1804                                        3 of 5

5          This is a provisional obviousness-type double patenting rejection because the conflicting
claims have not in fact been patented.

           The obviousness-type double patenting rejection is a judicially established doctrine based
upon public policy and is primarily intended to prevent prolongation of the patent term by
prohibiting claims in a second patent not patentably distinct from claims in a first patent. In re
10 Vogel, 164 USPQ 619 (CCPA 1970). A timely filed terminal disclaimer in compliance with 37 CFR
1.321(b) would overcome an actual or provisional rejection on this ground provided the
conflicting application or patent is shown to be commonly owned with this application. See 37
CFR 1.78(d).

           Claims 23-29 are rejected under 35 U.S.C. 112, first paragraph, as the disclosure is
15 enabling only for claims limited to intact maize callus in which the cells do not undergo a process
of protoplasting. See MPEP 706.03(n) and 706.03(z).

           The specification teaches the transformation via particle mediated acceleration of DNA
coated microprojectiles of maize regenerable cells. The specification does not teach the
application of the technique to protoplasts and as such is not enabling for cells, tissue, or organs
20 which have undergone protoplasting. Rhodes et al. (pages 204-207, in particular page 206)
disclose the transformation and regeneration of maize plants via the process of electroporation in
which regenerated plants were shown to be sterile and in which control plants not treated by
electroporation were also sterile. Thus at the time the instant invention was made the art did not
teach the ability to transform and regenerated fertile plants from protoplast and as such the
25 claimed invention is also considered to not be enables for such material.

           The following is a quotation of 35 U.S.C. §103 which forms the basis for all obviousness
rejections set forth in this Office action:

30              "A patent may not be obtained though the invention is not identically disclosed or described as set forth in
           section 102 of this title, if the differences between the subject matter sought to be patented and the prior
           art are such that the subject matter as a whole would have been obvious at the time the invention was
           made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall
           not be negatived by the manner in which the invention was made.

                Subject matter developed by another person, which qualifies as prior art only under subsection (f) and (g)
           of section 102 of this title, shall not preclude patentability under this section where the subject matter and

5    the claimed invention were, at the time the invention was made, owned by the same person or subject to an obligation of assignment to the same person."

This application currently names joint inventors. In considering patentability of the claims under 35 U.S.C. 103, the examiner presumes that the subject matter of the various claims was commonly owned at the time any inventions covered therein were made absent any

10    evidence to the contrary. Applicant is advised of the obligation under 37 CFR 1.56 to point out the inventor and invention dates of each claim that was not commonly owned at the time a later invention was made in order for the examiner to consider the applicability of potential 35 U.S.C. 102(f) or (g) prior art under 35 U.S.C. 103.

Claims 23-29 are provisionally rejected under 35 U.S.C §103 as being obvious over

15    copending application serial number 08/233076.

Copending application serial number 08/233076 has a common assignee with the instant application. Based upon the earlier effective U.S. filing date of the copending application, it would constitute prior art under 35 U.S.C 102(e) if patented. This provisional rejection under 35 U.S.C §103 is based upon a presumption of future patenting of the conflicting application.

20    This provisional rejection might be overcome either by showing under 37 CFR §1.132 that any unclaimed invention disclosed in the copending application was derived from the inventor of this application and is thus not the invention "by another, or by a showing of a date of invention prior to the effective U.S. filing date of the copending application.

Claims 23-29 are rejected under 35 U.S.C § 103 as being unpatentable over Klein et al. in

25    view of Armstrong et al.

Klein et al. (Biotechnology, pages 559-563) reveal the factors influencing gene delivery into maize suspension cells and scutellum tissue via the use of high-velocity microprojectile acceleration. These authors teach the application of the process to the surface of explanted maize embryos in which the GUS reporter/marker gene is expressed. In particular, at page 562,

30    right column of the penultimate paragraph, stable transformation of maize callus via the disclosed technique is evident. Thus, Klein et al. is seen to clearly teach the application of the method of bombarding maize scutellum and/or suspension cells to transform them. Armstrong

SM 0001030