PATENT

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| In re Application of: | ) | |
| | ) | |
| Ronald C. Lundquist et al. | ) | Examiner: G. Benzion |
| | ) | |
| Serial No.: 08/677,695 | ) | Group Art Unit: 1649 |
| | ) | |
| Filed: July 10, 1996 | ) | Docket: 950.001US4 |
| | ) | |
| For: METHODS FOR PREPARING FERTILE TRANSGENIC CORN PLANTS | ) | |

## APPELLANTS' BRIEF ON APPEAL

Box AF
Assistant Commissioner for Patents
Washington, D.C. 20231

Sir:

This Brief is presented in support of the Notice of Appeal filed February 17, 1999, from the final rejection of claims 23-25, 29, 41, 45, 48-52, 55-59, and 68-74 of the above-identified application, as set forth in the Final Office Action, mailed August 28, 1998, and the Advisory Action, mailed January 22, 1999. Claims 1-22, 26-28, 30-40, 42-44, 46-47, 53-54, 60-67, and 75-192 have been withdrawn from consideration.

This Brief is being submitted in triplicate, as set forth in 37 C.F.R. § 1.192(a). A request for an oral hearing is submitted herewith, along with the fee set forth in 37 C.F.R. §1.17(b). A check in the amount of $300.00 is filed herewith to cover the fee for filing of a brief in support of an appeal under 37 C.F.R. 1.17(c). The Patent Office is also authorized to charge **Deposit Account No. 19-0743** for any additional fees deemed necessary.

1

0002749

## 1. REAL PARTY IN INTEREST

The real party in interest of the above-captioned patent application is the assignee, DEKALB Genetics Corporation.

## 2. RELATED APPEALS AND INTERFERENCES

The Appeals from the Final Office Actions in United States Patent Application Serial Nos. 08/441,625, and 08/112,245, which were submitted to the Board on April 3, 1998, and June 12, 1999, respectively, may directly affect, be affected by, or have a bearing on the Board's decision in the present appeal.

## 3. STATUS OF THE CLAIMS

Claims 23-25, 29, 41, 45, 48-52, 55-59, and 68-74 are pending, stand rejected and are the subject of this appeal. Claims 1-22, 26-28, 30-40, 42-44, 46-47, 53-54, 60-67, and 75-192 were withdrawn from consideration by the Examiner. Appellants overcame the statutory double patenting rejection of claims 26 and 27, as noted by the Examiner in the Advisory Action, mailed January 22, 1999 (Appendix II).

## 4. STATUS OF AMENDMENTS

Claims 23-29, 41-45, 48-52, 55-59, and 68-74 were finally rejected in the final Office Action mailed August 28, 1998 (Appendix II). Claims 26 and 27 were canceled in Appellants' Rule 116 Amendment, filed November 19, 1998. The Amendment was entered by Advisory Action mailed January 22, 1999, which maintained the rejections. Claims 28 and 42-44 were canceled in Appellants' Rule 116 Amendment, filed March 18, 1999 (Appendix II). This Amendment was entered by Advisory Action faxed to Appellants on August 19, 1999, that maintained the rejections.

## 5. SUMMARY OF THE INVENTION

This invention provides a method of producing fertile transgenic plants of the species *Zea mays* (also referred to herein as maize or corn) by bombarding intact, regenerable maize cells with DNA-coated microparticles comprising a selectable marker or reporter gene, such as one

2

imparting resistance to herbicides. A population of transformed cells which comprise the DNA are selected or identified from the population of bombarded cells. Fertile transgenic *Zea mays* plants are regenerated from the selected cells, wherein the DNA is sexually transmitted to progeny plants. The DNA is preferably expressed so that the transgenic progeny plants exhibit one or more phenotypic characteristics that render it identifiable over the corresponding untransformed *Z. mays* plant (claims 41, 48, and 55).

The DNA can be "expressed" so that the transgenic progeny plants are resistant to an amount of an agent, such as a herbicide, which would be toxic to a *Zea mays* plant which does not comprise the DNA (claim 49). The DNA can also be expressed so that the transgenic progeny plants exhibit increased resistance to insects (claim 50).

The progeny plants can be crossed with members of non-transgenic inbred lines to yield new transgenic inbred and hybrid lines (claims 48 and 55).

