methodologies taught by the specification. In re Armbruster, 185 U.S.P.Q. 152 (C.C.P.A. 1975) (factual evidence acquired after filing date is appropriate to support enablement) (Appendix IV).

## 1. The Stephens Declaration.

The Rule 132 Declaration by Michael Stephens (Appendix III), a Research Director at DEKALB Genetics Corporation, evidences that a synthetic HD73 *Bt* gene can be stably introduced into maize suspension cells in accord with the methodology as taught in the '045 application, and expressed in transformed regenerated R0 and R1 *Zea mays* plants as an insecticidally effective amount of the *Bt* endotoxin. The Board is respectfully requested to note that the present application discloses methods for the bombardment, identification, and regeneration of maize plants from maize cells using techniques identical to those disclosed in the '045 application. Thus, the Stephens Declaration establishes that a synthetic *Bt* gene can be stably introduced into cultured maize cells to yield fertile transgenic maize in accord with the methodology as taught in the present application. The use of a *Bt* gene is disclosed in the present application at page 11, lines 15-16.

Additionally, the paper "Field Performance of Elite Transgenic Maize Plants Expressing an Insecticidal Protein Derived from *Bacillus thuringiensis*," coauthored by M.G. Koziel et al., Bio/Technology, 11, 194 (1993)(Appendix III), was incorporated by reference into the Spencer Declaration. The authors of this paper demonstrated stable introduction into maize immature embryos of both a synthetic HD1 Bt gene encoding a truncated *Bt* endotoxin and a 35S/*bar* gene by microprojectile bombardment. The R0 and R1 maize plants exhibited resistance to phosphinothricin and to infestation to European corn borer larvae under field conditions (see page 195, Col. 2; Table 1, and page 198, Col. 1). Thus, this article provides further evidence of the generality of the claimed method.

## 2. The Gordon-Kamm Declaration.

The Rule 132 Declaration of Dr. William J. Gordon-Kamm (Appendix III), an expert in the transformation of maize and a co-author of the paper "Transformation of Maize Cells and Regeneration of Fertile Transgenic Plants," The Plant Cell, 2, 603 (July 1990)(Appendix III), establishes that the bombardment method disclosed in U.S. Patent Application Serial No. 07/974,379, filed November 10, 1992, now U.S. Patent No. 5,538,877 (Appendix III), was

13

effective to transform cultured maize cells with the bacterial gene *bar*, which encodes the enzyme phosphinothricin acetyltransferase (PPT or PAT). Fertile transgenic R0 maize plants were recovered which, in turn, yielded R1 maize plants that were resistant to the herbicide bialaphos. Furthermore, the *bar* gene also was used for selection of transformed maize cells. Finally, Dr. Gordon-Kamm presents his opinion that the present method will be effective to produce transgenic maize plants which express other transgenes known to impart herbicide resistance, such as genes encoding mutant ESPS synthases, the nitrilase gene, mutant ALS, genes expressing methotrexate-resistant DHFR and the like. It should be noted that the present application discloses methods for the bombardment, identification, and regeneration of maize plants from maize cells using techniques identical to those disclosed in the '379 application, now U.S. Pat. No. 5,538,877. Thus, the Gordon-Kamm Declaration establishes that the *bar* gene can be stably introduced into cultured maize cells to yield fertile transgenic maize in accord with the methodology as taught in the present application.

### 3. The Spencer Declaration.

The Rule 132 Declaration of T. Michael Spencer (Appendix III), a Project Leader with DEKALB Genetics Corporation, establishes that transgenic R0, R1 and R2 maize plants, produced in accord with the teachings of the present application, express an introduced gene encoding forms of ESPS synthase which impart glyphosate resistance to R2 generation maize plants. The *aroA* gene, which encodes an EPSP synthase, is disclosed in the specification at page 11, lines 16-17. The Examiner is requested to note that the transformation methods disclosed in the '045 application are identical to those disclosed in the present application.

### 4. The Anthony Declaration.

The Rule 132 Declaration by Janice L. Anthony (Appendix III), a former Project Leader with DEKALB Genetics Corporation, evidences that the bombardment method disclosed in the '488 application can be used to stably introduce a 10-kD zein seed storage protein gene operably linked to any one of three different promoters into maize callus, maize suspension cells, and immature maize embryos. The declaration establishes that fertile transgenic *Zea mays* and progeny were obtained from the maize cells and tissue transformed with the gene encoding the seed storage protein. Seeds, obtained from R1 and R2 progeny of the transgenic R0 *Zea mays*

14

plants containing introduced genes encoding seed storage proteins, contained significantly increased levels of the seed storage protein and methionine. It should be noted that the transformation methods disclosed in the '488 application are identical to those disclosed in the present application. Thus, the Anthony Declaration establishes that a 10-kD zein storage protein can be introduced into maize callus, maize suspension cells and immature maize embryos to yield fertile transgenic maize plants in accord with the methodology as taught in the present application.

The Examiner has also taken the position that the specification does not describe use of DNA constructs invented after the filing date of the application. The declaratory evidence is not submitted solely to evidence that prior art DNA constructs could be introduced and expressed in maize, but rather to evidence that the methodologies disclosed in the specification would enable transformation with a wide variety of DNA constructs, which would be expressed in fertile plants to yield a variety of useful phenotypes. Any chemical process claim can only be evaluated in terms of its ability to function with the starting materials available as of the effective filing date of the claim. It is simply a Catch 22 for the Examiner to argue that a process claim is overly broad because additional starting materials were synthesized and found to work that were not contemplated by the art as of the filing date. This is why examiners are directed not to use post-filing date references to demonstrate that an application is nonenabling. In re Gunn, 190 U.S.P.Q. 202 (C.C.P.A. 1976); In re Hogan, 194 U.S.P.Q. 527 (C.C.P.A. 1977); M.P.E.P. §2164.05(a). Conversely, a claim can encompass embodiments of the invention that are invented after the effective filing date of the claim, even if those embodiments may themselves be patentable. See Atlas Powder Co. v. E. I. DuPont DeNemours & Co., 224 U.S.P.Q. 409 (Fed. Cir. 1985). Under the Examiner's reasoning, method claims enabled as of their filing date would become nonenabled as the art progressed, not a result contemplated by the patent statutes.

Thus, the Declarations provide evidence that a person of ordinary skill in the art could, using the present application as a guide and the knowledge generally available to the skilled person, practice the claimed method commensurate in scope with the claims.

## III.    The Examiner has Failed to Establish a *Prima Facie* Case of Obviousness.

Claims 23-25, 28-29, 41-45, 48-52 and 55-59 have been rejected by the Examiner under 35 U.S.C. § 103(a), as being obvious over Sanford (Physiol. Plant., 79, 206-209 (1990)) in view

15

of Klein et al. (Bio/Technol., 6, 559-563 (1988)), Armstrong et al. (Planta, 164, 207-214 (1985)), Adang et al. (U.S. Patent No. 5,380,831), De Block et al. (EMBO J., 6, 2513-2518 (1987)) and Poehlman (In: Breeding Field Crops, 3rd Edition, AVI Publishing Co., Inc., Westport, CT, p. 203-206 (1986))(Appendix III).

Additionally, claims 68-74 were rejected under 35 U.S.C. § 103(a) as being unpatentable over Sanford (Physiol. Plant., 79, 206-209 (1990)) in view of Klein et al. (Bio/Technol., 6, 559-563 (1988)) and Armstrong et al. (Planta, 164, 207-214 (1985)), Adang et al. (U.S. Patent No. 5,380,831), De Block et al. (EMBO J., 6, 2513-2518 (1987)) and Poehlman (In: Breeding Field Crops, 3rd Edition, AVI Publishing Co., Inc., Westport, CT, p. 203-206 (1986)) as applied to claims 23-29, 41-45, 48-52 and 55-59 above and further in view of Murry et al. (U.S. Patent 5,371,003) and Fillatti et al. (U.S. Patent 5,565,347)(Appendix III).

The Examiner has not established a *prima facie* case of obviousness. To establish a *prima facie* case of obviousness, three basic criteria must be met. First, there must be some suggestion or motivation, either in the cited references themselves or in the knowledge generally available to an art worker, to modify the reference or to combine reference teachings so as to arrive at the claimed invention. Second, the art must provide a reasonable expectation of success. Finally, the prior art references must teach or suggest all the claim limitations. (M.P.E.P. § 2143)(Appendix IV). To be considered for the purposes of obviousness, a reference must either be fully enabling in and of itself, or be enabling when combined with a secondary reference whose teachings will remedy the inadequacies of the first reference. Symbol Technologies, Inc. v. Opticon, Inc., 935 F.2d 1569, 19 U.S.P.Q.2d 1241, 1248 (Fed. Cir. 1991)(Appendix IV).

Thus, in order to find the present claims obvious, the prior art must provide a reproducible method of preparing a fertile, transgenic corn plant. The art must be motivated by a reasonable expectation of success to prepare a corn plant by (1) bombarding intact, regenerable maize cells with DNA-coated microparticles comprising a selectable marker or reporter gene, such as one imparting resistance to the biocides, hygromycin or phosphinothricin, (2) selecting a population of transformed cells which comprise the DNA, and (3) regenerating a fertile transgenic *Zea mays* plant from the selected cells, wherein the DNA is heritable to yield transgenic progeny plants (claims 23, 41, 48, and 55). The art must also provide a method of preparing a transgenic *Zea mays* plant wherein the DNA is expressed so that the transgenic

16

progeny plant exhibits one or more phenotypic characteristics that render it identifiable over the corresponding untransformed *Z. mays* plant (claims 41, 48, and 55). The DNA can be "expressed" so that the transgenic plant is resistant to an amount of an agent, such as a herbicide, which would be toxic to a *Zea mays* plant which does not comprise the DNA (claims 49, 56), or to insect attack (claims 50, 51, 57, and 58).

### A.    The primary reference.

The Examiner cited Sanford (Physiologia Plantarum, 79, 206-209 (1990)) (Appendix IV) as teaching the method of microprojectile bombardment to deliver DNA to plant cells. See Office Action, March 24, 1998 (Appendix II). However, the Sanford publication is a review article, which was published in June, 1990, and which simply reflects the art prior to the effective filing date of this application and prior to the first report of the successful production of fertile transgenic maize by Gordon-Kamm et al. in July, 1990 (Gordon-Kamm et al, The Plant Cell, 2, 603-618 (July, 1990))(Appendix IV).

