REDACTED VERSION – PUBLICLY FILED

5,538,880

## 5

The transgenic plants of this invention may be produced by (i) establishing friable embryogenic callus from the plant to be transformed, (ii) transforming said cell line by a microprojectile bombardment technique, (iii) controllably identifying or selecting transformed cells, and (iv) regenerating fertile transgenic plants from the transformed cells. Some of the plants of this invention may be produced from the transgenic seed produced from the fertile transgenic plants using conventional crossbreeding techniques to develop commercial hybrid seed containing heterologous DNA. 10

### I. Plant Lines and Tissue Cultures

The cells which have been found useful to produce the fertile transgenic maize plants herein are those callus cells which are regenerable, both before and after undergoing a selection regimen as detailed further below. Generally, these cells will be derived from meristematic tissue which contain cells which have not yet terminally differentiated. Such tissue in graminaceous cereals in general and in maize, in particular, comprise tissues found in juvenile leaf basal regions, immature tassels, immature embryos, and coleoptilar nodes. Preferably, immature embryos are used. Methods of preparing and maintaining callus from such tissue and plant types are well known in the art and details on so doing are available in the literature, c.f. Phillips et al. (1988), the disclosure of which is hereby incorporated by reference.

The specific callus must be able to regenerate into a fertile plant. The specific regeneration capacity of particular callus is important to the success of the bombardment/selection process used herein because during and following selection, regeneration capacity may decrease significantly. It is therefore important to start with cultures that have as high a degree of regeneration capacity as possible. Callus which is more than about 3 months and up to about 36 months of age has been found to have a sufficiently high level of regenerability and thus is currently preferred. The regenerative capacity of a particular culture may be readily determined by transferring samples thereof to regeneration medium and monitoring the formation of shoots, roots, and plantlets. The relative number of plantlets arising per Petri dish or per gram fresh weight of tissue may be used as a rough quantitative estimate of regeneration capacity. Generally, a culture which will produce at least one plant per gram of callus tissue will be preferred.

While maize callus cultures can be initiated from a number of different plant tissues, the cultures useful herein are preferably derived from immature maize embryos which are removed from the kernels of an ear when the embryos are about 1–3 mm in length. This length generally occurs about 9–14 days after pollination. Under aseptic conditions, the embryos are placed on conventional solid media with the embryo axis down (scutellum up). Callus tissue appears from the scutellum after several days to a few weeks. After the callus has grown sufficiently, the cell proliferations from the scutellum may be evaluated for friable consistency and the presence of well-defined embryos. By "friable consistency" is meant that the tissue is easily dispersed without causing injury to the cells. Tissue with this morphology is then transferred to fresh media and subcultured on a routine basis about every two weeks.

The callus initiation media is solid because callus cannot be readily initiated in liquid medium. The initiation/maintainence media is typically based on the N6 salts of Chu et al. (1975) as described in Armstrong et al. (1985) or the MS

## 6

salts of Murashige et al. (1962). The basal medium is supplemented with sucrose and 2,4-dichlorophenoxyacetic acid (2,4-D). Supplements such as L-proline and casein hydrolysate have been found to improve the frequency of initiation of callus cultures, morphology, and growth. The cultures are generally maintained in the dark, though low light levels may also be used. The level of synthetic hormone 2,4-D, necessary for maintainence and propagation, should be generally about 0.3 to 3.0 mg/l.

Although successful transformation and regeneration has been accomplished herein with friable embryogenic callus, this is not meant to imply that other transformable regenerable cells, tissue, or organs cannot be employed to produce the fertile transgenic plants of this invention. The only actual requirement for the cells which are transformed is that after transformation they must be capable of regeneration of a plant containing the heterologous DNA following the particular selection or screening procedure actually used.

### II. DNA Used for Transformation

The heterologous DNA used for transformation herein may be circular or linear, double-stranded or single-stranded. Generally, the DNA is in the form of a plasmid and contains coding regions of beneficial heterologous DNA with flanking regulatory sequences which serve to promote the expression of the heterologous DNA present in the resultant corn plant. "Heterologous DNA" is used herein to include all synthetically engineered or biologically derived DNA which is introduced into a plant by man by genetic engineering, including but not limited to, nonplant genes, modified genes, synthetic genes, portions of genes, as well as DNA and genes from maize and other plant species.

The compositions of and methods for constructing heterologous DNA for successful transformations of plants is well known to those skilled in the art, and the same compositions and methods of construction may be utilized to produce the heterologous DNA useful herein. The specific composition of the DNA is not central to the present invention and the invention is not dependent upon the composition of the specific transforming DNA used. Weising et al. (1988), the subject matter of which is incorporated herein by reference, describes suitable DNA components thereof which include promoters, polyadenylation sequences, selectable marker genes, reporter genes, enhancers, introns, and the like, as well as provides suitable references for compositions thereof. Sambrook et al. (1989) provides suitable methods of construction.

Generally the heterologous DNA will be relatively small, i.e. less than about 30 kb to minimize any susceptibility to physical, chemical, or enzymatic degradation which is known to increase as the size of the DNA increases.

Suitable heterologous DNA for use herein includes all DNA which will provide for, or enhance, a beneficial feature of the resultant transgenic corn plant. For example, the DNA may encode proteins or antisense RNA transcripts in order to promote increased food values, higher yields, pest resistance, disease resistance, and the like. For example, a bacterial dapA gene for increased lysine; Bt-endotoxin gene or protease inhibitor for insect resistance; bacterial ESPS synthase for resistance to glyphosate herbicide; chitinase or glucan endo-1,3-B-glucosidase for fungicidal properties. Also, the DNA may be introduced to act as a genetic tool to generate mutants and/or assist in the identification, genetic tagging, or isolation of segments of corn DNA. Additional examples may be found in Weising, supra.

5,538,880

7

The heterologous DNA to be introduced into the plant further will generally contain either a selectable marker or a reporter gene or both to facilitate identification and selection of transformed cells. Alternatively, the selectable marker may be carried on a separate piece of DNA and used in a cotransformation procedure. Both selectable markers and reporter genes may be flanked with appropriate regulatory sequences to enable expression in plants. Useful selectable markers are well known in the art and include, for example, antibiotic and herbicide resistance genes. Specific examples of such genes are disclosed in Weising et al, supra. A preferred selectable marker gene is the hygromycin B phosphotransferase (HPT) coding sequence, which may be derived from E. coli. Other selectable markers known in the art include aminoglycoside phosphotransferase gene of transposon Tn5 (AphII) which encodes resistance to the antibiotics kanamycin, neomycin, and G418, as well as those genes which code for resistance or tolerance to glyphosate, methotrexate, imidazolinones, sulfonylureas, bromoxynil, dalapon, and the like. Those selectable marker genes which confer herbicide resistance or tolerance are also of commercial utility in the resulting transformed plants.

Reporter genes which encode for easily assayable marker proteins are well known in the art. In general, a reporter gene is a gene which is not present or expressed by the recipient organism or tissue and which encodes a protein whose expression is manifested by some easily detectable property, e.g. phenotypic change or enzymatic activity. Examples of such genes are provided in Weising et al, supra. Preferred genes include the chloramphenicol acetyl transferase gene from Tn9 of E. coli, the beta-glucuronidase gene of the uidA locus of E. coli, and the luciferase genes from firefly Photinus pyralis.

The regulatory sequences useful herein include any constitutive, inducible, tissue or organ specific, or developmental stage specific promoter which can be expressed in the particular plant cell. Suitable such promoters are disclosed in Weising et al, supra. The following is a partial representative list of promoters suitable for use herein: regulatory sequences from the T-DNA of Agrobacterium tumefaciens, including mannopine synthase, nopaline synthase, and octopine synthase; alcohol dehydrogenase promoter from corn; light inducible promoters such as, ribulose-biphosphate-carboxylase small subunit gene from a variety of species; and the major chlorophyll a/b binding protein gene promoter; 35S and 19S promoters of cauliflower mosaic virus; developmentally regulated promoters such as the waxy, zein, or bronze promoters from maize; as well as synthetic or other natural promoters which are either inducible or constitutive, including those promoters exhibiting organ specific expression or expression at specific development stage(s) of the plant.

Other elements such as introns, enhancers, polyadenylation sequences and the like, may also be present on the DNA. Such elements may or may not be necessary for the function of the DNA, although they can provide a better expression or functioning of the DNA by affecting transcription, stability of the mRNA, or the like. Such elements may be included in the DNA as desired to obtain the optimal performance of the transforming DNA in the plant. For example, the maize AdhIS first intron may be placed between the promoter and the coding sequence of a particular heterologous DNA. This intron, when included in a DNA construction, is known to generally increase expression in maize cells of a protein. (Callis et al. 1987) However, sufficient expression for a selectable marker to perform satisfactorily can often be obtained without an intron. (Klein

8

et al. 1989) An example of an alternative suitable intron is the shrunken-1 first intron of Zea mays. These other elements must be compatible with the remainder of the DNA constructions.

To determine whether a particular combination of DNA and recipient plant cells are suitable for use herein, the DNA may include a reporter gene. An assay for expression of the reporter gene may then be performed at a suitable time after the DNA has been introduced into the recipient cells. A preferred such assay entails the use of the E. coli beta-glucuronidase (GUS) gene (Jefferson et al. 1987). In the case of the microprojectile bombardment transformation process of the present invention, a suitable time for conducting the assay is about 2–3 days after bombardment. The use of transient assays is particularly important when using DNA components which have not previously been demonstrated or confirmed as compatible with the desired recipient cells.

### III. DNA Delivery Process

The DNA can be introduced into the regenerable maize callus cultures via a particle bombardment process. A general description of a suitable particle bombardment instrument is provided in Sanford et al. (1987), the disclosure of which is incorporated herein by reference. While protocols for the use of the instrument in the bombardment of maize non-regenerable suspension culture cells are described in Klein et al. (1988a, 1988b, and 1989), no protocols have been published for the bombardment of callus cultures or regenerable maize cells.

In a microprojectile bombardment process, also referred to as a biolistic process, the transport of the DNA into the callus is mediated by very small particles of a biologically inert material. When the inert particles are coated with DNA and accelerated to a suitable velocity, one or more of the particles is able to enter into one or more of the cells where the DNA is released from the particle and expressed within the cell. While some of the cells are fatally damaged by the bombardment process, some of the recipient cells do survive, stably retain the introduced DNA, and express it.

