REDACTED VERSION – PUBLICLY FILED

```
1               IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
2                        WESTERN DIVISION

3   DEKALB GENETICS CORPORATION, )      Docket No. 04 C 50323
                                 )
4                  Plaintiff,    )      Rockford, Illinois
                                 )      Monday, May 16, 2005
5                                )      1:30 o'clock p.m.
                  v.             )
6                                )
                                 )
7   SYNGENTA SEEDS, INC., et al.,)
                                 )
                  Defendants.    )
8
                    TRANSCRIPT OF PROCEEDINGS
9          BEFORE THE HONORABLE P. MICHAEL MAHONEY

10  APPEARANCES:

11  For the Plaintiff:         HOWREY, SIMON, ARNOLD & WHITE
                               (750 Bering Drive,
12                              Suite 400,
                               Houston, Texas  77057) by
13                             MR. THOMAS A. MILLER
                               MR. SCOTT W. CLARK
14
                               WILLIAMS & MC CARTHY
15                             (321 West State Street,
                               Suite 400,
16                             Rockford, Illinois  61101) by
                               MR. JOHN J. HOLEVAS
17
    For the Defendant:         CASSIDAY, SCHADE & GLOOR
18                             (20 North Wacker Drive,
                               Suite 1040,
19                             Chicago, Illinois  60606-2903) by
                               MR. DAVID C. VAN DYKE
20
                               FINNEGAN, HENDERSON, FARABOW,
21                             GARRETT & DUNNER
                               (901 New York Avenue, N.W.,
22                             Washington, D.C.  20001-4413) by
                               MR. MICHAEL J. FLIBBERT
23
    Court Reporter:            Mary T. Lindbloom
24                             211 South Court Street
                               Rockford, Illinois  61101
25                             (815) 987-4486
```

REDACTED VERSION – PUBLICLY FILED

17

1           MR. MILLER:  All right, your Honor.  I'll give it a

2    whack this time.

3           We're really not talking about the product, although

4    ultimately when we're talking about information that we want,

5    we're calling it non-GA21.  That's the easiest way to describe

6    it because they did try to make their own glyphosate-resistant

7    corn product.

8           The claims that are involved in this patent -- and

9    they are attached to the briefing, I think -- if you look at

10   the '880 patent, the dependent claim, the first dependent claim

11   that we're seeking to enforce, is a process for making a

12   progeny plant.  That's exactly what Syngenta people are doing

13   right now.

14          THE COURT:  But when you say that, counsel, isn't it a

15   particular process for making the plant?  It can't be just any

16   process.

17          MR. MILLER:  It requires, your Honor, that it be made

18   from a plant that was transformed using the bombardment

19   process.

20          THE COURT:  Well, if they don't use the bombardment

21   process in this entire experiment, how can it relate to your

22   patent?

23          MR. MILLER:  Because, your Honor, the claim only says

24   that the plant that they start with to make progeny plants must

25   have been made at some point in time by a bombardment process.

REDACTED VERSION – PUBLICLY FILED

Minute Order Form (06/77)

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Philip G. Reinhard | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 96 C 50112 | **DATE** | 9/17/1999 |
| **CASE TITLE** | DeKalb Genetics Corp. vs. Pioneer Hi-Bred Int'l Inc. | | |

MOTION:

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

DOCKET ENTRY:

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ☒ [Other docket entry] The court hereby adopts all of the findings in the special master's Report and Recommendation as the findings of the court. Pioneer's request for an oral hearing on the issue of claim construction is denied.

(11) ☒ [For further detail see order on the reverse side of the original minute order.]

DEPOSITION EXHIBIT 5 Ward 12-14-05

| | |
|---|---|
| No notices required, advised in open court. | |
| No notices required. | |
| Notices mailed by judge's staff. | |
| Notified counsel by telephone. | |
| Docketing to mail notices. | |
| Mail AO 450 form. | |
| Copy to judge/magistrate judge. | |

A109

REDACTED VERSION – PUBLICLY FILED

(Reserved for use by the Court)

## ORDER

Seven patent infringement suits, in which DeKalb Genetics Corporation is the plaintiff, were referred on January 4, 1999, to Special Master Robert L. Harmon, who was approved by all the parties, pursuant to Fed. R. Civ. P. 53. The order of reference specified that the special master would "report to this court and the parties his conclusions, and the reasons for them, regarding the meaning of any disputed term in any allegedly infringed claim of the following patents: U.S. Patent Nos. 5,484,956; 5,489,520; 5,538,877; and 5,538,880." Order of Reference, ¶ 3, DeKalb Genetics Corp. v. Pioneer Hi-Bred Int'l, Inc., 96 C 50112 (N.D. Ill. Jan. 4, 1999). The special master held an evidentiary hearing on May 25-28, 1999, in which six expert witnesses testified and extensive attorney argument was heard. The parties filed extensive briefs both before and after the hearing. The special master's lengthy and comprehensive Report and Recommendation regarding claim construction was received by the court on June 30, 1999. All parties have filed objections to various aspects of the Report and Recommendation, but it is not necessary for the court to specifically address each objection. Suffice it to say, all counsel for all parties are knowledgeable and have been very thorough in presenting their arguments to the court.

The court, not the jury, has the power and obligation to construe as a matter of law the meaning of language used in patent claims. Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995) aff'., 517 U.S. 370 (1996). This court has reviewed *de novo* the thorough Report and Recommendation, the objections thereto filed by the parties, the transcripts of the evidentiary hearing and the patents and their prosecution histories. The court hereby adopts all of the findings in the special master's Report and Recommendation as the findings of the court. See Fed. R. Civ. P. 52.

Mycogen and Pioneer's requests for oral hearings on the issue of claim construction are denied as neither seek to submit additional evidence, but rather to argue legal positions already clear to the court.

REDACTED VERSION – PUBLICLY FILED



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| DEKALB GENETICS CORPORATION, | ) | Civil Actions  96 C 50112 |
| | ) | 96 C 50114 |
| Plaintiff, | ) | 96 C 50159 |
| | ) | 96 C 50239 |
| v. | ) | 96 C 50241 |
| | ) | 96 C 50284 |
| PIONEER HI-BRED INTERNATIONAL, INC., | ) | 98 C 50186 |
| MYCOGEN CORPORATION, including its | ) | |
| Operating subsidiaries AGRIGENETICS, INC. and | ) | Judge Philip G. Reinhard |
| MYCOGEN PLANT SCIENCES, INC., | ) | Magistrate P. Michael Mahoney |
| CIBA-GEIGY CORPORATION, and NORTHRUP | ) | Special Master Robert L. Harmon |
| KING CO. (formerly Sandoz Seeds Co.), | ) | |
| | ) | Transgenic Corn Patent Litigation |
| Defendants. | ) | |

DOCKETED
JUL 0 1 1999

**REPORT AND RECOMMENDATION
OF SPECIAL MASTER
REGARDING CLAIM CONSTRUCTION**

These seven civil actions are related by the fact that each involves an assertion of

infringement of one or more of four United States patents owned by plaintiff DeKalb Genetics

Corporation (DeKalb). The patents are in the field of genetic engineering and address the

production of transgenic corn. The four principal defendants are Pioneer Hi-Bred International,

Inc. (Pioneer), Northrup King Co. (NK), Ciba Geigy Corporation (Ciba), and Mycogen

Corporation (Mycogen).

