this condition by assessment at some level other than a whole plant growing in the field or greenhouse. Indeed, various techniques were employed in the Lundquist patents for evaluating the presence of the hygromycin resistance trait in R0 and R1 plants: direct testing by Southern blot in both R0 and R1, and root elongation bioassay and etiolated leaf bioassay for R1. (E.g., '880 patent, C17L39–C18L57) None of these involved application of a herbicide at "real-world levels under field conditions."

Defendants argue that the claims must exclude antibiotics such as hygromycin because they are not chemicals sold to farmers for herbicidal use. But this argument allows no room for the fact that the '880 and '877 patents also disclose and claim transformation with selectable marker genes, such as the "hygromycin B phosphotransferase (HTP) coding sequence , which may be derived from *E. coli.*" (E.g., '877 patent, C6L54–56) Claim 4 of the '877 patent specifies that the heterologous DNA includes a selectable marker gene and claim 5 requires that the claim 4 gene impart herbicide resistance to the R0 plant. This claim program supports the conclusion that claim 1 would be satisfied by transformation with a selectable marker gene that imparts herbicide resistance. The examples described in the specification are all concerned with hygromycin resistance gene transformations.

The prosecution histories support the conclusion that antibiotics, such as hygromycin, that exhibit herbicidal activity, are among the agents contemplated by the term "herbicidal resistance." During the prosecution of the '956 patent (which does not claim herbicidal resistance), the applicants asserted (SM137) that the term "herbicide resistance" is art-recognized, and referred to a list of herbicides in the specification (C9L20) that included methotrexate, a metabolic inhibitor that was characterized as a human drug by defendants' expert, Dr. Goodman. (Tr. 1035) In the prosecution of the '877 patent, the Examiner at one point

Report and Recommendation of Special Master Regarding Claim Construction          Page 46
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

indicated that "it may be nothing more than a matter of semantics as to whether hygromycin can

be considered a herbicide," although he was troubled by the lack of evidence that the expression

of hygromycin, as taught in the specification, would satisfy the limitation of herbicide resistance

in a corn plant. (SM724) In his reasons for allowing the patent, however, the Examiner

concluded that the hygromycin example in the patent, and the "general discussion of art known

and available DNA sequences, including herbicide resistance as a type of selectable or

screenable marker, provides a sufficient written description of whole plants produced by the

claimed process." (SM858) In the prosecution of the '520 patent, the same Examiner remarked

that the '877 application was directed to expression of the hygromycin gene "which similarly

confers herbicide resistance to the plants and the progeny produced of that methodology."

(SM1332) In short, the prosecution histories support the conclusion that "herbicide" is not

limited to chemicals sold to farmers as herbicides, but simply means agents that exhibit

herbicidal activity against corn cells.

Resistance is required, however. Neither the claims nor the specification specify how

much resistance is required, and it is clear that the term is used qualitatively. It is logical to

conclude that more resistance is required, when evaluated against the same herbicidal agent in

the same context (be it as a selectable marker gene or an agriculturally beneficial characteristic

of a corn plant growing in a farmer's field), than the same plant without the transgene. It is

recommended that the jury be instructed that "herbicide resistance" means that the plant has

more resistance to an agent having herbicidal activity, when applied to plant material, than the

same plant that does not have the transgene under the same conditions of application and plant

material.

Report and Recommendation of Special Master Regarding Claim Construction          Page 47
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

Insect resistance. The claims of the '956 patent specify a R0 plant containing DNA encoding BT endotoxin, wherein the DNA "is expressed so that the plant exhibits resistance to an insect and wherein said expression is not present in said plant not containing" the DNA. This language, by its very terms, requires that the R0 plant, which is required to be fertile and transgenic, exhibit the phenotypic characteristic of insect resistance. The claims of the other Lundquist patents are somewhat different. Independent claim 6 of the '877 patent requires only that the R0 plant be capable of imparting insect resistance to its progeny. So, too, with independent claim 10 of the '880 patent. Again, the dependent claims of that patent that address the production of progeny require that characteristic to be expressed in the progeny plants.

