REDACTED VERSION – PUBLICLY FILED

12/08/95   13:16   ☎612 339 3061   ____ SCHWEGMAN, LUNDB _____   🖾002

PATENT

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | | |
|---|---|---|---|
| Applicants: | R. C. Lundquist et al. | Examiner: | G. Benzion |
| Serial No.: | 08/249,458 | Art Unit: | 1804 |
| Filed: | May 26, 1994 | Docket: | 950.001US2 |
| For: | FERTILE TRANSGENIC CORN PLANTS | | |

Box AF
Assistant Commissioner for Patents
Washington, D. C. 20231

AMENDMENT UNDER 37 C.F.R. §1.312

Sir:

In response to the Notice of Allowance, Notice of Allowability, and Examiner's Amendment to claim 23, mailed November 27, 1995, please amend as follows:

In the Claims

Claim 23 (amended). A process for producing a fertile transgenic *Zea mays* plant comprising the steps of (i) bombarding intact regenerable *Zea mays* cells with DNA-coated microprojectiles, (ii) identifying or selecting a population of transformed cells, and (iii) regenerating a fertile transgenic plant therefrom, wherein said DNA is transmitted through a complete sexual cycle of said transgenic plant to its progeny, and imparts herbicide [or insect] resistance thereto.

REDACTED VERSION – PUBLICLY FILED

12/08/95   13:16   ☎612 339 3061        SCHWEGMAN, LUNDB _____ 🔲003

Claim 30 (amended). [The] A process [of claim 23 further] comprising [(iv)] obtaining

progeny from [said] a fertile transgenic plant [of step (iii)] obtained by

the process of claim 23, which comprise said DNA.

Claim 31 (amended). The process of claim 30 wherein said progeny are obtained by crossing

said fertile transgenic plant [of step (iii)] with an inbred line.

Claim 32 (amended). The process of claim 30 [or 31] comprising obtaining seed from said

progeny and obtaining further progeny plants comprising said DNA

from said seed.

Claim 33 (amended). The process of claim 31 wherein the progeny obtained [in step (iv)] are

crossed back to the inbred line, to obtain further progeny which

comprise said DNA.

Claim 36. A process for producing a fertile transgenic *Zea mays* plant comprising the

steps of (i) bombarding intact regenerable *Zea mays* cells with DNA-coated

microprojectiles, (ii) identifying or selecting a population of transformed cells,

and (iii) regenerating a fertile transgenic plant therefrom, wherein said DNA is

transmitted through a complete sexual cycle of said transgenic plant to its

progeny, wherein the DNA imparts insect resistance thereto.

REDACTED VERSION – PUBLICLY FILED

12/08/95   13:17   ☎812 339 3061        SCHWEGMAN, LUNDB ____ __ _____ ____   ☒004

Claim 37.    The process of claim 36 wherein the fertile transgenic *Zea mays* plant is

regenerated from transformed embryogenic tissue.

Claim 38.    The process of claim 36 wherein the cells are derived from immature embryos.

Claim 39.    A process comprising obtaining progeny from a fertile transgenic plant

obtained by the process of claim 36, which comprise said DNA.

Claim 40.    The process of claim 39 wherein said progeny are obtained by crossing said

fertile transgenic plant with an inbred line.

Claim 41.    The process of claim 39 comprising obtaining seed from said progeny and

obtaining further progeny plants comprising said DNA from said seed.

Claim 42.    The process of claim 40 wherein the progeny obtained are crossed back to the

inbred line, to obtain further progeny which comprise said DNA.

Claim 43.    The process of claim 41 wherein seeds are obtained from said further progeny

plants and plants comprising said DNA are recovered from said seed.

Claim 44.    The process of claim 42 wherein said further progeny are crossed back to the

inbred line to obtain progeny which comprise said DNA.

3

REDACTED VERSION – PUBLICLY FILED

12/08/95   13:17   ☎612 333 3061       SCHWEGMAN, LUNDB                    Ⓩ005

## Remarks

Claims 23 and 30-33 having been amended, and claims 36-44 having been added, the claims pending in the above-identified application are claims 23-24 and 29-44.

