REDACTED VERSION – PUBLICLY FILED

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MONSANTO COMPANY and MONSANTO TECHNOLOGY LLC, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 04-305-SLR (lead case) |
| SYNGENTA SEEDS, INC., SYNGENTA BIOTECHNOLOGY, INC., | ) ) ) ) | |
| Defendants. | ) ) | |
| DEKALB GENETICS CORPORATION, | ) ) | |
| Plaintiff, | ) ) | Civil Action No. 05-355-SLR |
| v. | ) ) | **CONTAINS RESTRICTED CONFIDENTIAL** |
| SYNGENTA SEEDS, INC., SYNGENTA BIOTECHNOLOGY, INC., | ) ) ) | **INFORMATION SUBJECT TO PROTECTIVE ORDER - FILED UNDER SEAL** |
| Defendants. | ) ) | |

**SYNGENTA'S OPENING BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OF NON-ENABLEMENT OF THE SHAH PATENT**

Of counsel:
Michael J. Flibbert
Howard W. Levine
Jennifer A. Johnson
FINNEGAN, HENDERSON, FARABOW,
    GARRETT & DUNNER, L.L.P.
901 New York Avenue, N.W.
Washington, D.C. 20001
(202) 408-4000

Attorneys for Defendants

Dated: January 11, 2006

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
YOUNG CONAWAY STARGATT &
    TAYLOR, LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19899-0391
(302) 571-6600
jshaw@ycst.com

REDACTED VERSION – PUBLICLY FILED

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................... ii

INDEX OF EXHIBITS ............................................................................................... iv

I.  INTRODUCTION ........................................................................................... 1

II. NATURE AND STAGE OF PROCEEDINGS ................................................ 3

III. SUMMARY OF THE ARGUMENT .............................................................. 4

IV. STATEMENT OF FACTS .............................................................................. 5

    A.  The '835 Patent .................................................................................... 5

    B.  Monocots Could Not Be Transformed During the 1985-86 Time
        Frame ................................................................................................... 7

        1.  *In re Goodman* ...................................................................... 8

        2.  *PGS v. DeKalb* ..................................................................... 9

        3.  *Monsanto v. Bayer* ............................................................... 13

        4.  The Evidence in this Case Is Consistent with These Previous
            Litigations ............................................................................. 15

V.  ARGUMENT ................................................................................................ 17

    A.  Summary Judgment Is an Appropriate Vehicle for Holding the '835
        Patent Invalid Under 35 U.S.C. § 112 ............................................... 17

    B.  The Broad Claims of the '835 Patent Are Not Enabled Under 35
        U.S.C. § 112 ....................................................................................... 18

        1.  The *Goodman* and *PGS* Decisions Demonstrate the Inability to
            Use a Chimeric Gene to Transform Monocot Cells in 1985-86 ...... 18

        2.  The Functional Language in the Claims Cannot Be Ignored and
            Further Demonstrates that Claims 1, 5, and 6 of the '835 Patent
            Are Not Enabled ..................................................................... 20

VI. CONCLUSION .............................................................................................. 28

REDACTED VERSION – PUBLICLY FILED

# TABLE OF AUTHORITIES

## FEDERAL CASES

**Page**

*ABB Automation Inc. v. Schlumberger Res. Mgmt. Servs., Inc.*,
254 F. Supp. 2d 479 (D. Del. 2003)............................................................................17

*Acco Brands, Inc. v. Micro Sec. Devices, Inc*,
346 F.3d 1075  (Fed. Cir. 2003).................................................................................22

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242  (1986).................................................................................................17

*In re Armstrong World Indus., Inc.*,
2005 U.S.App. LEXIS 28897 (3d Cir. Dec. 29, 2005) ...............................................19

*Atlas Powder Co. v. E.I. duPont De Nemours & Co.*,
750 F.2d 1569 (Fed. Cir. 1984)..................................................................................18

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)..................................................................................................17

*In re Daimlerchrysler Ag Sec. Litig.*,
294 F. Supp. 2d 616 (D. Del. 2003)............................................................................19

*Enzo Biochem, Inc. v. Calgene, Inc.*,
188 F.3d 1362 (Fed. Cir. 1999)........................................................................ passim

*In re Goodman*,
11 F.3d 1046 (Fed. Cir. 1993).......................................................................... passim

*K-2 Corp. v. Salomon S.A.*,
191 F.3d 1356 (Fed. Cir. 1999)..................................................................................22

*Lemelson v. United States*,
752 F.2d 1538 (Fed. Cir. 1985)..................................................................................21

*Monsanto Co. v. Bayer BioScience, N.V.*,
363 F.3d 1235 (Fed. Cir. 2004).............................................................................13-15

*Nat'l Recovery Techs., Inc. v. Magnet Separation Sys., Inc.*,
166 F.3d 1190 (Fed. Cir. 1999)..................................................................................18

*New Hampshire v. Maine*,
　　532 U.S. 742 (2001)...........................................................................................19

*Phillips v. AWH Corp.*,
　　415 F.3d 1303 (Fed. Cir. 2005).........................................................................21

*Plant Genetic Sys., N.V. v. DeKalb Genetics Corp.*,
　　175 F. Supp. 2d 246 (D. Conn. 2001)........................................................ passim

*Plant Genetic Sys., N.V. v. DeKalb Genetics Corp.*,
　　315 F.3d 1335 (Fed. Cir. 2003)................................................................. passim

*In re Swinehart*,
　　439 F.2d 210 (C.C.P.A. 1971) ......................................................................22, 23

*TechSearch, L.L.C. v. Intel Corp.*,
　　286 F.3d 1360 (Fed. Cir. 2002).........................................................................21

*United States v. Pelullo*,
　　399 F.3d 197 (3d Cir. 2005)...............................................................................19

*In re Vaeck*,
　　947 F.2d 488 (Fed. Cir. 1991)................................................................... passim

*In re Wands*,
　　85 F.2d 731 (Fed. Cir. 1988)..............................................................................18

*Warner-Jenkinson Co. Inc. v. Hilton Davis Chem. Co.*,
　　520 U.S. 17 (1997)..........................................................................................2, 21

*Warner-Lambert Co. v. Teva Pharms. USA, Inc.*,
　　418 F.3d 1326 (Fed. Cir. 2005).........................................................................17

*Wright Medical Tech., Inc. v. Osteonics Corp.*,
　　122 F.3d 1440 (Fed. Cir. 1997).........................................................................22

## FEDERAL STATUTES

Fed. R. Civ. P. 56.....................................................................................................17

