REDACTED VERSION - PUBLICLY FILED

and regeneration of fertile transgenic plants. Plant Cell 2: 603–618.

Kamo KK, Hodges TK (1986) Establishment and characterization of embryogenic maize callus and cell suspension cultures. Plant Sci 45: 111–117.

Murashige T, Skoog F (1982) A revised medium for rapid growth and bioassays with tobacco tissue cultures. Physiol Plant 15: 473–497.

Shillito RD, Carswell GK, Johnson CM, DiMaio JJ, Harms CT (1989) Regeneration of fertile plants from protoplasts of elite inbred maize. Bio/Technology 7: 581–587.

Songstad DD, Armstrong CL, Petersen WL (1991) AgNO₃ increases type II callus production from immature embryos of maize inbred B73 and its derivatives. Plant Cell Rep 9: 699–702.

*122*

# Production of Transgenic Maize Plants via Microprojectile-Mediated Gene Transfer

MICHAEL FROMM

This chapter describes the rationale and techniques for producing transgenic maize plants. The emphasis will be on a basic understanding of how to develop a system for producing transgenic plants rather than a specific protocol. [Table 122.1 lists references for various protocols.] This is because the specific details are changing rapidly and depend on the availability to the investigator of the specific reagents. However, the basic principles remain the same and a good understanding of these will allow the investigator to effectively apply the latest technical improvements.

The technique used to transfer DNA into plant cells is the high velocity microprojectiles method. The DNA-coated, 1-μm tungsten or gold particles are accelerated by a microprojectile gun, of which there are several designs available. The critical aspect is that the particle gun transfers particles and DNA efficiently into the target cells, as measured by the transient and stable transformation assays described below. Any particle acceleration

*The Maize Handbook—M. Freeling, V. Walbot, eds.*
© 1994 Springer-Verlag, New York, Inc.



REDACTED VERSION – PUBLICLY FILED

678   CELL CULTURE PROTOCOLS

TABLE 122.1.   References for maize transformation protocols

| Topic | References, sources, components[*] |
| --- | --- |
| Particle gun designs | |
|   Air rifle | 13 |
|   Electric discharge | 2, 11 |
|   Gunpowder | 6–10 |
|   Helium | 15 |
| Microprojectile/DNA preparations | 2, 6–11, 13–15, 17 |
| Plasmids | |
|   C1 and B anthocyanin genes | 5 |
|   GUS genes for corn | 7, 12 |
|   Bar gene selectable marker | 3, 4, 6, 14, 16 |
| EG5 BMS cell line | 1 |
| BMS transformation | 10, 14 |
| Transgenic plant production | 4, 6 |
| Herbicide sources | |
|   BASTA herbicide formulation | 18 |
|   Pure PPT | 19 |
|   Herbiace herbicide formulation | 20 |
|   Pure Bialaphos | 20 |
| PAT enzyme and leaf assay | 3, 6, 14, 16 |
| Media | |
|   BMS media | 21 |
|   N6 media | 22 |

[*]References, sources, components:

1. Chourey PS, Zurawski DB (1981) Callus formation from protoplasts of a maize culture. Theor Appl Genet 59: 341–344.

2. Christou P, Swain WF, Yang, N-S, McCabe DE (1989) Inheritance and expression of foreign genes in transgenic soybean plants. Proc Natl Acad Sci USA 86: 7500–7504.

3. De Block M, Botterman J, Vandewiele M, Dockx J, Thoen C, Gossele V, Movva NR, Thompson C, van Montagu M, Leemans J (1987) Engineering herbicide resistance in plants by expression of a detoxifying enzyme. EMBO J 6: 2513–2518.

4. Fromm ME, Morrish F, Armstrong C, Williams R, Thomas J, Klein TM (1990) Inheritance and expression of chimeric genes in the progeny of transgenic maize plants. Bio/Technology 8: 833–839.

5. Goff SA, Klein TA, Roth BA, Fromm ME, Cone KC, Radicella JP, Chandler VL (1990) Transactivation of anthocyanin biosynthetic genes following transfer of the B regulatory genes into maize tissues. EMBO J 9: 2517–2522.

6. Gordon-Kamm WJ et al (1990) Transformation of maize cells and regeneration of fertile transgenic plants. Plant Cell 2: 603–618.

REDACTED VERSION – PUBLICLY FILED

*Production of Transgenic Maize Plants via Microprojectile-Mediated Gene Transfer*  **679**

TABLE 122.1. [Continued]

7. Klein TM, Gradziel T, Fromm ME, Sanford JC (1988) Factors influencing gene delivery into Zea mays cells by high-velocity microprojectiles. Bio/Technology 6: 559–563.

8. Klein TM, Fromm ME, Weissinger A, Tomes D, Schaaf S, Sletten M, Sanford JC (1988) Transfer of foreign genes into intact maize cells with high-velocity microprojectiles. Proc Natl Acad Sci USA 85: 4305–4309.

9. Klein TM, Harper EC, Svab Z, Sanford JC, Fromm ME, Maliga P (1988) Stable genetic transformation of intact Nicotiana cells by the particle bombardment process. Proc Natl Acad Sci USA 85: 8502–8505.

10. Klein TM, Kornstein L, Sanford JC, Fromm ME (1989) Genetic transformation of maize cells by particle bombardment. Plant Physiol 91: 440–444.

11. McCabe DE, Swain WF, Marinell BJ, Christou P (1988) Stable transformation of soybean Glycine max by particle acceleration. Bio/Technology 6: 923–926.

