REDACTED VERSION – PUBLICLY FILED

necessary to reach the remaining claim construction issues, Syngenta provides its proposed constructions below.

1. **The Term "Herbicide" in Claim 1 of the '880 Patent Means a Chemical Agent Employed to Kill or Inhibit the Growth of Weeds and Excludes Antibiotics**

   a. **The Specification Distinguishes Between Herbicides and Antibiotics**

Because the '880 patent does not define the term "herbicide," the ordinary and customary meaning in the art of the term is presumed to be correct. *See K-2 Corp.*, 191 F.3d at 1362-63 ("the ordinary and accustomed meaning of a disputed claim term is presumed to be the correct one . . . ."). Here, one of ordinary skill in the art, as of the January 22, 1990, priority date of the '880 patent, would understand the term "herbicide" to mean a chemical agent employed to kill or inhibit the growth of weeds.[6] *See* 12/14/05 Depo. Tr. of E. Ward at 135:18-24 (Ex. 18); *see also Phillips*, 415 F.3d at 1318 (stating that resort to extrinsic evidence such as expert testimony can be useful "to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of ordinary skill in the art, or to establish that a particular term in the patent . . . has a particular meaning in the pertinent field.").

DeKalb itself has used the term "herbicide" in its regulatory submissions in a way that is consistent with the ordinary meaning of the term. In DeKalb's and Monsanto's Petition for Determination of Nonregulated Status: Roundup Ready Corn Line GA21, Plaintiffs stated:

---

[6] The Illinois district court's construction of the term "herbicide" did not take into consideration DeKalb's separate claims, discussed below, directed to "herbicide" and "antibiotic" resistance. Moreover, the Illinois court also relied on the prosecution history of U.S. Patent No. 5,484,956, which the court acknowledged does not claim "herbicide" resistance. Ex. 10 at 44-47.

**Redacted**    059155.1008

REDACTED VERSION – PUBLICLY FILED

Plaintiffs' clear representation to U.S. regulatory authorities confirms that a herbicide is a chemical agent employed to kill or inhibit the growth of weeds.

Thus, the ordinary meaning of the term "herbicide" as an agent that is intended for the destruction or inhibition of weeds should be adopted as the basic definition. Such a definition would not include a material that is known in the art by its function as an antibiotic. Moreover, the inventors of the '880 patent explicitly distinguished antibiotics from herbicides in the specification and thus excluded antibiotics from the scope and meaning of the term "herbicide" in the '880 patent claims.

Specifically, the '880 patent describes the use of "toxic agents"—herbicides *or* antibiotics—that can be used to select (i.e., distinguish or identify) plants that have a transgene stably integrated into the plant's genome from plants that do not:

> [S]election generally entails the use of some *toxic agent*, e.g. *herbicide or antibiotic*, which can effect [*sic*, affect] either the regenerability or the resultant plant fertility.

Ex. 2 at col. 2:53-55 (emphasis added). Although herbicides and antibiotics are both classified as "toxic agents," the inventors, by using the term "or," made their intentions clear that antibiotics, such as hygromycin, are not herbicides.[7] *See Schumer v. Laboratory Computer Sys., Inc.*, 308 F.3d 1304, 1311 (Fed. Cir 2002) (construing the term "or" to mean "an alternative

---

[7]    Dr. Ronald Lundquist, first named inventor on the '880 patent, testified on behalf of DeKalb on redirect in a prior litigation involving the '880 patent that hygromycin is an antibiotic. February 13, 2001, trial testimony of Dr. Ronald Lundquist in *DeKalb Genetics Corp. v. Pioneer Hi-Bred Int'l, Inc. et al.*, Nos. 96 C 50112 (N.D. Ill. filed 6/10/96) at 266 ("After all that time, I haven't even said what hygromycin is. It's an antibiotic.") (Ex. 20).

DB01:1959785.1     **Redacted**     059155.1008

REDACTED VERSION – PUBLICLY FILED

between different or unlike things . . . ."); *see also* Ex. 2, col. 10:5-22 (using the phrase "toxic agent").

Additionally, the '880 patent contains other instances where the inventors distinguished between "toxic agents" that were antibiotics from those that were herbicides.  For example, the '880 patent states:

> Useful selectable markers are well known in the art and include, for example, *antibiotic and herbicide* resistance genes. . . .  Other selectable markers known in the art include . . . *the antibiotics kanamycin, neomycin, and G418,* as well as those genes which code for resistance or tolerance to glyphosate, . . . imidazolinones, sulfonylureas, bromoxynil, dalapon, and the like.   *Those selectable marker genes which confer herbicide resistance or tolerance are also of commercial utility in the resulting transformed plants.*[8]

*Id*. at col. 7:8-22 (emphasis added).

Based on the specification itself, therefore, the inventors of the '880 patent confirmed that the term "herbicide" in the patent does not include antibiotics.  *See Phillips*, 415 F.3d at 1316 ("the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor.  In that instance as well, the inventor has dictated the correct claim scope, and the inventor's intention, as expressed in the specification, is regarded as dispositive.")

    b.    The Prosecution History of the '880 Patent and a
          Related Application Confirm that Distinction Between
          Herbicides and Antibiotics

On June 7, 1991, during prosecution of the '983 application, DeKalb filed an amendment adding claim 48, which read:

> Claim 48.  The process of claim 47 wherein said selectable marker gene imparts herbicide resistance to said fertile transgenic <u>Zea mays</u> plant.

---

[8]  In the same prior litigation, Dr. Lundquist was asked whether the hygromycin gene he used had any commercial value.  Dr. Lundquist responded, "None, whatsoever . . . .  But it has -- nobody sprays antibiotic on the cornfield.  It has no commercial value whatsoever."  Ex. 20 at 266.  Since antibiotics, and hygromycin in particular, have no commercial utility, they clearly do not qualify as "herbicides," as described in the specification of the '880 patent.

19

REDACTED VERSION – PUBLICLY FILED

6/7/91 Amendment in Application Ser. No. 07/467,983 (Ex. 21) at 0000669. The PTO rejected

claim 48 under 35 U.S.C. § 112, ¶ 1, for lack of an enabling disclosure. *See* 8/23/91 Office

Action in Application Ser. No. 07/467,983 (Ex. 22) at 0000699. Basing its rejection on the fact

that the hygromycin-resistance gene does not confer herbicide resistance, the PTO stated:

> With the exception of the [hygromycin resistance] genes noted above, *which are not considered to be genes that confer resistance to art recognized "herbicides"*, the specification is silent as to a gene which when expressed would impart said herbicide resistance. . . . Thus, for the reasons noted above enablement is limited to marker genes demonstrated in the specification in which herbicide resistance is <u>not</u> a consideration.

