8

1              IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
2                    WESTERN DIVISION

3   DEKALB GENETICS CORPORATION, )        Docket No. 04 C 50323
                                 )
4                  Plaintiff,    )        Rockford, Illinois
                                 )        Monday, May 16, 2005
5                                )        1:30 o'clock p.m.
                                 )
6              v.                )
                                 )
7   SYNGENTA SEEDS, INC., et al.,)
                                 )
8                  Defendants.   )

8                    TRANSCRIPT OF PROCEEDINGS
9          BEFORE THE HONORABLE P. MICHAEL MAHONEY

10  APPEARANCES:

11  For the Plaintiff:        HOWREY, SIMON, ARNOLD & WHITE
                              (750 Bering Drive,
12                             Suite 400,
                               Houston, Texas  77057) by
13                            MR. THOMAS A. MILLER
                              MR. SCOTT W. CLARK
14
                              WILLIAMS & MC CARTHY
15                             (321 West State Street,
                               Suite 400,
16                             Rockford, Illinois  61101) by
                              MR. JOHN J. HOLEVAS
17
     For the Defendant:        CASSIDAY, SCHADE & GLOOR
18                             (20 North Wacker Drive,
                               Suite 1040,
19                             Chicago, Illinois  60606-2903) by
                              MR. DAVID C. VAN DYKE
20
                              FINNEGAN, HENDERSON, FARABOW,
21                            GARRETT & DUNNER
                              (901 New York Avenue, N.W.,
22                             Washington, D.C.  20001-4413) by
                              MR. MICHAEL J. FLIBBERT
23
     Court Reporter:           Mary T. Lindbloom
24                            211 South Court Street
                              Rockford, Illinois  61101
25                            (815) 987-4486

2

1      (The following is from a tape-recording of proceedings:)

2      THE COURT:  All right, counsels.  04 C 50323,

3   DeKalb v. Syngenta.  I would ask counsel, starting with DeKalb,

4   to please identify themselves for the record.

5      MR. MILLER:  Good afternoon, your Honor.  Tom Miller

6   with Howrey for plaintiff, DeKalb.

7      MR. CLARK:  Scott Clark with Howrey for DeKalb.

8      THE COURT:  Good afternoon, counsels.

9      MR. HOLEVAS:  John Holevas, Williams & McCarthy, for

10  DeKalb, your Honor.

11     THE COURT:  Good afternoon, counsel.

12     MR. FLIBBERT:  Mike Flibbert from Finnegan Henderson

13  for defendants, your Honor.

14     THE COURT:  Good afternoon, counsel.

15     MR. FLIBBERT:  Good afternoon.

16     MR. VAN DYKE:  Hi, Judge.  David Van Dyke on behalf of

17  the defendants.

18     THE COURT:  Good afternoon, counsels.

19     I've got a couple things that you've given me.  Some

20  you're taking back, as near as I can tell.  But why don't,

21  first of all, since I believe Magistrate Schenkier handled you

22  all last time, why don't you give me an overview as far as

23  where you both believe the case is as far as going ahead.

24     I understand there still is a motion pending in front

25  of the district court for transfer of venue.  Technically I

1    MR. MILLER:  All right, your Honor.  I'll give it a

2  whack this time.

3    We're really not talking about the product, although

4  ultimately when we're talking about information that we want,

5  we're calling it non-GA21.  That's the easiest way to describe

6  it because they did try to make their own glyphosate-resistant

7  corn product.

8    The claims that are involved in this patent -- and

9  they are attached to the briefing, I think -- if you look at

10  the '880 patent, the dependent claim, the first dependent claim

11  that we're seeking to enforce, is a process for making a

12  progeny plant.  That's exactly what Syngenta people are doing

13  right now.

14    THE COURT:  But when you say that, counsel, isn't it a

15  particular process for making the plant?  It can't be just any

16  process.

17    MR. MILLER:  It requires, your Honor, that it be made

18  from a plant that was transformed using the bombardment

19  process.

20    THE COURT:  Well, if they don't use the bombardment

21  process in this entire experiment, how can it relate to your

22  patent?

23    MR. MILLER:  Because, your Honor, the claim only says

24  that the plant that they start with to make progeny plants must

25  have been made at some point in time by a bombardment process.

9

Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge ,or Magistrate Judge | Philip G. Reinhard | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 96 C 50112 | DATE | 9/17/1999 |
| CASE TITLE | DeKalb Genetics Corp. vs. Pioneer Hi-Bred Int'l Inc. | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ☒ [Other docket entry]    The court hereby adopts all of the findings in the special master's Report and Recommendation as the findings of the court. Pioneer's request for an oral hearing on the issue of claim construction is denied.

