PAGE.18          21293773300                    MAY 22 2002 12:28

Report and Recommendation of Special Master Regarding Claim Construction          Page 17
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

The word "transgenic" appears in the claims of each patent. Both families of patents make it clear that the key element underlying this term is genetic engineering. For example, the '520 patent says that the DNA sequences are 'incorporated into recipient cells by genetic engineering methods rather than classical reproduction or breeding techniques." (C3L53-56) The Lundquist patents expressly define the term "transgenic" to include "any cell, cell line, callus, tissue, plant part or plant, the genotype of which has been altered beneficially by the presence of heterologous DNA that was introduced into the genotype by a process of genetic engineering." (E.g., '956 patent, C4L55-59) "Heterologous DNA" is defined in the Lundquist patents (see, e.g. '956 patent, C6L30-52) as a DNA segment that is synthetic, semi-synthetic, or biologically derived, and includes non-plant genes such as those from bacteria, yeasts, animals, or viruses, as well as modified genes and portions of genes.[32] The heterologous DNA is not limited to non-plant sources, however, and can be from another *Zea mays* genotype, or even the same genotype into which it is to be introduced. The '520 patent similarly defines transgenic plants as "plants that have incorporated exogenous genes or DNA sequences, including but not limited to genes or DNA sequences which are perhaps not normally present, genes not normally transcribed and translated ('expressed') in a given cell type, or any other genes of [sic. "or"] DNA sequences which one desires to introduce into the non-transformed plant, such as genes which may normally be present in the non-transformed plant but which one desires to have altered expression." (C33L40-50) Accordingly, it is recommended that the jury be instructed that, in the claims of each of the patents, a "transgenic" corn plant is one that includes a DNA sequence resulting from genetic engineering.

---

[32] The parties have raised the larger issue of the meaning of "heterologous DNA" as actually employed in the claims; this is dealt with separately later in this report.

PAGE.19    2129377300                                    MAY 22 2002 12:28

Report and Recommendation of Special Master Regarding Claim Construction          Page 18
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

     The claims of the '520, '877, and '880 patents employ the word "comprising." It is recommended that the jury be instructed that "comprising," in the parlance of patent claims, is synonymous with "including," and does not exclude the presence of additional elements.[33]

     The claims of the '956 patent make reference to the R0 and R1 generations of corn plants. Although there is no dispute as the meaning of these designations, they play a large role in the construction of the term "progeny," as it is much more convenient to set out a formal construction of that term using such designations. Accordingly, it is recommended that the jury be instructed that a plant of the R0 generation is the regenerated plant; a plant of the R1 generation is a plant that has been grown from seed of the R0 plant harvested after that R0 plant has been fertilized by pollen from a different corn plant (crossed), its own pollen (self mated), or pollen of a sibling plant (sib mated); a plant of the R2 generation is one that has been grown from seed harvested from a crossed, selfed or sibbed R1 plant, etc.[34]

Process Steps

     The claims of the '887, '880, and '520 patents are directed to processes, each comprising a number of steps. In each instance, the next step builds upon the proceeding step, in logical fashion. Thus, in this case, as in Mantech Environmental Corp. v. Hudson Environmental Serv. Inc., 152 F.3d 1368, 47 USPQ2d 1732, 1739 (Fed. Cir. 1998), the sequential nature of the claim steps is apparent from the plain meaning of the claim language and nothing in the written description suggests otherwise. It is recommended, therefore, that the jury be instructed that the

---

[33] Hewlett-Packard Co. v. Repeat-O-Type Stencil, 123 F.3d 1445, 43 USPQ2d 1650, 1655 (Fed. Cir. 1997). So, too, with the word "comprises."
[34] The Lundquist patents teach that "plants regenerated from the transformed callus are referred to as the R0 generation or R0 plants. The seeds produced by the various sexual crosses of the R0 generation plants are referred to as R1 progeny or the R1 generation. When R1 seeds are germinated, the resulting plants are also referred to as the R1 generation." (E.g., '880 patent, C11L14-15)

PAGE.20          21293773300                                          MAY 22 2002 12:28

Report and Recommendation of Special Master Regarding Claim Construction          Page 19
Transgenic Corn Patent Litigation (N.D. Illinois -- Judge Reinhard)

process claims of the patents in suit require the method steps to be performed sequentially, in the

order set forth in the claim.

The independent process claims of the '520, '887, and '880 patents each contain the

following language: "wherein said DNA is transmitted through a complete sexual cycle of said

transgenic plant to its progeny." The independent product claim of the '956 patent is similar,

except it uses the phrase "complete normal sexual cycle." Such language does not constitute a

process step or limitation; rather, it defines a characteristic of the R0 plant that is the subject of

the '956 claims and that is produced by the process of the independent claims of the other

patents. Nor does the language in any way exclude human intervention in the reproductive

process. It is clear that "normal sexual cycle" referred to is the fundamental corn reproductive

process whereby genetic material is passed to progeny through either pollen or egg cells. Corn

breeding and hybrid seed production systems obviously involve, almost invariably, human

intervention in that process, e.g., detasseling in crossing blocks to ensure cross-pollination, hand

pollination, etc. It is recommended that the jury be instructed that this language does not define

a necessary step in the process of the independent process claims, and merely requires that the

R0 plant be capable of passing the transgene to progeny through either pollen or egg cells,

without or without human intervention.

Product-by-Process[35]

The claims of the '956 patent are directed to a corn plant having heterologous DNA that

encodes for BT endotoxin. Each claim, however, contains a phrase that can only be described as

a method limitation: "wherein said DNA is introduced into said plant by microprojectile

---

[35] This is the only topic upon which defendant NK took a position. Accordingly, except for the discussion of this
topic, the use of the collective term "defendants" should be understood to exclude NK, unless the context indicates
otherwise.

PAGE.21                    005377300                                        21293377300                                          MAY 22 2002 12:28

Report and Recommendation of Special Master Regarding Claim Construction                    Page 20
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

bombardment of *Zea mays* callus cells." Despite this clear language, DeKalb contends that these

claims must be construed as not limited to plants that are transformed by the biolistic technique.

Rather, it says, these claims are so-called "product-by-process" claims, and therefore must be

construed to cover the recited corn plant, no matter what technique was used to introduce the

heterologous DNA.

