PAGE.44          21293??300                    MAY 22 2002 12:34

Report and Recommendation of Special Master Regarding Claim Construction          **Page 43**
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

There is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims. To the extent that the absence of such difference in meaning and scope would make a claim superfluous, the doctrine of claim differentiation states the presumption that the difference between claims is significant. D.M.I., 755 F.2d at 1574, 225 USPQ at 239; Autogiro, 384 F.2d at 404, 155 USPQ at 708. At the same time, practice has long recognized that "claims may be multiplied . . . to define the metes and bounds of the invention in a variety of different ways." Bourns, Inc. v. United States, 537 F.2d 486, 492 (Ct. Cl. 1976), 187 USPQ 174, 178 (Ct. Cl. 1975), aff'd. per curiam, 199 USPQ 256 (Ct. Cl. 1976). Thus two claims which read differently can cover the same subject matter.

There is no doubt that claims 4-9 and 13-18 are of differing scope, even employing the proper definition of progeny. However, in view of the apparent misunderstanding, at least on the part of one defendant, it may be that the Court will wish to consider instructing the jury on exactly how the dependency and interrelationship of these claims is to be sorted out. To that end, the following analysis of claims 4-9 could provide the framework for such an instruction (claims 13-18 mirror 4-9 and would be read the same way).

> Claim 4 covers the R1 and succeeding generations, no matter how they are obtained from the R0 plant of claim 1

> Claim 5 covers the R1 and succeeding generations, which must be obtained by crossing the R0 plant of claim 1 with an inbred line

> Claim 6 covers the same plants as claim 4 except for R1 plants

> Claim 7 covers a plant obtained by back crossing a plant covered by claim 5 with the inbred line used in claim 5 and thus does not cover R1 plants

> Claim 8 covers the same plants as claim 4 except for R1 and R2 plants

> Claim 9 covers a plant obtained by back crossing a plant covered by claim 7 with the inbred line used in claim 5 and thus does not cover R1 or R2 plants

It is recommended that the jury be instructed that, in all other occurrences of the term "progeny" in the claims of the patents in suit, it means the R1 and succeeding generations.

Report and Recommendation of Special Master Regarding Claim Construction          Page 44
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

### Insect or Herbicide Resistance

The claims of the Lundquist patents all require, in one fashion or another, that the heterologous DNA confer herbicide resistance or insect resistance to the regenerated plant or its progeny. Ciba and Pioneer take issue with DeKalb's construction of these terms.

Herbicide resistance. Independent claim 1 of the '877 patent requires that the R0 plant be capable of imparting herbicide resistance to its progeny. So, too, with independent claim 1 of the '880 patent. The dependent claims of that patent that address the production of progeny then require that characteristic to be expressed in the progeny plants.

Ciba and Pioneer urge that "herbicide resistance" be construed to mean (1) resistance at the plant level rather than the cellular level, and (2) resistance to chemicals sold to farmers for weed control at the concentrations and levels of application in which they are used to kill whole plants (Ciba) or applied at real-world levels under field conditions (Pioneer). DeKalb's position is that herbicide resistance is phenotypic trait of a transgenic corn plant which allows the cells of the plant to survive or grow in the presence of a herbicide which could kill or stunt the growth of nontransgenic plant cells; any herbicide will do, and field conditions are not required.

In the opinion of the SM, the claim language is clear and unambiguous, and nothing in the patent specifications or prosecution histories limits the construction that it should receive. The claims plainly do not require that the herbicide be a chemical that is sold to farmers for that purpose, nor do they require that it resistance to the herbicide be assessed under field conditions. These conclusions are confirmed by the statement in the Lundquist patents that the "transgenic plants may have many uses in research or breeding." (E.g., '877 patent, C11L62-63)

The claims also plainly require that progeny corn plants (and not merely the callus cells from which they were derived) exhibit the trait in question, but they do not exclude evaluation of

PAGE.46    21293773300    MAY 22 2002 12:34

this condition by assessment at some level other than a whole plant growing in the field or greenhouse. Indeed, various techniques were employed in the Lundquist patents for evaluating the presence of the hygromycin resistance trait in R0 and R1 plants: direct testing by Southern blot in both R0 and R1, and root elongation bioassay and etiolated leaf bioassay for R1. (E.g., '880 patent, C17L39-C18L57) None of these involved application of a herbicide at "real-world levels under field conditions."

