With respect to the Klein et al. paper, the Examiner states that page 562, col. 2, discloses that the "stable transformation of maize callus via the disclosed technique is evident," and concludes that "Klein et al. is clearly seen to teach the application of the method of bombarding maize scutellum and/or suspension cells to transform them." However, the Examiner is urged to consider that he is reading Klein et al. to "teach" much more than the art worker could possibly derive from this limited and specific disclosure. For example, Applicants specifically disagree with the Examiner's conclusion at page 5 of the Office Action that "the use of particle acceleration technology to transform totipotent maize cultures is both the logical progression from the observation of stable transformation as noted in Klein et al. (page 562) to the use of known regenerable fertile tissue..." for the following reasons:

(1)    Klein et al. do not disclose or confirm that the cultured BMS maize cells or the scutellum that were bombarded were stably transformed with the exogenous DNA, much less that the DNA could be passed from one cell generation to another. Klein et al. repeatedly refer to transient expression of the gene in both the cultured cells and scutellum.

(2)    Klein et al. do not disclose what type of tissue was used to produce the "cultures of maize" that were "stably transformed" in the "manuscript in preparation" much less that these cultures could be regenerated into fertile plants. The fact that both the cited Klein et al. paper and the later Klein et al. Plant Physiol. paper (91, 440 (1989)) use BMS cultures as starting materials is

4

SM 0001037

evidence that Klein et al. in fact transformed a tissue that could not be regenerated into plants.

(3)   The mention of "tissue" that will be a prime target for future attempts at transformation is clearly intended as a reference to scutellum, not to callus. However, as noted at point (1) above, there is nothing to suggest that Klein et al. believed that they had achieved stable transformation of scutellum. Therefore, Klein et al. do not "teach" the production of stably transformed maize tissue.

In conclusion, there is nothing in the Klein et al. paper that would "teach" (enable) the art worker to prepare a stably transformed maize tissue, or to regenerate the tissue into a fertile maize plant that can sexually transmit the introduced DNA to the next generation. The Klein et al. paper is no more than an invitation to conduct further undefined experiments, and does not amount to a suggestion, either considered alone, or in combination with Armstrong et al., to take the course that led to Applicants' success.

Even assuming, arguendo, that the cited art renders it *prima facie* obvious to proceed along the lines arguably suggested by Klein et al. to transformed bombard maize Type II callus, it is respectfully submitted that it would still be unexpected that fertile transgenic maize plants capable of transmission of the foreign DNA to progeny would be obtained by this route. As evidence of the reasonable expectations of the art with respect to these teachings, the Examiner is requested to consider paragraph 14 of the Rule 132 declaration executed by Professor Ronald J. Phillips on July 20, 1992, in commonly-assigned application Serial No. 07/508,045, filed April 11, 1990. In his declaration, Professor Phillips

5

SM 0001038

contrasts the regenerability of friable Type II embryogenic maize callus, to characteristics that would render its transformation unpredictable, namely its fragility and the uncertainty with respect to its ability to stably integrate the foreign DNA or to regenerate plants. Paragraph 14, which summarizes his conclusions, is reproduced below:

> 14.    It might well be obvious for a researcher in this area to try to transform a maize tissue, cultured cells or protoplasts that had a history of "regenerability" in the untransformed state. However, the "state of the art" in mid-1989 to early 1990 would not permit one of ordinary skill in the art to reasonably predict that the three pieces of the puzzle of maize transformation, namely stable transformation accompanied by subsequent cell division, regenerability, and fertility/transmission, would come together via any available methodology employing any available maize starting material, including scutellum, much less that the biolistic transformation of friable embryonic Type II callus would be the path to success.

In In re Wood, 202 USPQ 171, 174 (CCPA 1979), the court emphasized that "[o]f course, an evaluation of the claimed invention performed by an impartial, qualified third party is a valuable indication of the nonobviousness of an invention." The Examiner is requested to consider that Professor Phillips' declaration is based on facts derived from his extensive experience with the *in vitro* cell/tissue culture of maize, and that the declaration is sufficient to rebut any *prima facie* case of obviousness established by the cited art. The Examiner is also requested to consider that the declaration is particularly effective in view of the remoteness of the cited art from the claimed invention; there are no experiments disclosed in the cited art relating to (a) obtaining stably transformed dividing cells from any transformed maize tissue source, following the use of biolistics to introduce the foreign DNA; (b) regenerating R0 plants from the transformed callus; or (c) confirming the presence of the

6

SM 0001039

foreign DNA in the germline cells of the R0 plants. Therefore, withdrawal of the

obviousness rejection is appropriate and is respectfully requested.

