1    the disputed claim language.  The appropriate starting point

2    is always the language of the claim itself, and the words of

3    the claim are generally given their ordinary and customary

4    meaning, and I believe I have done that here.

5         There are cases where a patentee may act as his or her

6    own lexicographer and assign a special definition to a word so

7    long as that definition is clearly stated in the patent

8    specification or in the prosecution history.

9         The Federal Circuit has held that it's appropriate for

10   courts to consult dictionaries to determine ordinary and

11   customary meanings of disputed claims terms, as those sources

12   are considered unbiased reflections of common understanding.

13   Other sorts of extrinsic evidence is generally not to be

14   consulted if the intrinsic evidence is unequivocal, but the

15   Federal Circuit has held that it is entirely appropriate for a

16   Court to consult trustworthy extrinsic evidence to ensure that

17   the claims construction is not inconsistent with clearly

18   expressed -- the plainly apposite and widely-held

19   understanding in the pertinent technical field.

20        I have applied these rules to my decisions here today,

21   and although yesterday I did hear testimony from the parties'

22   expert witnesses, I am considering that testimony as nothing

23   more than arguments of lawyers on the legal issues presented,

24   along, of course, with the necessary technical explanation of

25   the basic science at issue in this case.

MGA0058861

1        I note particularly that the scientists did not

2   disagree at all with one another when they were discussing

3   science.  Their only disagreement is when they became

4   advocates and tried to help or not help the lawyers, so I give

5   that sort of testimony the weight it deserves and consider it

6   as part of the argument, not as extrinsic evidence.

7        The science of the invention is not disputed, and was

8   received as background so I could understand the disputes.  I

9   will add that I do appreciate the basic science lessons, both

10  those delivered yesterday, which were quite helpful, and those

11  in the briefs.  I needed it, and I think that both parties'

12  submissions were very helpful on the scientific issues.

13       There was one issue, however, the import issue, that I

14  actually didn't understand the dispute until I heard the

15  presentations and saw the animations yesterday, so that

16  presentation certainly helped, although one party may now

17  regret teaching me that issue, and on that issue the science

18  was not disputed, I don't believe, either, in any way that

19  affects the decision.

20       My reasons for the specific rulings are as follows:

21  The first term at issue was "chimeric plant gene," and the

22  order contains two paragraphs as the parties had because the

23  term is actually used in some claims as "chimeric gene" and in

24  others as "chimeric plant gene."  The definition I have

25  adopted is, "The term chimeric gene means a gene that is

MGA0058862

1    comprised of parts that do not occur together in nature," and

2    the term "chimeric plant gene" means a "chimeric gene that is

3    expressible in a plant."

4         I'll point out that this construction contains a

5    grammatical error, since we all know that under the rules of

6    grammar, the whole comprises the parts and is not comprised of

7    the parts, but you all agreed on this grammatical error and

8    agreed that this was the proper definition so far as it went,

9    so I'm sticking with it because you both asked for it.

10        Now the parties' submissions did show some disagreement

11   as to the term "chimeric plant gene," but this disagreement

12   was really minor.  Monsanto argued that I should add a

13   sentence stating that the gene in Claim 1 is chimeric because

14   the promoter is heterologous with respect to the coding

15   sequence, and although this is a correct statement of fact as

16   far as it goes, it is not a proper statement to include in the

17   claim construction as a matter of law.  It is not a proper

18   limitation on the term "chimeric plant gene" because the gene

19   in Claim 1 could be chimeric for other reasons as well.

20        Additionally, the last clause of Claim 1 states,"the

21   promoter being heterologous with respect to the coding

22   sequence," and if I defined "chimeric plant gene" to include

23   this statement, it would make that portion of the claim

24   language redundant.

25        The parties' briefs also revealed a dispute about

1   whether the term should be "expressible" versus "expressed,"

2   but the arguments yesterday also revealed that this was not a

3   serious dispute, and in any event, I agree with Bayer that it

4   makes sense not to speak in the past tense with something

5   intended to be part of a living and reproducing organism, and

6   so "expressible" seemed appropriate to me.

7           The second issue was "chloroplast transit peptide," and

8   I have ruled that the term "chloroplast transit peptide" means

9   "a naturally occurring series of amino acids that causes the

10  transport of a polypeptide into a chloroplast." As it turns

11  out, I believe that this term presented the hardest issue and

12  is the closest call. I have accepted Bayer's argument that

13  the CTP must be naturally occurring because I believe, reading

14  the claim language and the patent as a whole, and giving due

15  consideration to the prosecution history, that at the time of

16  this invention, a chloroplast transit peptide under the

17  widely-held understanding in the pertinent technical field,

18  meant something found to naturally occur in a plant, or as I

19  understand it, in green algae, since they also have

20  chloroplasts, but naturally occurring is appropriate.

21          The references in the patent specification to sources

22  for CTP all point to plants or naturally occurring substances,

23  not to synthetic substances. At the time of this patent

24  application, the state of the knowledge of CTPs was such that

25  I do not believe that the patent contemplated that this term

1    would include anything that might ever be invented that would

2    function like a CTP.  The language of the patent just doesn't

3    justify saying that anything ever invented that functions like

4    a CTP must be one, and I think the CTP in this patent has to

5    be naturally occurring because that's what the words meant at

6    the time they were used.

