# EXHIBIT 27

SEP 17 1986

| 99TH CONGRESS<br>2d Session | HOUSE OF REPRESENTATIVES | REPORT<br>99-807 |

# PATENT EQUITY ACT

SEPTEMBER 9, 1986.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. KASTENMEIER, from the Committee on the Judiciary, submitted the following

# REPORT

ORIGINAL

[To accompany H.R. 4899]

[Including cost estimate of the Congressional Budget Office]

The Committee on the Judiciary, to whom was referred the bill (H.R. 4899) to amend title 35, United States Code, with respect to patented processes and Patent Cooperation Treaty, and for other purposes, having considered the same, report favorably thereon with an amendment and recommend that the bill as amended do pass.

The amendment is as follows:

Strike out all after the enacting clause and insert in lieu thereof the following:

SECTION 1. SHORT TITLE.

This Act may be cited as the "Patent Equity Act".

SEC. 2. REFERENCE TO TITLE 35, UNITED STATES CODE.

Whenever in this Act an amendment is expressed in terms of an amendment to a section or other provision, the reference shall be considered to be made to a section or other provision of title 35, United States Code.

## TITLE I—PATENTED PROCESSES

SEC. 101. RIGHTS OF OWNERS OF PATENTED PROCESSES.

Section 154 is amended by inserting after "United States," the following: "and, if the invention is a process, of the right to exclude others from using or selling throughout the United States, or importing into the United States, products made by that process.".

SEC. 102. INFRINGEMENT FOR INFORMATION OR SALE.

Section 271 is amended by adding at the end the following new subsection:

"(g) Whoever without authority imports into the United States or sells or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, sale, or use of the product occurs during the term of such process patent. In an action for infringement

of a process patent, no remedy may be granted for infringement on account of the use of a product unless there is no adequate remedy under this title for infringement on account of the importation or sale of that product. A product which is made by a patented process will, for purposes of this title, not be considered to be so made after—

"(1) it is materially changed by subsequent processes; or

"(2) it becomes a minor or nonessential component of another product.".

SEC. 103. DAMAGES FOR INFRINGEMENT.

Section 287 is amended—

(1) by inserting "(a)" before "Patentees"; and

(2) by adding at the end the following:

"(b)(1) No damages may be recovered for an infringement under section 271(g) of this title with respect to a product unless the infringement knew or was on notice that the product was made by a process patented in the United States. Damages may be recovered for such infringement occurring after such knowledge or notice and, with respect to—

"(A) a product obtained before such knowledge or notice, or

"(B) a product which—

"(i) is purchased pursuant to a contract that is entered into before such knowledge or notice and that provides for the delivery of a fixed quantity of the product in a specified period of time, and

"(ii) is in the inventory of or in transit to the purchaser, or is received by the purchaser within 6 months after such knowledge or notice,

shall be limited to reasonable royalties therefor.

"(2) For purposes of paragraph (1), 'notice' means the receipt of facts set forth in writing which are sufficient to establish that there is a substantial likelihood that the product was made by an infringing process.".

SEC. 104. EFFECTIVE DATE.

The amendments made by this title apply to United States patents granted before, on, or after the date of the enactment of this Act, except that these amendments do not apply to any product imported into or made in the United States before such date.

SEC. 105. REPORTS TO CONGRESS.

(a) CONTENTS.—The Secretary of Commerce shall, not later than the end of each 1-year period described in subsection (b), report to the Congress on the effect of the amendments made by this title on the importation of ingredients to be used for manufacturing products in the United States in those domestic industries that submit complaints to the Department of Commerce, during that 1-year period, alleging that their legitimate sources of supply have been adversely affected by the amendments made by this title.

(b) WHEN SUBMITTED.—A report described in subsection (a) shall be submitted with respect to each of the five 1-year periods which occur successively beginning on the date of the enactment of this Act and ending five years after that date.

## TITLE II—PATENT COOPERATION TREATY AUTHORIZATION

SEC. 201. DEFINITIONS.

(a) TREATY.—Section 351(a) is amended by striking ", excluding chapter II thereof".

(b) REGULATIONS.—Section 351(b) is amended by striking "excluding part C thereof".

(c) INTERNATIONAL SEARCHING AUTHORITY AND INTERNATIONAL PRELIMINARY EXAMINING AUTHORITY.—Section 351(g) is amended by striking "term 'International Searching Authority means" and inserting "terms 'International Searching Authority' and 'International Preliminary Examining Authority' mean".

SEC. 202. TIME FOR FILING FEES.

Section 361(d) is amended to read as follows:

"(d) The international fee, and the transmittal and search fees prescribed under section 376(a) of this part, shall be paid either on filing of an international application or within such later time as the Commissioner may prescribe.".

SEC. 203. PATENT OFFICE AS INTERNATIONAL PRELIMINARY EXAMINING AUTHORITY.

(a) AUTHORITY OF PATENT OFFICE.—Section 362 is amended to read as follows:

"§ 362. International Searching Authority and International Preliminary Examining Authority

"(a) The Patent and Trademark Office may act as an International Searching Authority and an International Preliminary Examining Authority with respect to international applications in accordance with the terms and conditions of an agreement which may be concluded with the International Bureau, and may discharge all duties required of such Authorities, including the collection of handling fees and their transmittal to the International Bureau.

"(b) The handling fee, preliminary examination fee, and any additional fees due for international preliminary examination shall be paid within such time as the Commissioner may prescribe.".

(b) CONFORMING AMENDMENT.—The item relating to section 362 in the table of sections for chapter 36 is amended to read as follows:

"362. International Searching Authority and International Preliminary Examining Authority.".

SEC. 204. INTERNATIONAL STAGE: PROCEDURE.

Section 364(a) is amended by striking "or International Searching Authority, or both," and inserting ", an International Searching, Authority, or an International Preliminary Examining Authority,".

SEC. 205. SECRECY OF INTERNATIONAL APPLICATIONS.

Section 368(c) is amended by striking "or International Searching Authority, or both," and inserting ", an International Searching Authority, or an International Preliminary Examining Authority,".

