ments to the International Bureau. Thereafter, copies of the international application and the international search report, together with any amendments to the claims, are forwarded by the International Bureau to each of the designated States.

The international application, search report and amendments are published by the International Bureau eighteen months from the priority date. (Publication does not take place if all the countries designated in the international application previously declared that, as far as they are concerned, international publication is not necessary.) At the expiration of the twentieth month, international processing of the international application under chapter I ends and the national stage of patent processing begins in each designated State. At that time, the applicant is required to pay national fees and submit any required translations to the national patent offices of those designated States in which the applicant still wishes to obtain protection. If regional patents are desired, the applicant would pay the appropriate fees and submit any required translations to the European Patent Office or the African Intellectual Property Organization. Thereafter, the patent granting procedure is continued by the national or regional patent offices and the applicant may amend the application before each office makes its own determination whether to grant a national or regional patent. In those countries in which the applicant does not pay the national fees and meet other national or regional requirements, the international application is simply considered withdrawn. Coverage of regional patents can be adjusted in a similar fashion.

Chapter II of the Treaty offers an optional supplement to chapter I. If the applicant "elects" previously "designated" member countries which are also bound by chapter II, several additional features and procedures become effective. This election must be made prior to the expiration of nineteen months from the priority date to avoid having to comply with the time limits imposed by chapter I. Election of chapter II extends the international stage by an additional ten months. The national stage, therefore, does not begin until thirty months from the priority date of the international application. Further, as explained in greater detail below, an International Preliminary Examining Authority will prepare an international preliminary examination report for the benefit of the applicant and the elected Offices. In this fashion, the applicant obtains further information on the potential patentability of an invention and the elected Offices are given the benefit of the opinion from a qualified source on whether the invention, as claimed in the international application, meets certain criteria of patentability. Of course, elected Offices may agree or disagree with the conclusions reached by the International Preliminary Examining Authority.

If an applicant wishes an international application to be processed in accordance with chapter II of the Treaty, the applicant must file a "demand" to that effect with the appropriate International Preliminary Examining Authority within the time limit mentioned above. The "demand" also identifies in which member countries previously designated under chapter I, the international application should be treated in accordance with chapter II. In other words, the applicant has the choice to proceed in accordance

with chapter I in some designated States, while "electing" others for treatment of the application under chapter II.

The International Preliminary Examining Authority conducts an examination to determine three criteria: whether the claimed invention has novelty, involves an inventive step (is nonobvious) and is industrially applicable. The applicant and the Authority communicate with each other during the examination proceeding and the applicant is given at least one opportunity to amend the claims, the description, and the drawings of the international application. Thereafter, an international preliminary examination report is established by the Authority. The report does not contain any statement regarding the patentability of the claimed invention according to the law of any country; it merely states whether in the Authority's opinion each claim contained in the international application satisfies the three criteria. Each statement is usually accompanied by citations of prior art references and other explanations. As already noted above, the report is communicated to the applicant and the national offices of the elected States, which then may use it in connection with their own national patent granting process.

The present legislation authorizes the U.S. Patent and Trademark Office to act as an International Preliminary Examining Authority and as an elected Office for international applicants, under chapter II of the Patent Cooperation Treaty.

However, when the Secretary of Commerce transmitted the Administration's draft bill to the Speaker of the House on February 13, 1985, he noted that the U.S. Patent and Trademark Office did not plan to assume the functions of an International Preliminary Examining Authority until it had achieved a reduction to 18 months in the pendency of national patent applications. This goal was to be attained in 1987, after which the U.S. Patent and Trademark Office would assume these functions. Until such time, the Secretary stated that U.S. applicants could rely upon the European Patent Office to act as its International Preliminary Examining Authority.

The U.S. Patent and Trademark Office now expects to achieve 18 month pendency of patent applications in 1989. This delay is caused by an unexpected large increase in the filing rate of patent applications, combined with budgetary reductions in 1986. The commitment by the European Patent Office to act as an International Preliminary Examining Authority for international applications filed with the U.S. Patent and Trademark Office continues for a period of three years from the date on which the reservation to chapter II is withdrawn by the United States. Also, the European Patent Office has confined its examination under chapter II to a yearly limit of 500 U.S. applications in which it previously conducted a search under chapter I. This figure appears to be reasonable, given the small number of international applications processed under chapter II in the recent past. For example, in 1984, the European Patent Office issued 3,574 international search reports and 69 international preliminary examination reports. In 1985, the figures were 4,165 and 108, respectively.

As previously noted, the applicant has until the end of the 30th month from the priority date of the international application to

pay the national fees and submit any necessary translations to the various patent offices of those elected States in which patent protection is desired. Examination and other processing in the elected Offices can start only after the expiration of that time period, unless the applicant chooses to have it start earlier.

Both chapters I and II of the PCT are of considerable benefit to U.S. applicants. Of primary importance is an applicant's ability to file a single application in one location, in one language and for one initial set of fees to obtain the same results which, before the existence of the Treaty, could only be achieved by paying agents to file separate applications in some 39 countries, in different languages, using various formats and paying many national fees. Of no less importance are the time periods of twenty months under chapter I, and thirty months under chapter II, before payments for translations and national fees become due. These time limits facilitate the ability of applicants to reach firm opinions regarding the commercial possibilities of their inventions. In addition, the international search reports and the international preliminary examination reports constitute a solid basis for determining the chances of obtaining patent protection. Chapters I and II of the Treaty, therefore, promote the development of international law and comity. They facilitate the expansion of established programs allowing U.S. inventors to file foreign patent applications and encouraging smaller businesses and individual inventors to become more actively engaged in seeking patent protection abroad.

