**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

MONSANTO COMPANY and )
MONSANTO TECHNOLOGY LLC, )
)
Plaintiffs, )
v. )       C. A. No. 04-305 SLR
)          (Lead Case)
SYNGENTA SEEDS, INC. )
SYNGENTA BIOTECHNOLOGY, INC., et al., )
)       **PUBLIC VERSION**
Defendants. )
)
_____ )
)
DEKALB GENETICS CORPORATION, )
)
Plaintiff, )
v. )
)
SYNGENTA SEEDS, INC., )
SYNGENTA BIOTECHNOLOGY, INC., et al. )
)
)
Defendants. )

**MONSANTO'S ANSWERING BRIEF IN OPPOSITION TO
SYNGENTA'S MOTION FOR SUMMARY JUDGMENT OF
NON-ENABLEMENT OF THE SHAH PATENT**

OF COUNSEL:                    Richard L. Horwitz (#2246)
                               David E. Moore (#3983)
Susan K. Knoll                 POTTER ANDERSON & CORROON LLP
Thomas A. Miller               Hercules Plaza, 6th Floor
Melinda Patterson              1313 N. Market Street
Stephen E. Edwards             Wilmington, DE 19801
Steven G. Spears               (302) 984-6000
HOWREY LLP                     rhorwitz@potteranderson.com
1111 Louisiana, 25th Floor     dmoore@potteranderson.com
Houston, TX 77002
(713) 787-1400                 *Attorneys For Monsanto Company,*
                               *Monsanto Technology LLC, and*
Dated: January 26, 2006        *DEKALB Genetics Corporation*
Public Version Dated: February 1, 2006

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     NATURE AND STAGE OF PROCEEDINGS ...................................................... 1

III.    SUMMARY OF THE ARGUMENT ..................................................................... 1

IV.     STATEMENT OF MATERIAL FACTS NOT DISCLOSED BY SYNGENTA .. 2

        A.      The Asserted Claims Of The '835 Patent Are "Gene" Claims, Not
                "Plant" Claims .............................................................................................. 3

        B.      Plaintiffs Have Consistently And Correctly Distinguished The
                Enablement Requirement For Transformed Plant And Plant Cell
                Claims From Gene Claims............................................................................. 5

                1.      The PGS Patent Claims Were Directed Toward
                        Transformed Plant Cells ...................................................................5

                2.      In The Bayer Case, Monsanto Only Made The "Corn
                        Enablement" Argument For The Plant Claims, Not The
                        Gene Claims......................................................................................6

        C.      The '835 Patent Discloses Genes That Provided Glyphosate
                Resistance In Plants, Including Corn ............................................................ 8

                1.      The '835 Patent Specification Discloses A Specific EPSPS
                        Gene That Was Shown To Provide Glyphosate Resistance
                        In Corn .............................................................................................9

                2.      The '835 Patent Teaches How To Obtain A Native EPSPS
                        Gene That Works In Corn To Confer Glyphosate
                        Resistance .......................................................................................11

                3.      The '835 Patent Discloses A Method For Acquiring A
                        Mutant EPSPS Gene That Confers Glyphosate Resistance
                        In Corn ...........................................................................................13

                4.      The Isolated Experiment With The pMON894 Construct Is
                        No Basis For Granting Summary Judgment Of Non-
                        Enablement Because It Was Not Designed For Expression
                        In Corn Cells...................................................................................14

V.      ARGUMENT...................................................................................................... 16

        A.      The Standard For Summary Judgment of Non-Enablement..................... 16

B.    To Prove Lack Of Enablement, Syngenta Must Show That The
Specification Does Not Enable The Creation Of The Claimed
Chimeric Gene Construct Without Undue Experimentation .................. 167

C.    No Authority Exists For The Proposition That Claims To
"Chimeric Plants Genes" Are Not Enabled If Corn Cannot Be
Transformed ........................................................................................... 18

1.    The *PGS* and *Bayer* Cases Involved Plant Claims, Not
Gene Claims...................................................................................19

2.    The *In re Goodman* Method Claims Relating To
Transformed Plant Cells Are Not Applicable To The
Asserted Gene Claims Of The '835 Patent....................................20

3.    The *Enzo* Case Involved Plant Cell Claims, Not Gene
Claims ...........................................................................................20

4.    *In re Vaeck* Similarly Does Not Create A New Enablement
Requirement For Gene Claims.......................................................21

D.    Genuine Issues of Material Fact Preclude Summary Judgment ............... 24

VI.    CONCLUSION.......................................................................................................... 266

# TABLE OF AUTHORITIES

## CASES

*Amgen, Inc. v. Chugai Pharmaceutical Co., Ltd.,*
    927 F.2d 1200 (Fed. Cir. 1991) ................................................................ 18

*Amgen, Inc. v. Hoechst Marion Roussel, Inc.,*
    314 F.3d 1313 (Fed. Cir. 2003) ..................................................... 17, 24, 25

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)................................................................................ 16

*Boston Scientific Scimed, Inc. v. Cordis Corp.,*
    392 F. Supp.2d.676 (D. Del. 2005)........................................................... 16

*Dolly, Inc. v. Spalding & Evenflo Co., Inc.,*
    16 F.3d 394 (Fed. Cir. 1994) .................................................................. 16

*Envirotech Corp. v. Al George, Inc.,*
    730 F.2d 753 (Fed. Cir. 1984) ................................................................ 18

*Enzo Biochem, Inc. v. Calgene, Inc.,*
    188 F.3d 1362 (Fed. Cir. 1999) .......................................................... 20, 21

*In re Brana,*
    51 F.3d 1560 (Fed. Cir. 1995) ................................................................ 25

*In re Goodman,*
    11 F.3d 1046 (Fed. Cir. 1993) .......................................................... 20, 21

*In re Vaeck,*
    947 F.2d 488 (Fed. Cir. 1991) ................................................. 21, 22, 23, 24

*In re Wands,*
    858 F.2d 731 (Fed. Cir. 1988) ................................................................ 17

*Invitrogen Corp. v. Clontech Labs, Inc.,*
    429 F.3d 1052 (Fed. Cir. 2005) .......................................................... 17, 23, 24

*Johns Hopkins Univ. v. CellPro, Inc.,*
    152 F.3d 1342 (Fed. Cir. 1998) .......................................................... 17, 23

*Monsanto Co. v. Bayer Bioscience N.V.,*
    363 F.3d 1235 (Fed. Cir. 2004) ...................................................... 7, 8, 19, 21

