LEXSEE

RHONE-POULENC AGRO S.A., Plaintiff, v. MONSANTO COMPANY and
DEKALB GENETICS CORP., Defendants.

No. 1:97CV1138

UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF
NORTH CAROLINA

2000 U.S. Dist. LEXIS 21330

February 8, 2000, Decided
February 8, 2000, Filed

**SUBSEQUENT HISTORY:** Related proceeding at
Monsanto Co. v. Aventis Cropscience SA, 2001 U.S.
Dist. LEXIS 8891 (D. Del., May 16, 2001)
Affirmed by Rhone-Poulenc Agro, S.A. v. DeKalb Ge-
netics Corp., 271 F.3d 1081, 2001 U.S. App. LEXIS
24813 (Fed. Cir., 2001)
Vacated by, Remanded by Rhone-Poulenc Agro, S.A. v.
DeKalb Genetics Corp., 284 F.3d 1323, 2002 U.S. App.
LEXIS 5006 (Fed. Cir., 2002)
Reaffirmed Rhone-Poulenc Agro v. Genetics, 2003 U.S.
App. LEXIS 19971 (Fed. Cir., Sept. 29, 2003)

**PRIOR HISTORY:** Rhone-Poulenc Agro S.A. v. Mon-
santo Co., 73 F. Supp. 2d 554, 1999 U.S. Dist. LEXIS
20790 (M.D.N.C., 1999)

**DISPOSITION:** [*1]  Plaintiff Rhone-Poulenc Agro
SA's (RPA) motion for a permanent injunction [Doc. #
504] GRANTED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff agricultural
product vendor brought several claims including trade
secret misappropriation and patent infringement against
defendant agricultural product vendors. Three of the
claims were adjudicated before juries during two sepa-
rate phases. This Memorandum Opinion addressed sev-
eral post-trial issues.

**OVERVIEW:** RD-125 is a construct of a mutated corn
gene that made corn tolerant to glyphosate herbicides.
Plaintiff had developed RD-125 and had transferred it to
the first defendant for further lab and field testing pursu-
ant to an agreement between the parties. Plaintiff alleged
that defendant breached the agreement by not communi-
cating just how successful the field tests were and then

subsequently obtaining the right to use the RD-125 tech-
nology from plaintiff. The court held that substantial
evidence supported the jury's finding that defendant, re-
alizing the economic potential of RD-125, fraudulently
induced plaintiff to grant defendant rights to the technol-
ogy. A second defendant was dismissed because it was a
bona fide purchaser of the technology. The court held
that there was substantial evidence from which a reason-
able jury could have concluded that the first defendant
failed to meet its burden to prove by clear and convinc-
ing evidence that plaintiff's patent was invalid as obvi-
ous. Nor did defendant meet its burden of proving that
plaintiff intended to deceive the U.S. Patent and Trade-
mark Office. Other objections advanced by defendant did
not warrant a new trial.

**OUTCOME:** One defendant was dismissed and plain-
tiff's motion for reconsideration of that ruling was de-
nied. The other defendant's motion for judgment as a
matter of law on plaintiff's fraudulent inducement claim,
trade secret misappropriation claim, and on the issue of
obviousness of plaintiff's patent was denied. That defen-
dant's motion for a new trial was denied. Plaintiff's mo-
tion for entry of permanent injunction was granted.

**CORE TERMS:** patent, construct, corn, gene, transit,
peptide, glyphosate, plant, license, technology, maize,
trade secret, phase, chloroplast, invention, protein, mis-
appropriation, obviousness, mutant, double, amino acids,
declaration, tolerance, seed, resistance, matter of law,
new trial, fraudulent, bona fide purchaser, modification

**LexisNexis(R) Headnotes**

*Civil Procedure > Trials > Judgment as Matter of Law*
[HN1] See Fed. R. Civ. P. 50(b).

*Civil Procedure > Trials > Judgment as Matter of Law*
[HN2] When considering a motion for judgment as a matter of law after a verdict has been returned, all evidence should be viewed in the light most favorable to the prevailing party and all reasonable inferences should be drawn in its favor. In making this determination, the court is not permitted to retry factual findings or credibility determinations reached by the jury. Rather, the court should assume that testimony in favor of the prevailing party is credible unless totally incredible on its face and ignore the substantive weight of any evidence supporting the moving party. A Fed. R. Civ. P. 50(b) motion should be granted only if the court determines, without weighing the evidence or considering the credibility of the witnesses, that substantial evidence does not support the jury's findings.

*Torts > Business & Employment Torts > Deceit & Fraud*
[HN3] Constructive fraud arises when a party to a confidential or fiduciary relationship breaches a duty that has been implied by law because of the special relationship between the parties.

*Torts > Business & Employment Torts > Deceit & Fraud*
[HN4] The elements of actual fraud are: (1) a false representation or concealment of a material fact; (2) that was reasonably calculated to deceive; (3) which was made with the intent to deceive; (4) that did in fact deceive (or reasonably induce reliance); and (5) resulted in injury or damage.

*Torts > Business & Employment Torts > Concealment*
[HN5] Fraud can be practiced by silence as well as by a positive misrepresentation, if a duty to speak exists.

*Torts > Business & Employment Torts > Deceit & Fraud*
[HN6] Constructive fraud arises when a party to a confidential or fiduciary relationship breaches a duty that has been implied by law because of the special relationship between the parties. When a fiduciary relationship exists, a presumption of fraud is raised when the superior party obtains a possible improper benefit from the relationship.

*Torts > Business & Employment Torts > Concealment*
[HN7] In a fraudulent omission case, a duty to disclose material information may arise where a fiduciary relationship exists between the parties to the transaction.

*Business & Corporate Entities > Joint Ventures*
[HN8] As a matter of law, a fiduciary relationship exists between members of a joint venture.

*Civil Procedure > State & Federal Interrelationships > Choice of Law*
[HN9] A federal court applying state law will apply the choice of law rules of the jurisdiction in which it sits.

*Contracts Law > Contract Conditions & Provisions > Forum Selection Clauses*
*Civil Procedure > State & Federal Interrelationships > Choice of Law*
[HN10] Under North Carolina's choice of law rules, the interpretation of a contract is governed by the law of the place where the contract was made. However, if the parties to the contract have agreed that a given jurisdiction's substantive law will govern the interpretation of the contract, then a North Carolina court will give effect to that contractual provision.

*Business & Corporate Entities > Joint Ventures*
[HN11] In Illinois, a joint venture is an association of two or more persons [or entities] to carry out a single enterprise for profit. A formal agreement is not essential to establish a joint venture. Rather, the existence of a joint venture may be inferred from the facts and circumstances demonstrating that the parties in fact entered into a joint venture. In determining whether a joint venture exists, the intent of the parties is the most significant element.

*Business & Corporate Entities > Joint Ventures*
[HN12] In Illinois, the following elements must be present for a joint venture to exist: (1) an agreement, either express or implied, to carry on a single enterprise with a legitimate purpose; (2) a community of interest in the purpose; (3) expectation of profits; (4) duty to share profits and losses; and (5) the right of each person to direct and govern the conduct of the other members of the venture. The burden of proving that a joint venture exists is on the party claiming that such a relationship exists, and whether or not a joint venture exists typically is a question of fact for the trier of fact.

*Business & Corporate Entities > Joint Ventures*
[HN13] Possibly, the most important criterion of a joint venture is joint control and management of the property used in accomplishing its aims under Illinois law. The legal requirement of a right to management or control has been interpreted as requiring some right by the parties to direct and govern the conduct of each other in connection with the joint venture.

*Business & Corporate Entities > Joint Ventures*
[HN14] Where the right to control is lacking, a joint enterprise does not exist under Illinois law.

*Torts > Business & Employment Torts > Concealment*

[HN15] In fraudulent omission cases the obligation imposed on parties is not always easy to ascertain because the scope of the duty to disclose can vary between different situations and jurisdictions. In North Carolina, a legal duty to disclose material information can arise from a relation of trust, from confidence, inequality of condition and knowledge, or other attendant circumstances.

*Torts > Business & Employment Torts > Concealment*
[HN16] One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question. One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading and facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

*Torts > Business & Employment Torts > Concealment*
[HN17] A duty to disclose arises when a party has taken affirmative steps to conceal material facts. It is a basic principle in the law of fraud in respect of the effect of nondisclosure that the proposition that in the absence of a duty to speak, nondisclosure is not fraudulent, presupposes mere silence, and is not applicable where, by words or conduct, a false representation is intimated or any deceit practiced. Moreover, the rule that fraud cannot be predicated on a failure to disclose facts where the information is as accessible to one party as to the other, and where the truth may be ascertained by the exercise of reasonable diligence, does not justify a resort to active deceit or fraud, and hence does not apply where a party, in addition to nondisclosure, uses any artifice to throw the other party off his guard and to lull him into a false security. Therefore, each party to a contract must take care not to say or do anything tending to impose upon the other.

*Torts > Business & Employment Torts > Concealment*
[HN18] Concealment becomes a fraud where it is effected by misleading and deceptive talk, acts, or conduct, where it is accompanied by misrepresentations, or where, in addition to a party's silence there is any statement, word, or act on his part which tends affirmatively to a suppression of the truth, to a covering up or disguising of the truth, or to a withdrawal or distraction of a party's attention from the real facts; then the line is overstepped, and the concealment becomes a fraud. Such conduct is designated "active concealment," and it produces the same result in law as positive misrepresentation. Likewise, resort to any trick or artifice to prevent an adversary from discovering the truth is equivalent to active misrepresentation.

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings*
[HN19] See Fed. R. Civ. P. 15(b).

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings*
[HN20] An amendment to conform to evidence may be made at any time, so long as the opposing party has not been prejudiced in presenting his case. Fed. R. Civ. P. 15(b) is intended to promote the objective of deciding cases on their merits rather than in terms of the relative pleading skills of counsel, and therefore it should be interpreted liberally. Finally, the rule is designed to allow amendment of a pleading when the facts proven at trial differ from those alleged in the complaint, and thus support a cause of action that the claimant did not plead. Because notice to the defendant of the allegations to be proven is essential to sustaining a cause of action, Rule 15(b) applies only when the defendant has consented to trial of the non-pled factual issues and will not be prejudiced by amendment of the pleadings to include them.

*Contracts Law > Contract Modifications*
[HN21] Contract modification must satisfy all the requirements of a valid contract, including the requirement of consideration. A modification of a contract may be ratified by acquiescence in a course of conduct consistent with the existence of that modification.

*Civil Procedure > Jury Trials > Province of Court & Jury*
*Contracts Law > Contract Modifications*
[HN22] Whether a contract has been modified is ordinarily question of fact; however, the sufficiency of facts presented to constitute a modification is a question of law. Moreover, if after consideration of all evidence, the court determines that reasonable people could reach only one conclusion, the modification issue can be decided by the court as a matter of law.

