the very least, according to DeKalb, whether the parties modified the 1985/1991 Agreements to include commercialization rights and royalty obligations to RD-125 was a question of fact for the second jury to consider. n19

> n19 The Court ruled separately that the 1985/1991 Agreements, on their face, did not include rights to the RD-125 construct. (Apr. 19, 1999 Tr. [Doc. # 491], at 199.) Therefore, DeKalb must claim that license rights are granted by a modification of the parties to these agreements.

[*55]

III (B) (i)

DeKalb's argument misconstrues, among other things, the procedural history of the bifurcation order that was issued -- upon DeKalb's motion and against the wishes of RPA -- prior to the start of trial. Pursuant to that order, any issue regarding DeKalb's potential licenses to this technology should have been adjudicated during the first trial. On February 16, 1999, this Court granted a joint motion from DeKalb and Monsanto to "bifurcate RPA's contract and licensing claims from RPA's remaining claims." (Mem. Supp. Joint Mot. Bifurcate [Doc. # 149], at 12.) The intent and logic of the bifurcation order was clear: in order to avoid the complicated issues of patent law and to promote judicial economy, a jury first would determine whether the Defendants had a license to the technology and, if so, the scope of that license. If the Defendants prevailed in the first phase or trial, a second would be unnecessary, since a license would be a complete defense to the remaining claims. A second jury would determine the rest of the claims only if RPA prevailed before the first.

It was the clear understanding of the parties -- and the entire point of bifurcating the trial -- that [*56] all aspects of the contractual relationships among RPA, DeKalb, and Monsanto would be adjudicated during the first trial. As the Defendants pointed out then, "only if RPA succeeds in its effort to overturn defendants' licenses will the Court have to address the other aspects of RPA's claims, including its patent claims, defendants' patent defenses, and damages." (Mem. Supp. Joint Mot. Bifurcate [Doc. # 149], at 3.) DeKalb stated that the first phase would "focus on the negotiation of the relevant contracts and the parties' courses of dealing under them." (Mem. Supp. Joint Mot. to Bifurcate [Doc. # 149], at 3; see also Def.'s Reply Mem. [Doc. # 174], at 3.; Feb. 16, 1999 Tr. [Doc. # 259], at 46 ("The Court and the jury needs [sic] to resolve these contract relationship issues between DeKalb Calgene, DeKalb RPA, and the settlement in 1994 of the first lawsuit that RPA brought

against Monsanto before you get to any patent issues.").) Moreover, DeKalb's motion to bifurcate was made with full knowledge that part of its "contract and license" claim would require a determination of whether DeKalb had a commercial license under a modified version of the 1985/1991 Agreements, [*57] should the 1994 Agreement be rescinded. (Mem. Supp. Joint Mot. to Bifurcate [Doc. # 149], at n.2; Def.'s Reply Mem. [Doc. # 174], at 4 (stating that the dispute in first phase "centers on DeKalb's rights to the [technology] under both the 1994 Agreement and earlier agreements"); Feb. 16, 1999 Tr. [Doc. # 259], at 44-46.) RPA also was clear in its assertion that if the 1994 Agreement were rescinded, it believed that DeKalb would not have any rights to the disputed technology. (Feb. 16, 1999 Tr. [Doc. # 259], at 20, 26; Apr. 14, 1999 Tr. [Doc. # 488], at 119.) Therefore, without a doubt, DeKalb understood that by bifurcating the trial, all of the licensing issues were to be resolved in the first phase of the trial. (Def.'s Reply Mem. [Doc. # 174], at 6 ("Of course, if defendants prevail on the licensing issue, there will be no need to try the patent issues at all."); Feb. 16, 1999 Tr. [Doc. # 259], at 52 ("If it is determined . . . in the contract case that Monsanto and DeKalb are licensed, you really don't have to deal with these [patent issues]. The issues only arise if it is determined that we are not licensed.").) The determination of the contractual arrangement [*58] by which the technology was transferred was the entire purpose of the first phase or trial, which DeKalb itself repeatedly made clear in its arguments to the Court.

Now, however, DeKalb attempts to avoid the consequences of its own success in bifurcating the trial. DeKalb asserts that because the Court allowed the trade secret misappropriation claim to be moved from the first to the second trial, DeKalb "had no obligation to establish their licensing defense in the first trial." (DeKalb's Br. Opp. to RPA's Mot. Entry of J. [Doc. # 402], at 2.) According to DeKalb, it would be "nonsense" and "preposterous" for DeKalb to be required "to present a license defense in response to RPA's claim for fraudulent inducement which was the sole claim at issue in the first trial." (DeKalb's Br. Opp. to RPA's Mot. Entry of J. [Doc. # 402], at 2, 4.) The contrary is true, however; it would have constituted a compelling defense to the fraud claim. A jury determining that DeKalb had acquired a license to commercialize RD-125 through the 1985/1991 Agreements would find it difficult (1) to conclude that DeKalb had a motive to defraud RPA about something to which it already had obtained commercialization [*59] rights and (2) to conclude that RPA could establish the required element of injurious reliance since RPA could not have been fraudulently deprived of a construct by a party, to whom it had already given commercialization rights.

Further, the postponement of the trade secret misappropriation claim to the second phase of the trial did nothing to alter the structure of the two trials. From the very beginning of the first phase, the parties understood that contract and fraud claims would be adjudicated. See discussion supra Part III(A)(iii). Indeed, trade secret misappropriation instructions were not even included in the jury's preliminary instructions, because the Court understood RPA to state that the misappropriation claim was subsumed by the fraud claim. (Apr. 5, 1999 Tr. [Doc. # 481], at 264-65; Apr. 14, 1999 Tr. [Doc. # 488], at 117-18.) Moreover, during the discussion of whether the misappropriation claim should be postponed, DeKalb affirmed that, if RPA prevailed on either the contract or fraud issues against DeKalb, "that would take care of any question of trade secret appropriation with regard to DeKalb." (Apr. 14, 1999 Tr. [Doc. # 488], at 118.) Furthermore, [*60] no objection was raised by DeKalb when the decision to postpone the misappropriation claim was discussed, nor in response to RPA's statement that:

> Your Honor, we are all agreed, I think, both sides of the aisle and Your Honor that the key is the contract. On behalf of RPA we would not mind pushing off the entire trade secret issue to the patent case and let the jury here decide the contract case. The contract case, as your Honor has ruled in your prior order, will determine whether Monsanto and DeKalb have rights. If they have the rights that ends the case. If they do not have the rights, I think Your Honor indicated the judgment can be against DeKalb in this action.

(Apr. 14, 1999 Tr. [Doc. # 488], at 119-25.)

Finally, DeKalb states that, in the first phase of the trial, it was prevented from presenting evidence in defense of its trade secret claim after that claim was postponed. (DeKalb's Br. Opp. RPA's Mot. Entry J. [Doc. # 402], at 3.) Again, DeKalb misconstrues the record. DeKalb was prevented from presenting evidence relating to whether and when the technology was a trade secret -- not whether DeKalb had a license to it under either the 1994 Agreement or [*61] a modification of the 1985/1991 Agreements. (Apr. 19, 1999 Tr. [Doc. # 491], at 168.)

