glyphosate in the chloroplasts, the Barry patent's purpose is to battle glyphosate in both the cytoplasm and the chloroplasts. (Id. at 1706-12.) According to Dr. DeRose, this different purpose requires a relatively weak transit peptide, because some of the enzyme would need to stay in the cytoplasm and not be transported to the chloroplast. (Id. at 1778-79.) This different purpose also explains why the Barry construct would use a transit peptide that is only 9% as efficient as a natural [*108] transit peptide. (May 18, 1999 Tr. [Doc. # 495], at 380 (DeRose Test.).) Such a low level of efficiency indicated to Dr. DeRose that the Barry construct does not work well at bringing enzymes into the chloroplasts. (Id.) In contrast, the OTP's sole purpose is to transport the protein into the chloroplast.

Thus, DeKalb attempted to show obviousness by cobbling together various pieces of the prior art, without demonstrating any suggestion or motivation in the prior art to make the invention of Claim 11 of the '471 patent. DeKalb cannot satisfy its burden of proof with such an argument, for as the Federal Circuit has noted,

> [HN35]
> determination of obviousness can not be based on the hindsight combination of components selectively culled from the prior art to fit the parameters of the patented invention. There must be a teaching or suggestion within the prior art, or within the general knowledge of a person of ordinary skill in the field of the invention, to look to particular sources of information, to select particular elements, and to combine them in the way they were combined by the inventor.

ATD Corp. v. Lydall, Inc., 159 F.3d 534, 546 (Fed. Cir. 1998). [*109]

Although it is not necessary given this conclusion, the Court also notes that the secondary factors discussed above support a finding of nonobviousness. Companies such as Monsanto, RPA, and DeKalb tried for many years to develop glyphosate tolerant corn. After many failings, the only brand to make it to market is Roundup Ready corn, which contains the OTP. DeKalb has forecast great profits for Roundup Ready corn, and farmers pay a large "technology fee" solely for the glyphosate-resistant trait.

In sum, there was substantial evidence from which a reasonable jury could conclude that DeKalb failed to meet its burden to prove by clear and convincing evidence that Claim 11 of the '471 patent was invalid as obvious. Accordingly, DeKalb's motion for judgment as a matter of law on the issue of obviousness [Doc. # 510] is DENIED.

### III (E)

DeKalb next claims that there was not substantial evidence to support the jury's verdict that RD-125 was a trade secret. (Def. Br. Supp. Mot. J. Matter L. [Doc. # 511], at 13.) For RD-125 [HN36] to be a trade secret, it must have "derived independent actual or potential commercial value from not being generally known or readily ascertainable through independent [*110] development or reverse engineering by persons who can obtain economic value from its disclosure or use." N.C. Gen. Stat. § 66-152(3)(a). Factors that may assist a fact-finder in determining whether something is a trade secret include the amount of effort or money expended in developing the information and the ease or difficulty with which the information could properly be acquired or duplicated by others. See Wilmington Star-News, Inc. v. New Hanover Regional Medical Center, Inc., 125 N.C. App. 174, 181, 480 S.E.2d 53, 56 (1997). n29

> n29 Prior to the start of the trial's second phase, the parties agreed that North Carolina law was the proper law to apply to RPA's trade secret misappropriation claim.

DeKalb relies on two arguments to support its motion for judgment as a matter of law. First, DeKalb asserts that RD-125 was not a trade secret because it was "functionally indistinguishable" from other transit peptide/EPSPS combinations available at the time. (Def. Br. Supp. Mot. J. Matter L. [Doc. [*111] # 511], at 14.) According to DeKalb, the RD-125 did not possess "some modicum of originality or novelty," (id. at 14), because "combinations that did the exact same thing were available elsewhere," (id. at 16).

It is true that combining a transit peptide with an EPSPS gene to impart glyphosate tolerance in plants was a technique generally known within the industry. Yet, that knowledge is not the secret RPA is attempting to protect. Rather, RPA is claiming as a trade secret the specific combination of the OTP with a maize EPSPS gene that has two precise amino acids mutated. Therefore, it is not persuasive that, prior to RPA's creation of RD-125, others may have performed these same mutations in genes from sources other than maize. (May 17, 1999 Tr. [Doc. # 494], at 228 (DeRose Test.); May 26, 1999 Tr. [Doc. # 499], at 1453-54 (Dewey Test.).) Indeed, Monsanto had performed "hundreds of thousands of mutations" in EPSPS genes prior to 1996. (May 24, 1999 Tr. [Doc. # 498], at 1277 (Padgette Test.).) Yet, it

never completed the precise mutations found in RD-125's mutated maize EPSPS gene. (Id.) Even as of 1996, a Monsanto scientist who was involved in the company's glyphosate [*112] tolerance research was not aware of the RD-125 combination, even though Monsanto had been working in this area for a decade. (May 21, 1999 Tr. [Doc. # 533], at 1106-11 (Armstrong Test.).) Moreover, no evidence was presented that Monsanto ever combined a double mutated maize EPSPS gene with the OTP. It is the combination of the OTP with the two specific mutations in a maize EPSPS gene that is unique and novel.

Not only is RD-125 original and novel, but also it is distinguishable from other technology because it is the only transit peptide/EPSPS combination that has worked to produce commercially viable, glyphosate tolerant corn seed. n30 At the time of the misappropriation -- 1996 -- Monsanto abandoned its most promising line of corn (the "Natalie" line) to adopt the GA21 event containing RD-125, because Natalie showed insufficient levels of glyphosate tolerance. (May 21, 1999 Tr. [Doc. # 533], at 1117 (Armstrong Test.).) Monsanto will not bring another line of glyphosate resistant corn to market until at least 2001, and this line (the NK event) was not even tested until after the misappropriation in December 1996. (Id. at 1118.) As North Carolina courts have noted, the difficulty [*113] with which information could be duplicated by others can support a conclusion that the information is a trade secret. See Wilmington Star-News, Inc., 125 N.C. App. at 181, 480 S.E.2d at 56. Therefore, the singular success of Roundup Ready corn, fueled in part by RD-125, gives evidence that RD-125 was different than other such combinations and not readily ascertainable. DeKalb's first claim that RD-125 was readily ascertainable because it was "functionally indistinguishable from other transit peptides" is rejected.

