intentional. Putting aside the common sense reading of the instruction's language, one need only turn to Black's Law Dictionary and Webster's Dictionary to find further support. Black's defines "election" as the "act of choosing or selecting one or more from a greater number of persons, things, courses, or rights. . . . The internal, free, and spontaneous separation of one thing from another, without compulsion, consisting in intention and will." Black's Law Dictionary 464-65 (5th ed. 1979). Webster's defines "elect" as "carefully selected: CHOSEN," Webster's Ninth New Collegiate Dictionary 400 (1987), and "choose" as "to select freely and after consideration," id. at 236. Because it is abundantly clear that any election of a course of conduct after knowledge of a breach is, by definition, intentional, DeKalb's motion for a new trial on this ground is DENIED. [*150]

### IV (B)

DeKalb further claims that several prejudicial errors occurring during the second phase require the Court to grant its motion for new trial of the patent and trade secret misappropriation claims. (Def. Br. Supp. Mot. New Tr. [Doc. # 513], at 1.) These errors can be divided into three groupings: first, a rehash of DeKalb's complaint regarding its license defense; second, evidentiary rulings; and third, jury instructions.

### IV (B) (i)

DeKalb's initial complaint relates to the Court's ruling that, as a matter of law, DeKalb would not be permitted to present its license defense in the second phase of the trial. (Id. at 2-9.) The Court has explained this ruling supra. See discussion supra Part III(B). In sum, because of the bifurcation order, which was requested by DeKalb, any evidence regarding an alleged license to this technology should have been presented in the first phase of the trial. The Court has determined that, at the end of the first phase, there was insufficient evidence regarding an alleged license under an implied modification of the 1985/1991 Agreements to present that question to a jury. As DeKalb would not have been allowed to present this issue [*151] to the second jury under the ruling explained in this Opinion, DeKalb was not prejudiced by the manner in which the issue was resolved at trial. Therefore, DeKalb's arguments for a new trial based on the license issue are rejected.

### IV (B) (ii)

Next, DeKalb asserts that a new trial should be granted based upon "erroneous prejudicial evidentiary rulings." (Def. Br. Supp. Mot. New Tr. [Doc. # 513], at 10.) First, the Court must determine whether any of the rulings about which DeKalb complains were erroneous. Second, even if the Court is mistaken regarding its decision on evidentiary rulings, a new trial should be ordered

only if the error affects the substantial rights of the parties. [HN50] Federal Rule of Civil Procedure 61 provides:

> Harmless Error. No error in either the admission or the exclusion of evidence . . . is ground for granting a new trial . . . , unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

Fed. R. Civ. P. 61. The question, then, for this motion is whether [*152] there was error which "reasonably affected the outcome of the case." ATD Corp. v. Lydall, Inc., 159 F.3d 534, 549 (Fed. Cir. 1998). [HN51] A number of factors have guided the courts in their determinations of whether error is harmless, including (1) whether erroneously admitted evidence was the primary evidence relied upon, (2) whether the aggrieved party was nonetheless able to present the substance of its claim, (3) the existence and usefulness of curative jury instructions, (4) the extent of jury argument based on tainted evidence, (5) whether erroneously admitted evidence was merely cumulative, and (6) whether other evidence was overwhelming. See id. at 549-50.

DeKalb asserts that the Court erred in admitting evidence of the "commercial success" of Roundup Ready corn, because it claims that no evidence was presented of the "nexus" between this success and the patented invention, the OTP. As discussed supra in Part III(D)(ii), the Court finds that sufficient evidence was presented to conclude that such a nexus existed. Moreover, any error in this regard is harmless, because evidence of commercial success and the other secondary considerations was [*153] not necessary given the Court's conclusion that DeKalb failed to provide evidence of a motivation, suggestion, or teaching in the prior art. See discussion supra Part III(D)(iii).

DeKalb also objects because the Court did not allow full cross examination of Mr. Bokhart regarding this nexus. This argument is meritless as well. RPA was explicit in stating that Mr. Bokhart was not being offered to demonstrate nexus between the OTP and commercial success. (May 20, 1999 Tr. [Doc. # 497], at 876.) Moreover, Mr. Bokhart was qualified as an expert witness in the fields of accounting and the analysis of financial documents, (id. at 880-81), and repeatedly avoided answering questions that delved into the "technological" background of Roundup Ready corn, (see, e.g., May 21,

1999 Tr. [Doc. # 533], at 951-52.) Mr. Bokhart provided the opinion that DeKalb was able to charge an extra fee for Roundup Ready corn due to the trait of glyphosate resistance. Other evidence, discussed supra in Part III(D)(ii), provided sufficient evidence for the jury to find that the OTP was directly responsible for this trait.

DeKalb further asserts that the Court's exclusion of the "Chretien [*154] memo" (Def.'s Ex. 1467) precluded DeKalb from receiving a fair trial. (Def. Br. Supp. Mot. New Tr. [Doc. # 513], at 13.) According to DeKalb, n41 an RPA patent agent stated in a memo that, after DeKalb's PCT application in 1995, "the gene finds itself in the public domain." (Id. at 14.) DeKalb asserted at trial that its purpose in seeking to introduce the Chretien memo was for the jury to draw an inference that, whether RPA wanted it disclosed or not, "the gene" -- presumably the double mutant maize gene -- was in the public domain as of 1995. (May 18, 1999 Tr. [Doc. # 495], at 281.) However, the Court fails to find any relevance to Mr. Chretien's opinion regarding whether RD-125 was "disclosed" to the public. Mr. Chretien is a French patent agent, not an attorney. The jury had the PCT application, testimony about its purpose, and instructions regarding what constitutes a trade secret and what constitutes disclosure. Allowing the opinion of a non-expert in a form which could not be cross-examined would have provided no assistance to the jury and would have been prejudicial to RPA. See Fed. R. Evid. 401, 403.

> n41 As the memo was not introduced into evidence, the Court does not have a complete copy of the memo and is relying on DeKalb's representation of the memo's contents and the transcript of the Court's hearing on this issue.

[*155]  TMore importantly, the jury found that DeKalb disclosed RD-125 in the PCT application without RPA's permission. (Verdict Form for Phase 1 [Doc. # 459], at 2.) The Court has found that substantial evidence supported this finding. See discussion supra Part III(E). Indeed, the Chretien memo itself notes that, in Mr. Chretien's opinion, he thought DeKalb committed itself not to make a disclosure. (May 18, 1999 Tr. [Doc. # 495], at 280.) The lack of permission to disclose renders any inference regarding the actual disclosure of the PCT application irrelevant because even if "the gene" was disclosed in 1995, DeKalb cannot benefit from its own unauthorized disclosure of the gene combined with the OTP. See discussion supra Part III(E). Therefore, even if the Court was mistaken in excluding the Chretien memo, the error was harmless because it did not effect the outcome of the trial. See Fed. R. Civ. P. 61.

