IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MONSANTO COMPANY and MONSANTO
TECHNOLOGY LLC,

    Plaintiffs,

    v.

SYNGENTA SEEDS, INC.,
SYNGENTA BIOTECHNOLOGY, INC.,

    Defendants.

---

DEKALB GENETICS CORPORATION,

    Plaintiff,

    v.

SYNGENTA SEEDS, INC.,
SYNGENTA BIOTECHNOLOGY, INC.,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 04-305-SLR
(lead case)

**CONTAINS RESTRICTED
CONFIDENTIAL
INFORMATION SUBJECT TO
PROTECTIVE ORDER - FILED
UNDER SEAL**

## SYNGENTA'S RESPONSE TO PLAINTIFFS' OPENING
## CLAIM CONSTRUCTION BRIEF

Of counsel:
Michael J. Flibbert
Howard W. Levine
Sanya Sukduang
FINNEGAN, HENDERSON, FARABOW,
    GARRETT & DUNNER, L.L.P.
901 New York Avenue, N.W.
Washington, D.C. 20001
(202) 408-4000

Attorneys for Defendants
Dated: February 2, 2006

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
YOUNG CONAWAY STARGATT &
    TAYLOR, LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19899-0391
(302) 571-6600
jshaw@ycst.com

## TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................1

II.   NATURE AND STAGE OF THE PROCEEDINGS ...................................1

III.  SUMMARY OF THE ARGUMENT ........................................................2

IV.   THE LUNDQUIST PATENTS .................................................................4

   A.  Claims 4-9 of the '880 Patent Depend From and Incorporate by
       Reference Process Steps (i)-(iii) of Claim 1 .....................................4

       1.  The Illinois District Court Construed Claims 4-9 As Dependent
           Claims ........................................................................................4

       2.  DeKalb Ignores Its Previous Admission That Claims 4-9 of the
           '880 Patent Depend From Claim 1 ...............................................5

       3.  The Language and Form of Claims 4-9 of the '880 Patent Do
           Not Support Plaintiffs' Construction ...........................................6

       4.  The '880 Patent Specification Does Not Support Limiting
           Claim 4 to a Single Step................................................................7

       5.  Plaintiffs Ignore Critical Portions of the '880 Patent's
           Prosecution History Which Support Construing Claims 4-9 as
           Dependent Claims........................................................................7

       6.  Regardless of Its Dependency, Claim 4 Requires Performance
           of Process Steps (i)-(iii) and the Additional Step of Obtaining
           Progeny .......................................................................................8

   B.  The Term "Herbicide" in Claim 1 of the '880 Patent Means a
       Chemical Agent Employed to Kill or Inhibit the Growth of Weeds and
       Excludes Antibiotics .........................................................................9

       1.  The Specification Distinguishes Between Herbicides and
           Antibiotics...................................................................................9

       2.  The Prosecution History of the '880 Patent Confirms the
           Distinction Between Herbicides and Antibiotics.........................11

       3.  The Illinois District Court's Construction of "Herbicide
           Resistance" Is Circular and Based on Extrinsic Evidence..........12

   C.  Claims 4-9 Are Limited to Obtaining R1, R2, and R3 Progeny............13

i

1.      The Term "Progeny" in Claims 4-7 of the '880 Patent Means
        the R1 Progeny...................................................................................13

2.      The Term "Further Progeny" in Claims 6-9 of the '880 Patent
        Means the R2 Progeny and the Term "Progeny" in Claim 9 of
        the '880 Patent Means the R3 Progeny......................................................15

3.      The Illinois District Court's Construction of "Progeny" Was
        Based on Extrinsic Evidence and Incomplete.............................................16

V.  THE SHAH PATENT..............................................................................................17

    A.  Plaintiffs Do Not Dispute that the Functional Language of the Asserted
        '835 Patent Claims Must Be Given Effect..................................................17

    B.  The CTP Must Be Naturally Occurring, Target the Passenger Protein
        to the Chloroplast, and Subsequently Be Removed.....................................17

        1.      Plaintiffs' Ignore the Prior Missouri Court's Construction of
                CTP...................................................................................................18

        2.      The '835 Patent Specification Describes Only Naturally
                Occurring CTPs ...............................................................................18

        3.      During the 1985-86 Time Frame, All Existing CTPs Were
                Naturally Occurring and Located at the N-terminus.................20

        4.      The CTP Must Be Cleaved (or Removed) from the Mature
                EPSPS ..............................................................................................21

    C.  A Fusion Polypeptide Is a Chain of Amino Acids Consisting of a CTP
        Fused to an EPSPS, Where the CTP and EPSPS Are Not Found
        Together in Nature ....................................................................................24

        1.      The Missouri Court Construed CTP/EPSPS "Fusion
                Polypeptide" to Mean Joining a CTP and EPSPS Not Found
                Together In Nature...........................................................................25

        2.      The Claim Language "Fusion Polypeptide" Does Not Include
                Naturally Occurring (Homologous) CTP/EPSPS Proteins.........................26

        3.      The Prosecution History Confirms the Heterologous Nature of
                a CTP/EPSPS Fusion Polypeptide...............................................30

    D.  The Phrase "Enhance the Glyphosate Resistance of a Plant Cell"
        Means the Plant Cell Will Survive Application of Glyphosate at a
        Concentration Sufficient to Select a Transformed Plant Cell From a
        Non-Transformed Plant Cell......................................................................33

ii

VI.    CONCLUSION..................................................................................................34

059155.1008

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Bloom Eng'g Co. v. N. Am. Mfg. Co.,*
129 F.3d 1247 (Fed. Cir. 1997)................................................................7

*In re Clarke,*
356 F.2d 987 (C.C.P.A. 1965) ................................................................32

*Johns Hopkins Univ. v. CellPro, Inc.,*
152 F.3d 1342 (Fed. Cir. 1998)...........................................................28, 30

*Phillips v. AWH Corp.,*
415 F.3d 1303 (Fed. Cir. 2005)......................................................... passim

*Schumer v. Laboratories Computer Sys., Inc.,*
308 F.3d 1304 (Fed. Cir. 2002)..........................................................10, 11

*South Corp. v. United States,*
690 F.2d 1368 (Fed. Cir. 1982)...............................................................32

*In re Stempel,*
241 F.2d 755 (C.C.P.A. 1957) ................................................................32

## FEDERAL STATUTES

35 U.S.C. § 103.............................................................................31

35 U.S.C. § 112, ¶ 3.........................................................................6

35 U.S.C. § 112, ¶ 4....................................................................2, 4, 6, 7

37 C.F.R. § 1.131..........................................................................31

DB01:1983111.1

059155.1008

## INDEX OF EXHIBITS

| | |
|---|---|
| Exhibit 45 | U.S. Patent No. 5,489,520 |
| Exhibit 46 | Monsanto's Statement Regarding the Construction of the Asserted Claims of the '835 Patent filed in 01-CV-1825 (E.D. Mo.) |
| Exhibit 47 | 12/16/05 Depo. Tr. of B. Bruce |
| Exhibit 48 | Monsanto's Response to Bayer's Opening Brief Regarding the Construction of the Asserted Claims of the '835 Patent filed in 01-CV-1825 (E.D. Mo.) |
| Exhibit 49 | 5/26/88 PTO Office Action in U.S. Application 879,814 |
| Exhibit 50 | 10/24/88 Amendment B filed in U.S. Application No. 879,814 |

059155.1008

Defendants Syngenta Seeds, Inc., Syngenta Biotechnology Inc., Golden Harvest Seeds, Inc., Garwood Seed Co., Golden Seed Company, L.L.C., Sommer Bros. Seed Company, Thorp Seed Co., and JC Robinson Seeds, Inc. (collectively "Syngenta") respectfully submit this brief in response to the Opening Claim Construction Brief filed by Plaintiffs DeKalb Genetics Corporation ("DeKalb"), Monsanto Company and Monsanto Technology LLC (collectively "Monsanto").

## I.    INTRODUCTION

Plaintiffs' opening claim construction brief offers proposed constructions of several claim terms in the Lundquist and Shah patents that are unsupported by the intrinsic evidence. In fact, although Plaintiffs purport to rely on the claim language, specifications, and prosecution histories of the patents-in-suit, they ignore the very portions of the intrinsic evidence that contradict their proposed constructions. Further, Plaintiffs' proposed constructions of the Shah patent are in conflict with the understanding skilled artisans possessed at the relevant time period, as testified to by their own expert, Dr. Keegstra. Moreover, certain of Plaintiffs' proposed constructions are exactly the opposite of the constructions Plaintiffs proposed in the previous Illinois and Missouri actions involving the Lundquist '880 and Shah patents.

Syngenta's proposed constructions, on the other hand, are supported by the claim language (as understood by those skilled in the art at the time), specifications, and prosecution histories of the Lundquist and Shah patents. For these reasons, Syngenta's proposed constructions set forth in its opening claim construction brief should be adopted.

## II.    NATURE AND STAGE OF THE PROCEEDINGS

Syngenta's opening claim construction brief provides a statement of the nature and stage of the proceedings. *See* D.I. 215 at 2-3.

