# EXHIBIT 46

**RECEIVED**

APR - 8 2003

U. S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| MONSANTO COMPANY and<br>MONSANTO TECHNOLOGY LLC,<br><br>Plaintiffs,<br><br>v.<br><br>BAYER CROPSCIENCE LP,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

C. A. NO. 4:01CV01825 CDP

**MONSANTO'S STATEMENT REGARDING THE CONSTRUCTION
OF THE ASSERTED CLAIMS OF THE '835 PATENT**

H: 523088(B7M8011.DOC)

MGA0062334

## TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................... 1

II.    SUMMARY OF THE CLAIM CONSTRUCTION ISSUES ............................ 2

III.   THE LEGAL STANDARD FOR CLAIMS CONSTRUCTION ...................... 3

IV.    THE CONSTRUCTION OF THE DISPUTED CLAIM TERMS ..................... 5

       A.    The Asserted Claims ................................................................................ 6

       B.    The Specification and Prosecution History .............................................. 7

       C.    Monsanto's Proposed Claim Construction ............................................. 10

             1.    chimeric plant gene .................................................................... 10

             2.    chloroplast transit peptide .......................................................... 12

             3.    chloroplast transit peptide/5-enolpyruvylshikimate-3-phosphate synthase
                   fusion polypeptide .................................................................... 14

             4.    permits the fusion polypeptide to be imported into a chloroplast of a plant
                   cell ............................................................................................ 17

V.     CONCLUSION ............................................................................................ 20

MGA0062335

## TABLE OF AUTHORITIES

CASES

*Bell Atlantic Network Services, Inc. v. Covad Communications Corp., Inc.,*
  262 F.3d 1258 (Fed. Cir. 2001) ................................................................................................ 4
*Hoechst Celanese Corp. v. BP Chemicals Ltd.,*
  78 F.3d 1575 (Fed. Cir.), *cert. denied,* 117 S.Ct. 275 (1996) ............................................ 4, 5
*Insituform Tech., Inc. v. Cat Contracting, Inc.,*
  99 F.3d 1098 (Fed. Cir.1996), *cert. denied,* 117 S.Ct. 1555 (1997) ...................................... 3
*Karlin Technology, Inc. v. Surgical Dynamics, Inc.,*
  177 F.3d 968 (Fed. Cir. 1999) ................................................................................................. 5
*Markman v. Westview Instruments, Inc.,*
  52 F.3d 967 (Fed. Cir.1995) (en banc), *aff'd,* 517 U.S. 370 (1996)......................... 3, 5, 19, 20
*Schering Corp. v. Amgen, Inc.,*
  222 F.3d 1347 (Fed. Cir. 2000) ............................................................................................... 4
*Vitronics Corp. v. Conceptronic, Inc.,*
  90 F.3d 1576 (Fed. Cir. 1996) ................................................................................... 4, 5, 13, 16

H: 523088(B7M8011.DOC)

MGA0062336

## I.    INTRODUCTION

This is a patent case involving the genetic engineering of plants to impart resistance to glyphosate—an herbicide sold by Monsanto under the trademark Roundup®. Glyphosate inhibits the growth of plants by inhibiting an enzyme called 5-enolpyruvylshikimate-3-phosphate synthase, commonly known as "EPSPS," which functions to catalyze a reaction in the biochemical pathway for creating aromatic amino acids. Glyphosate is commonly used for weed control. With the development of glyphosate resistant crops such as glyphosate resistant corn, soybeans, and cotton, farmers now have the ability to spray glyphosate herbicide over an entire field, thus, inhibiting the growth of weeds without damaging their plant crops.

As set forth in U.S. Patent No. 4,940,835 (the "'835 patent") (Ex. A), Monsanto scientists came up with the idea of creating chimeric plant genes which, when expressed in a plant cell, would render the plant cell and plants regenerated from the plant cell resistant to glyphosate. Where numerous others had failed, the Monsanto inventors discovered that the key to achieving efficacious expression of glyphosate resistance in plants was in the use of a chimeric plant gene encoding a polypeptide which contained a chloroplast transit peptide. The chloroplast transit peptide or "CTP" functions in a plant cell to cause the transport of a polypeptide into a chloroplast in the plant cell. By transforming plant cells with chimeric EPSPS genes whose sequence included a chloroplast transit peptide sequence, the Monsanto inventors created glyphosate resistant plant cells which could be regenerated into glyphosate resistant plants—an achievement which had eluded numerous scientists for years.

Monsanto's '835 patent entitled "Glyphosate-Resistant Plants" issued on July 10, 1990. At present, and based on the discovery provided to date, the Monsanto Plaintiffs assert that defendant Bayer CropScience LP ("Bayer") is infringing claims 1-6 of the '835 patent by

MGA0062337

making, using, and importing chimeric plant genes that are within the scope of the asserted claims.[1]  Asserted claim 1 is directed to a chimeric plant gene which includes a plant expressible promoter in combination with a coding sequence encoding a chloroplast transit peptide/5-enolpyruvylshikimiate-3-phosphate synthase fusion polypeptide and which, when expressed, enhances the glyphosate resistance of a plant cell transformed with the gene, where the promoter and the CTP/EPSPS coding sequence come from different sources.  Claims 2-6 depend from claim 1 and describe types of promoters and EPSPS coding sequences that can be used to practice the claimed invention.

