# EXHIBIT 48

RECEIVED

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JUN 2 7 2003

U. S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

MONSANTO COMPANY and
MONSANTO TECHNOLOGY LLC,

Plaintiffs,

v.

BAYER CROPSCIENCE LP,

Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

C. A. NO. 4:01CV01825 CDP

**MONSANTO'S RESPONSE TO BAYER'S OPENING BRIEF
REGARDING THE CONSTRUCTION OF THE ASSERTED CLAIMS
OF THE '835 PATENT**

H: 534423(BGD301!.DOC)

MGA0062458

# TABLE OF CONTENTS

I.   SUMMARY OF THE REPLY ................................................................................. 1

II.  DISCUSSION ...................................................................................................... 2

    A.   Chimeric Plant Gene .................................................................................. 2

    B.   Chloroplast Transit Peptide ........................................................................ 4

        1.   Bayer's "Naturally Occurring" Limitation ................................... 4

        2.   Bayer's "Naturally Located At The N-Terminal Portion Of A Nuclear-Encoded Polypeptide" Limitation .............................................. 5

        3.   Monsanto's Proposed Construction Does Not Result In A "Means-Plus-Function" Claim ...................................................................... 6

    C.   Chloroplast Transit Peptide/5-Enolpyruvylshikimate-3-Phosphate Synthase Fusion Polypeptide .................................................................... 7

        1.   Bayer's "Directly Adjacent" Limitation ...................................... 8

        2.   Bayer's "Not Found Together In Nature" Limitation .................... 9

    D.   Permits The Fusion Polypeptide To Be Imported Into A Chloroplast Of A Plant Cell ........................................................................................ 13

III. CONCLUSION ................................................................................................. 16

H 534423(BGD3011.DOC)

MGA0062459

## TABLE OF AUTHORITIES

**Cases**

*Altiris, Inc. v. Symantec Corp.,*
  318 F.3d 1363 (Fed. Cir. 2003) ......................................................................................... 6

*Amgen, Inc. v. Hoechst Marion Roussel, Inc.,*
  314 F.3d 1313 (Fed. Cir. 2003) ..................................................................................... 2, 10

*Anderson v. Int'l Engineering & Manufacturing, Inc.,*
  160 F.3d 1345 (Fed. Cir. 1998) ....................................................................................... 13

*Apex Inc. v. Raritan Computer, Inc.,*
  325 F.3d 1364 (Fed. Cir. 2003) ......................................................................................... 6

*Bell Atlantic Network Services, Inc. v. Covad Communications Group, Inc.,*
  262 F.3d 1258 (Fed. Cir. 2001) ....................................................................................... 16

*Comark Comm, Inc. v. Harris Corp.,*
  156 F.3d 1182 (Fed. Cir. 1998) ......................................................................................... 1

*Envirco Corp. v. Clestra Cleanroom, Inc.,*
  209 F.3d 1360 (Fed. Cir. 2000) ......................................................................................... 6

*Hoechst Celanese Corp. v. BP Chemicals Ltd.,*
  78 F.3d 1575 (Fed. Cir. 1996) ........................................................................................... 2

*Invitrogen Corp., v. Biocrest Man'f, L.P.,*
  327 F.3d 1364 (Fed. Cir. 2003) ......................................................................................... 2

*Karlin Technology, Inc. v. Surgical Dynamics, Inc.,*
  177 F.3d 968 (Fed. Cir. 1999) ........................................................................................... 1

*Pall Corp. v. Hemasure, Inc.,*
  181 F.3d 1305 (Fed. Cir. 1999) ..................................................................................... 13, 14

*Renishaw PLC v. Marposs Societa' Per Azioni,*
  158 F.3d 1243 (Fed. Cir. 1998) ..................................................................................... 13, 14

*Schendel v. Curtis,*
  83 F.3d 1399 (Fed. Cir. 1996) ......................................................................................... 13

*Stiftung v. Renishaw PLC,*
  945 F.2d 1173 (Fed. Cir. 1991) ......................................................................................... 8

*Teleflex, Inc. v. Ficosa North America, Corp.,*
  299 F.3d 1313 (Fed. Cir. 2002) ......................................................................................... 1

H: 534423(BGD301!.DOC)

MGA0062460

*Texas Digital Systems, Inc. v. Telegenix, Inc.*,
    308 F.3d 1193 (Fed. Cir. 2002) ........................................................................ 12, 14

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ............................................................................... 2

