# APPENDIX

1          IN THE UNITED STATES DISTRICT COURT

2         FOR THE EASTERN DISTRICT OF MISSOURI

3

4

MONSANTO COMPANY,

5              Plaintiff,

6         vs.                          No. 4:01-CV-1825 CDP

7

BAYER CROPSCIENCE LP,

8              Defendant.

9

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - -

PRESENT:    The Honorable Catherine D. Perry, Presiding

11

ATTORNEYS FOR PLAINTIFF: John F. Lynch, Susan K. Knoll, Steven

12  G. Spears and Joseph P. Conran

13  ATTORNEYS FOR DEFENDANT: George Pazuniak, Francis DiGiovanni
and John H. Quinn, III

14

15

16

17

18                    Markman Hearing

19              July 1 and 2, 2003

20

21

22

23              TERI HANOLD HOPWOOD
              Registered Merit Reporter
24         Thomas F. Eagleton Courthouse
      111 South Tenth Street, Room 3.348
25         St. Louis, Missouri  63102


**C1**

MGA0058699

1     INDEX

2

3     KENNETH KEEGSTRA

4          Direct Examination by Ms. Knoll . . . . . . . . . . 38

5          Cross Examination by Mr. Pazuniak . . . . . . . . . .68

6          Redirect Examination by Ms. Knoll . . . . . . . . . 105

7

8     BARRY D. BRUCE

9          Direct Examination by Mr. Pazuniak . . . . . . . . 111

10         Cross Examination by Mr. Lynch . . . . . . . . . . 116

11         Redirect Examination by Mr. Pazuniak . . . . . . . .127

12

13    JULY 2, 2003 . . . . . . . . . . . . . . . . . . . . 161

14

15

16

17

18

19

20

21

22

23

24

25

**C2**

1    THE COURT:  Before you start this line of

2  questioning, I think we'll start our lunch recess.  What's

3  your best estimate of how much longer you expect your

4  cross-examination to take?

5    MR. PAZUNIAK:  15 minutes.

6    THE COURT:  We will be in recess for one hour.  As

7  I count it, you have used up approximately an hour, maybe a

8  minute more or a minute less.  Ms. Kirkland is the official

9  timekeeper.  Court will be in recess until 1:30.

10    (A recess was taken.)

11    THE COURT:  You may continue with the

12  cross-examination.

13    CONTINUED CROSS EXAMINATION

14  BY MR. PAZUNIAK:

15  Q.  Doctor Keegstra, please turn to examples 18 and 19 of the

16  '835 patent.

17  A.  Okay, I have them.

18  Q.  Both examples involve systems that do not include a plant

19  or a plant cell.

20  A.  That's correct.  They both involve demonstrating in vitro

21  import into isolated chloroplasts.

22  Q.  Is it correct that neither example 18 nor 19 identify a

23  promoter that is functional in a plant cell?

24  A.  They do not involve transcription inside the cell, so they

25  would not require it.

**C3**

MGA0058796

1    Q.  Is it fair to say that neither example 18 or 19 involve

2    any glyphosate resistance or testing of glyphosate resistance?

3    A.  That's correct, they do not.

4    Q.  In fact, both examples 18 and 19 are literally test tube

5    tests run in the cell-free environment, right?

6    A.  Yes, we have done lots of them, and I still think they are

7    important, sure.

8    Q.  We got a little bit off on a tangent, and my co-counsel

9    refreshed my recollection, and I'm not sure we put a closure

10   on the series of questions we had before.  Other than the --

11   and this is on the issue of chloroplast transit peptides,

12   other than the CTP disclosed as the petunia CTP for the EPSPS,

13   and what you had identified in example 19 as the change with

14   the six amino acids, is there any other CTP disclosed in the

15   '835 patent by sequence or by other identifying

16   characteristics?

17   A.  Other CTPs are reported.  I think we agreed before the

18   sequences were not reported, and they told us nothing about

19   their characteristics.

20   Q.  Now, can you -- I'd like to have you take a look at what

21   is PM 61.  It was also marked as PMX 6, and I'll just put it

22   here on the ELMO.  Do you recognize this article, sir?

