## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MONSANTO COMPANY and<br>MONSANTO TECHNOLOGY LLC,<br><br>Plaintiffs,<br><br>v.<br><br>SYNGENTA SEEDS, INC.<br>SYNGENTA BIOTECHNOLOGY, INC., et al.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C. A. No. 04-305 SLR<br>(Lead Case)<br><br><br>**PUBLIC VERSION** |
| DEKALB GENETICS CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>SYNGENTA SEEDS, INC.,<br>SYNGENTA BIOTECHNOLOGY, INC., et al.<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |

## PLAINTIFFS' RESPONSIVE CLAIM CONSTRUCTION BRIEF

OF COUNSEL:

Susan K. Knoll
Thomas A. Miller
Melinda Patterson
Stephen E. Edwards
Steven G. Spears
HOWREY LLP
1111 Louisiana, 25th Floor
Houston, TX 77002
(713) 787-1400

Dated: February 2, 2006
Public Version Dated: February 10, 2006

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys For Monsanto Company,*
*Monsanto Technology LLC, and*
*DEKALB Genetics Corporation*

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 4

II.     THE LUNDQUIST PATENTS ........................................................................... 4

        A.   Claim 4 Covers A Process Of Making Progeny Plants Using The Plant
             Made By The Process Of Claim 1 .............................................................. 4

             1.   The Plain Language Of Claim 4 Demonstrates That It Does
                  Not Depend From Claim 1 .................................................................. 4

             2.   Whether Claim 4 Is Categorized As Independent Or Dependent
                  Does Not Change How It Should Be Construed .................................. 4

        B.   "Herbicide Resistance" ............................................................................... 4

             1.   The Specification Demonstrates An Intent To Include
                  Hygromycin Resistance In The Herbicide Resistance
                  Limitation, Not An Intent To Disclaim It ......................................... 4

             2.   The Examiner Conceded During Prosecution Of The '880
                  Patent That The Claim Term "Herbicide Resistance"
                  Encompassed The Example Of Hygromycin Resistance .................... 4

             3.   Syngenta Improperly Relies On Extrinsic Evidence To
                  Contradict The Unambiguous Meaning Of "Herbicide
                  Resistance" Based On The Intrinsic Evidence .................................... 4

        C.   The Specification and Prosecution History Do Not Limit The Meaning
             Of "Progeny" To The Immediate Offspring Of A Plant .............................. 4

        D.   "Glyphosate Resistance" ............................................................................. 4

III.    THE SHAH PATENT .......................................................................................... 4

        A.   Syngenta's Construction Of "Chloroplast Transit Peptide" Keeps
             Changing To Add More Limitations That Are Not Recited In The
             Plain Claim Language ................................................................................. 4

             1.   Syngenta's Changing Construction Of CTP ....................................... 4

             2.   Syngenta's Proposals To Add The Limitation "Naturally
                  Occurring" To The Claim Term "Chloroplast Transit Peptide"
                  Should Be Rejected ........................................................................... 4

             3.   "Cleavage" Of The Chloroplast Transit Peptide Is Not
                  Required ............................................................................................ 4

           4.    The Claim Contains No Requirement That Cleavage Occurs At
               A Particular Place To Leave Only A "Mature EPSPS .................... 4

   B.   Syngenta's Definition Of "Fusion Polypeptide" Ignores The Intrinsic
      Evidence .......................................................................................... 4

   C.   The Specification Contradicts Syngenta's Proposal Regarding
      Enhancing Glyphosate Resistance .................................................. 4

   D.   Syngenta's "Functional Language" Argument ............................ ................ 4

IV.   CONCLUSION ........................................................................................... 4

# TABLE OF AUTHORITIES

## Cases

*Genentech, Inc. v. Chiron Corp.,*
  112 F.3d 495 (Fed. Cir. 1997) ................................................................. 25, 26

*Gillette Co. v. Energizer Holdings,*
  405 F.3d 1367 (Fed. Cir. 2005) ............................................................... 19, 23

*Johnson Worldwide Assoc. v. Zebco Corp.,*
  175 F.3d 985 (Fed. Cir. 1999) ..................................................................... 14

*Kao Corp. v. Unilever United States, Inc.,*
  334 F. Supp.2d 527 (D. Del. 2004) ............................................................... 6

*Liebel-Flarsheim Co. v. Medrad, Inc.,*
  358 F.3d 898 (Fed. Cir. 2004) .................................................................. 6, 7

*Microsoft Corp. v. Multi-Tech Sys., Inc.,*
  357 F.3d 1340 (Fed. Cir. 2004) ............................................................... 10, 11

*Pfizer, Inc. v. Teva Pharm. USA, Inc.,*
  429 F.3d 1364 (Fed. Cir. 2005) ................................................................... 13

*Phillips v. AWH Corp.,*
  415 F.3d 1303 (Fed. Cir. 2005) ............................................................... passim

*Playtex Products v. Proctor & Gamble Co.,*
  400 F.3d 901 (Fed. Cir. 2005) ................................................................ 18, 19

*Praxair, Inc. v. ATMI, Inc.,*
  No. 03-1158-SLR, 2005 WL 2989767 (D. Del. Nov. 8, 2005) ......................................... 8

*Schumer v. Laboratory Computer Sys., Inc.,*
  308 F.3d 1304 (Fed. Cir. 2002) ................................................................ 7, 8

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.,*
  242 F.3d 1337 (Fed. Cir. 2001) ............................................................. 5, 6, 7

*Wilson Sporting Goods Co. v. David Geoffrey & Assoc.,*
  904 F.2d 677 (Fed. Cir. 1990) ..................................................................... 3

**Rules and Statutes**

35 U.S.C. § 112(2) ................................................................................................................. 14

37 C.F.R. § 1.312 ................................................................................................................... 3

## I.    INTRODUCTION

Syngenta's proposed constructions for the disputed claim terms of the Lundquist and Shah patents are wrong as a matter of law.  Syngenta improperly reads limitations into the claims that are not there, construes the claims in a manner that excludes preferred embodiments, ignores relevant portions of the specification and prosecution histories, and relies on extrinsic evidence that contradicts the intrinsic evidence—all in violation of established Federal Circuit law.  Syngenta also argues that Plaintiffs disclaimed certain claim scope (for example, resistance to hygromycin in the '880 patent) without pointing to an explicit statement of disclaimer as required by Federal Circuit law.  When the law of claim construction is properly applied, the intrinsic evidence supports Plaintiffs' proposed claim constructions.

## II.    THE LUNDQUIST PATENTS

### A.    Claim 4 Covers A Process Of Making Progeny Plants Using The Plant Made By The Process Of Claim 1

Syngenta argues that claims 4-9[1] of the '880 patent depend from claim 1 and, therefore, Syngenta does not infringe claims 4-9 because claim 1 is not infringed. Claim 4, however, is not written in traditional dependent format.  But even if the claim is construed as a dependent claim, that does not change the way the plain language of the claim should be construed, nor does it allow Syngenta to avoid liability of infringement of claims 4-9.

