

Potter
Anderson
&Corroon LLP

1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
302 984-6000

www.potteranderson.com

Richard L. Horwitz
Partner
Attorney at Law
rhorwitz@potteranderson.com
302 984-6027 Direct Phone
302 658-1192 Fax

May 30, 2006
Public Version Filed: June 6, 2006

**VIA HAND DELIVERY
AND ELECTRONIC FILING**

The Honorable Sue L. Robinson
J. Caleb Boggs Federal Building
844 King Street
Wilmington, DE 19801

**PUBLIC VERSION**

Re: *Monsanto Company, et al. v. Syngenta Seeds, et al.*
    **C.A. No. 04-305-SLR (Consolidated)**

Dear Chief Judge Robinson:

Pursuant to the Court's January 12, 2006 Scheduling Order, defendants Monsanto Company and Monsanto Technology LLC (collectively "Monsanto") seek leave to file motions for summary judgment on: 1) the relevant market and Monsanto's lack of market power; 2) the absence of market foreclosure; and 3) Syngenta's sham-patent litigation claims. Since grounds 1) and 2) are both requisite elements of Syngenta's antitrust claims, if summary judgment is granted on either ground it would be dispositive of Counts I—III of Syngenta's Second Amended Complaint ("Amended Complaint").

## I. LACK OF MONOPOLY POWER IN THE RELEVANT MARKET

A monopolization claim under Section 2 of the Sherman Act requires that plaintiff prove, among other things, that defendant possesses monopoly power in the relevant market. *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). Before the question of market power can be addressed, plaintiff must first prove the existence of the alleged relevant market. *Pennsylvania Dental Ass'n v. Medical Serv Ass'n of Pa.*, 745 F.2d 248, 260 (3d Cir. 1984). Under Third Circuit precedent, summary judgment is appropriate if the plaintiff fails to present sufficient evidence in support of its proffered market definition, *Pastore v. Bell Tel. Co.*, 24 F.3d 508, 512 (3d Cir. 1994), or if there is insufficient evidence of defendant's market power. *Ideal Dairy Farms v. John Labatt, Ltd.*, 90 F.3d 737 (3d Cir. 1996).

In its own words, Syngenta is "a world-leading agribusiness [and] leader in crop protection." It "ranks third in the high-value commercial seeds market," with 2005 sales of "approximately $8.1 billion." www.syngenta.com. In the U.S. corn market, Pioneer Hi-Bred International commands a leading 35% share. Monsanto's share is less than 15%,[1] while Syngenta's share is above 15%. Syngenta and DuPont have dominant positions in crop protection (such as chemicals and seed treatments). ▮

---

[1] Even if the shares of independently-owned seed companies that are Monsanto licensees were to be included (they should not be), the total combined share is at or below 45%.

The Honorable Sue L. Robinson
May 30, 2006
Public Version : June 6, 2006
Page 2

[redacted]

Monsanto's market share does not even approach monopoly levels. The Third Circuit has held that a market share of less than 55% is insufficient as a matter of law to establish monopoly power. *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 201 (3d Cir. 1992), *cert. denied*, 507 U.S. 921 (1993); *see also Ideal Dairy Farms v. John Labatt, Ltd.*, 90 F.3d 737, 749—50 (3d Cir. 1996) (affirming district court's grant of summary judgment to antitrust defendant based on plaintiff's improper market definition and failure to prove defendant's monopoly power in properly-drawn product market).

Confronted with this reality, Syngenta attempts to artificially inflate Monsanto's share by gerrymandering extremely narrow, single-product markets for "glyphosate-tolerant (GT) corn traits" (Count I) and "European corn borer (ECB) resistant corn traits" (Count II).[3] However, it is well-settled that the relevant antitrust product market is comprised of all products reasonably interchangeable for the same purposes. *E.I. DuPont*, 351 U.S. at 324.

