IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MONSANTO COMPANY, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No.: 04-305-SLR (Consol.) |
| | ) | |
| SYNGENTA SEEDS, INC., *et al.*, | ) | **RESTRICTED CONFIDENTIAL** |
| | ) | **FILED UNDER SEAL** |
| Defendants. | ) | |
| | | **REDACTED PUBLIC VERSION** |

## OPPOSITION TO MONSANTO'S LETTER TO THE HONORABLE SUE L. ROBINSON DATED MAY 30, 2006

YOUNG CONAWAY STARGATT & TAYLOR, LLP
John W. Shaw (No. 3362)
Rolin P. Bissell (No. 4478)
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19801
(302) 571-6600
jshaw@ycst.com
*Attorneys for Syngenta Seeds, Inc., Syngenta Corporation, Syngenta Biotechnology, Inc., Advanta USA, Inc., Garst Seed Company, and Golden Harvest Seeds, Inc.*

Of Counsel:

SHEARMAN & STERLING LLP
Richard F. Schwed
Stephen Fishbein
599 Lexington Avenue
New York, NY 10022-6069
(212) 848-4000

Heather Lamberg Kafele
801 Pennsylvania Avenue, N.W.
Washington D.C. 20004-2634
(20) 508-8000

Dated: June 13, 2006

# YOUNG CONAWAY STARGATT & TAYLOR, LLP

KAREN E. KELLER
DIRECT DIAL: (302) 571-6554
DIRECT FAX: (302) 576-3467
kkeller@ycst.com

THE BRANDYWINE BUILDING
1000 WEST STREET, 17TH FLOOR
WILMINGTON, DELAWARE 19801

P.O. BOX 391
WILMINGTON, DELAWARE 19899-0391

(302) 571-6600
(302) 571-1253 FAX
(800) 253-2234 (DE ONLY)
www.youngconaway.com

June 13, 2006

BY CM/ECF AND HAND DELIVERY
The Honorable Sue L. Robinson
United States District Court
844 King Street
Wilmington, DE 19801

**CONFIDENTIAL -
FILED UNDER SEAL**

**REDACTED PUBLIC VERSION**

Dear Chief Judge Robinson:

    Syngenta Seeds, Inc. ("Syngenta") respectfully submits this response to Monsanto Company and Monsanto's Technology LLC's ("Monsanto") request for leave to file motions for summary judgment.

I.    **Monsanto Has Monopoly Power in the Relevant Markets**

    The question of relevant market is a "highly factual one best allocated to the trier of fact." *Fineman v. Armstrong World Indus.*, 980 F. 2d 171, 199 (3d Cir. 1992). Summary judgment on market definition has been granted only in rare cases where the plaintiff failed to produce *any* probative evidence to support its market definition. *See e.g., Home Health Specialists, Inc. v. Liberty Health Sys.*, No. Civ. A. 92-3413, 1994 WL 463406, at *2-6 (E.D. Pa. Aug. 24, 1994). Despite this, Monsanto claims there can be no dispute that the relevant market is an all-encompassing "corn market" consisting of all "systems" growers may use to control weeds and insects. It is facile to claim that an entire industry encompassing seeds, traits, hundreds of pesticides and tillage is a relevant antitrust market presenting no issue of material fact.[1] This claim is wrong for the following reasons.

    First, Monsanto focuses on hybrid seeds. Syngenta's claimed markets are for the licensing of technological inputs ("input traits") into hybrid seeds, not markets for hybrid seeds themselves. It is well-established that markets can exist for technological inputs. (Ex. 1.) [REDACTED]

[REDACTED]

---

[1] Monsanto's letter is internally inconsistent. Monsanto first asserts that the relevant competition is between "competing systems" and later that the relevant market is "all corn sold for planting."

[2] [REDACTED] Monsanto's claim that Syngenta has admitted a broad corn market in the *Sample* case does not prove there can be no dispute about the relevant market in this case. In *Sample,* an all seed market may be appropriate to determine if class-wide injury could be proven as to an alleged conspiracy among sellers of

June 13, 2006
Page 2

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ In any event, substitutability is not enough: "For every product, substitutes exist. But a relevant market cannot meaningfully encompass *that infinite range*." *Times-Picayune Pub'g Co. v. United States*, 345 U.S. 594, 612 n.31 (1953).

