# EXHIBIT 31



Syngenta International AG
Media Office
CH-4002 Basel
Switzerland
Telephone: +41 61 323 23 23
Fax:      +41 61 323 24 24
www.syngenta.com

**Media Release**

## Syngenta acquires glyphosate tolerance technology for corn

**Basel, Switzerland, 12 May 2004**

Syngenta announced today that it has acquired rights to a commercially successful glyphosate tolerance technology in corn from Bayer CropScience. The technology, called GA21, enables farmers to control weeds in corn with post emergence applications of the non-selective herbicide glyphosate. Syngenta will offer the technology in NK® brand hybrids and through licenses with other seed companies. Financial terms of the transaction were not disclosed.

"This transaction gives Syngenta fast-track entry into an important segment of the corn crop protection market", said David Jones, Head of Business Development for Syngenta. "This valuable technology further strengthens our already broad product portfolio of corn hybrids, traits and crop protection products."

Syngenta is a world-leading agribusiness committed to sustainable agriculture through innovative research and technology. The company is a leader in crop protection, and ranks third in the high-value commercial seeds market. Sales in 2003 were approximately $6.6 billion. Syngenta employs some 19,000 people in over 90 countries. Syngenta is listed on the Swiss stock exchange (SYNN) and in New York (SYT). Further information is available at www.syngenta.com.

| Analyst/Investor Enquiries: | Jonathan Seabrook (Switzerland) | +41 61 323 7502 |
| | Jennifer Gough (Switzerland) | +41 61 323 5059 |
| | Rhonda Chiger (USA) | +1 (917) 322 2569 |
| | | |
| Media Enquiries: | Markus Payer (Switzerland) | +41 61 323 2323 |
| | Sarah Hull (USA) | +1 (202) 347 8348 |

Cautionary Statement Regarding Forward-Looking Statements

This document contains forward-looking statements, which can be identified by terminology such as 'expect', 'would', 'will', 'potential', 'plans', 'prospects', 'estimated', 'aiming', 'on track' and similar expressions. Such statements may be subject to risks and uncertainties that could cause the actual results to differ materially from these statements. We refer you to Syngenta's publicly available filings with the U.S. Securities and Exchange Commission for information about these and other risks and uncertainties. Syngenta assumes no obligation to update forward-looking statements to reflect actual results, changed assumptions or other factors. This document does not constitute, or form part of, any offer or invitation to sell or issue, or any solicitation of any offer, to purchase or subscribe for any ordinary shares in Syngenta AG, or Syngenta ADSs, nor shall it form the basis of, or be relied on in connection with, any contract therefore.

# EXHIBITS 33-53

## REDACTED IN THEIR ENTIRETY

# EXHIBIT 54

314-244-7960 USDC

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

FILED

'U   2 2003AM

U. S. DISTRICT COURT
EASTERN ┄ ┄ ┄ OF MO

MONSANTO COMPANY, et al.,      )
                               )
          Plaintiffs,          )
                               )
     vs.                       )        Case No. 4:01CV1825  CDP
                               )
BAYER CROPSCIENCE LP,          )
                               )
          Defendant.           )

## CLAIMS CONSTRUCTION ORDER

Having considered the parties' filings and heard their arguments, and for the

reasons stated in open court,

**IT IS HEREBY ORDERED** that the disputed terms, as used in the claims

at issue, are construed as follows:

The term "chimeric gene" means a gene that is comprised of parts that do

not occur together in nature.

The term "chimeric plant gene" means a chimeric gene that is expressible in

a plant.

The term "chloroplast transit peptide" means a naturally occurring series of

amino acids that causes the transport of a polypeptide into a chloroplast.

The term "chloroplast transit peptide/5-enolpyrulvylshikimate-3-phosphate

synthase [EPSPS] fusion polypeptide" means a polypeptide that has at least two

RECEIVED TIME  JUL. 2.  4:35PM

MGA0062516

314-244-7960 USDC

parts, which must include a chloroplast transit peptide (as defined above) joined to an EPSPS, where the chloroplast transit peptide and EPSPS are not found together in nature.

The term "permits the fusion polypeptide to be imported into a chloroplast of a plant cell" means the function of a chloroplast transit peptide (as defined above).

