IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MONSANTO COMPANY, et al.,          )
                                   )
          Plaintiffs,              )
                                   )
                                   )   Civ. No. 04-305-SLR
     v.                            )
                                   )
                                   )
SYNGENTA SEEDS, INC., et al.,      )
                                   )
          Defendants.              )

Richard L. Horwitz, Esquire and David E. Moore, Esquire of
Potter, Anderson & Corroon LLP, Wilmington, Delaware.  Counsel
for Plaintiff.  Of Counsel:  Peter E. Moll, Esquire, John J.
Rosenthal, Esquire and Scott Flick, Esquire of Howrey LLP,
Washington D.C.; Kenneth A. Letzler, Esquire and Jonathan I.
Gleklen, Esquire of Arnold & Porter LLP, Washington D.C..

John W. Shaw, Esquire and Rolin P. Bissell, Esquire of Young,
Conaway, Stargatt & Taylor, LLP, Wilmington, Delaware.  Counsel
for Defendant.  Of Counsel:  Richard F. Schwed, Esquire and
Stephen Fishbein, Esquire of Shearman & Sterling LLP, New York,
New York; Heather Lamberg Kafele, Esquire and Jonathan R.
DeFossee, Esquire of Shearman & Sterling, LLP, Washington D.C..

**MEMORANDUM OPINION**

Dated: August 𝒦 , 2006
Wilmington, Delaware

ROBINSON, Chief Judge

## I. INTRODUCTION

On July 28, 2004, Syngenta Seeds, Inc. filed this antitrust action against Monsanto Company and Monsanto Technology LLC (collectively called "Monsanto"), alleging that Monsanto has monopolized the markets for glyphosate-tolerant corn ("GA21 corn") traits and European corn borer-tolerant corn traits and has attempted to monopolize the foundation corn seed market. Monsanto filed an amended answer with counterclaims against Syngenta AG, Syngenta Participations AG, Syngenta Corporation, Syngenta Seeds, Inc., Syngenta Biotechnology, Inc., Advanta USA, Inc., Gartst Seed Co., and Golden Harvest Seed Inc.[1] In its counterclaims, Monsanto alleges that counterclaim defendants misappropriated Monsanto's GA21 event and are improperly selling Monsanto's event as their own. The counterclaims include: (1) Reverse passing off under the Lanham Act; (2) False advertising under the Lanham Act; (3) Violations of the Delaware Deceptive Trade Practices Act; and (4) Tortious interference with a contract. (D.I. 77)

Before the court is a motion to dismiss by Syngenta AG and Syngenta Participations AG ("Participations") for lack of

[1]Syngenta Corporation, Syngenta Biotechnology, Inc., Advanta USA, Inc., Garst Seed Co., and Golden Harvest Seeds, Inc., together with Syngenta Seeds, Inc., are collectively referred to as the "Syngenta U.S. Companies".

personal jurisdiction.² (D.I. 169)

## II.  BACKGROUND

### A.  The Business of Syngenta AG and Participations

Syngenta AG is a holding company located in Basel,
Switzerland, formed in 1999 under the laws of Switzerland. (D.I.
171 at ¶ 3) Syngenta AG became a public company in November
2000. (Id.) Syngenta AG has no employees and its business
consists primarily of owning shares in companies in the
agriculture, seeds and chemicals businesses. (Id.)

Syngenta AG owns Syngenta Corporation, the parent company to
all of the other Syngenta U.S. Companies engaged in the
distribution, marketing and sale of genetically modified corn
seeds. (D.I. 185 at ¶ 5)

Participations is a Swiss company, located in Basel,
Switzerland, which is a wholly owned subsidiary of Syngenta AG.
(D.I. 171 at ¶ 4) Like Syngenta AG, Participations is a holding
company with no employees. (Id.) Participations owns interests
in companies located outside of Switzerland that are in the
agriculture, seeds and chemicals businesses. (Id.)
Participations also owns intellectual property rights, which it
licenses principally to affiliated companies. (Id.)

