~~producers lack the ability to offer a range of traited corn seed choices in competition with Monsanto. This diminished competitiveness further increases Monsanto's market power.~~

~~129. In May 2004, Monsanto effectively terminated Syngenta's license and supply agreement with Holden's for the supply of foundation corn seeds, having failed to negotiate a renewal in good faith. On information and belief, the Holden's agreement was terminated for the purpose of preventing Syngenta from expanding its own foundation seed business.~~

~~130. On information and belief, in connection with Monsanto's acquisition of DeKalb, Monsanto undertook to provide Seed Companies access to Holden's foundation seeds on a non-discriminatory basis for the purpose of converting Holden's lines with third-party corn traits. Monsanto's non-discrimination undertaking will expire in December 2005. Holden's newly offered foundation seed contracts reflect that Monsanto will not honor its non-discrimination obligations after that date.~~

~~131. As discussed above, *see* paragraphs 82 to 110, Monsanto has enforced its GA21 License and instructed seed companies not to deal with Syngenta and not to provide Syngenta with GA21 foundation seeds.~~

~~132. As discussed above, *see* paragraphs 111 to 113, Monsanto has entered into exclusionary bundled incentive programs. These incentive programs have the effect of foreclosing access to customers to Syngenta and other foundation seed providers from key segments of the market.~~

~~133. In April 2004, after learning of Syngenta's acquisition of GA21, Monsanto renewed an early effort to acquire Advanta for the purpose of blocking Syngenta. Advanta originally was offered for sale in mid-2003. In April 2004, Monsanto obtained exclusive negotiation rights with Advanta and eventually made an increased offer. On information and~~

~~belief, Monsanto knew of Syngenta's interest in Advanta and its acquisition of GA21 intellectual property rights from Bayer CropScience when it made its revised offer and hoped to block Syngenta's acquisition and access to GA21 inventory at Garst. Monsanto's unlawful interference increased the cost of Syngenta's entry through an increased purchase price and other expenses.~~

~~134. Monsanto's conduct to maintain its monopolies in glyphosate-tolerant corn traits, ECB-resistant corn traits and stacked corn traits will further its ability to control prices and exclude competitors from the market for foundation seeds.~~

~~135. Monsanto's conduct creates the dangerous probability that it will achieve a monopoly position in the foundation corn seed market.~~

~~136. On information and belief Monsanto has engaged in other unlawful conduct in order to prevent Syngenta's entry and maintain its monopolies in glyphosate-tolerant corn, ECB-resistant corn, and stacked corn traits, and to attempt to gain a monopoly in the market for foundation corn seed.~~ ~~4.~~    **Monsanto's Long-Standing History of Anticompetitive Conduct**

<u>120.</u>    ~~137.~~ Monsanto's pattern of anticompetitive conduct dates back to the mid 1990s and has involved additional wrongful conduct, including, among other things: (i) refusing to grant Syngenta access to certain technology for its ECB-resistant corn trait (Bt11) unless Syngenta agreed to refrain from promoting or recommending the fact that its ECB-resistant corn trait contained a glufosinate-resistant trait, thereby inhibiting sales of stacked corn traits and inhibiting sales of glufosinate-tolerant traits; and (ii) refusing to grant Syngenta access to glyphosate-tolerant corn events in part because Syngenta declined to adopt Monsanto's grower license and technology fee pricing structure for Syngenta's ECB-resistant corn and/or glyphosate-tolerant soybean seed products and otherwise retaliating against Syngenta in numerous ways for such refusal. By

imposing and attempting to impose such requirements, Monsanto sought, among other things, to remove a potential threat to Monsanto's competitive dominance of its glyphosate-tolerant corn traits and otherwise entrench its monopolies in the other trait and stacked trait markets. These activities are consistent with Monsanto's current coercive practices that impede Syngenta's or any other competitor's ability to successfully enter and compete in the markets for glyphosate-tolerant corn traits, ECB-resistant corn traits, or stacked glyphosate-tolerant and ECB-resistant corn traits.

## RELEVANT MARKETS AND MONSANTO'S MONOPOLY POWER

*A.    Glyphosate-Tolerant and Stacked Corn Traits*

121.    ~~138.~~ The licensing of glyphosate-tolerant corn traits is a line of commerce or relevant product market within the meaning of the antitrust laws. A related relevant market or submarket is the licensing of glyphosate-tolerant corn traits stacked with another key corn trait, such as ECB-resistance.

122.    ~~139.~~ Glyphosate-tolerant corn traits provide a unique product to developers of inbred or foundation corn seed lines. There are no substitutes for glyphosate-tolerant corn traits for these customers. Glyphosate-tolerant corn traits stacked with another corn trait provide a performance bundle of traits to developers of inbred or foundation corn seed lines. There are no substitutes for stacked glyphosate-tolerant corn traits for these customers.

123.    ~~140.~~ No reasonable substitutes for glyphosate-tolerant corn traits or stacked glyphosate-tolerant corn traits are available to developers of inbred or foundation seed lines. A significant, non-transitory increase of the fees associated with the licensing of Monsanto's glyphosate-tolerant corn trait or stacked glyphosate-tolerant corn traits would not result in foundation seed companies or other customers purchasing other traits.

