# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SYNGENTA SEEDS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> MONSANTO COMPANY and <br> MONSANTO TECHNOLOGY LLC, <br><br> Defendants. | ) <br> ) <br> ) <br> ) C.A. No.: 04-908-SLR <br> ) <br> ) <br> ) <br> ) **JURY TRIAL DEMANDED** <br> ) <br> ) <br> ) |

## THIRD AMENDED COMPLAINT

Plaintiff Syngenta Seeds, Inc. ("Syngenta"), by and through its undersigned attorneys, demands a trial by jury and alleges on knowledge as to itself and its own acts and on information and belief as to all other matters, as follows:

### NATURE OF THE ACTION

1. This case arises from defendants Monsanto Company and Monsanto Technology LLC's (together "Monsanto") improper and illegal monopolization and attempted monopolization in the supply chain for biotechnology corn seed used by farmers throughout the United States. Since the 1990s, Monsanto has maintained and increased its monopoly power in multiple markets through a series of coercive tactics and exclusive dealing arrangements designed to keep out all competitors. Monsanto's illegal and improper efforts have increased dramatically since May 2004, when Syngenta's affiliate publicly announced its acquisition of key technology and other assets that facilitated Syngenta's entry into these markets in competition with Monsanto for the 2005 selling season. Immediately following that announcement, Monsanto launched a scorched-earth campaign to cut off Syngenta's access to

the market and destroy key assets that would facilitate Syngenta's entry and ability to compete effectively. This attempt to thwart Syngenta's entry unlawfully maintains and attempts to create monopolies in multiple markets in violation of Section 2 of the Sherman Act.

2.  Monsanto's domination and control of the corn seed supply chain begins with Monsanto's monopolies in the markets for biotechnology "traits." Through the use of biotechnology, it is possible to introduce new genetic characteristics, or traits, into seeds in order to add desirable characteristics to crops. For example, biotechnology seed traits permit farmers to grow corn or soybeans tolerant to a leading non-selective herbicide, glyphosate. This "glyphosate-tolerant" trait allows growers to spray glyphosate herbicide over the entire crop, and kill all weeds, without risking any damage to the corn or soybean crop. Other biotechnology seed traits permit farmers to plant corn that is resistant to certain pervasive insects that are harmful to the crops, such as corn rootworm and the European corn borer.

3.  Monsanto is a monopolist in the markets for every biotechnological corn trait available in the United States market. Over the past several years, Monsanto has controlled 100% of the market for the glyphosate-tolerant corn trait, 100% of the market for the corn rootworm-resistant corn trait, and at least 84% of the market for the European corn borer-resistant trait. Although Syngenta has recently attempted to enter in competition with Monsanto, Syngenta's efforts have been impeded by Monsanto's anticompetitive acts, with the result that Monsanto maintains at least 99% of the market for the glyphosate-tolerant corn trait, 100% of the market for the corn rootworm-resistant corn trait, and at least 80% of the market for the European corn borer-resistant trait. Monsanto also controls 100% of the market for the glyphosate-tolerant soybean trait.

4. Monsanto has maintained its monopoly power through a long-running series of exclusionary and unlawful practices. Monsanto has denied seed companies access to these traits unless the seed companies agree to enter restrictive licenses designed to prevent competition. These licenses impede the seed companies' ability to deal in the competitive traits of any other company, including Syngenta. The licenses impose massive financial penalties on seed companies unless a very high percentage of seeds they sell contain Monsanto traits, making it impossible for Syngenta and other potential competitors to enter and compete effectively in the trait markets.

5. Monsanto also has unlawfully maintained and enhanced its monopoly power through its "bundling" agreements. As a result of these agreements, any seed company that sells a meaningful amount of seeds containing a single trait provided by any company other than Monsanto faces significant penalties from Monsanto across all traits licensed by Monsanto. For example, many seed companies grow and sell glyphosate-resistant corn seeds, rootworm-resistant corn seeds, European corn borer-resistant corn seeds and glyphosate-resistant soybean seeds. If a seed company does not sell a minimum percentage of seeds containing Monsanto traits for *each and every* one of those product lines, it will lose discounts (known in the industry as "seed service fees") for *all* Monsanto traits. Monsanto thus has used its monopoly power in several markets to create a virtually impenetrable barrier to entry for any competitor seeking to enter any one of those trait markets.

