88. Monsanto's letter also reminded the Seed Companies about the June 28, 2005 cutoff for commercial activity in GA21, and then went on to demand:

> "<u>Accordingly, after June 28, 2005, all commercial hybrids containing GA21 must be destroyed</u>." (emphasis in original).

89. On information and belief, this was the first time Monsanto had ever suggested to Seed Companies that they would be required to destroy any GA21 inventory.

90. Monsanto repeated its demand the day after Syngenta announced its acquisition of the GA21 rights:

> In our March 17, 2004 letter we gave notice to all GA21 licensees that the last year of commercial production of GA21 Roundup Ready corn was 2003, and that no production would be allowed in 2004. Additionally, the March 17 letter included notification requiring your company to destroy all GA21 inbred seed stock.

91. Monsanto's acceleration of the end of GA21 production and its demand that Seed Companies destroy GA21 inbreds and hybrids are wrongful acts intended to deny Syngenta access to a critical asset required for swift entry and to maintain Monsanto's monopoly in glyphosate-tolerant corn traits. Monsanto has no legal right to demand that the Seed Companies destroy any inventory.

92. On information and belief, some Seed Companies have destroyed their GA21 inbreds on Monsanto's instruction.

       ***d.***     ***Monsanto's Exclusive Dealing Seed Licenses and Related Pressure Not To Do Business with Syngenta***

93. On May 13, 2004, the day after Monsanto filed its patent infringement lawsuit, it notified Seed Companies that it sought to prevent any unauthorized sales of GA21 corn seeds. Monsanto pressured Seed Companies not to deal with Syngenta and implicitly threatened to sue the Seed Companies if they cooperated with Syngenta's entry.

94. Monsanto's GA21 License forces Seed Companies to deal exclusively in Monsanto's GA21 and not in any other company's GA21 trait, effectively foreclosing competition in glyphosate-tolerant corn traits. Monsanto has enforced the GA21 License to prevent Seed Companies from licensing GA21 rights from Syngenta and from selling GA21 foundation seeds or hybrid seeds except to growers or other licensees directly licensed or approved by Monsanto.

95. Through these restrictions, Monsanto controls the outlets for corn seed and thus controls the Seed Companies' marketing. Seed companies are wed to Monsanto, regardless of any alternative GA21 trait available in the market. If the Seed Companies were to license GA21 from Syngenta, Monsanto would block them from bringing GA21 seeds to market, including through lawsuits, as Monsanto has made clear in its recent letters.

96. Monsanto's threats to enforce the GA21 Licenses were made even though it had lost the rights to the underlying technology as a result of the Rhone-Poulenc litigation.

97. On May 13, 2004, Monsanto warned the Seed Companies that:

> "Separately and independent of any patent claims Monsanto has against Syngenta . . . your Monsanto GA21 license agreement requires your company to withdraw all corn containing the GA21 event."

98. Monsanto also claimed that its GA21 Licenses prohibit the Seed Companies from selling GA21 seed to anyone who is not licensed or approved in advance by Monsanto:

> " . . . seed containing GA21 currently in your inventory can only be sold to growers licensed by Monsanto to plant the corn as a commercial crop or be sold to another GA21 licensee via Corn States Hybrid Services brokerage department. GA21 cannot be sold to companies not licensed by Monsanto. Remember, all commercial activity needs to be completed by June 28, 2005."

99. Monsanto claimed that:

> "no agreement with or intellectual property license from Syngenta or any other third party can change your obligation to discontinue commercial activity with GA21 or to withdraw and cease activity with it in the appointed timeframe."

100. Monsanto then instructed the Seed Companies that if they even talked with Syngenta about GA21, they were required to tell Monsanto. Citing a provision of its NK603 corn license that requires Seed Companies to report any infringement of Monsanto's purported patent rights:

> "If Syngenta or any other third party contacts you or your company to access from you or to offer to you any GA21 corn material, we look forward to hearing from you."

