## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MONSANTO COMPANY, *et al*, | ) | |
| | ) | C.A. No. 04-305-SLR |
| Plaintiffs, | ) | (Consolidated) |
| | ) | |
| v. | ) | **PUBLIC VERSION** |
| | ) | |
| SYNGENTA SEEDS, INC., *et al*, | ) | |
| | ) | |
| Defendants. | ) | |

## MONSANTO'S MEMORANDUM OF LAW OPPOSING SYNGENTA'S MOTION TO EXCLUDE THE EXPERT REPORT AND TESTIMONY OF PROFESSOR WILLIAM R. LATHAM

Of COUNSEL:

Peter E. Moll
Scott Flick
John J. Rosenthal
HOWREY LLP
1299 Pennsylvania Ave., N.W.
Washington, DC  20004
(202) 783-0800
(202) 383-6610 facsimile

Kenneth A. Letzler
Jonathan I. Gleklen
ARNOLD & PORTER LLP
555 12th Street, N.W.
Washington, D.C. 20004
(202) 942-5000
(202) 942-5454 facsimile

Dated:  November 3, 2006
Public Version Dated:  November 13, 2006

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market St.
Wilmington, DE 19801
(302) 984-6000
(302) 658-1192 facsimile
rhorwitz@potteranderson.com
dmoore@potteranderson.com

Attorney for MONSANTO COMPANY and
MONSANTO TECHNOLOGY LLC

# TABLE OF CONTENTS

NATURE AND STAGE OF THE PROCEEDINGS .................................................................1

SUMMARY OF ARGUMENT ...........................................................................................2

STATEMENT OF FACTS ................................................................................................4

ARGUMENT ................................................................................................................7

I.    DR. LATHAM'S EXPERT REPORT FITS THE FACTS OF THE
      CASE ................................................................................................................7

      A.    Monsanto Has Stated A Claim For Tortious
            Interference With The Golden Harvest Contract ...............................................7

      B.    Syngenta Cannot Benefit From The Limitation Of
            Liability Clauses In The License Agreements ................................................16

      C.    Disgorgement Is An Appropriate Remedy For
            Tortious Interference .................................................................................18

II.   DR. LATHAM USES SOUND DATA AND METHODS AND
      THUS MEETS THE RELIABILITY REQUIREMENT ......................................20

      A.    Syngenta's Internal Projections Are A Reliable
            Method To Calculate Its Profits ..................................................................20

      B.    Syngenta's Own Expert Uses Less Reliable
            Projections Than Those That Syngenta Criticizes ........................................22

      C.    Syngenta Should Not Benefit From Withholding
            Information From Monsanto .......................................................................23

      D.    At Trial, Damages Can Be Based On Actual Sales
            Data ........................................................................................................26

      E.    Dr. Latham Will Not Testify About Irrelevant
            Matters ....................................................................................................26

CONCLUSION ...........................................................................................................26

## TABLE OF AUTHORITIES
### CASES

*Abbott Labs. v Teva Pharms. USA, Inc.,*
  432 F. Supp. 2d 408, 433 (D. Del. 2006)..........................................................................8

*Albiero v. City of Kanakee,*
  122 F.3d 417 (7th Cir. 1997) ..................................................................................2, 8

*Am. Homepatient, Inc. v. Colier,*
  C.A. No. 274-N, 2006 WL 1134170 (Del. Ch. Apr. 19, 2006) ..................8, 10, 11, 12

*Brown v. SAP Am., Inc.,*
  C.A. No. 98-507-SLR, 1999 WL 803888 (D. Del. Sept. 13, 1999) ...........................17

*Certified Labs. of Tex., Inc. v. Rubinson,*
  303 F. Supp. 1014 (E.D. Pa. 1969) ....................................................................18, 19

*Children's Seashore House v. Waldman,*
  197 F.3d 654 (3d Cir. 1999)........................................................................................8

*CompuSpa, Inc. v. Int'l Bus. Machs. Corp.,*
  228 F. Supp. 2d 613 (D. Md. 2002).............................................................................17

*Data Based Sys. Int'l, Inc. v. Hewlett Packard,*
  No. 00-CV-04425, 2001 WL 1251212 (E.D. Pa. Sept. 26, 2001) ...........................3, 17

*Daubert v. Merrell Dow Pharms.,*
  509 U.S. 579 (1993)..............................................................................................7, 20

*Dole v. Arco Chem. Co.,*
  921 F.2d 484 (3d Cir.1990).........................................................................................16

*Fillebrown v. Steelcase, Inc.,*
  63 Fed. Appx. 54 (3d Cir. 2002)........................................................................3, 20, 23

*Jaasma v. Shell Oil Co.,*
  412 F.3d 501 (3d Cir. 2005).........................................................................................7

*LePage's v. 3M,* No. CA 97-3983,
  2000 WL 280350 (E.D. Pa. Mar. 14, 2000)..............................................................3, 21

*Mem'l Gardens, Inc. v. Olympian Sales & Mgmt. Consultants, Inc.,*
  690 P.2d 207 (Colo. 1987)..........................................................................................17

*Menkowitz, M.D. v. Pottstown Mem'l Med. Center,*
  154 F.3d 113 (3d Cir. 1998)...................................................................................2, 8, 12, 13

*Millett v. Truelink, Inc.,*
  C.A. No. 05-599, 2006 WL 2583100 (D. Del. Sept. 7, 2006) ......................................16

*Nat'l Merch. Corp. v. Leyden,*
  348 N.E.2d 771 (Mass. 1976) ......................................................................................18

*Oddi v. Ford Motor Co.,*
  234 F.3d 136 (3d Cir. 2000)............................................................................................7

*In re Paoli R.R. Yard PCB Litig.,*
  35 F.3d 717 (3d Cir. 1994)......................................................................................7, 20

*S.E.C. v. Infinity Group Co.,*
  212 F.3d 180 (3d Cir. 2000)....................................................................................23, 25

*Schecter v. Friedman,*
  57 A.2d 251 (N.J. 1948)................................................................................................18

*Sulzer Carbomedics, Inc. v. Oregon Cardio-Devices, Inc.,*
  257 F.3d 449 (5th Cir. 2001) ...................................................................................3, 17

*Total Containment, Inc. v. Dayco Prods., Inc.,*
  No. Civ. A. 1997-CV-6013, 2001 WL 1167506 (E.D. Pa. Sept. 6, 2001) ............20, 21