Genetic engineering of plants, which entails the isolation and manipulation of genetic material (usually in the form of DNA or RNA) and the subsequent introduction of that genetic material into a plant or plant cells, has been of great value to modern agriculture and plant breeding. Increased crop food values, higher yields, feed value, reduced production costs, pest resistance, stress tolerance, drought resistance, the production of pharmaceuticals, chemicals and biological molecules as well as other beneficial traits have been realized or are all potentially achievable through genetic engineering techniques. Once a gene has been identified, cloned, and engineered, it is still necessary to introduce it into corn in such a manner that the resulting corn plant is both fertile and capable of passing the gene on to its progeny. Only if the introduced DNA is heritable can the corn be used in breeding programs for successful commercialization of transgenic corn. Currently, about 20% of the acreage of corn in the United States is planted with transgene corn (maize) which has been genetically engineered to resist insects or to resist damage by herbicides used to control weeds. See, C.L. Armstrong, Maydica, 44:101-109 (1999) (Appendix III).

A variety of methods have been developed and are currently available for the transformation of various plants and plant cells with preselected DNA. The first successfully transformed plants were dicotyledonous or broad-leafed. However, prior to Appellants' success, some species were not transformable by any method. No technology had been developed which permitted the production of fertile transformed corn plants that could transmit the introduced

3

DNA to progeny plants. Many previous failures had resulted from attempts to transfer genes to corn protoplasts (maize cells from which the outer cell has been removed), or intact maize cells using a variety of transformation techniques. Although several of the techniques resulted in successful transformation of cultured corn cells, the resulting cells either could not be regenerated into corn plants or the corn plants produced were sterile (C. Rhodes et al., Science, 240, 204 (1988)) (Appendix III). Thus, while corn protoplasts and some other cells had previously been transformed, the resulting transformed cells or "transformants" could not be regenerated into fertile transgenic plants. These failures are well documented in the literature and have been discussed in a number of reviews (I. Potrykus, Trends Biotechnol., 7, 269 (Oct. 1989); K. Weising et al., Ann. Rev. Genet., 22, 421 (1988); F. Cocking et al., Science, 236, 1259 (1987); C. Rhodes et al., Science, 240, 204 (1988); C.L. Armstrong, Maydica, 44, 101 (1999) (Appendix III)).

Despite extensive efforts to produce fertile transformed corn plants which could transmit the introduced DNA to progeny, prior to the publication by Appellants of the methodologies and results disclosed and claimed in the present application, there were no reported successes. On the other hand, prior to the effective filing date of the present application, it was known that certain types of corn callus could be regenerated to form mature plants and that the resulting plants were often fertile. For example, see, R. I. Phillips et al., Corn and Corn Improvement, G. F. Sprague and J. S. Dudley, eds., ASA, Inc., Madison, WI (1988) at pages 345-387 (Appendix III). However, no stable transformation of such maize callus was ever achieved, i.e., there were no techniques developed which would permit the successful stable transformation of a regenerable callus, which might ultimately lead to fertile, transgenic plants.

The art was thus faced with a dilemma. While it was known that corn protoplasts and suspension cell cultures could be transformed, no techniques were available to regenerate the transformed protoplasts or cells into fertile plants. It was also known that corn callus could be regenerated into fertile plants, but there were no techniques known which could transform the callus, while not killing the cells or otherwise destroying the ability of the callus to survive selection and to regenerate fertile plants.

In the 1980's a transformation technique was developed that employed the bombardment of intact plant cells and tissues with DNA-coated microprojectiles. The technique, disclosed in Sanford et al., Particulate Sci. Technol., 5, 27 (1987) (Appendix III) was shown to be effective to

4

produce transient gene expression in some plant cells and tissues including those from onion, maize (Klein et al., PNAS USA, 85, 4305 (1988)) (Appendix III), tobacco, rice, wheat, and soybean. Stable expression was obtained in the dicots tobacco and soybean. In fact, transient expression in *Zea mays* cells was obtained by bombardment of suspension cultures of *Zea mays* Black Mexican Sweet (Klein et al., Bio/Technology, 6, 559 (1989)) (Appendix III). However, these cultures were non-regenerable.