Notably, the Sanford review does not disclose transgenic corn plants prepared by bombardment. At page 207, col. 1, Sanford states that "with further development of the [bombardment] technology, any tissue of any plant species might be transformable by the biolistic process" (emphasis added). Sanford does not provide any specific techniques relating to tissue for segmentation, transformation, or selection. The Sanford review is no more than an invitation to conduct further experiments, and does not amount to a disclosure that corn cells can be transformed, selected, and subsequently regenerated to yield fertile transgenic plants.

Additionally, the Examiner asserted that Sanford cites Wang et al. (Plant Mol. Biol., 11, 433-439 (1988)) (Appendix III) as disclosing transformation of corn by microprojectile bombardment. See Office Action, March 24, 1998 (Appendix II). The Wang et al. reference discloses the transient transformation of cultured cells of rice, wheat and soybean by bombardment. The Board is respectfully requested to note that Wang et al. do not teach the stable transformation of corn.

### B.    The secondary references.

The Examiner states on page 7 of the March 24, 1998 Office Action that Klein et al. (Bio/Technol., 6, 559-563 (1988))(Appendix III), disclose on page 562, col. 2, that the "stable

17

0002765

transformation of maize callus via the disclosed technique is evident." See Office Action, March 24, 1998 (Appendix II). The Examiner concludes that Klein et al. "clearly teach the application of the method of bombarding maize scutellum and/or suspension cells to transform them." However, is it Appellants' position that the Examiner has read Klein et al. to "teach" much more than the art worker could possibly derive from this limited and specific disclosure.

To begin with, Klein et al. do not disclose or confirm that the cultured BMS maize cells or the scutellum that were bombarded were found to be stably transformed with the exogenous DNA. Klein et al. repeatedly refer to transient expression of the gene in both the cultured cells and scutellum (see, for instance, Figure 2 and Figure 3), and conclude that "[bombardment] may be useful for the stable transformation of monocot species" (emphasis added). In all cases, Klein et al. assayed for transgene expression at 48 hours after bombardment. Therefore, it is highly unlikely that Klein et al. assayed stable transgene expression.

Moreover, Klein et al. do not disclose what type of tissue was used to produce the "cultures of maize" that were "stably transformed" in the "manuscript in preparation" much less that these cultures could even potentially be regenerated into fertile plants. The fact that both the cited Klein et al. paper and the later Klein et al. Plant Physiol. paper (91, 440 (1989))(Appendix III) use BMS cultures as starting materials is evidence that Klein et al. in fact transformed a tissue that could not be regenerated into plants. The Board is respectfully requested to note that BMS had been transformed by other methodologies as early as 1986. M.E. Fromm et al. Nature, 319, 791 (1986)(Appendix III).

Furthermore, the mention of "tissue" that will be a prime target for future attempts at transformation is clearly intended as a reference to scutellum, not to callus. However, as noted above, there is nothing to suggest that Klein et al. believed that they had achieved stable transformation of scutellum. Indeed, in 1989, when Klein et al. published that they had achieved stable transformation of corn cells, it was BMS cells, not scutellum, that had been transformed. Clearly in 1988, Klein et al. did not believe that they taught the production of stably transformed maize tissue.

In fact, there is nothing in the Klein et al. paper that would "teach" the art worker how to prepare stably transformed maize cells, or how to regenerate the cells to yield a fertile maize plant that can sexually transmit the introduced DNA to subsequent generations. The Klein et al. paper is no more than an invitation to conduct further undefined experiments, and does not

18

provide a reasonable expectation that the use of Appellants' method, either considered alone, or in combination with any of the cited art, would lead to success.

Armstrong et al. (Planta, 164, 207-214 (1985)) was cited by the Examiner as disclosing the regeneration of maize from friable embryogenic callus of both Type I and Type II tissue cultures of inbred and hybrid cultures. See Office Action, March 24, 1998 (Appendix II). However, Armstrong et al. do not suggest that such cultures would remain viable after bombardment and selection, or that the cultures would retain the ability to regenerate fertile maize plants containing the foreign DNA that would sexually transmit the foreign DNA to progeny plants. Thus, Armstrong et al. do not suggest Appellants' method, either alone or in combination with any of the cited art.

The Examiner cited Adang et al. as teaching the modification and use of *Bt* endotoxin genes to produce plants that are insect resistant. See Office Action,, March 24, 1998 (Appendix II). Adang et al. disclose methods to transform plants that consist of direct DNA uptake, electroporation, microinjection, and T-DNA mediated transformation. Adang et al. suggest that both dicots and monocots can be transformed.

However, there is no suggestion in Adang et al. that maize cells can be transformed by microprojectile bombardment, or that fertile transgenic maize capable of transmitting the foreign DNA to progeny plants can be regenerated from bombarded cells. Thus, Adang et al., alone or in combination with the other cited art, fails to suggest the claimed method.

De Block et al. disclose the introduction of the *bar* gene into the dicots tobacco, tomato and potato by *Agrobacterium*-mediated transformation. There is no suggestion in De Block et al. to transform maize by microprojectile bombardment, or to regenerate fertile transgenic maize plants capable of transmitting the foreign DNA to progeny plants. In fact, De Block does not suggest any utility for *bar*-modified corn, i.e., that corn is even susceptible to phosphinothricin. Thus, De Block et al., alone or in combination with the other cited art fails to yield the claimed method.

Poehlman was cited by the Examiner as disclosing that backcross breeding can be used to add a gene encoding a superior characteristic to a different variety. See Office action, March 24, 1998 (Appendix II). Appellants certainly do not claim to have invented these techniques. However, the availability of such techniques does not remedy the deficiencies in the teachings of the art. There is no suggestion in Poehlman that fertile transgenic maize will be capable of

19

0002767

transmitting the foreign DNA to progeny plants when manipulated by standard corn breeding methods. In fact, until a transgene was successfully moved into inbred and hybrid lines, it was not predictable that these "conventional methods" would accomplish these results.

Although the Examiner has argued that Appellants have not considered the references in combination, the Examiner has not presented reasons that the art worker would logically combine them. For example, the use of the constructs taught by Adang et al. or De Block et al. with transformation methods such as *A. tumefaciens*-mediated transformation in the bombardment techniques taught by Klein et al., would not yield transformed, regenerable cells.

Taken together, Sanford, Klein et al., Armstrong et al., Adang et al., De Block et al., and Poehlman et al. as applied to claims 23-25, 29, 41-45, 48-52 and 55-59 do not teach or suggest the claimed method. Consequently, a *prima facie* case of obviousness has not been established.

C.    **Murry et al. and Fillatti et al., in combination with the other references, do not render the present invention obvious.**

Murry et al. claim a method for transforming non-protoplastic plant tissue and cells which involves the horizontal electrophoresis of DNA into plant tissue and cells. Murry et al. also claim a method for producing transformed fertile plants, including dicots, monocots, and corn, using this method of transformation. See Murry et al., U.S. Patent No. 5,371,003 (Appendix III).

Murry et al. do not disclose a transformation process based on microprojectile bombardment, as recited by all of the independent claims, e.g., claim 23. Thus, Murry et al. is not relevant to the patentability of the present process claims, except insofar as it teaches antibiotic resistance markers, which Appellants do not claim to have invented.

Fillatti et al. disclose the method of transforming "plants employed for commercial purposes and subject to cultivation and management . . . . including vegetables" by co-cultivating cotyledon tissue with *Agrobacterium*, not by microprojectile bombardment (col. 3, lines 2-3). See Fillatti et al, U.S.. Patent No. 5,565,347 (Appendix III). Transformed cells are selected on in media containing kanamycin. The Examiner asserts Fillatti et al. disclose a method to obtain transgenic plants in which the selection of transgenic cells and plants based on the detection of expressed transgenic antibiotic resistance markers. See Office Action, March 24, 1998(Appendix II). However, while Fillatti et al. suggest the disclosed method will transform

20

plants employed for commercial purposes, the specification provides examples of and claims directed to transforming only tomato cells.

There is no suggestion in Murry et al. or Fillatti et al. that maize cells can or should be transformed by microprojectile bombardment. Moreover, neither Murry et al. or Fillatti et al. suggest that fertile transgenic maize capable of transmitting the foreign DNA to progeny plants can be regenerated from bombarded cells. Thus, Murry et al. and Fillatti et al., either alone or in combination fail to yield the claimed method.

### D.    Strong Secondary evidence supports the nonobviousness of the present invention.

Evidence of secondary considerations may often be the most probative evidence of nonobviousness. Such evidence may establish that an invention appearing to have been obvious in light of the prior art was not. Stratoflex Inc. v. Aeroquip Corporation, 713 F.2d 1530, 218 U.S.P.Q. 871 (Fed. Cir. 1983) (Appendix IV). Such considerations include long-felt need for the invention, failure of others to produce the invention, and acceptance of the invention by the art. The Board is respectfully requested to consider the following secondary evidence of nonobviousness.

### 1.    The Phillips Declaration.

Even assuming, *arguendo*, that the cited art renders it *prima facie* obvious to proceed along the lines arguably suggested by Sanford and Klein et al., viz., to bombard maize Type II callus with DNA, it is respectfully submitted that it would still be unexpected that fertile transgenic maize plants would be obtained by this route.

In *In re Wood*, 202 U.S.P.Q. 171, 174 (C.C.P.A. 1979)(Appendix IV), the court emphasized that "[o]f course, an evaluation of the claimed invention performed by an impartial, qualified third party is a valuable indication of the nonobviousness of an invention." As evidence of the reasonable expectations of the art with respect to these teachings, the Board is requested to consider paragraph 14 of the Rule 132 declaration executed by Professor Ronald J. Phillips on July 20, 1992, in commonly-assigned application Serial No. 07/508,045, filed April 11, 1990 (Appendix III). The Phillips declaration is based on facts derived from his extensive experience

21

with the *in vitro* cell/tissue culture of maize, and that the declaration is sufficient to rebut any *prima facie* case of obviousness established by the cited art.

In his declaration, Professor Phillips contrasts the regenerability of friable Type II embryogenic maize callus, to characteristics that would render its transformation unpredictable, namely its fragility and the uncertainty with respect to its ability to stably integrate foreign DNA or to regenerate plants. Paragraph 14, which summarizes his conclusions, is reproduced below:

> 14.    It might well be obvious for a researcher in this area to try to transform a maize tissue, cultured cells or protoplasts that had a history of "regenerability" in the untransformed state. However, the "state of the art" in mid-1989 to early 1990 would not permit one of ordinary skill in the art to reasonably predict that the three pieces of the puzzle of maize transformation, namely stable transformation accompanied by subsequent cell division, regenerability, and fertility/transmission, would come together via any available methodology employing any available maize starting material, including scutellum, much less that the biolistic transformation of friable embryonic Type II callus would be the path to success.