The particles, called microprojectiles, are generally of a high density material such as tungsten or gold. They are coated with the DNA of interest. The microprojectiles are then placed onto the surface of a macroprojectile which serves to transfer the motive force from a suitable energy source to the microprojectiles. After the macroprojectile and the microprojectiles are accelerated to the proper velocity, they contact a blocking device which prevents the macroprojectile from continuing its forward path but allows the DNA-coated microprojectiles to continue on and impact the recipient callus cells. Suitable such instruments may use a variety of motive forces such as gunpowder or shock waves from an electric arc discharge J. C. Sanford et al., J. Particle Science and Technology, 5,27 (1987). An instrument in which gunpowder is the motive force is currently preferred and such is described and further explained in Sanford et al. (1987), the disclosure of which is incorporated herein by reference.

A protocol for the use of the gunpowder instrument is provided in Klein et al. (1988a, b) and involves two major steps. First, tungsten microprojectiles are mixed with the DNA, calcium chloride, and spermidine free base in a specified order in an aqueous solution. The concentrations of the various components may be varied as taught. The currently preferred procedure entails exactly the procedure of Klein et al. (1988b) except for doubling the stated

REDACTED VERSION – PUBLICLY FILED

5,538,880

9

optimum DNA concentration. Secondly, in the actual bombardment, the distance of the recipient cells from the end of the barrel as well as the vacuum in the sample chamber. The currently preferred procedure for bombarding the callus entails exactly the procedure of Klein et al. (1988b) with the recipient tissue positioned 5 cm below the stopping plate tray.

The callus cultures useful herein for generation of transgenic plants should generally be about 3 months to 3 years old, preferably about 3 to 18 months old. Callus used for bombardment should generally be about midway between transfer periods and thus past any "lag" phase that might be associated with a transfer to a new media, but also before reaching any "stationary" phase associated with a long time on the same plate.

The specific tissue subjected to the bombardment process is preferably taken about 7–10 days after subculture, though this is not believed critical. The tissue should generally be used in the form of pieces of about 30 to 80, preferably about 40 to 60, mg. The clumps are placed on a petri dish or other surface and arranged in essentially any manner, recognizing that (i) the space in the center of the dish will receive the heaviest concentration of metal-DNA particles and the tissue located there is likely to suffer damage during bombardment and (ii) the number of particles reaching a cell will decrease (probably exponentially) with increasing distance of the cell from the center of the blast so that cells far from the center of the dish are not likely to be bombarded and transformed. A mesh screen, preferably of metal, may be laid on the dish to prevent splashing or ejection of the tissue. The tissue may be bombarded one or more times with the DNA-coated metal particles.

### IV. Selection Process

Once the calli have been bombarded with the DNA and the DNA has penetrated some of the cells, it is necessary to identify and select those cells which both contain the heterologous DNA and still retain sufficient regenerative capacity. There are two general approaches which have been found useful for accomplishing this. First, the transformed calli or plants regenerated therefrom can be screened for the presence of the heterologous DNA by various standard methods which could include assays for the expression of reporter genes or assessment of phenotypic effects of the heterologous DNA, if any. Alternatively and preferably, when a selectable marker gene has been transmitted along with or as part of the heterologous DNA, those cells of the callus which have been transformed can be identified by the use of a selective agent to detect expression of the selectable marker gene.

Selection of the putative transformants is a critical part of the successful transformation process since selection conditions must be chosen so as to allow growth and accumulation of the transformed cells while simultaneously inhibiting the growth of the non-transformed cells. The situation is complicated by the fact that the vitality of individual cells in a population is often highly dependent on the vitality of neighboring cells. Also, the selection conditions must not be so severe that the plant regeneration capacity of the callus cells and the fertility of the resulting plant are precluded. Thus the effects of the selection agent on cell viability and morphology should be evaluated. This may be accomplished by experimentally producing a growth inhibition curve for the given selective agent and tissue being transformed beforehand. This will establish the concentration range which will inhibit growth.

10

When a selectable marker gene has been used, the callus clumps may be either allowed to recover from the bombardment on non-selective media or, preferably, directly transferred to media containing that agent.

Selection procedures involve exposure to a toxic agent and may employ sequential changes in the concentration of the agent and multiple rounds of selection. The particular concentrations and cycle lengths are likely to need to be varied for each particular agent. A currently preferred selection procedure entails using an initial selection round at a relatively low toxic agent concentration and then later round(s) at higher concentration(s). This allows the selective agent to exert its toxic effect slowly over a longer period of time. Preferably the concentration of the agent is initially such that about a 5–40% level of growth inhibition will occur, as determined from a growth inhibition curve. The effect may be to allow the transformed cells to preferentially grow and divide while inhibiting untransformed cells, but not to the extent that growth of the transformed cells is prevented. Once the few individual transformed cells have grown sufficiently the tissue may be shifted to media containing a higher concentration of the toxic agent to kill essentially all untransformed cells. The shift to the higher concentration also reduces the possibility of nontransformed cells habituating to the agent. The higher level is preferably in the range of about 30 to 100% growth inhibition. The length of the first selection cycle may be from about 1 to 4 weeks, preferably about 2 weeks. Later selection cycles may be from about 1 to about 12 weeks, preferably about 2 to about 10 weeks. Putative maize transformants can generally be identified as proliferating sectors of tissue among a background of non-proliferating cells. The callus may also be cultured on non-selective media at various times during the overall selection procedure.

Once a callus sector is identified as a putative transformant, transformation can be confirmed by phenotypic and/or genotypic analysis. If a selection agent is used, an example of phenotypic analysis is to measure the increase in fresh weight of the putative transformant as compared to a control on various levels of the selective agent. Other analyses that may be employed will depend on the function of the heterologous DNA. For example, if an enzyme or protein is encoded by the DNA, enzymatic or immunological assays specific for the particular enzyme or protein may be used. Other gene products may be assayed by using a suitable bioassay or chemical assay. Other such techniques are well known in the art and are not repeated here. The presence of the gene can also be confirmed by conventional procedures, i.e. Southern blot or polymerase chain reaction (PCR) or the like.

### V. Regeneration of Plants and Production of Seed

Cell lines which have been shown to be transformed must then be regenerated into plants and the fertility of the resultant plants determined. Transformed lines which test positive by genotypic and/or phenotypic analysis are then placed on a media which promotes tissue differentiation and plant regeneration. Regeneration may be carried out in accordance with standard procedures well known in the art. The procedures commonly entail reducing the level of auxin which discontinues proliferation of a callus and promotes somatic embryo development or other tissue differentiation. One example of such a regeneration procedure is described in Green et al. (1981). The plants are grown to maturity in a growth room or greenhouse and appropriate sexual crosses and selfs are made as described by Neuffer (1981).

5,538,880

11

Regeneration, while important to the present invention, may be performed in any conventional manner. If a selectable marker has been transformed into the cells, the selection agent may be incorporated into the regeneration media to further confirm that the regenerated plantlets are transformed. Since regeneration techniques are well known and not critical to the present invention, any technique which accomplishes the regeneration and produces fertile plants may be used.

## VI. Analysis of R1 Progeny

The plants regenerated from the transformed callus are referred to as the R0 generation or R0 plants. The seeds produced by various sexual crosses of the R0 generation plants are referred to as R1 progeny or the R1 generation. When R1 seeds are germinated, the resulting plants are also referred to as the R1 generation.

To confirm the successful transmission and inheritance of the heterologous DNA in the sexual crosses described above, the R1 generation should be analyzed to confirm the presence of the transforming DNA. The analysis may be performed in any of the manners such as were disclosed above for analyzing the bombarded callus for evidence of transformation, taking into account the fact that plants and plant parts are being used in place of the callus.

## VII. Breeding of Genetically Engineered Commercial Hybrid Seed

Generally, the commercial value of the transformed corn produced herein will be greatest if the heterologous DNA can be incorporated into many different hybrid combinations. A farmer typically grows several varieties of hybrids based on differences in maturity, standability, and other agronomic traits. Also, the farmer must select a hybrid based upon his physical location since hybrids adapted to one part of the corn belt are generally not adapted to another part because of differences in such traits as maturity, disease, and insect resistance. As such, it is necessary to incorporate the heterologous DNA into a large number of parental lines so that many hybrid combinations can be produced containing the desirable heterologous DNA. This may conveniently be done by breeding programs in which a conversion process (backcrossing) is performed by crossing the initial transgeniC fertile plant to normal elite inbred lines and then crossing the progeny back to the normal parent. The progeny from this cross will segregate such that some of the plants will carry the heterologous DNA whereas some will not. The plants that do carry the DNA are then crossed again to the normal plant resulting in progeny which segregate once more. This crossing is repeated until the original normal parent has been converted to a genetically engineered line containing the heterologous DNA and also possessing all other important attributes originally found in the parent. A separate backcrossing program will be used for every elite line that is to be converted to a genetically engineered elite line. It may be necessary for both parents of a hybrid seed corn to be homozygous for the heterologous DNA. Corn breeding and the techniques and skills required to transfer genes from one line or variety to another are well-known to those skilled in the art. Thus introducing heterologous DNA into lines or varieties which do not generate the appropriate calli can be readily accomplished by these breeding procedures.

12

## VIII. Uses of Transgenic Plants

The transgenic plants produced herein are expected to be useful for a variety of commercial and research purposes. Transgenic plants can be created for use in traditional agriculture to possess traits beneficial to the grower (e.g. agronomic traits such as pest resistance or increased yield), beneficial to the consumer of the grain harvested from the plant (e.g. improved nutritive content in human food or animal feed) or beneficial to the food processor (e.g. improved processing traits). In such uses, the plants are generally grown for the use of their grain in human or animal foods, however, other parts of the plants, including stalks, husks, vegetative parts, and the like, may also have utility, including use as part of animal silage or for ornamental purposes (e.g. Indian corn). Often chemical constituents (e.g. oils or starches) of corn and other crops are extracted for food or industrial use and transgenic plants may be created which have enhanced or modified levels of such components. The plants may also be used for seed production for a variety of purposes.

Transgenic plants may also find use in the commercial manufacture of proteins or other molecules encoded by the heterologous DNA contained therein, where the molecule of interest is extracted or purified from plant parts, seeds, and the like. Cells or tissue from the plants may also be cultured, grown in vitro, or fermented to manufacture such molecules, or for other purposes (e.g. for research).