In an Order of Reference dated January 4, 1999, the Court appointed the undersigned as

Special Master (SM) in these cases pursuant to Rule 53, FRCP. The specific purpose of the

reference was to have the SM provide a recommended construction of the claims of the patents

in suit. Under the express terms of the Order, the SM has "all of the powers described in Rule 53

of Fed. R. Civ. P., to conduct an evidentiary hearing on the record to hear and recommend to the

A111

REDACTED VERSION – PUBLICLY FILED

Court the resolution of all issues of interpretation of the claims of the patents-in-suit, as provided

for in *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995), *aff'd.*, 517 U.S. 370,

116 S.Ct. 1384 (1996)," and "is not limited by any prior rulings of Judge Reinhard or Magistrate

Mahoney."

A four-day hearing was held in Chicago, Illinois on May 25-28, 1999. Live witness

testimony was received from six expert witnesses, each with a Ph.D. in biological science and

each with substantial experience and achievement in technical areas pertinent to the technology

of the patents in suit. Their testimony was helpful in assisting the SM to acquire sufficient

understanding of that technology to inform and enable the claim construction exercise. In

addition, counsel explained the prosecution histories of the patents and attempted to demonstrate

how the transactions reflected there supported their positions on claim interpretation. Extensive

attorney argument was entertained throughout the hearing. Massive written submissions were

filed preceding and subsequent to the hearing. Upon full consideration of all matters raised

during those proceedings, this report is respectfully submitted in response to the Court's directive

to recommend a construction of the claims of the patents in suit.

## GOVERNING LEGAL PRINCIPLES

### The Legal Framework for Claim Construction

Proper claim construction necessarily precedes a determination of whether the claims

read on the accused devices or methods for infringement purposes.[1] Indeed, claim construction

---

[1] *E.g., Fonar Corp. v. Johnson & Johnson*, 821 F.2d 627, 3 USPQ2d 1109, 1112 (Fed. Cir. 1987)

REDACTED VERSION – PUBLICLY FILED

Report and Recommendation of Special Master Regarding Claim Construction        Page 3
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

will normally control the remainder of the decisional process,[2] for it is axiomatic that the claims

must be construed in the same way for infringement that they are for determining validity.[3]

   In the Markman case, supra, the Supreme Court held that interpretation of patent claims

is a question for the court, while application of properly construed claims to determine

infringement is a question for the finder of fact, in this case the jury. As a starting point, the

words in a patent claim should be given their ordinary and customary meaning unless it appears

from the specification that the patentee defined them otherwise.[4] Nonetheless, when technical or

scientific terms in the claims require definition or explanation or understanding in the course of

deciding whether the claims are infringed, it is the court's responsibility to undertake that task.[5]

   In discharging its Markman responsibility, the court must inevitably decide what the scope

of the underlying evidentiary inquiry will be. The Federal Circuit explained this decisional

process in Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 39 USPQ2d 1573 (Fed. Cir.

1996). Ordinarily, the court should confine itself, if possible, to an examination of the intrinsic

patent documents: the patent itself and its prosecution history. In most situations, an analysis of

the intrinsic evidence alone will resolve any ambiguity in a disputed claim element. In those

cases where the public record unambiguously describes the scope of the patented invention,

reliance on any extrinsic evidence is improper. Only if there is still some genuine ambiguity in

the claims, after consideration of all available intrinsic evidence, should the court resort to

extrinsic evidence such as expert testimony. And even if the judge decides to hear all possible

evidence before construing the claims, expert testimony inconsistent with the intrinsic evidence

---

[2] Panduit Corp. v. Dennison Mfg. Co., 810 F.2d 1561, 1 USPQ2d 1593, 1597 (Fed. Cir. 1987).
[3] E.g., Intervet America, Inc. v. Kee-Vet Labs., Inc., 887 F.2d 1050, 12 USPQ2d 1474, 1476 (Fed. Cir. 1989). It is recommended that the jury be so instructed.
[4] E.g., York Prods. Inc. v. Central Tractor F&F Center, 99 F.3d 1568, 40 USPQ2d 1619, 1622 (Fed. Cir. 1996). Statements in the prosecution history are also pertinent; for example, a clear disavowal of claim coverage can limit the construction of the claim. Id. at 1624.
[5] Fromson v. Anitec Printing Plates Inc., 132 F.3d 1437, 45 USPQ2d 1269, 1271 (Fed. Cir. 1997).

REDACTED VERSION – PUBLICLY FILED

Report and Recommenda.  ...Special Master Regarding Claim Construction            Page 4
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

should be accorded no weight. Extrinsic evidence in general, and expert testimony in particular, may be used only to help the court come to the proper understanding of the claims; it may not be used to vary or contradict the claim language. Nor may it contradict the import of other parts of the specification. Nor may the inventor's subjective intent as to claim scope, when unexpressed in the patent documents, have any effect.

As indicated, the parties called six highly articulate and qualified experts in biological science. In considering the evidence adduced through these witnesses, the SM was constantly mindful of the Federal Circuit's clear direction in Bell & Howell Doc. Man. Prod. Co. v. Altek Sys., 132 F.3d 701, 45 USPQ2d 1033, 1038 (Fed. Cir. 1998):

> Once a dispute over claim construction arises, "experts" should also not be heard to inject a new meaning into terms that is inconsistent with what the inventor set forth in his or her patent and communicated, first to the patent Examiner and ultimately to the public. Patents should be interpreted on the basis of their intrinsic record, not on the testimony of such after-the-fact "experts" that played no part in the creation and prosecution of the patent. * * * Use of expert testimony to explain an invention may be useful. But reliance on extrinsic evidence to interpret claims is proper only when the claim language remains genuinely ambiguous after consideration of the intrinsic evidence, Vitronics, 90 F.3d at 1584, 39 USPQ2d at 1578, i.e., when the intrinsic evidence is "insufficient to enable the court to construe disputed claim terms." Id. at 1585, 39 USPQ2d at 1579. Accordingly, any expert testimony that is inconsistent with unambiguous intrinsic evidence should be accorded no weight. * * *

These admonitions have conditioned the methodology employed in this proceeding. The parties have submitted extensive extrinsic evidence, and the SM has been willing, within reason, to consider all such evidence. In the end, however, apart from whatever benefit this evidence may have provided in gaining an understanding of the technology at hand, it has not been relied upon in construing the claims.[6] All potential ambiguities in the claim language itself were resolvable by reference to the intrinsic patent documents.