Ciba and Pioneer urge that "insect resistance" be construed to mean (1) resistance at the plant level rather than the cellular level, and (2) resistance to insect pests of corn rather than just any insect. Pioneer goes further and argues that the plants must "kill actual corn pests, namely, the European corn borer, under field conditions." DeKalb's position is that any insect will do, and that field conditions are not required; that the term requires insect resistance to be assessed when insects consume cells of the plant.

Again, the claim language is clear and unambiguous, and nothing in the patent specifications or prosecution histories impacts the construction that it should receive. The claims plainly require that corn plants exhibit the trait in question, not just callus cells from which the plants were derived. The claims just as plainly do not require that the insect be a European corn borer, or any other generally recognized corn pest. Nor do they require assessment of resistance under field conditions. The latter conclusions are confirmed by the statement in the Lundquist patents that the "transgenic plants produced herein are expected to be useful for a variety of commercial and research purposes." (E.g., '956 patent, C14L18-19)

What the claims do require, however, is "resistance," and although the claims, specifications, and prosecution histories do not require insect death, there must be some benchmark against which to assess that trait. Again, the most logical construct is to compare the transgenic plant with the same plant that does not contain the heterologous DNA. Accordingly, it is recommended that the jury be instructed that "insect resistance" means that the plant has more resistance to an insect, when the insect consumes or otherwise attacks plant material, than the same plant that does not have the transgene, under the same conditions.

### Heterologous DNA Encoding BT Endotoxin

The claims of the '956 patent call for the use of "heterologous DNA encoding *Bacillus thuringiensis* endotoxin. Pioneer contends that this language is limited to a native BT gene from one of the 40,000+ strains of *Bacillus thuringiensis*. It says that the language cannot be read to cover plants containing DNA that is chemically manipulated,[57] truncated, or shortened, or DNA that merely encodes fragments of the full-length, native BT endotoxin.

This suggested construction is not supported by the intrinsic evidence. To the contrary, the '956 specification makes it clear that heterologous DNA encompasses "synthetic, semi-synthetic, or biologically derived DNA," including "modified genes" and "portions of genes." (C6L45-52) Moreover, the claim language itself does not require native DNA from *Bacillus thuringiensis*, but rather any DNA that encodes BT endotoxin. Reading the claim as a whole, in light of the specification, compels the conclusion that BT endotoxin means a protein that a person of ordinary skill in the art would recognize as a BT endotoxin, in terms of substantial

---

[57] For example, so-called "codon-optimized" DNA, which involves the rewriting of the DNA sequence of a gene derived from a foreign source, such as a bacterium, so that it can be better utilized by the cellular machinery of the recipient plant. (Tr. 914-16)

similarity both of structure and of insecticidal activity.[58]   The prosecution history does not

contain any transactions that would tend to contradict this interpretation.

It is recommended that the jury be instructed that "heterologous DNA encoding *Bacillus*

*thuringiensis* endotoxin" means any DNA that encodes for an endotoxin that a person of ordinary

skill in the art would recognize as a BT endotoxin, in terms of substantial similarity both of

structure and of insecticidal activity.

### Said DNA

All of the patent claims use the phrases "said DNA" or "said heterologous DNA" where

appropriate to refer to further plant characteristics or process steps.  Pioneer urges that this

phraseology be construed to require that any progeny plant must contain the identical DNA

sequence originally used in the bombardment process or found in the R0 transformant.  DeKalb

argues that this restrictive interpretation would not allow for any structural or sequential changes

caused by the DNA insertion process or by natural processes occurring within the cell.

Again, Pioneer's interpretation appears to be at odds with the patent specifications.  The

'520 patent discloses the possibility of changes in structure or sequence following bombardment

and chromosomal integration, noting that "intact sequences will not always be present,

presumably due to rearrangement or deletion of sequences in the cell." (C12L50-52)  The '956

patent similarly explains that the foreign gene is not present in the callus as the intact or

nonchromosomal plasmid used to bombard the callus (C20L12-14) and that Southern blot

technology indicated either incomplete digestion or that multiple rearranged copies were present

(C25L48-49).

---

[58] It is clear that identity of structure and function is not required with respect to the endotoxin.  The fact that the
specification teaches that modified genes and portions of genes may be used allows for the possibility of differences
in the encoded protein.