Claim 23 has been amended to delete reference to imparting insect resistance. This aspect of the invention is introduced as independent claim 36, and dependent claims 37-44 correspond to allowed claims 24 and 29-33, respectively.

It is respectfully submitted that these claims do not introduce new matter, and are allowable without further search or consideration. Therefore, entry is appropriate under Rule 312, and is respectfully requested.

Respectfully submitted,

R. C. Lundquist et al.,

By their attorneys,

SCHWEGMAN, LUNDBERG
& WOESSNER, P.A.
3500 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402
(612) 339-0331

Dated: 8 Dec. 1995

By: Warren D. Woessner
Reg. No. 30,440

4

A180

REDACTED VERSION – PUBLICLY FILED

#17

| Response to Rule 312 Communication | Application No. 08/249,458 | Applicant(s) Lundquist et al. |
|---|---|---|
| | Examiner Gary Benzion, Ph.D | Group Art Unit 1803 |

☐ The petition filed on _____ under 37 CFR 1.312(b) is granted. The paper has been forwarded to the examiner for consideration on the merits.

☒ The amendment filed on ___11 Dec 1995___ under 37 CFR 1.312 has been considered, and has been:

   ☐ entered.

   ☒ entered as directed to matters of form not affecting the scope of the invention (Order 3311).

   ☐ disapproved. See explanation below.

   ☐ entered in part. See explanation below.

DOUGLAS W. ROBINSON
SUPERVISORY PATENT EXAMINER
GROUP 1800

GARY BENZION, PH.D
PRIMARY EXAMINER
ART UNIT 1803

A181

U.S. Patent and Trademark Office
PTO-271 (Rev. 5-95)         Response to Rule 312 Communication        Part of Paper No. ___17___

REDACTED VERSION – PUBLICLY FILED

# Calendar No. 155

| 100TH CONGRESS *1st Session* | SENATE | REPORT 100–83 |
|---|---|---|

## PROCESS PATENTS AMENDMENTS ACT OF 1987

JUNE 23, 1987.—Ordered to be printed

Mr. BIDEN, from the Committee on the Judiciary,
submitted the following

## REPORT

[To accompany S. 1200]

The Committee on Judiciary, to which was referred the bill (S. 1200) to amend Title 35, United States Code, with respect to patented processes, patent misuse and licensee challenges to patent validity, having considered the same, reports favorably thereon with an amendment in the nature of a substitute and recommends that the bill (as amended) do pass.

## CONTENTS

| | Page |
|---|---|
| I. Purpose | 2 |
| II. Text of Bill | 3 |
| III. Title I | 29 |
| A. Purpose | 29 |
| B. History of Legislation | 29 |
| C. Discussion | 29 |
| D. Section-by-Section Analysis | 48 |
| IV. Title II | 61 |
| A. Purpose | 61 |
| B. History of Legislation | 61 |
| C. Discussion | 62 |
| D. Section-by-Section Analysis | 66 |
| E. Justice Department Views | 67 |
| V. Title III | 68 |
| A. Purpose | 68 |
| B. History of Legislation | 69 |
| C. Discussion | 70 |
| D. Section-by-Section Analysis | 71 |
| VI. Title IV | 72 |
| A. Purpose | 72 |
| B. Discussion | 73 |
| C. Section-by-Section Analysis | 73 |
| VII. Regulatory Impact Statement | 75 |

91–010

46

producing Vitamin C.[5] Enactment of S. 1200 would help Genentech protect itself against an influx of Vitamin C produced abroad by means of their economical new process, and produced all the more cheaply because the foreign manufacturer had no R&D expenses in procuring the process. But under the "new product" approach, Genentech would not benefit from the presumption clause in bringing suits for such infringement of its process.

Most of the foreign patent statutes that extend process protection to the product resulting from the process also include the limitation that the product must be made "directly" from the process. The significance of this qualification is discussed at length in the section-by-section analysis. The basic point is that if a final product has undergone a material change after being initially produced by the patented process, then it should no longer be covered within the scope of protection offered by S. 1200.