35 U.S.C. § 112............................................................................................... passim

REDACTED VERSION – PUBLICLY FILED

## INDEX OF EXHIBITS

| Appendix Pages | Description |
|---|---|
| A1 - A26 | U.S. Patent No. 4,940,835 |
| A27 - A34 | DeKalb Genetic Corp.'s Proposed Findings of Fact, filed Sept. 22, 2000 in *Plant Genetic Sys., N.V. v. DeKalb Genetics Corp.*, No. 3:96 CV 2015 DJS (D. Conn.) |
| A35 - A43 | DeKalb's Brief in Opposition, filed March 5, 2002, in *Plant Genetic Sys., N.V. v. DeKalb Genetics Corp.*, Appeal No. 02-1011 (Fed. Cir.) |
| A44 - A53 | *Plant Genetic Sys., N.V. v. DeKalb Genetics Corp.*, Civ. A. No. 3:96 CV 2015 DJS (D. Conn.), trial transcript dated May 16, 2000 |
| A54 - A57 | DeKalb Genetics Corp.'s Proposed Conclusions of Law, filed Sept. 22, 2000, in *Plant Genetic Sys., N.V. v. DeKalb Genetics Corp.*, Civ. A. No. 3:96 CV 2015 DJS (D. Conn.) |
| A58 - A63 | DeKalb Genetics Corp.'s Initial Post-Trial Brief, filed Sept. 22, 2000, in *Plant Genetic Sys., N.V. v. DeKalb Genetics Corp.*, Civ. A. No. 3:96 CV 2015 DJS (D. Conn.) |
| A64 - A69 | *Plant Genetic Sys., N.V. v. DeKalb Genetics Corp.*, Civ. A. No. 3:96 CV 2015 DJS (D. Conn.), trial transcript dated May 26, 2000 |
| A70 - A74 | 9/24/2005 deposition transcript of Dr. Fromm |
| A75 - A84 | Fromm, "Production of transgenic maize plants via microprojectile-mediated gene transfer," *Maize Handbook* (Freeling and Walbot, eds., Springer Verlag 1994) |
| A85 - A87 | 12/7/2005 deposition transcript of Dr. Finer |
| A88 - A93 | Plaintiff's Statement Regarding the Construction of the Asserted Claims of the Patents-In-Suit, filed Aug. 5, 2002, in *Monsanto Co. v. Aventis CropScience, N.V.*, Civ. Action No. 4:00CV01915 ERW (D. Mo.) |
| A94 - A104 | Brief for Plaintiff Appellee Monsanto Co., filed June 12, 2003 in *Monsanto v. Bayer BioScience, N.V.*, Appeal No. 03-1201 (Fed. Cir.) |
| A105 - A109 | 10/7/2005 deposition transcript of Dr. Shah |
| A110 - A114 | 9/2/2005 deposition transcript of Dr. Horsch |
| A115 - A117 | 9/13/2005 deposition transcript of Dr. Rogers |
| A118 - A120 | 10/10/2005 deposition transcript of Dr. Fraley |
| A121 - A132 | Corn Transformation Project Review MKZ0014835-46 |
| A133 - A150 | Monsanto Laboratory Notebook 5,315,401 |
| A151 - A156 | Monsanto's Third Supplemental Responses to Syngenta's First Set of Interrogatories (Nos. 1-4) |
| A157 | '835 patent prosecution history excerpt |

REDACTED VERSION – PUBLICLY FILED

I.     INTRODUCTION

It is a black-letter principle of patent law that the breadth of the claims must be commensurate with the teaching of the specification to be enabling, and thus valid, under 35 U.S.C. § 112. The broad claims of U.S. Patent No. 4,940,835 ("the '835 patent") (A1-26) violate this basic rule.

There are two main classes of plants, dicots and monocots. Monocot plants include the commercially important crops of corn, wheat, and rice. In contrast, dicot plants include the plants discussed in the '835 patent examples, such as petunia, tobacco, and tomato. In the instant lawsuit, Plaintiffs Monsanto, and its wholly owned subsidiary DeKalb, have sued Syngenta based on its *corn* product (called "GA21"), which has been genetically engineered to provide resistance to the herbicide glyphosate.

The '835 patent, however, describes transforming *only dicot* cells to enhance their glyphosate resistance. And the only gene specifically described (by nucleotide or amino acid sequence) is a *petunia* gene. Not one of the examples in the '835 patent shows the transformation of a monocot cell, and certainly none of the examples address the transformation of corn. Nevertheless, claims 1, 5, and 6 of the '835 patent broadly recite a chimeric plant gene that "functions in *plant cells*" "to enhance the glyphosate resistance of *a plant cell* transformed with the gene." '835 patent at col. 32 (emphasis added) (A25). Thus, according to the specific language in the claim, the recited gene must be capable of functioning in any plant cell to provide glyphosate resistance.

It is, however, beyond dispute that skilled scientists could *not* transform monocot plant cells to incorporate foreign genes (such as those that provide glyphosate resistance) as of the July 7, 1986 filing date of the '835 patent. And in case after case involving new technology, such as genetic engineering, the courts have refused to sustain claims of broad scope based on very

limited positive results, let alone where the results have been found not to be operative or achievable as broadly claimed. *See, e.g, In re Goodman*, 11 F.3d 1046, 1052 (Fed. Cir. 1993) (holding claims broad enough to cover genetic modification of monocot plants invalid because monocot plants could not be transformed as of Goodman's 1985 filing date); *Plant Genetic Sys., N.V. v. DeKalb Genetics Corp.* (referred to herein as "the *PGS* case"), 315 F.3d 1335, 1343 (Fed. Cir. 2003) (holding claims encompassing the transformation of monocot plant cells invalid because it was not possible to transform monocots as of the 1987 filing date).

Indeed, in previous litigation where Plaintiffs Monsanto and DeKalb were *opposing* a patent, they specifically argued and successfully established that it was *not* possible to transform monocot cells, in particular corn, during the relevant time frame: "As of March 11, 1987, a person of ordinary skill in the art of plant molecular biology could not transform corn." DeKalb Genetic Corp.'s Proposed Findings of Fact, FOF 51, filed Sept. 22, 2000 in the district court *PGS* case, No. 3:96 CV 2015 DJS (D. Conn.) (A31); *See Plant Genetic Sys., N.V. v. DeKalb Genetics Corp.*, 175 F. Supp. 2d 246, 265 (D. Conn. 2001).

Clearly, there is no dispute as to the facts surrounding what is disclosed in the '835 patent or what was possible and not possible in the art concerning the genetic transformation of plants as of the relevant filing dates. Instead, to sustain the validity of its claims, Monsanto argues that the functional language expressly set forth in the claim should be ignored. In other words, although claim 1 states that the gene must "enhance the glyphosate resistance of a plant cell transformed with the gene," this language should be given no effect. This argument, however, conflicts with well-established precedent that each and every element of the claim is essential and may not be ignored. *See Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997).

REDACTED VERSION – PUBLICLY FILED

Claim construction is a question of law for the Court, and if the claims are construed as Syngenta proposes and believes correct, the failure of the asserted claims of the '835 patent to meet the enablement requirement of § 112 of the patent statute follows as a matter of law. Accordingly, for all these reasons, developed in more detail below, Syngenta respectively requests this Court enter summary judgment that claims 1, 5, and 6 of the '835 patent are not enabled under 35 U.S.C. § 112.

## II.    NATURE AND STAGE OF PROCEEDINGS

This is a patent case involving three patents asserted by the Plaintiffs.

On May 12, 2004, Syngenta announced that it had acquired rights to GA21 corn technology from Bayer CropScience, a successor of Rhone-Poulenc Agro, S.A. ("RPA"). The same day, Monsanto Company, together with Monsanto Technology LLC, sued Syngenta for infringement of the '835 patent in this Court. *Monsanto Co. v. Syngenta Seeds, Inc.*, No. 04-CV-0305 (D. Del. filed May 12, 2004) ("the Shah action"). This motion addresses the validity of the '835 patent.

On July 27, 2004, DeKalb, a wholly owned subsidiary of Monsanto Company, sued Syngenta in the Northern District of Illinois, alleging that Syngenta had infringed U.S. Patent Nos. 5,538,880 and 6,013,863 to Lundquist and Walters in connection with Syngenta's proposed marketing of GA21 corn. *DeKalb Corp. v. Syngenta Seeds, Inc.*, No. 04-CV-50323 (N.D. Ill. filed July 27, 2004) ("the Lundquist action").