12. McElroy D, Zhang W, Cao J, Wu R (1990) Isolation of an efficient actin promoter for use in rice transformation. Plant Cell 2: 163–172.

13. Oard JH, Paige DF, Simmonds JA, Gradziel TM (1990) Transient gene expression in maize, rice, and wheat cells using an airgun apparatus. Plant Physiol 92: 334–339.

14. Spencer TM, Gordon-Kamm WJ, Daines RJ, Start WG, Lemaux PG (1990).Bialaphos selection of stable transformants from maize cell culture. Theor Appl Genet 79: 625–631.

15. Sanford JC et al (1991) An improved helium-driven biolistic device. Technique J Meth Cell Molec Biol 3: 3–16.

16. Thompson CJ, Movva NR, Tizard R, Crameri R, Davies JE, Lauwereys M, Botterman J (1987) Characterization of the herbicide-resistance gene bar from *Streptomyces hygroscopicus*. EMBO J 6: 2519–2523.

17. Tomes D, Weissinger AK, Ross M, Higgins R, Drimmond BJ, Schaaf S, Malone-Schoneberg J, Staebell M, Flynn P, Anderson J, Howard J (1990) Transgenic tobacco plants and their progeny derived by microprojectile bombardment of tobacco leaves. Plant Molec Biol 14: 261–268.

18. Hoechst Celanese Corp. Somerville NJ.

19. Cresent Chemical Co. Inc. 1324 Motor Parkway, Hauppauge, New York 11788, phone (516) 348-0333: catalog #35603 glufosinate ammonium (CAS #77182-82-2, 1 g $89.00).

20. Meiji Seika Kaisha, Ltd. Pharmaceutical Research Center, Morooka-CHO, Kohoku-ku, Yokohama 222, Japan.

21. BMS media. 4.4 g MS salts [Gibco]; 0.25 mg/liter each of thiamine HCl, pyridoxine, and calcium pantothenate and 1.3 mg/liter niacin; 2 mg/liter 2, 4-D; 0.13 g/liter L-asparagine; 0.1 g/liter inositol; 20 g/liter sucrose. 0.2% GELRITE or 0.6% agarose: adjust pH to 5.8 before autoclaving.

22. N6 medium: 4.0 g/liter Chu [N₆] basal salts [Sigma C-1416]. 1.0 ml/liter Eriksson's Vitamin Mix [1,000× stock made from Sigma E-1511 Powder]. 0.5 mg/liter thiamine HCl. 20 g/liter sucrose. 1 mg/liter 2, 4-D. 2.88 g/liter L-proline [only with Bialaphos selection, not with PPT selection]. 0.1 g/liter vitamin-free casamino acids. 0.2% GELRITE or 0.6 % agarose. adjust pH to 5.8 before autoclaving. [Add sterile herbicides after autoclaving and cooling to 55°C.]



REDACTED VERSION – PUBLICLY FILED

**680**  CELL CULTURE PROTOCOLS

device that meets these efficiency criteria is suitable. (The Dupont PDS 1000 and PDS 2000 work well in the author's experience.) The particle/DNA mixture is also an important parameter and several of the published protocols (see Table 122.1) should be evaluated by the rapid transient assays described below to determine which works best for you.

Basically, the protocol for the production of transgenic corn plants uses microprojectiles to transfer genes into embryogenic maize cells, a selectable marker gene system to recover these transgenic cells, and a regeneration system to convert the transgenic calli into fertile plants. This system is reproducible and is in use in a number of laboratories. However, it should be understood that this is still a difficult procedure that involves considerable tissue culture effort and experience with the microprojectile gun. Initially, one should expect to spend at least 40 hours of labor for each line of fertile transgenic plants produced.

There are two types of gene transfer assays: transient and stable transformation assays. After gene transfer, the majority of the introduced plasmid DNA persists as free plasmid DNA in the nucleus for a period of 7 days or so. During its transient existence in the cell, the introduced DNA is transcribed into mRNA and translated into protein given the appropriate regulatory signals. Transient gene expression is very useful to measure gene transfer efficiency because results can be obtained in 2 days and the efficiency can be quantified. Furthermore, the actual cells expressing the introduced DNA can be visualized with the $\beta$-glucuronidase (GUS) or anthocyanin genes described below.

In a small percentage of the cells, typically 1–5% of those transiently expressing the new DNA, the plasmid DNA will integrate into chromosomes. If these cells continue to divide, they grow into stably transformed calli containing the plasmid DNA. The bombarded cells of some cultures divide better than others, so the actual ratio of transiently expressing cells to stably transformed cells varies from 5% down to very small values, approaching zero in some cases. Thus, while transiently expressing cells are a good measure of the efficiency of gene transfer, they are not entirely predictive of stable transformation frequencies between different cultures. However, higher transient frequencies in a particular culture seem to correlate with better stable transformation frequencies in that culture system.