Ex. 22 at 0000699-700 (underlined emphasis in original; bold and italic emphasis added).

DeKalb filed a response to the PTO's Office Action and attempted to rely on a PCT

application to support its contention that hygromycin is a herbicide. *See* 2/20/92 Response in

Application Ser. No. 07/467,983 (Ex. 23) at 0000711-712. But the PTO was not convinced,

stating:

> While it may be nothing more than a matter of semantics as to whether hygromycin can be considered a herbicide, it remains a fact that the only compound that may have such properties exemplified in the instant specification was hygromycin. *However, there is no evidence that the expression of hygromycin, as taught in the specification, imparts properties that satisfy the claim limitation to:*
>
> *. . . imparts herbicide resistance to said fertile transgenic Zea mays plant.*
>
> *Clearly Applicants have not demonstrated the above limitation.*

5/13/92 Final Office Action in Application Ser. No. 07/467,983 (Ex. 24) at 0000724.

Since the PTO's Office Action was final, DeKalb filed a continuation application, the

'379 application, on November 10, 1992. Here again, the PTO rejected claim 48 under § 112,

¶ 1, based on the fact that the disclosure of hygromycin resistance did not enable herbicide-

resistant fertile transgenic corn plants. *See* 3/8/93 Office Action in Application Ser. No.

07/974,379 (Ex. 25) at 0000760. Unable to establish that hygromycin is a herbicide, DeKalb

059155.1008

REDACTED VERSION – PUBLICLY FILED

relied on a declaration of Dr. Gordon-Kamm, who discussed his work creating fertile transgenic corn resistant to the herbicide bialaphos. *See* 3/4/93 Preliminary Amendment in Application Ser. No. 07/974,379 (Ex. 26) at 0000766-67 and SM 0000777-780. DeKalb also filed a declaration from Mr. Michael Spencer, in which Mr. Spencer alleged that glyphosate resistance in corn was achieved using a bacterial *aroA* EPSPS gene and a double mutant maize EPSPS gene. *See* Declaration Under 37 C.F.R. § 1.132, filed in Application Ser. No. 07/974,379 (Ex. 27) at 000835-43. Neither of these declarations, however, states that hygromycin is a herbicide.

Prosecution of the '379 application continued until finally, on July 27, 1994, the PTO indicated that the pending claims, including claim 48, were allowable. *See* 7/27/94 Interview Summary in Application Ser. No. 07/974,379 (Ex. 28) at 0000857-59. In allowing the claims, however, the PTO distinguished the specification's disclosure of a hygromycin-resistance gene, which conferred "a new non-native plant phenotype corresponding to *hygromycin resistance*," and the disclosure of "art known and available DNA sequences," including "those providing herbicide resistance." *Id.* at 000858.

It is clear from the prosecution of the applications leading to the '880 patent that the PTO also understood that antibiotics, such as hygromycin, are not herbicides.

The prosecution history of an application leading to the '863 patent further confirms that the Court should construe the term "herbicide" to exclude antibiotics. On November 12, 1996, during prosecution of the '695 application, DeKalb filed a Preliminary Amendment adding *separate* claims directed to "herbicide resistance" (e.g., claims 56, 62, and 64-66) and "antibiotic resistance" (e.g., claims 68-72). *See* 11/12/96 Preliminary Amendment in Application Ser. No.

059155.1008

REDACTED VERSION – PUBLICLY FILED

08/677,695 (Ex. 29) at 0002456-62.[9]  Further, in response to a Restriction Requirement, DeKalb

stated:

> Applicants provisionally elect with traverse a selectable marker gene encoding
> *antibiotic resistance* wherein the gene encodes resistance to bleomycin, encodes
> resistance to *hygromycin*, . . . .

8/21/97 Response to Restriction Requirement in Application Ser. No. 08/677,695 (Ex. 30) at

0002557-58.

The related '695 application provides clear insight into the inventors' understanding that

antibiotics are not herbicides.  Since the '695 application and '880 patent share the same

specification and stem from the same family of applications, the inventors' statements made

during prosecution of the '695 application are clearly relevant to the Court's claim construction

analysis.[10]  *See, e.g., Microsoft Corp.*, 357 F.3d at 1350 (applying statements made during

prosecution of a later-filed application to construe terms of earlier issued patent sharing the same

specification).  For these reasons, the Court should construe the term "herbicide" in claim 1 of

the '880 patent to exclude antibiotics.

2.    **The Term "Progeny" in Claims 4-7 of the '880 Patent Means
      the R1 Progeny**

Claim 4 of the '880 patent states that "progeny" are obtained "from a fertile transgenic

plant obtained by the process of claim 1," i.e., from an "R0" plant produced by the process of

---

[9] The application leading to the '863 patent was filed as a divisional of the '695
application. *See* Ex. 1, front cover. Moreover, the '695 application and the '880 patent share a
common specification. In fact, the '695 application stems from the same series of applications as
the '880 patent. Compare Ex. 1, front cover "Related U.S. Application Data" to Ex. 2, front
cover "Related U.S. Application Data."

[10] The claims of U.S. Patent No. 6,946,587, which shares the same specification as the
'880 patent and stems from the same family of applications as the '880 patent, also distinguish
between herbicide-resistant and antibiotic-resistant fertile transgenic corn plants. *See* U.S. Patent
No. 6,946,587 (Ex. 31) at claims 10 and 13-19.

22

059155.1008

REDACTED VERSION – PUBLICLY FILED

claim 1. Ex. 2 at claim 4. Sexual crosses of the R0 generation plants are known in the art as "R1" progeny. This is confirmed in the specification, which states:

> The plants regenerated from the transformed callus are referred to as the R0 generation or R0 plants. The seeds produced by various *sexual crosses of the R0 generation plants are referred to as R1 progeny or the R1 generation.* When R1 seeds are germinated, the resulting plants are also referred to as the R1 generation.

Ex. 2 at col. 11:14-19. Thus, the only way of "obtaining progeny" is to conduct a sexual cross of the R0 plant.