(11) ☒ [For further detail see order on the reverse side of the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| | | | date mailed notice | |
| SW | courtroom deputy's initials | | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

DEPOSITION EXHIBIT
5
Ward
12-14-05
PENGAD 800-531-6989

(Reserved for use by the Court)

## ORDER

Seven patent infringement suits, in which DeKalb Genetics Corporation is the plaintiff, were referred on January 4, 1999, to Special Master Robert L. Harmon, who was approved by all the parties, pursuant to Fed. R. Civ. P. 53. The order of reference specified that the special master would "report to this court and the parties his conclusions, and the reasons for them, regarding the meaning of any disputed term in any allegedly infringed claim of the following patents: U.S. Patent Nos. 5,484,956; 5,489,520; 5,538,877; and 5,538,880." Order of Reference, ¶ 3, DeKalb Genetics Corp. v. Pioneer Hi-Bred Int'l, Inc., 96 C 50112 (N.D. Ill. Jan. 4, 1999). The special master held an evidentiary hearing on May 25-28, 1999, in which six expert witnesses testified and extensive attorney argument was heard. The parties filed extensive briefs both before and after the hearing. The special master's lengthy and comprehensive Report and Recommendation regarding claim construction was received by the court on June 30, 1999. All parties have filed objections to various aspects of the Report and Recommendation, but it is not necessary for the court to specifically address each objection. Suffice it to say, all counsel for all parties are knowledgeable and have been very thorough in presenting their arguments to the court.

The court, not the jury, has the power and obligation to construe as a matter of law the meaning of language used in patent claims. Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995) aff'., 517 U.S. 370 (1996). This court has reviewed de novo the thorough Report and Recommendation, the objections thereto filed by the parties, the transcripts of the evidentiary hearing and the patents and their prosecution histories. The court hereby adopts all of the findings in the special master's Report and Recommendation as the findings of the court. See Fed. R. Civ. P. 52.

Mycogen and Pioneer's requests for oral hearings on the issue of claim construction are denied as neither seek to submit additional evidence, but rather to argue legal positions already clear to the court.

**10**



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

DEKALB GENETICS CORPORATION,   )   Civil Actions  96 C 50112
                      )                 96 C 50114
Plaintiff,           )                 96 C 50169
                      )                 96 C 50239
v.                )                 96 C 50241
                      )                 96 C 50284
PIONEER HI-BRED INTERNATIONAL, INC.,  )                 98 C 50186
MYCOGEN CORPORATION, including its   )
Operating subsidiaries AGRIGENETICS, INC. and )
MYCOGEN PLANT SCIENCES, INC.,     )   Judge Philip G. Reinhard
CIBA-GEIGY CORPORATION, and NORTHRUP )   Magistrate P. Michael Mahoney
KING CO. (formerly Sandoz Seeds Co.),     )   Special Master Robert L. Harmon
                      )
Defendants.           )   Transgenic Corn Patent Litigation

---

## REPORT AND RECOMMENDATION
## OF SPECIAL MASTER
## REGARDING CLAIM CONSTRUCTION

These seven civil actions are related by the fact that each involves an assertion of

infringement of one or more of four United States patents owned by plaintiff DeKalb Genetics

Corporation (DeKalb). The patents are in the field of genetic engineering and address the

production of transgenic corn. The four principal defendants are Pioneer Hi-Bred International,

Inc. (Pioneer), Northrup King Co. (NK), Ciba Geigy Corporation (Ciba), and Mycogen

Corporation (Mycogen).

In an Order of Reference dated January 4, 1999, the Court appointed the undersigned as

Special Master (SM) in these cases pursuant to Rule 53, FRCP. The specific purpose of the

reference was to have the SM provide a recommended construction of the claims of the patents

in suit. Under the express terms of the Order, the SM has "all of the powers described in Rule 53

of Fed. R. Civ. P., to conduct an evidentiary hearing on the record to hear and recommend to the

Report and Recommendation of Special Master Regarding Claim Construction          Page 2
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

Court the resolution of all issues of interpretation of the claims of the patents-in-suit, as provided

for in *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995), *aff'd.*, 517 U.S. 370,

116 S.Ct. 1384 (1996)," and "is not limited by any prior rulings of Judge Reinhard or Magistrate

Mahoney."

A four-day hearing was held in Chicago, Illinois on May 25-28, 1999. Live witness

testimony was received from six expert witnesses, each with a Ph.D. in biological science and

each with substantial experience and achievement in technical areas pertinent to the technology

of the patents in suit. Their testimony was helpful in assisting the SM to acquire sufficient

understanding of that technology to inform and enable the claim construction exercise. In

addition, counsel explained the prosecution histories of the patents and attempted to demonstrate

how the transactions reflected there supported their positions on claim interpretation. Extensive

attorney argument was entertained throughout the hearing. Massive written submissions were

filed preceding and subsequent to the hearing. Upon full consideration of all matters raised

during those proceedings, this report is respectfully submitted in response to the Court's directive

to recommend a construction of the claims of the patents in suit.