This contention may seem somewhat remarkable given the Federal Circuit's unswerving

adherence to the proposition that each limitation of a claim is material and essential, and that in

order for a court to find infringement, the patent owner must show the presence of every

limitation or its substantial equivalent in the accused product.[36] What DeKalb is contending –

nothing more and nothing less – is that the microprojectile bombardment language is not a

limitation at all, and may be safely ignored in deciding both infringement and validity.

DeKalb is quick to point out that there is perfectly good authority for what may seem on

the surface to be a rather strange proposition: that a claim may be – indeed, must be – read and

interpreted as though it did not contain what is some rather explicit language. For this it cites

Scripps Clinic & Res. Found. v. Genentech, Inc., 927 F.2d 1565, 18 USPQ2d 1001, 1016 (Fed.

Cir. 1991), for the statement that "the correct reading of product-by-process claims is that they

are not limited to product prepared by the process set forth in the claims." The claim in Scripps

was in the following format: "Highly purified and concentrated human or porcine VIII:C

prepared in accordance with the method of claim 1." A similar format was at issue in a case

decided the following year, Atlantic Thermoplastics Co. v. Faytex Corp., 970 F.2d 834, 23

USPQ2d 1481 (Fed. Cir. 1992): "The molded innersole produced by the method of claim 1."

---

[36] E.g., Lemelson v. United States, 752 F.2d 1538, 224 USPQ 526, 533 (Fed. Cir. 1985); Perkin-Elmer Corp. v.
Westinghouse Elec. Corp., 822 F.2d 1529, 3 USPQ2d 1321, 1325 (Fed. Cir. 1987). See generally, Pennwalt Corp.
v. Durand-Wayland, Inc., 833 F.2d 931, 4 USPQ2d 1737 (Fed. Cir. 1987).

PAGE.22          0083772300                              MAY 22 2002 12:29

Report and Recommendation of Special Master Regarding Claim Construction          Page 21
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

But despite what appears to be a classical product-by-process claim in each case, the difference in outcome in the two cases is startling.

The panel decision in Atlantic Thermoplastics did not purport to overrule Scripps. Instead, it conducted a detailed analysis of Supreme Court and other precedent and concluded that "process terms in product-by-process claims serve as limitations in determining infringement." This holding, not surprisingly, provoked a request for rehearing in banc. Although the request was ultimately denied, it was not without controversy. See the dissenting opinions of Judges Nies, Rich, Lourie, and Newman, 974 F.2d 1979, 23 USPQ2d 1801, and the concurring opinion of Judge Rader, 974 F.2d 1299, 24 USPQ2d 1138.

In the present litigation the Court has already had occasion to consider the apparent conflict between Scripps and Atlantic Thermoplastics. Defendant NK moved, in Civil Action No. 96 C 50169, for summary judgment of noninfringement of the '956 patent on the ground that it employed a substantially different process to transfer heterologous DNA. Instead of using microprojectile bombardment, according to NK, it uses passive protoplast uptake. DeKalb responded by pointing out that, under Scripps, NK should not be able to escape liability simply because its used a different technique for gene transfer. In a Memorandum Opinion and Order dated August 14, 1997, this Court found that there was a direct conflict between the panel decisions in Scripps and Atlantic Thermoplastics. Applying the Federal Circuit's conflict rule,[37] this Court honored the Scripps rule. That led to a denial of NK's summary judgment motion.

---

[37] The Federal Circuit has adopted the rule that prior decisions of a panel of the court are binding precedent on subsequent panels unless and until overturned in banc. Where there is direct conflict, the precedential decision is the first. E.g., Newell Cos. v. Kenney Mfg. Co., 864 F.2d 757, 9 USPQ2d 1417, 1423 (Fed. Cir. 1988). The Atlantic Thermoplastics panel apparently felt that it had found a way around the in banc rule, noting that a "decision that fails to consider Supreme Court precedent does not control if the court determines that the prior panel would have reached a different conclusion if it had considered controlling precedent." 23 USPQ at 1485n.2. However, as pointed out in one of the dissents from the denial of rehearing, 23 USPQ at 1816, that "merely states a reason why Scripps was wrongly decided with respect to the product-by-process issue."

PAGE.23          21293773300                                    MAY 22 2002 12:29

Report and Recommendation of Special Master Regarding Claim Construction                    **Page 22**
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

  The SM does not recommend that the Court revisit its resolution of the <u>Scripps/Atlantic</u>

<u>Thermoplastics</u> dilemma. If the direct conflict rule has meaning, it would seem to obligate bench

and bar to follow <u>Scripps</u> until the Federal Circuit tells us otherwise. But that does not mean that

the claims of the '956 patent are to be construed as though the words "wherein said DNA is

introduced into said plant by microprojectile bombardment of *Zea mays* callus cells" were

missing. Let us look again at the <u>Scripps</u> rule: "the correct reading of product-by-process claims

is that they are not limited to product prepared by the process set forth in the claims." The

question immediately arises, are the claims of the '956 patent product-by-process claims? The

answer to that question resolves the matter of claim construction.

  That a process limitation appears in a claim does not convert it to a product-by-process

claim.[38] It appears that in connection with NK's motion for summary judgment, the parties

simply treated independent claim 1 as a product-by-process claim, without controversy.[39] But

that does not alone resolve the matter, in view of the obligation of a court to construe claims

independent of the views of the adversary parties.[40]

  The precedent of the Federal Circuit itself does not provide much direct guidance on the

matter, with the exception of Judge Newman's opinion dissenting from the denial of rehearing in

banc in <u>Atlantic Thermoplastics.</u> In that opinion, reported at 974 F.2d 1979, 23 USPQ 1801,

1802-1816, she does an exhaustive analysis of the cases, and concludes that true product-by-

process claims are those in which the product cannot be properly defined and discriminated from

---

[38] <u>Fromson v. Advance Offset Plate, Inc.</u>, 720 F.2d 1565, 219 USPQ 1137, 1141 (Fed. Cir. 1983).
[39] In the Court's Memorandum Opinion and Order, p.3n.2, the Court said "The parties here both treat claim 1 of the '956 patent as a product-by-process claim rather than a pure product or a pure process claim. The court has no reason to question that assessment."
[40] See note 9, supra, and accompanying text.

☒023          HALE & DORR LLP          05/22/2002 12:17 FAX 21293773300

prior art otherwise than by reference to the process of producing it. This is in contrast to a product claim that merely includes a process limitation.