Defendants argue that the claims must exclude antibiotics such as hygromycin because they are not chemicals sold to farmers for herbicidal use. But this argument allows no room for the fact that the '880 and '877 patents also disclose and claim transformation with selectable marker genes, such as the "hygromycin B phosphotransferase (HTP) coding sequence , which may be derived from *E. coli*." (E.g., '877 patent, C6L54-56) Claim 4 of the '877 patent specifies that the heterologous DNA includes a selectable marker gene and claim 5 requires that the claim 4 gene impart herbicide resistance to the R0 plant. This claim program supports the conclusion that claim 1 would be satisfied by transformation with a selectable marker gene that imparts herbicide resistance. The examples described in the specification are all concerned with hygromycin resistance gene transformations.

The prosecution histories support the conclusion that antibiotics, such as hygromycin, that exhibit herbicidal activity, are among the agents contemplated by the term "herbicidal resistance." During the prosecution of the '956 patent (which does not claim herbicidal resistance), the applicants asserted (SM137) that the term "herbicide resistance" is art-recognized, and referred to a list of herbicides in the specification (C9L20) that included methotrexate, a metabolic inhibitor that was characterized as a human drug by defendants' expert, Dr. Goodman. (Tr. 1035) In the prosecution of the '877 patent, the Examiner at one point

PAGE.47     212937730      MAY 22 2002 15:35

Report and Recommendation of Special Master Regarding Claim Construction                    **Page 46**
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

indicated that "it may be nothing more than a matter of semantics as to whether hygromycin can
be considered a herbicide," although he was troubled by the lack of evidence that the expression
of hygromycin, as taught in the specification, would satisfy the limitation of herbicide resistance
in a corn plant. (SM724) In his reasons for allowing the patent, however, the Examiner
concluded that the hygromycin example in the patent, and the "general discussion of art known
and available DNA sequences, including herbicide resistance as a type of selectable or
screenable marker, provides a sufficient written description of whole plants produced by the
claimed process." (SM858) In the prosecution of the '520 patent, the same Examiner remarked
that the '877 application was directed to expression of the hygromycin gene "which similarly
confers herbicide resistance to the plants and the progeny produced of that methodology."
(SM1332) In short, the prosecution histories support the conclusion that "herbicide" is not
limited to chemicals sold to farmers as herbicides, but simply means agents that exhibit
herbicidal activity against corn cells.

Resistance is required, however. Neither the claims nor the specification specify how
much resistance is required, and it is clear that the term is used qualitatively. It is logical to
conclude that more resistance is required, when evaluated against the same herbicidal agent in
the same context (be it as a selectable marker gene or an agriculturally beneficial characteristic
of a corn plant growing in a farmer's field), than the same plant without the transgene. It is
recommended that the jury be instructed that "herbicide resistance" means that the plant has
more resistance to an agent having herbicidal activity, when applied to plant material, than the
same plant that does not have the transgene under the same conditions of application and plant
material.

Report and Recommendation of Special Master Regarding Claim Construction    **Page 47**
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

Insect resistance. The claims of the '956 patent specify a R0 plant containing DNA
encoding BT endotoxin, wherein the DNA "is expressed so that the plant exhibits resistance to
an insect and wherein said expression is not present in said plant not containing" the DNA. This
language, by its very terms, requires that the R0 plant, which is required to be fertile and
transgenic, exhibit the phenotypic characteristic of insect resistance. The claims of the other
Lundquist patents are somewhat different. Independent claim 6 of the '877 patent requires only
that the R0 plant be capable of imparting insect resistance to its progeny. So, too, with
independent claim 10 of the '880 patent. Again, the dependent claims of that patent that address
the production of progeny require that characteristic to be expressed in the progeny plants.

Ciba and Pioneer urge that "insect resistance" be construed to mean (1) resistance at the
plant level rather than the cellular level, and (2) resistance to insect pests of corn rather than just
any insect. Pioneer goes further and argues that the plants must "kill actual corn pests, namely,
the European corn borer, under field conditions." DeKalb's position is that any insect will do,
and that field conditions are not required; that the term requires insect resistance to be assessed
when insects consume cells of the plant.