Therefore, it is respectfully submitted that , as amended, claims 23 and 29 are

in condition for allowance, and early notification to that effect is earnestly solicited.

Respectfully submitted,

R. C. Lundquist et al.,

By their attorneys,

SCHWEGMAN, LUNDBERG
    & WOESSNER, P.A.
3500 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402
(612) 339-0331

Dated: _17 Dec 1994_                      By: _Warren O Woessner_
                                              Warren D. Woessner
                                              Reg. No. 30,440

7

SM 0001040

13




UNITED STATES DEPARTMENT OF COMMERCE
Patent and Trademark Office
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| SERIAL NUMBER | FILING DATE | | | ATTORNEY DOCKET NO. |
|---|---|---|---|---|
| 08/249,458 | 05/26/94 | LUNDQUIST | R | 950.1US02 |

18M2/1127

SCHWEGMAN, LUNDBERG & WOESSNER
ATTN:  WARREN D. WOESSNER
3500 IDS CENTER
80 SOUTH EIGHTH STREET
MINNEAPOLIS, MN 55402

BENZION EXAMINER

| ART UNIT | PAPER NUMBER |
|---|---|
| 1803 | 15/E 8B |

DATE MAILED:  11/27/98  6/95

## NOTICE OF ALLOWABILITY

PART L
1. ☑ This communication is responsive to *Telephonic communication of 11/15/95*
2. ☑ All the claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice Of Allowance And Issue Fee Due or other appropriate communication will be sent in due course.
3. ☑ The allowed claims are *23, 24 & 29-35, new renumbered as claims 1-9 respectively*
4. ☐ The drawings filed on _____ are acceptable.
5. ☐ Acknowledgment is made of the claim for priority under 35 U.S.C. 119. The certified copy has [_] been received, [_] not been received, [_] been filed in parent application Serial No. _____ filed on _____
6. ☑ Note the attached Examiner's Amendment.
7. ☐ Note the attached Examiner Interview Summary Record, PTOL-413.
8. ☐ Note the attached Examiner's Statement of Reasons for Allowance.
9. ☐ Note the attached NOTICE OF REFERENCES CITED, PTO-892.
10. ☐ Note the attached INFORMATION DISCLOSURE CITATION, PTO-1449.

PART II.

A SHORTENED STATUTORY PERIOD FOR RESPONSE to comply with the requirements noted below is set to EXPIRE THREE MONTHS FROM THE "DATE MAILED" indicated on this form. Failure to timely comply will result in the ABANDONMENT of this application. Extensions of time may be obtained under the provisions of 37 CFR 1.136(a).

1. ☐ Note the attached EXAMINER'S AMENDMENT or NOTICE OF INFORMAL APPLICATION, PTO-152, which discloses that the oath or declaration is deficient. A SUBSTITUTE OATH OR DECLARATION IS REQUIRED.
2. ☑ APPLICANT MUST MAKE THE DRAWING CHANGES INDICATED BELOW IN THE MANNER SET FORTH ON THE REVERSE SIDE OF THIS PAPER.
   a. ☐ Drawing informalities are indicated on the NOTICE RE PATENT DRAWINGS, PTO-948, attached hereto or to Paper No. _____. CORRECTION IS REQUIRED.
   b. ☐ The proposed drawing correction filed on _____ has been approved by the examiner. CORRECTION IS REQUIRED.
   c. ☐ Approved drawing corrections are described by the examiner in the attached EXAMINER'S AMENDMENT. CORRECTION IS REQUIRED.
   d. ☑ Formal drawings are now REQUIRED.

_____

Any response to this letter should include in the upper right hand corner, the following information from the NOTICE OF ALLOWANCE AND ISSUE FEE DUE: ISSUE BATCH NUMBER, DATE OF THE NOTICE OF ALLOWANCE, AND SERIAL NUMBER.

Attachments:
_ Examiner's Amendment
_ Examiner Interview Summary Record, PTOL-413
_ Reasons for Allowance
_ Notice of References Cited PTO-892
_ Information Disclosure Citation, PTO-1449

_ Notice of Informal Application PTO-152
_ Notice re Patent Drawings, PTO-948
_ Listing of Bonded Draftsmen
_ Other

SM 0001077

PTOL-37 (REV. 4-89) *

USCOMM-DC 89-3799

5      An Examiner's Amendment to the record appears below. Should the changes be unacceptable to Applicant, an amendment may be filed as provided by 37 CFR 1.312. To ensure consideration of such an amendment, it **MUST** be submitted no later than the payment of the Issue Fee.