7         I am not applying a validity/invalidity standard to

8    make this decision.  I'm basing this on what I believe the

9    words mean as a matter of claims construction.

10        I do want to point out that I am not buying into

11   Bayer's arguments that this is some kind of a

12   means-plus-function term.  It is not.  A series of amino acids

13   is a description of a structure, although it is further

14   defined by the transit function included in it, but I don't

15   believe that the addition of a functional adjective makes this

16   a means-plus-function term.

17        To the extent that example 19 is inconsistent with this

18   interpretation, and I'm not convinced that it is, but if it

19   is, then an example in the specifications cannot vary the

20   claims, and the law does not require that every example be

21   within the scope of all the claims.

22        In this case, both scientists agree that example 19 is

23   not within the scope of all of the claims because it is a test

24   tube thing and there was no action within the plant cell, but

25   even if it is inconsistent, I believe the claim language is

MGA0058865

1    clear, and that the interpretation I have given it is correct.

2         The third term which I will have trouble pronouncing,

3    but I will try, is "chloroplast transit peptide/

4    5-enolpyruvylshikimate-3-phosphate synthase" -- I'll call

5    that EPSPS from now on -- "fusion polypeptide." This term

6    means "a polypeptide that has at least two parts which must

7    include a chloroplast transit peptide as defined already

8    joined to an EPSPS where the chloroplast transit peptide and

9    EPSPS are not found together in nature."

10        I thought this issue was going to be the hardest one to

11   decide, but as I just discussed, I don't think it was.  I

12   don't think this was that close a call, but it is somewhat

13   difficult to explain.  To put it as simply as possible,

14   "fusion" in this patent means what most people think it means.

15   Lay people like me think fusion means putting different things

16   together.  Scientists in this field think it means putting

17   different things together.  The dictionary thinks "fusion

18   polypeptide" or "fusion protein" means a protein created out

19   of two genetically different things, in other words, a protein

20   created in a non-natural process, i.e. fused, which contains

21   amino acid sequences from distinct proteins.  Even Monsanto's

22   expert witness agrees that that's what it normally means.

23        Monsanto more or less argues that it was being its own

24   lexicographer here, or it was using the term in a very special

25   way, and although I recognize that a patent can use a word in

MGA0058866

1    other than its normal meaning, it's supposed to be very clear

2    when it does that, and here it certainly is not clear, and I

3    don't believe that it's even implicit in the language or the

4    history.

5        I have carefully reviewed the patent and the patent

6    prosecution history, and I don't think there is anything there

7    that shows that "fusion polypeptide" meant something other

8    than its normal meaning.

9        Monsanto, not the patent examiner, first used the term

10   in the original application, and when Monsanto used it the

11   first time, it used it with the plain and ordinary meaning of

12   the definition I've adopted here. Everyone agrees that a

13   naturally occurring EPSPS has a CTP, and nobody refers to

14   those naturally occurring things as fusion polypeptides.

15       This patent teaches putting different things together.

16   It did not just describe what naturally occurs in all plant

17   cells, so I think the CTP/EPSPS fusion polypeptide referred to

18   in these claims is something created from a CTP and an EPSPS

19   that do not occur together in nature.

20       Now, I'm not including Bayer's urged language that they

21   have to be directly adjacent to one another, as I don't

22   believe there is anything in the claim language or anywhere

23   else that provides that restriction, and so that is not

24   included in the construction I've adopted.

25       That brings us to the fourth term, the term "permits

REDACTED VERSION – PUBLICLY FILED

1    the fusion polypeptide to be imported into a chloroplast of a

2    plant cell means the function of a chloroplast transit peptide

3    as previously defined." Upon reflection, once I understood

4    the science of this, this was actually easy. This is not a

5    close call at all. Again, I want to point out that there was

6    no scientific dispute about this, only a legal one.

7        Actually, although the decision is easy, the term is

8    somewhat hard to define, and the definition I have adopted,

9    which was proposed by Monsanto, is a little awkward. I think

10   there is a normal reason for that, and that's because this

11   term really does just mean what it says. If ever there was a

12   plain and ordinary meaning, this one has one, and further

13   definition seems a little silly.

14       "Permits" means allows. "To be imported" means for

15   something to be carried into some place. That's what the

16   words mean, and that's the function of the CTP. It permits a

17   polypeptide to be imported into a chloroplast. That's what

18   the words say and that's what they mean, and although I have

19   stated that the definition above will be used in my jury

20   instructions and am adopting it, I question whether you will

21   really want me to do that because I'm not sure that any

22   further definition is needed of what are really very plain

23   words. But since Bayer has challenged it, I do have to rule

24   on it, and I'm adopting Monsanto's definition because I

25   believe it's correct, although as I stated, I'm not sure it's

MGA0058868

REDACTED VERSION – PUBLICLY FILED
171

1   really necessary.

2        I will tell you definitely that Bayer's attempt to add

3   the requirement that the entire CTP/EPSPS fusion gene be

4   transported intact completely across the chloroplast envelope

5   membranes and the requirement that they attempt to impose that

6   all of the parts stay together until it is all inside the

7   chloroplast simply isn't anywhere in the patent language, its

8   specification, or its prosecution history.  Yes, I have heard

9   Bayer's argument that Monsanto set up two alternatives and

10  then picked one, but I don't believe that it did.  I don't

11  think these are necessarily alternatives.  Rather, they are

12  descriptions of a process that was not well understood at the

13  time, and still isn't, according to the agreement of the

14  scientists.