SEC. 206. COMMENCEMENT OF NATIONAL STAGE.

(a) RECEIPT OF DOCUMENTS FROM THE INTERNATIONAL BUREAU.—Subsection (a) of section 371 is amended to read as follows:

"(a) Receipt from the International Bureau of copies of international applications with any amendments to the claims, international search reports, and international preliminary examination reports (including any annexes thereto) may be required in the case of international applications designating or electing the United States.".

(b) TIME LIMIT FOR COMMENCEMENT OF NATIONAL STAGE.—Subsection (b) of section 371 is amended to read as follows:

"(b) Subject to subsection (f) of this section, the national stage shall commence with the expiration of the applicable time limit under article 22(1) or (2) or under article 39(1)(a) of the treaty.".

(c) FILING OF ENGLISH TRANSLATION.—Subsection (c) of section 371 is amended—

(1) in paragraph (4) by striking the period and inserting "; and";

(2) by adding at the end the following:

"(5) a translation into the English language of any annexes to the international preliminary examination report, if such annexes were made in another language.".

(d) TIME PERIOD FOR SUBMISSION OF ANNEXES.—Subsection (d) of section 371 is amended by adding at the end the following new sentence: "The requirement set forth in subsection (c)(5) of this section shall be complied with at such time as the Commissioner may prescribe, and failure to do so shall be regarded as cancellation of the amendments made under article 34(2)(b) of the treaty.".

(e) TIME PERIOD FOR PRESENTATION OF AMENDMENTS.—Subsection (e) of section 371 is amended by inserting "or article 41" after "28".

SEC. 207 FEES.

(a) Handling and Preliminary Examination Fees.—Subsection (a) of section 376 is amended—

(1) by striking "fee, which amount is" and inserting "fee and the handling fee, which amounts are";

(2) by redesignating paragraph (5) as paragraph (6); and

(3) by inserting after paragraph (4) the following new paragraph:

"(5) A preliminary examination fee and any additional fees (see section 362(b)); and".

(b) PRESCRIPTION AND REFUNDABILITY OF FEES.—Subsection (b) of section 376 is amended—

(1) in the first sentence by inserting "and the handling fee" after "international fee"; and

(2) in the third sentence by inserting "the preliminary examination fee, and any additional fees," after "fee,".

SEC. 208. EFFECTIVE DATE.

The amendments made by this title—

(1) shall take effect on the same day as the effective date of entry into force with respect to the United States of chapter II of the Patent Cooperation Treaty, on account of the withdrawal of the declaration under article 64(1)(a) of the Patent Cooperation Treaty; and

(2) shall apply to all international applications pending on or filed on or after the date on which the amendments made this title take effect.

## SUMMARY

H.R. 4899 contains two titles.

Title I relates to process patent protection and Title II relates to implementation of the Patent Cooperation Treaty. This bill enhances United States patent protection and helps to harmonize our patent laws with those of our trading partners.

## BACKGROUND

### PROTECTION OF UNITED STATES PROCESS PATENTS

American patent law has long recognized the validity of securing for inventors the right to exclude others from practicing an invention that consists of a method of making a product. Process patent protection has been a part of United States law since at least the 19th century.[1] Process patents extend intellectual property protection for new and useful processes, art or methods of creating an object. Since 1952 there has been an explicit statutory acknowledgment of the availability of process patent protection.[2] Process patents, however, have been granted only partial protection against acts of infringement.[3] This is so because, unlike product patents, the use of a patented process outside the United States and a subsequent importation of the product is not an act of patent infringement. The failure fully to protect American process patents harms American businesses and products results contrary to the public interest. Many foreign countries adequately protect process patents, thus leaving American patent holders in a position to become the victims of unfair competition.

Process patent protection today is of central importance in the pharmaceutical industry, to the development of solid state electronics, for the manufacture of certain amorphous metals [4] and, per-

---

[1] *See generally. In re Tarczy-Hornoch.* 397 F.2d 856 (C.C.P.A. 1968) (J. Rich discusses the case law history of process patents).

[2] 66 Stat. 92, 773; 35 U.S.C 100(b) (reprinted in *Industrial Property Laws and Treaties,* United States of America—Text 2-001).

[3] *Enka, B.V. of Arnhem, Holland* v. *E.I. du Pont, Etc.,* 519 F.Supp. 356, 362: D. Del. 1981) (19 U.S.C. 1337, 1337a does not give Federal District Courts jurisdiction over acts outside the U.S.). *See generally.* Note. "Importation of Arcticles Produced by Patented Processes: Unfair Trade Practices or Infringement." 18 *Geo. Wash. J. Int'l L. & Econ.* 129 (1984) (hereinafter cited as "*Note*"); Kaye & Plaia. "Unfair Trade Practices in International Trade Competition: A Review of Developments Under Section 337." 64 *J. Pat. Off. Soc'y.* 360 (1982); Ablondi & Vent. "Section 337 Import Investigations—Unfair Import Practices." *4 Loy. Int'l. & Comp. L.J.* 27 (1981); *see also,* Stark. "Efforts by Treaty. Case and Statute to Provide Holders of Process Patents Protection Against Imported Goods Made by the Patented Process." 42 *J. Pat. Off. Soc'y.* 21 (1960); Comment, "Patent Protection Under the Tariff Act." 13 *Case W. L. Rev.* 377, 381–82 (1962); *see also,* DeLio & Worth. "A Review of Protection of Patent Interests from Unfair Methods of Competition in Importation." 25 *Geo. Wash. L. Rev.* 341 (1957). *reprinted in* 39 *J. Pat. Off. Soc'y* 282 (1957) (hereinafter cited as "*DeLio & Worth*"); Rich "Infringement Under Section 271 of the Patent Act of 1952" 35 *J. Pat. Off. Soc'y.* 476 (1953).