Passage of the proposed legislation would promote the progress of science and the useful arts in the United States, thereby satisfying the constitutional clause regarding patent law. See Article I, section 8, clause 8. As eloquently observed by Thomas F. Smegal, Jr., President of the American Intellectual Property Law Association:

> The Patent Cooperation Treaty (PCT) contributes to the progress of science and technology by improving the methods of obtaining legal protection for inventions. PCT provides a simplified procedure for the filing of patent applications on the same invention in different countries. It renders more economical the obtaining of patent coverage in several countries.
>
> The Constitutional Clause does not refer to foreign rights nor the use of U.S. made inventions in foreign commerce. However, the PCT, the Paris Convention Treaty, and other international treaties stimulate inventive activity in the U.S. by providing a legal framework for protecting the fruits of such activity in other countries. In this sense, these international agreements are compatible with our Constitution.[49]

Even if the proposed legislation was not perceived as being compatible with the intellectual property clause of the Constitution, Congress would still be justified in enacting it pursuant to the interstate and foreign commerce clause of the Constitution (Article

---

[49] Letter from Thomas F. Smegal, Jr., Esq., to Hon. Robert W. Kastenmeier (dated February 19, 1986).

I, Section 8, clause 3). Professor Donald Chisum has explained this proposition in the following terms:

> By facilitating the obtaining of patent protection abroad, the legislation will promote exports from the United States—either directly in the form of products and services or indirectly in the form of transfers of technology through licensing in exchange for royalty income. Such promotion of exports is an appropriate exercise by Congress of its power to regulate interstate and foreign commerce.[50]

Like a belt and suspenders, the intellectual property and the interstate commerce clauses are adequate to sustain constitutional requirements.

### SECTION-BY-SECTION

The Patent Equity Act contains 2 titles; Title I relates to process patent protection, and Title II implements the Patent Cooperation Treaty.

#### SUMMARY OF TITLE I—PATENTED PROCESSES

The purpose of this title is to provide more meaningful protection to owners of patented processes. Under current patent law, owners of such patents have remedies for unauthorized use of the process only if the process was used in the United States. As a consequence, while a domestic manufacturer using the patented process would infringe the process patent, a foreign manufacturer who imports the product would not. There is also no remedy against parties who use or sell the product, regardless where it is made.

The value of new manufacturing techniques is reflected in the resulting products. A new process may enhance the quality of the product produced, or the new process may permit the product to be made much more economically. In some cases, for example biotechnology, the new process may be the only method of producing a new product. In all of these instances, the advantage to the process patent owner is realized by using or selling the product, or licensing others to do so. As a consequence, the unfettered ability of others to import, sell or use a product made by the patented process, severely diminishes the value of a U.S. process patent.

The only remedy available to the owner of a process patent is under sections 337 and 337a of the Tariff Act of 1930, as amended. Under section 337, the patent owner may petition the International Trade Commission (ITC) to determine that the importation of the product of a patented process constitutes an unfair trade practice, and to exclude the product from entry. This remedy requires the patent owner to establish that the product was made by the patented process and that the importation will damage an efficiently and effectively operated domestic industry, prevents the establishment of such an industry, or will restrain or monopolize trade in the United States. Even if the ITC finds a violation, the President can disapprove such determination. If the petitioner is successful, the

---

[50] Letter from Professor Donald S. Chisum to Hon. Robert W. Kastenmeier (dated February 18, 1986).

ITC will exclude the goods from entry. Regarding goods that have already entered the United States, the ITC can issue a cease and desist order against an individual firm. However, these orders are not effective if importers of offending products can easily find alternative channels. Also, if the importation is discovered after the goods have entered commerce, the patent owner may be left with no remedy, since the ITC does not have the authority to award damages.

The laws of many other industrialized countries protect process patent owners there against unauthorized sale or use of products made by the patented process, or the importation of such products into these countries.[51] This title would expand the scope of our patent laws to tailor them more closely to the national laws of these countries and, thereby, provide owners of process patents in the United States the protection now available abroad to owners of foreign process patents.

This title creates, for the first time in patent law, liability for the importation, sale or use of a product made by a process covered by a United States patent. Liability is predicated on a finding that the importer, user or seller, knew, or was on notice, that the product was made by the patented process.[52] However, liability would not obtain in situations where the product in question was materially changed by subsequent processes, or where the product is a minor or non-essential component of another product. Without such limitations, liability could attach, for example, to the seller of a car in which the steel was made from iron ore that was mined by a patented process, or in which the reflective surface used on the rear view mirror was made by a patented process.

Those found liable for infringement of a process patent can be assessed damages under section 284 of title 35. However, with respect to unexpired process patents, there would be no liability for products imported into or made in the United States before the date of enactment of this bill.[53] Further, the liability of unauthorized sellers, users, and importers would be limited to reasonable royalties for infringements that occurred before they knew that the product in question was made by a patented process, or were put on notice to this effect. Damage liability would also be limited to reasonable royalties in the case of good faith purchasers who ob-

---

[51] Virtually all our trading partners have such laws. (See, e.g., Japan, Germany, Great Britain, Switzerland). The legislation does not permit recovery against the ultimate "user"/consumer unless no adequate remedy can be obtained against the importer or seller. This limitation seemed appropriate because proponents claimed that such a "use" right was usually unnecessary and unlikely to be enforced. Further because process patents can materially affect a product in ways which are difficult to ascertain the exhaustion requirement seemed appropriate because the importer and seller are in a commercial relationship and therefore in a better position to know how the good was made.