*PGS v. DEKALB Genetics Corp.*,
  175 F. Supp.2d 246 (D. Conn. 2001),
  *aff'd*, 315 F.3d 1335 (Fed. Cir. 2003)............................................................... passim

*Rockwell Int'l Corp. v. United States*,
  147 F.3d 1358 (Fed. Cir. 1998) ........................................................................... 16

*Transmatic, Inc. v. Gulton, Indus., Inc.*,
  53 F.3d 1270 (Fed. Cir. 1995) ............................................................................... 4

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F.3d 1576 (1996).............................................................................................. 5

## STATUTES AND RULES

35 U.S.C. § 112....................................................................................................... 16

Fed. R. Civ. P. 56(c) ............................................................................................... 16

## I.    INTRODUCTION

Plaintiffs Monsanto Company and Monsanto Technology LLC (collectively "Monsanto") and DEKALB Genetics Corporation ("DEKALB") oppose Syngenta's motion for summary judgment of non-enablement of U.S. Patent No. 4,940,835 ("the '835 patent").

## II.    NATURE AND STAGE OF PROCEEDINGS

Monsanto brought the "lead case" in this action on May 12, 2004 alleging that Syngenta's GA21 corn products infringe Monsanto's '835 patent. C.A. No. 05-355 SLR, in which DEKALB asserts that Syngenta's GA21 corn products infringe U.S. Patent Nos. 5,538,880 and 6,013,863 ("the Lundquist patents") was consolidated with the lead case on August 23, 2005. Fact discovery and expert discovery are closed, and trial is scheduled to begin on May 30, 2006.

## III.    SUMMARY OF THE ARGUMENT

Syngenta's motion for summary judgment of non-enablement should be denied because it is premised on a heightened enablement requirement for claims directed to genes that is legally and factually unsupportable. Syngenta contends that the asserted gene claims of the '835 patent must be enabled for all plant cells, and since corn plants could not be transformed as of the filing date of the '835 patent, there is no enablement for glyphosate resistant corn. That corn plants could not be successfully transformed as of the '835 patent filing date is not in dispute. But it is black letter law that only the full scope of the *claims* must be enabled. Syngenta's position is wrong as a matter of law because the asserted '835 patent claims are unambiguously directed to "chimeric plant genes," not transformed plants, and the specification plainly enables the creation of chimeric genes falling within that claim scope.

Summary judgment is also not appropriate based on Syngenta's contention that there was no EPSPS gene known at the time the '835 patent application was filed that could provide glyphosate resistance in corn. Substantial evidence exists that such genes were known, as described in the '835 patent and the prior art, and were capable of providing glyphosate resistance in plants, including corn. Even Syngenta's expert has admitted that the '835 patent discloses an EPSPS gene and it is suitable for use in corn. As a result, there are many disputed issues of material fact that require denial of Syngenta's motion.

## IV.    STATEMENT OF MATERIAL FACTS NOT DISCLOSED BY SYNGENTA

Syngenta's statement of facts is incomplete. Not mentioned by Syngenta are the facts surrounding the consistent positions taken by Monsanto and DEKALB in prior cases (over the past decade) clearly distinguishing between patent claims directed to transformed *plants* (and plant cells) and patent claims directed to *genes*. While Monsanto has argued that plant claims are not enabled if transformation of significant plant species (like corn or monocots) was not known, Monsanto has never argued that such a requirement exists for gene claims like those of the '835 patent. Moreover, Syngenta has failed to include the facts surrounding the demonstration by DEKALB that one of the EPSPS coding sequences disclosed in the '835 patent was capable of functioning in corn plants to confer enhanced glyphosate resistance. Nor has Syngenta addressed the methods disclosed in the '835 patent that teach a means to obtain and use native and mutant EPSPS plant genes to obtain glyphosate resistance in plants such as corn. These material facts require denial of Syngenta's summary judgment motion.

### A.    The Asserted Claims Of The '835 Patent Are "Gene" Claims, Not "Plant" Claims

The '835 patent describes chimeric plant genes that confer glyphosate resistance.

[Exh. 1, '835 patent]   Plaintiffs assert that Syngenta's GA21 corn products infringe

claims 1, 5 and 6 of the '835 patent.  These claims are plainly directed to "chimeric plant

genes":

1.    A *chimeric plant gene* which comprises:

 (a)    a promoter sequence which functions in plant cells;

 (b)    a coding sequence which causes the production of RNA, encoding a chloroplast transit peptide/5-enolpyruvylshikimiate-3-phosphate synthase fusion polypeptide, which chloroplast transit peptide permits the fusion polypeptide to be imported into a chloroplast of a plant cell;

 (c)    a 3' non-translated region which encodes a polyadenylation signal which functions in plant cells to cause the addition of polyadenylate nucleotides to the 3' end of the RNA;

the promoter being heterologous with respect to coding sequence and adapted to cause sufficient expression of the fusion polypeptide to enhance the glyphosate resistance of a plant cell transformed with the gene.

5.    A *chimeric gene* of claim 1 in which the coding sequence encodes a mutant 5-enolpyruvylshikimiate-3-phosphate synthase (EPSPS).

6.    A *chimeric gene* of claim 1 in which the EPSPS coding sequence encodes an EPSPS from an organism selected from the group consisting of bacteria, fungi and plants.

[Exh. 1, '835 patent, col. 32, ll. 31-47 and 56-62, emphasis added]

Syngenta argues that this position ignores the "functional language" set forth in

the asserted claims.  [Syngenta Br. at 20]  As set forth in Plaintiffs' claim construction

brief, these functional limitations only require that certain components of the claimed

chimeric plant gene—the promoter sequence, the coding sequence, and the 3' non-

translated region—be capable of functioning in plant cells. The limitations do not convert these claims into plant or plant cell claims.

Specifically, the functional language "which functions in plant cells" in element (a) modifies the "promoter sequence" gene component. [*See* Exh. 1, '835 patent, col. 32, ll. 31-47] Likewise, the functional language "which functions in plant cells to cause the addition of polyadenylate nucleotides …" in element (c) modifies the "3' non-translated region" gene component. [*Id.*] Thus, the functional language describes the characteristics or operation of the specified component and merely requires that these components be capable of functioning in plant cells. Despite this clear language, Syngenta applies these characteristic-defining components to convert claims to a gene to claims for transformed plants, and then asserts that transformed corn plants must be enabled.