*Contracts Law > Contract Modifications*
[HN23] In Illinois, the terms of a written contract can be modified by a subsequent oral agreement even though the contract precludes oral modifications.

*Contracts Law > Contract Modifications*

[HN24] Illinois law allows parties to a contract to modify provisions of the contract without affecting their liabilities under other terms of the agreement.

*Patent Law > Ownership > Conveyances > Equitable Assignments & Joint Ownership*
*Patent Law > Infringement Actions > Defenses > General Overview*
[HN25] The bona fide purchaser rule is recognized in patent law, as well as by North Carolina, through the common law, and by its adoption of the Uniform Commercial Code. N.C. Gen. Stat. § 25-2-403. It is well established that when a legal title holder of a patent transfers his or her title to a third party purchaser for value without notice of an outstanding equitable claim or title, the purchaser takes the entire ownership of the patent, free of any prior equitable encumbrance.

*Patent Law > Nonobviousness > Elements & Tests > General Overview*
*Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > General Overview*
*Patent Law > Nonobviousness > Evidence & Procedure > Fact & Law Issues*
[HN26] A patent is invalid if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which the subject matter pertains. 35 U.S.C.S. § 103. It is undisputed that the ultimate question of obviousness is a question of law. At the same time, factual issues underlie the ultimate obviousness decision, including (1) the scope and content of the prior art; (2) the differences between the claimed invention and the prior art; (3) the level of ordinary skill in the art; and (4) certain secondary considerations. These factual issues do not convert the ultimate conclusion of obviousness from one of law into one of fact.

*Civil Procedure > Trials > Judgment as Matter of Law*
*Patent Law > Nonobviousness > Elements & Tests > General Overview*
[HN27] When considering a Fed. R. Civ. P. 50(b) motion involving the question of obviousness of a patent, in recreating the facts as they may have been found by the jury, and in applying the Graham factors to the case, the court assesses the record evidence in the light most favorable to the verdict winner. Where there is a verdict of validity, the question is not whether the patentee had introduced sufficiently substantial evidence to support the verdict, but whether the challenger's evidence so met the burden imposed by 35 U.S.C.S. § 282 (the burden of establishing invalidity of a patent or any claim shall rest on the party asserting such invalidity) that reasonable

jurors could not have concluded that the challenger failed to overcome that burden.

*Patent Law > Inequitable Conduct > Burdens of Proof*
*Patent Law > Infringement Actions > Burdens of Proof*
*Patent Law > Infringement Actions > Defenses > Patent Invalidity > Validity Presumption*
[HN28] In patent infringment claims, there is a statutory presumption of validity, 35 U.S.C.S. § 282, therefore the facts to support a conclusion of invalidity must be proven by clear and convincing evidence.

*Patent Law > Nonobviousness > Evidence & Procedure > Fact & Law Issues*
*Patent Law > Claims & Specifications > Enablement Requirement > General Overview*
*Patent Law > Nonobviousness > Elements & Tests > General Overview*
[HN29] The second step in an obviousness inquiry is to determine whether the claimed invention would have been obvious as a legal matter, based on underlying factual inquiries including: (1) the level of ordinary skill in the art, (2) the scope and content of the prior art, (3) the differences between the claimed invention and the prior art, and (4) secondary considerations of nonobviousness.

*Patent Law > Nonobviousness > Elements & Tests > General Overview*
[HN30] A nexus is required between the merits of the claimed invention and the evidence offered, if that evidence is to be given substantial weight enroute to conclusion on the obviousness issue.

*Patent Law > Inequitable Conduct > General Overview*
*Patent Law > Subject Matter > Products > Machines*
*Patent Law > Infringement Actions > Burdens of Proof*
[HN31] A prima facie case of nexus is generally made out when the patentee shows both that there is commercial success, and that the thing (product or method) that is commercially successful is the invention disclosed and claimed in the patent. When the thing that is commercially successful is not coextensive with the patented invention—for example, if the patented invention is only a component of a commercially successful machine or process — the patentee must show prima facie a legally sufficient relationship between that which is patented and that which is sold.

*Patent Law > Nonobviousness > Elements & Tests > Prior Art*
*Patent Law > Nonobviousness > Elements & Tests > Secondary Considerations*
*Patent Law > Nonobviousness > Elements & Tests > Claimed Invention as a Whole*

[HN32] While superior properties or unexpected results may be used to show nonobviousness, the lack of such evidence does not lead conclusively to a determination that an invention is obvious. Evidence of secondary considerations, including evidence of unexpected results and commercial success, are but a part of the "totality of evidence" that is used to reach the ultimate conclusion of obviousness.

*Patent Law > Nonobviousness > Elements & Tests > Prior Art*
[HN33] In proving the obviousness of a patent claim, it is insufficient that prior art show similar components, unless it also contains some teaching, suggestion, or incentive for arriving at the claimed structure.

*Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > General Overview*
*Patent Law > Claims & Specifications > Enablement Requirement > General Overview*
*Patent Law > Nonobviousness > Elements & Tests > General Overview*
[HN34] A determination regarding the relationship of the prior art to the invention takes place prior to an inquiry regarding the prior art's teaching about that relationship. If those of ordinary skill would have recognized a relationship between the prior art and the invention, then, and only then, does the trial court proceed to examine whether the prior art in fact contains a coherent teaching about that relationship.

*Patent Law > Nonobviousness > Elements & Tests > Hindsight*
*Patent Law > Nonobviousness > Elements & Tests > Prior Art*
*Patent Law > Nonobviousness > Evidence & Procedure > General Overview*
[HN35] A determination of obviousness can not be based on the hindsight combination of components selectively culled from the prior art to fit the parameters of the patented invention. There must be a teaching or suggestion within the prior art, or within the general knowledge of a person of ordinary skill in the field of the invention, to look to particular sources of information, to select particular elements, and to combine them in the way they were combined by the inventor.

*Torts > Business & Employment Torts > Unfair Business Practices*
*Trade Secrets Law > Nonprotected Information > Reverse Engineering*
*Trade Secrets Law > Factors > General Overview*
[HN36] A trade secret must have derived independent actual or potential commercial value from not being generally known or readily ascertainable through independ-

ent development or reverse engineering by persons who can obtain economic value from its disclosure or use. N.C. Gen. Stat. § 66-152(3)(a). Factors that may assist a fact-finder in determining whether something is a trade secret include the amount of effort or money expended in developing the information and the ease or difficulty with which the information could properly be acquired or duplicated by others.

*Trade Secrets Law > Factors > Ready Availability*
*Torts > Business & Employment Torts > Unfair Business Practices*
*Trade Secrets Law > Protected Information > Combinations & Compilations*
[HN37] A trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret.

*Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > Elements*
*Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > Effect of Inequitable Conduct*
[HN38] A patent may be unenforceable due to inequitable conduct if the applicant does not disclose material information to the United States Patent and Trademark Office or submits false material information, with an intent to deceive or mislead the examiner.

*Patent Law > Inequitable Conduct > Burdens of Proof*
*Patent Law > Infringement Actions > Burdens of Proof*
[HN39] The party asserting the inequitable conduct defense to a claim of patent infringement, has the burden of proving materiality and intent by clear and convincing evidence.

*Patent Law > Inequitable Conduct > Burdens of Proof*
*Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > Effect of Inequitable Conduct*
[HN40] In order for a court to find a patent unenforceable based upon an alleged material misrepresentation, the court must first find that the statements about which the defendant complains are actually misrepresentations, made with knowledge of their falsity. Then, the court must determine whether any misrepresentations or omissions meet a threshold level of materiality. The court also must determine whether the evidence shows a threshold level of intent to mislead the United States Patent and Trademark Office. Only if the threshold levels of materiality and intent are established by clear and convincing evidence, are materiality and intent weighed together. The more material the misrepresentation or omission, the less evidence of intent will be required in order to find that inequitable conduct has occurred. Finally, in light of

all the circumstances, the court must then determine whether the applicant's conduct is so culpable that the patent should be held unenforceable.

*Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > General Overview*
[HN41] The starting point in determining materiality is the United States Patent and Trademark Office regulations.

*Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > General Overview*
[HN42] See 37 C.F.R. § 1.56.

*Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > General Overview*
[HN43] Intent to deceive the United States Patent and Trademark Office (PTO) is often inferred from surrounding circumstances when a material misrepresentation is shown. However, the materiality of a misrepresentation or omission does not lead automatically to an inference of intent to deceive, because intent is a separate and essential component of inequitable conduct. Even when the misrepresentation is in affidavit form, an inference is not required. Furthermore, mere gross negligence is insufficient to justify an inference of an intent to deceive the PTO. Evidence of good faith must be considered in determining whether inequitable conduct has been shown by clear and convincing evidence. However, good faith is only one factor to be considered along with the totality of the evidence.

*Civil Procedure > Relief From Judgment > Motions for New Trial*
[HN44] Under Fed. R. Civ. P. 59(a), a new trial will be granted if the verdict will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict.

*Evidence > Procedural Considerations > Inferences & Presumptions*
[HN45] Under the spoliation of evidence rule, an adverse inference may be drawn against a party who destroys relevant evidence. The inference can be drawn even if the party's destruction of the documents did not occur in bad faith.

*Evidence > Writings & Real Evidence*
[HN46] An obligation to preserve evidence arises when a party should have known that the evidence may be relevant to future litigation.

*Civil Procedure > Appeals > Standards of Review > Plain Error*

[HN47] Where one party timely objects to the relevance of information, but does not object contemporaneously to any of opposing counsel's statements during closing arguments statements regarding inferences the jury may draw from this evidence, the statements during closing arguments should be reviewed under a "plain error" standard.

*Civil Procedure > Jury Trials > Jury Instructions*
*Civil Procedure > Relief From Judgment > Motions for New Trial*
[HN48] A court's failure to give appropriate jury instructions is an adequate basis for granting a new trial.

*Contracts Law > Contract Conditions & Provisions > Waivers*
[HN49] Under Illinois law, a waiver is an intentional relinquishment of a known right that may be express or implied from the conduct of the party that has allegedly waived its right.

*Civil Procedure > Appeals > Standards of Review > Harmless & Invited Errors*
*Civil Procedure > Relief From Judgment > Motions for New Trial*
[HN50] See Fed. R. Civ. P. 61.

*Evidence > Procedural Considerations > Rulings on Evidence*
*Civil Procedure > Appeals > Standards of Review > Harmless & Invited Errors*
[HN51] A number of factors have guided the courts in their determinations of whether error in the admission or exclusion of evidence is harmless, including (1) whether erroneously admitted evidence was the primary evidence relied upon, (2) whether the aggrieved party was nonetheless able to present the substance of its claim, (3) the existence and usefulness of curative jury instructions, (4) the extent of jury argument based on tainted evidence, (5) whether erroneously admitted evidence was merely cumulative, and (6) whether other evidence was overwhelming.