In sum, the postponement of the misappropriation claim did not relieve DeKalb of its obligation to demonstrate that it acquired the technology properly, through either the 1994 Agreement or a modification of the

1985/1991 Agreements. As recognized throughout the trial, by both parties and the Court, the first trial would determine each of the parties' rights regarding the technology. Therefore, the second would be necessary only if it was determined that DeKalb had no commercialization rights to the technology. The argument that DeKalb now presents, if accepted, would give DeKalb two opportunities to argue before different juries whether -- from the same evidence -- there had been an agreement and, if so, what its terms had been. Such a result would nullify the effect of DeKalb's own bifurcation motion by repeating the production in the second trial of substantially the same evidence that was submitted in the first phase and, also, giving DeKalb the opportunity to argue as it did in the first that there had been no agreement and, upon losing that, to argue before the second what the nature of the [*62] agreement had been. Such a result would, then, allow DeKalb not only to relitigate the contract issue, but to do so the second time before a jury which had heard nothing of misrepresentations nor seen witness demeanor which could affect credibility determinations.

Since DeKalb substantively bases its argument that it had commercialization rights upon the first jury's finding that the agreement for the transfer of RD-125 was a "modification of the 1985/1991 Agreements", the Court will examine the evidence presented to determine whether it was sufficient to support a finding that DeKalb obtained a license to commercialize RD-125 under the 1985/1991 Agreements.

### III (B) (ii)

[HN21] Contract modification must satisfy all the requirements of a valid contract, including the requirement of consideration. See Bass v. Prime Cable of Chicago, Inc., 284 Ill. App. 3d 116, 126, 674 N.E.2d 43, 51, 220 Ill. Dec. 772, 780 (1996). "A modification of a contract may be ratified by acquiescence in a course of conduct consistent with the existence of that modification." Corrugated Metals, Inc. v. Industrial Comm'n, 184 Ill. App. 3d 549, 556, 132 Ill. Dec. 739, 744, 540 N.E.2d 479, 484 (1989). [*63]

DeKalb has the burden of proving that a modification occurred. See Boardman v. Bubert, 325 Ill. 38, 41, 155 N.E. 784, 786 (1927). [HN22] Whether a contract has been modified is ordinarily question of fact; however, the sufficiency of facts presented to constitute a modification is a question of law. See Martz v. MacMurray College, 255 Ill. App. 3d 749, 753, 627 N.E.2d 1133, 1135, 194 Ill. Dec. 491, 493 (1993). Moreover, if after consideration of all evidence, the court determines that reasonable people could reach only one conclusion, the modification issue can be decided by the court as a matter of law. See E.A. Cox Co. v. Road Sav-

ers Int'l Corp.. 271 Ill. App. 3d 144, 152, 648 N.E.2d 271, 277-78, 207 Ill. Dec. 815, 821-22 (1995).

The 1985 Agreement contains a clause declaring that it "may be amended only by a writing signed by both parties." (Pl.'s Ex. 2, Art. 8.3, at 17.) However, DeKalb is not precluded by Article 8.3 from claiming that the Agreement was modified by the conduct of the parties because, [HN23] in Illinois, n20 "the terms of a written contract can be modified by a subsequent oral agreement even though . . . the contract precludes [*64] oral modifications." Tadros v. Kuzmak, 277 Ill. App. 3d 301, 312, 660 N.E.2d 162, 170, 213 Ill. Dec. 905, 913 (1995).

    n20 The law of Illinois will be used to determine the requirements for a modification of the 1985/1991 Agreements because those agreements contain a choice of law clause designating Illinois law. (Pl.'s Ex. 2, Art. 8.9, at 19.)

The 1985 Agreement recognized that Calgene (and RPA) would engage in future development and that neither party would be bound to a license agreement for future technology based on the 1985 Agreement. In Article 8.1, Calgene (and then RPA) agreed to notify DeKalb of any future development which "may have practical application to the transformation, regulation or expression of useful genes in corn . . . for the sole purpose of permitting [DeKalb] to indicate an interest in acquiring such developments by license or otherwise." (Pl.'s Ex. 2, Art. 8.1, at 16.) Moreover, in the first meeting between DeKalb and RPA after the 1991 Agreement, the final version [*65] of the minutes noted that

        there was some discussion regarding the regulatory environment for transgenic plants and also potential legal entanglements regarding technology for which patents might issue in the future. Since it is highly unlikely that our first transformants will lead to commercialization, we decided to let scientific issues drive our decisions rather than patent and regulatory issues. Thus, our primary objective is to test expression of aroA (CT7) in maize plants using the best technology available.

(Pl.'s Ex. 43, Minutes, June 17, 1991 Rhone Poulenc/DEKALB Plant Genetics Meeting, at DKB 040792.) The parties protected themselves from this decision to postpone determination of rights to technology other than the CT-7 by also agreeing that all materials exchanged between the parties would be covered by the 1984 Confidentiality Agreement. (Id. at DKB 040790.) The only reasonable conclusion from this is that, prior to the June 17, 1991 meeting, the parties had not agreed to expand the commercialization and royalty aspects of the 1985/1991 Agreements to materials other than the CT-7.

Among the post-1991 evidence to which DeKalb turns for support are [*66] RPA documents in which RPA scientists discuss the double mutant maize gene in the same documents as the CT-7 gene, (see, e.g., Def.'s Ex. 401; 470), or in which RPA scientists discuss the EPSPS gene as being within "the framework of the DEKALB contract," (Def.'s Ex. 391). Also, in an internal report, RPA scientists discussed its evaluation of the mutated maize gene under the heading "DeKalb Agreement." (Def.'s Ex. 420, at RPA 023092-93.) Yet, these references are isolated labels and classifications by RPA's scientists -- they do not reasonably suggest that RPA meant to provide DeKalb with full commercialization rights under an agreement limited on its face to the CT-7 gene. There is no question that, as discussed, the 1985/1991 Agreements provided a framework to accommodate non-CT-7 (non-Comai) genetic materials exchanged between Calgene/RPA and DeKalb but DeKalb has pointed to nothing within the Agreements which would support a reading that a transfer of that material would give DeKalb a license to commercialize a product containing that material. Neither did DeKalb adduce evidence that anyone discussed such an agreement or comported themselves in such a way as to infer such an [*67] agreement pertaining to RD-125. DeKalb's conclusions rely on unsubstantiated conjecture about the intent of the parties to transfer commercialization rights, rather than on evidence that RPA agreed to give DeKalb such a sweeping license to RD-125.

DeKalb further points to documents, created after the November 1992 meeting, in which RPA refers to providing the double mutant gene pursuant to a "contractuel [sic] commitment" to DeKalb. (Br. Opp. RPA's Mot. Entry J. [Doc. # 402], at 7 (citing Def.'s Ex. 14, at RPA 016128); see also Def.'s Ex. 490, at RPA 016136; Def.'s Ex. 31, at RPA 016146; Def.'s Ex. 40.) However, rather than shedding any light on whether the contractual commitment included commercialization rights and royalty responsibilities, these documents simply support the jury's verdict that an oral agreement was made on November 2, 1992 in which RPA would provide RD-125 to DeKalb in exchange for results of testing.