> n30 Although evidence was presented that other factors, such as the rice actin promoter, contributed more than RD-125 to the success of Roundup Ready corn, Dr. DeRose gave credible testimony that "the success of Roundup Ready corn is the combination of the OTP with the maize mutant EPSPS." (May 17, 1999 Tr. [Doc. # 494], at 211.)

DeKalb's second argument is that there was not substantial evidence to support the jury's verdict that the RD-125 was a trade secret in April 1996, because [*114] DeKalb asserts that the RD-125 previously had been published by DeKalb with RPA's consent in DeKalb's 1995 PCT application (Def.'s Ex. 793). (Def. Br. Supp. Mot. J. Matter L. [Doc. # 511], at 17.)

DeKalb's argument must fail because there is substantial evidence to support the jury's finding that RD-125 did not cease to be a trade secret when DeKalb's PCT application was published. (Verdict Form For Phase 1 [Doc. # 459], at 2.) First, as Dr. DeRose noted, the PCT application only discusses the use of RD-125 as a selectable marker in a petri dish -- it does not discuss using it for glyphosate tolerance in corn plants. (May 27, 1999 Tr. [Doc. # 500], at 1775 (DeRose Test.).) Second, the PCT application does not disclose fully the OTP. Rather, it merely describes it as an "optimized transit peptide sequence consisting of sequences from sunflower and maize." (Def.'s Ex. 793, at 108.) Although the OTP patent had been published by 1995, Dr. DeRose testified that the OTP in RD-125 was slightly mutated and thus not revealed in the '471 patent. (May 27, 1999 Tr. [Doc. # 500], at 1774 (DeRose Test.).) Third, the PCT application does not disclose the exact nucleotide sequence of the [*115] double mutated maize EPSPS gene, and Drs. DeRose and LeBrun testified that it would be difficult or impossible for someone skilled in the art to create the double mutant maize gene without the nucleotide sequence. (May 17, 1999 Tr. [Doc. # 494], at 222 (DeRose Test.); May 20, 1999 Tr. [Doc. # 497], at 830 (LeBrun Test.).)

Essentially, DeKalb attempts to argue that after the 1995 PCT application, all of the information necessary to construct RD-125 was in the public domain and "readily obtainable." (Def. Br. Supp. Mot. J. Matter L. [Doc. # 511], at 18.) The original OTP was disclosed in the '471 patent and a later French patent application, published on September 11, 1992 (Def.'s Ex. 1257), it was mentioned in the PCT application, and the specific mutations of the OTP in RD-125 were disclosed separately in a French patent application in 1995 (Def.'s Ex. 1480.) n31 Moreover, DeKalb asserts that the double mutant maize EPSPS gene nucleotide sequence was available in 1995 because the sequence for the native maize EPSPS gene was published in a November 20, 1990 patent by Monsanto (Def.'s Ex. 1450) and the two mutations were published in the PCT application. (Def. Br. Supp. Mot. J. [*116] Matter L. [Doc. # 511], at 18.)

> n31 DeKalb does not address the typographical errors in the description of the OTP, which Dr. DeRose testified have never been corrected publicly. (May 18, 1999 Tr. [Doc. # 495], at 323-35 (DeRose Test.).)

However, DeKalb misunderstands the nature of the inquiry, for " [HN37] a trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process,

design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." Glaxo Inc. v. Novopharm Ltd., 931 F. Supp. 1280, 1300 (E.D.N.C. 1996) (quoting Syntex Ophthalmics, Inc. v. Tsuetaki, 701 F.2d 677, 684 (7th Cir. 1983)) (internal quotation marks omitted). The jury reasonably could have found that RD-125 would remain a secret even after the various publications of different pieces of it. None of the pieces disclosed that RD-125 could be used in corn plants for glyphosate tolerance. [*117] Moreover, even with Monsanto's publication of the nucleotide sequences of the native maize EPSPS gene, Dr. DeRose testified that it took RPA three-and-one-half years for RPA to isolate and mutate that particular gene. (May 27, 1999 Tr. [Doc. # 500], at 1792.) DeKalb's witnesses testified only that various pieces of RD-125 were disclosed at different points between 1990 and 1995. Yet, none of these disclosures refer to each other, or to the ultimate use of RD-125 in corn. As important, there is no evidence that, in 1996, one skilled in the art who was interested in glyphosate tolerance in corn would know to collect these piecemeal bits of information and to connect them together to recreate RD-125. Indeed, there would be no motivation for such action, because by the time the trade secret actually was disclosed in 1997, n32 only two parties knew that RD-125 worked in marketable, glyphosate-tolerant corn: DeKalb and Monsanto. Thus, the jury could reasonably conclude that neither the DeKalb's 1995 PCT application, nor the various disclosures of pieces of RD-125, disclosed the entirety of RD-125 such that it lost its trade secret status.