Finally, DeKalb objects to the exclusion of Dr. Comai as a witness. (Def. Br. Supp. Mot. New Tr. [Doc. # 513], at 15-16.) The Court finds that the problems surrounding Dr. Comai's testimony, including prejudice to RPA because DeKalb had never identified him as a [*156] possible witness prior to trial, jury confusion, duplicative testimony, and relevance, were fully aired at trial. (May 21, 1999 Tr. [Doc. # 533], at 908-39.) The Court's view remains that Dr. Comai's testimony does not survive the balancing of Federal Rule of Evidence 403, for the reasons stated at the hearing on May 21, 1999.

The evidentiary rulings about which DeKalb complains did not prejudice substantial rights of the parties or result in a miscarriage of justice.

## IV (B) (iii)

DeKalb's last set of arguments involves claims that three jury instructions were so erroneous as to require a new trial. [HN52] Improper instructions, of course, may be grounds for a new trial. See, e.g., Harwood v. Partrederreit AF 15.5.81, 944 F.2d 1187, 1192 (4th Cir. 1991). However, instructions must be viewed in their entirety, and a new trial is appropriate only when it is clear that error in the instructions as a whole was such as to have misled the jury. See Railroad Dynamics, Inc. v. A. Stucki Co., 727 F.2d 1506, 1518 (Fed. Cir. 1984). The Court finds that the jury instructions about which DeKalb complains are all correct statements of the law, and that as a whole, [*157] the jury was duly charged regarding the essential elements of the claims and defenses in this case.

The first complaint is that the Court refused to allow DeKalb to argue that the Patent Office's determination of nonobviousness should not be granted deference because it was based upon the LeBrun declaration, which DeKalb asserts was fraudulent. (Def. Br. Supp. Mot. New Tr. [Doc. # 513], at 16-18.) Moreover, imbedded in this complaint is DeKalb's further objection that it should have been allowed to present evidence that "RPA's patent issued because of the fraudulent LeBrun declaration." (Id. at 18.) The thrust of DeKalb's instruction and proposed argument to the jury was that the jury should consider whether RPA's rebuttal evidence to the PTO was sufficient to overcome the PTO's initial determination of prima facie obviousness. Such argument is incorrect as a matter of law, for

> [HN53]
> the determination of obviousness, vel non, requires that all the evidence be considered together. . . . If rebuttal evidence of adequate weight is produced, the holding of prima facie obviousness, being but a legal inference from previously uncontra-

dicted evidence, is dissipated. The objective [*158] evidence of unobviousness is not evaluated for its separate knockdown ability against the stonewall of the prima facie case, but is considered together with all other evidence, in determining whether the invention as a whole would have been obvious to a person ordinary skill in the field of the invention.

Applied Materials v. Advanced Semi. Materials, 98 F.3d 1563, 1570 (Fed. Cir. 1996) (citations and quotation marks omitted). Rather than accept DeKalb's erroneous proposition, the Court properly instructed the jury on the appropriate deference to the PTO, the burden of proof, and the Graham factors for consideration of the obviousness issue. (Jury Instructions [Doc. # 460], at 11-17.). Cf. Al-Site Corp. v. VSI Int'l, Inc., 174 F.3d 1308, 1323 (Fed. Cir. 1999). The Court's rulings on this matter prevented DeKalb from presenting confusing evidence of the PTO's decision, when that decision was made under a "preponderance of the evidence" standard and the jury here would be using a "clear and convincing" standard. Moreover, in order to rebut a showing of one of the Graham secondary considerations, the Court allowed DeKalb to present evidence [*159] undermining Le-Brun's assertion in his declaration that the invention in the '471 patent demonstrated "new or unexpected properties." In reviewing the transcript of DeKalb's discussion with the Court on this matter, it seems that DeKalb's real complaint on this issue is that the Court did not allow DeKalb to argue its inequitable conduct case to the jury during the phase of the trial that focused on obviousness. (May 26, 1999 Tr. [Doc. # 499], at 1380-1401.) The Court finds this complaint to be untenable as well.

DeKalb also asserts that the Court should have instructed the jury that to be patentable, an invention must be structurally different from the products in the prior art, and that the difference must result from a difference between the manner in which the prior art product functions and the manner in which the claimed invention functions. (Def. Br. Supp. Mot. New Tr. [Doc. # 513], at 18.) The Court finds no support for DeKalb's proposed instruction in the cases it cites. Moreover, the instruction provided by the Court -- that [HN54] the "patent laws do not require an invention to be superior to the prior art in order to be patentable," (Jury Instructions [Doc. # 460], at 13) [*160] -- is correct as a matter of law. See Ryco, Inc. v. Ag-Bag Corp., 857 F.2d 1418, 1424 (Fed. Cir. 1988) ("Nothing in the patent statute requires that an invention be superior to the prior art to be patentable."). Therefore, the Court rejects DeKalb's argument on this point.

DeKalb's last objection to the jury instructions relates to the Court's wording of its instruction regarding trade secret misappropriation. (Def. Br. Supp. Mot. New Tr. [Doc. # 513], at 19.) As with DeKalb's argument regarding the Court's use of the words "knowing" and "elects" instead of "intentional," see discussion supra Part IV(A), this complaint is nothing more than post hoc argument about the choice of words that ultimately convey the same substantive meaning to the jury. This complaint is also rejected.

The objections advanced by DeKalb do not warrant a new trial. DeKalb's motion for a new trial on the patent and trade secret claims [Doc. # 512] is DENIED.

## V. LEGAL AND EQUITABLE RELIEF

The foregoing conclusions compel the following rulings regarding the remedies available to RPA. First, the Court will rescind the 1994 Agreement. Second, the Court will enter Judgment for [*161] RPA for $ 1 in nominal damages and for $ 15 million for unjust enrichment based upon DeKalb's fraud. See discussion infra Part V(A). Third, the Court will enter Judgment for RPA for $ 50 million for punitive damages. See discussion infra Part V(B). Fourth, the Court will enter Judgment for RPA on its trade secret misappropriation claim and its patent infringement claim. It is the Court's understanding that DeKalb and RPA have entered into a stipulation regarding damages from these claims. Fifth, the Court will issue a permanent injunction upon DeKalb regarding its use of the '471 patent, the parameters of which will be explained in a separate Order, filed contemporaneously herewith. See discussion infra Part V(C). Sixth, the Court will deny DeKalb's motion for a stay of the permanent injunction; however, the Court will stay the imposition of the injunction for thirty days from the filing of this Opinion in order to allow DeKalb the opportunity to appeal the denial of its motion for a stay. See discussion infra Part V(D). Seventh, the Court will deny RPA's motions for attorneys' fees, increased damages, and special equitable remedies. See discussion [*162] infra Part V(E).