## III.    SUMMARY OF THE ARGUMENT

1.    Plaintiffs' opening claim construction brief contradicts that each of claims 4-9 depends (directly or indirectly) from claim 1 of the '880 patent. Plaintiffs do not refute that DeKalb previously admitted in a prior litigation that claims 4-9 depend from claim 1 and that the Illinois district court in this litigation construed the '880 patent claims as requiring microprojectile bombardment. Further, Plaintiffs have no valid basis to dispute that by their form and language, claims 4-9 depend from claim 1 and the prosecution history compels a conclusion that these claims be treated as dependent from claim 1. Indeed, Plaintiffs do not even address the requirements for the construction of dependent claims set forth in 35 U.S.C. § 112, ¶ 4. If the Court construes claims 4-9 as dependent claims, DeKalb's infringement allegations can be dismissed as a matter of law for the reasons set forth in the accompanying Lundquist Non-Infringement Motion. *See* D.I. 209.

2.    The term "herbicide" in claim 1 of the '880 patent means a chemical agent employed to kill or inhibit the growth of weeds and excludes antibiotics. Plaintiffs, however, contend that the term "herbicide resistance" encompasses not only herbicides, but also antibiotics. Contrary to Plaintiffs' contention, the specification consistently distinguishes between "herbicides" (such as glyphosate) and "antibiotics" (such as hygromycin) and ***does not*** use the two terms interchangeably. Moreover, construing "herbicide" to exclude "antibiotics"— consistent with the specification—would not exclude a preferred embodiment as Plaintiffs suggest. Finally, the prosecution history of the '880 patent and a related application also confirm the distinction between herbicides and antibiotics.

3.    The '880 patent's claim language, specification, and prosecution history establish that: (i) the term "progeny" in claims 4-7 means the R1 progeny; (ii) the term "further progeny"

2

in claims 6-9 means the R2 progeny; and (iii) the term "progeny" (second occurrence) in claim 9 means the R3 progeny. Here again, Plaintiffs disregard the intrinsic record of the '880 patent. Moreover, Plaintiffs' proposed construction impermissibly reads in a "commercial breeding program" limitation into the claims.

4.      Plaintiffs do not offer a proposed construction for the functional language recited in claim 1 of the '835 patent. Thus, Syngenta's proposed construction, which simply requests that the Court confirm that the express functional language of claim 1 constitutes limitations of . the claim, should be adopted. Consequently, the Court should grant Syngenta's Shah Non-Enablement Motion. *See* D.I. 214.

5.      Plaintiffs offer no support for their contention that the Missouri district court's construction of chloroplast transit peptide ("CTP") to mean "a naturally occurring series of amino acids that causes the transport of a polypeptide into a chloroplast," runs afoul of the Federal Circuit's decision in *Phillips*. Plaintiffs also fail to establish that the Missouri court's construction is inconsistent with the claim language as understood by those of ordinary skill in the art, the specification, and the consistent scientific testimony of both Monsanto's and Syngenta's technical experts. And Plaintiffs' proposed construction, eliminating cleavage of the CTP from the mature EPSPS protein, is inconsistent with the position Monsanto took in the prior Shah case and ignores the specification of the Shah patent.

6.      With respect to the term CTP/EPSPS "fusion polypeptide," Plaintiffs again cannot argue that the Missouri district court did not properly construe this term to mean a chain of amino acids consisting of a CTP (as defined above) fused to an EPSPS, where the CTP and EPSPS are not found together in nature. This construction is supported by the claim language as

3

understood by those skilled in the art, the specification, and the prosecution history, which Plaintiffs essentially ignore.

## IV.   THE LUNDQUIST PATENTS

### A.   Claims 4-9 of the '880 Patent Depend From and Incorporate by Reference Process Steps (i)-(iii) of Claim 1

Plaintiffs contend that process steps (i)-(iii) from claim 1 are not included in dependent claim 4 of the '880 patent. *See* D.I. 203 at 20. Rather, Plaintiffs argue that claim 4 is limited to a single step of "obtaining progeny" where the R0 plant from claim 1 is used as "starting material." *Id.* Plaintiffs' construction is allegedly supported by three pieces of evidence: (1) the language of claim 4 differs from the language of claim 5, which is a dependent claim (*Id.* at 20-21); (2) the specification states that the "invention" is a method of obtaining progeny from the R0 plant (*Id.* at 21); and (3) the inventors amended claim 4 during prosecution to remove its dependency from claim 1 (*Id.*). Plaintiffs ignore, however, that (a) the Illinois court construed claims 4-9 as dependent claims; (b) DeKalb admitted that claim 4 incorporates process steps (i)-(iii) of claim 1; (c) the language of claim 4 dictates its construction as a dependent claim; (d) the specification of the '880 patent supports construing claim 4 as a dependent claim; and (e) the prosecution history of the '880 patent confirms that the inventors prosecuted, and the PTO examined, claim 4 as a dependent claim.

### 1.   The Illinois District Court Construed Claims 4-9 As Dependent Claims

In its opening brief, Plaintiffs argue that "[t]he Illinois court's claim construction should be adopted in the instant case." D.I. 203 at 3. If the Court does adopt the Illinois court's prior claim construction, then Syngenta's Lundquist Non-Infringement Summary Judgment Motion should be granted as it is undisputed that the Illinois court recognized that the '880 patent claims

"are directed to processes, *each comprising a number of steps*," none of which Syngenta ever performed. Appendix of Exhibits in Support of Syngenta's Opening Claim Construction Brief Regarding the Lundquist and Shah Patents, Vols. I and II (D.I. 216 and 218) Ex. 10 at 18 (emphasis added). The court further determined that each of the '880 patent claims requires microprojectile bombardment:

> As already indicated, the microprojectile bombardment limitation of the product claims of the '956 patent cannot be ignored. *Each of the process claims of the remaining three patents* [including the '880 patent] *contains a step calling for bombardment with DNA-coated microprojectiles.*

*Id.* at 29 (emphasis added); *see also id.* at 36 ("The '880 claims call for bombardment of 'intact regenerable *Zea mays* cells.'"). Nothing in Plaintiffs' claim construction brief establishes that any claim of the Lundquist patents is limited to a single step. Moreover, construction of claims 5-6 of the '863 patent and 4-9 of the '880 patent as dependent claims (including process steps (i)-(iii) of claim 1) is warranted by DeKalb's own admissions in the prior Illinois case and the intrinsic evidence.

### 2. DeKalb Ignores Its Previous Admission That Claims 4-9 of the '880 Patent Depend From Claim 1

While arguing that this Court should adopt the prior Illinois district court's claim construction, DeKalb conveniently ignores the fact that in the very same prior litigation it admitted that claim 4 of the '880 patent depends from claim 1, expressly asserting that processes covered by claim 4 require the performance of process steps (i)-(iii) plus the additional step of obtaining progeny:

> [P]rocesses that are covered by this claim [claim 4] *must comprise at least the steps listed in subparts (i) - (iii) of claim 1 and the additional step of obtaining progeny* from a plant obtained by the process that has at least those steps.

D.I. 216, Ex. 7 at 60 (emphasis added). DeKalb fails to even address its prior admission that claim 4 requires *four steps*: process steps (i)-(iii) plus the additional step of obtaining progeny. *Id.*

### 3.    The Language and Form of Claims 4-9 of the '880 Patent Do Not Support Plaintiffs' Construction

Under the patent laws, a patent claim is either independent or dependent—there is no other alternative. *See* 35 U.S.C. § 112, ¶ 3 ("A claim may be written in *independent* or, if the nature of the case admits, in *dependent* or multiple *dependent* form.") (emphasis added). Here, Plaintiffs refuse to take a position as with whether claim 4 of the '880 patent is an independent or dependent claim. *See* D.I. 216, Ex. 5 at 5 (stating, with regard to claim 4, that DeKalb "does not have a contention as to the classification of this claim as independent or dependent"). Instead, based on a comparison of claims 4 and 5, Plaintiffs argue that claim 4 is limited to the single step of "obtaining progeny." D.I. 203 at 20-21. Claims 4 and 5, however, both recite the phrase "the process of claim 1 [or 4]," the only difference being the phrase's placement within the claim. Moreover, the reference in claim 4 to claim 1 requires construing claim 4 as a dependent claim that incorporates by reference the limitations of claim 1. *See* 35 U.S.C. § 112, ¶ 4 ("[A] claim in dependent form shall contain a reference to a claim previously set forth and then specify a further limitation of the subject matter claimed. A claim in dependent form shall be construed to incorporate by reference all the limitation of the claim to which it refers."). Indeed, Plaintiffs do not even address the requirements of § 112, ¶ 4 in their brief.

Claims 5-9 are all written in this same form, referring (either directly or indirectly) to claim 4 and incorporating one or more additional limitations. Thus, claims 4-9 all depend directly or indirectly from claim 1 and—as a matter of law—incorporate by reference process

6

steps (i)-(iii) of claim 1. *See* § 112, ¶ 4; *Bloom Eng'g Co. v. N. Am. Mfg. Co.*, 129 F.3d 1247, 1250 (Fed. Cir. 1997).