The Court should adopt Monsanto's proposed construction of the claim terms because they are supported by the intrinsic and extrinsic evidence.  Bayer's proposed construction should be rejected because in order to avoid infringement Bayer must convince the Court to impose baseless limitations in the asserted claims.

## II.    SUMMARY OF THE CLAIM CONSTRUCTION ISSUES

The parties have conferred and have reached agreement regarding the proper construction of the claim terms "promoter sequence which functions in plant cells" (as used in claim 1) and "chimeric gene" (as used in claims 2-6), as set forth in the Revised Joint Statement of Disputed Claim Terms ("Revised Joint Statement," Ex. B).  In addition, Bayer has recently informed Monsanto that it will not contest Monsanto's construction of the claim terms "plant cell" and "adapted to cause sufficient expression of the fusion polypeptide to enhance the glyphosate resistance of a plant cell transformed with the gene," as used in claim 1.  However, the parties disagree as to the proper construction of the following claim terms which appear in claim 1:

---

[1] Plaintiffs have been advised through discovery that the Defendant has no products for commercial sale in the United States.

H: 523088(B7M8011.DOC)

2

MGA0062338

- chimeric plant gene;

- chloroplast transit peptide;

- chloroplast transit peptide/5-enolpyruvylshikimate-3-phosphate synthase fusion polypeptide; and

- permits the fusion polypeptide to be imported into a chloroplast of a plant cell.

The parties' proposed constructions of the four disputed claim terms are set forth in the Revised Joint Statement. *See* Ex. B. As discussed more fully below, Monsanto asserts that each of the disputed claim terms should be construed in view of the patent claims, the patent specification, and the prosecution history, and that resort to extrinsic evidence is not necessary. However, Bayer proposes to graft improper limitations to each of the claim terms in violation of the rules that govern claim interpretation. Thus, to the extent required to rebut Bayer's proposed claim construction, Monsanto will offer expert testimony at the upcoming claim construction hearing to demonstrate to the Court that its proposed claim construction comports with how a person of ordinary skill in the art would construe the disputed claim terms as of 1985.

## III.    THE LEGAL STANDARD FOR CLAIMS CONSTRUCTION

Although the Court is fully aware of the rules pertaining to the construction of patent claims, the general guidelines are set forth for completeness. Claim construction is a matter for the court. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979 (Fed. Cir.1995) (en banc), *aff'd*, 517 U.S. 370 (1996). Claims are construed from the vantage point of a person of ordinary skill in the art at the time of the invention. *Id.* at 986. In construing a claim, a court looks first to the intrinsic evidence of record, namely, the language of the claim, the patent specification, and the prosecution history. *Insituform Tech., Inc. v. Cat Contracting, Inc.,* 99 F.3d 1098, 1105 (Fed. Cir. 1996), *cert. denied,* 117 S.Ct. 1555 (1997).

MGA0062339

In considering the intrinsic evidence, a court should first look to the claim language, as claim terms are typically given their customary, plain and ordinary meaning to one of ordinary skill in the art at the time the patent application was filed. *Schering Corp. v. Amgen, Inc.*, 222 F.3d 1347, 1353 (Fed. Cir. 2000). Second, a court should consider the specification (the disclosure or text of the patent preceding the claims) to determine whether the inventors have used any terms in a manner inconsistent with their ordinary meaning. *Bell Atlantic Network Services, Inc. v. Covad Communications Corp., Inc.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001). Federal Circuit law is clear that in considering the specification, there is a presumption in favor of the plain and ordinary meaning of claim language, as opposed to an unconventional meaning. *Id.* It is also understood that a patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning. *Id.* It is wholly improper, and contrary to Federal Circuit precedent, however, to adopt a claim construction that would not cover the preferred embodiments and examples described in the specification. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996). "Such an interpretation is rarely, if ever, correct...." *Id.* ; *see also Hoechst Celanese Corp. v. BP Chemicals Ltd.*, 78 F.3d 1575, 1581 (Fed. Cir.), *cert. denied*, 117 S.Ct. 275 (1996) ("We share the district court's view that it is unlikely that an inventor would define the invention in a way that excluded the preferred embodiment, or that persons of skill in this field would read the specification in such a way."). Third, a court can consider the prosecution history of the patent. This history contains the complete record of all the proceedings before the PTO leading to the issuance of a patent. The prosecution history is considered to determine whether or not there were any express representations made in obtaining the patent which relate to, or would otherwise impact, the scope and meaning of the claims. *Vitronics*, 90 F.3d at 1583.