*Vivid Technologies, Inc. v. American Science & Eng'g, Inc.*,
    200 F.3d 795 (Fed. Cir. 1999) ............................................................................... 8

**Statutes**

35 U.S.C. §112, ¶6 ...................................................................................................... 6

H: 534423(BGD301¹ DOC)

iii

MGA0062461

## I.    SUMMARY OF THE REPLY

Bayer goes to great lengths to violate two basic principals of claims construction in advocating its proposed construction of the claims of the patent-in-suit. First, Bayer repeatedly reads limitations into the plain language of the claims that simply are not there, apparently in hopes that this will allow it to ultimately avoid a finding of infringement. For example, through its proposed construction, Bayer tries to:

- Add a limitation that the claimed "chloroplast transit peptide" be "naturally occurring;"

- Add a limitation that the claimed "chloroplast transit peptide" be "naturally located at the N-terminal portion" of a nuclear encoded polypeptide;

- Add a limitation that the claimed "chloroplast transit peptide" be "directly adjacent to" the claimed "EPSPS;"

- Add a limitation that the claimed "cholorplast transit peptide" and "EPSPS" not be found together in nature; and

- Add a limitation that the claimed "fusion polypeptide" be transported "intact" across the "chloroplast envelope membranes" and into the chloroplast (even though this new term does not appear in the specification).

But the function of the Court at a *Markman* hearing is to construe any ambiguous limitations present in the claims, not add new ones. Indeed, the law of claims construction is unambiguous that "limitations from the specification are not to be read into the claims."[1]

Second, Bayer repeatedly construes the claims so that they do not even cover the embodiments of the invention disclosed in the specification. For example, through its proposed construction, Bayer construes the claims so that they do not cover:

- The non-naturally occurring "chloroplast transit peptide" addressed in Example 19;

---

[1] *Teleflex, Inc. v. Ficosa North America, Corp.*, 299 F.3d 1313, 1326 (Fed. Cir. 2002). *See also Karlin Technology, Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 971 (Fed. Cir. 1999); *Comark Comm, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998).

H: 534423(BGD3011.DOC)

MGA0062462

- Chloroplast transit peptides that are not "naturally located at the N-terminal portion" of the claimed EPSPS gene as addressed in Example 19; and

- The combinations of chloroplast transit peptides and EPSPS genes that are found in nature addressed in almost all of the Examples.

These efforts by Bayer violate the well-recognized principal of claims construction that claims should not be construed in a manner that would not cover the preferred embodiments or examples disclosed in the patent. "Such an interpretation is rarely, if ever, correct."[2] Taking its breach of this principal to an extreme, Bayer proposes a construction of "imported into a chloroplast" that would require that the complete CTP/EPSPS protein be imported "intact" into the chloroplast despite clear testimony from both experts that this is not the mechanism by which chloroplast transit peptides work. Thus, not only does Bayer's proposed construction of this term exclude the embodiments and examples in the specification, but it also seeks to limit the claim so that it would read on nothing exemplified in the specification.

Bayer's efforts to add limitations to the claims and to read them to exclude the embodiments disclosed by the inventors should be rejected by this Court. For the following reasons, the constructions proposed by Monsanto comport both with the intrinsic and the extrinsic evidence and should be adopted by the Court.

## II.   DISCUSSION

### A.   Chimeric Plant Gene

**Monsanto:** A "chimeric gene" has its plain and ordinary meaning which is a gene that is comprised of parts that do not occur together in nature. A "chimeric plant gene" also has its plain and ordinary meaning which is a chimeric gene that is expressed in a plant. With regard to claim 1, the gene is chimeric because the

---

[2] *Invitrogen Corp., v. Biocrest Man'f, L.P.*, 327 F.3d 1364, 1369 (Fed. Cir. 2003); *Amgen, Inc. v. Hoechst Marion Roussel, Inc.* 314 F.3d 1313, 1349 (Fed. Cir. 2003); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996); *Hoechst Celanese Corp. v. BP Chemicals Ltd.*, 78 F.3d 1575, 1581 (Fed. Cir. 1996).

H- 534423(BGD301! DOC)

MGA0062463

promoter is specified in the claim to be heterologous with respect to the coding sequence.

**Bayer:** A "chimeric gene" means a gene that is comprised of parts that do not occur together in nature. "Plant" has its plain and ordinary meaning: any organism of the kingdom plantae. A "chimeric plant gene" means a chimeric gene that is expressable in a plant.