23   A.  Yes.

24            MR. PAZUNIAK:  May I hand it to the clerk?

25            THE COURT:  Yes, hand it to the clerk.

**C4**

MGA0058797

RESTRICTED CONFIDENTIAL VIDEO DEPOSITION OF
BARRY D. BRUCE

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - -x

MONSANTO COMPANY and            :   04-305(SLR)

MONSANTO TECHNOLOGY LLC,        :

     Plaintiffs,              :

   vs.                            :

SYNGENTA SEEDS, INC.,           :

SYNGENTA BIOTECHNOLOGY, INC.,   :

ET AL.,                         :

     Defendants.              :

- - - - - - - - - - - - - - -x

DEKALB GENETICS CORPORATION,    :

     Plaintiff,               :   Civil Action Number

   vs.                            :   05-355-SLR

SYNGENTA SEEDS, INC.,           :

SYNGENTA BIOTECHNOLOGY, INC.,   :

ET AL.,                         :

     Defendants.              :

- - - - - - - - - - - - - - -x

RESTRICTED CONFIDENTIAL VIDEO DEPOSITION OF

BARRY D. BRUCE

Washington, DC

Friday, December 16, 2005

REPORTED BY: CARMEN SMITH
Job No. 54931

RESTRICTED CONFIDENTIAL VIDEO DEPOSITION OF
BARRY D. BRUCE

## Page 2

1    Restricted Confidential Video Deposition of
2    BARRY D. BRUCE, called for examination pursuant to
3    notice of deposition, on Friday, December 16, 2005,
4    in Washington, DC, at the offices of Finnegan,
5    Henderson, Farabow, Garrett & Dunner, 901 New York
6    Avenue NW, at 9:04 a.m., before CARMEN SMITH, a
7    Notary Public within and for the District of
8    Columbia, when were present on behalf of the
9    respective parties:
10        MELINDA PATTERSON, ESQ.
11        Howrey LLP
12        1111 Louisiana, 25th Floor
13        Houston, Texas 77002-5242
14        713-787-1483
15        On behalf of Plaintiffs
16
17        SANYA SUKDUANG, ESQ.
18        JARED S. COHEN, ESQ.
19        Finnegan Henderson Farabow Garrett & Dunner
20        901 New York Avenue NW
21        Washington, DC 20001-4413
22        202-408-4377
23        On behalf of Defendants
24
25    ALSO PRESENT: JONATHAN PERRY, Videographer

## Page 3

1            PROCEEDINGS
2        (Bruce Exhibit 1 identified.)
3        VIDEO OPERATOR: This is tape number 1 of
4    the videotaped deposition of Barry Douglas Bruce,
09:02:59 5    taken in the matter of Monsanto Company, et al.,
6    versus Syngenta Seeds, Incorporated, et al., Case
7    Number 04-305-SLR, and in the matter of DeKalb
8    Genetics Corporation versus Syngenta Seeds,
9    Incorporated, et al., Case Number 05-355-SLR, in the
09:03:24 10    U.S. District Court for the District of Delaware.
11        Today's date is December 16, 2005. Time
12    on the video screen is currently 9:04:10 a.m.
13        This deposition is being taken at the
14    offices of Finnegan Henderson, 901 New York Avenue
09:03:45 15    Northwest, Washington, D.C.
16        My name is Jonathan Perry. I am the
17    videographer here on behalf of Sunbelt Reporting and
18    Litigation Services. The court reporter is Carmen
19    Smith, also with Sunbelt Reporting and Litigation
09:04:00 20    Services.
21        Will counsel present please introduce
22    themselves and state whom they represent.
23        MS. PATTERSON: Melinda Patterson of
24    Howrey for Monsanto and DeKalb Genetics.
09:04:10 25        MR. SUKDUANG: Sanya Sukduang from

## Page 4

1    Finnegan Henderson representing Syngenta Seeds,
2    Syngenta Biotechnology, Defendants.
3        MR. COHEN: Jared Cohen from Finnegan
4    Henderson, representing Syngenta.
5    Whereupon,
6            BARRY D. BRUCE
7    was called as a witness and, having first been duly
8    sworn, was examined and testified as follows:
9            EXAMINATION
09:04:35 10    BY MS. PATTERSON:
11        Q   Dr. Bruce, could you please state your
12    name and present position for the record.
13        A   My name is Barry Douglas Bruce, and my
14    present employment is with the University of
09:04:52 15    Tennessee in Knoxville, where I am an associate
16    professor of biochemistry, cellular and molecular
17    biology.
18        MR. SUKDUANG: Just as a preliminary
19    matter, we would like to mark this transcript as
09:05:03 20    restricted confidential, subject to the protective
21    order.
22        BY MS. PATTERSON:
23        Q   Dr. Bruce, I have placed before you a
24    document that's been marked as Bruce Exhibit 1.
09:05:20 25    Could you take a look at that and identify it for