---

[1]  Syngenta incorrectly states that Plaintiffs withdrew their allegations that Syngenta infringed claim 1 of each of the Lundquist patents.  [Syngenta Opening Claim Construction Brief at 3, 9]  In fact, Plaintiffs have never alleged that Syngenta's GA21 activities infringe claim 1 of the '880 patent or the '863 patent.  In the complaint, Plaintiffs alleged that Syngenta infringed "one or more of claims 1-9 of the '880 patent" and "one or more claims of the '863 patent."  [C.A. No. 05-355, D.I. 89 attachment 3 at ¶¶ 19, 24]

1.    **The Plain Language Of Claim 4 Demonstrates That It Does Not Depend From Claim 1**

Claim 4 is not in the form of a dependent claim, i.e., claim 4 does not "refer[] to a previous claim (independent claim 1), and [] then specif[y] a further limitation." [Syngenta Opening Claim Construction Brief ("Syngenta Brief") at 13]  Instead, claim 4 covers "[*a*] *process comprising obtaining progeny* from a fertile transgenic plant obtained by the process of claim 1 which comprises said DNA." ['880 patent, col. 22, ll. 61-63, emphasis added]

The clear language of claim 4 contrasts with that of claim 5 of the '863 patent, which recites "the process of claim 1 further comprising" and then adds the further step of obtaining progeny plants.  ['863 patent, col. 30, ll. 14-16]  Using dependent claim format, claim 5, unlike '880 patent claim 4, refers back to the process of claim 1 in its preamble and recites that the claimed process "further" comprises an additional step.  The differences in language between claim 4 of the '880 patent and claim 5 of the '863 patent demonstrate that claim 4 is not a dependent claim.[2]

Syngenta also argues that the prosecution history of the '880 patent shows that claim 4 is a dependent claim.  Syngenta's argument that PTO Rule 312 only "permits claim revisions under limited circumstances, e.g., a change in wording of the claims not affecting the *scope* of the claims" [Syngenta Brief at 15] is wrong.  Rule 312 states:

> No amendment may be made as a matter of right in an application after the mailing of the notice of allowance.  Any amendment pursuant to this paragraph filed before the payment of the issue fee may be entered on the

---

[2]    Plaintiffs agree that '880 patent claims 5-9 are dependent claims, but Syngenta incorrectly states [Syngenta Brief at 13] that claims 5-9 are written in the same form as claim 4.  In fact, these claims, unlike claim 4, follow traditional dependent claim format by referring to the process of an earlier claim in their preambles and then specifying a further limitation.

>recommendation of the primary examiner, approved by the Commissioner, without withdrawing the case from issue.

37 C.F.R. § 1.312, Amendments After Allowance (1985). DEKALB did not tell the PTO

that "its wording change was a matter of form only" [Syngenta Brief at 15], but rather

that the amended claim did not introduce new matter and was allowable without further

search or consideration. [SM 0001085]

Further, Syngenta cites no authority for the proposition that the examiner's

checking a box labeled "as directed to matters of form not affecting the scope of the

invention" [see SM 0001092] can somehow change the clear language of the claim.

[Syngenta Brief at 15] Syngenta also cites no authority to support its reliance on how

claims are marked in the Index of Claims to determine whether a claim is dependent or

independent. [Id. at 15-16] In fact, the Manual of Patent Examining Procedure

("MPEP") states that for calculating fees, every claim that refers to another claim is

treated as dependent, without determining whether there is actually a true dependent

relationship. [Ex. 16, MPEP 608.01(n)(II) attached hereto]

Even if claim 4 is construed as a dependent claim, Syngenta cannot avoid

infringement by invoking the "axiom" that there is no infringement of a dependent claim

if the independent claim from which it depends is not infringed. As fully discussed in

Plaintiffs' opposition to Syngenta's motion for summary judgment of non-infringement

of the Lundquist patents [D.I. 244], the Federal Circuit in *Wilson Sporting Goods Co. v.

David Geoffrey & Assoc.*, 904 F.2d 677, 685-86 (Fed. Cir. 1990), held that the

aforementioned "axiom" does not apply when all limitations of the independent claim are

present in the accused device. Here, it is undisputed that the original GA21 event was

made using the steps recited in claim 1. Accordingly, whether Syngenta itself carried out

the steps recited in claim 1 is irrelevant to Syngenta's liability for infringement of claims
4-9.

### 2. Whether Claim 4 Is Categorized As Independent Or Dependent Does Not Change How It Should Be Construed

Whether claim 4 is categorized as independent or dependent does not change the
meaning of the plain language of the claim. As pointed out above, the clear language of
claim 4 recites a process of obtaining progeny plants using plants made by the process of
claim 1 as a starting material. The plain language does not support Syngenta's proposal
that claim 4 covers an additional step to the process of claim 1.

Syngenta argues that in the prior Illinois litigation, DEKALB admitted that claims
4-9 depend from claim 1 and that the Illinois court construed claim 4 as requiring
microprojectile bombardment. [Syngenta Brief at 12-13] However, the issue presented
here—whether claim 4 uses the fertile transgenic plant of claim 1 as the starting material
(Plaintiffs' proposed construction) or whether claim 4 is another step added to the process
of claim 1 (Syngenta's proposed construction)—simply was not at issue in the Illinois
litigation.

Moreover, Syngenta ignores another part of the interrogatory response it cites that
is consistent with Plaintiffs' proposed claim construction here. Specifically, DEKALB's
response stated:

> [P]rocesses that comprise additional steps are also within the scope of the
> claim. For example, a process of producing a fertile transgenic inbred
> plant that involved practicing steps (i)-(iii) to obtain a transgenic plant *as
> the starting material* for a series of breeding crosses to obtain a
> descendent fertile transgenic *Zea mays* plant is also covered by this claim.

[Syngenta Brief, Ex. 7 at 60-61, emphasis added] This is consistent with Plaintiffs'
assertion here that claim 4 recites a process of making progeny plants from a fertile

transgenic corn plant made by the microprojectile bombardment process of claim 1 and, that to infringe claim 4, someone at some time must have carried out the three steps of claim 1 to make the original fertile transgenic corn plant that is the starting material for claim 4.

The intrinsic evidence discussed in Plaintiffs' Claim Construction Brief ("Plaintiffs' Brief") at 20-21 fully supports their proposed construction of claim 4. Syngenta's proposed construction should be rejected.

### B.     "Herbicide Resistance"

#### 1.     The Specification Demonstrates An Intent To Include Hygromycin Resistance In The Herbicide Resistance Limitation, Not An Intent To Disclaim It

Syngenta's argument [Syngenta Brief at 19] that the specification of the '880 patent reveals an "intentional disclaimer" whereby "the inventors of the '880 patent confirmed that the term 'herbicide' in the patent does not include antibiotics" is not correct. On the contrary, the Applicants provided an example of hygromycin resistant fertile transgenic corn and stated that the hygromycin resistance gene was preferred, indicating an intent *not* to disclaim.

Syngenta's "intentional disclaimer" argument fails to apply the proper standard for an intentional disclaimer of claim scope according to well-established Federal Circuit precedent. In SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc., 242 F.3d 1337 (Fed. Cir. 2001), *cited in Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005), the Federal Circuit applied that doctrine, stating:

> Where the specification *makes clear* that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without

> reference to the specification, might be considered broad enough to
> encompass the feature in question.

*Id.* at 1341 (emphasis added). The patentee in *SciMed* claimed balloon dilation catheters

used in coronary angioplasty procedures. *Id.* at 1339. The Federal Circuit agreed that

portions of the patent's specification led to the "inescapable conclusion" that the claims

encompassed catheters with coaxial lumens but not catheters with side-by-side lumens.

*Id.* at 1342-43. For example, the specification stated that a catheter with coaxial lumens

was "the basic . . . structure for ***all*** embodiments of the present invention." *Id.* at 1344.