Growers purchase GT and ECB traits for weed and insect control, respectively. For weed control, growers choose (on the basis of total cost, yield, etc.) among a number of competing, alternative systems, including: 1) GT corn seed used with the associated (non-selective) glyphosate herbicide; 2) conventional corn used with other (selective) herbicides; 3) conventional corn with no chemicals (using traditional tillage methods); 4) glufosinate-resistant corn (Liberty Link) used with its associated chemical (Liberty); and 5) Clearfield corn (which tolerates over-the top sprays of the imidazoline class of broad-spectrum herbicides). [redacted]. Similar competing systems exist for insect control. [redacted] The indisputable fact is that genetically modified corn is a substitute for conventional corn, as the graph below illustrates:

---

[2] For the Court's convenience, cited materials are included in a separate Appendix, cited as "App."
[3] Syngenta's claimed "national" geographic market is contrary to undisputed evidence from both parties. Demand for GMO varies significantly by state and region depending on the percentage of corn grown for export to the European Union (which banned sales of GMO corn for years), varying levels of infestation, and other agronomic conditions.

The Honorable Sue L. Robinson
May 30, 2006
Public Version : June 6, 2006
Page 3



*Source*: USDA, National Agricultural Statistics Service, "Prospective Plantings," and USDA Economic Research Service, "Genetically Engineered Crops for Pest Management," p. 13.

Syngenta has admitted the existence of a broader corn market in other cases. In its Opposition to Plaintiffs' Motion for Class Certification in *Sample v. Monsanto et al.* (an antitrust class action against Monsanto, Syngenta and others), Syngenta rejected the notion that transgenic corn is a separate and distinct market: "***Conventional corn and soy seed compete against YGC and RRS seeds. If the price of GM seeds gets too high, or if the price of conventional seed gets sufficiently low, farmers can and will switch to conventional varieties***." App. E (Syngenta Brief), at 7 (emphasis added). Syngenta further argued against allegations of a narrow transgenic seed market: "As noted above, YGC and RRS seed compete against both conventional and other GM corn and soybean varieties, as well as other forms of pest control." *Id.*, App. E, at 9.

Syngenta's own documents unambiguously detail the competition among these competing systems in the "Corn Market."[4] Each of the literally thousands of documents within Syngenta' production confirm that products such as GT corn compete with conventional corn. Syngenta's documents also recognize that transgenic seeds are a substitute for its chemical products.

---

[4] *See, e.g.,* 

The Honorable Sue L. Robinson
May 30, 2006
Public Version : June 6, 2006
Page 4

[REDACTED]

The deposition testimony of Syngenta's executives also confirms the existence of an overall corn market. [REDACTED]6

These party admissions show indisputably what Monsanto, as well as third parties such as Doane Research, seed companies, and governmental agencies like the Department of Agriculture have always understood the relevant product market to be: all corn sold for planting.

## II.  SYNGENTA HAS NOT BEEN FORECLOSED

There is no evidence that Monsanto has prevented Syngenta from entering any markets.

**Licensing GT Traits.** A critical fact omitted from Syngenta's Amended Complaint is that it had no GT trait to license until 2005, *after* the filing of this action. Syngenta could not enter the alleged market for the "licensing of GT traits" because of its own failure to develop or acquire anything to sell, not by reason of any conduct of Monsanto. [REDACTED] Accordingly, at the time it filed this action, Syngenta lacked standing to sue. *See Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*, 118 F.3d 178, 179 (3d Cir. 1997) (plaintiff that was neither competitor nor consumer failed to allege proper antitrust injury and lacked antitrust standing).

As to the time period *after* Syngenta filed this action, it has failed to present sufficient evidence of market foreclosure. In fact, Syngenta entered the market shortly after acquiring certain rights to a GT trait ("GA21") from Bayer Crop Science. It began selling GA21 for the 2005 planting season under its NK, Garst and Golden Harvest brands. As of February 2006, Greenleaf Genetics already had over 60 licensees. *See* www.agrisuretraits.com. Shortly thereafter, Syngenta and Pioneer – the nation's largest seed company – announced that Greenleaf Genetics would become a joint venture of the two companies. Moreover, Syngenta has failed to identify more than a handful of instances in which its offers to license its newly acquired GT trait were allegedly rejected because of Monsanto's licensing agreements. In an alleged market comprised of over 250 seed companies, this is insufficient as a matter of law to establish foreclosure from the distribution channels of the corn market. *See United States v. Dentsply Intern., Inc.*, 399 F.3d 181, 190 (3d Cir. 2005) (actionable foreclosure must be "from a substantial percentage of the available opportunities for product distribution").