Third, although growers are switching *to* seeds with traits, they are not switching *from* traited to conventional products in any significant number, ▓▓▓▓▓ which is what economic theory would predict if the products were close substitutes. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Fourth, Monsanto's approach ignores the "cellophane fallacy."[3] Antitrust economists understand that firms exercise market power by raising prices above the competitive level until other products become sufficiently close substitutes to make any further price increase unprofitable. Clearly, growers value traits highly, and Monsanto prices accordingly. To the extent Monsanto claims some competition from other products at the grower level, it is evidence that Monsanto is exercising monopoly power in pricing traits. "The existence of significant substitution in the event of further price increases or even at the current price does not tell us whether the defendant already exercises significant market power." *Eastman Kodak Co. v. Image Tech. Serv., Inc.*, 504 U.S. 451, 471 (1992). It is incorrect to conclude that GT and ECB traits are not relevant markets or that Monsanto lacks market power simply because farmers may use some alternatives at current (inflated) prices.

Fifth, Syngenta's markets comport with the rule of reasonable interchangeability and cross-elasticity of demand. *United States v. E.I. DuPont de Nemours & Co.*, 351 U.S. 377, 404 (1956). ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Sixth, expert economic testimony is critical to decide questions of market definition and market power,[4] and Syngenta intends to introduce expert economic evidence in support of its market definition.

Finally, the record contains ample evidence that Monsanto has monopoly power in the GT and ECB trait markets. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

---

hybrid seeds. However, if the allegation were that technology providers had fixed trait royalty prices, a trait market would have been the appropriate market.

[3] *See* William Landes & Richard Posner, *Market Power in Antitrust Cases*, 94 Harvard. L. Rev. 9378, 961 (1981); Richard Posner, *Antitrust Law*, (1976), 126-27.

[4] *Virginia Vermiculite, Ltd, v. W.R. Grace & Co.*, 98 F. Supp. 2d 729, 736 (W.D. Va. 2000) ("Generally, an expert is utilized in establishing the relevant market."); *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F. 3d 1421, 1435 (9th Cir. 1999) ("expert opinion . . . may defeat summary judgment"); *Moecker Honeywell Int'l, Inc.*, 144 F. Supp. 2d 1291, 1305 (M.D. Fla. 2001) (denying summary judgment on market definition due to differing expert testimony).

June 13, 2006
Page 3

## II. Syngenta Has Demonstrated Anticompetitive Injury

<u>Standing as to the GA21 Trait</u>. Monsanto cites as a "critical fact" Syngenta's alleged lack of a GT trait at the time this lawsuit was filed. Not only is this "fact" disputed, it is plainly false. ▓▓▓ Syngenta announced it was commercializing GA21 on May 12, 2004 ▓▓▓ (Exs. 31-▓.) Indeed, Monsanto's Counterclaim acknowledges that Syngenta was actively marketing GA21. (D.I. 138.) ▓▓▓ In view of this substantial evidence establishing Syngenta as a competitor, summary judgment on standing is inappropriate.[5]

<u>Anticompetitive Effect</u>. Total market foreclosure is not required to sustain a claim for improper monopolization. *E.g. United States v. Dentsply Int'l*, 399 F.3d 181, 191 (3d Cir. 2005) ("the test is not total foreclosure"). Rather, a sufficient anticompetitive harm is proved if defendant's conduct results in a significant restriction of "the market's ambit" or delays competition by increasing new entrants' costs. *Id.*; *see LePage's, Inc. v. 3M*, 324 F.3d 141, 159-60 (3d Cir. 2003); *United States v. Microsoft*, 253 F.3d 34, 69 (D.C. Cir. 2001). Here, the evidence adduced in discovery raises serious factual disputes as to all of these issues.

When Monsanto began to commercialize traits in the 1990's, its stated intent was to exclude competitors through restrictive seed company licenses. ▓▓▓

Consistent with these stated goals, Monsanto embarked on a strategy to tie up the trait licensing markets. ▓▓▓



---

[5] The law requires only that Syngenta be a *potential* competitor in that it "has manifested an intention to enter the business and has demonstrated [its] preparedness to do so." *Monroe v. Consol. Rail Corp.*, 1983 WL 1813, at *2 (M.D. Penn. March 2, 1983) (internal citation omitted). Syngenta's multi-million dollar investment in acquiring GA21 and its substantial marketing in support of the product at the very least raise factual disputes making summary judgment inappropriate. *See Hecht*, 570 F.2d at 988 (issue of preparedness "presented a question of fact for the jury").

June 13, 2006
Page 4

▮ This bundling of discounts across product lines most certainly runs afoul of the antitrust laws. See *LePage's,* 324 F.3d at 154-56 (finding Section 2 violation in bundled rebates).

Monsanto has further foreclosed competition through improper threats aimed at keeping seed companies from doing business with Syngenta. 