These definitions apply to the use of these terms each time they appear in each of the claims at issue, and will be incorporated into the jury instructions.

**IT IS FURTHER ORDERED** that a telephone conference will be held with all counsel on **Friday, August 1, 2003** at **11:00 a.m.** to discuss any modifications to the Case Management Order in this case necessitated by my granting the parties' request to delay resolution of these issues. Counsel for Bayer is responsible for placing the call and assuring that all necessary counsel are included, and I expect counsel to confer in advance and attempt to reach agreement on any proposed modifications.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 2nd day of July, 2003.

- 2 -

RECEIVED TIME  JUL. 2.  4:35PM

MGA0062517

# EXHIBIT 55

The word "transgenic" appears in the claims of each patent. Both families of patents make it clear that the key element underlying this term is genetic engineering. For example, the '520 patent says that the DNA sequences are "incorporated into recipient cells by genetic engineering methods rather than classical reproduction or breeding techniques." (C3L53-56) The Lundquist patents expressly define the term "transgenic" to include "any cell, cell line, callus, tissue, plant part or plant, the genotype of which has been altered beneficially by the presence of heterologous DNA that was introduced into the genotype by a process of genetic engineering." (E.g., '956 patent, C4L55-59) "Heterologous DNA" is defined in the Lundquist patents (see, e.g. '956 patent, C6L30-52) as a DNA segment that is synthetic, semi-synthetic, or biologically derived, and includes non-plant genes such as those from bacteria, yeasts, animals, or viruses, as well as modified genes and portions of genes.[32] The heterologous DNA is not limited to non-plant sources, however, and can be from another *Zea mays* genotype, or even the same genotype into which it is to be introduced. The '520 patent similarly defines transgenic plants as "plants that have incorporated exogenous genes or DNA sequences, including but not limited to genes or DNA sequences which are perhaps not normally present, genes not normally transcribed and translated ('expressed') in a given cell type, or any other genes of [sic: "or"] DNA sequences which one desires to introduce into the non-transformed plant, such as genes which may normally be present in the non-transformed plant but which one desires to have altered expression." (C33L40-50) Accordingly, it is recommended that the jury be instructed that, in the claims of each of the patents, a "transgenic" corn plant is one that includes a DNA sequence resulting from genetic engineering.

---

[32] The parties have raised the larger issue of the meaning of "heterologous DNA" as actually employed in the claims; this is dealt with separately later in this report.

The claims of the '520, '877, and '880 patents employ the word "comprising." It is recommended that the jury be instructed that "comprising," in the parlance of patent claims, is synonymous with "including," and does not exclude the presence of additional elements.[33]

The claims of the '956 patent make reference to the R0 and R1 generations of corn plants. Although there is no dispute as the meaning of these designations, they play a large role in the construction of the term "progeny," as it is much more convenient to set out a formal construction of that term using such designations. Accordingly, it is recommended that the jury be instructed that a plant of the R0 generation is the regenerated plant; a plant of the R1 generation is a plant that has been grown from seed of the R0 plant harvested after that R0 plant has been fertilized by pollen from a different corn plant (crossed), its own pollen (self mated), or pollen of a sibling plant (sib mated); a plant of the R2 generation is one that has been grown from seed harvested from a crossed, selfed or sibbed R1 plant, etc.[34]

## Process Steps

The claims of the '877, '880, and '520 patents are directed to processes, each comprising a number of steps. In each instance, the next step builds upon the proceeding step, in logical fashion. Thus, in this case, as in Mantech Environmental Corp. v. Hudson Environmental Serv. Inc., 152 F.3d 1368, 47 USPQ2d 1732, 1739 (Fed. Cir. 1998), the sequential nature of the claim steps is apparent from the plain meaning of the claim language and nothing in the written description suggests otherwise. It is recommended, therefore, that the jury be instructed that the

---

[33] Hewlett-Packard Co. v. Repeat-O-Type Stencil, 123 F.3d 1445, 43 USPQ2d 1650, 1655 (Fed. Cir. 1997). So, too, with the word "comprises."
[34] The Lundquist patents teach that "plants regenerated from the transformed callus are referred to as the R0 generation or R0 plants. The seeds produced by the various sexual crosses of the R0 generation plants are referred to as R1 progeny or the R1 generation. When R1 seeds are germinated, the resulting plants are also referred to as the R1 generation." (E.g., '880 patent, C11L14-15)

process claims of the patents in suit require the method steps to be performed sequentially, in the

order set forth in the claim.