²If the motion is denied, Syngenta AG and Participations
also move for dismissal for failure to state a claim upon which
relief can be granted, adopting the arguments advanced by the
Syngenta U.S. Companies in their motion. (D.I. 132)

2

**B.    Business of the Sygnenta U.S. Companies**

Syngenta Corporation is a Delaware corporation with its
principal place of business in Wilmington, Delaware.  (D.I. 172
at ¶ 3)  It is a holding company that owns, either directly or
indirectly, Syngenta Seeds, Inc., Syngenta Biotechnology, Inc.,
and Garst Seed Company.[3]  (Id.)  Syngenta Corporation is a
wholly-owned subsidiary of Participations and it is only one of
more than 100 subsidiaries worldwide ultimately owned by Syngenta
AG.  (D.I. 171 at ¶ 18)

Syngenta Seeds, Inc. was formed under the laws of Delaware
and is headquartered in Golden Valley, Minnesota.  (D.I. 172 at ¶
5)  It is engaged, among other things, in the production,
marketing and sale of commercial seeds, including hybrid corn
seeds.  (Id.)

**C.    Contacts With Delaware**

Syngenta AG's Executive Committee is based at corporate
headquarters in Basel, Switzerland.  (D.I. 185 at ex. 8)  The
Executive Committee is "responsible for the operational
management of the Company."  (Id.)  The Executive Committee
consists of a Chief Executive Officer ("CEO"), the Chief
Operating Officers ("COO") of the Crop Protection and Seed
business, and the heads of Syngenta AG's global functions.  (Id.)

---

[3]The other Syngenta U.S. Companies are majority owned,
directly or indirectly, by GH Holding, Inc., a wholly-owned
subsidiary of Participations.  (D.I. 172 at ¶ 18)

3

Individual members of the Executive Committee include:  (1) Michael Mack, who is based in Basel and is Chairman and President of Syngenta Corporation in Delaware and the COO of Syngenta Seeds in Minnesota; (2) Jeff Beard, who is the COO of Syngenta Seeds; (3) John Atkin, who is the COO of Syngenta Corporation in Delaware and the COO of Syngenta Crop Protection in North Carolina; (4) David Lawrence, who is the head of Research and Technology for Syngenta AG and sits on the board of directors of Syngenta Biotechnology, Inc.; (5) Richard Steiblin, a former member of the Executive Committee, who also served as a board member of Syngenta Corporation in Delaware.  (Id. at exs. 8, 9, 11, 12, 14, 15)

Each of the Syngenta U.S. Companies has its own board of directors, which is separate from the boards of Syngenta AG and Participations, as well as from the Syngenta AG Executive Committee.  (D.I. 171 at ¶ 21; D.I. 172 at ¶ 12)  There are no overlapping members on the boards of Syngenta AG and the Syngenta U.S. Companies.  (D.I. 171 at ¶ 21)  A few of the Participations directors and some Executive Committee members serve on the boards of certain of the Syngenta U.S. Companies.  (D.I. 171 at ex. B)  The board of directors of Syngenta AG has its own meetings, at times and locations separate and apart from the meetings of any Syngenta U.S. Companies' boards and the board of directors of Participations generally acts by written consent.

4

(D.I. 171 at ¶ 12, 21)

Syngenta AG and Participations are not authorized to, and do not, direct the day-to-day operations of the Syngenta U.S. Companies. (D.I. 171 at ¶ 19) The Syngenta U.S. Companies are managed by their own officers and employees, who have responsibility for the day-to-day operation of the business. (D.I. 172 at ¶ 10) For example, Syngenta Seeds, Inc. and its United States affiliates in the seeds business develop and implement the United States sales and marketing strategy for GA21 corn seed. (Id.) These companies make the day-to-day decisions on what, where, when, and how to sell GA21 corn seed. (Id.) They hire and fire their own sales forces, adopt their own branding strategies, set their own prices, run their own promotions, and decide on their own which customers to target. (Id.)

The Syngenta U.S. Companies maintain office, production, research, sales and distribution facilities in the United States, separate from the operations of Syngenta AG and Participations, neither of which has any facilities in the United States. (D.I. 171 at ¶ 22; D.I. 172 at ¶ 11) Syngenta Corporation and its subsidiaries also maintain their own books and records and prepare their own financial statements. (D.I. 171 at ¶ 24; D.I. 172 at ¶ 13) Syngenta Corporation files its own United States tax returns. (D.I. 172 at ¶ 13) In accordance with Swiss law

5

and international accounting standards, Syngenta AG does prepare

a consolidated financial statement for it and its subsidiaries,

which includes the results of Syngenta Corporation and its

subsidiaries.  (D.I. 171 at ¶ 24)  However, Syngenta Corporation

and its U.S. affiliates are responsible for preparing their own

financial statements, which are then consolidated with Syngenta

AG's results.  (D.I. 171 at ¶ 24; D.I. 172 at ¶ 13)