124.    ~~141.~~ The derived demand for the package of non-glyphosate-tolerant corn and selective herbicides does not provide adequate discipline for the package of glyphosate-tolerant

corn or stacked glyphosate-tolerant corn traits and glyphosate and other pesticides. Monsanto has charged monopoly rents in the price of glyphosate-tolerant corn traits and stacked glyphosate-tolerant corn traits. Unimpeded competition from Syngenta's entry would substantially reduce the monopoly price of both.

125. ~~142.~~ The United States is a relevant geographic market within the meaning of the antitrust laws. Before genetically modified corn can be commercialized in the United States, it must receive regulatory approval from U.S. governmental agencies. The U.S. Department of Agriculture regulates the use of biotechnology traits in crops planted in the United States. The U.S. Environmental Protection Agency regulates the use of both plant incorporated protectants and chemical herbicides in the United States. Other factors, such as the U.S. distribution system and other demand characteristics, support a U.S. geographic market.

126. ~~143.~~ Monsanto is the dominant supplier of glyphosate-tolerant corn traits and stacked glyphosate-tolerant corn traits in the United States. Monsanto possesses monopoly power in both, where its market share is at least 99%. Monsanto has the power to control prices and exclude competition in the relevant markets.

127. ~~144.~~ Substantial barriers to entry and expansion exist in the licensing of glyphosate-tolerant corn traits and stacked glyphosate-tolerant corn traits. The considerable time and expense to develop a competing corn trait and obtain the necessary regulatory approvals are strong barriers to entry. Importantly, Monsanto's anti-stacking provision and bundling of incentives provide additional barriers to entry for any competitor.

128. ~~145.~~ Monsanto's market domination and the existence of entry barriers are evidenced by its high licensing fees.

**B.      *European Corn Borer-Resistant and Stacked Corn Traits***

129. ~~146.~~ The licensing of ECB-resistant corn traits is a line of commerce or relevant market within the meaning of the antitrust laws. A related relevant market or submarket is the licensing of ECB-resistant corn traits stacked with another key corn trait, such as glyphosate-tolerance.

130. ~~147.~~ ECB-resistant corn traits differ from other non-transgenic insect-resistant corn traits that provide protection against other crop pests. ECB-resistant corn traits offer superior performance at lower total cost versus traditional chemical insecticides. ECB-resistant corn traits stacked with another corn trait provide a performance bundle of traits to developers of inbred or foundation corn seed lines. There are no substitutes for stacked ECB-resistant corn traits for these customers.

131. ~~148.~~ No reasonable non-transgenic insect-resistant corn trait substitutes are available to developers of inbred or foundation corn lines and to purchasers that seek the crop yield to cost value that ECB-resistant corn traits provide. A significant, non-transitory increase by Monsanto of the fees associated with the licensing of its ECB-resistant corn trait or stacked ECB-resistant corn traits would not result in customers licensing other insect-resistant corn traits.

132. ~~149.~~ The derived demand of using non-ECB-resistant corn traits plus traditional insecticides does not provide sufficient discipline over the price of ECB-resistant corn traits.

133. ~~150.~~ Monsanto has charged monopoly rents in the price of ECB-resistant corn traits and stacked ECB-resistant corn traits. Syngenta's expansion would substantially reduce the monopoly price of that trait or stack.

134. ~~151.~~ The United States is a relevant geographic market within the meaning of the antitrust laws. Before genetically modified corn can be commercialized in the United States, it must receive regulatory approval from U.S. governmental agencies. The U.S. Department of

Agriculture regulates the use of biotechnology traits in crops planted in the United States. The U.S. Environmental Protection Agency regulates the use of both plant incorporated protectants and chemical insecticides in the United States. Other factors, such as the U.S. distribution system and other demand characteristics, support a U.S. geographic market.

135.    ~~152.~~ Monsanto is the dominant supplier of ECB-resistant corn traits and stacked ECB-resistant corn traits in the United States. Monsanto possesses monopoly power in the market for licensing of ECB-resistant corn traits and stacked ECB-resistant corn traits, where its market share is at least 80%. Monsanto has the power to control prices and exclude competition in the relevant market.

136.    ~~153.~~ Substantial barriers to entry and expansion exist in the licensing of ECB-resistant corn traits and stacked ECB-resistant traits. The considerable time and expense to develop a competing corn trait and obtain the necessary regulatory approvals are strong barriers to entry. Importantly, Monsanto's anti-stacking provisions and bundling of incentives provide additional barriers to entry for any competitor.

137.    ~~154.~~ Monsanto's market domination and the existence of entry barriers are evidenced by its high licensing fees.