6. Although Monsanto has engaged in unlawful conduct over many years, its conduct has increased drastically since May 2004. On May 12, 2004, Syngenta's affiliate announced that it acquired intellectual property rights to "GA21," a glyphosate-resistant corn trait. Syngenta's affiliate also announced its intent to acquire the corn and soybean seed

3

businesses of Garst Seeds and the Golden Harvest Group. As a result of these acquisitions, Syngenta poses a substantial competitive threat to Monsanto's monopoly positions. Absent Monsanto's unlawful and anticompetitive conduct, Syngenta would have been able to compete effectively with a substantial alternative source of corn seed containing the glyphosate-tolerant trait and other key traits.

7. Since learning of Syngenta's imminent entry into the glyphosate-tolerant trait market, Monsanto has launched a wide-ranging attack designed to delay and obstruct Syngenta's entry. Monsanto's new unlawful tactics include:

- filing two baseless patent infringement lawsuits;
- misrepresenting Syngenta's ability to commercialize GA21 to discourage seed companies from dealing with Syngenta;
- misrepresenting its rights and intimidating seed companies to cease all GA21 production and destroy GA21 inbred inventories;
- accelerating the withdrawal of GA21 seeds from the market and engaging in other tactics to remove GA21 seeds from distribution channels; and
- pressuring foundation seed companies, seed companies, and brokers to deal exclusively with Monsanto and not do business with Syngenta, particularly with respect to inbreds containing the GA21 trait.

8. By its conduct, Monsanto seeks to maintain its monopoly in key corn traits. If permitted to enter and compete on a level playing field, Syngenta would be the first alternative source for the glyphosate-tolerant corn trait, and the first competitive source for the European corn borer-resistant corn trait stacked with a glyphosate tolerant trait.

9. The antitrust laws flatly prohibit Monsanto's anticompetitive conduct and the resulting antitrust injury to plaintiff, seed companies, farmers and consumers. Syngenta brings this action in order to remove the artificial and unlawful barriers erected by Monsanto, permit

4

Syngenta to compete fully and fairly in the corn traits markets, and to obtain compensation for the injuries caused by Monsanto's illegal acts.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction under 28 U.S.C. § 1337 (commerce and antitrust regulation) and 28 U.S.C. § 1331 (federal question), as this action arises under Section 2 of the Sherman Act (15 U.S.C. § 2), Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26) and Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).

11. This Court has personal jurisdiction under Section 12 of the Clayton Act (15 U.S.C. § 22). Monsanto Company and Monsanto Technology LLC are both inhabitants of and may be found in this district. Both companies are organized and existing under the laws of the State of Delaware.

12. Venue is proper because Monsanto Company and Monsanto Technology LLC reside within this judicial district as provided in 28 U.S.C. § 1391(b) and (c) and as provided in Sections 4 and 12 of the Clayton Act (15 U.S.C. §§ 15 and 22).

## THE PARTIES

13. Plaintiff Syngenta Seeds, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 7500 Olson Memorial Highway, Golden Valley, Minnesota 55427. Syngenta Seeds, Inc. is a producer of commercial seeds, including field crop seeds, vegetable seeds and flower seeds.

14. Defendant Monsanto Company is a Delaware corporation with its principal place of business at 800 North Lindbergh Boulevard, St. Louis, Missouri 63167.

15. Defendant Monsanto Technology (an affiliate of Monsanto Company) is a Delaware limited liability company with its principal place of business at 800 North Lindbergh Boulevard, St. Louis, Missouri 63167.