101. On June 2, 2004, Monsanto reiterated its demand that Seed Companies deal only with approved or licensed customers. By letter, Monsanto reminded licensees of their "obligations under Section 3.02" of the GA21 License agreement to sell only to growers directly licensed by Monsanto (or to retailers required to do the same) and "to obtain prior written consent from Monsanto involving any proposed transactions between yourself and another Monsanto licensee."

102. On information and belief, Monsanto's purpose in sending this letter was to make sure the Seed Companies did not directly or indirectly sell any inventory to Syngenta.

103. On information and belief, in May and June 2004, Monsanto communicated with seed brokers regarding Syngenta's entry and has required them to agree in writing not to deal in GA21 hybrid seeds, or their brokerage agreements would be terminated and they would risk losing access to hybrids containing Monsanto germplasm and traits.

22

104. On information and belief, Monsanto made statements to foundation seed companies to intimidate the foundation seed companies from selling inbreds containing the GA21 trait.

105. Monsanto's intimidation of Seed Companies and foundation seed companies and attempted enforcement of the GA21 License to exclude Syngenta is wrongful conduct designed to maintain Monsanto's glyphosate-tolerant corn trait monopoly.

106. The GA21 Licenses, even if valid, constitute illegal exclusive dealing arrangements.

      e.    *Monsanto's Bundled Incentives*

107. In addition to entering into exclusive dealing agreements with its customers, Monsanto has pressured Seed Companies not to sell seeds containing a single trait provided by any company other than Monsanto through its "bundling" agreements – namely, Monsanto's GA21 License, its other trait licenses and the Incentive Agreement. As a result of these agreements, Seed Companies are economically coerced into only selling seeds containing traits provided by Monsanto. If any Seed Company sells a meaningful amount of seeds containing a single trait provided by any company other than Monsanto, it will face significant penalties from Monsanto across all traits licensed by Monsanto.

108. For example, under the Incentive Agreement, for a Seed Company to qualify for certain financial incentives it must sign all applicable trait licenses and must be sure that, every year, its sales of each and every trait are at least 70% Monsanto brand products. If the Seed Company does not maintain Monsanto's target, it will lose the incentives across Monsanto's entire line of products. And if the Seed Company allows Monsanto's share to fall below a specified share on any product, all incremental Seed Service fees, plus interest, become due and owing to Monsanto.

109. The effect of Monsanto's bundled incentive programs is to create insurmountable economic barriers through bundling fees and incentives across all product lines, which, in turn, defeat or deter new entrants and foreclose a substantial portion of competition for the licensing of traits to Seed Companies.

### 2. Monsanto's Maintenance of its European Corn Borer Trait Monopoly

110. Currently, Monsanto's share of the ECB-resistant trait market is at least 80 %. Its ECB-resistance event is called MON810. Monsanto licenses the MON810 event for sale under the YieldGard® trademark and in a stack with its glyphosate-tolerant event, NK603.

111. Syngenta's share of the ECB trait market is approximately 9%. Its ECB event is called Bt11. Syngenta is required to pay a royalty to Monsanto in connection with Bt11 and has restrictions on its ability to sublicense.

112. Dow AgroSciences/Pioneer also market an ECB event, under the name Herculex®, representing approximately 11% of the ECB market. On information and belief, Dow/Pioneer's rights also are subject to a Monsanto license that carries a royalty.

113. Between Monsanto's sales of YieldGard® and its licensing to Syngenta and Dow AgroSciences/Pioneer, Monsanto collects revenues for all ECB-resistant corn seed sold in the United States.

114. Because combinations of traits or "stacks," such as Monsanto's ECB/NK603 stack, represent significant value to growers, there is a strong trend toward ECB/glyphosate-tolerant stacks and away from ECB-only offerings. A substantial portion of ECB-resistant traits are stacked with NK603.

115. For the 2005 planting season, through its proprietary GA21 trait, Syngenta has offered stacked GA21/Bt11 products that will confer glyphosate tolerance and ECB resistance in its own seed and through licensing to other Seed Companies.

24

116. Monsanto's licensing restrictions have impeded and will continue to impede Syngenta's ability to offer stacked GA21/Bt11 products, putting Syngenta at a disadvantage in the marketplace.