*Tristate Courier and Carriage, Inc. v. Berryman,*
  C.A No. 20574, 2004 WL 835886 (Del. Ch. Apr. 15, 2004)....................................3, 18

*W, Oil & Fuel Co. v. Kemp,*
  245 F.2d 633 (8th Cir. 1957) .......................................................................................17

*Weston v. Pennsylvania,*
  251 F.3d 420 (3d Cir. 2001)...........................................................................................8

*Witchita Clinic, P.A. v. Columbia/HCA Healthcare Corp.,*
  45 F. Supp. 2d 1164 (D. Kan. 1999)............................................................................17

*Zippertubing Co. v. Telefex Inc.,*
  757 F.2d 1401 (3d Cir. 1985)...............................................................................3, 18, 19

## STATUTES

Fed. R. Civ. P. 15(c) ................................................................................................................16

Fed. R. Civ. P. 37 .....................................................................................................................23

Fed. R. Evid. 702 .................................................................................................................7, 20

## NATURE AND STAGE OF THE PROCEEDINGS

These consolidated proceedings began on May 5, 2004, when Monsanto brought its Shah patent infringement claims against Syngenta based on Syngenta's commercialization of genetically modified corn seed that is resistant to the herbicide glyphosate (e.g., "Roundup"). The source for the seeds' glyphosate tolerance was the GA21 event – genetically modified corn plants in which Monsanto claimed patent rights. (D.I. 34 – Second Amended Complaint). Months later, on July 28, 2004, Syngenta brought antitrust claims alleging that Monsanto had monopolized purported markets for glyphosate-tolerant and European Corn Borer (ECB) resistant corn seed. (D.I. 124 – Second Am. Compl.). The Court consolidated the patent and antitrust cases on March 24, 2005. (D.I. 48).

In its answer to Syngenta's antitrust complaint, Monsanto asserted four counterclaims arising from Syngenta's commercialization of Monsanto-sourced GA21: 1) reverse passing off in violation of the Lanham Act; 2) deceptive trade practices in violation of the Delaware Deceptive Trade Practices Act (DDTPA); 3) false advertising in violation of the Lanham Act; and 4) tortious interference with Monsanto's contractual relations. (D.I. 138).

The expert report of Dr. William Latham, an Associate Professor of Economics at the University of Delaware,[1] quantifies Monsanto's damages relating to these counterclaims. The report identifies four alternative damages measures, and calculates three of those measures. Shortly after Monsanto served Dr. Latham's report, the Court dismissed Monsanto's Lanham Act counterclaims but upheld its DDTPA claim. (D.I. 480). The Court's ruling did not affect Monsanto's tortious interference claims, which

---

[1] Dr. Latham chaired the Economics Department at the University of Delaware from 1990 to 1996. His extensive experience in the field of economics is set forth in his resume. Dr. Latham's curriculum vitae is Appendix A of his expert report. Dr. Latham's expert report is attached as Exhibit A.

were not a subject of Syngenta's motion to dismiss. On October 13, 2006, Syngenta moved to exclude Dr. Latham's expert report and testimony. (D.I. 503).

## SUMMARY OF ARGUMENT

1.      Syngenta's primary argument in support of its motion rests upon an unduly narrow reading of Monsanto's counterclaim for tortious interference with contractual relations. Ignoring all but two paragraphs of Monsanto's counterclaims, Syngenta mistakenly argues that Monsanto has only alleged tortious interference with the Garst contract and not the Golden Harvest contract, and that Monsanto therefore cannot recover for Agrisure GT sales sourced from Golden Harvest. But Monsanto has alleged all of the relevant *facts* establishing Syngenta's interference with the Golden Harvest agreement. By focusing solely on the legal theory identified in the counterclaims rather than factual allegations, Syngenta disregards controlling Third Circuit law which holds that a pleading is sufficient if "the *material facts* as alleged, in addition to inferences drawn from those allegations, provide a basis for recovery." *Menkowitz, M.D. v. Pottstown Mem'l Med. Ctr.*, 154 F.3d 113, 124-25 (3d Cir. 1998) (emphasis added). Whether a pleading gives fair notice depends on the facts alleged in the pleading, not how the party characterizes the claim. *Id*; *Albiero v. City of Kanakee*, 122 F.3d 417, 419 (7th Cir. 1997).

Monsanto has exceeded these notice pleading standards by setting forth in its counterclaims the relevant provisions of the Golden Harvest contract, as well as the Syngenta conduct that caused these provisions to be breached, in great detail. Because Syngenta admits that *all* of its Agrisure GT seed contains GA21 material that came from either Garst or Golden Harvest (D.I. 504 – Syngenta Br. 10), all Agrisure GT sales flow from the tortious interference described in the counterclaims.

2.      Syngenta cannot benefit from the limitation of liability provision in Monsanto's license agreements with Garst and Golden Harvest. Syngenta was not a

2

party to those contracts, nor is Monsanto alleging that Syngenta breached those contracts. Instead, Syngenta is a third party against whom Monsanto brought tort, not contract, claims. Thus, the limitation of liability provisions have no application here. *Sulzer Carbomedics, Inc. v. Oregon Cardio-Devices, Inc.*, 257 F.3d 449, 455-56 (5th Cir. 2001); *Data Based Sys. Int'l, Inc. v. Hewlett Packard*, No. 00-CV-4425, 2001 WL 1251212, at *16 (E.D. Pa. Sept. 26, 2001).

3.    Dr. Latham identifies disgorgement of Syngenta's profits as ███████████. Contrary to Syngenta's argument, courts can award disgorgement of a defendant's profits in a tortious interference case. *Tristate Courier and Carriage, Inc. v. Berryman*, C.A. No. 20574, 2004 WL 835886, at *13 n.147 (Del. Ch. Apr. 15, 2004); *Zippertubing Co. v. Telefex Inc.*, 757 F.2d 1401, 1411 (3d Cir. 1985).