Thus, prior to the effective filing date of the present application, no protocols had been published describing the introduction of DNA by a particle bombardment technique into cultures of maize cells of any type capable of regenerating fertile, transgenic plants. The bombardment of corn callus followed by regeneration of fertile plants had not been reported and no fertile corn plants had resulted from DNA-coated microprojectile bombardment of suspension cultures of corn cells. Thus, plant scientists had failed to produce fertile transformed corn plants after at least 10 years of attempts. See the Rule 132 Declaration of Dr. David Somers (Appendix III).

A further stumbling block to the successful production of fertile transgenic maize plants had been encountered in selecting those few transformed cells in such a manner that neither the regeneration capacity of the cells nor the fertility of the regenerated plant was destroyed. Due to the generally low level of transformation produced by available transformation techniques, the need for selection of the transformants is self-evident. However, selection generally entails the use of some toxic agent, e.g., herbicide or antibiotic, which can effect either the regenerability of the cells or the fertility of the resultant plant, if it does not kill the cells outright.

Appellants overcame these obstacles as described in the above-identified application. This accomplishment received wide recognition in the scientific community and the methodologies disclosed in the present application were rapidly adopted by the art. Following the publication of the results achieved by the DEKALB research group in July 1990 (Gordon-Kamm et al, The Plant Cell, 2, 603-618 (July, 1990))(Appendix III)) using the method of the present invention, research groups employing the transformation of callus by microprojectile bombardment accomplished the transformation of wheat, oats, barley and sorghum. See Vasil et al. (U.S. Patent No. 5,405,765) (wheat); Somers, D.A. et al., Bio/Technology, 10: 1589 (1992) (oats); Wan, Y. and Lemaux, P.G., Plant Physiology, 104: 37 (1994) (barley); Casas, A.M. et al., PNAS USA, 90: 11212 (1993) (sorghum) (Appendix III). The technical breakthrough of Appellants' invention is not the mere physical introduction of DNA into corn cells, but the

5

ability to introduce preselected DNA into the corn genome in a reproducible manner to yield fertile, transgenic plants and transgenic progeny plants that exhibit desirable traits preselected by the plant scientist.

## 6. ISSUES PRESENTED FOR REVIEW

A. Whether or not claims 23-25, 29, 41, 45, 48-52 and 55-59 are properly rejected under the judicially created doctrine of obviousness-type double patenting over claims 1-10 of U.S. Patent No. 5,538,877 issued July 23, 1996, and claims 1-18 of U.S. Patent No. 5,538,880, issued July 23, 1996.

B. Whether or not claims 23-25, 29, 41, 45, 48-52 and 55-59 are properly rejected under 35 U.S.C. § 112, first paragraph, as nonenabling for the expression of any gene known as of the filing date of the claim (See Advisory Action mailed January 22, 1999)(Appendix II).

C. Whether or not claims 23-25, 29, 41, 45, 48-52, and 55-59 are properly rejected under 35 U.S.C. § 103 as being unpatentable over Sanford, J. C. Physiol. Plant, 79, 206-209 (1990); in view of Klein, T. M. et al., Bio/Technol., 6, 559-563 (1988); Armstrong, C. L. et al., Planta, 164, 207-214 (1985); Adang, M. J. et al., Gene, 36, 289-300 (1985); DeBlock et al., EMBO J., 6, 2513-2518 (1987); and Poehlman, J. M., "Backcross Breeding," In: Breeding Field Crops, 3rd ed., AVI Publishing Co., Inc., p. 203-206 (1986).

D. Whether or not claims 68-74 were properly rejected under 35 U.S.C. § 103 as being unpatentable over Sanford, J. C. Physiol. Plant, 79, 206-209 (1990); in view of Klein, T. M. et al., Bio/Technol., 6, 559-563 (1988); Armstrong, C. L. et al., Planta, 164, 207-214 (1985); Adang, M. J. et al., Gene, 36, 289-300 (1985); DeBlock et al., EMBO J., 6, 2513-2518 (1987); and Poehlman, J. M., "Backcross Breeding," In: Breeding Field Crops, 3rd ed., AVI Publishing Co., Inc., p. 203-206 (1986), and further in view of Murray et al. (U.S. Patent No. 5,371,003, issued December 6, 1994).