Rule 132 Declaration of Ronald Phillips (Appendix III).

The Board is requested to note that there are no experiments disclosed in the cited art relating to obtaining stably transformed dividing cells from any transformed maize tissue source, following the use of microprojectile bombardment to introduce the foreign DNA, and then regenerating fertile plants from the transformed cells . Therefore, the Phillips declaration is particularly effective evidence of nonobviousness, in view of the remoteness of the cited art from the claimed invention.

Appellants respectfully submit that a *prima facie* case of obviousness has not been established. As discussed *supra*, neither Sanford, Klein et al., Armstrong et al., Adang et al., De Block et al., or Poehlman teach or suggest the method of claims 23-29, 41-45, 48-52, and 55-59. Furthermore, Murry et al. and Fillatti et al. do not cure the deficiencies of Sanford, Klein et al., Armstrong et al., Adang et al., De Block et al., or Poehlman. Thus, the claimed method as recited in claims 68-74 is not clearly *prima facie* obvious in view of Sanford, Klein et al., Armstrong et al., Adang et al., De Block et al., or Poehlman further in view of Murry et al. and Fillatti et al.

22

2.    The Pierce Declaration.

During the prosecution of Tomes et al. (U.S. Patent No. 5,886,244) (Appendix III), a patent which includes both Klein and Sanford as co-inventors, the representatives of Tomes et al. presented extensive factual evidence to rebut the assertion that the Klein et al. Paper ("S") anticipated or rendered the claimed method obvious. This factual evidence included two declarations by Dr. Dorothy Pierce (Appendix III), an expert in corn transformation.

As further evidence that the art would not reasonably expect success on the basis of Klein et al., the Board is urged to consider paras. 9-12 of the second Pierce declaration, which was found by the Examiner to be persuasive of the unobviousness of the Tomes et al. methods.

9. As for the prior art, it is my professional opinion that Klein et al. (S) does not anticipate the claims of the invention because this reference only shows transient assay data in BMS and immature embryos. Their transient data merely show that the DNA has been delivered to maize cells and that the cells are capable of expressing that DNA transiently. Transient expression only suggests that it may be possible to recover stable transformants, but recovery of stable transformants is certainly not guaranteed, predicted or made obvious by the transient expression. In my professional experience, I am aware of many cases in plant research where experiments showing transient expression failed to produce any stable transformants, and, even in cases where stable transformation does occur, this happens in only a very small proportion of the cells which show transient expression. Moreover, since BMS is non-regenerable, their BMS data are of questionable relevance to the regeneration of fertile, transgenic maize plants. Although immature embryos are a more relevant system, since they can regenerate, the embryo data of Klein et al. (S) are of limited relevance since they only show transient expression. They also do not describe the regeneration of transgenic plants from the bombarded embryos. Moreover, their data do not show that the same cells which are capable of expressing GUS can also give rise to regenerated plants. In light of the fact that embryos are a complex array of multiple cell types, with different developmental origins and fates, the data shown provide no clue as to the ultimate fate or capability of the bombarded expressing cells. The two types of cells could be different. In my professional opinion, it cannot be predicted or assumed that simply because some small cells express GUS in an embryo that this will lead to transgenic plants being produced. In order to prove this, expression would need to be demonstrated at later stages of plant recovery to show that transgenic plants did in fact arise from those bombarded embryos.

10. Additionally, the size of the target cell and initial survival of that cell after bombardment are not the only factors in determining the success with which the bombardment process will proceed. It is true that cells with embryogenic and regeneration potential tend to be smaller, but it is also important to consider the

23

ability to survive for longer periods of time, to divide and ultimately to regenerate after bombardment. In my professional opinion, in fact, the damage seen after bombardment could argue against long term survival of the bombarded cells and ability of those cells to divide, differentiate, and regenerate. The transient expression clearly demonstrates short-term survival of those expressing cells, but it is also known that in many cases cells which express DNA transiently fail to survive beyond that transient period.

11. Also, the ability to see GUS spots on the scutellum of the embryo does not mean that transgenic plants can necessarily be produced. The origin of callus from the embryo is dependent on the genotype used. In some genotypes callus does arise from the scutellar surface, but in other genotypes it arises from the interior of the embryo, so in my professional opinion these results are not necessarily predictive of success in regenerating fertile transgenic plants from transiently expressing cells on the surface of the embryo.

12. With respect to the citation of the Klein et al. (S) reference as the primary reference in the obviousness rejection set forth beginning at page 8 of the Office Action, for the reasons stated above, I maintain that Klein et al (S) does not predict or make obvious the production of stable transformants, particularly regenerated, fertile, transgenic maize plants.

Second Declaration of Dorothy Pierce, dated January 23, 1996 (Appendix III).

As summarized by C. L. Armstrong, cited *supra*:

By early 1988, DNA precipitation and particle delivery parameters optimized using BMS cells were being used to demonstrate reasonably efficient delivery and expression of the *B*-glucuronidase gene into scutellar cells of immature A188 embryos (50 or more GUS+ spots on some embryos: Klein et al. [cited Bio/Technology paper]. Despite the fact that A188 is a line well-known for excellent tissue culture response from immature embryos [citations omitted], and that a stable biolistic transformation procedure for tobacco was successfully developed in this same time period by [Klein et al.], these early efforts with immature maize embryos were unsuccessful for stable transformation.

C.L. Armstrong, Maydica, 44:101-109 (1999)(Appendix III).

Thus, the Klein et al. (or Sanford reference) do not render it obvious that stable transformation of any maize tissue could be accomplished by biolistics. It is also not obvious that stably transformed, normally regenerable maize cells would retain their functionality, or even that they would survive bombardment.

24

3.    Additional Secondary Evidence.

A Rule 132 Declaration executed by Professor David Somers (Appendix III), an expert in the area of plant physiology, including corn tissue and cell culture, presents articles and reviews published in early to mid-1990 that clearly evidence the long-felt but unresolved need, the failure of others to produce a fertile transgenic corn plant, skepticism relating to the route used by Appellants, and recognition by the art of the significance of Appellants' success. In particular, Dr. Somers points to an article in the journal Science, published shortly after the announcement that fertile, transgenic corn had been achieved, that begins by noting that the achievement of fertile, transgenic corn is "the capstone of almost a decade's efforts to genetically engineer this country's most important crop," and then continues by noting the "years of frustration and a renewed effort to genetically engineer corn begun by Carol Rhodes and her colleagues." The article notes that while Dr. Rhodes and her group were successful in regenerating transformed corn, their "celebrations were short-lived: the resulting plants were infertile." Citing a 1981 Scientific American review as evidence of the long-felt need for methods to transform cereals, Dr. Somers concluded that as of early 1990, one of ordinary skill in the art would be aware of at least a decade of failures in achieving fertile, transgenic corn plants.

The Board is also requested to consider the following documents, in the form of various scientific articles evidencing the long felt but unresolved need for the invention and the failure of others to achieve the invention, scientific accolades of peers in the research community for the ultimate achievement of the present invention, and evidence of rapid adoption of the invention by the art, as further secondary evidence of nonobviousness.

Rhodes et al. (Science, 240, 204 (1988)) (Appendix III), referred to in the Science article discussed above, is particularly relevant. The Rhodes evidences that while various genes could readily be introduced into corn protoplasts via electroporation, of 38 transformed plants derived from 10 different transformants, none were found to be fertile. Id., p. 206, col. 3 (Appendix III). The Rhodes article evidences the failure of others to achieve fertile, transgenic corn, and demonstrates that the technical breakthrough of the present invention is not the mere introduction of DNA into the corn genome, but the ability to do so in a manner that achieves fertile, transgenic plants and transgenic offspring plants. It will be recalled that Rhodes et al. were

25

0002773

routinely successful using an electric field to introduce individual genes into corn cells, but all of the plants that were prepared were infertile.

In the November 1990 issue of Bioworld (Appendix III), in an article by Robbins-Roth et al. entitled "They Make it Happen in Biotech," Dr. Catherine Mackey, head of the DeKalb transformation research team, was picked as one of four scientists shaping the biotech industry's growth. Robbins-Roth et al., Bioworld, p. 36 (Nov/Dec 1990) (Appendix III). The article refers to the achievement of genetically-engineered corn as "one of the Holy Grails" of agricultural biotechnology. The article then states that monocots such as corn "have been the toughest nuts to crack" in agricultural biotechnology. Id.

Similarly, Agricultural Genetics Report (Appendix III) characterized the race for corn transformation as biotechnology's "run for the roses" and "Holy Grail":

> The Bottom Line: Well, more heard from in agricultural biotechnology's run for the roses -- corn transformation. As we have observed earlier in this space, stable transformation of maize has always been the Holy Grail of agricultural biotechnology.

Agricultural Genetics Report, March/April 1990, p. 2 (Appendix III).

In October 1990, the ARI Newsletter (Appendix III) observed that while Sandoz Crop Protection had allegedly produced transgenic corn, the plants were infertile. Additionally, the October 1990 issue of Genetic Technology News (Appendix III) included a special section detailing the "breakthrough" represented by genetically engineered corn. The article states that "now we know for sure that it is possible to genetically engineer corn." Further, an article from AG Biotechnology News characterizes the development of this technology as "revolutionary." Freiberg, B., AG Biotechnology News, p. 26 (1990) (Appendix III).

The achievement of genetically engineered corn did not go unnoticed in the lay press either. Investor's Daily characterized this achievement as "an advance that other scientists hailed yesterday as a breakthrough" (Appendix III). The Rockford Register Star characterized this achievement as "the launching point for a genetic engineering revolution." Steimel, D., Rockford Register Star, col. 1, (August 6, 1990) (Appendix III). The Chicago Tribune quoted the Assistant director of the Washington University Center for Plant Science as the achievement being a "tremendous breakthrough." Gunset, G., Chicago Tribune (April 19, 1990)

(Appendix III). Moreover, the Wall Street Journal recognized the great achievement represented by the achievement of fertile, transgenic corn:

> While scientists have been able to get new genes into monocot plants, the plants previously have ended up sterile and unable to pass the new genes on in their seed. (emphasis supplied)

Bishop, J. E., The Wall Street Journal, B1 (April 1990) (Appendix III).