The transgenic plants may also be used in commercial breeding programs, or may be crossed or bred to plants of related crop species. Improvements encoded by the heterologous DNA may be transferred, e.g. from corn cells to cells of other species e.g. by protoplast fusion.

The transgenic plants may have many uses in research or breeding, including creation of new mutant plants through insertional mutagenesis, in order to identify beneficial mutants that might later be created by traditional mutation and selection. The methods of the invention may also be used to create plants having unique "signature sequences" or other marker sequences which can be used to identify proprietary lines or varieties.

The following non-limiting examples are illustrative of the present invention. They are presented to better explain the general procedures which were used to prepare the fertile *Zea mays* plants of this invention which stably express the heterologous DNA and which transmit that DNA to progeny. All parts and percents are by weight unless otherwise specified. It must be recognized that a specific transformation event is a function of the amount of material subjected to the transformation procedure. Thus when individual situations arise in which the procedures described herein do not produce a transformed product, repetition of the procedures will be required.

## EXAMPLE I

Fertile transgenic *Zea mays* plants which contain heterologous DNA which is heritable were prepared as follows:

### I. Initiation and Maintenance of Maize Cell Cultures Which Retain Plant Regeneration Capacity

Friable, embryogenic maize callus cultures were initiated from hybrid immature embryos produced by pollination of inbred line A188 plants (University of Minnesota, Crop Improvement Association) with pollen of inbred line B73 plants (Iowa State University). Ears were harvested when

REDACTED VERSION – PUBLICLY FILED

5,538,880

13

the embryos had reached a length of 1.5 to 2.0 mm. The whole ear was surface sterilized in 50% v/v commercial bleach (2.63% w/v sodium hypochlorite) for 20 min. at room temperature. The ears were then washed with sterile distilled, deionized water. Immature embryos were aseptically isolated and placed on nutrient agar initiation/maintenance media with the root/shoot axis exposed to the medium. Initiation/maintenance media (hereinafter refered to as F medium) consisted of N6 basal media (Chu 1975) with 2% (w/v) sucrose, 1.5 mg per liter 2,4-dichlorophenoxyacetic acid (2,4-D), 6 mM proline, and 0.25% Gelrite (Kelco, Inc. San Diego). The pH was adjusted to 5.8 prior to autoclaving. Unless otherwise stated, all tissue culture manipulations were carried out under sterile conditions.

The immature embryos were incubated at 26° C. in the dark. Cell proliferations from the scutellum of the immature embryos were evaluated for friable consistency and the presence of well defined somatic embryos. Tissue with this morphology was transferred to fresh media 10 to 14 days after the initial plating of the immature embryos. The tissue was then subcultured on a routine basis every 14 to 21 days. Sixty to eighty milligram quantities of tissue were removed from pieces of tissue that had reached a size of approximately one gram and transferred to fresh media. Subculturing always involved careful visual monitoring to be sure that only tissue of the correct morphology was maintained. The presence of somatic embryos ensured that the cultures would give rise to plants under the proper conditions. The cell culture named AB12 used in this example was such a culture and had been initiated about 1 year before bombardment.

II. Plasmids—pCHN1-1, pHYGI1, pBII2.21, and pLUC-1

The plasmids pCHN1-1, pHYGI1, and pLUC-1 were constructed in the vector pBS+ (Stratagene, Inc., San Diego, Calif.), a 3.2 Kb circular plasmid, using standard recombinant DNA techniques. pCHN1-1 contains the hygromycin B phosphotransferase (HPT) coding sequence from E. coli (Gritz et al. 1983) flanked at the 3' end by the nopaline synthase (nos) polyadenylation sequence of Agrobacterium tumefaciens M. Bevan et al., Nuc. Acids Res., 11, 369, 1983). Expression is driven by the cauliflower mosaic virus (CaMV) 35S promoter (Guilley et al. 1982), located upstream from the hygromycin coding sequence. The plasmid pHYGI1 was constructed by inserting the 553 bp Bcl-BamHI fragment containing the maize AdhIS first intron (Callis et al. 1987) between the CaMV 35S promoter and the hygromycin coding sequence of pCHN1-1. A map of pHYGI1 is provided as FIG. 1A.

pBII221 contains the E. Coli B-glucuronidase coding sequence flanked at the 5' end by the CaMV 35S promoter and at the 3' end by the nos polyadenylation sequence. The plasmid was constructed by inserting the maize AdhIS first intron between the 35S promoter and the coding sequence of pBII221 (Jefferson et al. 1987). A map of pBII221 is provided as FIG. 2A.

pLUC-1 contains the firefly luciferase coding sequence (DeWet et al. 1987) flanked at the 5' end by the CaMV 35S promoter and at the 3' end by the nos polyadenylation sequence. This plasmid was used solely as a negative control.

Plasmids were introduced into the embryogenic callus culture AB12 by microprojectile bombardment.

III. DNA Delivery Process

The embryogenic maize callus line AB12 was subcultured 7 to 12 d prior to microprojectile bombardment. AB12 was

14

prepared for bombardment as follows. Five clumps of callus, each approximately 50 mg in wet weight were arranged in a cross pattern in the center of a sterile 60 × 15 mm petri plate (Falcon 1007). Plates were stored in a closed container with moist paper towels throughout the bombardment process. Twenty six plates were prepared.

Plasmids were coated onto M-10 tungsten particles (Biolistics) exactly as described by Klein, et al (1988b) except that, (i) twice the recommended quantity of DNA was used, (ii) the DNA precipitation onto the particles was performed at 0° C., and (iii) the tubes containing the DNA-coated tungsten particles were stored on ice throughout the bombardment process.

All of the tubes contained 25 ul 50 mg/ml M-10 tungsten in water, 25 ul 2.5M CaCl₂, and 10 ul 100 mM spermidine free base along with a total of 5 ul 1 mg/ml total plasmid content. When two plasmids were used simultaneously, each was present in an amount of 2.5 ul. One tube contained only plasmid pBII221; two tubes contained both plasmids pHYGI1 and pBII221; two tubes contained both plasmids pCHN1-1 and pBII221; and one tube contained only plasmid pLUC-1.

All tubes were incubated on ice for 10 min., pelletized by centrifugation in an Eppendorf centrifuge at room temperature for 5 seconds, and 25 ul of the supernatant was discarded. The tubes were stored on ice throughout the bombardment process. Each preparation was used for no more than 5 bombardments.

Macroprojectiles and stopping plates were obtained from Biolistics, Inc. (Ithaca, N.Y.). They were sterilized as described by the supplier. The microprojectile bombardment instrument was obtained from Biolistics, Inc.

The sample tray tray was positioned at the position 5 cm below the bottom of the stopping plate tray of the microprojectile instrument, with the stopping plate in the slot below the barrel. Plates of callus tissue prepared as described above were centered on the sample plate tray and the petri dish lid removed. A 7×7 cm square rigid wire mesh with 3×3 mm mesh and made of galvanized steel was placed over the open dish in order to retain the tissue during the bombardment. Tungsten/DNA preparations were sonicated as described by Biolistics, Inc. and 2.5 ul was pipetted onto the top of the macroprojectiles. The instrument was operated as described by the manufacturer. The following bombardments were performed:

2×pBII221 prep To determine transient expression frequency

10×pHYGI1/pBII221 As a potential positive treatment for transformation

1×pCHN1-1/pBII221 As a potential positive treatment for transformation

4×pLUC-1 Negative control treatment

The two plates of callus bombarded with pBII221 were transferred plate for plate to F medium (with no hygromycin) and the callus cultured at 26° C. in the dark. After 2 d this callus was then transferred plate for plate into 35×10 mm petri plates (Falcon 1008) containing 2 ml of GUS assay buffer which consists of 1 mg/ml 5-bromo-4-chloro-3-indolyl-beta-D-glucuronide (Research Organics), 100 mM sodium phosphate pH 7.0, 5 mM each of potassium ferricyanide and potassium ferrocyanide, 10 mM EDTA, and 0.06% Triton X-100. These were incubated at 37° C. for 3 d after which the number of blue cells was counted giving 291 and 477 transient GUS expressing cells in the two plates, suggesting that the DNA delivery process had also occurred with the other bombarded plates. These plates were discarded after counting since the GUS assay is destructive.

5,538,880

| 15 | 16 |

### IV. Selection Process

Hygromycin B (Calbiochem) was incorporated into the medium by addition of the appropriate volume of filter sterilized 100 mg/ml Hygromycin B in water when the media had cooled to 45° C. prior to pouring plates.

Immediately after all samples had been bombarded, callus from all of the plates treated with pHYGI1/pBII221, pCHN1-1/pBII221 and three of the plates treated with pLUC-1 were transferred plate for plate onto F medium containing 15 mg/l hygromycin B, (five pieces of callus per plate). These are referred to as round 1 selection plates. Callus from the fourth plate treated with pLUC-1 was transferred to F medium without hygromycin. This tissue was subcultured every 2–3 weeks onto nonselective medium and is referred to as unselected control callus.

After two weeks of selection, tissue appeared essentially identical on both selective and nonselective media. All callus from eight plates from each of the pHYGI1/pBII221 and pCHN1-1/pBII-221 treatments and two plates of the control callus on selective media were transferred from round 1 selection plates to round 2 selection plates that contained 60 mg/l hygromycin. The round 2 selection plates each contained ten 30 mg pieces of callus per plate, resulting in an expansion of the total number of plates.

The remaining tissue on selective media, two plates each of pHYGI1/pBII221 and pCHN1-1/pBII221 treated tissue and one of control callus, were placed in GUS assay buffer at 37° C. to determine whether blue clusters of cells were observable at two weeks post-bombardment. After 6 d in assay buffer this tissue was scored for GUS expression.

| TREATMENT | REPLICATE | OBSERVATIONS |
|---|---|---|
| pLUC-1 | | no blue cells |
| pHYGI1/pBII221 | plate 1 | 11 single cells |
| | | 1 four cell cluster |
| | plate 2 | 5 single cells |
| pCHN1-1/pBII221 | plate 1 | 1 single cell |
| | | 2 two cell clusters |
| | plate 2 | 5 single cells |
| | | 1 two cell cluster |
| | | 2 clusters of 8–10 cells |

After 21 d on the round 2 selection plates, all viable portions of the material were transferred to round 3 selection plates containing 60 mg/l hygromycin. The round 2 selection plates, containing only tissue that was apparently dead, were reserved. Both round 2 and 3 selection plates were observed periodically for viable proliferating sectors.