[6] See Mantech Environmental Corp. v. Hudson Environmental Serv., Inc., 152 F.3d 1368, 47 USPQ2d 1732, 1737 (Fed. Cir. 1998), where the Federal Circuit held that "the district court was legally correct both in admitting and

Report and Recommenda(      )Special Master Regarding Claim Construction            Page 5
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

The SM is also mindful of the admonition of the Federal Circuit that "claim construction is

not an obligatory exercise in redundancy," and that it is unnecessary to repeat or restate every

claim term in order to comply with the <u>Markman</u> directive that claim construction is a matter for

the court.[7] Such an approach would carry the very real potential of confusing rather than

enlightening the jury.[8] Thus, where terms are expressly defined in the patent specification, it is

sufficient simply to refer the jury to that definition; the court can decide at the time of trial

whether explanatory technical testimony would be necessary or, indeed, helpful at all. And

where a term is not defined or used in a special way in the specification, and is otherwise

unambiguous, the jury should be instructed to give the term its ordinary meaning and will

presumably require no additional assistance.

It is also important to understand that claim construction is an obligation of the court that is

independent of the views asserted by the adversary parties.[9] Among them, the parties have

requested consideration and construction of many, but not all, of the elements of the claims of

the patents in suit. The SM has considered each claim as a whole, and each element of each

claim, and has recommended a specific interpretation of those terms and phrases, and only those

terms and phrases, that require construction. Accordingly, to the extent various claim elements

are not addressed in this report, it may be assumed that the SM is recommending that they be

---

accepting the testimony of the parties' expert witnesses 'for the purpose of background in the technical area at issue,'
* * * and then basing its claim construction solely upon intrinsic evidence. Although this information always may
be admitted by the trial court to educate itself about the patent and the relevant technology, the claims and the
written description remain the primary and more authoritative sources of claim construction. Thus, they always must
be considered and where clear must be followed." See also <u>Key Pharm. Inc. v. Hercon Labs. Corp.</u>, 161 F.3d 709,
48 USPQ2d 1911 (Fed. Cir. 1998).
[7] <u>United States Surgical Corp. v. Ethicon, Inc.</u>, 103 F.3d 1554, 41 USPQ2d 1225, 1236 (Fed. Cir. 1997).
[8] For example, repeatedly instructing a jury that an ordinary English word does not really mean what they think it
does, but instead has the meaning of some synonym, can only cause confusion. If they meant not the one but the
other, why did the inventors and their attorneys not use the other? This is a question no jury should have to concern
itself with.
[9] <u>Exxon Chem. Patents Inc. v. Lubrizol Corp.</u>, 64 F.3d 1553, 35 USPQ 1801, 1802 (Fed. Cir. 1995).

REDACTED VERSION – PUBLICLY FILED

Report and Recommenda.. ..  ᴗpecial Master Regarding Claim Constructiᴗ..          Page 6
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

grouped in the category of claim elements that need no construction, and that would be subject to

a general jury instruction concerning application of ordinary English usage. Similarly, this

report is not to be viewed as reflecting an acceptance or endorsement by the SM of any proposed

construction of either party, unless it expressly so states. Once again, if the report is silent as to a

particular element, that means only that the SM is suggesting that no construction is necessary,

regardless of what a party may have offered as a proposed construction.

### The Timing of the Inquiry

There is a threshold question in the claim construction analysis that requires some

consideration. It is the person of ordinary skill in the field of the invention through whose eyes

the claims are construed. Such person is deemed to read the words used in the patent documents

with an understanding of their meaning in the field, and to have knowledge of any special

meaning and usage in the field. The inventor's words that are used to describe the invention –

the inventor's lexicography – must be understood and interpreted by the court as they would be

understood and interpreted by a person in that field of technology. Thus the court starts the

decisionmaking process by reviewing the same resources as would that person, viz., the patent

specification and the prosecution history. These documents have legal as well as technological

content, for they show not only the framework of the invention as viewed by the inventor, but

also the issues of patentability as viewed by the patent Examiner.[10]

But this does not resolve the timing of the inquiry. An important question remains: as of

_what date_ must the court step into the shoes of the person skilled in the art?  To put it another

way, what is the state of knowledge, viewed chronologically, possessed by such a person when

the claim construction exercise is performed?  Surprisingly, the law on this seemingly

---

[10] Multiform Desiccants Inc. v. Medzam Ltd., 133 F.3d 1473, 45 USPQ2d 1429, 1432 (Fed. Cir. 1998).

REDACTED VERSION – PUBLICLY FILED

Report and Recommendat.  .. special Master Regarding Claim Construction.          Page 7
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

fundamental point is not crystal clear. In Markman[11] itself, the Federal Circuit said "the focus is

on the objective test of what one of ordinary skill in the art at the time of the invention would

have understood the term to mean." But it is not clear that this was intended to define a rigid

time frame for conducting the analysis. In a more recent case the court remarked that an inventor

cannot "by later testimony change the invention and the claims from their meaning at the time

the patent was drafted and granted."[12] Even more recently, the court observed that "the literal

meaning of a claim is fixed upon its issuance."[13] In point of fact, it does not appear that the

Federal Circuit has ever squarely addressed the proper timing of the claim construction inquiry in

a context where the answer might be outcome-determinative.

It makes a certain amount of sense to use the issue date, or perhaps even the filing date, as

the chronological viewing post in determining the understanding of the hypothetical person of

ordinary skill in the art. After all, the give and take of prosecution has not taken place as of the

date of filing or date of invention. The ultimate language of the issued claims usually has not

even been formulated until some prosecution has taken place – sometimes not until late in the

prosecution. Indeed, as of the actual date of invention, claims and claim language are not part of

the picture. Certainly it would not seem unreasonable, for purposes of claim construction, to

permit the hypothetical person of skill to be regarded as possessing prior art information that

could be acquired at least during the period between actual invention and the filing of the patent

application.

---

[11] Markman v. Westview Instr., Inc., 52 F.3d 957, 34 USPQ2d 1321, 1335 (Fed. Cir. 1995).
[12] Voice Tech. Group Inc. v. VMC Sys. Inc., 164 F.3d 605, 49 USPQ2d 1333, 1341 (Fed. Cir. 1999). A pair of
recent cases from the District of Kansas has also used the issue date as the pertinent time for determining what the
claims would have meant to a person of ordinary skill in the art. KCJ Corp. v. Kinetic Concepts, Inc., 30 F.Supp.2d
1319, 1323 (D. Kan. 1998); Hay & Farage Indus. v. New Holland North Am. Inc., 25 F.Supp.2d 1170, 1173 (D.
Kan. 1998).
[13] Al-Site Corp. v. VSI Int'l Inc., — F.3d —, 50 USPQ2d 1161, 1163 (Fed. Cir. 1999).