Pioneer argues (Opening Brief, p. 54) that the patents "do not enable or provide a written description for a method in which the heterologous DNA in a transgenic progeny plant is modified or changed during the breeding process." If this is so, then Pioneer may have identified a Gentry issue,[59] or some other issue, that could provide a defense under 35 U.S.C. §112¶1. But that argument does not compel Pioneer's suggested claim construction. The patents make it clear that an important goal is to incorporate the beneficial transgene into a breeding program, and if the gene is altered by natural processes during that program, that result is certainly contemplated by the patents. The key requirement is that a person of ordinary skill in the art be able to recognize the genetic material for what it originally was. If so much alteration or modification has occurred that this is no longer possible, then there will, at that stage, no longer be literal infringement. It is recommended that the jury be instructed that "said DNA" refers to the DNA that was inserted into the transformed cells, even if altered by the insertion process or by later natural processes, so long as a person of ordinary skill can recognize it as the inserted DNA.

Chromosomal Integration

The claims of the Adams '520 patent require that the transgene be "chromosomally integrated." Pioneer contends that this limitation should be read into the Lundquist patents as well. (Opening Brief, pp. 72-82) As best the SM can understand this argument, it addresses a pure Gentry issue[60] rather than one of claim construction. If Pioneer can establish that the Lundquist patents teach chromosomal integration as an essential element of the invention there disclosed, it may have identified a problem concerning the adequacy of the written description for claims that are not so limited. But it still will not have justified an interpretation of the claims that would supply that missing element.

[59] See notes 18-27, supra, and accompanying text.
[60] Id.

REDACTED VERSION – PUBLICLY FILED

Report and Recommendation of Special Master Regarding Claim Construction    Page 51
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

Respectfully submitted,

Robert L. Harmon

Robert L. Harmon

Special Master

Report and Recommend    of Special Master Regarding Claim Const.  .ion          Page 52
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

## APPENDIX

### Claims of U.S. Patent 5,484,956 (issued to Lundquist et al.)

1. A fertile transgenic *Zea mays* plant of the R0 generation containing heterologous DNA encoding *Bacillus thuringiensis* endotoxin, wherein said DNA is expressed so that the plant exhibits resistance to an insect, wherein said expression is not present in said plant not containing said DNA, and wherein said DNA is transmitted through a complete normal sexual cycle of the R0 plant to the R1 generation, and wherein said DNA is introduced into said plant by microprojectile bombardment of *Zea mays* callus cells.

2. The transgenic plant of claim 1 wherein said DNA comprises a promoter.

3. The transgenic plant of claim 1 which is selected from the group consisting of field corn, popcorn, sweet corn, flint corn and dent corn.

4. A seed produced by the transgenic plant of claim 1 which comprises a replication of said heterologous DNA.

5. An R1 transgenic *Zea mays* plant derived from the plant of claim 1 wherein said R1 plant expresses said heterologous DNA so that the R1 plant exhibits said phenotypic characteristics.

6. A progeny transgenic *Zea mays* plant derived from the plant of claim 5 wherein said progeny plant expresses said heterologous DNA so that the progeny plant exhibits said phenotypic characteristics.

## Claims of U.S. Patent 5.538.877 (issued to Lundquist *et al.*)

1. A process for producing a fertile transgenic *Zea mays* plant comprising the steps of (i) establishing a regenerable embryogenic callus culture from a *Zea mays* plant to be transformed, (ii) transforming said culture by bombarding it with DNA-coated microprojectiles, (iii) identifying or selecting a transformed cell line, and (iv) regenerating a fertile transgenic *Zea mays* plant therefrom, wherein said DNA is transmitted through a complete sexual cycle of said transgenic plant to its progeny and imparts herbicide resistance thereto.

2. The process of claim 1 wherein the callus culture subjected to bombardment is in clumps of about 30 to 80 mg per clump.

3. The process of claim 1 wherein said callus is initiated on solid media.

4. The process of claim 1 wherein the DNA comprises a selectable marker gene or a reporter gene.

5. The process of claim 4 wherein said selectable marker gene imparts herbicide resistance to said fertile transgenic *Zea mays* plant.