Some parties urged the Committee to include the word "directly" in the statutory language of the bill, making the U.S. law conform to the norm of industrialized nations and insuring that process patent protection does not become too broad. A number of industry advocates of the bill on the other hand were concerned that including the word "directly" might unduly restrict the scope of the bill if it were interpreted narrowly to exclude products that had been altered in trivial ways after the stage of manufacture where the patented process was used. The Committee concluded that both parties were seeking the same balance, and reached the decision to exclude products that had been "materially changed by subsequent processes; or . . . become a trivial and nonessential component of another product." Inevitably the courts will have to assess the permutations of this issue of proximity to or distance from the process on a case-by-case basis. The section-by-section analysis offers guidance and examples for the interpretation of this provision.

Because of our obligations under the GATT treaty to refrain from trade discrimination, the process patent bill was crafted to apply equally to the use or sale of a product made by a process patented in this country whether the product was made (and the process used) in this country or in a foreign country. As explained earlier, the bill is prompted by the use of patented processes in other countries followed by the importation of the resulting products into this country. The use of the process in this country is already an act of infringement under existing patent law, and such an infringing party would be subject to the jurisdiction of the U.S. courts. Thus the inclusion of domestic process patent infringement in the scope of a bill to extend protection to the products is regarded by the Committee as a formality to conform to the GATT, with little or no practical consequences in patent enforcement. The American Bar Association suggested in a letter to the Committee [6] that an

[5] Statement of Thomas D. Kiley, Esq., Vice President, Corporate Development, Genentech, Inc., before the House Judiciary Subcommittee on Courts, Civil Liberties and the Administration of Justice, February 19, 1986 (Hearing on "Intellectual Property and Trade," 99th Congress, Serial Number 60).

[6] Letter from Jan Jancin, Jr., President, ABA Section of Patent, Trademark and Copyright Law, to Senator Mathias, March 10, 1986. Printed in "Process Patents," Hearing on S. 1543 before the Senate Judiciary Subcommittee on Patents, Copyrights and Trademarks, 99th Congress, 1st Session, pp. 266–3.

REDACTED VERSION – PUBLICLY FILED

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BRITISH TELECOMMUNICATIONS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 03-526-SLR |
| | ) | |
| SBC COMMUNICATIONS INC., | ) | |
| AMERITECH CORPORATION and | ) | |
| SOUTHWESTERN BELL | ) | |
| COMMUNICATIONS SERVICES, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | | |
| BRITISH TELECOMMUNICATIONS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 03-527-SLR |
| | ) | |
| QWEST COMMUNICATIONS | ) | |
| INTERNATIONAL INC. and | ) | |
| QWEST COMMUNICATIONS | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |
| | | |
| BRITISH TELECOMMUNICATIONS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 03-528-SLR |
| | ) | |
| VERIZON COMMUNICATIONS, INC., | ) | |
| VERIZON DELAWARE, INC., and | ) | |
| GTE SOUTHWEST INCORPORATED, | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM ORDER

REDACTED VERSION – PUBLICLY FILED

At Wilmington this 24th day of February, 2004, having considered the defendants' various motions to dismiss and the papers submitted in connection therewith;

IT IS ORDERED that defendants' motions to dismiss (Civ. No. 03-526-SLR, D.I. 14; Civ. No. 03-527-SLR, D.I. 13; Civ. No. 03-528-SLR, D.I. 32) are granted, for the reasons that follow:

1.   Standard of review.   The standards governing motions filed under Rules 12(b)(6) and 12(c) of the Federal Rules of Civil Procedure require that the court accept as true all of the material allegations of the complaint and construe the complaint in plaintiff's favor.   See Trump Hotels & Casinos Resort, Inc. v. Mirage Resorts, Inc., 140 F.3d 478 (3d Cir. 1998).   Motions for judgment on the pleadings should be granted only if the asserted claims fail to allege any set of facts under which plaintiff would be entitled to relief.   See Conley v. Gibson, 355 U.S. 41 (1957).