The Shah and Lundquist actions both charged Syngenta with patent infringement in the use of GA21 corn, which is a genetically modified corn tolerant to the herbicide glyphosate. Due to the overlapping issues, Syngenta moved to transfer the Lundquist action to this Court. On May 19, 2005, the Illinois district court granted Syngenta's motion to transfer. Docket Item

("D.I.") 92.  This Court consolidated the Shah and Lundquist actions on August 23, 2005.

D.I. 111.  The parties completed all discovery on December 19, 2005.  *Id.*

### III.    SUMMARY OF THE ARGUMENT

1.      The '835 patent describes transforming *only dicot* cells to enhance their glyphosate resistance.  The only gene specifically described (by nucleotide or amino acid sequence) in the '835 patent is a *petunia* (i.e., dicot) gene.  Not one of the examples in the '835 patent shows the transformation of a monocot cell, and certainly none of the examples address the transformation of corn.

2.      Nevertheless, claims 1, 5, and 6 of the '835 patent broadly recite a chimeric gene in functional terms, as opposed to its DNA or amino acid structure.  Claim 1 recites a gene that functions "in *plant cells*," such that a chloroplast transit peptide "permits the fusion polypeptide to be imported into a chloroplast of *a plant cell*," and that the promoter be "adapted to cause sufficient expression of the fusion polypeptide *to enhance the glyphosate resistance of a plant cell transformed with the gene.*"  '835 patent at col. 32 (A25).  Thus, the claim covers the use of the chimeric gene to enhance glyphosate resistance in any type of plant cell—both dicots and monocots—transformed with the gene.

3.      It is beyond dispute that skilled scientists could *not* transform monocot plant cells to incorporate foreign genes (such as those that provide glyphosate resistance) as of the July 7, 1986 filing date of the '835 patent.  *See In re Goodman*, 11 F.3d at 1052; *PGS*, 315 F.3d at 1343.  Indeed, in previous litigations where Plaintiffs Monsanto and DeKalb were *opposing* a patent, they specifically argued and successfully established that it was *not* possible to transform monocot cells, in particular corn, during the relevant time frame: "As of March 11, 1987, a person of ordinary skill in the art of plant molecular biology could not transform corn."  DeKalb

Genetic Corp.'s Proposed Findings of Fact, FOF 51, filed Sept. 22, 2000 in the district court *PGS*

case, No. 3:96 CV 2015 DJS (D. Conn.) (A31); *See PGS*, 175 F. Supp. 2d at 265.

4.      After extensive analysis of the state of the art of monocot transformation in 1985-

87 and the teachings of the respective patents, the courts in *Goodman* and *PGS* held that claims

broad enough to cover the transformation of monocot plant cells invalid as non-enabled.  The

'835 patent teaches nothing more than the methods already considered in those cases.

Accordingly, once this Court confirms that the express functional language of claim 1 constitutes

limitations that cannot be ignored, it is clear that the broad claims of the '835 patent fail to meet

the enablement requirement of 35 U.S.C. § 112.

## IV.     STATEMENT OF FACTS

### A.     The '835 Patent

The '835 patent, entitled "Glyphosate-Resistant Plants," describes the creation of dicot

plants (including petunia and tobacco) with enhanced resistance to the herbicide glyphosate.  The

application leading to the '835 patent was filed on July 7, 1986 (Application No. 879,814).  This

application is a continuation-in-part of Application No. 792,390, filed October 29, 1985, which is

itself a continuation-in-part of Application No. 763,482, filed August 7, 1985.  Claims 1, 5, and 6

of the '835 patent (the claims asserted by Plaintiffs against Syngenta) recite a chimeric plant gene

formed of several DNA sequences (a "promoter" sequence, a "coding" sequence, and a "non-

translated region").  DNA sequences can be identified by structure, such as shown in Figures 3,

4a and 4b of the '835 patent.  However, in claim 1, Monsanto chose to define the claimed gene in

terms of the functions it must accomplish in a plant cell—*not* by its DNA or amino acid

structure.

Claim 1, with the relevant functional language emphasized, recites:

A chimeric plant gene which comprises:

(a)    a promoter sequence *which functions in plant cells*;

(b)    a coding sequence which causes the production of RNA, encoding a chloroplast transit peptide [referred to herein as "CTP"]/5-enolpyruvylshikimate-3-phosphate synthase [referred to herein as "EPSPS"] fusion polypeptide, *which chloroplast transit peptide permits the fusion polypeptide to be imported into a chloroplast of a plant cell; and*

(c)    a 3' non-translated region which encodes a polyadenylation signal *which functions in plant cells to cause the addition of polyadenylate nucleotides to the 3' end of the RNA*;

the promoter being heterologous with respect to the coding sequence and *adapted to cause sufficient expression of the fusion polypeptide to enhance the glyphosate resistance of a plant cell transformed with the gene.*

'835 patent at col. 32 (A25).

As set forth in claim 1, the "promoter" sequence must function in the plant cell (part (a)) and, critically, must cause sufficient expression of the "fusion polypeptide" to achieve the essential purpose of the invention—to enhance the plant cell's resistance to the herbicide glyphosate (part (c)). The "coding" sequence must cause the production of the fusion polypeptide in the plant cell (part (b)). Additionally, the fusion polypeptide must have a "CTP" portion that imports the fusion polypeptide to a particular part of the plant cell called the "chloroplast" (part (c)). Finally, the "non-translated region" must function in plant cells to cause a specified effect (part (c)).

There can be no dispute that DNA structure is not used to identify these elements of claim 1, the principal claim at issue here. Nor can there be dispute that claim 1 repeatedly uses express functional language to define the gene and how it is required to function in plant cells. And in order for any of these functions to be achieved at all, the plant cell must be "transformed," i.e. the gene successfully incorporated into the plant DNA. As explicitly stated in claim 1, part (c), glyphosate resistance can only be enhanced in "a plant cell *transformed with the gene*." (emphasis added).

- 6 -

REDACTED VERSION – PUBLICLY FILED

Central to this summary judgment motion is the indisputable fact that few plant cells could be transformed with *any* gene when the applications leading to the '835 patent were filed in 1985-86. As further explained below, it is notoriously well known—and has been decided in published court opinions—that in the 1985-87 time frame, those practicing in the field could not achieve successful transformation of the monocot class of plants, including corn. Certainly genetic transformation of corn products of the type accused in this case was not possible as of any time in 1986. As Monsanto previously said, and Syngenta agrees: "As of March 11, 1987, a person of ordinary skill in the art of plant molecular biology could not transform corn." Findings of Fact, FOF 51, filed Sept. 22, 2000, in the *PGS* district court case (A31).

Claim 5 recites, "A chimeric gene of claim 1 in which the coding sequence encodes a mutant 5-enolpyruvylshikimate-3-phosphate synthase (EPSPS)." '835 patent at col. 32 (A25). Claim 6 recites, "A chimeric gene of claim 1 in which the EPSPS coding sequence encodes an EPSPS from an organism selected from the group consisting of bacteria, fungi and plants." *Id.* These claims do not provide limitations that affect the § 112 non-enablement analysis in this motion, and thus they stand or fall on summary judgment with claim 1.

## B. Monocots Could Not Be Transformed During the 1985-86 Time Frame

The language of claim 1 states that the chimeric gene "functions in a plant cell" and "enhance[s] the glyphosate resistance of a plant cell transformed with the gene." *Id.* However, every example in the '835 patent (actual or prophetic) where Monsanto transformed plant cells (Examples 2-13) uses the *Agrobacterium* method of transformation to transform *dicot* plant cells. As of the filing date of the '835 patent, however, *Agrobacterium only worked in dicots.* *Agrobacterium* does not naturally infect monocots, and it was not possible to infect monocot plant cells using this method during the 1985-86 time frame. *See* § IV.B.1-4, *infra*.