Two particularly useful reporter genes for transient assays are the *E. coli vidA* (GUS) gene and the anthocyanin regulatory genes *C1* and *B* (*Lc* or *R*), expressed from the CaMV 35S promoter. In the case of GUS, the cells can be stained with the substrate 5-bromo-4-chloro-3-indolyl $\beta$-D-glucuronic acid (XGLUC), which turns the GUS-expressing cells blue. The *B* and *C1* anthocyanin regulatory genes induce the endogenous maize anthocyanin structural genes, if present, and this results in purple-anthocyanin-pigmented cells. (This anthocyanin response is genotype-dependent, in that all the anthocyanin structural genes must be present. Most nonpigmented maize lines will respond, particularly the most common A188 or A188 × B73 cultures). [Editors' Note: Most modern inbred lines of maize are *c1* and *r-r* but contain all of the required enzyme-encoding genes. See Coe et al. (1988) for further details, in *Corn and Corn Improvement*.] Note that while the GUS reaction product diffuses out and colors multiple cells, the purple anthocyanin pigment is vacuolar and should be restricted to a single cell. In either case, these genes allow the efficiency of gene transfer to be measured as the number of pigmented cells 2 days after

*Production of Transgenic Maize Plants via Microprojectile-Mediated Gene Transfer*   **681**

bombardment. This allows someone to optimize their skills with the particle gun quickly. Bombardment of embryogenic callus cultures should produce several hundred to several thousand spots. (Note: you need a dissecting microscope to see the anthocyanin-pigmented cells.) The number of spots reflects both the gene transfer efficiency and the expression level of the plasmid transferred—*a poorly expressed plasmid will not produce very many colored cells.*

Once you can use the particle gun efficiently as measured by transient assays, the next step is to use a nonregenerable Black Mexican Sweet (BMS) suspension culture as the target for stable transformation studies. This will require the use of a selectable marker plasmid (discussed below) and selection for a period of 4–8 weeks. The reason for using BMS cells for training is that BMS cells are at least 100-fold easier to transform relative to regenerable embryogenic cells. This allows even suboptimal procedures to produce positive transformation results while at the same time providing a useful training exercise in selection conditions that will be applicable to the regenerable cells. Additionally, learning to routinely transform BMS cells is a valuable skill as many gene expression questions can be answered in this system quickly and efficiently. Note that anthocyanin induction by expression of the *C1* and *B* cDNAs is very dependent on the BMS culture source, with the EG5 BMS culture working the best (Table 122.1).

There are a number of selectable markers available, preferably expressed from the vectors that give the highest expression. The ideal selectable marker allows the transgenic corn cells to grow rapidly in the presence of a metabolic inhibitor that prevents the growth of all the nontransgenic neighboring cells. The more efficient this process the quicker the growth of the transgenic calli can be observed and the less labor required to reach this stage. The essence of the selection dilemma is that initially the transgenic cell is surrounded by nontransgenic cells. Stringent selection pressure will cause these neighboring cells to die too quickly, and this will kill the rare transgenic cells, too. Therefore, the selection pressure and selective agent need to be mild enough, at least initially, so that the unhealthy nontransgenic cells do not inhibit the division of the transgenic cells. As the number of transgenic cells increases, this gets to be less of a problem. Because the stable transformation efficiency is low, quite a large number of cells are bombarded. These cells can rapidly grow into more plates of tissue than can be easily handled, so a selective agent that effectively inhibits growth quickly helps reduce the amount of tissue culture labor required to recover the transgenic calli.

The various selectable markers used successfully in monocots are genes encoding the neomycin phosphotransferase II, hygromycin phosphotransferase, acetolactate synthase (ALS), and phosphinothricin acetyltransferase (PAT) activities. Of these, I would recommend using the *bar* gene encoding the PAT enzyme. The ALS gene is a very efficient marker in tissue culture but appears to have a detrimental effect in some of the transgenic plants. The *bar* gene-encoded PAT enzyme detoxifies, via acetylation, the herbicide phosphinothricin (PPT), the active ingredient in the herbicide BASTA. An alternative active form of this herbicide is bialaphos: PPT with two alanyl groups attached. Bialaphos is activated to PPT in the plant cell and is then acetylated by the PAT activity. There

REDACTED VERSION – PUBLICLY FILED

*682*  CELL CULTURE PROTOCOLS

are relatively convenient enzyme assays for PAT activity, and the plants can be stored phenotypically by painting a leaf with the herbicide.

In addition to the experience with transient and stable transformation systems above, one needs to learn how to establish embryogenic maize callus and suspension cultures. This is fully discussed in other chapters in this volume. The use of A188 and A188 hybrids, such as A188 · B73, greatly facilitates the embryogenic response, and success at establishing embryogenic callus cultures is likely on the first attempt. Establishing embryogenic suspension cultures is more difficult and takes several months.

The following protocol for producing transgenic corn plants assumes that embryogenic callus or a suspension culture has been established recently, within 1–6 months for callus cultures and 3–9 months for suspension cultures. (As the cultures get older, plant regeneration and fertility decrease). The protocol also assumes that transient assays have been used to obtain efficient gene transfer conditions and that BMS stable transformations have been carried out to demonstrate that the vector and selection system are functioning properly. This protocol assumes that the bar gene is being used as the selectable marker. The use of a selectable marker plasmid with a second gene that expresses GUS facilitates identifying the transgenic calli. Alternatively, co-transformation with a second plasmid encoding GUS can be used.

## PROTOCOL FOR PRODUCING TRANSGENIC MAIZE PLANTS

### Day 1. Bombardment of the Target Cells

1. Place embryogenic callus on N6 agarose medium or suspension cultures on paper filters on N6 agarose medium. Try to make a thin lawn of tissue in a circle of about 5 cm diameter. (Because gene transfer is on the surface of the tissue, the extra thickness just gives extra cells to select against.)

2. Bombard the tissues with the DNA-microprojectile preparation and particle gun parameters that gave the best transient assay results. Up to three bombardments of the same sample can often increase the transformation efficiency.