Indeed, while prosecuting the '880 patent, DeKalb specifically stated that the term "progeny" refers to R1 progeny. In response to a PTO rejection of claims 33 and 35 ('880 patent claims 7 and 9), DeKalb stated:

> [C]laim 31 [patent claim 5] recites that in step (iv), *'R1' progeny* of the 'R0' plant of step (iii), are obtained by crossing the R0 plant with an inbred line.

5/31/95 Response Under 37 C.F.R. § 1.116 in Application Serial No. 08/249,458 (Ex. 32) at 0001055 (emphasis added). Thus, DeKalb explicitly stated during prosecution that the term "progeny," as used in claim 5 of the '880 patent, is limited to the R1 progeny.[11] And because claim 5 refers to "said progeny" of claim 4, the term "progeny" in claims 4 and 5 must have the same meaning. Additionally, claims 6 refers to "said progeny" of claim 4 and claim 7 refers to "the progeny" of claim 5. As such, the term "progeny" recited in claims 4-7 must all mean the R1 progeny.

---

[11] The Illinois district court construed the term "progeny." Ex. 10 at 38-43. The court, however, relied on the specification of U.S. Patent No. 5,489,520, at issue in the prior case but not related to the '880 patent, to support its construction. *Id.* at 39. Further, the court relied on a passage in U.S. Patent No. 5,484,956, which is not in the '880 patent. *Id.* at 40. Finally, the court did not construe the separate claim term "further progeny" (discussed herein).

059155.1008

REDACTED VERSION – PUBLICLY FILED

### 3. The Term "Further Progeny" in Claims 6-9 of the '880 Patent Means the R2 Progeny

Claim 7 of the '880 patent states that "the progeny" of claim 5 (the R1 progeny) are crossed back to the inbred line to obtain "further progeny." Thus, the only way to obtain the "further progeny" is to conduct a sexual cross of the R1 progeny plant with an inbred line. Crossing R1 progeny back to an inbred line would produce "R2" progeny. Here again, the prosecution history support this construction as DeKalb specifically argued that:

> Claim 33 ['880 patent claim 7] effectively recites step (iv), obtaining 'R1' progeny; (v) crossing the 'R1' progeny with the inbred line, and (vi) obtaining *further 'R2' progeny*.

Ex. 32 at 0001055 (emphasis added). DeKalb could not have been any clearer in stating that the term "further progeny" was limited to the R2 progeny. Since claim 6 also recites the term "further progeny," that term used in that claim must also mean the R2 progeny. Claims 8 and 9 refer to "said further progeny," which establishes that the term "further progeny" in these claims also means the R2 progeny.

### 4. The Term "Progeny" in Claim 9 of the '880 Patent Means the R3 Progeny

Claim 9 requires that the "further progeny" obtained by the process of claim 7 (R2 progeny), are crossed back to the inbred line to obtain "progeny." Accordingly, the only way to obtain the "progeny" of claim 9 is to conduct a sexual cross of the R2 "further progeny" of claim 7 with an inbred line. Crossing R2 progeny back to an inbred line would produce "R3" progeny. DeKalb confirmed this during prosecution when it stated:

> Step 34 [*sic*, claim 35, '880 patent claim 9] recites that (vii) the 'further (R2) progeny' are crossed back to the inbred line to *obtain 'R3' progeny*."

Ex. 32 at 0001055 (emphasis added). Thus, the term "progeny" (second occurrence) in claim 9 of the '880 patent means the R3 progeny.

24

REDACTED VERSION – PUBLICLY FILED

## VI.    THE SHAH '835 PATENT

### A.    The Functional Language of the Asserted Claims Must Be Given Effect

For the reasons discussed below, the Court should construe claim 1 of the '835 patent to give effect to the functional limitations in the claim.[12] This claim construction issue is relevant to Syngenta's Motion for Summary Judgment of Non-Enablement of the Shah '835 Patent, filed concurrently herewith.

Claims 1, 5, and 6 of the '835 patent (the claims asserted by Plaintiffs against Syngenta) recite a chimeric plant gene formed of several DNA sequences (a "promoter" sequence, a "coding" sequence, and a "non-translated region").    DNA sequences can be identified by structure, such as shown in Figs. 3, 4a and 4b of the '835 patent. However, in claim 1 (and thus dependent claims 5-6), Monsanto chose to define the claimed gene in terms of the functions it must accomplish in an operative plant cell—*not* by its DNA or amino acid structure. *See* Ex. 3, claim 1. The language of claim 1 expressly recites various functions required of the components of the chimeric gene:

1.    A chimeric plant gene which comprises:

(a)    a promoter sequence *which functions in plant cells*;

(b)    a coding sequence which causes the production of RNA, encoding a chloroplast transit peptide/5-enolpyruvylshikimate-3-phosphate synthase fusion polypeptide, *which chloroplast transit peptide permits the fusion polypeptide to be imported into a chloroplast of a plant cell*; and

(c)    a 3' non-translated region which encodes a polyadenylation signal *which functions in plant cells to cause the addition of polyadenylate nucleotides to the 3' end of the RNA*;

---

[12] Syngenta's proposed construction of the functional language recited in claim 1 can be found in the parties' Joint Claim Construction Statement, filed January 11, 2006.

the promoter being heterologous with respect to the coding sequence and *adapted to cause sufficient expression of the fusion polypeptide to enhance the glyphosate resistance of a plant cell transformed with the gene*.

Ex. 3, claim 1 (emphasis added). Thus, the plain language emphasized above demonstrates that the chimeric gene must function "in a plant cell," such that the CTP "permits the fusion polypeptide to be imported into a chloroplast of a plant cell," and that the promoter is "adapted to cause sufficient expression of the fusion polypeptide to enhance the glyphosate resistance of a plant cell transformed with the gene."[13]    There is simply no basis in law for ignoring these clear and unambiguous limitations in the claim.

As discussed above, "words of a claim 'are generally given their ordinary and customary meaning.'" *Phillips*, 415 F.3d at 1312. Moreover, each and every element of a claim must be considered and should not be ignored under any circumstances. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997) ("Each element contained in a patent claim is deemed material to defining the scope of the patented invention . . . ."); *Lemelson v. United States*, 752 F.2d 1538, 1551 (Fed. Cir. 1985) ("[I]t is . . . well settled that each element of a claim is material and essential . . . "); *see also TechSearch, L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1373 (Fed. Cir. 2002) ("We have further recognized that specific claim limitations cannot be ignored as insignificant or immaterial in determining infringement.").