## GOVERNING LEGAL PRINCIPLES

### The Legal Framework for Claim Construction

Proper claim construction necessarily precedes a determination of whether the claims

read on the accused devices or methods for infringement purposes.[1] Indeed, claim construction

---

[1] E.g., Fonar Corp. v. Johnson & Johnson, 821 F.2d 627, 3 USPQ2d 1109, 1112 (Fed. Cir. 1987)

PAGE.04                212937300                                                MAY 22 2002 12:24

Report and Recommendation of Special Master Regarding Claim Construction                **Page 3**
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

will normally control the remainder of the decisional process,[2] for it is axiomatic that the claims

must be construed in the same way for infringement that they are for determining validity.[3]

In the Markman case, supra, the Supreme Court held that interpretation of patent claims

is a question for the court, while application of properly construed claims to determine

infringement is a question for the finder of fact, in this case the jury. As a starting point, the

words in a patent claim should be given their ordinary and customary meaning unless it appears

from the specification that the patentee defined them otherwise.[4] Nonetheless, when technical or

scientific terms in the claims require definition or explanation or understanding in the course of

deciding whether the claims are infringed, it is the court's responsibility to undertake that task.[5]

In discharging its Markman responsibility, the court must inevitably decide what the scope

of the underlying evidentiary inquiry will be. The Federal Circuit explained this decisional

process in Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 39 USPQ2d 1573 (Fed. Cir.

1996). Ordinarily, the court should confine itself, if possible, to an examination of the intrinsic

patent documents: the patent itself and its prosecution history. In most situations, an analysis of

the intrinsic evidence alone will resolve any ambiguity in a disputed claim element. In those

cases where the public record unambiguously describes the scope of the patented invention,

reliance on any extrinsic evidence is improper. Only if there is still some genuine ambiguity in

the claims, after consideration of all available intrinsic evidence, should the court resort to

extrinsic evidence such as expert testimony. And even if the judge decides to hear all possible

evidence before construing the claims, expert testimony inconsistent with the intrinsic evidence

[2] Panduit Corp. v. Dennison Mfg. Co., 810 F.2d 1561, 1 USPQ2d 1593, 1597 (Fed. Cir. 1987).
[3] E.g., Intervet America, Inc. v. Kee-Vet Labs., Inc., 887 F.2d 1050, 12 USPQ2d 1474, 1476 (Fed. Cir. 1989). It is
recommended that the jury be so instructed.
[4] E.g., York Prods. Inc. v. Central Tractor F&F Center, 99 F.3d 1568, 40 USPQ2d 1619, 1622 (Fed. Cir. 1996).
Statements in the prosecution history are also pertinent; for example, a clear disavowal of claim coverage can limit
the construction of the claim. Id. at 1624.
[5] Fromson v. Anitec Printing Plates Inc., 132 F.3d 1437, 45 USPQ2d 1269, 1271 (Fed. Cir. 1997).

PAGE.05    21293772300                                                  MAY 22 2002 12:24

Report and Recommendation of Special Master Regarding Claim Construction                    **Page 4**
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

should be accorded no weight. Extrinsic evidence in general, and expert testimony in particular,

may be used only to help the court come to the proper understanding of the claims; it may not be

used to vary or contradict the claim language. Nor may it contradict the import of other parts of

the specification. Nor may the inventor's subjective intent as to claim scope, when unexpressed

in the patent documents, have any effect.

As indicated, the parties called six highly articulate and qualified experts in biological

science. In considering the evidence adduced through these witnesses, the SM was constantly

mindful of the Federal Circuit's clear direction in Bell & Howell Doc. Man. Prod. Co. v. Altek

Sys., 132 F.3d 701, 45 USPQ2d 1033, 1038 (Fed. Cir. 1998):

> Once a dispute over claim construction arises, "experts" should also not be heard to inject
> a new meaning into terms that is inconsistent with what the inventor set forth in his or her
> patent and communicated, first to the patent Examiner and ultimately to the public.
> Patents should be interpreted on the basis of their intrinsic record, not on the testimony of
> such after-the-fact "experts" that played no part in the creation and prosecution of the
> patent. * * * Use of expert testimony to explain an invention may be useful. But reliance
> on extrinsic evidence to interpret claims is proper only when the claim language remains
> genuinely ambiguous after consideration of the intrinsic evidence, Vitronics, 90 F.3d at
> 1584, 39 USPQ2d at 1578, i.e., when the intrinsic evidence is "insufficient to enable the
> court to construe disputed claim terms." Id. at 1585, 39 USPQ2d at 1579. Accordingly,
> any expert testimony that is inconsistent with unambiguous intrinsic evidence should be
> accorded no weight. * * *

These admonitions have conditioned the methodology employed in this proceeding. The

parties have submitted extensive extrinsic evidence, and the SM has been willing, within reason,

to consider all such evidence. In the end, however, apart from whatever benefit this evidence

may have provided in gaining an understanding of the technology at hand, it has not been relied

upon in construing the claims.[6] All potential ambiguities in the claim language itself were

resolvable by reference to the intrinsic patent documents.