The claims of the '956 patent yield quite readily to such an approach. Without the language reciting microprojectile bombardment, claim 1 parses out, rather simply, to (1) a fertile R0 corn plant that (2) contains the BT gene, wherein (3) the BT gene expresses to confer insect resistance, while (4) that expression is not present in a plant not containing the gene, and (5) wherein the gene can be transmitted to the R1 generation through a complete normal sexual cycle of the plant. This provides a complete and adequate definition of the product – a corn plant – regardless of the process by which the BT gene is introduced. It also adequately discriminates from the prior art described in the '956 patent. As the patent recites it, prior attempts to produce transgenic corn were characterized by failure in several respects. Although certain types of corn cells had been successfully transformed, the resulting cells "either could not be regenerated into corn plants or the corn plants produced were sterile." (C2L6-7) On the other hand, although certain types of corn cells had been regenerated to produce fertile plants, no stable transformation of such cells had been achieved. (C2L11-17)

The product limitations of claim 1 address each of these alleged shortcomings of the prior art – regenerability, fertility, and stability – and thus differentiate the claimed corn plant over prior corn plants. The limitation of a "fertile transgenic *Zea mays* plant of the R0 generation" requires that the plant be one that was regenerated and is fertile. The requirement that the gene be "transmitted through a complete normal sexual cycle of the R0 plant to the R1 generation" addresses both fertility and stability. And the limitation that the gene be "expressed so that the plant exhibits resistance to an insect, wherein said expression is not present in said plant not containing" the gene, likewise addresses stability. The further recital of microprojectile

PAGE.25    21293773OO    МАY 22 2002 12:29

bombardment is not necessary to complete this definition and differentiation. A corn plant

having the product characteristics of claim 1 would be distinguishable from the prior art

described in the patent whether the BT gene had been introduced by microprojectile

bombardment or some other technique. Thus, the '956 claims are not product-by-product claims

and do not fall within the very limited exception – ostensibly embraced by Scripps – to the

elementary patent law rule that every limitation in a patent claim is material.[41]

      Nonetheless, even if by some stretch the '956 claims could be regarded as subject to the

Scripps ruling, the prosecution history reveals ample basis for construing the claims as they are

written. During prosecution the Examiner rejected the pending claims on grounds of lack of

enablement. (SM163)[42] The Examiner's position was that the specification enabled only biolistic

transformation. In an amendment, application claim 25 was added, with a limitation to the

biolistic process. (SM177) The Examiner continued to reject all claims except 25 for lack of

enablement. (SM211) In a final office action (SM275), the Examiner maintained the rejection of

all claims but claim 25 on the grounds of lack of enablement, and indicated that claim 25 would

be allowable if rewritten in independent form. The Examiner's comments are illuminating

(SM276):

      * * * Note that at page 2 of the previous Office Action the Examiner indicated
that the rejection was based on the lack of enablement (i.e., a section 112, first paragraph
rejection) for plant produced by a process other than that disclosed, that is to maize plants
produced by the biolistic process. This process, and only this process, is evidenced by
available art to overcome prior art attempts to produce the claimed invention.
Furthermore evidence existed in the art that transgenic plants produced by prior art
processes are essentially different. The fact that the biolistic process appears to be
essential to overcome plant sterility and/or chromosome integration and heritability of a
transgene only provides guidance to the practitioner in the art as to how to apply the
exemplified process to produce the claimed invention. While the recitation of limitations
in product claims to fertile transgenic plants in which the transgene is both

---

[41] E.g., Glaxo, Inc. v. Novopharm, Ltd., 110 F.3d 1562, 42 USPQ2d 1257, 1261 (Fed. Cir. 1997).
[42] The prosecution histories of the patents in suit, as submitted by the parties, have been sequentially numbered with
the prefix SM followed by the page number.

PAGE.26          21293773800                                    MAY 22 2002 12:30

chromosomally integrated and heritable may overcome rejections based on 35 USC § 102 or 103, neither novelty nor obviousness are considerations under section 112, first paragraph. Accordingly, as Applicants have failed to rebut the Examiner's evidence that the process is essential to the claimed product the rejection is still warranted and is maintained.

What the Examiner was telling the applicants here is quite clear. He was pointing out that, while the product limitations of the claims might well be sufficient to distinguish over the prior art (for purposes of novelty and nonobviousness), the lack of a recital of microprojectile bombardment (in all claims save claim 25) meant that the specification was not sufficient to enable the practice of those claims, inasmuch as it disclosed only microprojectile bombardment in an enabling fashion. Indeed, what the Examiner was actually doing here was attempting to avoid the very patentability/validity problem that the Federal Circuit was addressing in the Gentry case.[43] In his view, based upon the evidence that he had before him, the biolistic process was "essential to the claimed product," and the written description did not adequately support broader claims than that.

The applicants responded by amending the claims so that all of them recited microprojectile bombardment. (SM285) Their comments to the Examiner in this respect are revealing:

> This amendment is in accord with the amendment which the Examiner indicated would overcome the 35 U.S.C. §112(1) rejection based on the alleged failure of the specification to enable claims other than those directed to "genetically engineered plants produced via biolistic transformation" in the Office Action dated November 30, 1990. As amended, claim 1 is enabled by the specification, since it is directed to those fertile transgenic Zea mays plants which are produced by microprojectile bombardment, or "biolistics." (SM286)

Here, they were telling the world that the addition of the microprojectile bombardment limitation was to obviate the nonenablement rejection. They went on to argue vigorously that the properties

---

[43] See notes 18-27, supra, and accompanying text.

of the transgenic plant, as recited in the claims, distinguished over the prior art even without the

biolistic process limitation.  They complained that it "is well settled that it is improper to require

an Applicant to insert process limitations into a product claim <u>unless</u> the compositional features

which distinguish the product from the art cannot otherwise be recited in the claim." (SM287;

emphasis present)  They even cited <u>Scripps</u> for the proposition that they were entitled to a

product claim that would encompass transgenic corn plants produced by microprojectile

bombardment, as well as by "any other process achieving the same result."  (SM288)  But in the

end, they conceded:

> Nonetheless, in order to advance the prosecution of the present application, claim
> 1 has been amended to recite that the recited transgenic <u>Zea mays</u> plant is one which is
> produced by microprojectile bombardment.
> Therefore, it is respectfully submitted that the amended claims are fully in accord
> with 35 U.S.C. §112, and withdrawal of this rejection is respectfully requested.  (SM289)

Here, they were clearly telling the world that, although they believed they might be entitled to a

product claim that covered transgenic corn regardless of the transformation mechanism, they

were no longer pursuing such a claim in this application.