Again, the claim language is clear and unambiguous, and nothing in the patent
specifications or prosecution histories impacts the construction that it should receive. The claims
plainly require that corn plants exhibit the trait in question, not just callus cells from which the
plants were derived. The claims just as plainly do not require that the insect be a European corn
borer, or any other generally recognized corn pest. Nor do they require assessment of resistance
under field conditions. The latter conclusions are confirmed by the statement in the Lundquist
patents that the "transgenic plants produced herein are expected to be useful for a variety of
commercial and research purposes." (E.g., '956 patent, C14L18-19)

PAGE.49    21293773300                                    MAY 22 2002 12:33

What the claims do require, however, is "resistance," and although the claims, specifications, and prosecution histories do not require insect death, there must be some benchmark against which to assess that trait. Again, the most logical construct is to compare the transgenic plant with the same plant that does not contain the heterologous DNA. Accordingly, it is recommended that the jury be instructed that "insect resistance" means that the plant has more resistance to an insect, when the insect consumes or otherwise attacks plant material, than the same plant that does not have the transgene, under the same conditions.

## Heterologous DNA Encoding BT Endotoxin

The claims of the '956 patent call for the use of "heterologous DNA encoding *Bacillus thuringiensis* endotoxin. Pioneer contends that this language is limited to a native BT gene from one of the 40,000+ strains of *Bacillus thuringiensis*. It says that the language cannot be read to cover plants containing DNA that is chemically manipulated,[57] truncated, or shortened, or DNA that merely encodes fragments of the full-length, native BT endotoxin.

This suggested construction is not supported by the intrinsic evidence. To the contrary, the '956 specification makes it clear that heterologous DNA encompasses "synthetic, semi-synthetic, or biologically derived DNA," including "modified genes" and "portions of genes." (C6L45-52) Moreover, the claim language itself does not require native DNA from *Bacillus thuringiensis*, but rather any DNA that encodes BT endotoxin. Reading the claim as a whole, in light of the specification, compels the conclusion that BT endotoxin means a protein that a person of ordinary skill in the art would recognize as a BT endotoxin, in terms of substantial

---

[57] For example, so-called "codon-optimized" DNA, which involves the rewriting of the DNA sequence of a gene derived from a foreign source, such as a bacterium, so that it can be better utilized by the cellular machinery of the recipient plant. (Tr. 914-16)

PAGE.50    21293773300    MAY 22 2002 12:35

Report and Recommendation of Special Master Regarding Claim Construction          Page 49
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

similarity both of structure and of insecticidal activity.[58]  The prosecution history does not

contain any transactions that would tend to contradict this interpretation.

It is recommended that the jury be instructed that "heterologous DNA encoding *Bacillus*

*thuringiensis* endotoxin" means any DNA that encodes for an endotoxin that a person of ordinary

skill in the art would recognize as a BT endotoxin, in terms of substantial similarity both of

structure and of insecticidal activity.

## Said DNA

All of the patent claims use the phrases "said DNA" or "said heterologous DNA" where

appropriate to refer to further plant characteristics or process steps.  Pioneer urges that this

phraseology be construed to require that any progeny plant must contain the identical DNA

sequence originally used in the bombardment process or found in the R0 transformant.  DeKalb

argues that this restrictive interpretation would not allow for any structural or sequential changes

caused by the DNA insertion process or by natural processes occurring within the cell.

Again, Pioneer's interpretation appears to be at odds with the patent specifications.  The

'520 patent discloses the possibility of changes in structure or sequence following bombardment

and chromosomal integration, noting that "intact sequences will not always be present,

presumably due to rearrangement or deletion of sequences in the cell." (C12L50-52)  The '956

patent similarly explains that the foreign gene is not present in the callus as the intact or

nonchromosomal plasmid used to bombard the callus (C20L12-14) and that Southern blot

technology indicated either incomplete digestion or that multiple rearranged copies were present

(C25L48-49).

---

[58] It is clear that identity of structure and function is not required with respect to the endotoxin.  The fact that the specification teaches that modified genes and portions of genes may be used allows for the possibility of differences in the encoded protein.