The title has been amended as follows:

10      METHOD FOR PREPARING FERTILE TRANSGENIC CORN PLANTS.

In the claims.

Claim 23 has been amended as follows:

23. (Twice amended). A process for producing a fertile transgenic *Zea mays* plant comprising the steps of (i) bombarding intact regenerable *Zea mays* cells with DNA-coated microprojectiles, (ii) identifying or selecting a population of transformed cells and (iii) regenerating a fertile transgenic plant therefrom, wherein said DNA is transmitted through a complete sexual cycle of said transgenic plant to its progeny[.] and imparts herbicide or insect resistance thereto.

Authorization for this Examiner's Amendment was given in a telephone interview with Warren Woessner on November 15, 1995

Any inquiry concerning this or earlier communication from the examiner should be directed to Gary Benzion, Ph.D whose telephone number is (703) 308-1119. The examiner can normally be reached on Monday-Friday from 8 AM to 4:30 PM. If attempts
15    to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Douglas W. Robinson can be reached on (703)-308-2897. Any inquiry of a general nature or

SM 0001078

Serial No.    08/249,458                                          3 of 3
Art Unit      1803

relating to the status of this application should be directed to the Group receptionist whose telephone number is (703) 308-0196.

20    Papers related to this application may be submitted to Group 1800 by facsimile transmission.  Papers should be faxed to Group 180 via the PTO Fax Center located in Crystal Mall 1.  The faxing of such papers must conform with the notice published in the Official Gazette, 1096 OG 30 (November 15, 1989).  The CM1 Fax Center number is (703)-308-4227.  Informal communication may be sent via facsimile at 703-308-7362.

Benzion
25    11/16/95

GARY BENZION
PRIMARY EXAMINER
GROUP 1800

SM 0001079

14

12/08/95   13:16   ☎612 339 3061          SCHWEGMAN, LUNDB                    ☒002

PATENT

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | | |
|---|---|---|---|
| Applicants: | R. C. Lundquist et al. | Examiner: | G. Benzion |
| Serial No.: | 08/249,458 | Art Unit: | 1804 |
| Filed: | May 26, 1994 | Docket: | 950.001US2 |

For:    **FERTILE TRANSGENIC CORN PLANTS**

Box AF
Assistant Commissioner for Patents
Washington, D. C. 20231

### AMENDMENT UNDER 37 C.F.R. §1.312

Sir:

In response to the Notice of Allowance, Notice of Allowability, and Examiner's Amendment to claim 23, mailed November 27, 1995, please amend as follows:

### In the Claims

Claim 23 (amended). A process for producing a fertile transgenic *Zea mays* plant comprising the steps of (i) bombarding intact regenerable *Zea mays* cells with DNA-coated microprojectiles, (ii) identifying or selecting a population of transformed cells, and (iii) regenerating a fertile transgenic plant therefrom, wherein said DNA is transmitted through a complete sexual cycle of said transgenic plant to its progeny, and imparts herbicide [or insect] resistance thereto.

SM 0001082

12/08/95   13:16   ☎612 339 3061          SCHWEGMAN, LUNDB _____          @003

Claim 3̶8̶ **4** (amended). [The] A process [of claim 23 further] comprising [(iv)] obtaining

progeny from [said] a fertile transgenic plant [of step (iii)] obtained by

the process of claim 2̶3̶ **1**, which comprise said DNA.

Claim 3̶1̶ **5** (amended). The process of claim 3̶0̶ **4** wherein said progeny are obtained by crossing

said fertile transgenic plant [of step (iii)] with an inbred line.

Claim 3̶2̶ **6** (amended). The process of claim 3̶0̶ **4** [or 31] comprising obtaining seed from said

progeny and obtaining further progeny plants comprising said DNA

from said seed.

Claim 3̶3̶ **7** (amended). The process of claim 3̶1̶ **5** wherein the progeny obtained [in step (iv)] are

crossed back to the inbred line, to obtain further progeny which

comprise said DNA.

Claim 3̶8̶ **10.** A process for producing a fertile transgenic *Zea mays* plant comprising the

steps of (i) bombarding intact regenerable *Zea mays* cells with DNA-coated

microprojectiles, (ii) identifying or selecting a population of transformed cells,

and (iii) regenerating a fertile transgenic plant therefrom, wherein said DNA is

transmitted through a complete sexual cycle of said transgenic plant to its

progeny, wherein the DNA imparts insect resistance thereto.