15       I think when the patent is read as a whole, it is clear

16  that Monsanto was claiming the process of getting this fusion

17  gene into the chloroplast, and whichever of the two ways it

18  worked, once it began to enter the chloroplast, both are

19  covered, and the important thing is the business gets in, not

20  the timing of the cleavage of the CTP from the EPSPS, and

21  that's really what this issue is about.  It's not about

22  importing.  It's really an issue about when does cleavage

23  occur, and nothing in the word "importing" suggests that

24  that's an issue covered by the patent.

25       The timing of when the CTP is separated from the EPSPS

REDACTED VERSION – PUBLICLY FILED

1    simply is not a part of this patent, and construing this

2    language as Bayer urges would be reading something into the

3    language that simply isn't there.

4         So those are my reasons for my rulings.  As you can see

5    from the order I handed out, I will hold a telephone

6    conference on August 1st at 11:00 and I'll expect, Mr. Quinn,

7    Bayer to set up that telephone conference.  During the call,

8    we'll establish schedules for this case, as well as for the

9    other two that I have already set a conference call in.  It

10   will be one conference call to discuss all three cases because

11   all the same counsel are involved and the same parties.

12        In the other case, I've required a joint scheduling

13   plan, but in this case I've not done that.  I'm simply asking

14   that you meet and confer and attempt to resolve any issues and

15   hope you propose something that you can agree on because we

16   already had a schedule in this case, and it just needs to be

17   modified because of the delay that we had because of the

18   ongoing settlement discussions between the parties.

19        I also at that conference do want to talk to you all

20   about settlement.  I realize that you have bigger issues in

21   these cases, and that your clients have bigger issues, but I

22   want to talk to you about using a mediator for one or more of

23   the cases assigned to me, and I want to discuss these three

24   cases because they are the ones that I am concerned with, even

25   though I know your clients have bigger concerns.

MGA0058870

REDACTED VERSION – PUBLICLY FILED[3]

1          Your clients haven't been able to reach a global

2    settlement, and apparently they can't agree on what "global"

3    means, but you have three cases in front of me involving two

4    patents, and we ought to talk about settling these cases, even

5    if you cannot settle globally.

6          One of the questions I'm going to ask you at that

7    meeting is what is really going on in these cases.  I'm very

8    curious.  It looks like I ended up with the afterthought

9    cases.  I thought your clients were cleaning out your closets

10   and said, "Is there anything we haven't sued each other on?

11   Let's throw in a new lawsuit," and that's what happened in

12   January, and I'm not sure it happened about this case, but I

13   want to know what's really going on, and I want to talk

14   seriously about if there is any way to resolve these cases,

15   and you'll have a month to think about my Markman rulings, and

16   see if that makes resolution of this case in particular any

17   easier, and then as I told you, as you all know, I don't know

18   much about the other cases because they are still so new, and

19   we were dealing with personal jurisdiction issues.

20         So we'll talk about all of that stuff in August.  I

21   want everybody here by telephone.  I don't want to see any of

22   you in person.  Not that I don't like you, but I don't need

23   you all here in person, and I don't need 20 lawyers on the

24   phone call, although you are free to have 20 lawyers on the

25   phone call if you want to.  Just be sure that whoever is there

REDACTED VERSION – PUBLICLY FILED[4]

1    has sufficient knowledge and authority to do what we need to

2    do on the phone call, but I'm not offended if everybody isn't

3    there all the time, as I know probably both of you know

4    because you have both been in front of me before.  Those are

5    my rulings.  Court is in recess.

6                    (A recess was taken.)

7

8

9

10

11

12                    REPORTER'S CERTIFICATE

13        I, TERI HANOLD HOPWOOD, RMR, Official Court Reporter

14    for the United States District Court for the Eastern District

15    of Missouri do hereby certify that the foregoing is a true and

16    correct transcript of the proceedings had in this cause as

17    same appears from my stenotype notes made personally during

18    the progress of said proceedings.

19

20          *Teri Hanold Hopwood, RMR*

21              TERI HANOLD HOPWOOD, RMR

22                Official Court Reporter

23

24

25

MGA0058872

REDACTED VERSION – PUBLICLY FILED

35

REDACTED VERSION – PUBLICLY FILED

Dilip M. Shah - October 7, 2005
Monsanto Company v. Syngenta Seeds, Inc.

Page 1

1          MONSANTO COMPANY and

2        MONSANTO TECHNOLOGY, LLC

3                VS.

4         SYNGENTA SEEDS, INC.,

5      SYNGENTA BIOTECHNOLOGY, INC.

6

7

8

9

10

11    VIDEOTAPED DEPOSITION OF DILIP M. SHAH

12

13

14

15            OCTOBER 7, 2005

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY

Ace-Federal Reporters, Inc.