[4] *Certain Amorphous Metal Alloys and Amorphous Metal Products.* 377–TA–143 (1984): *Innovation and Patent Law Reform: Hearings Before the Subcommittee on Courts. Civil Liberties and*

Continued

haps most significantly, for the biotechnology industry. For most biotech companies the best—and sometimes only—available protection for their intellectual property is a process patent.[5] Such patents are effective in securing for the inventor the right to prevent others from practicing that invention in the United States. Because such protections are limited to the territory of the United States, it is possible—if not likely—for a process patent holder to face domestic competition from persons who have used the patented process to create a product overseas and then shipped it into the United States. In these situations the patent owner cannot sue for patent infringement; rather, the owner is relegated to the United States International Trade Commission (ITC) to seek *limited non-monetary relief.*[6]

The failure of American patent law to make unlawful the importation of goods made using an American process patent has deep historical roots. American patent law—like the law of other nations—does not have an extraterritorial effect.[7] To provide that American law should govern conduct that occurs in other countries would conflict with basic notions of national sovereignty. For that reason, American patent law has always required that the infringing act occur within the United States territory.[8] With respect to process patents, courts have reasoned that the only act of infringement is the act of making through the use of a patented process; therefore, there can be no infringement if that act occurs outside the United States.[9] Although the courts are correctly construing current law, this rationale is inadequate public policy because it ignores the reality that the offending act is the importation of a product made through the use of a protected process patent or its subsequent sale within the United States. There is no logical reason to exclude from the ambit of patent infringement acts associated with the abuse of a United States process patent as long as they occur within the reach of United States domestic law.[10] Moreover, as the President's Commission on Industrial Competitiveness has found, the failure to extend such protection diminishes the eco-

_the Administration of Justice of the House Committee on the Judiciary_, 98th Cong., 2d Sess. 2581 (1984) (statement of Allied Corporation) (hereinafter _Innovations and Patent Law Reform_).

[5] The Office of Technology Assessment describes the nature of the process patent problem for biotechnology companies in its recent report. _Commercial Biotechnology: An International Analysis_ 390, 391, 401, 405 (1984).
   "Because many countries do not provide patent protection for the chemical products of biological processes, and because . . . micro-organisms and subcellular entities will not be protectable *per se* under the patent laws of many countries, process protection may be the only protection available in many cases." R. Schwab. D. Jeffery. D. Conlin. _U.S. and Foreign Intellectual Property Law Relating to Biological Inventions_ (1983), at 12 (unpublished contract report submitted to the Congress of the United States Office of Technology Assessment).

[6] Brunsvold. "Analysis of the United States International Trade Commission as a Forum for Intellectual Property Disputes." 60 _J. Pat. Off. Soc'y._ 505 (1978) (hereinafter cited as "Brunsvold").

[7] _In re Amtorg Trading Corporation_, 75 F.2d 826, 831-832 (1935) (citations omitted), *cert. denied*, 276 U.S. 576 (1935).

[8] DeLio & Worth, *supra* note 3, at 286-344.

[9] *Id; Note* at 133: _United States v. Studiengesellschaft Kohle m.b.H._, 607 F.2d 1122, 1127-28 (D.C Cir.1981) ("[a] sale of a product made by a patented process does not itself infringe the patent; it is the unauthorized use of the process that infringes the patent.") (citations omitted).

[10] This view was first enunciated by a governmental entity in 1966 when President Johnson's Commission on the Patent System recommended a change in the patent laws to protect process patents from overseas infringement. _Report of the President's Commission on the Patent System_ (1966).

nomic value of United States process patents.[11] Without domestic legal protection, competitors using the protected process may accept the limited risks of foreign production and importation, in exchange for lower foreign production costs. There is no policy justification for encouraging such overseas production and concurrent violation of United States intellectual property rights.

The compelling nature of this deficiency in United States patent laws has been evident both in the Congress and to the Executive Branch. Reform in this area is a center piece in trade law reform.[12] The remainder of this section of the report will outline the nature of the current remedies available to process patent holders, to point out their drawbacks and to discuss the need for a legislative solution.

### CURRENT REMEDIES/ADVANTAGES

Owners of intellectual property may currently seek relief before the United States International Trade Commission (ITC) under section 337 of the Tariff Act of 1930, 19 U.S.C. 1337 and 1337a.[13] The ITC may grant relief if it is shown that the responding parties have engaged in an unfair method of competition and unfair acts in the importation of articles into the United States, or their sale by the owner, importer, consignee, or agent of either, the effect or tendency of which is to substantially injure or destroy an industry efficiently and economically operated in the United States.[13a] The most commonly asserted unfair trade practice is alleged patent infringement. Proceedings before the ITC present patent owners with a number of opportunities for enforcement that would not ordinarily come into play in the context of a patent infringement lawsuit.[14] Among the possible advantages of bringing a case before the ITC are the fact that the agency is under a statutory deadline to conclude the case within 12 months after filing.[15] The ITC may extend this period up to 18 months for complex cases.[16] In some cases this

[11] President's Commission on Industrial Competitiveness. *Preserving America's Industrial Competitiveness.* at 328–9. 343 (1985).

[12] See. e.g., "Administration Trade Package: White House Maps Bill to Item Tide of Protectionism," *New York Times,* September 12, 1985. A1. D6.

The Administration trade bill included process patent reform. H.R. 4585 (Rep. Erdreich) (99th Cong.). *See* Office of the United States Trade Representative, Executive Office of the President, *Administration Statement on the Protection of U.S. Intellectual Property Rights Abroad,* April 7, 1986 (reprinted in 3 Int. Trade Rep. 481 (April 9, 1986).

[13] *See generally,* Staff of the International Trade Commission. Unfair Import Investigation Division, *Litigating Intellectual Property Cases of the International Trade Commission* (unpublished) (undated) (available from the ITC) (hereinafter cited as *"ITC Staff Paper"*).

[13a] It should be noted that amendments to section 337 have also been proposed during the 99th Congress. H.R. 3776, 3777, 4312, 4539 and See also S. 1860 and 1869.

H.R. 4747 has been reported favorably by the Subcommittee on Courts, Civil Liberties and the Administration of Justice to the Committee on the Judiciary. This bill has also been incorporated *in hace verba* in H.R. 4800, an omnibus trade bill which passed the House of Representatives.