The term "no adequate remedy" as used in the bill means that jurisdiction can not be obtained or full damages can not be recovered. To avoid duplicative litigation, suits against the user can be commenced with litigation against importers and sellers. The bill merely affects the order and priority of payment during the damage phase of the case.

[52] Notice is defined as written notice setting forth sufficient facts to establish a reasonable likelihood that the product was made using the protected process.

[53] The products must be in the United States. To permit the continued importation after knowledge or notice (under "reasonable royalties") would conflict with the policy of section 337 of the Tariff Act which gives the patent owner the right to exclude much offending goods at the border.

ligated themselves, before they had knowledge or notice, to accept delivery of infringing products.

Title I contains five sections:

Section 101 provides that section 154 of title 35 is amended by adding to the present rights held by the patent owner, the right to exclude others from using or selling throughout the United States, or importing into the United States, a product made by a patented process.

Section 102 amends section 271 by adding a new subsection (g). This subsection provides that whoever without authority imports into the United States or sells or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer. This liability exists, however, only if the importation, sale or use or the product occurs in the United States during the term of such process patent. This liability is further limited by the second sentence of proposed subsection (g). This limitation provides that no remedy may be granted for the infringement on account of the use of a product unless there is no adequate remedy under this title on account of the importation or sale of that product. In essence this means that the patent holder and the court must look in the first instance to the more involved parties, i.e., unauthorized the importer and the seller before seeking relief from the unauthorized user. This provision does not preclude suit against a user, but rather affects the liability phase of an infringement proceeding. Proposed subsection (g) further provides that a product which is made by a patented process will, for purposes of title 35, not be considered to be so made after: (1) it was materially changed by subsequent processes or (2) it became a minor or nonessential component of another product.

The intended scope of protection is an important consideration when the patentee is enforcing his rights for infringing acts involving the product of the process. The easy case is when the product which results from the process is imported, sold, or used in its form immediately after manufacture. If the patented process produces chemical X, anyone importing, using, or selling chemical X made by that process, is liable for infringement. If the patented process cuts unique grooves in screws, anyone importing or selling these screws is liable for infringement.

However, the scope of this law reaches beyond the easy case or fact situation. The Committee intends to provide protection to process patent owners which is meaningful and not easily evaded.

The process may produce chemical X, which is subsequently subjected to further processing or manufacturing steps. If the subsequent modifications change the basic structure of chemical X so that a clearly different chemical Y results, the connection between the patented process and the product, chemical Y, is broken. Thus, the fact that chemical X was materially changed precludes a claim of infringement for the importation, use, or sale of chemical Y. Also, commerce in chemical Y does not prejudice the rights of the process patent owner whose commercial stake is in chemical X.

However, the subsequent processing modifications of chemical X may only be trivial or conventional in nature. For example, modifications which result in the formation of simple derivatives, including salts or esters, or the removal of impurities, are not material

changes of chemical X. Processing steps which only change shape, size or form are also not material. For example, if chemical X were a polyester resin, the use, sale, or importation of the resin could constitute an act of infringement regardless of whether the resin was formed into yarn or fabricated into some other physical object. Similarly, if chemical X was the active ingredient of a pharmaceutical product, or one of its active ingredients, liability for infringement is not avoided by putting chemical X in a tablet or some other dosage form.

The patented process may produce a product which is used as a component of a second product. The form of the immediate product of the process may or may not be altered. The issue then arises whether the importation, sale, or use of the second product constitutes infringement of the process patent.

The Committee intends that liability for infringement exists if the immediate product of the process becomes an integral, important, or essential feature of the second product. An important fact question is whether the manufacturer of the second product chose to use the product of the process to gain qualities and advantages provided by it. For example, if the manufacturer of the second product informs potential purchasers of such qualities and advantages, it would indicate that the first product was intentionally used for this purpose, and infringement would lie.

The product of the patented process may be a light-weight, high-strength fiber, for example. If that fiber is woven into a bullet-proof vest or used to form the interior structure of automobile tires, the qualities of the fiber provide not only an essential element of the second product, but a meaningful selling point. Therefore, the importation, sale, or use of these vests or tires would constitute infringement. If the process produces a highly heat resistant metal which is used to form important components of a machine to generate electricity, the importation, use, or sale of that machine would also constitute infringement. When the qualities of the product of the process are an important, meaningful addition to the value of the second product, the patentee whose invention produces these improvements over known products should be compensated.

However, if the product of the process is a minor or nonessential component of the second product, no liability for infringement should exist. An indication of this circumstance would be that the product of the process was chosen for no identifiable reason from among other, equally useful, products. For example, the patented process may produce a stain repellant used to treat the upholstery of automobile seats. Or, bolts made by a patented process are used to attach the seats to the automobile floor. In such cases, the importer, user, or seller of the automobile would not be liable for infringement.

Many foreign patent laws which protect patented processes from infringement include a statutory rebuttable presumption which inures to the plantiff after a certain showing.[54] At first, the Com-

---

[54] Most foreign countries (e.g. Australia, Canada, GDR, FRG, Greece, Japan and the Netherlands) also include in presumption because of the difficulty of finding out how a product was made when the manufactures occurred overseas. Many of these countries limit the application of the presumption to new products.

mittee considered including a statutory rebuttable presumption provision in this title. It was not included, however, because the Committee determined that U.S. courts already possess the equitable power to address a plaintiff's difficult problems of proof when they occur. The Committee realizes that patent owners frequently will be unable to obtain information concerning the nature of processes being practiced by foreign manufacturers, for example. Also, a defendant who imports, sells or uses in the United States products obtained from a manufacturer may have more information than the patent owner, or may be in a better position to obtain it.