The error of Syngenta's position is further proven by the language of the unasserted plant claims in the '835 patent. When the Applicants wanted claims directed to plants transformed with the gene of claim 1, rather than claims directed to the gene itself, they explicitly drafted such claims. For example:

> 29. A glyphosate-resistant dicotyledonous *plant* which has been regenerated from a glyphosate-resistant plant cell comprising the chimeric plant gene of claim 1.

[Exh. 1, '835 patent, col. 33, ll. 60-62, emphasis added; *see generally* claims 29-49 covering glyphosate resistant plants, col.. 33, l. 60 - col. 34, l. 55] Syngenta's proposal that the gene claims have the same limitations as the plant claims violates the principle that different claims in the same patent have different scope. *Transmatic, Inc. v. Gulton, Indus., Inc.*, 53 F.3d 1270, 1277 (Fed. Cir. 1995).

Syngenta's proposal is also inconsistent with the prosecution history of the unasserted *plant* claims of the '835 patent. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (1996). During prosecution, Applicants submitted plant claims directed to "[a] glyphosate resistant plant" and gene claims directed to "[a] chimeric plant gene." [Exh. 1, '835 patent file history at 0005318, 0005315] The Examiner rejected the plant claims, but not the gene claims, on the basis that "the disclosure is enabling only for claims limited to a method for producing dicot plants." [*Id.* at 0005340] Applicants then amended the plant claims, but not the gene claims, to include the dicot limitation, and the Examiner allowed both the plant and gene claims. The Examiner's concession that the gene claims were enabled should be persuasive evidence to this Court that Syngenta's proposal regarding the functional limitations is incorrect. *See Vitronics,* 90 F.3d at 1582 ("the record before the Patent and Trademark Office is often of critical significance in determining the meaning of the claims.")

> **B.     Plaintiffs Have Consistently And Correctly Distinguished The Enablement Requirement For Transformed Plant And Plant Cell Claims From Gene Claims**

> **1.     The *PGS* Patent Claims Were Directed Toward Transformed Plant Cells**

Syngenta's reliance on *PGS v. DEKALB Genetics Corp.*, 175 F. Supp.2d 246 (D. Conn. 2001), *aff'd*, 315 F.3d 1335 (Fed. Cir. 2003) ("*PGS*") is wholly misplaced because that case involved plant and plant cell claims, not gene claims. DEKALB successfully argued that PGS's patent claims directed to *plant cells* containing a bar gene that provided resistance against the herbicide glufosinate were invalid for lack of enablement because corn could not be transformed at the time the patent application was filed. *Id.* at 265. The asserted claims broke down into two types, "the cell claims" and the "plant and

5

seed claims." *Id.* at 252-253.  Claim 1, the lone independent "cell claim," read as follows:

> 1.    A *plant cell* having a heterologous DNA stably integrated into its genome; said DNA comprising a heterologous DNA fragment encoding a protein having an acetyl transferase activity which inactivates a glutamine synthetase inhibitor *in said cell.*

*Id.* at 253 (emphasis added).  Claim 8, a representative "plant and seed claim" read as follows:

> 8.    A *plant* which consists of the cells of claim 1 and which is susceptible to infection and transformation by Agrobacterium and capable of regeneration thereafter.

*Id.* (emphasis added).  The district court stated that "the inventions claimed by the '236 patent are *plants and plant cells* that have stably integrated the *bar* gene into their genetic structure." *Id.* at 255 (emphasis added).

DEKALB's position in that case is unmistakable.    In closing argument, DEKALB's counsel specifically distinguished the enablement issue presented by the plant cell claims versus gene claims, such as those in the instant case:

> If they had a claim to the bar gene, this lawsuit would not be going forward.... They don't have a claim to the bar gene here.  What they have a claim here to is to transforming cells with the bar gene and transforming plants with the bar gene.  And they can't get a claim to cells they were not able or didn't reasonably teach people to transform and they can't get a claim to plants that they couldn't transform and reasonably teach people how to transform.

[Ex. 3, Tr. Trs. at 2102]

### 2.    In The *Bayer* Case, Monsanto Only Made The "Corn Enablement" Argument For The Plant Claims, Not The Gene Claims

The consistency of Plaintiffs' position is clearly shown in the case against Bayer (and its predecessor, Aventis, the successor to PGS), in the Eastern District of Missouri.

*Monsanto Co. v. Bayer Bioscience N.V.*, 363 F.3d 1235 (Fed. Cir. 2004) involved four patents "with largely overlapping specifications" that claimed both genetically engineered plants that produced a truncated version of an insecticidal *Bt* protein and the truncated gene itself. *Id.* at 1236. The Missouri district court entered summary judgment that the plant claims were not enabled, giving collateral estoppel effect to the decision in the *PGS* case that corn was not susceptible to transformation by *Agrobacterium* as of the priority date of Bayer's '546 and '372 patents-in-suit. *Id.* at 1242. That summary judgment was later reversed by the Federal Circuit but on remand Bayer voluntarily dismissed those patent claims from the case.[1] *Id.* at 1243-44.

The relevant claims of the '546 patent were to a method for protecting plants and plant cells:

> 1.    *A method for protecting a plant cell* from Lepidopteran insects, comprising producing in said plant cell an insecticidal amount of a truncated protein comprising at least 60 kD fragment of the protein of FIG. 13, wherein said truncated protein is toxic to Lepidopteran insects.

> 5.    *A method for protecting a plant* from Lepidopteran insects, comprising growing a plant in a field, wherein said plant produces an insecticidal amount of truncated protein comprising an at least 60kD fragment of the protein of FIG. 13 in cells of said plant, wherein said protein is toxic to Lepidopteran insects.

[Exh. 4, '546 patent, col. 61, ll. 56-60 and col. 62, ll. 12-17, emphasis added]    The relevant claims of the '372 patent were directed to "a plant" and "a plant cell":

---

[1]    Specifically, the Federal Circuit reversed and remanded the district court's determination that claims 1-7 of the '546 patent and claims 13 and 18 of the '372 patent were invalid for lack of enablement based upon collateral estoppel. Id. at 1243-44. The Federal Circuit held that the specifications of the '546 and '372 patents "differ[ed] significantly from the specification of the patent at issue in the Plant Genetic Systems case," and thus, collateral estoppel would only apply "if the district court concludes [on remand] that the specification of the '546 and '372 patents themselves do not teach the transformation of monocots." Bayer, 363 F.3d at 1243-44.