*Civil Procedure > Jury Trials > Jury Instructions*
*Civil Procedure > Relief From Judgment > Motions for New Trial*
[HN52] Improper jury instructions, of course, may be grounds for a new trial. However, instructions must be viewed in their entirety, and a new trial is appropriate only when it is clear that error in the instructions as a whole was such as to have misled the jury.

*Patent Law > Nonobviousness > Elements & Tests > General Overview*

[HN53] The determination of obviousness, vel non, requires that all the evidence be considered together. If rebuttal evidence of adequate weight is produced, the holding of prima facie obviousness, being but a legal inference from previously uncontradicted evidence, is dissipated. The objective evidence of unobviousness is not evaluated for its separate knockdown ability against the stonewall of the prima facie case, but is considered together with all other evidence, in determining whether the invention as a whole would have been obvious to a person ordinary skill in the field of the invention.

*Patent Law > Inequitable Conduct > General Overview*
*Patent Law > U.S. Patent & Trademark Office Proceedings > Continuation Applications > General Overview*
*Patent Law > Statutory Bars > General Overview*
[HN54] The patent laws do not require an invention to be superior to the prior art in order to be patentable.

*Contracts Law > Remedies > Election of Remedies*
[HN55] Under North Carolina's doctrine of election of remedies, a party alleging fraud must elect either the remedy of rescission or that of damages, but may not seek both, as these remedies are inconsistent. One who elects rescission may recover back what he has parted with under the contract, but cannot recover damages for the fraud. However, the election of remedies rule does not preclude an award based upon unjust enrichment, for the unjust enrichment award is a restitutionary measure -- not a measure of "damages" from the contract or the fraud.

*Contracts Law > Remedies > Rescission & Redhibition*
[HN56] Rescission does not limit a defrauded party only to return of the property that was defrauded. The rule that rescission requires a return to the status quo ante is a general rule, not an absolute one. North Carolina courts have acknowledged that, as part of a rescission order, a prevailing party is entitled to full restitution.

*Contracts Law > Remedies > Rescission & Redhibition*
[HN57] A rescission is an avoidance of a transaction. Rescission will normally be accompanied by restitution on both sides. Rescission is thus less a remedy and more a matter of the conceptual apparatus that leads to the remedy: the contract is being unmade, so restoration of benefits received under the contract seems to follow.

*Contracts Law > Remedies > Rescission & Redhibition*
[HN58] Rescission of a contract implies the entire abrogation of the contract from the beginning.

*Torts > Business & Employment Torts > Deceit & Fraud*

*Torts > Damages*
[HN59] In cases involving fraud, the defrauded party is entitled to have restitution of all values which he transferred in the transaction as a result of the misrepresentation. In a claim based on actual fraud, part of the "value" calculation includes profits the fraudulent party received from its actions. Indeed, courts normally award as restitution all unique tangible and intangible property transferred to the defendant if it is capable of specific return, and if that property is still in the defendant's hands, and any benefits defendant derived from the use of the property or intangibles transferred as may be appropriate.

*Torts > Business & Employment Torts > Deceit & Fraud*
[HN60] It is simple equity that a wrongdoer should disgorge his fraudulent enrichment.

*Torts > Business & Employment Torts > Deceit & Fraud*
*Torts > Damages*
*Patent Law > Ownership > Conveyances > Licenses*
[HN61] In order to determine how much a defendant unjustly benefitted from its use of a patent license that was fraudulently obtained, the court must resort to general considerations of fairness, taking into account the nature of the defendant's wrong, the relative extent of his or her contribution, and the feasibility of separating this from the contribution traceable to the plaintiff's interest. The more culpable the defendant's behavior, and the more direct the connection between the profits and the wrongdoing, the more likely that the plaintiff can recover all defendant's profits.

*Contracts Law > Remedies > Rescission & Redhibition*
*Torts > Business & Employment Torts > Deceit & Fraud*
[HN62] Rescission is merely the first step in a restitutionary analysis of a fraud claim. The second step is to consider restitution by determining whether the fraudulent party unjustly benefitted from its wrongful conduct.

*Contracts Law > Remedies > Rescission & Redhibition*
*Torts > Damages > Punitive Damages*
[HN63] In North Carolina, punitive damages are allowed to punish a wrongdoer and to deter similar future conduct. Fraudulent conduct alone is sufficient to support an award of punitive damages. Punitive damages may also be awarded in an equitable action for recission when the recission is based upon fraudulent conduct.

*Torts > Damages > Punitive Damages*
[HN64] Under North Carolina law prior to 1997, the decision whether to award punitive damages and the appropriate amount of the award is in the discretion of the

jury, although, to pass judicial scrutiny, an award must not be so excessively disproportionate to the circumstances of aggravation or outrage justifying the award that due process is offended.

*Torts > Damages > Damages Generally*
[HN65] The United States Supreme Court has emphasized three factors in determining whether an award is grossly excessive: reprehensibility of the defendant's conduct; the ratio of the award to the actual harm inflicted and the potential harm which might have been inflicted; and a comparison to comparable civil and criminal penalties.

*Patent Law > Infringement Actions > Exclusive Rights > Manufacture, Sale & Use*
*Patent Law > Ownership > Patents as Property*
*Patent Law > Remedies > Equitable Relief > Injunctions*
[HN66] Infringement having been established, it is contrary to the laws of property, of which the patent law partakes, to deny the patentee's right to exclude others from use of his property. 35 U.S.C.S. § 261. It is the general rule that an injunction will issue when infringement has been adjudged, absent a sound reason for denying it.

*Civil Procedure > Injunctions*
[HN67] Four factors guide the determination of a motion for a stay pending appeal: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies. Each factor, however, need not be given equal weight, and the formula cannot be reduced to a set of rigid rules. Indeed, the four stay factors can effectively merge. In considering whether to grant a stay pending appeal, a court assesses the movant's chances for success on appeal and weighs the equities as they affect the parties and the public.

*Civil Procedure > Injunctions*
[HN68] The United States Court of Appeals for the Federal Circuit has suggested using a sliding-scale approach when evaluating motions for a stay: the stronger the showing the stay movant can make on its likelihood of success on the merits, the less compelling the showing must be with respect to the other three factors. Conversely, if the stay movant can show only a "substantial legal question," then it can obtain a stay only if it prevails on the other three stay factors.

*Patent Law > Inequitable Conduct > Burdens of Proof*

*Patent Law > Infringement Actions > Burdens of Proof*
[HN69] Willfulness of patent infringement is determined from the totality of the circumstances, and must be proven by clear and convincing evidence.

*Patent Law > Remedies > Collateral Assessments > Attorney Fees*
[HN70] 35 U.S.C.S. § 285 provides that the court in exceptional cases may award reasonable attorney fees to the prevailing party. Among the types of conduct which can form a basis for finding a case exceptional are willful infringement, inequitable conduct before the United States Patent and Trademark Office, misconduct during litigation, vexatious or unjustified litigation, and frivolous suit. Such conduct must be supported by clear and convincing evidence.

COUNSEL: For RHONE-POULENC AGROCHIMIE S.A., plaintiff: MICHAEL E. RAY, CHARLES A. BURKE, JOHN F. MORROW, JR., WOMBLE CARLYLE SANDRIDGE & RICE, WINSTON-SALEM, NC.

For RHONE-POULENC AGROCHIMIE S.A., plaintiff: TIMOTHY G. BARBER, WOMBLE CARLYLE SANDRIDGE & RICE, CHARLOTTE, NC.

For RHONE-POULENC AGROCHIMIE S.A., plaintiff: RICHARD D. LEVIN, RUDOLF E. HUTZ, J. KENNETH JOUNG, CONNOLLY BOVE LODGE & HUTZ, GEORGE PAZUNIAK, FRANCIS DIGIOVANNI, CONNOLLY BOVE LODGE & HUTZ, WILMINGTON, DE.

For MONSANTO COMPANY, DEKALB GENETICS CORPORATION, defendants: JAMES DONALD COWAN, JR., SMITH HELMS MULLISS & MOORE, GREENSBORO, NC.

For MONSANTO COMPANY, defendant: LYN K. BROOM, SMITH HELMS MULLISS & MOORE, GREENSBORO, NC.

For MONSANTO COMPANY, defendant: ROBERT N. SAYLER, SONYA D. WINNER, DOUGLAS E. PHILLIPS, DAVID J. BALL, JR., CHARLES E. BUFFON, DEBORAH A. GARZA, ADRIANA S. LUEDKE, LAURA B. GASHO, JOHN T. DELACOURT, ERIC BOSSET, KURT CALIA, COVINGTON & BURLING, WASHINGTON, DC.

For MONSANTO COMPANY, defendant: JOHN F. LYNCH, ARNOLD WHITE & DURKEE, HOUSTON, TX.

For MONSANTO COMPANY, [*2] defendant: DAVID C. WEINER, HAHN LOUSER & PARKS, L.L.P., CLEVELAND, OH.

For DEKALB GENETICS CORPORATION, defendant: RAY S. BOLZE, LISA J. SAKS, DAVID M. MORRIS, ELLEN DASSANCE, MICHAEL MAYER, SUSAN K. KNOLL, MICHAEL E. LEE, PATRICIA M. MCDERMOTT, HOWREY SIMON ARNOLD & WHITE, LLP, WASHINGTON, DC.

For DEKALB GENETICS CORPORATION, defendant: STUART C. GAUFFREAU, GREENSBORO, NC.

For CALGENE, INC., movant: DANIEL W. FOUTS, ADAMS KLEEMEIER HAGAN HANNAH & FOUTS, GREENSBORO, NC.

For CALGENE, INC., movant: DAVID C. WEINER, HAHN LOUSER & PARKS, L.L.P., CLEVELAND, OH.

For DEKALB GENETICS CORPORATION, counter-claimant: STUART C. GAUFFREAU, GREENSBORO, NC.

For MONSANTO COMPANY, counter-claimant: JAMES DONALD COWAN, JR., SMITH HELMS MULLISS & MOORE, GREENSBORO, NC.

For DEKALB GENETICS CORPORATION, counter-claimant: RAY S. BOLZE, LISA J. SAKS, DAVID M. MORRIS, PATRICIA M. MCDERMOTT, ELLEN DASSANCE, MICHAEL MAYER, HOWREY SIMON ARNOLD & WHITE, LLP, WASHINGTON, DC.

For RHONE-POULENC AGROCHIMIE S.A., counter-defendant: MICHAEL E. RAY, WOMBLE CARLYLE SANDRIDGE & RICE, WINSTON-SALEM, NC.

For RHONE-POULENC AGROCHIMIE S.A., counter-defendant: CHARLES A. BURKE, [*3] JOHN F. MORROW, JR., WOMBLE CARLYLE SANDRIDGE & RICE, WINSTON-SALEM, NC.