Finally, DeKalb contrasts the lack of written agreement for the transfer of RD-125 with Dr. Mackey's testimony that RPA was "fastidious" about requiring written agreements for the transfer of genetic material, (Br. Opp. RPA's Mot. Entry J. [Doc. # 402], [*68] at 7 (citing Apr. 14, 1999 Tr. [Doc. # 488], at 186)), and documen-

tary evidence that Dr. Freyssinet required written agreements for other materials it transferred that were not related to glyphosate tolerance, (id. at 7 (citing Def.'s Ex. 27; Def.'s Ex. 523)). This argument has no force, however, since RD-125 did relate to glyphosate tolerance and was protected by the 1984 Confidentiality Agreement. There would have been no need for an additional written agreement. (Apr. 12, 1999 Tr. [Doc. # 486], at 135-38; Pl.'s Ex. 43, Minutes, June 17, 1991 Rhone Poulenc/DEKALB Plant Genetics Meeting, at DKB 040792.)

In sum, from the evidence in the first trial, a reasonable juror could conclude only that, in 1991, RPA assumed an agreement that specifically contemplated that further technological development would not be included within the commercial licenses granted under the 1985/1991 Agreements. (Pl.'s Ex. 2, Art. 8.1, at 16.) This agreement incorporated the 1984 Confidentiality Agreement, which specifically did not include commercialization rights. (Id. Art. 8.3, at 17; Pl.'s Ex. 1, 1984 Confidentiality Agreement, P 4.) Furthermore, at the first meeting between RPA and DeKalb, [*69] the parties specifically engaged in a broad collaboration based upon finding glyphosate tolerance in corn, postponed dealing with legal, regulatory, and patent issues, and adopted the 1984 Confidentiality Agreement. (Pl.'s Ex. 43, Minutes, June 17, 1991 Rhone Poulenc/DEKALB Plant Genetics Meeting, at DKB 040792.) This intent to postpone agreement regarding commercialization and royalties of technology other than CT-7 cannot be undermined by vague references from scientists regarding "contractuel [sic] commitments." Rather, DeKalb needed to present evidence that RPA and DeKalb had a meeting of the minds regarding a license to commercialize the double mutant maize gene. It did not. There is simply no evidence upon which a reasonable jury could conclude that the parties understood and agreed that the 1985/1991 Agreements had been modified to the extent that DeKalb was given a license to commercialize RD-125.

The jury's verdict response to Question 1(C) must be read with this conclusion in mind. Question One of the Issue Sheet asked, "Has RPA proven by a preponderance of the evidence that DeKalb agreed to provide RPA with the results of its testing in return for receiving the double [*70] mutant maize EPSPS genes?" After the jury's affirmative response, the jury was asked three questions regarding how the agreement was formed. The jury answered that the agreement was formed (A) orally at the November 1992 meeting in Mystic, Connecticut, (B) through the conduct of RPA and DeKalb at or following the Mystic meeting in November 1992, and (C), through the conduct of the parties as a modification of the 1985/1991 written agreements. Given that no evidence was presented such that a reasonable jury could conclude

the modification mentioned in (C) would include commercialization rights, the jury's answer can mean only that the modification was DeKalb's agreement to provide RPA with the results of its testing in return for receiving the double mutant maize EPSPS genes. Moreover, this interpretation is the more natural reading of the Issue Sheet, because the "agreement" mentioned in 1(C) initially was defined as such in Question 1. Furthermore, DeKalb's license argument completely ignores the jury's response to Questions 1(A) and 1(B); whereas the Court's reading of the Issue Sheet and the evidence allows for consistency among the jury's answers. Finally, the answer in Question [*71] 1(C) is supported by [HN24] Illinois law, which allows parties to a contract to modify provisions of the contract without affecting their liabilities under other terms of the agreement. See Deien Chevrolet, Inc. v. Reynolds and Reynolds Co., 265 Ill. App. 3d 842, 845, 639 N.E.2d 949, 952, 203 Ill. Dec.390, 393 (1994). In other words, RPA and DeKalb could modify a contract relating to the CT-7 gene by adding a separate agreement with different obligations regarding the double mutant maize gene.

### III (B) (iii)

In conclusion, DeKalb was required to present all of its evidence relating to potential licenses to the technology in the first trial. After examining all of the evidence in the light most favorable to DeKalb, it is determined that no reasonable jury could find that DeKalb possessed the right to commercialize the RD-125 technology under a modified version of the 1985/1991 Agreements.

### III (C)

The Court dismissed Monsanto from the second trial because Monsanto is a bona fide purchaser of the RD-125 technology, and therefore cannot be liable as a patent infringer or a trade secret misappropriater. n21 The following brief summary of facts will supplement the facts set [*72] forth supra, n22 and will provide context for the Court's resolution of this issue.

n21 Monsanto made two motions on this issue: a motion for Judgment as a Matter of Law on the patent and misappropriation claims [Doc. # 355] and a motion for summary judgment under Fed. R. Civ. P. 56 [Doc. # 394].

n22 See discussion supra Part I.

### III (C) (i)

In the 1994 Agreement, RPA and Calgene granted DeKalb the nonexclusive right to use and to sublicense various technologies and genetic materials. Section 4.1 of that agreement reads as follows:

Page 25

> 4.1 RPA and CALGENE hereby grant to
> DeKalb the world-wide, paid-up right to
> use the RPA/CALGENE Technology and
> RPA/CALGENE Genetic Material in the
> field of use of corn. DeKalb shall have the
> right to grant sublicenses to the aforemen-
> tioned right to use without further pay-
> ment being made to RPA and CALGENE.

(Pl.'s Ex. 4, 1994 Agreement § 4.1, at 5.) The terms "RPA/CALGENE Technology" and "RPA/CALGENE Genetic Material" are defined in Sections 1.6 [*73] and 1.7, respectively, and it is undisputed that the terms in-clude both the double mutant maize gene and the OTP at issue in the second phase of the trial.

In 1996, DeKalb entered into a licensing agreement ("1996 Agreement") with Monsanto in which DeKalb stated that it had "certain rights relating to Genetic Ele-ment(s), Germplasm, Plasmid(s) and Gene(s), including technical information and Know-How relating to, among other things, transformed plants and seeds, useful for Glyphosate protection in corn plants." (1996 Agreement § 1.04.) DeKalb granted to Monsanto "a royalty-bearing, non-exclusive, license under the Licensed DEKALB Patent Rights, DEKALB Know-How, Licensed DEKALB Methods and Licensed DEKALB Non-patent Proprietary Materials, (a) to make, have made, and use Licensed MONSANTO Corn Products . . ., and (b) to sublicense . . . to make, have made, use and sell Licensed MONSANTO Corn Products." (Id. § 3.10.) Monsanto cross-licensed to DeKalb other technology in return. It is undisputed that among the materials DeKalb licensed to Monsanto through the 1996 Agreement was the same construct -- RD-125 -- that RPA and Calgene licensed to DeKalb through the 1994 Agreement.

DeKalb [*74] and Monsanto, under the auspices of the 1996 Agreement, developed and commercialized the GA21 corn line by utilizing RD-125, among other things. Again, this GA21 corn line became what is now sold as Roundup Ready corn.

At a motions hearing on April 26, 1999, both Mon-santo and DeKalb admitted that their use of the OTP in Roundup Ready corn infringed United States Patent 5,510,471 (" '471 patent"). Moreover, RPA claimed that Monsanto's and DeKalb's commercialization of RD-125 resulted in misappropriation of RPA's trade secrets.

Monsanto asserted several defenses to both the pat-ent and the misappropriation claims; however, only one defense was decided upon by the Court. n23 Monsanto asserted that, even though the Court rescinded the 1994

license that forms the basis for its sublicense under the 1996 Agreement, Monsanto should not be liable for pat-ent infringement or for misappropriation because it was a bona fide purchaser of the license for value without no-tice of DeKalb's wrongdoing. (Br. Supp. Def. Mot. Pur-suant to F.R.C.P. 56 [Doc. # 395], at 13-19; Br. Supp. Def. Mot. Judgment Matter L. [Doc. # 356], at 5-10.)