---

n32 See Verdict Form for Phase 1 [Doc. # 459], at 2 (jury finding that RD-125 ceased to be a trade secret by February 1997 when RPA's PCT application was published

[*118]

Lastly, even if the PCT application disclosed RD-125, there was sufficient evidence for the jury to conclude that RPA did not provide DeKalb with permission to include RD-125 in its PCT application. (Verdict Form For Phase 1 [Doc. # 459], at 2.) On August 5, 1993, DeKalb requested permission from RPA to publish in a patent application information regarding various constructs RPA earlier had provided to DeKalb. (Def.'s Ex. 595.) DeKalb clearly requested permission to publish the double mutant maize EPSPS gene in a description of DeKalb's corn transformation process; however, DeKalb's request did not mention that it would publish the specific combination of RD-125 (i.e., the double mutant maize gene connected to the OTP). (Id.; May 27, 1999 Tr. [Doc. # 500], at 1773 (DeRose Test.).) As it is this combination that is the trade secret, the jury reasonably could have found that DeKalb's publication in the PCT patent application exceeded the extent of RPA's permission. n33

---

n33 Another problem with DeKalb's "permission" argument is that DeKalb is attempting to rely on DeKalb's own disclosure to assert that RD-125 lost its trade secret status. See Glaxo Inc. v. Novopharm Ltd., 931 F. Supp. 1280, 1300 (E.D.N.C. 1996) (noting that "it is true that parties responsible for the dissemination of another's trade secret may not benefit from the disclosure"). Although DeKalb points to RPA's "permission" to publish the construct, it seems that any "permission" must be evaluated in light of the fact that RPA was under the misperception that RD-125 did not work -- a misperception caused by DeKalb's own fraud. See discussion supra Part III(A)(ii). In other words, it is questionable whether any permission granted by RPA to DeKalb under these circumstances is fully informed permission.

[*119]

Therefore, DeKalb's motion for judgment as a matter of law on the claim of trade secret misappropriation [Doc. # 510] is DENIED.

III (F)

In the second phase or trial, DeKalb also asserted an inequitable conduct defense to RPA's patent claim, based upon alleged false statements and material omissions in a Declaration filed by Dr. Michel LeBrun, one of the named inventors on the '471 patent. " [HN38] A patent may be unenforceable due to inequitable conduct if the applicant does not disclose material information to the PTO or submits false material information, with an intent to deceive or mislead the examiner. Goodyear Tire & Rubber Co. v. Hercules Tire & Rubber Co., 162 F.3d 1113, 1122 (Fed. Cir. 1998). DeKalb, as [HN39] the party asserting the inequitable conduct defense, has the burden of proving materiality and intent by clear and convincing evidence. See Kingsdown Med. Consultants v. Hollister Inc., 863 F.2d 867, 872 (Fed. Cir. 1988).

[HN40] In order for the Court to find the '471 patent unenforceable based upon an alleged material misrepresentation, the Court must first find that the statements about which DeKalb complains are actually misrepresentations, made [*120] with knowledge of their falsity. See Hebert v. Lisle Corp., 99 F.3d 1109, 1116 (Fed. Cir. 1996) ("A holding of unenforceability based on the filing of a false oath requires that the oath was false, and made with knowledge of the falsity. Knowledge of falsity is

predicate to intent to deceive.") (citation omitted). Then, the Court must determine whether any misrepresentations or omissions meet a threshold level of materiality. The Court also must determine whether the evidence shows "a threshold level of intent to mislead the PTO." Baxter Int'l, Inc., v. McGaw, Inc., 149 F.3d 1321, 1327 (Fed. Cir. 1998). Only if the threshold levels of materiality and intent are established by clear and convincing evidence, are materiality and intent weighed together. See id. The more material the misrepresentation or omission, the less evidence of intent will be required in order to find that inequitable conduct has occurred. See id. Finally, "in light of all the circumstances, the court must then determine whether the applicant's conduct is so culpable that the patent should be held unenforceable." Id.

The first application for what became the '471 patent [*121] was filed on March 4, 1992. (Pl.'s Ex. 963, at 19.) In October 1992, the patent examiner rejected claims 1 through 6 and 12, as obvious over certain prior art, including the Journal of Biological Chemistry article ("Comai article"). (Pl.'s Ex. 963, at 102, 107.) The applicants responded by, among other things, deleting claims 1 through 12 and substituting new claims 25 through 37. (Pl.'s Ex. 963, at 125.) In July 1993, the examiner issued a second office action rejecting these new claims for obviousness over the Comai article again, as well as another piece of prior art. (Pl.'s Ex. 963, at 142, 147.) On January 18, 1994, the applicant responded with Claim 38, the claim which would ultimately become Claim 11 and which is the subject of the instant litigation. (Pl.'s Ex. 963, at 156; May 19, 1999 Tr. [Doc. # 496], at 588 (Fiorito Test.).) Claim 38 was rejected as obvious on September 13, 1994 over, again, the Comai article and another piece of prior art. n34 (Pl.'s Ex. 963, at 230-32.)

The examiner met with a representative from RPA on January 24, 1995. (Pl.'s Ex. 963, at 235.) According to the examiner's notations, she told the RPA representative that "evidence in the form of [*122] a Declaration showing unexpected properties of construct with two transit peptides may overcome [103 rejection]. . . No commitment to patentability was made." (Id.) On June 6, 1995, the examiner rejected Claim 38, among other claims, over the Comai article. (Pl.'s Ex. 963, at 244-47). The examiner cited no other relevant prior art. The examiner's rejection and comments were forwarded to Dr. LeBrun. (May 18, 1999 Tr. [Doc. # 495], at 436-37.) Dr. LeBrun prepared a Declaration pursuant to 37 C.F.R. § 1.132, n35 in which he attempted to respond to the examiner's comments and rejections by comparing the invention with the prior art found in the Comai article. He signed the Declaration on August 28, 1995. This was his last act as an RPA employee, as he left RPA's employ three days later. (Id. at 437-38.) The examiner thereafter issued a Notice of Allowability on October 23, 1995. (Pl.'s Ex. 963, at 304.) The patent application was published on April 23, 1996. (Pl.'s Ex. 6.)

---

n34 It should be noted that the PTO, in each of these office actions, also rejected many of the same claims as indefinite under 35 U.S.C. § 112.