### V (A)

The jury awarded RPA $ 15 million based upon unjust enrichment. This verdict does not contradict North Carolina law, is in accord with general principles of restitutionary remedies, and is supported by substantial evidence.

DeKalb asserts that RPA, having been granted rescission, should not be allowed to recover for unjust enrichment as well. (Def. Reply Mem. [Doc. # 506], at 8.) This argument relies on [HN55] North Carolina's doctrine of election of remedies, whereby "a party alleging fraud must elect either the remedy of rescission or that of

damages, but may not seek both, as these remedies are inconsistent." Mehovic v. Mehovic, 133 N.C. App. 131, 514 S.E.2d 730, 733 (N.C. Ct. App. 1999) (citing Parker v. White, 235 N.C. 680, 688, 71 S.E.2d 122, 128 (1952)); see also Bernard v. Central Carolina Truck Sales, Inc., 68 N.C. App. 228, 231, 314 S.E.2d 582, 585 (1984). One who elects rescission "may recover back what he has parted with under [the contract], but cannot recover damages for the fraud." Mehovic, 514 S.E.2d at 733 (quoting Parker, 235 N.C. at 688, 71 S.E.2d at 128) [*163] (internal quotation marks omitted). However, the election of remedies rule does not preclude an award based upon unjust enrichment, for the unjust enrichment award is a restitutionary measure -- not a measure of "damages" from the contract or the fraud. See 1 Dan B. Dobbs, Law of Remedies § 4.1(1), at 557 (2d ed. 1993) (noting that "*restitution* is not *damages*; restitution is a restoration required to prevent unjust enrichment"). An award based upon unjust enrichment, then, requires DeKalb to disgorge the profits it made from its fraudulent actions. It is based upon DeKalb's illicit gains -- not damage to RPA as a result of the fraud.

Although North Carolina courts have not addressed whether an award based on unjust enrichment would be proper in a fraud case such as the instant matter, in which an item received through fraud had increased in value during the time between the fraud and the rescission, n42 it is likely that North Carolina courts would allow an unjust enrichment award under these circumstances. [HN56] Rescission does not limit a defrauded party only to return of the property that was defrauded. Cf. Lumsden v. Lawing, 117 N.C. App. 514, 518, 451 S.E.2d 659, 662 (1995) [*164] (acknowledging that the rule that rescission requires a return to the status quo ante is a general rule, not an absolute one). North Carolina courts have acknowledged that, as part of a rescission order, RPA is entitled to "full restitution" for the license it provided DeKalb in the 1994 Agreement. See Opsahl v. Pinehurst, Inc., 81 N.C. App. 56, 65, 344 S.E.2d 68, 74 (1986). In fact, at least one North Carolina court has gone farther than awarding unjust enrichment damages by allowing punitive damages in a case involving rescission of a contract, which implies an openness to consider the equities of a situation involving intentional fraud. See Mehovic, 514 S.E.2d at 733.

n42 In Kee v. Dillingham, 229 N.C. 262, 49 S.E.2d 510 (1948), the North Carolina Supreme Court did allow for a plaintiff to recover "special damages" if "rescission of the contract does not place the injured party in status quo, as where he has suffered damages which cancellation of the contract cannot repair." Id. at 265, 49 S.E.2d at 512. However, special damages are still measures of contractual "damages," and therefore do not, by definition, include restitutionary measures such as unjust enrichment. See Lumsden v. Lawing, 107 N.C. App. 493, 502, 421 S.E.2d 594, 599 (1992); Canady v. Mann, 107 N.C. App. 252, 256-57, 419 S.E.2d 597, 600 (1992) (citing Black's Law Dictionary 469 (4th ed. 1951), which defines "special damages" as damages that "are the actual, but not the necessary, result of the injury complained of, and which in fact follow it as a natural and proximate consequence in the particular case, that is, by reason of special circumstances or conditions").

[*165]

Importantly, an award based upon unjust enrichment comports with general principles of damages and remedies as well. As Professor Dobbs states,

> [HN57]
> [a] rescission is an avoidance of a transaction. Rescission will normally be accompanied by restitution on both sides. Rescission is thus less a remedy and more a matter of the conceptual apparatus that leads to the remedy: the contract is being unmade, so restoration of benefits received under the contract seems to follow.

1 Dobbs, supra § 4.3(6), at 614; see also Lumsden, 117 N.C. App. at 518, 451 S.E.2d at 662 (" [HN58] Rescission of a contract implies the entire abrogation of the contract from the beginning.").

[HN59] In cases involving fraud, the defrauded party "is entitled to have restitution of all values which he transferred in the transaction as a result of the misrepresentation." 2 Dobbs, supra § 9.3(4), at 593. In a claim based on actual fraud, such as the instant case, part of the "value" calculation includes profits the fraudulent party received from its actions. Indeed, courts normally award as restitution "all unique tangible and intangible property transferred to the defendant if it is capable [*166] of specific return, and if that property is still in the defendant's hands, . . . *and* . . . any benefits defendant derived from the use of the property or intangibles transferred . . . as may be appropriate." Id. at 593-94 (emphasis added). The Restatement (Second) of Contracts § 376 (1981) recognizes the right of a party that is defrauded to rescind a contract and sue for restitution "for any benefit he has conferred on the other party," including the fraudulent party's profits. An illustration in the Restatement is analogous to the instant case:

A fraudulently induces B to make a contract to sell a tract of land for $ 100,000. After B has conveyed the land and A has paid the price, A farms the land at a net profit of $ 10,000. B then discovers the fraud, disaffirms the contract for misrepresentation, tenders back the $ 100,000, and sues A for specific restitution plus the $ 10,000 profit that A made by farming the land. B can recover the land and $ 10,000 in restitution from A.

Restatement (Second) of Contracts § 376 illus. a(5) (1981).

The seminal case involving this notion of awarding unjust enrichment to a defrauded party based upon [*167] the increase in value of the defrauded property is Janigan v. Taylor, 344 F.2d 781 (1st Cir. 1965). n43 In Janigan, the defendant induced plaintiffs to sell their stock by fraudulent concealment of inside information. Two years later, the stock had increased in value dramatically. Although it was speculative whether the plaintiffs would have profited in the same way had they retained the stock, the court held that they could recover the defendant's profits to prevent the defendant's unjust enrichment. Id. at 786. The court distinguished between cases in which, by fraud, "one is caused to buy something that one would not have bought or would not have bought at that price," and cases in which "the property is not bought from, but sold to the fraudulent party." Id. at 786.

n43 Although Janigan arose under federal securities laws, "state-law fraud remedies produce the same kind of results, with the plaintiff recovering the defendant's market price gain at a much later date." 2 Dobbs, supra § 9.3(4), at 598-99.

[*168]

In the latter case, which aptly describes the instant case, it is appropriate to consider awarding the defrauded party "future accretions not foreseeable at the time of the transfer," even though they may be speculative, because they accrued to the fraudulent party. Id.