Moreover, if claim 4 were reduced to a single step, as Plaintiffs contend, then such a construction would render claim 4 invalid, as the '880 patent plainly acknowledges that the single step of "obtaining progeny" was "well-known [and thus obvious] to those skilled in the art." D.I. 216, Ex. 2 at col. 11:61-67.

### 4. The '880 Patent Specification Does Not Support Limiting Claim 4 to a Single Step

It is "a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude,'" not the specification. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (citations omitted). And nowhere does the specification of the '880 patent support limiting the claimed invention of claim 4 to a single step using the R0 plant as "starting material." In fact, the specification never uses the phrase "starting material," let alone refer to the R0 plant as such. As discussed above, the language and form of claims 4-9 clearly require process steps (i)-(iii) of claim 1 as limitations. The portion of the '880 specification cited by Plaintiffs (D.I. 203 at 21) does not contradict this, as the quoted language states nothing with respect to the phrase "obtained by the process of claim 1," recited in claim 4. *See* D.I. 216, Ex. 2 at col. 4:50-53 (addressing the production of plants and progeny).

### 5. Plaintiffs Ignore Critical Portions of the '880 Patent's Prosecution History Which Support Construing Claims 4-9 as Dependent Claims

Plaintiffs' brief does accurately reflect that application claim 30, which read:

30.    The process of claim 23 further comprising (iv) obtaining progeny from said fertile transgenic plant of step (iii), which comprise said DNA[,]

was amended to obtain claim 4 in its final form. Plaintiffs, however, fail to inform the Court that DeKalb's amendment was filed by Rule 312 amendment *after* claim 30 had been allowed and

059155.1008

prosecution was closed. D.I. 216, Ex. 14 at 0001082-85. Plaintiffs also fail to point out that DeKalb acknowledged that the amended claim did "not introduce new matter" and was "allowable without further search or consideration." D.I. 216, Ex. 14 at 0001085. DeKalb further fails to acknowledge that the PTO entered DeKalb's Rule 312 amendment on that basis, characterizing it "as directed to matters of form *not affecting the scope of the invention*." D.I. 216, Ex. 15 at 0001092 (emphasis added). DeKalb's failure to even address this critical portion of the '880 patent's prosecution history is telling.

Moreover, during prosecution, the PTO identified application claims 23 and 36 (patent claims 1 and 10) as independent claims and the remaining claims, including application claim 30 (patent claim 4), as dependent claims. *See* D.I. 216, Ex. 16 at 0001130; D.I. 216, Ex. 17 ("Independent claims should be designated in the Index of Claims by encircling the claim number in red ink."). For these reasons, the prosecution history compels a conclusion that claim 4-9 of the '880 patent are dependent claims that incorporate process steps (i)-(iii) of claim 1. Accordingly, if the Court adopts this construction, it should grant Syngenta's Lundquist Non-Infringement Motion. *See* D.I. 209.

6.     **Regardless of Its Dependency, Claim 4 Requires Performance of Process Steps (i)-(iii) and the Additional Step of Obtaining Progeny**

As discussed in Syngenta's opening brief, the plain language of claim 4 requires performance of process steps (i)-(iii) and the additional step of "obtaining progeny." *See* D.I. 215 at 16. Moreover, even if the Court construes claim 4 as requiring use of the R0 plant as starting material—which is not supported by the intrinsic evidence—process steps (i)-(iii) must still be performed to obtain the "progeny" of claim 4. This is because the *only* means for obtaining the R0 plant (or any subsequent progeny of the R0 plant) taught by the '880 patent is to first perform the bombardment, selection, and regeneration process steps of claim 1. *See* D.I.

8

216, Ex. 2, cols. 8-11. Thus, regardless of whether the Court construes claim 4 as a dependent claim, the claim still requires the performance of process steps (i)-(iii) and the additional step of "obtaining progeny."

### B. The Term "Herbicide" in Claim 1 of the '880 Patent Means a Chemical Agent Employed to Kill or Inhibit the Growth of Weeds and Excludes Antibiotics

Syngenta proposed a construction for the term "herbicide," whereas Plaintiffs believe the Court should adopt the Illinois district court's construction of the term "herbicide resistance." D.I. 203 at 11. Plaintiffs primarily argue that the term "herbicide resistance" should be construed broadly to encompass antibiotics and herbicides. To support this position, Plaintiffs argue that Syngenta's proposed construction, excluding antibiotics, limits the claim to only commercially available herbicides. *See* D.I. 203 at 11-12. Plaintiffs also argue that the specification of the '880 patent uses the terms "antibiotic" and "herbicide" interchangeably. *Id.* at 12-13. Finally, Plaintiffs rely on the prosecution history of the '880 patent to argue that the PTO Examiner considered the patent's examples directed to hygromycin (an antibiotic) resistance sufficient to support a claim direct to "herbicide resistance." *Id.* at 13-15. Plaintiffs ignore, however, the fact that the Illinois district court did not separately construe the term "herbicide" and none of the parties to that prior litigation offered a proposed construction of the term. *See* D.I. 216, Ex. 10 at 44-46. Plaintiffs overlook this fact because they are aware that if the Court focuses on the term "herbicide," the critical limitation, the specification and prosecution history make clear that antibiotics are not herbicides.

### 1. The Specification Distinguishes Between Herbicides and Antibiotics

Plaintiffs' contention that the specification of the '880 patent uses the terms "herbicide" and "antibiotic" interchangeably is simply wrong. D.I. 203 at 12. The '880 patent makes clear

9

that selection for transgenic corn can be accomplished using "toxic agents" such as "herbicide[s] *or* antibiotic[s]." D.I. 216, Ex. 2 at col. 2:53-55 (emphasis added); *Schumer v. Lab. Computer Sys., Inc.*, 308 F.3d 1304, 1311 (Fed. Cir. 2002) (construing the term "or" to mean "an alternative between different or unlike things . . . ."). Further, while the '880 patent states that antibiotic and herbicide resistance genes are "useful selectable markers," the specification draws a clear distinction between the two. D.I. 216, Ex. 2 at col. 7:8-22 ("Those *selectable marker genes which confer herbicide resistance* or tolerance are also of commercial utility in the resulting transformed plants.") (emphasis added).

Moreover, the specification's exclusion of antibiotics as herbicides does not, as Plaintiffs contend, exclude a preferred embodiment. D.I. 203 at 12. The '880 patent does state that the hygromycin resistance gene is a preferred "selectable marker gene." D.I. 216, Ex. 2 at col. 7:11-14. But claim 1 of the '880 patent does not recite use of a "selectable marker gene"; claim 1 of the '863 patent does. *See* D.I. 216, Ex. 1 at col. 29:26-30 and Certificate of Correction ("(i) bombarding intact regenerable *Zea mays* cells with DNA-coated microprojectiles, wherein said DNA comprises at least a *selectable marker gene* . . . .") (emphasis added). Additionally, in the recently issued '587 patent to Lundquist, independent claim 9 broadly claims a "selectable marker gene," and claims 10 and 13, which depend from claim 9, claim "herbicide resistance" and "antibiotic resistance," respectively. D.I. 218, Ex. 31 at col. 32. This demonstrates that Plaintiffs themselves recognize the distinction between a "selectable marker gene" conferring "herbicide resistance" from one that confers "antibiotic resistance." Accordingly, construing the term "herbicide" to exclude antibiotics will not exclude a preferred embodiment of the '880 patent.

10

2.    **The Prosecution History of the '880 Patent Confirms the Distinction Between Herbicides and Antibiotics**

Syngenta and Plaintiffs both rely on essentially the same series of events during prosecution of the applications leading to the '880 patent to support the respective constructions for the term "herbicide" or "herbicide resistance." Plaintiffs are wrong, however, when they state the "Examiner agreed that the example of hygromycin resistance in the specification provided support for 'herbicide resistance' . . . ." D.I. 203 at 14. During prosecution, the PTO Examiner steadfastly rejected claims directed to "herbicide resistance" on the basis that there was "no evidence that the expression of hygromycin, as taught in the specification, imparts properties that satisfy the claim limitation to: . . . imparts herbicide resistance to said fertile transgenic <u>Zea mays</u> plant. *Clearly Applicants have not demonstrated the above limitation.*" D.I. 216, Ex. 24 at 0000724; *see also*, D.I. 215 at 19-21. Plaintiffs' brief conveniently excludes the above passage.

Moreover, in the Reasons for Allowance, the PTO Examiner relied on examples directed to hygromycin resistance to support the limitation in claim 1 that the "DNA is transmitted through a complete sexual cycle of said transgenic plant to its progeny," and not for support of "herbicide" resistance. *See* D.I. 218, Ex. 28 at 0000857-59. The PTO Examiner then drew a distinction between the specification's disclosure of a hygromycin-resistance gene, which conferred "a new non-native plant phenotype corresponding to *hygromycin resistance*," and the disclosure of "art known and available DNA sequences," including "those providing herbicide resistance." *Id*. at 000858. Thus, the prosecution history of the '880 patent is consistent with the specification's exclusion of antibiotics as herbicides.