H: 523088(B7M8011.DOC)

MGA0062340

If the analysis of the intrinsic evidence fails to resolve an ambiguity in a disputed claim term, a court may refer to extrinsic evidence to determine what the term would have meant to one of ordinary skill in the art at the time of filing. *Id.*; *Markman*, 52 F.3d at 986 ("[T]he focus in construing disputed terms in claim language ... is on the objective test of what one of ordinary skill in the art at the time of the invention would have understood the term to mean."). Extrinsic evidence includes inventor and expert testimony, reference materials, and prior art not cited in the prosecution history. *Hoechst*, 78 F.3d at 1579. While the court may receive extrinsic evidence to educate itself about the invention and the relevant technology, extrinsic evidence cannot be used to arrive at a claim construction that is clearly at odds with the construction mandated by the intrinsic evidence. *Karlin Technology, Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 971 (Fed. Cir. 1999). Moreover, reliance on extrinsic evidence to interpret the claims is improper if the intrinsic evidence makes the claim meaning clear and unambiguous. *Vitronics*, 90 F.3d at 1583.

## IV.    THE CONSTRUCTION OF THE DISPUTED CLAIM TERMS

Pursuant to the Court's Case Management Order, Monsanto and Bayer met and conferred regarding claims construction issues. The parties have reached an agreement regarding the construction of certain of the terms of the asserted claims, as set forth in the Second Amended Joint Statement of the Disputed Claim Terms which is being filed herewith.

The parties, however, were unable to reach agreement with regard to four claim terms that appear in claim 1. Monsanto asserts that each of these claim terms should be construed in view of the intrinsic evidence (i.e., the patent claims, specification and prosecution history) and that resort to extrinsic evidence is not necessary. But to the extent required to rebut Bayer's proposed claim construction, as well as any expert testimony offered by Bayer at the *Markman*

MGA0062341

hearing, Monsanto will offer expert testimony to support its claim construction and demonstrate

to the Court how one of ordinary skill in the art would construe the disputed claim terms as of

the filing date of the Shah patent applications.

### A.    The Asserted Claims

Monsanto asserts that Bayer is infringing claims 1-6 of the '835 patent.  Each of the

claim terms that requires the Court's construction appears in claim 1.  Claim 1 states:

> 1.    A chimeric plant gene which comprises:
>
> (a)    a promoter sequence which functions in plant cells;
>
> (b)    a coding sequence which causes the production of RNA, encoding a chloroplast transit peptide/5-enolpyruvylshikimate-3-phosphate synthase fusion polypeptide, which chloroplast transit peptide permits the fusion polypeptide to be imported into a chloroplast of a plant cell; and
>
> (c)    a 3' non-translated region which encodes a polyadenylation signal which functions in plant cells to cause the addition of polyadenylate nucleotides to the 3' end of the RNA;
>
> the promoter being heterologous with respect to the coding sequence and adapted to cause sufficient expression of the fusion polypeptide to enhance the glyphosate resistance of a plant cell transformed with the gene.

Claims 2-6 depend from claim 1 and relate to types of promoters and EPSPS coding sequences

that can be used to practice the claimed invention.  Claims 2-6 state:

> 2.    A chimeric gene of claim 1 in which the promoter sequence is a plant virus promoter sequence.
>
> 3.    A chimeric gene of claim 2 in which the promoter sequence is a promoter sequence from cauliflower mosaic virus (CaMV).
>
> 4.    A chimeric gene of claim 3 in which the promoter sequence is the CaMV35S promoter sequence.
>
> 5.    A chimeric gene of claim 1 in which the coding sequence encodes a mutant 5-enolpyruvylshikimate-3-phosphate synthase (EPSPS).
>
> 6.    A chimeric gene of claim 1 in which the EPSPS coding sequence encodes an EPSPS from an organism selected from the group consisting of bacteria, fungi, and plants.

H: 523088(B7M8011.DOC)

MGA0062342

Claims 1-6 of the '835 patent correspond to prosecution claims 33-38, which are discussed below.

**B.    The Specification and Prosecution History[2]**

The '835 patent issued on July 10, 1990, from U.S. patent application Serial No. 06/879,814 (the "'814 application"), which was filed on July 7, 1986. The '814 application was filed as a continuation-in-part application and claimed priority to U.S. patent application Serial No. 06/792,390 (the "'390 application"), which was filed on October 29, 1985 and was subsequently abandoned. The '390 application was also filed as a continuation-in-part application and claimed priority to U.S. patent application Serial No. 06/763,482 (the "'482 application"), which was filed on August 7, 1985 and was subsequently abandoned.

Each of the applications that led to the issuance of the '835 patent describes a DNA sequence encoding an EPSPS polypeptide which, when expressed in a plant cell contains a chloroplast transit peptide which allows the polypeptide, or an enzymatically active portion thereof, to be transported from the cytoplasm of the plant cell into a chloroplast in the plant cell, and enhances the glyphosate resistance of the plant cell transformed with the gene. The first-filed '482 application included examples of glyphosate resistant petunia cells, while the two continuation-in-part applications added examples of glyphosate resistant tobacco, soybean, cotton, oil seed rape, flax, potato and sunflower plant cells, as well as plants regenerated from glyphosate resistant petunia and tomato plant cells, using the chimeric plant genes of the claimed invention.