The sole dispute involving the construction of "chimeric plant gene" is whether the explanatory sentence "with regard to claim 1, the gene is chimeric because the promoter is specified in the claim to be heterologous with respect to the coding sequence" should be included to further clarify for the jury what the term "chimeric" means.[3] The plant gene of the claims at issues is comprised of four components: a promoter, a chloroplast transit peptide, an EPSPS coding region, and a polyadenylation signal or stop signal. Monsanto's position is that the plant gene is chimeric if any one of those four components does not appear in nature.

As previously explained by Monsanto and as expressly set forth in the claim, use of a heterologous promoter clearly would make a genetic construct "chimeric." Such a construction would comport with all of the intrinsic and extrinsic evidence. *See* Monsanto Br. at 10-12. Bayer does not dispute this and has offered no reason for not including the explanatory sentence other than characterizing it as an "entirely extraneous statement." Because it is undisputed that the additional information completely comports with how a skilled artisan would understand the term "chimeric plant gene," Monsanto respectfully requests that the Court adopt its proposed construction to clarify this complex technical term for the jury.

---

[3] Bayer also asserts that the term "plant" must be defined. Monsanto disagrees, as the term "plant" has its plain and ordinary meaning. Monsanto does not dispute that the term "plant" refers to "an organism of the kingdom plantae" but does not believe that this adds any further meaning to the claim or is a term that will aid the jury in any manner in resolving this case.

3

H 534423(BGD30!! DOC)

MGA0062464

B.      **Chloroplast Transit Peptide**

> **Monsanto:** "Chloroplast transit peptide" has its plain and ordinary meaning which is a series of amino acids that functions in a plant cell to cause the transport of a polypeptide into a chloroplast in the plant cell.

> **Bayer:** A "chloroplast transit peptide" means a naturally occurring chain of amino acids that is naturally located at the N-terminal portion of a nuclear-encoded polypeptide, targeting the polypeptide to a chloroplast.

The parties generally agree that a "chloroplast transit peptide" is a "series" (Monsanto) or "chain" (Bayer) of amino acids that "causes the transport" (Monsanto) or "targets" (Bayer) a polypeptide to a chloroplast. However, as addressed in Monsanto's opening *Markman* brief, Bayer's proposed construction improperly attempts to insert additional claim limitations that are inconsistent with the intrinsic evidence.

### 1.     Bayer's "Naturally Occurring" Limitation

The first limitation Bayer seeks to introduce into the definition of "chloroplast transit peptide" is that the CTP be "naturally occurring." Bayer Br. at 16-18. But the claim language very clearly specifies just a "chloroplast transit peptide" with no limitation whatsoever as to whether it be naturally occurring or otherwise. For all of its efforts, Bayer offers no valid explanation for importing this additional limitation into the claims in hopes that it might provide Bayer with a way to avoid infringement.

Moreover, Bayer offers no explanation at all for improperly excluding a preferred embodiment of the invention through its proposed construction. At column 6, lines 10-11, the '835 patent clearly states that "the following examples further demonstrate several preferred embodiments of this invention." *See* JM1. The testimony is undisputed that the transit peptide disclosed by the Monsanto inventors in Example 19 is not "naturally occurring" but rather combines portions of a petunia CTP with a part of "the mature ssRUBISCO from wheat." Monsanto Br. at 13; JM1 at col. 30, ll. 45-55. Indeed, Bayer's own expert Dr. Bruce conceded

H-534423(BGD30H.DOC)

MGA0062465

during his deposition that Bayer's requirement that the CTP be "naturally occurring" would exclude the non-naturally occurring CTP of Example 19 from the scope of the '835 patent. Monsanto Br. Ex. D at 64-66, 70-72. Bayer simply has not met its heavy burden to present compelling evidence for a construction that would exclude this embodiment of a CTP that could be used in the invention.

Bayer attempts to justify its construction with the blanket assertion that "The ordinary meaning of the term "chloroplast transit peptide" is ... "naturally occurring." Bayer Br. at 16. But Bayer offers no supporting evidence whatsoever for why this is the case. Clearly in the context of the specification, Monsanto has used this term to describe the non-naturally occurring transit peptide in Example 19, which has the first 66 amino acids of a petunia EPSPS CTP linked to 6 amino acids from the chloroplast transit peptide from a gene designated as RUBISCO. JM1 at col. 30, ll. 45-55. Bayer's argument that the term "chloroplast transit peptide" was never used to describe something that was not naturally occurring (Bayer Br. at 17) similarly ignores Example 19. Finally, the specification's disclosure that "Suitable CTP's ... may be obtained from various sources.... Most preferably, the CTP is obtained from the endogenous EPSPS gene of the subject plant..." (JM1 at col. 4, ll. 35-40) does not compel Bayer's proposed construction. This statement clearly does not limit the disclosed CTP's to natural sources, but rather points to natural sources as being just one of the "various sources" for the claimed transit peptides.