## Page 5

1    the record, please?
2        A   This black folder?
3        Q   Yes.
4        A   It says "Deposition Exhibit 1, Bruce." Do
09:05:29 5    you want me to look at everything that's in it?
6        Q   I want you to look at it. It's a copy. I
7    believe, of your expert report. There are circled
8    numbers that have been added by hand in your expert
9    report. Those circled numbers -- for example if you
09:05:50 10    look at page 3 of your report, paragraph 8, there is
11    a circled number that's been added by "the Shah '835
12    patent." Do you see that?
13        A   It looks like a 1, yes.
14        Q   Right. And at tab 1 of your binder, there
09:06:11 15    is the document the Shah patent that corresponds to
16    the circle number 1. So there is a convenient way
17    there for you to locate the documents that you have
18    referenced in your report.
19        And at the back of the binder is a copy of
09:06:28 20    your rebuttal report.
21        A   50? Is that what you're saying?
22        Q   It's marked "rebuttal report," towards the
23    back, and at the very back. And it has been circle
24    numbered with corresponding tabs in the same way.
09:06:59 25        A   And the numbers go forward and backwards,

2  (Pages 2 to 5)

Sunbelt Reporting & Litigation Services
361 882-0763 Corpus     713 667-0763 Houston     214 747-0763 Dallas

475d516b-ace0-4dc8-9dcd-4d2866bce0a5

RESTRICTED CONFIDENTIAL VIDEO DEPOSITION OF
BARRY D. BRUCE

## Page 10

1    of chloroplast transit peptide is.
2        A    I define it in my expert report on
3    paragraph 17. It is -- a chloroplast transit
4.    peptide means a naturally occurring chain of amino
09:14:00 5    acids that are naturally located at the N-terminus,
6    the terminal portion of a nuclear encoded
7    polypeptide, which directs the targeting
8    transporting cleavage of that polypeptide into a
9    chloroplast.
09:14:1610    Q    Okay. Now, that's not what paragraph 17
11    says, though; right?
12        A    So in this case, 17 uses the word
13    "direct," which is somewhat of a shorthand for the
14    process of importation -- targeting, importation and
09:14:3715    cleavage. I go on to clarify that in my -- in my
16    rebuttal report, but I'm trying to sort of interpret
17    the term "transport and direct" in a more clear
18    fashion.
19        Q    Okay. So have you added, then,
09:14:5920    qualifications or changes to the court's prior order
21    with respect to the meaning of the term "chloroplast
22    transit peptide"?
23        A    I'm not -- I don't feel that I've
24    substantively changed that. I have tried to provide
09:15:1525    some clarification of the process of targeting,

## Page 11

1    transport and cleavage and how that fits into the --
2    maybe the more abbreviated term "direct" or
3    "transport."
4        Q    Okay. But the court's prior order only
09:15:32 5    says "transport"; is that correct?
6        A    It -- in this sentence here, it discusses
7    transport. In a more detailed discussion, the
8    court, I believe, acknowledged that phenomena of
9    cleavage and discussed the temporal -- or
09:15:5610    interpreted the issues of the temporal event of
11    cleavage.
12        Q    All right. Well, we'll get to that a
13    little bit later. But suffice it to say that here
14    it only says "transport"; correct?
09:16:0815        MR. SUKDUANG: Objection; asked and
16    answered.
17        BY MS. PATTERSON:
18        Q    Correct?
19        A    The reading of this claims construction
09:16:1520    order by the St. Louis court simply causes -- uses
21    the term "causes the transport."
22        Q    Okay. Now, let's move on to the term
23    "chloroplast transit
24    peptide/5-enolpyruvylshikimate-3- phosphate
09:16:3225    synthase (EPSPS) fusion polypeptide."

## Page 12

1        And the court there defined that term as
2    "a polypeptide that has at least two parts, which
3    must include a chloroplast transit peptide (as
4    defined above) joined to an EPSPS."
09:16:54 5        Do you agree with that portion of the
6    court's definition of chloroplast transit peptide
7    5-enolpyrulvylshikimate-3-phosphate synthase fusion
8    polypeptide?
9        MR. SUKDUANG: And Dr. Bruce, if
09:17:1610    necessary, you can review the rest of that
11    paragraph.
12        BY MS. PATTERSON:
13        Q    And I'm only asking about that portion of
14    the court's construction. We'll get to the second
09:17:2315    portion of the court's construction of that term in
16    just a minute.
17        A    And, okay, so can I ask that I be allowed
18    to abbreviate the EPSPS synthase to EPSPS?
19        Q    Can we do that for the rest of the day?
09:17:4120    A    Is that -- okay. So it will save some
21    time.
22        So my original report and claim
23    construction was structured such that it required
24    the chloroplast transit peptide to be adjacent to
09:18:0925    the EPSPS encoding sequence such that they are not