In *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004), the

Federal Circuit explained that "words or expressions of ***manifest exclusion or***

***restriction***" (emphasis added) are required to show the intent to disclaim claim scope.

*See also Kao Corp. v. Unilever United States, Inc.*, 334 F. Supp. 2d 527, 545 (D. Del.

2004) (quoting *Liebel-Flarsheim* 358 F.3d at 906). The inventions in *Liebel-Flarsheim*

were "methods and devices for use in connection with powered fluid injectors, which can

be used to inject fluids into patients during medical procedures." *Id.* at 900. The accused

infringer argued that because all of the embodiments described in the specification

featured pressure jackets, "the claims of those patents must be construed as limited to

devices that use pressure jackets." *Id.* at 905-06. The Federal Circuit disagreed,

reasoning that "[u]nlike in *SciMed,* the specification in this case contains no disclaimer;

all that Medrad can point to in the common specification of the . . . patents is the absence

of any embodiment that lacks a pressure jacket." *Id.* at 907 (citing *SciMed,* 242 F.3d at

1344). The court concluded that "[t]his case is therefore governed by the principle that

absent a clear disclaimer of particular subject matter, the fact that the inventor may have

anticipated that the invention would be used in a particular way does not mean that the scope of the invention is limited to that context." *Id.* at 909 (internal quotation omitted).

Here, there is no clear disclaimer language regarding the scope of "herbicide resistance" like the clear language in *SciMed* about the catheter lumen arrangement. Syngenta argues that the passage "[t]hose selectable marker genes which confer herbicide resistance or tolerance are also of commercial utility in the resulting transformed plants" is an intentional disclaimer. [Syngenta Brief at 19; '880 patent, col. 7, ll. 8-22] The distinction made in the cited passage, if any, is a distinction between herbicide resistance in transformed tissue and herbicide resistance in the resulting fertile transgenic plants. The quoted passage is not an explicit disclaimer of the preferred hygromycin resistant fertile transgenic corn plants of Example I from the scope of the claim term "herbicide resistance." Like the specification in *Liebel-Flarsheim*, the '880 patent specification does not clearly state that the claimed invention does not include hygromycin resistance by using "words or expressions of manifest exclusion or restriction." 358 F.3d at 906.

Syngenta's reliance on *Schumer v. Laboratory Computer Sys., Inc.*, 308 F.3d 1304 (Fed. Cir. 2002) to support its argument that the specification distinguishes between antibiotics and herbicides is likewise misplaced. In *Schumer*, the claim at issue included the following language:

> receiving a definition of a second coordinate system for the digitizer, which second coordinate system allows specification of points specified in the digitizer's coordinate system but is not congruent with the digitizer's coordinate system because *one of the following elements is different from* the digitizer's coordinate system: location of the point of origin, *or* angle of rotation, *or* scale.

*Id.* at 1306 (emphasis added). The issue was whether the claim required that "the first computer system has to be capable of translating *all three* attributes" at once, not whether

the applicants in that case had drawn a distinction between two or more terms. *Id.* at 1311 (emphasis added). The district court decided that the claim required the recited system "to be capable of translating all three attributes," and therefore "effectively substituted the word 'and' from the preamble for the word 'or' used in the body of the claim." *Id.* The Federal Circuit vacated, ruling that the claim language "one of the following" provided a list of discrete options for the recited difference. *Id.* at 1311, 1317.

There is no issue in the present case analogous to the one in *Schumer*. The claims of the '880 patent do not recite a list of alternative limitations like the claim in *Schumer*. The passage from the '880 specification "herbicide or antibiotic," on the other hand, is inclusive. Applying this Court's holding in *Praxair, Inc. v. ATMI, Inc.*, No. 03-1158-SLR, 2005 WL 2989767, at *1 (D. Del. Nov. 8, 2005), this passage of the '880 patent demonstrates that the terms "antibiotic" and "herbicide" were used interchangeably. Accordingly, under *Praxair*, both are encompassed by "herbicide resistance."

For all of these reasons, the specification of the '880 patent does not reflect an intentional disclaimer of hygromycin resistant fertile transgenic corn plants from the claims reciting "herbicide resistance."

> **2.    The Examiner Conceded During Prosecution Of The '880 Patent That The Claim Term "Herbicide Resistance" Encompassed The Example Of Hygromycin Resistance**

Syngenta's Brief at 20 cites the May 1992 rejection of the herbicide resistance claims out of context, ignoring what had just transpired between the Applicants and the Examiner. In their first response to the Examiner's enablement rejection of the herbicide resistance claims, the Applicants pointed out that the Examiner had argued in the Applicants' co-pending PCT application that hygromycin possesses "herbicidal

properties." [SM0000712] The Examiner then backpedaled from his position that hygromycin was not a herbicide, stating:

> While it may be nothing more than a matter of semantics as to whether hygromycin can be considered a herbicide, it remains a fact that the only compound that may have such properties exemplified in the instant specification was hygromycin.

[SM0000724] Thus, the Examiner conceded here for the first time that hygromycin may be considered a herbicide. Eventually, the Examiner in his "Statement of Reasons for Allowance" conceded that claims reciting "herbicide resistance" were supported in part by the hygromycin resistant plants described in the '880 patent examples. [SM0000858; Plaintiffs' Brief at 14-15]

Syngenta asserts incorrectly that the Examiner drew a distinction between hygromycin resistance and herbicide resistance, quoting phrases from the Examiner's Reasons for Allowance out of context. [Syngenta Brief at 20-21] Contrary to Syngenta's argument, the Examiner made no distinction between hygromycin and herbicide resistance. Instead, the hygromycin resistance example in the specification supported the Examiner's reasons for allowing claims that recited herbicide resistance.

> **The above example**, [of hygromycin resistance] along with the [sic resistance] that of β-glucuronidase and luciferase expression, **and the general discussion of art known and available DNA sequences, including herbicide resistance as a type of selectable or screenable marker**, provides a sufficient written description of [herbicide resistant] whole plants produced by the claimed process.

[SM0000858] Moreover, the Examiner referred to "herbicide resistance as a type of selectable . . . marker." [*Id.*] The hygromycin resistance example in the specification is an example of using herbicide resistance as a selectable marker. Consequently, the

Reasons for Allowance support Plaintiffs' construction, not Syngenta's.[3]    The Illinois

court agreed. [Plaintiffs' Brief, Ex. 1, Illinois Order at 45-46]

Finally, Syngenta points to the prosecution history of a related Lundquist patent

application that occurred *after* the '880 patent issued.[4]    Unlike the Applicants' clear,

repeated assertion during the prosecution of the '880 patent that hygromycin is a

herbicide and the Examiner's eventual agreement to that assertion, there is no language in

the preliminary amendment or response cited by Syngenta that could be construed as a

statement by the Applicants as to whether hygromycin resistant fertile transgenic corn

was within the scope of the '880 patent claims reciting herbicide resistance.