---

5 [REDACTED]

6 [REDACTED]



The Honorable Sue L. Robinson
May 30, 2006
Public Version : June 6, 2006
Page 5

**Licensing ECB Traits.** Monsanto licenses Bt11 to Syngenta. Prior to 2005, the only evidence that Syngenta even tried to license any ECB traits to others is testimony that Beck's Seed Company licensed the "Bt11" trait from Syngenta. However, this testimony evidences Syngenta's market access, not foreclosure. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ Syngenta has failed to adduce evidence that any conduct by Monsanto had the effect of excluding it from the marketplace.

**Foundation Seed.** Syngenta was not in the foundation seed business until 2004. ▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬ In Count III, Syngenta claims it was denied access to foundation seed as a buyer. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ Moreover, Monsanto lacks market power in this alleged market, given its admitted 45% share. (2d Am. Compl. ¶ 7). Finally, Monsanto currently supplies its foundation seed to well over 100 companies, and even provides breeding services to its foundation seed competitors. ▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ Syngenta's allegation that only it has been denied access, standing alone, is insufficient to establish injury to competition.

### III. MONSANTO'S PATENT SUITS ARE NOT SHAM LITIGATION

To establish that the *Shah* and *Lundquist* cases were "sham" patent litigation, Syngenta must first prove that Monsanto's litigation efforts were objectively baseless, *i.e.*, that "no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized ..." *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 60 (1993); *accord In re Warfarin Sodium Antitrust Litigation*, 214 F.3d 395 (3d Cir. 2000). Syngenta's claim fails if Monsanto had "a reasonable belief [at the time the suit is filed] that there is a *chance* that a claim *may* be held valid upon adjudication." *PRE* 508 U.S. at 62–63 (emphasis added). Syngenta must prove the suit is "objectively baseless" with clear and convincing evidence. *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1069 (Fed. Cir. 1998). Sham litigation claims are frequently disposed of at the summary judgment stage. Out of 38 federal summary-judgment decisions involving a challenge to a sham litigation claim, summary judgment was granted in 31, well over 80%.[7]

A summary judgment ruling in favor of a patent defendant, in and of itself, does not establish that the action was objectively baseless. *PRE*, 508 U.S. at 60 n.5. At the time the patent cases were filed, a reasonable litigant could certainly expect success on the merits. Monsanto was a *bona fide* patentee. Hundreds of companies in the industry had taken out licenses under the Shah and Lundquist patents. Syngenta itself, as well as Garst and Golden Harvest (now part of Syngenta), took licenses under the Lundquist patent. Bayer, from whom Syngenta bought GA21 rights, is a licensee under the Shah patent. Bayer obtained the license as part of the settlement of a patent action brought by Monsanto in the United States District Court for the Eastern District of Missouri. In that suit, the Shah patent received a favorable claim construction from the court. The Lundquist patent also was subject to a favorable claim construction in a prior patent action brought in the United States District Court for the Northern District of Illinois. That case also settled, with Syngenta taking a license under the Lundquist '880 patent. The Illinois court also decided certain issues that support the infringement claims against Syngenta here.

---

[7] Based on LexisNexis searches conducted on May 25-26, examining every federal case that contained the terms "summary judgment," "sham litigation," and "patent" (151 decisions total, 38 on point).

The Honorable Sue L. Robinson
May 30, 2006
Public Version : June 6, 2006
Page 6

Further evidence that Monsanto's patent suits were anything but objectively baseless is Syngenta's apprehension of suit by Monsanto. Syngenta's own doubts show that it – as well as other industry players such as Bayer – were not only concerned about Monsanto's IP rights, but in fact took precautionary measures to avoid being successfully sued on the Shah patent. Syngenta shipped all GA21 material it received from Bayer out of the U.S. to "non-Shah" countries. The record (including the actual GA21 purchase agreement between Bayer and Syngenta) is replete with references, and indeed contractual requirements, relating to the Shah patent and so-called "Shah countries," *i.e.*, countries in which Monsanto's Shah patent applies to glyphosate-tolerance in corn. Syngenta has blocked further inquiry into its concerns about Monsanto's patents by asserting the attorney-client privilege at depositions and in response to documents requests.

## CONCLUSION

For the foregoing reasons, Monsanto respectfully requests leave to move for summary judgment pursuant to Fed. R. Civ. P. 56.

Respectfully submitted,

*/s/ Richard L. Horwitz*

Richard L. Horwitz

735130

cc: John W. Shaw (By Hand Delivery)
Richard F. Schwed (By Federal Express)
Peter E. Moll (By Federal Express)