The evidence raises significant factual disputes precluding summary judgment. This is demonstrated by the *Dentsply* case in which the Third Circuit found a Section 2 violation where only a portion of one distribution channel was foreclosed. Dentsply, a manufacturer of artificial teeth, adopted a policy discouraging its 23 independent dealers from carrying competitors' products. The market was comprised of "hundreds of dealers," and manufacturers also could sell directly to customers without dealers. 399 F.3d at 185, 193. Further, the dealers could stop doing business with Dentsply at any time. *Id.* The Third Circuit nevertheless found a Section 2 violation because Dentsply's conduct affected a "key" group of dealers and the policy "help[ed] keep sales of competing teeth below the critical level necessary for any rival to pose a real threat to Dentsply's market share." *Id.* at 191. See *LePage's,* 324 F.3d at 160 (exclusionary contracts aimed at certain "key" high-volume retailers); *Microsoft,* 253 F.3d at 70 (foreclosure may result from blocking less than 50% of the market).

Here, Monsanto's conduct is considerably more exclusionary than Dentsply's: Monsanto has entered actual contractual restrictions ▮ with virtually every seed company. It has amplified the exclusionary effect of these provisions with explicit threats aimed at keeping Syngenta out of the market. ▮
▮ *Dentsply,* 399 F.3d at 191.

### III.   Monsanto's Patents Suits Constitute Sham Litigation

Monsanto's request for summary judgment on Syngenta's sham patent litigation allegations should be denied because there are significant factual issues. *See, e.g., Landmarks Holding Corp. v. Bermant,* 664 F. 2d 891 (2d Cir. 1981) (improper to grant summary judgment on sham litigation where facts in dispute); *Kravco Co., v. Valley Forge Ctr. Assoc.,* No. 91-4932 1992 U.S. Dist. LEXIS 375, at *4-5 (E.D. Pa. Jan. 13, 1992). As a starting point, the discovery record demonstrates that Monsanto failed to conduct "a reasonable investigation before filing suit." *Hoffman-La Roche, Inc. v. Genpharm, Inc.,* 2000 U.S. LEXIS 8128, at *5-6 (D.N.J. 2000). Monsanto filed suit for infringement of the Shah patent on May 12, 2004, ▮
▮ These facts alone provide a basis for denying summary judgment.

In addition, all of the facts supporting the Court's summary judgment decision were known to Monsanto – or should have been known with the minimal investigation – at the time it filed the lawsuits:

June 13, 2006
Page 5

- Monsanto knew that Syngenta did not perform the steps of independent claim 1 of the Lundquist patent (DeKalb performed those steps before the Lundquist patent issued);

- Monsanto knew that the only asserted Lundquist claims are dependent claims of claim 1;

- Monsanto knew that at the time of the Shah patent a person skilled in the art could not transform a monocot plant cell (e.g., corn) because it had argued, and won, on that issue in a prior case; and

- Monsanto knew or should have known that the Shah patent prosecution history does not support its position that the patent was enabled with respect to corn.

Moreover, the Court's decision is based on well-established patent law. For example, it is a fundamental principle that "dependent claims cannot be found infringed unless the claims from which they depend have been found . . . infringed"; yet Monsanto continues to push its Lundquist patent claims to this date.[8]

Monsanto's own submission demonstrates that there are numerous issues of disputed fact. ■■■ At best, this creates a disputed issue of material fact as to whether the seed companies believed those patents to be enforceable. ■■■ Whether Monsanto's belief is "reasonable" is an inherent fact question.

Finally, summary judgment on this issue would not resolve any claim because Syngenta does not have a separate baseless patent litigation count. Thus, the question should be considered as an evidentiary matter, and does not warrant summary judgment briefing that potentially could place the trial date at risk.[9]

Respectfully Submitted,

/s/ *Karen E. Keller*
Karen E. Keller (#4489)

cc: Clerk of the Court (by CM/ECF and hand delivery)
All counsel of Record

---

[8] Monsanto did not receive "favorable" claim constructions on the Shah and Lundquist patents in prior litigations. In the Missouri case, the court disagreed with Monsanto's proposed construction on two key terms, construing those terms in essentially the same manner as followed by this Court. (Ex. 54.) In the Illinois case, the court construed claim 4 of the Lundquist patent as a dependent claim incorporating process steps (i)-(iii), the same construction adopted by this Court. (Ex. 55.)

[9] Even the possibility of moving the trial date is prejudicial to Syngenta, especially given that schedule was truncated because Monsanto missed the deadline for producing documents. (Exs. 56, D.I. 197.)