The independent process claims of the '520, '887, and '880 patents each contain the

following language: "wherein said DNA is transmitted through a complete sexual cycle of said

transgenic plant to its progeny." The independent product claim of the '956 patent is similar,

except it uses the phrase "complete normal sexual cycle." Such language does not constitute a

process step or limitation; rather, it defines a characteristic of the R0 plant that is the subject of

the '956 claims and that is produced by the process of the independent claims of the other

patents. Nor does the language in any way exclude human intervention in the reproductive

process. It is clear that "normal sexual cycle" referred to is the fundamental corn reproductive

process whereby genetic material is passed to progeny through either pollen or egg cells. Corn

breeding and hybrid seed production systems obviously involve, almost invariably, human

intervention in that process, e.g., detasseling in crossing blocks to ensure cross-pollination, hand

pollination, etc. It is recommended that the jury be instructed that this language does not define

a necessary step in the process of the independent process claims, and merely requires that the

R0 plant be capable of passing the transgene to progeny through either pollen or egg cells,

without or without human intervention.

Product-by-Process[25]

The claims of the '956 patent are directed to a corn plant having heterologous DNA that

encodes for BT endotoxin. Each claim, however, contains a phrase that can only be described as

a method limitation: "wherein said DNA is introduced into said plant by microprojectile

---

[25] This is the only topic upon which defendant NK took a position. Accordingly, except for the discussion of this topic, the use of the collective term "defendants" should be understood to exclude NK, unless the context indicates otherwise.

Report and Recommendation of Special Master Regarding Claim Construction                    Page 29
Transgenic Corn Patent Litigation (N.D. Illinois—Judge Reinhard)

bombardment of *Zea mays* callus cells." Despite this clear language, DeKalb contends that these

claims must be construed as not limited to plants that are transformed by the biolistic technique.

Rather, it says, these claims are so-called "product-by-process" claims, and therefore must be

construed to cover the recited corn plant, no matter what technique was used to introduce the

heterologous DNA.

This contention may seem somewhat remarkable given the Federal Circuit's unswerving

adherence to the proposition that each limitation of a claim is material and essential, and that in

order for a court to find infringement, the patent owner must show the presence of every

limitation or its substantial equivalent in the accused product.[36] What DeKalb is contending —

nothing more and nothing less — is that the microprojectile bombardment language is not a

limitation at all, and may be safely ignored in deciding both infringement and validity.

DeKalb is quick to point out that there is perfectly good authority for what may seem on

the surface to be a rather strange proposition: that a claim may be — indeed, must be — read and

interpreted as though it did not contain what is some rather explicit language.  For this it cites

Scripps Clinic & Res. Found. v. Genentech, Inc., 927 F.2d 1565, 18 USPQ2d 1001, 1016 (Fed.

Cir. 1991), for the statement that "the correct reading of product-by-process claims is that they

are not limited to product prepared by the process set forth in the claims."  The claim in *Scripps*

was in the following format: "Highly purified and concentrated human or porcine VIII:C

prepared in accordance with the method of claim 1."  A similar format was at issue in a case

decided the following year, Atlantic Thermoplastics Co. v. Faytex Corp., 970 F.2d 834, 23

USPQ2d 1481 (Fed. Cir. 1992): "The molded innersole produced by the method of claim 1."

---

[36] E.g., Lemelson v. United States, 752 F.2d 1538, 224 USPQ 524, 533 (Fed. Cir. 1985); Perkin-Elmer Corp. v.
Westinghouse Elec. Corp., 822 F.2d 1528, 3 USPQ2d 1321, 1325 (Fed. Cir. 1987).  See generally, Pennwalt Corp.
v. Durand-Wayland, Inc., 833 F.2d 931, 4 USPQ2d 1737 (Fed. Cir. 1987)