### D.   Syngenta AG and Participations' Strategy to Misappropriate GA21 for Sale in the United States

A four day meeting was held in Washington, D.C. to

orchestrate a "strategy for bringing Syngenta branded GA21 to the

[U.S.] market."  (D.I. 185 at ex. 1)  The meeting was attended by

Adrian Dubock, the head of mergers and Acquisitions for

Participations in Basel; Marian Flattery, the head of Global IP

and Licensing for Participations in Basel; Ed Resler, Vice

President and General Counsel, Plant Science, of Syngenta Seeds,

Inc. in Minnesota; Jeff Stein, Regulatory Director at Syngenta

Biotechnology, Inc. in North Carolina; and Erik Dunder,

Regulatory Manager for GA21 for Syngenta Biotechnology, Inc.

(D.I. 185 at ex. 1)

To implement its strategy, Syngenta AG assembled a unit

called the Corn Business Team.  (D.I. 185, ex. 16 at 17)  Until

2004, the Corn Business Team was formally a part of Syngenta AG

and reported directly to Syngenta AG's Business Development

Leadership and Technical Review Committees.  (D.I. 185, ex. 16 at

6

152) The Corn Business Team was comprised of employees from Syngenta AG, Syngenta International AG, Syngenta Seeds, Syngenta Crop Protection, Syngenta Biotechnology, and Syngenta Corporation.[4] (D.I. 185, ex. 32 at 3, 5.1) The Corn Business Team required Syngenta AG's approval for important business decisions, such as deciding on a logo for the Agrisure trademark. (D.I. 185, ex. 37 at 3)

## E. Syngenta AG's Control Over Business Decisions[5]

### 1. Delaware meeting

A meeting took place in May of 2002 in Wilmington, Delaware. (D.I. 310, ex. A at 1) David Jessen did not attend the meeting, but testified regarding a Power Point presentation given at the meeting. (D.I. 310, ex. A at 1) In attendance and participating in the meeting were members of Syngenta AG's management and various employees of the Syngenta U.S. Companies. (D.I. 310, ex. A at 1) The goal of the meeting was to "gain a better understanding of the competitive threat we face from [the Monsanto product]." (Id.) The presentation sets forth other specific goals of the meeting, including: (1) Review a number of

___

[4]One member, Bill Dickheiser, was located in Delaware. (D.I. 185 at ex. 32)

[5]The court denies Monsanto's request for jurisdictional discovery due to its two supplemental record submissions and the extensive discovery already performed. However, the court will consider the supplemental record produced and, therefore, grants Monsanto's two motions to supplement the record. (D.I. 310, 407)

short-term actions that Syngenta[6] can take to reduce the
penetration of Monsanto's product; (2) Consider the long term
strategic options available to Syngenta to redefine its
competitive position in the marketplace; and (3) Discuss
obstacles to impact, how to overcome these obstacles, and next
steps.  (D.I. 310, ex. A at 2)  The "Five Pillars" of the meeting
were discussed:  (1) "Create doubt about claims - Syngenta
disputing Monsanto's claims about the performance and safety of
its Roundup Ready trait;" (2) "Offer compelling alternatives -
Syngenta offering its conventional seed along with its selective
herbicide rather than Monsanto's Roundup Ready trait along with
Roundup;" (3) "Drive up switching costs - Syngenta offering its
customers financial incentives not to switch to Roundup Ready;"
(4) "Non-market activities - Syngenta initiating legal action to
impede Roundup Ready's growth;" and (5) "Redefine the playing
field - Syngenta would counter Monsanto's and Pioneer's strategy
of marketing their products as a complete package."  (D.I. 407,
ex. 1 at 10)  A Steering Committee was set up to "provide overall
direction" and "make decisions" regarding the project.  (D.I.
310, ex. A at 2)  A number of Syngenta AG employees attending the
Delaware meeting are on the Steering Committee.  (D.I. 310, ex. A

---

[6]The record is unclear as to whether the presentation was
directed to Syngenta AG or the Syngenta U.S. Companies.  The
facts were derived from a business presentation and there is no
clarification from Monsanto regarding what entities are
encompassed by the term "Syngenta."

at 2)