~~C.    Foundation Corn Seeds~~

~~155.    The license/sale of foundation corn seed is a line of commerce or relevant product market within the meaning of the antitrust laws.~~

~~156.    No reasonable substitute for foundation corn seed is available to hybrid seed companies, who need access to foundation seed in order to produce finished seeds. A significant, non-transitory increase in the prices of foundation corn seed would not result in customers purchasing other products.~~

~~157.   Substantial barriers to entry and expansion exist in the foundation corn seed market. The considerable time and expense to develop foundation seed lines are strong barriers to entry. It takes several years to develop each foundation seed line.~~

~~158.   The United States is a relevant geographic market within the meaning of the antitrust laws, because foundation seed producers outside the United States are not a reasonable alternative source for hybrid seed producers. There are no significant imports of foundation seeds into the United States and there is substantial regulation of imports.~~

~~159.   Monsanto is the leading producer of corn foundation seeds in the United States. It possesses market power in the corn foundation seed market; Monsanto's share of all corn foundation seed produced is approximately 45% and its share of all corn foundation seed commercially sold or licensed is about 70%.~~

~~160.   There is a dangerous probability that Monsanto will gain monopoly power in the market for corn foundation seeds.~~

~~161.   Monsanto's market domination and the existence of entry barriers are evidenced by the increasing prices of foundation corn seed and the exclusionary practices employed.~~

~~162.   The most likely source of effective competition to Monsanto's monopoly or market power in the relevant markets is through Syngenta's unimpeded entry as a second competitor for licensing the relevant traits and producing corn foundation seeds. Such entry would threaten to take significant revenues away from Monsanto.~~

**EFFECTS OF DEFENDANTS' UNLAWFUL SCHEME**

1.   **Effects on the Glyphosate-Tolerant and Stacked Corn Trait Markets**

<u>138.</u>   ~~163.~~ Monsanto's unlawful conduct has caused and will cause substantial harm to competition in the market for the licensing of glyphosate-tolerant corn traits and stacked

glyphosate-tolerant corn traits. Absent Monsanto's exclusionary conduct and practices, Syngenta's entry would have created effective competition in the markets for the licensing of glyphosate-tolerant corn traits. Syngenta's entry would have introduced much-needed competition to these markets, increasing market efficiency, providing greater access to traits, and increasing choice and lower costs for Seed Companies, foundation seed companies and growers. If Monsanto is permitted to maintain its sham litigation and continue its campaign of unlawful tactics and licensing practices, Syngenta's entry and ability to compete successfully in the glyphosate-tolerant corn trait and stacked traits markets will continue to be harmed.

139. ~~164.~~ Monsanto's wrongful acts to exclude Syngenta from glyphosate-tolerant corn trait licensing have caused injury to Syngenta's business in the form of increased expenses and delay, and adverse effects on customers as well as lost revenues. Monsanto's exclusionary conduct has adversely affected Syngenta's ability to gain market acceptance for and confidence in its entry, depriving Syngenta of potential profits.

140. ~~165.~~ By delaying Syngenta's entry and impeding its ability to compete, Monsanto has harmed, and will continue to harm, competition and cause injury at all levels of distribution: foundation seed producers, hybrid seed producers, dealers and retailers, and end-use growers. Monsanto's wrongful acts have forced Seed Companies, foundation seed producers and growers to pay higher fees than would prevail in a competitive environment.

2. **Effects on the ECB-Resistant and Stacked Corn Trait Markets**

141. ~~166.~~ Monsanto's wrongful acts have also injured and will injure competition in the market for the licensing of ECB-resistant corn traits and stacked ECB-resistant corn traits. Monsanto's control of ECB-resistant corn traits licensing leaves Seed Companies and end-use growers with effectively only one source from which to license ECB-resistant corn traits or

stacked traits. If Monsanto is permitted to maintain its sham litigation and continue its campaign of unlawful tactics and licensing practices, Syngenta's ability to expand its licensing of ECB-resistant traits and stacks to offer a real alternative to Monsanto will be substantially hampered.

142.    ~~167.~~ Delay of Syngenta's expansion has harmed and will continue to harm competition and cause injury at all levels of distribution: foundation seed producers, hybrid seed producers, retailers and dealers, and end-use growers. Seed Companies, foundation seed producers and growers are deprived of a competitive alternative to Monsanto, and pay higher fees than would prevail in a competitive environment.

143.    ~~168.~~ Monsanto's wrongful acts have caused injury to Syngenta's business in the form of increased expenses and delay, as well as lost revenues. If permitted to persist, Monsanto's exclusionary conduct will deprive Syngenta of potential profits.

~~3.    **Effects on the Foundation Corn Seed Market**~~

~~169.    Monsanto's wrongful acts have also injured and will injure competition in the market for foundation corn seeds. By foreclosing competition in corn trait licensing, Monsanto reduces competition and enhances its market power in the foundation corn seed market by excluding competition from non-Monsanto-trait bearing foundation corn seeds, aiding Monsanto's attempt to monopolize the foundation seed market. Absent Monsanto's conduct, traits not controlled by Monsanto could be licensed to foundation seed companies (and used in Syngenta's foundation seed business) to compete with Monsanto's foundation seed operations. As a result of Monsanto's unlawful action, Seed Companies and growers are deprived of a competitive alternative to Monsanto, and pay higher fees than would prevail in a competitive environment.~~