16. Defendants Monsanto Company and Monsanto Technology (together, "Monsanto") are engaged in interstate commerce and in activities substantially affecting interstate commerce. Monsanto is a leading supplier of agricultural products, including biotechnology traits and seeds, with sales to customers located throughout the United States. Both defendants are companies organized under Delaware law and both maintain registered agents in Delaware.

## FACTUAL BACKGROUND

### A. *CORN SEEDS AND TRAITS*

17. Corn is the leading cash crop in the United States, with an annual value of over $24 billion. In 2003, approximately 79 million acres of corn were grown in the United States.

18. Like most crops, corn production can be impaired by weeds. To control weeds, growers apply herbicides – chemical compounds that destroy or inhibit the growth of undesirable plants.

19. "Selective herbicides" are tolerated by the crop but kill or suppress one or more undesirable weeds that infest the crop. "Non-selective herbicides" are active on all vegetation and do not distinguish between the commercial crop (such as corn) and other vegetation (such as weeds).

#### 1. Biotechnology Crop Traits

20. Biotechnology has made it possible to introduce new genetic characteristics into plant seeds. The genetic make-up (or "genome") of a seed can be altered by transferring a

6

transgenic "event" into the seed genome. An event contains, among other things, a specific gene that expresses a desirable characteristic in the seed.

21. The insertion of a desirable transgenic event into a seed alters the seed's genome, conferring a desirable characteristic, or "trait," on the crops grown from the seed.

22. Since 1996, there have been a number of commercially available biotechnology corn traits for corn seeds. One of the most common of these traits is for glyphosate tolerance. Glyphosate-tolerant corn is impervious to the effect of glyphosate, the leading non-selective herbicide used by growers. As a result of this biotechnology, growers that plant glyphosate-tolerant corn may apply glyphosate over an entire field, killing the weeds while allowing the corn crop to survive.

23. There are two different transgenic events that can be inserted into corn seed to create glyphosate tolerance: NK603 and GA21.

24. Biotechnology is also used to make corn resistant to the European corn borer ("ECB") and the corn rootworm ("CRW"). The ECB-resistant corn trait and the CRW-resistant corn trait are both created by the insertion of the gene for Bacillus thuringensis (Bt) into the corn seed genome.

25. Crop protection traits, including herbicide tolerance and insect resistance, are useful to growers because they reduce production costs and increase yield. U.S. farmers are increasingly planting genetically modified varieties of seed. It is estimated that 46% of the corn planted in the U.S. in 2004 was transgenic corn (up from 40% in 2003) and that 86% of all commercial soybeans planted were transgenic.

### 2. The Corn Seed Chain of Distribution

26. There typically are four levels in the corn seed chain of distribution: foundation seed companies, hybrid seed companies, dealers and retailers, and end-use growers.

27. Inbred or foundation seed lines are developed by foundation seed companies and hybrid seed companies to exhibit desirable agronomic characteristics such as high yield, resistance to disease, high oil content or other attributes. Developers of inbred or foundation seed lines also can introduce biotechnology traits, such as glyphosate tolerance or ECB resistance, into inbred or foundation seed lines. It may take several years to develop each inbred or foundation seed line.

28. Foundation seed companies license or sell foundation seed to hybrid seed companies (the "Seed Companies") for the production of finished, hybrid seed. Hybrid seed (or finished seed) is the seed used to grow all commercially grown corn in the United States today. Hybrid seed is created when a Seed Company crosses two unrelated foundation seed lines.

29. Seed Companies typically sell or license hybrid seed through dealers and retailers or directly to growers (farmers). Growers plant the hybrid seed and grow the crops for cash.

### B. MONSANTO

#### 1. Monsanto's Acquisitions of Trait and Foundation Seed Assets

30. Since the mid 1990s, Monsanto has engaged in a series of transactions to acquire traits, technology, intellectual property, hybrid seed, and foundation seed assets.