117. Monsanto's license restrictions have prevented Syngenta from developing stacks of Bt11 and Seed Company or foundation seed company sourced GA21 or NK603. Monsanto's GA21 and NK603 licenses prevent Seed Companies and foundation seed companies from stacking GA21 or NK603 with Bt11.

118. Monsanto's restrictions have no reasonable business or scientific justification. In fact, on information and belief, Monsanto has selectively waived these restrictions to permit certain Seed Companies to produce a comparable stack.

119. As a result of Monsanto's maintenance of its glyphosate-tolerant corn trait monopoly and its unlawful contractual restrictions, Syngenta and others are unable to compete effectively in the licensing of ECB traits or the licensing of ECB traits stacked with another corn trait. Through these devices, Monsanto unlawfully maintains its monopoly in ECB traits or stacked traits and eliminates competition that would redound to the benefit of consumers.

3. **Monsanto's Long-Standing History of Anticompetitive Conduct**

120. Monsanto's pattern of anticompetitive conduct dates back to the mid 1990s and has involved additional wrongful conduct, including, among other things: (i) refusing to grant Syngenta access to certain technology for its ECB-resistant corn trait (Bt11) unless Syngenta agreed to refrain from promoting or recommending the fact that its ECB-resistant corn trait contained a glufosinate-resistant trait, thereby inhibiting sales of stacked corn traits and inhibiting sales of glufosinate-tolerant traits; and (ii) refusing to grant Syngenta access to glyphosate-tolerant corn events in part because Syngenta declined to adopt Monsanto's grower license and technology fee pricing structure for Syngenta's ECB-resistant corn and/or

25

glyphosate-tolerant soybean seed products and otherwise retaliating against Syngenta in numerous ways for such refusal. By imposing and attempting to impose such requirements, Monsanto sought, among other things, to remove a potential threat to Monsanto's competitive dominance of its glyphosate-tolerant corn traits and otherwise entrench its monopolies in the other trait and stacked trait markets. These activities are consistent with Monsanto's current coercive practices that impede Syngenta's or any other competitor's ability to successfully enter and compete in the markets for glyphosate-tolerant corn traits, ECB-resistant corn traits, or stacked glyphosate-tolerant and ECB-resistant corn traits.

## RELEVANT MARKETS AND MONSANTO'S MONOPOLY POWER

**A.**   *Glyphosate-Tolerant and Stacked Corn Traits*

121.   The licensing of glyphosate-tolerant corn traits is a line of commerce or relevant product market within the meaning of the antitrust laws. A related relevant market or submarket is the licensing of glyphosate-tolerant corn traits stacked with another key corn trait, such as ECB-resistance.

122.   Glyphosate-tolerant corn traits provide a unique product to developers of inbred or foundation corn seed lines. There are no substitutes for glyphosate-tolerant corn traits for these customers. Glyphosate-tolerant corn traits stacked with another corn trait provide a performance bundle of traits to developers of inbred or foundation corn seed lines. There are no substitutes for stacked glyphosate-tolerant corn traits for these customers.

123.   No reasonable substitutes for glyphosate-tolerant corn traits or stacked glyphosate-tolerant corn traits are available to developers of inbred or foundation seed lines. A significant, non-transitory increase of the fees associated with the licensing of Monsanto's glyphosate-tolerant corn trait or stacked glyphosate-tolerant corn traits would not result in foundation seed companies or other customers purchasing other traits.

124. The derived demand for the package of non-glyphosate-tolerant corn and selective herbicides does not provide adequate discipline for the package of glyphosate-tolerant corn or stacked glyphosate-tolerant corn traits and glyphosate and other pesticides. Monsanto has charged monopoly rents in the price of glyphosate-tolerant corn traits and stacked glyphosate-tolerant corn traits. Unimpeded competition from Syngenta's entry would substantially reduce the monopoly price of both.