4.    Dr. Latham's methodology for determining Syngenta's future profits is reliable. Dr. Latham calculated Syngenta's estimated profits during the damages period using Syngenta's own pre-lawsuit projections created in the ordinary course of business. Courts routinely accept such projections as valid data to use in proving damages. *See LePage's, Inc. v. 3M*, No. C.A. 97-3983, 2000 WL 280350, at *8 (E.D. Pa. Mar. 14, 2000). Syngenta's argument that Dr. Latham should have used different data to support his conclusion is not relevant to a *Daubert* motion; such a motion should not be used to determine whether one methodology is better than another, only whether the challenged methodology is appropriate. *Fillebrown v. Steelcase, Inc.*, 63 Fed. Appx. 54, 56 (3d Cir. 2002). Furthermore, Syngenta's expert, Dr. Richard Gilbert, also used a "projection" to calculate Syngenta's alleged damages, only he used internal projections created after Syngenta filed suit. Part of Dr. Gilbert's projections were based on a telephone conversation that he had with Syngenta's counsel and a Syngenta executive concerning Syngenta's alleged damages.

5.    Dr. Latham submitted his report before the Court dismissed Monsanto's Lanham Act claims. Monsanto does not intend to have Dr. Latham testify about those claims, or about whether Syngenta acted willfully.

## STATEMENT OF FACTS

In 1998, Monsanto entered into license agreements with both Garst and Golden Harvest. (D.I. 138 – Answer and Counterclaims ¶¶ 26, 32). Those agreements, titled "Roundup Ready® Corn License and Seed Services Agreement," granted Garst and Golden Harvest a non-exclusive license to use Monsanto's Corn Line GA21 to develop and sell their own glyphosate-tolerant hybrid corn seed varieties. *Id.* Those agreements imposed certain restrictions on what Garst and Golden Harvest could do with Monsanto's GA21 lines. (D.I. 138 – Answer and Counterclaims ¶¶ 27-31, 33-37). For example, the license agreements provided that Garst and Golden Harvest:



- (D.I. 138 – Answer and Counterclaims ¶¶ 27, 33)

- (D.I. 138 – Answer and Counterclaims ¶¶ 28, 34)

- ; (D.I. 138 – Answer and Counterclaims ¶¶ 29, 35) and

- , (§ 3.05); (D.I. 138 – Answer and Counterclaims ¶¶ 26, 32).

In addition to those restrictions, each license agreement provided that if Monsanto produced a new glyphosate-tolerant trait, the licensee would be required to withdraw GA21 from the market within five years or less. (D.I. 138 – Answer and Counterclaims ¶ 40). In 2001, Monsanto exercised that provision after it introduced its second-generation

glyphosate-tolerant trait, NK603. *Id.* Monsanto asked its licensees to cease GA21 production in 2003, and to sell all of its GA21 by June 28, 2005. (D.I. 138 – Answer and Counterclaims ¶ 41).[2] Syngenta knew of Monsanto's GA21 license agreements and the restrictions that they contained. (D.I. 138 – Answer and Counterclaims ¶ 43).

In May 2004, Syngenta announced that it would acquire Garst, and in June 2004, announced that it would acquire Golden Harvest. (D.I. 138 – Answer and Counterclaims ¶¶ 44-45). At the same time, Syngenta also announced that it intended to commercialize GA21. (D.I. 138 – Answer and Counterclaims ¶ 52). Contrary to the above license provisions, both Garst and Golden Harvest transferred GA21 material to Syngenta, and

█████████████████████████████████████████████████████████████[3]

Golden Harvest and Garst also introduced hybrid seed varieties containing the GA21 event. (D.I. 138 – Answer and Counterclaims ¶¶ 53, 56-57). Although these varieties were made from Monsanto-sourced GA21, Garst and Golden Harvest sold them under Syngenta's "Agrisure GT Advantage" trademark and without the marking required under their license agreements with Monsanto. (D.I. 138 – Answer and Counterclaims ¶ 53).

Syngenta's sales of Monsanto-sourced GA21 through NK, Garst, and Golden Harvest violated, at a minimum, sections 3.01 (forbidding sale to non-licensees), 3.02 (forbidding third party trademarks), 3.03 (requiring notice disclosing Monsanto's patent protection), 3.04 (requiring the Roundup Ready trademark), 3.12 (agreement to withdraw if a new product is introduced), and 11.06 (change in control provision), as well as all provisions requiring payment to Monsanto. (D.I. 138 – Answer and Counterclaims ¶¶ 51).

---

[2] Monsanto initially requested that licensees stop selling GA21 by February 28, 2005, but later extended the date by four months.

[3] Cited testimony from Mr. Robinson's deposition is attached as Exhibit D.

When Syngenta filed this antitrust action, Monsanto asserted various counterclaims arising from Syngenta's using Garst and Golden Harvest to obtain GA21. (D.I. 138 – Answer and Counterclaims). Monsanto alleged violations of the Lanham Act, the Delaware Deceptive Trade Practices Act, as well as tortious interference with contractual relations. In support of those claims, Monsanto offered Dr. Latham's expert report, which calculated Monsanto's damages attributable to Syngenta's actions. Dr. Latham identified four possible measures of those damages:

> **Alternative 1:** Monsanto's lost profits on NK603 (including branded seed sales and trait licensing revenue) resulting from Syngenta's sales of Agrisure GT. In other words, had Syngenta not illegally obtained Monsanto-sourced GA21, a percentage of those customers that bought Agrisure GT directly from Syngenta, or licensed the GA21 trait from Syngenta, instead would have purchased Monsanto's NK603 traited seed, or licensed Monsanto's NK603 trait.

> **Alternative 2:** The profits Monsanto would have earned in Alternative 1, plus any profits that Monsanto would have earned from sales of complementary products, such as Monsanto's glyphosate herbicide, Roundup. Dr. Latham was unable to calculate the loss of complementary sales with precision and therefore did not include them, thus lowering his damages estimate.

> **Alternative 3:** The profits Syngenta earned by acquiring and selling GA21 through its NK branded seed and its companies Garst and Golden Harvest.

> **Alternative 4:** The reasonable royalty Monsanto would have earned from Syngenta's sales. This alternative measures what Monsanto would have earned had Syngenta licensed Monsanto's glyphosate-tolerant trait and paid a reasonable royalty on the sales Syngenta actually made.

In calculating Alternative 1 (lost profits) and Alternative 4 (reasonable royalty), Dr. Latham used actual sales data to estimate Syngenta's sales during the damages period. Dr. Latham then multiplied that sales estimate by Monsanto's profit margins and royalty rates, respectively, to arrive at a total figure. In calculating Alternative 3 (Syngenta's profits), Dr. Latham used Syngenta's internal profit projections for entering the glyphosate tolerant by commercializing GA21.