6

The prior art cited against the claims can be found in Appendix III.

## 7. GROUPING OF CLAIMS

Since claims 68-74 are not subject to the enablement rejection, they should be grouped separately for the purposes of this appeal.

## 8. ARGUMENT

### I. The Obviousness-type Double Patenting Rejection.

Claims 23-25, 29, 41, 45, 48-52, and 55-59 were rejected by the Examiner under the judicially created doctrine of obviousness-type double patenting as being unpatentable over claims 1-10 of U.S. Patent No. 5,538,877 and claims 1-18 of U.S. Patent No. 5,538,880 (Appendix III). Upon indication of otherwise allowable subject matter, filing of a terminal disclaimer will be considered.

### II. The Specification Enables the Skilled Person to Make and Use the Invention Without Undue Experimentation.

Claims 23-25, 29, 41, 45, 48-52 and 55-59 stand rejected under 35 U.S.C. § 112, first paragraph (Appendix IV). The Examiner asserted that the specification does not enable the skilled person to make and use the invention commensurate in scope with the claims. Specifically, the Examiner concedes that the specification enables the expression of the exemplified genes, but maintains that it does not reasonably provide enablement for the expression of "any gene known at the time [of filing the application] . . . to meet the requirements of the claims." See Advisory Action, January 22, 1999) (Appendix II).

The test of enablement is discussed in the M.P.E.P. as follows:

> Any analysis of whether a particular claim is supported by the disclosure in an application requires a determination of whether that disclosure, when filed, contained sufficient information regarding the subject matter of the claims as to enable one skilled in the pertinent art to make and use the claimed invention. The standard for determining whether the specification meets the enablement requirement was cast in the Supreme Court decision of

7

0002755

Mineral Separation v. Hyde, 242 U.S. 261, 270 (1916) which postured the question: is the experimentation needed to practice the invention undue or unreasonable? That standard is still the one to be applied. In re Wands, 858 F.2d 731, 737, 8 U.S.P.Q.2d 1400, 1404 (Fed. Cir. 1988). Accordingly, even though the statue does not use the term "undue experimentation," it has been interpreted to require that the claimed invention be enabled so that any person skilled in the art can make and use the invention without undue experimentation. In re Wands, 858 F.2d at 737, 8 U.S.P.Q.2d at 1404 (Fed. Cir. 1988).

M.P.E.P. §2164.01 (Appendix IV).

Additionally, it is well-settled that it is not necessary that a patent Applicant have prepared and tested all the embodiments of his invention in order to meet the requirements of § 112. In re Angstadt, 190 U.S.P.Q. 214, 218 (C.C.P.A. 1976) (Appendix IV). Furthermore, the Examiner is requested to consider that enablement is not precluded by the necessity for some experimentation, such as routine screening. The key word is "undue" not "experimentation." Id., 190 U.S.P.Q. at 219. In fact, a considerable amount of experimentation is permissible if it is merely routine, or the specification provides a reasonable amount of guidance with respect to the direction in which the experimentation should take. Ex parte Jackson, 217 U.S.P.Q. 804, 807 (Bd. App. 1982) (Appendix IV).

Applying the above described standard to the present matter, Appellants assert that the present specification discloses the elements of the claimed method in great detail and would teach the skilled artisan to carry it out with a given gene without undue experimentation. The detailed description includes initiation and maintenance of maize cell cultures, DNA delivery, selection of transformed cells, plant regeneration and production of seed, and methods to confirm the presence of transgenic DNA in transformed callus, regenerated plants and progeny.

As noted by the Examiner in the March 24, 1998 Office Action, working Examples I, II and III disclose methods for producing fertile *Zea mays* plants containing DNA expressing the reporter gene β-glucuronidase or hygromycin B phosphotransferase. See Office Action, March 24, 1998, pages 5-6 (Appendix II). *Hpt* confers resistance to hygromycin B. The specification also includes an extensive disclosure of genes that can be used to produce transgene plants by the disclosed method. Given the detail of Appellants' specification, and the high level of skill of the

8

art, the art worker could readily prepare a wide variety of fertile transgenic maize plants falling within the scope of the claims.