Further evidence of the unobviousness of the claimed invention is provided by the rapid acceptance by the art of the methodologies disclosed in the present application. Following the publication of the results achieved by the DEKALB research groups in July of 1990, research groups employing the transformation of callus by microprojectile bombardment accomplished the transformation of wheat, oats, barley, and sorghum. See Vasil et al., U.S. Patent No. 5,405,765 (issued April 11, 1995); Y. Wan and P. G. Lemaux, Plant Physiol., 104, 37 (1994); D.A. Somers et al., Bio/Technology, 10, 1589 (1992); A.M. Casas et al., PNAS USA, 90, 11212 (1993) (Appendix III).

Appellants respectfully request that the Board weigh the evidence of secondary considerations in combination with the other factual evidence of nonobviousness presented herein by Appellants and to resolve the obviousness question in favor of this important and wide-reaching technological advance.

## 9. SUMMARY

Therefore, the Board is respectfully urged to reverse all the rejections and to pass the appealed claims to issue.

Respectfully submitted,

RONALD C. LUNDQUIST et al.

By their Representatives,

SCHWEGMAN, LUNDBERG, WOESSNER & KLUTH, P.A.
P.O. Box 2938
Minneapolis, MN  55402
(612) 373-6903

Date _21 Sept 1999_  By _(signature)_

Warren D. Woessner, Ph.D.
Reg. No. 30,440

WDW:pjj

I hereby certify that this correspondence is being deposited with the United States Postal Service as first class mail in an envelope addressed to Assistant Commissioner of Patents, Washington, D.C. 20231 on September _11_, 1999

_JANA OHMAR_
Name

_(signature) Jana C. Ottr_
Signature

28

0002776

## APPENDIX I

The Claims on Appeal

Claim 23.    A method for producing a fertile transgenic *Zea mays* plant comprising the steps of:

(I)    bombarding intact regenerable *Zea mays* cells with DNA-coated microprojectiles;

(ii)    identifying or selecting a population of transformed cells; and

(iii)    regenerating a fertile transgenic plant comprising said DNA therefrom, wherein said DNA is transmitted through a complete sexual cycle of said transgenic plant to progeny plants.

Claim 24.    The method of claim 23 wherein said DNA construct further comprises a selectable marker gene or a reporter gene.

Claim 25.    The method of claim 23 wherein the cells are derived from immature embryos.

Claim 29.    The method of claim 28 wherein said DNA construct further comprises a selectable marker gene or a reporter gene.

Claim 41.    A method of producing a fertile transgenic *Zea mays* plant, comprising:

(a)    cultivating a fertile transgenic *Zea mays* plant produced by a process comprising (I) bombarding intact regenerable *Zea mays* cells with DNA-coated microprojectiles, (ii) identifying or selecting a population of transformed cells; and (iii) regenerating a fertile transgenic plant therefrom, wherein said DNA is heritable to yield a transgenic progeny plant;

(b)    obtaining said transgenic progeny *Zea mays* plant, the genome of which has been altered by said DNA, wherein said DNA is expressed so that the transgenic progeny plant exhibits one or more phenotypic characteristics that render it identifiable over the corresponding untransformed *Zea mays*

29

plant which does not comprise said DNA construct, and wherein the DNA is transmitted through a complete sexual cycle of the transgenic progeny *Zea mays* plant to progeny plants.

Claim 45.    The method of claim 41 wherein said DNA construct further comprises a selectable marker gene or a reporter gene.

Claim 48.    A method of producing a fertile transgenic inbred *Zea mays* plant, comprising:

(a)    cultivating a fertile transgenic *Zea mays* plant produced by a process comprising (I) bombarding intact regenerable *Zea mays* cells with DNA-coated microprojectiles; (ii) identifying or selecting a population of transformed cells; and (iii) regenerating a fertile transgenic plant therefrom, wherein said DNA is heritable to yield transgenic progeny plants;

(b)    crossing a member of a nontransgenic inbred *Zea mays* line to said transgenic progeny plant;

(c)    recovering a fertile transgenic progeny plant that comprises said DNA; and

(d)    repeating steps (b) and (c) to yield a fertile transgenic inbred *Zea mays* progeny, the genome of which has been altered by said DNA, wherein said DNA is expressed so that the transgenic inbred plant exhibits one or more phenotypic characteristics that render it identifiable over the corresponding untransformed *Zea mays* plant which does not comprise said DNA, and wherein the DNA is transmitted through a complete sexual cycle of the transgenic inbred *Zea mays* plant to progeny plants.

Claim 49.    The method of claim 48 wherein said phenotypic characteristic is herbicide resistance.

Claim 50.    The method of claim 48 wherein said phenotypic characteristic is insect resistance.

30

0002778

Claim 51.    The method of claim 50 wherein said DNA construct encodes a *Bacillus thuringiensis* endotoxin.

Claim 52.    The method of claims 50 or 51 wherein said DNA construct further comprises a selectable marker gene or a reporter gene.

Claim 55.    A method of producing a fertile transgenic hybrid *Zea mays* plant, comprising:

(a)    cultivating a fertile transgenic *Zea mays* plant produced by a process comprising (I) bombarding intact regenerable *Zea mays* cells with DNA-coated microprojectiles; (ii) identifying or selecting a population of transformed cells; and (iii) regenerating a fertile transgenic plant therefrom, wherein said DNA is transmitted through a complete sexual cycle of said transgenic plant to transgenic progeny plants;

(b)    crossing a non-transgenic inbred *Zea mays* line with said transgenic *Zea Mays* plant, and

(c)    recovering said fertile transgenic hybrid *Zea mays* plant, the genome of which has been altered by the introduction of said DNA, wherein said DNA is expressed so that the transgenic hybrid plant exhibits one or more phenotypic characteristics that render it identifiable over the corresponding untransformed *Zea mays* plant which does not comprise said DNA, and wherein the DNA is transmitted through a complete sexual cycle of the transgenic inbred *Zea mays* plant to progeny plants.

Claim 56.    The method of claim 55 wherein said phenotypic characteristic is herbicide resistance.

Claim 57.    The method of claim 55 wherein said phenotypic characteristic is insect resistance.

Claim 58.    The method of claim 57 wherein said DNA construct encodes a *Bacillus thuringiensis* endotoxin.

31

Claim 59.    The method of claims 57 or 58 wherein said DNA construct further comprises a selectable marker gene or a reporter gene.

Claim 68.    The process of claim 29, 38, 45, 52 or 59 wherein the selectable marker gene encodes antibiotic resistance.

Claim 69.    The process of claim 68 wherein the gene encodes resistance to bleomycin.

Claim 70.    The process of claim 68 wherein the gene encodes resistance to hygromycin.

Claim 71.    The process of claim 68 wherein the gene is the *hpt* gene.

Claim 72.    The process of claim 68 wherein the gene encodes resistance to neomycin, kanamycin or G418.

Claim 73.    The process of claim 72 wherein the gene is the *nptII* gene.

Claim 74.    The process of claim 72 wherein the gene is the *nptI* gene.

32

0002780

## APPENDIX II

Office Actions and Amendments

1.    Office Action, mailed March 24, 1998.
2.    Final Office Action, mailed August 28, 1998.
3.    Amendment and Response, mailed November 19, 1998.
4.    Advisory Action, mailed January 22, 1999
5.    Amendment and Response, mailed March 18, 1999.
6.    Advisory Action, faxed August 19, 1999.
7.    Notice of Appeal, mailed February 17, 1999.

33

0002781

## APPENDIX III

Art of Record and Other References

### I.     Art of Record

Adang et al., U.S. Patent No. 5,380,831 (issued January 10, 1995).

Adang, M. J. et al., Gene, 36, 289 (1985).

Anthony, J.L., Rule 132 Declaration.

Armstrong et al., Planta, 164, 207(1985).

Armstrong, C.L., Maydica, 44:101 (1999).

Bishop, J. E., "Two Teams Plane Genes into Corn," The Wall Street Journal, B1 (April 1990).

Casas, A.M. et al., PNAS USA, 90, 11212 (1993).

Cocking, F. et al., Science, 236, 1259 (1987).

DeBlock et al., EMBO J., 6, 2513 (1987).

Fillatti et al., U.S. Patent No. 5,565,347 (issued ).

Freiberg, B., "More Researchers Discover Corn Transformation Technology," AG Biotechnology News, p. 26 (1990).

Fromm et al., Nature, 319, 791 (1986).

Gordon-Kamm, W. J. et al., The Plant Cell, 2, 603 (1990).

Gordon-Kamm, W. J., Rule 132 Declaration.

Gunset, G., "Genetic Advance May Transform Corn," Chicago Tribune (April 19, 1990).

Klein et al., Bio/Technology, 6, 559 (1989).

Klein et al., PNAS USA, 85, 4305 (1988).

Klein et al., Plant Physiol., 91, 440 (1989).

Koziel et al., Bio/Technology, 11, 194 (1993).

Lundquist et al., U.S. Patent No. 5,538,877 issued July 23, 1996.

Lundquist et al., U.S. Patent No. 5,538,880, issued July 23, 1996.

Murray et al., Nucl. Acids Res., 17, 477 (1989).

Murry et al., U.S. Patent No. 5,371,003 (issued December 6, 1994).

Phillips, R.I. et al., Corn and Corn Improvement, G. F. Sprague and J. S. Dudley, eds., ASA, Inc., Madison, WI (1988), p. 345-387 (1988).

Phillips, R.J., Rule 132 Declaration.

Pierce, D., Rule 132 Declaration, dated January 23, 1996.

34

Poehlman, J. M., "Backcross Breeding," In: Breeding Field Crops, 3rd ed., AVI Publishing Co.,
        Inc., p. 203-206 (1986).

Potrykus, I., Trends Biotechnol., 7, 269 (Oct. 1989).

Rhodes, C., et al., Science, 240, 204 (1988).

Robbins-Roth et al., "They Make it Happen in Biotech," Bioworld, p. 30-36 (Nov/Dec 1990).

Sanford et al., Particulate Sci. Technol., 5, 27 (1987).

Sanford, J. C. Physiologia Plantarum, 79, 206 (1990).

Somers, D.A. et al., Bio/Technology, 10, 1589 (1992).

Somers, D.A., Rule 132 Declaration.

Spencer, T.M., Rule 132 Declaration.

Stephens, M., Rule 132 Declaration.

Steimel, D., "Corn Breeders Stalk Perfect Hybrid," Rockford Register Star, (August 6, 1990).