After 35 d on round 3 selection plates both the round 2 and round 3 sets of selection plates were checked for viable sectors of callus. Two such sectors were observed proliferating from a background of dead tissue on plates treated with pHYGI1/pBII221. The first sector named 3AA was from the round 3 group of plates and the second sector named 6L was from the round 2 group of plates. Both lines were then transferred to F medium without hygromycin.

After 19 d on F medium without hygromycin the line 3AA grew very little whereas the line 6L grew rapidly. Both were transferred again to F medium for 9 d. The lines 3AA and 6L were then transferred to F medium containing 15 mg/l hygromycin for 14 d. At this point, line 3AA was observed to be of very poor quality and slow growing. The line 6L however grew rapidly on F medium with 15 mg.l hygromycin. In preparation for an inhibition study of the line 6L on hygromycin, the line was then subcultured to F medium without hygromycin.

After 10 d on F medium an inhibition study of the line 6L was initiated. Callus of 6L was transferred onto F medium containing 0, 10, 30, 100, and 250 mg/l hygromycin B. Five plates of callus were prepared for each concentration and each plate contained ten approximately 50 mg pieces of callus. One plate of unselected control tissue was prepared for each concentration of hygromycin.

It was found that the line 6L was capable of sustained growth over 9 subcultures on 0, 10, 30, 190, and 250 mg/l hygromycin. The name of the line 6L was changed at this time from 6L to PH1 (Positive Eygromycin transformant 1)

Additional sectors were recovered at various time points from the round 2 and 3 selection plates. None of these were able to grow in the presence of hygromycin for multiple rounds, i.e. two or three subcultures.

### V. Confirmation of Transformed Callus

To show that the PH1 callus had acquired the hygromycin resistance gene, a Southern blot of PH1 callus was prepared as follows: DNA was isolated from PH1 and unselected control calli by freezing 2 g of callus in liquid nitrogen and grinding it to a fine powder which was transferred to a 30 ml Oak Ridge tube containing 6 ml extraction buffer (7M urea, 250 mM NaCl, 50 mM Tris-HCl pH 8.0, 20 mM EDTA.pH 8.0, 1% sarcosine). To this was added 7 ml of phenol:chloroform 1:1, the tubes shaken and incubated at 37° C. 15 min. Samples were centrifuged at 8K for 10 min. at 4° C. The supernatant was pipetted through miracloth (Calbiochem 475855) into a disposable 15 ml tube (American Scientific Products, C3920–15A) containing 1 ml 4.4M ammonium acetate, pH 5.2. Isopropanol, 6 ml, was added, the tubes shaken, and the samples incubated at –20° C. for 15 min. The DNA was pelleted in a Beckman TJ-6 centrifuge at the maximum speed for 5 min. at 4° C. The supernatant was discarded and the pellet was dissolved in 500 ul TE-10 (10 mM Tris-HCl pH 8.0, 10 mM EDTA pH 8.0) 15 min. at room temperature. The samples were transferred to a 1.5 ml Eppendorf tube and 100 ul 4.4M ammonium acetate, pH 5.2 and 700 ul isopropanol were added. This was incubated at –20° C. for 15 min. and the DNA pelleted 5 min. in an Eppendorf microcentrifuge (12,000 rpm). The pellet was washed with 70% ethanol, dried, and resuspended in TE-1 (10 mM Tris-HCl pH 8.0, 1 mM EDTA).

The isolated DNA (10 ug) was digested with BamHI (NEB) and electrophoresed in a 0.8% w/v agarose gel at 15V for 16 hrs in TAE buffer (40 mM Tris-acetate, 1 mM EDTA). The DNA within the gel was then depurinate, by soaking the gel twice in 0.25 M HCl for 15 min., denatured and cleaved by soaking the gel twice in 0.5M NaOH/1.0M NaCl 15 min., and neutralized by soaking the gel twice in 0.5M Tris pH 7.4/3M NaCl 30 min. DNA was then blotted onto a Nytran membrane (Shleicher & Shuell) by capillary transfer overnight in 6X SSC (20X SSC, 3M NaCl, 0.3M sodium citrate pH 7.0). The membrane was baked at 80° C. for 2 hrs under vacuum. Prehybridization treatment of the membrane was done in 6X SSC, 10X Denhardt's solution, 1% SDS, 50 ug/ml denatured salmon sperm DNA using 0.25 ml prehybridization solution per cm² of membrane. Prehybridization was carried out at 42° C. overnight.

A 32P labelled probe was prepared by random primer labelling with an Oligo Labelling Kit (Pharmacia) as per the suppliers instructions with 32P-dCTP (ICN Radiochemicals). The template used was the 1055 bp BamHI fragment of pHYGI1, which is the HPT coding sequence. The fragment was gel purified and cut again with PsI (NEB) before labelling.

A56

5,538,880

17

The hybridization was performed in 50% formamide, 6X SSC, 1% SDS, 50 ug/ml denatured salmon sperm DNA (Sigma), 0.05% sodium pyrophosphate and all of the iso-propanol precipitated heat denatured probe (107 CPM/50ug template). The hybridization was carried out at 42° C. overnight.

The membrane was washed twice in 50 ml 6X SSC, 0.1% SDS 5 min. at room temperature with shaking, then twice in 500 ml 6X SSC, 0.1% SDS 15 min. at room temperature, then twice in 500 ml 1X SSC, 1% SDS 30 min. at 42° C., and finally in 500 ml 0.1X SSC 1% SDS 60 min. at 65° C. Membranes were exposed to Kodak X-OMAT AR film in an X-OMATIC cassette with intensifying screens. As shown in FIG. 3B, a band was observed for PH1 callus at the expected position of 1.05 Kb, indicating that the HPT coding sequence was present. No band was observed for control callus.

VI. Plant Regeneration and Production of Seed

PH1 callus was transferred directly from all of the concentrations of hygromycin used in the inhibition study to RM5 medium which consists of MS basal salts (Murashige et al. 1962) supplemented with thiamine HCl 0.5 mg/l, 2,4-D 0.75 mg/l, sucrose 50 g/l, asparagine 150 mg/l, and Gelrite 2.5 g/l (Kelco Inc. San Diego).

After 14 d on RM5 medium the majority of PH1 and negative control callus was transferred to R5 medium which is the same as RM5 medium, except that 2,4-D is omitted. These were cultured in the dark for 7 d at 26° C. and transferred to a light regime of 14 hours light and 10 hours dark for 14 d at 26° C. At this point, plantlets that had formed were transferred to one quart canning jars (Ball) containing 100 ml of R5 medium. Plants were transferred from jars to vermiculite after 14 and 21 d. Plants were grown in vermiculite for 7 or 8 d before transplanting into soil and grown to maturity. A total of 65 plants were produced from PH1 and a total of 30 plants were produced from control callus.

To demonstrate that the introduced DNA had been retained in the Ro tissue, a Southern blot was performed as previously described on leaf DNA from three randomly chosen Ro plants of PH1. As shown in FIG. 4B, a 1.05 Kb band was observed with all three plants indicating that the HPT coding sequence was present. No band was observed for DNA from a control plant.

Controlled pollinations of mature PH1 plants were conducted by standard techniques with inbred lines A188, B73 and Oh43. Seed was harvested 45 days post-pollination and allowed to dry further 1–2 weeks. Seed set varied from 0 to 40 seeds per ear when PH1 was the female parent and from 0 to 32 seeds per ear when PH1 was the male parent.

VII. Analysis of the R1 Progeny

The presence of the hygromycin resistance trait was evaluated by a root elongation bioassay, an etiolated leaf bioassay, and by Southern blotting. Two ears each from

18

regenerated PH1 and control plants were selected for analysis. The pollen donor was inbred line A188 for all ears.

(A) Root Elongation Bioassay

Seed was sterilized in a 1:1 dilution of commercial bleach in water plus alconox 0.1% for 20 min. in 125 ml Erlenmeyer flasks and rinsed 3 times in sterile water and imbibed overnight in sterile water containing 50 mg/ml captan by shaking at 150 rpm.

After imbibition, the solution was decanted from the flasks and the seed transferred to flow boxes (Flow Laboratories) containing 3 sheets of $H_2O$ saturated germination paper. A fourth sheet of water saturated germination paper was placed on top of the seed. Seed was allowed to germinate 4 d.

After the seed had germinated, approximately 1 cm of the primary root tip was excised from each seedling and plated on MS salts, 20 g/l sucrose, 50 mg/l hygromycin, 0.25% Gelrite, and incubated in the dark at 26° C. for 4 d.

Roots were evaluated for the presence or absence of abundant root hairs and root branches. Roots were classified as transgenic (hygromycin resistant) if they had root hairs and root branches, and untransformed (hygromycin sensitive) if they had limited numbers of branches. The results are shown in Table 1.

(B) Etiolated leaf bioassay

After the root tips were excised as described above, the seedlings of one PH1 ear and one control ear were transferred to moist vermiculite and grown in the dark for 5 d. At this point 1 mm sections were cut from the tip of the coleoptile, surface sterilized 10 seconds, and plated on MS basal salts, 20 g/l sucrose, 2.5 g/l Gelrite with either 0 (control) or 100 mg/l hygromycin and incubated in the dark at 26° C. for 18 hr. Each plate contained duplicate sections of each shoot. They were then incubated in a light regimen of 14 hours light 10 hours dark at 26° C. for 48 hr, and rated on a scale of from 0 (all brown) to 6 (all green) for the percent of green color in the leaf tissue. Shoots were classified as untransformed (hygromycin sensitive) if they had a rating of zero and transformed (hygromycin resistant) if they had a rating of 3 or greater. The results are shown in Table 1.

(C) Southern Blots

Seedling form the bioassays were transplanted to soil and are growing to sexual maturity. DNA was isolated from 0.8 g of leaf tissue after about 3 weeks and probed with the HPT coding sequence as described previously. Plants with a 1.05 Kb band present in the Southern blot were classified as transgenic. As shown in FIG. 5B, two out of seven progeny of PH1 plant 3 were transgenic as were three out of eight progeny of PH1 plant 10. The blot results correlated precisely with data from the bioassays, confirming that the heterologous DNA was transmitted through one complete sexual life cycle. All data are summarized in Table 1.