REDACTED VERSION – PUBLICLY FILED

Report and Recommendation of Special Master Regarding Claim Construction          Page 8
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

Nonetheless, the SM has concluded that, given the importance of the date of invention in other assessments of the knowledge of one skilled in the art,[14] it would not be prudent to brush aside Markman's focus upon that date as mere dictum. Clearly, prosecution history is an important source of intrinsic evidence in interpreting claims because it is a contemporaneous exchange between the applicant and the Examiner. The public has the right to rely on an applicant's remarks made in seeking allowance of claims.[15] But the prosecution history can be given full play by simply viewing it as would a hypothetical person of ordinary skill in the art who, though reading it later, was basing an understanding of it upon knowledge of the scope and content of the prior art as it existed at the time of invention.

This conclusion, however, raises another consideration, viz.: what is the date of invention and, if it is demonstrated to precede the filing date, does that time difference matter in construing the claims? Mycogen suggests (Mycogen's Memorandum Regarding the Date of Claim Construction, handed up during the hearing) that "it would seem prudent to resolve the proper date of invention prior to any construction of the claims in this case." In its post-hearing memorandum, Ciba says that it "does not propose that the SM determine, as a factual matter, the actual dates of invention, such as for purposes of Section 102(g)." Pioneer, who asserts that the invention date is the appropriate vantage point, but that the filing date may sometimes be used as an approximation, does not comment on whether the date of invention needs to be decided at this juncture. (Pioneer's Brief Regarding the Proper Date for Evaluating Claim Construction)

---

[14] E.g., Sensonics, Inc. v. Aerosonic Corp., 81 F.3d 1566, 38 USPQ 1551, 1554 (Fed. Cir. 1996) (obviousness under 35 U.S.C. §103). But inquiries under §112 tend to focus upon the filing date. E.g., Amgen, Inc. v. Chugai Pharm. Co., 927 F.2d 1200, 18 USPQ2d 1016, 1024 (Fed. Cir. 1991) (best mode); Vas-Cath Inc. v. Mahurkar, 935 F.2d 1555, 19 USPQ2d 1111, 1119 (Fed. Cir. 1991) (§112¶1 generally); Hybritech Inc. v. Monoclonal Antibodies, Inc., 802 F.2d 1367, 231 USPQ 81, 94 (Fed. Cir. 1986) (enablement).
[15] Desper Prods. Inc. v. Qsound Labs, Inc., 157 F.3d 1325, 48 USPQ2d 1088, 1096-97 (Fed. Cir. 1998).

DeKalb, who contends that the filing date is the only appropriate date, is likewise silent on the subject.

Clearly, the record is not sufficiently developed at this point to permit an informed and reasoned decision on the actual date of invention for the several inventions claimed in the patents in suit. Moreover, any such effort, if it involved fact-finding (which it surely must), would invade the province of the jury with respect to matters such as prior invention under 35 U.S.C. §102(g) and antedating prior art under §§102(a) and (e).[16] However, Ciba points out that, during the prosecution of the Lundquist patents, the applicants submitted affidavits under Rule 131,[17] seeking to antedate certain prior art by establishing an earlier date of invention. The earliest date in question was May 1989, and the Rule 131 showing was simply directed at establishing a date of invention sometime prior to that date. Accordingly, it would seem reasonable to select, as a date upon which to assess the knowledge of one of ordinary skill in the art, the time frame just prior to May of 1989. Although no similar showing was made during prosecution of the Adams '520 patent, the technology is so similar, and the chronology so close (Lundquist originally filed in January of 1990 and Adams in April of 1990), that it is not unreasonable under the circumstances to use that date for the '520 patent as well.

The claim construction analysis in this report has been conducted, therefore, by seeking to understand what the claims would have meant to a person of ordinary skill in the art, having knowledge of the art as it existed as of May 1989.

---

[16] Priority of invention is a question of law to be determined based upon underlying factual determinations. E.g., Innovative Scuba Concepts, Inc. v. Feder Indus., Inc., 26 F.3d 1112, 31 USPQ2d 1132, 1134 (Fed. Cir. 1994).
[17] Rule 131 (37 C.F.R. §1.131) provides an ex parte mechanism whereby a patent applicant may antedate subject matter in a reference, even if the reference describes the same invention that is claimed by the applicant, provided that the same invention is not claimed in the reference when the reference is a United States patent. The disclosure in a reference United States patent does not fall under 35 U.S.C. §102(g) but under 35 U.S.C. §102(a) or (e), and thus can be antedated in accordance with Rule 131. But when the subject matter sought to be antedated is claimed in the reference patent, Rule 131 is not available and an interference must be had to determine priority. In re Zletz, 893 F.2d 319, 13 USPQ2d 1320, 1322-23 (Fed. Cir. 1989).

REDACTED VERSION – PUBLICLY FILED

Report and Recommendat.     pecial Master Regarding Claim Constructio.          Page 10
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

### The Written Description Requirement

A general observation regarding defendants' positions on some of the claim construction
questions addressed in this report seems to be in order. In several instances, they appear to be
suggesting nothing more nor less than a straightforward importation of limitations from the
specification into the claim. This is, of course, forbidden.[18] Although the specification may well
indicate that certain embodiments are preferred, particular embodiments appearing in the
specification will not be read into the claims when the claim language is broader than such
embodiments.[19] If everything in the specification were required to be read into the claims, or if
structural claims were to be limited to devices operated precisely as a specification-described
embodiment is operated, there would be no need for claims. Nor could an applicant, regardless
of the prior art, claim more broadly than that embodiment.[20]

But defendants' fundamental argument does raise concerns that may have to be addressed
outside the strict context of claim construction. What they seem truly to be suggesting is that, in
some instances, there is no support in the patent specification for the claimed invention. In other
words, the argument is that DeKalb is claiming more broadly (or even differently) than its patent
disclosures permit. This argument cannot be lightly dismissed.

The first paragraph of 35 U.S.C. §112 contains what has become known as the "written
description" requirement. This provision, which is distinct from the enablement and best mode
requirements, serves to ensure that the inventor had possession, as of the filing date of the
application, of the specific subject matter later claimed. Put another way, the applicant must

---

[18] E.g., Intervet, supra note 3, 12 USPQ2d at 1476.
[19] Electro Med. Svs. S.A. v. Cooper Life Sciences, Inc., 34 F.3d 1048, 32 USPQ2d 1017, 1021 (Fed. Cir. 1994).
[20] SRI Int'l v. Matsushita Elec. Corp., 775 F.2d 1107, 227 USPQ 577, 585 (Fed. Cir. 1985).