6. A process for producing a fertile transgenic *Zea mays* plant comprising the steps of (i) establishing a regenerable embryonic callus culture from a *Zea mays* plant to be transformed, (ii) transforming said culture by bombarding it with DNA-coated microprojectiles, (iii) identifying or selecting a transformed cell line, and (iv) regenerating a fertile transgenic *Zea mays* plant therefrom, wherein said DNA is transmitted through a complete sexual cycle of said transgenic plant to its progeny, and imparts insect resistance thereto.

7. The process of claim 6 wherein the callus culture subjected to bombardment is in clumps of about 30 to 80 mg per clump.

8. The process of claim 7 wherein said callus is initiated on solid media.

9. The process of claim 6 wherein the DNA comprises a selectable marker gene or a reporter gene.

10. The process of claim 9 wherein said selectable marker gene imparts herbicide resistance to fertile transgenic *Zea mays* plant.

REDACTED VERSION – PUBLICLY FILED

### Claims of U.S. Patent 5,538,880 (issued to Lundquist *et al.*)

1. A process for producing a fertile transgenic *Zea mays* plant comprising the steps of (i) bombarding intact regenerable *Zea mays* cells with DNA-coated microprojectiles, (ii) identifying or selecting a population of transformed cells, and (iii) regenerating a fertile transgenic plant therefrom, wherein said DNA is transmitted through a complete sexual cycle of said transgenic plant to its progeny, and imparts herbicide resistance thereto.

2. The process of claim 1 wherein the fertile transgenic *Zea mays* plant is regenerated from transformed embryogenic tissue.

3. The process of claim 1 wherein the cells are derived from immature embryos.

4. A process comprising obtaining progeny from a fertile transgenic plant obtained by the process of claim 1 which comprise said DNA.

5. The process of claim 4 wherein said progeny are obtained by crossing said fertile transgenic plant with an inbred line.

6. The process of claim 4 comprising obtaining seed from said progeny and obtaining further progeny plants comprising said DNA from said seed.

7. The process of claim 5 wherein the progeny obtained are crossed back to the inbred line, to obtain further progeny which comprise said DNA.

8. The process of claim 6 wherein seeds are obtained from said further progeny plants and plants comprising said DNA are recovered from said seed.

9. The process of claim 7 wherein said further progeny are crossed back to the inbred line to obtain progeny which comprise said DNA.

10. A process for producing a fertile transgenic *Zea mays* plant comprising the steps of (i) bombarding intact regenerable *Zea mays* cells with DNA-coated microprojectiles, (ii) identifying or selecting a population of transformed cells, and (iii) regenerating a fertile transgenic plant therefrom, wherein said DNA is transmitted through a complete sexual cycle of said transgenic plant to its progeny, wherein the DNA imparts insect resistance thereto.

11. The process of claim 10 wherein the fertile transgenic *Zea mays* plant is regenerated from transformed embryogenic tissue.

12. The process of claim 10 wherein the cells are derived from immature embryos.

13. A process comprising obtaining progeny from a fertile transgenic plant obtained by the process of claim 10, which comprise said DNA.

REDACTED VERSION – PUBLICLY FILED

Report and Recommend_ _ a of Special Master Regarding Claim Cons___ _tion    Page 55
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

14. The process of claim 13 wherein said progeny are obtained by crossing said fertile transgenic plant with an inbred line.

15. The process of claim 13 comprising obtaining seed from said progeny and obtaining further progeny plants comprising said DNA from said seed.

16. The process of claim 14 wherein said progeny obtained are crossed back to the inbred line, to obtain further progeny which comprise said DNA.

17. The process of claim 15 wherein seeds are obtained from said further progeny plants and plants comprising said DNA are recovered from said seed.

18. The process of claim 16 wherein said further progeny are crossed back to the inbred line to obtain progeny which comprise said DNA.