2.   Background.   Plaintiff has alleged that multiple defendants are infringing U.S. Patent No. 4,691,896 (the "'896 patent"), entitled "Optical Fiber Transmission Line," and U.S. Patent No. 4,948,097 (the "'097 patent), entitled "Method of and Apparatus for Installing Transmission Lines."   More specifically, plaintiff contends that defendants have infringed the patents in suit by: a) "installing fiber optic cable using [claimed] processes," in violation of 35 U.S.C. § 271(a); b) actively

2

A185

REDACTED VERSION – PUBLICLY FILED

inducing its subsidiaries to infringe one or more of the asserted
claims; and c) "using fiber optic cable installed using [claimed]
processes," in violation of 35 U.S.C. § 271(g).  (Civ. No. 03-
526-SLR, D.I. 8 at ¶¶ 8,9; Civ. No. 03-527-SLR, D.I. 8 at ¶¶ 7,8;
Civ. No. 03-528-SLR, D.I. 10 at ¶¶ 7,8)  Defendants' motions are
directed to these latter claims of infringement; to wit,
defendants assert that, as a matter of law, their alleged use of
fiber optic cable does not implicate 35 U.S.C. § 271(g).

> 3.  Section 271(g) provides that
>
> [w]hoever without authority imports into the
> the United States or offers to sell, sells, or
> uses within the United States a product which
> is made by a process patented in the United
> States shall be liable as an infringer, if the
> importation, offer to sell, sale, or use of the
> product occurs during the term of such process
> patent . . . .  A product which is made by a
> patented process will, for purposes of this title,
> not be considered to be so made after –
>
> (1) it is materially changed by subsequent
> processes; or
>
> (2) it becomes a trivial and nonessential
> component of another product.

(Emphasis added)

> 4.  The Federal Circuit, in <u>Bayer AG v. Housey
> Pharmaceuticals, Inc.</u>, 340 F.3d 1367 (Fed. Cir. 2003), found the
> above statutory language to be ambiguous and, therefore, embarked
> on a review of the legislative history of § 271(g).  One of the
> primary sources of the legislative history of the Process Patents
> Amendments Act of 1987 is Senate Report No. 100-83 (1987),

3

A186

REDACTED VERSION – PUBLICLY FILED

*reprinted* in 9 Donald S. Chisum, <u>Chisum On Patents</u>, App. 25

(2002).  S. Rep. No. 100-83 describes the background of the

legislation as follows:

> The U.S. patent laws recognize three basic
> types of inventions for which patents may
> be obtained:  products, methods of use, and
> methods of manufacture.  Patents on the last
> are also known as process patents, that is,
> patents on process inventions.  A process
> patent covers a process for making a product,
> which may or may not be patented itself.
> Process patents promise to be increasingly
> important to a number of industries in the
> coming years, especially in the areas of
> industrial and pharmaceutical chemicals,
> optical fibres, and above all in the fields of
> biotechnology and bioengineering research.
> Biotechnology companies are often built around
> a new process for artificial manufacture of a
> substance that occurs in nature and is therefore
> itself unpatentable.  A well known example is
> the Genentech Corporation of California, whose
> principal assets since its founding in 1976
> have been process patents on revolutionary new
> ways of making human insulin and growth hormone.

9 Donald S. Chisum, <u>Chisum On Patents</u>, App. 25 at 41-42 (emphasis

added).  In further explanation of newly added § 271(g), S. Rep.

No. 100-83 provides:

> This subsection provides that whoever without
> authority imports in the United States or sells
> or uses within the United States a product which
> is made by a process patented in the United
> States is liable as an infringer.
>
> Since a process patentee can already prevent
> the use of the patented process by domestic
> manufacturers, the primary effect will be on
> foreign-made goods.  These amendments will not
> give extraterritorial effect to U.S. law.  U.S.
> patents will not prevent foreign manufacturers
> from using abroad the process covered by the

4

REDACTED VERSION – PUBLICLY FILED

> U.S. patent, so long as the products they make
> thereby are sold and used abroad.  But the
> amendments will prevent circumvention of a U.S.
> patentee's rights through manufacture abroad
> and subsequent importation into the United States
> of products made by the patented process.