- 7 -

The specification also states that "alternative methods can be used to insert the EPSPS genes of this invention into plant cells. Such methods may involve, for example, liposomes, electroporation, chemicals which increase free DNA uptake, and the use of viruses or pollen as vectors." '835 patent at col. 5, lines 32-38 (A12). But like *Agrobacterium*, it is undisputed that these methods also ***could not*** be used to transform monocot plant cells during the 1985-86 time period. *See* § IV.B.1-4, *infra*.

Indeed, the ability to transform monocot plant cells during the 1985-86 time period has been extensively litigated. In each of these cases, the court held that those skilled in the art could not transform monocots with a foreign gene during the 1985-86 time period. As discussed below, Plaintiffs Monsanto and DeKalb themselves have specifically argued in prior litigations that such transformations could not be performed.

### 1.    *In re Goodman*

For example, in *Goodman*, the claims at issue broadly recited methods of producing mammalian peptides in any plant cell. 11 F.3d at 1048. Goodman's application claimed priority to a parent application filed July 29, 1985. *Id.* at 1049. As does the '835 patent, the specification of Goodman's application described *Agrobacterium* as the method of transformation. *Id.* The Federal Circuit held the broad claims invalid under 35 U.S.C. § 112, noting that "production of peptides in monocotyledonous [monocot] plants involved extensive problems unaddressed by Goodman's specification." *Id.*

In particular, the Federal Circuit relied on a 1987 article by Goodman himself (Goodman, et al., "Gene transfer in crop improvement," *Science*, 236:48-54 (1987)) as "underscor[ing] the 'major block' to using the claimed method with monocot plant cells." *Id.* at 1051. The court concluded that transformation via *Agrobacterium*, as well as other known methods such as direct DNA uptake by protoplasts, viral-mediated transformation, and microinjection of DNA, were not

- 8 -

effective in 1985 for transforming cells derived from monocot plants. *Id.* at 1050-52. "[O]n Goodman's 1985 filing date, the record shows no reliable gene transformation method for use with monocot plants. Each of the methods for monocot plants was fraught with unpredictability. The teachings in the specification do not cure this unpredictability. The record shows that practicing a gene transformation method for all monocot plants, if possible at all in 1985, would have required extensive experimentation that would preclude patentability." *Id.* at 1052. The Federal Circuit concluded that "Goodman's specification does not enable one skilled in biotechnology in 1985 to practice the method for all 'plant cells' as application claims 1-9 require. The record, especially Goodman's own [1987] article, shows the need for extensive experimentation to practice the claimed method for just a few plants, let alone all plant cells as broadly claimed in the application." *Id.*

### 2.    *PGS v. DeKalb*

Likewise, in the *PGS* case, the Federal Circuit affirmed the district court's finding that claims similar to those at issue here were not enabled. 315 F.3d at 1344. The patent-in-suit, U.S. Patent No. 5,561,236 ("the '236 patent"), was owned by PGS. Claim 1 recited, "A plant cell having a heterologous DNA stably integrated into its genome; said DNA comprising a heterologous DNA fragment encoding a protein having an acetyl transferase activity which inactivates a glutamine synthetase inhibitor in said cell." *Id.* at 1338. DeKalb argued (through the same attorneys as in this case) that this claim was not enabled for monocots (specifically, corn) as of March 11, 1987, which was the earliest U.S. filing date of the '236 patent. DeKalb argued the following:

- "[O]n March 11, 1987, no methods existed for placing heterologous genes into monocot plants, including corn." DeKalb's Brief in Opposition, p. 1, filed March 5, 2002, in *PGS v. DeKalb Genetics Corp.*, Appeal No. 02-1011 (Fed. Cir.) (A39).

- "As of March 11, 1987, a person of ordinary skill in the art of plant molecular biology could not transform corn." DeKalb Genetics Corp.'s Proposed Findings of Fact, FOF 51, filed Sept. 22, 2000, in *PGS v. DeKalb Genetics Corp.*, Civ. A. No. 3:96 CV 2015 DJS (D. Conn.) (A31).

- "[T]he fundamental transformation of corn was done in 1990 by Catherine Mackey and others[.]" *PGS v. DeKalb Genetics Corp.*, Civ. A. No. 3:96 CV 2015 DJS (D. Conn.), Lynch representations to court, dated May 16, 2000, at p. 327, lines 3-15 (A46).

- "[I]t would be ludicrous for DEKALB . . . to go before any court and say . . . that corn was transformed before Catherine Mackey did it," in 1990. *PGS v. DeKalb Genetics Corp.*, Civ. A. No. 3:96 CV 2015 DJS (D. Conn.), Lynch representations to court, dated May 16, 2000, at p. 327, lines 13-18 (A46).

- "[T]he Holy Grail [of agronomics] . . . was the transformation of corn in 1990[.]" *PGS v. DeKalb Genetics Corp.*, Civ. A. No. 3:96 CV 2015 DJS (D. Conn.), Lynch representations to court, dated May 16, 2000, at p. 333, lines 1-2 (A52).

- "[A] patent application that disclose[s] a method for practicing an invention in dicots [does] not enable a claim that encompasse[s] practicing the invention in both dicots and monocots." DeKalb Genetics Corp.'s Proposed Conclusions of Law, COL 17, filed Sept. 22, 2000, in *PGS v. DeKalb Genetics Corp.*, Civ. A. No. 3:96 CV 2015 DJS (D. Conn.) (A55).

- As of March 11, 1987, "no one in the world had succeeded in stably integrating a heterologous gene into the genome of corn such that the gene was capable of being passed to later generations." DeKalb Genetics Corp.'s Initial Post-Trial Brief, p. 1, filed Sept. 22, 2000, in *PGS v. DeKalb Genetics Corp.*, Civ. A. No. 3:96 CV 2015 DJS (D. Conn.) (A59).

- "A transformation protocol cannot readily be transferred from one plant species to another plant species." DeKalb Genetics Corp.'s Proposed Findings of Fact, p. 8, n.5, filed Sept. 22, 2000, in *PGS v. DeKalb Genetics Corp.*, Civ. A. No. 3:96 CV 2015 DJS (D. Conn.) (A29).

PGS, in contrast, argued that foreign DNA could be stably integrated into monocots (such as corn) by the time the patent was filed in March of 1987. *PGS*, 175 F. Supp. 2d at 256.

During a 13-day bench trial, the parties presented evidence on plant cell transformation techniques and the chronology of progress towards monocot transformation. The parties

- 10 -

presented evidence pertaining to three plant cell transformation methods: (1) *Agrobacterium*-mediated transformation; (2) electroporation; and (3) microprojectile bombardment. *Id.* at 255-64. The court found that by March of 1987, ***none of these methods*** allowed the transformation of monocot plant cells. *Id.* at 257.

In finding that monocot cells could not be transformed by 1987, the district court specifically considered a method published in a 1986 paper by Dr. Michael Fromm (Fromm et al., "Stable transformation of maize after gene transfer by electroporation," *Nature*, 319:791-93 (1986)). *Id.* at 262. Syngenta notes that Dr. Fromm is a former Monsanto employee and expert witness for Monsanto in the current case. The 1986 Fromm paper discloses an electroporation method used to transform Black Mexican Sweet ("BMS") corn protoplasts with foreign DNA. *Id.* PGS argued that Dr. Fromm's work was evidence that one of skill in the art could transform plant cells other than dicots in 1987. The court, however, disagreed, based at least in part on Dr. Fromm's testimony at trial on DeKalb's behalf concerning the limitations of this method. *Id.* at 263.