### Days 1–14. Start Selection on Media Containing Bialaphos

1. Allow the bombarded cells to grow without selection pressure for 1–14 days, typically 2–7 days. This step is probably an important variable and several different times might be chosen to find out what works best for a given culture. Suspension culture cells can be placed back in suspension during this time or grown on solid media.

2. Transfer the cells to medium containing Bialaphos. (Note that PPT is not effective when the medium contains amino acids, while Bialaphos is effective even with amino acids present.) The recommended starting point is 1 mg/liter Bialaphos (1 mg/liter Bialaphos active ingredient if using a herbicide formulation). Usually the cells will

REDACTED VERSION – PUBLICLY FILED

*Production of Transgenic Maize Plants via Microprojectile-Mediated Gene Transfer*   **683**

continue to grow the first time they are placed on selective media as they have a metabolic reserve pool and the Bialaphos takes some time to become effective. This growth is cell density-dependent, with higher densities giving more growth.

## Week 3–4. Transfer Cells to Fresh Selective Media

When the cell density on the first selection plates becomes too much for further efficient selection (more than 25% of the tissue size of the maximum number of cells that can grow on the same media without Bialaphos), replate the cells by gently flattening and spreading the tissues on fresh selective plates (one original plate will end up on several new plates to reduce the tissue density) containing 1–3 mg/liter Bialaphos. This second plating will usually inhibit cell growth enough to observe growth of the transgenic calli above the background of "flat" nongrowing cell clusters.

## Weeks 6–10. Isolate Individual Transgenic Calli

Transgenic calli become obvious by their faster growth and size at this stage. Pick obviously growing calli onto fresh selective plates. Observe the remaining calli on the selective plate to see if slower-growing transgenic calli appear later. Sometimes, if too much growth has occurred, all the cells must be replated to fresh selective plates to allow 12 weeks for transgenic calli to appear.

## Weeks 8–12. Increase Amount of Individual Transgenic Calli

Continue to grow individual callus lines on selective media to increase the amount of material to initiate large-scale regeneration efforts. Once resistant calli have been obtained it is important to verify that they are transgenic, at least when establishing the system, as it takes some time to regenerate the plants and analyze them. These tests should simply confirm that the calli are transgenic, with the more extensive analysis saved for the plants. The easiest first test is to measure enzyme activities, especially if the selectable marker plasmid also carried a second scorable marker like the GUS gene in pBARGUS, or was co-transformed with the GUS gene. However, the GUS gene might not always be present or expressed, so PAT assays of the bar gene selectable marker are also possible. Alternatively, the DNA can be analyzed by PCR or Southern Blot. (Note that the anthocyanin markers are still unproven as visual markers when expressed from promoters other than their own in stably transformed embryogenic cells—these should be used cautiously, if at all, until proven to be nondetrimental to the cells and plants.)

## Weeks 10–14. Start the Regeneration Process

The regeneration process is identical to published procedures for nontransgenic calli except that selective pressure is usually maintained. The key concern is that some of the transgenic calli consist of a mixture of transgenic and nontransgenic cells. This can lead

A83

REDACTED VERSION – PUBLICLY FILED

**684**   CELL CULTURE PROTOCOLS

to a predominance of nontransgenic plants during regeneration. Fortunately, selection pressure during regeneration inhibits the nontransgenic shoots and facilitates the recovery of the transgenic plants. Some of the calli appear to consist entirely of transgenic cells and give rise to transgenic plants without selection pressure. Probably the best strategy is to regenerate both with and without selection, using PPT or Bialaphos levels similar to those used to originally recover the calli (1–3 mg/liter). If you obtain plants on selection, they most likely are transgenic. If you only obtain plants without selection, you might need to screen the plants. Fortunately, the BASTA leaf painting assay is easy and gives results in 3 days on which plants are transgenic. Alternatively, enzymatic or DNA analysis can be performed.

### Weeks 14–18. Regeneration Produces Plantlets

The most difficult step is getting the plantlets into soil and into the greenhouse. The cuticle of the plants is very thin after the high-humidity conditions in tissue culture. Therefore, high-humidity conditions need to be used when first transplanted to soil. This is followed by a slow lowering of humidity before transfer to the greenhouse. Fortunately, humidity control can be achieved with simple closed plastic containers, with gradual opening of the system to the air by progressively propping open the lid over several days.

### Months 6–7. Plants Reach Fertility

Quite frequently transgenic plants are male and female fertile. However, tissue-culture-derived plants are often male sterile. Even in the cases where the transgenic plants are male fertile, it is a good idea to cross the transgenic ear with pollen from a normal non-tissue-culture-derived plant to increase the vigor of the progeny. Self-pollinations can be done in the next generation.

A less-frequent problem encountered in plants regenerated from older tissue culture lines is that the endosperm does not develop fully, causing the kernels to abort 2–3 weeks after fertilization. This problem can be recognized by noticing that the seeds stop enlarging [it does not damage the ear to peel back the husk to look at the kernels, and then just cover the ear again] and that they seem hollow when pressed. Dissection will show that the endosperm has stopped growing or even shriveled. Fortunately, the embryo is normal and can be rescued by dissection and germination in the medium used for the regeneration process.

### Months 7–9. Transgenic R1 Seeds Obtained

They can be stored and germinated as normal maize seeds.

## ACKNOWLEDGMENTS

Many of the ideas and protocols developed for maize transformation were in collaboration with Chuck Armstrong, Arlene Barnason, Briana Dennehey, Beate Hairston, Ted Klein, Fionnuala Morrish, and Bill Petersen.