Moreover, it is beyond dispute that functional language serves to limit a patentee's scope of protection. *In re Swinehart*, 439 F.2d at 212 (recognizing the use of functional language in claims); *Wright Med. Tech., Inc. v. Osteonics Corp.*, 122 F.3d 1440, 1443-44 (Fed. Cir. 1997) (functional language "adapted to closely fit in and extend through the narrowest portion of the human femur" analyzed as a claim limitation); *K-2 Corp.*, 191 F.3d at 1363 (functional language

---

[13] The parties agree that the term "transformed" means the stable integration of the chimeric plant gene in a plant cell's genome.

REDACTED VERSION – PUBLICLY FILED

"is, of course, an additional limitation in the claim"); *Acco Brands, Inc. v. Micro Sec. Devices, Inc.,* 346 F.3d 1075, 1078 (Fed. Cir. 2003) ("Viewed in light of the specification, the phrase 'for extending' is a functional restriction on the pin."). This principle applies to functional language used in lieu of DNA structure as in this case. *See Enzo Biochem, Inc. v. Calgene, Inc.,* 188 F.3d 1362 (Fed. Cir. 1999) (relying on functional language in holding the claim at issue under 35 U.S.C. § 112); *In re Vaeck,* 947 F.2d 488 (Fed. Cir. 1991) (holding chimeric gene claim invalid because it sought to claim the use of the gene in cell types not enabled by the specification).

Courts should also consult the specification to confirm that the claim construction is proper. Claims "must be read in view of the specification, of which they are a part." *Phillips,* 415 F.3d at 1315. "[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appear, but in the context of the entire patent, including the specification." *Id.* at 1313.

Here, one of ordinary skill would understand that Examples 2-13 of the '835 patent describe transforming dicot plant cells with a heterologous promoter-CTP/EPSPS gene and then using glyphosate as a mechanism to select those cells that have been transformed. Examples 11-13 further describe taking the transformed cells and regenerating transgenic dicot plants that are resistant to glyphosate. In other words, in each of these examples, Monsanto discusses carrying out the functions set forth in claims 1, 5, and 6. There is simply nothing in the claim language or the specification that would lead one of ordinary skill in the art to believe that the functional language explicitly set forth in the claim is immaterial.

Furthermore, the specification describes the various components of the chimeric plant gene in the '835 patent in terms of their function, as opposed to their structure. For example, with respect to the "promoter," the Shah patent inventors stated:

REDACTED VERSION – PUBLICLY FILED

> The particular promoter selected should be capable of causing sufficient expression to result in the production of an effective amount of EPSPS polypeptide to render the plant cells and plants regenerated therefrom substantially resistant to glyphosate.

Ex. 3 at col. 3:33-38. Moreover, in terms of the CTP, the inventors stated that the CTP functions to "cause[ ] the polypeptide to be *imported* into chloroplasts, and . . . is believed to be *removed* from the remainder of the polypeptide so that an active portion of the EPSPS polypeptide exists and functions inside the chloroplast." Ex. 3 at col. 4:28-34 (emphasis added); *see also* Ex. 3 at col. 30:3-5 ("[t]he pre-EPSPS (+CTP) was rapidly translocated into chloroplasts and cleaved to the mature EPSPS of $M_r\alpha 48$ kDa."); col. 31:8-12. Additional support for the other functional limitations recited in claim 1 can be found throughout the specification. *See, e.g.*, Ex. 3 at col. 5:13-16 ("The 3' non-translated region contains a polyadenylation signal which functions in plants to cause the addition of polyadenylate nucleotides to the 3' end of the EPSPS mRNA."); Example 2 at col. 16:61-63 ("This confirms that the CaMV/EPSPS gene conferred glyphosate resistance upon the transformed cells."); Example 3 at col. 17:1-5 ("The cells transformed with the CaMV/EPSPS gene created substantial amounts of callus tissue on 0.5 mM glyphosate, whereas the cells which did not contain that gene did not create any detectable callus tissue."); Example 4 at col. 19: 58-60; Example 8 at col. 23:40-42; Example 11 at col. 25:34-40; and Example 13 at col. 26:16-20.

"'A 'court should also consider the patent's prosecution history, if it is in evidence.'" *Phillips*, 415 F.3d at 1317 (quoting *Markman*, 52 F.3d at 980). During prosecution of the application leading to the '835 patent, the examiner stated in an interview summary that "[t]he applicant agreed to use function[al] language in [the] claims." 1/4/88 Examiner Interview Summary Record in Application Ser. No. 879,814 (Ex. 33) at 0005311. Given Monsanto's decision to draft the '835 patent claims using functional language, it would be improper to

construe claim 1 as simply requiring a chimeric plant gene and nothing more. *See Phillips*, 415

F.3d at 1317. Thus, there is nothing in the claim language, specification, or prosecution history

that would lead one of ordinary skill in the art to believe that the functional language explicitly

set forth in the claim is immaterial. Accordingly, based on the well-established precedent of the

Federal Circuit, the Court should construe the functional language of claim 1 as limitations of the

claim. *See, e.g., In re Swinehart*, 439 F.2d at 212; *K-2 Corp.*, 191 F.3d at 1363.

**B.    The CTP Must Be Naturally Occurring, Target the Passenger Protein to the Chloroplast, and Subsequently Be Removed**

If the Court construes the term "chloroplast transit peptide," as recited in claim 1 of the

'835 patent, to mean (1) a naturally occurring chain of amino acids that (2) targets the EPSPS

protein to the chloroplast, and (3) is cleaved (or removed) from the mature protein, then

Syngenta cannot literally infringe any asserted claim of the '835 patent. *See* Syngenta's Shah

Patent Non-Infringement Motion.

**1.    The CTP Must Be Naturally Occurring**

**a.    The Missouri District Court's Claim Construction**

The Eastern District of Missouri construed the term "chloroplast transit peptide" ("CTP")

in *Monsanto Co. v. Bayer CropScience LP*, Case No. 4:01CV01825 CDP (E.D. Mo. filed Nov.

20, 2001). There, the court explicitly held that the term "'chloroplast transit peptide' means a

***naturally occurring*** series of amino acids that causes the transport of a polypeptide into a

chloroplast." 7/2/03, *Markman* Hearing Tr. in *Monsanto Co. v. Bayer CropScience LP*, Case No.