---

[6] See Mantech Environmental Corp. v. Hudson Environmental Serv. Inc., 152 F.3d 1368, 47 USPQ2d 1732, 1737
(Fed. Cir. 1998), where the Federal Circuit held that "the district court was legally correct both in admitting and

PAGE.06                 21293773200                              MAY 22 2002 12:25

Report and Recommendation of Special Master Regarding Claim Construction          **Page 5**
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

The SM is also mindful of the admonition of the Federal Circuit that "claim construction is not an obligatory exercise in redundancy," and that it is unnecessary to repeat or restate every claim term in order to comply with the Markman directive that claim construction is a matter for the court.[7] Such an approach would carry the very real potential of confusing rather than enlightening the jury.[8] Thus, where terms are expressly defined in the patent specification, it is sufficient simply to refer the jury to that definition; the court can decide at the time of trial whether explanatory technical testimony would be necessary or, indeed, helpful at all. And where a term is not defined or used in a special way in the specification, and is otherwise unambiguous, the jury should be instructed to give the term its ordinary meaning and will presumably require no additional assistance.

It is also important to understand that claim construction is an obligation of the court that is independent of the views asserted by the adversary parties.[9] Among them, the parties have requested consideration and construction of many, but not all, of the elements of the claims of the patents in suit. The SM has considered each claim as a whole, and each element of each claim, and has recommended a specific interpretation of those terms and phrases, and only those terms and phrases, that require construction. Accordingly, to the extent various claim elements are not addressed in this report, it may be assumed that the SM is recommending that they be

---

accepting the testimony of the parties' expert witnesses 'for the purpose of background in the technical area at issue,' * * * and then basing its claim construction solely upon intrinsic evidence. Although this information always may be admitted by the trial court to educate itself about the patent and the relevant technology, the claims and the written description remain the primary and more authoritative sources of claim construction. Thus, they always must be considered and where clear must be followed." See also Key Pharm. Inc. v. Hercon Labs. Corp., 161 F.3d 709, 48 USPQ2d 1911 (Fed. Cir. 1998).

[7] United States Surgical Corp. v. Ethicon, Inc., 103 F.3d 1554, 41 USPQ2d 1225, 1236 (Fed. Cir. 1997).

[8] For example, repeatedly instructing a jury that an ordinary English word does not really mean what they think it does, but instead has the meaning of some synonym, can only cause confusion. If they meant not the one but the other, why did the inventors and their attorneys not use the other? This is a question no jury should have to concern itself with.

[9] Exxon Chem. Patents Inc. v. Lubrizol Corp., 64 F.3d 1553, 35 USPQ 1801, 1802 (Fed. Cir. 1995).

PAGE.07    212937300                                    MAY 22 2002 12:25

Report and Recommendation of Special Master Regarding Claim Construction          Page 6
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

grouped in the category of claim elements that need no construction, and that would be subject to

a general jury instruction concerning application of ordinary English usage.  Similarly, this

report is not to be viewed as reflecting an acceptance or endorsement by the SM of any proposed

construction of either party, unless it expressly so states.  Once again, if the report is silent as to a

particular element, that means only that the SM is suggesting that no construction is necessary,

regardless of what a party may have offered as a proposed construction.

## The Timing of the Inquiry

There is a threshold question in the claim construction analysis that requires some

consideration.  It is the person of ordinary skill in the field of the invention through whose eyes

the claims are construed.  Such person is deemed to read the words used in the patent documents

with an understanding of their meaning in the field, and to have knowledge of any special

meaning and usage in the field.  The inventor's words that are used to describe the invention –

the inventor's lexicography – must be understood and interpreted by the court as they would be

understood and interpreted by a person in that field of technology.  Thus the court starts the

decisionmaking process by reviewing the same resources as would that person, viz., the patent

specification and the prosecution history. These documents have legal as well as technological

content, for they show not only the framework of the invention as viewed by the inventor, but

also the issues of patentability as viewed by the patent Examiner.[10]

But this does not resolve the timing of the inquiry.  An important question remains: as of

what date must the court step into the shoes of the person skilled in the art?  To put it another

way, what is the state of knowledge, viewed chronologically, possessed by such a person when

the claim construction exercise is performed?  Surprisingly, the law on this seemingly

---

[10] Multiform Desiccants Inc. v. Medzam Ltd., 133 F.3d 1473, 45 USPQ2d 1429, 1432 (Fed. Cir. 1998).

PAGE.08          212937300                                                    MAY 22 2002 12:25

Report and Recommendation of Special Master Regarding Claim Construction          **Page 7**
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

fundamental point is not crystal clear. In Markman[11] itself, the Federal Circuit said "the focus is

on the objective test of what one of ordinary skill in the art at the time of the invention would

have understood the term to mean." But it is not clear that this was intended to define a rigid

time frame for conducting the analysis. In a more recent case the court remarked that an inventor

cannot "by later testimony change the invention and the claims from their meaning at the time

the patent was drafted and granted."[12] Even more recently, the court observed that "the literal

meaning of a claim is fixed upon its issuance."[13] In point of fact, it does not appear that the

Federal Circuit has ever squarely addressed the proper timing of the claim construction inquiry in

a context where the answer might be outcome-determinative.

It makes a certain amount of sense to use the issue date, or perhaps even the filing date, as

the chronological viewing post in determining the understanding of the hypothetical person of

ordinary skill in the art. After all, the give and take of prosecution has not taken place as of the

date of filing or date of invention. The ultimate language of the issued claims usually has not

even been formulated until some prosecution has taken place – sometimes not until late in the

prosecution. Indeed, as of the actual date of invention, claims and claim language are not part of

the picture. Certainly it would not seem unreasonable, for purposes of claim construction, to

permit the hypothetical person of skill to be regarded as possessing prior art information that

could be acquired at least during the period between actual invention and the filing of the patent

application.