In his Reasons for Allowance of the '956 patent, the Examiner stated that the "invention

is drawn to fertile transgenic *Zea mays* plants comprising heterologous DNA encoding *Bacillus*

*thuringiensis (Bt)* endotoxin which was produced by the process of microprojectile bombardment

of *Zea mays* callus cells followed by plant regeneration." (SM510)  As was their right, the

applicants filed comments on the reasons for allowance (SM527), stating that the claims were

"intended to cover any fertile, transgenic R0 *Zea mays* plants comprising a Bt toxin gene that is

prepared by transformation with heterologous DNA, whether it be by microprojectile

bombardment or some other transformation methodology."  The process language concerning

microprojectile bombardment was said to have been introduced "simply as a means of addressing

Report and Recommendation of Special Master Regarding Claim Construction    **Page 27**
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

any possible §101 "Product of Nature" concerns, in order to demonstrate that the claimed plant is a product of man rather than a product of nature." Finally, they flatly stated that their intention is "that this language not be construed as limited to plants prepared by microprojectile bombardment," citing Scripps.

These self-serving statements represent nothing more than a belated, afterthought attempt to patch up a position that simply will not hold water. First, and most importantly, the applicants had made their intention clear in the amendment after final rejection (SM285) when they acquiesced in the Examiner's §112 rejection by amending the claims. If they intended to seek a product claim without the biolistic limitation, they should have done it at that point. The suggestion that they could insert the process language to escape a rejection of the claims, and then later be permitted to escape the limitation that the language establishes, offends every adult notion of fair play. The public is entitled to rely upon what a patent applicant actually does with the claims during prosecution, rather than be bound by what that applicant later says its intentions were.[44] A patent applicant cannot disclose and claim an invention narrowly and then, in the course of an infringement suit, argue effectively that the claims should be construed to cover that which is neither described nor enabled in the patent.[45]

Moreover, the reason asserted in the comments for having added the biolistic language – to avoid a possible "product of nature" problem, simply does not ring true. As previously indicated, a "transgenic" corn plant is one that includes a DNA sequence resulting from genetic engineering. This would seem more than adequate to identify the claimed plant as a product of

---

[44] The prosecution history limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance. Standard Oil Co. v. American Cyanamid Co., 774 F.2d 448, 227 USPQ 293, 296 (Fed. Cir. 1985). The relevant inquiry is whether a competitor would reasonably believe that the applicant had surrendered the particular subject matter. Cybor Corp. v. FAS Tech., Inc., 138 F.2d 1448, 46 USPQ2d 1169, 1175 (Fed. Cir. 1998).

[45] North Am. Vaccine Inc. v. American Cyanamid Co., 7 F.3d 1571, 28 USPQ2d 1333, 1337 (Fed. Cir. 1993).

man as opposed to a product of nature. And if not, it would have been a simple matter to insert a limitation to genetic engineering, or some other definition that would have excluded a product of nature and not limited the transformation technique to biolistic processes. It also bears noting that, at the time the microprojectile bombardment limitation was added to the claims, there was no outstanding rejection based upon product of nature concerns.

   Finally, consideration should be given to the rule that claims should be construed, where possible, to preserve their validity.[46] DeKalb cautions that this rule should not be accorded too broad a sweep. It argues that if claims were always to be construed to preserve validity, a court could never determine that a claim was invalid. But no case suggests that the rule be taken to that extreme. Indeed, the Federal Circuit has made it clear that it is improper to attempt to avoid invalidity by importing claim limitations from narrower claims or even from the specification.[47] The courts will not save claims by redrafting them with extraneous limitations.[48] However, the application of the rule in the present case does not involve importing a limitation – just the opposite. The concern is that, were the microprojectile bombardment limitation to be read out of the '956 claims, the very invalidity defense of enablement that the Examiner felt was cured by the addition of that limitation would be back in play. Giving effect to the limitation to avoid that problem is a far cry from importing an extraneous limitation into the claim. It amounts to nothing more than honoring the express language of the claim so as to avoid invalidity.[49]

---

[46] E.g., Modine, supra note 20, 37 USPQ2d at 1617.
[47] E.g., Environmental Designs, Ltd. v. Unocal, 713 F.2d 693, 218 USPQ 865, 871 (Fed. Cir. 1983); Kalman v. Kimberly-Clark Corp., 713 F.2d 760, 218 USPQ 781, 788 (Fed. Cir. 1983).
[48] E.g., Corning Glass Works v. Sumitomo Elec. U.S.A., Inc., 868 F.2d 1251, 9 USPQ2d 1962, 1966 (Fed. Cir. 1989).
[49] If a claim is susceptible to a broader and a narrower meaning, and the narrower one is clearly supported by the intrinsic evidence while the broader one raises questions of enablement, the narrower of the two should prevail. Digital Biometrics, Inc. v. Identix, Inc., 149 F.3d 1335, 47 USPQ2d 1418, 1424 (Fed. Cir. 1998).

It is recommended that the jury be instructed that the claims of the '956 patent are not infringed unless the accused plant was produced using microprojectile bombardment or its substantial equivalent.

## Target of the Microprojectile Bombardment

As already indicated, the microprojectile bombardment limitation of the product claims of the '956 patent cannot be ignored. Each of the process claims of the remaining three patents contains a step calling for bombardment with DNA-coated microprojectiles. The question at hand here is, what is the target of this biolistic process?

In claiming the target, each patent defines it a little differently:

> '520 patent – "a regenerable culture from a *Zea mays* plant"

> '880 patent – "intact regenerable *Zea mays* cells"

> '956 patent – "*Zea mays* callus cells"

> '877 patent – "regenerable embryogenic callus culture from a *Zea mays* plant"

In the '520 and '877 patents, the first step of the claims calls for "establishing" the culture, which is then transformed by bombardment. The '956 and '880 patent claims respectively call for bombardment of "callus" cells and "intact regenerable" cells, without any preceding establishment step.