PAGE.51          2123377300                    MAY 22 2002 12:36

Report and Recommendation of Special Master Regarding Claim Construction          **Page 50**
Transgenic Corn Patent Litigation (N.D. Illinois -- Judge Reinherd)

Pioneer argues (Opening Brief, p. 54) that the patents "do not enable or provide a written description for a method in which the heterologous DNA in a transgenic progeny plant is modified or changed during the breeding process." If this is so, then Pioneer may have identified a Gentry issue,[59] or some other issue, that could provide a defense under 35 U.S.C. §112¶1. But that argument does not compel Pioneer's suggested claim construction. The patents make it clear that an important goal is to incorporate the beneficial transgene into a breeding program, and if the gene is altered by natural processes during that program, that result is certainly contemplated by the patents. The key requirement is that a person of ordinary skill in the art be able to recognize the genetic material for what it originally was. If so much alteration or modification has occurred that this is no longer possible, then there will, at that stage, no longer be literal infringement. It is recommended that the jury be instructed that "said DNA" refers to the DNA that was inserted into the transformed cells, even if altered by the insertion process or by later natural processes, so long as a person of ordinary skill can recognize it as the inserted DNA.

## Chromosomal Integration

The claims of the Adams '520 patent require that the transgene be "chromosomally integrated." Pioneer contends that this limitation should be read into the Lundquist patents as well. (Opening Brief, pp. 72–82) As best the SM can understand this argument, it addresses a pure Gentry issue[60] rather than one of claim construction. If Pioneer can establish that the Lundquist patents teach chromosomal integration as an essential element of the invention there disclosed, it may have identified a problem concerning the adequacy of the written description for claims that are not so limited. But it still will not have justified an interpretation of the claims that would supply that missing element.

---

[59] See notes 18-27, supra, and accompanying text.
[60] Id.

@051          HALE & DORR LLP          05/22/2002 12:24 FAX 2129377300          @051

21293773300    PAGE.52    MAY 22 2002 12:35

Report and Recommendation of Special Master Regarding Claim Construction    **Page 51**
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

Respectfully submitted,

*Robert L. Harmon*

Robert L. Harmon

Special Master

@052    HALE & DORR LLP    05/22/2002 12:24 FAX 21293773300

21293??300                                    MAY 22 2002 12:35                    PAGE.53

Report and Recommendation of Special Master Regarding Claim Construction                **Page 52**
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

## APPENDIX

### Claims of U.S. Patent 5,484,956 (issued to Lundquist *et al.*)

1. A fertile transgenic *Zea mays* plant of the R0 generation containing heterologous DNA encoding *Bacillus thuringiensis* endotoxin, wherein said DNA is expressed so that the plant exhibits resistance to an insect, wherein said expression is not present in said plant not containing said DNA, and wherein said DNA is transmitted through a complete normal sexual cycle of the R0 plant to the R1 generation, and wherein said DNA is introduced into said plant by microprojectile bombardment of *Zea mays* callus cells.

2. The transgenic plant of claim 1 wherein said DNA comprises a promoter.

3. The transgenic plant of claim 1 which is selected from the group consisting of field corn, popcorn, sweet corn, flint corn and dent corn.

4. A seed produced by the transgenic plant of claim 1 which comprises a replication of said heterologous DNA.

5. An R1 transgenic *Zea mays* plant derived from the plant of claim 1 wherein said R1 plant expresses said heterologous DNA so that the R1 plant exhibits said phenotypic characteristics.

6. A progeny transgenic *Zea mays* plant derived from the plant of claim 5 wherein said progeny plant expresses said heterologous DNA so that the progeny plant exhibits said phenotypic characteristics.

Report and Recommendation of Special Master Regarding Claim Construction     Page 53
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

### Claims of U.S. Patent 5,538,877 (issued to Lundquist et al.)

1. A process for producing a fertile transgenic *Zea mays* plant comprising the steps of (i) establishing a regenerable embryogenic callus culture from a *Zea mays* plant to be transformed, (ii) transforming said culture by bombarding it with DNA-coated microprojectiles, (iii) identifying or selecting a transformed cell line, and (iv) regenerating a fertile transgenic *Zea mays* plant therefrom, wherein said DNA is transmitted through a complete sexual cycle of said transgenic plant to its progeny and imparts herbicide resistance thereto.

2. The process of claim 1 wherein the callus culture subjected to bombardment is in clumps of about 30 to 80 mg per clump.

3. The process of claim 1 wherein said callus is initiated on solid media.

4. The process of claim 1 wherein the DNA comprises a selectable marker gene or a reporter gene.

5. The process of claim 4 wherein said selectable marker gene imparts herbicide resistance to said fertile transgenic *Zea mays* plant.