2

SM 0001083

Claim 11.    The process of claim 10 wherein the fertile transgenic *Zea mays* plant is regenerated from transformed embryogenic tissue.

Claim 12.    The process of claim 10 wherein the cells are derived from immature embryos.

Claim 13.    A process comprising obtaining progeny from a fertile transgenic plant obtained by the process of claim 10, which comprise said DNA.

23

Claim 14.    The process of claim 13 wherein said progeny are obtained by crossing said fertile transgenic plant with an inbred line.

Claim 15.    The process of claim 13 comprising obtaining seed from said progeny and obtaining further progeny plants comprising said DNA from said seed.

Claim 16.    The process of claim 14 wherein the progeny obtained are crossed back to the inbred line, to obtain further progeny which comprise said DNA.

Claim 17.    The process of claim 15 wherein seeds are obtained from said further progeny plants and plants comprising said DNA are recovered from said seed.

Claim 18.    The process of claim 16 wherein said further progeny are crossed back to the inbred line to obtain progeny which comprise said DNA.

3

SM 0001084

19

12/08/95    13:17    ☎612 339 3061    SCHWEGMAN, LUNDB    ☒005

## Remarks

Claims 23 and 30-33 having been amended, and claims 36-44 having been added, the claims pending in the above-identified application are claims 23-24 and 29-44.

Claim 23 has been amended to delete reference to imparting insect resistance. This aspect of the invention is introduced as independent claim 36, and dependent claims 37-44 correspond to allowed claims 24 and 29-33, respectively.

It is respectfully submitted that these claims do not introduce new matter, and are allowable without further search or consideration. Therefore, entry is appropriate under Rule 312, and is respectfully requested.

Respectfully submitted,

R. C. Lundquist et al.,

By their attorneys,

SCHWEGMAN, LUNDBERG
& WOESSNER, P.A.
3500 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402
(612) 339-0331

Dated: 8 Dec. 1995                   By: _____
                                         Warren D. Woessner
                                         Reg. No. 30,440

4

SM 0001085

**15**

#17

| **Response to Rule 312 Communication** | Application No.<br>08/249,458 | Applicant(s) | | Lundquist et al. |
|---|---|---|---|---|
| | Examiner<br>Gary Benzion, Ph.D | | Group Art Unit<br>1803 | |

☐ The petition filed on _____ under 37 CFR 1.312(b) is granted.  The paper has been forwarded to the examiner for consideration on the merits.

☒ The amendment filed on ___*11 Dec 1995*___ under 37 CFR 1.312 has been considered, and has been:

    ☐ entered.

    ☒ entered as directed to matters of form not affecting the scope of the invention (Order 3311).

    ☐ disapproved.  See explanation below.

    ☐ entered in part.  See explanation below.

DOUGLAS W. ROBINSON
SUPERVISORY PATENT EXAMINER
GROUP 1800

SM 0001092

GARY BENZION, PH.D
PRIMARY EXAMINER
ART UNIT 1803

U. S. Patent and Trademark Office
PTO-271 (Rev. 5-95)          Response to Rule 312 Communication          Part of Paper No. __17__

16

Staple Issue Slip Here

| POSITION | ID NO. | DATE |
|---|---|---|
| CLASSIFIER | 19 | 6/19/92 |
| EXAMINER | | 353  6-20 |
| TYPIST | | 18  6-20 |
| VERIFIER | 204 | |
| CORPS CORR. | | |
| SPEC. HAND | | |
| FILE MAINT. | | |
| DRAFTING | | |

## INDEX OF CLAIMS



SYMBOLS

| | |
|---|---|
| — | Rejected |
| ✓ | Allowed |
| (Through numeral) | Canceled |
| + | Restricted |
| N | Non-elected |
| I | Interference |
| A | Appeal |
| O | Objected |

SM 0001130

(LEFT INSIDE)

**17**

# Manual of
# PATENT
# EXAMINING
# PROCEDURE

### Original Sixth Edition, January 1995
### Latest Revision July 1996




## U.S. DEPARTMENT OF COMMERCE
### Patent and Trademark Office

Rev. 2, July 1996

MANUAL OF PATENT EXAMINING PROCEDURE

**717.04**

### 717.04   Index of Claims [R−1]

>Constant reference is made to the "Index of Claims" found in the inside of the file wrapper of all applications. It should be kept up to date so as to be a reliable index of all claims standing in a case, and of the amendment in which the claims are to be found.