REDACTED VERSION – PUBLICLY FILED

# Exhibit 35
# REDACTED

REDACTED VERSION – PUBLICLY FILED

36

REDACTED VERSION – PUBLICLY FILED

RESTRICTED CONFIDENTIAL VIDEO DEPOSITION OF
BARRY D. BRUCE

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - -x

MONSANTO COMPANY and          :   04-305(SLR)

MONSANTO TECHNOLOGY LLC,      :

        Plaintiffs,           :

    vs.                       :

SYNGENTA SEEDS, INC.,         :

SYNGENTA BIOTECHNOLOGY, INC.,:

ET AL.,                       :

        Defendants.           :

- - - - - - - - - - - - - -x

DEKALB GENETICS CORPORATION,  :

        Plaintiff,            :   Civil Action Number

    vs.                       :   05-355-SLR

SYNGENTA SEEDS, INC.,         :

SYNGENTA BIOTECHNOLOGY, INC.,:

ET AL.,                       :

        Defendants.           :

- - - - - - - - - - - - - -x

RESTRICTED CONFIDENTIAL VIDEO DEPOSITION OF

BARRY D. BRUCE

Washington, DC

Friday, December 16, 2005

REPORTED BY: CARMEN SMITH
             Job No. 54931

REDACTED VERSION – PUBLICLY FILED

RESTRICTED CONFIDENTIAL VIDEO DEPOSITION OF
BARRY D. BRUCE

## Page 2

1  Restricted Confidential Video Deposition of
2  BARRY D. BRUCE, called for examination pursuant to
3  notice of deposition, on Friday, December 16, 2005,
4  in Washington, DC, at the offices of Finnegan,
5  Henderson, Farabow, Garrett & Dunner, 901 New York
6  Avenue NW, at 9:04 a.m., before CARMEN SMITH, a
7  Notary Public within and for the District of
8  Columbia, when were present on behalf of the
9  respective parties:
10     MELINDA PATTERSON, ESQ.
11     Howrey LLP
12     1111 Louisiana, 25th Floor
13     Houston, Texas 77002-5242
14     713-787-1483
15     On behalf of Plaintiffs
16
17     SANYA SUKDUANG, ESQ.
18     JARED S. COHEN, ESQ.
19     Finnegan Henderson Farabow Garrett & Dunner
20     901 New York Avenue NW
21     Washington, DC 20001-4413
22     202-408-4377
23     On behalf of Defendants
24
25  ALSO PRESENT: JONATHAN PERRY, Videographer

## Page 3

1         PROCEEDINGS
2      (Bruce Exhibit 1 identified.)
3      VIDEO OPERATOR: This is tape number 1 of
4  the videotaped deposition of Barry Douglas Bruce,
09:02:59 5  taken in the matter of Monsanto Company, et al.,
6  versus Syngenta Seeds, Incorporated, et al., Case
7  Number 04-305-SLR, and in the matter of DeKalb
8  Genetics Corporation versus Syngenta Seeds,
9  Incorporated, et al., Case Number 05-355-SLR, in the
09:03:24 10  U.S. District Court for the District of Delaware.
11     Today's date is December 16, 2005. Time
12  on the video screen is currently 9:04:10 a.m.
13     This deposition is being taken at the
14  offices of Finnegan Henderson, 901 New York Avenue
09:03:45 15  Northwest, Washington, D.C.
16     My name is Jonathan Perry. I am the
17  videographer here on behalf of Sunbelt Reporting and
18  Litigation Services. The court reporter is Carmen
19  Smith, also with Sunbelt Reporting and Litigation
09:04:00 20  Services.
21     Will counsel present please introduce
22  themselves and state whom they represent.
23     MS. PATTERSON: Melinda Patterson of
24  Howrey for Monsanto and DeKalb Genetics.
09:04:10 25     MR. SUKDUANG: Sanya Sukduang from

## Page 4

1  Finnegan Henderson representing Syngenta Seeds,
2  Syngenta Biotechnology, Defendants.
3     MR. COHEN: Jared Cohen from Finnegan
4  Henderson, representing Syngenta.
5     Whereupon,
6        BARRY D. BRUCE
7  was called as a witness and, having first been duly
8  sworn, was examined and testified as follows:
9        EXAMINATION
09:04:35 10     BY MS. PATTERSON:
11     Q  Dr. Bruce, could you please state your
12  name and present position for the record.
13     A  My name is Barry Douglas Bruce, and my
14  present employment is with the University of
09:04:52 15  Tennessee in Knoxville, where I am an associate
16  professor of biochemistry, cellular and molecular
17  biology.
18     MR. SUKDUANG: Just as a preliminary
19  matter, we would like to mark this transcript as
09:05:03 20  restricted confidential, subject to the protective
21  order.
22     BY MS. PATTERSON:
23     Q  Dr. Bruce, I have placed before you a
24  document that's been marked as Bruce Exhibit 1.
09:05:20 25  Could you take a look at that and identify it for