These bills, in general, seek to facilitate enforcement of intellectual property rights in the ITC. Most of the bills eliminate the requirements that the complainant in the ITC show that on "injury" occurred if they can show intellectual property ownership and infringement. These bills also eliminate the requirement that the complainant establish that the affected industry is "efficiently and economically operated." While these changes, if adopted, may make the ITC a slightly more attractive forum for the adjudication of process patent disputes, such changes would not eliminate the need for legislation to permit infringement actions in the District Court.

[14] *Id.* As of September 1983, the Commission had instituted 165 Section 337 actions.

[15] 19 U.S.C. 1337(b)(1).

[16] 19 U.S.C. 1337(f)(1).

truncated time frame may preclude discovery opportunities and can be seen as a disadvantage. Moreover, the ITC, acting with the advice of an expert staff, must determine within 30 days after the complaint is filed whether to commence the investigation.[17]

The second advantage to the ITC proceeding is the relative ease of enforcement. The ITC can issue exclusion orders which direct the Customs Service to prevent goods from coming into the United States.[18] These exclusion orders can extend to non-respondents if a pattern or practice of abuse has been shown.[19] In cases where personal jurisdiction exists, the ITC may also issue cease and desist orders.[20] Thus, with respect to some domestic purchasers of foreign-made goods, a type of injunctive relief is possible.

The third arguable advantage is that respondents in an ITC proceeding may not assert a counterclaim.[21] Other factors to consider include possible differences between the ITC and Federal District Courts on questions such as patent misuse or patent validity. This difference should be slight because the reviewing court for both fora is the Court of Appeals for the Federal Circuit.

The assistance of the ITC can be viewed as an advantage or a disadvantage. The early active intervention of the ITC staff can help frame the issues and provide inexpensive expert assistance. On the other hand, such intervention is designed to reveal to each side the strengths or weaknesses of the other side's case.

There are some discovery problems in ITC proceedings in foreign countries. For example, Japan does not honor ITC requests for assistance. While the unavailability of discovery can be remedied by orders precluding the admissibility of evidence when discovery efforts have been thwarted, some foreign countries may be more likely to honor requests from Federal District Courts.

A final—and as yet unresolved problem—is that an ITC decision on patent validity may not result in the application of *res judicata* or collateral estoppel in a subsequent judicial proceeding. This limitation comes into play in the context of non-process patents when a patent holder seeks relief in addition to that provided before the ITC.

### DISADVANTAGES OF CURRENT REMEDY

The advantages of using the ITC to enforce a process patent are, however, outweighed by the disadvantages.[22] First among the prob-

---

[17] 19 C.F.R. 210.12 (1984).

[18] 19 U.S.C. 1337(d). Because ITC proceedings are *in rem* in nature, such orders are proper. *Sealed Air Corporation* v. *ITC*, 645 F.2d 976 (C.C.P.A. 1981).

In at least two cases involving process patents, the Commission has entered general exclusion orders which bar any goods made using the protected process. *Certain Multi-Cellular Plastic Film*, No. 337-TA-54 (Int'l Trade Comm. 1979) at 22-24; *aff'd sub nom.*, *Sealed Air Corp.* v. *ITC*, 645 F.2d 976 (C.C.P.A. 1981); and *Certain Methods for Extracting Plastic Tubing*, No. 337-TA-110 (1982) at 19-21. This means that with a general exclusion order the burden of proof is on the importer to show that the goods were made by other than the protected process.

It is also possible to obtain a temporary exclusion order which excludes articles from entry into the United States during the course of an ITC investigation, unless the respondent posts an adequate bond. 19 U.S.C. 1337(e).

[19] U.S.C. 1337(d); *see also, Sealed Air Corp.*, supra note 19: *Note at 140. n. 98, 99, 100*.

[20] *Certain Airtight Cast-Iron Stoves*, No. 337-TA-69 (1981), 215 U.S.P.Q. 963 (Int'l Trade Comm. 1980): *Note* at 140. n. 103.

[21] *ITC Staff Paper* at 8-9.

[22] In fairness it should be noted that commencement of an action in Federal court presents its own set of problems. Service of process can be a difficult procedural hurdle to overcome. More-

Continued

lems with the ITC is that no damages may be obtained. For the domestic producer who has already suffered a monetary loss as a result of process patent piracy, future oriented relief is an incomplete remedy. The absence of a sufficient deterrent means that many overseas manufacturers and their domestic merchandisers are willing to absorb the risk of an ITC proceeding as a cost of doing business. Enactment of the proposed process patent legislation is the best way patent holders can expect to see a diminution in the abuse of their patents by overseas manufacturers.[23]

The second major drawback is that any relief granted by the ITC can be nullified by the President for foreign policy or other reasons. Before 1985, this possibility was more likely in cases where the jurisdiction of the ITC was in question or where the remedies were harsh or overly broad.[24] For the first time in memory, President Reagan on January 4, 1985, overturned the ITC decision to exclude "grey market goods" on policy grounds.[25] Despite well-reasoned opinion by the ITC,[26] the President refused to uphold the exclusion order. Thus, there is no reason to believe that an ITC decision will be tried and decided in a neutral, judicial type of forum free from political, foreign policy or commercial considerations.

The third difficulty for the owner of a process patent is that the statutory criteria are somewhat vague and susceptible to uncertain interpretations. In addition to showing that the respondents have imported goods using an unfair method of competition or in violation of a process patent, it is necessary to show injury to a domestic industry. The ITC has issued somewhat confusing opinions about the prerequisites to showing that a domestic industry exists.[27] It also appears difficult to show the separate requirement of "injury" if one's business is still showing a profit.[28] Assuming that the do-

---

over, even if a patent holder obtains a judgment against a foreign manufacturer, enforcement can be difficult. *ITC Staff Paper* at 4-6.