The Committee intends, therefore, that when a patent owner has produced direct or circumstantial evidence establishing a substantial likelihood that a product was produced by the patented process, the burden of producing evidence to rebut the patent owner's evidence will be on the defendant. The Committee intends that the burden shift on the defendant regardless whether the product produced by the patented process is a new product or a product previously known to the public.

The burden of production of evidence in this situation should shift on the defendant as soon as the patent owner has made a reasonable effort to determine the process actually used in the production of the product. Such an effort can be made by attempting to obtain discovery, or by showing that efforts to obtain discovery of information located in a foreign country would be futile. Shifting the burden on the defendant in such circumstances is the only way to assure the effectiveness of the legislation.

The U.S. International Trade Commission uses a somewhat similar approach in proceedings under section 337 of the Tariff Act of 1930. The ITC draws inferences that facts are favorable to the patent owner in certain situations when the facts are not forthcoming from alleged infringers.

It is the Committee's intention, however, that when a defendant meets the burden of producing evidence to rebut the plaintiff's showing of substantial likelihood of infringement, the burden of persuading the court will be on the patent owner. Thus, the patent owner always has the ultimate burden of producing evidence adequate to persuade the court that infringement exists.

After the plaintiff has presented the case (when the foreign manufacturer is not a party to the suit), the court will be called on to decide whether the plaintiff has established a prima facie case. At this point, the Committee intended that the plaintiff be allowed to demonstrate to the court that he made a "reasonable effort." In this respect, the plaintiff must show that he has exhausted all reasonable approaches to obtain divulgence of information from foreign parties. A diligent effort at discovery should suffice. If a plaintiff can successfully make this showing, and the court finds that the plaintiff has established a substantial likelihood that the product was made by the patented process, the Committee expects that the defendant be called upon to rebut the presumption that the patented process was used to make such product. Again, while the Committee intends that the defendant bear the burden of proceeding forward with the case, it does not intend to shift the ultimate burden of proof on the defendant. As in all civil litigation, the plaintiff bears the burden of establishing the truth of the com-

plaint by a preponderance of the evidence in order to prevail. The court could, however, draw inferences from a defendant's unwillingness to disclose the process used, or why his efforts to learn of the process were unsuccessful.

The evidence of infringement may be direct or circumstantial. Circumstantial evidence adequate to establish infringement could include, for example, telltale signs of the use of the patented process which could be found in the product itself. When chemical processes are used, unique trace impurities or a characteristic pattern of impurities may be present which fingerprint the process of manufacture. Circumstantial evidence also could include a showing that the patented process represents a substantial improvement in efficiency over prior processes and that no alternative, economically feasible process exists. This could be demonstrated, for example, by showing that the sales price of the product would have to be considerably higher if the product was made by any known process other than the patented one.

The Federal Rules of Evidence Rule 301 provides, in pertinent part:

> . . . a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of non persuasion, which remains throughout the trial upon the party or whom it was originally cast.

See generally H.R. Rep. No. 1597, 930 Cong., 2d Sess. 5–6 (Conference Report).

This rule deals with the effect of a presumption once a presumption is found in other sources of law. The Committee expects that in light of logic, experience and directions found in this report, that presumptions will be applied in process patent cases.

Notwithstanding the applicability of Federal Rules of Evidence Rule 301 some important questions about the impact of the rule remain. P. Rothstein, Evidence in a Nutshell 133–34, (1481). These questions are to be resolved in favor of the clarity offered by the 1974 Uniform Rules of Evidence Id. at 125.

Section 103 amends section 287 of title 35 by adding a subsection (b) which would place certain limitations on the recovery of damages. Subsection (b)(1) provides that no damages may be recovered for an infringement under subsection 271(g), unless the infringer knew or was on notice that the product was made by a process patented in the United States. The proposed subsection also provides that damages may be recovered only for infringement occurring after such knowledge or notice with two exceptions, involving the recovery of reasonable royalties. The phrase "reasonable royalties", as used in section 103, is intended to mitigate the adverse economic consequences to the non-manufacturing, good-faith purchaser of goods produced by an infringing process. While the appropriate royalty will vary with the circumstances, the royalty in a particular case should reflect the amount that reasonably prudent business people would have agreed to in an arm's length transaction at a time prior to the infringement.

Proposed subsection (b)(1)(A) provides that liability is limited to reasonable royalties in the case of use or sale of a product obtained before the infringer had knowledge or notice. Proposed subsection (b)(1)(B) also limits liability to reasonable royalties if certain conditions are met. If the product was purchased pursuant to a contract entered into before such knowledge or notice, if that contract provides for the delivery of a fixed quantity of the product in a specified period of time, and if any one of three additional conditions are met, then reasonable royalties constitute the outside limit of the potential liability, rather than damages. The three additional conditions are that either: (1) the product is already in the inventory of the purchaser; (2) the product is in transit to the purchaser; or (3) the product has been received by the purchaser within 6 months of receipt of notice or knowledge by the purchaser.

Proposed subsection (b)(1)(B), therefore, limits the damage liability of good-faith purchasers who have entered into a contract before they receive knowledge or notice of infringement obligating them to accept delivery of products. The provision, however, is not intended to preclude a patent owner from obtaining a preliminary injunction or temporary restraining order to block sales of infringing products if the owner can make the requisite showing of irreparable harm and likelihood of success in the lawsuit. The provision also is not intended to limit damage recovery for products received after knowledge or notice pursuant to a supply contract that is open-ended regarding the quantity of products to be supplied. Further, the provision is not intended to encourage deliberate stockpiling of merchandise for the purpose of limiting infringement liability.