13.    *A plant* comprising the chimeric gene of claim 1, stably inserted into the genome of the plant.

18.    *A plant cell* comprising about 60-80 kD toxic fragment of the BT2 protein of SEQ ID No. 1.

[Exh. 5, '372 patent, col. 114, ll. 55-56 and col. 116, ll. 4-5, emphasis added]

Monsanto did not argue lack of enablement for asserted claim 1 of the '372, which was directed to a "chimeric gene" and recited functional language characteristic of the promoter and 3' region in the '835 patent (*see Bayer*, 363 F.3d at 1237, 1242):

1.    *A chimeric gene*, comprising:

   a) a first DNA encoding an about 60-80 kD insecticidal protein fragment of a Bacillus thuringiensis insecticidal crystal protein; and

   b) a promoter region and a 3' non-translated region comprising a polyadenylation signal, said promoter and 3' non-translated regions *allowing the DNA to be expressed in a plant cell.*

[Exh. 5, '372 patent, col. 113, ll. 37-44, emphasis added]

Accordingly, while Monsanto argued that the plant, plant cell and method claims were not enabled based upon the inability to transform corn, Monsanto never made any such argument as to the gene claims.

## C.    The '835 Patent Discloses Genes That Provided Glyphosate Resistance In Plants, Including Corn

Syngenta's contention that there was no EPSPS gene known at the time the '835 patent application was filed that could provide glyphosate resistance in corn at best raises a factual dispute which precludes summary judgment. DEKALB demonstrated that EPSPS genes described in the '835 patent provided glyphosate resistance in plants, including corn. Moreover, the '835 patent teaches methods that can be used to produce native and mutant plant genes that function in corn to provide increased glyphosate resistance.

8

1.    **The '835 Patent Specification Discloses A Specific EPSPS Gene That Was Shown To Provide Glyphosate Resistance In Corn**

The specification of the '835 patent discloses an EPSPS gene (the C-*aroA* gene) that when combined with a chloroplast transit peptide, as taught by the '835 patent, was shown by DEKALB scientists to provide glyphosate resistance in corn. [Exh. 6, Gasser Decl. ¶ 6; Exh. 7, Fromm Decl. ¶ 4]

The C-*aroA* gene is disclosed in U.S. Patent No. 4,535,060 to Comai ("the '060 patent), and this patent is referenced in the specification of the '835 patent:

> As described in U.S. Patent No. 4,535,060 (Comai; assigned to Calgene, Inc.; filing date Jan. 5, 1983) and in Comai 1983, a culture of Salmonella bacteria was contacted with mutagen (ethyl methanesulfonate). … U.S. Patent No. 4,535,060 suggested that the mutant EPSPS gene could be inserted into plant cells to create glyphosate-resistant ($Gly^R$) plant cells.

[Exh. 6, Gasser Decl. ¶ 6.a; Exh. 1, '835 patent, col. 1, ll. 51-64]  The '060 patent describes mutations in the EPSPS encoding gene (C-*aroA*) of *Salmonella typhimurium* which provides resistance to glyphosate. [Exh. 6, Gasser Decl. ¶ 6.b]  DEKALB scientists conducted corn transformation studies employing the C-*aroA* EPSPS gene via the pDPG238 construct. [Exh. 7, Fromm Decl. ¶ 4.a]  Attached as Exh. is a USDA permit application that discloses the components of the pDPG238 construct, which satisfied all of the properly construed limitations of claim 1 of the '835 patent, as set forth below:[2]

_____

[2] The pDPG238 gene construct also contains a "Zea mays alcohol dehyrogenase intron 1 (enhancer element)," or an "intron." Although not claimed, the specification of the '835 patent discloses the use of introns to obtain "enhanced expression." [Exh. 1, '835 patent, col. 26, ll. 52-54 ("fragments containing introns may also be used to construct additional chimeric EPSPS genes to obtain enhanced levels of the mRNA.")]

9

| Limitation | Evidence |
|---|---|
| Promoter | Exh. 8 (DKLB 127460-491 at 471) (USDA permit application shows that the pDPG238 construct contains "the Cauliflower Mosaic Virus 35S promoter..."); Exh. 6, Gasser Decl. ¶ 6.c.[3] |
| EPSPS protein | Exh. 18, '060 patent, abstract ("A mutated aroA gene is employed which expresses 5-enolpyruvylshikimate 3-phosphate synthase ..."). |
| Chloroplast transit peptide | Exh. 8 (DKLB 127471) (pDPG238 construct has a "transit peptide gene ...."); Exh. 6, Gasser Decl. ¶ 6.c. |
| 3' untranslated region | Exh. 8 (DKLB 127471) (pDPG238 construct contains: "the polyadenylations sequence of ... transcript 7."); Exh. 6 Gasser Decl. ¶ 6.c.[4] |
| Heterologous promoter and coding sequence | Viral promoter and bacterial coding sequence (*Salmonella typhimurium*), i.e., components are heterologous. |

[Redacted]

---

[3] Moreover, the CaMV 35S promoter was known to function in plants. [Exh. 19, Klee Tr. 24:4-7]

[4] According to the specification of the '835 patent, "[e]xamples of suitable 3' regions [include] the 3' transcribed, non-translated regions containing polyadenylation signal of the ... conglycinin (7S) storage protein gene," which would include the "transcript 7" terminator.

████████████████████████████████

████████████████████

2.    The '835 Patent Teaches How To Obtain A Native
EPSPS Gene That Works In Corn To Confer
Glyphosate Resistance

The specification of the '835 patent also teaches how to obtain a native gene conforming to the claims of the patent that produces enhanced glyphosate resistance in plants, including corn. [Exh. 6, Gasser Decl. ¶ 5] According to Examples 1, 5-7 and 14-17 of the '835 patent, an EPSPS gene that is capable of producing enhanced glyphosate resistance can be obtained by isolating the endogenous EPSPS of the plant of interest and then used to confer glyphosate tolerance. [Exh. 1, '835 patent, col. 6, l. 17 – col. 16, l. 26 (example 1), col. 19, l. 61 – col. 21, l. 5 (examples 5-7), col. 26, l. 22 – col. 28, l. 52 (examples 14-17); Exh. 6, Gasser Decl. ¶ 5.a] This is achieved by combining the native EPSPS gene with an appropriate promoter, resulting in overexpression of the EPSPS gene and glyphosate resistance. [Exh. 6, Gasser Decl. ¶ 5.b; Exh. 1, '835 patent, col. 3, ll. 33-42 (selection of promoter); col. 19, l. 61 – col. 21, l. 5 (use of endogenous sequence)]