For RHONE-POULENC AGROCHIMIE S.A., counter-defendant: GEORGE PAZUNIAK, FRANCIS DIGIOVANNI, RICHARD D. LEVIN, RUDOLF E. HUTZ, J. KENNETH JOUNG, CONNOLLY BOVE LODGE & HUTZ, WILMINGTON, DE.

For RHONE-POULENC AGROCHIMIE S.A., counter-defendant: TIMOTHY G. BARBER, WOMBLE CARLYLE SANDRIDGE & RICE, CHARLOTTE, NC.

For DEKALB GENETICS CORPORATION, counter-defendant: JAMES DONALD COWAN, JR., SMITH HELMS MULLISS & MOORE, GREENSBORO, NC.

For DEKALB GENETICS CORPORATION, counter-defendant: RAY S. BOLZE, LISA J. SAKS, DAVID M. MORRIS, ELLEN DASSANCE, MICHAEL MAYER, PATRICIA M. MCDERMOTT, HOWREY SIMON ARNOLD & WHITE, LLP, WASHINGTON, DC.

For DEKALB GENETICS CORPORATION, counter-defendant: STUART C. GAUFFREAU, GREENSBORO, NC.

For RHONE-POULENC AGROCHIMIE S.A., cross-defendant: MICHAEL E. RAY, CHARLES A. BURKE, JOHN F. MORROW, JR., WOMBLE CARLYLE SANDRIDGE & RICE, WINSTON-SALEM, NC.

For RHONE-POULENC AGROCHIMIE S.A., cross-defendant: TIMOTHY G. BARBER, WOMBLE CARLYLE SANDRIDGE & RICE, CHARLOTTE, NC.

For RHONE-POULENC AGROCHIMIE S.A., cross-defendant: RICHARD D. LEVIN, RUDOLF E. HUTZ, J. [*4] KENNETH JOUNG, GEORGE PAZUNIAK, FRANCIS DIGIOVANNI, CONNOLLY BOVE LODGE & HUTZ, WILMINGTON, DE.

**JUDGES:** N. Carlton Tilley, Jr., United States District Judge.

**OPINIONBY:** N. Carlton Tilley, Jr.

**OPINION:**

MEMORANDUM OPINION

TILLEY, Chief Judge

Three of Plaintiff Rhone-Poulenc Agro S.A.'s ("RPA") claims were adjudicated before juries during two separate phases, culminating on June 2, 1999. This Memorandum Opinion will address several post-trial issues. This Opinion will also discuss for the record the reasoning for several rulings made by the Court during the course of the trial. n1

n1 Since this opinion contains a number of cross references, an Index has been placed on the last two pages to assist in locating specific sections.

**I. FACTUAL HISTORY**

The facts of the case, stated in the light most favorable to the prevailing party, RPA, are as follows.

RPA is a worldwide manufacturer and vendor of diversified agricultural products, and is engaged in chemical and biotechnological research and development with particular [*5] interests in the area of weed control and crops. Defendant Monsanto Company ("Monsanto") manufactures and sells a diversified line of agricultural products as well, including herbicides, and is engaged in biotechnological research and development. Defendant DeKalb Genetics Corporation ("DeKalb"), which became a fully-owned subsidiary of Monsanto in December 1998, is involved in agricultural genetics and biotechnology for corn seed, and is one of the largest corn seed suppliers in the United States.

This case involves sophisticated biotechnology and genetic engineering. Monsanto produces a herbicide called Roundup, whose active ingredient is glyphosate. Glyphosate is an effective, yet environmentally safe, herbicide that, appropriately applied, will kill all green foliage with which it comes into contact. This case involved research and development of genetically engineered corn that is tolerant to glyphosate herbicides, such as Roundup. The ability to grow glyphosate-tolerant corn increases the efficiency of farmers, because they can spray glyphosate herbicide over the entire crop of corn, killing all of the weeds but not damaging any of the corn plants.

In 1985, DeKalb and Calgene, [*6] Inc. ("Calgene") entered into an agreement for the joint development of crops containing Calgene's C-AroA, or CT-7, gene n2 (an "EPSPS" gene derived from salmonella bacteria) that would make corn crops tolerant to glyphosate (the "1985 Agreement"). The 1985 Agreement called for the formation of a "Project Review Committee," composed of scientists from each company, that would have general oversight responsibility for the progress of each party under the agreement. It also provided for various royalty payments to be made by DeKalb to Calgene for products developed under the agreement. As part of the 1985 Agreement, DeKalb received an exclusive license to the Comai patents in the field of use of corn. In 1991, RPA, DeKalb, and Calgene entered into an "Assignment and Assumption Agreement," (the "1991 Agreement") whereby RPA assumed Calgene's rights and obligations under the 1985 Agreement. These agreements often are referred to together as the "1985/1991 Agreements."

n2 This C-AroA, or CT-7, gene is the gene contained in patents referred to throughout the trial as the "Comai" patents.

[*7]

The 1985/1991 Agreements dealt only with the CT-7 gene; however, RPA and DeKalb were involved together in a broader collaboration with the ultimate goal of genetically altering corn to make it resistant to glyphosate. In the collaboration, RPA performed the initial genetic work by creating various genetic constructs. Then, DeKalb "transformed" corn cells by placing RPA's constructs into corn cells, grew full corn plants from the transformed cells in the greenhouse, and finally, in the field, grew full corn plants from the seeds of the greenhouse plants. At each stage, DeKalb tested the transformed cells and plants for glyphosate resistance. Neither party had the capability to perform the other party's role in this collaboration, and both roles were necessary in order to produce glyphosate resistant corn.

Under this collaboration, genetic material other than the CT-7 gene was transferred from one company to the other. On June 17, 1991, at the first joint meeting of RPA and DeKalb after the 1991 Agreement was signed, the companies agreed that any material transferred between the companies would be subject to a Confidentiality Agreement originally entered into by Calgene and DeKalb [*8] in 1984. Material transferred under this Confidentiality Agreement was to be used for "the limited purpose of . . . investigation and evaluation. No rights to manufacture, license or otherwise deal in or with the Information shall be acquired by the receiving party, directly or indirectly, by reason of its receipt of the Information." (Pl.'s Ex. 1, 1984 Confidentiality Agreement P 4.) The term "Information" was defined to include, among other things, maize regulatory sequences, maize transposable elements, and corn genes. (Id. P 2.)

At a November 1992 meeting, Dr. Georges Freyssinet of RPA told Dr. Catherine Mackey of DeKalb that RPA would provide to DeKalb new genetic material containing a mutated EPSPS gene from corn (as opposed to the bacterial CT-7 gene) on which RPA had been working. In return for providing these new constructs, Dr. Mackey agreed that DeKalb would provide RPA with the results of its testing of the constructs. n3 Also at this meeting, RPA notified DeKalb of its decision to withdraw from at least some of its responsibilities under the 1985/1991 Agreements.

n3 Whether Drs. Freyssinet and Mackey entered a binding agreement was contested in the first trial of this matter. The jury determined, among other things, that an agreement was made at this November 1992 meeting.

[*9]

When Dr. Freyssinet returned from this meeting, he requested that Dr. Rick DeRose, an RPA scientist, pre-

pare various constructs of the mutated corn gene to send to DeKalb. Pursuant to that end, Dr. DeRose combined an optimized transit peptide ("OTP") with a maize EPSPS gene that had been mutated at two different locations in the amino acid sequence (the "double mutant maize EPSPS gene"). This new construct, consisting of the OTP and the double mutant maize EPSPS gene, is the subject of RPA's trade secret misappropriation claim, and was designated as "RD-125." The OTP is covered by Claim 11 of U.S. Patent 5,510,471 (" '471 patent") n4 and is the subject of RPA's patent infringement claim. Dr. DeRose transferred RD-125 to DeKalb in February 1993. n5

> n4 On December 14, 1999, the '471 patent was reissued as Patent RE 36,449. In this Opinion, the Court will continue to use the '471 designation.

> n5 Dr. DeRose transferred other constructs to DeKalb at the same time; however, only the content and combination of the RD-125 are the subject of this lawsuit.

[*10]

In late 1993 and early 1994, in a greenhouse, DeKalb succeeded in growing transformed corn plants that contained RPA's RD-125 construct and were resistant to Roundup herbicide at potentially commercial levels. On February 18, 1994, DeKalb sent RPA a report of its results, stating that:

> We have now demonstrated tolerance in transgenic plants in the greenhouse to up to four times the field application recommended by Monsanto for tolerant corn! We will repeat these experiments in the field in the summer of 1994. It is obvious from these results that the mutant maize gene has been the key to success.

(Pl.'s Ex. 241.) Dr. Freyssinet of RPA responded with a three sentence letter stating: "I thank you for the report on development of glyphosate resistant corn. The results look good[.] I hope they will be confirmed by the field experiments." (Pl.'s Ex. 242.) Then, on March 10, 1994, DeKalb sent RPA another letter that once again mentioned the summer field trials and the gains in glyphosate tolerance DeKalb had achieved in the greenhouse with RD-125. (Pl.'s Ex. 245.) In addition, that letter requested RPA's opinion regarding the use of RD-125 for other projects, and also [*11] requested a response to the

"many questions" that need to be answered regarding the "recent successes" of RD-125. (Id.)

DeKalb conducted field tests in Hawaii in the summer of 1994, and on September 6, 1994, DeKalb received results from the tests that indicated that corn plants containing RPA's RD-125 were resistant to four times the normal level of Roundup herbicide. The report from the field testing was not sent to RPA. Rather, on September 7, 1994, Dr. Chris Flick of DeKalb sent RPA a letter which stated, in its entirety, that:

> As the results that we have obtained in maize with the glyphosate resistant double mutant maize gene provided by RPA to DEKALB have been very encouraging, we are interested in whether this gene would also function as a selectable marker in soybeans. Is it possible for DEKALB to use this gene in soybeans as a selectable marker?

> I will await your answer.

(Pl.'s Ex. 310.) In 1994, these letters were the extent of the communications between DeKalb and RPA regarding RD-125 and its introduction into corn lines. Following the tests, DeKalb immediately began backcrossing the plants with RD-125 with its Elite lines of corn. (April 14, 1999 tr. p. [*12] 230; April 15, 1999 tr. pp. 4 1, 42)

Also during the summer of 1994, Calgene and RPA filed a patent infringement action against Monsanto in which Calgene and RPA accused Monsanto of using the patented technology contained in the Comai patents in making, using, and selling glyphosate resistant soybeans. Calgene owned the Comai patents, and RPA had certain exclusive rights under these patents in soybeans. DeKalb also had an interest in the litigation, because under the 1985 Agreement, DeKalb was the exclusive licensee of the Comai patents in the field of use of corn.