> n23 As the Court finds that Monsanto is enti-
> tled to protection as a bona fide purchaser from
> RPA's claims of patent infringement and misap-
> propriation, the Court will not address Mon-
> santo's alternative arguments for dismissal. (Br.
> Supp. Def. Mot. Pursuant to F.R.C.P. 56 [Doc. #
> 395], at 13.)

[*75]

### III (C) (ii)

[HN25] The bona fide purchaser rule is recognized in patent law, see Filmtec Corp. v. Allied-Signal, Inc., 939 F.2d 1568, 1573-74 (Fed. Cir. 1991), as well as by North Carolina, through the common law, see Wilson v. Commercial Fin. Co., 239 N.C. 349, 356, 79 S.E.2d 908, 914 (1954), and by its adoption of the Uniform Commer-cial Code, see N.C. Gen. Stat. § 25-2-403. As noted by the Federal Circuit, "it is well established that when a legal title holder of a patent transfers his or her title to a third party purchaser for value without notice of an out-standing equitable claim or title, the purchaser takes the entire ownership of the patent, free of any prior equitable encumbrance." Filmtec, 939 F.2d at 1573 (applying common law bona fide purchaser rule). Moreover, the Federal Circuit recently affirmed the use of the bona fide purchaser defense in Heidelberg Harris, Inc. v. Loebach, 145 F.3d 1454, 1458 (Fed. Cir. 1998). In that case, an inventor assigned all rights in his invention to an as-signee, who later obtained a patent on the invention and then granted an unrestricted, exclusive license to that patent [*76] to a third party. See id. at 1456-57. Al-though the original assignment from the inventor to the assignee was later rescinded due to fraud, the Federal Circuit held that the third party was not liable for patent infringement because it retained its exclusive license under the bona fide purchaser rule. See id. at 1459.

In the instant case, the essential prerequisites for finding that Monsanto is a bona fide purchaser are evi-dent. There has been no suggestion that Monsanto had notice of DeKalb's fraudulent behavior when Monsanto received its license in 1996. Moreover, Monsanto gave value to DeKalb in the form of licenses to certain of its patents and technology in exchange for the license to DeKalb's (and RPA's) technology, including RD-125. Therefore, Monsanto argues that it should be considered

a bona fide purchaser under Filmtec and Heidelberg Harris.

However, RPA asserts that this case differs from Filmtec and Heidelberg Harris in that Monsanto, the alleged bona fide purchaser, did not receive its license from the legal title holder of the technology, RPA. Rather, Monsanto received a license to the technology from a nonexclusive [*77] licensee that had the right to sublicense. Therefore, according to RPA, as between the two innocent parties here -- RPA and Monsanto -- Monsanto should bear the risk of fraud.

This scenario appears to be a matter of first impression in the law of patents and of trade secret misappropriation. In order to resolve whether Monsanto should be considered a bona fide purchaser, the Court will turn to the precepts that undergird the bona fide purchaser rule generally, and then apply those precepts to the facts of this case. One of the main considerations behind the bona fide purchaser rule is the "waste that would be created if people either had to inquire how their transferors obtained their property or to accept a risk that a commercial deal would be reversed for no reason they could perceive at the time." Bonded Fin. Servs., Inc. v. European Am. Bank, 838 F.2d 890, 892 (7th Cir. 1988). The bona fide purchaser rule preserves the stability of commercial transactions by promoting the free transferability and negotiability of property in commerce. See, e.g., C.H. Robinson Co. v. B.H. Produce Co., 723 F. Supp. 785, 793 (N.D. Ga. 1989). RPA's position would [*78] frustrate this rationale because it would undermine the ability of a licensee to grant sublicenses. Any reasonable party interested in receiving a license for technology virtually would be forced to obtain the license from the patent owner rather than a licensee, even if that licensee had been granted the clear power to grant sublicenses by the technology's owner. Otherwise, the potential sublicensee would bear a continuing risk that the licensee obtained the technology through fraud.

Therefore, it seems more appropriate to place the risk of fraud on the party with the best chance of catching the fraud initially -- the defrauded party. Cf. Sale Chevrolet, Buick, BMW, Inc. v. Peterbilt of Florence, Inc., 133 N.C. App. 177, 514 S.E.2d 747, 749-50 (N.C. Ct. App. 1999). As the Supreme Court has noted, as strong as a defrauded party's claim in equity may be, "it can in no case be stronger than that of a purchaser who has put himself in peril by purchasing a title, and paying a valuable consideration, without notice of any defect in it, or adverse claim to it." United States v. California & O. Land Co., 148 U.S. 31, 41, 37 L. Ed. 354, 13 S. Ct. 458 (1893). [*79] Such risk allocation is applicable in this case; even though it is a right to use and to sublicense that was obtained by fraud, rather than actual title to the patent.

Indeed, more important than whether DeKalb was the "legal title holder" of the technology is that Monsanto's sublicense came from a license stating that it had been paid for up-front and was unrestricted. From Monsanto's perspective as an innocent sublicensee, under the grant provided in the 1994 Agreement, Monsanto's license rights could not be taken away by any subsequent action of DeKalb, the licensee, such as nonpayment of royalties. No situation other than fraud would disenfranchise DeKalb from its right to use and to sublicense the technology in the field of use of corn. Because the bona fide purchaser rule serves, in part, to protect innocent purchasers in situations in which fraud is present, Monsanto should not be precluded from relying on the 1994 Agreement's grant to DeKalb, even though DeKalb never received actual title to the technology. Thus, while RPA is correct that DeKalb is not the legal title holder of the technology because it is a nonexclusive licensee, this distinction is not enough to remove Monsanto [*80] from being considered a bona fide purchaser.

Therefore, the Court holds that in this case, in which DeKalb's right to use was paid for up-front, unrestricted, and accompanied by a right to sublicense, the sublicensee, Monsanto, is entitled to be considered a bona fide purchaser, because it paid value for the right to use the technology without knowledge of any wrongdoing by DeKalb. Monsanto will be DISMISSED from Counts I and V of RPA's Complaint, and RPA's motion for reconsideration of this ruling [Doc. # 518] is DENIED.

Although it recognizes that the bona fide purchaser in Heidelberg Harris received an indefinite license to the disputed patent, see Heidelberg Harris, 145 F.3d at 1459, the Court here holds that Monsanto is dismissed only from the patent infringement and trade secret misappropriation claims at issue in this case. In other words, the Court makes no finding regarding any future license by Monsanto of the technology at issue here. Moreover, Monsanto apparently has sublicensed RPA's technology to various seed manufacturers, and Monsanto seems also to assert that all of its sublicensees are free from liability to RPA for patent infringement and [*81] trade secret misappropriation. While it is true that DeKalb granted Monsanto the right to sublicense the technology in the 1996 Agreement, (1996 Agreement § 3.10), the plain language of the 1994 Agreement may not support the right of DeKalb's sublicensees, such as Monsanto, to grant sublicenses themselves. Therefore, the Court makes no finding regarding continuing use of the technology by Monsanto's sublicensees either. n24

n24 There also is a question whether Monsanto's sublicensees could rely on Section 9.2 of the 1994 Agreement to assert that they are bona

fide purchasers. Under Section 9.2, DeKalb could assign its rights under the 1994 Agreement to Monsanto in December 1998, because Monsanto acquired "substantially all of the assets" of DeKalb at that time. (Pl.'s Ex. 4, 1994 Agreement P 9.2, at 8-9.) However, any sublicensee that acquired its rights after December 1998 would have acquired them with knowledge of RPA's equitable claim in this lawsuit, which was filed in 1997. Therefore, the bona fide purchaser rule might not apply.