[*123]

---

n35 Section 1.132 states that

when any claim of an application or a patent under reexamination is rejected on reference to a U.S. patent which substantially shows or describes but does not claim the same patentable invention, as defined in § 1.601(n), on reference to a foreign patent, on reference to a printed publication, or on reference to facts within the personal knowledge of an employee of the Office, or when rejected upon a mode or capability of operation attributed to a reference, or because the alleged invention is held to be inoperative, lacking in utility, frivolous, or injurious to public health or morals, affidavits or declarations traversing these references or objections may be received.

37 C.F.R. § 1.132.

---

DeKalb asserts that the LeBrun Declaration n36 contains both material misrepresentations as well as a material omission. (Def. Mem. L. Supp. Inequitable Conduct Defense [Doc. # 503], at 7-18.) Evidence regarding these claims was heard by the same jury that heard the trade secret and obviousness issues in the second trial, although for this issue, [*124] the jury was sitting in an advisory capacity. At the end of that evidence, the jury made several findings regarding DeKalb's claims. DeKalb's specific claims, the jury's findings, and the Court's conclusions are discussed below.

---

n36 The LeBrun Declaration is Exhibit 20 of Plaintiff's Exhibit 963. Hereinafter, it will be cited as "LeBrun Decl."

---

III (F) (i)

DeKalb first claims that Dr. LeBrun's statements in Paragraph Six of his Declaration were false and misleading. In Paragraph Six, Dr. LeBrun stated that

> 6. The nucleic acid constructs of the present invention which code for two uniquely positioned chloroplast transit peptides are able to localize a gene product into a chloroplast of a plant cell. A nucleic acid construct coding for a single transit peptide from a sunflower ribulose-1,5 bisphosphate carboxylase small subunit (ribulose-1,5 bisphosphate carboxylase small subunit is hereinafter referred to as "SSU") fused to a heterologous gene is also able to localize a gene product into a chloroplast of a [*125] plant cell but with a much lower efficiency than the constructs of the present invention. A nucleic acid construct coding for a single transit peptide from a sunflower SSU and 22 amino acids of the mature N-terminal region of a maize SSU is also less efficient than the claimed constructs of the present APPLICATION in expressing and transporting the aroA gene product and also results in an amino-terminal extension of the aroA gene product. These findings are illustrated in Exhibit 2.

(LeBrun Decl. P 6, at 3.) In Paragraph Seven, Dr. LeBrun fully explains Exhibit 2 to the Declaration, which depicts a "Western analysis" (or "Western Blot") test. (Id. P 7, at 3-4; May 26, 1999 Tr. [Doc. # 499], at 1491 (Dewey Test.).)

DeKalb asserts that the Western Blot test described in Exhibit 2 was not conducted in a manner that would produce "quantitative data." (Def.'s Mem. L. Supp. Inequitable Conduct Defense [Doc. # 503], at 8.) Therefore, according to DeKalb, LeBrun's statement in Paragraph Six that the claimed transit peptide is more efficient than the prior art is a material misrepresentation, because the Western Blot provided no evidence of increased quantitative efficiency [*126] over the prior art. (Id. at 9.)

The jury disagreed with DeKalb's assessment of Paragraph Six, as it found that DeKalb did not prove that "Dr. LeBrun made a positive assertion of fact that the Western Blot results shown in Exhibit 2 demonstrated that the transit peptide of the prior art had a lesser quantitative efficiency than the OTP." (Phase Two Verdict Form [Doc. # 464], at 1.) The Court adopts this finding by the jury because there is substantial evidence to support this conclusion. See Hupp v. Siroflex of Am., 122 F.3d 1456, 1465 (Fed. Cir. 1997). Moreover, the Court determines that, even if the sentences made in Paragraph Six can be read as statements of fact, the facts disclosed by Dr. LeBrun were not misleading or false.

The Court reaches this conclusion because it determines that Paragraphs Six and Seven of the Declaration are meant to be read together; whereas DeKalb's argument requires that the two paragraphs be read in isolation from one another. At the end of Paragraph Six, Dr. LeBrun mentions that "these findings are illustrated in Exhibit 2." Immediately thereafter in the beginning of Paragraph Seven, Dr. LeBrun begins explaining the Western [*127] Blot test in Exhibit 2, which provides qualitative results regarding the size of the protein in the chloroplast. There is no debate that Paragraph Seven accurately and fully describes the test results from the Western Blot test in Exhibit 2, and Dr. Dewey agreed that Paragraph Seven is the only paragraph that describes or explains the Western Blot test. (May 27, 1999 Tr. [Doc. # 500], at 1660.) Indeed, Dr. Dewey agreed that the Western Blot test is a typical test for scientists conducting microbiology work, and according to the description in Paragraph Seven, the test in Exhibit 2 was conducted in a manner consistent with the way Western Blot tests are normally run in laboratories. (Id. at 1658.) Dr. Dewey did not find anything in Paragraph Seven to be false or misleading, and he agreed with all three conclusions reached by Dr. LeBrun in Paragraph Seven. (Id. at 1658-60.) Indeed, DeKalb's expert testified that if Paragraphs Six and Seven are read together carefully, any person skilled in the art would conclude that Exhibit 2 did not attempt to show any quantitative measurement. (June 1, 1999 Tr. [Doc. # 472], at 101.) Dr. Dewey further agreed that "anyone reading Paragraph [*128] 6, and even if that person interpreted Paragraph 6 to mean something about quantitative measurement, upon reading the rest of the declaration and specifically the following paragraph, would recognize that there was no quantitative measurements attempted in this test." (Id.) Therefore, the Court finds that DeKalb did not demonstrate that Paragraph Six stated as a fact that the claimed product had a higher "quantitative efficiency" than the prior art as a result of the Western Blot tests in Exhibit 2. Rather, Exhibit 2 is fully explained in Paragraph Seven, which was meant to be read in conjunction with Paragraph Six. DeKalb did not meet its burden of proof that Dr. LeBrun made any false statements in Paragraph Six.