There can be no speculation but that the defendant actually made the profit and, once it is found that he acquired the property by fraud, that the profit was the proximate consequence of the fraud, whether foreseeable or not. It is more appropriate to give the defrauded party the benefit even of windfalls than to let the fraudulent party keep them. We may accept defendant's position that there was no fiduciary relationship and that he was dealing at arm's length. Nonetheless, [HN60] it is simple equity that a wrongdoer should disgorge his fraudulent enrichment.

Id. (citation omitted). In short, the court "fashioned relief to prevent the wrongdoer from the windfall benefit of his wrongful conduct." Estate of Jones v. Kvamme, 449 N.W.2d 428, 432 (Minn. 1989).

The same principle applies to this matter. In the instant case, DeKalb has made a great deal of money because of its fraudulent [*169] use of RD-125 since 1994. An award of "full restitution," Opsahl, 81 N.C. App. at 65, 344 S.E.2d at 74, must take into account the enormous increase in the value of RD-125 in the years after DeKalb received its license fraudulently. It would be neither equitable nor just simply to rescind the 1994 Agreement and to abrogate DeKalb's license to RD-125, while also allowing DeKalb to keep the proceeds of those ill-gotten gains. DeKalb should not be allowed to profit from its wrongful use of RPA's property.

[HN61] In order to determine how much DeKalb unjustly benefitted from its use of RD-125,

the court must resort to general considerations of fairness, taking into account the nature of the defendant's wrong, the relative extent of his or her contribution, and the feasibility of separating this from the contribution traceable to the plaintiff's interest. . . . The more culpable the defendant's behavior, and the more direct the connection between the profits and the wrongdoing, the more likely that the plaintiff can recover all defendant's profits.

Earthinfo, Inc. v. Hydrosphere Resource Consultants, Inc., 900 P.2d 113, 119 (Colo. 1995). The jury [*170] considered substantially similar factors in reaching its $ 15 million verdict for unjust enrichment. The Court instructed the jury that

unjust enrichment is a very broad and flexible doctrine recognized in the law. It has as its basis the principle that it is contrary to equity and good conscience for a defendant to retain a benefit which has come to him at the expense of the plaintiff. It's [sic] three basic requirements are (1) that the defendant was benefitted, (2) that the defendant unjustly did not pay the plaintiff for the benefits, and (3) that the failure of payment was to the plaintiff's detriment. In considering whether the doctrine should be applied in a particular case, all the facts must be examined to determine whether the circumstances render it "just or unjust, equitable or inequitable, conscionable or unconscionable," to apply the doctrine. The appropriate remedy when a party has been unjustly enriched at the expense of another is to award the injured party all of the profits attributable to the unjustly retained benefit.

(Jury Instructions [Doc. # 370], at 1.) The jury was directed to consider "in what amount, if any, RPA has proven DeKalb's profits [*171] were attributable to use of the RPA double mutant maize EPSPS gene and optimized transit peptide (OTP)." (Id. at 2.)

The Court adopts the jury's determination that $ 15 million is an appropriate calculation of the role played by RD-125 in the success of Roundup Ready corn. RPA's RD-125 construct is directly responsible for imparting the glyphosate resistant trait to Roundup Ready corn. See discussion supra Part III(D)(ii); III(D)(iii). DeKalb charges an additional $ 18 per bag premium for the trait of glyphosate resistance on top of its price for normal, non-glyphosate-resistant corn seed. Christopher Bokhart, RPA's expert witness, testified that in 1998 and 1999, DeKalb would receive almost $ 22 million because of Roundup Ready corn, consisting of $ 8.5 million in trait premiums, (Apr. 13, 1999 Tr. [Doc. # 487], at 196), a subsidy from Monsanto of $ 4.3 million to cover some of DeKalb's growing costs, (id. at 198), and incremental sales of corn containing RD-125 of $ 9 million, (id. at 200-01). By not granting RPA all of the $ 21.8 million calculated by Mr. Bokhart, the jury's award appropriately credits DeKalb for its role in producing Roundup Ready corn; however, [*172] it also recognizes the substantial evidence that demonstrated that Roundup Ready corn would not be resistant to glyphosate without RD-125.

In sum, [HN62] rescission is merely the first step in a restitutionary analysis of a fraud claim. The second step is to consider restitution by determining whether the fraudulent party unjustly benefitted from its wrongful conduct. 1 Dobbs, supra § 4.3(6), at 614. In this case, the jury determined, and the Court agrees, that RPA is entitled in equity to $ 15 million, due to the unjust enrichment DeKalb received in 1998 and 1999 from perpetrating its fraud in 1994.

### V (B)

[HN63] In North Carolina, punitive damages are allowed to punish a wrongdoer and to deter similar future conduct. Fraudulent conduct alone is sufficient to support an award of punitive damages. See Newton v. Standard Fire Ins. Co., 291 N.C. 105, 112-113, 229 S.E.2d 297, 301-302 (1976). Punitive damages may also be awarded in an equitable action for recission when the recission is based upon fraudulent conduct. See Mehovic, 514 S.E.2d at 734.

Although North Carolina has now adopted legislation limiting an award of punitive damages to the greater of $ 250,000 [*173] or three times actual damages, that statute, N.C. Gen. Stat. § 1D-25 (1997), did not become effective until the fraud claim in this case had accrued and is to be given no retroactive application. [HN64] Under the law to be applied in this case, the decision whether to award punitive damages and the appropriate amount of the award is in the discretion of the jury, although, to pass judicial scrutiny, an award must not be so excessively disproportionate to the circumstances of aggravation or outrage justifying the award that due process is offended. See Maintenance Equip. Co. v. Godley Builders, 107 N.C. App. 343, 352, 420 S.E.2d 199, 204 (1992).

The jury in this case was instructed to consider the following factors in reaching its decision about punitive damages:

(1) the reprehensibility of DeKalb's motives and conduct; (2) the likelihood, at the relevant time, of serious harm to RPA or others similarly situated; (3) the degree of DeKalb's awareness of the probable consequences of its conduct; (4) the duration of DeKalb's conduct; (5) the actual damages suffered by RPA; (6) any concealment by DeKalb of the facts or consequences of its conduct; (7) the existence and [*174] frequency of any past similar conduct by DeKalb; (8) whether DeKalb profited by the conduct; and (9) DeKalb's ability to pay punitive damages, as evidenced by its revenues or net worth.

(Jury Instructions (3rd Phase) [Doc. # 470], at 2-3.)

These are similar to the factors often cited by courts determining whether a punitive damage award comports with due process. Cf. Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 21-22, 111 S. Ct. 1032, 1045-1046, 113 L. Ed. 2d 1 (1991).