11

3.    The Illinois District Court's Construction of "Herbicide Resistance" Is Circular and Based on Extrinsic Evidence

Plaintiffs rely heavily on the Illinois court's construction of the term "herbicide resistance" in its opening claim construction brief. *See* D.I. 203 at 10-11. In that prior litigation, the Illinois court stated that "herbicide resistance" means "the plant has more resistance to an agent having herbicidal activity, when applied to plant material, than the same plant that does not have the transgene under the same conditions of application and plant material." D.I. 216, Ex. 10 at 46. This is the same construction proposed by Plaintiffs. D.I. 203 at 10. The Illinois court's use of the phrase "herbicidal activity" to construe the phrase "herbicide" results in a circular definition void of any meaning. This result is contrary to the purpose of construing the claim terms.

The court's construction of "herbicide resistance" was also based on the prosecution history of U.S. Patent No. 5,484,956, which the court acknowledged did not claim "herbicide resistance," and thus, cannot possibly provide insight as to the claimed term. D.I. 216, Ex. 10 at 45. The court also relied on the prosecution history of U.S. Patent No. 5,489,520, which is extrinsic, and in no way related to the Lundquist patents. *Id.* at 46; *see also*, U.S. Patent No. 5,489,520 (Ex. 45) front cover (naming inventors other than Ron Lundquist and David Walters, and not claiming benefit of any application leading to the '880 patent). Reliance on this type of extrinsic evidence is disfavored and, thus, should not be adopted. *See Phillips*, 415 F.3d 1319 (stating that "undue reliance on extrinsic evidence poses the risk that it will be used to change the meaning of claims in derogation of the 'indisputable public records consisting of the claims, the specification and the prosecution history,' thereby undermining the public notice function of patents.").

12

The Illinois district court also did not have an opportunity to evaluate DeKalb's separate claims directed to "herbicide resistance" and "antibiotic resistance." During prosecution of the '695 application, which led to the '863 patent, DeKalb filed a Preliminary Amendment adding *separate* claims directed to "herbicide resistance" (e.g., claims 56, 62, and 64-66) and "antibiotic resistance" (e.g., claims 68-72). *See* D.I. 218, Ex. 29 at 0002456-62; *see also* D.I. 218, Ex. 31 at claims 10 and 13-19 (providing separate claims for "herbicide resistance" and "antibiotic resistance"). Further, in response to a Restriction Requirement, DeKalb stated:

> Applicants provisionally elect with traverse a selectable marker gene encoding *antibiotic resistance* wherein the gene encodes resistance to bleomycin, encodes resistance to *hygromycin*, . . . .

D.I. 218, Ex. 30 at 0002557-58. The '863 patent was not at issue in the prior Illinois action and, therefore, that court did not review DeKalb's own admissions. Because the Illinois district court's construction of the term "herbicide resistance" is circular and based on extrinsic evidence, the Court should construe the term "herbicide" in claim 1 of the '880 patent to exclude antibiotics.

### C.    Claims 4-9 Are Limited to Obtaining R1, R2, and R3 Progeny

#### 1.    The Term "Progeny" in Claims 4-7 of the '880 Patent Means the R1 Progeny

Plaintiffs contend that the term "progeny" recited in claims 1 and 4-9 of the '880 patent means: the R1 and succeeding generations no matter how they are obtained from the R0 plant (claims 1 and 4-5); R2 and succeeding generations (claims 6 and 7); and R3 and succeeding generations (claims 8-9). D.I. 203 at 16-17. Plaintiffs argue that support for their construction comes from the '880 patent's disclosure of a commercial breeding program and that if Plaintiffs intended to claim only a limited number of generations, they would have done so in the claim language. D.I. 203 at 16-19. Plaintiffs' argument ignores not only the specification, but also

13

clear statements made during the prosecution of the '880 patent that contradict Plaintiffs' proposed construction.

The specification of the '880 patent clearly states that:

> The plants regenerated from the transformed callus are referred to as the R0 generation or R0 plants. The seeds produced by various *sexual crosses of the R0 generation plants are referred to as R1 progeny or the R1 generation.* When R1 seeds are germinated, the resulting plants are also referred to as the R1 generation.

D.I. 216, Ex. 2 at col. 11:14-19. Plaintiffs' figure at page 9 of their brief also confirms that *only* R1 progeny may be obtained from sexual crosses of the R0 plant. *See* D.I. 203 at 9. Thus, Plaintiffs' contention that "progeny" covers R1 and succeeding generations "no matter how they are obtained from the R0 plant of claim 1," (D.I. 203 at 16), is contradicted by the specification and their own brief. The only way of "obtaining progeny" is to conduct a sexual cross of the R0 plant. And because claim 4 states that "progeny" are obtained "from a fertile transgenic plant obtained by the process of claim 1," i.e., from an "R0" plant, the term "progeny" in claim 4 can only cover R1 progeny.

This was confirmed during prosecution of the '880 patent where DeKalb specifically stated that the term "progeny" was limited to R1 progeny. D.I. 218, Ex. 32 at 0001055 ("claim 31 [patent claim 5] recites that in step (iv), *'R1' progeny* of the 'R0' plant of step (iii), are obtained by crossing the R0 plant with an inbred line.") (emphasis added). DeKalb also stated that "[c]laims 30-31 [patent claims 4-5] are supported by the specification at pages 31-34, wherein the presence of the introduced DNA is confirmed in *the R1 generation plants, which are obtained by crossing the R0 plant with A188, B73 and Oh43.*" D.I. 216, Ex. 11, at 0001047 (emphasis added). Plaintiffs completely ignore these highly relevant portions of the prosecution history.

14

Plaintiffs' assertion that the asserted claims essentially encompass a "commercial breeding program" ignores the plain language of the claims and DeKalb's expressed disavowal of succeeding generations. As discussed above, the patentability of the asserted claims during prosecution was based solely on process steps (i)-(iii) of claim 1, as the additional step of "obtaining progeny" was "well-known to those skilled in the art." D.I. 216, Ex. 2 at col. 11:61-67. Accordingly, it is logical that the inventors added dependent claims directed to additional steps involving obtaining progeny from a limited number of generations. Moreover, the claims are silent with respect to a "commercial breeding program" and construing the claims as such would impermissibly read in limitations from the specification. Thus, limiting the term "progeny" in claims 4-7 to R1 progeny will not "strip the '880 patent of any meaningful value," as it is clear the only allegedly novel aspect of the claims resides in process steps (i)-(iii).

### 2. The Term "Further Progeny" in Claims 6-9 of the '880 Patent Means the R2 Progeny and the Term "Progeny" in Claim 9 of the '880 Patent Means the R3 Progeny

As discussed above, Plaintiffs contend, without any support from the claims, specification, or prosecution history of the '880 patent, that claims 6-7 encompass R2 progeny and later generations and claims 8-9 cover the R3 progeny and later generations. D.I. 203 at 17. Such a construction, however, ignores the claim language and prosecution history.

Claim 7 of the '880 patent states that "the progeny" of claim 5 (the R1 progeny) are crossed back to the inbred line to obtain "further progeny." As demonstrated in the figure at page 9 of Plaintiffs' brief, a sexual cross of the R1 progeny results *only* in "R2" progeny. This too, was confirmed during prosecution, where DeKalb specifically argued that:

> Claim 33 ['880 patent claim 7] effectively recites step (iv), obtaining 'R1' progeny; (v) crossing the 'R1' progeny with the inbred line, and (vi) obtaining *further 'R2' progeny.*

15

D.I. 218, Ex. 32 at 0001055 (emphasis added). Since claim 6, 8, and 9 also recite the term "further progeny," that term used in those claims must also mean the R2 progeny.

Similarly, claim 9 states that the "further progeny" obtained by the process of claim 7 (R2 progeny), are crossed back to the inbred line to obtain "progeny." Crossing R2 progeny back to an inbred line would produce only "R3" progeny. *See* D.I. 203 at 9. DeKalb again confirmed this during prosecution when it stated:

> Step 34 [*sic*, claim 35, '880 patent claim 9] recites that (vii) the 'further (R2) progeny' are crossed back to the inbred line to *obtain 'R3' progeny*."

D.I. 218, Ex. 32 at 0001055 (emphasis added). Thus, the term "progeny" (second occurrence) in claim 9 of the '880 patent means the R3 progeny.

### 3. The Illinois District Court's Construction of "Progeny" Was Based on Extrinsic Evidence and Incomplete

Here again, Plaintiffs rely on the Illinois district court's construction of the term "progeny" for support. D.I. 203 at 16. In reaching its construction of the term "progeny," however, the Illinois district court relied on the specification of the Adams '520 patent, which is in no way related to the Lundquist patents. *See* D.I. 216, Ex. 10 at 39-40. The specification of the Adams '520 patent might have been relevant in the prior Illinois case, because the patent was at issue, but it is clearly not relevant here and should not form a basis for the Court's claim construction. Moreover, the court relied on portions of the specification of the '956 patent not found within the specification of the '880 patent. *See* D.I. 216, Ex. 10 at 40. Finally, the Illinois district court never independently construed the terms "further progeny," as recited in claims 6-9, and "progeny" (second occurrence), recited in claim 9. Because the Illinois district court's claim construction was incomplete and based on extrinsic evidence not applicable to the meaning of the terms "progeny" and "further progeny" in the '880 patent, the Court should conduct its own, independent analysis based on the intrinsic evidence relevant to the '880 patent. Such an

16

analysis will reveal that "progeny" in claims 4-9 means R1 progeny, "further progeny" in claims 6-9 means R2 progeny, and "progeny" (second occurrence) in claim 9 means R3 progeny.