---

[2] In the interest of completeness and for the Court's background, Monsanto offers this short summary regarding the prosecution history of the '835 patent. However, the prosecution history is not particularly instructive regarding the scope and meaning of the asserted claims.

H: 523088(B7M8011.DOC)

MGA0062343

The three patent applications were filed within one year of each other, and each application received essentially the same first Office Action at approximately the same time. The first two applications, however, were abandoned without reply, while the prosecution of the '814 application proceeded. Prosecution claim 1, which is exemplary of the original claims of the '814 application, stated:

> A cloning or expression vector comprising a gene which encodes a 5-enolpyruvylshikimate-3-phosphate synthase (EPSPS) polypeptide under the control of a suitable promoter, said polypeptide comprising a chloroplast transit peptide which permits the polypeptide, upon expression in a plant cell, to be imported into a chloroplast of the cell, said polypeptide rendering the plant cell resistant to glyphosate.

*See* Ex. C, Prosecution History at 220. Following the first Office Action, in which all then-pending claims were rejected, an Examiner Interview was held. According to the Examiner Interview Summary, photographs demonstrating the necessity for the CTP to confer glyphosate resistance were shown to the Examiner, and the art of record was discussed. *See* Ex. C, Prosecution History at 259. In addition, the Examiner requested that the claims be rewritten using functional language. The Examiner Interview Summary states as follows:

> The state of art at time of invention in terms of site of herbicide tolerance w/respect to EPSPS location in chloroplast. The applicant agreed to use functional language in claims. Plant claims per se discussed. Discussion for necessity of deposit. No agreement was reached in regard to patentability.

*See* Ex. C, Prosecution History at 259.

Following the Examiner Interview, Monsanto filed an Amendment in which all then-pending claims were cancelled and new claims 33-91 were added. *See* Ex. C, Prosecution History at 262-81. The new claims were directed to a chimeric plant gene, a cloning or

MGA0062344

expression vector, a plant transformation vector, and other embodiments. Prosecution claim 33,

the sole independent claim, stated:

> 33. A chimeric plant gene which comprises:
>
> (a) a promoter sequence which functions in plant cells;
>
> (b) a coding sequence which causes the production of RNA, encoding a chloroplast transit peptide/5-enolpyruvylshikimate-3-phosphate synthase fusion polypeptide, which chloroplast transit peptide permits the fusion polypeptide to be imported into a chloroplast of a plant cell; and
>
> (c) a 3' non-translated region which encodes a polyadenylation signal which functions in plant cells to cause the addition of polyadenylate nucleotides to the 3' end of the RNA;
>
> the promoter being heterologous with respect to the coding sequence and adapted to cause sufficient expression of the fusion polypeptide to enhance the glyphosate resistance of a plant cell transformed with the gene.

*See* Ex. C, Prosecution History at 263.

Following the Amendment, the Examiner issued a second Office Action, rejecting new

prosecution claims 33-91 based on obviousness-type double patenting, nonenablement, and

obviousness in view of the prior art. *See* Ex. C, Prosecution History at 283-92. In its response,

Monsanto addressed each of the Examiner's rejections and amended certain claims. *See* Ex. C,

Prosecution History at 295-302. However, no claim amendments were made with regard to

prosecution claims 33-38. *See* Ex. C, Prosecution History at 296. Monsanto also submitted a

declaration prepared by Dilip Shah, one of the named inventors, to swear behind the cited prior

art and overcome the Examiner's obviousness rejection. *See* Ex. C, Prosecution History at 304-

09. In his declaration, Dr. Shah showed a chloroplast transit peptide sequence and a native

EPSPS sequence which occur together in nature in the petunia EPSPS gene. Subsequently, a

telephone interview was held with the Examiner, and later, prosecution of the application was

suspended for six-months due to a potential patent interference. *See* Ex. C, Prosecution History

at 310-12.

9

MGA0062345

Ultimately, prosecution claims 33-91 were allowed, and the '835 patent was issued with 59 claims. *See* Ex. C, Prosecution History at 314; *see also* Ex. A. Asserted claims 1-6 correspond to prosecution claims 33-38, as originally submitted to the PTO for examination and without amendment.

### C.    Monsanto's Proposed Claim Construction

For the Court's convenience, Monsanto's and Bayer's respective definitions for the four disputed claim terms of claim 1 are set forth below, followed by a discussion of the reasons why Monsanto's proposed claim construction is proper, based on the intrinsic evidence, i.e., the patent claims, the specification and the file history, and why Bayer's proposed claim construction is wrong as a matter of law.

#### 1.    chimeric plant gene

> **Monsanto:** A "chimeric gene" has its plain and ordinary meaning which is a gene that is comprised of parts that do not occur together in nature. A "chimeric plant gene" also has its plain and ordinary meaning which is a chimeric gene that is expressed in a plant. With regard to claim 1, the gene is chimeric because the promoter is specified in the claim to be heterologous with respect to the coding sequence.