2.    Bayer's "Naturally Located At The N-Terminal Portion Of A Nuclear-Encoded Polypeptide" Limitation

The second limitation Bayer improperly seeks to introduce into the claims is that the chloroplast transit peptide be "naturally located at the N-terminal portion of a nuclear encoded polypeptide." Where this new limitation came from is a complete mystery and remains as such in Bayer's opening brief. Bayer offers no explanation at all for why this limitation should be

H· 534421(BGD301!.DOC)

MGA0062466

added to the claims other than another blanket and unsupported assertion that this is the "ordinary meaning of the term 'chloroplast transit peptide.'" Bayer Br. at 16. Further, this construction again improperly excludes the transit peptide of Example 19, as such a chimeric transit peptide would not be found naturally located at the N-terminal portion of any nuclear encoded polypeptide. Because Bayer has no supporting basis in the claims, specification, file history or extrinsic evidence for this proposed construction, it should also be rejected.

### 3. Monsanto's Proposed Construction Does Not Result In A "Means-Plus-Function" Claim

Aside from attempting to improperly add limitations that exclude preferred embodiments, the only dispute that Bayer presents with Monsanto's proposed construction is that it would convert the claims into means-plus-function claims. "Means-plus-function" claims are a particular type of patent claim addressed at 35 U.S.C. §112, ¶6. Through the use of means-plus-function limitations, patent applicants are allowed to claim an element of a combination functionally, without reciting structures for performing those functions. *Envirco Corp. v. Clestra Cleanroom, Inc.*, 209 F.3d 1360, 1364 (Fed. Cir. 2000). Specialized rules govern their construction. But there is no need for any detailed familiarity with those rules because they are not at all implicated by Monsanto's proposed construction.

A claim element that contains the word "means" and recites a function is presumed to be a means-plus-function element under § 112, ¶ 6. *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1375 (Fed. Cir. 2003). Conversely, a claim element that lacks the term "means" is presumed *not* to be a means-plus-function element, unless the element relies on functional terms rather than structure or material to describe the performance of the claimed function. *Apex Inc. v. Raritan Computer, Inc.*, 325 F.3d 1364, 1372 (Fed. Cir. 2003). The fact that a particular claim term is

6

MGA0062467

defined in functional terms is not sufficient to convert a claim limitation into a means-plus-function claim. *Id.*

The '835 patent claims do not contain the word "means" so they are presumed to not be means-plus function claims. Bayer argues that Monsanto's proposed construction implicates the means-plus-function doctrine because "Monsanto takes the position that the term 'CTP' does not connote a definite structure." Bayer Br. at 18. But Bayer is incorrect, as Monsanto's proposed construction recognizes that a chloroplast transit peptide is a defined structure—i.e., a series of amino acids—that that serves a specific function—i.e., causes the transport of a polypeptide into a chloroplast in a plant cell. Moreover, Monsanto's proposed construction does not rely on functional terms to describe the performance of a "claimed" function, as Monsanto's claims are directed to "chimeric plant genes," *not* a "means for performing a specified function." Thus, the means-plus-function law cited by Bayer simply does not apply.

C.    **Chloroplast Transit Peptide/5-Enolpyruvylshikimate-3-Phosphate Synthase Fusion Polypeptide**

**Monsanto:** "Chloroplast transit peptide/5-enolpyruvylshikimate-3-phosphate synthase fusion polypeptide" is a polypeptide that includes at least two parts, the first of which comprises a series of amino acids that function in tandem as a chloroplast transit peptide (as defined above) joined to second part that comprises a second series of amino acids that functions to catalyze a reaction in the biochemical pathway for creating aromatic amino acids.

**Bayer:** The term "chloroplast transit peptide/5-enolpyruvyl-shikimate-3-phosphate synthase [EPSPS] fusion polypeptide" means a chain of amino acids consisting of chloroplast transit peptide (as defined above) directly adjacent to an EPSPS, where the chloroplast transit peptide and EPSPS are not found together in nature.