## Page 13

1    derived from the same source, so that they are
2    heterologous to one another, and that I -- my
3    original report discussed that there should be only
4    two components and each of which would be denoted,
09:18:31 5    chloroplast transit peptide would be abbreviated
6    'CTP' and EPSPS would be abbreviated "EPSPS."
7        The fusion polypeptide nomenclature really
8    is to denote that they are not naturally occurring,
9    but these are two -- two entities that have
09:18:5410    individual roles.
11        The judge has I guess -- I'm not sure if
12    it's an expansion or constriction, has simply said
13    this fusion polypeptide only has to have two
14    components, which I can accept, but it's not
09:19:1715    the definition that I put forward, and I would feel
16    that in instances it could be a misleading
17    definition.
18        Q    Well, there it says a polypeptide that has
19    at least two components; isn't that correct?
09:19:2820    A    It says that, but I would prefer a more
21    clear delineation where each element is denoted.
22    But if it has to have at least two, one of which is
23    a chloroplast transit peptide and one is EPSPS, and
24    they are now fused together and are heterologous in
09:19:5025    nature.

4  (Pages 10 to 13)

RESTRICTED CONFIDENTIAL VIDEO DEPOSITION OF
BARRY D. BRUCE

**Page 102**

1    THE WITNESS: And those oligonucleotide
2    sequences -- I can't tell you, they vary. Sometimes
3    an oligonucleotide sequence recognized by a
4    restriction enzyme is nine bases, sometimes it's
11:44:39 5    four. I don't off the top of my read recall what is
6    the sequence specificity for the sequence enzyme
7    Sph1. However, you will always necessitate a change
8    in the nucleic acid sequence when you're engineering
9    a restriction site.
11:44:56 10    BY MS. PATTERSON:
11    Q    And basically, my question is very simple.
12    The fact that the cleavage site of pMON6140 EPSPS
13    was changed from SER-VAL-ALA-THR-ALA-GLN TO
14    GLY-GLY-ARG-VAL-SER-CYS does not affect your opinion
11:45:22 15    that the CTP in example 19 and 6240 is a chloroplast
16    transit peptide as you define it; is that correct?
17    A    It appears to be a construct which has
18    undergone some molecular biological changes to
19    enable a process which they call CTP switching to
11:45:44 20    occur with some facility.
21    Q    Okay. And that would still -- that
22    construct that's in pMON6242 would still include
23    what you would call a chloroplast transit peptide;
24    is that correct?
11:45:56 25    MR. SUKDUANG: Asked and answered.

**Page 103**

1    THE WITNESS: Yeah, I believe it -- and
2    they refer to it as well. They call that the EPSPS
3    CTP.
4    BY MS. PATTERSON:
11:46:07 5    Q    Right. And that's an EPSPS that doesn't
6    have the EPSPS cleavage site in it; correct?
7    MR. SUKDUANG: Objection; vague.
8    THE WITNESS: I'm -- like I said, I --
9    they have put this together, they have done a simple
11:46:27 10    assay, they have shown that the protein is cleaved.
11    They don't know if it's cleaved correctly. They
12    don't know where it's cleaved.
13    I'm not sure -- I can't read the sequences
14    and in construct of what's there know if they're
11:46:49 15    cleaved the same way. I'm not sure if it's cleaving
16    in the -- it's just they're saying that the import
17    assays -- said that it's transported, so the way
18    they do that is they digest the chloroplast with an
19    enzyme, they look for it to see if it's in the
11:47:01 20    stroma, and then they found on STS page it had a
21    smaller molecular weight.
22    It may have cleaved similar to the EPSPS
23    construct or it may have cleaved similar to the
24    RUBISCO. You know, it's just that there was --
11:47:19 25    there is an undisclosed cleavage process or cleavage

**Page 104**

1    event.
2    BY MS. PATTERSON:
3    Q    Okay. But the CTP that's being referred
4    to there in the last sentence of the patent, it
11:47:32 5    says, "the EPSPS CTP." It is your -- you're not
6    saying that the mere fact that that EPSPS CTP had
7    some changes in the region of the cleavage site
8    disqualifies that construct from being a CTP,
9    assuming that it functioned correctly?
11:47:58 10    MR. SUKDUANG: Objection; asked and
11    answered.
12    THE WITNESS: Again, I -- I read this and
13    I read their very clear sentence that describes this
14    as the change that they introduced, the change
11:48:12 15    introduced as an "in-frame Sph1 site which allows
16    CTP switching between small subunit RUBISCO and
17    EPSPS. They do something within the best that they
18    could do at this time or with the time they had
19    available to them to show that this new -- this CTP
11:48:30 20    that they put in with this little molecular
21    biological trick of adding a new restriction enzyme
22    functioned.
23    BY MS. PATTERSON:
24    Q    Okay. And so it still meets your
11:48:42 25    definition of a CTP, right, even though it's not