Syngenta's reliance on *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340

(Fed. Cir. 2004), is misplaced because that case involved an intentional disclaimer of

claim scope during prosecution, while the instant case does not.    *See id.* at 1350.    In

*Microsoft*, the patents-at-issue related to "personal computer-based systems and methods

for simultaneously transmitting voice and/or computer data to a remote site over a

telephone line."    *Id.* at 1342.    The court decided that the patentee had disclaimed

embodiments where the data was transmitted over a network like the internet, and,

therefore, its invention was "limited to communications over a telephone line."    *Id.* at

1348-49.    For example, in its response to an obviousness rejection, the patentee

summarized the invention as follows:

---

[3]  Syngenta refers to two declarations filed during prosecution of the '379 application, but
does not explain the relevance of these declarations to its proposed construction of
"herbicide." [Syngenta Brief at 21]

[4]  Syngenta's complaint that the Illinois court did not consider this related application
prosecution history should be disregarded.  DEKALB produced that prosecution history
to Syngenta's predecessor Ciba during the Illinois litigation.  Ciba was apparently of the
view that there was nothing in it for the Illinois court to consider in construing the '880
patent claims.

> In their specification, Applicants disclose a communications system which operates over a standard telephone line. Such a telephone line is commonly referred to in the art as a "plain old telephone service" (POTS) line and establishes a point-to-point connection between telephone equipment on each end of the line. Applicants' invention ... transmits the packets across a POTS line to a remote site.

*Id.* The court also noted that later in the prosecution history, the patentee distinguished a prior art reference that used a computer network by arguing that communications in the claimed invention "proceed directly from the communications system through the telephone line." *Id.* at 1349 n.5. The court concluded that "[w]e cannot construe the claims to cover subject matter broader than that which the patentee itself regarded as comprising its inventions and represented to the PTO." *Id.* at 1349.

Here, there was no explicit characterization of the invention during prosecution that excluded resistance to hygromycin from "herbicide resistance," and Syngenta has pointed to none. Thus, the *Microsoft* decision is not applicable.

### 3. Syngenta Improperly Relies On Extrinsic Evidence To Contradict The Unambiguous Meaning Of "Herbicide Resistance" Based On The Intrinsic Evidence

Syngenta's proposal that "herbicide" means "a chemical agent employed to kill or inhibit the growth of weeds" based on testimony of its expert, Dr. Ward, is wholly without support in the intrinsic evidence. While the '880 patent specification provides an example of fertile transgenic corn plants resisting the toxic effects of hygromycin, nowhere does the specification (or the prosecution history) discuss controlling weeds. The term "herbicide resistance" was explicitly defined through exchanges between the Applicants and the Examiner during prosecution to include hygromycin resistance. [*See* Plaintiffs' Brief at 13-15] Accordingly, Syngenta's "employed to kill weeds" proposal must be rejected as it is improper for a court to use extrinsic evidence to contradict the

11

unambiguous meaning of a claim term based on the intrinsic evidence.[5] *Phillips*, 415 F.3d at 1324.

The fallacy of relying on extrinsic evidence is that both parties can point to extrinsic evidence that supports their position because there is a "virtually unbounded universe of potential extrinsic evidence." *Id.* at 1318. Here, the extrinsic evidence Syngenta relies on is completely undercut by the testimony and documents of Syngenta's own experts demonstrating that "herbicide" means an agent used to kill plant cells rather than one "employed to kill weeds." Syngenta's expert, Dr. Ward, admitted that one meaning of "herbicide" is an agent used to kill plant cells. [Ex. 18, Ward Tr. 135:18-136:16, attached hereto] Moreover, in his own patent, Dr. Ward stated that "[h]erbicide [means] a chemical substance used to kill or suppress the growth of plants, plant cells, plant seeds, or plant tissues." [Ex. 19, Ward Depo. Ex. 11 at col. 7, ll. 7-8, attached hereto] Dr. Ward testified that this was a "reasonable definition." [Ex. 18, Ward Tr. 146:14-147:7]

Syngenta's argument that the "employed to kill weeds" definition would exclude an agent "known in the art by its function as an antibiotic" [Syngenta Brief at 18] is contradicted by Dr. Christou's documents and testimony. Dr. Christou conceded that whether a specific agent is considered a herbicide or an antibiotic depends on how the agent is being used. [Ex. 20, Christou Tr. at 202:19-203:8, attached hereto] As explained

---

[5]  In the prior Illinois case, Syngenta's expert, Dr. Christou, opined that "[a]s a scientist, I understand that herbicide resistance relates to a herbicide that would otherwise kill corn." [Ex. 17, Amended And Supplemental Rule 26(a) Report Of Paul Christou at ¶ 38, attached hereto] Thus, Syngenta's experts contradict each other.

in Plaintiffs' Brief at 12, the '880 patent specification describes the inventors' use of hygromycin to kill plant cells. Hygromycin, therefore, is a "herbicide."[6]

Thus, the extrinsic evidence cannot be used to limit construction of "herbicide resistance" as Syngenta proposes.

### C.   The Specification and Prosecution History Do Not Limit The Meaning Of "Progeny" To The Immediate Offspring Of A Plant

Syngenta cites a single passage from the specification to support its proposal that "progeny" claims 4-9 of the '880 patent should be limited to the immediate generation of offspring of a parent plant. This violates established Federal Circuit authority that in construing claims, the specification must be considered as a whole. *Pfizer, Inc. v. Teva Pharm. USA, Inc.*, 429 F.3d 1364, 1373 (Fed. Cir. 2005) ("It is necessary to consider the specification as a whole, and to read all portions of the written description, if possible, in a manner that renders the patent internally consistent.").

Syngenta cites an isolated passage in the '880 patent specification that mentions "R1 progeny." [Syngenta Brief at 23; '880 patent, col. 11, ll. 14-19] Other parts of the

---

[6] The extrinsic evidence is also consistent with the conclusion that the specification uses the terms "antibiotic" and "herbicide" interchangeably. Dr. Christou is a listed inventor on a patent that labels as *antibiotics* the well-known commercial herbicides phosphinothricin, chlorosulfuron, imidazolinones, and glyphosate:

> Selectable genetic markers may be chimeric genes that confer selectable phenotypes such as, e.g., resistance to *antibiotics* such as kanamycin, hygromycin, *phosphinothricin, chlorosulfuron*, methotrexate, gentamycin, spectinomycin, streptomycin, methotrexate, *imidazolinones*, and *glyphosate*.

[Ex. 21, Christou Depo. Ex. 27 at col. 5, ll. 41-46, emphasis added, attached hereto]

specification, however, use the term "progeny" in a broader sense to refer to all subsequent generations of progeny. [*See* Plaintiffs' Brief at 18-19] "Varied use of a disputed term in the written description demonstrates the breadth of the term rather than providing a limited definition." *Johnson Worldwide Assoc. v. Zebco Corp.*, 175 F.3d 985, 991 (Fed. Cir. 1999). The Illinois court recognized this and rejected Ciba's reliance on the same isolated "R1 progeny" reference in the specification. [Plaintiffs' Brief, Ex. 1, Illinois Order at 39-40]

Likewise, Syngenta's predecessor Ciba made the same argument about the prosecution history as Syngenta makes here, and the Illinois court rejected it. [Plaintiffs' Brief, Ex. 9, Ciba Opening Br. at 97-98; Plaintiffs' Brief, Ex. 1, Illinois Order at 41] The Examiner had asserted that the progeny claims were "substantial duplicates" of each other. In response, the Applicants pointed out the ***differences*** between the claims, i.e., that the earliest generation covered differed between the claims:

> At page 3 of the Office Action, the Examiner rejected claims 33 and 35 under 35 U.S.C. § 112(2) as indefinite, on the basis that claims 31 and 33 are substantial duplicates. This rejection is respectfully traversed.
>
> Briefly, claim 31 recites that in step (iv), "R1" progeny of the "R0" plant of step (iii), are obtained by crossing the R0 plant with an inbred line. Claim 33 effectively recites step (iv), obtaining "R1" progeny; (v) crossing the "R1" progeny with the inbred line, and (vi) obtaining further "R2" progeny.
>
> Step [sic, claim] 34 recites that (vii) the "further (R2) progeny" are crossed back to the inbred line to obtain "R3" progeny.
>
> Therefore, the claims are not duplicates.... .