# EXHIBIT 56

1

```
1              IN THE UNITED STATES DISTRICT COURT

2              IN AND FOR THE DISTRICT OF DELAWARE

3                          - - -

4   MONSANTO COMPANY and        :    CIVIL ACTION
    MONSANTO TECHNOLOGY LLC,     :
5                                :
               Plaintiffs        :
6                                :
               vs.               :
7                                :
    SYNGENTA SEEDS, INC. and     :
8   SYNGENTA BIOTECHNOLOGY,      :
    INC.,                        :
9                                :
               Defendants        :    NO. 04-305 (SLR)
10                         - - -

11
                            Wilmington, Delaware
12                          Monday, November 14, 2005
                            4:30 o'clock, p.m.
13                         - - -

14
    BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge
15                         - - -

16
    APPEARANCES:
17
              POTTER, ANDERSON & CORROON LLP
18            BY:  RICHARD L. HORWITZ, ESQ.

19                    -and-

20            HOWREY LLP
              BY:  PETER E. MOLL, ESQ. and
21                 JOHN J. ROSENTHAL, ESQ.
                   (Washington, D.C.)
22
                   Counsel for Plaintiffs
23

24                              Valerie J. Gunning
                                Official Court Reporter
25
```

2

```
1    APPEARANCES (Continued):

2              YOUNG, CONAWAY, STARGATT & TAYLOR LLP
               BY:  ROLIN P. BISSELL, ESQ.
3
                        -and-
4
               SHEARMAN & STERLING LLP
5              BY:  RICHARD SCHWED,  ESQ.
                    (New York, New York)
6
                        -and-
7
               SHEARMAN & STERLING LLP
8              BY:  HEATHER LAMBERG KAFELE, ESQ.
                    (Washington, D.C.)
9
                    Counsel for Defendants
10
                        - - -
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

17

1    and provided to us 120,000 pages of those documents.

2                    THE COURT:  Out of how many pages?

3                    MR. MOLL:  Out of a total of 330,000.  And they

4    are in the process of imaging and providing to us the

5    additional 110,000 pages for review.

6                    So right now we have 120, so it's 230.  I'm

7    sorry, your Honor.  I misspoke.

8                    So that is what we have as far as the paper

9    documents are concerned.  And as I indicated, your Honor,

10   I have not only sent additional people to St. Louis to

11   help with the collection, and Monsanto has not only hired

12   a great number of additional people out there and two

13   vendors, but I have 20-plus lawyers in D.C., reviewing

14   these documents.

15                   But in addition to the paper documents, we have

16   132 hard drives and other electronic records from Monsanto's

17   servers and databases, which contain, I won't go into the

18   gigabytes, but which contain roughly seven to nine million

19   pages of documents which we have not yet received from the

20   vendor, but we are working on what we have.

21                   And if we sit here and we say we have 20 people

22   and we try to figure out how fast 20 people can review

23   documents, how many they can review in a day, when we do the

24   math, being realistic, that's what we are coming out with,

25   and that's on the documents from the first production.  It

18

1   does not -- it does not in any way relate to documents in

2   this second request that still need to be discussed.

3              So what we -- you know, I didn't want to be here

4   asking for two months, but, your Honor, I think,

5   realistically, that's what we're going to need.

6              THE COURT:  Well, it could be we skip summary

7   judgment in this case, then.  I mean, I'm not confident

8   that -- if you tell me you need two months, I can say do it

9   faster, and if you can't do it faster, you can't do it

10  faster.

11             But what I can say is that if, in fact, this case

12  is going to involve millions of pages of documents that you

13  have had trouble accumulating, assimilating, reviewing, I,

14  frankly, think think there is no way that a summary judgment

15  process makes any sense at all, and therefore we can

16  accommodate you, but leave out summary judgment, because I,

17  frankly, do not think you can present millions of pages of

18  documents to me and say there are no genuine issues of

19  material fact.

20             So that's basically where I am.  I am not going

21  to tell you you can do something you swear as an officer

22  of the court you can't do.  But I can tell you, as an

23  officer of the court, that there's no way that I will be

24  able to determine the summary judgment motion based on

25  millions of pages of documents that you all have trouble

19

1   managing.

2              MR. MOLL:  And I understand that, your Honor,

3   and I appreciate what the Court is saying.  And as I said, if

4   there was some way for us humanly possible to get it done

5   faster, I would have it done faster because, as I've said,

6   and I have been pushing myself all along to make sure the

7   process is moving along because the last thing I want to be