## 2.   Syngenta AG's Executive Committee

Syngenta AG's Executive Committee had the "final say" over whether a product was commercialized.[7]   (Id. at 7)   Approval was also required before going forward in a development stage.   (Id.) The final budget for a product required approval from the Executive Committee of Syngenta AG.   Before Syngenta Seeds could invest in a capital item or commit to a capital item, it had to get the approval of the Executive Committee in Switzerland. (D.I. 310, ex. A at 8)   The CEO of Syngenta AG and the Executive Committee also made decisions regarding the acquisition of Garst and Golden Harvest.   (D.I. 310, ex. A at 9, 10)

Syngenta AG's Executive Committee was allegedly involved in the development, approval and execution of a strategy to:   (1) Acquire certain rights to GA21 from Bayer AG; (2) Acquire seed companies (Garst and Golden Harvest) with access to Monsanto's GA21; (3) Obtain Monsanto GA21 from those seed companies; and (4) Sell the Monsanto GA21.   (D.I. 407, ex. 1 at 2)   Various Syngenta AG employees including David Jones (member of Syngenta AG's Executive Committee), Adrian Dubock (head of Mergers and Acquisitions for Syngenta AG), and Marian Flattery (head of Global IP and Licensing for Participations) participated in

---

[7]However, related specifically to GA21, the approvals in place were not addressed in the testimony.   (D.I. 310, ex. A at 7)

9

internal meetings leading up to the Bayer AG agreement.  (D.I. 407, ex. 1 at 4-5)  Furthermore, Syngenta AG had ultimate approval over the acquisition and licensing of Bayer's GA21 rights, Syngenta AG signed the Agreement for Scientific Evaluation of Transgenic Material transferring certain GA21 material to Syngenta AG, and Participations' Marian Flattery and Adrian Dubock signed the Acquisition Agreement with Bayer AG relating to certain rights in GA21 owned by Bayer AG.  (D.I. 407, ex. 1 at 5)  Mr. Dubock and Ms. Flattery also executed the subsequent Amendment to the Agreement for Scientific Evaluation of Transgenic Materials with Bayer AG.  (D.I. 407, ex. 1 at 5) Syngenta AG was involved in the communications surrounding the public announcement of the Agreement.  (D.I. 407, ex. 1 at 6)

Dr. Sorenson, head of Syngenta's[8] United States corn and soybean business, reported directly to Syngenta AG Executive Committee member Jeff Beard and his successor Michel Mack on many issues, including marketing strategy and financials of the business.  (D.I. 407, ex. A1, 113-14)  Dr. Sorenson spoke to Mr. Beard (and later Mr. Mack) an average of once a week or once every two weeks.  (D.I. 407, ex. A1 at 115)  Dr. Sorenson provided the Executive Committee with regular written reports on the United States corn seed business.  (D.I. 407, ex. A1 at 138-

---

[8]Again, due to the excerpting of the deposition testimony, the record is unclear as to what entity "Syngenta" encompasses in this context.

10

39)  Dr. Sorenson would fly to Switzerland to have in-person meetings to discuss, among other things, the strategy to enter into the glyphosate tolerant seed business.  (D.I. 407, ex. A1 at 115-16)

Dr. Sorenson made several presentations to Syngenta AG's Executive Committee regarding the United States corn and soy business, the Garst and Golden Harvest acquisitions, possibilities of joint ventures, and five year business plans, including one for the United States corn seed business.[9]  (D.I. 407, ex. A1 at 16-7)  Leadership teams with responsibilities for corn seed strategy in the United States included Syngenta AG employees.  (D.I. 407, ex. A1 at 17)

## III.  STANDARD OF REVIEW

When reviewing a motion to dismiss pursuant to Rule 12(b)(2), a court must accept as true all allegations of jurisdictional fact made by the plaintiff and resolve all factual disputes in the plaintiff's favor.  Once a jurisdictional defense has been raised, the plaintiff bears the burden of establishing with reasonable particularity that sufficient minimum contacts have occurred between the defendant and the forum state to support jurisdiction.  Provident Nat'l Bank v. California Fed.