31. In 1996, Monsanto acquired a minority interest in DeKalb Genetics Corporation ("DeKalb"), which had a leading foundation and hybrid corn seed business. In addition, DeKalb licensed to Monsanto (i) the intellectual property rights to the GA21 (glyphosate-tolerant) event that DeKalb was developing in collaboration with Rhone-Poulenc and (ii) the intellectual

8

property rights for ECB-resistant corn traits and for an alternative herbicide (glufosinate) resistant corn.

32.   In 1997, Monsanto began marketing an ECB-resistant corn under the YieldGard tradename.

33.   In February 1997, Monsanto acquired Asgrow, another leading soybean and corn seed company. Following the acquisition, Monsanto terminated an existing collaboration between Asgrow and AgrEvo to commercialize a herbicide-tolerant soybean trait (glufosinate tolerance) competitive with Monsanto's Roundup Ready® soybean trait.

34.   Next, in September 1997, Monsanto acquired Holden's, the leading foundation corn seed supplier.

35.   Finally, in 1998, Monsanto announced that it would acquire the remaining shares of DeKalb. Following its acquisition of Holden's and DeKalb, Monsanto caused both DeKalb and Holden's to withdraw their support for glufosinate-tolerant corn traits and otherwise impeded the commercial acceptance of glufosinate-tolerant traits.

36.   By 1998, Monsanto had introduced a Roundup Ready® (glyphosate-tolerant) corn trait using the GA21 event DeKalb had developed with Rhone-Poulenc.

37.   In 1997, Rhone-Poulenc (now Bayer CropScience), owner of patents covering the GA21 event, sued DeKalb (its licensee) and Monsanto (the sublicensee), alleging that DeKalb had misappropriated Rhone-Poulenc technology by hiding successful field tests of GA21. It charged Monsanto with patent infringement, among other things.

38.   DeKalb was found to have no rights to GA21 in February 2000 in *Rhone-Poulenc Agro, S.A. v. Monsanto Co. and DeKalb Genetics Corp.*, No. 1:97CV1138, 2000 U.S. Dist. LEXIS 21330 (M.D.N.C., Feb. 8, 2000), *aff'd in relevant part*, 272 F.3d 1335 (Fed. Cir. 2001).

The Federal Circuit later determined that Monsanto had no defense to Rhone-Poulenc's infringement action and lacked any rights to GA21, *see Rhone-Poulenc Agro, S.A., v. DeKalb Genetics Corp.*, 284 F.3d 1323 (Fed. Cir. 2002), which Monsanto purportedly had sublicensed to Seed Companies.

39. Realizing that its licensed rights were lost through the Rhone-Poulenc litigation, in 2000, Monsanto required Seed Companies to which it had sublicensed GA21 to switch to NK603 (a glyphosate-tolerant event owned by Monsanto) and sign new, NK603 contracts.

40. In 2003, Monsanto began marketing a CRW corn trait, called YieldGard Rootworm,® and in 2004 a combination product or "stack" of ECB-resistant corn trait and the CRW-resistant corn trait, called YieldGard Plus.® Today, Monsanto also produces a stacked ECB-resistant and glyphosate-tolerant corn trait.

### 2. Monsanto's Licensing Practices

41. Monsanto has generated revenues from its traits by licensing them to foundation seed companies, hybrid seed companies and end-use growers. It also has generated revenue by selling foundation and hybrid seeds containing those traits through its Asgrow, Holden's and DeKalb subsidiaries.

42. Over the past seven years, Monsanto's revenues from its licenses have been derived from "Grower Fees" paid by farmers and collected by the Seed Company as agent for Monsanto. More recently, Monsanto collects royalties directly from Seed Companies. A typical Roundup Ready® corn seed grower fee ranged up to $18 per bag of seed.

43. Monsanto's typical license with Seed Companies (the "GA21 License") for its GA21 glyphosate-tolerant corn trait includes the following terms:

- Seed Companies may not sell GA21 corn seed except to corn growers – or through retailers to growers – that are directly licensed by Monsanto;