125. The United States is a relevant geographic market within the meaning of the antitrust laws. Before genetically modified corn can be commercialized in the United States, it must receive regulatory approval from U.S. governmental agencies. The U.S. Department of Agriculture regulates the use of biotechnology traits in crops planted in the United States. The U.S. Environmental Protection Agency regulates the use of both plant incorporated protectants and chemical herbicides in the United States. Other factors, such as the U.S. distribution system and other demand characteristics, support a U.S. geographic market.

126. Monsanto is the dominant supplier of glyphosate-tolerant corn traits and stacked glyphosate-tolerant corn traits in the United States. Monsanto possesses monopoly power in both, where its market share is at least 99%. Monsanto has the power to control prices and exclude competition in the relevant markets.

127. Substantial barriers to entry and expansion exist in the licensing of glyphosate-tolerant corn traits and stacked glyphosate-tolerant corn traits. The considerable time and expense to develop a competing corn trait and obtain the necessary regulatory approvals are strong barriers to entry. Importantly, Monsanto's anti-stacking provision and bundling of incentives provide additional barriers to entry for any competitor.

128. Monsanto's market domination and the existence of entry barriers are evidenced by its high licensing fees.

**B.   *European Corn Borer-Resistant and Stacked Corn Traits***

129. The licensing of ECB-resistant corn traits is a line of commerce or relevant market within the meaning of the antitrust laws. A related relevant market or submarket is the licensing of ECB-resistant corn traits stacked with another key corn trait, such as glyphosate-tolerance.

130. ECB-resistant corn traits differ from other non-transgenic insect-resistant corn traits that provide protection against other crop pests. ECB-resistant corn traits offer superior performance at lower total cost versus traditional chemical insecticides. ECB-resistant corn traits stacked with another corn trait provide a performance bundle of traits to developers of inbred or foundation corn seed lines. There are no substitutes for stacked ECB-resistant corn traits for these customers.

131. No reasonable non-transgenic insect-resistant corn trait substitutes are available to developers of inbred or foundation corn lines and to purchasers that seek the crop yield to cost value that ECB-resistant corn traits provide. A significant, non-transitory increase by Monsanto of the fees associated with the licensing of its ECB-resistant corn trait or stacked ECB-resistant corn traits would not result in customers licensing other insect-resistant corn traits.

132. The derived demand of using non-ECB-resistant corn traits plus traditional insecticides does not provide sufficient discipline over the price of ECB-resistant corn traits.

133. Monsanto has charged monopoly rents in the price of ECB-resistant corn traits and stacked ECB-resistant corn traits. Syngenta's expansion would substantially reduce the monopoly price of that trait or stack.

134.     The United States is a relevant geographic market within the meaning of the antitrust laws. Before genetically modified corn can be commercialized in the United States, it must receive regulatory approval from U.S. governmental agencies. The U.S. Department of Agriculture regulates the use of biotechnology traits in crops planted in the United States. The U.S. Environmental Protection Agency regulates the use of both plant incorporated protectants and chemical insecticides in the United States. Other factors, such as the U.S. distribution system and other demand characteristics, support a U.S. geographic market.

135.     Monsanto is the dominant supplier of ECB-resistant corn traits and stacked ECB-resistant corn traits in the United States. Monsanto possesses monopoly power in the market for licensing of ECB-resistant corn traits and stacked ECB-resistant corn traits, where its market share is at least 80%. Monsanto has the power to control prices and exclude competition in the relevant market.

136.     Substantial barriers to entry and expansion exist in the licensing of ECB-resistant corn traits and stacked ECB-resistant traits. The considerable time and expense to develop a competing corn trait and obtain the necessary regulatory approvals are strong barriers to entry. Importantly, Monsanto's anti-stacking provisions and bundling of incentives provide additional barriers to entry for any competitor.

137.     Monsanto's market domination and the existence of entry barriers are evidenced by its high licensing fees.

**EFFECTS OF DEFENDANTS' UNLAWFUL SCHEME**

**1.     Effects on the Glyphosate-Tolerant and Stacked Corn Trait Markets**

138.     Monsanto's unlawful conduct has caused and will cause substantial harm to competition in the market for the licensing of glyphosate-tolerant corn traits and stacked