## ARGUMENT

Under Federal Rule of Evidence 702, a party may introduce expert testimony if it "will assist the trier of fact to understand the evidence or to determine a fact in issue" so long as "1) the testimony is based on sufficient facts and data, 2) the testimony is the product of reliable principles and methods, and 3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. Rule 702 incorporates standards the Supreme Court identified in *Daubert v. Merrell Dow Pharms., Inc.*[4] Courts refer to Rule 702's requirements as "qualifications, reliability, and fit." *Jaasma v. Shell Oil Co.*, 412 F.3d 501, 513 (3d Cir. 2005).

Syngenta does not challenge Dr. Latham's qualifications to testify as an expert. As demonstrated below, Dr. Latham meets the "fit" and reliability requirements and, thus, his testimony should be admitted.

## I.     DR. LATHAM'S EXPERT REPORT FITS THE FACTS OF THE CASE

Dr. Latham's methodology and data relate directly to the facts of the case and thus satisfy the "fit" requirement. The Third Circuit addressed the "fit" requirement in *In re Paoli R.R. Yard PCB Litig. (Paoli II)*, 35 F.3d 717, 743 (3d Cir. 1994). The "fit" requirement is not intended to be a high standard. *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145 (3d Cir. 2000). Instead, the party only need demonstrate that the methodology underlying the calculation relates to the facts of the case. *Paoli II*, 35 F.3d at 744. As described below, Dr. Latham's testimony exceeds this standard.

### A.     Monsanto Has Stated A Claim For Tortious Interference With The Golden Harvest Contract

Syngenta ignores all but two paragraphs of Monsanto's counterclaim to argue that Monsanto only states a claim for tortious interference with the Garst contract, not the

---

[4] 509 U.S. 579 (1993).

Golden Harvest agreement, and thus can only recover for sales of Agrisure GT (GA21) sourced from Garst. Syngenta can only make this argument by ignoring the specific factual allegations set forth in the counterclaims.[5] (D.I. 504 – Syngenta Br. 10).

Syngenta's narrow reading of the counterclaims is contrary to federal notice pleading standards. The Federal Rules of Civil Procedure require only that a pleading provide "fair notice of the transaction" and "set forth the material points necessary to sustain recovery." *Menkowitz,* 154 F.3d at 124. Otherwise, "one misstep by counsel may be decisive to the outcome." *Weston v. Pennsylvania*, 251 F.3d 420, 429 (3d Cir. 2001). In deciding whether a pleading gives notice of a claim, a court should look to the *facts* alleged in the pleading, not how the party characterizes its claim. *Menkowitz*, 154 F.3d at 124; *Albiero*, 122 F.3d at 419. A claim is adequately pled if a party can "prove any set of facts in support of its claim that would entitle it to relief." *Children's Seashore House v. Waldman*, 197 F.3d 654, 658 (3d Cir. 1999).

Based on the factual allegations of the counterclaims, it is evident that Monsanto can prove a set of facts establishing Syngenta's liability for interference with the Golden Harvest contract. Under Delaware law, establishing tortious interference requires: "(i) the existence of a valid contract; (ii) the interferer's knowledge of the contract; (iii) intentional interference that induces or causes a breach of the contract; and (iv) damages." *Am. Homepatient, Inc. v. Colier*, C.A. No. 274-N, 2006 WL 1134170 (Del. Ch. Apr. 19, 2006) This Court has held that a party need not identify the specific contracts interfered with to state a claim for tortious interference. *Abbott Labs. v Teva Pharms. USA, Inc.*, 432 F. Supp. 2d 408, 433 (D. Del. 2006) (Jordan, J.).

---

[5]    At the time the counterclaims were filed, Monsanto knew that Golden Harvest had breached its license agreement but not that Golden Harvest also transferred GA21 material to Syngenta. (*See* Countercl. ¶¶ 77-78). █████████████████████
██████████████████████████████████████████████████████████ .

8

The counterclaims go well beyond the liberal notice pleading standard by specifically alleging facts in support of each of these elements. First, Monsanto alleged the existence of Golden Harvest's contract. *See Am. Homepatient*, No. C.A. 274, 2006 WL 1134170, at *4 (identifying the existence of a contract as the first element of tortious interference claim). As set forth in the counterclaims:

> 32.    In May 1998, the Golden Harvest Companies entered into an agreement with Monsanto entitled "Roundup Ready® Corn License and Seed Services Agreement" (hereinafter "Golden Harvest GA21 Agreement"), which granted the Golden Harvest Companies a non-exclusive limited license to "develop, produce, have produced, and sell" Golden Harvest Brand corn hybrids produced through "crossing with Corn Line GA-21 or progeny."

(D.I. 138 – Answer and Counterclaims ¶ 32). Monsanto also identified and directly quoted the agreement's relevant provisions:

> 33.    Section 3.02, entitled "Distribution of Licensed Corn Products," provides in part:
>
> > (a)    With respect to the sales of Licensed Corn Products hereunder in the Territory, Licensee shall only be permitted to distribute and/or sell Licensed Corn Products branded solely under the following trademarks or trade name exclusively owned or used by Licensee: Golden Harvest. Licensee shall not use any trademark of any Third Party in connection with sales of Licensed Corn Products other than trademarks associated with non-genetically engineered traits present in Licensed Corn Products.
>
> > (b)    Pursuant to Subsection 3.01(a) above, the Licensee may not give, sell or otherwise transfer Licensed Corn Product(s) except as commercial seed (1) to growers directly licensed by Monsanto for their sole use in producing a commercial grain crop, and/or (2) to retail dealers for retail sale to growers directly licensed by Monsanto for the growers' sole use in producing a commercial grain crop. Licensee may not sell the Licensed Corn Product(s) to a wholesale seller.
>
> 34.    Under the Golden Harvest GA21 Agreement, the Golden Harvest Companies were required to properly mark and display all packages containing licensed corn products. These strictures are found in Paragraph (a) of Section 3.03, entitled "Marking of Licensed Corn Products," which provides:

In conjunction with the use of a Grower Agreement and subject to Subsection 3.11(b), Licensee shall conspicuously display directly on all packages containing Licensed Corn Products to be sold or transferred to permitted third-party growers or customers, the following notice, or a notice having the same meaning and effect, with the blanks appropriately filled in to the extent such notice is applicable in the respective area:

These seeds are covered under United States patents (To Be Provided By Monsanto). No license and/or sublicense is conveyed to use these seeds solely by the (purchase/bailment/transfer) of such seeds. A license / sublicense under said patents must first be obtained from Monsanto Company before these seeds can be used in any way.