Thus, to practice the claimed method, following bombardment, transformed cells would be identified or selected and then regenerated to produce a maize plant comprising the transgene. Moreover, fertility of the resulting transgenic plant and presence of the transgene would be confirmed in order to determine whether the transgenic plant was within the scope of the claims. However, this does not constitute "undue experimentation," particularly in an art where the level of skill is high, and time-consuming screening procedures are routine. In re Wands, 858 F.2d 731, 8 U.S.P.Q.2d 1400, 1404 (Fed. Cir. 1988)(Appendix IV).

The first-stated basis for the rejection is that the specification "does not reasonably provide enablement for the expression of known genetic elements *per se* in the absence of demonstration that the prior art clearly [teaches] that the technology necessary to express said genetic elements was known and available to those of skill in the art...." [emphasis added]. See Final Office Action, August 8, 1998, page 3, paragraph 2 (Appendix II). To begin with, this rejection is facially inapplicable to claims 23-25 and 28 which do not require expression of the DNA employed for transformation.

The thrust of the Examiner's rejection is that the specification fails to disclose which DNA constructs would be integrated and expressed once they were introduced into maize plants. This is indicated by the statement that "a specification is not considered enabled if it fails to disclose the specific starting materials or conditions for making the invention," and that success in expression "requires precise manipulations of exact starting material to [practice the claimed method]." See Final Office Action, August 8, 1998, pages 3-4 (Appendix II).

However, the Board is requested to note that of the three examples given by the Examiner as evidence of the need to alter genes to obtain expression, neither the bar gene nor the ESPS gene were truncated or codon optimized and the Bt gene need not be truncated to obtain expression.

Although the Examiner has cited University of California v. Eli Lilly and Co., 43 U.S.P.Q.2d 1398 (Fed. Cir. 1997)(Appendix IV), as supporting his contention that Appellants were not in possession of an invention which was enabled by the specification, this case was decided on the basis of the written description requirement of § 112(1), not on the basis of enablement, which was found to be present. Furthermore, the holding of University of California

9

v. Eli Lilly and Co. related to compositions of matter, not to method claims, which necessarily recite manipulative elements, and do not claim structural components. Appellants know of no case law holding that an originally filed method claim fails to meet the written description requirement due to some failure in the teachings of the specification.

In Genentech, Inc. v. Novo Nordisk, 42 U.S.P.Q.2d 1001 (Fed. Cir. 1997) (Appendix IV), the method claim asserted by Genentech was held to be nonenabled due to a total absence of information relating to a manipulative step and the starting material to which it was to be applied: "For example, no reaction conditions for the steps needed to produce hGH are provided; no description of any specific cleavable conjugate protein appears" [emphasis added]. Id. In the present situation, a working example is provided, along with a description of at least three specific vectors designed to introduce foreign DNA into maize.

The Examiner also argues that "the specification does not broadly teach what is needed to transfer, in a heritable way and express, all transgenic DNA into maize, nor does it provide specific guidance as to what genetic elements will lead to the successful transfer and expression in the claimed [method]" [emphasis added]. The first of these two assertions is contradicted by the Examiner's recognition that a patent specification need "not teach each possible embodiment." With respect to the second assertion, the Board is urged to consider that Appellants specifically disclosed almost every DNA construct that was known to express in non-maize plant cells, tissue or plants as of the filing date, by citing the fifty page Weising et al. review (C.K. Weising et al., "Foreign Genes in Plants: Transfer, Structure, Expression and Applications," Ann. Rev. Genet., 22, 421 (1988))(Appendix III). As concluded by the authors:

> To summarize, the expression of any desirable gene in plants, even if derived from another kingdom, should be possible in [the] future by creating an appropriate construct of cDNA and functional control regions. Whether or not the resulting transcripts will be translated to yield stable proteins will probably depend on the particular gene under study.

Id. at 443 (Appendix III).

To address a specific point raised by the Examiner, the desirability of truncated genes is disclosed by Weising et al. at page 459. Codon modification was known to the art by 1989. See, E. Murray et al., Nucl. Acids Res., 17, 477 (1989)(Appendix III). As the Examiner is well aware, a specification need not include, and preferably omits, that which is known to the art.