Tomes et al., U.S. Patent No. 5,886,244 (issued ).

Vasil et al., U.S. Patent No. 5,405,765 (issued April 11, 1995).

Wan, Y. and P. G. Lemaux, Plant Physiol., 104, 37 (1994).

Wang et al. ,Plant Mol. Biol., 11, 433 (1988).

Weising, K. et al., Ann. Rev. Genet., 22, 421 (1988).

WO 89/11789, published December 14, 1989.


**II.    Other References**

Agricultural Genetics Report, "Keystone Crops," 2 (March/April 1990).

ARI Newsletter, "Dekalb Researchers Produce Fertile Corn Plants with Foreign Genes,"
        (October/November 1990).

Genetic Technology News, "Genetically Engineered Corn: Breakthrough Brings Market Closer,"
        8-11 (October 1990).

Investor's Daily, "Genetic Engineering Advance Announced for Corn Plants," (April 19, 1990).

0002783

## APPENDIX IV

Cited Statutes, Rules, and Caselaw

### I.    Statutes and Rules

35 U.S.C. § 101

35 U.S.C. § 103

35 U.S.C. § 112

M.P.E.P. § 2143

M.P.E.P. §2164.01

M.P.E.P. §2164.05(a).


### II.    Caselaw

In re Angstadt, 190 U.S.P.Q. 214, 218 (C.C.P.A. 1976).

In re Armbruster, 185 U.S.P.Q. 152 (C.C.P.A. 1975).

Atlas Powder Co. v. E. I. DuPont DeNemours & Co., 224 U.S.P.Q. 409 (Fed. Cir. 1985).

Brenner v. Manson, 148 U.S.P.Q. 689 (S. Ct. 1966).

Genentech, Inc. v. Novo Nordisk, 42 U.S.P.Q.2d 1001 (Fed. Cir. 1997).

In re Gunn, 190 U.S.P.Q. 202 (C.C.P.A. 1976).

In re Hogan, 194 U.S.P.Q. 527 (C.C.P.A. 1977)

Hybritech Inc. v. Monoclonal Antibodies Inc., 231 U.S.P.Q. 81, 84 (Fed. Cir. 1986).

Ex parte Jackson, 217 U.S.P.Q. 804, 807 (Bd. App. 1982).

Spectra-Physics, Inc. v. Coherent Inc., 3 U.S.P.Q.2d 1737 (Fed. Cir. 1987).

Stratoflex Inc. v. Aeroquip Corporation, 713 F.2d 1530, 218 U.S.P.Q. 871 (Fed. Cir. 1983).

Symbol Technologies, Inc. v. Opticon, Inc., 935 F.2d 1569, 19 U.S.P.Q.2d 1241 (Fed. Cir. 1991).

In re Wands, 858 F.2d 731, 8 U.S.P.Q.2d 1400, 1404 (Fed. Cir. 1988).

In re Wood, 202 U.S.P.Q. 171 (C.C.P.A. 1979).

University of California v. Eli Lilly and Co., 43 U.S.P.Q.2d 1398 (Fed. Cir. 1997).

CLIENT COPY 

**UNITED STATES DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. |
|---|---|---|---|

| EXAMINER |
|---|

| ART UNIT | PAPER NUMBER |
|---|---|
| 1649 | 39 |

**DATE MAILED:**    12/17/99

N|A

**Please find below and/or attached an Office communication concerning this application or proceeding.**

Commissioner of Patents and Trademarks

Schwegman, Lundberg,
Woessner & Kluth, P.A.

DEC 2 3 1999

RECEIVED

0002785

2 - Mail Copy

| | Application No. 08/677,695 | App.   t(s) Lundquist et al. |
|---|---|---|
| ***Advisory Action*** | Examiner Gary Benzion, Ph.D. | Group Art Unit 1649 |

THE PERIOD FOR RESPONSE:  [check only a) or b)]

    a) ☐   expires _____ months from the mailing date of the final rejection.

    b) ☐   expires either three months from the mailing date of the final rejection, or on the mailing date of this Advisory Action, whichever is later.  In no event, however, will the statutory period for response expire later than six months from the date of the final rejection.

    Any extension of time must be obtained by filing a petition under 37 CFR 1.136(a), the proposed response and the appropriate fee.  The date on which the response, the petition, and the fee have been filed is the date of the response and also the date for the purposes of determining the period of extension and the corresponding amount of the fee.  Any extension fee pursuant to 37 CFR 1.17 will be calculated from the date of the originally set shortened statutory period for response or as set forth in b) above.

☒   Appellant's Brief is due two months from the date of the Notice of Appeal filed on _____ 22 Feb 1999 ____ (or within any period for response set forth above, whichever is later).  See 37 CFR 1.191(d) and 37 CFR 1.192(a).

Applicant's response to the final rejection, filed on ___30 Aug 1999_____ has been considered with the following effect, but is NOT deemed to place the application in condition for allowance:

☒   The proposed amendment(s):

    ☐   will be entered upon filing of a Notice of Appeal and an Appeal Brief.

    ☒   will not be entered because:

        ☒   they raise new issues that would require further consideration and/or search.  (See note below)

        ☐   they raise the issue of new matter.  (See note below)

        ☐   they are not deemed to place the application in better form for appeal by materially reducing or simplifying the issues for appeal.

        ☐   they present additional claims without cancelling a corresponding number of finally rejected claims.

    NOTE:  *The limitation "wherein said DNA comprise a selectable marker gene" would require substantially new application of art, not previously found necessary.  Thus raising new issues*

    ☐   Applicant's response has overcome the following rejection(s): _____

☐   Newly proposed or amended claims _____ would be allowable if submitted in a separate, timely filed amendment cancelling the non-allowable claims.

☐   The affidavit, exhibit or request for reconsideration has been considered but does NOT place the application in condition for allowance because: _____

☐   The affidavit or exhibit will NOT be considered because it is not directed SOLELY to issues which were newly raised by the Examiner in the final rejection.

☒   For purposes of Appeal, the status of the claims is as follows (see attached written explanation, if any):

    Claims allowed: _____

    Claims objected to: _____

    Claims rejected:  *23-25, 28, 29, 41-45, 55-59, and 68-74* _____

☐   The proposed drawing correction filed on _____ ☐ has  ☐ has not been approved by the Examiner.

☐   Note the attached Information Disclosure Statement(s), PTO-1449, Paper No(s). _____

☐   Other _____

*Gary Benzion*

GARY BENZION, PH.D.
PRIMARY EXAMINER
ART UNIT 1649

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| Docket Number | Anticipated Classification | | Prior Application | |
|---|---|---|---|---|
| | Class | Subclass | Examiner | Art Unit |
| 950.001US5 | | | | 1803 |

## DIVISIONAL  APPLICATION UNDER 37 C.F.R. § 1.60

BOX PATENT APPLICATION
Assistant Commissioner for Patents
Washington, D.C.  20231

Sir:

This is a request for filing a divisional application under 37 CFR § 1.60 of Serial No. 08/677,695, filed on July 10, 1996 and entitled FERTILE TRANSGENIC CORN PLANTS .

1. X   Enclosed is a true and correct copy of the prior application;  including the specification, claims, drawings, oath or declaration showing the applicant's signature, and any amendments referred to in the oath or declaration filed to complete the prior application.  (It is noted that no amendments referred to in the oath or declaration filed to complete the prior application introduced new matter therein.)

2. X   Cancel in this application original claims 1-18 of the prior application before calculating the filing fee. (At least one original independent claim must be retained for filing purposes.)

3. X   The inventors of the invention being claimed in this application are:

(1)   Ronald C. Lundquist
      4901 Clear Spring Road
      Minnetonka, MN 55345
      Citizen of United States of America

(2)   David A. Walters
      11424 Kell Road
      Bloomington, MN 55437
      Citizen of United States of America

4. __   Enclosed is a Preliminary Amendment (__ pages).  Any additional fees for claims added in this Preliminary Amendment have been included in the filing fee as calculated below:

0002787

DIVISIONAL  APPLICATION OF: Ronald C. Lundquist et al.                                         Page 2 of 3
Division of S/N 08/677,695
Docket: 950.001US5

| CLAIMS AS FILED | | | | |
|---|---|---|---|---|
| | (1)<br>Number Filed | (2)<br>Number Extra | Rate | Fee |
| TOTAL CLAIMS | 4 - 20  = | 0 | x 22 | $0.00 |
| INDEPENDENT CLAIMS | 1 - 3  = | 0 | x 80 | $0.00 |
| FEE FOR MULTIPLE DEPENDENT CLAIMS PRESENTED | | | | $0.00 |
| BASIC FILING FEE | | | | $770.00 |
| | | | TOTAL FILING FEE | $770.00 |

If the difference in Column (1) is less than zero, enter "0" in Column (2).

5. _X_   A check in the amount of _$770.00_ is attached to pay the filing fee.

6. _X_   **The Commissioner is hereby authorized to charge any additional fees which may be required in connection with this application or credit any overpayment to Deposit Account No. 19-0743.**

7. _X_   Amend the first sentence of the specification as follows:
"This application is a division of U.S. Patent Application Serial No. 08/677,695, filed July 10, 1996, which is a continuation of U.S. Patent Application Serial No. 07/974,379, filed November 10, 1992, now U.S. Patent No. 5,538,877, which in turn is a continuation of U.S. Patent Application Serial No. 07/467,983, filed January 22, 1990, now abandoned."

8. __   Informal drawings ( __ sheets) are enclosed.

9. _X_   The prior application is assigned of record to:

   DeKalb Genetics Corporation .

10. _X_ The Power of Attorney in the prior application is to:

   Warren D. Woessner
   Merchant, Gould, Smith, Edell, Welter & Schmidt
   3100 Norwest Center, Minneapolis, Minnesota 55402

11. __   A petition and fee was filed on __ to extend the term in the parent application until ___.