TABLE 1

| | | | ANALYSIS OF PH1 R1 PLANTS | | | | |
|---|---|---|---|---|---|---|---|
| PH1 PLANT | ROOT ASSAY | LEAF ASSAY | BLOT | CONT. PLANT | ROOT ASSAY | LEAF ASSAY | BLOT |
| 3.1 | + | ND | + | 4.1 | – | ND | ND |
| 3.2 | – | ND | – | 4.2 | – | ND | ND |

5,538,880

19                                                                          20

TABLE 1-continued

| | | | | ANALYSIS OF PHI R1 PLANTS | | | |
| PHI PLANT | ROOT ASSAY | LEAF ASSAY | BLOT | CONT. PLANT | ROOT ASSAY | LEAF ASSAY | BLOT |
|---|---|---|---|---|---|---|---|
| 3.3 | – | ND | – | 4.3 | – | ND | ND |
| 3.4 | – | ND | – | 4.4 | – | ND | ND |
| 3.5 | – | ND | – | 4.5 | – | ND | ND |
| 3.6 | + | ND | + | 4.6 | – | ND | ND |
| 3.7 | – | ND | – | 4.7 | – | ND | ND |
| | | | | 2.1 | – | ND | – |
| 10.1 | + | + | + | 1.1 | – | – | – |
| 10.2 | + | + | + | 1.2 | + | – | ND |
| 10.3 | – | – | ND | 1.3 | – | – | ND |
| 10.4 | – | – | – | 1.4 | – | – | ND |
| 10.5 | – | – | – | 1.5 | – | – | ND |
| 10.6 | – | – | – | 1.6 | – | – | ND |
| 10.7 | – | – | – | 1.7 | – | – | ND |
| 10.8 | ND | + | + | 1.8 | – | – | ND |

KEY: + = transgenic; – = nontransgenic; ND = not done

## EXAMPLE II

The procedure of Example I was repeated with minor modifications.

I. Plant lines and tissue cultures

The embryogenic maize callus line, AB12, was used as in Example I. The line had been initiated about 18 months before the actual bombardment occurred.

II. Plasmids

The plasmids pBII221 and pHYGI1 described in Example I were used.

III. DNA delivery process

Callus was bombarded exactly as in Example I except that the DNA used in the tungsten/DNA preparations differed. All of the tubes contained 25 ul 50 mg/ml M-10 tungsten in water, 25 ul 2.5M CaCl₂, and 10 ul 100 mM spermidine free base along with a total of 5 ul 1 mg/ml total plasmid content. One tube contained only plasmid pBII221; two tubes contained only plasmid pHYGI1; and one tube contained no plasmid but 5 ul TE-1 (10 mM Tris-HCl pH 8.0, 1 mM EDTA pH 8.0).

The following bombardments were done:

| 2 × pBII221 prep | For transient expression |
| 7 × pHYGI1 prep | Potential positive treatment |
| 3 × TE prep | Negative control treatment |

After all the bombardments were performed, the callus from the pBII221 treatments was transferred plate for plate to F medium as five 50 mg pieces. After 2 d the callus was placed into GUS assay buffer as per Example I. Numbers of transiently expressing cells were counted and found to be 686 and 845 GUS positive cells, suggesting that the particle delivery process had occurred in the other bombarded plates.

IV. Selection of Transformed Callus

After bombardment the callus from the pHYGI1 treatments was placed onto round 1 selection plates, F medium containing 15 mg/l hygromycin, as ten 25 mg pieces per plate (different from Example I). The same was done for two of the plates bombarded with the TE preparation (selected control callus). One plate of callus bombarded with the TE preparation was placed onto F medium with no hygromycin; this callus was maintained throughout the ongoing experi-

ment as a source of control tissue and was referred to as unselected control callus.

After 13 d the callus on round 1 selection plates was indistinguishable from unselected control callus. All of the callus was transferred from round 1 selection plates to round 2 selection plates containing 60 mg/l hygromycin. An approximate five fold expansion of the numbers of plates occurred.

The callus on round 2 selection plates had increased substantially in weight after 23 d, but at this time appeared close to dead. All of the callus was transfered from round 2 selection plates to round 3 selection plates containing 60 mg/l hygromycin. This transfer of all material from round 2 to round 3 selection differs from Example I in which only viable sectors were transferred and the round 2 plates reserved.

At 58 d post-bombardment three live sectors were observed proliferating from the surrounding dead tissue. All three lines were from pHYGI1 treatments and were designated 24C, 56A, and 55A.

After 15 d on maintainance medium, growth of the lines was observed. The line 24C grew well whereas lines 55A and 56A grew more slowly. All three lines were transferred to F medium containing 60 mg/l hygromycin. Unselected control callus from maintenance was plated to F medium having 60 mg/l hygromycin.

After 19 d on 60 mg/l hygromycin the growth of line 24C appeared to be entirely uninhibited, with the control showing approximately 80% of the weight gain of 24C. The line 56A was completely dead, and the line 55A was very close. The lines 24C and 55A were transferred again to F 60 mg/l hygromycin.

After 23 d on 60 mg/l hygromycin the line 24C again appeared entirely uninhibited. The line 55A was completely dead, as was the negative control callus on its second exposure to to F 60 mg/l hygromycin.

At 88 d post-bombardment, a sector was observed proliferating among the surrounding dead tissue on the round 3 selection plates. The callus was from a plate bombarded with pHYGI1 and was designated 13E. The callus was transferred to F medium and cultured for 19 d. Portions of the callus were then transferred to (i) F media containing 15 mg/l hygromycin and (ii) F media containing 60 mg/l hygromycin. Control callus was plated on F media with 15 mg/l hygromycin. After 14 d of culture, the callus line 13E

REDACTED VERSION – PUBLICLY FILED

5,538,880

**21**

appeared uninhibited on both levels of hygromycin. The control callus appeared to have about 80% of the weight gain of 13E. The callus lines were transferred to fresh media at the same respective levels of hygromycin.

### V. Confirmation of Transformed Callus

A Southern blot was prepared from DNA from the line 24C. As shown in FIG. 6B, a band was observed for the line 24C at the expected size of 1.05 Kb showing that the line 24C contained the HPT coding sequence. No band was observed for DNA from control tissue. The name of the callus line 24C was changed to PH2.

### VI. Plant Regeneration and Production of Seed

The line 24C along with unselected control callus were placed onto RM5 medium to regenerate plants as in Example I. After 16 d the callus was transferred to R5 medium as in Example I.

### EXAMPLE III

The procedure of Example II was repeated exactly except that different plasmids were used.

The plasmids pBII221 and pHYGI1 described in Example I were used as well as pMS533 which is a plasmid that contains the insecticidal Bacillus thuringiensis endotoxin (BT) gene fused in frame with the neomycin phosphotransferase (NPTII) gene. 5' of the fusion gene are located segments of DNA from the CaMV 35S and nopaline synthase promoters. 3' from the fusion gene are segments of DNA derived from the tomato protease inhibitor I gene and the poly A region of the nopaline synthase gene.

Callus was bombarded exactly as in Example I except that the DNA used in the tungsten/DNA preparations differed. Two tubes contained plasmids pHYGI1 and pMS533 and one tube contained no plasmid but 5 ul TE-1 (10 mM Tris-HCl pH 8.0, 1 mM EDTA pH 8.0).

The following bombardments were done:

| 9 × pHYGI1/pMS533 | Potential positive treatment |
| 2 × TE prep | Control treatment |

After bombardment the callus from the pHYGI1/pMS533 treatments was placed onto round 1 selection plates, F medium containing 15 mg/l hygromycin, as ten 25 mg pieces per plate. The same was done for one of the plates bombarded with the TE preparation (selected control callus). One plate of callus bombarded with the TE preparation was placed onto F medium with no hygromycin; this callus was maintained throughout the ongoing experiment as a source of control tissue and was referred to as unselected control callus.

After 12 d the callus on round 1 selection plates appeared to show about 90% of the weight gain of the unselected control callus. All of the callus was transferred from round 1 selection plates to round 2 selection plates containing 60 mg/l hygromycin as ten 30 mg pieces per plate.

After 22 d of selection on round 2 selection plates, the callus appeared completely uninhibited. All of the callus was transferred from round 2 selection plates to round 3 selection plates containing 60 mg/l hygromycin.

At 74 d post-bombardment a single viable sector was observed proliferating from the surrounding necrotic tissue. The callus line was from pHYGI1/pMS533 treated material

**22**

and was designated 86R. The callus line 86R was transferred to F medium.

After 24 d the callus line 86R had grown substantially. Portions of the callus were then transferred to (i) F media containing 15 mg/l hygromycin and (ii) F media containing 60 mg/l hygromycin. Control callus was plated on F media with 15 mg/l hygromycin.

After 19 d of culture, the callus line 86R appeared to grow rapidly and was uninhibited on both levels of hygromycin. The control callus appeared to have only about 50% of the weight gain of 86R. The callus lines were transferred to fresh media at the same respective levels of hygromycin to further test the resistance of the callus line 86R to hygromycin.

### COMPARATIVE EXAMPLE A

The basic procedures of Examples i–III have been attempted except varying the selection regime or the form of the callus. These other attempts, which are detailed in Table 2 below, were not successful. Since they were not repeated several times, it is not known whether they can be made to work. In all of the procedures, no viable sectors were observed. In the Table, "Sieved" indicates that the callus was passed through an 860 micron sieve before bombardment; the selective agent was hygromycin for each case except when pMXTI1 was the plasmid and methotrexate the selection agent.

TABLE 2

| | | | Summary of Comparative Example A | | | |
|---|---|---|---|---|---|---|
| Recip. Tissue | Plasmids | Recov. Period | Round 1 Level | Round 1 Period | Round 2 Level | Round 2 Period |
| Clumps | pCHN1-1 pBII221 | 13 | 60 | 21 | 60 | 81 |
| Clumps | pCHN1-1 pBII221 | 14 | 100 | 22 | — | — |
| Clumps | pHYGI1 pBII221 | 8 | 60 | 19 | 30 | 132 |
| Clumps | pCHN1-1 pBII221 | 0 | 30 | 22 | 60 | 109 |
| Clumps | pMTXI1 pBII221 | 8 | 3 | 103 | — | — |
| Sieved | pCHN1-1 pBII221 | 13 | — | — | — | — |

What is claimed is:

1. A process for producing a fertile transgenic Zea mays plant comprising the steps of (i) bombarding intact regenerable Zea mays cells with DNA-coated microprojectiles, (ii) identifying or selecting a population of transformed cells, and (iii) regenerating a fertile transgenic plant therefrom, wherein said DNA is transmitted through a complete sexual cycle of said transgenic plant to its progeny, and imparts herbicide resistance thereto.