Report and Recommendat~ ... ~ecial Master Regarding Claim Constructio.      Page 11
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

convey with reasonable clarity to those skilled in the art that he or she was in possession of the

invention claimed.[21]

The Federal Circuit appears to be in the early stages of development of a doctrine resting

upon the principle that when the preferred embodiment is fairly described in the specification as

the invention itself, the claims are not necessarily entitled to a scope broader than that

embodiment.[22] The recent decision of the Federal Circuit in Gentry Gallery, Inc. v. Berkline

Corp., 134 F.3d 1473, 45 USPQ2d 1498 (Fed. Cir. 1998), is the latest clear exemplar of this

doctrinal trend.[23] As the court put the matter in Gentry, 45 USPQ2d at 1503:

> It is a truism that a claim need not be limited to a preferred embodiment.
> However, in a given case, the scope of the right to exclude may be limited by a narrow
> disclosure. * * *
> In sum, the cases * * * do not stand for the proposition that an applicant can
> broaden his claims to the extent that they are effectively bounded only by the prior art.
> Rather, they make clear that claims may be no broader than the supporting disclosure,
> and therefore that a narrow disclosure will limit claim breadth.

At first glance, this language would seem to provide some support for defendants'. position on

construction of some claim elements. But one must be careful to observe precisely what it was

that the court actually did about the perceived discrepancy between disclosure and claim in

Gentry. Rather than treat the matter as a claim construction issue, or even an infringement issue,

the court there analyzed it as a question of compliance with the written description requirement

of 35 U.S.C. §112¶1. And properly so, for the evaluation of claim breadth versus fullness of

disclosure has no determinative role to play in a claim construction exercise. It is of course true

that claims should be construed, where possible, to preserve their validity.[24] But it is equally true

---

[21] E.g., In re Alton, 76 F.3d 1168, 37 USPQ2d 1578, 1581 (Fed. Cir. 1996).

[22] See Modine Mfg. Co. v. United States ITC, 75 F.3d 1545, 37 USPQ2d 1609, 1612 (Fed. Cir. 1996).

[23] See also Fromson v. Anitec Printing Plates Inc., 132 F.3d 1437, 45 USPQ2d 1269, 1274-75 (Fed. Cir. 1997);
Vehicular Tech. Corp. v. Titan Wheel Int'l. Inc., 141 F.3d 1084, 46 USPQ2d 1257 (Fed. Cir. 1998).

[24] E.g., Modine, supra note 242 37 USPQ2d at 1617. Indeed, the purpose of restricting the scope of claims through
the reverse doctrine of equivalents (a doctrine somewhat akin to the one under consideration) often is to preserve the

Report and Recommendati.    .ecial Master Regarding Claim Constructio.        Page 12
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

that it is improper to attempt to avoid invalidity by importing claim limitations from narrower

claims or even from the specification.[25]  The courts will not save claims by redrafting them with

extraneous limitations.[26]

     That being the case, the real Gentry issue that may emerge here is not whether the patent

claims must be construed as limited to the materials and techniques actually disclosed, but

whether the inventors of the patents provided a written description adequate to convey to a

skilled artisan that they had possession of a broader or different invention than that.[27]  Such a

question, however, is one of validity, a topic that is beyond the scope of this report.


## THE PATENT TECHNOLOGY

     The technology at hand is genetic engineering.  Only the most rudimentary understanding

of high-level principles of molecular biology is required in order to analyze the claim

construction issues presented in this case.

     Each of the thousands of different protein molecules that characterize a complex

organism is a precise sequence of amino acids.  There are approximately twenty naturally

occurring amino acids.  Deoxyribonucleic acid (DNA), which contains the genetic information

for living things, is found in the chromosomes of cells.  The DNA molecule is an enormous

structure built from sequential combinations of four smaller molecules (bases) linked together to

form the DNA chain.  It is the sequencing of these bases along the DNA strand that encodes the

---

validity of claims with respect to their original intended scope. Texas Instr., Inc. v. United States ITC, 846 F.2d
1369, 6 USPQ2d 1886, 1889 (Fed. Cir. 1988).
[25] E.g., Environmental Designs, Ltd. v. Unocal, 713 F.2d 693, 218 USPQ 865, 871 (Fed. Cir. 1983); Kalman v.
Kimberly-Clark Corp., 713 F.2d 760, 218 USPQ 781, 788 (Fed. Cir. 1983).
[26] E.g., Corning Glass Works v. Sumitomo Elec. U.S.A., Inc., 868 F.2d 1251, 9 USPQ2d 1962, 1966 (Fed. Cir.
1989).
[27] In a very recent case, the Federal Circuit indicated that Gentry "considers the situation where the patent's
disclosure makes crystal clear that a particular (i.e., narrow) understanding of a claim term is an 'essential element

REDACTED VERSION – PUBLICLY FILED

genetic information required to produce a particular sequence of amino acids and, thereby, a

particular protein. Thus, a gene may be thought of as a segment of DNA that encodes for a

particular protein. Each protein performs a unique biological function and confers on the

organism the traits that distinguish it from other organisms.[28]

It may immediately be seen that it might be desirable to incorporate genetic information

encoding a protein that confers a useful or beneficial trait in one organism into another organism

that does not naturally include that gene. This has become a reality in the rapidly-advancing

field of genetic transformation. The specific aspect of that field addressed by the patents in suit

is the production of transgenic corn. The patents and the testimony of the witnesses at trial

reveal some of the significant problems faced by early researchers in the field. Taken together,

the pose the complex question: How to get the non-native or heterologous DNA into the corn and

ensure that it expresses as a heritable trait? The complex story of how these problems were

overcome, and by whom, while it may become important at the plenary trial of these cases, need

not be recounted here. The specific technology necessary to enable construction of the claims

can be described adequately by reference to the preferred techniques employed by the inventors

of the patents in suit.[29]

In general, the heterologous DNA is introduced into the target corn cells by a

microprojectile bombardment process, also referred to as a biolistic process. In this technique,

very small particles of a biologically inert material, such as tungsten or gold, are coated with the

DNA of interest. When the coated particles are accelerated toward the target cells, some

---

of [the inventor's] invention.'" Johnson Worldwide Assoc. Inc. v. Zebco Corp., — F.3d —, 50 U.S.P.Q.2d 1607, 1613 (Fed. Cir. 1999).
[28] The '520 patent defines "genotype" as the genetic complement of an organism, and "phenotype" as traits exhibited by an organism resulting from the interaction of genotype and environment. (C13L13, 31-32)
[29] It must be kept in mind, of course, that claims can be, and often are, broader than the preferred embodiment. See notes 18-27 and accompanying text, supra.

particles are able to enter the cells, releasing the DNA so that it has a chance to integrate with the native DNA. ('956 patent, C10L38-57; '520 patent, C10L24-47) Although the patents acknowledge other techniques for transferring heterologous DNA, e.g. Agrobacterium infection, electroporation, and polyethylene glycol-mediated transformation ('956 patent, C4L8-12; '520 patent, C10L13-23), all of the patents clearly identify microprojectile bombardment as the preferred technique.