Report and Recommend. . a of Special Master Regarding Claim Cons. . ion      Page 56
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

### Claims of U.S. Patent 5,489,520 (issued to Adams *et al.*)

1. A process for producing a fertile transgenic *Zea mays* plant comprising the steps of (i) establishing a regenerable culture from a *Zea mays* plant to be transformed, (ii) transforming said culture by bombarding it with DNA-coated microprojectiles, wherein said DNA comprises a selectable marker gene encoding for phosphinothricin acetyl transferase, (iii) identifying or selecting a transformed cell line and (iv) regenerating a fertile transgenic *Zea mays* plant therefrom, wherein said DNA is transmitted through a complete sexual cycle of said transgenic plant to its progeny, wherein said progeny comprises said selectable marker gene encoding phosphinothricin acetyl transferase, and wherein said gene is chromosomally integrated.

2. The method of claim 1, wherein the gene encoding phosphinothricin acetyl transferase is the bar gene of *Streptomyces hygroscopicus*.

3. The method of claim 1, wherein the gene encoding phosphinothricin acetyl transferase is the bar gene of *Streptomyces viridochromogenes*.

4. The method of claim 1, further comprising obtaining progeny of said fertile, transgenic *Zea mays* plant, wherein said progeny is a fertile, transgenic *Zea mays* plant that comprises the gene encoding for phosphinothricin acetyl transferase.

5. The method of claim 4, further comprising breeding said progeny with a non-transgenic maize plant, to prepare a fertile, transgenic *Zea mays* plant that comprises the gene encoding for phosphinothricin acetyl transferase.

6. The method of claim 4, further comprising breeding said progeny with a second transgenic maize plant to prepare a fertile, transgenic *Zea mays* plant that comprises the gene encoding for phosphinothricin acetyl transferase.

7. The method of any one of claims 1 through 6, further comprising preparing seed from one or more fertile, transgenic *Zea mays* plants that comprises the gene encoding for phosphinothricin acetyl transferase, wherein said seed contains the gene encoding for phosphinothricin acetyl transferase.

8. The method of claim 7, further comprising cultivating said seed to prepare a fertile, transgenic *Zea mays* plant that comprises the gene encoding for phosphinothricin acetyl transferase.

REDACTED VERSION – PUBLICLY FILED

03/28/95   13:58   ☎812 339 3061        SCHWEGMAN, LUNDB                    ☒002

PATENT

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | | |
|---|---|---|---|
| Applicants: | R. C. Lundquist et al. | Examiner: | G. Benzion |
| Serial No.: | 08/249,458 | Art Unit: | 1804 |
| Filed: | May 26, 1994 | Docket: | 950.001US2 |
| For: | FERTILE TRANSGENIC CORN PLANTS | | |

Hon. Commissioner of Patent
and Trademarks
Washington, D. C. 20231

FAX CENTER
RECEIVED

MAR 2 8 1995

GROUP 1800

SUPPLEMENTAL AMENDMENT

Sir:

To supplement the Amendment filed December 27, 1994, please amend the

above-identified application as follows:

In the Claims

Please add the following claims:

Claim 30.   The process of claim 28 further comprising (iv) obtaining progeny from said

fertile transgenic plant of step (iii), which comprise said DNA.

Claim 31.   The process of claim 30 wherein said progeny are obtained by crossing said

fertile transgenic plant of step (iii) with an inbred line.

A167

REDACTED VERSION – PUBLICLY FILED

03/28/95  14:00  ☎612 339 3061           SCHWEGMAN, LUNDB_____  _____ ☒00¹

Claim 32.  The process of claim 30 or 31 comprising obtaining seed from said progeny and obtaining further progeny plants comprising said DNA from said seed.

Claim 33.  The process of claim 31 wherein the progeny obtained in step (iv) are crossed back to the inbred line, to obtain further progeny which comprise said DNA.

Claim 34.  The process of claim 32 wherein seeds are obtained from said further progeny plants and plants comprising said DNA are recovered from said seed.

Claim 35.  The process of claim 33 wherein said further progeny are crossed back to the inbred line to obtain progeny which comprise said DNA.

### Remarks

Claims 30-35 having been added, the claims pending in the above-identified application are claims 23, 29 and 30-35.

Claims 30-31 are supported by the specification at pages 31-34, wherein the presence of the introduced DNA is confirmed in the R1 generation plants, which are obtained by crossing the R0 plant with A188, B73 and Oh43.