Id. at 67 (emphasis added).  The Federal Circuit in Bayer

concluded through its review of S. Rep. No. 100-83 that the

statute was limited to "manufactured tangible products."  Bayer,

340 F.3d at 1375.

     5.  The Federal Circuit came to the same conclusion

after reviewing the House Report on the same legislation:

> "The purpose of this bill is to provide
> meaningful protection to owners of patented
> processes.  Under current patent law,
> owners of such patents have remedies for
> unauthorized use of the process only if the
> process was used in the United States.  As a
> consequence, while a domestic manufacturer
> using the patented process would infringe the
> process patent, a foreign manufacturer who
> imports the product would not.
>
>      \* \* \* \* \* \* \* \* \* \*
>
> The value of new manufacturing techniques is
> reflected in the resulting new products.  A
> new process may enhance the quality of the
> product produced, or the new process may permit
> the product to be made much more economically.
> In some cases, for example biotechnology, the
> new process may be the only method of producing
> a new product.  In all of these instances,
> the advantage to the process patent owner is
> realized by suing or selling the product, or
> licensing others to do so.  As a consequence,
> the unfettered ability of others to import,
> sell or use a product made by the patented
> process, severely diminishes the value of a
> U.S. process patent."

5

A188

REDACTED VERSION – PUBLICLY FILED

> [H.R. Rep. No. 100-60 at 3]. Thus, Congress
> was concerned with tangible products and not
> mere information. Here again, "process patent"
> was interpreted as synonymous with "manufacturing
> technique."

Id. at 1376. The Federal Circuit observed that, "[i]n the face

of silence in the legislative history, here as to the coverage

beyond manufactured articles, courts are reluctant to broadly

interpret the legislation." Id. The Federal Circuit concluded,

therefore, "that in order for a product to have been 'made by a

process patented in the United States' it must have been a

physical article that was 'manufactured'. . . ." Id. at 1377.

      6.  Analysis.  Although the facts in Bayer are

distinguishable from those at issue, the Federal Circuit's

discussion in Bayer constitutes the analytical framework which

this court must employ.  Significantly, the Federal Circuit found

the statutory language of § 271(g) to be ambiguous and,

therefore, resorted to the statute's legislative history to

discern its meaning and scope.  Having reviewed at some length

both the statutory language and the legislative history, the

court concludes that it is difficult to reconcile the two within

the factual context of this case.

      7.  On the one hand, the legislative history addresses

a relatively narrow universe of problems, that is, to provide

protection to owners of United States process patents against

foreign manufacturers who would use the processes outside the

REDACTED VERSION – PUBLICLY FILED

United States to make products that are then imported, used or sold in the United States. In the case at bar, the patented methods at issue are being used, if at all, in this country; consequently, the fundamental purpose underlying passage of the statute has absolutely no application.[1] Moreover, the legislative history clearly indicates that Congress was concerned with methods of manufacture and with manufactured goods destined to travel in the stream of commerce. The fiber optic cable installation at issue cannot be characterized as such a good. Once installed, the fiber optic cable installation does not travel in the stream of commerce. Instead, it serves as the fixed backbone for an underground optical fiber telecommunications network. Finally, at least one passage from the legislative history indicates that plaintiff's patents are not "process" patents at all,[2] but a "method of use" patent and, therefore, not the proper subject of a § 271(g) claim.

8. The language of the statute, of course, is much broader than forecast by the legislative history; accordingly, it is possible to shoehorn plaintiff's facts into the words employed

---

[1]Remember that Congress recognized that § 271(g) did not have to address the unauthorized domestic use of a patented process, because there were already remedies for such conduct.

[2]S. Rep. No. 100-83 specifically describes patents covering "methods of manufacture" as "process patents" and distinguishes the latter from patents covering "methods of use."

7

A190

REDACTED VERSION – PUBLICLY FILED

by Congress.[3]  The question is whether clever word-smithing of

the broad statutory language should take precedence over the more

narrow message sent by Congress in its legislative deliberations.

The court cannot honestly say that the facts at bar fit within

the meaning of the statute as illuminated by its legislative

history.[4]  Therefore, defendants' motions shall be granted.

IT IS FURTHER ORDERED that plaintiff's motions for

leave to file a surreply brief in opposition to defendants'

motions to dismiss (Civ. No. 03-526-SLR, D.I. 30; Civ. No. 03-

527-SLR, D.I. 29; Civ. No. 03-528-SLR, D.I. 57)) are denied as

moot.