Specifically, Dr. Fromm testified that his method was only applicable to protoplasts[1] derived from BMS corn cells, a special "old cell line" used in the laboratory. 5/26/2000 PGS Tr. 1840-42 (A66-68). Dr. Fromm characterized the "old cell line" as a "lab rat that's used in laboratories as a model system," indicating that BMS is not representative of any normal corn that would be used for commercial purposes. *Id.*; 8/24/2005 Fromm Dep. Tr. 39-40 (A73). Unlike normal corn cells, protoplasts of BMS cells would regenerate their cell wall and divide to form a cell culture after electroporation. 5/26/2000 PGS Tr. 1839 (A65). However, cells from

---

[1] A protoplast is a plant cell that has been treated to remove its cell wall to facilitate transformation.

REDACTED VERSION – PUBLICLY FILED

the BMS line could *never* regenerate into plants.  *Id.*; 8/24/2005 Fromm Dep. Tr. 39-40 (emphasis added) (A73).  Moreover, because of its unique properties, Dr. Fromm specifically published that BMS cells are "*100-fold easier to transform*" than normal corn cells.  *See* Fromm, "Production of transgenic maize plants via microprojectile-mediated gene transfer," *Maize Handbook* (Freeling and Walbot, eds., Springer Verlag 1994) at p. 681 (A81); 8/24/2005 Fromm Dep. Tr. 44-45 (A74).

Along the same line, another of Monsanto's proffered experts in the instant case, Dr. Finer, has testified here as follows:

12/7/2005 Finer Dep. Tr. 247 (emphasis added) (A87).

Thus, because Dr. Fromm's method only allowed for transformation of one special line of experimental cells, the district court in *PGS* held that Dr. Fromm's electroporation method did not provide a generalized method of transforming monocots:  "[T]he electroporation method published by Fromm in 1986 was *not* a generalized method for use with monocotyledonous plant cells.  The fact that Fromm could only transform BMS corn and not other varieties (i.e. because the protoplasts required by his method from other corn cell lines would die) is the dispositive fact, not that plants could not be regenerated."  175 F. Supp. 2d at 263 n.22 (emphasis added).

Redacted

REDACTED VERSION – PUBLICLY FILED

Fromm's 1986 paper "does not provide a general method by which a person skilled in the art could transform a variety of plant cells and in no way serves to enable the full scope of the cell claims in the '236 patent." *Id.* at 263.

Ultimately, the district court in *PGS* "found that despite the teachings of the specification, practicing stable gene transformation for monocot cells in 1987 required undue experimentation and, thus, the cell claims of the '236 patent were proven invalid for lack of enablement." *PGS,* 315 F.3d at 1338. The Federal Circuit affirmed the findings of the district court. *Id.* at 1344.

### 3.     *Monsanto v. Bayer*

The same issue was again litigated in *Monsanto Co. v. Bayer.* 363 F.3d 1235 (Fed. Cir. 2004). As before, Monsanto argued that one of ordinary skill could not transform monocot plants before 1987. In particular, Monsanto argued:

- "Abundant testimony and evidence firmly proves that nobody, Aventis [PGS] scientists included, could transform corn even in 1987."

- "[O]ne of ordinary skill in the art as of January 1986 would not have interpreted the claims to include corn. That corn could not be transformed by *Agrobacterium*, or by any other means as of this date, has already been resolved . . . ."

- "Aventis [PGS] scientists were not able to accomplish corn transformation by any means until after 1990 despite a continuous effort[] beginning in 1987, and a strong commission not to 'spare the horses' in the quest for success."

Plaintiff's [Monsanto's] Statement Regarding the Construction of the Asserted Claims of the Patents-In-Suit, filed Aug. 5, 2002, pp. 12-13, in *Monsanto Co. v. Aventis CropScience, N.V.,* Civ. Action No. 4:00CV01915 ERW (D. Mo.) (A90-91).

REDACTED VERSION – PUBLICLY FILED

Monsanto further argued that Bayer was estopped from arguing that it was possible to transform monocot plant cells because of the preclusive effect of the prior *PGS*[2] case. The district court agreed with Monsanto and held the claim at issue invalid based on collateral estoppel. *Monsanto*, 363 F.3d at 1237. Bayer appealed to the Federal Circuit. In support of the district court's decision to apply collateral estoppel, Monsanto characterized (in its Federal Circuit brief) the holdings of the district court in the PGS case as follows:

- "[T]he so-called 'monocot barrier' was still firmly in place in March of 1987. At that time, *Agrobacterium*-mediated transformation of monocots—if possible at all—would have required extensive experimentation that would preclude patentability. [175 F. Supp. 2d at] 261."

- "[N]o *Agrobacterium*-based methods existed that would allow a person of skilled [*sic*] in the art to use this technique to practice the entire scope of claim 1 of the '236 patent without undue experimentation. *Id.* at 262."

- "[A] significant amount of experimentation was necessary to be able to stably insert a heterologous DNA fragment into a monocotyledonous plant cell in early 1987. *Id.* at 264."

- "In March of 1987, a person skilled in the art who attempted to stably integrate the *bar* gene into plant cells other than dicots would have had to engage in undue experimentation—assuming that they could have successfully completed the task at all. *Id.* at 265."

- "There is no evidence that a general methodology existed in 1987 by which a person skilled in the art could produce a transgenic monocot. 175 F.Supp.2d at 268."

Brief for Plaintiff Appellee Monsanto Co., p. 7, filed June 12, 2003 in *Monsanto v. Bayer Bioscience, N.V.*, Appeal No. 03-1201 (Fed. Cir.) (A99). The Federal Circuit agreed with Monsanto that collateral estoppel applied, but only to the issue of whether the those skilled in art

---

[2] Bayer purchased Aventis CropScience, which was formed by the merger of AgrEvo and Rhone-Poulenc Agro. AgrEvo previously acquired Plant Genetic Systems.

could transform monocot plant cells *separate and apart from the teaching of the two patents at issue*:

> Bayer does not dispute that the parties in Plant Genetic Systems fully litigated the issue of whether one of ordinary skill in the art in 1986 would be able to transform a monocot using Agrobacterium. For that reason, if Monsanto succeeds in showing by clear and convincing evidence that the specifications of the '546 and '372 patents do not teach one of ordinary skill how to transform a monocot with a gene for a Bt toxin, Bayer would be precluded by Plant Genetic Systems from arguing that one of skill in the art in 1986 would already have known how to perform such a transformation. Thus, *collateral estoppel may bear on the enablement issue, but only if the district court concludes that the specifications of the '546 and '372 patents themselves do not teach the transformation of monocots.*

363 F.3d at 1243-44 (footnote omitted and emphasis added). Thus, the Federal Circuit reversed the district court's application of collateral estoppel, but only because the district court did not separately examine the specification to determine whether it provided any additional teachings as to how to transform monocots.[3] *Id.* at 1245.