John Finer - December 7, 2005
Monsanto Company v. Syngenta Seeds, Inc.,

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF DELAWARE

3    MONSANTO COMPANY and            )

4    MONSANTO TECHNOLOGY             )

5    LLC,                            )

6                                    )

7            Plaintiffs,             )

8                                    )        Civil Action

9                                    )        No. 04-305-SLR

10   v.                              )        (lead case)

11                                   )

12   SYNGENTA SEEDS, INC.,           )

13   SYNGENTA BIOTECHNOLOGY,         )

14   INC.,                           )

15                                   )

16           Defendants.             )

17   *****************************************************

18            VIDEOTAPED ORAL DEPOSITION OF

19                    JOHN FINER

20               December 7, 2005

21   *****************************************************

22         *** RESTRICTED - CONFIDENTIAL ***

23       *** SUBJECT TO PROTECTIVE ORDER ***

24

25   REPORTED BY:  SUSAN P. MILLER, RDR, CRR, CBC

REDACTED VERSION – PUBLICLY FILED

John Finer - December 7, 2005
Monsanto Company v. Syngenta Seeds, Inc.,

Page 2

1   VIDEOTAPED ORAL DEPOSITION OF JOHN FINER,
2   produced as a witness at the instance of the
3   Defendants, and duly sworn, was taken in the above
4   styled and numbered cause on Wednesday, December 7,
5   2005, from 9:06 a.m. to 5:39 p.m., before Susan
6   Perry Miller, RDR, RCR, CRR, CBC, Notary Public in and
7   for the State of Texas, reported via Machine
8   Shorthand with Realtime Computer Translation and
9   reported at the offices of Howrey LLP, 1111
10  Louisiana, 25th Floor, Houston, Texas, pursuant to
11  notice, the Federal Rules of Civil Procedure, and/or
12  any provisions stated on the record.
13              APPEARANCES
14  FOR PLAINTIFFS:
15      HOWREY, LLP
16      1111 Louisiana
17      25th Floor
18      Houston, Texas  77002-5242
19      (T) 713.787.1592
20      (F) 713.787.1440
21      By:  Mr. Donald H. Mahoney III
22          mahoneyt@howrey.com
23          Mr. Thomas A. Miller
24          MillerT@howrey.com
25

Page 3

1   APPEARENCE (CONTINUED):
2
3
4   FOR DEFENDANTS:
5       FINNEGAN HENDERSON FARABOW
6       GARRETT & DUNNER, LLP
7       901 New York Avenue, NW
8       Washington, DC  20001-4413
9       (T) 202.408.4000
10      (F) 202.408.4400
11      By:  Mr. Michael J. Flibbert
12          michael.flibbert@finnegan.com
13          Mr. Jared S. Cohen
14          jared.cohen@finnegan.com
15
16
17
18  VIDEOGRAPHER:
19
20      Mr. Jerry Sorsdal
21
22
23      *********************
24
25

Page 4

1              STIPULATIONS
2
3       VIDEOTAPED ORAL DEPOSITION OF JOHN
4   FINER, taken on December 7, 2005, pursuant to
5   notice, the Applicable Rules of Civil Procedure,
6   and/or any provisions stated on the record.
7
8       The Original Transcript or a
9   condensed copy thereof with the Original Signature
10  Page of this deposition will be sent to Mr. Donald
11  H. Mahoney III, Counsel for Plaintiffs Monsanto and
12  DeKalb, in order that the witness may read and sign
13  the deposition, pursuant to the Applicable Rules of
14  Civil Procedure.
15
16      ***************************
17
18
19
20
21
22
23
24
25

Page 5

1                  INDEX
2       VIDEOTAPED ORAL DEPOSITION OF
3       JOHN FINER, TAKEN ON 12/07/2005
4
5   APPEARANCES              2
6   STIPULATIONS             4
7   PRELIMINARY PROCEEDINGS          8
8
9   EXAMINATION OF JOHN FINER:
10  BY MR. FLIBBERT:             9
11  BY MR. MAHONEY:             279
12  BY MR. FLIBBERT:            292
13
14  REPORTER'S CERTIFICATION         299
15
16
17      Index of Videotapes
18  Tape 1              8
19  Tape 2              89
20  Tape 3              171
21  Tape 4              240
22
23
24
25

REDACTED VERSION – PUBLICLY FILED

# Page A87
# REDACTED

REDACTED VERSION – PUBLICLY FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI

FILED

AUG - 9 2002

U. S. DISTRICT COURT
E. DISTRICT OF MO.

MONSANTO COMPANY,

     Plaintiff,

    v.

AVENTIS CROPSCIENCE, N.V.

     Defendants.

CIVIL ACTION NO.
  4:00CV01915ERW

JURY TRIAL DEMANDED

**PLAINTIFF'S STATEMENT REGARDING THE CONSTRUCTION
OF THE ASSERTED CLAIMS OF THE PATENTS-IN-SUIT**

H. 491593X(@JM4011.DOC)

REDACTED VERSION – PUBLICLY FILED

Finally, Monsanto will show that the gene in MON810 corn does not encode a fragment of the Bt2 protein specified in Figure 13, but rather encodes a fragment of a different Bt protein, isolated from a different source, which has a different amino acid sequence. While the amino acid sequence of the shortened, 92 kD MON810 protein is the same as that of the 92 kD portion of Figure 13 of the '546 patent, this does not change the fact that the MON810 protein is not a fragment of the Figure 13 protein. Thus, MON810 further does not infringe the asserted claims of the '565 and '546 patents, or claims 4 and 18 of the '372 patent.