4:01CV-1825 CDP (E.D. Mo.) (Ex. 34) at 166 (emphasis added). In reaching this conclusion,

the court—using a claim construction analysis entirely consistent with *Phillips*—explained that

"I have accepted Bayer's argument that the CTP must be naturally occurring because . . . reading

the claim language and the patent as a whole, and giving due consideration to the prosecution

history, that at the time of this invention, a chloroplast transit peptide under the widely-held understanding in the pertinent technical field, meant something found to naturally occur in a plant . . . ." *Id.* at 166.

The court continued its analysis by focusing on the patent specification: "[t]he references in the patent specification to sources for CTP all point to plants or naturally occurring substances, not to synthetic substances. At the time of this patent application, the state of the knowledge of CTPs was such that *I do not believe that the patent contemplated that this term would include anything that might ever be invented that would function like a CTP.*" *Id.* at 166-67 (emphasis added).

### b.    The '835 Patent Specification Describes Only Naturally Occurring CTPs

The specification of the '835 patent supports the Missouri court's construction. Every example in the patent where plant cells (or plants regenerated from such cells) are transformed to obtain glyphosate resistance describes the use of a naturally occurring CTP. Examples 2, 3, 4, 8, 9, 10, 11, 12, and 13 describe transformations using the naturally occurring CTP from the petunia EPSPS gene. Examples 5, 6, and 7, prophetic examples, suggest using the naturally occurring CTP from the cotton EPSPS gene, the oil seed rape EPSPS gene, and the flax EPSPS gene, respectively.

Indeed, throughout the '835 patent, the inventors distinguish between an sequence that must be naturally occurring and a sequence that can be mutated, modified, or altered. For example, when describing promoters, the inventors state that promoters may be modified or altered. Ex. 3 at col. 3:45 to col. 4:12. Similarly, the inventors contemplate the use of mutant forms of the coding sequence for the EPSPS gene. *Id.* at col. 5:1-3. No similar language exists

30

059155.1008

REDACTED VERSION – PUBLICLY FILED

with respect to the CTP. Rather than being altered or modified, the specification merely states that the CTP should be "obtained from" a naturally occurring plant. *Id.* at col. 4:35-40.

Furthermore, the only nucleotide or amino acid sequence for a CTP actually described in the '835 patent is the naturally occurring petunia CTP from the petunia EPSPS gene. 10/7/05 Depo. Tr. of D. Shah at 135:8-9 (Ex. 35). Its DNA and amino acid sequences are disclosed in Figures 3 and 4 of the '835 patent.

### c.   During the 1985-86 Time Frame, Those Skilled in the Art Understood that All Existing CTPs Were Naturally Occurring

Those skilled in the art in 1985-86 understood that all CTPs were naturally occurring and found at the N-terminus of nuclear-encoded proteins. Dr. Barry Bruce, Syngenta's expert in the present case, testified that "[y]ou could say absolutely every transit peptide known in 1985 was placed at the N-terminus of a nuclear-encoded polypeptide." 12/16/05 Depo. Tr. of B. Bruce (Ex. 36) at 38:9-11. Likewise, Dr. Kenneth Keegstra, Monsanto's expert in the present case, testified that

12/15/05 Depo. Tr. of K. Keegstra (Ex. 37) at 36, 38. Moreover, there were only seven CTPs known to exist during the 1985-86 time frame out of the approximately 2000 proteins that are targeted to a plant's chloroplast. *Id.* at 118:7-12. Each of the known CTPs was naturally occurring. *Id.* at 38. Furthermore, there was no structural similarity between any of the seven known CTPs. *Id.* at 119-20. Because of the lack of structure/function relationship, there were no synthetic constructs considered to be CTPs, either in the literature or disclosed in the '835 patent. *Id.* at 38, 125-26.

### 2.   The CTP Must Target the EPSPS Protein to the Chloroplast

The parties do not dispute that the CTP must target the EPSPS protein to the chloroplast.

**Redacted**        059155.1008

REDACTED VERSION – PUBLICLY FILED

### 3.    The CTP Must Be Cleaved (or Removed) from the Mature EPSPS

The '835 patent states that the CTP functions to target a passenger protein to the chloroplast and is then removed to release an active polypeptide: "The CTP leader sequence causes the polypeptide to be imported into chloroplasts, and *the CTP* leader sequence encoded by the plant-derived EPSPS gene is believed to be *removed from the remainder of the polypeptide* so that an active portion of the EPSPS polypeptide exists and functions inside the chloroplast." Ex. 3 at col. 4:28-34 (emphasis added).

In addition, Examples 18 and 19 of the '835 patent specifically disclose the removal of the CTP from the EPSPS protein to which it is attached. *Id.* at Example 18, col. 30:3-5; Example 19, col. 31:8-12. In fact, the success of these experiments was determined by the presence of the EPSPS protein, cleaved from its CTP, in the stroma of the chloroplast. *Id.*

Those skilled in the art also understood, as set forth in the '835 patent, that a defining feature of a CTP is that it is removed from the mature protein. Perhaps the best evidence of this point is the testimony of Monsanto's own expert, Dr. Keegstra, who testified in the *Monsanto Co. v. Bayer CropScience LP* case. During his deposition in both the previous case and this case, Dr. Keegstra testified

3/25/03 Depo. Tr. of K. Keegstra (Ex. 38) at 55; Ex. 37 at 45, 50-51. Having chosen to define the CTP functionally rather than structurally, the functional aspect of cleavage must be considered in order to assess that the particular element *is* a transit peptide.

Further, Dr. Keegstra confirmed that his understanding was in accordance with the specific language of the '835 patent:

DB01:1959785.1                    **Redacted**                    059155.1008

REDACTED VERSION – PUBLICLY FILED

Ex. 37 at 149-50 (emphasis added); *see also*, Ex. 36 at 31:1 to 32:22. Thus, the specification of the '835 patent, supported by the understanding of those skilled in the art at the time, demonstrates that defining features of the CTP are that it targets the EPSPS to the chloroplast and is then removed (or cleaved) to yield a mature EPSPS protein.