---

[11] Markman v. Westview Instr., Inc., 52 F.3d 967, 34 USPQ2d 1321, 1335 (Fed. Cir. 1995).
[12] Voice Tech. Group Inc. v. VMC Sys. Inc., 164 F.3d 605, 49 USPQ2d 1333, 1341 (Fed. Cir. 1999). A pair of
recent cases from the District of Kansas has also used the issue date as the pertinent time for determining what the
claims would have meant to a person of ordinary skill in the art. KCJ Corp. v. Kinetic Concepts, Inc., 30 F.Supp.2d
1319, 1323 (D. Kan. 1998); Hay & Forage Indus. v. New Holland North Am. Inc., 25 F.Supp.2d 1170, 1173 (D.
Kan. 1998).
[13] Al-Site Corp. v. VSI Int'l Inc., — F.3d —, 50 USPQ2d 1161, 1168 (Fed. Cir. 1999).

PAGE.09          21293773300                                    MAY 22 2002 12:25

Report and Recommendation of Special Master Regarding Claim Construction          **Page 8**
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

Nonetheless, the SM has concluded that, given the importance of the date of invention in

other assessments of the knowledge of one skilled in the art,[14] it would not be prudent to brush

aside Markman's focus upon that date as mere dictum.  Clearly, prosecution history is an

important source of intrinsic evidence in interpreting claims because it is a contemporaneous

exchange between the applicant and the Examiner.  The public has the right to rely on an

applicant's remarks made in seeking allowance of claims.[15]  But the prosecution history can be

given full play by simply viewing it as would a hypothetical person of ordinary skill in the art

who, though reading it later, was basing an understanding of it upon knowledge of the scope and

content of the prior art as it existed at the time of invention.

This conclusion, however, raises another consideration, viz.: what is the date of invention

and, if it is demonstrated to precede the filing date, does that time difference matter in construing

the claims?  Mycogen suggests (Mycogen's Memorandum Regarding the Date of Claim

Construction, handed up during the hearing) that "it would seem prudent to resolve the proper

date of invention prior to any construction of the claims in this case." In its post-hearing

memorandum, Ciba says that it "does not propose that the SM determine, as a factual matter, the

actual dates of invention, such as for purposes of Section 102(g)."  Pioneer, who asserts that the

invention date is the appropriate vantage point, but that the filing date may sometimes be used as

an approximation, does not comment on whether the date of invention needs to be decided at this

juncture. (Pioneer's Brief Regarding the Proper Date for Evaluating Claim Construction)

---

[14] E.g., Sensonics, Inc. v. Aerosonic Corp., 81 F.3d 1566, 38 USPQ 1551, 1554 (Fed. Cir. 1996) (obviousness under 35 U.S.C. §103). But inquiries under §112 tend to focus upon the filing date. E.g., Amgen, Inc. v. Chugai Pharm. Co., 927 F.2d 1200, 18 USPQ2d 1016, 1024 (Fed. Cir. 1991) (best mode); Vas-Cath Inc. v. Mahurkar, 935 F.2d 1555, 19 USPQ2d 1111, 1119 (Fed. Cir. 1991) (§112¶1 generally); Hybritech Inc. v. Monoclonal Antibodies, Inc., 802 F.2d 1367, 231 USPQ 81, 94 (Fed. Cir. 1986) (enablement).
[15] Desper Prods, Inc. v. Qsound Labs, Inc., 157 F.3d 1325, 48 USPQ2d 1088, 1096-97 (Fed. Cir. 1998).

PAGE.10        21293377300                                        MAY 22 2002 12:26

**Report and Recommendation of Special Master Regarding Claim Construction**                   **Page 9**
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

DeKalb, who contends that the filing date is the only appropriate date, is likewise silent on the

subject.

Clearly, the record is not sufficiently developed at this point to permit an informed and

reasoned decision on the actual date of invention for the several inventions claimed in the patents

in suit. Moreover, any such effort, if it involved fact-finding (which it surely must), would

invade the province of the jury with respect to matters such as prior invention under 35 U.S.C.

§102(g) and antedating prior art under §§102(a) and (e).[16] However, Ciba points out that, during

the prosecution of the Lundquist patents, the applicants submitted affidavits under Rule 131,[17]

seeking to antedate certain prior art by establishing an earlier date of invention. The earliest date

in question was May 1989, and the Rule 131 showing was simply directed at establishing a date

of invention sometime prior to that date. Accordingly, it would seem reasonable to select, as a

date upon which to assess the knowledge of one of ordinary skill in the art, the time frame just

prior to May of 1989. Although no similar showing was made during prosecution of the Adams

'520 patent, the technology is so similar, and the chronology so close (Lundquist originally filed

in January of 1990 and Adams in April of 1990), that it is not unreasonable under the

circumstances to use that date for the '520 patent as well.