All of the patents make it clear that the preferred target of the bombardment is a so-called Type II callus; which is defined in the '520 patent as a "friable, fast growing embryogenic callus." (C13L1) What the parties hotly dispute is whether the claims must be construed to require that the target of the bombardment be a Type II callus.

In arguing their side of the question, the defendants rely heavily upon the prosecution histories of the patents, and rightly so, for this undisputed public record of proceedings in the

PAGE.31          0082773008212          MAY 22 2002 12:31

Report and Recommendation of Special Master Regarding Claim Construction          **Page 30**
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

PTO is of primary significance in understanding the claims. Markman, supra, 34 USPQ2d at 1330. However, although the prosecution history can and should be used to understand the language used in the claims, it cannot enlarge, diminish, or vary the limitations in the claims. Id. Only where an applicant, through statements made during prosecution, may commit to a particular meaning for a patent term is that meaning then binding in litigation.[50]

In relying on the prosecution histories of the patents, defendants have tended not to discriminate the prosecution of one patent from another. Instead, they have tended to point to transactions in the prosecution of one patent as supporting their proposed construction of the claims of another. This is dangerous. The Federal Circuit recently explored this problem in Abtox Inc. v. Exitron Corp., 122 F.3d 1019, 43 USPQ2d 1545, 1551, opinion modified at 46 USPQ2d 1735 (Fed. Cir. 1997). The teaching of Abtox is that, while it may be permissible to rely upon statements made during prosecution of other patents in a chain of related applications, it is important to confine the statements to their proper context in terms of the claims actually being prosecuted there.[51] That is the methodology employed in this report. Thus, only if statements made during prosecution of, say, the '877 patent are directly relevant, by reason of identity or close similarity in the terms actually used in the claims, are those statements considered in connection with construction of the claims of, say, the '880 patent.

Establishing a regenerable embryogenic callus culture. The '877 claims call out the step of "establishing a regenerable embryogenic callus culture" to be transformed by bombardment. A "callus" is defined in the '520 patent (C12L63) as a "proliferating mass of cells or tissue in vitro," and no party seems to take issue with that definition as a general proposition. Certainly the term

---

[50] CVI/Beta Ventures, Inc. v. Tura LP, 112 F.3d 1146, 42 USPQ2d 1577, 1585 (Fed. Cir. 1997).
[51] Sextant Avionique, S.A. v. Analog Devices Inc., —F.3d —, 49 USPQ2d 1865 (Fed. Cir. 1999) is not to the contrary.

ZE˙ƎꓤⱯꓒ        00EƖ⅃ᄅᄅ6ᄅƖᄅ        ƖE:ᄅƖ ᄅ00ᄅ ᄅᄅ ⱯⱯW

is used throughout the Lundquist patents consistently with that definition, although the emphasis

is on a particular type of callus, namely Type II.  But the '877 patent goes on to say that:

> Although successful transformation and regeneration has been accomplished herein with
> friable, embryogenic callus, this is not meant to imply that other transformable
> regenerable cells, tissue, or organs cannot be employed to produce the fertile transgenic
> plants of this invention.  The only actual requirement for the cells which are transformed
> is that after transformation they must be capable of regeneration of a plant containing the
> heterologous DNA following the particular selection or screening procedure actually used.
> (C5L55-63; emphasis added)

DeKalb's position is that this statement establishes the only essential condition on the target, i.e.,

the transformed cells must after transformation be capable of regeneration of a plant containing

the transgene.  Thus, if the claim calls for "callus cells," those callus cells must exhibit that

property.  Using this approach, the term "callus cells" would be construed to mean a proliferating

mass of cells or tissue in a culture medium that comprises cells which are regenerable at some

point after transformation.

The defendants contend that this language requires a Type II callus as the target, or at

least a callus culture that contains cells that can be regenerated at the time of transformation, and

excludes immature embryos.  In addition, they assert special significance for the term

"establishing."  Ciba says establishing means:

> culturing the cells to a state where they are a regenerable embryogenic callus meeting the
> test set out in the '877 patent at col. 5, l. 17-21.  "Establishing" should be given its
> ordinary meaning of making stable or permanent and does not mean initiating.  The
> clause should be construed as having a regenerable embryogenic callus culture in hand.

Mycogen argues that it means:

> initiating a regenerable callus culture, e.g., from an immature embryo, propagating the
> culture, and maintaining it through subculture to provide a target for biolistic
> transformation * * * .

Pioneer's contention is somewhat more convoluted:

PAGE.33            21293773300                                    MAY 22 2002 12:31

Report and Recommendation of Special Master Regarding Claim Construction          **Page 32**
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

> Pioneer agrees with DeKalb's interpretation of "establishing," as "placing corn material in culture conditions that will allow a callus to develop." However, Pioneer maintains that **the callus culture must be established prior to the bombardment step,** and accordingly the bombardment of immature embryos that have been placed on callus induction media does not fall within the scope of the claims.

For its part, DeKalb says that this language refers to taking any corn cells, tissues or organs which are capable of forming somatic embryos and regenerating a plant, placing them on or in callus initiation medium, and beginning cellular division.

An attempt to restate the contentions of the parties in understandable fashion seems in order here. DeKalb is urging that the claim language requires only that corn cells, which (1) have the capacity to form somatic embryos and (2) are capable of regeneration at some time after transformation, be (3) placed on callus initiation media, so that (4) cellular division begins prior to bombardment. The defendants contend that the language requires more. They urge that the language means that the target, at the time of bombardment, must be something that a person of ordinary skill in the art would recognize as (1) a callus culture, not just immature embryos, and (2) comprising cells that are, at the time of bombardment, regenerable.

With this restatement as a focus, it becomes possible to analyze the differences between the positions of the parties. They are definitely at odds on the matter of whether the target cells must be regenerable at the time of bombardment. Defendants contend, as Mycogen puts it, that the cells of the culture must have "a present capacity to give rise to regenerated plants." This restrictive definition must be understood for what it is: an undisguised effort to limit the claims of the '877 patent to the target disclosed in the examples described in the specification. Inasmuch as neither the actual language of the claims nor the import of the specification taken as a whole compels such a construction,[52] justification for such a limitation must be found, if at all,

---

[52] Indeed, the language quoted above in the text, from column 6, lines 18-27 of the '956 patent, teaches just the contrary, that the invention is not limited to Type II callus.