6. A process for producing a fertile transgenic *Zea mays* plant comprising the steps of (i) establishing a regenerable embryonic callus culture from a *Zea mays* plant to be transformed, (ii) transforming said culture by bombarding it with DNA-coated microprojectiles, (iii) identifying or selecting a transformed cell line, and (iv) regenerating a fertile transgenic *Zea mays* plant therefrom, wherein said DNA is transmitted through a complete sexual cycle of said transgenic plant to its progeny, and imparts insect resistance thereto.

7. The process of claim 6 wherein the callus culture subjected to bombardment is in clumps of about 30 to 80 mg per clump.

8. The process of claim 7 wherein said callus is initiated on solid media.

9. The process of claim 6 wherein the DNA comprises a selectable marker gene or a reporter gene.

10. The process of claim 9 wherein said selectable marker gene imparts herbicide resistance to fertile transgenic *Zea mays* plant.

PAGE.55                    2123377300                                        MAY 22 2002 12:36

Report and Recommendation of Special Master Regarding Claim Construction                    **Page 54**
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

## Claims of U.S. Patent 5,538,880 (issued to Lundquist *et al.*)

1.  A process for producing a fertile transgenic *Zea mays* plant comprising the steps of (i) bombarding intact regenerable *Zea mays* cells with DNA-coated microprojectiles, (ii) identifying or selecting a population of transformed cells, and (iii) regenerating a fertile transgenic plant therefrom, wherein said DNA is transmitted through a complete sexual cycle of said transgenic plant to its progeny, and imparts herbicide resistance thereto.

2.  The process of claim 1 wherein the fertile transgenic *Zea mays* plant is regenerated from transformed embryogenic tissue.

3.  The process of claim 1 wherein the cells are derived from immature embryos.

4.  A process comprising obtaining progeny from a fertile transgenic plant obtained by the process of claim 1 which comprise said DNA.

5.  The process of claim 4 wherein said progeny are obtained by crossing said fertile transgenic plant with an inbred line.

6.  The process of claim 4 comprising obtaining seed from said progeny and obtaining further progeny plants comprising said DNA from said seed.

7.  The process of claim 5 wherein the progeny obtained are crossed back to the inbred line, to obtain further progeny which comprise said DNA.

8.  The process of claim 6 wherein seeds are obtained from said further progeny plants and plants comprising said DNA are recovered from said seed.

9.  The process of claim 7 wherein said further progeny are crossed back to the inbred line to obtain progeny which comprise said DNA.

10. A process for producing a fertile transgenic *Zea mays* plant comprising the steps of (i) bombarding intact regenerable *Zea mays* cells with DNA-coated microprojectiles, (ii) identifying or selecting a population of transformed cells, and (iii) regenerating a fertile transgenic plant therefrom, wherein said DNA is transmitted through a complete sexual cycle of said transgenic plant to its progeny, wherein the DNA imparts insect resistance thereto.

11. The process of claim 10 wherein the fertile transgenic *Zea mays* plant is regenerated from transformed embryogenic tissue.

12. The process of claim 10 wherein the cells are derived from immature embryos.

13. A process comprising obtaining progeny from a fertile transgenic plant obtained by the process of claim 10, which comprise said DNA.

Report and Recommendation of Special Master Regarding Claim Construction                    Page 55
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

14. The process of claim 13 wherein said progeny are obtained by crossing said fertile transgenic plant with an inbred line.

15. The process of claim 13 comprising obtaining seed from said progeny and obtaining further progeny plants comprising said DNA from said seed.

16. The process of claim 14 wherein said progeny obtained are crossed back to the inbred line, to obtain further progeny which comprise said DNA.

17. The process of claim 15 wherein seeds are obtained from said further progeny plants and plants comprising said DNA are recovered from said seed.

18. The process of claim 16 wherein said further progeny are crossed back to the inbred line to obtain progeny which comprise said DNA.

MAY 22 2002 12:37

212937300      PAGE.57

Report and Recommendation of Special Master Regarding Claim Construction        Page 56
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

### Claims of U.S. Patent 5,489,520 (issued to Adams *et al.*)

1. A process for producing a fertile transgenic *Zea mays* plant comprising the steps of (i) establishing a regenerable culture from a *Zea mays* plant to be transformed, (ii) transforming said culture by bombarding it with DNA-coated microprojectiles, wherein said DNA comprises a selectable marker gene encoding for phosphinothricin acetyl transferase, (iii) identifying or selecting a transformed cell line and (iv) regenerating a fertile transgenic *Zea mays* plant therefrom, wherein said DNA is transmitted through a complete sexual cycle of said transgenic plant to its progeny, wherein said progeny comprises said selectable marker gene encoding phosphinothricin acetyl transferase, and wherein said gene is chromosomally integrated.