The preprinted series of claim numbers appearing on the file wrapper refer to the claim numbers as originally filed while the adjacent column should be used for the entry of the final numbering of the allowed claims.

Independent claims should be designated in the Index of Claims by encircling the claim number in red ink.

A line in red ink should be drawn below the number corresponding to the number of claims originally presented.

Thereafter, a line in red ink should be drawn below the number corresponding to the highest numbered claim added by each amendment. Just outside the Index of Claims form opposite the number corresponding to the first claim of each amendment there should be placed the letter designating the amendment.

If the claims are amended in rewritten form under 37 CFR 1.121(b), the original claim number should not be stricken from the Index of Claims but a notation should be made in red ink in the margin to the left of the original claim number, i.e. "Amend. 1"; if the claim is rewritten a second time, "Amend. 1" should be changed by striking out "1" and inserting "2" above it.

As any claim is canceled, a line in red ink should be drawn through its number.

A space is provided for completion by the examiner to indicate the date and type of each Office action together with the resulting status of each claim. A list of codes for identifying each type of Office action appears below the Index. At the time of allowance, the examiner places the final patent claim numbers in the column marked "Final."<

### 717.05   Field of Search [R−1]

>In each action involving a search, the examiner shall endorse, on the flap of the file wrapper, the U.S. classes and subclasses, International Patent Classification(s) and publications searched, the date when the search was made or was brought up to date and the examiner's initials, all entries being in BLACK INK. Great care should be taken so as to clearly indicate the places searched and the date(s) on which the search was conducted.

In order to provide a complete, accurate, and uniform record of what has been searched and considered by the examiner for each application, the Patent and Trademark Office has established procedures for recording search data in the application file. Such a record is of importance to anyone evaluating the strength and validity of a patent, particularly if the patent is involved in litigation. These procedures will also facilitate the printing of certain search data on patents.

Under the procedures, searches are separated into two categories and listed, as appropriate, in either the "SEARCHED" box or "SEARCHED NOTES" box on the file wrapper.

If additional space is required, entries should be continued on the outside right flap of the file wrapper.

*A. "SEARCHED" Box Entries*

Search entries made here, except those for search updates (see item A.3 below), will be printed under "Field of Search" on the patent front page. Therefore, the following searches will be recorded in the "SEARCHED" box by the examiner along with the date and the examiner's initials, according to the following guidelines:

(1) *A complete search of a subclass*, including all United States and foreign patent documents, whether filed by U.S. or IPC classification, and other publications placed therein.

The complete classification (class and subclass) should be recorded.

*Examples:*
424/270, 272, 273
224/42.1 F
414/DIG. 4
D3/32 R
A61K 9/22
A61K 31/56 − A61K 31/585

(2) *A limited search of a subclass*, for example, a search that is restricted to an identifiable portion of the patent documents placed therein. If, however, only the publications in a subclass are searched, such an entry is to be made under "SEARCH NOTES" rather than under "SEARCHED." (See item B(4) below.)

The class and subclass, followed by the information defining the portion of the subclass searched—in parenthesis, should be recorded.



18

RESTRICTED CONFIDENTIAL VIDEO DEPOSITION OF
ERIC WARD

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - -x

MONSANTO COMPANY and          : 04-305(SLR)

MONSANTO TECHNOLOGY LLC,       :

       Plaintiffs,            :

  vs.                          :

SYNGENTA SEEDS, INC.,          :

SYNGENTA BIOTECHNOLOGY, INC.,  :

ET AL.,                        :

      Defendants.            :

- - - - - - - - - - - - - - -x

DEKALB GENETICS CORPORATION,   :

      Plaintiff,             :   Civil Action Number

  vs.                          :   05-355-SLR

SYNGENTA SEEDS, INC.,          :

SYNGENTA BIOTECHNOLOGY, INC.,  :

ET AL.,                        :

      Defendants.            :