## Page 5

1  the record, please?
2     A  This black folder?
3     Q  Yes.
4     A  It says "Deposition Exhibit 1, Bruce." Do
09:05:29 5  you want me to look at everything that's in it?
6     Q  I want you to look at it. It's a copy. I
7  believe, of your expert report. There are circled
8  numbers that have been added by hand in your expert
9  report. Those circled numbers -- for example if you
09:05:50 10  look at page 3 of your report, paragraph 8, there is
11  a circled number that's been added by "the Shah '835
12  patent." Do you see that?
13     A  It looks like a 1, yes.
14     Q  Right. And at tab 1 of your binder, there
09:06:11 15  is the document the Shah patent that corresponds to
16  the circle number 1. So there is a convenient way
17  there for you to locate the documents that you have
18  referenced in your report.
19     And at the back of the binder is a copy of
09:06:28 20  your rebuttal report.
21     A  50? Is that what you're saying?
22     Q  It's marked "rebuttal report," towards the
23  back, not at the very back. And it has been circle
24  numbered with corresponding tabs in the same way.
09:06:59 25     A  And the numbers go forward and backwards,

2  (Pages 2 to 5)

REDACTED VERSION – PUBLICLY FILED

RESTRICTED CONFIDENTIAL VIDEO DEPOSITION OF
BARRY D. BRUCE

## Page 30

1          MS. PATTERSON: I need to get direct
2    answers to my questions.
3          MR. SUKDUANG: Hold on. Hold on. If you
4    continue to do that, we will have to stop. Now,
09:41:26 5    please let the witness finish his answer.
6          BY MS. PATTERSON:
7          Q. Okay. My question was did they do it?
8          MR. SUKDUANG: No, please. Let the
9    witness finish.
09:41:33 10          Dr. Bruce, please finish your answer.
11          THE WITNESS: My feeling is that they
12    described how to do it.
13          BY MS. PATTERSON:
14          Q. But they didn't do it?
09:41:39 15          A. I do not believe they did do that, no.
16          Q. Okay. So the answer to my question is no,
17    they didn't do it; correct?
18          MR. SUKDUANG: Objection; asked and
19    answered.
09:41:47 20          THE WITNESS: They described how to do it.
21          BY MS. PATTERSON:
22          Q. But they didn't do it?
23          MR. SUKDUANG: Objection; asked and
24    answered.
09:41:52 25          BY MS. PATTERSON:

## Page 31

1          Q. Okay. Now, there were some other -- other
2    references that you talk about -- that you talked
3    about altogether. Are you offering an opinion that
4    those other references render the patent invalid?
09:42:14 5          Or let's just move on. We'll get to that
6    when we get to that. Let's not anticipate too much.
7          Turning over to your opinion on page 6
8    where you define the term "chloroplast transit
9    peptide." You originally define the term
09:42:53 10    "chloroplast transit peptide" as "a naturally
11    occurring chain of amino acids that is naturally
12    located at the N-terminal portion of a nuclear
13    encoded polypeptide, which directs the polypeptide
14    to a chloroplast," and then you say, "This is the
09:43:15 15    ordinary meaning of the term as used in the field of
16    protein transport and plant molecular biology." Is
17    that correct?
18          A. Protein transport and plant molecular
19    biology. That is -- I think you read verbatim from
09:43:35 20    paragraph 17.
21          Q. Okay. And is that a correct definition of
22    chloroplast transit peptide?
23          A. That is correct, other than the fact that
24    I think one could clarify the word choice "direct"
09:43:51 25    and could expand that. But that word "direct" is a

## Page 32

1    shorthand denotation for the targeting, transport
2    and cleavage process, which has been put forward.
3          Q. Okay. So you're saying direct means
4    cleavage?
09:44:09 5          A. It doesn't mean only cleavage. It means
6    targeting, translocation and cleavage.
7          Q. Okay. So you're reading cleavage into the
8    word "directs" there; is that correct?
9          A. I'm -- that's -- I'm expanding direct.
09:44:25 10    It's not a particularly technical term. It's broad,
11    and it's not really a term that is used in the
12    protein import field.
13          Q. Okay. Now, you say there it's a
14    "naturally occurring chain of amino acids"; right?
09:44:45 15          A. Essentially, that's naturally occurring in
16    that it is found -- it's derived from someplace.
17    It's something that exists in our plants' genetic
18    material.
19          And the chain part, I can clarify if
09:45:03 20    that's an -- unclear. That essentially means that
21    these amino acids are coupled via a peptide bond
22    that is enabled through the process of translation.
23          Q. And when you say that the protein is
24    obtained from a plant material, are you really
09:45:39 25    meaning that the DNA encoding the protein is

## Page 33

1    obtained from a plant material?
2          A. I mean, one could possibly go and obtain
3    transpeptide biochemically. That's not to say you
4    couldn't get that by obtaining the DNA, which was
09:45:57 5    then -- through the process of transcription, which
6    takes the DNA through an intermediate known as mRNA,
7    and the process of translation, which takes the mRNA
8    into a series of amino acids, that you get that
9    chloroplast transit peptide from some naturally
09:46:17 10    occurring sort of faithful template.
11          Q. Okay. And -- but do you have an opinion
12    as to whether you could make changes at the DNA
13    level in the laboratory and still have a naturally
14    occurring chain of amino acids as a result?
09:46:40 15          A. One has to, I think, be sensitive to the
16    technology at hand in the mid-'80s. Molecular
17    biologists, they were doing molecular biology, they
18    were cloning. They were in a certain sense
19    primitive, because they were dependent upon -- they
09:47:00 20    were solely dependent on restriction enzymes, and
21    restriction enzymes happen to be random sequences
22    that are -- I shouldn't say "random," but they are
23    sequences within the DNA strand which give the
24    experimentalists a means to excise through the use
09:47:15 25    of a specific enzyme known as restriction