[23] *See Resolution 101-3,* 1983 A.B.A. Sec. on Pat., *Trademark & Copyright L. Committee Rep.* 23-25. *Resolution 101-?.* 1984 *Summary of Proceedings. A.B.A. Sec. on Pat., Trademark & Copyright L. Committee Rep.* Damages available in a patent infringement lawsuit must be adequate to compensate but not less than a reasonable royalty. 35 U.S.C. 284. In case of willful and wanton infringement, treble damages are available. *Id., Baumstimler v. Rankin,* 677 F.2d 1061 (5th Cir. 1982).

[24] *See. e.g., Certain Headboxes and Papermaking Machine Forming Sections for the Continuous Production of Paper and Components Thereof,* No. 337-TA-82 (1980) (remedy too broad), *see 46 Fed. Reg.* 32.361 (June 22, 1981) (President's disapproval), *investigation reopened.* No. 337-TA-82A. 217 U.S.P.Q. 179 (Int'l Trade Comm. 1981), *rev'd on other grounds sub. nom. Aktiebolaget Karlstads Mekaniska Werkstad v. ITC,* 705 F.2d 1565 (Fed. Cir. 1983); *Certain Welded Stainless Steel Pipe and Tube.* No. 337-TA-29 (1979) (ITC jurisdiction questioned).

[25] Letter from President Ronald Reagan to Hon. Paula Stern. Chairwoman. ITC dated January 4, 1985.

[26] *Certain Alkaline Batteries,* No. 337-TA-165 (1984).

[27] *Certain Softballs and Polyurethane Cores therefore,* No. 337-TA-190 (1985) (ITC does not use rigid formula in determining industry requirement). Certain Battery Operated Toy Vehicles, No. 337-TA-122 (1982), *aff'd. sub. nom. Schaper Mfg. Co. v. ITC.* 717 F.2d 1368 (Fed. Cir. 1983) (where complainant's product also made outside the U.S.; no domestic industry); *Certain Products with Gremlins Depictions,* No. 337-TA-201 (1986), *compare, Certain Ultra-Microtone Freezing Attachments.* Investigation No. 337-TA-10 (1976) (finding of domestic industry when only domestic act is the importation of goods from abroad) *with Certain Writing Instruments and Nibs Therefor.* Investigation No. 337-TA-129 (1984) (two patents, two possible industries, only one meets statutory definition) *see Note* at 137. n.72.

[28] Brunsvold at 513 (citations omitted); *Note* at 137. n. 72.
    In the leading case on the question of injury, the Court of Appeals for the Federal Circuit held that even though proof of injury in a patent case can be less than other Section 337 cases; it is still necessary to show that the infringer holds, or threatens to hold, a significant share of the market or has made significant sales. *Texron v. U.S. ITC.,* 753 F.2d 1019, 1029 (1985), *see also, Certain Optical Waveguide Fibers,* No. 337-TA-189 (June 19, 1985). (no injury finding); *Certain Combination Locks,* No. 337-TA-45 (1979) (no injury finding); *Certain Attache Cases,* No. 337-TA-49(1979) (no injury finding).

mestic industry has been injured, the complainant must also show that the industry is efficiently and economically operated. While this criterion has not yet produced anomalous results,[29] this is a trade policy issue which should be irrelevant in terms of process patent infringement. Unlike an intellectual property statute, the complainant must show that the imports involved have either the effect to destroy or substantially injure the domestic industry or have a tendency to destroy or substantially injure the domestic industry.[30] Thus, the complainant must introduce proof concerning: (1) loss of customers; (2) decline in production, sales or profits; (3) suppressed prices; (4) decline in employment; and or (5) significant market penetration by the imports.[31] The burden of showing such injury is on the complainant as is showing the casual link between the imports and the injury. As the ITC staff has noted:

> In establishing injury, complainants sometimes have difficulty in showing the necessary nexus—or casual link—between respondents' alleged unfair acts and the demise or slowing of a complainant's domestic industry. Thus, respondents may argue that a decline in sales or profits for complainant's product, rather than being the result of sales of respondents imported goods, is instead the result of a shift in demand to another type of product or of the sales of non-infringing goods by non-respondents.[32]

Finally, even if the party meets these criteria, the ITC must evaluate whether the public interest will be served by the issuance of an order of cease and desist or exclusion.[33] This consideration, which would also be irrelevant in patent litigation, is a potential pitfall in process patent enforcement actions. In many cases, the use of a patented process overseas will result in the production of goods that are substantially less expensive than those made domestically. Consumer advocates could easily argue that such cost consideration alone would preclude the issuance of an ITC order. While the ITC will usually balance cost considerations with the impact of its decision on the vitality of our intellectual property laws, a decision to decline an order solely on the grounds of cost would not be automatically rejected on appeal. In determining whether to issue an exclusion, the Commission must give consideration to the effect of that remedy on the: (1) public health and welfare; (2) competitive conditions in the U.S. economy; (3) the production of like or directly competitive articles in the U.S.; and (4) the U.S. consumer.[34] Moreover, the ITC, by law and regulation, must consult on this question with other federal agencies and outside groups.[35]

The looseness of this "public interest" test can be seen in the two cases the ITC relied on to deny an exclusion order. In one, the ITC

---

[29] Sec. e.g., *Certain Methods for Extracting Plastic Tubing*, No. 337-TA-110 (1982) a: 10-11. *See also. ITC Staff Paper* at 9-10. *Note* at 137. n. 74.

[30] 19 U.S.C. 1337(a).

[31] *Certain Roller Units.* No. 337-TA-49 (1979); *Certain Chain Door Locks*, No. 337-TA-5 (1976).

[32] *ITC Staff Paper* at 12.

[33] *Id.* at 22 (Commission considers complainant's anticompetitive behavior and the industry's likely pricing behavior in the absence of imports).

[34] 19 U.S.C. 1337(d): *S. Rep. No. 1298*, 93d Cong., 2d Sess. 193.197 (1974).

[35] 19 C.F.R. 210.14(a)(4)(1984): *see. e.g.*, 47 Fed. Reg. 39. 746 (1982).