The purpose of the six-month period after knowledge or notice is to allow some time for "innocent" infringers to change suppliers without facing potentially large damage liability. The six-month period is not meant to permit willfull or deliberate infringement, nor is this provision meant to provide infringers with a compulsory license for repeated infringement as a result of periodic switching from one infringing supplier to another. In this respect, the Committee expects that once an infringer has had the benefit of the provisions of this subsection through payment of only "reasonable royalties," he will he held to substantially higher standards of ascertaining that any subsequent supplier does not infringe the process patent in issue. Furthermore, the Committee does not intend that section (b) preclude a court, in an appropriate case, from imposing remedies provided for in other sections of title 35, such as those relating to injunctions (section 283), willful infringement (section 284), or attorneys fees (section 285).

Proposed subsection (b)(2) is added to define the notice that must be given to a non-manufacturing infringer to start the damage clock running. It provides for the "receipt of facts set forth in writing which are sufficient to establish that there is a substantial likelihood that the product was made by an infringing process." The purpose of this provision is to assure that process patents are not used to harass innocent purchasers of products who have no knowledge of the processes used to manufacture the products which they purchase from others. A notice which merely identifies a patent and alleges infringement without factual substantiation of the

basis for the allegation of infringement is insufficient to create liability for damages. Under Section 103, such a notice will be treated as though no notice of infringement had been given. In order to establish a substantial likelihood, the notice should include the following: (1) a copy of each asserted patent; and (2) an explanation of the facts that form the basis for the belief that infringement has occurred.

Section 104 provides the effective date for this title of the bill. This section provides that the amendments made by this title apply to United States patents granted before, on or after the date of enactment of this Act. The effective date provision also contains an exception. The exception states that these amendments do not apply to any product imported into or made in the United States before the effective date. The exception is necessary to avoid creating liability for persons who currently possess products in the United States and who sell or use such products after the effective date. Because under current law persons who use or sell products made in violation of a process patent are not liable for patent infringement it would be unfair to make them liable for the products they currently have on hand. The exception, however, does not exempt a class of products currently in the United States. By virtue of the words in the bill any product which is imported or made in the United States after the effective date would be subject to the provisions of this Act. Thus, if product X (which is made using a process protected by United States process patent) is already in the United States, those individual products could be sold or used without liability. If, however, a person attempted to import, sell or use that type of product such person would be liable if the product was not in the United States at the time of the effective date.

Section 105 provides that the Secretary of Commerce shall annually report to the Congress the effect of the amendments on the importation of ingredients to be used for manufacturing products in the United States on those industries that submit complaints to the Department of Commerce. The complaints to the Department of Commerce shall be submitted during the 1 year period and shall allege that their legitimate sources of supply have been adversely affected by the amendments made by this Act. Subsection (b) of this subsection specifies when the reports are to be submitted. Such reports, if any, are to be submitted annually for the next five years.

## TITLE II—PATENT COOPERATION TREATY AUTHORIZATION

### SECTION 201. DEFINITIONS

This section amends section 351 of title 35, United States Code, by deleting the phrases ", excluding chapter II thereof" in subsection (a) and "excluding part C thereof" in subsection (b). These exclusions were placed in the original legislation (Public Law 94–131, 89 Stat. 685) since chapter II of the PCT was not implemented then. The exclusion of the articles and regulations of the Treaty relating to chapter II must be eliminated in existing legislation to permit the United States to participate in chapter II.

Subsection 351(g) is amended to refer to the "International Preliminary Examining Authority" in association with the current reference to the "International Searching Authority" in anticipation of the United States Patent and Trademark Office becoming an International Preliminary Examining Authority when that Office's workload is sufficiently current.

### SECTION 202. TIME FOR FILING FEES

Section 202 amends section 361(d) of title 35, United States Code, to clarify that the international fee (and the transmittal and search fees prescribed in section 376(a) of title 35, United States Code) shall be paid to the Patent Office either on the filing of an international application or within such time as the Commissioner shall prescribe.

### SECTION 203. PATENT OFFICE AS INTERNATIONAL PRELIMINARY EXAMINING AUTHORITY

Section 203 amends the title of section 362 of title 35, in the table of sections for Chapter 36 title, to include reference to the International Preliminary Examining Authority, thus reflecting substantive changes in section 362.

Current section 362 of title 35, United States Code has been designated as subsection (a) and has been amended to permit the Patent and Trademark Office to act as an International Preliminary Examining Authority, should it desire to enter into an agreement with the International Bureau and perform the required functions. Current law only permits the Patent and Trademark Office to act as an International Searching Authority. Subsection 362(a), as amended, specifically provides for the collection of handling fees under article 31(5) of the Treaty (and Rule 57 of the Regulations thereunder) and the transmittal thereof to the International Bureau, for whose benefit such fees are paid.

New subsection 362(b) authorizes the Commissioner to establish time periods, within the limits of the Treaty and its Regulations, for the payment by applicants of the handling fee under Rule 57 of the Regulations and the preliminary examination fee under Rule 58 of the Regulations. The supplement to the handling fee under Rule 57.1(b) of the Regulations is paid by the applicant directly to the International Bureau and need not be provided for in the legislation.

### SECTION 204. INTERNATIONAL STAGE: PROCEDURE

This section amends subsection 364(a) of title 35, United States Code, by referring to the "International Preliminary Examining Authority" along with current references to "Receiving Office" and "International Searching Authority", in order to specify that all international processing functions, when performed by the Patent and Trademark Office, must be in accordance with the Treaty, its Regulations, and title 35, United States Code.