In accordance with these teachings, the '835 patent specification provides examples with native petunia and *Arabidopsis thaliana* EPSPS genes that use promoters to obtain increased glyphosate resistance. [Exh. 6, Gasser Decl. ¶ 5.c; Exh. 1 '835 patent, col. 24, l. 50 – col. 25, l. 41 (petunia), col. 26, l. 57 – col. 27, l. 28 (*Arabidopsis thaliana*)] The '835 patent also discloses the use of introns to "obtain enhanced levels of mRNA," i.e., enhanced levels of expression. [Exh. 6, Gasser Decl. ¶ 5.d; Ex. 1, '835 patent, col. 26, ll. 52-55]

Following these teachings, even a native maize EPSPS gene could be isolated and combined with an appropriate promoter to create a plant expression vector. [Exh. 6, Gasser Decl. ¶ 5.e] This was also confirmed by Syngenta's expert, Dr. Ward:

> Q.    [I]s it also fair to say that the methods that are disclosed in the patent, that is, the general methods, are suitable to allow you to clone the EPSPS gene for maize?
>
> A.    Yeah, I believe that's correct.
>
> *       *       *
>
> Q.    And you don't have any basis to conclude that this method would not be applicable to maize, isn't that true, to allow you to get the maize EPSPS gene?
>
> A.    The method of isolating the cDNA?
>
> Q.    Right.
>
> A.    No, I think that's correct.

[Exh. 12, Ward Tr. 67:22-68:1, 68:6-12] He also confirmed that the '835 patent discloses a suitable promoter that works in maize, the CaMV promoter, and that the NOS 3' end also worked in maize:

> Q.    But isn't it fair to say that we now know that the CaMV promoter would work in maize?
>
> A.    Yes.
>
> *       *       *
>
> Q.    Now, is it fair to say that the NOS 3 prime end is today known to work in maize?
>
> A.    You know, I don't have firsthand knowledge of that. ... — so that is the 3 prime end that's used in the constructs that were — eight or nine of the constructs that were sent to Dr. Fromm for transformation into BMS. So on that basis, it appears that Monsanto had reason to believe that that 3 prime end would work in maize, yes.

[Exh. 12, Ward Tr. 68:25 – 69:2, 69:12-22]

Such a plant expression vector could then be used to transform maize cells that would overexpress the native EPSPS maize gene, resulting in increased glyphosate

resistance. [Exh. 6, Gasser Decl. ¶ 5.e] Thus, the teachings of the '835 patent, supported by the admissions of Dr. Ward, the specification goes so far as providing a method to produce a native maize gene that produces enhanced glyphosate resistance in corn cells.

### 3.    The '835 Patent Discloses A Method For Acquiring A Mutant EPSPS Gene That Confers Glyphosate Resistance In Corn

The specification of the '835 patent also teaches how to obtain a mutant EPSPS gene (including the Gly to Ala mutation)[5] that conforms to the claims of the patent and produces enhanced glyphosate resistance in plants, including corn. [Exh. 6, Gasser Decl. ¶ 8] Specifically, Example 8 is a comprehensive disclosure of a selection scheme that can be used to identify glyphosate tolerant mutants of bacterial EPSPS. [Exh. 6, Gasser Decl. ¶ 8.a, Exh. 1,'835 patent, col. 21, l. 7-col. 23, l. 44] This example is directed to the identification of glyphosate tolerant colonies of *E coli*, the isolation of the mutant EPSPS from the tolerant cells, and the creation of a genetic construct for plant transformation with the isolated EPSPS. [*Id.*] Following these teachings, one of ordinary skill could isolate mutations—such as the Gly to Ala mutant—and introduce such mutations into an EPSPS gene to obtain enhanced glyphosate resistance in corn. [Exh. 6, Gasser Decl. ¶ 8.c]

That teaching of the specification was confirmed by Dr. Ward, Syngenta's expert, who acknowledged that Example 8 discloses a method for obtaining such a mutation:

Q.    And you believe that if you did this experiment [the procedure in Example 8] 10 times, it would pop up for you, too; right?

A.    Out of all the mutations you would isolate that were resistant to glyphosate, I think there's a reasonable likelihood you'd find the Gly to Ala, if you did the experiment 10 times.

---

[5] The "Gly to Ala mutation" refers to the names of two specific amino acids in the chain of amino acids that make up the EPSPS protein.

[Exh. 12, Ward Tr. 118:22 – 119:3]  Moreover, other independent researchers were also able to isolate an EPSPS gene with the Gly to Ala mutation using a similar glyphosate selection method.  [Exh. 6, Gasser Decl. ¶ 8.b]  Specifically, researchers in the laboratory of Dr. Nick Amrhein reported on the identification of a strain of *Klebsiella pneumoniae* (also known as *Aerobacter aerogenes*) that produced a glyphosate tolerant form of EPSPS through selection on glyphosate.  Sequencing of the EPSPS genes of the wild-type and mutant strains revealed the presence of a Gly to Ala mutation.  [Exh. 6, Gasser Decl. ¶ 8.b, Exh. 14, Sost and Amrhein, 1990, Arch. Biochem. Biophys. 282:433-436 (MGA26138-141)]  This, too, was confirmed by Dr. Ward:

> Q.   And isn't it a fact that actually Dr. Amrhein did a similar type of thing, not even exactly the same thing, and came up with that mutation independently?
>
> A.   Yeah, I believe you're referring to the work that was done in Dr. Nick Amrhein's lab in the early '80s, which then subsequently they were able to demonstrate what the molecular lesion was that led to the glyphosate tolerance in the Klebsiella strain that they isolated, at some later point, 1990 or thereabouts.
>
> Q.   Same mutation; right?
>
> A.   They found the same mutation, that's correct.

[Exh. 12, Ward Tr. 118:22 – 119:3]  Hence, the '835 patent also discloses a means to obtain a mutant EPSPS gene that works in corn to obtain enhanced glyphosate resistance.