In December 1994, two agreements were negotiated arising from these events. First, RPA, Calgene, and Monsanto agreed to a settlement of the patent litigation begun in July 1994. Monsanto paid $ 8 million in return for a co-exclusive license (shared in part with DeKalb) under the Comai patents, for use in all fields. Concurrent with this settlement process, RPA and DeKalb entered a new agreement (the "1994 Agreement") in which DeKalb agreed to share its exclusive license under the Comai patents in the field of use of corn with Monsanto. Under the 1994 Agreement, DeKalb was provided with $ 500,000 as its share of the Monsanto [*13] settlement proceeds. Moreover, the 1994 Agreement dissolved the 1985 and 1991 Agreements, and RPA granted DeKalb the "world-wide, paid-up right to use" various technolo-

gies, including RD-125, in the field of use of corn. The 1994 Agreement also gave DeKalb "the right to grant sublicenses to the aforementioned right to use" the technologies.

DeKalb eventually developed a glyphosate-tolerant corn line containing RD-125, named the "GA21 corn line." In January 1996, DeKalb and Monsanto entered an agreement to work together on a variety of projects, including glyphosate-tolerant corn, and DeKalb licensed to Monsanto the GA21 corn line, which included the RD-125 construct. Subsequently, corn seeds from GA21 were commercialized and marketed by Monsanto and DeKalb under the brand name "Roundup Ready." Sales of Roundup Ready corn seeds began in 1998.

Other facts will be discussed as needed in the legal conclusions sections of this Opinion, infra. n6

> n6 An index can be found at the end of this Opinion. The index indicates the page number on which each section and subsection of the Opinion begins.

[*14]

## II. PROCEDURAL HISTORY

RPA's First Supplemental and Amended Complaint ("Complaint") contained six claims: (I) misappropriation of RPA technology by DeKalb and Monsanto; (II) breach of the 1991 Agreement by DeKalb; (III) breach of the covenant of good faith and fair dealing as to the 1994 Agreement by DeKalb; (IV) rescission of the 1994 agreement; (V) patent infringement against Monsanto and DeKalb; and (VI) antitrust violations against Monsanto and DeKalb. (See Compl. [Doc. # 68].) Count II was dismissed with prejudice pursuant to a stipulation approved by the Court on February 2, 1999. (Stipulation of Voluntary Dismissal [Doc. # 242], at 1.) Both Defendants have filed motions to dismiss Count VI, which are under consideration by the Court. Discovery on Count VI has been postponed until after the Court rules on these motions.

DeKalb initially made two counterclaims: (I) RPA's breach of the 1994 Agreement; and (II) RPA's breach of the 1991 Agreement. (DeKalb's Answer [Doc. # 78].) The first counterclaim was dismissed pursuant to a stipulation approved by the Court on February 2, 1999. (Stipulation of Voluntary Dismissal [Doc. # 242], at 1.)

Monsanto initially made [*15] a single counterclaim for tortious interference. (Amended Answer and Countercl. [Doc. # 74].) However, this counterclaim also was dismissed pursuant to a stipulation approved by the

Court on February 2, 1999. (Stipulation of Voluntary Dismissal [Doc. # 242], at 1.)

On February 23, 1999, both Defendants amended their Answers to include subsequent counterclaims. (DeKalb's Amended Counterclaim [Doc. # 260]; Monsanto's Amended Counterclaim [Doc. # 261].) DeKalb made three counterclaims: (I) breach of the 1994 Agreement; (II) breach of the Covenant of Good Faith and Fair Dealing of the 1994 Agreement; and (III) patent infringement. Monsanto made three counterclaims as well: (I) breach of the 1994 Settlement Agreement; (II) breach of the covenant of good faith and fair dealing of the 1994 Settlement Agreement; and (III) patent infringement.

Granting a motion by the Defendants, the Court bifurcated the trial of RPA's claims so that a first jury would resolve the issues of licensing and ownership of RD-125, and if necessary (i.e., if DeKalb and Monsanto were not licensed), a second jury would consider RPA's patent claim. Cross-motions for summary judgment were filed prior to the [*16] first phase. The Court denied summary judgment on RPA's rescission claim, and deferred decision on the remaining counts until after it was determined in the first trial whether the 1994 Agreement would be rescinded.

On April 21, 1999, at the end of the first phase, the jury found that RPA agreed to allow DeKalb to use the RD-125 construct in return for DeKalb's agreement to provide the results of its testing to RPA. The jury found that this agreement existed in three forms: as an oral contract made between Dr. Freyssinet of RPA and Dr. Mackey of DeKalb at the Mystic, Connecticut meeting in November 1992; as an implied contract formed by the parties' conduct after the Mystic meeting; and as a modification of the 1985/1991 Agreements. (Jury Verdict [Doc. # 361], at 1-2.) Moreover, the jury found that DeKalb breached this agreement by not providing the results of the Hawaii field tests in the summer of 1994, and that this breach caused RPA to enter the 1994 Agreement on different terms than it otherwise would have. (Id. at 2.) Finally, the jury found that DeKalb fraudulently induced RPA to enter the 1994 Agreement on the terms that it did. The jury awarded RPA $ 15 million for [*17] DeKalb's unjust enrichment, $ 1 in nominal damages, and $ 50 million in punitive damages.

Based upon the assumption that the Court would rescind the 1994 Agreement as a result of this verdict, the Court and the parties moved forward to the second phase of the case, which adjudicated RPA's trade secret misappropriation and patent infringement claims. n7 At a motions hearing on April 26, 1999, the effect of the jury's verdict on the remainder of the case was discussed, several outstanding motions were resolved, n8 and various

claims and counterclaims were dismissed with prejudice.
n9

n7 Because of a misunderstanding between the Court and the parties, the parties agreed to move the trade secret misappropriation claim to the second phase. As a result, Monsanto was dismissed from the first phase because Monsanto was not a party to any contract with RPA to provide results from testing the RD-125, and no evidence was adduced that Monsanto was involved in any fraud.

n8 At the motions hearing, the parties agreed that the following motions in limine should be DENIED as MOOT: (1) RPA's Motion in Limine to Exclude Certain Testimony regarding Monsanto's Best Mode Defense [Doc. # 365]; (2) Defendants' Joint Motion in Limine to Preclude Testimony by RPA Witness Michael Freeling [Doc. # 383]; and (3) Monsanto's Motion in Limine to Preclude Proffer of Declarations as Evidence Experiments were Performed [Doc. # 385].

[*18]

n9 RPA withdrew its third claim, for breach of the covenant of good faith and fair dealing of the 1994 Agreement. Thus, Defendants' Motions for Summary Judgment [Docs. # 216 & # 222] are DENIED as MOOT as they pertain to RPA's Count III. DeKalb withdrew its counterclaim for RPA's alleged breach of the 1991 Agreement. Therefore, RPA's motion for summary judgment on this counterclaim [Doc. # 225] is DENIED as MOOT.

DeKalb's third counterclaim involved an alleged breach by RPA of the 1994 Agreement and its fourth counterclaim involved an alleged breach of the covenant of good faith and fair dealing of the same 1994 Agreement. As the 1994 Agreement will be rescinded, DeKalb's third and fourth Counterclaims are DISMISSED as MOOT. Moreover, RPA's motion to dismiss these counterclaims [Doc. # 275] is DENIED as MOOT; however, this decision does not affect the second part of RPA's Motion to Dismiss [Doc. # 275], which addresses Monsanto's second and third counterclaims.

Most important for the second phase of the trial, RPA voluntarily withdrew a portion of its claims for patent infringement in [*19] Count V of the Supplemen-

tal Complaint: Claims 15 and 17 of U.S. Patent 5,633,448 (" '448 patent"). Thus, the only patent claim adjudicated in the second phase of the trial was Claim 11 of the '471 patent. In response to this announcement, both DeKalb and Monsanto conceded that they did not retain any claim of noninfringement as to the '471 patent. Before the second phase of the trial began, the Court ruled that Monsanto was a bona fide purchaser from DeKalb of a license for both the OTP, which is the subject of the '471 patent, and the RD-125 construct. As such, Monsanto could not be held liable by RPA for patent infringement based on the '471 patent or for trade secret misappropriation based on the RD-125 construct. Therefore, Claims I and V against Monsanto were dismissed.

Also prior to the second phase of the trial, the Court ruled that DeKalb could not present to the jury a defense that it was licensed to use the OTP and the RD-125 construct under a modification of the 1985/1991 Agreements. The first jury had found that DeKalb breached any such modification by not disclosing the 1994 field test results, and the Court determined that DeKalb's breach necessarily was material to any [*20] modification of those agreements. Therefore, the Court ruled that DeKalb could not rely for its license defense upon the very contracts it had materially breached.

Ultimately, then, four issues were presented to the jury in the second phase of the trial. First, the jury determined that the RD-125 was a trade secret from April 1996 until February 1997, and that DeKalb misappropriated that trade secret by transferring it to Monsanto and by using it in its commercial Roundup Ready corn. Second, the jury determined that Claim 11 of the '471 patent was not obvious; therefore it was enforceable by RPA against DeKalb. Third, the jury -- serving in an advisory capacity on DeKalb's inequitable conduct defense -- found that a declaration submitted to the Patent and Trademark Office was not fraudulent. Fourth, the jury declined to award punitive damages against DeKalb for its trade secret misappropriation. n10 Moreover, the parties agreed that the Court would determine whether DeKalb's infringement of the '471 patent was willful.

n10 The parties stipulated to the amount of compensatory damages for which DeKalb was liable for its trade secret misappropriation.

[*21]

The case now comes before the Court for resolution of several issues. The Court first will address all of the parties' motions for judgment as a matter of law, as well as explain several rulings of law it made during the course of the trial. Next, the Court will address DeKalb's

various motions for a new trial. Finally, the Court will resolve all issues relating to remedies and damages.

## III. MOTIONS FOR JUDGMENT AS A MATTER OF LAW

Pursuant to Federal Rule of Civil Procedure 50(b), after each jury verdict, DeKalb renewed its motion for judgment as a matter of law, which it had made at the close of evidence. The text of [HN1] Federal Rule of Civil Procedure 50(b) states, in part,

> if, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment -- and may alternatively request a new trial or join a motion for a new trial under Rule 59. In ruling [*22] on a renewed motion, the court may: (1) if a verdict was returned:
>
> > (A) allow the judgment to stand,
> > (B) order a new trial, or
> > (C) direct entry of judgment as a matter of law . . .