[*82]

III (D)

Next, DeKalb asks that the jury's finding of nonobviousness be set aside and judgment as a matter of law be entered for DeKalb that Claim 11 of the '471 patent is obvious and, thus, invalid. Although the Court cited to general standards for a motion under Fed. R. Civ. P. 50(b) supra, specific criteria, set out below, exist for such a motion when it involves the question of obviousness.

[HN26] A patent is invalid "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which the subject matter pertains." 35 U.S.C. § 103. It is undisputed that the ultimate question of obviousness is a question of law. See Graham v. John Deere Co., 383 U.S. 1, 17, 15 L. Ed. 2d 545, 86 S. Ct. 684 (1966). At the same time, factual issues underlie the ultimate obviousness decision, including "(1) the scope and content of the prior art; (2) the differences between the claimed invention and the prior art; (3) the level of ordinary skill in the art; and (4) certain secondary considerations. [*83] " Richardson-Vicks Inc. v. Upjohn Co., 122 F.3d 1476, 1479 (Fed. Cir. 1997) (citing Graham, 383 U.S. at 17-18). These factual issues do not convert the ultimate conclusion of obviousness from one of law into one of fact. See id. "Nevertheless, [HN27] in re-creating the facts as they may have been found by the jury, and in applying the Graham factors to the case, [the Court] assesses the record evidence in the light most favorable to the verdict winner," in this case RPA. Id. "Where, as here, there is a verdict of validity, the question is not whether the patentee had introduced sufficiently substantial evidence to support the verdict, but whether the challenger's evidence so met the burden imposed by 35 U.S.C. § 282 ('the burden of establishing invalidity of a patent or any claim shall rest on the party asserting such invalidity') that reasonable jurors could not have concluded that the challenger failed to overcome that burden." Perkin Elmer Corp. v. Computervision Corp., 732 F.2d 888, 893 (Fed. Cir. 1984).

DeKalb asserts that it should be granted judgment as a matter of law because there was no substantial [*84] evidence to support the jury's determination of nonobviousness. (Def. Br. Supp. Motion J. Matter L. [Doc. # 511], at 5-7.) According to DeKalb, the alleged similarity in structure between the OTP and the prior art "renders the OTP obvious." (Id. at 7.) Because of this structural similarity, DeKalb asserts that RPA was required to present evidence to overcome this obviousness, either in the form of "improved properties" or "superior results." (Id. at 5-11.) Finally, DeKalb claims that RPA did not provide proof of a nexus between the OTP and any commercial success or long-felt need. (Id. at 11.)

In examining the factual basis for the jury's verdict and in construing DeKalb's arguments against that verdict, the Court remains cognizant of [HN28] the statutory presumption of validity, see 35 U.S.C. § 282, as well as that "the facts to support a conclusion of invalidity must be proven by clear and convincing evidence." Richardson-Vicks Inc., 122 F.3d at 1480 (quoting Ryko Mfg. Co. v. Nu-Star, Inc., 950 F.2d 714, 716 (Fed. Cir. 1991)) (internal quotation marks omitted). Moreover, the Court is aware that the Federal Circuit [*85] has stated that "it is preferred that a jury be provided with special interrogatories designed to reveal more clearly the findings it made." Perkin Elmer Corp., 732 F.2d at 893. However, the jury in this case was not asked to make such factual findings regarding obviousness; rather, the jury was asked to return a general verdict on the question of obviousness. (Verdict Form for Phase I [Doc. # 459], at 1.) Therefore, "absent such interrogatories, the law presumes the existence of findings necessary to support the verdict the jury reached." Perkin Elmer Corp., 732 F.2d at 893. "The particular findings the jury must make before it can reach a verdict are controlled by the court's instructions to the jury." Id. In this case, the jury was instructed in great detail as to the factors it was to consider under Graham, and then it was asked to deliver a general verdict. (Jury Instructions [Doc. # 460], at 11-17.) As detailed below, considering the evidence in the light most favorable to RPA, the Court concludes that a reasonable jury could properly have found that DeKalb did not prove by clear and convincing evidence that the OTP, as described in Claim 11 of the '471 patent, was obvious.

III (D)(i)

It is well-established that the first step in any validity analysis is to construe the claims of the invention to determine the subject matter for which patent protection is sought. n25 See Rockwell Int'l Corp. v. United States, 147 F.3d 1358, 1362 (Fed. Cir. 1998). In general, the patent dispute in the instant case revolves around transit peptides -- strings of amino acids that attach to various genes ("passenger proteins") and, then, transport the

genes from the cytoplasm of a plant cell into the plant cell's chloroplast. Claim 11's optimized transit peptide is a genetically constructed version of a natural transit peptide, consisting of

> a nucleic acid construct which codes for a polypeptide sufficient for localization of a gene product in a chloroplast of a plant cell which polypeptide comprises a fusion which in the direction of translation comprises a first chloroplast transit peptide from a sunflower ribulose-1,5-bisphosphate carboxylase small subunit, approximately 22 amino acids from the N-terminal region of a mature maize ribulose-1,5-bisphosphate carboxylase small subunit and a second chloroplast transit peptide from a maize rubulose-1,5 bisphosphate carboxylase small subunit.

(Pl.'s Ex. 6.) In simplified terms, the OTP is a specific constructed formation of three genetic elements. The first part consists of a sunflower's natural transit peptide, which is a piece of DNA from a sunflower gene called Rubisco that is fifty-five amino acids long. The second part [*86] is the first twenty-two amino acids from the mature portion of the maize Rubisco gene (also called the "N-terminal extension"). The final part is a second natural transit peptide, which is forty-seven amino acids long and from the maize Rubisco gene. (May 17, 1999 Tr. [Doc. # 494], at 186-91; May 18, 1999 Tr. [Doc. # 495], at 372.) The OTP is to be used for facilitating the transfer of EPSPS genes from a plant cell's cytoplasm to its chloroplast in order to effect glyphosate tolerance. (Pl.'s Ex. 6, at col. 1-2.)

> n25 The parties here do not dispute the scope of Claim 11 of the '471 patent.

### III (D) (ii)

[HN29] The second step in an obviousness inquiry is to determine whether the claimed invention would have been obvious as a legal matter, based on underlying factual inquiries including: (1) the level of ordinary skill in the art, (2) the scope and content of the prior art, (3) the differences between the claimed invention and the prior art, and (4) secondary considerations of nonobviousness. See Smiths Indus. Med. Sys., Inc. v. Vital Signs, Inc., 183 F.3d 1347, 51 U.S.P.Q.2D (BNA) 1415 (Fed. Cir. July 14, 1999).

*Level of Ordinary Skill in the Art*

The parties agreed prior to the trial that a person of ordinary skill in the art is a person having [*87] a doctoral degree in molecular biology or a masters degree in molecular biology in addition to a few years of experience in the field of plant molecular biology. (May 28, 1999 Tr. [Doc. # 501], at 1950.)