### III (F) (ii)

DeKalb next claims that Dr. LeBrun failed to disclose certain test results in Paragraphs Eight through Ten. (Def.'s Mem. L. Supp. Inequitable Conduct Defense [Doc. # 503], at 11-14.) These paragraphs discuss the results from "Calli tests," (or "agrobacterium" tests), located in Exhibit 4 to the Declaration, in which the weight of transformed explants were compared after one month

of exposure to glyphosate in a petri dish. A higher weight indicates more [*129] glyphosate tolerance. (May 26, 1999 Tr. [Doc # 499], at 1498 (Dewey Test.).) Three results were presented in Exhibit 4: from an untransformed control; from "the 294 construct," which contained a transit peptide, a twenty-two amino acid N-terminal extension, and the aroA gene; and from "the 410 construct," which corresponded to the claimed invention and which contained a transit peptide, a twenty-two amino acid N-terminal extension, a second transit peptide, and the aroA gene. The untransformed control weighed 5 grams, the 294 construct weighed 12 grams, and the 410 construct weighed 34 grams. (LeBrun Decl. Ex. 4.) In Paragraph 10, Dr. LeBrun concluded that the higher weight of the 410 construct clearly shows "the improved efficiency of the fusion protein of the present invention in increasing glyphosate tolerance in transformed explants. The improved glyphosate resistance of plants transformed with [the 410 construct] is due to either increased efficiency of import of the aroA protein or increased efficiency of the native sized aroA protein compared with the 'extended' aroA protein of the prior art, or both." (LeBrun Decl. P 10, at 5.)

DeKalb asserts that Dr. LeBrun [*130] should have disclosed results from other constructs that were tested at the same time as the 294 and 410 constructs, specifically the 297 construct, which contained a transit peptide and thirty-three amino acids connected to the aroA gene. (Def.'s Mem. L. Supp. Inequitable Conduct Defense [Doc. # 503], at 11-12.) However, the jury found that DeKalb did not prove by clear and convincing evidence that Dr. LeBrun "failed to disclose test results related to construct 297 in paragraphs 8 through 10, with the intent to deceive or mislead the patent office examiner." (Phase Two Verdict Form [Doc. # 464], at 2.)

The Court finds that the test results from constructs other than the 410 construct and the 294 construct were not material. [HN41] The starting point in determining materiality is the PTO regulations. See Critikon, Inc. v. Becton Dickinson Vascular Access, Inc., 120 F.3d 1253, 1257 (Fed. Cir. 1997). The Patent Office regulations state:

> [HN42]
> (b) . . . information is material to patentability when it is not cumulative to information already of record or being made of record in the application, and
>
> > (1) It establishes, by itself or in combination with other information, [*131] a prima facie case of unpatentability of a claim; or
>
> (2) It refutes, or is inconsistent with, a position the applicant takes in:
> (i) Opposing an argument of unpatentability relied on by the Office, or
> (ii) Asserting an argument of patentability

37 C.F.R. § 1.56. The entire purpose of the Declaration was to respond to the examiner's objections related to the Comai article prior art and to ascertain the effect of the invention's second transit peptide. n37 The best method of responding to these objections was to compare directly the claimed invention with the Comai prior art. Indeed, in the Amendment to the Application that accompanied Dr. LeBrun's Declaration, the applicants expressly state that the 294 construct is modeled after the Comai prior art. (Pl.'s Ex. 963, at 254.) The Comai prior art consisted of a transit peptide connected to a twenty-four amino acid N-terminal extension. Of all of the constructs Dr. LeBrun tested, no other construct more closely resembled the Comai prior art than the 294 construct, which contained a transit peptide and a twenty-two amino acid N-terminal extension. (May 19, 1999 Tr. [Doc. # 496], at 526 (LeBrun Test. [*132] ); May 27, 1999 Tr. [Doc. # 500], at 1662-63 (Dewey Test.).) The 410 construct also contained a transit peptide and a twenty-two amino acid N-terminal extension. In addition, the 410 construct has the second transit peptide that the inventors claimed differentiated it from the prior art.

---

n37 For example, in Paragraph Sixteen of the Declaration, Dr. LeBrun summarizes the findings from Paragraphs Five through Twelve, by stating that

> the present invention, exemplified by nucleic acid constructs containing two uniquely positioned SSU chloroplast transit peptide sequences, results in a more efficient expression of the aroA gene than [the 294 construct] modeled after fusion 3 of Comai, et al. Moreover, the aroA gene product produced by the claimed constructs of the APPLICATION do not lead to N-terminal extension of the aroA gene product.

(LeBrun Decl. P 16.)

In contrast, the 297 construct that was omitted had an N-terminal extension that was thirty-three amino acids in length and did not have [*133] a second transit peptide. DeKalb argues that a comparison between the 410 and the 297 was necessary because the 297 was "Comai-like," meaning that it had one transit peptide attached to an N-terminal extension. Yet, the difference in N-terminal extension length between the 297 and the 410 and 294 is important, because Dr. Dewey testified that one could not predict that the N-terminal regions of one transit peptide of one length would function in a manner similar to an internal portion of a transit peptide of a different length. (May 27, 1999 Tr. [Doc. # 500], at 1701-03.) Comparing the 297 construct, with thirty-three amino acids, with either the 410 or the 294 construct, each with twenty-two amino acids, would not serve the goal of attempting to ascertain the effect of the second transit peptide contained in the 410 construct. One could not be sure whether the second transit peptide or the additional amino acids caused the test results.

Moreover, DeKalb did not present any evidence that the actual test result from the 297 construct was significant to patentability or inconsistent with the applicant's position of superior results. The 297 construct weighed 27 grams, which indicates [*134] that the 410 construct is roughly 25% more effective than the 297 construct. (June 1, 1999 Tr. [Doc. # 472], at 113 (Dewey Test.).) Finally, the argument for the materiality of the 297 construct's results is undermined by the fact that nothing in the prior art contains the thirty-three amino acid N-terminal extension found in the 297 construct. (June 1, 1999 Tr. [Doc. # 472], at 108 (Dewey Test.).) In contrast, Dr. LeBrun was responding to specific objections from the examiner based upon the Comai prior art. Thus, the results from the 297 construct and other "Comai-like" constructs do not meet the definition of materiality found in 37 C.F.R. § 1.56.