In this case the jury determined that DeKalb had not only initially obtained RD-125 by agreeing to keep RPA apprised of its research progress but also that it had formed and executed a scheme to deceive and mislead RPA by wilfully concealing the actual success of RD-125 in conferring commercial levels of glyphosate resistance in corn. This included the important information that the resistance had been successfully passed from plants regenerated in the laboratory -- from cells grown in a petri dish -- to the seeds of those plants which, in turn, were planted in a field where they germinated and grew into plants that exhibited resistance to applications of glyphosate up to four times [*175] the normal commercial application. This information was important because it showed the trait could be passed from one generation to another and because seeds retaining the trait were viable and able to grow into plants in an outdoor environment. Both were significant since the introduction of new genetic material, even if successful in initially conferring a desired trait to the cells originally transformed, often affects other necessary traits including the ability to reproduce. Even when a transformed plant has the ability to reproduce, it is unknown whether the desired trait will be transmitted to the next generation or whether the insertion of the new genetic material will alter old traits necessary to the plant's continuing viability.

As a result of this information being concealed, RPA entered into the 1994 agreement without knowledge that RD-125 had any commercial value and -- without receiving any consideration n44 for doing so -- gave DeKalb an unconditional, paid-up license to use and to sublicense a genetic construct that accomplished an objective for which much of the worldwide agricultural industry had been searching competitively for a number of years.

n44 While DeKalb contended at trial that it did give some consideration for acquiring the right to use and commercialize RD-125, there was no evidence from which a reasonable fact finder could have determined there was any consideration in addition to that given for rights to the Comai genetic materials originally comprising the subject matter of the agreement.

[*176]

DeKalb, immediately upon completion of the Hawaii field tests, had begun back crossing with its commercial quality lines. Successful back crossing normally takes at least two-and-a-half to three years using the growing seasons in three parts of the world. Since no one else in the industry had discovered a means of conveying glyphosate resistance to corn plants, DeKalb gained a significant jump on all others. While DeKalb was moving toward commercialization, RPA lost its opportunity to negotiate the sale of licenses to others who might have wished to enter the back crossing process in competition with DeKalb. DeKalb, on the other hand, has licensed others including Monsanto, the company which now solely owns DeKalb. The present and future effect of those sublicenses will likely be determined in future litigation; however, one present effect of the Monsanto sublicense is that this Court -- on the basis that there was no showing that Monsanto was aware of fraud at the time of acquiring the license -- dismissed Monsanto as a defendant in this case.

DeKalb and, subsequently Monsanto, projected Roundup Ready corn not only as a product which would generate much interest and consequent sales [*177] among its normal customers, but as a product which would increase DeKalb's market share in the corn seed industry. Evidence supported a finding that in the first two years of availability $ 22 million in DeKalb corn seed sales was directly attributable to the glyphosate resistant trait. After hearing evidence from DeKalb regarding its costs to produce and market Roundup Ready corn, the jury determined that DeKalb had been unjustly enriched by $ 15 million.

In BMW v. Gore, 517 U.S. 559, 574-583, 116 S. Ct. 1589, 1598-1603, 134 L. Ed. 2d 809 (1996) [HN65] the Supreme Court emphasized three factors in determining whether an award is grossly excessive: reprehensibility of the defendant's conduct; the ratio of the award to the actual harm inflicted and the potential harm which might have been inflicted; and a comparison to comparable civil and criminal penalties.

The jury in this case found actual fraud. In dealings between corporations, fraud, which by nature and definition necessarily involves intentional trickery and deceit, stands at the apex of reprehensibility. The fraud here resulted in RPA granting DeKalb an unrestricted, paid up license to use RD-125 and the right to [*178] sublicense others to use RD-125 on a basis different than it would have had it known RD-125 actually worked. This effectively prevented RPA from negotiating with others for similar licenses at a time when those negotiations would likely have been the most profitable and it allowed DeKalb to grant sublicenses, the validity of which are still to be determined, perhaps at considerable expense. The jury determined that DeKalb, unjustly, had received

$ 15 million in a two-year period from sales directly attributable to the use of RD-125.

Civilly, in 1994, N.C.Gen. Stat. 75-1.1 provided for treble damages for unfair and deceptive trade practices. See Hardy v. Toler, 24 N.C. App. 625, 630-31, 211 S.E.2d 809, 813, modified on other grounds, 288 N.C. 303, 218 S.E.2d 342 (1975). Criminally, in 1994, obtaining property by false pretenses was a Class H felony punishable by imprisonment up to 10 years and a fine in the discredtion of the court. See N.C. Gen. Stat. § § 14-100 (1993) (current version at N.C. Gen. Stat. § 14-100 (supp. 1998)), 14-1.1 (1993) (repealed Jan. 1, 1995). On October 1, 1994, structured sentencing laws became effective in North Carolina. [*179] See N.C. Gen. Stat. § 15A-1340.10 et seq. (1997). On December 1, 1997, the offense of utilizing false pretenses to obtain property valued at more than $ 100,000 became a Class C felony. See N.C. Gen. Stat. § 14-100 and editor's note (supp. 1998). The presumptive sentence in such a case would be 58-73 months of incarceration, and a fine in the discretion of the court. See N.C. Gen. Stat. § 15A-1340.17. A fine "in the discretion of the court" apparently has no recognized limits short of the Eighth Amendment.

In this action, RPA was not seeking compensatory damages but recission of the 1994 agreement and disgorgement of profits. Even so, there is no apparent reason when performing the "ratio" analysis not to use the jury's unjust enrichment award of $ 15 million since that represents sales proceeds directly attributable to the wrongful use of RD-125. Doing so, the ratio to punitive damages is 3.3, a figure well within that allowed in both Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 111 S. Ct. 1032, 113 L. Ed. 2d 1 (1991) and TXO Prod. Corp. v. Alliance Resources Corp., 509 U.S. 443, 113 S. Ct. 2711, 125 L. Ed. 2d 366 (1993). [*180] The ratio is fractionally more than that now permitted by N.C. Gen. Stat. § 1D-25 (1997), but certainly not disproportionately excessive in view of the BMW indicia of reprehensibility, relationship to actual and potential harm, and comparison to other civil and criminal sanctions.

V (C)

RPA has submitted a Motion for Entry of a Permanent Injunction [Doc. # 504]. " [HN66] Infringement having been established, it is contrary to the laws of property, of which the patent law partakes, to deny the patentee's right to exclude others from use of his property." Richardson v. Suzuki Motor Co., 868 F.2d 1226, 1246-47 (Fed. Cir. 1989) (citing 35 U.S.C. § 261). "It is the general rule that an injunction will issue when infringement has been adjudged, absent a sound reason for denying it." Id. at 1247 (citing W.L. Gore & Associates, Inc. v. Garlock, Inc., 842 F.2d 1275, 1281 (Fed. Cir. 1988)). DeKalb has presented no such reason. Although

DeKalb argues strenuously that a permanent injunction should not issue because the public interest will be frustrated without access to the patented technology, (Def.'s Mem. Opp. [Doc. [*181]  # 524], at 5-10), the Court determines that the public interest has been appropriately considered in the Court's denial of a stay of this injunction. See discussion infra Part V(D). The cases cited by DeKalb in this regard are otherwise distinguishable.