## V.    THE SHAH PATENT

### A.    Plaintiffs Do Not Dispute that the Functional Language of the Asserted '835 Patent Claims Must Be Given Effect

Plaintiffs do not offer a proposed construction for the functional language recited in claim 1 of the '835 patent. *See* D.I. 203 at 39. Further, Plaintiffs do not contest that the '835 patent's functional language should be given effect. *Id.* Accordingly, Syngenta's proposed constructions for the functional language in claim 1 should be adopted. Moreover, by adopting Syngenta's proposed constructions, there is no genuine issue of material fact preventing the Court from granting Syngenta's Shah Non-Enablement Motion. *See* D.I. 214.

### B.    The CTP Must Be Naturally Occurring, Target the Passenger Protein to the Chloroplast, and Subsequently Be Removed

Syngenta's proposes that the term CTP appearing in claim 1 of the '835 patent means (1) a naturally occurring chain of amino acids that (2) targets the EPSPS protein to the chloroplast, and (3) is cleaved (or removed) from the mature protein. This prior construction is supported by the specification of the '835 patent and the testimony of the experts for both parties, who agree that Syngenta's construction is the ordinary meaning of the term as understood by those skilled in the art as of 1985-86. Further, by adopting this construction, the Court should grant Syngenta's Shah Non-Infringement Motion because, as a matter of law, Syngenta cannot infringe any asserted claim of the '835 patent. *See* D.I. 212.

Plaintiffs' construction that the term CTP means "a series of amino acids that cause the transport of a polypeptide into a chloroplast" was considered and rejected by the Missouri district court. *See Monsanto's Statement Regarding the Construction of the Asserted Claims of the '835 Patent* filed in 01-CV-1825 (E.D. Mo.) (Ex. 46) at 12-14; D.I. 218, Ex. 34 at 166. Plaintiffs'

proposed construction should be rejected here too, because it is inconsistent with the previous construction rendered by the Missouri court, contradicted by the specification of the '835 patent as understood by those skilled in the art and, moreover, relies on the very same arguments rejected by the Missouri court, including its assertion that Example 19 of the '835 patent represents a "synthetic" CTP. *Compare* Ex. 46 at 12-14 to D.I. 203 at 24-29.

### 1. Plaintiffs' Ignore the Prior Missouri Court's Construction of CTP

The Missouri district court, after carefully reviewing "the claim language and the patent as a whole, and giving due consideration to the prosecution history, [and] . . . the widely-held understanding in the pertinent technical field," construed the term CTP to mean "a naturally occurring series of amino acids that causes the transport of a polypeptide into a chloroplast." D.I. 218, Ex. 34 at 166. Plaintiffs, however, all but ignore the fact that the Missouri court construed this term. Plaintiffs take this approach because they know that the Missouri court analyzed the '835 patent claims in accordance with the principles affirmed in the Federal Circuit's opinion in *Phillips*. Further, Plaintiffs are well aware that the Missouri court's construction is supported by the specification of the '835 patent and the testimony of the experts for both parties, who agree that this construction is the ordinary meaning of the term as understood by those skilled in the art as of 1985-86.

### 2. The '835 Patent Specification Describes Only Naturally Occurring CTPs

As set forth in Syngenta's opening brief, the Missouri court previously held that the CTP must be naturally occurring. This interpretation is supported by the specification of the '835 patent. Indeed, Plaintiffs' discussion of the '835 patent's specification confirms that the patent discloses only naturally occurring CTPs. *See* D.I. 203 at 25-26. Every example, whether actual or prophetic, where plant cells (or plants regenerated from such cells) are transformed to

18

obtain enhanced glyphosate resistance describes the use of a naturally occurring CTP. *See* D.I. 216, Ex. 3 at Examples 2-13; D.I. 203 at 25. The only nucleotide or amino acid sequence for a CTP actually described in the '835 patent is the naturally occurring petunia CTP from the petunia EPSPS gene. D.I. 216, Ex. 3 at Figs. 3 and 4. And the specification expressly states that:

> Suitable CTP's for use in the present invention may be *obtained from* various sources. Most preferably, the CTP is *obtained from* the endogenous EPSPS gene of the subject plant to be transformed.

*Id.* at col. 4:35-38. The Missouri district court recognized that the specification "points to plants or naturally occurring substances, not to synthetic substances," as sources for CTPs. D.I. 218, Ex. 34 at 166:21-23. Monsanto's expert, Dr. Keegstra, testified that the term CTP, as it appears in the '835 patent, would not cover a totally synthetic CTP designed from first principles. *See* D.I. 218, Ex. 37 at 38:15-20.

Plaintiffs' reliance on Example 19 does not affect the proper construction of "CTP." *See* D.I. 203 at 26-27. First, Example 19 does not fall within the scope of claim 1 and has no bearing on the construction of the asserted claims. D.I. 218, Ex. 34 at 167 (stating that Example 19, as acknowledged by both experts, does not fall within the scope of the '835 patent). Example 19 does not disclose a CTP/EPSPS fusion polypeptide (it fuses the naturally occurring petunia CTP to the ssRUBISCO from wheat). Additionally, this example was conducted *in vitro* (not in plant cells) and does not describe obtaining enhanced glyphosate resistance of a plant cell. *See* D.I. 216, Ex. 3 at col. 30:43 to col. 31:15. Since Example 19 does not fall within the scope of claim 1, it cannot be considered an embodiment.

Second, Example 19 uses the naturally occurring CTP from the petunia EPSPS gene. *Id.* at col. 30:47-49 ("The 72-amino-acid transit peptide of EPSPS was fused to the mature ssRUBISCO from wheat."). The petunia CTP in Example 19 is not a "hybrid" CTP as Plaintiffs

059155.1008

contend, nor is it a synthetic construct such as the OTP used in GA21, which is comprised of three DNA sequences fused together to create a non-naturally occurring transit peptide. The change made to the petunia CTP used in Example 19 was done to facilitate genetic engineering (CTP switching) and still remains a naturally occurring CTP in the eyes of both experts. Indeed, both Dr. Keegstra and Dr. Bruce, Monsanto's and Syngenta's experts, agree that changes within the amino acid sequence of a naturally occurring CTP to facilitate genetic engineering, such as adding linkers to facilitate the fusion of a transit peptide and passenger protein, do not alter the naturally occurring status of a CTP. *See* D.I. 218, Ex. 37 at 39:21 to 40:10; 12/16/05 Depo. Tr. of B. Bruce (Ex. 47) at 104:24 to 106:12. Example 19 specifically states that the cleavage cite of pMON6140 was changed to "introduce an in-frame SphI site *which allows CTP switching between ssRUBISCO and EPSPS.*" D.I. 216, Ex. 3 at col. 30:61-66.

Third, the Missouri district court considered Monsanto's arguments with respect to Example 19 and still reached the conclusion that the term CTP means a naturally occurring series of amino acids. D.I. 218, Ex. 34 at 167-168. Particularly, the Missouri court stated that it was not convinced that Example 19 was inconsistent with its construction, but even if it were, "the law does not require that every example be within the scope of all the claims." *Id.* Moreover, the Missouri court acknowledged that both experts agreed that Example 19 was not within the scope of the claims. *Id.* For these reasons, Example 19 has no bearing on the construction of the term CTP.

### 3. During the 1985-86 Time Frame, All Existing CTPs Were Naturally Occurring and Located at the N-terminus

Plaintiffs' own expert, Dr. Keegstra, testified that as of the 1985-86 time frame, all CTPs were naturally occurring and located at the N-terminus. Syngenta's expert, Dr. Bruce, is in

agreement.  D.I. 218, Ex. 36 at 38:9-11; Ex. 37 at 36, 38.[1]   The Missouri district court acknowledged this fact when rendering its construction by stating "[a]t the time of this patent application, the state of the knowledge of CTPs was such that I do not believe that the patent contemplated that this term would include anything that might ever be invented that would function like a CTP." D.I. 218, Ex. 34 at 166-67.  The court went on to state "I think that CTP in this patent has to be naturally occurring because that's what the words meant at the time they were used." *Id.* at 167.  Plaintiffs, however, chose to exclude these highly relevant statements from their brief—likely on the basis that they directly contradict the very position Plaintiffs are forwarding.

### 4.    The CTP Must Be Cleaved (or Removed) from the Mature EPSPS

Plaintiffs' contend that the term CTP does not encompass cleavage from the mature protein. D.I. 203 at 28-30.  Rather, relying on an incomplete analysis of the '835 patent, and a distorted interpretation of the Missouri court's construction of a *different* term, Plaintiffs contend that cleavage is not required.  *Id.*  For the reasons discussed below, Plaintiffs' proposed construction is wrong and should not be adopted.