> **Bayer:** A "chimeric gene" means a gene that is comprised of parts that do not occur together in nature. "Plant" has its plain and ordinary meaning: any organism of the kingdom plantae. A "chimeric plant gene" means a chimeric gene that is expressable in a plant.

The term "chimeric plant gene" appears in the preamble of claim 1, which states "A chimeric plant gene which comprises…" and is followed by a description of the parts that make up a chimeric plant gene of claim 1. The structure of claim 1 reflects the knowledge of persons of ordinary skill in the art in the 1985-86 time frame that the term "gene" includes a structural gene and its attendant regulatory elements, i.e., a promoter, a coding region, and a 3' end. Asserted claims 2-6, which refer to "a chimeric gene of claim" 1, 2 or 3, each depend from claim

MGA0062346

1. The parties have agreed that the term "chimeric gene" as used in claims 2-6 refers to the "chimeric plant gene of claim 1." *See* Ex. B.

"Chimeric plant genes" and "chimeric genes" are described throughout the specification of the '835 patent. Chimeric genes include genes "having bacterial EPSPS coding sequences controlled by regulatory sequences derived from genes which are active in plant cells." *See* Ex. A, col. 2, ll. 9-11. Chimeric genes also include genes where the EPSPS coding sequence has been ligated or attached to a heterologous promoter. *See* Ex. A, col. 2, ll. 31-33.

The parties are generally in agreement regarding the construction of the claim term "chimeric plant gene" as used in claim 1, as both parties define a "chimeric gene" as a gene that is comprised of parts that do not occur together in nature, and define a "chimeric plant gene" as a chimeric gene that is "expressed" (Monsanto) or "expressable" (Bayer) in a plant. The parties disagree, however, as to whether the explanatory sentence "the gene is chimeric because the promoter is specified in the claim to be heterologous with respect to the coding sequence" should be included in the construction of "chimeric plant gene." Bayer objects to its inclusion, but has no basis for its position. Monsanto submits that it is proper and correct to include this language because claim 1 specifically states that the promoter should be "heterologous with respect to the coding sequence...." *See* Ex. A, claim 1. Thus, the requirement that the "chimeric plant gene" be comprised of parts that do not occur together in nature is satisfied by the fact that the promoter and the coding sequence come from different sources, i.e., they do not occur together in nature.

Monsanto's construction of "chimeric plant gene" is further supported by the schematic shown in Figure 2 of the '835 patent, which depicts the creation of a plant transformation vector that includes an EPSPS gene from petunia and a plant expressible promoter from the cauliflower

11

MGA0062347

mosaic virus and the NOS 3' end. *See also* Ex. A, Figure 7. This is described in the Brief Description of the Drawings as a "chimeric CaMV/EPSPS gene." *See* Ex. A, col. 2, l. 43-45. As neither Bayer nor its expert Dr. Barry Bruce has offered any explanation for why Monsanto's proposed construction of the claim term "chimeric plant gene" should not be adopted, Monsanto requests that the court adopt its proposed construction.

### 2.  chloroplast transit peptide

> **Monsanto:** "Chloroplast transit peptide" has its plain and ordinary meaning which is a series of amino acids that functions in a plant cell to cause the transport of a polypeptide into a chloroplast in the plant cell.

> **Bayer:** A "chloroplast transit peptide" means a naturally occurring chain of amino acids that is naturally located at the N-terminal portion of a nuclear-encoded polypeptide, targeting the polypeptide to a chloroplast.

The term "chloroplast transit peptide" is defined by its function—that is, a chloroplast transit peptide allows a polypeptide (or an enzymatically active portion thereof) to be transported from the cytoplasm of the plant cell into a chloroplast in the plant cell. Ex. A, col. 2, ll. 24-28. The specification states that suitable chloroplast transit peptides for use in the present invention may be obtained from various sources, such as the EPSPS gene of the subject plant to be transformed, or from another plant, and acknowledges that non-homologous CTPs may function in particular embodiments. Ex. A, col. 4, ll. 35-43.

The parties are in general agreement that a chloroplast transit peptide includes a "series" (Monsanto) or "chain" (Bayer) of amino acids that "causes the transport" (Monsanto) or "targets" (Bayer) a polypeptide to a chloroplast. However, Bayer's proposed claim construction seeks to introduce claim limitations that are not supported by the intrinsic evidence—that is, that the chloroplast transit peptide be "naturally occurring" and "naturally located at the N-terminal portion of a nuclear-encoded polypeptide."

H: 523088(B7M8011.DOC)

MGA0062348

According to Bayer's expert Dr. Bruce, his requirement that the sequence be "naturally occurring" in order to be considered a chloroplast transit peptide simply means that the amino acid sequence corresponds to a sequence as it exists in nature (referred to as a "wild type sequence"), even if changes to the sequence have been made at the DNA level. *See* Ex. D, Bruce Depo. at 36-42. In other words, a series or chain of amino acids that causes the transport or targets a polypeptide to a chloroplast is not a chloroplast transit peptide under Bayer's definition if the amino acid sequence is not identical to an amino acid sequence that exists in nature. *See id.* Bayer's requirement for a "naturally occurring" or wild-type amino acid sequence, however, ignores the patent's specification, and in particular, Example 19 of the '835 patent. Example 19 is entitled "CTP of Petunia EPSPS Facilitates Chloroplast Uptake of Heterologous Protein" and does not utilize a wild-type amino acid sequence to cause the transport or target a polypeptide to a chloroplast. *See* Ex. A, Example 19.