In furtherance of its efforts to arrive at a claims construction by which it can attempt to avoid infringement, Bayer improperly attempts to import two more limitations into the term "CTP/EPSPS fusion polypeptide"—(i) that the CTP be directly adjacent to the EPSPS, and (ii)

H: 534423(BGD3011 DOC)

MGA0062468

that the CTP and EPSPS not be found together in nature. Again, nothing supports adding these two new limitations to the claims.

### 1.    Bayer's "Directly Adjacent" Limitation

As support for importing the "directly adjacent" limitation into the claim term "CTP/EPSPS fusion polypeptide," Bayer relies upon yet another blanket and unsupported assertion that this is the plain meaning of this term. Bayer Br. at 21-22. But that simply is not the case. Nothing in this claim term excludes the possibility that other elements could be included. To the contrary, even Bayer concedes that it would be understood by those of skill in the art that such a fusion could have additional elements, such as linkers and other artifacts of the fusion process. Bayer Br. at 22. Bayer cannot walk away from this admission by advancing this completely contradictory construction. In short, nothing in the plain language "CTP/EPSPS fusion polypeptide" requires that these two elements be adjacent or excludes the presence of other elements—particularly ones related to the function of the transit peptide of directing the EPSPS into the chloroplast.

Bayer's argument also ignores another fundamental tenet of claim construct—that claims written in "opening ended" format (i.e., those that use the term "comprising") are broadly construed. "Comprising" is a term of art used in claim language which means that the named elements are essential, but that other elements may be added and still fall within the scope of the claim. *Vivid Technologies, Inc. v. American Science & Eng'g, Inc.*, 200 F.3d 795, 811 (Fed. Cir. 1999), citing *Stiftung v. Renishaw PLC*, 945 F.2d 1173, 1178 (Fed. Cir. 1991) (a claim "which uses the term 'comprising' is an 'open' claim which will read on devices which add additional elements"). The asserted claims all are directed to "A chimeric plant gene which comprises...," thus explicitly indicating that other elements can be present.

MGA0062469

2.    Bayer's "Not Found Together In Nature" Limitation

With its new "not found together in nature" limitation, Bayer attempts to exclude a host of chimeric genes containing CTP/EPSPS combinations isolated from plants from coverage by the '835 patent. But nothing cited by Bayer supports pasting this new limitation on top of the term "fusion protein."

With yet another blanket and unsupported statement, Bayer argues that Monsanto's claims should be limited to "fused polypeptides with the CTP and EPSPS coming from different sources." Bayer Br. at 19. Yet, the intrinsic evidence completely supports that the term "fusion protein" was not meant to exclude naturally occurring CTP/EPSPS fusions. The term "fusion polypeptide" is used to refer to a polypeptide that has a transit peptide function and an EPSPS function. This is reflected by the fact that most of the Examples in the '835 patent involve chimeric genes employing naturally occurring CTP/EPSPS fusions. For instance, Example 1 describes the creation of pMON546, a vector that utilizes a chloroplast transit peptide and EPSPS coding sequence from petunia. See JM1 at col. 6-16 and Figure 2. Next, Examples 2 and 3 describe the making of glyphosate resistant petunia cells and tobacco cells, respectively, using pMON546. See JM1 at col. 16-17. Further, Examples 5-7 describe the use of plant transformation vectors similar to pMON546, except that the CTP/EPSPS coding sequences are obtained from cotton, oil seed rape, and flax, respectively. See JM1 at col. 19-20. Indeed, Bayer's expert Dr. Bruce testified during his deposition that in his opinion, Bayer's proposed construction would exclude every single Example in the patent. Monsanto Br. Ex. D at 98-99. Thus, by importing this non-extant limitation into the claims, Bayer again seeks to arrive at a

MGA0062470

claims construction that excludes numerous preferred embodiments of the invention. Again, "Such an interpretation is rarely, if ever, correct...." *Amgen*, 314 F.3d at 1349. [4]

Attempting to show that its proposed construction is somehow consistent with a specification rife with examples of naturally occurring CTP/EPSPS fusions, Bayer tries to distort the text at column 4, lines 23-28 of the specification. Bayer Br. at 23. But this part of the specification does not state that "CTP/EPSPS fusion polypeptides" differ from natural CTP/EPSPS polypeptides, as suggested by Bayer. It simply recognizes that the inventors were able to make a chimeric gene that encodes a fusion polypeptide that works the same way as the fusion polypeptide encoded by the gene naturally found in plants.