**Page 105**

1    nature-identical to the CTP that is in the petunia
2    gene?
3    A    Okay. I -- I've been clear throughout
4    that when subtle changes are made that are basically
11:49:00 5    there for molecular biological purposes to engineer
6    a linker or restriction site, that that change does
7    not necessarily need to be denoted, that that's what
8    they did, is they changed this to add an Sph1 site.
9    That Sph1 site, I haven't studied the sequence, but
11:49:23 10    it changed the amino acids. Those amino acids I
11    guess are reflected by what they put down here,
12    gly-gly-arg-val-ser-cys.
13    That engineering step, as they call it,
14    that -- it was engineered, by my read, to introduce
11:49:41 15    kind of a tool, a CTP switching. It's to facilitate
16    that concept of switching CTPs.
17    I'm not sure what they're going to do with
18    that, but now they have made -- they made sort of a
19    cassette. They can have things swapped in.
11:49:57 20    Q    Okay. And your -- my only -- it's really
21    a simple question, very short, is it's still a CTP,
22    even though the amino acid around the cleavage site
23    of the petunia has changed; correct?
24    A    No evidence --
11:50:09 25    MR. SUKDUANG: Object. Objection; asked

27 (Pages 102 to 105)

RESTRICTED CONFIDENTIAL VIDEO DEPOSITION OF
BARRY D. BRUCE

**Page 106**

1  and answered.
2  THE WITNESS: There's -- it appears to
3  have been changed by the introduction of this site.
4  There was no explanation of what the consequence of
11:50:21  5  that change was. They did an experiment. It still
6  appeared to have targeting and import process. They
7  don't carefully ask where the cleavage site -- or
8  they don't carefully show where the cleavage site
9  is.
11:50:35 10  But they're concluding that that's still,
11  to their terminology, the EPSPS CTP. And since no
12  information has shown to change that, I would agree.
13  BY MS. PATTERSON:
14  Q. Okay. Now, you also say that the Shah
11:50:52 15  patent is entitled only to its July 7, 1986 filing
16  date. And my question to you is, is the basis for
17  your opinion that the Shah patent is only entitled
18  to its July 7, 1986 filing date -- let me ask this a
19  different way.
11:51:21 20  A. Can you tell me what paragraph in my
21  report you're referring to?
22  Q. Yeah. 39. And you say there that it is
23  your opinion that "the '390 and '482 applications
24  demonstrate that the inventors were not" "in
11:51:42 25  possession of heterologous CTP/EPSPS fusion

**Page 107**

1  polypeptides as of the filing" date of this
2  application." Do you see that?
3  A. I see that.
4  Q. Okay. Now, if, in fact, the Court holds
11:51:58  5  that the CTP/EPSPS fusion term does encompass
6  naturally occurring fusions between the CTP of a
7  particular gene with the EPSPS mature portion with
8  which it occurs in nature, would you agree that the
9  inventors were in possession of that subject matter
11:52:24 10  as of the earliest filing date?
11  A. I mean, it's -- let me get this straight.
12  You're putting a hypothetical -- you're saying if
13  somebody somewhere goes --
14  Q. The Court.
11:52:36 15  A. The Court, I don't know, who -- when is
16  this going to happen?
17  Q. Within the next two or three months, I
18  suppose.
19  A. So if --
11:52:44 20  Q. So if --
21  A. If this court does not understand,
22  appreciate or accept my heterologous CTP/EPSPS
23  fusion polypeptide criteria that I have put forward,
24  that these be heterologous, in other words the CTP
11:53:02 25  comes from something other than that, okay, so now

**Page 108**

1  they're going to rule in the idea that basically,
2  any precursor in nature is a fusion polypeptide? Is
3  that what they're going to have to say?
4  Q. Well, they're going to say, yes, that the
11:53:17  5  fusion polypeptide term in this patent, as it's
6  defined and construed, can include the naturally
7  occurring fusion between the CTP of, say, petunia
8  with the EPSPS gene of petunia. Let's assume the
9  Court makes that determination, which that is the
11:53:37 10  function of the Court, to construe the claims.
11  A. Okay.
12  Q. So let's assume that the Court construes
13  the claims that way. And would you then agree that
14  the inventors were in possession of the subject
11:53:51 15  matter of the claims as of the earliest filing date?
16  A. Again, I -- with all those hypotheticals,
17  I'm a bit uncomfortable going back. But it was
18  clear that these earlier filings did not have the
19  construct which was disclosed in example 8 at this
11:54:11 20  point.
21  Q. Right.
22  A. So they didn't have anything that fits my
23  definition. I believe they had maybe cloned the
24  petunia EPSPS gene and that was, I believe -- do I
11:54:29 25  have that, those earlier -- is that in here?