[SM0001052; SM0001055] Thus, the specific differences identified were that claims 4 and 5 do not cover R0 plants; claims 6 and 7 do not cover R1 or R0 plants; and claims 8 and 9 do not cover R2, R1, or R0 plants. There would have been no point in noting that

14

all of these claims covered all subsequent generations of progeny, since that would not have pointed out the *differences* in the claims. The Illinois court agreed, finding that a person of ordinary skill in the art would "have understood that the applicants were merely pointing out how the claims *differed*, rather than attempting to define their complete scope." [Plaintiffs' Brief, Ex. 1, Illinois Order at 41]

On the other hand, Plaintiffs' Brief at 19 cites a passage from the prosecution history demonstrating that progeny claims 6-9 cover "*R2 and higher generation progeny plants.*" Accordingly, this Court should adopt Plaintiffs' proposal that the claim term "progeny" means all generations of lineal descendants, and that the other language in claims 4-9 limits the earliest generation of progeny covered by the particular claim.

### D.    "Glyphosate Resistance"

Plaintiffs proposed a construction for the term "glyphosate resistance" in the claims of the '863 patent, and Syngenta asserted that "[t]here is no claim construction dispute concerning the '863 patent." [Syngenta Brief at 10]  Thus, Plaintiffs' proposed construction of the term "glyphosate resistance" should be adopted.

## III.    THE SHAH PATENT

### A.    Syngenta's Construction Of "Chloroplast Transit Peptide" Keeps Changing To Add More Limitations That Are Not Recited In The Plain Claim Language

The claim portion that deals with "chloroplast transit peptide" recites:

a coding sequence which causes the production of RNA, encoding a chloroplast transit peptide/5-enolpyruvylshikimate-3-phosphate synthase fusion polypeptide, which chloroplast transit peptide permits the fusion polypeptide to be imported into a chloroplast of a plant cell . . .

The claim does not state that the CTP must be "naturally occurring," "cleaved," or cleaved so that the only thing left after cleavage is a "mature EPSPS protein." The only

15

requirement that the claim imposes on the CTP is that the CTP "permits the fusion polypeptide to be imported into a chloroplast of a plant cell."

### 1.  Syngenta's Changing Construction Of CTP

Plaintiffs' proposed construction of a CTP, "a series of amino acids that causes the transport of a polypeptide into a chloroplast"[7] [Plaintiffs' Answering Brief In Opposition To Syngenta's Motion For Summary Judgment Of Non-Infringement Of The Shah '835 Patent, D.I. 247, Ex. 2 at 30] tracks the language of the claim. Syngenta's proposed definition of CTP continues to change, and with each change comes additional limitations. Syngenta's expert's original report had no cleavage requirement:

> [A] naturally occurring chain of amino acids that is naturally located at the N-terminal portion of a nuclear-encoded polypeptide, which directs the polypeptide to a chloroplast

[D.I. 247, Ex. 5 at ¶17; *see also* D.I. 247, Ex. 7, Syngenta Supp. Resp. to Interrogatory No. 3 at 6-8] Syngenta changed this definition to include a "cleavage" requirement in its expert's rebuttal report in November 2005. [D.I. 247, Ex. 8 at ¶ 6] In December, when the parties exchanged their proposed claim constructions for the Joint Claim Construction Statement ("JCCS"), Syngenta proposed the following:

> [A] naturally occurring chain of amino acids that is ***naturally located*** at the N-terminal portion of a nuclear-encoded polypeptide, which directs the polypeptide to a chloroplast and is ***cleaved therefrom.***

[D.I. 247, Ex. 9 at 1, emphasis added] Two days before the JCCS was due, Syngenta changed its construction again:

> [A] naturally occurring chain of amino acids that is ***located*** at the N-terminal portion of a nuclear-encoded polypeptide, which directs the

---

[7] Plaintiffs' addition of the phrase "without regard to cleavage" is included to rebut Syngenta's position, but is not required by the language of the claim.

polypeptide to a chloroplast and is cleaved (or removed) *from the EPSPS polypeptide.*

[D.I. 247, Ex. 2 at 30, emphasis added]  Syngenta's Brief again changes the construction for CTP to include specific limitations on *where* the cleavage must occur:

> [A] naturally occurring amino acid sequence that is located at the N-terminal of a protein that functions to target the *EPSPS protein to the chloroplast and is cleaved to leave the mature protein.*[8]

[Syngenta Brief at 34, emphasis added]

Syngenta's original proposed construction of CTP required the use of a CTP that was "naturally occurring," but had no cleavage requirement. That was added in the next round.   Syngenta changed its construction again to delete the "naturally" located language and to substitute "the EPSPS polypeptide" for "therefrom."  This change was presumably made to exclude naturally occurring CTP elements that were cleaved from the protein with which they occurred in nature but not necessarily cleaved from the EPSPS protein after they were placed in the chimeric gene.  Now, Syngenta takes the position that not only must the CTP be cleaved from the EPSPS, it must be cleaved at a position where it would leave only a "*mature* EPSPS" protein.  None of Syngenta's proposed limitations to CTP should be added to the plain meaning of the term.

### 2.    Syngenta's Proposals To Add The Limitation "Naturally Occurring" To The Claim Term "Chloroplast Transit Peptide" Should Be Rejected

Syngenta's proposal to add the limitation "naturally occurring" to the claim term "chloroplast transit peptide" is in direct violation of *Phillips*, 415 F.3d at 1323-24 (limitations from the examples are not to be imported into the claims).  Syngenta argues

---

[8] Syngenta's briefs contain various statements of its latest proposed claim interpretation, but all are consistent in the requirement that the CTP must be cleaved to leave "the mature EPSPS."

that "the only ... amino acid sequence for a CTP actually described in the '835 patent is the naturally occurring petunia CTP from the petunia EPSPS gene." [Syngenta Brief at 31]  Contrary to Syngenta's assertions, the specification exemplifies a CTP that is *not* naturally occurring and also discloses the amino acid sequence of such a CTP.  As explained in Plaintiffs' Brief at 27, the CTP in Example 19 has specified changes to the last 6 amino acids of the CTP and is not naturally occurring.[9]  Instead, it is a hybrid CTP made up of two elements, one part from the EPSPS CTP and one part from the RuBisCO CTP.  [*See* '835 patent, col. 30, l. 42-col. 31, l. 15]  The amino acid sequence of the EPSPS CTP portion is set forth in the first 66 amino acids in Figure 4a.  The amino acid sequence of the RuBisCO portion is set forth at col. 30, l. 63 as gly-gly-arg-val-ser-cys/met.  The substitution of the last 6 amino acids did not merely insert a nucleotide or two that would permit the CTP to be joined to the EPSPS; it required a substitution of about 20 nucleotides to make a hybrid CTP.  [D.I. 247, Ex. 1 at ¶ 9]  Thus, to the extent the term "naturally occurring" is construed to exclude hybrid CTPs, that would contradict the disclosure of the '835 patent itself and improperly exclude a disclosed embodiment from claim coverage. *See, e.g., Playtex Prods., Inc. v. Proctor & Gamble Co.*, 400 F.3d 901 (Fed. Cir. 2005) (claims of a patent may be limited to a preferred embodiment only by the express declaration of the patentee).