8   here is to tell the Court that we need more time.

9              We would like to get this resolved, too.  I think

10  when it comes to summary judgment, there may be some issues,

11  and we all know that we have the Pagges decision in the Third

12  Circuit and what that decision stands for, but there may be

13  some narrow issues that the Court -- that are very manageable

14  issues, that at some point the Court may want to address

15  because, in my mind, they're dispositive of some of these

16  antitrust claims.

17             The entire, in this monopolization case, one of

18  the key issues is the product market.

19             THE COURT:  All right.  Well, I'm not going to

20  discuss that now.

21             MR. MOLL:  Right.  I understand that, your

22  Honor.

23             THE COURT:  All I am saying is if I have to give

24  you two months, I will keep the trial date and what is going

25  to suffer is the summary judgment process.  And if I have to

1  do -- you know, I generally try to allow lawyers to advocate,

2  to do what they think they need to do to represent their

3  clients, and if lawyers truly believe that a summary judgment

4  motion is appropriate at the end of discovery, I generally

5  let them do it.

6         I don't review it before I allow you to file, but

7  this case might be different.  In this case I might have the

8  kind of meeting that I understand Judge Sleet has and I will

9  determine whether to allow you to proceed on discrete issues

10  where the facts are essentially agreed upon, which has never

11  happened, actually.

12         But, in any event, all I am saying is, to give

13  you two months, the summary judgment motion practice will not

14  be as it is contemplated, as it was contemplated when I

15  entered the scheduling order.

16         Now, the question is, I certainly will not give

17  Monsanto any more than two months, and I want to make sure

18  that what we have in place is a process to assure me and

19  Syngenta that Monsanto can complete its two months, and

20  I'm not sure what kind of assurances you can give us

21  in terms of the process that is going to happen.

22         Do you have an estimate from either vendor as

23  to when you're going to get documents in a format that you

24  can review, because I need that before I can tell you

25  whether this is a waste of my time to even think about two

21

1   months.

2          MR. MOLL:  Well, we do have an estimate,

3   your Honor, and we are confident if the vendor meets its

4   estimates -- they hadn't in the past.  We got, particularly

5   with the electronic documents, again, because it was so

6   novel, we got more time.  We do have one.  I do not have that

7   date right now, but I can tell you that based upon that

8   calculation, if we -- if your Honor will give us an

9   additional two months from today, we will get it done, and we

10  will do everything humanly possible to get it done and add

11  more people, if that is necessary.

12         It is not in our interest to delay any more than

13  we have to.  It is certainly not in Monsanto's interest to --

14  I mean, this is not a cheap process.  It has been very costly

15  and it's going to be very costly, to push like this to get it

16  done, and obviously the company does not like to, you know,

17  spend the money that they don't have to.

18         So it's not -- we're not doing this in any way,

19  shape or form to push things back other than to say, your

20  Honor, that as an officer of the court, I will represent

21  there's just no way we can get it done unless we get the two

22  months.  And we have the affidavits and, again, that would

23  explain that, and the date we propose is January 13th to get

24  it done.

25         THE COURT:  All right.  But what I want as

22

1   a matter of record, if you cannot give it to me today,

2   then I need an e-mail that will be docketed that gives me

3   an estimate from your vendor as to when the documents

4   will be reproduced in a format that you all can review

5   and an estimate from the attorneys when you will be able

6   to review those documents, from both the vendor dealing

7   with paper documents and the vendor dealing with the

8   electronic data.

9           MR. MOLL:  Okay.  We will do that.  Mr. Rosenthal

10  tells me he has those dates and I could give you the dates

11  we've got from the vendor right now on the completion of both

12  the paper and the electronic, your Honor.

13          THE COURT:  All right.

14          MR. MOLL:  Okay.  The vendor on the paper advises

15  us that they should be complete by the end of the week.  And

16  as I said, we received documents, we're receiving them from

17  that vendor on a rolling basis.  And the vendor on the

18  electronic documents has indicated that we should have those

19  documents in two and a half weeks.

20          And then if I do the math and from getting them

21  then, with the people we have and make assumptions that we --

22  that we -- that we make on the basis of historical, how many

23  documents one human being can review in a day, we believe,

24  and I'm -- that we will complete this production by the 13th

25  of -- be able to complete it by the 13th of January.  It's