---

[9]Tom Klevorn, head of NK Brands, made a presentation on GA21 to the Executive Committee.  Jeffrey Stein, director of Regulatory Affairs for North America, made a presentation to the Executive Committee on the regulatory assessment of GA21.  (D.I. 407 at 17)

11

Sav. & Loan Assoc., 819 F.2d 434, 437 (3d Cir. 1987). To establish personal jurisdiction, a party must allege facts sufficient to satisfy two requirements, one statutory and one constitutional. See Reach & Assoc., P.C. v. Dencer, 269 F.Supp. 2d 497, 502 (D. Del. 2003). With regard to the statutory requirement, the court must determine whether there is a statutory basis for jurisdiction under the forum state's long arm statute. Id. As for the constitutional basis, the court must determine whether the exercise of jurisdiction comports with the defendant's right to due process. Id. In cases involving foreign parties, the Supreme Court has stated that "[g]reat care and reserve should be exercise when extending our notions of personal jurisdiction into the international field." Asahi Metal Indus. Co. v. Superior Court, 480 U.S. 102, 115 (1987)

## IV. DISCUSSION

The Delaware long arm statute permits the exercise of personal jurisdiction over a nonresident who, in person or through an agent:

    (1)  Transacts any business or performs any character of work or service in the State;
    (2)  Contracts to supply service or things in this State;
    (3)  Causes tortious injury in the State by an act or omission in this State;
    (4)  Causes tortious injury in the State or outside of the State by an act or omission outside the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State;

    (5)    Has an interest in, uses or possesses real
           property in the State; or
    (6)    Contracts to insure or act as surety for, or on,
           any person, property, risk, contract, obligation
           or agreement located, executed or to be performed
           within the State at the time the contract is made,
           unless the parties otherwise provide in writing.

10 Del. C. § 3104(c).  Pursuant to subsection (c)(1)-(3) and (5)-

(6), specific jurisdiction may be established if the cause of

action arises from contacts with the forum.  Applied Biosystems,

Inc. v. Cruachem, LTD, 772 F.Supp. 1458, 1466 (D. Del. 1991).

Subsection (c)(4) provides for general jurisdiction, which

requires a greater extent of contacts, but which provides

jurisdiction even when the claim is unrelated to the forum

contacts.  Id.

     It is apparent from the record that the individual conduct

of Syngenta AG and Participations does not satisfy the

jurisdictional requirements cited above.  Syngenta AG and

Participations are holding companies that do not conduct business

in Delaware.  They are not registered to do business in Delaware.

They do not produce, market or sell corn seed or any product in

Delaware.  They do not have a bank account, a telephone number or

an address in Delaware.  They do not have "contacts with this

state that are so extensive and continuing that it is fair and

consistent with state policy to require that the defendant appear

here and defend a claim."  Red Sail Easter Ltd Partners, L.P. v.

Radio City Music Hall Productions, Inc., 1991 WL 129174, at *3

                                13

(Del. Ch. July 10, 1991).

The only personal contact these parties have had with Delaware is the meeting that took place in this State in May 2002. Certainly such a limited activity is insufficient to establish general jurisdiction. Likewise, this court cannot assert specific jurisdiction over Syngenta AG and Participations based on their conduct at the 2002 meeting. Although general marketing strategies were discussed, there is no record evidence that the acts identified in Monsanto's counterclaims took place in Delaware at that meeting.

The question remains whether the Syngenta U.S. Companies should be considered "agents" of Syngenta AG and Participations and, if so, whether the activities of the Syngenta U.S. Companies within the State of Delaware satisfy the requirements of the Delaware long arm statute.

## A.    Agency

Monsanto asserts that the Syngenta U.S. Companies are general agents of Syngenta AG and Participations and, therefore, their acts confer personal jurisdiction in Delaware. As explained in Applied Biosystems, Inc. v. Cruachem, LTD, 772 F.Supp. 1458 (D. Del. 1991), the agency theory

> examines the degree of control which the parent
> exercises over the subsidiary. . . .  The factors
> relevant to this determination include the extent of
> overlap of officers and directors, methods of
> financing, the division of responsibility for day-to-
> day management, and the process by which each

14

> corporation obtains its business.  No one factor is
> either necessary or determinative; rather it is the
> specific combination of elements which is significant.
> . . .
>      If any agency relationship is found to exist,
> courts will not ignore the separate corporate
> identities of parent and subsidiary, but will consider
> the parent corporation responsible for specific
> jurisdictional acts of the subsidiary.