35.     Monsanto granted the Golden Harvest Companies a non-exclusive license to use the Roundup Ready trademark. Paragraph (a) of Section 3.04, entitled "Trademark Usage," states:

The Roundup Ready trademark (or another trademark) owned by Monsanto shall be licensed to Licensee on a non-exclusive basis pursuant to the Roundup Ready® Trademark License Agreement, which shall be executed by the parties upon execution of this Agreement. Licensee shall conspicuously display said trademark, logos and taglines (e.g., "Herbicide Tolerant Corn") in full color directly on all seed packages of Licensed Corn Products, as well as all promotional and advertising material for Licensed Corn Products in the manner set forth in Appendix F and as Monsanto may, at its sole and reasonable discretion, notify Licensee from time to time. The placement of said trademark and logos shall be specified by Monsanto. Each occurrence of said trademark shall be accompanied by the following footnote:

"Roundup Ready is a trademark of Monsanto Company."

(D.I. 138 – Answer and Counterclaims ¶¶ 33-35).

After identifying the contract and its relevant provisions, Monsanto specifically alleged the second element of tortious interference – that Syngenta knew of these contracts:

43.     In its Amended Antitrust Complaint, Syngenta admits express knowledge of Monsanto's contractual relationships with others under the GA21 Agreement.

(D.I. 138 – Answer and Counterclaims ¶ 43). *See Am. Homepatient*, 2006 WL 1134170, at *4 (identifying knowledge of the contract as the second element of a tortious interference claim).

Next, the counterclaims allege facts establishing that Syngenta intentionally interfered with Golden Harvest's license agreement and caused Golden Harvest to breach that agreement:

> 46.    . . . [O]n June 25, 2004, Syngenta AG announced its intent to "complet[e] our strategy to develop critical mass in the US corn and soybean seeds market, complementing our leading position in crop protection." To that end, on August 2, 2004, Syngenta AG announced completion of its acquisition of **Golden Harvest Seeds**.
>
> 47.    At the time of their acquisition, both Garst and the **Golden Harvest** Companies were licensees of the GA21 event Roundup Ready® corn. However, Syngenta never independently obtained a GA21 license from Monsanto and had no independent right to develop, market, sell or license any product containing the GA21 event.
>
> 48.    Upon information and belief, Garst and the **Golden Harvest** Companies' source of germplasm containing the GA21 event was Monsanto and neither Garst nor the **Golden Harvest** Companies have obtained any germplasm with the GA21 event from any other trait provider.
>
> * * *
>
> 54    The **Golden Harvest Companies** also are improperly marketing, selling and licensing corn seed containing Monsanto's GA21 event under the trademark "Agrisure GT Advantage."
>
> 55.    All glyphosate-tolerant corn-seed products sold by Syngenta, **Golden Harvest**, and others under the Agrisure trademark improperly and unlawfully incorporate Monsanto's GA21 technology.
>
> 56.    Syngenta also has admitted during discovery in the Lundquist Patent Litigation, consolidated in this matter, that "[t]he GA21-37 F1 seed," used to breed **Golden Harvest's** commercialized corn-seed line called H-8845GT, "was obtained by **Golden Harvest Seeds, Inc.** in the Spring of 1997, from Monsanto." Syngenta has further admitted that, likewise, "[t]he GA21-31 F1 seed," used to breed **Golden Harvest's** two commercialized corn-seed lines called H-7371GT and H-8124GT, "was

11

> obtained by **Golden Harvest Seeds, Inc.** in the Spring of 1997, from Monsanto."
>
> 57.    Syngenta, by and through the **Golden Harvest Companies**, has made commercially available and sold the H-8845GT, H-7371GT, and H-8124GT corn lines – containing Monsanto's GA21 event trait – to seed brokers, seed dealers, and farmers in the United States, beginning in 2004 and continuing to the present.

(D.I. 138 – Answer and Counterclaims ¶¶ 46-48, 54-57) (emphasis added). *See Am. Homepatient*, 2006 WL 1134170, at *4 (identifying interference and breach of the contract as the third element of a tortuous interference claim).

Finally, after alleging all the other elements as described above, Monsanto alleged that it suffered damages due to Syngenta's conduct, the final element of a tortious interference claim. (D.I. 138 – Answer and Counterclaims ¶ 64). *See Am. Homepatient*, 2006 WL 1134170, at *4.[6]

When a party alleges facts entitling it to recovery, as Monsanto has, the party may recover despite any technical defects in the pleading. *Menkowitz*, 154 F.3d at 123-24. For example, in *Menkowitz*, the defendant moved to dismiss plaintiff's claim under the Rehabilitation Act because the plaintiff failed to allege that his disability was the "sole reason" for his dismissal. The Third Circuit agreed that the complaint lacked that specific allegation but it nevertheless reversed the district court's dismissal "[b]ased on [plaintiff's] recitation of facts" in the complaint. *Menkowitz*, 154 F.3d at 124. The court held that those alleged facts gave notice of a claim under the Rehabilitation Act despite the way the claim was pled. Any perceived deficiencies resulted from "inartful pleading

---

[6] Monsanto alleged these facts under the heading "The Roundup Ready Corn Seed License and Seed Services Agreement with the Golden Harvest Companies." (D.I. 138 – Answer and Counterclaims ¶¶ 32-39). That section immediately followed one entitled "The Roundup Ready Corn Seed License and Seed Services Agreement with Garst Seed Company" which contained nearly identical allegations about the Garst contract. (D.I. 138 – Answer and Counterclaims ¶¶ 26-31). The proximity and similarity of these sections to one another further demonstrate that Monsanto based its counterclaim on Syngenta's tortious interference with *both* agreements.

– the precise sort of pleading as a highly developed form of art that the federal rules sought to abandon." *Id.* Thus, the Third Circuit reinstated the claim. As in *Menkowitz*, Syngenta cannot deprive Monsanto of relief because Golden Harvest is not specifically mentioned in counterclaim Count IV.