10

Appellants can rely upon prior art which contains other subsidiary information needed to render the specification enabling. Spectra-Physics, Inc. v. Coherent Inc., 3 U.S.P.Q.2d 1737 (Fed. Cir. 1987)(Appendix IV). However, by citing Weising et al. and many other prior art references, including those relied upon by the Examiner to support his obviousness rejection, Appellants adequately informed the art of DNA constructs that could be employed in the present method.

The fact that it would be necessary to carry out multiple transformation experiments and extensive screening to determine which constructs would integrate, be heritable and/or express protein as to impart a phenotypic change is not fatal to enablement. The fact that the outcome of such a transformation/screening program is unpredictable for any given vector is precisely why a screening program is carried out. The Examiner simply cannot reasonably contend that a screening program to locate transformants with target phenotypic properties would not be carried out by the art because the results cannot be predicted in advance.

In fact, the Federal Circuit has explicitly recognized that the need, and methodologies required, to carry out extensive synthesis and screening programs to locate bioactive molecules do not constitute undue experimentation. In re Wands, 8 U.S.P.Q.2d 1400, 1406-1407 (Fed. Cir. 1988)(Appendix IV), the Court stated:

> The nature of monoclonal antibody technology is that it involves screening hybridomas to determine which ones secrete antibody with desired characteristics. Practitioners of this art are prepared to screen negative hybridomas in order to find one that makes the desired antibody.

Id. at 1406 (Appendix IV).

Likewise, practitioners in the art related to the present application would be well-equipped to prepare and screen putative transformed maize cells and plants to identify target transgenic material. See also, Hybritech Inc. v. Monoclonal Antibodies Inc., 231 U.S.P.Q. 81, 84 (Fed. Cir. 1986) (evidence that screening methods used to identify characteristics [of monoclonal antibodies] were available to art convincing of enablement)(Appendix IV). Thus, the fact that a given method claim envisions production of a large number of cells or plants which required screening is not dispositive of the enablement issue, particularly in an art area in which the level of skill is very high and in which screening large numbers of cells and plants is standard practice.

Furthermore, each step in the process of producing a fertile transgenic maize plant, from initiating maize cell lines to regenerating plants from transformed maize cells, is detailed in the

11

specification, as is a large number of genes that can be used in the claimed method. Thus, the specification provides a reasonable amount of guidance with respect to the direction in which experimentation should take to enable the expression of other known genetic elements. Ex parte Jackson, 217 U.S.P.Q. 804, 807 (Bd. App. 1982) (Appendix IV).

As further reason to doubt the enablement of the claimed method, the Examiner cites the present applications' disclosure of the *dapA* gene and the failure to recite the use of a chloroplast transit peptide (CTP) *per se* or in conjunction with the *dapA* gene. The Examiner is respectfully requested to note that WO 89/11789 (Appendix III) discloses a *dapA* gene further comprising DNA encoding a chloroplast transit peptide. This PCT application was published December 14, 1989, approximately one month before the effective filing date of the present application, and so this subsidiary information was available to the art who wished to introduce this gene into corn.

It is Appellants' position that given the detailed disclosure of Appellants' specification, in combination with the disclosure of WO89/11789 and the fact that amino acid syntheses occur in the chloroplasts, the art could modify a *dapA* gene for expression in maize using a CTP without undue experimentation.

The Examiner relies on Brenner v. Manson, 148 U.S.P.Q. 689 (S. Ct. 1966)(Appendix IV) for the proposition that merely disclosing the idea that genetic elements can be placed into maize does not constitute an enabling disclosure without providing the reasonable expectation that such action would be universally successful. In Brenner, the application had been rejected for failure to "disclose any utility for the chemical compound produced by the [claimed] process." *Id.* at 690. Thus, the rationale of Brenner, which adjudicated a rejection under 35 U.S.C. § 101, does not support the 35 U.S.C. § 112(1) rejection in the present application.

A. **Declaration evidence establishes that one of skill in the art could practice the invention without undue experimentation.**

As objective evidence that the specification discloses the claimed method in reasonable detail, so as to enable the expression of other genetic elements in the claimed method, the Board is respectfully requested to consider the Rule 132 declarations of Michael Stephens, William Gordon-Kamm, T. Michael Spencer, and Janice Anthony, disclosing successful preparation of transgenic corn after the effective filing date of the present application, employing the