DIVISIONAL APPLICATION OF: Ronald C. Lundquist et al.                                        Page 3 of 3
Division of S/N 08/677,695
Docket: 950.001US5

Address all future communications to:  (may only be completed by attorney or agent of record)

> SCHWEGMAN, LUNDBERG, WOESSNER & KLUTH, P.A.
> P.O. Box 2938
> Minneapolis, Minnesota 55402
> Attn:  Warren D. Woessner, Ph.D.
> (Telephone:  (612) 373-6903)

Date: _____ 4 - 18 - 97 _____            _____
                                          Warren D. Woessner, Ph.D.
                                          Reg. No. 30,440

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | | |
|---|---|---|---|
| Applicant: | Ronald C. Lundquist et al. | Examiner: | Unknown |
| Serial No. | Unknown | Art Unit: | Unknown |
| Filed: | April 21, 1997 | Docket: | 950.001US6 |
| Title: | FERTILE TRANSGENIC CORN PLANTS | | |

---

### PETITION FOR LICENSE FOR FOREIGN FILING

Assistant Commissioner for Patents
Washington, D.C.  20231

Dear Sir:

Request is hereby made under 35 U.S.C. Section 184 for a license to file foreign patent applications substantially identical with the patent disclosure attached hereto. Moreover, such request is made for expedited handling and the required fee of $130.00 is enclosed herewith. The U.S. Patent and Trademark Office is hereby authorized to charge any deficiency or credit any overpayment to Deposit Account No. 19-0743. Expedited handling is requested since failure to so handle could result in loss of foreign patent rights. The invention is entitled: FERTILE TRANSGENIC CORN PLANTS. Such foreign filing is not considered to be detrimental to the public safety or defense and does not involve any secrecy order or national security of the United States.

Applicants request that the License Office contact Mr. Paul Del Giudice at (703) 415-0810 immediately upon notification of the granting of the foreign filing license.

Respectfully submitted,

RONALD C. LUNDQUIST et al.

By their Representatives,

SCHWEGMAN, LUNDBERG WOESSNER & KLUTH
P.O. Box 2938
Minneapolis, Minnesota 55402
(6121) 339-0331

Date: _18 april 1997_    By _Wa O Wa_
Warren D. Woessner, Ph.D.
Reg. No. 30,440

0002790

## ABSTRACT OF THE DISCLOSURE

Fertile transgenic Zea mays (corn) plants which stably express heterologous DNA which is heritable are disclosed along with a process for producing said plants. The process comprises the microjectile bombardment of friable embryogenic callus from the plant to be transformed. The process may be applicable to other graminaceous cereal plants which have not proven stably transformable by other techniques.

0002791

Docket: BIOT-104

United States Patent Application

of

Ronald C. Lundquist
4901 Clear Spring Road
Minnetonka, MN 55345

and

David A. Walters
9348 Colorado Road
Bloomington, MN 55438

for

FERTILE TRANSGENIC CORN PLANTS

0002792

Docket: BIOT-104

## FERTILE TRANSGENIC CORN PLANTS

### BACKGROUND OF THE INVENTION

This invention relates to fertile transgenic plants of the species _Zea_ _mays_ (oftentimes referred to herein as maize or corn). The invention further relates to producing transgenic plants via particle bombardment and subsequent selection techniques which have been found to produce fertile transgenic plants.

Genetic engineering of plants, which entails the isolation and manipulation of genetic material (usually in the form of DNA or RNA) and the subsequent introduction of that genetic material into a plant or plant cells, offers considerable promise to modern agriculture and plant breeding. Increased crop food values, higher yields, feed value, reduced production costs, pest resistance, stress tolerance, drought resistance, the production of pharmaceuticals, chemicals and biological molecules as well as other beneficial traits are all potentially achievable through genetic engineering techniques. Once a gene has been identified, cloned, and engineered, it is still necessary to introduce it into a plant of interest in such a manner that the resulting plant is both fertile and capable of passing the gene on to its progeny.

A variety of methods have been developed and are currently available for the transformation of various plants and plant cells with DNA. Generally these plants have been dicotyledonous, and some success has been reported with certain of the monocotyledonous cereals. However, some species have heretofore proven untransformable by any method. Thus, previous to this discovery, no technology had been developed which would permit the production of stably transformed _Zea_ _mays_ plants in which the transforming DNA is heritable thereof. This failure in the

BIOT-104 - 1/22/90          - 1 -

0002793

art is well documented in the literature and has been discussed in a number of recent reviews (Potrykus, 1989; Weising et al., 1988; Cocking et al., 1987).

European Patent Publns. 270,356 (McCabe et al.) and 275,069 (Arntzen et al.) describe the introduction of DNA into maize pollen followed by pollination of maize ears and formation of seeds. The plants germinated from these seeds are alleged to contain the introduced DNA, but there is no suggestion that the introduced DNA was heritable, as has been accomplished in the present invention. Only if the DNA introduced into the corn is heritable can the corn be used in breeding programs as required for successful commercialization of transgenic corn.

Graves et al. (1986) claims Agrobacterium-mediated transformation of Zea mays seedlings. The alleged evidence was based upon assays known to produce incorrect results.

Despite extensive efforts to produce fertile transformed corn plants which transmit the transforming DNA to progeny, there have been no reported successes. Many previous failures have been based upon gene transfer to maize protoplasts, oftentimes derived from callus, liquid suspension culture cells, or other maize cells using a variety of transformation techniques. Although several of the techniques have resulted in successful transformation of corn cells, the resulting cells either could not be regenerated into corn plants or the corn plants produced were sterile (Rhodes et al. 1988) or, in some cases, it even turned out that the plants were in fact not transformed. Thus, while maize protoplasts and some other cells have previously been transformed, the resulting transformants could not be regenerated into fertile transgenic plants.

On the other hand, it has been known that at least certain corn callus can be regenerated to form mature plants in a rather straightforward fashion and that the resulting plants

BIOT-104 - 1/22/90          - 2 -

were often fertile.  However, no stable transformation of maize
callus was ever achieved, i.e. there were no techniques develop-
ed which would permit a successful stable transformation of a
regenerable callus.  An example of a maize callus transforma-
tion technique which has been tried is the use of Agrobacterium
mediated transfer.

The art was thus faced with a dilemma.  While it was
known that corn protoplast and suspension culture cells could
be transformed, no techniques were available which would regen-
erate the transformed protoplast into a fertile plant.  While
it was known that corn callus could be regenerated into a fer-
tile plant, there were no techniques known which could trans-
form the callus, particularly while not destroying the ability
of the callus both to regenerate and to form fertile plants.

Recently, a new transformation technique has been created
based upon the bombardment of intact cells and tissues with DNA-
coated microprojectiles.  The technique, disclosed in Sanford
et al. (1987) as well as in EPO Patent Publication 331,855 of
J.C. Sanford et al. based upon U.S.S.N. 161,807, filed February
29, 1988, has been shown effective at producing transient gene
expression in some plant cells and tissues including those from
onion, maize (Klein et al. 1988a), tobacco, rice, wheat, and
soybean, and stable expression has been obtained in tobacco and
soybeans.  In fact, stable expression has been obtained by bom-
bardment of suspension cultures of Zea mays Black Mexican Sweet
(Klein et al. 1989) which cultures are, however, non-regenera-
ble suspension culture cells, not the callus culture cells used
in the process of the present invention.

No protocols have been published describing the introduc-
tion of DNA by a bombardment technique into cultures of regener-
able maize cells of any type.  No stable expression of a gene
has been reported by means of bombardment of corn callus follow-
ed by regeneration of fertile plants and no regenerable fertile

BIOT-104 - 1/22/90          - 3 -

corn has resulted from DNA-coated microprojectile bombardment of the suspension cultures. Thus, the art has failed to produce fertile transformed corn plants heretofore.

A further stumbling block to the successful production of fertile transgenic maize plants has been in selecting those few transformants in such a manner that neither the regeneration capacity nor the fertility of the regenerated transformant are destroyed. Due to the generally low level of transformants produced by a transformation technique, the need for selection of the transformants is self-evident. However, selection generally entails the use of some toxic agent, e.g. herbicide or antibiotic, which can effect either the regenerability or the resultant plant fertility.

It is thus an object of the present invention to produce fertile, stably transgenic, _Zea mays_ plants and seeds which transmit the introduced gene to progeny. It is a further object to produce such stably transgenic plants and seeds by a particle bombardment and selection process which results in a high level of viability for a few transformed cells. It is a further object to produce fertile stably transgenic plants of other graminaceous cereals besides maize.

REFERENCES CITED

Armstrong, CL, et al. (1985) J Planta 164:207-214
Callis, J, et al. (1987) Genes & Develop 1:1183-1200
Chilton & Barnes (1983) Nuc Acids Res 11:364-385
Chu, CC, et al. (1975) Sci Sin (Peking) 18:659-668
Cocking, F, et al. (1987) Science 236:1259-1262
DeWet et al. (1985) Proc Natl Sci USA 82:7870-7873
Freeling, JC, et al. (1976) Maydica XXI:97-112
Graves, A, et al. (1986) Plant Mol Biol 7:43-50
Green, C, et al. (1975) Crop Sci 15:417-421
Green, CE, (1982) Plant Tissue Culture, A Fujiwara ed.
Maruzen, Tokyo, Japan pp 107-8

BIOT-104 - 1/22/90                    - 4 -

0002796

Green, C, et al. (1982) Maize for Biological Research, Plant Mol Biol Assoc, pp 367-372

Gritz, L, et al. (1983) Gene 25:179-188

Guilley, H, et al. (1982) Cell 30:763-773

Jefferson, R, et al. (1987) EMBO J 6:3901-3907)

Kamo, K, et al. (1985) Bot Gaz 146:327-334

Klein, T, et al. (1989) Plant Physiol 91:440-444

Klein, T, et al. (1988a) Proc Natl Acad Sci USA 85:4305-9

Klein, T, et al. (1988b) Bio/Technology 6:559-563

Lu, C, et al. (1982) Theor Appl Genet 62:109-112

McCabe, D, et al. (1988) Bio/Technology 6:923-926

Murashige, T, et al. (1962) Physiol Plant 15:473-497

Neuffer, M, (1982) Maize for Biological Research, Plant Mol Biol Assoc, pp 19-30

Phillips, R, et al. (1988) Corn and Corn Improvement, 3rd ed., Agronomy Soc Amer, pp 345-387

Potrykus, I (1989) Trends in Biotechnology 7:269-273

Rhodes, CA, et al. (1988) Science 240:204-7

Sambrook, J, et al (1989) Molecular Cloning: A Laboratory Manual, 2nd ed., Cold Spring Harbor Laboratory Press

Sanford, J, et al. (1987) J Part Sci & Techn 5:27-37

Weising, K, et al., (1988) Ann Rev of Genetics 22:421-478

Yanisch-Perron, L, et al. (1985) Gene 33:109-119

## SUMMARY OF THE INVENTION

The present invention relates to fertile transgenic _Zea mays_ plants containing heterologous DNA, preferably chromosomally integrated heterologous DNA, which is heritable by progeny thereof.