2. The process of claim 1 wherein the fertile transgenic Zea mays plant is regenerated from transformed embryogenic tissue.

3. The process of claim 1 wherein the cells are derived from immature embryos.

4. A process comprising obtaining progeny from a fertile transgenic plant obtained by the process of claim 1 which comprise said DNA.

5. The process of claim 4 wherein said progeny are obtained by crossing said fertile transgenic plant with an inbred line.

6. The process of claim 4 comprising obtaining seed from

REDACTED VERSION – PUBLICLY FILED

5,538,880

23

said progeny and obtaining further progeny plants comprising said DNA from said seed.

7. The process of claim 5 wherein the progeny obtained are crossed back to the inbred line, to obtain further progeny which comprise said DNA.

8. The process of claim 6 wherein seeds are obtained from said further progeny plants and plants comprising said DNA are recovered from said seed.

9. The process of claim 7 wherein said further progeny are crossed back to the inbred line to obtain progeny which comprise said DNA.

10. A process for producing a fertile transgenic *Zea mays* plant comprising the steps of (i) bombarding intact regenerable *Zea mays* cells with DNA-coated microprojectiles, (ii) identifying or selecting a population of transformed cells, and (iii) regenerating a fertile transgenic plant therefrom, wherein said DNA is transmitted through a complete sexual cycle of said transgenic plant to its progeny, wherein the DNA imparts insect resistance thereto.

11. The process of claim 10 wherein the fertile transgenic *Zea mays* plant is regenerated from transformed embryogenic tissue.

24

12. The process of claim 10 wherein the cells are derived from immature embryos.

13. A process comprising obtaining progeny from a fertile transgenic plant obtained by the process of claim 10, which comprise said DNA.

14. The process of claim 13 wherein said progeny are obtained by crossing said fertile transgenic plant with an inbred line.

15. The process of claim 13 comprising obtaining seed from said progeny and obtaining further progeny plants comprising said DNA from said seed.

16. The process of claim 14 wherein the progeny obtained are crossed back to the inbred line, to obtain further progeny which comprise said DNA.

17. The process of claim 15 wherein seeds are obtained from said further progeny plants and plants comprising said DNA are recovered from said seed.

18. The process of claim 16 wherein said further progeny are crossed back to the inbred line to obtain progeny which comprise said DNA.

*    *    *    *    *

A60

REDACTED VERSION – PUBLICLY FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| DEKALB GENETICS CORPORATION, | C.A. NO. 04 C 50323 |
| Plaintiff, | |
| v. | JURY TRIAL DEMANDED |
| SYNGENTA SEEDS, INC., | Judge Philip G. Reinhard |
| SYNGENTA BIOTECHNOLOGY, INC., | |
| GOLDEN HARVEST SEEDS, INC., | Magistrate Judge P. Michael Mahoney |
| GARWOOD SEED CO., | |
| GOLDEN SEED COMPANY, L.L.C., | |
| SOMMER BROS. SEED COMPANY, | |
| THORP SEED CO., AND | |
| JC ROBINSON SEEDS, INC. | |
| Defendants. | |

## DEKALB'S SECOND SUPPLEMENTAL RESPONSES TO SYNGENTA'S INTERROGATORIES NOS. 1 & 2

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Plaintiff DEKALB

Genetics Corporation ("DEKALB") provides these supplemental responses and objects to

Syngenta's Interrogatories Nos. 1 & 2 as follows:

### GENERAL OBJECTIONS

1.      DEKALB objects to the Interrogatories to the extent that they are overly

broad and unduly burdensome and seek information that is neither relevant nor

reasonably calculated to lead to the discovery of admissible evidence.

DM_US\8188916.v1

1

A61

REDACTED VERSION – PUBLICLY FILED

2.     DEKALB objects to the definitions and instructions accompanying the Interrogatories to the extent that they seek to impose requirements on DEKALB greater than those imposed by the Federal Rules of Civil Procedure.

3.     DEKALB objects to the Interrogatories to the extent that they seek information protected by the attorney-client and/or work product privileges and/or any other applicable privilege or immunity.

4.     DEKALB objects to the Interrogatories to the extent that they seek information that is subject to or precluded by restrictions of confidentiality imposed by, or pursuant to, agreements between DEKALB and third parties.

5.     DEKALB objects to the Interrogatories to the extent that they prematurely and improperly seek discovery of expert opinions.  Such information will be disclosed within the timeframe outlined in the Court's Scheduling Order.

6.     Discovery in this litigation is ongoing.  Accordingly, DEKALB objects to each Interrogatory as unfairly prejudicial and premature to the extent that it would require DEKALB to formulate its full contentions on various topics in order to answer at this stage of the litigation.  DEKALB reserves the right to supplement its responses to these Interrogatories as discovery progresses in this case and as additional evidence is adduced.

7.     DEKALB objects to Syngenta's definition of the term "DEKALB" to the extent that it extends to any other corporate entity or other business form other than DEKALB, and to any person other than DEKALB's present employees, officers, directors, or agents.

8.     DEKALB reserves the right to assert additional and further objections to Syngenta's Interrogatories to the extent that DEKALB's production of documents or

REDACTED VERSION – PUBLICLY FILED

information in this action reveals that such additional and further objections are appropriate.

DEKALB incorporates these general objections into each Interrogatory response as if fully set forth therein.

**INTERROGATORY NO. 1:**

Identify each claim of the '880 patent that DeKalb contends Syngenta has infringed, and, for each such claim, identify which Syngenta product(s) DeKalb contends were made by an infringing process, describe all alleged acts of infringement by Syngenta (including when and where the alleged acts of infringement occurred), state whether the alleged infringement was literal or under doctrine of equivalents, identify the specific statutory basis (or bases) for the alleged infringement (*e.g.*, 35 U.S.C. §§ 271(a), (b), (c) or (g)), provide a claim chart describing, on an element-by-element basis, all facts and evidence supporting DeKalb's contention that Syngenta performed each step or other element of the claim (including the steps of "bombarding intact regenerable *Zea mays* cells with DNA-coated microprojectiles," "identifying or selecting a population of transformed cells," and "regenerating a fertile transgenic plant therefrom"), and state DeKalb's contentions regarding the proper construction of each claim element and the basis for those contentions (including all references to the specification, prosecution history, and extrinsic evidence that DeKalb relies upon to support its claim construction contentions).

**ORIGINAL RESPONSE TO INTERROGATORY NO. 1**

DEKALB asserts its general objections. DEKALB objects to Interrogatory No. 1 as premature to the extent it requires legal contentions not yet completely formed which may depend in part on the results of additional factual investigation, discovery, and/or consultations with and opinions of expert witnesses, which have not been completed. DEKALB further objects to Interrogatory No. 1 to the extent it seeks information protected by the attorney-client privilege, work product immunity and/or any other applicable privilege or immunity.

Subject to its general and specific objections and to amendment based on facts learned during discovery, DEKALB responds as follows:

DM_US\8188916.v1

3

REDACTED VERSION – PUBLICLY FILED

Syngenta directly infringes claims 4-9 of the '880 patent under § 271(a) and (g). DEKALB is currently aware of at least the following Syngenta corn products that infringe claims 4-9 of the '880 patent: NK Agrisure GT Advantage corn varieties N75-B1, N89-V3, N63-U9, N78-D6, N58-L8, and N76-A9 (Exhibit 1, 7) and possibly N89-V6 and N76-B1 (Exhibit 2) as well. Syngenta's acts of infringement under § 271(a) include making such products. Syngenta's acts of infringement under § 271(g) include using, selling, and offering for sale such products. Syngenta infringes under § 271(a) and (g) regardless of whether the GA21 R0 plant was made by someone other than Syngenta before the '880 patent issued.

When Syngenta sells corn seed including GA21 technology to a farmer who grows plants from that seed, Syngenta is inducing and contributing to the infringement of claims 4-9 of the '880 patent under § 271(b) and (c). When Syngenta provides corn products including GA21 technology to one or more entities that are not wholly controlled by Syngenta and such entities then make, use, sell, offer to sell, or import corn products including such GA21 technology, Syngenta is contributing to the infringement of claims 4-9 of the '880 patent under § 271(c) and may be inducing the infringement of the same claims under § 271(b). An example of this is Syngenta's offering corn products including GA21 technology for sale through the Golden Harvest group of companies. When Syngenta provides corn products including GA21 technology to the Golden Harvest group of companies and those companies then make, use, sell, offer to sell, or import corn products including GA21 technology, Syngenta is contributing to and inducing the infringement of claims 4-9 of the '880 patent under § 271(b) and (c). Upon information and belief, all of these infringing acts are acts of literal infringement.

REDACTED VERSION – PUBLICLY FILED

Syngenta announced on May 12, 2004 its acquisition of rights to GA21 from Bayer CropScience and its intention to offer GA21 in NK brand hybrids and through licenses with other seed companies. Syngenta does not have a license to the asserted claims of the '880 patent from DEKALB, and Bayer CropScience did not have the capacity to convey any rights under the asserted claims of the '880 patent to Syngenta. Syngenta's infringing acts are listed in the chart below.