As will be seen, one of the large issues of claim construction has to do with the target of the bombardment. In the preferred embodiment, a culture is initiated using immature corn embryos. These are placed, embryo axis down, in a conventional solid culture medium containing a hormone such as 2,4-D. Under appropriate conditions, the corn embryo cells begin to dedifferentiate into a proliferating mass of cells or tissue called "callus." The callus forms on an area of the upper side of the embryo called the "scutellum." The goal is to produce a friable, fast growing, embryogenic callus capable of differentiating into somatic embryos.

Once suitable callus tissue is obtained, it is subjected to the bombardment process. During this process, some cells will not receive any of the heterologous DNA, some will be destroyed by the microprojectiles, and some will be transformed. The next task is to separate, or "select" the transgenic cells or tissues for further processing. This is preferably accomplished by introducing into the target cells during transformation a "selectable marker gene" that enables selection of those target cells and tissues that also contain the heterologous DNA of interest. For example, the so-called "bar" gene (originating in Streptomyces species) encodes for phosphinothricin acetyl transferase (PAT), which inactivates the active ingredient in the herbicide bialaphos. Exposure of post-bombardment callus to the herbicide will enable separation of the successfully transformed cells from those that are unchanged. In other words,

Report and Recommendat.    ecial Master Regarding Claim Constructio.                Page 15
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

the transgenic cells, being resistant to bialaphos, continue to proliferate, while the unchanged

cells die.

The final step is regeneration of the transformed cell lines into plants. Using

conventional techniques, transformed callus can be regenerated into corn plants by placing it in

suitable regeneration media under conditions that promote tissue differentiation and ultimate

plantlet growth. The resultant plants, if they are stably transformed and fertile, can then be used

in a conventional breeding program to obtain hybrid seed.

The patents provide preferred examples of heterologous DNA that can be introduced to

transform corn for beneficial purposes. The '956 patent postulates a transformation scheme

using a DNA sequence originating in *Bacillus thuringiensis* (BT) which encodes for an

insecticidal endotoxin. The same patent also discloses the use of a gene from *E. coli* that confers

resistance to the antibiotic hygromycin. The '520 teaches transformation with the bar gene to

obtain PAT expression to inactivate bialaphos and other herbicides. The latter two examples

illustrate the fact that a single transgene may find utility in more than one context, i.e., as a

selectable marker gene in the transformation process itself, and as a gene expressing a beneficial

trait, such as resistance to herbicides, in the corn plant.

The patents in suit fall into two groups. One, the so-called "Lundquist" (after one of the

two joint inventors) family of patents, comprises United States Patents No. 5,484,956 (issued

January 16, 1996), No. 5,538,877, and No. 5,538,880 (both issued July 23, 1996). Each of the

three Lundquist patents traces its lineage back to an original Lundquist application filed January

22, 1990, and they accordingly have essentially identical specifications. The "Adams" (after the

first-named of thirteen joint inventors) family includes No. 5,489,520 (issued February 6, 1996),

which traces back to an original Adams application filed April 17, 1990.

In general, the '880 and '877 patents claim methods for producing fertile corn plants that contain transgenic DNA which imparts insect or herbicide resistance.  The '877 patent also claims a method for producing such a plant in which the DNA includes a selectable marker or reporter gene.  The '956 patent claims a fertile transgenic corn plant that contains heterologous DNA encoding BT endotoxin.  The '520 patent claims a process for producing a fertile corn plant that contains transgenic DNA which includes a selectable marker gene encoding for PAT.

DISCUSSION

Claim construction begins, as it must, with the words of the claims.[30]  The claims of the four patents in suit are set out in the attached Appendix. In the discussion that follows, certain claim terms or elements may be common to different claims, sometimes in different patents.  It may be assumed, unless expressly stated otherwise, that the discussion applies to all occurrences of such terms or elements.

Terms Well-Defined in the Patents

The term *Zea mays* occurs in all of the claims of the patents in suit.  The Lundquist patents (e.g., '956 patent, C4L48-54) define that species of plant as corn, including field corn, popcorn, sweet corn, flint corn, and dent corn.  The Adams '520 patent uses the term consistently with that definition.  It is recommended that the jury be instructed that *Zea mays* means corn of all types, including but not limited to field corn, popcorn, sweet corn, flint corn, and dent corn.[31]

The claims of the '520 and '877 patent use the term "gene." Both families of patents use the word throughout as synonymous with "DNA sequence," and it is recommended that the jury be so instructed.

---

[30] Vehicular Tech. Corp. v. Titan Wheel Int'l, 141 F.3d 1084, 46 USPQ2d 1257, 1260 (Fed. Cir. 1998).
[31] It is also suggested that the jury be instructed that dependent claim 3 of the '956 patent does not change the meaning of *Zea mays*, but rather expressly narrows the kinds of corn to "field corn, popcorn, sweet corn, flint corn and dent corn." This would provide an apt illustration of claim dependency.

A126

REDACTED VERSION – PUBLICLY FILED

Report and Recommendat[...] [S]ecial Master Regarding Claim Construction                Page 17
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

   The word "transgenic" appears in the claims of each patent. Both families of patents

make it clear that the key element underlying this term is genetic engineering. For example, the

'520 patent says that the DNA sequences are 'incorporated into recipient cells by genetic

engineering methods rather than classical reproduction or breeding techniques." (C3L53-56)

The Lundquist patents expressly define the term "transgenic" to include "any cell, cell line,

callus, tissue, plant part or plant, the genotype of which has been altered beneficially by the

presence of heterologous DNA that was introduced into the genotype by a process of genetic

engineering." (E.g., '956 patent, C4L55-59) "Heterologous DNA" is defined in the Lundquist

patents (see, e.g. '956 patent, C6L30-52) as a DNA segment that is synthetic, semi-synthetic, or

biologically derived, and includes non-plant genes such as those from bacteria, yeasts, animals,

or viruses, as well as modified genes and portions of genes.[32] The heterologous DNA is not

limited to non-plant sources, however, and can be from another *Zea mays* genotype, or even the

same genotype into which it is to be introduced. The '520 patent similarly defines transgenic

plants as "plants that have incorporated exogenous genes or DNA sequences, including but not

limited to genes or DNA sequences which are perhaps not normally present, genes not normally

transcribed and translated ('expressed') in a given cell type, or any other genes of [sic. "or"]

DNA sequences which one desires to introduce into the non-transformed plant, such as genes

which may normally be present in the non-transformed plant but which one desires to have

altered expression." (C33L40-50) Accordingly, it is recommended that the jury be instructed

that, in the claims of each of the patents, a "transgenic" corn plant is one that includes a DNA

sequence resulting from genetic engineering.

---

[32] The parties have raised the larger issue of the meaning of "heterologous DNA" as actually employed in the claims; this is dealt with separately later in this report.