Claims 32-35 are supported by originally filed claim 13, and at pages 19-20 of the specification, which set forth methodologies for obtaining R2 and higher generation progeny plants from the initial R0 transgenic plants.

2

44

REDACTED VERSION – PUBLICLY FILED

02/28/95   14:00   ☎912 339 3081        SCHWEGMAN, LUNDB                    ☐002

When the Examiner takes the application up for the next Office Action,

consideration of these amendments and remarks is respectfully requested.

Since the Amendment filed on December 27, 1994 was fully responsive to the

Office Action, it is believed that no extension fees are due for filing this amendment.

However, if any fees are due, please charge them to Deposit Account No. 19-0743.

Respectfully submitted,

R. C. Lundquist et al.,

By their attorneys,

SCHWEGMAN, LUNDBERG
  & WOESSNER, P.A.
3500 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402
(612) 339-0331

Dated:   3-28-95                    By:   *Warren D. Woessner* (signature)
                                          Warren D. Woessner
                                          Reg. No. 30,440

3

A169

REDACTED VERSION – PUBLICLY FILED

PATENT

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | | |
|---|---|---|---|
| Applicants: | R. C. Lundquist et al. | Examiner: | G. Benzion |
| Serial No.: | 08/249,458 | Art Unit: | 1804 |
| Filed: | May 26, 1994 | Docket: | 950.001US2 |
| For: | FERTILE TRANSGENIC CORN PLANTS | | |

Hon. Commissioner of Patent
and Trademarks
Washington, D. C. 20231

AMENDMENT

Sir:

In response to the Office Action mailed September 28, 1994, please amend the above-identified application as follows:

In the Claims

Cancel claims 25-28.

Claim 23 (amended). A process for producing a fertile transgenic *Zea mays* plant comprising the steps of (i) bombarding intact regenerable *Zea mays* cells with DNA-coated microprojectiles, (ii) identifying or selecting a population of transformed cells [wherein said DNA is chromosomally integrated,] and (iii) regenerating a fertile transgenic plant therefrom, wherein said DNA is transmitted through a complete sexual cycle of said transgenic plant to its progeny.

A170

REDACTED VERSION – PUBLICLY FILED

foreign DNA in the germline cells of the R0 plants. Therefore, withdrawal of the obviousness rejection is appropriate and is respectfully requested.

Therefore, it is respectfully submitted that , as amended, claims 23 and 29 are in condition for allowance, and early notification to that effect is earnestly solicited.

Respectfully submitted,

R. C. Lundquist et al.,

By their attorneys,

SCHWEGMAN, LUNDBERG
  & WOESSNER, P.A.
3500 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402
(612) 339-0331

Dated: 17 Dec 1994                    By: Warren D. Woessner
                                          Warren D. Woessner
                                          Reg. No. 30,440

7

A171

REDACTED VERSION – PUBLICLY FILED



**UNITED STATES DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**

Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| SERIAL NUMBER | FILING DATE | FIRST NAMED APPLICANT | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 08/249,458 | May 25, 1994 | Lundquist et al. | 950,001US2 |

| | |
|---|---|
| | EXAMINER |
| | Benzion, G |
| ART UNIT | PAPER NUMBER |
| 1803 | 14 |

DATE MAILED:

## EXAMINER INTERVIEW SUMMARY RECORD

All participants (applicant, applicant's representative, PTO personnel):

(1) Warren Woessner                                    (3)

(2) Gary Benzion (PTO)                                 (4)

Date of interview November 15, 1995

Type:  ☒ Telephonic   ☐ Personal (copy is given to   ☐ applicant   ☐ applicant's representative).

Exhibit shown or demonstration conducted:   ☐ Yes   ☐ No.  If yes, brief description:

Agreement ☒ was reached with respect to some or all of the claims in question.   ☐ was not reached.

Claims discussed: 33

Identification of prior art discussed: none

Description of the general nature of what was agreed to if an agreement was reached, or any other comments:

Agreement for amendment to place case in condition for allowance.

(A fuller description, if necessary, and a copy of the amendments, if available, which the examiner agreed would render the claims allowable must be attached.  Also, where no copy of the amendments which would render the claims allowable is available, a summary thereof must be attached.)

☒ 1.    It is not necessary for applicant to provide a separate record of the substance of the interview.