---

[3]Plaintiff offers the plausible, albeit not compelling,
argument that the fiber optic cable installation at issue is a
"multi-component product comprising an underground conduit (a
tubular pathway extending between two points) and a fiber optic
cable." (D.I. 24 at 6)

[4]The language of both the claims and specification of the
patents in suit substantiates this conclusion.  Claim 1 of the
'896 patent uses the phrase "[a] method of advancing a
lightweight and flexible optical fiber member along a previously
installed tubular pathway." ('896 Reexam Cert., col. 1 at ll.
22-26)(emphasis added)  Claim 1 of the '097 patent likewise
recites "[a] method of installing a lightweight and flexible
transmission line into and along a length of previously installed
tubular pathway between first and second ends of the pathway."
('097 Reexam Cert., col 2 at ll. 8-11)(emphasis added)  The '896
specification states that the "invention relates to optical fibre
transmission lines, and in particular though not exclusively to
methods, apparatus, and cable structures for their installation."
('896 patent, col. 1 at ll. 6-9)(emphasis added)  Similarly, the
'097 specification states that the invention relates to "a method
and apparatus for installing" "optical fibre and other
lightweight and flexible transmission lines." ('097 patent, col.
1 at ll. 13-17)(emphasis added)

8

A191

REDACTED VERSION – PUBLICLY FILED

IT IS FURTHER ORDERED that defendants' motions to stay (Civ. No. 03-526-SLR, D.I. 19; Civ. No. 03-527-SLR, D.I. 18) are denied without prejudice to renew at the conclusion of discovery.

_____
United States District Judge

9

A192

REDACTED VERSION – PUBLICLY FILED

Staple Issue Slip Here

| POSITION | | ID NO. | DATE |
|---|---|---|---|
| CLASSIFIER | | 19 | 6/17/94 |
| EXAMINER | | 353 | 6-20 |
| TYPIST | | 19 | 6-20 |
| VERIFIER | | 2nd | |
| CORPS CORR. | | | |
| SPEC. HAND | | | |
| FILE MAINT. | | | |
| DRAFTING | | | |

INDEX OF CLAIMS



(LEFT INSIDE)

SM 0001130

A193

REDACTED VERSION – PUBLICLY FILED

# Manual of
# PATENT
# EXAMINING
# PROCEDURE

### Original Sixth Edition, January 1995
### Latest Revision July 1996

 

## U.S. DEPARTMENT OF COMMERCE
### Patent and Trademark Office

Rev. 2, July 1996

MANUAL OF PATENT EXAMINING PROCEDURE

**717.04**

## 717.04  Index of Claims [R–1]

>Constant reference is made to the "Index of Claims" found in the inside of the file wrapper of all applications. It should be kept up to date so as to be a reliable index of all claims standing in a case, and of the amendment in which the claims are to be found.

The preprinted series of claim numbers appearing on the file wrapper refer to the claim numbers as originally filed while the adjacent column should be used for the entry of the final numbering of the allowed claims.

Independent claims should be designated in the Index of Claims by encircling the claim number in red ink.

A line in red ink should be drawn below the number corresponding to the number of claims originally presented.

Thereafter, a line in red ink should be drawn below the number corresponding to the highest numbered claim added by each amendment. Just outside the Index of Claims form opposite the number corresponding to the first claim of each amendment there should be placed the letter designating the amendment.

If the claims are amended in rewritten form under 37 CFR 1.121(b), the original claim number should not be stricken from the Index of Claims but a notation should be made in red ink in the margin to the left of the original claim number, i.e. "Amend. 1"; if the claim is rewritten a second time, "Amend. 1" should be changed by striking out "1" and inserting "2" above it.

As any claim is canceled, a line in red ink should be drawn through its number.

A space is provided for completion by the examiner to indicate the date and type of each Office action together with the resulting status of each claim. A list of codes for identifying each type of Office action appears below the Index. At the time of allowance, the examiner places the final patent claim numbers in the column marked "Final."<

## 717.05  Field of Search [R–1]

>In each action involving a search, the examiner shall endorse, on the flap of the file wrapper, the U.S. classes and subclasses, International Patent Classification(s) and publications searched, the date when the search was made or was brought up to date and the examiner's initials, all entries being in BLACK INK. Great care should be taken so as to clearly indicate the places searched and the date(s) on which the search was conducted.