### 4. The Evidence in this Case Is Consistent with These Previous Litigations

The evidence in this case confirms the determinations made by the courts in *Goodman*, *PGS*, and *Monsanto*. As mentioned above, each of the examples of the '835 patent describes only transformation of dicot cells. 10/07/2005 Shah Dep. Tr. 131 (A108). Dr. Fromm, also deposed in this case, specifically confirmed that corn could not be transformed using *Agrobacterium* during the 1986 time period. 8/24/2005 Fromm Dep. Tr. 19-21 (A72). Furthermore, Dr. Horsch, one of the inventors of the '835 patent, testified that by 1988 it was still unclear whether *Agrobacterium* could be used to transform corn. 9/2/2005 Horsch Dep. Tr. 118

---

[3] Here, the specification of the '835 patent does not teach any methods for attempting to transform monocots that were not widely known in the art and specifically considered by the district court in the *PGS* case. *See* '835 patent at col. 5, lines 30-38 (A12).

REDACTED VERSION – PUBLICLY FILED

(A113); *see also* 9/13/2005 Rogers Dep. Tr. 112 (A117).

10/10/2005 Fraley Dep. Tr. 98 (A120).

Even when a suitable transformation method became available, Monsanto still had considerable difficulty finding a gene that could be used to enhance the glyphosate resistance of monocot cells.  By 1990 scientists could use a "microprojectile bombardment" method to transform "normal" (non-BMS) monocot cells to stably incorporate and select for certain foreign DNA.  However, although it was possible to use certain genes as selectable markers, Monsanto still could not use the EPSPS gene to select non-BMS monocot cells based on the cells' resistance to glyphosate.  In August of 1990, Monsanto scientists (including Dr. Fromm and Dr. Armstrong) wrote, the

MKZ0002762 (A145).  The gene that provided such glyphosate resistance was a double mutant corn EPSPS gene not described in the '835 patent.  *See id.*  As set forth above, the only gene specifically described in the '835 patent (by nucleotide or amino acid sequence) was the petunia CTP/EPSPS gene.

---

[4] The parties have agreed that the term "transformed" means stable integration of the chimeric gene into the genome of the plant cell.

Redacted

REDACTED VERSION – PUBLICLY FILED

## V.    ARGUMENT

### A.    Summary Judgment Is an Appropriate Vehicle for Holding the '835 Patent Invalid Under 35 U.S.C. § 112

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Summary judgment is appropriate where "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The non-moving party must then demonstrate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The mere existence of a "scintilla of evidence" or evidence which is merely colorable or not significantly probative is not sufficient to raise a genuine issue of fact and defeat a motion for summary judgment. *Anderson*, 477 U.S. at 249, 251.

"[T]here must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue." *ABB Automation Inc. v. Schlumberger Res. Mgmt. Servs., Inc.*, 254 F. Supp. 2d 479, 481 (D. Del. 2003) (granting summary judgment of patent invalidity for lack of enablement). Enablement is ultimately a question of law based on underlying factual determinations. *Warner-Lambert Co. v. Teva Pharms. USA, Inc.*, 418 F.3d 1326, 1337 (Fed. Cir. 2005). As set forth below, summary judgment of invalidity based on 35 U.S.C. § 112 is warranted given the lack of any material disputed fact concerning the inability to transform monocot plant cells in the 1985-86 time period and the correct construction of the claims at issue. *See ABB Automation*, 254 F. Supp. 2d at 482 ("The validity dispute is essentially a dispute regarding claim construction."). Indeed, given the positions Plaintiffs Monsanto and DeKalb have taken in the prior litigations, Plaintiffs should be estopped from arguing any contrary position.

B.     **The Broad Claims of the '835 Patent Are Not Enabled Under 35 U.S.C. § 112**

1.     **The *Goodman* and *PGS* Decisions Demonstrate the Inability to Use a Chimeric Gene to Transform Monocot Cells in 1985-86**

In exchange for the right to exclude others from practicing the claimed invention, the patent must contain a written specification "as to enable any person skilled in the art . . . to make and use" the claimed invention. 35 U.S.C. § 112; *In re Vaeck*, 947 F.2d 488, 495 (Fed. Cir. 1991). "Enablement is determined as of the effective filing date of the patent." *PGS*, 315 F.3d at 1339. Importantly, a patent must teach how to make and use an invention as broadly as it is claimed. *In re Vaeck*, 947 F.2d at 495-96. "[T]he specification . . . must teach . . . how to make and use the full scope of the claimed invention without 'undue experimentation.'" *PGS*, 315 F.3d at 1339. "The scope of the claims must be less than or equal to the scope of the enablement." *Nat'l Recovery Techs., Inc. v. Magnet Separation Sys., Inc.*, 166 F.3d 1190, 1196 (Fed. Cir. 1999). "To determine whether there is a reasonable correlation between the scope of the claims and the scope of enablement, the degree of predictability of the relevant art may need to be considered." *PGS*, 315 F.3d at 1340.

Although some experimentation is permitted, the amount of experimentation must not be unduly extensive. *Atlas Powder Co. v. E.I. duPont De Nemours & Co.*, 750 F.2d 1569, 1576 (Fed. Cir. 1984). Determining whether experimentation is "undue" requires balancing: "(1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims." *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988). An inventor cannot "***claim what was specifically desired but difficult to obtain at the time the***

*application was filed, unless the patent discloses how to make and use it.*" *PGS*, 315 F.3d at 1340 (emphasis added).

Based on the positions advocated by Monsanto and DeKalb in the prior cases, and the findings made by the courts in *Goodman*, *PGS*, and *Monsanto*, which took into account the *Wands* factors, (*see* § IV.B, *supra*), there can be no legitimate dispute concerning the inability to transform monocot plant cells to stably incorporate a foreign gene as of either the August or October 1985 priority date or the July 1986 filing date[5] of the application that resulted in the '835 patent.[6]  Applying the well-established precedent discussed above, the Federal Circuit held in both *Goodman* and *PGS* that claims reciting methods of producing mammalian peptides in plant cells (*Goodman*) and claims reciting plant cells containing foreign DNA (*PGS*) were invalid under § 112 because it was simply not possible to transform monocot plant cells before 1987.

Here, the *Wands* factors demonstrate that claim 1 of the '835 patent is not enabled.  The specification of the '835 patent does not teach any method or provide guidance to transform monocot plant cells beyond that which was known to those skilled in the art and considered in both *Goodman* and *PGS*.  The examples in the '835 patent describe only the transformation of dicot plant cells.  There is no question that the science of genetically engineering plant cells was

---

[5] Although it is unclear which date Monsanto is relying on for purposes of establishing compliance with § 112, it is undisputed that transformation of monocots was not possible even as of the later July 1986 filing date of the application leading to the '835 patent.

[6] Given the positions Monsanto and DeKalb have taken in the prior litigations, Syngenta does not believe that Monsanto and DeKalb intend to argue that it was possible to transform monocot plant cells during the 1985-86 time period.  Nevertheless, if they were to take that position, Syngenta submits that the doctrine of judicial estoppel would apply to bar Monsanto and DeKalb from relitigating the state of the art of monocot transformation during the relevant time period. *See New Hampshire v. Maine*, 532 U.S. 742, 749-51 (2001); *United States v. Pelullo*, 399 F.3d 197, 222-23 (3d Cir. 2005) (following *New Hampshire*); *In re Armstrong World Indus., Inc.*, 2005 U.S. App. LEXIS 28897, at **29-30 (3d Cir. Dec. 29, 2005) (following *New Hampshire*); *In re Daimlerchrysler Ag Sec. Litig.*, 294 F. Supp. 2d 616, 628 (D. Del. 2003) (following *New Hampshire*).

unpredictable, particularly in 1985-86. Indeed, even after microprojecticle bombardment methods became widely available (in 1987-89), Monsanto could still not obtain glyphosate resistance in "normal" corn cells until late 1990-91, due to the problems with the EPSPS gene itself. As such, the inability to transform monocots prevented one from even beginning to experiment with chimeric plant genes, such as those described in the '835 patent to see if they would provide glyphosate resistance to monocot cells. There is no dispute that it would have taken undue experimentation to transform monocots and obtain glyphosate resistance. Accordingly, the claims of the '835 patent that recite a gene that can allegedly be used to transform *any plant cell* to enhance its glyphosate resistance are invalid under § 112.