## IV.    CONSTRUCTION OF THE CLAIMS

### A.    TERM 1: "A plant cell susceptible to transformation by Agrobacterium."

PROPER CONSTRUCTION: This term specifies plant cells which were capable of being transformed by Agrobacterium without undue experimentation by an individual of ordinary skill in the art as the January 22, 1986 filing date of the '799 patent. As such, this clause excludes corn, which was not susceptible to such transformation as of that date.

This limitation appears in all asserted claims of the '799 patent. That this term should be read to exclude corn has already been fully briefed in connection with Monsanto's Motion For Summary Judgment That The Claims Of The '799 patent Are Not infringed Based Upon Collateral Estoppel. That briefing sets forth that The United Stated District Court for the District of Connecticut has already held, adverse to Aventis, that corn was not susceptible to transformation by Agrobacterium as of March of 1987, and hence as of the January 22, 1986 filing date of the '799 patent. *Plant Genetic Sys.*, 175 F. Supp. 2d at 261-270. Thus, just by examining the claim language as it would have been understood as of the filing of the '799 patent, *Schering Corp.*, 222 F.3d at 1353, the only proper construction for "susceptible to transformation by Agrobacterium" is that it does not include corn cells. Indeed, the Connecticut court gave the same construction to a similar limitation, which was added to the claims in that

H: 491930(@JN4011.DOC)

REDACTED VERSION – PUBLICLY FILED

patent, under circumstances very similar to those under which the claims of the '799 patent were modified. *Plant Genetic Sys.*, 175 F. Supp. at 265-70.

This construction is further supported by the other intrinsic evidence. In the specification of the '799 patent, the only plants identified as being susceptible to transformation by any technique are dicots. Ex. 1 at Col. 11, l. 63-67. Moreover, the subject limitation was added to the claims precisely for the purpose of restricting the claim scope to plants which those in the art were capable of transforming at the time of filing. During prosecution of the '799 patent, the examiner repeatedly rejected the pending claims as non-enabled insofar as they purported to cover all plant species. 4/21/89 Office Action at 394-95 ("routineers are well aware that monocots [which include corn] have generally proven refractory to transformation in this manner."); 4/26/91 Office Action at 501 (Claims are limited in accordance with the teachings of the specification where the "plant or plant cell is tobacco."); 10/21/91 Interview Summary at 537 ("Examiner suggested that widest enabled scope would seem to be ... to dicot transformed plant cells"). In response, Aventis finally limited the claims to "those susceptible to transformation by Agrobacterium." 10/28/91 Supplemental Amendment, at 540. Hence, the intrinsic evidence fully supports the conclusion that the insertion of the subject language was precisely for the purpose of satisfying the examiner's objections that the claims were not enabled insofar as they might be construed to embrace at least corn or other monocot plants. *See e.g., Plant Genetic Systems,* 175 F. Supp. 265-70.

Finally, to the extent that extrinsic evidence is considered in construing this claim language, it conclusively establishes that one of ordinary skill in the art as of January 1986 would not have interpreted the claims to include corn. That corn could not be transformed by Agrobacterium, or by any other means as of this date, has already been resolved against Aventis

REDACTED VERSION – PUBLICLY FILED

in the Connecticut action. Abundant testimony and evidence firmly proves that nobody, Aventis scientists included, could transform corn even in 1987. *Id.,* at 261-65. The evidence further shows that Aventis scientists were not able to accomplish corn transformation by any means until after 1990 despite a continuous efforts beginning in 1987, and a strong commission not to "spare the horses" in the quest for success. *Id.,* at 260. To the extent that further extrinsic evidence is needed to construe this limitation, Monsanto is prepared to offer the testimony of its expert, Dr. Joachim Messing, that this term would not have been understood to include corn as of the filing of the '799 patent. Ex. 7, Messing Expert Report, pg. 12-18.[4]

    B.    **TERM 2: "DNA fragment that encodes a N-terminal fragment of approximately 60-80 kD,"**

        **EQUIVALENT LANGUAGE: "DNA fragment encoding an insecticidal ... Bt2 toxin of about 60-80 kD," or "DNA encoding an about 60-80 kD insecticidal protein fragment."**

        **PROPER CONSTRUCTION: This term requires that the accused product contain a portion of a full-length Bt DNA which contains the genetic code to create a fragment of a Bt protein with a total size of about 60-80 kD. "kD" is simply a means for measuring the size of a protein, and "N-terminal" specifies that the fragment be the front part of the gene. Whether the DNA in the accused product "encodes" an about 60-80 KD protein is determined by looking to the size of the Bt DNA fragment present and calculating the molecular weight of the protein which that DNA directs a cell to produce.**

        1.    The Claim Language

These terms are from all the asserted claims of the '799 and '565 patent and claims 1-5 and 13 of the '372 patent. The plain language of these claims drives their construction. In the context of molecular biology, "encodes" has a well-defined meaning, and refers to the well-

---

[4] Claims 13 and 18 of the '372 patent and the asserted claims of the '546 patent relate to plant and plant cells, but do not contain the "susceptible to transformation by Agrobacterium" limitation. These claims, therefore, read on all plant cells and plants, and thus encompass corn plants. But because corn could not be transformed as of the January, 1986 filing date, these claims are invalid for lack of enablement, as previously briefed by Monsanto. The same would be true of the '799 patent claims, if construed to cover corn.