Monsanto contends that cleavage or removal is not a defining feature of the CTP, apparently basing its argument on the decision of the Missouri district court in the prior case. The court, however, did not hold that cleavage was not part of the definition of a CTP. In that case, Bayer and Monsanto disputed the meaning of the term "import" in claim 1. Bayer argued that the phrase "permits the fusion polypeptide to be imported into a chloroplast of a plant cell" meant that the entire CTP/EPSPS needed to be imported into the chloroplast intact. Ex. 34 at 169-71. The Missouri district court disagreed, stating that "I think when the patent is read as a whole, it is clear that Monsanto was claiming the process of getting this fusion gene into the chloroplast, and whichever of the two ways it worked, once it began to enter the chloroplast, both are covered, and the important thing is the business gets in, *not the timing of the cleavage of the CTP from the EPSPS, and that's really what his issue is about. It's not about importing.*

33

**Redacted**

059155.1008

REDACTED VERSION – PUBLICLY FILED

3.    **The CTP Must Be Cleaved (or Removed) from the Mature EPSPS**

The '835 patent states that the CTP functions to target a passenger protein to the chloroplast and is then removed to release an active polypeptide: "The CTP leader sequence causes the polypeptide to be imported into chloroplasts, and *the CTP* leader sequence encoded by the plant-derived EPSPS gene is believed to be *removed from the remainder of the polypeptide* so that an active portion of the EPSPS polypeptide exists and functions inside the chloroplast." Ex. 3 at col. 4:28-34 (emphasis added).

In addition, Examples 18 and 19 of the '835 patent specifically disclose the removal of the CTP from the EPSPS protein to which it is attached. *Id.* at Example 18, col. 30:3-5; Example 19, col. 31:8-12. In fact, the success of these experiments was determined by the presence of the EPSPS protein, cleaved from its CTP, in the stroma of the chloroplast. *Id.*

Those skilled in the art also understood, as set forth in the '835 patent, that a defining feature of a CTP is that it is removed from the mature protein. Perhaps the best evidence of this point is the testimony of Monsanto's own expert, Dr. Keegstra, who testified in the *Monsanto Co. v. Bayer CropScience LP* case. During his deposition in both the previous case and this case, Dr. Keegstra testified

3/25/03 Depo. Tr. of K. Keegstra (Ex. 38) at 55; Ex. 37 at 45, 50-51. Having chosen to define the CTP functionally rather than structurally, the functional aspect of cleavage must be considered in order to assess that the particular element *is* a transit peptide.

Further, Dr. Keegstra confirmed that his understanding was in accordance with the specific language of the '835 patent:

32

**Redacted**

REDACTED VERSION – PUBLICLY FILED

Ex. 37 at 149-50 (emphasis added); *see also*, Ex. 36 at 31:1 to 32:22. Thus, the specification of the '835 patent, supported by the understanding of those skilled in the art at the time, demonstrates that defining features of the CTP are that it targets the EPSPS to the chloroplast and is then removed (or cleaved) to yield a mature EPSPS protein.

Monsanto contends that cleavage or removal is not a defining feature of the CTP, apparently basing its argument on the decision of the Missouri district court in the prior case. The court, however, did not hold that cleavage was not part of the definition of a CTP. In that case, Bayer and Monsanto disputed the meaning of the term "import" in claim 1. Bayer argued that the phrase "permits the fusion polypeptide to be imported into a chloroplast of a plant cell" meant that the entire CTP/EPSPS needed to be imported into the chloroplast intact. Ex. 34 at 169-71. The Missouri district court disagreed, stating that "I think when the patent is read as a whole, it is clear that Monsanto was claiming the process of getting this fusion gene into the chloroplast, and whichever of the two ways it worked, once it began to enter the chloroplast, both are covered, and the important thing is the business gets in, *not the timing of the cleavage of the CTP from the EPSPS, and that's really what his issue is about. It's not about importing.*

**Redacted**    059155.1008

*Its really an issue about when does cleavage occur, and nothing in the word importing suggests that that's an issue covered by the patent.*" *Id.* at 171 (emphasis added).

Thus, the Missouri court held that, in construing the term "import," it was not relevant when the cleavage took place. Syngenta agrees that the timing of the cleavage is not important. However, this very language indicates that *cleavage of the CTP does in fact take place.* Indeed, there was no question in the prior case that cleavage was an integral part of the CTP as both experts believed that to be the case, and neither party argued to the contrary. Since the question of whether cleavage was required for a CTP was not at issue during the prior litigation, Monsanto's argument that the court construed the term CTP to exclude the cleavage step is illogical. Thus, as both the specification and the expert testimony demonstrate that those skilled in the art as of the 1985-86 time frame understood that the CTP must be removed (or cleaved) from the mature protein, this Court should interpret the term CTP as a naturally occurring amino acid sequence that is located at the N-terminal of a protein that functions to target the EPSPS protein to the chloroplast and is cleaved to leave the mature protein.

C.    **A Fusion Polypeptide Is a Chain of Amino Acids Consisting of a CTP Fused to an EPSPS, Where the CTP and EPSPS Are Not Found Together in Nature**

1.    **The Missouri Court's Claim Construction**

Claim 1 of the '835 patent recites a coding sequence "which causes the production of RNA encoding chloroplast transit peptide/5-enolpyruvylshikimate-3-phosphate synthase ["EPSPS"] *fusion polypeptide.*" Ex. 3 at claim 1 (emphasis added). A CTP/EPSPS fusion polypeptide is a chain of amino acids consisting of a CTP fused to an EPSPS, where the CTP and EPSPS do not occur together in nature. In other words, whereas the CTP itself must be naturally occurring (see above), the fusion of the CTP with the EPSPS gene forms a synthetic product and *not* one that occurs naturally.

34

REDACTED VERSION – PUBLICLY FILED

This specific claim construction was made by the Missouri district court after a *Markman* hearing where the court considered the claim language, the '835 patent specification, and relevant expert testimony. Ex. 34 at 162-63. Based on all this evidence, the court held that the term CTP/EPSPS fusion polypeptide means "a polypeptide that has at least two parts which must include a [CTP] as defined already joined to an EPSPS where the [CTP] and EPSPS are not found together in nature." *Id.* at 168:2-9. The court stated that "I thought this issue was going to the be the hardest one to decide, but as I just discussed, I don't think it was. I don't think this was a close call." *Id.* at 168.

The court began its analysis—as set forth in *Phillips*—by examining the plain language of the claim. The court found that the lay definition of the word "fusion," the understanding of scientists in the field, and the dictionary definition all pointed to *same meaning*:

> To put it simply as possible, "fusion" in this patent means what most people think it means. Lay people like me think fusion means putting different things together. Scientists in this field think it means putting different things together. The dictionary thinks "fusion polypeptide" or "fusion protein" means a protein created out of two genetically different things, in other words, a protein created in a non-natural process, i.e. fused, which contains amino acid sequences from distinct proteins. Even Monsanto's expert witness agrees that that's what it normally means.