The claim construction analysis in this report has been conducted, therefore, by seeking to

understand what the claims would have meant to a person of ordinary skill in the art, having

knowledge of the art as it existed as of May 1989.

---

[16] Priority of invention is a question of law to be determined based upon underlying factual determinations. E.g.,
Innovative Scuba Concepts, Inc. v. Feder Indus., Inc., 26 F.3d 1112, 31 USPQ2d 1132, 1134 (Fed. Cir. 1994).
[17] Rule 131 (37 C.F.R. §1.131) provides an ex parte mechanism whereby a patent applicant may antedate subject
matter in a reference, even if the reference describes the same invention that is claimed by the applicant, provided
that the same invention is not claimed in the reference when the reference is a United States patent. The disclosure
in a reference United States patent does not fall under 35 U.S.C. §102(g) but under 35 U.S.C. §102(a) or (e), and
thus can be antedated in accordance with Rule 131. But when the subject matter sought to be antedated is claimed in
the reference patent, Rule 131 is not available and an interference must be had to determine priority. In re Zletz, 893
F.2d 319, 13 USPQ2d 1320, 1322-23 (Fed. Cir. 1989).

Report and Recommendation of Special Master Regarding Claim Construction          **Page 10**
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

## The Written Description Requirement

A general observation regarding defendants' positions on some of the claim construction questions addressed in this report seems to be in order. In several instances, they appear to be suggesting nothing more nor less than a straightforward importation of limitations from the specification into the claim. This is, of course, forbidden.[18] Although the specification may well indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim language is broader than such embodiments.[19] If everything in the specification were required to be read into the claims, or if structural claims were to be limited to devices operated precisely as a specification-described embodiment is operated, there would be no need for claims. Nor could an applicant, regardless of the prior art, claim more broadly than that embodiment.[20]

But defendants' fundamental argument does raise concerns that may have to be addressed outside the strict context of claim construction. What they seem truly to be suggesting is that, in some instances, there is no support in the patent specification for the claimed invention. In other words, the argument is that DeKalb is claiming more broadly (or even differently) than its patent disclosures permit. This argument cannot be lightly dismissed.

The first paragraph of 35 U.S.C. §112 contains what has become known as the "written description" requirement. This provision, which is distinct from the enablement and best mode requirements, serves to ensure that the inventor had possession, as of the filing date of the application, of the specific subject matter later claimed. Put another way, the applicant must

---

[18] E.g., Intervet, supra note 3, 12 USPQ2d at 1476.
[19] Electro Med. Sys. S.A. v. Cooper Life Sciences, Inc., 34 F.3d 1048, 32 USPQ2d 1017, 1021 (Fed. Cir. 1994).
[20] SRI Int'l v. Matsushita Elec. Corp., 775 F.2d 1107, 227 USPQ 577, 585 (Fed. Cir. 1985).

MAY 22 2002 12:25    PAGE.12    212937300

Report and Recommendation of Special Master Regarding Claim Construction    Page 11
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

convey with reasonable clarity to those skilled in the art that he or she was in possession of the

invention claimed.[21]

The Federal Circuit appears to be in the early stages of development of a doctrine resting

upon the principle that when the preferred embodiment is fairly described in the specification as

the invention itself, the claims are not necessarily entitled to a scope broader than that

embodiment.[22] The recent decision of the Federal Circuit in Gentry Gallery, Inc. v. Berkline

Corp., 134 F.3d 1473, 45 USPQ2d 1498 (Fed. Cir. 1998), is the latest clear exemplar of this

doctrinal trend.[23]  As the court put the matter in Gentry, 45 USPQ2d at 1503:

> It is a truism that a claim need not be limited to a preferred embodiment.
> However, in a given case, the scope of the right to exclude may be limited by a narrow
> disclosure. * * *
>      In sum, the cases * * * do not stand for the proposition that an applicant can
> broaden his claims to the extent that they are effectively bounded only by the prior art.
> Rather, they make clear that claims may be no broader than the supporting disclosure,
> and therefore that a narrow disclosure will limit claim breadth.

At first glance, this language would seem to provide some support for defendants' position on

construction of some claim elements. But one must be careful to observe precisely what it was

that the court actually did about the perceived discrepancy between disclosure and claim in

Gentry. Rather than treat the matter as a claim construction issue, or even an infringement issue,

the court there analyzed it as a question of compliance with the written description requirement

of 35 U.S.C. §112¶1.  And properly so, for the evaluation of claim breadth versus fullness of

disclosure has no determinative role to play in a claim construction exercise.  It is of course true

that claims should be construed, where possible, to preserve their validity.[24]  But it is equally true

---

[21] E.g., In re Alton, 76 F.3d 1168, 37 USPQ2d 1578, 1581 (Fed. Cir. 1996).
[22] See Modine Mfg. Co. v. United States ITC, 75 F.3d 1545, 37 USPQ2d 1609, 1612 (Fed. Cir. 1996).
[23] See also Fromson v. Anitec Printing Plates Inc., 132 F.3d 1437, 45 USPQ2d 1269, 1274-75 (Fed. Cir. 1997);
Vehicular Tech. Corp. v. Titan Wheel Int'l, Inc., 141 F.3d 1084, 46 USPQ2d 1257 (Fed. Cir. 1998).
[24] E.g., Modine, supra note 242 37 USPQ2d at 1617.  Indeed, the purpose of restricting the scope of claims through
the reverse doctrine of equivalents (a doctrine somewhat akin to the one under consideration) often is to preserve the