PAGE.34          212937300          MAY 22 2002 12:32

Report and Recommendation of Special Master Regarding Claim Construction          Page 33
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

in the prosecution history. Thus, the question is whether prosecution history compels a

construction that requires that the intact corn cells be regenerable at the time of bombardment,

contrary to the statement in the patent that "the only actual requirement for the cells which are

transformed is that after transformation they must be capable of regeneration of a plant."

(Emphasis added.)

The SM has been directed to no transaction in the '877 prosecution history that would

even support this construction, much less compel it.[53] Only if the phrase "regenerable embryonic

callus culture" were to be construed as limited to Type II callus would this result obtain.

The parties seem agreed that "embryogenic" means material that can form somatic

embryos. Thus the remaining crucial point of difference between the parties is the meaning of

the phrase "establishing a * * * callus culture." Again, defendants' position is not compelled by

either the claim language or the specification. The prosecution history, however, does provide

some support.

During the prosecution of the '877 patent, the Examiner rejected the claims over the Klein

Bio/Technology publication. (SM662) In response, the applicants pointed out that in Klein

"callus is not mentioned as a possible target in this paragraph, which clearly refers to the use of

intact embryos as targets. In contrast to this methodology, Applicants' claim recites that friable

embryogenic callus cultures were bombarded." (SM674) In a later response, the applicants

again distinguished Klein on the ground that it identified the scutellum of cultured immature

embryos as the bombardment target. (SM770-71) DeKalb concedes (at page 15 of its post-

hearing brief) that "regenerable friable embryogenic callus culture" (which was indeed the

---

[53] As will be seen below, the Klein reference was distinguished on the basis that the transformation target was
scutellum of immature embryos, not callus (SM674, 713, 770-71), rather than on any argument that the pending
claims required the target cells to be regenerable at the time of bombardment.

PAGE.35        21293773000                                    MAY 22 2002 12:32

Report and Recommendation of Special Master Regarding Claim Construction        **Page 34**
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

language in the claims being prosecuted at that time) refers to a Type II callus culture. But it also points out that the term "friable" was later removed from the claims.

It may well be that the elimination of the word "friable" would negate the conclusion that the phrase "regenerable embryogenic callus culture" is limited to Type II callus, but the fact remains that the applicants were telling the PTO, and the world, that the target of the bombardment step was different from the scutella of immature embryos that were apparently bombarded in Klein. Thus, the phrase must be interpreted to require a different target than Klein used. At the same time, it must be understood that these statements in no way constitute an unequivocal concession that the claims are limited to a transformation target of Type II callus or exclude immature embryos from the definition of "callus." What the statements say is that bombarding the <u>scutellum</u> of cultured immature embryos is distinguishable from bombarding <u>callus cells</u> that can be regenerated after transformation. But this simply tees up a fundamental infringement issue and not a claim construction issue. The infringement issue is the factual question of whether bombardment of whatever the defendants may have bombarded amounts to bombardment of a "callus culture." If the target was merely the scutellum of cultured immature embryos, then the construction of the claims prohibits a finding of infringement. It seems reasonable to expect that at trial there may be any amount of expert technical testimony, pro and con, on the question of whether the particular scutella that served as the target did not already comprise a "callus culture" as that term is used in the claims, or whether it was the same as the target disclosed in Klein.

Adding the word "establishing" to the mix does not alter this construction. Plain English and logic tells us that one cannot <u>have</u> a "callus culture" to bombard until it has been established to some extent. Merely setting up the conditions under which callus initiation can take place

PAGE.36          212937300                          MAY 22 2002 12:32

Report and Recommendation of Special Master Regarding Claim Construction          Page 35
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

does not, at that instant, produce a "callus culture." On the other hand, it may produce a callus culture very quickly. Again, expert testimony will undoubtedly be forthcoming at trial on this question. But the jury needs no instruction on the meaning of the word "establishing." It is used in the claims in its ordinary meaning.

Accordingly, it is recommended that the jury be instructed that "regenerable embryogenic callus culture" means that the target of the bombardment step must be a proliferating mass of embryogenic cells or tissue in a culture medium, and that the mass must comprise cells or tissue which are regenerable after transformation, and must not be merely the immature embryo scutellum that was used as a target in the Klein reference.

Callus cells.  The '956 patent claims require bombardment of "callus cells." Ciba contends that "callus cells" should be interpreted to exclude immature embryos placed on callus initiation medium. Pioneer and Mycogen agree, and Mycogen offers a positive definition as well, i.e., "cells in a regenerable callus culture that has been propagated and maintained through subculture, the cells of the culture having a present capacity to give rise to regenerated plants." DeKalb urges that the term means "cells which form when any corn cell, tissue or organ has been placed on or in callus initiation medium and cellular division has begun." Although it concedes that regeneration is implied in the claims (post-hearing brief, p.11), it again argues that there is no basis in the specification or prosecution history for any construction that the callus cells must be capable of regenerating a corn plant either before or immediately after bombardment. The same language quoted above in connection with the '877 patent also appears in the '956 patent (C6L18-27) and also supports DeKalb's position on both counts. The prosecution history, however, reveals the same set of transactions with respect to the Klein reference.

PAGE.37     212937730О     МАY 22 2002 12:32

Report and Recommendation of Special Master Regarding Claim Construction                    **Page 36**
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

     During the prosecution of the '956 patent, the Examiner rejected the claims over Klein.
(SM170)  In response, the applicants pointed out that Klein contained a "suggestion to transform
scutellum and then to generate callus from the transformed cells" and "not a suggestion that
callus of any sort should be the target of biolistic transformation." (SM189)  In a later response,
the applicants again distinguished Klein on the ground that it identified the scutellum of cultured
immature embryos as the bombardment target. (SM249-51)  Once again, these statements in no
way constitute an unequivocal concession that the claims are limited to a transformation target of
Type II callus or exclude immature embryos from the definition of "callus."  But what the
statements do say is that bombarding the <u>scutellum</u> of cultured immature embryos is
distinguishable from bombarding callus cells that can be regenerated after transformation.  The
applicants clearly differentiated the callus cells that are the subject of the bombardment in the
'956 claims from the scutellum of immature embryos that was the Klein bombardment target.