2. The method of claim 1, wherein the gene encoding phosphinothricin acetyl transferase is the bar gene of *Streptomyces hygroscopicus*.

3. The method of claim 1, wherein the gene encoding phosphinothricin acetyl transferase is the bar gene of *Streptomyces viridochromogenes*.

4. The method of claim 1, further comprising obtaining progeny of said fertile, transgenic *Zea mays* plant, wherein said progeny is a fertile, transgenic *Zea mays* plant that comprises the gene encoding for phosphinothricin acetyl transferase.

5. The method of claim 4, further comprising breeding said progeny with a non-transgenic maize plant, to prepare a fertile, transgenic *Zea mays* plant that comprises the gene encoding for phosphinothricin acetyl transferase.

6. The method of claim 4, further comprising breeding said progeny with a second transgenic maize plant to prepare a fertile, transgenic *Zea mays* plant that comprises the gene encoding for phosphinothricin acetyl transferase.

7. The method of any one of claims 1 through 6, further comprising preparing seed from one or more fertile, transgenic *Zea mays* plants that comprises the gene encoding for phosphinothricin acetyl transferase, wherein said seed contains the gene encoding for phosphinothricin acetyl transferase.

8. The method of claim 7, further comprising cultivating said seed to prepare a fertile, transgenic *Zea mays* plant that comprises the gene encoding for phosphinothricin acetyl transferase.

11

03/28/95   13:58   ☎612 339 3081      SCHWEGMAN, LUNDB                    ☑002

# OFFICIAL

PATENT

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | | |
|---|---|---|---|
| Applicants: | R. C. Lundquist et al. | Examiner: | G. Benzion |
| Serial No.: | 08/249,458 | Art Unit: | 1804 |
| Filed: | May 26, 1994 | Docket: | 950.001US2 |
| For: | FERTILE TRANSGENIC CORN PLANTS | | |

Hon. Commissioner of Patent
  and Trademarks
Washington, D. C. 20231

FAX CENTER
RECEIVED

MAR 2 8 1995

GROUP 1800

### SUPPLEMENTAL AMENDMENT

Sir:

To supplement the Amendment filed December 27, 1994, please amend the

above-identified application as follows:

### In the Claims

Please add the following claims:

Claim 30.    The process of claim 25 further comprising (iv) obtaining progeny from said

fertile transgenic plant of step (iii), which comprise said DNA.

Claim 31.    The process of claim 30 wherein said progeny are obtained by crossing said

fertile transgenic plant of step (iii) with an inbred line.

SM 0001046

03/28/95   14:00   ☎612 339 3061        SCHWEGMAN, LUNDB _____   _____        🖾001

Claim 32.  The process of claim 30 or 31 comprising obtaining seed from said progeny and obtaining further progeny plants comprising said DNA from said seed.

Claim 33.  The process of claim 31 wherein the progeny obtained in step (iv) are crossed back to the inbred line, to obtain further progeny which comprise said DNA.

Claim 34.  The process of claim 32 wherein seeds are obtained from said further progeny plants and plants comprising said DNA are recovered from said seed.

Claim 35.  The process of claim 33 wherein said further progeny are crossed back to the inbred line to obtain progeny which comprise said DNA.

## Remarks

Claims 30-35 having been added, the claims pending in the above-identified application are claims 23, 29 and 30-35.

Claims 30-31 are supported by the specification at pages 31-34, wherein the presence of the introduced DNA is confirmed in the R1 generation plants, which are obtained by crossing the R0 plant with A188, B73 and Oh43.

Claims 32-35 are supported by originally filed claim 13, and at pages 19-20 of the specification, which set forth methodologies for obtaining R2 and higher generation progeny plants from the initial R0 transgenic plants.

2

SM 0001047

When the Examiner takes the application up for the next Office Action, consideration of these amendments and remarks is respectfully requested.

Since the Amendment filed on December 27, 1994 was fully responsive to the Office Action, it is believed that no extension fees are due for filing this amendment. However, if any fees are due, please charge them to Deposit Account No. 19-0743.