- - - - - - - - - - - - - - -x

RESTRICTED CONFIDENTIAL VIDEO DEPOSITION OF

ERIC WARD

Washington, DC

Wednesday, December 14, 2005

REPORTED BY: CARMEN SMITH
Job No. 54929

Sunbelt Reporting & Litigation Services
361 882-0763 Corpus    713 667-0763 Houston    214 747-0763 Dallas

a7a1edd0-a8a7-4df3-94ea-0b7cc9dbd9d2

RESTRICTED CONFIDENTIAL VIDEO DEPOSITION OF
ERIC WARD

## Page 2

1   Restricted Confidential Video Deposition of ERIC
2   WARD, called for examination pursuant to notice of
3   deposition, on Wednesday, December 14, 2005, in
4   Washington, DC, at the offices of Finnegan. Henderson.
5   Farabow, Garrett & Dunner, 901 New York Avenue NW, at
6   9:14 a.m., before CARMEN SMITH, a Notary Public within
7   and for the District of Columbia, when were present on
8   behalf of the respective parties:
9
10      MELINDA PATTERSON. ESQ.
11      Howrey LLP
12      1111 Louisiana, 25th Floor
13      Houston, Texas 77002-5242 .
14      713-787-1483
15      On behalf of Plaintiffs
16
17      MICHAEL FLIBBERT. ESQ.
18      SANYA SUKDUANG, ESQ.
19      Finnegan Henderson Farabow Garrett & Dunner
20      901 New York Avenue NW
21      Washington. DC 20001-4413
22      202-408-4377
23      On behalf of Defendants
24
25              -- continued --

## Page 3

1   APPEARANCES (Continued):
2
3       HEATHER KAFELE. ESQ.
4       Shearman & Sterling
5       801 Pennsylvania Avenue NW
6       Washington, DC 20004-2634
7       202-508-8000
8       On behalf of Syngenta Defendants
9
10
11
12
13
14
15
16
17
18
19
20
21
22      ALSO PRESENT:
23      JONATHAN PERRY, Videographer
24
08:58:08 25

## Page 4

1               PROCEEDINGS
2           VIDEO OPERATOR:  This is tape number 1 of the
3   videotaped deposition of Eric Ward, taken in the
4   matter of Monsanto Company et al. versus Syngenta
09:14:11 5  Seeds, Incorporated, et al., Case Number 04-305-SLR,
6   and in the matter of DeKalb Genetics Corporation
7   versus Syngenta Seeds, Incorporated, et al., Case
8   Number 105 CV 355 SLR, in the U.S. District Court for
9   the District of Delaware.
09:14:34 10      Today's date is December 14, 2005. The time
11  on the video screen is currently 9:15:13 a.m.
12          This deposition is being held at the offices
13  of Finnegan Henderson, 901 New York Avenue. Northwest,
14  Washington, D.C. My name is Jonathan Perry. I am the
09:15:00 15 videographer here on behalf of Sunbelt Reporting and
16  Litigation Services. The court reporter is Carmen
17  Smith, also with Sunbelt Reporting.
18          Will counsel present please introduce
19  themselves and state whom they represent.
09:15:11 20      MS. PATTERSON:  Melinda Patterson for
21  Monsanto Company and DeKalb Genetics Corporation.
22          MR. FLIBBERT:  Michael Flibbert of Finnegan
23  Henderson, and with me is Heather Kafele of Shearman
24  and Sterling on behalf of the Syngenta Defendants.
09:15:31 25      VIDEO OPERATOR:  Will the reporter swear in

## Page 5

1   the witness, please.
2           Whereupon,
3                   ERIC WARD
4   was called as a witness and, having first been duly
09:15:37 5  sworn, was examined and testified as follows:
6               EXAMINATION
7   BY MS. PATTERSON:
8       Q   Good morning, Dr. Ward.
9       A   Good morning.
09:15:39 10     Q   Would you please state your name and address
11  for the record?
12      A   My name is Eric Ward. My address is 3761
13  Bentley Drive in Durham, North Carolina.
14      Q   And by whom are you presently employed?
09:15:54 15     A   I'm employed presently by a company called
16  Cropsolution, Incorporated.
17      Q   What is the business of that company?
18      A   We are an entrepreneurial firm that discovers
19  new agricultural chemicals.
09:16:13 20     Q   And do you use biotechnology research in
21  those discovery efforts?
22      A   Our principal mode of discovery is chemical
23  synthesis.
24      Q   And does your company engage in
09:16:36 25 transformation of plants?