9 (Pages 30 to 33)

REDACTED VERSION – PUBLICLY FILED

RESTRICTED CONFIDENTIAL VIDEO DEPOSITION OF
BARRY D. BRUCE

**Page 34**

```
        1    endonucleus.
        2         In the process of doing that you may take
        3    the sequence out. You may actually put it into a
        4    construct which adds a restriction enzyme for some
09:47:38 5    utilitarian purpose.
        6         But it is my definition that those changes are
        7    for the ease of molecular biology are not in a
        8    substantive way changing the naturally occurring
        9    nature of a transit peptide.
09:47:55 10       Q   Okay. And would that still be true, even
       11    if the change to insert or remove a restriction site
       12    resulted in an amino acid substitution within the
       13    chloroplast transit peptide?
       14         MR. SUKDUANG: Objection; vague.
09:48:12 15       THE WITNESS: Again, I think that people
       16    had become permissive of these changes, as long as
       17    there was not evidence or even the expectation that
       18    that change was in any way altering the activity or
       19    behavior of that protein.
09:48:35 20       BY MS. PATTERSON:
       21         Q   Okay. So in your view, chloroplast
       22    transit peptide would be naturally occurring so long
       23    as it essentially mimicked the way that the
       24    chloroplast transit from nature behaved; is that
09:48:54 25    correct?
```

**Page 35**

```
        1         A   Well, a chloroplast transit peptide is
        2    naturally occurring.
        3         Q   But I'm saying if you had --
        4         A   You're saying a naturally occurring one
09:49:05 5    would mimic a naturally occurring one?
        6         Q   Well, no. I'm saying if you make some
        7    changes to the one that you obtained in the
        8    laboratory but it still worked in exactly the same
        9    way as the one that was naturally occurring in the
09:49:17 10    plant, you would still consider that to be a
       11    chloroplast transit peptide?
       12         MR. SUKDUANG: Objection to the extent it
       13    calls for a legal conclusion.
       14         THE WITNESS: Again, I think that a
09:49:27 15    scientist who does this would have some, you know,
       16    obligation at some place in the publication to
       17    describe what they did. Good science might require
       18    them to describe the changes, but if they say that
       19    this transit peptide was obtained through a cleavage
09:49:51 20    with a restriction endonuclease, that would not be
       21    recognized as changing its fundamental properties.
       22         BY MS. PATTERSON:
       23         Q   Okay. So but my question was simply if
       24    the chloroplast transit peptide that had some amino
09:50:09 25    acid changes to it worked in exactly the same way as
```

**Page 36**

```
        1    the chloroplast transit peptide that naturally
        2    occurred in the plant, you would still consider that
        3    to be a chloroplast transit peptide; is that
        4    correct?
09:50:22 5         MR. SUKDUANG: Objection; asked and
        6    answered. Objection to the extent it calls for a
        7    legal conclusion, and vague.
        8         THE WITNESS: They -- these sequences are
        9    naturally occurring. I acknowledge that you have to
09:50:41 10    possibly use the tools available to obtain them.
       11    The inventors or a person who was obtaining this
       12    from an organism would use a shorthand to say this
       13    is the transit peptide of, obtained from, by, and
       14    then whatever their strategy was. Good molecular
09:51:09 15    biology would probably be designed to not alter it
       16    in a significant way. If there was a change that
       17    was put forward, it, I believe, would require the
       18    experimental list to show that that change made no
       19    difference.
09:51:31 20       BY MS. PATTERSON:
       21         Q   And if it was shown that that change made
       22    no differences, would you still consider that to be
       23    a chloroplast transit peptide?
       24         MR. SUKDUANG: Objection; asked and
09:51:38 25    answered. Objection to the extent it calls for a
```

**Page 37**

```
        1    legal conclusion.
        2         THE WITNESS: I'm not sure how to answer
        3    this any better. It's still naturally occurring.
        4    It was a transit peptide. They have obtained it.
09:51:48 5    They haven't changed it. It would then be described
        6    as a chloroplast transit peptide, with the
        7    clarification of where it was obtained from.
        8         BY MS. PATTERSON:
        9         Q   Okay. Now, you say that the chloroplast
09:52:00 10    transit peptide is "naturally located at the
       11    N-terminal portion of a nuclear encoded
       12    polypeptide." And I'm trying to understand what you
       13    mean by "naturally located at the N-terminal portion
       14    of a nuclear encoded polypeptide."
09:52:28 15       Are you just trying to say that when
       16    you're looking for a chloroplast transit peptide,
       17    that you look at the N-terminal portion of the
       18    nuclear-encoded polypeptide as opposed to looking at
       19    some other place, like the C-terminal portion or
09:52:42 20    part of the mature protein. I --
       21         A   Well, I'm trying to describe the
       22    understanding in 1985 of, in essence, how transit
       23    peptides were identified and what was the sort of
       24    consensus. There was two to three to four,
09:53:01 25    depending on how you count, known transit peptides,
```

10 (Pages 34 to 37)