10

denied complainant relief because the imported goods were to be used by Ford Motor Company to improve Congressionally-mandated fuel efficiency, and domestic industry could not meet the demand.[36] The other involved the use of basic research equipment in nuclear structure physics.[37]

It is possible to argue that the current ITC remedy is sufficient; however, such an argument appears to ignore the reality of the United States international trade deficit. Moreover, such a view tends to obscure the importance of comparing the level of protection American laws afford patent holders to that given by its major trading partners. Virtually all of the industrialized market-economy countries, in particular the European Economic Community [38] and Japan,[39] provide greater protection for their process patents than the United States does. Holders of American process patents are disadvantaged in the United States market because of the inadequate remedy. On the other hand, American inventors must comply with foreign patent laws that preclude the importation of a product made through the use of a patented process protected by a foreign patent. Thus, it can be argued persuasively that the current state of United States law encourages the loss of American jobs.

## CONGRESSIONAL RESPONSE

As indicated at the outset, the issue of expanded process patent protection is one in which Congress must face serious and legitimate questions about the United States balance of trade. Enactment of this legislation would be an impressive first step in furthering the protection of United States intellectual property rights.

Congress has previously turned its attention to this gap in the patent law. During the last two Congresses legislation has been in-

---

[36] *Certain Automatic Crankpin Grinders.* No. 337-TA-60. 205 U.S.P.Q. 71 (Int'l Trade Comm. 1979).

[37] *Certain Inclined Field Acceleration Tubes and Components Thereof.* No. 337-TA-67 (1980).

[38] The European Patent Convention countries provide process patent protection against infringement by use of a pro'ected process, overseas. *See. e.g.,* 1977 Patents Act, Ch. 37 Section 601(1Xc) (United Kingdom) (reprinted in *Industrial Property Laws and Treaties,* UNITED KINGDOM—Text 2-001); *see also, Note* at 141-145; 1980 Patent Law Section 9 (Federal Republic of Germany) (reprinted in *Industrial Property Laws and Treaties.* GERMANY (FEDERAL REPUBLIC OF)—Text 2-002); Article 64(2) of the European Patent Convention (reprinted in *Industrial Property Laws and Treaties,* MULTILATERAL TREATIES—Text 2-008). *See also.* Community Patent Convention. Article 29(b) (reprinted in *Industrial Property Laws and Treaties,* MULTILATERAL TREATIES—Text 2-001). *Contra* (insofar as pharmaceuticals are concerned) Law on Inventions and Trademarks (1975) (Mexico) (processes for obtaining, modifying, or applying products and mixtures relating to the chemical-pharmaceutical industry, or medicines are not patentable, but can be granted a certificate of invention for 10 years wherein the owner must grant a compulsory license with a right to receive royalties) (reprinted in *Industrial Property Laws and Treaties,* MEXICO—Text 1-001); Patents Law of 1967. Section 102 (Israel) (reprinted in 21 *Laws of the State of Israel,* Jerusalem. 1967) (a compulsory license can be issued if the process is for the manufacturing of a product for sale as a medicine).

Article *Squater* of the Paris Convention for the Protection of industrial Property, to which the United States of America is party, provides: "When a product is imported into a country of the Union where there exists a patent protecting a process of manufacture of the said product, that are accorded to him by the legislation of the country of importation, on the basis of the process patent, with respect to products manufactured in that country."

[39] Patent Law of 1959. Section 2(3Xiii) (Japan) (Law No. 121. April 13, 1959, as last amended by Law No. 83, August 24, 1982) (reprinted in *Industrial Property Laws and Treaties, JAPAN—Text 2-001); see also.* Patent Act of Canada, VI Can. Rev. Stat., Chap. P-4 (1970) (reprinted in *Industrial Property; 1970. p. 166); see also.* Dole Refrigerating Products Ltd. *v.* Canadian Ice Machine Co., 17 Fox Pat. C. 125 (Exch. Ct. 1957).

troduced to redress this deficiency.[40] Each of the bills had as its core the belief that process patents deserved greater protection. One of the bills passed the House of Representatives during the 98th Congress. Title I of H.R. 6286 (by Rep. Kastenmeier, D-Wis).[41] This bill provided that importation of a product made outside the United States in violation of a process patent constitutes an act of patent infringement. Unfortunately, the bill was killed in the Senate, in large part, due to the opposition of the generic drug industry.[42]

In this session of Congress new bills were introduced in the House of Representatives by Rep. Kastenmeier (D-Wis.), H.R. 4539, and Moorhead (R-Calif.), H.R. 1069 and H.R. 3776. These bills do not distinguish between products made using a patented process within the United States and those made outside the United States. H.R. 1069 and H.R. 3776 also provide that once discovery concerning the patented process has been exhausted, a rebuttable presumption arises that the goods have been made in violation of a process patent. Similar legislation, S. 1543, is also pending in the Senate.[43]

### HEARINGS AND MARKUP

During this Congress the Subcommittee on Courts, Civil Liberties and the Administration of Justice was limited to three days of hearings on those bills. The Subcommittee heard from the administration, pharmaceutical concerns, business and labor representatives. A consensus for legislation in this area emerged. Eventually, the Committee, with a quorum present, ordered, reported H.R. 4899, relating to process patent reform.

### CONCLUSION

Notions of fairness and logic dictate expanded protection for United States process patents. Without such protection, owners of

---

[40] H.R. 3577 (Moorhead). 98th Cong., 1st Sess.: H.R. 4526 (Kastenmeier). 98th Cong., 1st Sess.; H.R. 6286 (Kastenmeier). 98th Cong., 2d Sess., 101; S. 1841 (Thurmond). 98th Cong., 2d Sess.; S. 1535 (Mathias). 98th Cong., 2d Sess. Hearings in the House of Representatives are found in *Innovation and Patent Law Reform, supra n. 4.* In the Senate, the hearings are contained in *National Productivity and Innovation Act of 1983: Hearings Before the Subcommittee on Patents, Copyrights and Trademarks of the Senate Committee on the Judiciary.* 98th Cong., 1st Sess. (1983). The first bill to expand the remedies for process patent infringement was introduced as early as 1852. *Cong. Globe* 32d Cong., 1st Sess. 1549–51. 1566–73 (1852) and 32 Cong. 2d Sess. 127, 128, 528, 534–36 (1853). This measure was opposed in part because of concerns about the potential liability of "innocent infringers" purchasing goods on the open market (remarks of Mr. Hall (at 1549)). Similar bills were introduced in the 94th Congress. *See. e.g.,* S. 2255. Those bills failed when patent law recodification stalled. *See also* S. 2504, 93d Cong., 1st Sess., proposed section 271(e).