## SECTION 205. SECRECY OF INTERNATIONAL APPLICATIONS

Subsection 368(c) of title 35, United States Code is amended to prevent the unauthorized disclosure of the contents of international applications by the Patent and Trademark Office when acting as an International Preliminary Examining Authority.

## SECTION 206. COMMENCEMENT OF NATIONAL STAGE

Current section 371 of title 35, United States Code must be amended to facilitate the possibility of proceeding under chapter II of the Treaty. First, subsection 371(a) is amended to authorize the Commissioner to require the International Bureau to supply international applications with any amendments to the claims, if any, international search reports and international preliminary examination reports, including annexes thereto. The annexes consist of amendments to the claims, description, or drawings of the international application made before the International Preliminary Examining Authority, as indicated in Rule 70.16 of the Regulations. The amended wording makes it possible for the Commissioner to require copies of all such documents or to exclude certain papers, such as those filed in or issued by the Patent and Trademark Office.

Second, subsection 371(b) is amended to refer to the later time period under article 39(1)(a) of the Treaty, at which an applicant may enter the national stage by virtue of having elected the Patent and Trademark Office under chapter II. This time limit has been changed by the Assembly of the International Patent Cooperation Union from 25 months to 30 months, as of January 1, 1985.

Third, subsection 371(c) is amended by adding a new paragraph (5) which requires the applicant to file, in addition to the requirements of paragraphs (1)-(4), a translation into the English language of any annexes to the international preliminary examination report, if such annexes are in a language other than English. Although the International Bureau is responsible under article 36(3)(a) of the Treaty for communication to the Patent and Trademark Office of copies of these annexes in their original language, together with the international preliminary examination report, the applicant is responsible under article 36(2)(b) and (3)(b) of the Treaty, to prepare a translation of the annexes if necessary and to transmit such translation to the Patent and Trademark Office.

Fourth, subsection 371(d) of title 35, United States Code, is amended to include reference to the time period for submission of annexes to the international preliminary examination report. The amendment also provides the sanction of cancellation of the amendments for noncompliance.

Fifth and last, subsection 371(e) of title 35, United States Code, is amended to ensure the right of the applicant to amend the application during the national stage before the elected Office, as provided in article 41 of the Treaty.

## SECTION 207. FEES

Subsection 376(a) of title 35 is amended to include reference to the handling fee to parallel the current reference to the interna-

29

tional fee. The amounts of these fees are indicated in Rule 96 of the Regulations, which is titled "The Schedule of Fees." Further, a new paragraph (5) is added to subsection 376(a) to allow the Patent and Trademark Office to specify the amount of the preliminary examination fee and any additional fees thereto, referred to in subsection 362(b).

Subsection 376(b) of title 35 is amended to include reference to the fact that the amount of the handling fee is not prescribed by the Commissioner. Reference is also made to the preliminary examination fee and additional fees to the preliminary examination fee, as being refundable to the applicant where the Commissioner determines such a refund to be warranted.

### SECTION 208. EFFECTIVE DATE

Section 9 specifies the effective date of the Act to be that of the entry into force of chapter II of the Treaty with respect to the United States. When the United States ratified the Treaty in November 1975, it did so with a declaration under article 64(1)(a) thereof, that it was not bound by the provisions of chapter II. Under article 64(6)(b) of the Treaty, this declaration may be withdrawn at any time by notification to the Director General of the World Intellectual Property Organization and takes effect three months after the day on which the notification was received.

The Act applies to all international applications pending on or filed on or after its effective date. Accordingly, applicants whose applications have been pending less than 19 months from their priority date at the time chapter II becomes effective for the United States, will be able to make a "demand" for treatment under chapter II, thereby delaying the entry of the national stage in elected States to 30 months. Although there is no time limit in the Treaty for submitting the "demand", its effects can only be guaranteed if it is submitted before the expiration of 19 months from the priority date of the international application. Submission of the "demand" after that date still entitles the applicant to receive an international preliminary examination report, but does not toll the applicable time limit under article 22 of the Treaty.

### OVERSIGHT FINDINGS

The Committee makes no oversight findings, with respect to this legislation.

In regard to clause 2(l)(3)(D) of rule XI of the Rules of the House of Representatives, no oversight findings have been submitted to the Committee by the Committee on Government Operations.

### STATEMENT OF THE COMMITTEE ON GOVERNMENT OPERATIONS

No statement has been received on the legislation from the House Committee on Government Operations.

### NEW BUDGET AUTHORITY

In regard to clause 2(l)(3)(B) of rule XI of the Rules of the House of Representatives, H.R. 4899 creates no new budget authority or increased tax expenditures for the Federal Government.

## INFLATIONARY IMPACT STATEMENT

Pursuant to clause 2(l)(4) of rule XI of the Rules of the House of Representatives, the Committee finds that the bill will have no foreseeable inflationary impact on prices or costs in the operation of the national economy.

## FEDERAL ADVISORY COMMITTEE ACT OF 1972

The Committee finds that this legislation does not create any new advisory committees within the meaning of the Federal Advisory Committee Act of 1972.

## COMMITTEE VOTE

On June 1986, H.R. 2468 was ordered reported favorably, as amended, by the Committee on the Judiciary, by voice vote, a quorum of members being present.

## COST ESTIMATE

In regard to clause 7 of rule XXIII of the Rules of the House of Representatives, the Committee agrees with the cost estimate of the Congressional Budget Office.