### 4.   The Isolated Experiment With The pMON894 Construct Is No Basis For Granting Summary Judgment Of Non-Enablement Because It Was Not Designed For Expression In Corn Cells

Monsanto also performed preliminary experiments with the petunia EPSPS gene in a collaboration between Monsanto and a USDA scientist.  [Exh. 6, Gasser Decl. ¶ 7]  These experiments, if raised by Syngenta in its reply brief, only raise fact issues to be tried and are not a basis for granting summary judgment in Syngenta's favor, particularly

in view of its clear and convincing evidentiary burden.  Plaintiffs provide the following

facts.



[Exh. 17 (MGA0082590); Exh. 6, Gasser Decl. ¶ 7.b]

[*Id.* ¶ 7.c]

[*Id.* ¶ 7.d]

[*Id.* ¶ 7.e]

. [Exh. 17, laboratory notebook pages (MGA0082590, MGA0082647); Exh. 6, Gasser Decl. ¶ 7.f]

[Exh. 17 (MGA0082596); Exh. 6, Gasser Decl. ¶ 7.g]

████████████████████████████████████████

█████████████████████████████ [*Id.*]

## V.    ARGUMENT

### A.    The Standard For Summary Judgment of Non-Enablement

On Syngenta's motion for summary judgment that the '835 patent is not enabled, Syngenta has the burden to show that no genuine issue of material fact exists and that Syngenta is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Dolly, Inc. v. Spalding & Evenflo Co., Inc.*, 16 F.3d 394, 397 (Fed. Cir. 1994).

In determining whether Syngenta has met this burden, all facts must be viewed in a light most favorable to Plaintiffs, and Plaintiffs are given the benefit of all reasonable inferences that can be drawn from the evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Rockwell Int'l Corp. v. United States*, 147 F.3d 1358 (Fed. Cir. 1998). Furthermore, the court must view the evidence presented through the prism of the substantive evidentiary burden that would inhere at trial—clear and convincing evidence of invalidity. *Rockwell*, 147 F.3d at 1362, 1366; *see also Boston Scientific Scimed, Inc. v. Cordis Corp.*, 392 F. Supp.2d 676, 679-80 (D. Del. 2005) ("A patent is presumed valid and the burden of proving invalidity, whether under § 112 or otherwise, rests with the challenger.").

### B.    To Prove Lack Of Enablement, Syngenta Must Show That The Specification Does Not Enable The Creation Of The Claimed Chimeric Gene Construct Without Undue Experimentation

The enablement requirement set forth in 35 U.S.C. § 112 requires that the patent specification "contain a written description of the [claimed] invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly

connected, to make and use the same ....." To be enabling, the specification must teach "those in the art enough that they can make and use the invention without 'undue experimentation.'" *Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1334 (Fed. Cir. 2003). "Whether making and using an invention would have required undue experimentation ... is a legal conclusion based upon underlying factual inquiries." *Johns Hopkins Univ. v. CellPro, Inc.*, 152 F.3d 1342, 1354 (Fed. Cir. 1998)(*citing In re Wands*, 858 F.2d 731, 735, 736-37 (Fed. Cir. 1988)). Moreover, "[t]he enablement requirement is met if the description enables *any mode* of making and using the invention." *Id. at* 1361 (emphasis added).

Here, the claims are to chimeric genes, essentially combining a promoter, chloroplast transit peptide, an EPSPS gene, and a 3' end. Accordingly, to be enabled, the specification must simply teach how to make such chimeric genes, and a mode for how to use such genes. Nowhere does Syngenta's motion dispute that the specification meets these requirements. Syngenta's argument is premised upon the legally unsupportable notion that gene claims are only enabled if the specification enables the transformation of every plant species in which such genes might be expressed. However, the Federal Circuit's decision in *Amgen* holds that the specification does not need to enable every mode of using the invention. *Amgen*, 314 F.3d at 1335. The Federal Circuit has more recently explained that "[e]nablement does not require the inventor to foresee every means of implementing an invention at pains of losing his patent franchise. Were it otherwise, claimed inventions would not include improved modes of practicing those inventions." *Invitrogen Corp. v. Clontech Labs, Inc.*, 429 F.3d 1052, 1071 (Fed. Cir.

2005). Thus, the type of standard that Syngenta advocates in its motion is wrong as a matter of law.

Applying the appropriate standards, summary judgment of non-enablement should be denied. First, Syngenta's motion is predicated upon an improper construction of the asserted claims of the '835 patent. When these claims are properly evaluated as gene claims—as opposed to transformed plant cell claims—Syngenta's motion must fail as a matter of law. Second, Syngenta's motion must fail because genuine issues of material fact exist as to whether the '835 patent adequately discloses an EPSPS gene capable of providing glyphosate resistance in corn.

## C.    No Authority Exists For The Proposition That Claims To "Chimeric Plants Genes" Are Not Enabled If Corn Cannot Be Transformed

Ignoring the plain language of the asserted claims, Syngenta contends that the asserted claims of the '835 patent must be enabled for all plant cells, and since corn could not be transformed as of the filing date of the '835 patent, there is no enablement for glyphosate resistant corn. [Syngenta Br. at 19-20] But the law is clear that "resort must be had in the first instance to the words of the claim." *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 759 (Fed. Cir. 1984).

Accordingly, whether corn could be successfully transformed as of the '835 patent filing date has no relevance to the enablement inquiry, as discussed at Section V.B, *supra*. It is black letter law that the full scope of the *claims* must be enabled. *Amgen, Inc. v. Chugai Pharmaceutical Co., Ltd*, 927 F.2d 1200, 1213 (Fed. Cir. 1991). Syngenta's non-enablement position is wrong as a matter of law because the asserted '835 patent claims are unambiguously directed to "chimeric plant genes," not

transformed plant cells. Thus, the inability to transform corn is not relevant to an inquiry regarding the enablement of the asserted *gene* claims of the '835 patent.

Having recast the asserted gene claims of the '835 patent as transformed plant cell claims, Syngenta seeks to rely upon a series of inapposite cases to buttress its argument that the inability to transform corn cells as of the '835 patent filing date renders the asserted gene claims non-enabled. But none of the claims at issue in those prior cases were directed to chimeric plant genes; instead, they were directed to transformed plants, transformed plant cells, or methods relating to transformed plants and/or plant cells. Hence, none of these cases are applicable to the asserted claims of the '835 patent, which are directed to a chimeric plant gene.