Fed. R. Civ. P. 50(b). [HN2] All evidence should be viewed in the light most favorable to the prevailing party, here RPA, and all reasonable inferences should be drawn in its favor. See Konkel v. Bob Evans Farms, Inc., 165 F.3d 275, 279 (4th Cir. 1999). DeKalb's Rule 50(b) motion should be denied if, giving RPA the benefit of every legitimate inference in its favor, there was evidence upon which a jury could reasonably return a verdict for RPA. See Cline v. Wal-Mart Stores, Inc., 144 F.3d 294, 301 (4th Cir. 1998). In making this determination, the Court is not permitted to retry factual findings or credibility determinations reached by the jury. See id. Rather, the Court should assume that testimony in favor of RPA is credible, "unless totally incredible on its face," and ignore the substantive weight of any evidence supporting the moving party. Id. (quoting Duke v. Uniroyal, Inc., 928 F.2d 1413, 1419 (4th Cir. 1991)).

A Rule 50(b) motion [*23] should be granted only if the Court determines, "without weighing the evidence or considering the credibility of the witnesses, that sub-

stantial evidence does not support the jury's findings." Konkel, 165 F.3d at 279.

### III (A)

The first phase of the trial in this matter involved RPA's claim, under Count IV of its Complaint, for rescission of the 1994 Agreement based upon fraudulent inducement. RPA asserted that DeKalb fraudulently induced it to enter the 1994 Agreement by not disclosing the results of the 1994 field tests. Originally, RPA based its claim for rescission on both constructive and actual fraud. In its summary judgment Memorandum Opinion [Doc. # 327], this Court determined that genuine issues of material fact existed with regard to each theory.

[HN3] Constructive fraud arises when a party to a confidential or fiduciary relationship breaches a duty that has been implied by law because of the special relationship between the parties. See Watts v. Cumberland County Hosp. Sys., Inc., 317 N.C. 110, 115-16, 343 S.E.2d 879, 883-84 (1986). Although RPA initially asserted several bases under which such a relationship could be found, the Court, in [*24] its April 1, 1999 Memorandum Opinion, determined that a genuine issue of material fact existed only as to whether RPA and DeKalb were engaged in a joint venture together. (Mem. Op. [Doc. # 327], at 16.) Thus, at trial, RPA asserted that it was engaged in a joint venture with DeKalb and that DeKalb, by not disclosing the field test results, breached a fiduciary duty owed to RPA as a joint venturer. However, before the case was submitted to the jury and for the reasons set forth below, n11 the Court ruled, as a matter of law, that RPA and DeKalb were not engaged in a joint venture. Therefore, the jury was not permitted to consider RPA's constructive fraud claim. n12

---

n11 See discussion infra Part III(A)(i).

n12 Nor was the jury instructed that, under an actual fraud claim, a "duty to disclose" may arise if the concealing party has a fiduciary or confidential relationship with the allegedly defrauded party.

---

[HN4] The elements of actual fraud are: (1) a false representation or concealment of a material fact; [*25] (2) that was reasonably calculated to deceive; (3) which was made with the intent to deceive; (4) that did in fact deceive (or reasonably induce reliance); and (5) resulted in injury or damage. See 15 N.C. Index 4th, Fraud, Deceit, etc. § 7 (1992); cf. Myers & Chapman, Inc. v. Thomas G. Evans, Inc., 323 N.C. 559, 568, 374 S.E.2d 385, 391 (1988). n13 RPA did not assert that DeKalb made any affirmative false statements regarding the field test results. Therefore, in order to satisfy the first element

of its fraud claim, RPA was required to prove that DeKalb had a duty to disclose the field test results. See Setzer v. Old Republic Life Ins. Co., 257 N.C. 396, 399, 126 S.E.2d 135, 137 (1962) (holding that [HN5] fraud can be practiced by silence as well as by a positive misrepresentation, if a duty to speak exists). RPA asserted that this duty to disclose arose either from a contractual duty of DeKalb's or from a partial or ambiguous statement made by DeKalb in order to mislead RPA. In its Memorandum in Support of its Motion for Judgment as a Matter of Law [Doc. # 517], DeKalb asserts that RPA failed to satisfy any of the five elements for actual fraud. [*26] (Id. at 3-19.)

n13 Although the Court relied on both North Carolina and Illinois law in its summary judgment opinion, (Mem. Op. [Doc. # 327], at 9), the Court later determined that North Carolina law applies to the fraud claims.

However, for the reasons set forth below, the Court determines that substantial evidence supports the jury's finding that DeKalb, realizing the economic potential of RD-125, fraudulently induced RPA to enter the 1994 Agreement by intentionally concealing information about the efficacy and potential value of RD-125 and taking affirmative steps to create a false impression about the success of RD-125.

Although a breach of contract claim was not specifically pled by RPA, the evidence demonstrated and the jury found that DeKalb breached a contractual duty to keep RPA informed of test results. Therefore, the Court, under Federal Rule of Civil Procedure 15(b), will amend the pleadings to add a claim for breach of contract, in order to conform to the evidence. See discussion infra [*27] Part III(A)(iii).

III (A) (i)

After the close of RPA's case-in-chief, the Court ruled there was insufficient evidence to support a jury finding that RPA and DeKalb were engaged in a joint venture, and, therefore, the jury was not instructed regarding RPA's constructive fraud claim. Nor was the jury instructed that, under an actual fraud claim, a "duty to disclose" may arise if the concealing party has a fiduciary or confidential relationship with the allegedly defrauded party. This Part of the Memorandum Opinion will explain that decision.

[HN6] Constructive fraud arises when a party to a confidential or fiduciary relationship breaches a duty that has been implied by law because of the special relationship between the parties. See Watts, 317 N.C. at 115-16, 343 S.E.2d at 883-84. When a fiduciary relationship exists, a presumption of fraud is raised when the superior party obtains a possible improper benefit from the relationship. See id. In this case, if DeKalb, the transferee of RD-125, stood in a confidential or fiduciary relationship to RPA, the transferor of RD-125, it would be the duty of DeKalb "to exercise the utmost good faith in the transaction" and to disclose [*28] to the transferor all material facts relating thereto. Vail v. Vail, 233 N.C. 109, 114, 63 S.E.2d 202, 206 (1951). Similarly, [HN7] in a fraudulent omission case, a duty to disclose material information may arise "where a fiduciary relationship exists between the parties to the transaction." Harton v. Harton, 81 N.C. App. 295, 297, 344 S.E.2d 117, 119 (1986). [HN8] As a matter of law, a fiduciary relationship exists between members of a joint venture. See Reese v. Melahn, 53 Ill. 2d 508, 513, 292 N.E.2d 375, 379 (1973). n14

n14 The reason for using Illinois law is explained infra.

To determine whether a joint venture existed, the Court first determined the appropriate law to apply. [HN9] As a federal court applying state law, this Court applied the choice of law rules of the jurisdiction in which it sits. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496, 85 L. Ed. 1477, 61 S. Ct. 1020 (1941). [HN10] Under North Carolina's choice of law rules, the interpretation [*29] of a contract is governed by the law of the place where the contract was made. See Tanglewood Land Co. v. Byrd, 299 N.C. 260, 262, 261 S.E.2d 655, 656 (1980). However, if the parties to the contract have agreed that a given jurisdiction's substantive law will govern the interpretation of the contract, then a North Carolina court will give effect to that contractual provision. See id.

In its pretrial briefing, RPA asserted that a joint venture was created by DeKalb and RPA under the 1985 and 1991 Agreements. (RPA Answering Br. [Doc. # 246], at 12.) The 1985/1991 Agreements had a choice of law provision that designated Illinois law as the proper law to apply to disputes arising from the Agreements. (Pl.'s Ex. 2, Art. 8.9, at 19.)

[HN11] In Illinois, a joint venture is

an association of two or more persons [or entities] to carry out a single enterprise for profit. A formal agreement is not essential to establish a joint venture. Rather, the existence of a joint venture may be inferred from the facts and circumstances demonstrating that the parties in fact entered into

a joint venture. In determining whether a joint venture exists, the intent of the parties [*30] is the most significant element.

O'Brien v. Cacciatore, 227 Ill. App. 3d 836, 843, 591 N.E.2d 1384, 1388-89, 169 Ill. Dec. 506, 510-11 (1992) (citations omitted). [HN12] The following elements must be present for a joint venture to exist: (1) an agreement, either express or implied, to carry on a single enterprise with a legitimate purpose; (2) a community of interest in the purpose; (3) expectation of profits; (4) duty to share profits and losses; and (5) the right of each person to direct and govern the conduct of the other members of the venture. See Pinkowski v. Coglay, 347 F.2d 411, 413 (7th Cir. 1965); O'Brien, 227 Ill. App. 3d at 843, 591 N.E.2d at 1389, 169 Ill. Dec. at 511. The burden of proving that a joint venture exists is on the party claiming that such a relationship exists, and whether or not a joint venture exists typically is a question of fact for the trier of fact. See O'Brien, 227 Ill. App. 3d at 843, 591 N.E.2d at 1389, 169 Ill. Dec. at 511. However, in this case, RPA did not present sufficient evidence of an essential element, i.e., dual control over the relationship. " [HN13] Possibly, the most important [*31] criterion of a joint venture is joint control and management of the property used in accomplishing its aims." Herst v. Chark, 219 Ill. App. 3d 690, 694, 579 N.E.2d 990, 992, 162 Ill. Dec. 176, 178 (1991). "The legal requirement of a right to management or control has been interpreted as requiring some right by the parties to direct and govern the conduct of each other in connection with the joint venture." Id. at 696, 579 N.E.2d at 994, 162 Ill. Dec. at 180.

The evidence presented at trial did not support the view that RPA and DeKalb were able to "direct and govern" each other's conduct. Rather, each party completed its work for the project independently. Indeed, the relationship between the parties developed because each party perceived the other as having the ability to complete different aspects of the research necessary to produce glyphosate tolerant corn. (Apr. 7, 1999 Tr. [Doc. # 483], at 136.) RPA was an expert in genetic research and in creating various genetic constructs, while DeKalb's expertise involved taking a genetic construct and "transforming" it into corn. (Apr. 12, 1999 Tr. [Doc. # 486], at 213-14; Apr. 13, 1999 Tr. [Doc. # [*32] 487], at 20-21.) Each company needed the other to complete its own part of the project in order for the overall project to be successful. No evidence was presented of any DeKalb employee directing RPA on how to complete its genetic research and development. Nor was any evidence presented of RPA directing DeKalb's efforts to transform corn and to grow corn from seeds generated through the transformation process. In fact, the creator of RD-125,

Dr. Rick DeRose of RPA, testified that he could not provide support for DeKalb's experiments with RD-125 after he gave the construct to DeKalb, because RPA was

> responsible for making these constructs, and DeKalb was responsible for actually getting these constructs into corn. So unless they needed information on how these constructs were made or how to test these constructs to see if they're working, we didn't have any more real input into what was going on.

(Apr. 8, 1999 Tr. [Doc. # 484], at 54.) Dr. DeRose had never even witnessed transformed corn until he visited DeKalb's laboratory in Mystic, Connecticut in August 1993. (Id. at 62-63.)