*Scope and Content of the Prior Art*

The prior art to be examined must have been published prior to March 5, 1991, which is the effective filing date for the '471 patent. See 35 U.S.C. § 103 (mandating that obviousness be tested as of "the time the invention was made").

The evidence at trial demonstrated that, prior to 1991, it was well known in the field that introducing some type of EPSPS gene (whether from a bacterium or a plant) into a plant cell's chloroplast may assist in providing glyphosate tolerance in plants. It was also known that a transit peptide was necessary for moving an EPSPS gene, or another protein, into a plant cell's chloroplasts. (Def.'s Ex. 1421 (U.S. Patent No. 4,940,835 ("Shah patent")); May 21, 1999 Tr. [Doc. # 533], at 1166.) In nature, once a protein is inside the chloroplast, an enzyme removes the transit peptide, and leaves a "mature" protein. (May 26, 1999 Tr. [Doc. # 499], at 1457 (Dewey Test.).)

Calgene's Dr. Luca [*88] Comai conducted some of the pioneering work in modifying EPSPS genes to achieve glyphosate resistance once the EPSPS gene is moved into the chloroplast. He worked primarily with an EPSPS gene called the CT-7, which was derived from a bacterium, not a plant. Because bacterial EPSPS genes are not connected to transit peptides naturally, Dr. Comai initially attached to the CT-7 gene a transit peptide from a protein called Rubisco, in order to transport the CT-7 gene into the plant's chloroplast. n26 However, this simple transit peptide did not move the CT-7 gene into the plant chloroplast very effectively. (Id. at 1458 (Dewey Test.).) As DeKalb's expert, Dr. Ralph Dewey, explained, the chloroplast did not recognize the "foreign" protein (i.e., the bacterial protein) and therefore it did not allow entry into the chloroplast, even though a transit peptide was being used. (Id. at 1459.)

> n26 In nature, corn plants possess EPSPS genes that have their own transit peptides, which are sufficient to move the EPSPS proteins into the chloroplast. (May 26, 1999 Tr. [Doc. # 499], at 1457 (Dewey Test.).)

[*89]

To address this problem, Dr. Comai attached to the original transit peptide a short region of the "mature"

portion of the same Rubisco gene, which, as mentioned above, also is called the "N-terminal extension." (Id. at 1459-60.) In a 1988 article published in The Journal of Biological Chemistry, Dr. Comai used an N-terminal extension that was twenty-four amino acids long, and concluded that the extension was necessary for efficient chloroplast transport. (Def.'s Ex. 148, at 15104.) Dr. Dewey explained that the rationale for adding a portion of the mature protein was to "fool" the chloroplast by following the natural transit peptide with a part of a protein that normally belongs in the chloroplast. (May 26, 1999 Tr. [Doc. # 499], at 1460.) Therefore, the construct that became known at the trial as the "Comai transit peptide" in the prior art consisted of a natural transit peptide from a sunflower Rubisco gene connected to twenty-four amino acids from a mature sunflower Rubisco protein. n27 For glyphosate resistance, this construct was then followed by the CT-7 bacterial gene. The Comai transit peptide, which was the cumulative result of Dr. Comai's research as published in [*90] patents, (Def.'s Exs. 131 (U.S. Patent No. 4,535,060), 160 (U.S. Patent No. 4,769,061)), a patent application (Def.'s Ex. 1232 (PCT application designated as WO/88/2401)), and the article in The Journal of Biological Chemistry, (Def.'s Ex. 148), n28 was one of the two prior transit peptide constructs relied upon by DeKalb to demonstrate that the OTP was obvious.

n27 Drs. DeRose and LeBrun testified that the Comai prior art, as described by the Comai patent, contained an amino acid extension of 22 amino acids. (May 18, 1999 Tr. [Doc. # 495], at 374 (DeRose Test.); May 19, 1999 Tr. [Doc. # 496], at 498 (LeBrun Test.).) However, Dr. Dewey testified that the Comai transit peptide had an extension of 24 amino acids, (May 26, 1999 Tr. [Doc. # 499], at 1461), which can be seen in Dr. Comai's article, (Def.'s Ex. 148, at 15105). The Court will use 24 as the number of amino acids in the Comai extension because that is the number actually found in the 1988 Comai publication.

n28 The jury specifically considered as prior art these four Comai works, as well as two others: U.S. Patent No. 5,776,760 ("Barry patent") (Def.'s Ex. 1452), discussed infra, and U.S. Patent No. 4,940,835 ("Shah patent") (Def.'s Ex. 1421), discussed supra. (Jury Instructions [Doc. # 460], at 13.)

[*91]

The other transit peptide construct in the prior art relied upon by DeKalb is disclosed in U.S. Patent No. 5,776,760 (the "Barry patent") (Def.'s Ex. 1452). The Barry patent discloses a transit peptide construct made of three parts. First, it contains a natural transit peptide of the Rubisco protein from arabidopsis, which is fifty-five amino acids long. Second, this transit peptide is attached to twenty-three amino acids of the mature portion of this arabidopsis Rubisco gene. The third part is a "serine residue and eight amino acids, six of which correspond to the very end of the transit peptide." (May 27, 1999 Tr. [Doc. # 500], at 1689 (Dewey Test.).)

*Differences Between the Claimed Invention and the Prior Art*

The most pronounced difference between the Comai transit peptide construct and the OTP is that the OTP contains an additional, complete transit peptide between the N-terminal extension and the passenger protein. This second transit peptide is no "mere structural variation," as claimed by DeKalb. (Def. Br. Supp. Mot. J. Matter L. [Doc. # 511], at 9.) Rather, the OTP's final transit peptide serves to allow the entire construct, including the N-terminal extension, to [*92] be disengaged from the passenger protein after the construct has been transported into the chloroplast. (May 18, 1999 Tr. [Doc. # 495], at 375 (DeRose Test.); id. at 401 (LeBrun Test.).) In contrast, the Comai transit peptide construct leaves its N-terminal extension attached to the passenger protein, because only the initial transit peptide is removed by an enzyme after the construct enters the chloroplast. (Id. at 374-75.)

DeKalb argues that the N-terminal extension does not affect the passenger protein; therefore, the fact that the OTP's extension is removed is a meaningless distinction from the Comai prior art. However, Dr. DeRose testified that because the N-terminal extension is removed, the OTP solved the "paradox" that existed in the research prior to 1991. The paradox was that the N-terminal extension was necessary to import the EPSPS passenger protein into the chloroplast (as noted by Comai), but, by remaining attached to the protein after the first transit peptide was removed, the extension decreased the efficiency of the EPSPS genes once they were inside the chloroplasts. (Id. at 354-55.) Dr. LeBrun testified regarding experiments that supported Dr. DeRose's [*93] description of the paradox. In the 1980's, RPA experimented in tobacco with Dr. Comai's teachings regarding the N-terminal extension and concluded that adding an N-terminal extension resulted in higher glyphosate tolerance than that which resulted from transit peptides without the extension, but it still did not produce an agronomical level of resistance. (Id. at 392-93.) According to Dr. LeBrun, the larger the extension that is attached to the EPSPS enzyme, the more the activity of the enzyme in the chloroplast is decreased and glyphosate tolerance is reduced. (Id. at 396-400.) Even Dr.