By comparing the two constructs that were most alike, and that most closely resembled the cited prior art, Dr. LeBrun made the most relevant comparison with the prior art that could be made. No other comparison of an available construct with the 410 construct would test only the effect of the second transit peptide, which was the distinguishing feature of the claimed invention. DeKalb did not meet its burden of proof that the omission of the test results of constructs having different N-terminal extension lengths, [*135] including the 297 construct, was material to the Declaration.

### III (F) (iii)

Next, DeKalb asserts that Paragraph Eleven of the Declaration contains false and misleading statements about a greenhouse test described in that paragraph. (Def.'s Mem. L. Supp. Inequitable Conduct Defense [Doc. # 503], at 15.) n38 In Paragraph Eleven, Dr. LeBrun stated that greenhouse tests had been performed comparing the 410 construct with the 294 construct, and that those greenhouse tests showed that the plants containing the 410 construct demonstrated negligible phytotoxicity when compared to the plants containing the 294 construct. (LeBrun Declaration P 11.) The jury found that DeKalb did not prove by clear and convincing evidence that the above statement was knowingly false, or made without regard for its truthfulness. (Phase Two Verdict Form [Doc. # 464], at 2.)

n38 DeKalb's brief contains several other complaints regarding Paragraph 11, including an allegation that Dr. LeBrun failed to disclose material test results that allegedly contradict his statements in Paragraph 11. (Def.'s Mem. L. Supp. Inequitable Conduct Defense [Doc. # 503], at 15.) The Court informed the parties that questions of misrepresentation and intent to deceive would be presented to the advisory jury and that the Court would make findings relating to questions of materiality without submitting them to the jury. DeKalb had ample opportunity to address their questions before the jury and elected not to do so. DeKalb was asked to specify those portions of the Declaration that it identified as constituting inequitable conduct and those issues were placed in interrogatory form and presented to the jury. Those matters which DeKalb now raises post trial relate to issues other than materiality and should have been identified and argued before the jury, which would have had the opportunity to answer discreet question about them. DeKalb has waived these additional objections to Paragraph Eleven of the Declaration.

[*136]

Again, the Court credits the testimony of Dr. LeBrun, who fully explained the results in Paragraph Eleven. He testified that the greenhouse test that was performed involved treating transformed plants with glyphosate in the greenhouse. (May 19, 1999 Tr. [Doc. # 496], at 483.) After two or three weeks, the plants were examined for several different signs of glyphosate toxification, including reduction in the size of the plant, reduction in the plants' surface area, or some yellowing symptoms. (Id. at 483-84.) Together, these "global" observations were called the "phytotoxicity level," which is mentioned in Paragraph Eleven. (Id. at 484.) The greenhouse observations were reflected in Defendant's Exhibit 1234. (Id. at 485.) Despite DeKalb's allegations, neither the Declaration nor Dr. LeBrun ever stated that all thirty of the transformed plants possessed negligible phytotoxic-

ity. Rather, Dr. LeBrun credibly explained that the results in Paragraph Eleven come from general observations of "plants transformed with [the 410 construct]" as compared to "plants transformed with [the 294 construct]." (LeBrun Decl. P 11.) Finally, Dr. LeBrun's conclusion regarding the superiority [*137] of the 410 construct after the Calli and greenhouse tests also was supported by RPA's subsequent decision to drop work with all other transit peptides. (May 19, 1999 Tr. [Doc. # 496], at 485.) DeKalb did not meet its burden of proof that Dr. LeBrun made any false statements in Paragraph Eleven.

### III (F) (iv)

Finally, DeKalb claims that Paragraph Twelve of the Declaration contains false and misleading statements about field tests described in that paragraph. (Def.'s Mem. L. Supp. Inequitable Conduct Defense [Doc. # 503], at 16-18.) n39 In Paragraph Twelve, Dr. LeBrun stated that field tests had been performed comparing the 410 construct with the 294 construct, and that those field tests showed that the plants containing the 410 construct demonstrated negligible (5% or below) phytotoxicity when compared to the plants containing the 294 construct. (LeBrun Decl. P 12.) The jury found that DeKalb did not prove by clear and convincing evidence that the above statement was knowingly false, or made without regard for its truthfulness. (Phase Two Verdict Form [Doc. # 464], at 3.)

---

n39 As with its other objections, DeKalb's brief contains complaints not addressed by the jury, because it was not asked any special interrogatories regarding them. Therefore, as stated above, because DeKalb did not timely object to these issues not being addressed, the Court considers DeKalb's complaints on these issues waived.

---

[*138]

Essentially, DeKalb's claims are that the field tests discussed in Paragraph Twelve did not occur and that Dr. LeBrun cited to falsified results from imaginary tests. However, sufficient evidence supports the conclusion that the field tests discussed in Paragraph Twelve did occur. Dr. LeBrun testified credibly at several different points regarding the procedure undertaken during the field tests as well as the results of those field tests. (May 18, 1999 Tr. [Doc. # 495], at 401-06, 430-31, 433-34; May 19, 1999 Tr. [Doc. # 496], at 488-89.) Moreover, documentary support for the tests does exist, despite DeKalb's assertions to the contrary. (Def.'s Ex. 239, at 028387; Pl.'s Ex. 55.) For example, a January 1991 annual report from RPA discussed an aroA gene connected to the OTP and confirmed that RPA still observed phytotoxicity of about 5% after a treatment with Roundup at 800 grams of active ingredient per hectare -- the exact result found in Paragraph Twelve. (Def.'s Ex. 239; May 18, 1999 Tr. [Doc. # 495], at 403-04 (LeBrun Test.).) Neither the jury nor the Court was or is persuaded otherwise by the lack of direct documentary evidence of the field trials, given the length of time [*139] between their occurrence and the trial, and the well-documented lack of record-keeping at RPA. (May 17, 1999 Tr. [Doc. # 494], at 160-64 (DeRose Test.); May 19, 1999 Tr. [Doc. # 496], at 486-87 (LeBrun Test.).) DeKalb did not meet its burden of proof that Dr. LeBrun made any false statements in Paragraph Twelve.