DeKalb admitted to infringing the '471 patent through its use of the invention in Claim 11 in Roundup Ready corn, and all of DeKalb's defenses have been rejected. Substantial evidence supported the jury's verdict that Claim 11 of the '471 patent was not invalid due to obviousness. See discussion supra Part III(D). DeKalb did not provide clear and convincing evidence that the '471 patent is unenforceable due to inequitable conduct. See discussion supra Part III(F). Therefore, RPA's Motion for Entry of a Permanent Injunction will be GRANTED. The parameters of that injunction will be set forth in an Order filed contemporaneously herewith.

V (D)

DeKalb has requested a stay pending appeal of any injunction issued by the Court [Doc. # 514].  [HN67] Four factors guide the determination of this motion: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the [*182] applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." Standard Havens Prod., Inc. v. Gencor Indus., Inc., 897 F.2d 511, 512 (Fed. Cir. 1990) (quoting Hilton v. Braunskill, 481 U.S. 770, 776, 95 L. Ed. 2d 724, 107 S. Ct. 2113 (1987)) (internal quotation marks omitted). Each factor, however, need not be given equal weight, and the formula "cannot be reduced to a set of rigid rules." 897 F.2d at 513 (quoting Hilton, 481 U.S. at 777). Indeed, the four stay factors can effectively merge: "in considering whether to grant a stay pending appeal, this court assesses movant's chances for success on appeal and weighs the equities as they affect the parties and the public." 897 F.2d at 512-13 (quoting E.I. DuPont de Nemours & Co. v. Phillips Petroleum, 835 F.2d 277, 278 (Fed. Cir. 1987) (internal quotation marks omitted)).

 [HN68] The Federal Circuit has suggested using a sliding-scale approach when evaluating motions for a stay: the stronger the showing the stay movant can make on its likelihood [*183] of success on the merits, the less compelling the showing must be with respect to the other three factors. Conversely, if the stay movant can show only a "substantial legal question," then it can obtain a stay only if it prevails on the other three stay factors. See 897 F.2d at 513. On the liklihood of success question,

DeKalb has reiterated the arguments it made in its motions for judgment as a matter of law and for a new trial. "Although the Court is confident that it ruled correctly on these matters, it cannot fairly be said that none raises a 'substantial legal question.' Equally true, however, is that [DeKalb] has not shown a 'strong likelihood of success on the merits' on any of these issues." Odetics, Inc. v. Storage Tech. Corp. 14 F. Supp. 2d 785, 798 (E.D. Va. 1998).

DeKalb would not suffer irreparable injury if an injunction is issued. DeKalb argues that it will lose profits if a stay is denied and this decision is overturned on appeal, particularly because RPA is not required to post a bond to obtain a permanent injunction. (Def. Mem. Supp. Motion Stay [Doc. # 515], at 9.) The Court fails to see how this "injury" differs from the "injury" suffered by [*184] any unsuccessful patent infringement defendant who faces injunctive relief prohibiting future infringement. Given that "it is the general rule that an injunction will issue when infringement has been adjudged, absent a sound reason for denying it," Richardson, 868 F.2d at 1247, the Court must determine that DeKalb has not made a sufficient showing of injury other than to its business interests. Of course, a patent defendant that is forced to stop infringing a patent upon which it has built substantial business often will suffer such injury. See Windsurfing Int'l, Inc. v. AMF Inc., 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986) ("One who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected."). Certainly, DeKalb has not made a showing of harm that approaches the showing of "employee layoffs, immediate insolvency, and, possibly, extinction," made by the defendant in Standard Havens. Standard Havens, 897 F.2d at 515 (warning that Windsurfing International does not overcome the equities of a case nor should it be applied "mechanically" [*185] in a motion for a stay). The Court finds that DeKalb will not suffer "irreparable injury" absent a stay.

While RPA's irreparable harm is presumed in terms of granting a permanent injunction, see Richardson, 868 F.2d at 1246-47, a stay in the injunction during the pendency of an appeal would not substantially harm RPA. RPA is already compensated for the bags of corn DeKalb will sell through the 1999 fiscal year. Moreover, RPA and DeKalb, through their stipulated damages, have established a royalty that DeKalb would pay during the course of the injunction should this Opinion be upheld by the Federal Circuit.

Of course, a stay would amount to compelling [RPA] to grant [DeKalb] a license

for the duration of the appeal, thereby depriving [RPA] of the full benefit of its statutory monopoly right to decide whether, when, and to whom to license its ['471] patent -- but only for the duration of the appeal. Thus, while significant in the injunction calculus, this harm is not decisive in the stay context. Were this not so, such harm, present in every case, would always preclude issuance of a stay.

Odetics, Inc., 14 F. Supp. 2d at 799. [*186] Moreover, RPA is not yet in the business of producing glyphosate resistant corn seed. Therefore, allowing DeKalb to continue selling Roundup Ready corn during the pendency of the appeal would not threaten any of RPA's current lines of business. See Standard Havens, 897 F.2d at 515 (staying injunction because, among other things, plaintiff made no showing of "noncompensable injury such as lost market share"). Over the long term, RPA would be irreparably harmed by the absence of an injunction, but RPA has not shown that it will suffer substantial injury if the stay is granted for the relatively brief pendency of an appeal.

Finally, the public interest does not support a stay, although it is a close question. Courts have only in "rare instances" allowed for a stay of a patent injunction because of the public interest. Rite-Hite Corp. v. Kelley Co., 56 F.3d 1538, 1547-48 (Fed. Cir. 1995) (citing cases). DeKalb claims that this case falls into that limited category because the public interest would be severely affected if farmers are deprived of the health and environmental benefits of glyphosate herbicides by not being allowed to buy Roundup Ready corn. [*187] (Def. Mem. Supp. Mot. Stay [Doc. # 515], at 4-8.) The evidence from the case and in the affidavits presented along with DeKalb's motion support the notion that the use of glyphosate herbicides -- and, correspondingly, of glyphosate-resistant corn seed -- provide substantial benefits. However, it is difficult to square this evidence with DeKalb's own arguments during the trial (which was disregarded by the jury) that it was having difficulty even making a profit with Roundup Ready corn. Clearly our farm system has not become so dependent on Roundup Ready corn seed that enjoining its production would undermine the public's interest in "a healthy farming economy and adequate crop yields." (Id. at 6.) As stated by RPA, DeKalb's argument overstates the importance of Roundup Ready corn seed to the farm industry because "the fact of the matter is that for decades -- centuries, even -- farmers have grown corn for public consumption without DeKalb's Roundup Ready corn seed" and "as a general rule the public has been able to consume such

corn without encountering negative health effects." (Pl.'s Br. Resp. [Doc. # 529], at 15.)