Plaintiffs cannot dispute that during the 1985-86 time period, all known CTPs were cleaved (or removed) from the mature protein.  The specification of the '835 patent confirms this scientific principle, stating that "the CTP leader sequence encoded by the plant-derived EPSPS

---

[1] In *Phillips*, the Federal Circuit cautioned against the use of extrinsic evidence in the form of expert testimony because it "is generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence." *Phillips*, 415 F.3d at 1318.  Here, however, both experts agree that as of the filing date of the '835 patent, all CTPs were naturally occurring and located at the N-terminus.  Thus, the caution concerning expert testimony set forth in *Phillips* does not apply in the instant case.  Moreover, the Federal Circuit in *Phillips* stated that a court can consider such expert testimony at its discretions to understand how those skilled in the art would understand the claim terms.  *Id.*

059155.1008

gene is *believed to be removed from the remainder of the polypeptide so that an active portion of the EPSPS polypeptide exists and functions inside the chloroplast.*" D.I. 216, Ex. 3 at col. 4:28-34 (emphasis added). Plaintiffs also overlook the specification wherein it states that the CTP functions to target a passenger protein to the chloroplast and is then removed from the mature protein. D.I. 215 at 32-33; D.I. 216, Ex. 3 at col. 4:28-34. Plaintiffs also ignore Example 18, which specifically discloses the removal of the CTP from the EPSPS protein to which it is attached. *Id.* at Example 18, col. 30:3-5. Moreover, as explained by Dr. Keegstra, persons of skill in the art during 1985-86 understood that "cleavage is a determining factor in assessing whether a particular element is a transit peptide." D.I. 218, Ex. 38 at 55; Ex. 37 at 45, 50-51, and 149-50. Plaintiffs offer no basis to discount their own experts testimony. Thus, the specification of the '835 patent, supported by the understanding of those skilled in the art at the time, demonstrates that defining features of the CTP are that it targets the EPSPS to the chloroplast and is then removed (or cleaved) to yield a mature EPSPS protein.

Plaintiffs argue that it was defining the term CTP in a special way. According to Plaintiffs, the phrase "which chloroplast transit peptide permits the fusion polypeptide to be imported into a chloroplast of a plant cell" appearing in claim 1 means that the term CTP does not include "cleavage" as a defining feature. D.I. 203 at 28-29. This is simply not correct. In every instance where Plaintiffs rely on the specification to denote the *function* of a CTP, the patent indicates that the CTP performs the functions of importing *and* cleavage. D.I. 203 at 28-29; D.I. 216, Ex. 3 at col. 2:24-28 (the CTP "allows the [CTP/EPSPS] polypeptide, or *an enzymatically active portion thereof*, to be transported from the cytoplasm of the plant cell into a chloroplast[.]"), col. 2:66 to col. 3:2 (using the phrase "or an active portion thereof" to denote cleavage), col. 3:19-24, and col. 4:28-34 (using the terms "imported" and "removed" to define

22

the function of the CTP).  Thus, to the extent Plaintiffs argue that the CTP functions only to

"import," they are incorrect.

Moreover, *Monsanto specifically argued in the prior Missouri action that the function*

*of "importation" results in cleavage of the CTP*.  In the prior Shah litigation, Bayer took the

position that the phrase "permits the fusion polypeptide to be imported in a chloroplast of a plant

cell" means that the entire "fusion polypeptide" is imported into the chloroplast "intact."  Ex. 46

at 18.  Monsanto disagreed, arguing that in keeping with the '835 patent's specification and the

"scientific understanding of protein transport in the chloroplast of a plant cell," "the chloroplast

transit peptide is 'removed' from the remainder of the polypeptide during the importation

process."  *Id.* at 18.   To support its position that the CTP is cleaved during importation,

Monsanto pointed to Example 18, which they characterize as "evidencing the *removal* of the

CTP *during import* into the chloroplast."  *Id.* (emphasis added).   Monsanto also relied on

publications by its expert, Dr. Keegstra, which it argued indicated that "during the process of

*importation* . . . the CTP is proteolytically *cleaved* from the EPSPS passenger protein, leaving

the processed EPSPS in the chloroplast."   *Id.* at 19 (emphasis added).   Monsanto also

acknowledged that "the specification [of the '835 patent] . . . expressly recognizes that this

*importation process results in the cleavage of the CTP from the EPSPS protein.*"  Monsanto's

Response to Bayer's Opening Brief Regarding the Construction of the Asserted Claims of the

'835 Patent filed in 01-CV-1825 (E.D. Mo. Nov. 20, 2001) (Ex. 48) at 14-15 (emphasis added).

Thus, during the claim construction phase of the prior Shah litigation, Monsanto vigorously

argued that the process of "importation" results in cleavage of the CTP from the EPSPS protein.[2]

---

[2] To the extent Plaintiffs argue in its responsive claim construction brief that Syngenta has "changed" its proposed construction of the term CTP, such an argument is without merit.  In the Joint Claim Construction Statement, Syngenta has taken the position that the CTP "is cleaved

(continued...)

By taking the opposite position now, it is clear that Plaintiffs' construction is purely litigation driven.

### C.    A Fusion Polypeptide Is a Chain of Amino Acids Consisting of a CTP Fused to an EPSPS, Where the CTP and EPSPS Are Not Found Together in Nature

Plaintiffs' proposed construction for the term "CTP/EPSPS fusion polypeptide" is:

> a polypeptide that has at least two parts, which must include a chloroplast transit peptide (as defined above) joined to an EPSPS, where such chloroplast transit peptide need not be directly adjacent to the EPSPS.

D.I. 203 at 30. The primary difference between Plaintiffs' construction and Syngenta's, is that Syngenta's proposed construction requires a CTP/EPSPS fusion polypeptide where the CTP and EPSPS are not found together in nature. D.I. 215 at 34. Plaintiffs' proposed construction should be rejected because it is contradicted by the prior construction reached by the Missouri court

---

(...continued)
(or removed) from the EPSPS polypeptide." D.I. 204 at 30. This statement is no different from the one above, wherein Syngenta states CTP "is cleaved (or removed) from the mature EPSPS." The "EPSPS polypeptide" is the "mature EPSPS." *See* D.I. 216, Ex. 3 at Fig. 4a (identifying the amino acid sequence of the "mature EPSPS;" col. 2:52-54 ("Figs. 4a and 4b shows the nucleotide, amino acid sequence and restriction map of the full-length CDNA of petunia EPSPS."); Example 18 col. 30:27-36 (identifying the "mature enzyme" and "mature EPSPS" as "lacking the CTP."). In fact, in its opening claim construction brief, Plaintiffs acknowledged that the terms "EPSPS protein" and "mature EPSPS" are synonymous. D.I. 203 at 30 n. 12. Because, as discussed above, Monsanto changed its construction of the term CTP, Syngenta was required to explicitly state that cleavage is a defining feature of a CTP.

Moreover, to the extent Plaintiffs argue that cleavage of the CTP from the mature EPSPS protein is inconsistent with the Missouri court's claim construction because it excludes the possibility of intervening sequences between the CTP and EPSPS, they are incorrect. Syngenta's proposed construction does permit the inclusion of sequences between the CTP and EPSPS. For example, in Syngenta's opening Shah Non-Infringement motion (D.I. 212), Syngenta provided an example of a naturally occurring CTP was fused to an EPSPS gene where 24 additional amino acids was inserted between the CTP and EPSPS. D.I. 212 at 4-5. In this example, the CTP was cleaved from the mature EPSPS protein. Yet, Syngenta still referred to the CTP as a CTP. *Id.* Accordingly, construing the term CTP to include cleavage from the mature EPSPS protein is consistent with the Missouri court's claim construction.

24

after considering the same arguments Plaintiffs offer here, the intrinsic evidence, and the understanding of "fusion polypeptide" held by those skilled in the art in 1986, as confirmed by Plaintiffs' own expert, Dr. Keegstra.

### 1. The Missouri Court Construed CTP/EPSPS "Fusion Polypeptide" to Mean Joining a CTP and EPSPS Not Found Together In Nature

Plaintiffs contend that Syngenta's proposed construction of the term "fusion polypeptide" interjects claim limitations previously rejected by the prior Missouri district court. D.I. 203 at 30-31. Plaintiffs are simply wrong. Syngenta argued in its opening brief that this Court should adopt the Missouri district court's prior construction of CTP/EPSPS "fusion polypeptide," which means "a polypeptide that has at least two parts which must include a [CTP] as defined already joined to an EPSPS where the [CTP] and EPSPS are not found together in nature." D.I. 215 at 35, citing D.I. 218, Ex. 34 at 168:2-9. The prior construction is correct and should be adopted because the Missouri district court followed the analysis subsequently set forth in *Phillips*.

The Missouri court began by evaluating the language of the claims, *see Phillips*, 415 F.3d at 1312, and concluded that "fusion polypeptide":

> means a protein created out of two genetically different things, in other words, a protein created in a non-natural process, i.e. fused, which contains amino acid sequences from distinct proteins. Even Monsanto's expert witness agrees that that's what it normally means.