In Example 19, the inventors of the '835 patent describe the sequence being evaluated as a "CTP" and conclude that "the results show that the EPSPS CTP alone confers sufficient information to target a heterologous protein to the chloroplast stroma." *See* Ex. A, col. 31, ll. 13-15. Despite the inventors' use of the "CTP" terminology in the title and conclusion, however, Bayer's expert Dr. Bruce insisted during his deposition that the sequence in Example 19 is not a "chloroplast transit peptide" as Bayer defines that term. *See* Ex. D, Bruce Depo. at 64-66, 70-72. Thus, under Bayer's definition, Example 19 falls outside of the scope of the patent, a result that is wholly improper and contrary to Federal Circuit precedent under *Vitronics*.

As to Bayer's requirement that the chloroplast transit peptide be "naturally located at the N-terminal portion of a nuclear-encoded polypeptide," it is well recognized in the art that to effectively target the passenger protein into the chloroplast, the series of amino acids that makes

MGA0062349

up the chloroplast transit peptide is inherently positioned in the right place, which is near the amino terminus (also referred to as the "N-terminus"), or in laymen's terms, the front end, of the passenger protein. *See, e.g.*, Ex. E, Keegstra Report at 8; *see also* Ex. A, Figure 4b (showing "transit peptide" in front of the "mature protein"). Bayer's expert Dr. Bruce acknowledged that "the understanding and observation and experimentation has always found the chloroplast transit peptide to be positioned solely at the N-terminus of the protein that makes up the precursor." Ex. D, Bruce Depo. at 76-77. Thus, because a CTP is known to be positioned at the N-terminal portion of the polypeptide that is being targeted to the chloroplast, there is no reason to require that the CTP be "naturally located at the N-terminal portion of a nuclear-encoded polypeptide" in the construction of the claim term "chloroplast transit peptide."

For the reasons stated, Monsanto respectfully requests that the Court construe the claim term "chloroplast transit peptide" to mean "a series or chain of amino acids that causes the transport or targets a polypeptide to a chloroplast" and without the additional limitations proposed by Bayer.

3.  **chloroplast transit peptide/5-enolpyruvylshikimate-3-phosphate synthase fusion polypeptide**

> **Monsanto:** "Chloroplast transit peptide/5-enolpyruvylshikimate-3-phosphate synthase fusion polypeptide" is a polypeptide that includes at least two parts, the first of which comprises a series of amino acids that function as a chloroplast transit peptide (as defined above) joined to second part that comprises a second series of amino acids that functions to catalyze a reaction in the biochemical pathway for creating aromatic amino acids.

H: 523088(B7M8011.DOC)

MGA0062350

> **Bayer:** The term "chloroplast transit peptide/5-enolpyruvyl-shikimate-3-phosphate synthase [EPSPS] fusion polypeptide" means a chain of amino acids consisting of chloroplast transit peptide (as defined above) directly adjacent to an EPSPS, where the chloroplast transit peptide and EPSPS are not found together in nature.

Monsanto's proposed construction for the claim term "chloroplast transit peptide/5-enolpyruvyl-shikimate-3-phospate synthase fusion polypeptide" acknowledges that the coding sequence is made up of at least two parts, namely a chloroplast transit peptide and an EPSPS sequence, where the CTP and EPSPS are functionally linked in a manner that allows the EPSPS polypeptide to be transferred into the chloroplast. While Bayer is in agreement that the claim term "chloroplast transit peptide/5-enolpyruvyl-shikimate-3-phospate synthase [EPSPS] fusion polypeptide" refers to a CTP and an EPSPS, Bayer seeks to add two limitations—that is, that the CTP and EPSPS be "directly adjacent" and that the CTP and EPSPS are "not found together in nature."

The additional limitations that Bayer seeks to read into claim 1, however, are not supported by the specification, and thus, Bayer's proposed construction must fail. More specifically, according to Bayer's expert Dr. Bruce, applying Bayer's definition of "chloroplast transit peptide/5-enolpyruvylshikimate-3-phosphate synthase fusion polypeptide" would result in the exclusion of each of the 19 Examples of the '835 patent from the claim scope. Ex. D, Bruce Depo. at 93-101. Dr. Bruce even admitted that when he formulated his definition for "chloroplast transit peptide/5-enolpyruvylshikimate-3-phosphate synthase fusion polypeptide," he did not consider any of the Examples:

> Q.    ... Is it fair to say that, Dr. Bruce, that you've defined the term "chloroplast transit peptide/5-enolpyruvylshikimate-3-phosphate synthase fusion polypeptide" in a way that excludes every single one of the examples in the patent?
> A.   Yes.