Earlier in its brief (Bayer Br. at 7), Bayer argues that the statement in a previous application that "it is not known whether a fusion peptide comprising (1) a CTP sequence derived from a heterologous protein such as ssRUBISCO, coupled to (2) a mature EPSPS sequence" (JM2 at 14) somehow evidences Monsanto's intent to define "fusion" as a combination of a CTP and EPSPS gene from two different sources. Clearly, the statement on its face does not exclude homologous CTP's. But Bayer also takes this earlier specification completely out of context. Here, Monsanto was clearly not defining the term "fusion polypeptide." Rather, Monsanto was simply addressing one such "fusion polypeptide"—a chimeric CTP/EPSPS construct containing a CTP from a heterologous gene, such as RUBISCO and a mature EPSPS sequence. Had Monsanto agreed with the construction proposed by Bayer, there would have been no need for Monsanto to have specified that the "fusion protein" being

---

[4] Monsanto's proposed construction does not eliminate the term "fusion" from the claims, as Bayer suggests. Bayer Br. at 21. Instead, the term "fusion polypeptide" simply further clarifies that the CTP and EPSPS must be part of a fused protein, and serves as an antecedent bases for the subsequent limitation, "which [CTP] permits the fusion polypeptide to be imported...."

H 534425(BGD3011.DOC)

MGA0062471

discussed contained elements obtained from heterologous sources, because that would have been implicit in the definition of "fusion polypeptide."

Because nothing in the claims or the specification supports its contrived limitation of the claims to transit peptides and EPSPS genes that do not occur together in nature, Bayer resorts to a blatant mischaracterization of the prosecution history. Bayer boldly states that "The clear purpose of adding the term 'fusion' to the limitation was to address the PTO's concern that Monsanto was including a 'known gene' (a wild-type CTP/EPSPS) in the claim." Bayer Br. at 25. But nothing could be further from the truth. First, the "known gene" that was the source of the Examiner's rejection was not a "wild-type CTP/EPSPS" construct as misrepresented by Bayer. Instead, the alleged "known gene" was the bacterial EPSPS gene of Comai, combined with the plant transit peptide of Van den Broeck. JM2 at 250-51.

But more fundamentally, Monsanto simply could not have been adding the term "fusion" to overcome the pending prior art rejection relied upon by Bayer because the Examiner expressly stated that "it would have been obvious to the ordinary artisan to form a **fusion protein** [i.e., polypeptide] with a transit peptide and the EPSPS gene to confer glyphosate tolerance." JM2 at 251 (emphasis added). Stated another way, Monsanto could not have relied upon a "fusion protein" limitation to overcome a rejection that the prior art taught a "fusion protein." Instead, the prosecution history is abundantly clear that Monsanto overcame this prior art rejection with a declaration establishing an invention date prior to the relied-upon publications that dealt with the isolation of an EPSPS gene containing its own naturally associated chloroplast transit peptide. JM2 at 299, 304-05. What is more, the deposit submitted by Monsanto to support its application was of a clone containing pMON546, a chimeric gene employing a native petunia CTP/EPSPS fusion. JM2 at 270-71. Had the claims been limited to exclude such fusions, as argued by

11

MGA0062472

Bayer, it is hard to explain why the Examiner would have accepted the deposit of a chimeric

gene with a natural CTP/EPSPS fusion.

As a final matter, Bayer argues that its proposed construction is mandated by a proffered

dictionary definition for the term "fusion protein." The suggested dictionary definition is:

> A protein containing amino acid sequences from each of two distinct
> proteins; it is formed by the expression of a recombinant genetic construct
> prepared by joining together two coding sequences with their reading
> frames in phase."

Bayer Br. at 19-20. Bayer completely overlooks that this proffered definition does not exclude

CTP/EPSPS combinations found together in nature. Take for example a naturally occurring

maize CTP/EPSPS protein: this protein can reasonably be viewed as "two distinct proteins"—

the transit peptide and the EPSPS. Moreover, in nature, this combined protein is "formed by the

expression" of a genetic construct that joins together two distinct DNA "coding sequences with

their reading frames in phase." This understanding of the term "fusion protein" is also consistent

with the other dictionary definitions supplied by Bayer for the same reasons. Bayer Br. at 20,

n.9.[5] Monsanto will present expert testimony at the *Markman* hearing about how this term as

defined would be understood by a person of skill in the art to include both naturally and non-

naturally occurring CTP/EPSPS fusions.