**Page 109**

1  Q. What do you need?
2  A. The '482 application.
3  Q. I have a copy of it if you need it.
4  A. I think I can recall it, but again, I'm
11:54:41  5  not comfortable recalling --
6  Q. My question is really simple, and that is
7  if the Court determines that fusion encompasses
8  homologous fusions of, say, the petunia EPSPS with
9  the petunia CTP, would you still have an opinion
11:55:11 10  that the Shah patent is entitled only to its July 7,
11  1986 filing date?
12  A. That's -- it's such a hypothetical, I'd
13  really prefer to revisit these two earlier filings
14  and look at them with that new ruling to come up
11:55:32 15  with my opinion.
16  Q. Okay. But -- so can I give you the two
17  earlier filings?
18  A. Well, I mean, I don't know that I want to
19  read the whole things today. My recollection is
11:55:43 20  that they do disclose a petunia EPSPS precursor
21  protein.
22  Q. Okay. And so my question is really
23  simple. Is your determination that the Shah patent
24  is entitled only to its July 7, 1986 filing date
11:56:05 25  based upon, in part, the definition that you have

28 (Pages 106 to 109)

RECEIVED

APR - 8 2003

U. S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

MONSANTO COMPANY and            )
MONSANTO TECHNOLOGY LLC,         )
                                 )        C. A. NO. 4:01CV01825 CDP
                Plaintiffs,      )
                                 )
        v.                       )
                                 )
BAYER CROPSCIENCE LP,            )
                                 )
                Defendant.       )
                                 )

**MONSANTO'S STATEMENT REGARDING THE CONSTRUCTION
OF THE ASSERTED CLAIMS OF THE '835 PATENT**

H: 523088(B7M8011.DOC)

**C10**

MGA0062334

chloroplast transit peptides work, and is not in keeping with the scientific understanding of protein transport into the chloroplast of a plant cell.

As an example, the '835 patent specifically states that the EPSPS gene encodes a polypeptide which contains a chloroplast transit peptide which "enables the EPSPS polypeptide (or an active portion thereof) to be transported into a chloroplast inside the plant cell." Ex. A, col. 2, l. 66-col. 3, l. 2. The specification also states that the CTP leader sequence is believed to be removed, while the active portion of the EPSPS polypeptide enters the chloroplast:

> After the CTP/EPSPS polypeptide from a gene of this invention is translated from mRNA in the cytoplasm of the transformed plant cell, it is believed to be processed in the same manner as the natural EPSPS polypeptide. The CTP leader sequence causes the polypeptide to be imported into chloroplasts, and the CTP leader sequence encoded by the plant-derived EPSPS gene is believed to be removed from the remainder of the polypeptide so that an active portion of the EPSPS polypeptide exists and functions inside the chloroplast.

Ex. A, col. 4, ll. 24-34. Further, Example 18, which discusses how the protein import process works in the context of a chloroplast uptake experiments, demonstrates that the "precursor EPSPS" disappeared and a "mature form" of the EPSPS with a lower molecular weight subsequently appeared in the chloroplast, thus evidencing the removal of the CTP during import into the chloroplast:

> The pre-EPSPS (+CTP) was rapidly translocated into chloroplasts and cleaved to the mature EPSPS of $M_r \alpha 48$ kDa. The $NaDodSO_4$. PAGE autoradiograph revealed the disappearance of the precursor EPSPS from the incubation medium, and the subsequent appearance of a lower molecular weight, mature form in the chloroplast fraction.

Ex. A, col. 30, ll. 3-9. Thus, Bayer's requirement that the "entire" CTP/EPSPS polypeptide be transported "intact" into the chloroplast is inconsistent with the specification, which specifically acknowledges that the chloroplast transit peptide is "removed" from the remainder of the polypeptide during the importation process.