Bayer's argument to the Missouri court that the chloroplast transit peptide must be "naturally occurring" rested in part upon an assertion that synthetic chloroplast transit peptides that had been prepared *starting from scratch in the laboratory,* *i.e.*, synthetic

---

[9] This construct also rebuts Syngenta's argument [Syngenta Brief at 30], that "the inventors distinguish between a sequence that must be naturally occurring and a sequence that can be mutated, modified or altered," so as to exclude CTP's that are not naturally occurring.

molecules that would function like a CTP but that had been designed *"a priori" "from first principles"*, had not been reported prior to the '835 filing date.[10]  On that basis, Bayer apparently convinced the Missouri court to adopt the requirement that a chloroplast transit peptide had to be "naturally occurring."   The Missouri court explained:

> The references in the patent specification to sources for CTP all point to plants or naturally occurring substances, *not to synthetic substances. ...  I do not believe that the patent contemplated that this term would include anything that might ever be invented that would function like a CTP.*

[Plaintiffs' Brief, Ex. 4 at 166:21-167:2, emphasis added]

However, even if such entirely synthetic "CTPs" were not known in 1985 as Syngenta contends, that does not require reading "naturally occurring" into the claims so as to literally exclude many of the types of changes that were known, such as those set forth in the specification. *See Playtex*, 400 F.3d at 908.  Syngenta's emphasis on hypothetical "synthetic CTPs" is not supported by the intrinsic evidence.  Clearly, it is an insufficient basis for inserting limitations into the claims that are not there.  *See Gillette Co v. Energizer Holdings Inc.*, 405 F.3d 1367, 1374 (Fed. Cir. 2005) ("words or

---

[10] Dr. Bruce recently explained the nature of such CTPs as follows:

> Q.    Okay.  Okay.  I think we're on the same page now.  And I think what I'm understanding you're saying, basically, is when you're saying a priori and first principles, that one of skill in the art in that 1985-1986 time frame did not know how to sit down with a piece of paper and design a chloroplast transit peptide that would function just by choosing individual amino acids and lining them up?

> A.    No. . . .  As much as, you know, I said it in my own words, I think that we're saying the same thing.

[D.I. 247, Ex. 6, Bruce Tr. 45:9-22]

expressions of *manifest exclusion* or *explicit disclaimers* in the specification are necessary to disavow claim scope") (emphasis added).

### 3. "Cleavage" Of The Chloroplast Transit Peptide Is Not Required

Syngenta's purported requirement that the CTP be "cleaved (or removed) from the EPSPS polypeptide" also lacks sufficient basis in the intrinsic evidence to transform a claim that simply requires that the CTP causes the EPSPS to be carried into the chloroplast into a claim that also requires that the CTP must be "cleaved."  Even though the specification recognizes the concept of cleavage and indicates in certain places that cleavage "is believed to" occur ['835 patent, col. 4, ll. 31-32], "preferably" occurs [*id.* at col. 5, ll. 41-43], or did occur in certain embodiments [*id.* at Examples 18 and 19], that is no reason to read a cleavage requirement into the claim language when it is not there. *Hoganas Ab v. Dresser Indus., Inc.*, 9 F.3d 948, 950 (Fed. Cir. 1993) ("It is improper for a court to add 'extraneous' limitations to a claim, that is, limitations added wholly apart from any need to interpret what the patentee meant by particular words or phrases in the claim").

This is particularly true in view of the specification's repeated distinction between transport (or import) and cleavage. [*See* Plaintiffs' Brief at 28-29] Syngenta also ignores the fact that the constructs in Examples 18 and 19, which it points to in support of its cleavage theory, would be excluded from the claims under its own proposed claim constructions. [Ex. 22, Bruce Tr. 66:4-12, attached hereto] Further, it was not Example 18 or 19 that demonstrated the success of the claimed invention – it was the demonstration of glyphosate resistance.

Syngenta's reliance on Dr. Keegstra's testimony and attempt to distinguish the Missouri court's claim construction in this regard is not helpful to its case. The Missouri court defined "import" as follows:

> 'Permits' means allows. '*To be imported' means for something to be carried into some place*. That's what the words mean, and that's the function of the CTP. It permits a polypeptide to be imported into a chloroplast. That's what the words say and that's what they mean . . . .

[Plaintiffs' Brief, Ex. 4 at 170:14-18, emphasis added]

Dr. Keegstra had testified at the Markman hearing that cleavage was not required by claim 1:

> Q.     By your definition that you have given to the Court, would it include any CTPs, whether or not they remained attached to the passenger protein inside the chloroplast?
>
> A.     I guess by my definition, yes, that would be true, since we have not made proteolytic removal part of our definition. If they remained attached, they would be covered.

[D.I. 247, Ex. 4, Markman Tr. 88:8:14]

In his recent deposition Dr. Keegstra explained that "by and large, I think when [the Applicants] use the term 'import,' they mean what I would call translocation." [D.I. 247, Ex. 3, Keegstra Tr. 148:23-25] Dr. Keegstra explained that the specification uses the word import (or what he would call translocation) in a way that distinguished it from cleavage:

> [T]hat is, in fact, one of the places where they use 'import' to mean translocation, because . . . that sentence only makes sense if you read 'The CTP leader sequence causes the polypeptide to be translocated into chloroplasts, and the CTP leader sequence encoded by the plant-derived EPSPS gene is believed to be removed.' If the word 'import' there included processing [i.e., cleavage], it would be a nonsensical sentence.

[*Id* at 149:13-22, referring to '835 patent, col. 4, ll. 28-34]

21

But, the testimony Syngenta cites [Syngenta Brief at 33], claiming that Dr. Keegstra testified that "cleavage is a determining factor in assessing whether a particular element was a chloroplast transit peptide" was based on Dr. Keegstra's modern day understanding of the chloroplast import process as a whole, not how the term import was used in the '835 patent or the state of the knowledge at the time the patent was filed. [D.I. 247, Ex. 3, Keegstra Tr. 54:14-63:18]   In fact, in responding to the question quoted, Dr. Keegstra was requested to *ignore* the prior court's construction based on the teachings in the specification. [*See also id.* at 49:12-16]   Dr. Keegstra explained that his testimony was based on information outside the context of the '835 patent and knowledge that had "come subsequent."

> You expressed earlier, in response to a question from Mr. Levine, that despite having a difference of opinion, based on your scientific definition of 'import,' that I think you indicated that you do not strongly disagree with the Court's definition of 'import.' Why is that?
>
> A.    I think there are two reasons for that. *One is that I think what the judge was taking into account, at least I assume what the judge was taking into account, was the state of the knowledge at the time of the '835 patent, and a lot of what I've been talking about here is knowledge that has come subsequent.*
>
> In *1984-85*, as I've described several times during the course of the events today, we had a very poor understanding of this process of protein import, and so it was – *it was quite common for people to use the term 'import' to talk just about the movement of the protein into the chloroplast.* . . .
>
> *So I think in part, it makes sense to use that definition because that reflects the state of the knowledge in 1985*; in part, because there are still folks who use it that way. *I think the '835 patent, by and large, used it that way.*

[*Id.* at 145:17-146:18, emphasis added]   The fact that Dr. Keegstra refers to the "import process" differently today than the way the term "import" was used in the '835 patent

does not alter the patent's usage of that term or the fact that the Missouri court's construction of the term "import" was correct. The intrinsic record usually provides the technological and temporal context to enable the court to ascertain the meaning of the claim to one of ordinary skill in the art at the time of the invention. *Gillette Co*, 405 F.3d at 1370; *see also Phillips*, 415 F.3d at 1318. The court in *Phillips* explained that extrinsic evidence is in general considered to be less reliable than the patent and its prosecution history in determining how to read claim terms for exactly that reason. A court should discount any expert testimony "that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent." *Phillips* at 1318.