Id. at 1463.  "An agency relationship alone, however, is not

sufficient to confer jurisdiction.  Rather, the result of finding

such an agency relationship is simply that we may attribute

certain of [the Syngenta U.S. Companies'] acts to [Syngenta AG

and Participations] in assessing whether the requirements of the

Delaware long-arm statute have been satisfied."  Id. at 1464.

     Monsanto relies on several aspects of the relationship

between the parties to establish that the Syngenta U.S. Companies

are general agents of Syngenta AG and Participations.  More

specifically, Monsanto asserts that there is:  (1) An overlap of

some officers and directors; (2) Transferring of employees; and

(3) Syngenta AG's involvement in formulating and approving

strategic policy (e.g., meetings with the Executive Committee

regarding the United States strategy and budgetary issues), major

capital expenditures (e.g., acquiring GA21 rights), and key

decisions (e.g., the Garst and Golden Harvest acquisitions).

     Under Delaware case law, however, the facts asserted by

Monsanto are not sufficient to establish an agency relationship.

See Akzona Inc. v. E.I. Du Pont Nemours & Co., 607 F.Supp. 227

(D. Del. 1984);[10] <u>Sears, Roebuck & Co v. Sears</u>, 744 F.Supp. 1297
(D. Del. 1990).[11]  The facts of record do not reflect a situation
where the parent company is involved in manufacturing or
production activities and the subsidiary is acting as the
parent's distributor or sales agent.  See <u>C.R. Bard Inc. v.
Guidant Corp</u>, 997 F.Supp. 556, 561 (D. Del. 1998).  The Syngenta
U.S. Companies make their own decisions about day-to-day
activities, and design, manufacture, market and distribute the
GA21 corn.  See <u>Akzona Inc.</u>, 607 F.Supp. at 238.[12]  No agency
relationship has been demonstrated.

---

[10]The <u>Akzona</u> court found no agency relationship between a
parent and its wholly owned subsidiary, where there was some
overlap between the board of directors, references to
subsidiaries as divisions of the parent in the annual report,
requirement that parent approve capital expenditures by
subsidiaries exceeding $850,000, references in board meetings and
reports to the development of products as the parent company's
"decision" or "project," parent company taking credit for the
product project in its annual report, parent company's
negotiation with an agency of the Dutch government to set up a
joint venture, parent company's guarantee of 50% of the Dutch
government loans to the subsidiaries, and parent company's
participation in the decision to bring a declaratory judgment.

[11]The <u>Sears</u> court found no agency relationship when there
was no evidence that the subsidiary could enter into negotiations
or binding agreements for the parent or act for the parent in any
other way in Delaware.

[12]The meeting in Delaware is the only event that could
arguably reflect an agency relationship if, at that meeting, the
details of the alleged misappropriation plan were explored.  As
noted above, the record is devoid of any evidence that suggests
the participants at the Delaware meeting discussed a
misappropriation plan or any actions that are alleged to
constitute the misappropriation.

### B.   Delaware Long Arm Statute

Even if an agency relationship were shown, Monsanto has not carried its burden to demonstrate that the activities directed or controlled by Syngenta AG and Participations are the jurisdictional acts of Syngenta AG and Participations.[13]   See C.R. Bard Inc, 997 F.Supp. at 560 ("The agency theory requires not only that the precise conduct shown to be instigated by the parent be attributable to the parent, but also that such conduct satisfy § 3104(c)(1)."). "When applying the agency theory, a court should focus its inquiry on the arrangement between the parent and the subsidiary, the authority given in that arrangement, and the relevance of that arrangement to the . . . claim." Id. at 560.  The counterclaims at issue are:  (1) Reverse passing off under the Lanham Act; (2) Violations of the Delaware Deceptive Trade Practices Act; (3) False advertising under the Lanham Act; and (4) Tortious interference with a contract.

### 1.   Specific Jurisdiction § 3104(c)(1), (2), (3)

Jurisdiction under § 3104(c)(1) or (2) can be obtained if, through the Syngenta U.S. Companies, Syngenta AG and Participations have conducted any business or contracted to supply services or things in Delaware.  Section 3104(c)(3)

---

[13]For this reason, the court need not reach the constitutional analysis.

17

provides for jurisdiction when a nonresident or its agent has caused tortious injury in Delaware by an act or omission that occurred in this State.  Applied Biosystems, 772 F.Supp. at 1467.