As Syngenta admits █████████████████████████████████████████
████████████████████. (D.I. 504 – Syngenta Br. 10). Each of the four types of Agrisure GT sales identified by Syngenta on page 10 of its brief resulted directly from the breach of contract provisions set forth above:

| Type of Agrisure GT Sales | License Agreement Provisions Violated by Sale[7] |
|---|---|
| Agrisure GT sold by Syngenta ██████████ ███████████ | 3.01 (forbidding sale to non-licensees); 302(b) (forbidding transfer of foundation seeds); 3.12 (agreement to withdraw GA21 if new product is introduced); and 11.06 (change in control provision) |
| Agrisure GT sold by Syngenta █████████ ██████████ | 3.01(forbidding sale to non-licensees); 302(b) (forbidding transfer of foundation seeds); 3.12 (agreement to withdraw GA21 if new product is introduced); and 11.06 (change in control provision) |
| Agrisure GT sold by Garst ██████████ ████████ | 302 (forbidding third party trademarks); 3.03 (requiring notice disclosing Monsanto's patent protection); 3.04 (requiring the Roundup Ready trademark); 3.12 (agreement to withdraw GA21 if new product is introduced) |

---

[7] This list contains the most obvious violations and is not intended to be exhaustive.

| | |
|---|---|
| Agrisure GT sold by Golden Harvest ████████ ████████ | 302 (forbidding third party trademarks); 3.03 (requiring notice disclosing Monsanto's patent protection); 3.04 (requiring the Roundup Ready trademark); 3.12 (agreement to withdraw GA21 if new product is introduced) |

Syngenta also received notice during discovery of Monsanto's claim for tortiously interfering with the Golden Harvest license agreements.  Dr. Latham's report revealed that



(Latham Rep. 4).[8]  Dr. Latham also testified that

Dr. Latham further

_____

[8] Dr. Latham's expert report is attached as Exhibit A.

[9] Cited pages from  Dr. Latham's deposition testimony are attached as Exhibit E.

Despite Syngenta's current interpretation of Monsanto's counterclaim, Syngenta's rebuttal expert report  . When Dr. Gilbert re-calculated Dr. Latham's figures, Only months later did Syngenta argue that Monsanto had not alleged tortious interference with the Golden Harvest agreement.

Furthermore, the parties have litigated Syngenta's interference with Golden Harvest's license agreement throughout discovery. Monsanto deposed Syngenta executive Edward Robinson, formerly a senior executive at Golden Harvest before its acquisition by Syngenta, and questioned him . Monsanto similarly questioned Syngenta's key witnesses such as Tom Klevorn (former head of Syngenta's NK brand seed), and Ed Resler (Syngenta's in-house counsel)

---

[10] Dr. Gilbert's rebuttal expert report is attached as Exhibit C.

[11] Pages cited from Mr. Klevorn's and Mr. Resler's depositions are attached as Exhibit F and Exhibit G, respectively.

In relying on this evidence, Dr. Latham's report is no different than that of

Syngenta's expert, Dr. Gilbert.  Dr. Gilbert 

Notwithstanding the absence of any allegations concerning this program in Syngenta's

complaint, Dr. Gilbert .

Once the parties, as here, join an issue during the litigation, courts require that the

issue should "be decided on the merits rather than on technicalities," whether through the

notice pleading standard or the liberal amendment of pleadings under Rule 15.  *See*

*Millett v. Truelink, Inc.*, C.A. No. 05-599, 2006 WL 2583100, at *2 (D. Del. Sept. 7,

2006) (Robinson, C.J.), *citing*, *Dole v. Arco Chem. Co.*, 921 F.2d 484, 486-87 (3d Cir.

1990).  In fact, where the parties litigate an issue through to trial, the Federal Rules of

Civil Procedure provide for amending the pleadings at or even after trial to conform to

the evidence.  Fed. R. Civ. P. 15(c).  Given that preference for determining claims on the

merits rather than pleading technicalities, Syngenta's narrow reading of Monsanto's

counterclaim should not prevail.

### B.    Syngenta Cannot Benefit From The Limitation Of Liability Clauses In The License Agreements.

The limitation of liability provisions in Monsanto's license agreements with Garst

and Golden Harvest do not benefit Syngenta.  Syngenta was not a party to those contracts

---

[12] Dr. Gilbert's expert report is attached as Exhibit B.

[13] Pages cited from Mr. Lucas's, Mr. Cassidy's, and Mr. Wyffles's depositions are attached as Exhibit I, Exhibit J, and Exhibit K, respectively.

and did not assume any burdens under them, nor did it provide any consideration. *See Sulzer Carbomedics*, 257 F.3d at 455-56 (rejecting attempt by third party to invoke limitation of liability provision contained in a contract to limit third party's liability for tortious interference with that contract). Further, the clauses by their terms do not apply because they refer to actions between the parties to the contracts arising out of those contracts; Monsanto's counterclaim is a tort claim against a third party for interfering with the contracts. *Id.*; *CompuSpa, Inc. v. Int'l Bus. Machs. Corp.*, 228 F. Supp. 2d 613, 627 (D. Md. 2002); *Data Based Sys. Int'l*, 2001 WL 1251212, at *16. Thus, Syngenta cannot invoke the protections of those contracts. *Sulzer Carbomedics*, 257 F.3d at 455-56; *CompuSpa, Inc.*, 228 F. Supp. 2d at 627; *Data Based Sys. Int'l*, 2001 WL 1251212, at *16.

None of the cases cited by Syngenta involved a limitation of liability clause. In *W. Oil & Fuel Co. v. Kemp*,[14] *Wichita Clinic, P.A. v. Columbia/HCA Healthcare Corp.*,[15] and *Mem'l Gardens, Inc. v. Olympian Sales & Mgmt. Consultants, Inc.*,[16] the courts addressed liquidated damages clauses, not limitation of liability clauses. Finally, in *Brown v. SAP Am., Inc.*,[17] this Court made the unremarkable finding that a limited liability provision could be applied to the plaintiff, who was party to that contract, in its breach of contract and warranty claims; the Court never addressed a tortious interference claim against a third party. In contrast, *Sulzer Carbomedics*, *CompuSpa*, and *Data Based Sys. Int'l*, cited above, each rejected a third party's attempt to invoke a limitation of liability clause to limit that third party's liability for tortious interference with that contract.

---

[14] 245 F.2d 633, 644 (8th Cir. 1957).