The invention further relates to all products derived from transgenic _Zea mays_ plants, plant cells, plant parts, and seeds.

The invention further relates to transgenic _Zea mays_

BIOT-104 - 1/22/90                    - 5 -

seeds stably containing heterologous DNA and progeny which in-
herit the heterologous DNA.

The invention further relates to a process for producing
fertile transgenic Zea mays plants containing heterologous DNA.
The process is based upon microprojectile bombardment, selec-
tion, and plant regeneration techniques.

The invention further relates to a process for producing
fertile transformed plants of graminaceous plants other than
Zea mays which have not been reliably transformed by tradition-
al methods such as electroporation, Agrobacterium, injection,
and previous ballistic techniques.

The invention further relates to regenerated fertile ma-
ture maize plants from transformed embryogenic tissue, transgen-
ic seeds produced therefrom, and R1 and subsequent generations.

In preferred embodiments, this invention produces the fer-
tile transgenic plants by means of a DNA-coated microprojectile
bombardment of clumps of friable embryogenic callus, followed
by a controlled regimen for selection of the transformed callus
lines.

BRIEF DESCRIPTION OF THE DRAWINGS

Figure 1A shows a map of plasmid vector pHYGI1 utilized
in Example I.  Figure 1B shows the relevant part of pHYGI1 en-
compassing the HPT coding sequence and associated regulatory
elements.  The base pair numbers start from the 5' nucleotide
in the recognition sequence for the indicated restriction en-
zymes, beginning with the EcoRI site at the 5' end of the CaMV
35S promoter.

Figure 2 shows a map of plasmid vector pBII221 utilized
in Example I.

BIOT--104 -- 1/22/90          - 6 -

Figure 3 is a Southern blot of DNA isolated from the PH1 callus line and an untransformed control callus line.

Figure 4 is a Southern blot of leaf DNA isolated from Ro plants regenerated from PH1 and untransformed callus.

Figure 5 is a Southern blot of leaf DNA isolated from R1 progeny of PH1 Ro plants and untransformed Ro plants.

Figure 6 is a Southern blot of DNA isolated from the PH2 callus line and an untransformed control callus line.

## DESCRIPTION OF THE PREFERRED EMBODIMENTS

The present invention is directed to the production of fertile transgenic plants and seeds of the species Zea mays and to the plants, plant tissues, and seeds derived from such trans-genic plants, as well as the subsequent progeny and products de-rived therefrom. The transgenic plants produced herein include all plants of this species, including field corn, popcorn, sweet corn, flint corn and dent corn.

"Transgenic" is used herein to include any cell, cell line, callus, tissue, plant part or plant which contains heter-ologous DNA that was introduced into plant material by a pro-cess of genetic engineering, or which was initially introduced into a plant species by such a process and was subsequently transferred to later generations by sexual or asexual cell crosses or cell divisions.

By "heritable" is meant that the DNA is capable of trans-mission through a complete sexual cycle of a plant, i.e. passed from one plant through its gametes to its progeny plants in the same manner as occurs in normal corn.

The transgenic plants of this invention may be produced by (i) establishing friable embryogenic callus from the plant

BIOT-104 - 1/22/90        - 7 -

to be transformed, (ii) transforming said cell line by a micro-
projectile bombardment technique, (iii) controllably identify-
ing or selecting transformed cells, and (iv) regenerating fer-
tile transgenic plants from the transformed cells. Some of the
plants of this invention may be produced from the transgenic
seed produced from the fertile transgenic plants using conven-
tional crossbreeding techniques to develop commercial hybrid
seed containing heterologous DNA.

I. Plant lines and tissue cultures

The cells which have been found useful to produce the fer-
tile transgenic maize plants herein are those callus cells
which are regenerable, both before and after undergoing a selec-
tion regimen as detailed further below. Generally, these cells
will be derived from meristematic tissue which contain cells
which have not yet terminally differentiated. Such tissue in
graminaceous cereals in general and in maize, in particular,
comprise tissues found in juvenile leaf basal regions, immature
tassels, immature embryos, and coleoptilar nodes. Preferably,
immature embryos are used. Methods of preparing and maintain-
ing callus from such tissue and plant types are well known in
the art and details on so doing are available in the litera-
ture, c.f. Phillips et al. (1988), the disclosure of which is
hereby incorporated by reference.

The specific callus used must be able to regenerate into
a fertile plant. The specific regeneration capacity of particu-
lar callus is important to the success of the bombardment/selec-
tion process used herein because during and following selec-
tion, regeneration capacity may decrease significantly. It is
therefore important to start with cultures that have as high a
degree of regeneration capacity as possible. Callus which is
more than about 3 months and up to about 36 months of age has
been found to have a sufficiently high level of regenerability
and thus is currently preferred. The regenerative capacity of
a particular culture may be readily determined by transferring

BIOT-104 - 1/22/90                - 8 -

samples thereof to regeneration medium and monitoring the forma-
tion of shoots, roots, and plantlets.  The relative number of
plantlets arising per Petri dish or per gram fresh weight of
tissue may be used as a rough quantitative estimate of regener-
ation capacity.  Generally, a culture which will produce at
least one plant per gram of callus tissue will be preferred.

While maize callus cultures can be initiated from a num-
ber of different plant tissues, the cultures useful herein are
preferably derived from immature maize embryos which are remov-
ed from the kernels of an ear when the embryos are about 1-3 mm
in length.  This length generally occurs about 9-14 days after
pollination. Under aseptic conditions, the embryos are placed
on conventional solid media with the embryo axis down (scutel-
lum up).  Callus tissue appears from the scutellum after sever-
al days to a few weeks.  After the callus has grown sufficient-
ly, the cell proliferations from the scutellum may be evaluated
for friable consistency and the presence of well-defined embry-
os.  By "friable consistency" is meant that the tissue is easi-
ly dispersed without causing injury to the cells.  Tissue with
this morphology is then transferred to fresh media and subcul-
tured on a routine basis about every two weeks.

The callus initiation media is solid because callus can-
not be readily initiated in liquid medium.  The initiation/main-
tainence media is typically based on the N6 salts of Chu et al.
(1975) as described in Armstrong et al. (1985) or the MS salts
of Murashige et al. (1962).  The basal medium is supplemented
with sucrose and 2,4-dichlorophenoxyacetic acid (2,4-D).  Sup-
plements such as L-proline and casein hydrolysate have been
found to improve the frequency of initiation of callus cul-
tures, morphology, and growth.  The cultures are generally main-
tained in the dark, though low light levels may also be used.
The level of synthetic hormone 2,4-D, necessary for maintain-
ence and propagation, should be generally about 0.3 to 3.0
mg/l.

BIOT-104 - 1/22/90              - 9 -

0002801

Although successful transformation and regeneration has been accomplished herein with friable embryogenic callus, this is not meant to imply that other transformable regenerable cells, tissue, or organs cannot be employed to produce the fertile transgenic plants of this invention. The only actual requirement for the cells which are transformed is that after transformation they must be capable of regeneration of a plant containing the heterologous DNA following the particular selection or screening procedure actually used.

## II. DNA Used for Transformation

The heterologous DNA used for transformation herein may be circular or linear, double-stranded or single-stranded. Generally, the DNA is in the form of a plasmid and contains coding regions of beneficial heterologous DNA with flanking regulatory sequences which serve to promote the expression of the heterologous DNA present in the resultant corn plant. "Heterologous DNA" is used herein to include all synthetically engineered or biologically derived DNA which is introduced into a plant by man by genetic engineering, including but not limited to, non-plant genes, modified genes, synthetic genes, portions of genes, as well as DNA and genes from maize and other plant species.

The compositions of and methods for constructing heterologous DNA for successful transformations of plants is well known to those skilled in the art, and the same compositions and methods of construction may be utilized to produce the heterologous DNA useful herein. The specific composition of the DNA is not central to the present invention and the invention is not dependent upon the composition of the specific transforming DNA used. Weising et al. (1988), the subject matter of which is incorporated herein by reference, describes suitable DNA components thereof which include promoters, polyadenylation sequences, selectable marker genes, reporter genes, enhancers, introns, and the like, as well as provides suitable references

BIOT-104 - 1/22/90          - 10 -

for compositions thereof.  Sambrook et al. (1989) provides suitable methods of construction.

Generally the heterologous DNA will be relatively small, i.e. less than about 30 kb to minimize any susceptibility to physical, chemical, or enzymatic degradation which is known to increase as the size of the DNA increases.

Suitable heterologous DNA for use herein includes all DNA which will provide for, or enhance, a beneficial feature of the resultant transgenic corn plant.  For example, the DNA may encode proteins or antisense RNA transcripts in order to promote increased food values, higher yields, pest resistance, disease resistance, and the like.  For example, a bacterial dap A gene for increased lysine; Bt-endotoxin gene or protease inhibitor for insect resistance; bacterial ESPS synthase for resistance to glyphosate herbicide; chitinase or glucan endo-1,3-B-glucosidase for fungicidal properties.  Also, the DNA may be introduced to act as a genetic tool to generate mutants and/or assist in the identification, genetic tagging, or isolation of segments of corn DNA.  Additional examples may be found in Weising, supra.

The heterologous DNA to be introduced into the plant further will generally contain either a selectable marker or a reporter gene or both to facilitate identification and selection of transformed cells.  Alternatively, the selectable marker may be carried on a separate piece of DNA and used in a cotransformation procedure.  Both selectable markers and reporter genes may be flanked with appropriate regulatory sequnces to enable expression in plants.  Useful selectable markers are well known in the art and include, for example, antibiotic and herbicide resistance genes.  Specific examples of such genes are disclosed in Weising et al, supra.  A preferred selectable marker gene is the hygromycin B phosphotransferase (HPT) coding sequence, which may be derived from E. coli.  Other selectable markers

BIOT-104 - 1/22/90           - 11 -

known in the art include aminoglycoside phosphotransferase gene of transposon Tn5 (AphII) which encodes resistance to the anti-biotics kanamycin, neomycin, and G418, as well as those genes which code for resistance or tolerance to glyphosate, methotrex-ate, imidazolinones, sulfonylureas, bromoxynil, dalapon, and the like. Those selectable marker genes which confer herbicide resistance or tolerance are also of commercial utility in the resulting transformed plants.