Syngenta's predecessor, Ciba-Geigy, was a party to *DEKALB Genetics Corp. v. Ciba-Geigy Corp.*, No. 96 C 50241. The court in that case construed the claims of the '880 patent in the context of a patent infringement action that DEKALB brought against Ciba-Geigy. *DEKALB Genetics Corp. v. Ciba-Geigy Corp.*, No. 96 C 50241 (N.D. Ill. June 30, 1999) (Report and Recommendation of Special Master Regarding Claim Construction). DEKALB contends that that claim construction applies here. References to the specification, prosecution history, and extrinsic evidence supporting that claim construction are found in the Special Master's report and in DEKALB's Markman briefs.

| INFRINGEMENT CHART FOR THE '880 PATENT | |
|---|---|
| Claim | Evidence Supporting DEKALB's Contentions that Syngenta has Infringed Claims 4-9 |
| 1. A process for producing a fertile transgenic *Zea mays* plant comprising the steps of | GA21 is the designation for a specific transgenic corn event. (*See generally* Exhibit 3).<br><br>GA21 corn includes a DNA sequence resulting from genetic engineering. (*Id.* at 23-28). |
| (i) bombarding intact regenerable *Zea mays* cells with DNA-coated microprojectiles, | GA21 corn was produced by bombarding intact embryogenic corn cells, which were regenerable, with DNA coated microprojectiles. (*Id.* at 23). The DNA on the microprojectiles included an EPSPS gene that confers glyphosate resistance to corn cells. (*Id.* at 26-45). |

REDACTED VERSION – PUBLICLY FILED

| INFRINGEMENT CHART FOR THE '880 PATENT | |
|---|---|
| **Claim** | **Evidence Supporting DEKALB's Contentions that Syngenta has Infringed Claims 4-9** |
| (ii) identifying or selecting a population of transformed cells, and | As part of the process of producing GA21, corn cells bombarded with the DNA coated microprojectiles were grown in the presence of glyphosate and only the transformed corn cells continued to grow, i.e., the transformed cells were selected. (*Id.* at 23). |
| (iii) regenerating a fertile transgenic plant therefrom, | A fertile transgenic corn plant was regenerated from corn cells transformed as described above. (*Id.*) |
| wherein said DNA is transmitted through a complete sexual cycle of said transgenic plant to its progeny, | GA21 corn passed the EPSPS gene that it contains to progeny corn plants. (*Id.* at 26-45). |
| and imparts herbicide resistance thereto. | GA21 corn expresses the EPSPS gene that it contains. (*Id.*)  The EPSPS gene in GA21 corn imparts glyphosate resistance to the GA21 corn. (*Id.* at 26-45). Glyphosate is a herbicide. (*Id.* at 26-49). |
| 4.  A process comprising obtaining progeny from a fertile transgenic plant obtained by the process of claim 1 which comprise said DNA. | On information and belief, in order to make and sell corn varieties containing GA21 technology for the 2005 growing season, Syngenta has obtained progeny plants containing GA21 technology. (*See* Exhibits 1-2, 4-7).<br><br>On information and belief, in order to make and sell corn varieties that contain GA21 technology for the 2005 growing season, Syngenta has introgressed the GA21 trait into inbred corn lines by crossing plants containing GA21 technology with plants from inbred corn lines, obtaining progeny containing GA21 technology, and then backcrossing the progeny through several generations to the inbred corn line. (*See id.*) |
|  | On information and belief, in order to make and sell corn varieties that contain GA21 technology for the 2005 growing season, Syngenta has crossed the resulting inbred corn plants containing GA21 technology with other inbred corn plants to obtain commercial hybrid corn varieties containing GA21 technology. (*See id.*)<br><br>Syngenta is selling or offering to sell such corn hybrids through NK and Golden Harvest for the 2005 growing season.  Syngenta is marketing these varieties under Syngenta's Agrisure GT Advantage brand. (*See id.*)<br><br>Agrisure GT Advantage is Syngenta's brand name for GA21. (Exhibits 2, 5, 6).  The NK varieties include N58-L8, N63-U9, N75-B1, N76-A9, N78-D6, N89-V3 (Exhibits 1, 7) and possibly N89-V6 and N76-B1 (Exhibit 2).  The Agrisure GT Advantage corn varieties have the GA21 trait and they are resistant to glyphosate, a herbicide. (*See* Exhibits 1-2, 4-7). |

REDACTED VERSION – PUBLICLY FILED

| INFRINGEMENT CHART FOR THE '880 PATENT | |
|---|---|
| Claim | Evidence Supporting DEKALB's Contentions that Syngenta has Infringed Claims 4-9 |
| 5. The process of claim 4 wherein said progeny are obtained by crossing said fertile transgenic plant with an inbred line. | On information and belief, in order to make and sell corn varieties that contain GA21 technology for the 2005 growing season, Syngenta has introgressed the GA21 trait into inbred corn lines by crossing plants containing GA21 technology with plants from inbred corn lines, obtaining progeny containing GA21 technology, and then backcrossing the progeny through several generations to the inbred corn line.  (*See id.*)<br><br>On information and belief, in order to make and sell corn varieties that contain GA21 technology for the 2005 growing season, Syngenta has crossed the resulting inbred corn plants containing GA21 technology with other inbred corn plants to obtain commercial hybrid corn varieties containing GA21 technology.  (*See id.*)<br><br>Syngenta is selling or offering to sell such corn hybrids through NK and Golden Harvest for the 2005 growing season.  Syngenta is marketing these varieties under Syngenta's Agrisure GT Advantage brand.  (*See id.*)<br><br>Agrisure GT Advantage is Syngenta's brand name for GA21.  (Exhibits 2, 5, 6).  The NK varieties include N58-L8, N63-U9, N75-B1, N76-A9, N78-D6, N89-V3 (Exhibits 1, 7) and possibly N89-V6 and N76-B1 (Exhibit 2).  The Agrisure GT Advantage corn varieties have the GA21 trait and they are resistant to glyphosate, a herbicide.  (*See* Exhibits 1-2, 4-7). |
| 6. The process of claim 4 comprising obtaining seed from said progeny and obtaining further progeny plants comprising said DNA from said seed. | Same as for claim 5. |
| 7. The process of claim 5 wherein the progeny obtained are crossed back to the inbred line, to obtain further progeny which comprise said DNA. | Same as for claim 5. |
| 8. The process of claim 6 wherein seeds are obtained from said further progeny plants and plants comprising said DNA are recovered from said seed. | Same as for claim 5. |

REDACTED VERSION – PUBLICLY FILED

| INFRINGEMENT CHART FOR THE '880 PATENT | |
|---|---|
| Claim | Evidence Supporting DEKALB's Contentions that Syngenta has Infringed Claims 4-9 |
| 9. The process of claim 7 wherein said further progeny are crossed back to the inbred line to obtain progeny which comprise said DNA. | Same as for claim 5. |

## FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1

DEKALB incorporates its previous general and specific objections and its previous response to Interrogatory No. 1 into this response. DEKALB further responds that DEKALB generated R0 plants from transgenic corn event GA21 at its Mystic, Connecticut facility in the 1993-94 timeframe. On information and belief, Defendants have conducted the activities recited in claims 4-9 in the United States during the term of the '880 patent. (*See* Exhibits 1-2, 4-7 from original response.)

DEKALB has already provided Defendants with DEKALB's claim construction contentions in its previous response to Interrogatory No. 1, incorporated into this supplemental response. DEKALB further contends that claim 4 of the '880 patent claims a process comprising the step of obtaining progeny, and the progeny recited in claim 4 were made from the fertile transgenic plants obtained by the process of claim 1, or a plant from any generation of descendants of the claim 1 plants. (*See* Report and Recommendation of Special Master Regarding Claim Construction at 43, construing term "progeny" for '880 patent claim 4; *see also id.*, construing term "progeny" for '880 patent claims 5-9).

REDACTED VERSION – PUBLICLY FILED

**SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1**

DEKALB incorporates its previous general and specific objections and its previous responses to Interrogatory No. 1 into this response. DEKALB further responds that in the case of GA21 corn, the steps of claim 1 of the '880 patent were carried out at least by the following dates:

| Claim Step | Date Performed |
|---|---|
| 1. A process for producing a fertile transgenic *Zea mays* plant comprising the steps of | |
| (i) bombarding intact regenerable *Zea mays* cells with DNA-coated microprojectiles, | July 15, 1993 |
| (ii) identifying or selecting a population of transformed cells, and | July 27, 1993 |
| (iii) regenerating a fertile transgenic plant therefrom, | February 25, 1994 |
| wherein said DNA is transmitted through a complete sexual cycle of said transgenic plant to its progeny, | |
| and imparts herbicide resistance thereto. | |

**INTERROGATORY NO. 2:**

Identify each claim of the '863 patent that DeKalb contends Syngenta has infringed, and, for each such claim, identify which Syngenta product(s) DeKalb contends were made by an infringing process, describe all alleged acts of infringement by Syngenta (including when and where the alleged acts of infringement occurred), state whether the alleged infringement was literal or under the doctrine of equivalents, identify the specific statutory basis (or bases) for the alleged infringement (*e.g.*, 35 U.S.C. §§ 271(a), (b), (c) or (g)), provide a claim chart describing, on an element-by-element basis, all facts and evidence supporting DeKalb's contention that Syngenta performed each step or other element of the claim (including the steps of "bombarding intact regenerable *Zea mays* cells with DNA-coated microprojectiles," "identifying or selecting a population of transformed cells," and "regenerating a fertile transgenic plant therefrom"), and state DeKalb's contentions regarding the proper construction of each claim element and the

REDACTED VERSION – PUBLICLY FILED

basis for those contentions (including all references to the specification, prosecution history, and extrinsic evidence that DeKalb relies upon to support its claim construction contentions).

## RESPONSE TO INTERROGATORY NO. 2

DEKALB asserts its general objections. DEKALB objects to Interrogatory No. 2 as premature to the extent it requires legal contentions not yet completely formed which may depend in part on the results of additional factual investigation, discovery, and/or consultations with and opinions of expert witnesses, which have not been completed. DEKALB further objects to Interrogatory No. 2 to the extent it seeks information protected by the attorney-client privilege, work product immunity and/or any other applicable privilege or immunity.

Subject to its general and specific objections and to amendment based on facts learned during discovery, DEKALB responds as follows:

Syngenta directly infringes claims 5 and 6 of the '863 patent under § 271(a) and (g). DEKALB is currently aware of at least the following Syngenta corn products that infringe claims 5 and 6 of the '863 patent: N75-B1, N89-V3, N63-U9, N78-D6, N58-L8, and N76-A9 (Exhibit 1, 7) and possibly N89-V6 and N76-B1 (Exhibit 2) as well. Syngenta's acts of infringement under § 271(a) include making such products. Syngenta's acts of infringement under § 271(g) include using, selling, and offering for sale such products. Syngenta infringes under § 271(a) and (g) regardless of whether the GA21 R0 plant was made by someone other than Syngenta before the '863 patent issued.