The claims of the '520, '877, and '880 patents employ the word "comprising." It is recommended that the jury be instructed that "comprising," in the parlance of patent claims, is synonymous with "including," and does not exclude the presence of additional elements.[33]

The claims of the '956 patent make reference to the R0 and R1 generations of corn plants. Although there is no dispute as the meaning of these designations, they play a large role in the construction of the term "progeny," as it is much more convenient to set out a formal construction of that term using such designations. Accordingly, it is recommended that the jury be instructed that a plant of the R0 generation is the regenerated plant; a plant of the R1 generation is a plant that has been grown from seed of the R0 plant harvested after that R0 plant has been fertilized by pollen from a different corn plant (crossed), its own pollen (self mated), or pollen of a sibling plant (sib mated); a plant of the R2 generation is one that has been grown from seed harvested from a crossed, selfed or sibbed R1 plant, etc.[34]

Process Steps

The claims of the '887, '880, and '520 patents are directed to processes, each comprising a number of steps. In each instance, the next step builds upon the proceeding step, in logical fashion. Thus, in this case, as in Mantech Environmental Corp. v. Hudson Environmental Serv. Inc., 152 F.3d 1368, 47 USPQ2d 1732, 1739 (Fed. Cir. 1998), the sequential nature of the claim steps is apparent from the plain meaning of the claim language and nothing in the written description suggests otherwise. It is recommended, therefore, that the jury be instructed that the

---

[33] Hewlett-Packard Co. v. Repeat-O-Type Stencil, 123 F.3d 1445, 43 USPQ2d 1650, 1655 (Fed. Cir. 1997). So, too, with the word "comprises."
[34] The Lundquist patents teach that "plants regenerated from the transformed callus are referred to as the R0 generation or R0 plants. The seeds produced by the various sexual crosses of the R0 generation plants are referred to as R1 progeny or the R1 generation. When R1 seeds are germinated, the resulting plants are also referred to as the R1 generation." (E.g., '880 patent, C11L14-15)

Report and Recommendation of Special Master Regarding Claim Construction          Page 19
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

process claims of the patents in suit require the method steps to be performed sequentially, in the

order set forth in the claim.

The independent process claims of the '520, '887, and '880 patents each contain the

following language: "wherein said DNA is transmitted through a complete sexual cycle of said

transgenic plant to its progeny." The independent product claim of the '956 patent is similar,

except it uses the phrase "complete normal sexual cycle." Such language does not constitute a

process step or limitation; rather, it defines a characteristic of the R0 plant that is the subject of

the '956 claims and that is produced by the process of the independent claims of the other

patents. Nor does the language in any way exclude human intervention in the reproductive

process. It is clear that "normal sexual cycle" referred to is the fundamental corn reproductive

process whereby genetic material is passed to progeny through either pollen or egg cells. Corn

breeding and hybrid seed production systems obviously involve, almost invariably, human

intervention in that process, e.g., detasseling in crossing blocks to ensure cross-pollination, hand

pollination, etc. It is recommended that the jury be instructed that this language does not define

a necessary step in the process of the independent process claims, and merely requires that the

R0 plant be capable of passing the transgene to progeny through either pollen or egg cells,

without or without human intervention.

Product-by-Process[35]

The claims of the '956 patent are directed to a corn plant having heterologous DNA that

encodes for BT endotoxin. Each claim, however, contains a phrase that can only be described as

a method limitation: "wherein said DNA is introduced into said plant by microprojectile

---

[35] This is the only topic upon which defendant NK took a position. Accordingly, except for the discussion of this
topic, the use of the collective term "defendants" should be understood to exclude NK, unless the context indicates
otherwise.

Report and Recommendation of Special Master Regarding Claim Construction
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)                    Page 29

bombardment of *Zea mays* callus cells." Despite this clear language, DeKalb contends that these claims must be construed as not limited to plants that are transformed by the biolistic technique. Rather, it says, these claims are so-called "product-by-process" claims, and therefore must be construed to cover the recited corn plant, no matter what technique was used to introduce the heterologous DNA.

This contention may seem somewhat remarkable given the Federal Circuit's unswerving adherence to the proposition that each limitation of a claim is material and essential, and that in order for a court to find infringement, the patent owner must show the presence of every limitation or its substantial equivalent in the accused product.[56] What DeKalb is contending – nothing more and nothing less – is that the microprojectile bombardment language is not a limitation at all, and may be safely ignored in deciding both infringement and validity.

DeKalb is quick to point out that there is perfectly good authority for what may seem on the surface to be a rather strange proposition: that a claim may be – indeed, must be – read and interpreted as though it did not contain what is some rather explicit language. For this it cites Scripps Clinic & Res. Found. v. Genentech, Inc., 927 F.2d 1565, 18 USPQ2d 1001, 1016 (Fed. Cir. 1991), for the statement that "the correct reading of product-by-process claims is that they are not limited to product prepared by the process set forth in the claims." The claim in Scripps was in the following format: "Highly purified and concentrated human or porcine VIII:C prepared in accordance with the method of claim 1." A similar format was at issue in a case decided the following year, Atlantic Thermoplastics Co. v. Faytex Corp., 970 F.2d 834, 23 USPQ2d 1481 (Fed. Cir. 1992): "The molded innersole produced by the method of claim 1."

---

[56] E.g., Lemelson v. United States, 752 F.2d 1538, 224 USPQ 524, 533 (Fed. Cir. 1985); Perkin-Elmer Corp. v. Westinghouse Elec. Corp., 822 F.2d 1529, 3 USPQ2d 1321, 1325 (Fed. Cir. 1987). See generally, Pennwalt Corp. v. Durand-Wayland, Inc., 833 F.2d 931, 4 USPQ2d 1737 (Fed. Cir. 1987)

Report and Recommendation of Special Master Regarding Claim Construction          Page 21
Transgenic Corn Patent Litigation (N.D. Illinois -- Judge Reinhard)

But despite what appears to be a classical product-by-process claim in each case, the difference
in outcome in the two cases is startling.

The panel decision in Atlantic Thermoplastics did not purport to overrule Scripps.
Instead, it conducted a detailed analysis of Supreme Court and other precedent and concluded
that "process terms in product-by-process claims serve as limitations in determining
infringement." This holding, not surprisingly, provoked a request for rehearing in banc.
Although the request was ultimately denied, it was not without controversy. See the dissenting
opinions of Judges Nies, Rich, Lourie, and Newman, 974 F.2d 1979, 23 USPQ2d 1801, and the
concurring opinion of Judge Rader, 974 F.2d 1299, 24 USPQ2d 1138.

In the present litigation the Court has already had occasion to consider the apparent
conflict between Scripps and Atlantic Thermoplastics. Defendant NK moved, in Civil Action
No. 96 C 50169, for summary judgment of noninfringement of the '956 patent on the ground that
it employed a substantially different process to transfer heterologous DNA. Instead of using
microprojectile bombardment, according to NK, it uses passive protoplast uptake. DeKalb
responded by pointing out that, under Scripps, NK should not be able to escape liability simply
because its used a different technique for gene transfer. In a Memorandum Opinion and Order
dated August 14, 1997, this Court found that there was a direct conflict between the panel
decisions in Scripps and Atlantic Thermoplastics. Applying the Federal Circuit's conflict rule,[37]
this Court honored the Scripps rule. That led to a denial of NK's summary judgment motion.