Unless the paragraph below has been checked to indicate to the contrary, A FORMAL WRITTEN RESPONSE TO THE LAST OFFICE ACTION IS NOT WAIVED AND MUST INCLUDE THE SUBSTANCE OF THE INTERVIEW (e.g., items 1-7 of the second page of this form). If a response to the last Office action has already been filed, then applicant is given one month from this interview date to provide a statement of the substance of the interview.

☒ 2.    Since the examiner's interview summary above (including any attachments) reflects a complete response to each of the objections, rejections and requirements that may be present in the last Office action, and since the claims are now allowable, this completed form is considered to fulfill the response requirements of the last Office action.  Applicant is not relieved from providing a separate record of the substance of the interview unless box 1 above is also checked.

Examiner's Signature

File copy/Applicant's copy

SUBSTITUTE PTOL-413

USSN

A172

REDACTED VERSION – PUBLICLY FILED



UNITED STATES DEPARTMENT OF COMMERCE
Patent and Trademark Office
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

08/249,458    05/25/94    LUNDQUIST

SCHWEGMAN, LUNDBERG & WOESSNER
ATTN: WARREN D. WOESSNER
3500 IDS CENTER
80 SOUTH EIGHTH STREET
MINNEAPOLIS, MN 55402

### NOTICE OF ALLOWABILITY

PART I.

1. ☑ This communication is responsive to _telephone communication of 9/15/95_

2. ☑ All the claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice Of Allowance And Issue Fee Due or other appropriate communication will be sent in due course.

3. ☑ The allowed claims are _23, 24 & 29-35, new renumbered claims 1-9 respectively_

4. [ ] The drawings filed on _____ are acceptable.

5. [ ] Acknowledgment is made of the claim for priority under 35 U.S.C. 119. The certified copy has [ ] been received. [ ] not been received. [ ] been filed in parent application Serial No. _____ filed on _____

6. ☑ Note the attached Examiner's Amendment.

7. [ ] Note the attached Examiner Interview Summary Record, PTOL-413.

8. [ ] Note the attached Examiner's Statement of Reasons for Allowance.

9. [ ] Note the attached NOTICE OF REFERENCES CITED, PTO-892.

10. [ ] Note the attached INFORMATION DISCLOSURE CITATION, PTO-1449.

PART II.

A SHORTENED STATUTORY PERIOD FOR RESPONSE to comply with the requirements noted below is set to EXPIRE THREE MONTHS FROM THE "DATE MAILED" indicated on this form. Failure to timely comply will result in the ABANDONMENT of this application. Extensions of time may be obtained under the provisions of 37 CFR 1.136(a).

1. [ ] Note the attached EXAMINER'S AMENDMENT or NOTICE OF INFORMAL APPLICATION, PTO-152, which discloses that the oath or declaration is deficient. A SUBSTITUTE OATH OR DECLARATION IS REQUIRED.

2. ☑ APPLICANT MUST MAKE THE DRAWING CHANGES INDICATED BELOW IN THE MANNER SET FORTH ON THE REVERSE SIDE OF THIS PAPER.

   a. [ ] Drawing informalities are indicated on the NOTICE RE PATENT DRAWINGS, PTO-948, attached hereto or to Paper No. _____. CORRECTION IS REQUIRED.

   b. [ ] The proposed drawing correction filed on _____ has been approved by the examiner. CORRECTION IS REQUIRED.

   c. [ ] Approved drawing corrections are described by the examiner in the attached EXAMINER'S AMENDMENT. CORRECTION IS REQUIRED.

   d. ☑ Formal drawings are now REQUIRED.

---

Any response to this letter should include in the upper right hand corner, the following information from the NOTICE OF ALLOWANCE AND ISSUE FEE DUE: ISSUE BATCH NUMBER, DATE OF THE NOTICE OF ALLOWANCE, AND SERIAL NUMBER.