In order to provide a complete, accurate, and uniform record of what has been searched and considered by the examiner for each application, the Patent and Trademark Office has established procedures for recording search data in the application file. Such a record is of importance to anyone evaluating the strength and validity of a patent, particularly if the patent is involved in litigation. These procedures will also facilitate the printing of certain search data on patents.

Under the procedures, searches are separated into two categories and listed, as appropriate, in either the "SEARCHED" box or "SEARCHED NOTES" box on the file wrapper.

If additional space is required, entries should be continued on the outside right flap of the file wrapper.

### A. "SEARCHED" Box Entries

Search entries made here, except those for search updates (see item A.3 below), will be printed under "Field of Search" on the patent front page. Therefore, the following searches will be recorded in the "SEARCHED" box by the examiner along with the date and the examiner's initials, according to the following guidelines:

(1) *A complete search of a subclass,* including all United States and foreign patent documents, whether filed by U.S. or IPC classification, and other publications placed therein.

The complete classification (class and subclass) should be recorded.

*Examples:*
424/270, 272, 273
224/42.1 F
414/DIG. 4
D3/32 R
A61K 9/22
A61K 31/56 – A61K 31/585

(2) *A limited search of a subclass,* for example, a search that is restricted to an identifiable portion of the patent documents placed therein. If, however, only the publications in a subclass are searched, such an entry is to be made under "SEARCH NOTES" rather than under "SEARCHED." (See item B(4) below.)

The class and subclass, followed by the information defining the portion of the subclass searched—in parenthesis, should be recorded.



REDACTED VERSION – PUBLICLY FILED

## CERTIFICATE OF SERVICE

I hereby certify that on January 11, 2006, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Richard L. Horwitz, Esquire
> Potter Anderson & Corroon LLP
> Hercules Plaza
> 1313 North Market Street
> Wilmington, DE 19899-0951

I further certify that on January 11, 2006, copies of the foregoing document were served by hand delivery on the above listed counsel and on the following non-registered participants in the manner indicated below:

### BY FEDERAL EXPRESS

Peter E. Moll, Esquire
Howrey Simon Arnold & White, LLP
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004

Susan Knoll, Esquire
Howrey Simon Arnold & White, LLP
1111 Louisiana, 25th Floor
Houston, TX 77002-5242

Kenneth A. Letzler, Esquire
Arnold & Porter LLP
555 12th Street, N.W.
Washington, D.C. 20004

YOUNG CONAWAY STARGATT & TAYLOR, LLP

John W. Shaw (No. 3362)
Rolin P. Bissell (No. 4478)
Karen E. Keller (No. 4489)
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19801
(302) 571-6600
jshaw@ycst.com

*Attorneys for Syngenta Seeds, Inc., Syngenta Corporation, Syngenta Biotechnology, Inc., Advanta USA, Inc., Garst Seed Company, and Golden Harvest Seeds, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on January 19, 2006, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

>Richard L. Horwitz, Esquire
>Potter Anderson & Corroon LLP
>Hercules Plaza
>1313 North Market Street
>Wilmington, DE 19899-0951

I further certify that on January 19, 2006, copies of the foregoing document were served by hand delivery on the above listed counsel and on the following non-registered participants in the manner indicated below:

**BY FEDERAL EXPRESS**

Peter E. Moll, Esquire
Howrey Simon Arnold & White, LLP
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004

Kenneth A. Letzler, Esquire
Arnold & Porter LLP
555 12th Street, N.W.
Washington, D.C. 20004

Susan Knoll, Esquire
Howrey Simon Arnold & White, LLP
1111 Louisiana, 25th Floor
Houston, TX 77002-5242

YOUNG CONAWAY STARGATT & TAYLOR, LLP

_____
John W. Shaw (No. 3362)
Rolin P. Bissell (No. 4478)
Karen E. Keller (No. 4489)
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19801
(302) 571-6600
jshaw@ycst.com

*Attorneys for Syngenta Seeds, Inc., Syngenta Corporation, Syngenta Biotechnology, Inc., Advanta USA, Inc., Garst Seed Company, and Golden Harvest Seeds, Inc.*