> 2.    **The Functional Language in the Claims Cannot Be Ignored and Further Demonstrates that Claims 1, 5, and 6 of the '835 Patent Are Not Enabled**

In an effort to avoid the holdings in *PGS* and *Goodman*, Monsanto has asserted that claims 1, 5, and 6 cover a gene, not a plant cell. Monsanto's Third Supplemental Responses to Syngenta's First Set of Interrogatories (Nos. 1-4), at p. 5 (A153). Thus, according to Monsanto, the fact that those skilled in the art could not transform monocot plant cells is not relevant to an enablement analysis. Monsanto's argument, however, ignores the explicit language appearing in the claim that defines the various DNA sequences by function, not structure, and requires the gene to function in transformed plant cells to provide glyphosate resistance.

The plain meaning of the language emphasized above demonstrates that the chimeric gene must function "in a plant cell," such that the CTP "permits the fusion polypeptide to be imported into a chloroplast of a plant cell," and that the promoter is "adapted to cause sufficient expression of the fusion polypeptide to enhance the glyphosate resistance of a plant cell transformed with the gene." '835 patent at col. 32 (A25). There is simply no basis in law for ignoring these clear and unambiguous limitations in the claim.

- 20 -

REDACTED VERSION – PUBLICLY FILED

The "words of a claim 'are generally given their ordinary and customary meaning.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1313. Moreover, each and every element of a claim must be considered and should not be ignored under any circumstances. *Warner-Jenkinson*, 520 U.S. at 29 ("Each element contained in a patent claim is deemed material to defining the scope of the patented invention . . . ."); *Lemelson v. United States,* 752 F.2d 1538, 1551 (Fed. Cir. 1985) ("[I]t is . . . well settled that each element of a claim is material and essential . . . ."); *see also TechSearch, L.L.C. v. Intel Corp.,* 286 F.3d 1360, 1373 (Fed. Cir. 2002) ("We have further recognized that specific claim limitations cannot be ignored as insignificant or immaterial in determining infringement.").

Courts should also consult the intrinsic evidence—particularly the specification—to confirm that the claim construction is proper. "[C]laims 'must be read in view of the specification, of which they are a part.'" *Phillips*, 415 F.3d at 1315. "[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* at 1313. Here, one of ordinary skill would understand that Examples 2-10 of the '835 patent describe transforming dicot plant cells with a heterologous promoter-CTP/EPSPS gene and then using glyphosate as a mechanism to select those cells that have been transformed. Examples 11-13 further describe taking transformed cells and regenerating transgenic dicot plants resistant to glyphosate. In other words, in each of theses examples, Monsanto discusses carrying out the functions set forth in claims 1, 5, and 6.

REDACTED VERSION – PUBLICLY FILED

"A court 'should also consider the patent's prosecution history, if it is in evidence.'" *Id.* at 1317. During prosecution of the application leading to the '835 patent, the examiner stated explicitly in an interview summary that "[t]he applicant agreed to use function[al] language in [the] claims." '835 patent prosecution history at 5311 (A157). Thus, there is simply nothing in the claim language, the specification, or the prosecution history that would lead one of ordinary skill in the art to believe that the functional language explicitly set forth in claim 1 is immaterial. Accordingly, based on the well-established precedent of the Federal Circuit, Syngenta submits that the clear and unambiguous functional language in the claim must be given effect and not ignored. *See In re Swinehart*, 439 F.2d 210, 212-13 (C.C.P.A. 1971); *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1363 (Fed. Cir. 1999).

Moreover, it is beyond dispute that functional language serves to limit a patentee's scope of protection. *In re Swinehart*, 439 F.2d at 212-13 (recognizing the use of functional language in claims); *Wright Med. Tech, Inc. v. Osteonics Corp.*, 122 F.3d 1440, 1443-44 (Fed. Cir. 1997) (functional language "adapted to closely fit in and extend through the narrowest portion of the human femur" analyzed as a claim limitation); *K-2 Corp. v. Salomon S.A.*, 191 F.3d at 1363 (functional language "is, of course, an additional limitation in the claim."); *Acco Brands, Inc. v. Micro Sec. Devices, Inc.*, 346 F.3d 1075, 1078 (Fed. Cir. 2003) ("Viewed in light of the specification, the phrase 'for extending' is a functional restriction on the pin."). This principle applies to functional language used in lieu of DNA structure as in this case. *See Enzo Biochem, Inc. v. Calgene, Inc.*, 188 F.3d 1362 (Fed. Cir. 1999) (relying on functional language in holding the claim at issue invalid under 35 U.S.C. § 112); *In re Vaeck*, 947 F.2d at 495-96 (holding chimeric gene claim invalid because it sought to claim the use of the gene in cell types not enabled by the specification).

While functional language can be used to define the claimed invention, it often carries the risk of overbreadth and non-enablement, particularly in the areas of biotechnology. "'Functional' terminology may render a claim quite broad. By its own literal terms a claim employing such language covers any and all embodiments which perform the recited function. Legitimate concern often properly exists, therefore, as to whether the scope of protection defined thereby is warranted by the scope of enablement indicated and provided by the description contained in the specification." *Swinehart*, 439 F.2d at 213. The problem with functional language is that it may be "so broad that it causes the claim to have a potential scope of protection beyond that which is justified by the specification disclosure." *Id.* This is exactly the problem with the broad claims of the '835 patent.

Indeed, in *In re Vaeck* and *Enzo Biochem*, both of which involve gene claims, the Federal Circuit specifically considered whether the teachings of the specifications were commensurate with the scope of the claims, and in both cases, relied on functional language in determining that the claims were too broad and invalid under § 112.

In *In re Vaeck*, the invention at issue was a chimeric gene that when expressed in bacteria, could produce proteins that were harmful to insects. 947 F.2d at 489. The application described nine different genera of cyanobacteria as useful hosts for the chimeric gene. *Id.* at 490. The working examples in the application, however, *only* detailed the transformation of a single strain of cyanobacteria. *Id.* The record established that "the cyanobacteria are a diverse and relatively poorly studied group of organisms, comprising some 150 different genera, and that heterologous gene expression in cyanobacteria is 'unpredictable.'" *Id.* at 495. Nevertheless, the claims broadly recited using the chimeric gene in *any type* of cyanobacterial cells. Claim 1 is representative:

- 23 -

> A chimeric gene capable of being expressed in Cyanobacteria cells comprising:
>
> (a) a DNA fragment comprising a promoter region which is effective for expression of a DNA fragment in a Cyanobacterium; and
>
> (b) at least one DNA fragment coding for an insecticidally active protein produced by a Bacillus strain, or coding for an insecticidally active truncated form of the above protein or coding for a protein having substantial sequence homology to the active protein,
>
> the DNA fragments being linked so that the gene is expressed.

*Id.* at 490.