REDACTED VERSION – PUBLICLY FILED

Respectfully submitted,

HUSCH & EPPENBERGER, LLP

Dated: August 5, 2002                    By: _____
                                           Joseph P. Conran, E.D.Mo. #6455
                                           Thomas J. DeGroot, E.D. Mo. #2950
                                           Jeanine R. Bermel, E.D.Mo. #2622
                                           190 Carondelet Plaza # 600
                                           St. Louis, Missouri  63105
                                           314.480.1500 – telephone
                                           314.480.1505 – facsimile

HOWREY SIMON ARNOLD    & WHITE, LLP
    John F. Lynch
    Susan K. Knoll
    Steven G. Spears
    750 Bering Drive
    Houston, Texas  77057
    713.787.1400 – telephone
    713.787.1440 – facsimile

**ATTORNEYS FOR THE PLAINTIFF
MONSANTO COMPANY**

H: 491930(@JM4011.DOC)

28

REDACTED VERSION – PUBLICLY FILED

## CERTIFICATE OF SERVICE

It is hereby certified that a true and correct copy of **PLAINTIFF'S STATEMENT REGARDING THE CONSTRUCTION OF THE ASSERTED CLAIMS OF THE PATENTS-IN-SUIT** was served this 5th day of August, 2002, via hand delivery and overnight mail to the following:

Lisa A. Pake
HAAR & WOODS, LLP
1010 Market Street, Suite 1620
St. Louis, MO 63101
(314) 241-2227 (Hand Delivery)

Eric H. Weisblatt
Ronni S. Jillions
Susan M. Dadio
BURNS, DONAE, SWECKER & MATHIS, LLP
1737 King Street, Suite 500
Alexandria, VA 22314-2756
(703) 836-2021 (Overnight Mail)

Timothy G. Barber
WOMBLE CARLYLE SANDRIDGE & RICE, PLLC
3300 One First Union Center
301 South College Street
Charlotte, NC 28202-6025
(704) 338-7839 (Overnight Mail)

H 491980(@JM4011.DOC)

A93

REDACTED VERSION – PUBLICLY FILED



REDACTED VERSION – PUBLICLY FILED

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## MONSANTO v. BAYER BIOSCIENCE, 03-1201

### CERTIFICATE OF INTEREST

Counsel for Plaintiff-Appellee MONSANTO COMPANY certifies the following:

1.    The full name(s) of every party represented by me are:

> MONSANTO COMPANY

2.    The name(s) of the real parties in interest represented by me are:

> MONSANTO COMPANY

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:

> None.

4.    The names of all law firms and the partners or associates that appeared for MONSANTO COMPANY in the trial court or are expected to appear in this court are:

John F. Lynch
Susan K. Knoll
Melinda L. Patterson
Richard L. Stanley
Steven G. Spears
Connie Flores Jones
Shashi H. Kewalramani
Daniel T. Shvodian
Michael E. Lee (no longer with the firm)
HOWREY SIMON ARNOLD & WHITE, LLP

REDACTED VERSION – PUBLICLY FILED

750 Bering Drive
Houston, TX  77057-2198
Telephone:  713.787.1400
Facsimile:  713.787.1440

Joseph P. Conran
Jeanine Bermel
Thomas J. DeGroot (no longer with the firm)
HUSCH & EPPENBERGER, LLP
190 Carondelet Plaza #600
St. Louis, MO  63105-3441
Telephone:  314.480.1500
Facsimile:  314.480.1530

Dated: _6/12/2003_          Respectfully submitted,


HOWREY SIMON ARNOLD & WHITE, LLP



By: _____
Counsel for Plaintiff-Appellee
Monsanto Company

REDACTED VERSION – PUBLICLY FILED

upon its "Bt2" construction. A84-86. Monsanto moved that same day for entry of judgment requesting the identical relief. A16152-54. Finally, on December 27, 2002, the district court granted Monsanto's motion to hold the patents-in-suit unenforceable for inequitable conduct (A100-17), and entered judgment of non-infringement for the asserted "Bt2" claims. A94-98.

Bayer filed this appeal. A16580-82. On January 10, 2003, Monsanto filed a motion for attorneys' fees under 35 U.S.C. § 285. That motion is pending.

## III.    STATEMENT OF FACTS

The patents-in-suit arise from a January 1986 application that pre-dates the codon modification strategies for Bt genes addressed in *Mycogen Plant Science, Inc. v. Monsanto Co.*, 243 F.3d 1316, 1321-24 (Fed. Cir. 2001).    In contrast, Bayer's patents-in-suit involve plant expression using a particular native Bt gene that is unmodified save for removal ("truncation") of the end of the gene. A121; A208; A553; A668. The patents disclose only examples of insect resistant tobacco plants made using such a truncated, native version of what Bayer called a "Bt2" gene, specified as being *B.t. berliner* 1715. A287-88.[1]

In contrast, Monsanto's MON810 corn seed has been genetically modified to express a Bt protein at levels toxic to the European corn borer without adversely

---

[1] Contrary to Blue Br. 5, Bayer has never been found to be the first inventor of this truncated, native Bt technology. A87-93; A94-98.

REDACTED VERSION – PUBLICLY FILED

affecting other beneficial insects, animals, or humans. MON810 corn seed does not use a Bt2 gene (*see infra* § III.C), and indisputably incorporates Monsanto's later-developed codon modification strategies.