*Id.* at 168:13-22. The court then rejected Monsanto's argument that it had used the term "fusion polypeptide" in the specification in a special way. "Monsanto more or less argues that it was being its own lexicographer here, or it was using the term in a very special way, and although I recognize that a patent can use a word in other than its normal meaning, it's supposed to be very clear when it does that, and here it certainly is not clear, and I don't believe that it's even implicit in the language or the history." *Id.* at 168-69.

Considering the patent specification, the court found that the '835 "patent teaches putting different things together. It did not just describe what naturally occurs in the all plant cells, so I

think the CTP/EPSPS fusion polypeptide referred to in these claims is something created from a CTP and an EPSPS that do not occur together in nature." *Id.* at 169. The court also examined the prosecution history in reaching its decision:

> Monsanto, not the patent examiner, first used the term in the original application, and when Monsanto used it the first time, it used it with the plain and ordinary meaning of the definition I've adopted here. *Everyone agrees that a naturally occurring EPSPS has a CTP, and nobody refers to those naturally occurring things as fusion polypeptides.*"

*Id.*

### 2. The Missouri Court Was Correct

The Missouri court was correct in its claim construction as the language of the claim as understood by those of ordinary skill, the patent specification, and the prosecution history establish that the term fusion polypeptide refers to synthetic combination of CTP and EPSPS sequences that do not occur together in nature.

#### a. The Claim Language Supports the Missouri Court's Claim Construction

Perhaps the best evidence of the plain meaning of the term "fusion polypeptide" comes from the testimony of Monsanto's own expert, Dr. Keegstra. Claim language is examined from the perspective of one of ordinary skill in the art. *Phillips*, 415 F.3d at 1313. As discussed above, Dr. Keegstra was Monsanto's expert in the Missouri action and also here in this case. Dr. Keegstra testified at his deposition in the prior litigation that a

Ex. 38 at 101:20 to 103:12

(emphasis added). In addition, during the prior *Markman* hearing, Dr. Keegstra reiterated that "[m]ost people use 'fusion' to designate things that are synthetically joined together, and not naturally joined together." Ex. 34 at 67. "I think I said earlier that [fusion] is not the term that I would have used in describing [the fusion polypeptides of the '835 patent] . . . . It is not the

36

**Redacted**

normal -- the most common use of the term 'fusion polypeptide' or 'fusion protein.'" Ex. 34 at

97. Dr. Keegstra confirmed in this case that the term "fusion polypeptide" does not, by plain and

ordinary usage, designate a naturally occurring CTP/EPSPS protein, and that he was unaware of

any publication where either he or anyone else used the term "fusion polypeptide" to refer to a

naturally occurring protein. Ex. 37 at 65-68. Dr. Barry Bruce (Syngenta's expert) likewise

expresses the opinion that a fusion polypeptide means that the two parts do not occur together in

nature. Ex. 36 at 59-61. Thus, this is not even a situation in which there is a dispute between the

experts concerning the normal and plain meaning of the term "fusion" in the claim phrase

"fusion polypeptide."

> **b.    The Specification and Prosecution History Confirm that
> the CTP and EPSPS in the Fusion Polypeptide Come
> From Different Sources**

As mentioned above, the Missouri court found "Monsanto, not the patent examiner, first

used the term in the original application, and when Monsanto used it the first time, it used it with

the plain and ordinary meaning of the definition I've adopted here." Ex. 34 at 169. Again, the

Missouri court was correct.

The original priority applications for the '835 patent (filed August 1985 and October

1985) specifically state:

> Although it is not known whether a *fusion peptide* comprising (1) a *CTP
> sequence derived from a heterologous protein* such as ssRUBISCO, *coupled to
> (2) a mature EPSPS sequence derived from a bacterial or plant cell,* might
> confer some degree of glyphosate resistance upon a transformed cell, removal of
> the CTP leader sequence from the mature EPSPS sequence is preferred.

U.S. Application No. 763,482 (Ex. 39) at 0005012:16-23; U.S. Application No. 792,390 (Ex. 40)

at 0005107:16-23. In these applications a "fusion peptide" was unambiguously defined as a CTP

from a source different than the source of the EPSPS. And that definition carries over to

specification of the '835 patent. For example, the specification states that:

37

REDACTED VERSION – PUBLICLY FILED

> the EPSPS gene of the present invention encodes an *CTP/EPSPS fusion polypeptide*. After the CTP/EPSPS polypeptide from a gene of this invention is translated from mRNA in the cytoplasm of the transformed plant cell, it is believed to be processed in the same manner as the *natural EPSPS polypeptide*.

Ex. 3 at col. 4:23-28. Thus the specification distinguishes between the *naturally occurring* EPSPS polypeptide having its native CTP and a "CTP/EPSPS fusion polypeptide" where the CTP and EPSPS portions are from different sources.

Whenever the specification uses the terms "fusion" or "fused," it describes the fusion of a CTP and EPSPS from different sources, i.e., heterologous. *See, e.g.*, Ex. 3 at col. 30:45-58 ("The following EPSPS experiments show that the CTP can target a heterologous protein to the stroma compartment. The 72-amino-acid transit peptide of EPSPS was *fused* to the mature ssRUBISCO from wheat . . . . The mature ssRUBISCO cDNA fragment was *fused* behind the *P. hybrida* EPSPS CTP cDNA fragment. This *fusion* was done by joining an EcoRI/SphI fragment of pMON6242 with the wheat ssRUBISCO cDNA.").

In addition, there are only two constructs specifically named in the patent that are used to transform dicot plant cells to enhance their glyphosate resistance. One of these constructs, pMON546, contains the natural petunia CTP/EPSPS gene, which does not encode a fusion polypeptide. pMON546 was used in Examples 2-4 of the '835 patent. *See* Ex. 3 at Examples 2-4.[14] The other construct used by Monsanto to transform plant cells was pMON542. This construction contains the petunia CTP "fused" to a bacterial EPSPS gene, which does encode a fusion protein. 5/1/85 Plant Mol. Bio. Monthly Report (Ex. 41)

pMON542 was used in Examples 8-9 of the '835 patent. *See* Ex. 3 at col. 23:40-45

---

[14] Examples 5-7 are prophetic examples and do not identify a specific plasmid for the transformation, only that the plasmid is similar to pMON546. Example 10 is also a prophetic example teaching the use of pMON546. Examples 11-13 describe glyphosate-resistant plants regenerated from cells transformed with pMON546.