MAY 22 2002 12:27    2129377300    PAGE.13

Report and Recommendation of Special Master Regarding Claim Construction
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

that it is improper to attempt to avoid invalidity by importing claim limitations from narrower claims or even from the specification.[25] The courts will not save claims by redrafting them with extraneous limitations.[26]

That being the case, the real <u>Gentry</u> issue that may emerge here is not whether the patent claims must be construed as limited to the materials and techniques actually disclosed, but whether the inventors of the patents provided a written description adequate to convey to a skilled artisan that they had possession of a broader or different invention than that.[27]  Such a question, however, is one of validity, a topic that is beyond the scope of this report.

## THE PATENT TECHNOLOGY

The technology at hand is genetic engineering.  Only the most rudimentary understanding of high-level principles of molecular biology is required in order to analyze the claim construction issues presented in this case.

Each of the thousands of different protein molecules that characterize a complex organism is a precise sequence of amino acids.  There are approximately twenty naturally occurring amino acids.  Deoxyribonucleic acid (DNA), which contains the genetic information for living things, is found in the chromosomes of cells.  The DNA molecule is an enormous structure built from sequential combinations of four smaller molecules (bases) linked together to form the DNA chain.  It is the sequencing of these bases along the DNA strand that encodes the

---

validity of claims with respect to their original intended scope. <u>Texas Instr., Inc. v. United States ITC</u>, 846 F.2d 1369, 6 USPQ2d 1886, 1889 (Fed. Cir. 1988).
[25] E.g., <u>Environmental Designs, Ltd. v. Unocal</u>, 713 F.2d 693, 218 USPQ 865, 871 (Fed. Cir. 1983); <u>Kalman v. Kimberly-Clark Corp.</u>, 713 F.2d 760, 218 USPQ 781, 788 (Fed. Cir. 1983).
[26] E.g., <u>Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.</u>, 868 F.2d 1251, 9 USPQ2d 1962, 1966 (Fed. Cir. 1989).
[27] In a very recent case, the Federal Circuit indicated that <u>Gentry</u> "considers the situation where the patent's disclosure makes crystal clear that a particular (i.e., narrow) understanding of a claim term is an 'essential element

PAGE.14          21293377300                                    MAY 22 2002 13:27

Report and Recommendation of Special Master Regarding Claim Construction          Page 13
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

genetic information required to produce a particular sequence of amino acids and, thereby, a

particular protein. Thus, a gene may be thought of as a segment of DNA that encodes for a

particular protein. Each protein performs a unique biological function and confers on the

organism the traits that distinguish it from other organisms.[28]

It may immediately be seen that it might be desirable to incorporate genetic information

encoding a protein that confers a useful or beneficial trait in one organism into another organism

that does not naturally include that gene. This has become a reality in the rapidly-advancing

field of genetic transformation. The specific aspect of that field addressed by the patents in suit

is the production of transgenic corn. The patents and the testimony of the witnesses at trial

reveal some of the significant problems faced by early researchers in the field. Taken together,

the pose the complex question: How to get the non-native or heterologous DNA into the corn and

ensure that it expresses as a heritable trait? The complex story of how these problems were

overcome, and by whom, while it may become important at the plenary trial of these cases, need

not be recounted here. The specific technology necessary to enable construction of the claims

can be described adequately by reference to the preferred techniques employed by the inventors

of the patents in suit.[29]

In general, the heterologous DNA is introduced into the target corn cells by a

microprojectile bombardment process, also referred to as a biolistic process. In this technique,

very small particles of a biologically inert material, such as tungsten or gold, are coated with the

DNA of interest. When the coated particles are accelerated toward the target cells, some

_____

of [the inventor's] invention.'" Johnson Worldwide Assoc. Inc. v. Zebco Corp., — F.3d —, 50 U.S.P.Q.2d 1607,
1613 (Fed. Cir. 1999).
[28] The '520 patent defines "genotype" as the genetic complement of an organism, and "phenotype" as traits
exhibited by an organism resulting from the interaction of genotype and environment. (C13L13, 31-32)
[29] It must be kept in mind, of course, that claims can be, and often are, broader than the preferred embodiment. See
notes 18-27 and accompanying text, supra.

Report and Recommendation of Special Master Regarding Claim Construction          **Page 14**
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

particles are able to enter the cells, releasing the DNA so that it has a chance to integrate with the

native DNA. ('956 patent, C10L38-57; '520 patent, C10L24-47)  Although the patents

acknowledge other techniques for transferring heterologous DNA, e.g. Agrobacterium infection,

electroporation, and polyethylene glycol-mediated transformation ('956 patent, C4L8-12; '520

patent, C10L13-23), all of the patents clearly identify microprojectile bombardment as the

preferred technique.