     It is therefore recommended that the jury be instructed that "callus cells" means a
proliferating mass of cells in a culture medium, and that the mass must comprise cells which are
regenerable after transformation, and must not be merely the immature embryo scutellum that
was used as a target in the Klein reference.

     <u>Intact regenerable cells.</u>  The '880 claims call for bombardment of "intact regenerable *Zea
mays* cells."  Here the term "callus" is not used.  The defendants assert that this language must be
construed essentially identically to the construct they contended for the '956 patent, i.e., cells that
have a present capacity to give rise to regenerated plants, to the exclusion of cells of an immature
embryo.  DeKalb again urges, as it did for the '956 patent, that the term means any corn cells that
are capable of being regenerated into a mature corn plant at the time regeneration is initiated.

Report and Recommendation of Special Master Regarding Claim Construction          **Page 37**
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

Again, the language at column 6, lines 10-18 of the '880 patent, tends to support DeKalb's

proposed construction.

The prosecution of the '880 patent is similar to the '956 and '877 in this respect. The

applicants argued that the Klein reference was distinguishable because it taught bombardment of

scutellum rather than callus. (SM1038) This is not pertinent to the issue at hand, because the

claims of the '880 patent do not require callus. They simply require corn cells that are

"regenerable." Beyond question, it is clear that in the preferred embodiment described in the

Lundquist patents, the target was a Type II callus comprising cells that were regenerable at the

time of bombardment. But the patents make it clear that this was not required, and nothing in the

prosecution history demonstrates that the applicants committed to a different meaning for the

term "regenerable."

Again, there may be complex infringement issues generated by the term "regenerable."

But these are questions of infringement, not claim construction. It is recommended that the jury

be instructed that "intact regenerable *Zea mays* cells," as the target of bombardment in the '880

claims, means corn cells that, after transformation, must be capable of regeneration of a plant

containing the transgene.

Establishing a regenerable culture. The teaching of the '520 patent, like that of the

Lundquist patents, is that the invention is not limited to the use of Type II callus. It contains the

following statement (C9L56-67):

> Other recipient cell targets include, but are not limited to, meristem cells, Type I and II
> calli and gametic cells such as microspores and pollen. Pollen, as well as its precursor
> cells, microspores, may be capable of functioning as recipient cells for genetic
> transformation, or as vectors to carry foreign DNA for incorporation during fertilization.
> Direct pollen transformation would obviate the need for cell culture. Meristematic cells
> (i.e. plant cells capable of continual cell division and characterized by an undifferentiated
> cytological appearance, normally found at growing points or tissues in plants such as root
> tips, stem apices, lateral buds, etc.) may represent another type of recipient plant cell.

PAGE.39          212937300                                    MAY 22 2002 12:33

Report and Recommendation of Special Master Regarding Claim Construction          **Page 38**
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

The '520 claims recite the steps of "establishing a regenerable culture" and then transforming the culture by bombarding it. The defendants argue for essentially the same construction as the other patents. Pioneer neatly summarizes its position, in the context of this claim language, as an immature embryo "is not a culture." DeKalb asserts that the language means any corn cell, tissue or organ which is capable of regenerating into a mature plant and has been grown or is growing on or in a culture medium. The plain language of the claims and the specification of the '520 patent are consistent with DeKalb's position.

Moreover, nothing in the prosecution history of either the '520 patent or its parent application compels a contrary construction. Although the Klein reference was cited in a rejection against the parent, there was no effort to distinguish the pending claims on the basis of either "regenerable" or "culture." Klein was not made the basis for a rejection in the '520 prosecution.

It is recommended that the jury be instructed that "regenerable culture" means that the transformation target in the second step of the '520 claims is any corn cell, tissue or organ that is capable of regenerating into a mature plant and has been grown or is growing on or in a culture medium. As with the '877 patent, the jury needs no instruction as to the word "establishing."

### Meaning of the Term "Progeny"

All claims of the patents in suit employ the word "progeny," except for the '956 patent, which uses the term only in dependent claim 6. The parties hotly contest the meaning of the word as used in the claims. DeKalb construes progeny to mean any and all generations of

PAGE.40          21293773300                    MAY 22 2002 12:33

Report and Recommendation of Special Master Regarding Claim Construction          Page 39
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

descendants from a transgenic plant.  Basically, defendants argue that the term refers to the

immediate offspring of a particular sexual cross of the transformed plant.[54]

Neither the claims nor the specification provide any real support for defendants' position.

The logical, grammatical construction of the claim language itself is that, unless used in a

specifically different context (see discussion of '880 claims below), "progeny" can refer to any

generation but R0, and is certainly not limited to R1.  The specifications do not alter this

conclusion.  Often, when the term is used, it is apparent that the reference is to the R1 generation,

but that is because the experiments exemplified in the patents had only been carried to the R1

generation.  At other times, however, it is clear that the usage of the word is much broader.  For

example, the Lundquist patents state:

> The present invention is directed to the production of fertile transgenic plants and seeds of the species *Zea mays* and to the plants, plant tissues, and seeds derived from such transgenic plants, as well as the subsequent progeny and products derived therefrom. (E.g., '956 patent, C4L48-52)

Similarly, in the Adams '520 patent:

> Furthermore, it would be of particular significance to provide novel approaches to monocot transformation, such as transformation of maize cells, which would allow for the production of stably transformed, fertile corn plants and progeny into which desired exogenous genes have been introduced. (C3L14-19)

---

[54] Claim scope is determined without regard for the accused product or process.  E.g., Young Dental Mfg. Co. v. Q3 Special Prods., Inc., 112 F.3d 1137, 42 USPQ2d 1589, 1592 (Fed. Cir. 1997).  Nonetheless, one might wonder what the fuss is about.  As Ciba points out, under defendants' proposed construction of "progeny," "DeKalb could preclude anyone from making R0 and R1 plants with the claimed methods – and therefore any new plant products – during the patent term."  (Post-Markman Hearing Memorandum, p. 10)  Apparently, however, some of the accused activity involves descendants of R0 plants that pre-date the patents' issuance.  This circumstance may present a nice question of infringement, but it does not invoke claim construction.  As the Federal Circuit took pains to point out in SRI, supra note 20, 227 USPQ at 583, "claims are not construed 'to cover' or 'not to cover' the accused device.  That procedure would make infringement a matter of judicial whim.  It is only after the claims have been construed without reference to the accused device that the claims, as so construed, are applied to the accused device to determine infringement."  (Emphasis present.)