Respectfully submitted,

R. C. Lundquist et al.,

By their attorneys,

SCHWEGMAN, LUNDBERG
& WOESSNER, P.A.
3500 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402
(612) 339-0331

Dated: _3-28-95_

By: _Warren D. Woessner_
     Warren D. Woessner
     Reg. No. 30,440

3

SM 0001048

**12**

PATENT

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | | |
|---|---|---|---|
| Applicants: | R. C. Lundquist et al. | Examiner: | G. Benzion |
| Serial No.: | 08/249,458 | Art Unit: | 1804 |
| Filed: | May 26, 1994 | Docket: | 950.001US2 |
| For: | FERTILE TRANSGENIC CORN PLANTS | | |

Hon. Commissioner of Patent
  and Trademarks
Washington, D. C. 20231

AMENDMENT

Sir:

    In response to the Office Action mailed September 28, 1994, please amend the

above-identified application as follows:

**In the Claims**

    Cancel claims 25-28.

Claim 23 (amended). A process for producing a fertile transgenic *Zea mays* plant comprising

the steps of (i) bombarding intact regenerable *Zea mays* cells with

DNA-coated microprojectiles, (ii) identifying or selecting a population

of transformed cells [wherein said DNA is chromosomally integrated,]

and (iii) regenerating a fertile transgenic plant therefrom, wherein said

DNA is transmitted through a complete sexual cycle of said transgenic

plant to its progeny.

SM 0001034

## IN THE SPECIFICATION

At page 1, after "This is a continuation of application Serial No. 07/974,379, filed November 10, 1992", insert --, which is a continuation of application Serial No. 07/467,983, filed January 22, 1990, abandoned --.

## Remarks

Reconsideration and withdrawal of the rejection of the claims of the above-identified application is respectfully requested. Claims 25-28 having been cancelled, and claim 23 having been amended, the claims pending in the application are claims 23 and 29.

The amendment to claim 23 to recite that the bombarded cells are "intact," as opposed to protoplasts, is supported at page 3, full para. 3, lines 1-3 of the specification.

The specification has been amended to claim priority from grandparent application Serial No. 07/467,983, filed January 22, 1990. This amendment is supported by the copy of the declaration filed with the present Rule 60 continuation application, and by the Official Filing Receipt of the parent application.

At page 2 of the Office Action, the Examiner provisionally rejected the claims under the doctrine of obviousness-type double patenting over claims 39, 41-42 and 47-48 of commonly-assigned, copending application Serial No. "07/[9]74,379," or over claims 23-29 of commonly assigned, copending application Serial No. "08/233,0[67]." At the time that subject matter is indicated to be allowable in the present application, a terminal disclaimer will be submitted, if necessary, should these rejections still be applicable.

2

SM 0001035

At page 3 of the Office Action, the claims were rejected under 35 U.S.C. § 112(1), on the basis that the specification only enables the transformation of cells which have not been subjected to a process of protoplasting. The basis for this rejection is that, as of the filing date of the application, protoplasts had not been shown to be capable of regeneration into fertile *Zea mays* plants. This rejection is respectfully traversed.

As amended, claim 23 recites that the *Zea mays* cells which are bombarded are "intact," i.e., have an intact cell wall. Intact *Zea mays* cells are contrasted to protoplasts at page 3, full paragraph 3 of the specification. Therefore, it is respectfully submitted that the claimed method has been adequately differentiated from a method involving bombardment of protoplasts, and withdrawal of the rejection is respectfully requested.

At page 4 of the Office Action, the Examiner rejected the claims as obvious over commonly-assigned, copending application Serial No. 08/233,067. This rejection is respectfully traversed.

The specification has been amended to recite the effective filing date of the present application, which is January 22, 1990. This date is prior to the effective filing date of Serial No. 08/233,067, which is that of Serial No. 513,298, filed April 17, 1990. No priority claim has been made to an earlier application. Thus, it is respectfully submitted that the '067 application is not prior art to the present application. Therefore, withdrawal of this rejection is respectfully requested.

At pages 4-5 of the specification, the Examiner rejected the claims as obvious over Klein et al., Bio/Technology, 6, 559 (1988), in view of Armstrong et al., Planta, 164, 207 (1985). This rejection is respectfully traversed.

3

SM 0001036