2 (Pages 2 to 5)

RESTRICTED CONFIDENTIAL VIDEO DEPOSITION OF
ERIC WARD

## Page 134

1    ultimately.
2         But this is an interesting case, because
3    bromoxynil was already at this point sold as a
4    selective herbicide for use in corn to kill broad leaf
14:11:40 5    weeds. So at rates of something like several hundred
6    grams per hectare, bromoxynil was labeled specifically
7    for use in corn to control broad leaf weeds.
8         So I would be astonished that anyone would
9    ever try to use bromoxynil as a selectable marker or
14:12:01 10    try to confer tolerance to it in corn, given that corn
11    already had very high level tolerance. That was --
12         Q   Well, did you ever --
13         A   That was, in fact, the basis on which that
14    was commercialized was that a crop, corn, could
14:12:15 15    tolerate the herbicide.
16         Q   Did you look to see whether anybody had ever
17    used -- attempted to use bromoxynil to resistance gene
18    to confer the ability to be selected on bromoxynil in
19    corn?
14:12:35 20         A   It would be impossible, because corn is
21    already highly resistant to bromoxynil.
22         Q   Did you say it would be impossible?
23         A   Yes, I said it would be impossible.
24         Q   And even at the highest level of bromoxynil
14:12:48 25    that you could get into solution, are you still saying

## Page 135

1    it would be impossible to use bromoxynil as a
2    selective agent for corn cells?
3         MR. FLIBBERT: Objection.
4         THE WITNESS: I have no opinion about that.
14:13:01 5    It would be irrational to try it. But I suppose it
6    could work.
7         Would this be an okay time to take a quick
8    break?
9         MS. PATTERSON: Sure.
14:13:46 10         VIDEO OPERATOR: The time is 2:14. We're
11    going off the record. This is the end of tape number
12    2, going on to tape number 3.
13         (Recess.)
14         VIDEO OPERATOR: Time is 2:22 p.m. We're
14:21:48 15    back on the record. This is tape number 3 in the
16    deposition of Eric Ward.
17         BY MS. PATTERSON:
18         Q   Dr. Ward, what is your understanding of what
19    one of skill in the art would consider the term
14:21:59 20    "herbicide" to mean within the context of the
21    Lundquist patents?
22         A   Well, as I lay out in my report, it's a
23    commonly-used term that means a chemical that's used
24    to kill weeds.
14:22:24 25         Q   And is that the way you yourself define

## Page 136

1    "herbicide"?
2         A   Yes.
3         Q   And do you exclude in your definition of
4    herbicide materials that are used to kill plant cells
14:22:52 5    but not necessarily used to kill weeds?
6         A   It's a less common use of the term.
7         Q   But it can mean agents employed to kill plant
8    cells; correct?
9         A   I'm not aware that it's commonly used that
14:23:16 10    way.
11         Q   But it is a meaning of the term "herbicide";
12    correct?
13         A   An agent used to kill plant cells, you're
14    asking whether that's a meaning?
14:23:29 15         Q   Yes.
16         A   Yes, that's one possible meaning.
17         Q   Now, you have mentioned antibiotics in your
18    report. What is your understanding of the meaning of
19    the term "antibiotic"?
14:23:45 20         A   "Antibiotic" is actually a more difficult to
21    define term. If you look to the literature for a
22    definition, you find a range of definitions. But in
23    the broadest sense, it means something that kills a
24    living organism.
14:24:00 25         Q   And is that your definition of the term

## Page 137

1    "antibiotics"?
2         A   I think a more commonly-used definition is a
3    chemical that's used to a microbe for controlling
4    a disease, that kind of thing.
14:24:15 5         Q   A bacteria?
6         A   Can be a bacteria, yeah.
7         Q   Okay. And does it necessarily have to be for
8    controlling a disease?
9         A   No. As I said earlier, it doesn't
14:24:26 10    necessarily have to be.
11         Q   Okay. So what is your best definition of an
12    antibiotic?
13         A   An antibiotic is in a chemical compound
14    that's used to kill microbial organisms.
14:24:46 15         Q   Now, glyphosate can fit into that category,
16    can't it?
17         A   Yeah, this is actually an interesting point.
18    You know, if you draw kind of the Venn diagram large
19    enough, you can render either of these terms, either
14:25:02 20    herbicide or antibiotic, effectively meaningless, in
21    the sense that if you say any compound that's capable
22    of killing a microbial cell or any compound that's
23    capable of killing a plant cell is either an
24    antibiotic or herbicide respectively, it encompasses
14:25:23 25    all kinds of things that we use in our daily lives and