REDACTED VERSION – PUBLICLY FILED

RESTRICTED CONFIDENTIAL VIDEO DEPOSITION OF
BARRY D. BRUCE

**Page 38**

1    to all of biology, okay. And in every instance,
2    they were always found occurring at the N-terminus,
3    where that would be the 5 prime end of the gene,
4    that encoded that protein. And in every instance
09:53:21 5    that protein was encoded in the nuclear genome.
6        That N-terminal placement is – at this
7    point became an understood requirement for not only
8    the identification, but that was -- they were all
9    there. You could say absolutely every transit
09:53:45 10    peptide known in 1985 was placed at the N-terminus
11    of a nuclear-encoded polypeptide.
12        Q    Okay. So that was something that was
13    known to those of skill in the art with respect to a
14    nuclear-encoded polypeptide, if you were looking for
09:54:03 15    the chloroplast transit peptide, you should look at
16    the N – or the 5 prime – if you were looking at a
17    gene, you should look at the 5 prime portion of the
18    coding sequence, or if you were looking at a
19    protein, you should look at the N-terminal portion
09:54:16 20    for the chloroplast transit peptide; is that
21    correct?
22        MR. SUKDUANG: Objection; asked and
23    answered.
24        THE WITNESS: Somebody – that is where
09:54:26 25    they would look. It's not necessary that it would,

**Page 39**

1    by the tools available -- you know, again, what did
2    the experimentalists have then? They had the
3    ability to isolate cDNAs through a process of
4    reverse transcription. We had no genomes available.
09:54:45 5        They could use this process to get what
6    they would hope would be a full length cDNA. And in
7    the instances available, the full length cDNAs,
8    that's a technical means of cloning DNA, may have,
9    if it was full length, the entire transit peptide,
09:55:03 10    it may have a fragment of it.
11        Just because they had this, they would not
12    know what the transit peptide was, however. That
13    would require additional experimentation.
14        BY MS. PATTERSON:
09:55:12 15        Q    Well, if you were looking at a cDNA and
16    you were looking for a transit peptide, you would
17    look at the 5 prime end of the cDNA; isn't that
18    correct?
19        A    That is where you'd focus your attention,
09:55:25 20    yes.
21        Q    Okay. And that's what people of ordinary
22    skill in the art knew to do in 1985; right?
23        MR. SUKDUANG: Objection; asked and
24    answered.
09:55:32 25        THE WITNESS: Again, there were only a

**Page 40**

1    handful. I – and they were all there. I would not
2    say that there was complete confidence that that was
3    the only mechanism by which proteins were targeted
4    into chloroplasts. This was still a period of
09:55:48 5    active discovery and research.
6        They had a few, and these were what those
7    few looked like.
8        BY MS. PATTERSON:
9        Q    And every single one of them was there at
09:55:55 10    the 5 prime end of the gene; correct?
11        A    The three to four that were available,
12    yes.
13        Q    Now, in paragraph 19, you say that it was
14    not "considered possible to design a chloroplast
09:56:17 15    transit peptide from first principles." What do you
16    mean by that?
17        A    From first principles meaning that I can
18    use my detailed molecular knowledge of each step in
19    the targeting, transport and cleavage process to
09:56:45 20    fabricate something that would function and function
21    equivalently to a transit peptide in that setting.
22    There was no ability to sort of a priori, without
23    experience, synthesize or describe a polypeptide
24    sequence which would have that activity. There was
09:57:07 25    no ability to do that then.

**Page 41**

1        Q    Okay. So basically, what you're saying is
2    there was no ability at the time to – in your
3    opinion, to basically design a chloroplast transit
4    peptide from looking at – there was no ability to
09:57:32 5    design a chloroplast transit peptide by simply
6    synthetically assembling nucleotide – well, that's
7    a bad question.
8        What I'm trying to say is it wasn't
9    possible to design a chloroplast transit peptide
09:57:56 10    from scratch, I guess is what I'm trying to say.
11        A    It was not. The problem in the field was
12    that there was no homology. If you look at the
13    literature, they had identified a small number.
14    Careful analysis, said, hey, these are very
09:58:12 15    unrelated, they are different in length, they are
16    different in sequence, they are different in amino
17    acid composition. They only have in common this
18    N-terminal position. Nobody knew how they worked.
19        There was no theoretical framework to
09:58:30 20    describe their activity. And you certainly couldn't
21    have contemplated making one up using some sort of
22    ab initio understanding.
23        Q    And when you say an "ab initio
24    understanding," what do you mean?
09:58:49 25        A    From first principles. I mean, you just

11 (Pages 38 to 41)

REDACTED VERSION – PUBLICLY FILED

RESTRICTED CONFIDENTIAL VIDEO DEPOSITION OF
BARRY D. BRUCE

Page 58

```
            1    would say it's easily determined by assaying the
            2    uptake of an EPSPS fusion polypep -- excuse me,
            3    excuse me, they do not say fusion polypeptide.
            4    EPSPS polypeptide.
10:32:30    5        I think their language, if they had reused
            6    that, you wouldn't have had this question.
            7        BY MS. PATTERSON:
            8    Q  I'm sorry?
            9    A  I think if they had put in the language
10:32:39   10    "the uptake of the fusion polypeptide." that would
           11    have made it clearer. But I don't think
           12    that they're simply talking about the EPSPS
           13    polypeptide that they get, say, from fungi.
           14    Q  Well, they talk about Example 18. Let's
10:33:06   15    take a look at Example 18. What is the EPSPS
           16    polypeptide in example 18?
           17        MR. SUKDUANG: Objection; vague.
           18        THE WITNESS: So essentially, Example 18
           19    provides a somewhat abbreviated means for doing what
10:33:47   20    we may call an in vitro import uptake assay. And
           21    what they choose to use is their naturally occurring
           22    full length petunia EPSPS gene that they had cloned
           23    earlier. They also have a construct where they
           24    cloned it without. . .
10:34:26   25        So if you go to -- well, go ahead and ask
```