[41] 130 *Cong. Rec.* H. 10527 (daily ed. October 1, 1984).

[42] An additional concern about H.R. 6286 was raised by the United States Trade Representative concerning a potential conflict between the bill and the General Agreement on Tariff and Trade (GATT). See *Innovations and Patent Law Reform* (memorandum of Alice Zalik) at 2432. This issue has been further analyzed by the Committee on the Judiciary during the 99th Congress. The expert views received by the Committee have led it to conclude that process patent reform should not be limited to imports.
Hearings before the Subcommittee on Courts, Civil Liberties and the Administration of Justice, Committee on the Judiciary, United States House of Representatives, 99th Congress, 1st Sess. and 2d Sess. (1986) (letter from Professor Robert Hudec, University of Minnesota to Robert W. Kastenmeier, letter from Professor John Jackson, University of Michigan to Robert W. Kastenmeier) (unprinted hearings).

[43] This measure is substantially similar to a provision found in S. 1535, which had been ordered reported out by the Senate Judiciary Committee during the 98th Congress. Each house of Congress appears posed to give prompt attention to this issue.

12

an important type of intellectual property will be relegated to the use of an inadequate administrative remedy and will suffer competitive disadvantages. It is to be hoped that the legitimate concern over international trade will give this issue the visibility it deserves.

## PATENT COOPERATION TREATY—CHAPTER II

On November 14, 1975, Public Law 94-131 added a new Part IV to title 35, United States Code.[44] That law implemented the Patent Cooperation Treaty (PCT) and by its provisions enabled U.S. patent applicants to avail themselves of the advantages offered by the Treaty when it came into force in 1978.

The Treaty traces its conceptual genesis back to 1966, when an international study was undertaken to assess ways to reduce duplication of effort in the filing and processing of patent applications for the same inventions in different countries. After issuance of the study, an international Treaty was prepared—a final draft of which was considered at the Washington, D.C., Diplomatic Conference of May 25 through June 19, 1970. On June 19, 1970, the Treaty—entitled the Patent Cooperation Treaty—was signed by twenty countries, including the United States, and remained open for signature until December 31, 1970, by which date a total of thirty-five countries had became signatories. On September 12, 1972, President Nixon submitted the Treaty to the United States Senate for its advice and consent to ratification. The Senate gave its advice and consent on October 30, 1973. At present, the PCT is adhered to by thirty-nine countries.

The Treaty is administered by the World Intellectual Property Organization (WIPO), located in Geneva, Switzerland. Since its conception, U.S. applicants and those from other member countries have been using the PCT route to obtain patent protection to an ever increasing degree. For example, total filings under the Treaty have increased from 5,719 in 1984 to 7,019 in 1985. Participation by U.S. applicants in that time frame increased from 2,233 to 2,521. These figures continue to rise as more applicants become aware of the benefits offered by the PCT.

In essence, applicants choosing the PCT route for obtaining patent protection abroad can avail themselves of two main advantages over those filing conventional patent applications in foreign countries. First, applicants have the ability to file with the U.S. Patent and Trademark Office a single application in the English language, and thereby obtain foreign national filing dates in as many member countries of the PCT as desired. The other advantage is the long time lead provided by the Treaty procedure before applicants must become involved in the national patent granting process of the countries selected for patent protection. As summarized by the Director General of WIPO, Dr. Arpad Bogsch: "The PCT system has been revised over the years and is now an even more important instrument for filing patent applications abroad."[45]

[44] 89 Stat. 685 (1975). *See* S. Rep. No. 94-215, 94th Cong., 1st Sess. (1975); H. Rep. No. 94-592, 94th Cong., 1st Sess. (1975).
[45] Letter from Arpad Bogsch to Hon. Robert W. Kastenmeier (dated November 6, 1985).

The Patent Cooperation Treaty consists of eight chapters, but only chapters I and II are substantive in nature. When the United States deposited its instruments of ratification with the World Intellectual Property Organization on November 26, 1975, it did so with several reservations and specifically one, under Article 64(1)(a) of the Treaty, to the effect that it would not be bound by the provisions of chapter II. Of the other 38 member countries, only five others—Denmark, Liechtenstein, Norway, the Republic of Korea and Switzerland—also reserved with respect to chapter II.

Experience gained from the operation of the PCT since its entry into force in 1978 has shown, however, that adherence to chapter II would now be in the best interest of the United States. Accordingly, on July 27, 1984, President Reagan requested the advice and consent of the Senate to withdraw the United States reservation against adherence to chapter II.[46] Hearings on that request were held by the Senate Committee on Foreign Relations on June 11, 1986, and favorable Senate action is expected. When advice and consent are obtained from the Senate, the President may withdraw the reservation at any time by notifying the Director General of WIPO in accordance with Article 64(6)(b) of the Treaty.

The present legislation amends part IV of title 35, United States Code, to authorize the U.S. Patent and Trademark Office to undertake the responsibilities outlined in chapter II of the Treaty. These responsibilities are in addition to those under chapter I, which the U.S. Patent and Trademark Office has already undertaken in accordance with Public Law 94–131.

This implementing legislation is necessary because the Patent Cooperation Treaty is not self-executing. In *Foster* v. *Neilsen,* 27 U.S. (2 Pet.) 253 (1829), Chief Justice Marshall discussed the distinction between self-executing and non-self-executing treaties. Chief Justice Marshall stated:

> Our constitution declares a Treaty to be the law of the land. It is, consequently, to be regarded in courts of justice as equivalent to an act of the legislature, whenever it operates of itself, without the aid of any legistative provision. But when terms of the stipulation import a contract, when either of the party [parties] engages to perform a particular act, the Treaty addresses itself to the political, not the judicial department; and the legislature must excecute the contract, before it can become a rule for the court.