U.S. CONGRESS,
CONGRESSIONAL BUDGET OFFICE,
*Washington, DC, August 12, 1986.*

Hon. PETER W. RODINO, Jr.,
*Chairman, Committee on the Judiciary,*
*U.S. House of Representatives, Washington, DC.*

DEAR MR. CHAIRMAN: The Congressional Budget Office has reviewed H.R. 4899, the Patent Equity Act, as ordered reported by the House Committee on the Judiciary, August 5, 1986.

Title I of the bill would extend to patent owners the right to exclude others from using or selling in the United States, or importing into the United States, a product made by a patented process. As a result of the provisions of this title, the holder of a process patent would be allowed, with certain restrictions, to seek damages for patent infringements. Title I would also require the Secretary of Commerce to submit to the Congress annual reports on the effectiveness of the amendments.

Title II of H.R. 4899 would authorize the U.S. Patent and Trademark Office (PTO) to undertake the responsibilities outlined in Chapter II of the Patent Cooperation Treaty. Implementation of Chapter II of the treaty would simplify the filing process for patent applications on the same invention in different countries.

Based on information from the PTO, CBO estimates that enactment of H.R. 4899 would not result in significant additional costs to the federal government and will not affect the budgets of state or local governments.

If you wish further details on this estimate, we will be pleased to provide them.

With best wishes,
Sincerely,

RUDOLPH G. PENNER.

CHANGES IN EXISTING LAW MADE BY THE BILL, AS REPORTED

In compliance with clause 3 of Rule XIII of the Rules of the House of Representatives, changes in existing law made by the bill, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italic, existing law in which no change is proposed is shown in roman):

# TITLE 35, UNITED STATES CODE

\*    \*    \*    \*    \*    \*    \*

## PART II—PATENTABILITY OF INVENTIONS AND GRANT OF PATENTS

\*    \*    \*    \*    \*    \*    \*

### CHAPTER 14—ISSUE OF PATENT

\*    \*    \*    \*    \*    \*    \*

### § 154. Contents and term of patent

Every patent shall contain a short title of the invention and a grant to the patentee, his heirs or assigns, for the term of seventeen years, subject to the payment of fees as provided for in this title, of the right to exclude others from making, using, or selling the invention throughout the United States, *and, if the invention is a process, of the right to exclude others from using or selling throughout the United States, or importing into the United States, products made by that process,* referring to the specification for the particulars thereof. A copy of the specification and drawings shall be annexed to the patent and be a part thereof.

## PART III—PATENTS AND PROTECTION OF PATENT RIGHTS

\*    \*    \*    \*    \*    \*    \*

### CHAPTER 28—INFRINGEMENT OF PATENTS

\*    \*    \*    \*    \*    \*    \*

### § 271. Infringement of patent

(a) \*  \*  \*

*(g) Whoever without authority imports into the United States or sells or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, sale, or use of the product occurs during the term of such process patent. In an action for infringement of a process patent, no remedy may be granted for infringement on account of the use of a product unless there is no adequate remedy under this title for infringement on account of the importation or sale of that product. A product which is made by a patented process will, for purposes of this title, not be considered to be so made after—*

*(1) it is materially changed by subsequent processes; or*
*(2) it becomes a minor or nonessential component of another product.*

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

## CHAPTER 29—REMEDIES FOR INFRINGEMENT OF PATENT, AND OTHER ACTIONS

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

### § 287. Limitation on damages; marking and notice

(a) Patentees, and persons making or selling any patented article for or under them, may give notice to the public that the same is patented, either by fixing thereon the word "patent" or the abbreviation "pat.", together with the number of the patent, or when, from the character of the article, this can be done, by fixing to it, or to the package wherein one or more of them is contained, a label containing a like notice. In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice. Filing of an action for infringement shall constitute such notice.

*(b)(1) No damages may be recovered for an infringement under section 271(g) of this title with respect to a product unless the infringer knew or was on notice that the product was made by a process patented in the United States. Damages may be recovered only for such infringement occurring after such knowledge or notice and, with respect to—*

*(A) a product obtained before such knowledge or notice, or*
*(B) a product which—*

*(i) is purchased pursuant to a contract that is entered into before such knowledge or notice and that provides for the delivery of a fixed quantity of the product in a specified period of time, and*

*(ii) is in the inventory of or in transit to the purchaser, or is received by the purchaser within 6 months after such knowledge or notice,*

*shall be limited to reasonable royalties therefor.*

*(2) For purposes of paragraph (1), "notice" means the receipt of facts set forth in writing which are sufficient to establish that there is a substantial likelihood that the product was made by an infringing process.*

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

## PART IV—PATENT COOPERATION TREATY

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

## CHAPTER 35—DEFINITIONS

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

## § 351. Definitions

When used in this part unless the context otherwise indicates—
(a) The term "treaty" means the Patent Cooperation Treaty done at Washington, on June 19, 1970[, excluding chapter II thereof].
(b) The term "Regulations", when capitalized, means the Regulations under the treaty [excluding part C thereof], done at Washington on the same date as the treaty. The term "regulations", when not capitalized, means the regulations established by the Commissioner under this title.

\*       \*       \*       \*       \*       \*       \*

(g) The [term "International Searching Authority" means] *terms "International Searching Authority" and "International Preliminary Examining Authority"* mean a national patent office or intergovernmental organization as appointed under the treaty which processes international applications as prescribed by the treaty and the Regulations.