### 1.    The *PGS* and *Bayer* Cases Involved Plant Claims, Not Gene Claims

Syngenta wrongly points to the positions taken by Monsanto and DEKALB in the aforementioned *PGS* and *Bayer* cases. *See PGS*, 175 F.Supp.2d 246; *Bayer*, 363 F.3d 1235. Those cases are simply not relevant to this case because (1) the patent claims in the *PGS* case were directed to *plant cells* containing the bar gene, *PGS*, 315 F.3d at 1338, and (2) the pertinent claims in the *Bayer* case were directed to a *method* for protecting plants (and plant cells) and to *plants* and *plant cells* containing a gene that produced a truncated version of the *Bt* protein. [Exh. 4, '546 patent, col. 61, ll. 56-60 and col. 62, ll. 12-17; Exh. 5, '372 patent, col. 114, ll. 55-56 and col. 116, ll. 4-5] Hence, for those plant and plant cell claims to be valid, the specifications had to enable all plants and plant cells, including monocots such as corn. Monsanto and DEKALB did not argue in the *PGS* case or the *Bayer* case that gene claims were not enabled because corn could not be transformed.

19

2.    The *In re Goodman* Method Claims Relating To
       Transformed Plant Cells Are Not Applicable To The
       Asserted Gene Claims Of The '835 Patent

Syngenta cites as legal authority for its non-enablement argument *In re Goodman*,

11 F.3d 1046 (Fed. Cir. 1993) .  [Syngenta Br. at 9]  Syngenta unequivocally admits,

however, that in *Goodman*, the claims "at issue broadly recited *methods* of producing

mammalian peptides in any *plant cell*."  [Syngenta Br. at 8, emphasis added, citing

*Goodman*, 11 F.3d at 1048]  The Federal Circuit also characterized the asserted claims in

*Goodman* as follows:

> Claims 1-6 specify *methods* for producing mammalian peptides in plant
> cells using expression cassettes[] with initiation codons recognized by
> plant cells.  Claims 7-9 are directed to production of the peptide interferon
> in *plant cells*.  Claims 10-13 specify nucleic acid constructs *for use in the
> method claims*.

*Id.* (emphasis added)

Because the patent claims in the *Goodman* case were directed to *methods* for

producing mammalian peptides *in plant cells*, the Federal Circuit held that the

specification had to enable all plant cells, including monocots such as corn.  The claims

were invalid for lack of enablement because the specification did not enable the

transformation of monocots.  *Id.* at 1052.  By contrast, the asserted claims of the '835

patent are directed to "a chimeric plant gene," not to plant cells containing such a gene,

and the specification undeniably enables such genes, including each component of the

gene recited in the claims.

3.    The *Enzo* Case Involved Plant Cell Claims, Not Gene
       Claims

Syngenta also asserts that the Federal Circuit's decision in *Enzo Biochem, Inc. v.*

*Calgene, Inc.*, 188 F.3d 1362 (Fed. Cir. 1999), is applicable because it utilizes

comparable claims to a "non-native DNA construct" with "functional language." [Syngenta Br. at 25-26]

However, the district court and the Federal Circuit did not consider any claims directed to a gene construct, because the district court elected to evaluate an asserted *cell* claim as representative of all of the asserted claims. Hence, the gene construct claims were not analyzed separately and were not considered on appeal:

> As for the claims at issue, they were not separately argued, and the district court's analysis focused on claim 1 alone, with the understanding that it was the principal claim among those at issue. Accordingly, the other disputed claims stand or fall together with claim 1, including dependent claim 74, the one claim at issue directed only to prokaryotes. We thus do not independently consider whether the disclosure is sufficient to enable a claim encompassing the application of antisense in all prokaryotes.

*Id.* at 1377.

Thus, Syngenta's attempt to assert that the gene construct claim of "[c]laim 5 of ... is representative" [*see* Syngenta Br. at 26] is not supported by the Federal Circuit's *Enzo* decision. The Federal Circuit affirmed the district court's holding that *the cell claim* for regulating gene expression in all cells was not enabled. *Id.* at 1374. Thus, like the *PGS*, *Bayer* and *Goodman* cases, *Enzo* is also not applicable.

### 4. *In re Vaeck* Similarly Does Not Create A New Enablement Requirement For Gene Claims

Syngenta's reliance on *In re Vaeck* is also completely misplaced because (1) the claims required that the claimed insecticidal chimeric gene be "expressed in *Cyanobacteria*" and (2) it did not disclose a mode of use, i.e., a gene that was insecticidal when expressed in *Cyanobacteria*. 947 F.2d 488 (Fed. Cir. 1991). Here, the asserted claims from the '835 patent are not directed to chimeric genes in a specific organism, but

the specification discloses genes that have since been proven to work in plants, including

corn. [*See* §§ IV.C.1-3, *supra*]

As to the first issue, the patent in *Vaeck* claimed a chimeric gene requiring

effective expression in cyanobacteria to provide an insecticidal protein, as shown in

representative claim 1 on appeal:

> 1.    A chimeric gene ***capable of being expressed in Cyanobacteria cells*** comprising:
>
> > (a)    a DNA fragment comprising a promoter region which is effective for expression of a DNA fragment in Cyanobacterium;
> >
> > (b)    at least one DNA fragment coding for an insecticidally active protein produced by a Bacillus strain, or coding for an insecticidally active truncated form of the above protein or coding for a protein having substantial sequences homology to the active protein,
>
> the DNA fragments being linked so that the gene is expressed.

947 F.2d at 490 (emphasis added).  Unlike the asserted claims of the '835 patent, the

preamble to the *Vaeck* claim expressly recites: "[a] chimeric gene ***capable of being***

***expressed in Cyanobacteria cells***" to provide an "insecticidally active" protein.  Thus,

the functional language is present in the preamble of the claim.  In contrast, the preamble

of claim 1 of the '835 patent contains no such functional language.  Rather, the only

functional language is directed to the components of the chimeric plant gene to further

define that, for example, the promoter must be a plant promoter as opposed to a bacteria

or mammalian promoter.  [*See* § IV.A, *supra*]

As to the second issue in *Vaeck*, the Examiner found that the sole example

disclosed in the specification failed to disclose a transformant that actually expressed "an

insecticidally active protein" in *Cyanobacteria*, as required by the claim:

No evidence is presented in the specification that the DNA constructs are expressed in transformed Synechocystis 6803 or that such transformants can be effectively used as an insecticidal composition. ... No evidence is presented that the chimeric gene ... results in the expression of a fusion protein having these [insecticidal] activities."