Of course, the companies did participate in "Project Review Committee" meetings, [*33] pursuant to the 1985/1991 Agreements. This Committee, according to the 1985/1991 Agreements, consisted of three members from each company and had "general oversight responsibility for the progress of each party." (1985 Agreement, Pl.'s Ex. 2, P 6.1, 6.2.) Periodically, the Committee met to "report to each party . . . on all results achieved in their respective work . . . [and to] coordinate interaction of activities and results from work to achieve Benchmark objectives of developing Products in the most expeditious fashion." (Id. at P 6.3.) The then-President of Calgene, Roger Salquist, testified that the project was a "jointly-managed project" through the Project Review Committee prior to 1991. (Apr. 7, 1999 Tr. [Doc. # 483], at 135.)

However, the Committee's relevance to this analysis is minimal because in November 1992, RPA gave DeKalb official notice that it was ending its participation in the glyphosate resistance project and in the Project Review Committee meetings, and there was no evidence that the parties ever discussed or even contemplated another meeting. n15 From that point forward, any semblance of the "joint management" to which Mr. Salquist testified was non-existent. [*34] While the companies did communicate after RD-125 was transferred, typically these communiques were not examples of "joint control"; rather the letters were merely the exchange of potentially useful information. The evidence was unequivocal that, even if the Project Review Committee provided some element of "joint control" over the glyphosate resistance collaboration prior to 1992, once the RD-125 was transferred to DeKalb, RPA had almost no input into DeKalb's work with the construct, the Project Review Committee never met again, nor was ever scheduled to

meet again. Therefore, at least after RPA withdrew from the Project Review Committee meetings -- and the collaboration generally -- no joint venture between the companies existed. See Electrical Contractors, Inc. v. Goldberg & O'Brien Electric Co., 29 Ill. App. 3d 819, 823, 331 N.E.2d 238, 242 (1975) (" [HN14] Where the right to control is lacking, a joint enterprise does not exist." (quoting Bainbrich v. Wells, 28 Colo. App. 432, 476 P.2d 53, 54 (1970) (internal quotation marks omitted))).

n15 Dr. Freyssinet testified that RPA was merely "suspending" its involvement in the project.

[*35]

III (A) (ii)

In the Memorandum in Support of its Motion for Judgment as a Matter of Law [Doc. # 517], DeKalb asserts that RPA failed to satisfy any of the five elements for actual fraud. (Id. at 3-19.) Viewed in the light most favorable to the prevailing party -- here, the plaintiff -- the evidence tended to show the following:

In November 1992, at the last project review meeting between the parties, DeKalb requested that RPA permit it to experiment with the non-Comai, double mutant maize EPSPS gene, which had been developed by Dr. Rick DeRose of RPA and which was showing some early promise in the lab for conferring glyphosate resistance. In return, DeKalb, which had the technology to transform corn plants with this genetic material, promised to keep RPA, which did not have that technology, informed about the progress of its experiments.

Dr. DeRose combined the double mutant gene with an "Optimized Transit Peptide" developed by RPA, named the combination RD-125, and sent the construct to DeKalb. Throughout 1993, Dr. DeRose kept in contact with the scientists from DeKalb, including Michael Spencer and Dr. Flick. (Apr. 8, 1999 Tr. [Doc. # 484], at 54-66.) The two companies [*36] exchanged information periodically and Dr. DeRose visited DeKalb's facility in Mystic, Connecticut in August 1993. (Apr. 8, 1999 Tr. [Doc. # 484], at 60.) Moreover, in 1993 and 1994, a pattern developed whereby DeKalb updated RPA about information it had gathered from various phases of testing the construct, (Pl.'s Ex. 211, 241), and asked for RPA's permission to use the construct for other purposes, (Pl.'s Ex. 245, 262). Consistent with its promise to keep RPA informed of test results, DeKalb timely provided a complete copy of a February 1994 report discussing laboratory testing in which plants grown from individual cells transformed with RD-125 had survived an application of glyphosate four times stronger than a normal

commercial application. The cover letter accompanying the report characterized the results as "encouraging" and the material referred to upcoming field trials during the summer of 1994.

Researchers in this area understood that success in the laboratory seldom meant success when an experiment was carried into the field. In fact, there had never been successful field testing for resistance to commercial application levels of glyphosate in corn plants grown from seeds. [*37]

On September 6, 1994, Chris Flick learned of the successful Hawaii field tests. He understood that this was the first time corn grown from seeds and planted outdoors had withstood application of four times commercial levels of glyphosate and he understood this was one of the biggest happenings in the nine-year history of the project. The following day, September 7, 1994, Flick wrote to Dr. Freyssinet about RD-125 but mentioned nothing about the Hawaii testing. Instead, using the same adjective phrase employed when forwarding the descriptions of the February lab tests, he simply stated that since DeKalb had obtained "very encouraging" results in maize with the double mutant maize gene it would like permission to also use the gene in soybeans as a selectable marker. (Pl.'s Ex. 310)

That same day, September 7th, DeKalb lawyer Doug Fisher, who also was aware of the Hawaii field test results, wrote his RPA counterpart and encouraged a hastened agreement between DeKalb and RPA in preparation for the settlement with Monsanto regarding Monsanto's alleged infringement of the Comai patents. It had been understood that part of the agreement between DeKalb and RPA would relate to RPA granting [*38] certain rights and/or licenses to DeKalb regarding the use of Comai gene constructs. Afterward, Fisher and Flick, in putting together the list of genetic materials to be licensed, included RD-125, a non-Comai construct, when neither of them nor anyone else from DeKalb had informed RPA about the Hawaii tests.

When, during discovery, RPA requested Fisher's notes made contemporaneously with these matters, it was learned they had been destroyed.

When, during his video deposition, Dr. Flick was asked why he had not informed Dr. Freyssinet in the September 7th letter about the Hawaii field trials, he responded that to do so would have required that he write a longer letter. When asked why he could not have written a longer letter, he paused, considered the question, and eventually replied that he really could not think of a reason.

In fact, DeKalb never informed RPA directly about the field success of RD-125. RPA's first indication that

DeKalb had achieved positive results beyond the initial lab tests reported in February 1994 was in December 1996. (Def.'s Ex. 82 (Michael Spencer e-mail to Rick DeRose)). Yet, it was not until the Fall of 1997, when Dr. DeRose saw DeKalb's APHIS application [*39] for sale of a commercial product, that RPA became aware of DeKalb's commercialization of that material. (Apr. 8, 1999 Tr. [Doc. # 484], at 80 (DeRose Test.).)

In addition to the historical facts, the jury was entitled to consider the demeanor of the DeKalb witnesses and their explanation of those historical facts. While it may have been the result of illness or the natural apprehension of a person not accustomed to being video-deposed or, perhaps, some other perfectly innocent reason, Dr. Flick's answers and, especially, his manner of answering questions -- hesitation of response and rapid eye movements back and forth -- most reasonably could have been interpreted as indicative of deception. Dr. Mackey's assertion to the effect that she was ecstatic about the February 1994 RD-125 lab results, but not even excited about the Hawaii field trial results, permissibly could have been received with skepticism as could her testimony that, at the end of 1994, RPA knew as much about the efficacy of RD-125 transformed corn as did DeKalb.

In sum, the evidence warranted findings that: DeKalb had promised to keep RPA informed of test results and knew RPA was relying on it to do so, especially [*40] since the full results of the successful lab tests had been provided; that immediately after learning of the Hawaii results Dr Flick wrote the "soybean" letter -- using the same word "encouraging" as had been used in the February lab report cover letter -- for the purpose of lulling RPA into believing DeKalb was maintaining open communications and that there had been no further positive results so that DeKalb could gain full rights to RD-125 and a huge advantage over other potential competitors.

Again, the elements of actual fraud are: (1) a false representation or concealment of a material fact; (2) that was reasonably calculated to deceive; (3) which was made with the intent to deceive; (4) that did in fact deceive (or reasonably induce reliance); and (5) resulted in injury or damage.

The materiality of the field test results cannot be seriously contested. The test results provided significant evidence that a substantial hurdle to glyphosate resistance had been cleared. For the first time, corn plants grown from seed in the field had demonstrated significant levels of glyphosate resistance. Scientific experts testified that the field results were more meaningful than the greenhouse [*41] studies because they more closely approximated real-life conditions. Several RPA wit-nesses testified that they would not have recommended entering the 1994 Agreement had they known of the results. Moreover, the fact that, after DeKalb received the results, it immediately began backcrossing the GA21 lines in order to begin the commercialization process supports the conclusion that the test results were material.

In addition to materiality, in order to satisfy the first element of its fraud claim, RPA was required to prove that DeKalb had a duty to disclose the field test results. See Setzer v. Old Republic Life Ins. Co., 257 N.C. 396, 399, 126 S.E.2d 135, 137 (1962) (holding that fraud can be practiced by silence as well as by a positive misrepresentation, if a duty to speak exists). As this Court has noted, " [HN15] in fraudulent omission cases the obligation imposed on parties is not always . . . easy to ascertain because the scope of the duty to disclose can vary between different situations and jurisdictions." Breeden v. Richmond Community College, 171 F.R.D. 189, 194 n.4 (M.D.N.C. 1997). In North Carolina, a legal duty to disclose material information [*42] can arise "from a relation of trust, from confidence, inequality of condition and knowledge, or other attendant circumstances." Setzer, 257 N.C. at 399, 126 S.E.2d at 137 (quoting 23 Am. Jur., Fraud & Deceit, § 77). Although there is no fiduciary relationship in the instant case, (see discussion supra Part III(A)(i); Mem. Op. [Doc. # 327], at 9-18), there are other "attendant circumstances" that support the jury's conclusion that DeKalb had a duty to disclose the field test results to RPA.