Dewey, DeKalb's expert witness, admitted that severing the extension from the passenger protein might make a difference in some proteins. (May 26, 1999 Tr. [Doc. # 499], at 1463.) Therefore, the evidence would support a jury finding that there was a significant difference between the Comai prior art and the OTP, because the OTP contains a second, full transit peptide that allows a chloroplast enzyme to sever the EPSPS enzyme from the entire transit peptide construct.

Similar to the Comai transit peptide and the OTP, the Barry transit peptide construct contains an initial, natural transit [*94] peptide from a Rubisco gene attached to an N-terminal extension from a mature Rubisco gene -- though the extension in Barry is twenty-three amino acids in length. (May 27, 1999 Tr. [Doc. # 500], at 1688-89 (Dewey Test.).) A difference between the Barry patent and the OTP is that the OTP's natural transit peptides come from Rubisco genes in sunflower and maize, whereas Barry's natural transit peptides are derived from arabidopsis. (Id. at 1689.) Although transit peptides from different plants would be expected to function in a similar fashion, Dr. Dewey acknowledged that they would not behave "exactly precisely" the same as each other. (Id. at 1691.) A more significant difference between Barry and the OTP is that the Barry construct does not end with a full transit peptide. Rather, the last piece of the Barry construct prior to the passenger protein is derived from the very end of an arabidopsis Rubisco transit peptide and consists of eight amino acids. (May 26, 1999 Tr. [Doc. # 499], at 1488 (Dewey Test.).) In contrast, the final part of the OTP is a full, natural transit peptide from the maize Rubisco gene that is forty-seven amino acids in length. (May 17, 1999 Tr. [Doc. [*95] # 494], at 188 (DeRose Test.).)

*Evidence of Secondary Considerations*

Secondary considerations are essential components of the obviousness determination. See In Re Rouffet, 149 F.3d 1350, 1355 (Fed. Cir. 1998). Three such considerations were at issue in this case: commercial success, long-felt but unsolved need, and failure of others. See Graham, 383 U.S. at 17-18. Although DeKalb attempted to disprove a fourth secondary consideration -- unexpected results showing superiority over the prior art -- RPA did not rely on this consideration in its obviousness case and therefore the Court will not discuss it. See Medtronic, Inc. v. Intermedics, Inc., 799 F.2d 734, 739 n.13 (Fed. Cir. 1986) (stating that "the absence of objective evidence [i.e., secondary considerations] is a neutral factor").

The dispute regarding these secondary factors is not whether they exist, but rather whether evidence about the factors relates to the OTP by itself or to the Roundup Ready corn, of which the OTP is a part. In other words, the dispute regarding these factors is not whether to consider evidence of these secondary factors depends on whether the requirement of a "nexus" is met. According [*96] to the Federal Circuit, [HN30] "[a] nexus is required between the merits of the claimed invention and the evidence offered, if that evidence is to be given substantial weight enroute to conclusion on the obviousness issue." Stratoflex, Inc. v. Aeroquip Corp., 713 F.2d 1530, 1539 (Fed. Cir. 1983).

For evidence of commercial success to be introduced, RPA bears the burden of coming forward with evidence sufficient to constitute a prima facie case of the requisite nexus between the commercial success of Roundup Ready corn and the OTP. See Demaco Corp. v. F. Von Langsdorff Lic., Ltd., 851 F.2d 1387, 1392 (Fed. Cir. 1988).

> [HN31]
> A prima facie case of nexus is generally made out when the patentee shows both that there is commercial success, and that the thing (product or method) that is commercially successful is the invention disclosed and claimed in the patent. When the thing that is commercially successful is not coextensive with the patented invention--for example, if the patented invention is only a component of a commercially successful machine or process -- the patentee must show prima facie a legally sufficient relationship between that which is patented [*97] and that which is sold.

Id. DeKalb asserts that it is the GA21 event (created by DeKalb) that led to any commercial success of Roundup Ready corn -- not the OTP -- and therefore, RPA did not successfully demonstrate this "legally sufficient relationship." (Def. Br. Supp. Mot. J. Matter L. [Doc. # 511], at 11-12.)

However, there is substantial evidence to demonstrate that the OTP plays an essential role in imparting the glyphosate tolerant trait to Roundup Ready corn. First, the OTP patent itself was directed towards improving glyphosate resistance by facilitating the transfer of EPSPS genes to a plant cell's chloroplast. (Pl.'s Ex. 6, at col. 1-2.) Therefore, the OTP in Roundup Ready corn is being used in a manner consistent with the purpose of the '471 patent. Second, as Drs. DeRose and LeBrun testified, the OTP solved the "paradox" that existed with the Comai prior art because its N-terminal extension is disengaged after the passenger protein is transported into the chloroplast. This evidence reasonably could support a conclusion that the OTP's solution to this paradox re-

sulted in commercial levels of glyphosate resistance by enabling certain enzymes to remain active [*98] after they were disconnected from the transit peptide. Third, and quite simply, it had been known since at least 1986 that a transit peptide was necessary to bring an EPSPS gene into the chloroplast to provide glyphosate resistance, and the OTP is the only transit peptide to be used in commercially viable, glyphosate-resistant corn. For example, Monsanto abandoned its most promising corn events in December 1996 in order to concentrate fully on GA21, because Monsanto's lines -- containing other transit peptides -- showed insufficient levels of glyphosate tolerance. (May 21, 1999 Tr. [Doc. # 533], at 1117 (Armstrong Test.).) Moreover, the NK event, which allegedly will replace the GA21 event and which uses a different transit peptide, has not been commercialized yet, nor will it be introduced until at least the year 2001. (Id. at 1119.)

It is true that when the OTP was combined with genes other than the double mutant maize gene in RD-125, it did not provide glyphosate tolerance on its own. (May 18, 1999 Tr. [Doc. # 495], at 353 (DeRose Test.).) Moreover, Dr. DeRose testified that it was the combination of the OTP and the double mutant maize gene in RD-125 that imparted the glyphosate [*99] tolerance trait in corn. (May 17, 1999 Tr. [Doc. # 494], at 211.) However, DeKalb has not provided any case that suggests that the claimed invention must single-handedly be responsible for the commercial success of the disputed product. Rather, as Demaco Corporation makes clear, because this case involves a situation in which "the thing that is commercially successful is not coextensive with the patented invention," RPA simply must demonstrate that there exists "a legally sufficient relationship between that which is patented and that which is sold." 851 F.2d at 1392. Although other elements may share credit for imparting the glyphosate tolerant trait in corn, sufficient evidence exists to conclude that the OTP also was required for the trait to be exhibited in Roundup Ready corn.

Thus, because the evidence is sufficient for a jury to conclude that the OTP is a direct cause of the glyphosate tolerant trait in Roundup Ready corn, it is appropriate to consider any evidence of the commercial success of Roundup Ready corn. In that regard, RPA's damages expert, Christopher Bokhart, provided sufficient evidence of the commercial success of Roundup Ready corn, including [*100] evidence that a premium was being paid specifically for the trait of glyphosate resistance. See In re Huang, 100 F.3d 135, 140 (Fed. Cir. 1996) (stating that evidence of commercial success is relevant in the obviousness context if there is proof that the sales were a direct result of the unique characteristics of the invention).