### III (F) (v)

In addition to the findings made supra, the Court ultimately concludes that DeKalb did not meet its burden of proving the separate element of intent to deceive the PTO. " [HN43] Intent is often inferred from surrounding circumstances when a material misrepresentation is shown." Glaxo Inc. v. Novopharm, Ltd., 52 F.3d 1043, 1048 (Fed. Cir. 1995). However, the materiality of a misrepresentation or omission does not lead automatically to an inference of intent to deceive, because intent "is a separate and essential component of inequitable conduct." Molins PLC v. Textron, Inc., 48 F.3d 1172, 1178 (Fed. Cir. 1995) (quoting Allen Organ Co. v. Kimball Int'l, Inc., 839 F.2d 1556, 1567 (Fed. Cir. 1988)) (internal quotation marks omitted). Even when the misrepresentation is in affidavit form, an inference is not required. [*140] See Glaxo Inc., 52 F.3d at 1048. Furthermore, "mere gross negligence is insufficient to justify an inference of an intent to deceive the PTO." Baxter Int'l, Inc. v. McGaw, Inc., 149 F.3d 1321, 1329 (Fed. Cir. 1998) (citing Kingsdown Med. Consultants, 863 F.2d at 876). Evidence of good faith must be considered in determining whether inequitable conduct has been shown by clear and convincing evidence. See Baxter Int'l, Inc., 149 F.3d at 1330 (citing Kingsdown Med. Consultants, 863 F.2d at 876). However, good faith is only one factor to be considered along with the totality of the evidence. See id.

First, the Court finds that, even if Paragraph Six contains misrepresentations, Dr. LeBrun did not intend to mislead the PTO with his statements in Paragraphs Six and Seven. He testified credibly at trial that he still believes that the "efficiency of the OTP in conferring resistance to glyphosate is due to the fact that it allows an efficient transport into the chloroplast and the release of a native protein into the chloroplast." (May 18, 1999 Tr. [Doc. # 495], at 434.) Moreover, it was clear from [*141] his testimony that Dr. LeBrun used the term "efficiency" to mean a more global assessment about the qualitative results he received from his testing. (May 19, 1999 Tr.

[Doc. # 496], at 555 (LeBrun Test.).) Also, Dr. LeBrun testified credibly that he intended Paragraph Six to be a general introduction to the following paragraphs, and he freely acknowledged that the Exhibit 2 test results from the Western Blot did not provide a quantitative assessment of the claimed construct. (Id.) Most important, the ability of a person skilled in the art to read Paragraphs Six and Seven together and conclude that Exhibit 2 did not provide quantitative results, see discussion supra, leads to the conclusion that these paragraphs were written in good faith and not written with the intent to deceive the PTO into believing that Exhibit 2 provided results different than what is explained in Paragraph Seven.

Second, even if the results of the Calli tests of other constructs were material, the clear intent of Dr. LeBrun in Paragraphs Eight through Ten was to compare, as accurately as possible, the claimed invention with the examiner's citation to the Comai prior art. Dr. LeBrun testified that [*142] the purpose of the test

> was to provide directly comparable results, and by directly comparable I mean a construct having a transit peptide of 55 amino acids from sunflower, then an extension of 22 amino acid [sic] from mature part of the rubisco of maize, and this is 294, compared to OTP which have [sic] in addition a transit peptide from maize. And so we compared the prior art of Comai but strictly to the OTP. It's not a strict comparison with the 297 or 293 [constructs], and that is the reason why we didn't use these results in the patent.

(May 19, 1999 Tr. [Doc. # 496], at 526.) The Court accepts as credible Dr. LeBrun's explanation for his omission of the test results from other constructs.

Third, even if misrepresentations occurred in Paragraphs Eleven and Twelve, it is determined that Dr. LeBrun did not intend to deceive the PTO. At most, his general language about "global" results and observations, as well as the scant documentation of the testing in both the greenhouse and the field, are the result of the practices and procedures inherent in commercial research in France, as testified to by both Dr. LeBrun and Dr. DeRose. (May 17, 1999 Tr. [Doc. # [*143] 494], at 160-64 (DeRose Test.); May 19, 1999 Tr. [Doc. # 496], at 486-87 (LeBrun Test.).) As Dr. LeBrun put it when discussing the greenhouse tests:

> The important point is to remind [sic] that this is a dynamic process. What we did was to test hypothesis, and so we made constructs, we transformed plants, we regenerated plants, and we addressed the efficiency of the construct during the greenhouse test. And the whole idea is to look during a certain time to the evolution of these constructs after treatment and to have [a] global idea of efficiency of the constructs.
>
> And so it can be not done on loose paper or things like that. The important things is to remember what is the important construct and then afterward you can store this important construct and we can forget the other. It's not important. And we can continue to improve the one we have selected, and this is the case for OTP.
>
> OTP was superior. The other were [sic] not. We continued with OTP, and we forgot the other kind of constructs.

(May 19, 1999 Tr. [Doc. # 496], at 486-87.) Although DeKalb asserts that the lack of documentation leads to an inference of fraud, the Court concludes that a more likely [*144] inference is that RPA simply did not document these tests well. Any mistake that may have found its way into the Declaration based upon these procedures was the result of simple negligence -- not the result of an intent to mislead the PTO or even gross negligence.