Balancing this potential harm to farmers, of course, is [*188] the public interest in maintaining the integrity of the patent system. Odetics, Inc., 14 F. Supp. 2d at 799-800 (citing 35 U.S.C. § 154). At best, the public interest is a neutral factor in the balancing of harms.

In conclusion, substantial or irreparable harm would not imbue to RPA, DeKalb, or the public if a stay is denied. As DeKalb has not demonstrated a "strong likelihood of success on the merits," the Court will deny its motion for entry of stay of the injunction during the pendency of an appeal. However, the Court will stay the injunction for thirty days after the entry of the Order accompanying this Opinion in order for DeKalb to appeal this ruling regarding the stay to the Federal Circuit.

V (E)

Finally, RPA has moved for further equitable relief [Doc. # 504] and increased damages and attorneys' fees [Doc. # 476]. The Court will deny these motions.

First, RPA has not demonstrated that it has any right to the GA21 event. Second, RPA has not presented "clear and convincing" evidence of willful infringement by DeKalb. " [HN69] Willfulness is determined from the totality of the circumstances, and must be proven by clear and convincing evidence. [*189] " Braun Inc. v. Dynamics Corp., 975 F.2d 815, 822 (Fed. Cir. 1992) (citations omitted). Although RPA has demonstrated intentional, fraudulent acquisition of rights to the OTP by DeKalb, it has done so under a preponderance of the evidence standard. The Court finds that RPA has not met the higher burden of proof required for the imposition of increased damages.

Third, [HN70] 35 U.S.C. § 285 provides that the court in "exceptional cases may award reasonable attorney fees to the prevailing party." Among the types of conduct which can form a basis for finding a case exceptional are "willful infringement, inequitable conduct before the P.T.O., misconduct during litigation, vexatious or unjustified litigation, and frivolous suit." Beckman Instruments v. LKB Produkter AB, 892 F.2d 1547, 1551 (Fed. Cir. 1989). "Such conduct must be supported by clear and convincing evidence." Id. Again, RPA has not demonstrated by clear and convincing evidence that this case should be considered "exceptional."

This the 8th day of February, 2000.

N. Carlton Tilley, Jr.

United States District Judge

**INDEX**

I. FACTUAL HISTORY

II. [*190] PROCEDURAL HISTORY

III. MOTIONS FOR JUDGMENT AS A MATTER OF LAW

III (A)
III (A) (i)
III (A) (ii)
III (A) (iii)
III (A) (iv)
III (B)
III (B) (i)
III (B) (ii)
III (B) (iii)
III (C)
III (C) (i)
III (C) (ii)
III (D)
III (D) (i)
III (D) (ii)
III (D) (iii)
III (E)
III (F)
III (F) (i)
III (F) (ii)
III (F) (iii)
III (F) (iv)
III (F) (v)

IV. MOTIONS FOR A NEW TRIAL

IV (A)
IV (A) (i)
IV (A) (ii)
IV (B)
IV (B) (i)
IV (B) (ii)
IV (B) (iii)

V. LEGAL AND EQUITABLE RELIEF

V (A)
V (B)
V (C)
V (D)
V (E)

INJUNCTION

TILLEY, Chief Judge

This case is now before the Court on post-trial motions from both parties. One of those motions is Plaintiff Rhone-Poulenc Agro SA's (RPA) motion for a permanent injunction [Doc. # 504]. For the reasons set forth in the Memorandum Opinion filed contemporaneously with

this Order, that motion is GRANTED. The purpose of this Order is to establish the scope of the injunction.

IT IS HEREBY ORDERED:

1. DeKalb is permanently enjoined from making any use of the technology covered by United States Patent 5,510,471 ( '471 patent). n1 This prohibition means that DeKalb shall neither use that technology in research, nor produce [*191] or sell any products involving that technology. The sole exception to this general rule is set forth below.

n1 On December 16, 1999, the Patent Office reissued the '471 patent as RE 36,449 ( '449 patent). The '471 patent, therefore, no longer exists. Nonetheless, the Court will continue to refer to the '471 patent, as it was known throughout this litigation. This injunction should be read to apply to the '449 patent, of course.

2. Because DeKalb may no longer grow or sell the GA21 corn line, any GA21 corn that DeKalb currently has growing shall be "turned under" or otherwise destroyed. However, DeKalb may sell any GA21 corn that it had in inventory on June 2, 1999. This provision covers corn in bags on that date, whether it had not yet been sold or had been sold and returned to DeKalb. It does not cover inventory acquired since that date and, consequently, any inventory acquired after June 2, 1999 must be destroyed.

This the 8th day of February, 2000.

N. Carlton Tilley, Jr.

United States District Judge [*192]

**2**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MONSANTO COMPANY and
MONSANTO TECHNOLOGY LLC,

        Plaintiff,

    v.

SYNGENTA SEEDS, INC.,
SYNGENTA BIOTECHNOLOGY, INC., et. al.,

        Defendants.

C.A. NO. 04-305 SLR
(Lead case)


RESTRICTED CONFIDENTIAL
SUBJECT TO PROTECTIVE
ORDER

DEKALB GENETICS CORP.,

        Plaintiff,

    v.

SYNGENTA SEEDS, INC.,
SYNGENTA BIOTECHNOLOGY, INC., et. al.,

        Defendants.

C.A. NO. 05-355 SLR


**EXPERT REPORT OF JOHN J. FINER**

1

# Exhibit 2

# Redacted

**3**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

MONSANTO COMPANY and
MONSANTO TECHNOLOGY LLC,

   Plaintiffs,

     v.

SYNGENTA SEEDS, INC.,
SYNGENTA BIOTECHNOLOGY, INC.,

   Defendants.

_____

DEKALB GENETICS CORPORATION,

   Plaintiff,

     v.

SYNGENTA SEEDS, INC.,
SYNGENTA BIOTECHNOLOGY, INC.,

   Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 04-305-SLR
(lead case)


Civil Action No. 1:05cv355-SLR

**CONTAINS RESTRICTED
CONFIDENTIAL
INFORMATION SUBJECT TO
PROTECTIVE ORDER**

## REBUTTAL RULE 26(a)(2) EXPERT REPORT OF ERIC WARD, Ph.D.

   I, Eric Ward, Ph.D., submit the following rebuttal expert report on behalf of Defendants

Syngenta Seeds, Inc., Syngenta Biotechnology, Inc., Golden Harvest Seeds, Inc., Garwood Seed

Co., Golden Seed Company, L.L.C., Sommer Bros. Seed Company, Thorp Seed Co., JC

Robinson Seeds, Inc., and Garst Seed Company, Inc. (collectively "Syngenta").