D.I. 218, Ex. 34 at 168:13-22.

The Missouri district court then consulted the '835 patent's specification to determine whether the inventors defined "fusion polypeptide" in a manner different from its ordinary meaning. *See Phillips*, 415 F.3d at 1316 ("Consistent with that general principle, our cases recognize that the specification may reveal a special definition given to a claim term by the

059155.1008

patentee that differs from the meaning it would otherwise possess."). The court, rejecting

Monsanto's contention that it was acting as its own lexicographer, stated that "I don't think there

is anything there that shows that 'fusion polypeptide' meant something other than its normal

meaning." D.I. 218, Ex. 34 at 168-69. The court also found that the '835 "patent teaches

putting different things together. It did not just describe what naturally occurs in all plant cells,

so I think the CTP/EPSPS fusion polypeptide referred to in these claims is something created

from a CTP and an EPSPS that do not occur together in nature." *Id.* at 169.

Finally, the Missouri court, consistent with *Phillips*, considered the patent's prosecution

history and concluded that:

> Monsanto, not the patent examiner, first used the term [fusion polypeptide] in the
> original application, and when Monsanto used it the first time, it used it with the
> plain and ordinary meaning of the definition I've adopted here. *Everyone agrees*
> *that a naturally occurring EPSPS has a CTP, and nobody refers to those*
> *naturally occurring things as fusion polypeptides.*"

*Id.* (emphasis added). The prior Missouri court's claim construction is well supported, thorough,

and meets all of the criteria set forth in *Phillips*.

### 2.  The Claim Language "Fusion Polypeptide" Does Not Include Naturally Occurring (Homologous) CTP/EPSPS Proteins

Plaintiffs contend that a "fusion polypeptide" means both a "homologous fusion" and a

"heterologous fusion." D.I. 203 at 32 (arguing that "fusion" is used as an adjective as opposed to

a verb and, thus, does not require human intervention.). Plaintiffs' construction, however, is

inconsistent with the plain meaning of the term, which the Missouri district court and

Monsanto's expert already agreed means joining two things that "are not found together in

nature." D.I. 218, Ex. 34 at 168. In fact, Dr. Keegstra testified in the prior litigation that a

"fusion polypeptide . . . [is] *not* the way that I would refer to a naturally-occurring precursor,"

and that "[m]ost people use 'fusion' to designate things that are synthetically joined together, and

not naturally joined together." D.I. 218, Ex. 38 at 101:20 to 103:12 (emphasis added); Ex. 34 at 67.

Further, Monsanto specifically inserted the term "fusion" into claim 1 during prosecution of the application leading to the '835 patent *after* it added Example 8, which describes the fusion of the petunia CTP to a bacterial EPSPS gene, two sequences that do not occur together in nature. D.I. 218, Ex. 43 at 0005246-50; Ex. 44 at 0005315, claim 33 (b). The claims previously filed with Monsanto's earlier applications, which did not include Example 8, did not include the term "fusion." D.I. 218 at Ex. 39 at 0005038, claim 1; Ex. 40 at 0005133, claim 1.

Moreover, Monsanto's use of the term "heterologous" to describe the promoter in claim 1 does not mean that absence of this qualifier before the term "fusion polypeptide" indicates the claim encompasses both homologous and heterologous constructs. As discussed above, the plain meaning of "fusion" denotes the joining of two things that do not occur together in nature. Thus, the addition of "heterologous" before "fusion polypeptide" would add ambiguity to the claim. Also, claim 1 specifically states that the promoter is "heterologous" to the CTP/EPSPS "coding sequence," meaning that the promoter must be "heterologous" to both the CTP and EPSPS portions. Ex. 47 at 283:15-18 ("Again, I think that they're trying to be clear here to describe that the promoter is heterologous with respect to both pieces of the coding sequence."). This is confirmed by the '835 patent's specification, where in every example the promoter is heterologous to *both* the CTP and EPSPS sequences. *See, e.g.,* D.I. 216, Ex. 3 at Example 2 (using pMON546 which contains the promoter from cauliflower mosaic virus 35S ("CaMV 35S"), which is heterologous to both the petunia CTP and petunia EPSPS); Example 8 (using pMON542, also using the CaMV 35S promoter, which is heterologous to the petunia CTP and

*E. coli* EPSPS).    Accordingly, the claim language supports the Missouri court's prior construction of "fusion polypeptide."

Plaintiffs also contend that by construing "fusion polypeptide" to encompass only heterologous constructs, preferred embodiments in the specification would be excluded. D.I. 203 at 34.    The '835 patent, states, however, that "the following examples further demonstrate *several* preferred embodiments of this invention." D.I. 216, Ex. 3 at col. 6:10-11 (emphasis added).    The two CTP/EPSPS constructs represented in the examples are pMON546 (and those like it), which contains the petunia CTP/EPSPS found together in nature (Examples 1-7 and 10-13), and pMON542, which is a "fusion polypeptide" comprising the petunia CTP and the *E. coli* EPSPS gene, which are not found together in nature (Examples 8 and 9). D.I. 218, Ex. 41 at MRR002678 (describing pMON542).    Accordingly, the examples of the '835 patent disclose at least two embodiments (naturally occurring CTP/EPSPS proteins and "synthetic" or heterologous CTP/EPSPS fusion polypeptides).    That Syngenta's proposed construction— represented by pMON542—encompasses only one of the two preferred embodiments disclosed in the specification is entirely proper. *See Johns Hopkins Univ. v. CellPro, Inc.*, 152 F.3d 1342, 1355 (Fed. Cir. 1998) ("A patent claim should be construed to encompass *at least one* disclosed embodiment in the written description portion of the patent specification.") (emphasis added).

Additionally, Plaintiffs argue that the sentence "most preferably, the CTP is obtained from the endogenous EPSPS gene of the subject plant to [be] transformed" means that the CTP/EPSPS gene in claim 1 can be naturally occurring.    This is incorrect, particularly when one views the language in its proper context:

28

| | |
|---|---|
| CTP/EPSPS fusion polypeptide | The EPSPS gene of the present invention encodes an CTP/EPSPS fusion polypeptide. After the CTP/EPSPS polypeptide from a gene of this invention is translated from mRNA in the cytoplasm of the transformed plant cell, it is believed to be processed in the same manner as the natural EPSPS polypeptide. The CTP leader sequence causes the polypeptide to be imported into chloroplasts, and the CTP leader sequence encoded by the plant-derived EPSPS gene is believed to be removed from the remainder of the polypeptide so that an active portion of the EPSPS polypeptide exists and functions inside the chloroplast. D.I. 216, Ex. 3 at col. 4:23-24 |
| Source of CTP | Suitable CTP's for use in the present invention may be obtained from various sources. Most preferably, the CTP is obtained from the endogenous EPSPS gene of the subject plant to the transformed. Alternately, one may often use a CTP from an EPSPS gene of another plant. Although there is little homology between the CTP sequences of the EPSPS gene and the ssRUBISCO gene (see, e.g., Broglie (1983), one may find that non-homologous CTPs may function in particular embodiments. Suitable CTP sequences for use in the present invention can be easily determined by assaying the chloroplast uptake of an EPSPS polypeptide comprising the CTP of interest as described in Example 18 hereinafter. D.I. 216, Ex. 3 at col. 4:35-49. |
| Source of EPSPS | The sequence encoding a EPSPS polypeptide can be obtained from numerous sources. Suitable sources include bacteria, fungi and plants. EPSPS coding sequences from other sources can be obtained using the full-length petunia cDNA (see FIG. 4) or a suitable fragment thereof as a hybridization probe as described in Examples 1 and 14-17. D.I. 216, Ex. 3 at col. 4:49-55. |

The language cited by Monsanto comes from the paragraph discussing the source of the CTP, it has nothing to do with the EPSPS portion. All the language means is that the CTP is preferably obtained from the plant one desires to transform (e.g., to transform a tobacco plant, obtain the CTP from the tobacco EPSPS gene). The patent also states "[a]lternately, one may

29

often use a CTP from an EPSPS gene of another plant," meaning that one can use the CTP from the petunia plant in transformation experiments using tobacco plants. *Id.* at col. 4:35-40; *see also*, Example 3 (using petunia CTP in tobacco). In addition, the specification states that one can use CTP's from other plant proteins (non-EPSPS proteins) that are transported into the chloroplast, i.e., RuBisCO. "Although there is little homology between the CTP sequences of the EPSPS gene and the ssRUBISCO gene . . . one may find that non-homologous CTPs may function in particular embodiments." *Id.* at col. 4:40-44. Example 19 of the '835 patent (which does not fall within the scope of claim 1) depicts this very embodiment. *Id.* at col. 30:47-49. This section of the '835 patent's specification does not even purport to define the source of the EPSPS gene. It is the next paragraph that does this.

In defining the EPSPS portion of the CTP/EPSPS "fusion polypeptide," the patent states:

> The sequence encoding a EPSPS polypeptide can be obtained from numerous sources. Suitable sources include bacteria, fungi, and plants. EPSPS coding sequences from other sources can be obtained using the full-length petunia cDNA . . . as a hybridization probe . . . .