15

MGA0062351

> Q. And when you were formulating your opinion as to what that
> claim term meant, did you consider the fact that you were
> excluding from your definition every single example in the patent?
> A. No.

Ex. D, Bruce Depo. at 98-99. This alone is enough to render Bayer's proposed construction

invalid and improper under the rules of claim construction and *Vitronics*.

Even if Bayer's requirements that the CTP and EPSPS be "directly adjacent" and "not

found together in nature" are considered separately, the net result is the same. For example,

Bayer's requirement that the CTP and EPSPS are "not found together in nature" would have the

effect of causing many of the Examples to be outside the scope of the claims, as the inventors

utilized a chloroplast transit peptide from the petunia EPSPS with a petunia EPSPS, as shown in

Examples 1-3. "Such an interpretation is rarely, if ever, correct...." *Vitronics*, 90 F.3d at 1583.

Bayer's requirement that the CTP and EPSPS be "directly adjacent" is also unsupported

by the specification and claims, and based on the information provided by Bayer and its expert

Dr. Bruce to date, the meaning of "directly adjacent" is unclear. For example, Dr. Bruce failed

to specifically describe what he considered to be "directly adjacent" in his expert report. *See* Ex.

F, Bruce Report at 12-15. And when asked to explain his understanding of the term "directly

adjacent" during his deposition, Dr. Bruce acknowledged that "directly adjacent" did not

necessarily mean "next to" and stated that in his opinion, the "directly adjacent" requirement

would be met even if there were 1300 amino acids between the CTP and EPSPS:

> Q. And what do you mean by "directly adjacent"?
> A. Well, again, directly can mean exactly right next to each other
> or it can mean that there is nothing else that is perceived to be of
> importance that is there....
> ...
> Q. You are saying if that did occur, even though these things
> would have been separated by, did you say 1300 amino acids --
> A. I was being --

H: 523088(B7M8011.DOC)

MGA0062352

> Q.  -- that they could still be considered to be directly adjacent to
> each other if those amino acids were not believed to do anything?
> A.  One would really question the use of that language, but if that
> was the conclusions of the authors, I might tolerate that
> nomenclature.

Ex. D, Bruce Depo. at 81, 85-86.  Thus, Bayer's "directly adjacent" limitation, a limitation which

does not appear anywhere in the '835 patent claims or the specification, and apparently does not

even have a specific meaning according to Bayer's own expert, should be disregarded.

In short, while Bayer's strained construction of "chloroplast transit peptide/5-

enolpyruvylshikimate-3-phosphate synthase fusion polypeptide" would exclude all 19 Examples

in the '835 patent, Monsanto's proposed claim construction is consistent with the specification.

Therefore, the Court should adopt Monsanto's proposed claim construction of this disputed

claim term.

> **4.      permits the fusion polypeptide to be imported into a chloroplast of a
> plant cell**
>
> **Monsanto:**  "Permits the fusion polypeptide to be imported into a
> chloroplast of a plant cell" has its plain and ordinary meaning which is the
> function of a chloroplast transit peptide as recited in the above definition.
>
> **Bayer:**  "permits the fusion polypeptide to be imported into a chloroplast"
> means that the chloroplast transit peptide directs the entire chloroplast
> transit peptide/EPSPS fusion polypeptide to be transported intact across
> the chloroplast envelope membranes and into the chloroplast of a plant
> cell.

While Monsanto contends that the claim term "permits the fusion polypeptide to be

imported into a chloroplast of a plant cell" has its plain and ordinary meaning and simply refers

to the function of a chloroplast transit peptide, as defined in Section C, Bayer's claim

construction requires that the "entire" CTP/EPSPS polypeptide be transported into the

chloroplast, and that it be transported "intact."  Bayer's proposed construction, however, is

inconsistent with the words used by the inventors of the '835 patent in describing how

H: 523088(B7M8011.DOC)

MGA0062353

chloroplast transit peptides work, and is not in keeping with the scientific understanding of protein transport into the chloroplast of a plant cell.

As an example, the '835 patent specifically states that the EPSPS gene encodes a polypeptide which contains a chloroplast transit peptide which "enables the EPSPS polypeptide (or an active portion thereof) to be transported into a chloroplast inside the plant cell." Ex. A, col. 2, l. 66-col. 3, l. 2. The specification also states that the CTP leader sequence is believed to be removed, while the active portion of the EPSPS polypeptide enters the chloroplast:

> After the CTP/EPSPS polypeptide from a gene of this invention is translated from mRNA in the cytoplasm of the transformed plant cell, it is believed to be processed in the same manner as the natural EPSPS polypeptide. The CTP leader sequence causes the polypeptide to be imported into chloroplasts, and the CTP leader sequence encoded by the plant-derived EPSPS gene is believed to be removed from the remainder of the polypeptide so that an active portion of the EPSPS polypeptide exists and functions inside the chloroplast.