But even if Monsanto's proposed construction were inconsistent with the above

dictionary definition (which it is not), Federal Circuit law is very clear that "the intrinsic record

may show that the specification uses the words in a manner clearly inconsistent with the ordinary

meaning reflected, for example, in a dictionary definition." *Texas Digital Systems, Inc. v.*

---

[5] The constructions reached in prior Federal Circuit cases cited by Bayer clearly would have no
application here because they involved different patents, specifications and prosecution histories.
Bayer Br. at 20. But even those cases support a construction of "fusion polypeptide" as
including naturally occurring CTP/EPSPS fusions. For example, such a fusion would be "a

H: 534423(BGDJ011.DOC)

MGA0062473

*Telegenix, Inc.*, 308 F.3d 1193, 1204 (Fed. Cir. 2002). "In such a case, the inconsistent dictionary definition must be ignored." *Id.*; see also *Pall Corp. v. Hemasure, Inc.*, 181 F.3d 1305, 1309 (Fed. Cir. 1999) ("Thus a technical term is taken to have the meaning that it would ordinarily have in the field of the invention, unless it is shown that the inventor used the term with a special meaning and that persons of skill in the filed would so understand the usage."); *Renishaw PLC v. Marposs Societa' Per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998) ("However, a common meaning, such as one expressed in a relevant dictionary, that flies in the face of the patent disclosure is undeserving of fealty."); see also *Anderson v. Int'l Engineering & Manufacturing, Inc.*, 160 F.3d 1345, 1348 (Fed. Cir. 1998) ("a word describing patented technology takes its definition from the context in which it was used by the inventor"). Here, the above intrinsic evidence unmistakably points to the conclusion that the term "fusion polypeptide" is used in the specification to include naturally occurring fusions such as those described in the examples.

### D.     Permits The Fusion Polypeptide To Be Imported Into A Chloroplast Of A Plant Cell

**Monsanto:** "Permits the fusion polypeptide to be imported into a chloroplast of a plant cell" has its plain and ordinary meaning which is the function of a chloroplast transit peptide as recited in the above definition.

**Bayer:** "permits the fusion polypeptide to be imported into a chloroplast" means that the chloroplast transit peptide directs the entire chloroplast transit peptide/EPSPS fusion polypeptide to be transported intact across the chloroplast envelope membranes and into the chloroplast of a plant cell.

With regard to this final disputed claim term, Bayer takes its violations of the tenets of claims construction to an extreme by proposing a construction that not only excludes all of the Examples in the specification, but also is completely inconsistent with the common

---

molecule that contains amino acid sequences of two different proteins" for the reasons explained above. *Schendel v. Curtis,* 83 F.3d 1399, 1400 (Fed. Cir. 1996).

H: 534423(BGD30)1.DOC)

MGA0062474

understanding of how transit peptides function. Nowhere does Bayer dispute the well-established proof that scientists, including Bayer's expert, use the term "import" to globally describe the process by which a transit peptide directs a passenger protein into the chloroplast. Monsanto Br. at 19. Moreover, nowhere does Bayer dispute the common understanding by scientists that the entire CTP is not typically imported into the chloroplast. *Id.* Instead, Bayer proposes a construction that is completely at odds with all of the scientific evidence.

Following its common theme, Bayer again attempts to add a new limitation—that the fusion polypeptide "be transported **intact** across the **chloroplast envelope membranes....**" Nothing in the claim language, however, requires or supports such a limitation. Just because the claims require that the fusion polypeptide be "imported" does not mean that it must be imported "intact." Moreover, there is no requirement that the entire fusion polypeptide make it through all of the "chloroplast envelope membranes" to be imported into the chloroplast.

Bayer's proposed dictionary definition is also to no avail. Initially, it cannot be expected that the editors of the *American Heritage Dictionary* had EPSPS enzymes and chloroplast envelope membranes in mind when it set out to define the term "import." Bayer Br. at 26. Moreover, Bayer's argument based upon that definition that "an object is imported into the chloroplast when that object has been brought into the chloroplast" again presumes Bayer's added limitation that the fusion polypeptide "be transported **intact** across the **chloroplast envelope membrane,**" a limitation that again appears nowhere in the claims or specification.