H: 523088(B7M8011.DOC)

MGA0062354

Moreover, as Monsanto's expert Dr. Kenneth Keegstra explains in his expert report, Bayer's construction is not consistent with the current scientific understanding of the protein import process. *See* Ex. E at 9-10. Rather, as explained in Keegstra and Cline, *The Plant Cell*, 1999, 11:557-570, it is now known that during the process of importation, the fusion protein is the substrate which enables the import process to begin, and during the final stages of translocation of the CTP/EPSPS polypeptide, the CTP is proteolytically cleaved from the EPSPS passenger protein, leaving the processed EPSPS in the chloroplast. *See* Ex. G. Even Bayer's expert Dr. Bruce conceded during his deposition that when he used the term "import into the chloroplast" in his own multiple publications, he recognized that "cleavage takes place either during, that means prior to the completion of the transport process, or shortly thereafter," and was not trying to differentiate between the two alternative types of processing. *See* Ex. D, Bruce Depo. at 122-23, 165-66 ("And I use the term 'import' to describe the phenomenon of chloroplast protein targeting transport and processing. I was using it in a large global fashion.... I was not using that phrase ... to try to distinguish between those two.")

While Monsanto maintains that its construction of the claim term "permits the fusion polypeptide to be imported into a chloroplast of a plant cell" is supported by the patent specification, and that resort to extrinsic evidence about the detailed nature of the mechanism is not necessary, Monsanto's expert Dr. Keegstra is prepared to offer expert testimony during the upcoming *Markman* hearing to assist the Court in understanding the mechanism of protein transport and the function of a chloroplast transit peptide, for purposes of construing the disputed claim term.

MGA0062355

RECEIVED

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JUN 2 7 2003

U. S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

MONSANTO COMPANY and
MONSANTO TECHNOLOGY LLC,        )
                                )
                                )       C. A. NO. 4:01CV01825 CDP
        Plaintiffs,             )
                                )
    v.                          )
                                )
BAYER CROPSCIENCE LP,           )
                                )
        Defendant.              )
                                )

**MONSANTO'S RESPONSE TO BAYER'S OPENING BRIEF
REGARDING THE CONSTRUCTION OF THE ASSERTED CLAIMS
OF THE '835 PATENT**

H: 534423(BGD301!.DOC)

MGA0062458

understanding of how transit peptides function. Nowhere does Bayer dispute the well-established proof that scientists, including Bayer's expert, use the term "import" to globally describe the process by which a transit peptide directs a passenger protein into the chloroplast. Monsanto Br. at 19. Moreover, nowhere does Bayer dispute the common understanding by scientists that the entire CTP is not typically imported into the chloroplast. *Id.* Instead, Bayer proposes a construction that is completely at odds with all of the scientific evidence.

Following its common theme, Bayer again attempts to add a new limitation—that the fusion polypeptide "be transported **intact** across the **chloroplast envelope membranes....**" Nothing in the claim language, however, requires or supports such a limitation. Just because the claims require that the fusion polypeptide be "imported" does not mean that it must be imported "intact." Moreover, there is no requirement that the entire fusion polypeptide make it through all of the "chloroplast envelope membranes" to be imported into the chloroplast.

Bayer's proposed dictionary definition is also to no avail. Initially, it cannot be expected that the editors of the *American Heritage Dictionary* had EPSPS enzymes and chloroplast envelope membranes in mind when it set out to define the term "import." Bayer Br. at 26. Moreover, Bayer's argument based upon that definition that "an object is imported into the chloroplast when that object has been brought into the chloroplast" again presumes Bayer's added limitation that the fusion polypeptide "be transported **intact** across the **chloroplast envelope membrane**," a limitation that again appears nowhere in the claims or specification.

But again, even if Bayer's proposed construction comports with the dictionary definition, this is clearly a case where "the intrinsic record [shows] that the specification uses the words in a manner clearly inconsistent with the ordinary meaning." *Texas Digital*, 308 F.3d at 1204; *Pall*, 181 F.3d at 1309; *Renishaw*, 158 F.3d at 1250. Indeed, the specification clearly describes the

H: 534423(BGD3011.DOC)

MGA0062475

importation process as encompassing either a situation where all or part of the fusion polypeptide is imported into the chloroplast, and expressly recognizes that this importation process results in the cleavage of the CTP from the EPSP protein. Monsanto Br. at 18. But more fundamentally, because Bayer apparently concedes that the CTP is cleaved during the importation process, all of the preferred embodiments of the invention provided in the Examples would again be excluded by Bayer's proposed construction. Thus, all of the intrinsic evidence points to a construction where the fusion polypeptide need not be imported intact into the chloroplast.