Finally, Syngenta's argument [Syngenta Brief at 33-34] that the issue addressed by the Missouri court involved a "timing of cleavage" requirement that Dr. Bruce now concedes to have been incorrect, rather than a "cleavage" limitation per se, relies on a purported "distinction" that is immaterial. The Missouri court recognized that the specification was not concerned about cleavage at all. As stated by the Missouri court, "I think when the patent is read as a whole, it is clear that Monsanto was claiming the process of getting this fusion gene [sic, protein] into the chloroplast . . . ." [Plaintiffs' Brief, Ex. 4 at 171:15-17] Syngenta cannot override this by asking this Court to infer that the "Missouri Court assumed cleavage to be an intrinsic feature of a CTP." [Syngenta's Opening Brief In Support Of Its Motion For Summary Judgment Of Non-Infringement Of The Shah Patent, D.I. 212 at 20] Cleavage, whether it be at a certain time, position in the fusion polypeptide, or even at all, is not required by the plain language of the claims.

4.    **The Claim Contains No Requirement That Cleavage Occurs At A Particular Place To Leave Only A "Mature EPSPS**

Syngenta's most recent construction of the term "chloroplast transit peptide" to require that the CTP be cleaved "to leave a mature protein" is also contradicted by the Missouri court's definition of the claim term "chloroplast transit peptide/5-enolpyruvylshikimate-3-phosphate synthase fusion polypeptide" ("CTP/EPSPS"), of which the term CTP is the first part.

The Missouri court correctly construed the claim term CTP/EPSPS fusion polypeptide to mean "a polypeptide that has *at least* two parts, which must *include* a chloroplast transit peptide (as defined above) *joined* to an EPSPS . . . ." [Plaintiffs' Brief, Ex. 3, emphasis added]  The term "joined" does not exclude the presence of intervening elements between the CTP and the EPSPS.  The Missouri court rejected Bayer's attempt to require that the CTP and EPSPS be "directly adjacent" to one another, stating:

> Now, I'm not including Bayer's urged language that they have to be directly adjacent to one another, as I don't believe there is anything in the claim language or anywhere else that provides that restriction, and so that is not included in the construction I've adopted.

[Plaintiffs' Brief, Ex. 4 at 169:20-24]

The Missouri court adopted Monsanto's construction that the polypeptide "has *at least* two parts," which correctly leaves the claim open to the inclusion of additional elements between a CTP and an EPSPS in the CTP/EPSPS fusion polypeptide.  That interpretation is consistent with the transitional phrase "comprising" used in the claim preamble.  Syngenta's expert agreed.  Dr. Bruce's report states:

> Implicit in my definition above is that [chloroplast transit peptide/5-enolpyruvylshikimate-3-phosphate synthase fusion polypeptide] requires a chain of amino acids comprising *two or more distinct elements* . . . .

[D.I. 247, Ex. 5, Bruce Rpt. at ¶ 27, emphasis added]  Dr. Bruce said that he would not

read the claim to exclude additional elements "intervening between the chloroplast transit

peptide and the mature EPSPS coding sequence." [D.I. 247, Ex. 6, Bruce Tr. 60:18-61:8]

By adding the requirement that cleavage leaves only a "mature EPSPS protein" to

the claim construction proposed in the JCCS, Syngenta is now proposing a construction

that is directly contrary to the Missouri court's construction.  Specifically, if the CTP is

cleaved at the point where it would leave only a mature EPSPS protein as Syngenta now

asserts, there would be no room for intervening elements to exist.

Syngenta's new construction is also contravened by Federal Circuit precedent.  In

*Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997), the Federal Circuit

explicitly rejected a district court's claim construction that had the effect of excluding

intervening elements.  In that case, an interference count read:

> A DNA construct comprising a sequence coding for human
> insulin-like growth factor-I joined in proper reading frame with
> Saccharomyces alpha-factor secretory leader and processing signal
> sequence.

*Id.* at 497.  The district court construed the count to exclude a construct which had both

of the claimed elements but also included an additional element, DNA that encoded a

collagenase cleavage site, between the IGF-I and α-factor secretory leader.  The Federal

Circuit reversed on grounds that this construction was unduly narrow and fundamentally

at odds with the open-ended nature of comprising claims.

> *This interpretation of the count is consistent with the open-ended term*
> *'comprising.'* 'Comprising' is a term of art used in claim language which
> means that the named elements are essential, but other elements may be
> added and still form a construct within the scope of the claim.
>
> *The claim construction issue then becomes whether the term 'joined'*

  
> *forecloses the possibility of additional nucleotides being inserted*
> *between the two joined elements, the alpha-factor processing sequences*
> *and human IGF-I sequence. We find that it does not.*

*Id* at 501 (citations omitted, emphasis added).

The *Genentech* precedent is directly on point. As in *Genentech*, "comprising" permits a construct which has elements intervening between the CTP and the EPSPS from the scope of the claim. The Missouri court reached that same conclusion, defining the CTP/EPSPS fusion polypeptide as including "at least two parts," a CTP and an EPSPS, and rejecting Bayer's attempt to require that the CTP and EPSPS be "directly adjacent" to one another.[11]

### B.    Syngenta's Definition Of "Fusion Polypeptide" Ignores The Intrinsic Evidence

The Missouri court's definition of the second portion of the claim term, "CTP/EPSPS fusion polypeptide," as requiring that the "fusion" be made by the hand of man was before *Phillips* and was based primarily on extrinsic evidence,[12] and is now an improper approach. In explaining its definition of "fusion," the Missouri court said:

---

[11]    As explained in Plaintiffs' Brief Opposing Summary Judgment Of Noninfringement Of The Shah Patent [D.I. 247 at 16], Syngenta's new definition would exclude CTPs so labeled by Syngenta at pages 4 and 5 of its brief in support of summary judgment. Syngenta's proposed construction is inconsistent with the understanding in the art at the time, as well as the presentation set forth in Syngenta's own brief.

[12] There is conflicting extrinsic evidence on the meaning of "fusion." For example, it appears that Syngenta, through its predecessor Zeneca, also understood the term "EPSPS fusion peptides" in the '835 patent to refer to naturally occurring and non-naturally occurring fusions. In U.S. Patent No. 6,380,463, the authors state:

> 4. Genes which confer resistance to glyphosate. Such genes include the glyphosate oxidoreductase gene (GOX) (see International Patent Publication No. WO92/00377 in the name of Monsanto Company); genes which encode for 5-enolypyruvl-3-shikimic acid synthase (EPSPS), including Class I and Class II EPSPS, genes which encode for mutant EPSPS, and *genes* which *encode for EPSPS fusion peptides such as that*

.... To put it as simply as possible, "fusion" in this patent means what most people think it means. *Lay people like me think fusion means putting different things together. Scientists in this field think it means putting different things together. The dictionary thinks "fusion polypeptide" or "fusion protein" means a protein created out of two genetically different things, in other words, a protein created in a non-natural process, i.e. fused, which contains amino acid sequences from distinct proteins. Even Monsanto's expert witness agrees that that's what it normally means.*

[Plaintiffs' Brief, Ex. 4 at 168:13-22]

But, as Plaintiffs' Brief at 32 explains, the word "fusion" in the context of the patent specification does not require that humans perform the act of joining. Syngenta's arguments based on passages from the specification describing how one piece of DNA "was fused to" another are inapposite. There is no issue that the term "fusion" includes man-made fusions – the issue is whether it also includes naturally occurring polypeptides where the CTP is fused to the EPSPS by the hand of nature.