It is established that the incorporation of the Syngenta U.S. Companies in Delaware would provide specific jurisdiction over any tort causes of action related to the act of incorporation.  See Applied Biosystems at 1467.  However, "the mere fact that a non-Delaware corporation owns a Delaware subsidiary is not sufficient in itself to justify Delaware's exercise of personal jurisdiction over the non-Delaware parent." Ace & Co. v. Balfour Beatty PLC, 148 F.Supp.2d 418, 422-23 (D. Del. 2001).  None of the counterclaims rise from the act of incorporation.

The reverse passing off claim and deceptive trade practices claim are based on the sale and marketing of GA21 corn seed without acknowledging Monsanto as the source of the GA21 event. There is no evidence that Syngenta AG and Participations direct or control sales or marketing in Delaware.  To the contrary, the evidence that the Syngenta U.S. Companies report to and update the Executive Committee regarding these decisions tends to substantiate the opposite conclusion.  The 2002 meeting is equally unavailing to establish jurisdiction.  The 2002 meeting in Delaware is not related to and does not give rise to any of the counterclaims.  In fact, the meeting took place several years

18

prior to the relevant time period of the counterclaims.  Finally,
the tortious interference claim is based on a contract between
Syngenta Seeds, Inc. and Advanta USA, Inc. and has no
relationship to Delaware, as it was neither negotiated nor signed
in Delaware.

    Monsanto also asserts a stream of commerce theory, citing
A.V. Imports, Inc. v. Col De Fratta, 171 F.Supp.2d 369 (D.N.J.
2001).[14]  However, as the court in A.V. Imports clearly states,
"the mere placement of a product into the stream of commerce with
an awareness that it may end up in a specific state is not enough
to establish minimum contacts."  Id. at 372 (citing Asahi Metal
Industry Co., 480 U.S. at 107).  Monsanto has produced no
evidence that Syngenta AG or Participations, or any of the
Syngenta U.S. Companies, "purposefully availed" themselves of the
forum state.

    Press releases and similar communications do not give rise
to personal jurisdiction unless they are "expressly aimed" at the
relevant forum.  See IMO Indus. v. Kiekert AG, 155 F.3d 254, 265
(3d Cir. 1998).  Syngenta International AG issued a press release
on May 12, 2004 from its Swiss headquarters, but it was not
"specifically directed toward Delaware residents" nor was it

---

[14]The court is not confident this precedent is applicable to
the case at bar, but need not decide this issue as there is no
showing that Delaware was in any way targeted, as is required
under this theory.

"part of a 'sustained promotional campaign'" in Delaware.
Applied Biosystems, 772 F.Supp. at 1467; Virgin Wireless, 201
F.Supp.2d at 299 (finding a single press release attributed to
English company cannot justify personal jurisdiction in
Delaware).

    Finally, Monsanto asserts that the filing of the antitrust
litigation in Delaware serves as a basis for personal
jurisdiction.  The court finds this argument unpersuasive.  The
holding in Mobil Oil Corp. v. Advanced Envtl. Recycling Techs.,
833 F.Supp. 437 (D. Del. 1993), establishes that the filing of a
lawsuit may be relevant to establishing jurisdiction when the
claim at issue is sham litigation.  Again, the filing of the
lawsuit bears no relevance to the counterclaims at issue and,
therefore, cannot serve as a basis for personal jurisdiction.

### 2.  General Jurisdiction § 3104(c)(4)

    Section 3104(c)(4) provides for general jurisdiction in tort
cases.  Jurisdiction is authorized if Syngenta AG or
Participations, through its agents, "regularly does or solicits
business, engages in any other persistent course of conduct in
the State or derives substantial revenue from services, or things
used or consumed in the State."

    That the subsidiaries are incorporated in Delaware is not
imputed to Syngenta AG and Participations.  See Applied
Biosystems, 772 F.Supp. 1458, 1469.  The act of incorporating a

20

subsidiary in Delaware is not enough to confer general
jurisdiction in this instance because it does not appear that
Syngenta AG and Participations have engaged in a pattern of
corporate dealings under Delaware law.  See Sears, 744 F.Supp. at
1306 (finding that the defendant only owned one Delaware
subsidiary and had not engaged in a pattern of corporate dealings
in Delaware).  In Altech Indus., Inc. v. Al Tech Speciality Steel
Corp., 542 F.Supp. 53 (D. Del. 1982), the court held it could
exercise jurisdiction over a non-Delaware corporation under §
3104(c)(4) where:  (1) The defendant owned eighty-two
subsidiaries and a "vast majority" of these were incorporated in
Delaware; and (2) The defendant had "utilized the benefits of the
Delaware corporation law in various ways," including conducting
mergers and acquisitions with, and amending the articles of
incorporation of, its many subsidiaries.  Id. at 55.  The court
does not find that Syngenta AG and Participations have availed
themselves of the general jurisdiction of Delaware.