[15] 45 F. Supp. 2d 1164 (D. Kan. 1999).

[16] 690 P.2d 207 (Colo. 1984).

[17] C.A. No. 98-507-SLR, 1999 WL 803888 (D. Del. Sept. 13, 1999).

### C.    Disgorgement Is An Appropriate Remedy For Tortious Interference.

As noted above, Dr. Latham identified ███████████████████████. Those

measures included disgorgement of Syngenta's profits derived from selling GA21.

Contrary to Syngenta's assertions, the Court can award disgorgement as a remedy

for tortious interference.[18] The Delaware Chancery Court, applying Delaware law, has

recognized that it was authorized to award disgorgement for tortious interference. *See*

*Tristate Courier and Carriage*, 2004 WL 835886 at *13 n.147. Similarly, in

*Zippertubing*, the Third Circuit upheld a district court's award for disgorgement of the

defendant's profits as damages for a tortious interference claim. 757 F.2d at 1411. In

fact, the Court has discretion to award Syngenta's disgorged profits as damages in several

instances, such as:

- if the plaintiff's lost profits are difficult to calculate and disgorgement would prevent a windfall to the defendant; *Zippertubing*, 757 F.3d at 1411; *Certified Labs of Texas, Inc. v. Rubinson*, 303 F. Supp. 1014, 1025-26 (E.D. Pa. 1969);

- if the plaintiffs' loss does not equal the defendant's gain and disgorgement is necessary to prevent rewarding a tortfeasor; *Nat'l Merch. Corp. v. Leyden*, 348 N.E.2d 771, 775-76 (Mass. 1976);

- if the defendant acted willfully or with malice; *Id.*; *Schecter v. Friedman*, 57 A.2d 251, 255 (N.J. 1948).

The Court may determine that one or more of these situations applies to this case

and award disgorgement. For example, Dr. Latham testified ███████████████

███████████████████████. Monsanto created Roundup Ready corn

---

[18]    Even if the Court ultimately decides not to award disgorgement, that does not require striking Dr. Latham's report.

[19]    As Dr. Latham explains in his report, █████████████████████████

██████████████████████████████████████████

specifically to complement its Roundup herbicide. Thus, if Syngenta wrongfully impaired Roundup Ready sales, sales of Roundup herbicide, as well as other Monsanto products, necessarily suffered as well. To quantify these losses, Dr. Latham would have to ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████. [20] As Dr. Latham points out,

███████████████████████████████████████████████████████████

██████████████████████. *Id.* Under these circumstances, disgorgement is an appropriate remedy that prevents a windfall to the defendant. *Zippertubing*, 757 F.3d at 1411; *Certified Labs. of Tex*, 303 F. Supp. at 1025-26.

The Court or jury also may find, consistent with the allegations in Monsanto's counterclaims, that Syngenta acted willfully. Syngenta worded its press release announcing that it purchased Bayer's rights to GA21 to mislead the market into believing that the GA21 it would be selling came from Bayer, not Monsanto.[21] Some third party seed companies also testified that ███████████████████████████

_____

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████.

[20] As explained in Monsanto's motion to strike his testimony, Dr. Gilbert harbors no such reservations. Dr. Gilbert ████████████████████████████████████

██████████████████████████████████████████████████

[21] █████████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████

These willful acts also could entitle Monsanto to disgorgement.

## II.    DR. LATHAM USES SOUND DATA AND METHODS AND THUS MEETS THE RELIABILITY REQUIREMENT

Dr. Latham's expert report meets the reliability requirement in Rule 702. The Supreme Court imposed the reliability test to ensure that experts based testimony on "more than subjective belief or unsupported speculation." *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 590 (1993). But, as the Third Circuit has noted, the reliability "standard is not that high." *Paoli II*, 35 F.3d at 745. The court explained that "reliability"

> does not mean that plaintiffs have to prove their case twice -- they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are *correct*, they only have to demonstrate by a preponderance of evidence that their opinions are reliable. . . . *Daubert* states that a judge should find an expert opinion reliable under Rule 702 if it is based on "good grounds," i.e., if it is based on the methods and procedures of science. A judge will often think that an expert has good grounds to hold the opinion that he or she does even though the judge thinks that the opinion is incorrect.

*Id.* at 744. In applying the reliability test, the Court need not decide whether one methodology is preferable to another, only whether that methodology is sound. *Fillebrown*, 63 Fed. Appx. at 56.

### A.    Syngenta's Internal Projections Are A Reliable Method To Calculate Its Profits

Dr. Latham properly ████████████████████████████████████████ ████████████████████████████████ A company's own internal

---

[22] Pages cited from Mr. Bercerra's and Mr. Beck's depositions are attached as Exhibit L and Exhibit M, respectively.

[23] Syngenta belabors the case *Total Containment, Inc. v. Dayco Prods., Inc.*, No. Civ. A. 1997-CV-6013, 2001 WL 1167506 (E.D. Pa. Sept. 6, 2001), no doubt because a portion of Dr. Latham's testimony was excluded there, to argue Dr. Latham's methods and data

projections are reliable estimates for calculating damages. *See LePage's*, 2000 WL 280350, at *8 (finding 3M's internal projections of future growth reliable basis for expert testimony). Syngenta now seeks, for the first time and in the context of litigation, to discredit its own document that its business people created and relied upon in evaluating Syngenta's trait licensing business.

The document itself belies Syngenta's assertion that these projections are simply valuations for the rights to GA21. As Dr. Latham explains in his report,

Thus, Dr. Latham's analysis is not an "apples to oranges" comparison as Syngenta claims. (D.I. 505 – Pl. Br. 15-20).

Syngenta erroneously claims that Dr. Latham failed to understand Syngenta's data. First, any failure would be due, in part,

---

are not reliable. But *Total Containment* is distinguishable from this case. In *Total Containment*, as Syngenta notes, the data used by Dr. Latham came from a third party, Dun & Bradstreet, that Dr. Latham acknowledged contained known difficulties. Further, there were discrepancies between that data and what Dr. Latham intended to measure. But here, Syngenta's projections are exactly what Dr. Latham is measuring – the value, *i e*, profit, to Syngenta for each year it sells glyphosate-tolerant corn.



Second,

. The full question and answer are as follows:

Q.