Reporter genes which encode for easily assayable marker proteins are well known in the art. In general, a reporter gene is a gene which is not present or expressed by the recip-ient organism or tissue and which encodes a protein whose ex-pression is manifested by some easily detectable property, e.g. phenotypic change or enzymatic activity. Examples of such genes are provided in Weising et al, supra. Preferred genes include the chloramphenicol acetyl transferase gene from Tn9 of E. coli, the beta-glucuronidase gene of the uidA locus of E. coli, and the luciferase genes from firefly Photinus pyralis.

The regulatory sequences useful herein include any con-stitutive, inducible, tissue or organ specific, or development-al stage specific promoter which can be expressed in the partic-ular plant cell. Suitable such promoters are disclosed in Weis-ing et al, supra. The following is a partial representative list of promoters suitable for use herein: regulatory sequences from the T-DNA of Agrobacterium tumefaciens, including manno-pine synthase, nopaline synthase, and octopine synthase; alco-hol dehydrogenase promoter from corn; light inducible promoters such as, ribulose-biphosphate-carboxylase small subunit gene from a variety of species; and the major chlorophyll a/b bind-ing protein gene promoter; 35S and 19S promoters of cauliflower mosaic virus; developmentally regulated promoters such as the waxy, zein, or bronze promoters from maize; as well as synthet-ic or other natural promoters which are either inducible or con-stitutive, including those promoters exhibiting organ specific

BIOT-104 - 1/22/90          - 12 -

expression or expression at specific development stage(s) of the plant.

Other elements such as introns, enhancers, polyadenylation sequences and the like, may also be present on the DNA. Such elements may or may not be necessary for the function of the DNA, although they can provide a better expression or functioning of the DNA by affecting transcription, stability of the mRNA, or the like. Such elements may be included in the DNA as desired to obtain the optimal performance of the transforming DNA in the plant. For example, the maize Adh1S first intron may be placed between the promoter and the coding sequence of a particular heterologous DNA. This intron, when included in a DNA construction, is known to generally increase expression in maize cells of a protein. (Callis et al. 1987) However, sufficient expression for a selectable marker to perform satisfactorily can often be obtained without an intron. (Klein et al. 1989) An example of an alternative suitable intron is the shrunken-1 first intron of Zea mays. These other elements must be compatible with the remainder of the DNA constructions.

To determine whether a particular combination of DNA and recipient plant cells are suitable for use herein, the DNA may include a reporter gene. An assay for expression of the reporter gene may then be performed at a suitable time after the DNA has been introduced into the recipient cells. A preferred such assay entails the use of the E. coli beta-glucuronidase (GUS) gene (Jefferson et al. 1987). In the case of the microprojectile bombardment transformation process of the present invention, a suitable time for conducting the assay is about 2-3 days after bombardment. The use of transient assays is particularly important when using DNA components which have not previously been demonstrated or confirmed as compatible with the desired recipient cells.

BIOT-104 - 1/22/90          - 13 -

### III. DNA delivery process

The DNA can be introduced into the regenerable maize callus cultures via a particle bombardment process. A general description of a suitable particle bombardment instrument is provided in Sanford et al. (1987), the disclosure of which is incorporated herein by reference. While protocols for the use of the instrument in the bombardment of maize non-regenerable suspension culture cells are described in Klein et al. (1988a, 1988b, and 1989), no protocols have been published for the bombardment of callus cultures or regenerable maize cells.

In a microprojectile bombardment process, also referred to as a biolistic process, the transport of the DNA into the callus is mediated by very small particles of a biologically inert material. When the inert particles are coated with DNA and accelerated to a suitable velocity, one or more of the particles is able to enter into one or more of the cells where the DNA is released from the particle and expressed within the cell. While some of the cells are fatally damaged by the bombardment process, some of the recipient cells do survive, stably retain the introduced DNA, and express it.

The particles, called microprojectiles, are generally of a high density material such as tungsten or gold. They are coated with the DNA of interest. The microprojectiles are then placed onto the surface of a macroprojectile which serves to transfer the motive force from a suitable energy source to the microprojectiles. After the macroprojectile and the microprojectiles are accelerated to the proper velocity, they contact a blocking device which prevents the macroprojectile from continuing its forward path but allows the DNA-coated microprojectiles to continue on and impact the recipient callus cells. Suitable such instruments may use a variety of motive forces such as gunpowder or shock waves from an electric arc discharge (Swain, et al. 1988). An instrument in which gunpowder is the motive force is currently preferred and such is described and

BIOT-104 - 1/22/90            - 14 -

further explained in Sanford et al. (1987), the disclosure of which is incorporated herein by reference.

A protocol for the use of the gunpowder instrument is provided in Klein et al. (1988a, b) and involves two major steps. First, tungsten microprojectiles are mixed with the DNA, calcium chloride, and spermidine free base in a specified order in an aqueous solution. The concentrations of the various componenets may be varied as taught. The currently preferred procedure entails exactly the procedure of Klein et al. (1988b) except for doubling the stated optimum DNA concentration. Secondly, in the actual bombardment, the distance of the recipient cells from the end of the barrel as well as the vacuum in the sample chamber. The currently preferred procedure for bombarding the callus entails exactly the procedure of Klein et al. (1988b) with the recipient tissue positioned 5 cm below the stopping plate tray.

The callus cultures useful herein for generation of transgenic plants should generally be about 3 months to 3 years old, preferably about 3 to 18 months old. Callus used for bombardment should generally be about midway between transfer periods and thus past any "lag" phase that might be associated with a transfer to a new media, but also before reaching any "stationary" phase associated with a long time on the same plate.

The specific tissue subjected to the bombardment process is preferably taken about 7-10 days after subculture, though this is not believed critical. The tissue should generally be used in the form of pieces of about 30 to 80, preferably about 40 to 60, mg. The clumps are placed on a petri dish or other surface and arranged in essentially any manner, recognizing that (i) the space in the center of the dish will receive the heaviest concentration of metal-DNA particles and the tissue located there is likely to suffer damage during bombardment and (ii) the number of particles reaching a cell will decrease

BIOT-104 - 1/22/90          - 15 -

(probably exponentially) with increasing distance of the cell from the center of the blast so that cells far from the center of the dish are not likely to be bombarded and transformed. A mesh screen, preferably of metal, may be laid on the dish to prevent splashing or ejection of the tissue. The tissue may be bombarded one or more times with the DNA-coated metal particles.

IV. _Selection process_

    Once the calli have been bombarded with the DNA and the DNA has penetrated some of the cells, it is necessary to identify and select those cells which both contain the heterologous DNA and still retain sufficient regenerative capacity. There are two general approaches which have been found useful for accomplishing this. First, the transformed calli or plants regenerated therefrom can be screened for the presence of the heterologous DNA by various standard methods which could include assays for the expression of reporter genes or assessment of phenotypic effects of the heterologous DNA, if any. Alternatively and preferably, when a selectable marker gene has been transmitted along with or as part of the heterologous DNA, those cells of the callus which have been transformed can be identified by the use of a selective agent to detect expression of the selectable marker gene.

    Selection of the putative transformants is a critical part of the successful transformation process since selection conditions must be chosen so as to allow growth and accumulation of the transformed cells while simultaneously inhibiting the growth of the non-transformed cells. The situation is complicated by the fact that the vitality of individual cells in a population is often highly dependent on the vitality of neighboring cells. Also, the selection conditions must not be so severe that the plant regeneration capacity of the callus cells and the fertility of the resulting plant are precluded. Thus the effects of the selection agent on cell viability and

BIOT-104 - 1/22/90            - 16 -

morphology should be evaluated.    This may be accomplished by experimentally producing a growth inhibition curve for the given selective agent and tissue being transformed beforehand. This will establish the concentration range which will inhibit growth.

When a selectable marker gene has been used, the callus clumps may be either allowed to recover from the bombardment on non-selective media or, preferably, directly transferred to media containing that agent.

Selection procedures involve exposure to a toxic agent and may employ sequential changes in the concentration of the agent and multiple rounds of selection.    The particular concentrations and cycle lengths are likely to need to be varied for each particular agent.    A currently preferred selection procedure entails using an initial selection round at a relatively low toxic agent concentration and then later round(s) at higher concentration(s).    This allows the selective agent to exert its toxic effect slowly over a longer period of time.    Preferably the concentration of the agent is initially such that about a 5-40% level of growth inhibition will occur, as determined from a growth inhibition curve.    The effect may be to allow the transformed cells to preferentially grow and divide while inhibiting untransformed cells, but not to the extent that growth of the transformed cells is prevented.    Once the few individual transformed cells have grown sufficiently the tissue may be shifted to media containing a higher concentration of the toxic agent to kill essentially all untransformed cells. The shift to the higher concentration also reduces the possibility of non-transformed cells habituating to the agent.    The higher level is preferably in the range of about 30 to 100% growth inhibition.    The length of the first selection cycle may be from about 1 to 4 weeks, preferably about 2 weeks.    Later selection cycles may be from about 1 to about 12 weeks, preferably about 2 to about 10 weeks.    Putative maize transformants can general-

BIOT-104 -- 1/22/90                        - 17 -

ly be identified as proliferating sectors of tissue among a background of non-proliferating cells. The callus may also be cultured on non-selective media at various times during the overall selection procedure.

Once a callus sector is identified as a putative trans-formant, transformation can be confirmed by phenotypic and/or genotypic analysis. If a selection agent is used, an example of phenotypic analysis is to measure the increase in fresh weight of the putative transformant as compared to a control on various levels of the selective agent. Other analyses that may be employed will depend on the function of the heterologous DNA. For example, if an enzyme or protein is encoded by the DNA, enzymatic or immunological assays specific for the partic-ular enzyme or protein may be used. Other gene products may be assayed by using a suitable bioassay or chemical assay. Other such techniques are well known in the art and are not repeated here. The presence of the gene can also be confirmed by conven-tional procedures, i.e. Southern blot or polymerase chain reac-tion (PCR) or the like.

V. Regeneration of Plants and Production of Seed

Cell lines which have been shown to be transformed must then be regenerated into plants and the fertility of the resul-tant plants determined. Transformed lines which test positive by genotypic and/or phenotypic analysis are then placed on a media which promotes tissue differentiation and plant regenera-tion. Regeneration may be carried out in accordance with stan-dard procedures well known in the art. The procedures commonly entail reducing the level of auxin which discontinues prolifer-ation of a callus and promotes somatic embryo development or other tissue differentiation. One example of such a regenera-tion procedure is described in Green et al. (1981). The plants are grown to maturity in a growth room or greenhouse and appro-priate sexual crosses and selfs are made as described by Neuf-fer (1981).

BIOT-104 - 1/22/90          - 18 -