When Syngenta sells corn seed including GA21 technology to a farmer who grows plants from that seed, Syngenta is inducing and contributing to the infringement of claims 5 and 6 of the '863 patent under § 271(b) and (c). When Syngenta provides corn products including GA21 technology to one or more entities that are not wholly

A70

controlled by Syngenta and such entities then make, use, sell, offer to sell, or import corn products including such GA21 technology, then Syngenta is contributing to the infringement of claims 5 and 6 of the '863 patent under § 271(c) and may be inducing the infringement of the same claims under § 271(b). An example of this is Syngenta's offering corn products including GA21 technology for sale through the Golden Harvest group of companies. When Syngenta provides corn products including GA21 technology to the Golden Harvest group of companies and those companies then make, use, sell, offer to sell, or import corn products including GA21 technology, Syngenta is contributing to and inducing the infringement of claims 5 and 6 of the '863 patent under § 271(b) and (c). Upon information and belief, all of these infringing acts are acts of literal infringement.

Syngenta announced on May 12, 2004 its acquisition of rights to GA21 from Bayer CropScience and its intention to offer GA21 in NK brand hybrids and through licenses with other seed companies. Syngenta does not have a license to the asserted claims of the '863 patent from DEKALB, and Bayer CropScience did not have the capacity to convey any rights under the asserted claims of the '863 patent to Syngenta. Syngenta's infringing acts are listed in the chart below.

Syngenta's predecessor, Ciba-Geigy, was a party to *DEKALB Genetics Corp. v. Ciba-Geigy Corp.*, No. 96 C 50241. The court in that case construed the claims of the '880 patent in the context of a patent infringement action that DEKALB brought against Ciba-Geigy. *DEKALB Genetics Corp. v. Ciba-Geigy Corp.*, No. 96 C 50241 (N.D. Ill. June 30, 1999) (Report and Recommendation of Special Master Regarding Claim Construction). The '863 patent issued from application no. 08/844,555, which is a

REDACTED VERSION – PUBLICLY FILED

division of application no. 08/677,695, which is a continuation of application no. 07/974,379, which is the grandparent application of the '880 patent. The elements of claims 5 and 6 are substantially identical to, and have the same meaning as, elements from the asserted claims of the '880 patent. DEKALB contends that that claim construction applies here to the asserted claims of the '863 patent. References to the specification, prosecution history, and extrinsic evidence supporting that claim construction are found in the Special Master's report and in DEKALB's Markman briefs.

| INFRINGEMENT CHART FOR THE '863 PATENT | |
|---|---|
| **Claim** | **Evidence Supporting DEKALB's Contentions that Syngenta has Infringed Claims 5-6** |
| 1. A process for producing a fertile transgenic *Zea mays* plant comprising the steps of | GA21 is the designation for a specific transgenic corn event. (*See generally* Exhibit 3).<br><br>GA21 corn includes a DNA sequence resulting from genetic engineering. (*Id.* at 23-28). |
| (i) bombarding intact regenerable *Zea mays* cells with DNA-coated microprojectiles, wherein said DNA comprises at least a selectable marker gene; | GA21 corn was produced by bombarding intact embryogenic corn cells, which were regenerable, with DNA coated microprojectiles. (*Id.* at 23). The DNA on the microprojectiles included an EPSPS gene that confers glyphosate resistance to corn cells (*Id.* at 26-45) and also that acts as a selectable marker gene for the selection of transformed corn cells (*Id.* at 23). |
| (ii) selecting a population of transformed cells expressing the selectable marker gene; and | As part of the process of producing GA21, corn cells bombarded with the DNA coated microprojectiles were grown in the presence of glyphosate and only the transformed corn cells continued to grow, i.e., the transformed cells were selected. (*Id.*) |
| (iii) regenerating a fertile transgenic plant therefrom, | A fertile transgenic corn plant was regenerated from corn cells transformed as described above. (*Id.*) |

REDACTED VERSION – PUBLICLY FILED

| INFRINGEMENT CHART FOR THE '863 PATENT | |
|---|---|
| Claim | Evidence Supporting DEKALB's Contentions that Syngenta has Infringed Claims 5-6 |
| wherein said DNA is expressed so as to impart glyphosate resistance to said transgenic plant and is transmitted through a normal sexual cycle of said transgenic plant to progeny plants, | GA21 corn expresses the EPSPS gene that it contains. (*Id.* at 26-45). The EPSPS gene in GA21 corn imparts glyphosate resistance to the GA21 corn. (*Id.*) GA21 corn passed the EPSPS gene that it contains to progeny corn plants. (*Id.*) |
| 5.  The process of claim 1 further comprising obtaining transgenic glyphosate resistant progeny plants of subsequent generations from said fertile transgenic plant | On information and belief, in order to make and sell corn varieties containing GA21 technology for the 2005 growing season, Syngenta has obtained progeny plants containing GA21 technology. (*See* Exhibits 1-2, 4-7).<br><br>On information and belief, in order to make and sell corn varieties that contain GA21 technology for the 2005 growing season, Syngenta has introgressed the GA21 trait into inbred corn lines by crossing plants containing GA21 technology with plants from inbred corn lines, obtaining progeny containing GA21 technology, and then backcrossing the progeny through several generations to the inbred corn line.  (*See id.*)<br><br>On information and belief, in order to make and sell corn varieties that contain GA21 technology for the 2005 growing season, Syngenta has crossed the resulting inbred corn plants containing GA21 technology with other inbred corn plants to obtain commercial hybrid corn varieties containing GA21 technology.  (*See id.*)<br><br>Syngenta is selling or offering to sell such corn hybrids through NK and Golden Harvest for the 2005 growing season.  Syngenta is marketing these varieties under Syngenta's Agrisure GT Advantage brand. (*See id.*)<br><br>Agrisure GT Advantage is Syngenta's brand name for GA21. (Exhibits 2, 5, 6).  The NK varieties include N58-L8, N63-U9, N75-B1, N76-A9, N78-D6, N89-V3 (Exhibits 1, 7) and possibly N89-V6 and N76-B1 (Exhibit 2).  The Agrisure GT Advantage corn varieties have the GA21 trait and they are resistant to glyphosate, a herbicide. (*See* Exhibits 1-2, 4-7). |

REDACTED VERSION – PUBLICLY FILED

| INFRINGEMENT CHART FOR THE '863 PATENT | |
|---|---|
| Claim | Evidence Supporting DEKALB's Contentions that Syngenta has Infringed Claims 5-6 |
| 6. The process of claim 5 further comprising obtaining seed from one of said progeny plants | On information and belief, in order to make and sell corn varieties containing GA21 technology for the 2005 growing season, Syngenta has obtained progeny plants containing GA21 technology and seed from those progeny plants containing GA21 technology. (*See id.*)<br><br>On information and belief, in order to make and sell corn varieties that contain GA21 technology for the 2005 growing season, Syngenta has introgressed the GA21 trait into inbred corn lines by crossing plants containing GA21 technology with plants from inbred corn lines, obtaining progeny containing GA21 technology, and then backcrossing the progeny through several generations to the inbred corn line. (*See id.*) |
| | On information and belief, in order to make and sell corn varieties that contain GA21 technology for the 2005 growing season, Syngenta has crossed the resulting inbred corn plants containing GA21 technology with other inbred corn plants to obtain commercial hybrid corn varieties containing GA21 technology. (*See id.*)<br><br>Syngenta is selling or offering to sell such corn hybrids through NK and Golden Harvest for the 2005 growing season. Syngenta is marketing these varieties under Syngenta's Agrisure GT Advantage brand. (*See id.*)<br><br>Agrisure GT Advantage is Syngenta's brand name for GA21. (Exhibits 2, 5, 6). The NK varieties include N58-L8, N63-U9, N75-B1, N76-A9, N78-D6, N89-V3 (Exhibits 1, 7) and possibly N89-V6 and N76-B1 (Exhibit 2). The Agrisure GT Advantage corn varieties have the GA21 trait and they are resistant to glyphosate, a herbicide. (*See* Exhibits 1-2, 4-7). |

## FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2

DEKALB incorporates its previous general and specific objections and its previous response to Interrogatory No. 2 into this response. DEKALB further responds that DEKALB generated R0 plants from transgenic corn event GA21 at its Mystic, Connecticut facility in the 1993-94 timeframe. On information and belief, Defendants have conducted the activities recited in claims 5 and 6 in the United States during the term of the '863 patent. (*See* Exhibits 1-2, 4-7 from original response.)

REDACTED VERSION – PUBLICLY FILED

DEKALB has already provided Defendants with DEKALB's claim construction contentions in its previous response to Interrogatory No. 2, incorporated into this supplemental response. DEKALB further contends that claim 5 of the '863 patent recites the step of "obtaining transgenic glyphosate resistant progeny plants of subsequent generations from said fertile transgenic plant" in the claimed process. DEKALB further contends that claim 6 of the '863 patent recites the step of "obtaining seed from one of said progeny plants" in the claimed process.

**SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2**

DEKALB incorporates its previous general and specific objections and its previous responses to Interrogatory No. 2 into this response. DEKALB further responds that in the case of GA21 corn, the steps of claim 1 of the '863 patent were carried out at least by the following dates:

| | |
|---|---|
| 1. A process for producing a fertile transgenic *Zea mays* plant comprising the steps of | |
| (i) bombarding intact regenerable *Zea mays* cells with DNA-coated microprojectiles, wherein said DNA comprises at least a selectable marker gene; | July 15, 1993 |
| (ii) selecting a population of transformed cells expressing the selectable marker gene; and | July 27, 1993 |
| (iii) regenerating a fertile transgenic plant therefrom, | February 25, 1994 |
| wherein said DNA is expressed so as to impart glyphosate resistance to said transgenic plant and is transmitted through a normal sexual cycle of said transgenic plant to progeny plants, | |

REDACTED VERSION – PUBLICLY FILED

Dated: _April 21_, 2005

Respectfully submitted,

By _Thomas A Miller_

John J. Holevas
Illinois Bar No. 06193197
WILLIAMS & MCCARTHY
321 West State Street
Rockford, IL  61101
(815) 987-8900

John F. Lynch
Thomas A. Miller
Susan K. Knoll
Scott W. Clark
HOWREY SIMON ARNOLD & WHITE, LLP
750 Bering Drive
Houston, TX  77057
(713) 787-1400

**ATTORNEYS FOR PLAINTIFF
DEKALB GENETICS CORPORATION**

DM_US\8188916.v1

16

A76

REDACTED VERSION – PUBLICLY FILED

# Exhibit 3

REDACTED VERSION – PUBLICLY FILED



Petition for Determination of Nonregulated Status:
Roundup Ready Corn Line GA21
Monsanto Company, St. Louis
April 9, 1997
Revised July 30, 1997
97-138U
CBI DELETED

David P. Miller

DKB 029863