---

[37] The Federal Circuit has adopted the rule that prior decisions of a panel of the court are binding precedent on
subsequent panels unless and until overturned in banc. Where there is direct conflict, the precedential decision is the
first. E.g., Newell Cos. v. Kenney Mfg. Co., 864 F.2d 757, 9 USPQ2d 1417, 1423 (Fed. Cir. 1988). The Atlantic
Thermoplastics panel apparently felt that it had found a way around the in banc rule, noting that a "decision that fails
to consider Supreme Court precedent does not control if the court determines that the prior panel would have
reached a different conclusion if it had considered controlling precedent." 23 USPQ at 1485n.2. However, as
pointed out in one of the dissents from the denial of rehearing, 23 USPQ at 1816, that "merely states a reason why
Scripps was wrongly decided with respect to the product-by-process issue."

REDACTED VERSION – PUBLICLY FILED

Report and Recommendation of Special Master Regarding Claim Construction                    Page 22
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

    The SM does not recommend that the Court revisit its resolution of the Scripps/Atlantic Thermoplastics dilemma. If the direct conflict rule has meaning, it would seem to obligate bench and bar to follow Scripps until the Federal Circuit tells us otherwise. But that does not mean that the claims of the '956 patent are to be construed as though the words "wherein said DNA is introduced into said plant by microprojectile bombardment of *Zea mays* callus cells" were missing. Let us look again at the Scripps rule: "the correct reading of product-by-process claims is that they are not limited to product prepared by the process set forth in the claims." The question immediately arises, are the claims of the '956 patent product-by-process claims? The answer to that question resolves the matter of claim construction.

    That a process limitation appears in a claim does not convert it to a product-by-process claim.[38] It appears that in connection with NK's motion for summary judgment, the parties simply treated independent claim 1 as a product-by-process claim, without controversy.[39] But that does not alone resolve the matter, in view of the obligation of a court to construe claims independent of the views of the adversary parties.[40]

    The precedent of the Federal Circuit itself does not provide much direct guidance on the matter, with the exception of Judge Newman's opinion dissenting from the denial of rehearing in banc in Atlantic Thermoplastics. In that opinion, reported at 974 F.2d 1979, 23 USPQ 1801, 1802-1816, she does an exhaustive analysis of the cases, and concludes that true product-by-process claims are those in which the product cannot be properly defined and discriminated from

---

[38] Fromson v. Advance Offset Plate, Inc., 720 F.2d 1565, 219 USPQ 1137, 1141 (Fed. Cir. 1983).
[39] In the Court's Memorandum Opinion and Order, p.3n.2, the Court said "The parties here both treat claim 1 of the '956 patent as a product-by-process claim rather than a pure product or a pure process claim. The court has no reason to question that assessment."
[40] See note 9. supra. and accompanying text.

prior art otherwise than by reference to the process of producing it. This is in contrast to a product claim that merely includes a process limitation.

The claims of the '956 patent yield quite readily to such an approach. Without the language reciting microprojectile bombardment, claim 1 parses out, rather simply, to (1) a fertile R0 corn plant that (2) contains the BT gene, wherein (3) the BT gene expresses to confer insect resistance, while (4) that expression is not present in a plant not containing the gene, and (5) wherein the gene can be transmitted to the R1 generation through a complete normal sexual cycle of the plant. This provides a complete and adequate definition of the product – a corn plant – regardless of the process by which the BT gene is introduced. It also adequately discriminates from the prior art described in the '956 patent. As the patent recites it, prior attempts to produce transgenic corn were characterized by failure in several respects. Although certain types of corn cells had been successfully transformed, the resulting cells "either could not be regenerated into corn plants or the corn plants produced were sterile." (C2L6-7) On the other hand, although certain types of corn cells had been regenerated to produce fertile plants, no stable transformation of such cells had been achieved. (C2L11-17)

The product limitations of claim 1 address each of these alleged shortcomings of the prior art – regenerability, fertility, and stability – and thus differentiate the claimed corn plant over prior corn plants. The limitation of a "fertile transgenic *Zea mays* plant of the R0 generation" requires that the plant be one that was regenerated and is fertile. The requirement that the gene be "transmitted through a complete normal sexual cycle of the R0 plant to the R1 generation" addresses both fertility and stability. And the limitation that the gene be "expressed so that the plant exhibits resistance to an insect, wherein said expression is not present in said plant not containing" the gene, likewise addresses stability. The further recital of microprojectile

Report and Recommendation of Special Master Regarding Claim Construction          Page 24
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

bombardment is not necessary to complete this definition and differentiation. A corn plant

having the product characteristics of claim 1 would be distinguishable from the prior art

described in the patent whether the BT gene had been introduced by microprojectile

bombardment or some other technique. Thus, the '956 claims are not product-by-product claims

and do not fall within the very limited exception – ostensibly embraced by Scripps – to the

elementary patent law rule that every limitation in a patent claim is material.[41]

Nonetheless, even if by some stretch the '956 claims could be regarded as subject to the

Scripps ruling, the prosecution history reveals ample basis for construing the claims as they are

written. During prosecution the Examiner rejected the pending claims on grounds of lack of

enablement. (SM163)[42] The Examiner's position was that the specification enabled only biolistic

transformation. In an amendment, application claim 25 was added, with a limitation to the

biolistic process. (SM177) The Examiner continued to reject all claims except 25 for lack of

enablement. (SM211) In a final office action (SM275), the Examiner maintained the rejection of

all claims but claim 25 on the grounds of lack of enablement, and indicated that claim 25 would

be allowable if rewritten in independent form. The Examiner's comments are illuminating

(SM276):

> * * * Note that at page 2 of the previous Office Action the Examiner indicated
> that the rejection was based on the lack of enablement (i.e., a section 112, first paragraph
> rejection) for plant produced by a process other than that disclosed, that is to maize plants
> produced by the biolistic process. This process, and only this process, is evidenced by
> available art to overcome prior art attempts to produce the claimed invention.
> Furthermore evidence existed in the art that transgenic plants produced by prior art
> processes are essentially different. The fact that the biolistic process appears to be
> essential to overcome plant sterility and/or chromosome integration and heritability of a
> transgene only provides guidance to the practitioner in the art as to how to apply the
> exemplified process to produce the claimed invention. While the recitation of limitations
> in product claims to fertile transgenic plants in which the transgene is both

[41] E.g., Glaxo, Inc. v. Novopharm, Ltd., 110 F.3d 1562, 42 USPQ2d 1257, 1261 (Fed. Cir. 1997).
[42] The prosecution histories of the patents in suit, as submitted by the parties, have been sequentially numbered with the prefix SM followed by the page number.