Attachments:
- Examiner's Amendment
- Examiner Interview Summary Record, PTOL-413
- Reasons for Allowance
- Notice of References Cited PTO-892
- Information Disclosure Citation PTO-1449

Notice of Informal Application, PTO-152
Notice re Patent Drawings, PTO-948
Listing of Bonded Draftsmen
Other

PTOL-37 (REV. 4-89) ∗

USCOMM-DC 89-3799

A173

REDACTED VERSION – PUBLICLY FILED

Serial No.    08/249,458
Art Unit    1803                                                    2 of 3

5    An Examiner's Amendment to the record appears below. Should the changes be
unacceptable to Applicant, an amendment may be filed as provided by 37 CFR 1.312. To
ensure consideration of such an amendment, it MUST be submitted no later than the
payment of the Issue Fee.

The title has been amended as follows:

10    <u>METHOD FOR PREPARING</u> FERTILE TRANSGENIC CORN PLANTS.

In the claims.

Claim 23 has been amended as follows:

23. (Twice amended). A process for producing a fertile transgenic *Zea mays* plant
comprising the steps of (i) bombarding intact regenerable *Zea mays* cells with DNA-
coated microprojectiles, (ii) identifying or selecting a population of transformed cells and
(iii) regenerating a fertile transgenic plant therefrom, wherein said DNA is transmitted
through a complete sexual cycle of said transgenic plant to its progeny[.] <u>and imparts
herbicide or insect resistance thereto.</u>

Authorization for this Examiner's Amendment was given in a telephone interview
with Warren Woessner on November 15, 1995

Any inquiry concerning this or earlier communication from the examiner should be
directed to Gary Benzion, Ph.D whose telephone number is (703) 308-1119. The
examiner can normally be reached on Monday-Friday from 8 AM to 4:30 PM. If attempts
15    to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Douglas
W. Robinson can be reached on (703)-308-2897. Any inquiry of a general nature or

A174

REDACTED VERSION – PUBLICLY FILED

Serial No.    08/249,458
Art Unit      1803                                                          3 of 3

relating to the status of this application should be directed to the Group receptionist whose telephone number is (703) 308-0196.

20        Papers related to this application may be submitted to Group 1800 by facsimile transmission. Papers should be faxed to Group 180 via the PTO Fax Center located in Crystal Mall 1. The faxing of such papers must conform with the notice published in the Official Gazette, 1096 OG 30 (November 15, 1989). The CM1 Fax Center number is (703)-308-4227. Informal communication may be sent via facsimile at 703-308-7362.

Benzion
25        11/16/95

GARY BENZION
PRIMARY EXAMINER
GROUP 1800

A175

REDACTED VERSION – PUBLICLY FILED

12/08/95   13:18   ☎612 339 3061      SCHWEGMAN. LUNDB                    ☒001

## SCHWEGMAN, LUNDBERG & WOESSNER, P.A.
PATENT • TRADEMARK • COPYRIGHT • ATTORNEYS

3500 IDS Center
80 South Eighth Street
Minneapolis, MN 55402

Telephone 612-339-0331          Facsimile 612-339-3061

December 8, 1995                    (612) 339-0331

Time:_____
(Minneapolis, Minn.)

TO: Assistant Commissioner for        FROM: Warren D. Woessner
    Patents
    Attn:  G. Benzion               OUR REF: 950.001US2
    Patent Examining Corps
    Facsimile Center                TELEPHONE: (612) 373-6903
    Washington, D.C.  20231

Total pages, including cover letter: 5
    FAX NUMBER 1-703-308-7722  4227

If you do NOT receive all of the pages, please telephone us at 612-339-0331, or fax
us at 612-339-3061.

    Document Transmitted: AMENDMENT UNDER 37 CFR 1.313 (4 pp.)

    Applicant: Ronald C. Lundquist et al.    Examiner: G. Benzion

    Serial No.: 08/249,458          Group Art Unit: 1804

    Filed: May 25, 1994             Docket No.: 950.001US2

    Title: FERTILE TRANSGENIC CORN PLANTS

    Please charge any additional fees or credit overpayment to Deposit Account No.
19-0743.
                                    By: _____
                                    Name: Warren D. Woessner
                                    Reg. No.: 30,440

I hereby certify that this paper is being transmitted by facsimile to the U.S.
Patent and Trademark Office on the date shown below.

Lisa D. LaBreche
Printed Name

_____          December 8, 1995
Signature                                Date

A176