Relying on the functional language in the claim, the Federal Circuit held that claim 1 was not enabled under 35 U.S.C. § 112. The Federal Circuit noted the "relatively incomplete understanding of the biology of cyanobacteria . . . as well as the limited disclosure by appellants of particular cyanobacterial genera operative in the claimed invention." *Id.* at 495. *"There is no reasonable correlation between the narrow disclosure in appellants' specification and the broad scope of protection sought in the claims encompassing gene expression in any and all cyanobacteria."* *Id.* (emphasis added). The court further explained that there "must be sufficient disclosure, either through illustrative examples or terminology, to teach those of ordinary skill how to make and how to use the invention as broadly as it is claimed. This means that the disclosure must adequately guide the art worker to determine, without undue experimentation, which species among all those encompassed by the claimed genus possess the disclose utility." *Id.* at 496 (footnote omitted). In unpredictable areas of technology, the court stated that "the required level of disclosure will be greater than . . . a 'predictable' factor such as a mechanical or electrical element." *Id.* Thus, because the specification did not enable the entire breadth of the claims, the Federal Circuit held the claims unpatentable under § 112.

REDACTED VERSION – PUBLICLY FILED

*Vaeck* is highly analogous to the facts here and supports summary judgment of non-enablement. Both the Vaeck patent and the '835 patent involve gene claims. Both involve achieving specified functions in lieu of structure for their component DNA sequences. And in both these patents, the claims at issue have the fundamental defect that the function is to be achieved in a cyanobacterium (Vaeck's claim 1) or plant cell ('835 claim 1) broadly rather than in species in which it was achievable as of the relevant filing date.

Similar to the claims at issue in *Vaeck*, claims 1, 5, and 6 of the '835 patent recite a chimeric gene that can be used in any plant cell—*dicots and monocots*—"to enhance the glyphosate resistance of a plant cell transformed with the gene." '835 patent at col. 32 (A25). As the specification in *Vaeck* only disclosed the use of the chimeric gene in one species of cyanobacteria, the examples in the '835 patent only teach using the chimeric gene to obtain glyphosate resistance in *dicots*. Moreover, as in *Vaeck* where the court found that expression of heterologous genes in different species of cyanobacteria was unpredictable, there is no dispute in this case—as it has already been decided by the Federal Circuit—that it would have taken undue experimentation to transform monocot cells with heterologous genes during the 1985-86 time frame. *See* Brief for Plaintiff Appellee Monsanto Co., p. 7, filed June 12, 2003 in *Monsanto v. Bayer Bioscience, N.V.*, Appeal No. 03-1201 (Fed. Cir.) (A99). Accordingly, the Federal Circuit's holding in *Vaeck* demonstrates that the broad claims of the '835 patent, which are not commensurate with the specification, are similarly invalid under 35 U.S.C. § 112.

A similar issue faced the Federal Circuit in *Enzo Biochem*. There, the invention at issue pertained to antisense technology as a method for controlling gene expression. *Enzo Biochem*, 188 F.3d at 1367-68. Enzo Biochem asserted that Calgene's genetically engineered tomato infringed the patents-in-suit. *Id.* at 1368. Enzo Biochem asserted claims against Calgene that

REDACTED VERSION – PUBLICLY FILED

recited a "non-native DNA construct." Claim 5 of U.S. Patent No. 5,190,931 ("the '931 patent"),

is representative:

> A non-native DNA construct which, when present in a prokaryotic [bacterial] or eukaryotic cell containing a gene, produces an RNA which regulates the function of said gene, said DNA construct containing the following operably linked DNA segments:
>
> a.    transcriptional promoter segment;
>
> b.    a transcription termination segment; and
>
> c.    a DNA segment comprising a segment of said gene, said gene segment located between said promoter segment and said termination segment and being inverted with respect to said promoter segment and said termination segment, whereby the RNA produced by transcription of the inverted gene segment regulates the function of said gene.

*Id.* at 1368. The specification of the '931 patent taught the use of antisense technology in

regulating three genes in the prokaryote bacterium *E. coli*. *Id.* at 1367-68. Although the

specification only contained working examples in bacteria, the specification stated that the

"practices of this invention are generally applicable with respect to any organism containing

genetic material which is capable of being expressed. Suitable organisms include prokaryotic

and eukaryotic organisms, such as bacteria, yeast, and other cellular organisms. The practices of

this invention are also applicable to viruses, particularly where the viruses are incorporated into

the organism." *Id.* at 1368. As discussed above, the '835 patent similarly states that the chimeric

gene can be used to transform plant cells in general (including monocots), even though all the

examples only disclose the use of the gene in dicots.

        In analyzing the enablement issue in the case, the Federal Circuit gave full effect to the

functional language set forth in the claim. Applying the functional language in the context of the

factors set forth in *In re Wands*, the court determined that the claims were broad, encompassing

the practice of antisense in all cells, both prokaryotic and eukaryotic. *Id.* at 1372. The court also

REDACTED VERSION – PUBLICLY FILED

agreed that while the level of skill in the art was high, antisense technology was highly unpredictable. *Id.* This was established, in part, by "the inventor's own failed attempts to control the expression of other genes in prokaryotes or eukaryotes using antisense technology." *Id.* In terms of the amount of guidance provided by the specification, the court observed that "[o]utside of the three genes regulated in E. coli, virtually no guidance, direction, or working examples were provided for practicing the invention in eukaryotes, or even any prokaryote other than E. coli." *Id.* at 1374. The court likened the deficiency of the specification to the deficient specification in *Vaeck*, and concluded it "constituted no more than a plan or invitation to practice antisense in those cells [other than *E. coli*]." *Id.* at 1375. Ultimately, the court "agree[d] with Calgene that [the inventor] has provided only the mere 'germ of the idea' for exploiting antisense in eukaryotes." *Id.* "We conclude, therefore, as did the district court, that the breadth of enablement in the patent specifications is not commensurate in scope with the claims, as the quantity of experimentation required to practice antisense in cells other than E. coli at the filing date would have been undue." *Id.* at 1377 (citation omitted).

These cases clearly demonstrate that the functional language set forth in the broad claims of the '835 patent must be considered. Like *Vaeck* and *Enzo*, the asserted claims of the '835 patent are defined functionally, and this functional language should be given effect. Indeed, Monsanto could have claimed the chimeric genes it had invented using structural terms, i.e. a plasmid map or a sequence listing (DNA or amino acid), but chose not to.

If the functional language is limiting—as it must—there is no question that the specification of the '835 patent is not commensurate with the full scope of claims of the '835 patent. Claims 1, 5, and 6 purport to cover all chimeric genes that, when transformed into any type of plant cell, enhance the cell's glyphosate resistance. There is no dispute concerning the

REDACTED VERSION – PUBLICLY FILED

inability to transform monocot plant cells during the 1985-86 time period, as specifically discussed in *PGS* and *Goodman*. Claims 1, 5 and 6 of the '835 patent are clearly not enabled as a matter of law pursuant to 35 U.S.C. § 112.

## VI.    CONCLUSION

For all the above reasons, Syngenta submits that this Court should enter summary judgment that claims 1, 5, and 6 of the '835 patent are invalid under 35 U.S.C. § 112.

Respectfully submitted,

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
YOUNG CONAWAY STARGATT &
   TAYLOR, LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19899-0391
(302) 571-6600
jshaw@ycst.com

Of counsel:

Michael J. Flibbert
Howard W. Levine
Jennifer A. Johnson
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
901 New York Avenue, N.W.
Washington, D.C. 20001-4413
(202) 408-4000                                    Attorneys for Defendants

Dated: January 11, 2006