## A. Bayer Has Already Unsuccessfully Litigated Whether Corn Could Be Transformed Without Undue Experimentation As Late As March 1987

In *PGS I*, PGS sued DEKALB alleging infringement of the '236 patent. *See* 315 F.3d at 1337. Whereas the patents-in-suit are directed to engineering an insect resistant trait (Bt) into plants, the '236 patent was directed to engineering a herbicide resistant trait (from a gene known as *Bar*) into plants. *Id.* at 1337-38; *see* A1360; A1389-91. The asserted effective filing date for the '236 patent was March 11, 1987 – nearly 14 months after the January 1986 date asserted for the patents-in-suit. 315 F.3d at 1337.

Claims 1-5 and 8-15 of the '236 patent ("the cell claims") were asserted to cover any transgenic plant, including corn, transformed to be herbicide resistant using the *Bar* gene. A1389-90; 315 F.3d at 1338. (Similarly, claims 1-7 of the '546 patent and claims 13 and 18 of the '372 patent allegedly cover any transgenic plant with the claimed Bt trait (A754; A665-66)). Applying this Court's law, the district court in *PGS I* concluded that the "cell claims" were not enabled because there was no method for transforming monocots, including corn, without undue

REDACTED VERSION – PUBLICLY FILED

experimentation as of March 11, 1987.  175 F. Supp. 2d at 261-62.  Among that

court's factual findings were:

> [T]he so-called 'monocot barrier' was still firmly in place in March of
> 1987.  At that time, *Agrobacterium*-mediated transformation of
> monocots – if possible, at all – would have required extensive
> experimentation that would preclude patentability. *Id.* at 261.

> [N]o *Agrobacterium*-based methods existed that would allow a person
> of skilled in the art to use this technique to practice the entire scope of
> Claim 1 of the '236 patent without undue experimentation. *Id.* at 262.

> [A] significant amount of experimentation was necessary to be able to
> stably insert a heterologous DNA fragment into a monocotyledonous
> plant cell in early 1987. *Id.* at 264.

> In March of 1987, a person skilled in the art who attempted to stably
> integrate the *bar* gene into plant cells other than dicots would have
> had to engage in undue experimentation – assuming that they could
> have successfully completed the task at all. *Id.* at 265.

Based on those and other findings, the Connecticut court held that the cell claims

of the '236 patent were invalid due to lack of enablement. *Id.*

Claims 8-9 and 12-15 of the '236 patent ("the plant and seed claims") were

limited to plants "susceptible to infection and transformation by Agrobacterium

and capable of regeneration thereafter." A1390. (Similarly, the '799 patent claims

are limited to "a plant cell susceptible to transformation by Agrobacterium."

A206-07.) The findings in *PGS I* continued:

> [T]here is no evidence that a general methodology existed in 1987 by
> which a person skilled in the art could produce a transgenic monocot.
> 175 F. Supp. 2d at 268.

REDACTED VERSION – PUBLICLY FILED

> [A]s of the filing date of the '236 patent no methodology existed by which monocots could be infected and transformed by *Agrobacterium* to produce plants capable of regeneration. *Id.* at 269.

In light of those findings, the district court in *PGS I* construed the plant and seed claims to be limited to dicots, and found them not infringed. *Id.* at 269-70.

In *PGS II*, this Court affirmed both aspects of the district court's determinations. 315 F.3d at 1339-46. Importantly, this Court held that "the district court did not clearly err in its evidentiary findings." *Id.* at 1339. This Court thus agreed that the district court in *PGS I* "properly conducted its enablement analysis ... before reaching its conclusion that the stable transformation of monocot cells required undue experimentation on March 11, 1987." *Id.* at 1344. This Court also affirmed the district court's construction of the "plant and seed claims" as not encompassing monocots as being consistent with the intrinsic and extrinsic evidence. *Id.* at 1344-46.

The district court here properly concluded that if corn could not be transformed as of March, 1987, then it certainly could not have been transformed as of the asserted January, 1986 filing date for the patents-in-suit. A69-70; A75-76. Bayer cannot rely upon the patents-in-suit as leading to a different result because (i) they have no disclosure at all related to corn, and (ii) the specification was published in Europe in September 1986, so the present patents-in-suit were within the prior art that was found non-enabling for corn in *PGS I*. A1420.

REDACTED VERSION – PUBLICLY FILED

Indeed, Bayer's 30(b)(6) witness on *Agrobacterium*-mediated corn transformation conceded that Bayer had no evidence other than what had already been found unpersuasive in *PGS I*:

> Q:  ... My question to you is are you aware of any evidence which support the notion that corn was susceptible to transformation by agrobacterium as of January 22, 1986 that has not been considered and rejected by the District Court of Connecticut?
>
> A:  So this is [Goldman and Graves, 1986] for me, the only publication that I was aware of.
>
> Q:  And you are not aware of any other evidence?
>
> A:  As of January '86?
>
> Q:  Yes.
>
> A:  I am not aware of any other evidence for corn.

A1456-58 at A1458; A11129-133; A11346-53, at A11350.  Dr. Reynaerts, PGS's head of plant transformation in 1986, agreed that "it was thought generally in the scientific community that Agrobacterium would not work in corn in 1986." A11166.

## B.  PGS' False Declaration Deceives The PTO Into Issuing The Patents-In-Suit

Persisting with this lawsuit despite the adverse findings and judgment in *PGS I*, Bayer opened itself to full discovery into how Bayer's predecessor, PGS, obtained these patents-in-suit.  As a result, Monsanto discovered a textbook example of inequitable conduct.