38

**Redacted**

and col. 23:53-58. It is clear from the evidentiary record in the case (as will be pursued in

Syngenta's best mode defense) that Monsanto knew that pMON542 provided superior

glyphosate resistance over pMON546. *See*                                          (Ex. 42)


        Thus, it was perfectably reasonable for Monsanto to direct claim 1 to CTP/EPSPS

fusion polypeptides as opposed to naturally occurring CTP/EPSPS sequences. Indeed, neither of

the original applications had contained a claim specifically directed to a fusion polypeptide

because the inventors had not yet established that they could achieve expression of a CTP/EPSPS

fusion polypeptide where the CTP portion and EPSPS portion were from different sources. Ex.

39 at 0005038-41; Ex. 40 at 0005133-36; Ex. 41 at MRR002678. It was only when Example 8

of the '835 patent was added, which clearly shows transformation (of a dicot plant, not a

monocot) using a fusion polypeptide, that Monsanto amended claim 1 to include the fusion

polypeptide language. U.S. Application No. 879,814 (Ex. 43) at 0005246-50; 1/21/88

Amendment A in U.S. Application No. 879,814 (Ex. 44) at 0005315. Therefore, claim 1 is

expressly limited to a CTP/EPSPS *fusion polypeptide*, which is a synthesized rather than a

natural polypeptide.

    **D.**    **The Phrase "Enhance the Glyphosate Resistance of a Plant Cell"**
            **Means the Plant Cell Will Survive Application of Glyphosate at a**
            **Concentration Sufficient to Select a Transformed Plant Cell From a**
            **Non-Transformed Plant Cell**

    Claim 1 of the '835 patent states that the chimeric plant gene must enhance the

glyphosate-resistance of a plant cell transformed with the gene. *See* Ex. 3 at claim 1. The

phrase "enhance the glyphosate resistance of a plant cell" in the context of the '835 patent

means using glyphosate as a means to "select" those cells that have been transformed. As set

REDACTED VERSION – PUBLICLY FILED

forth in the specification, "a EPSPS gene 'confers a substantial degree of glyphosate resistance upon a plant cell' if it allows a *selectable* fraction of a culture of transformed plant cells to survive a concentration of glyphosate which kills essentially all untransformed cells from the same type of plant under the same conditions." Ex. 3 at col. 5:61-66 (emphasis added).

Moreover, in Examples 2-13, the inventors selected transformed dicot plant cells or plants using glyphosate at a concentration sufficient to allow transformed cells to survive, while killing untransformed cells. *See, e.g.*, Ex. 3 at col. 16:51-63; col. 23:50-44. Thus, Examples 2-13 demonstrate that plant cells transformed with the chimeric plant gene exhibit "enhanced glyphosate resistance" when they survive selection using a concentration of glyphosate that otherwise kills untransformed plant cells.

## VII.    CONCLUSION

For the reasons given above, Syngenta requests that the Court construe the Lundquist and Shah patent terms-at-issue as set forth herein.

Respectfully submitted,

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
YOUNG CONAWAY STARGATT &
    TAYLOR, LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19899-0391
(302) 571-6600
jshaw@ycst.com

Of counsel:
Michael J. Flibbert
Howard W. Levine
Sanya Sukduang
FINNEGAN, HENDERSON, FARABOW,
    GARRETT & DUNNER, L.L.P.
901 New York Avenue, N.W.
Washington, D.C. 20001
(202) 408-4000

Dated: January 11, 2006

Attorneys for Defendants

40

REDACTED VERSION – PUBLICLY FILED

### CERTIFICATE OF SERVICE

I hereby certify that on January 11, 2006, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Richard L. Horwitz, Esquire
> Potter Anderson & Corroon LLP
> Hercules Plaza
> 1313 North Market Street
> Wilmington, DE 19899-0951

I further certify that on January 11, 2006, copies of the foregoing document were served by hand delivery on the above listed counsel and on the following non-registered participants in the manner indicated below:

**BY FEDERAL EXPRESS**

Peter E. Moll, Esquire
Howrey Simon Arnold & White, LLP
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004

Susan Knoll, Esquire
Howrey Simon Arnold & White, LLP
1111 Louisiana, 25th Floor
Houston, TX 77002-5242

Kenneth A. Letzler, Esquire
Arnold & Porter LLP
555 12th Street, N.W.
Washington, D.C. 20004

YOUNG CONAWAY STARGATT & TAYLOR, LLP

John W. Shaw (No. 3362)
Rolin P. Bissell (No. 4478)
Karen E. Keller (No. 4489)
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19801
(302) 571-6600
jshaw@ycst.com

*Attorneys for Syngenta Seeds, Inc., Syngenta Corporation,
Syngenta Biotechnology, Inc., Advanta USA, Inc., Garst
Seed Company, and Golden Harvest Seeds, Inc.*

DB01:1611981.1

## CERTIFICATE OF SERVICE

I hereby certify that on January 19, 2006, I caused to be electronically filed a true and correct

copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification

that such filing is available for viewing and downloading to the following counsel of record:

> Richard L. Horwitz, Esquire
> Potter Anderson & Corroon LLP
> Hercules Plaza
> 1313 North Market Street
> Wilmington, DE 19899-0951

I further certify that on January 19, 2006, copies of the foregoing document were served by hand

delivery on the above listed counsel and on the following non-registered participants in the manner

indicated below:

### BY FEDERAL EXPRESS

Peter E. Moll, Esquire
Howrey Simon Arnold & White, LLP
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004

Kenneth A. Letzler, Esquire
Arnold & Porter LLP
555 12th Street, N.W.
Washington, D.C. 20004

Susan Knoll, Esquire
Howrey Simon Arnold & White, LLP
1111 Louisiana, 25th Floor
Houston, TX 77002-5242

YOUNG CONAWAY STARGATT & TAYLOR, LLP

_____
John W. Shaw (No. 3362)
Rolin P. Bissell (No. 4478)
Karen E. Keller (No. 4489)
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19801
(302) 571-6600
jshaw@ycst.com

*Attorneys for Syngenta Seeds, Inc., Syngenta Corporation,
Syngenta Biotechnology, Inc., Advanta USA, Inc., Garst
Seed Company, and Golden Harvest Seeds, Inc.*