As will be seen, one of the large issues of claim construction has to do with the target of

the bombardment.   In the preferred embodiment, a culture is initiated using immature corn

embryos.  These are placed, embryo axis down, in a conventional solid culture medium

containing a hormone such as 2,4-D.  Under appropriate conditions, the corn embryo cells begin

to dedifferentiate into a proliferating mass of cells or tissue called "callus."  The callus forms on

an area of the upper side of the embryo called the "scutellum."  The goal is to produce a friable,

fast growing, embryogenic callus capable of differentiating into somatic embryos.

Once suitable callus tissue is obtained, it is subjected to the bombardment process.

During this process, some cells will not receive any of the heterologous DNA, some will be

destroyed by the microprojectiles, and some will be transformed.  The next task is to separate, or

"select" the transgenic cells or tissues for further processing.  This is preferably accomplished by

introducing into the target cells during transformation a "selectable marker gene" that enables

selection of those target cells and tissues that also contain the heterologous DNA of interest.  For

example, the so-called "bar" gene (originating in Streptomyces species) encodes for

phosphinothricin acetyl transferase (PAT), which inactivates the active ingredient in the

herbicide bialaphos.  Exposure of post-bombardment callus to the herbicide will enable

separation of the successfully transformed cells from those that are unchanged.  In other words,

MAY 22 2002 12:27        21293 77300        PAGE.16

Report and Recommendation of Special Master Regarding Claim Construction          Page 15
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

the transgenic cells, being resistant to bialaphos, continue to proliferate, while the unchanged

cells die.

The final step is regeneration of the transformed cell lines into plants. Using

conventional techniques, transformed callus can be regenerated into corn plants by placing it in

suitable regeneration media under conditions that promote tissue differentiation and ultimate

plantlet growth. The resultant plants, if they are stably transformed and fertile, can then be used

in a conventional breeding program to obtain hybrid seed.

The patents provide preferred examples of heterologous DNA that can be introduced to

transform corn for beneficial purposes. The '956 patent postulates a transformation scheme

using a DNA sequence originating in *Bacillus thuringiensis* (BT) which encodes for an

insecticidal endotoxin. The same patent also discloses the use of a gene from *E. coli* that confers

resistance to the antibiotic hygromycin. The '520 teaches transformation with the bar gene to

obtain PAT expression to inactivate bialaphos and other herbicides. The latter two examples

illustrate the fact that a single transgene may find utility in more than one context, i.e., as a

selectable marker gene in the transformation process itself, and as a gene expressing a beneficial

trait, such as resistance to herbicides, in the corn plant.

The patents in suit fall into two groups. One, the so-called "Lundquist" (after one of the

two joint inventors) family of patents, comprises United States Patents No. 5,484,956 (issued

January 16, 1996), No. 5,538,877, and No. 5,538,880 (both issued July 23, 1996). Each of the

three Lundquist patents traces its lineage back to an original Lundquist application filed January

22, 1990, and they accordingly have essentially identical specifications. The "Adams" (after the

first-named of thirteen joint inventors) family includes No. 5,489,520 (issued February 6, 1996),

which traces back to an original Adams application filed April 17, 1990.

In general, the '880 and '877 patents claim methods for producing fertile corn plants that contain transgenic DNA which imparts insect or herbicide resistance. The '877 patent also claims a method for producing such a plant in which the DNA includes a selectable marker or reporter gene. The '956 patent claims a fertile transgenic corn plant that contains heterologous DNA encoding BT endotoxin. The '520 patent claims a process for producing a fertile corn plant that contains transgenic DNA which includes a selectable marker gene encoding for PAT.

## DISCUSSION

Claim construction begins, as it must, with the words of the claims.[30] The claims of the four patents in suit are set out in the attached Appendix. In the discussion that follows, certain claim terms or elements may be common to different claims, sometimes in different patents. It may be assumed, unless expressly stated otherwise, that the discussion applies to all occurrences of such terms or elements.

### Terms Well-Defined in the Patents

The term *Zea mays* occurs in all of the claims of the patents in suit. The Lundquist patents (e.g., '956 patent, C4L48-54) define that species of plant as corn, including field corn, popcorn, sweet corn, flint corn, and dent corn. The Adams '520 patent uses the term consistently with that definition. It is recommended that the jury be instructed that *Zea mays* means corn of all types, including but not limited to field corn, popcorn, sweet corn, flint corn, and dent corn.[31]

The claims of the '520 and '877 patent use the term "gene." Both families of patents use the word throughout as synonymous with "DNA sequence," and it is recommended that the jury be so instructed.

---

[30] Vehicular Tech. Corp. v. Titan Wheel Int'l, 141 F.3d 1084, 46 USPQ2d 1257, 1260 (Fed. Cir. 1998).
[31] It is also suggested that the jury be instructed that dependent claim 3 of the '956 patent does not change the meaning of *Zea mays*, but rather expressly narrows the kinds of corn to "field corn, popcorn, sweet corn, flint corn and dent corn." This would provide an apt illustration of claim dependency.