PAGE.41          21293737300                                              MAY 22 2002 12:33

This varied use of a term in the written description demonstrates its breadth rather than providing

a limited definition.[55]

More importantly, it is clear from the patents that there was no intention to limit the

invention to plants of the R1 generation.  Indeed, the intent was expressed to the contrary.  The

Lundquist patents expressed it this way:

> Fertile, transgenic plants may then be used in a conventional maize breeding
> program in order to incorporate the introduced heterologous DNA into the desire lines or
> varieties.  Conventional breeding programs employ a conversion process (backcrossing).
> Methods and references for convergent improvement of corn are given by Hallauer et al.,
> (1988) incorporated herein by reference.  Briefly, conversion is performed by crossing
> the initial transgenic fertile plant to normal elite inbred lines.  The progeny from this
> cross will segregate such that some of the plants will carry the heterologous DNA
> whereas some will not.  The plants that do carry the DNA are then crossed again to the
> normal plant resulting in progeny which segregate once more.  This backcrossing process
> is repeated until the original normal parent has been converted to a line containing the
> heterologous DNA and also possessing all other important attributes originally found in
> the parent.  Generally, this will require about 6-8 generations.  A separate backcrossing
> program will be generally used for every elite line that is to be converted to a genetically
> engineered elite line.  (E.g., '956 patent, C13L43-62; emphasis added)

There is no mistaking the import of this passage.  The intention is to incorporate the transgene

into hybrid corn lines through a conventional breeding program, a process that will take several

generations.  That message is also clear in the '520 patent, which hypothesizes that "the

development of these and other techniques for the preparation of stable genetically transformed

monocots such as maize could potentially revolutionize approaches to monocot breeding."

(C3L22-25)  These statements are clearly inconsistent with any limitation of the claim scope to

only two or three generations.  As DeKalb correctly summarized the matter (Post-Markman

Hearing Brief, pp. 34-35):

> Defendants have asserted that under DEKALB's construction of "progeny" as
> meaning any and all generations of descendants, it would never be possible to
> demonstrate that the claimed subject matter was enabled, since there would always be
> future generations of progeny to which transmission of the foreign gene had not yet been

---

[55] Johnson Worldwide Assoc. v. Zebco Corp., supra note 27, 50 USPQ2d at 1611.

Report and Recommendation of Special Master Regarding Claim Construction        Page 41
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

demonstrated. Such an argument is unrealistic. No patentee would limit claims to transgenic plants of potential commercial value to a single generation of transformant. No matter how a claim is worded, any language that was not limited to a single generation of descendent must have a scope similar to DEKALB's construction of progeny. Defendants' argument implies that a patentee could never draft a valid claim covering more than one generation of descendant, or alternatively must wait for many years after production of the R0 transformant to file a patent application which demonstrated transmission to as many generations of descendants as were claimed. This would present an insurmountable barrier to any patents directed to production of transgenic progeny.

Accordingly, if defendants' restrictive interpretation is to rule, it must be mandated by some clear and unequivocal transaction in the prosecution histories.

During prosecution of the '880 patent, the Examiner rejected application claims 33 and 35 as indefinite on the grounds that they were substantial duplicates of claim 31. (SM10-52) These claims correspond to claims 5(31), 7(33), and 9(35) of the '880 patent. In response, the applicants pointed out that the claims were not duplicative, in that claim 31 results in an R1 progeny, claim 33 an R2 progeny, and claim 35 an R3. (SM1055) Defendants seize upon this transaction as representing a concession on the part of the applicants that the claims were limited to those generations. This, in the opinion of the SM, is not a fair assessment of the transaction. It is much more likely that a person of ordinary skill in the art, having read and understood the '880 patent, and having gained an appreciation that the intent of the applicants was to establish a transgenic line through a conventional breeding program, would have reached a different conclusion. Such a person would, in the opinion of the SM, have understood that the applicants were merely pointing out how the claims differed, rather than attempting to define their complete scope. The differences were correctly noted: claim 33 did not cover R1 and claim 35 did not cover R1 and R2. But to transmute that showing into a concession that claim 31 covered only R1 and claim 33 only R2 and claim 35 only R3, is more than the language or circumstances can support.

PAGE.43    21293377300    MAY 22 2002 12:34

Report and Recommendation of Special Master Regarding Claim Construction         Page 42
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

    Pioneer points out that, in claim 5 of the '956 patent, an R1 plant is said to be "derived from" the R0 plant. It argues from this that claim 6, which recites a progeny plant "derived from the plant of claim 5," must likewise be limited to the R2 generation. But claim 6, unlike claim 5, does not expressly call out an R2 plant. Indeed, unless the phrase "derived from" is narrowly interpreted to cover only a single generation derivation, this claim structure supports DeKalb's interpretation of progeny. But "derived from" cannot be read that narrowly. During the '956 prosecution, application claim 16 as originally filed was "The R1 and subsequent generations derived from the plant of claim 1." (SM74) This clearly supports a broader reading of "derived from." Later, new claims 36 and 37 were submitted as corresponding to claim 16, and the term "progeny" was used in place of "subsequent generations." This transaction provides strong support for DeKalb's position that progeny means the R1 and subsequent generations.

    Pioneer also argues that, under this interpretation of "progeny," claims 4-9 and 13-18 of the '880 patent are "non-sensical and duplicative." It argues that there "would be no need for claims 5-9 and 11[sic:14]-18 if progeny covered all generations." (Post-*Markman* Hearing Brief, p. 11) This argument seems to misapprehend the fundamental purpose of multiple claims, particularly dependent claims that successively narrow the claimed invention. For example, a necessarily narrower dependent claim may be valid when the broader claim from which it depends is not.[56] Thus there might very well be a "need" for narrower claims, and patent applicants routinely – almost invariably – submit and pursue such claim programs. Moreover, claims are not presumed to have an identical scope merely because they can cover the same accused product or process. As the Federal Circuit explained in Tandon Corp. v. United States ITC, 831 F.2d 1017, 4 USPQ2d 1283, 1288 (Fed. Cir. 1987):

---

[56] Wahpeton Canvas Co. v. Frontier Inc., 870 F.2d 1546, 10 USPQ2d 1201, 1207 n.10 (Fed. Cir. 1989).