35 (Pages 134 to 137)

a7a1edd0-a8a7-4df3-94ea-0b7cc9dbd9d2

RESTRICTED CONFIDENTIAL VIDEO DEPOSITION OF
ERIC WARD

Page 206

1  a different definition of herbicide, which was a
2  chemical substance used to kill or suppress the growth
3  of plants, plant cells, plant seeds or plant tissues.
4  I'd just like you to look at another patent
16:38:09 5  that you have, which I'll mark as Ward Exhibit 11,
6  U.S. patent number 6,271,445?
7  (Ward Exhibit 11 identified.)
8  BY MS. PATTERSON:
9  Q  I only have selected pages from this, but my
16:38:26 10  only question to you is, doesn't that patent have the
11  identical definition of herbicide that's set forth in
12  the other Ward patent that we talked about?
13  MR. FLIBBERT: I'm sorry, did you hand me a
14  copy?
16:38:37 15  MS. PATTERSON: I don't have an extra copy,
16  so you may look over his shoulder.
17  MR. FLIBBERT: We'll object to this document
18  as a partial copy of a patent.
19  THE WITNESS: So this is at column 7 about
16:39:14 20  line 6 that you're referring to?
21  BY MS. PATTERSON:
22  Q  Correct. And could you just read the
23  definition of herbicide that's set forth in your other
24  patent?
16:39:22 25  A  Herbicide—

Page 207

1  Q  Second patent.
2  A  "Herbicide: A chemical substance used to
3  kill or suppress the growth of plants, plant cells,
4  plant seeds or plant tissues."
16:39:37 5  You know, so this is a list of definitions,
6  and the exact intention of including this list was to
7  avoid the kind of discrepancy about the meaning of
8  terms in claims later on. So when we would write
9  these, we would typically include a definition that
16:39:56 10  was favorable to the inventors as possible when we
11  would write the patent.
12  Q  So you defined herbicides broadly? You put
13  in a broad definition of herbicide?
14  A  That was our intention, that's right.
16:40:06 15  Q  And that's the intent that inventors have in
16  order to — that's all right, I'll just skip that.
17  Now, moving on down in your report to page
18  12.
19  A  This is the rebuttal report or the --
16:41:17 20  Q  Correct, at paragraph 39. And there you say,
21  "a person of ordinary skill in the art would
22  understand that the term 'herbicide resistance,' as
23  used in the '880 patent, means that the fertile
24  transgenic corn plant will survive application of a
16:41:46 25  herbicide (as previously defined in my opening report)

Page 208

1  at a concentration sufficient to distinguish or select
2  a transgenic corn plant from a non-transgenic corn
3  plant."
4  My question to you is whether or not you had
16:42:06 5  any specific concentration in mind when you formulated
6  the opinion that the concentration of the herbicide
7  needed to be sufficient to select -- distinguish or
8  select a transgenic corn plant from a nontransgenic
9  corn plant.
16:42:26 10  A  By "concentration," you mean expressed in
11  some standard units like weight to volume or something
12  like that or percentage?
13  Q  Well, yeah, it was your word. So however.
14  A  Well, you asked did I have a specific
16:42:39 15  concentration in mind.
16  Q  Right. And you said "a concentration
17  sufficient."
18  A  Right. The concentration would vary
19  depending on what the herbicide being used to measure
16:42:52 20  resistance was.
21  Q  Okay. Well, let's take glyphosate, for
22  example.
23  A  You're asking me what concentration would be
24  a sufficient concentration to determine --
16:43:09 25  Q  I'm asking you whether you have an opinion.

Page 209

1  A  We talked earlier about the DeKalb field
2  experiments with aroA where the critical missing piece
3  is which plants are transgenic and which ones aren't.
4  And, you know, I think given that information,
16:43:33 5  something in that, you know, 8 ounce per acre range
6  would probably be sufficient. It sounds like 8 ounces
7  kills everything, 4 ounces allows a significant number
8  of escapes.
9  So probably depending on the growing
16:43:46 10  conditions, that can vary pretty significantly,
11  depending on whether your experiment is done in the
12  greenhouse, whether it's done in tissue culture in,
13  you know, boxes with little regenerated seedlings, or
14  whether it's done in the field.
16:44:00 15  But, you know, it's somewhere in that range,
16  it sounds like.
17  Q  Now, is it possible to tell which plants are
18  transformed from those that are not transformed if the
19  nontransformed plants are not killed by glyphosate but
16:44:39 20  merely injured?
21  MR. FLIBBERT: Objection.
22  THE WITNESS: I think it might be possible if
23  one had the one-to-one correspondence between
24  transgene and phenotype that I referred to earlier.
16:44:58 25  It depends on how much variability was in the

53  (Pages 206 to 209)

**19**

# Exhibit 19
# REDACTED