Page 59

```
            1    your question again. I may have answered it.
            2        BY MS. PATTERSON:
            3    Q  I think you did. Let's just move on.
            4        Now, at column 26 -- or paragraph 26
10:35:10    5    rather, you say, "To a person of ordinary skill in
            6    the art, this phrase means a chain of amino acids
            7    consisting of a chloroplast transit peptide (as
            8    defined above) fused to an EPSPS," and then you go
            9    on to say "where the chloroplast transit peptide and
10:35:29   10    EPSPS are not found together in nature."
           11        What I'm trying to understand is to what
           12    extent does your use of the term "consisting of" --
           13    to what extent is your use of the term "consisting
           14    of" intended to exclude the possibility of having
10:35:52   15    additional elements other than the CTP and the EPSPS
           16    gene present?
           17        MR. SUKDUANG: Objection to the extent it
           18    calls for a legal conclusion, and vague.
           19        THE WITNESS: Okay. I -- in this sort of
10:36:16   20    definition of this term, the -- really there's kind
           21    of I don't know what you call it, operative
           22    elements.
           23        I mean, it has to be -- the CTP or the
           24    chloroplast transit peptide EPSPS fusion polypeptide
10:36:32   25    with a slash in-between would mean to somebody of
```

Page 60

```
            1    ordinary skill that at the N-terminus, where the CTP
            2    is -- because it's placed first in the description,
            3    is going to be a chloroplast transit peptide, which
            4    I've defined above as a naturally occurring
10:36:53    5    sequence, and it's fused to an EPSPS.
            6        Again, at this -- at this point, the only
            7    critical thing is that that EPSPS is not naturally
            8    found associated with the chloroplast transit
            9    peptide. They are not the homologous construct.
10:37:18   10    They are heterologous in one or more ways.
           11        BY MS. PATTERSON:
           12    Q  Okay. So you're not using the term
           13    "consisting of" to exclude the possibility of
           14    elements intervening between the EPSPS and the
10:37:34   15    chloroplast --
           16        MR. SUKDUANG: Objection --
           17        BY MS. PATTERSON:
           18    Q  You're not using the term "consisting of"
           19    to exclude the possibility of elements intervening
10:37:41   20    between the chloroplast transit peptide and the
           21    mature EPSPS coding sequence; is that correct?
           22        MR. SUKDUANG: Objection, to the extent it
           23    calls for a legal conclusion, and vague.
           24        THE WITNESS: I think I clarify that in
10:37:57   25    the next sentence. I say, "Implicit in my
```

Page 61

```
            1    definition above is that this phrase requires a
            2    chain of amino acids comprising two or more distinct
            3    elements, at least two of which do not occur
            4    together in nature."
10:38:11    5        BY MS. PATTERSON:
            6    Q  Okay. So two or more. So you're not
            7    excluding the presence of additional elements?
            8    A  That's correct.
            9    Q  Okay. And when you say "at least two of
10:38:18   10    which do not occur together in nature," which two
           11    are you talking about?
           12    A  Well --
           13    Q  You're talking about the chloroplast
           14    transit peptide and the EPSPS mature coding region;
10:38:34   15    correct?
           16    A  If -- if there is only a single
           17    chloroplast transit peptide and a single EPSPS,
           18    those two proteins would have to be heterologous.
           19    They could, for instance, be heterologous because
10:38:49   20    the CTP came from bamboo shoots and EPSPS came from
           21    a pine tree, or they could be from different gene
           22    products. One could be from the petunia EPSPS and
           23    the other one could be from the petunia RUBISCO, the
           24    CTP, of course.
10:39:11   25    Q  Now, if you had, for example, a construct
```

16  (Pages 58 to 61)

REDACTED VERSION – PUBLICLY FILED

37

REDACTED VERSION – PUBLICLY FILED

Kenneth Keegstra - December 15, 2005
Monsanto Company v. Syngenta Seeds, Inc.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MONSANTO COMPANY and          )

MONSANTO TECHNOLOGY           )

LLC,                          )

                              )

       Plaintiffs,         )

                              )      Civil Action

                              )      No. 04-305-SLR

v.                            )      (lead case)

                              )

                              )

SYNGENTA SEEDS, INC.,         )

SYNGENTA BIOTECHNOLOGY,       )

INC.,                         )

                              )

       Defendants.        )

*************************************************

VIDEOTAPED ORAL DEPOSITION OF

KENNETH KEEGSTRA

December 15, 2005

*************************************************

*** RESTRICTED - CONFIDENTIAL ***

*** SUBJECT TO PROTECTIVE ORDER ***

REPORTED BY: SUSAN P. MILLER, RDR, CRR, CBC

REDACTED VERSION – PUBLICLY FILED

# Exhibit 37
# REDACTED