This distinction is particularly important to the House of Representatives, because it determines the House's role in how and under what conditions treaties become the law of the land. If a Treaty is self-executing, no implementing legislation is necessary. In other words, the Treaty supercedes existing law.

Courts, which are empowered to give direct legal effect to treaties that are self-executing, have consistently applied this theory, finding that treaties that require modifications to existing law, the

[46] *See* Message from the President of the United States Transmitting a Request for Advice and Consent to Withdraw a Reservation Declaring that the United States Would not Be Bound by the Provisions of Chapter II of the Trenty Made When the United States Deposited its Instrument of Ratification for the Patent Cooperation Treaty with the World Intellectual Property Organization on November 26, 1975, Treaty Doc. 98–29, 98th Cong., 2d Sess. (1984).

expenditure of moneys, or the disposition of government property, are not self-executing. Treaties are not self-executing if they further need to be implemented by way of legislation.[47]

In order to determine whether a Treaty is self-executing, it is necessary to analyze the intention of the parties to the Treaty as expressed in the terms of the Treaty. As relates to the PCT, its Article 1 states that no provisions—

> . . . shall be interpreted as diminishing the rights under the Paris Convention for the Protection of Industrial Property . . .

The PCT therefore incorporates by reference the Paris Convention. On the issue of self-execution, the latter expressly states:

> (1) Any country party to this Convention undertakes to adopt, in accordance with its constitution, the measures necessary to ensure the application of this Convention.
> (2) It is understood that, at the time a country deposits its instrument of ratification or accession, it will be in a position under its domestic law to give effect to the provisions of this Convention.

Both treaties, therefore, are clearly not self-executing.[48]

In order to put the importance of the present legislation into perspective, a short review of all the substantive provisions of the PCT is necessary. As already noted, the Treaty offers several major advantages. One is to simplify the filing of patent applications on the same invention in different countries by providing, among other things, centralized filing procedures and a standardized application format. Another advantage offered by the Treaty is the longer time periods available to applicants before they must commit themselves to undertake the expenses of translation, national filing fees and prosecution in each country in which they desire patent protection.

Before the advent of the PCT, the burden of obtaining patent protection in numerous countries was only alleviated by the twelve-month "priority" period provided by the Paris Convention for the Protection of Industrial Property. Under the provisions of that Convention, applicants who first file a patent application in their home countries are afforded this filing date as a "right of priority" against all intervening acts which otherwise might have defeated the obtaining of patent protection in other member countries, if they file applications on the same invention in such other countries within twelve months.

The PCT, on the other hand, enables applicants to file a single international application in which those member countries are designated where the applicant desires protection for an invention.

[47] See Cook v. United States, 288 U.S. 102, 119 (1933); Cameron Septic Tank Co. v. Knoxville, 227 U.S. 39 (1913); Whitney v. Robertson, 124 U.S. 190, 194 (1888); United States v. Rauscher, 119 U.S. 407, 418 (1886); Head Money Cases, 112 U.S. 580, 598 (1884); Chew Heong v. United States, 112 U.S. 536 (1884); United States v. Forty-Three Gallons of Whiskey, 93 U.S. 188, 196 (1876); Holden v. Joy, 84 U.S. (17 Wall.) 211, 247 (1872); Robertson v. General Electric Co., 32 F.2d 495 (4th Cir.), cert. denied, 280 U.S. 571 (1929); Vanity Fair Mills, Inc. v. T. Eaton Co., 133 F. Supp. 522 (S.D.N.Y. 1955).

[48] See Mannington Mills, Inc. v. Congoleum Corp., 595 F.2d 1287, 1299 (3rd Cir. 1979) for a judicial finding to this effect. The Berne Convention contains similar language (in Article 36) to the Paris Convention provision. Berne, therefore, also is not self-executing.

Without any further activity on the part of the applicant, these designated States recognize the international application from its filing date as equivalent to a regular national application. After filing the international application, the applicant has the option to postpone entry into the national patent processing stages of these countries to either twenty months from the application's priority date under chapter I, or thirty months under chapter II. These longer time periods permit applicants to be more selective of the countries in which they ultimately decide to obtain patent protection because they have more time and information to evaluate the strength of their potential patents and to determine their marketing plans.

The operational steps under chapters I and II of the Treaty are time sequential. Thus, under chapter I, an applicant files an international application with a Receiving Office, which usually is the patent office in the country of which the applicant is a national or resident. For U.S. applicants, the U.S. Patent and Trademark Office acts as the Receiving Office. The international application is filed in a specified language (English for U.S. applicants), in a standard format, and includes the designation of those member countries in which the applicant desires protection. The international application is subject to an international fee at the time of filing. The payment of national filing fees and translation expenses, however, in each of the designated States can be deferred until twenty months from the "priority date" of the international application. In this respect, the "priority date" of the international application depends on whether it contains a claim of priority to an earlier application under the provisions of the Paris Convention. If it does contain such a claim, the "priority date" is the filing date of the earlier application whose priority is claimed. Where the international application does not contain such a claim, the "priority date" is the filing date of the international application itself.

In order to make applicants aware of the possibility that their inventions may have been disclosed in prior publications, an International Searching Authority prepares a search report with respect to every international application. This search report contains, among other things, citations of patent documents and other publications considered to be relevant to the invention claimed in the international application The report also contains the classification of the subject matter of the invention and an indication of the fields which were searched in the documentation resources of the International Searching Authority. For U.S. applicants, the U.S. Patent and Trademark Office has assumed the function of such an Authority. However, U.S. applicants currently also have the choice of selecting the European Patent Office as an alternate International Searching Authority. This alternative is especially convenient in cases where an applicant intends to seek regional patent protection in Europe by means of the European Patent Convention.

Copies of the international search report are transmitted to the applicant and to the International Bureau of the World Intellectual Property Organization. The International Bureau serves as the administrative and coordinating organ for the Treaty. After having received the international search report, the applicant may amend the claims of his international application by sending such amend-