\*       \*       \*       \*       \*       \*       \*

CHAPTER 36—INTERNATIONAL STAGE

Sec.
361. Receiving Office.
[362. International Searching Authority.]
*362. International Searching Authority and International Preliminary Examining Authority.*

\*       \*       \*       \*       \*       \*       \*

## § 361. Receiving Office

(a) \* \* \*

\*       \*       \*       \*       \*       \*       \*

[(d) The basic fee portion of the international fee, and the transmittal and search fees prescribed under section 376(a) of this part, shall be paid on filing of an international application or within one month after the date of such filing. Payment of designation fees may be made on filing and shall be made not later than one year from the priority date of the international application.]
*(d) The international fee, and the transmittal and search fees prescribed under section 376(a) of this part, shall be paid either on filing of an international application or within such later time as the Commissioner may prescribe.*

[ **§ 362. International Searching Authority**

[The Patent and Trademark Office may act as an International Searching Authority with respect to international applications in accordance with the terms and conditions of an agreement which may be concluded with the International Bureau.]

*§ 362. International Searching Authority and International Preliminary Examining Authority*

*(a) The Patent and Trademark Office may act as an International Searching Authority and an International Preliminary Examining Authority, with respect to international applications in accordance with the terms and conditions of an agreement which may be*

34

concluded with the International Bureau, and may discharge all duties required of such Authorities, including the collection of handling fees and their transmittal to the International Bureau.

(b) The handling fee, preliminary examination fee, and any additional fees due for international preliminary examination shall be paid within such time as the Commissioner may prescribe.

> \*    \*    \*    \*    \*    \*    \*

## § 364. International stage: Procedure

(a) International applications shall be processed by the Patent and Trademark Office when acting as a Receiving Office [or International Searching Authority, or both,], *an International Searching Authority, or an International Preliminary Examining Authority,* in accordance with the applicable provisions of the treaty, the Regulations, and this title.

> \*    \*    \*    \*    \*    \*    \*

## § 368. Secrecy of certain inventions; filing international applications in foreign countries

(a) \* \* \*

> \*    \*    \*    \*    \*    \*    \*

(c) If a license to file in a foreign country is refused or if an international application is ordered to be kept secret and a permit refused, the Patent and Trademark Office when acting as a Receiving Office [or International Searching Authority, or both,], *an International Searching Authority, or an International Preliminary Examining Authority* may not disclose the contents of such application to anyone not authorized to receive such disclosure.

> \*    \*    \*    \*    \*    \*    \*

## CHAPTER 37—NATIONAL STAGE

> \*    \*    \*    \*    \*    \*    \*

## § 371. National stage: Commencement

[(a) Receipt from the International Bureau of copies of international applications with amendments to the claims, if any, and international search reports may be required in the case of all international applications designating the United States.]

(a) *Receipt from the International Bureau of copies of international applications with any amendments to the claims, international search reports, and international preliminary examination reports (including any annexes thereto) may be required in the case of all international applications designating or electing the United States.*

[(b) Subject to subsection (f) of this section, the national stage shall commence with the expiration of the applicable time limit under article 22 (1) or (2) of the treaty.]

(b) *Subject to subsection (f) of this section, the national stage shall commence with the expiration of the applicable time limit under article 22 (1) or (2) or under article 39(1)(a) of the treaty.*

(c) The applicant shall file in the Patent and Trademark Office—

(1) * * *

*     *     *     *     *     *     *

(4) an oath or declaration of the inventor (or other person authorized under chapter 11 of this title) complying with the requirements of section 115 of this title and with regulations prescribed for oaths or declarations of applicants[.]; *and*

*(5) a translation into the English language of any annexes to the international preliminary examination report, if such annexes were made in another language.*

(d) The requirements with respect to the national fee referred to in subsection (c)(1), the translation referred to in subsection (c)(2), and the oath or declaration referred to in subsection (c)(4) of this section shall be complied with by the date of the commencement of the national stage or by such later time as may be fixed by the Commissioner. The copy of the international application referred to in subsection (c)(2) shall be submitted by the date of the commencement of the national stage. Failure to comply with these requirements shall be regarded as abandonment of the application by the parties thereof, unless it be shown to the satisfaction of the Commissioner that such failure to comply was unavoidable. The payment of a surcharge may be required as a condition of accepting the national fee referred to in subsection (c)(1) or the oath or declaration referred to in subsection (c)(4) of this section if these requirements are not met by the date of the commencement of the national stage. The requirements of subsection (c)(3) of this section shall be complied with by the date of the commencement of the national stage, and failure to do so shall be regarded as a cancellation of the amendments to the claims in the international application made under article 19 of the treaty. *The requirement set forth in subsection (c)(5) of this section shall be complied with at such time as the Commissioner may prescribe, and failure to do so shall be regarded as cancellation of the amendments made under article 34(2)(b) of the treaty.*

(e) After an international application has entered the national stage, no patent may be granted or refused thereon before the expiration of the applicable time limit under article 28 *or article 41* of the treaty, except with the express consent of the applicant. The applicant may present amendments to the specification, claims and drawings of the application after the national stage has commenced.

*     *     *     *     *     *     *

## § 376. Fees

(a) The required repayment of the international [fee, which amount is] *fee and the handling fee, which amounts are* specified in the Regulations, shall be paid in United States currency. The Patent and Trademark Office may also charge the following fees.

(1) * * *

*     *     *     *     *     *     *

*(5) A preliminary examination fee and any additional fees (see section 362(b)); and*

[(5)]*(6)* Such other fees as established by the Commissioner.

(b) The amounts of fees specified in subsection (a) of this section, except the international fee *and the handling fee,* shall be prescribed by the Commissioner. He may refund any sum paid by mistake or in excess of the fees so specified, or if required under the treaty and the Regulations. The Commissioner may also refund any part of the search fee, *the preliminary examination fee, and any additional fees,* where he determines such refund to be warranted.

O