[Exh. 20, June 27, 1988, 1st Office Action at 7] Thus, there was no mode of use that satisfied the claim because there was no disclosure that the expressed protein was insecticidal.

Here, the facts are completely and materially different. The '835 patent demonstrates several modes of use with numerous working examples describing how to obtain glyphosate resistant plant cells (or plants) using a chimeric plant gene as in claim 1. [Exh. 1, '835 patent, col. 16, ll. 28-63 (example 2), col. 17, l. 7 – col. 19, l. 60 (example 4), col. 21, l. 7 – col. 23, l. 45 (example 8), col. 23, l. 46 – col. 24, l. 4 (example 9), col. 24, l. 50 – col. 25, l. 40 (example 11)] Moreover, unlike the *Vaeck* specification, the teachings in Examples 1, 5-7 and 14-17 describe the procedures that can be readily applied to isolate genes and practice the invention for other plant species. [Exh. 1, '835 patent, col. 6, l. 17 – col. 16, l. 26 (example 1), col. 19, l. 61 – col. 21, l. 5 (examples 5-7), col. 26, l. 22 – col. 28, l. 52 (examples 14-17); Exh. 6, Gasser Decl. ¶ 5.a] Each of the examples shows that the gene functions as claimed—it confers glyphosate resistance on plant cells transformed with the gene. "The enablement requirement is met if the description enables any mode of making and using the invention." *Johns Hopkins,* 152 F.3d at 1361; *Invitrogen*, 429 F.3d at 1071 (holding a product claim enabled when the patent specification disclosed one of several ways to make the claimed genetically-modified enzyme). Further, "[e]nablement does not require the inventor to foresee every means of implementing an invention at pains of losing his patent franchise. Were it

23

otherwise, claimed inventions would not include improved modes of practicing those inventions." *Invitrogen*, 429 F.3d at 1052.

Thus, the *Vaeck* decision stands for the unremarkable proposition that if you are going to claim genes "expressible in cyanobacteria" to produce an "insecticidally active" protein, the specification must disclose an insecticidal gene expressible in cyanobacteria. The facts here are completely and materially different. Indeed, in a more recent decision, the Federal Circuit discussed *Vaeck*, noting that underlying determinations for the enablement inquiry are "fact-specific." *See Amgen*, 314 F.3d at 1338. Hence, at a minimum, summary judgment is not appropriate here, given the existence of underlying issues of fact.

### D.    Genuine Issues of Material Fact Preclude Summary Judgment

Finally, Syngenta's motion does not even attempt to address the proper issues underlying the enablement inquiry. Syngenta does not assert that the '835 patent does not teach how to make the claimed chimeric genes. There is substantial evidence the '835 patent discloses the claimed chimeric EPSPS genes. As set forth above, Plaintiffs have produced evidence that the '835 patent teaches the claimed genes as well as methods that can be used to produce native and mutant plant EPSPS genes that function in plants to provide increased glyphosate resistance. [*See* §§ IV.C.2-4, *supra*] Plaintiffs have submitted the declaration of Dr. Gasser that shows that the disclosure of the '835 patent teaches multiple chimeric plants genes that come within the scope of the claims. [*Id*.] That evidence, standing alone, is sufficient to deny Syngenta's motion.

Moreover, the C-*aroA* gene, referenced in the '835 patent specification was demonstrated by DEKALB scientists to produce glyphosate resistance in corn. [*See* § IV.C.1] Syngenta's remaining arguments are also fraught with factual disputes. For

example, Syngenta's argument that Monsanto had difficulty selecting a gene on glyphosate is purely a fact issue that would have to be resolved at trial. [*See* Syngenta Br. at 15-16]  Furthermore, Plaintiffs have submitted post-filing declarations and post-filing publications that may be relied upon to show enablement. *Amgen*, 314 F.3d at 1334 (Fed. Cir. 2003) ("an expert may rely on post-filing publications to show enablement"); *In re Brana*, 51 F.3d 1560, 1567 n. 19 (Fed. Cir. 1995) ("declaration, though dated after applicant's filing date, can be used to substantiate [enablement].")

Accordingly, summary judgment is not appropriate because Syngenta cannot carry its burden to show that there are no genuine issues of material fact that the specification teaches those in the art enough that they can make and use the invention.

## VI.    CONCLUSION

Syngenta has impermissibly ignored the plain language of the asserted claims, misconstruing unambiguous gene claims as transformed plant claims. Summary judgment is also not appropriate because, at a minimum, genuine issues of material fact also remain. Substantial evidence indiciates that the '835 patent adequately discloses the claimed chimeric genes to a person skilled in the art. For the forgoing reasons, Plaintiffs respectfully request that the Court deny Syngenta's motion for summary judgment of non-enablement the '835 patent.

Respectfully submitted,

OF COUNSEL:

Susan K. Knoll
Thomas A. Miller
Melinda Patterson
Stephen E. Edwards
Steven G. Spears
HOWREY LLP
1111 Louisiana, 25th Floor
Houston, Texas 77092
Telephone (713) 787-1400

Dated:  January 26, 2005
Public Version Dated:  February 1, 2006
717623

POTTER ANDERSON & CORROON LLP

By:  /s/ David E. Moore
    Richard L. Horwitz (#2246)
    David E. Moore (#3983)
    Hercules Plaza, 6th Floor
    1313 N. Market Street
    Wilmington, DE  19801
    Telephone (302) 984-6000
    rhorwitz@potteranderson.com
    dmoore@potteranderson.com

*Attorneys for Plaintiffs*

27

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on February 1, 2006, the attached document

was hand-delivered to the following persons and was electronically filed with the Clerk

of the Court using CM/ECF which will send notification of such filing(s) to the following

and the document is available for viewing and downloading from CM/ECF:

John W. Shaw
Karen E. Keller
Young Conaway Stargatt & Taylor, L.L.P.
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE  19801


I hereby certify that on February 1, 2006, I have Federal Expressed the

foregoing document(s) to the following non-registered participants:

Richard F. Schwed
Stephen Fishbein
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY  10022-6069

Michael J. Flibbert
Don O. Burley
Howard W. Levine
Finnegan, Henderson, Farabow,
    Garrett & Dunner, L.L.P.
901 New York Ave., NW
Washington, DC  20001-4413


 /s/ David E. Moore
Richard L. Horwitz
David E. Moore
Potter Anderson & Corroon LLP
Hercules Plaza – Sixth Floor
1313 North Market Street
Wilmington, DE  19801
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com