DeKalb had promised disclosure in order to obtain permission to conduct research with the double mutant maize gene and knew that RPA had reason to expect that, because of that promise, it would be fully informed of significant test results. It is in the context of that relationship and that expectation that Dr. Flick's September 7, 1994 fax to Dr. Freyssinet must be examined with regard to its timing -- one day after receiving word of the Hawaii tests, its wording -- referring to the double mutant maize gene only in the same general terms used after the February lab tests, and, most notably, its lack of any mention of the Hawaii tests -- which Dr. Flick himself described [*43] (Tr. April 13, 1999, p. 14) as one of the most significant occurrences in DeKalb's glyphosate resistance project, a project which at that time was at least nine years old. In this context, Dr. Flick's letter reasonably could be considered a "partial or ambiguous" statement that imposed upon DeKalb a duty to disclose the field test results. n16 Such a duty would arise from a common-law duty to correct misleading statements. n17 See Ragsdale v. Kennedy, 286 N.C. 130, 139, 209 S.E.2d 494, 501 (1974) ("Even though a vendor may have no duty to speak under the circumstances, nevertheless if he does assume to speak he must make a full and fair dis-

closure as to the matters he discusses."); Shaver v. N.C. Monroe Constr. Co., 63 N.C. App. 605, 614-15, 306 S.E.2d 519, 525 (1983) (holding that, after a letter to employees impliedly represented that contributions were being made to a pension plan and after an employee was told that the plan was still "intact," the employer could have a duty to disclose the full truth that the plan had been terminated).

n16 The Restatement (Second) of Torts provides in pertinent part that:

> [HN16]
> (1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question. (2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated, ...(b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and...(e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

Restatement (Second) of Torts § 551 (1977).
[*44]

n17 Other instances in which a legal duty to disclose may arise are: (1) where a fiduciary relationship exists between the parties to the transaction; and, outside of a fiduciary relationship in which the parties are dealing at arm's length, (2) where a party has taken affirmative steps to conceal material facts from the other and (3) where one party has knowledge of a latent defect in the subject matter of the negotiations about which the other party is both ignorant and unable to discover through reasonable diligence. See Harton v. Harton, 81 N.C. App. 295, 297-98, 344 S.E.2d 117, 119 (1986).

Similar and in addition to the rule involving a partial or ambiguous statement, [HN17] a duty to disclose arises when a party has taken affirmative steps to conceal material facts. See Harton v. Harton, 81 N.C. App. 295, 297-98, 344 S.E.2d 117, 119 (1986). As one authority provides:

> It is a basic principle in the law of fraud in respect of the effect of nondisclosure that the proposition that in the absence of a duty to speak, nondisclosure is not fraudulent, presupposes [*45] mere silence, and is not applicable where, by words or conduct, a false representation is intimated or any deceit practiced. Moreover, the rule that fraud cannot be predicated on a failure to disclose facts where the information is as accessible to one party as to the other, and where the truth may be ascertained by the exercise of reasonable diligence, does not justify a resort to active deceit or fraud, and hence does not apply where a party, in addition to nondisclosure, uses any artifice to throw the other party off his guard or to lull him into a false security. Therefore, each party to a contract must take care not to say or do anything tending to impose upon the other.
>
> [HN18] Concealment becomes a fraud where it is effected by misleading and deceptive talk, acts, or conduct, where it is accompanied by misrepresentations, or where, in addition to a party's silence there is any statement, word, or act on his part which tends affirmatively to a suppression of the truth, to a covering up or disguising of the truth, or to a withdrawal or distraction of a party's attention from the real facts; then the line is overstepped, and the concealment becomes a fraud. Such conduct is designated [*46] "active concealment," and it produces the same result in law as positive misrepresentation. Likewise, resort to any trick or arti-

fice to prevent an adversary from discovering the truth is equivalent to active misrepresentation.

37 Am. Jur. 2d Fraud and Deceit § 174(C) (1968).

The September 7 fax cannot be isolated from the rest of the circumstances and read independently to determine whether it was misleading or ambiguous. When placed in the context of the entire course of dealings between DeKalb and RPA and the reasonable expectations of RPA, the fax would be understood to say: "As you know, we've had some success in the lab with the double mutant gene in corn and would also like to use it in the lab as a selectable marker in soybeans, and, by the way, as you can see, we are staying in touch regarding what is going on with the gene." A reasonable jury could conclude that RPA was "deprived [of the truth] to the same extent that [it] would have been by positive assertion." Id. And, even more, the jury could conclude that the letter actually was written for the deceptive purpose of lulling RPA into believing that success had not passed beyond the laboratory and that [*47] DeKalb was maintaining full and open communications about RD-125.

Finally, RPA was in fact deceived about the worth of RD-125, as evidenced by RPA's agreement to include it in the 1994 Agreement for, arguably, no consideration other than that already bargained for pertaining to the unsuccessful Comai gene. That this deception caused significant economic injury to RPA cannot be disputed given the value in the market of the first commercially feasible, glyphosate resistant corn seed. (Apr. 13, 1999 Tr. [Doc. # 487] at 191-92 (Bokhart Test.).)

The evidence, viewed in the light most favorable to RPA, demonstrated that substantial evidence existed to support the jury's verdict regarding RPA's fraudulent inducement claim against DeKalb. Therefore, DeKalb's Motion for Judgment as a Matter of Law on this claim is DENIED.

III (A) (iii)

In the complaint RPA asserted DeKalb's breach of the agreement to keep it advised of testing results, not as an independant claim for breach of contract, but as it related to recission of the 1994 settlement agreement. The issues of whether there had been such an agreement as the condition for transfer of the double mutant maize gene and whether there had [*48] been a breach of that agreement were specifically tried -- addressed in pre-trial motions, briefs, and argument, in opening statements at trial, by evidence, in closing arguments, by instructions to the jury, and by jury findings. Under Rule 15(b), the Court amends the pleadings in this matter to include a claim by RPA against DeKalb for breach of contract.

The pleadings will then conform to the evidence as well as to the jury's verdict, which determined that DeKalb materially breached a contractual duty to RPA by disclosing the results of the field tests.

[HN19] Federal Rule of Civil Procedure 15(b) provides:

> (b) Amendments to Conform to the Evidence. When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues [*49] made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

[HN20] An amendment to conform to evidence may be made at any time, so long as the opposing party has not been prejudiced in presenting his case. See 3 J. Moore, Federal Practice P 15.13[2], at 15-157 to 15-168 (2d ed. 1984) (cited in Brandon v. Holt, 469 U.S. 464, 471 n. 19, 83 L. Ed. 2d 878, 105 S. Ct. 873 (1985)). The Rule is "intended to promote the objective of deciding cases on their merits rather than in terms of the relative pleading skills of counsel," and therefore it should be interpreted liberally. 6 C. Wright & A. Miller, Federal Practice and Procedure § 1491, pp. 453, 454 (1971 ed. and Supp.1983) (cited in Brandon, 469 U.S. at 471 n.19). Finally, the Rule is

> designed to allow amendment of [*50] a pleading when the facts proven at trial differ from those alleged in the complaint, and thus support a cause of action that the

claimant did not plead. Because notice to the defendant of the allegations to be proven is essential to sustaining a cause of action, Rule 15(b) applies only when the defendant has consented to trial of the non-pled factual issues and will not be prejudiced by amendment of the pleadings to include them.

Gilbane Building Co. v. Federal Reserve Bank of Richmond, 80 F.3d 895, 901 (4th Cir. 1996).

From the beginning of the trial, n18 the Court assumed that the first trial would cover two claims that the Defendants had a duty to disclose the field trial results: one duty under a fraud context and one contractual duty. In discussing a proposed statement to potential jurors on the first day the parties gathered to discuss pretrial motions before the first trial, the Court stated that it was concerned about the Defendants' proposal because "it mentions only the Defendants' proposal because the contract claims involved." (Apr. 5, 1999 Tr. [Doc. # 481], at 4.) The Court then mentioned to the potential jurors that part of the jury's job in the [*51] case would be to determine "exactly what [the] understanding was by which Rhone-Poulenc gave [the gene] to DeKalb . . . ." (Id. at 19; see also id. at 21.) DeKalb acknowledged the contract issues before trial as well. When discussing the appropriate law to apply to the various claims, counsel for DeKalb stated that the "central allegation on which RPA seeks to rescind the 1994 agreement is the claim that DeKalb had duties under the 1991 agreement, contractual duties and fiduciary duties." (Id. at 95-96; see also id. at 96 ("What the obligations were, fiduciary or contractual, is going to be the core issue in [RPA's] rescission count."); id. at 97 ("We think that Illinois law should also control the issue of whether -- what the parties' duties were under that contract.").) Moreover, one of the Defendants' motions in limine being discussed at that hearing involved the Defendants' attempt to exclude evidence relating to RPA's claim that DeKalb breached either the 1991 Agreement or separate oral agreement, which the Court denied. (Joint Mot. [Doc. # 295]; Apr. 5, 1999 Tr. [Doc. # 481], at 188-93.) Importantly, this motion did not involve any claim that RPA [*52] never asserted a breach of contract claim in its Complaint; rather it involved the Defendants' assertion that RPA had not provided sufficient evidence regarding the claim.

n18 Admittedly, in its summary judgment Memorandum Opinion, the Court fell into the same trap as RPA by discussing the contractual duty to disclose as a means to satisfy the first element of the fraud claim. (Mem. Op. [Doc. # 327], at 21-22.)

Therefore, all of the parties entered the trial knowing that the pivotal issues were whether DeKalb had agreed to disclose test results in return for receiving non-Comai genetic materials including RD-125 and, if so, whether that agreement was breached. DeKalb offered evidence on each issue, and argued to the jury that if there were an agreement to disclose, it had been fulfilled. (Apr. 7, 1999 Tr. [Doc. # 483], at 9, 10, 17-20, 54, 60; Apr. 9, 1999 Tr. [Doc. # 485], passim; Apr. 10, 1999 Tr. [Doc. # 486], passim; Apr. 19, 1999 Tr. [Doc. # 491], at 193; Apr. 20, 1999 Tr. [Doc. # 492], [*53] at 42-43, 108, 116, 128; DeKalb's Proposed Jury Instructions [Doc. # 357], at 17.) The jury was presented specific questions regarding whether there had been an agreement and, if so, whether it had been breached. (Issue Sheet [Doc. # 361], at 1-2.) Substantial evidence supported a jury finding that DeKalb breached a contractual duty to disclose the field test results. Under Rule 15(b), the Court will allow the pleadings to be amended, because RPA's breach of contract claims were presented and tried as separate claims from RPA's fraud claim, with the consent of both parties.

### III (A) (iv)

Given the jury's finding that DeKalb fraudulently induced RPA to enter the 1994 Agreement by not disclosing the results of the field tests, the Court will ORDER that the 1994 Agreement be RESCINDED. Therefore, the parties are returned to their respective positions prior to the signing of the 1994 Agreement.

### III (B)

The next issue is whether DeKalb should have been allowed to argue to the second jury that it had a license to the OTP and to RD-125, even though the 1994 Agreement was rescinded by the first jury's finding of fraud and all relevant evidence pertaining to the transfer of RD-125 had [*54] been presented to the first jury. After the jury verdict in the first trial (fraud), and during pretrial discussions just prior to beginning the second trial (patent infringement and trade secret misappropriation), DeKalb asserted that if the 1994 Agreement were rescinded, it had a license to commercialize both the OTP and RD-125 under the 1985/1991 Agreements, as modified by the parties through their conduct. DeKalb based this assertion on the first jury's finding that the agreement by which the RD-125 was transferred was formed through, among other things, "the conduct of the parties as a modification of the 1985/1991 written agreements." (Issue Sheet [Doc. # 361], at 2 (Question 1(C)).) Therefore, DeKalb argued, it had a defense to both the trade secret misappropriation and the patent infringement claims in the second phase of the trial. At