Moreover, because the evidence allows for a conclusion that a nexus exists between the OTP and the glyphosate tolerant trait in Roundup Ready corn, it is permissible to consider evidence of long-felt need and failure of others. It is undisputed that there was a long-felt but unresolved need for glyphosate tolerance in corn prior to 1991. (See, e.g., May 21, 1999 Tr. [Doc. # 533], at 1080 (Armstrong Test.) (noting that Monsanto has attempted to impart glyphosate tolerance in corn since the mid-1980's).) Furthermore, DeKalb cannot seriously dispute the fact that sophisticated research companies and institutions spent many years failing to achieve marketable levels of glyphosate tolerance in corn. (See, e.g., id. at 1105 (stating that by 1996, Monsanto was not obtaining the level of glyphosate tolerance it desired in its own constructs); [*101] id. at 1119 (stating that Monsanto still has not successfully commercialized a glyphosate tolerant corn event other than GA21).)

Given the substantial evidence of a direct connection between the OTP and the success of Roundup Ready corn as the first glyphosate tolerant corn seed, it is appropriate to consider RPA's evidence of commercial success, long-felt need, and failure of others, in order to resolve the obviousness issue.

### III (D) (iii)

Again, it is a legal determination whether the Graham factors support the jury's conclusion that DeKalb did not met its burden in demonstrating invalidity under 35 U.S.C. § 103. This Court holds that sufficient evidence exists to support the jury's verdict.

DeKalb's claims for obviousness rest on the erroneous assumption that RPA was required to demonstrate that the OTP demonstrated superior, or improved, properties over the prior art, specifically over prior art by Dr. Comai and by the Barry patent. (DeKalb's Br. Supp. Mot. J. Matter L. [Doc. # 511], at 8-9.) [HN32] While superior properties or unexpected results may be used to show nonobviousness, the lack of such evidence does not lead conclusively to a determination [*102] that an invention is obvious. See Richardson-Vicks Inc., 122 F.3d at 1483 ("Evidence of secondary considerations, including evidence of unexpected results and commercial success, are but a part of the 'totality of evidence' that is used to reach the ultimate conclusion of obviousness.").

Instead, the relevant inquiry here is whether there is a reason, suggestion, or motivation in the prior art that would lead one of ordinary skill in the art to combine the references to Comai and Barry, and that would also suggest a reasonable likelihood of success. See, e.g., In re Dow Chem. Co., 837 F.2d 469, 473 (Fed. Cir. 1988). Such a suggestion or motivation may come from the references themselves, from knowledge by those skilled in the art that certain references are of special interest in a

field, or even from the nature of the problem to be solved. See Al-Site Corp. v. VSI Int'l. Inc., 174 F.3d 1308, 1324 (Fed. Cir. 1999). [HN33] It is insufficient that prior art show similar components, unless it also contains some teaching, suggestion, or incentive for arriving at the claimed structure. See Northern Telecom, Inc. v. Datapoint Corp., 908 F.2d 931, 934 (Fed. Cir. 1990). [*103]

DeKalb did not provide clear and convincing evidence that such motivation, teaching, or suggestion existed in the prior art it cited. Rather, DeKalb argues that RPA took the first two parts of the OTP -- the Rubisco transit peptide and the N-terminal extension -- from Comai, and combined them with an idea from the Barry patent to add a portion of a second transit peptide. Such an argument is nothing more than a classic case of an infringer inappropriately using hindsight to collect individual references from the prior art and employ them "as a mosaic to recreate a facsimile of the claimed invention." W.L. Gore & Assocs. v. Garlock, Inc., 721 F.2d 1540, 1552 (Fed. Cir. 1983).

Initially, it must be noted that DeKalb's own expert admitted that nothing in the prior art that existed prior to the Barry patent in 1990, including the Comai prior art, would have taught, described, or suggested using a second natural transit peptide in a chimeric transit peptide construct. (May 27, 1999 Tr. [Doc. # 500], at 1712-13 (Dewey Test.).) Dr. Dewey stated that if one "does not consider Barry, those other prior arts don't tell you to make that particular structure [the OTP]." ( [*104] Id.) Moreover, as noted above, there is sufficient evidence for the jury to conclude that the OTP's second transit peptide, which enables the disengagement of the N-terminal extension, is a significant difference from the Comai prior art. See discussion supra.

Therefore, DeKalb's obviousness defense rests on whether the Barry patent taught or suggested that a second transit peptide be added to a Comai-like structure of one Rubisco transit peptide and an N-terminal extension. The only evidence DeKalb presented was Dr. Dewey's conclusory opinion that the Barry patent taught that a second cleavage site would occur between the second transit peptide and the passenger protein. (May 27, 1999 Tr. [Doc. # 500], at 1693-95 (Dewey Test.).) However, Dr. Dewey could not point to anything specific in the Barry patent, or any prior art, that would suggest this teaching. See ATD Corp. v. Lydall, Inc., 159 F.3d 534, 546 (Fed. Cir. 1998) (overturning an obviousness determination based solely upon the "conclusory opinion" of an expert witness, with no specific evidence of a teaching or suggestion in the prior art).

Moreover, from the evidence in the record, the jury reasonably [*105] could conclude that the Barry patent does not teach or suggest a second transit peptide. First, as noted above, the OTP has a complete, second transit peptide, while the Barry construct only describes an additional eight amino acids between the N-terminal extension and the passenger protein. Second, Dr. DeRose, an expert with six years of specific experience in making herbicide-tolerant plants, testified that he did not read the Barry patent to disclose to a person of ordinary skill in the art that a cleavage site existed between the N-terminal extension and the passenger protein. (May 27, 1999 Tr. [Doc. # 500], at 1777-78 (DeRose Test.).) Additionally, Dr. DeRose was able to point to a specific portion of the '471 patent that, to a person of ordinary skill in the art, does teach a cleavage site between the second transit peptide and the passenger protein. (Id. at 1803-04.) Overall, Dr. DeRose testified that nothing in the Barry patent (or the Comai patent) would lead one of ordinary skill in the art to the OTP of the '471 patent. (May 18, 1999 Tr. [Doc. # 495], at 381.) Given this evidence, the structural differences between the two patents cannot be explained away by Dr. [*106] Dewey's conclusory opinion regarding the alleged teaching of a second cleavage site by Barry.

Third, the attenuated relationship between the Barry patent and the OTP reduces the relevancy of any similarity between the two patents. The Court recognizes that [HN34] a determination regarding the relationship of the prior art to the invention takes place prior to an inquiry regarding the prior art's teaching about that relationship. See Monarch Knitting Mach. Corp. v. Sulzer Morat GMBH, 139 F.3d 877, 882 (Fed. Cir. 1998) (stating that if those of ordinary skill would have recognized a relationship between the prior art and the invention, "then, and only then, does the trial court proceed to examine whether the prior art in fact contains a coherent teaching about that relationship"). By letting the jury consider the Barry patent, the Court already has determined that some relationship between the two patents exists. However, the strength of that relationship seems relevant to determining the depth of the teaching, suggestion, or motivation in the prior art. In this case, Dr. Dewey admitted that, although he spent 250 to 300 hours working on this matter, he was not aware of the [*107] Barry patent less than five months before trial. (May 27, 1999 Tr. [Doc. # 500], at 1686.) He was not aware of it at that point because the "transit peptide described in the Barry patent is a small portion of a larger patent" and "if you just look at . . . the title of the patent, all the information up front, you would not be aware that such a construct is described." (Id. at 1688.) Moreover, substantial evidence was presented that the Barry patent was focused on a different theory of glyphosate tolerance than the '471 patent, and therefore it would require a different type of transit peptide than the inventors of the OTP would find relevant. Whereas the OTP is focused on debilitating

Page 33