In sum, for the reasons stated, the Court finds that Dr. LeBrun did not make misrepresentations in Paragraphs Six, Eleven, and Twelve. Moreover, he did not omit any information that was material in Paragraphs Eight through Ten. The Court also finds that the evidence does not clearly and convincingly support a finding that Dr. LeBrun made any assertions or knowingly omitted any information with the intent to deceive the PTO. The Court finds that DeKalb failed to prove inequitable conduct by clear and convincing evidence.

### IV. MOTIONS FOR A NEW TRIAL

[HN44] Under Federal Rule of Civil Procedure 59(a), a new trial will be granted if the verdict "will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." Cline v. Wal-Mart Stores, Inc., 144 F.3d 294, 301 (4th Cir. 1998) (quoting Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc., 99 F.3d 587, 594 (4th Cir. 1996)) [*145] (internal quotation marks omitted). DeKalb asserts that during the trials the Court

made several errors which, singularly or in combination, should entitle DeKalb to a new trial.

IV (A)

DeKalb claims that two prejudicial errors occurring in the first phase warrant a new trial under Fed. R. Civ. P. 59(a).

IV (A) (i)

First, DeKalb argues that RPA "was permitted to present irrelevant and highly prejudicial testimony that DeKalb had not retained certain documents, and then -- based on no evidence whatsoever -- RPA told the jurors that they could infer fraud from the fact that the documents had been discarded." (Mem. Supp. DeKalb's Mot. New Tr. [Doc. # 509], at 1-2.)

" [HN45] Under the spoliation of evidence rule, an adverse inference may be drawn against a party who destroys relevant evidence." Vodusek v. Bayliner Marine Corp., 71 F.3d 148, 155 (4th Cir. 1995). The inference can be drawn even if the party's destruction of the documents did not occur in bad faith. See id. at 156. In this case, the documents were the notes taken by Doug Fisher during the negotiations of the 1994 Agreement. It is clear from the evidence in the case that these documents were [*146] highly relevant to RPA's case of intentional fraud. See Fed. R. Evid. 401. Mr. Fisher was the lead negotiator for DeKalb on the 1994 Agreement, and his notes and memoranda from the fall of 1994 certainly are relevant as direct evidence of DeKalb's intent as it entered the agreement. Moreover, the destruction of documents was relevant as indirect evidence of fraudulent intent because of Mr. Fisher's central role in many of the events that formed the basis for RPA's fraud claim: he knew about the field test results; he and Chris Flick arranged the composition of the list of RPA materials to be transferred under the 1994 Agreement, including RD-125; and on September 7, 1994 -- the same day as Dr. Flick's letter to RPA that asked permission to use RD-125 as a selectable marker in soybeans but failed to mention the Hawaii field trials -- Mr. Fisher sent a letter to RPA suggesting that they "move quickly" to finalize the 1994 Agreement, (Pl.'s Ex. 309).

Furthermore, at the time the documents were discarded, it was foreseeable that litigation might eventually envelop the 1994 Agreement. The propriety of DeKalb's acquisition of RPA's technology was an issue in DeKalb's negotiations with [*147] Monsanto in 1996 over rights to RD-125 and other technology. On April 8, 1996, Monsanto required DeKalb to represent formally that DeKalb had rights to RPA's technology under the 1994 Agreement. (Pl.'s Ex. 392, P 1.5(b).) As DeKalb claims that it destroyed the documents in early 1996 -- in the middle of its negotiations with Monsanto, after allowing the papers to stay in the "chicken coop" for over a year -- it is a reasonable inference that DeKalb might have destroyed the papers out of fear of future litigation regarding its acquisition of rights to the technology. See Kronisch v. United States, 150 F.3d 112, 126-27 (2d Cir. 1998) (holding that [HN46] an obligation to preserve evidence arises when "a party should have known that the evidence may be relevant to future litigation"). Therefore, allowing RPA to argue to the jury that it should draw an adverse inference from the absence of these relevant documents was proper. n40 DeKalb's motion for a new trial on this ground is DENIED.

n40 Moreover, it should be noted that [HN47] while DeKalb timely objected to the relevance of this information, it did not object contemporaneously to any of RPA's statements regarding inferences the jury may draw from this evidence. Therefore, counsel's statements during closing arguments should be reviewed under a "plain error" standard, which the Court determines is not met. See United States v. Williams, 152 F.3d 294, 300 (4th Cir. 1998).

[*148]

IV (A) (ii)

Second, DeKalb complains that the Court's jury instruction regarding DeKalb's waiver of RPA's alleged breach of the 1985/1991 Agreements "failed to specify, as Illinois law requires, that the jury could only find such waiver if DeKalb intended to relinquish its rights." (Mem. Supp. DeKalb's Mot. New Tr. [Doc. # 509], at 2.) [HN48] A court's failure to give appropriate jury instructions is an adequate basis for granting a new trial. See, e.g., Furka v. Great Lakes Dredge & Dock Co., 755 F.2d 1085 (4th Cir. 1985); Edwards v. Mayes, 385 F.2d 369, 373 (4th Cir. 1967).

[HN49] Under Illinois law, a waiver is an intentional relinquishment of a known right that may be express or implied from the conduct of the party that has allegedly waived its right. See Ryder v. Bank of Hickory Hills, 146 Ill. 2d 98, 104-05, 165 Ill. Dec. 650, 652-53, 585 N.E.2d 46, 48-49 (1991). The Court instructed the jury that a waiver occurs "when a party, knowing that the other has committed a breach, elects to accept the benefits of the contract. In other words, a party's continued acceptance of the benefits of the breaching party's performance would constitute [*149] a waiver of the breach." (Ct.'s Jury Instructions [Doc. # 360], at 12.) The essence of DeKalb's complaint is that this instruction did not include the word "intentional." However, by using the words "knowing" and "elects," the Court sufficiently conveyed to the jury that any waiver by DeKalb must be