# Exhibit 3

# Redacted

**4**

RESTRICTED CONFIDENTIAL VIDEO DEPOSITION OF
ERIC WARD

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - -x

MONSANTO COMPANY and          :   04-305(SLR)

MONSANTO TECHNOLOGY LLC,       :

      Plaintiffs,          :

   vs.                     :

SYNGENTA SEEDS, INC.,          :

SYNGENTA BIOTECHNOLOGY, INC.,:

ET AL.,                        :

      Defendants.          :

- - - - - - - - - - - - - - - -x

DEKALB GENETICS CORPORATION,  :

      Plaintiff,          :   Civil Action Number

   vs.                     :   05-355-SLR

SYNGENTA SEEDS, INC.,          :

SYNGENTA BIOTECHNOLOGY, INC.,:

ET AL.,                        :

      Defendants.          :

- - - - - - - - - - - - - - - -x

RESTRICTED CONFIDENTIAL VIDEO DEPOSITION OF

ERIC WARD

Washington, DC

Wednesday, December 14, 2005

REPORTED BY: CARMEN SMITH
Job No. 54929

a7a1edd0-a8a7-4df3-94ea-0b7cc9dbd9d2

RESTRICTED CONFIDENTIAL VIDEO DEPOSITION OF
ERIC WARD

---

Page 182

1  a certificate of service also with this that we just
2  took out of this exhibit, but I don't think it's of
3  any substantive value.
4      MS. PATTERSON: Okay.
5      BY MS. PATTERSON:
6  Q  All right. Now, you talk about some
7  documents that you've reviewed concerning work
8  performed at RPA, and you list there some published
9  court opinions.
15:48:23 10  A  Right.
11  Q  And my initial question to you is what
12  relevance does any of this information that's set
13  forth in Exhibit I have to any of the issues addressed
14  in your -- otherwise addressed in your report?
15:49:02 15  A  And by "Exhibit I" you mean --
16  Q  I mean at Roman I.
17  A  Roman I. Well, I guess I found it useful to
18  include this for a couple reasons at least. One was
19  the Finer report begins a rather lengthy narrative of
15:49:29 20  how the experiments with the GA21 construct were
21  performed and starts in the middle of things and
22  doesn't describe at all what GA -- the construct that
23  gave rise to GA21 was, where it came from, who made
24  it. So I thought in the interest of completeness, it
15:49:50 25  would be good to include that. In addition --

---

Page 183

1  Q  Let me just ask you --
2      MR. FLIBBERT: Let him finish his answer.
3      THE WITNESS: There's at least a couple of
4  reasons, and that's one. Number two is that this gene
15:50:01 5  is quite far away from anything that's even remotely
6  referred to in the '880 or the '863 patents, and so
7  this further serves to demonstrate how much additional
8  work was required to find a gene that would actually
9  confer glyphosate resistance in maize.
15:50:19 10      And then finally, you know, I live an hour or
11  so down the road from where these trials occurred or a
12  couple parts of this trial, and I thought it was -- I
13  mean, it's instructive that -- and I guess kind of
14  ironic in this case that the Plaintiff in this case
15:50:39 15  was actually ordered to no longer sell GA21, destroy
16  its stocks, void a commercial agreement that it had
17  entered into only as a result of having defrauded RPA,
18  which was required for it to get GA21 on the market,
19  and moreover was found -- a substantial damage award
15:51:07 20  was given to RPA, both punitive damages and various
21  kinds of compensatory damages, as I understand it.
22      I'm not a legal expert, so I don't know
23  exactly what all these opinion, the rubric says in
24  them. But those are kind of the three reasons that I
15:51:25 25  felt it would be useful to include it.

---

Page 184

1      BY MS. PATTERSON:
2  Q  So those are the three reasons that you found
3  it useful to include it. However, my question to you
4  was what was relevant about it? And I move to strike
15:51:34 5  your entire answer as nonresponsive, as I don't
6  believe you've given me any information as to the
7  relevance of any of this narrative that you set
8  forth at section I to any issue that is actually in
9  dispute in this litigation.
15:51:52 10      Specifically my question to you is, and
11  listen to it very specifically and answer only that
12  question, if you would, do you know whether there is
13  any dispute as to the identity of the mutations in the
14  EPSPS gene that is present in GA21? Is that a
15:52:09 15  disputed issue in this case, do you know?
16      MR. FLIBBERT: Objection.
17      THE WITNESS: I don't -- I don't believe it
18  is.
15:52:15 19      MS. PATTERSON:
20  Q  Right. So it's not in dispute. And it's not
21  in dispute that that gene actually came from RPA
22  originally; is that true?
23  A  Not that I'm aware of.
24  Q  Okay. So those issues aren't in dispute.
15:52:28 25  Now, I believe you said a whole bunch of other things,

---

Page 185

1  but the other things you said also don't relate to any
2  issue that's in dispute in this case; isn't that
3  right?
4      MR. FLIBBERT: Objection; mischaracterizes
15:52:42 5  his testimony.
6      BY MS. PATTERSON:
7  Q  They don't relate to the process by which the
8  corn was bombarded with the gene, do they?
9  A  Well, they are certainly relevant to the gene
15:52:50 10  that was used to bombard the corn and --
11  Q  And --
12  A  And confer the glyphosate resistance.
13  Q  Right. And I believe we just established
14  that the nature of the gene and the fact that it
15:52:58 15  confers glyphosate resistance is not an issue in this
16  case; isn't that right?
17      MR. FLIBBERT: Objection; mischaracterizes
18  the testimony.
19      THE WITNESS: But it certainly is important
15:53:07 20  that this took place at some time after these patents
21  were filed, and this gene is quite separate from
22  anything that's described in the patent. It's quite
23  far away experimentally from anything that's described
24  in the patent.
25      BY MS. PATTERSON:

---

47 (Pages 182 to 185)

a7a1edd0-a8a7-4df3-94ea-0b7cc9dbd9d2

5

CONTAINS RESTRICTED CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MONSANTO COMPANY and MONSANTO TECHNOLOGY LLC, | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Action No: 04-305-SLR (Lead Case) |
| SYNGENTA SEEDS, INC., SYNGENTA BIOTECHNOLOGY, INC., | § § § § § | |
| Defendants. | § § § | |
| | § | |
| DEKALB GENETICS CORPORATION, | § § § § | |
| Plaintiff, | § § | |
| v. | § § § | Civil Action No: 05-355-SLR |
| SYNGENTA SEEDS, INC., SYNGENTA BIOTECHNOLOGY, INC., GOLDEN HARVEST SEEDS, INC., GARWOOD SEED CO., GOLDEN SEED COMPANY, L.L.C., SOMMER BROS. SEED COMPANY, THORP SEED CO., and JC ROBINSON SEEDS, INC. | § § § § § § § § | |
| Defendants. | § § | |

# REBUTTAL REPORT
## OF
## JOHN C. JAROSZ

November 22, 2005