*Id.* at col. 4:51-55. Thus, the specification makes clear that with respect to a "CTP/EPSPS fusion polypeptide" the CTP (from natural plant sources) and EPSPS (from a variety of sources) are from different sources and are joined together.

### 3.    The Prosecution History Confirms the Heterologous Nature of a CTP/EPSPS Fusion Polypeptide

Plaintiffs purport to rely on the prosecution history of the '835 patent, but their opening brief completely ignores Monsanto's own definition of a CTP/EPSPS "fusion polypeptide." D.I. 203 at 35-37. The original priority applications for the '835 patent (filed August 1985 and October 1985) specifically state:

> Although it is not known whether a *fusion peptide* comprising (1) a *CTP sequence derived from a heterologous protein* such as ssRUBISCO, *coupled to*

> (2) *a mature EPSPS sequence derived from a bacterial or plant cell,* might confer some degree of glyphosate resistance upon a transformed cell, removal of the CTP leader sequence from the mature EPSPS sequence is preferred.

D.I. 218, Ex. 39 at 0005012:16-23; Ex. 40 at 0005107:16-23. In these applications a "fusion peptide" was unambiguously defined as a CTP from a source different than the source of the EPSPS.

Rather than directing the Court to portions of the prosecution history where "fusion polypeptide" is defined, Plaintiffs refer to a portion of the prior applications where the term "fusion polypeptide" does not even appear. *See* D.I. 218, Ex. 39 at 0005012; D.I. 203 at 35-36. It is unclear how the cited portion of the prior application supports, in any way, Plaintiffs' construction of "fusion polypeptide." However, if the Court directs its attention to the same section of the issued '835 patent, the inventors added the sentence "[t]he EPSPS gene of the present invention encodes an [*sic,* a] CTP/EPSPS fusion polypeptide," and added the two sections, discussed above, defining where the "CTP" and "EPSPS" sequences of the "fusion polypeptide" should come from. *Compare* D.I. 216, Ex. 3 at col. 4:23-24 to D.I. 218, Ex. 39 at 5012:1-11. These two additions to the specification of the '835 patent, not contained in the prior applications, demonstrate that the Shah inventors (1) knew that the "fusion polypeptide" denotes the joining of two things that do not occur together in nature, and (2) were not in possession of a "CTP/EPSPS fusion polypeptide," so construed, as of either the August or October 1985 filing dates.

Finally, Plaintiffs' reliance on Dilip Shah's declaration is misplaced. Dr. Shah's declaration was filed under 37 C.F.R. § 1.131 in order to swear behind several prior art references, teaching the use of CTPs, relied on by the PTO in support of a 35 U.S.C. § 103 obviousness rejection. A § 131 declaration "provides a procedure by which the applicant is permitted to show, if he can, that his date of invention was earlier than the date of the reference."

059155.1008

*In re Stempel*, 241 F.2d 755, 760 (C.C.P.A. 1957). As explained by the United States Court of Customs and Patent Appeals (predecessor of the Federal Circuit)[3] in *In re Stempel*, with respect to a § 131 declaration, "under the law all the applicant can be required to show is priority *with respect to so much of the claimed invention as the reference happens to show*. When he had done that he has disposed of the reference." *Id.* (emphasis added); *In re Clarke*, 356 F.2d 987, 991 (C.C.P.A. 1965) (citing *Stempel*). As stated above, the cited references teach the use of CTPs, but none of the references disclosed a "CTP/EPSPS fusion polypeptide." *See* 5/26/88 PTO Office Action in U.S. Application No. 879,814 (Ex. 49) at 0005340-42 (relying on Van den Broeck, Mousdale, and Netzer for their teaching of the use of a CTP). Thus, Dr. Shah was only required to show that he had in his possession a CTP prior to the date of any of the cited references. Dr. Shah did not mention a CTP/EPSPS "fusion polypeptide," did not provide an example of such a "fusion polypeptide," and in the response addressing Dr. Shah's declaration, Monsanto stated that "the present inventors had discovered that the plant EPSP synthase gene was a nuclear encoded gene which encoded a precursor form of EPSP synthase *which contained a chloroplast transit peptide* sequence at its N-terminus." 10/24/88 Amendment B filed in U.S. Application No. 879,814 (Ex. 50) at 0005352 (emphasis added).

For these reasons, the claim language, specification, prosecution history, and ordinary meaning of the term as understood by those skilled in the art, support the prior Missouri district court's construction that the term "fusion polypeptide" means "a polypeptide that has at least two parts which must include a [CTP] as defined already joined to an EPSPS where the [CTP] and EPSPS are not found together in nature."

---

[3] The decisions of the C.C.P.A. are binding precedent in the Federal Circuit. *South Corp. v. United States*, 690 F.2d 1368, 1369-70 (Fed. Cir. 1982) (*en banc*).

**D.    The Phrase "Enhance the Glyphosate Resistance of a Plant Cell" Means the Plant Cell Will Survive Application of Glyphosate at a Concentration Sufficient to Select a Transformed Plant Cell From a Non-Transformed Plant Cell**

Plaintiffs' contention that the term "resistance," in the phrase "enhance the glyphosate resistance of a plant cell," should have the same meaning in the '835 patent as it does in the Lundquist patents ignores the specification of the '835 patent, and impermissibly construes the claims of the '835 patent in light of the completely unrelated Lundquist patents. D.I. 203 at 37. As set forth in the specification of the '835 patent, an "EPSPS gene 'confers a substantial degree of glyphosate resistance upon a plant cell' if it allows a *selectable* fraction of a culture of transformed plant cells to survive a concentration of glyphosate which kills essentially all untransformed cells from the same type of plant under the same conditions." D.I. 216, Ex. 3 at col. 5:61-66 (emphasis added). Moreover, in Examples 2-13, the inventors selected transformed dicot plant cells or plants using glyphosate at a concentration sufficient to allow transformed cells to survive, while killing untransformed cells. *Id.* at col. 16:51-63; col. 23:50-44. The intrinsic evidence relating to the '835 patent is more relevant to construing the patent claims than the unrelated Lundquist patents, which fail to disclose any information relating to "glyphosate resistance."

Further, contrary to Plaintiffs' contention, Syngenta's proposed construction does not require the chimeric plant gene to be employed in the initial selection protocol. D.I. 203 at 38. In accordance with the specification, however, Syngenta's construction does require application of glyphosate at a concentration sufficient to select a transformed plant cell (a cell with enhanced glyphosate resistance) from a non-transformed plant cell. Without performing this selection step, a skilled artisan would not be able to determine whether the plant cell's enhanced glyphosate resistance was due to the chimeric plant gene or some other reason, such as natural resistance or

33

a new mutation. In addition, conducting the initial selection using kanamycin (an antibiotic), as described in *prophetic* Examples 6, 7, 9, and 12, will not provide any information as to whether the plant cells exhibit enhanced glyphosate resistance, as kanamycin is not glyphosate. And in prophetic examples 6, 7, 9 and 12, the inventors still conducted an additional selection step using glyphosate to select those plant cells and plants with enhanced glyphosate resistance. *See, e.g.,* D.I. 216, Ex. 3 at col. 20:34-43, col. 21:1-5, and col. 25:64 to col. 26:3.

## VI.    CONCLUSION

For the reasons given above, Syngenta requests that the Court construe the Lundquist and Shah patent terms-at-issue as set forth in Syngenta's opening claim construction brief.

Respectfully submitted,

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
YOUNG CONAWAY STARGATT &
      TAYLOR, LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19899-0391
(302) 571-6600
jshaw@ycst.com

Michael J. Flibbert
Howard W. Levine
Sanya Sukduang
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, L.L.P.
901 New York Avenue, N.W.
 Washington, D.C. 20001
(202) 408-4000

Dated:  February 2, 2006

Attorneys for Defendants

34

## CERTIFICATE OF SERVICE

I hereby certify that on February 2, 2006, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

Richard L. Horwitz, Esquire
Potter Anderson & Corroon LLP
Hercules Plaza
1313 North Market Street
Wilmington, DE 19899-0951

I further certify that on February 2, 2006, copies of the foregoing document were served by hand delivery on the above listed counsel and on the following non-registered participants in the manner indicated below:

**BY FEDERAL EXPRESS**

Peter E. Moll, Esquire
Howrey Simon Arnold & White, LLP
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004

Kenneth A. Letzler, Esquire
Arnold & Porter LLP
555 12th Street, N.W.
Washington, D.C. 20004

Susan Knoll, Esquire
Howrey Simon Arnold & White, LLP
1111 Louisiana, 25th Floor
Houston, TX 77002-5242

YOUNG CONAWAY STARGATT & TAYLOR, LLP

John W. Shaw (No. 3362)
Rolin P. Bissell (No. 4478)
Karen E. Keller (No. 4489)
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19801
(302) 571-6600
jshaw@ycst.com

*Attorneys for Syngenta Seeds, Inc., Syngenta Corporation, Syngenta Biotechnology, Inc., Advanta USA, Inc., Garst Seed Company, and Golden Harvest Seeds, Inc.*