Ex. A, col. 4, ll. 24-34. Further, Example 18, which discusses how the protein import process works in the context of a chloroplast uptake experiments, demonstrates that the "precursor EPSPS" disappeared and a "mature form" of the EPSPS with a lower molecular weight subsequently appeared in the chloroplast, thus evidencing the removal of the CTP during import into the chloroplast:

> The pre-EPSPS (+CTP) was rapidly translocated into chloroplasts and cleaved to the mature EPSPS of $M_r \alpha 48$ kDa. The NaDodSO4. PAGE autoradiograph revealed the disappearance of the precursor EPSPS from the incubation medium, and the subsequent appearance of a lower molecular weight, mature form in the chloroplast fraction.

Ex. A, col. 30, ll. 3-9. Thus, Bayer's requirement that the "entire" CTP/EPSPS polypeptide be transported "intact" into the chloroplast is inconsistent with the specification, which specifically acknowledges that the chloroplast transit peptide is "removed" from the remainder of the polypeptide during the importation process.

H: 523088(B7M8011.DOC)

MGA0062354

Moreover, as Monsanto's expert Dr. Kenneth Keegstra explains in his expert report, Bayer's construction is not consistent with the current scientific understanding of the protein import process. *See* Ex. E at 9-10. Rather, as explained in Keegstra and Cline, *The Plant Cell*, 1999, 11:557-570, it is now known that during the process of importation, the fusion protein is the substrate which enables the import process to begin, and during the final stages of translocation of the CTP/EPSPS polypeptide, the CTP is proteolytically cleaved from the EPSPS passenger protein, leaving the processed EPSPS in the chloroplast. *See* Ex. G. Even Bayer's expert Dr. Bruce conceded during his deposition that when he used the term "import into the chloroplast" in his own multiple publications, he recognized that "cleavage takes place either during, that means prior to the completion of the transport process, or shortly thereafter," and was not trying to differentiate between the two alternative types of processing. *See* Ex. D, Bruce Depo. at 122-23, 165-66 ("And I use the term 'import' to describe the phenomenon of chloroplast protein targeting transport and processing. I was using it in a large global fashion.... I was not using that phrase ... to try to distinguish between those two.")

While Monsanto maintains that its construction of the claim term "permits the fusion polypeptide to be imported into a chloroplast of a plant cell" is supported by the patent specification, and that resort to extrinsic evidence about the detailed nature of the mechanism is not necessary, Monsanto's expert Dr. Keegstra is prepared to offer expert testimony during the upcoming *Markman* hearing to assist the Court in understanding the mechanism of protein transport and the function of a chloroplast transit peptide, for purposes of construing the disputed claim term.

H: 523088(B7MS011.DOC)

MGA0062355

## V.    CONCLUSION

The '835 patent claims, the specification and the prosecution history all support Monsanto's construction of the disputed claim terms.   In contrast, Bayer's proposed claim construction—which incorporates numerous claim limitations that are unsupported by the specification and claims—is nothing more than a veiled attempt by Bayer to avoid literal infringement of the claims as properly construed.   For these reasons, Monsanto respectfully requests that the Court disregard Bayer's proposed claim construction and adopt Monsanto's proposed construction of the four disputed claim terms of the '835 patent, which is consistent with the intrinsic evidence, and to the extent necessary, will be supported by expert testimony during the *Markman* hearing.

Respectfully submitted,

Dated:  April 8, 2003

HUSCH & EPPENBERGER, LLC

Joseph P. Conran, E.D. Mo. #6455
Jeanine R. Bermel, E.D. Mo. #2622
190 Carondelet Plaza, Suite 600
St. Louis, Missouri 63105
(314) 480-1500 —telephone
(314) 480-1505 —facsimile

John F. Lynch
Susan K. Knoll
Janelle D. Waack
HOWREY SIMON ARNOLD & WHITE, LLP
750 Bering Drive
Houston, Texas 77057
(713) 787-1400—telephone
(713) 787-1440—facsimile

ATTORNEYS FOR PLAINTIFFS
MONSANTO COMPANY AND
MONSANTO TECHNOLOGY LLC

H: 523088(B7M801!.DOC)

20

MGA0062356

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of April, 2003, a true and correct copy of the foregoing **MONSANTO'S STATEMENT REGARDING THE CONSTRUCTION OF THE ASSERTED CLAIMS OF THE '835 PATENT** was served as follows:

John H. Quinn, III, #4110          **Hand Delivery (w/ Exhibits)**
Jay A. Summerville, #4502
Lisa M. Wood, #2707
ARMSTRONG TEASDALE LLP
One Metropolitan Sq., Suite 2600
St. Louis, MO 63102
(314) 621-5070 - telephone
(314) 621-5065 - facsimile

George Pazuniak          **Via Facsimile (w/o Exhibits)**
Francis DiGiovanni       **Overnight Delivery (w/ Exhibits)**
Oleh V. Bilynsky
CONNOLLY BOVE LODGE & HUTZ LLP
1220 Market Street
Wilmington, DE 19899
(302) 658-9141 - telephone
(302) 658-5614 - facsimile

**ATTORNEYS FOR DEFENDANT
BAYER CROPSCIENCE LP**

21

H: 523088(B7M8011.DOC)

MGA0062357