But again, even if Bayer's proposed construction comports with the dictionary definition, this is clearly a case where "the intrinsic record [shows] that the specification uses the words in a manner clearly inconsistent with the ordinary meaning." *Texas Digital*, 308 F.3d at 1204; *Pall*, 181 F.3d at 1309; *Renishaw*, 158 F.3d at 1250. Indeed, the specification clearly describes the

MGA0062475

importation process as encompassing either a situation where all or part of the fusion polypeptide is imported into the chloroplast, and expressly recognizes that this importation process results in the cleavage of the CTP from the EPSP protein. Monsanto Br. at 18. But more fundamentally, because Bayer apparently concedes that the CTP is cleaved during the importation process, all of the preferred embodiments of the invention provided in the Examples would again be excluded by Bayer's proposed construction. Thus, all of the intrinsic evidence points to a construction where the fusion polypeptide need not be imported intact into the chloroplast.

To make its nonsensical construction fit, Bayer contends that Monsanto deliberately narrowed its claims to require that the entire "fusion polypeptide" had to be imported into the chloroplast. Bayer Br. at 27-28. But there is no evidence to support Bayer's position. While it is true that the claims as originally submitted included the language "which causes the polypeptide, or a portion thereof which has EPSPS activity, to be transported" and the claims as issued do not include the phrase "or a portion thereof which has EPSPS activity," the change in language does not constitute a "clear and deliberate narrowing of the claims" as Bayer insists. Rather, a comparison of prosecution claim 1 of the first-filed '482 application and prosecution claim 1 of the third-filed '814 application shows that the claim language was changed from "causes the polypeptide, or a portion thereof which has EPSPS enzymatic activity, to be transported" to "permits the polypeptide, upon expression in a plant cell, to be imported." JM2 at 220. There is no suggestion from the amendment above that the Monsanto inventors intended to disclaim anything. Instead, the issue of whether the claims were limited to importation of all or part of the claimed fusion polypeptide simply was not an issue during the prosecution and was never raised by a single comment from the PTO examiner.

H 534423(BGD301!.DOC)

MGA0062476

by the understanding ascribed to this term by those of skill in the art. "[A] technical term used in a patent is interpreted as having the meaning a person of ordinary skill in the field of the invention would understand it to mean." *Bell Atlantic Network Services, Inc. v. Covad Communications Group, Inc.,* 262 F.3d 1258, 1267 (Fed. Cir. 2001). Here, that usage clearly supports only one construction—that advanced by Monsanto. Indeed, if Bayer's construction were adopted, the '835 patent would be rendered nonsensical, as the protein import mechanism does not work in the manner that Bayer proposes.

## CONCLUSION

For the reasons stated, Monsanto respectfully requests that the Court adopt its proposed constructions for the four disputed claim terms. Monsanto's proposed construction is consistent with the words of the claims, the specification, and the prosecution history, and particularly, the Examples provided by the inventors to illustrate their claimed inventions.

Respectfully submitted,

Dated: June 27, 2003

HUSCH & EPPENBERGER, LLC

By: _____
Joseph P. Conran, E.D.Mo. # 6455
Jeanine R. Bermel, E.D.Mo. # 2622
190 Carondelet Plaza, Suite 600
St. Louis, MO 63105-3441
Telephone: (314) 480-1500
Facsimile: (314) 480-1505
Court Dedicated Fax: (314) 480-1530

MGA0062477

HOWREY SIMON ARNOLD & WHITE, LLP
John F. Lynch
Susan K. Knoll
Steven G. Spears
750 Bering Drive
Houston, TX 77057
Telephone: (713) 787-1400
Facsimile: (713) 787-1440

Attorneys for Plaintiff Monsanto Company

MGA0062478

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of June, 2003, a true and correct copy of the foregoing **MONSANTO'S RESPONSE TO BAYER'S OPENING BRIEF REGARDING THE CONSTRUCTION OF THE ASSERTED CLAIMS OF THE '835 PATENT** was served via facsimile and overnight delivery to the following:

John H. Quinn, III, #4110
Jay A. Summerville, #4502
Lisa M. Wood, #2707
ARMSTRONG TEASDALE LLP
One Metropolitan Sq., Suite 2600
St. Louis, MO 63102
(314) 621-5070 - telephone
(314) 621-5065 - facsimile

George Pazuniak
Francis DiGiovanni
Oleh V. Bilynski
CONNOLLY BOVE LODGE & HUTZ LLP
1220 Market Street
Wilmington, DE 19899
(302) 658-9141 - telephone
(302) 658-5614 - facsimile

**ATTORNEYS FOR DEFENDANT
BAYER CROPSCIENCE LP**

H. 534423(BGD3011.DOC)

18

MGA0062479