To make its nonsensical construction fit, Bayer contends that Monsanto deliberately narrowed its claims to require that the entire "fusion polypeptide" had to be imported into the chloroplast. Bayer Br. at 27-28. But there is no evidence to support Bayer's position. While it is true that the claims as originally submitted included the language "which causes the polypeptide, or a portion thereof which has EPSPS activity, to be transported" and the claims as issued do not include the phrase "or a portion thereof which has EPSPS activity," the change in language does not constitute a "clear and deliberate narrowing of the claims" as Bayer insists. Rather, a comparison of prosecution claim 1 of the first-filed '482 application and prosecution claim 1 of the third-filed '814 application shows that the claim language was changed from "causes the polypeptide, or a portion thereof which has EPSPS enzymatic activity, to be transported" to "permits the polypeptide, upon expression in a plant cell, to be imported." JM2 at 220. There is no suggestion from the amendment above that the Monsanto inventors intended to disclaim anything. Instead, the issue of whether the claims were limited to importation of all or part of the claimed fusion polypeptide simply was not an issue during the prosecution and was never raised by a single comment from the PTO examiner.

1

1       IN THE UNITED STATES DISTRICT COURT

2     FOR THE EASTERN DISTRICT OF MISSOURI

3           EASTERN DIVISION

4        C.A. No. 4:01CV01825CDP

5 MONSANTO COMPANY and MONSANTO     )

6 TECHNOLOGY, LLC,             )

7                Plaintiffs,  )

8       vs.                 )

9 BAYER CROPSCIENCE, LP,        )

10             Defendant.   )

11

12      The deposition of KENNETH KEEGSTRA,

13 Ph.D., called by the Defendant for examination,

14 taken pursuant to the Federal Rules of Civil

15 Procedure of the United States District Courts

16 pursuant to the taking of depositions, taken

17 before Linda D. Hansen, CSR, RDR, CRR, a Notary

18 Public within and for the County of DeKalb, State

19 of Illinois, at Suite 3500, 321 North Clark

20 Street, Chicago, Illinois, on Tuesday, March 25,

21 2003, commencing at 9:25 o'clock a.m.

22

23

24

25

Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

RESTRICTED CONFIDENTIAL

MGA0059420

# C17 - C18

# Redacted

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MONSANTO COMPANY and )
MONSANTO TECHNOLOGY LLC, )
　 )
　　　　Plaintiffs, )    C. A. No. 04-305-SLR
　 )    (LEAD CASE)
　　v. )
　 )
SYNGENTA SEEDS, INC. and )
SYNGENTA BIOTECHNOLOGY, INC., et al., )
　 )
　　　　Defendants. )
_____ )
DEKALB GENETICS CORPORATION, )
　 )
　　　　Plaintiff, )    C. A. No. 05-355-SLR
　 )
　　v. )    **RESTRICTED-**
　 )    **CONFIDENTIAL**
SYNGENTA SEEDS, INC., )    **SUBJECT TO**
SYNGENTA BIOTECHNOLOGY, INC., et al., )    **PROTECTIVE ORDER**
　 )
　　　　Defendants. )

## EXPERT WITNESS REPORT OF DR. KENNETH KEEGSTRA

**I.    INTRODUCTION**

     I, Kenneth Keegstra, have been asked to prepare an expert report on certain claim construction issues relating to the technology that is the subject of United States Patent No. 4,940,835 ("the '835 patent").

**II.    QUALIFICATIONS**

     My qualifications for providing this report are as follows.  I received a B.A. in Chemistry from Hope College, Holland, Michigan in 1967 and a Ph.D. in Biochemistry from the University of Colorado at Boulder in 1971.  I was a postdoctoral associate for two years in the Biology Department at the Massachusetts Institute of Technology in

# C20

# Redacted

## CERTIFICATE OF SERVICE

I hereby certify that on February 9, 2006, I caused to be electronically filed a true and correct

copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification

that such filing is available for viewing and downloading to the following counsel of record:

> Richard L. Horwitz, Esquire
> Potter Anderson & Corroon LLP
> Hercules Plaza
> 1313 North Market Street
> Wilmington, DE 19899-0951

I further certify that on February 9, 2006, copies of the foregoing document were served by hand

delivery on the above listed counsel and on the following non-registered participants in the manner

indicated below:

### BY FEDERAL EXPRESS

Peter E. Moll, Esquire
Howrey Simon Arnold & White, LLP
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004

Kenneth A. Letzler, Esquire
Arnold & Porter LLP
555 12th Street, N.W.
Washington, D.C. 20004

Susan Knoll, Esquire
Howrey Simon Arnold & White, LLP
1111 Louisiana, 25th Floor
Houston, TX 77002-5242

YOUNG CONAWAY STARGATT & TAYLOR, LLP

John W. Shaw (No. 3362)
Rolin P. Bissell (No. 4478)
Karen E. Keller (No. 4489)
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19801
(302) 571-6600
jshaw@ycst.com

*Attorneys for Syngenta Seeds, Inc., Syngenta Corporation,
Syngenta Biotechnology, Inc., Advanta USA, Inc., Garst
Seed Company, and Golden Harvest Seeds, Inc.*