The passage from the original priority applications for the '835 patent that Syngenta quotes is anything but an "unambiguous" definition of "fusion" as Syngenta insists. That passage states:

Although it is not known whether a *fusion peptide* comprising (1) a *CTP sequence derived from a heterologous protein* such as ssRUBISCO, *coupled to (2) a mature EPSPS sequence derived from a bacterial or*

---

*comprised of a chloroplast transit peptide and EPSPS* (see for example EP 218 571, EP 293 358, WO91/04323, WO92/04449 and WO92/06201 in the name of Monsanto Company); and genes which are involved in the expression of CPLyase.

[Ex. 23, col. 6, ll. 30-42, attached hereto] The patent applications referenced in the quotation above represent work performed by Monsanto, much of which dealt with homologous fusions. Further the wording of the emphasized sentence indicates that the term EPSPS fusion peptides was defined as being comprised of a chloroplast transit peptide and EPSPS without regard to whether those two parts were homologous or not. [*Id*]

> *plant cell*, might confer some degree of glyphosate resistance upon a
> transformed cell, removal of the CTP leader sequence from the mature
> EPSPS sequence is preferred.

[Application Serial No. 763,482 at 0005012; Application Serial No. 792,390 at 0005107]

There is no dispute that a fusion of a RuBisCO CTP to an EPSPS is a "fusion

polypeptide." The issue is whether the term is limited to only that embodiment. The

quoted sentence sheds no light on that issue one way or the other.

The quoted language was altered in the final application leading to the '835 patent

to make it clear that the "fusion polypeptide" of the "present invention" includes natural

fusions. The specification now reads: "Although there is little homology between the

CTP sequences of the EPSPS gene and the ssRUBISCO gene (see, e.g., Broglie (1983)),

one may find that *non-homologous CTPs* may function in *particular embodiments*."

['835 patent, col. 4, ll. 40-44, emphasis added] By direct implication, that language also

specifies that *homologous* CTPs (i.e., naturally occurring fusions) should function in the

*other* embodiments of the invention. [*See id.* at col. 4, ll. 23-24] Both of Syngenta's

experts testified to that effect.[13] Thus, the change in the language of the specification that

Syngenta points to actually supports a conclusion opposite to that advanced by Syngenta.

Syngenta's focus on Example 8 cannot support a claim construction that would

exclude the remaining examples from the specification. Example 8 was added when the

Applicants filed the '814 continuation-in-part application along with Examples 5-7, 10,

and 14-17, all of which describe naturally occurring CTP/EPSPS coding sequences.

---

[13] Syngenta's expert, Dr. Ward, explained that "a nonhomologous CTP would be a CTP
that is not a CTP that is associated with the coding sequence that it's normally associated
with. So it's from another gene." [Ex. 18, Ward Tr. 123:15-22] Similarly, Dr. Bruce
explained that the only thing that would not qualify as a "non-homologous CTP" would
be a construct where the CTP and the EPSPS were from the same gene, i.e., a
homologous or naturally occurring fusion. [Ex. 22, Bruce Tr. at 97:6-98:8]

[Application Serial No. 879,814 at 0005243-62] As discussed in Plaintiffs' Brief at 36-37, this and other activity by the Applicants during prosecution, such as filing a declaration (which the PTO accepted) to antedate certain references based on the discovery of a naturally occurring CTP/EPSPS fusion polypeptide, is inconsistent with Syngenta's suggestion that the Applicant meant to abandon all non-heterogeneous CTP/EPSPS subject matter when it added the word "fusion" to the claims.

### C.    The Specification Contradicts Syngenta's Proposal Regarding Enhancing Glyphosate Resistance

Finally, Syngenta is also incorrect in requiring that the term "enhancing glyphosate resistance of a plant cell" means that glyphosate must have been used as the original agent that "selected" transformed cells from those that were not. As explained in detail in Plaintiffs' Brief at 38-39, a number of the Examples describe using kanamycin, not glyphosate, for selection. The Examples also describe glyphosate resistance in terms of resisting the effects of glyphosate sprayed on plants originally selected on kanamycin. [*Id.*] Thus, Syngenta's argument that "Examples 2-13 demonstrate that plant cells transformed with the chimeric plant gene exhibit 'enhanced glyphosate resistance' when they survive selection" is incorrect. Accordingly, the Court should also reject Syngenta's attempt to import a "selection" limitation into the claim term "enhance the glyphosate resistance of a plant cell."

### D.    Syngenta's "Functional Language" Argument

Syngenta's argument [Brief at 25-29] that "functional language" in the '835 patent claims converts a "chimeric gene claim" into something other than a "chimeric gene claim" is an attack on enablement of the '835 patent which has no place in claim

construction. Plaintiffs have addressed this in their opposition to Syngenta's motion

seeking summary judgment of non-enablement of the '835 patent. [D.I. 248 at 3-5]

## IV.    CONCLUSION

For the reasons stated, Syngenta's proposed constructions for the disputed claim

terms of the Lundquist and Shah patents are incorrect as a matter of law. Therefore,

Plaintiffs respectfully request that the Court adopt Plaintiffs' proposed construction of the

disputed claim terms.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Susan K. Knoll                        By:   /s/ David E. Moore
Thomas A. Miller                            Richard L. Horwitz (#2246)
Melinda Patterson                           David E. Moore (#3983)
Stephen E. Edwards                          Hercules Plaza, 6th Floor
Steven G. Spears                            1313 N. Market Street
HOWREY LLP                                  Wilmington, Delaware 19801
1111 Louisiana, 25th Floor                  Telephone (302) 984-6000
Houston, Texas 77002                        rhorwitz@potteranderson.com
Telephone (713) 787-1400                    dmoore@potteranderson.com

Dated: February 2, 2006               Attorneys for Plaintiffs
Public Version Dated: February 10, 2006

719323

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on February 10, 2006, the attached

document was hand delivered on the following persons and was electronically filed with

the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the

following and the document is available for viewing and downloading from CM/ECF:

John W. Shaw
Young Conaway Stargatt & Taylor, L.L.P.
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801

I hereby certify that on February 10, 2006, I have Electronically Mailed

the foregoing document(s) to the following non-registered participants:

Richard F. Schwed
Thomas A. McGrath III
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022-6069
rschwed@shearman.com

Michael J. Flibbert
Don O. Burley
Howard W. Levine
Finnegan, Henderson, Farabow,
  Garrett & Dunner, L.L.P.
901 New York Ave., NW
Washington, DC 20001-4413
michael.flibbert@finnegan.com
don.burley@finnegan.com
howard.levine@finnegan.com

/s/ David E. Moore
Richard L. Horwitz
David E. Moore
Potter Anderson & Corroon LLP
Hercules Plaza – Sixth Floor
1313 North Market Street
Wilmington, DE 19801
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

700765