     C.   **Fed. R. Civ. P. 4(K)(2)**

     When a foreign defendant does not have sufficient minimum
contacts with any single forum to comport with due process, Rule
4(k)(2) allows an alternate jurisdictional basis to pursue a
claim arising under federal law, where defendant has sufficient
nationwide contacts.

     If the exercise of jurisdiction is consistent with the
     Constitution and laws of the United States, serving a

                              21

> summons or filing a waiver of service of process is
> also effective, with respect to claims arising under
> federal law, to establish personal jurisdiction over
> the person of any defendant who is not subject to the
> jurisdiction of the courts of general jurisdiction of
> any state.

Fed. R. Civ. P. (4)(k)(2). The court must first determine that:
(1) The case arises under federal law, and is not pending before
the court pursuant to the court's diversity jurisdiction; and (2)
The foreign defendant lacks sufficient contacts with any single
state to subject it to personal jurisdiction there. United
States v. Int'l Brotherhood of Teamsters, 945 F.Supp. 609, 617
(D. Del. 1997). The court can then ascertain whether plaintiff
has demonstrated that defendant has sufficient aggregate contacts
with the United States to comport with constitutional notions of
due process. Id.

The court's analysis stops at the first step. The court
finds that Monsanto has not satisfied its burden of proving the
lack of state-specific contacts. See CFMT, Inc. v. Steag
Microtech, Inc., 1997 WL 313161 (D. Del. 1997). Rule 4(k)(2)
"provides a narrow exception which may subject an alien defendant
to a federal court's personal jurisdiction." Id. at *7. "To
satisfy this requirement, plaintiffs are required to make an
affirmative representation that the defendant is not subject to
the general jurisdiction of any state court." Id.; Telcordia
Techs. v. Alcatel S.A., 2005 WL 1268061, at *5 (D. Del. May 27,
2005)("The court agrees with the Third Circuit district courts

22

that have addressed the negation requirement and concludes that
[the plaintiff] bears the burden of demonstrating that [the
defendant] is not subject to jurisdiction in any state.").
While Monsanto asserts that it can argue Rule 4(k)(2) in the
alternative of arguing that Delaware has personal jurisdiction,
the court finds that Monsanto has not affirmatively represented
that Syngenta AG and Participations are not subject to the
jurisdiction of any state.  Instead, Monsanto has tried only to
shift the burden to Syngenta AG and Participations by arguing
that, if the court finds no jurisdiction lies in Delaware, then
no jurisdiction lies in any other state and Rule 4(k)(2) applies.
See In re Lupron Marketing & Sales Practices Litig., 245
F.Supp.2d 280, 302-03 (D. Mass. 2003).  The only basis asserted
by Monsanto that no jurisdiction lies in any other state is that
Monsanto is unable to find any basis for jurisdiction through
review of the discovery record and publically available sources.
Unfortunately, Monsanto does not elaborate on these bald
assertions.  Furthermore, since the filing of its original brief,
Monsanto has submitted two motions to supplement the record with
extensive deposition testimony.  Yet, no evidence was presented
in furtherance if its argument that Syngenta AG and
Participations are not subject to jurisdiction in any state.
Rather, Monsanto has extensively asserted that jurisdiction is
proper in Delaware.  Monsanto has also produced some tangential

23

evidence that meetings have taken place in the United States

other than Delaware, offices exist in states other than Delaware,

and the GA21 corn is sold in the United States other than

Delaware.  The court is unwilling to merely take Monsanto's

assertion that if jurisdiction does not lie in Delaware,

jurisdiction does not lie anywhere else in the country.  Monsanto

has not fulfilled its burden in showing this element of Rule

4(k)(2); as a result, the court need not perform further

analysis.

## V.   CONCLUSION

For the reasons discussed above, Syngenta AG and Syngenta

Participations AG's motion to dismiss for lack of personal

jurisdiction is granted.  An order consistent with this

memorandum opinion shall issue.