## B. Syngenta's Own Expert Uses Less Reliable Projections Than Those That Syngenta Criticizes

Syngenta's expert uses the same methodology –



– that Syngenta criticizes.  If Dr. Latham's report

Dr. Gilbert uses

. Dr. Gilbert equates

---

[24] Cited pages from Mr. Kostiuk's deposition are attached as Exhibit N.

Dr. Gilbert, 

Further, Dr. Gilbert's data is not more reliable that Dr. Latham's. First,

. Second,

. Regardless, in deciding a *Daubert* motion, the Court need not decide which methodology is more reliable. *Fillebrown*, 63 Fed. Appx. at 56.

Syngenta cannot have it both ways; it cannot argue that using

## C.    Syngenta Should Not Benefit From Withholding Information From Monsanto

Federal Rule of Civil Procedure 37 empowers a court to exclude any evidence that a party did not produce in discovery. Fed. R. Civ. P. 37; *Infinity Group Co.*, 212 F.3d at 198. The rule prevents a party from benefiting from its failure to disclose information during discovery, but that is precisely what Syngenta's motion seeks to accomplish.

Syngenta attacks Dr. Latham's data on two grounds: 1) that he should have used

; and 2) when he did use

---

25 

23



. But, to the extent these are valid criticisms, they resulted from Syngenta withholding or not having that information.

Dr. Latham testified

. Monsanto asked for this sales data and Syngenta represented to the Court that it did not have such data:

> [By Monsanto's Counsel]:
>
> The final thing that we don't have is, we do not have, and this has been denominated by the parties, the extracted load file. It's a document produced by Syngenta.
>
> We are trying to get from Syngenta information that they have on market share by trait and sales data by trait. They say they don't have such data. It's hard to believe, but if they don't, I would like to get a statement on the record that they don't maintain market share data and sales data by trait, and then we would be satisfied with that.
>
> [By Syngenta's Counsel]:
>
> I am not aware of any market share by trait and sales data that has not been produced. . . . Obviously, we're not withholding anything on that.

(May 1, 2006, Hearing Tr. at 22, 27).[26] Syngenta does not have to create data for the purposes of discovery, but it cannot fault Dr. Latham for not using data that does not exist.

Nor did Syngenta timely provide Monsanto with the data that Dr. Gilbert used. In his report, Dr. Gilbert



Syngenta withheld the four spreadsheets

---

[26] Testimony cited from the May 1, 2006, hearing is attached as Exhibit O.

[27] Dr. Gilbert relied on

– the documents that contained usable data – until the parties had exchanged the Gilbert and Latham reports.[28]  Furthermore, some of the data Dr. Gilbert used had been produced in an unreadable format, as Syngenta's counsel conceded.[29]  In fact, Syngenta's counsel admitted during Dr. Gilbert's deposition that ███████████████████████████
███████████████████████:

███████████████████████████████████████████████████

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████[31]
.

Thus, Syngenta criticizes Dr. Latham for not using data that Syngenta 1) did not produce; or 2) did not produce in a readable format.  Syngenta should not benefit from its failure to produce that information.  *S.E.C. v. Infinity Group Co.*, 212 F.3d 180, 198 (3d Cir. 2000).

---

[28] *See* Letter, dated July 25, 2006, from Heather Kafele to John Rosenthal, attached as Exhibit P.  Monsanto does not agree that Syngenta was authorized to withhold these documents as implied in Ms. Kafele's letter.

[29] *Id.*

[30] To the extent these projections were "newer" versions, Monsanto has been unable to locate or unable to read the prior versions.

[31] Cited pages from Dr. Gilbert's testimony are attached as Exhibit H.

**D.    At Trial, Damages Can Be Based On Actual Sales Data**

Syngenta faults Dr. Latham's estimates of Syngenta's Agrisure GT sales during

the damages period. Not only do such arguments go to weight rather than admissibility,

they will be moot at trial, since actual sales data will be available at that time.

**E.    Dr. Latham Will Not Testify About Irrelevant Matters**

As noted above, the Court dismissed Monsanto's Lanham Act claims *after* Dr.

Latham filed his report. Thus, Dr. Latham's report contains references to claims no

longer in the case. Dr. Latham will not testify about or refer to the dismissed claims at

trial as they are no longer relevant, nor will he offer any opinion as to whether Syngenta's

actions were willful.

## CONCLUSION

For the reasons stated above, Monsanto respectfully requests that the Court deny

Syngenta's motion to exclude the testimony of Dr. Latham.

Respectfully Submitted,

OF COUNSEL:                                  POTTER ANDERSON & CORROON, LLP

Peter E. Moll
John J. Rosenthal                            By:  /s/ David E. Moore
HOWREY LLP                                        Richard L. Horwitz (#2246)
1299 Pennsylvania Ave., N.W.                      David E. Moore (#3983)
Washington, DC 20004                              Hercules Plaza, 6th Floor
(202) 783-0800                                    1313 N. Market St.
(202) 383-6610 facsimile                          Wilmington, DE 19801
                                                  (302) 984-6000
Kenneth A. Letzler                                (302) 658-1192 facsimile
Jonathan I. Gleklen                               rhorwitz@potteranderson.com
ARNOLD & PORTER LLP                               dmoore@potteranderson.com
555 12th Street, N.W.
Washington, D.C. 20004                       Attorney for MONSANTO COMPANY and
(202) 942-5000                               MONSANTO TECHNOLOGY LLC
(202) 942-5454 facsimile

Dated: November 3, 2006
Public Version Dated: November 13, 2006
761798 / 28128

26

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on November 13, 2006, the attached

document was hand delivered on the following persons and was electronically filed with

the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the

following and the document is available for viewing and downloading from CM/ECF:

John W. Shaw
Young Conaway Stargatt & Taylor, L.L.P.
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801

I hereby certify that on November 13, 2006, I have Electronically Mailed

the foregoing document(s) to the following non-registered participants:

Richard F. Schwed
Thomas A. McGrath III
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022-6069
rschwed@shearman.com

Heather Lamberg Kafele
Shearman & Sterling LLP
801 Pennsylvania Avenue, N.W.
Suite 900
Washington, D.C. 20004
hkafele@shearman.com

/s/ David E. Moore
Richard L. Horwitz
David E. Moore
Potter Anderson & Corroon LLP
Hercules Plaza – Sixth Floor
1313 North Market Street
Wilmington, DE 19801
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

732377