IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MONSANTO COMPANY, *et al.*,

                Plaintiffs,

           v.

SYNGENTA SEEDS, INC., *et al.*,

                Defendants.

)
)
)
)
)
)
)
)
)
)

C.A. No.: 04-305-SLR (Consol.)

**REDACTED –
PUBLIC VERSION**

**SYNGENTA'S RESPONSE TO MONSANTO'S STATEMENT
OF FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE
TRIED IN SUPPORT OF A MOTION FOR SUMMARY JUDGMENT ON
COUNTS I AND II REGARDING FAILURE TO ESTABLISH MONOPOLY POWER**

YOUNG CONAWAY STARGATT & TAYLOR, LLP
John W. Shaw (No. 3362)
Michele Sherretta Budicak (No. 4651)
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19801
(302) 571-6600
mbudicak@ycst.com

*Attorneys for Syngenta Seeds, Inc.*

Of Counsel:

SHEARMAN & STERLING LLP
Richard F. Schwed
Stephen Fishbein
599 Lexington Avenue
New York, NY 10022-6069
(212) 848-4000

Heather Lamberg Kafele
801 Pennsylvania Avenue, N.W.
Washington D.C. 20004-2634
(202) 508-8000

Dated: March 21, 2008

                                                           

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................... iii

SUMMARY OF ARGUMENT ..................................................................................... 1

ISSUES OF LAW AND FACT ..................................................................................... 2

I.     MATERIAL FACTS IN DISPUTE.................................................................... 2

     A.     RESPONSE TO MONOPOLY POWER STATEMENT ¶¶1-3, 7
            Syngenta's Past Litigation Statements Do Not Eliminate Issues of Fact .............. 3

     B.     RESPONSE TO MONOPOLY POWER STATEMENT ¶¶ 4-6........................... 4

     C.     RESPONSE TO MONOPOLY POWER STATEMENT ¶¶ 8-23 Issues of
            Fact Exist as to Whether There Are Antitrust Markets for Licensing GT
            Traits and ECB Traits ....................................................................................... 4

            1.     The Relevant Markets in This Case Are Input Markets .............................4

            2.     Monsanto Has Recognized a Market for Licensing Traits .........................5

            3.     Monsanto Treats Trait Licensing As a Separate Market in Its Business .....6

            4.     Monsanto's Own Documents Demonstrate that There Are No
                Substitutes for Traits ....................................................................................7

             5.     Syngenta's Expert Has Opined, Using Well-Established Economic
                Principles, that the Relevant Antitrust Markets in This Case Are the
                Markets for Licensing GT and ECB Traits....................................................8

                 a.     Reasonable Interchangeability between Traits ................................ 9

                 b.     Elasticities of Demand .................................................................. 9

                 c.     The Lerner Index........................................................................ 10

                 d.     Prices of Complementary Products............................................. 10

             6.     Seed Company Testimony Demonstrates Further that There Are No
                 Substitutes for Traits ..................................................................................10

             7.     Monsanto's Arguments Regarding Alleged Competition in the Hybrid
                 Seed Markets Are Flawed...........................................................................11

a.  Corn Seed Containing GT and ECB Traits Has Unique
    Qualities Not Present in Conventional Corn, Further
    Demonstrating that They Are Not Close Substitutes ................... 12

b.  Growers Are Not Switching from Traited Corn to
    Conventional Corn ...................................................................... 12

D.  RESPONSE TO MONSANTO MONOPOLY STATEMENT ¶24 Monsanto
    Has Monopoly Power in the Relevant Markets for Licensing GT and ECB
    Traits ............................................................................................... 13

    1.  Monsanto Holds Extremely High Market Shares ....................... 13

    2.  Monsanto Controls Price and Can Increase Price Without
        Consequence ............................................................................. 14

    3.  The Cellophane Fallacy ............................................................. 14

    4.  Significant Barriers to Entry Exist ............................................ 15

II. ISSUES UPON WHICH MONSANTO SEEKS SUMMARY JUDGMENT ................. 15

    A.  RESPONSE TO MONOPOLY POWER STATEMENT ¶25 ............................. 15

    B.  RESPONSE TO MONOPOLY POWER STATEMENT ¶¶ 26-28 ...................... 15

    C.  MONSANTO'S PRESENTATION OF THE LAW IS INCOMPLETE AND,
        AS A RESULT, CANNOT BE RELIED UPON TO GRANT SUMMARY
        JUDGMENT ...................................................................................... 17

        1.  The Relevant Market Is a Factual Question – Not a Legal One ................ 17

        2.  Input Markets Are Well-Recognized in Antitrust Law ............................ 18

    D.  RESPONSE TO MONOPOLY POWER STATEMENT ¶ 29 ........................... 19

CONCLUSION .................................................................................................... 20

DB01:2531479.1                                                                    059155.1010

# TABLE OF AUTHORITIES

## CASES

*American Tobacco Co. v. United States*, 328 U.S. 781 (1946)......................................19

*Apartment Source L.P. v. Philadelphia Newspapers, Inc.*, 98 Civ. 5472, 1999 U.S. Dist.
LEXIS 4337 (D. Pa. April 1, 1999) .........................................................17, 18

*Broadcom Corp. v. Qualcomm, Inc.*, 501 F.3d 297 (3d Cir. 2007) .............................16

*Cytologix Corp. v. Ventana Med. Sys., Inc.*, 00 Civ. 12231, 2006 U.S. Dist. LEXIS 49677
(D. Mass. Jul. 20, 2006)........................................................................17

*Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003) ........................3

*Eastman Kodak Co. v. Image Tech. Serv., Inc.*, 504 U.S. 451 (1992)........................15, 17, 18, 19

*Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171 (3d Cir. 1992) .......................17

*Harrison Aire, Inc. v. Aerostar Int'l*, 423 F.3d 374 (3d Cir. 2005)................................3

*Ideal Dairy Farms v. John Labatt, Ltd.*, 90 F.3d 737 (3d Cir. 1996) ............................3

*Int'l Boxing Club v. United States*, 358 U.S. 242 (1959) ...........................................19

*Med Alert Ambulance, Inc. v. AH. Sys.*, 04 Civ. 1615, 2007 U.S. Dist. LEXIS 57083
(D.N.J. Aug. 6, 2007)............................................................................17

*Moecker v. Honeywell Int'l, Inc.*, 144 F. Supp. 2d 1291 (M.D. Fla. 2001) .................18

*Mutual Pharm. Co. v. Hoechst Marion Roussel, Inc.*, 96 Civ. 1409, 1997 U.S. Dist.
LEXIS 20038 (D. Pa. Dec. 17, 1997) ......................................................18

*Pennpac Int'l, Inc. v. Rotonics Mfg., Inc.*, 99 Civ. 2890, 2001 U.S. Dist. LEXIS 6842
(E.D. Pa. May 25, 2001) .......................................................................17

*Times-Picayune Co. v. United States*, 345 U.S. 594 (1953) ....................................7, 16

*United States v. E.I. DuPont de Nemours & Co.*, 351 U.S. 377 (1956) ....................7, 16

*United States v. E.I. DuPont de Nemours & Co.*, 353 U.S. 586 (1957) ..................18, 19

*United States v. Grinnell Corp.*, 384 U.S. 563 (1966)..........................................17, 19

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001).............................5, 19

DB01:2531479.1                                    059155.1010

**OTHER AUTHORITIES**

H. Hovenkamp, I IP AND ANTITRUST: AN ANALYSIS OF ANTITRUST PRINCIPLES APPLIED
    TO INTELLECTUAL PROPERTY LAW §4.3 (Supp. 2007)......................................................18

William Landes & Richard Posner, *Market Power in Antitrust Cases*, 94 Harvard. L.
    Rev. 9378, 961 (1981) ........................................................................................................14

DB01:2531479.1

059155.1010

Pursuant to the Court's Order of February 11, 2008 (D.I. 543), Syngenta Seeds, Inc. ("Syngenta") respectfully submits this response to Monsanto Company's and Monsanto Technology LLC's ("Monsanto") Statement Of Facts As To Which There Is No Genuine Issue To Be Tried In Support Of A Motion For Summary Judgment On Counts I And II Regarding Failure To Establish Monopoly Power (D.I. 550) ("Monopoly Power Statement").

## SUMMARY OF ARGUMENT

Summary judgment is generally an inappropriate vehicle for deciding issues of market definition and market power because of the fact-intensive nature of the inquiry. Here, the parties have a fundamental factual dispute as to what the relevant legal market is. Monsanto's Monopoly Power Statement asserts – incorrectly – that the relevant market is the market for the selling of hybrid corn seeds. Syngenta, in contrast, has always alleged that the relevant markets are the markets for licensing technology.

A fundamental factual dispute thus exists between the parties – a dispute that the courts have repeatedly held is not amenable to disposition on summary judgment. In addition, the most relevant facts relating to defining the relevant antitrust markets are disputed here – namely, whether there are separate "input markets" for licensing corn traits, which party's expert is more credible, and whether conventional corn is a substitute for transgenic corn.

For example, in support of its definition of the relevant markets, Syngenta's expert proffered quantitative economic analysis that confirms that relevant technology (or "input") markets exist for licensing glyphosate tolerant (GT) and European Corn Borer (ECB) traits. The record also shows that for trait licensees – independent seed companies – there are absolutely no alternatives to traits, much less reasonably interchangeable alternatives. Indeed, for the seed companies (the appropriate "consumers" in the relevant markets defined by Syngenta), not

having access to traits like GT and ECB means going out of business. Likewise, documents and testimony from the parties and more than a dozen third-party seed companies and seed dealers show that even in the downstream market where seed companies sell seed to farmers, there are no close substitutes for corn seeds containing GT and ECB traits. Expert testimony and Monsanto's own documents show that demand for GT and ECB traits is inelastic, adoption rates for traited corn have skyrocketed even in the face of increased prices, farmers pay a premium to use corn seed containing traits, and transgenic corn possesses unique characteristics that cannot be matched by conventional corn.

Finally, the parties' reliance on expert economic testimony to define the relevant product markets weighs heavily against the need for summary judgment motion practice. Both parties retained economists who are highly regarded in their respective fields to opine on the correct bounds of the markets. Courts have routinely recognized that these types of battles between well-qualified experts are issues of fact that are best left to a jury.

## ISSUES OF LAW AND FACT

### I.    MATERIAL FACTS IN DISPUTE

Contrary to Monsanto's Monopoly Power Statement, the relevant markets in this case are the markets for the licensing of GT traits and ECB traits. The relevant market is not the market for the sale of corn seed to farmers. The determination of what the relevant markets are is a factual question, and the importance of the disputed facts at issue counsels against using the Court's limited resources for summary judgment motion practice.

Each numbered paragraph of the factual portion of Monsanto's Monopoly Power Statement quotes from various pleadings and documents in the record. While Monsanto does not misquote those pleadings or documents, Monsanto's fidelity to the written word does not make it proper to credit the inferences interwoven with Monsanto's numbered paragraphs or eliminate

2

genuine factual issues that can only be disposed of at trial.[1]  In the sections that follow, we respond to Monsanto's "facts" and present additional facts that prevent the Court from concluding that no triable issues of fact exist.

### A.    RESPONSE TO MONOPOLY POWER STATEMENT ¶¶1-3, 7
#### Syngenta's Past Litigation Statements Do Not Eliminate Issues of Fact

Monsanto's reliance on Syngenta's briefs in support of its motion to dismiss Monsanto's Lanham Act counterclaims under *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003), is misplaced.  The key issue under *Dastar* is whether the defendant misappropriated the "final tangible goods" sold to consumers and passed those goods off as its own. *Id.* at 37.  In its motion to dismiss, Syngenta asserted that the final tangible goods sold to farmers are hybrid corn seed and that the GT trait is a technological "input" into the hybrid seed.  That assertion (and the Court's agreement with it) is fully consistent with Syngenta's position that there is a "relevant market" for GT traits.  As set forth below (Point I.C(1), *infra*), it is well established that relevant markets are not limited to markets for tangible goods sold to consumers but may include upstream inputs into those goods.

Monsanto's reliance on Syngenta's statements in class certification briefing in the *Sample* case is equally unavailing.  In *Sample*, Syngenta addressed the issue of whether class-wide injury could be proven in a case alleging a conspiracy among sellers of hybrid seeds.  The brief cited by Monsanto did not in any way address the issue of "relevant market," which is not an issue in a case alleging price fixing under § 1 of the Sherman Act.  Moreover, as discussed more fully

---

[1]  Syngenta disagrees with the inferences Monsanto inserts into its "factual" statement.  For instance, on page five of its Monopoly Power Statement, Monsanto states that "Conventional Hybrid Corn Seed and Transgenic Hybrid Corn Seed are Substitutes Within the Same Market." This is not a fact, it is a conclusion or an inference Monsanto has purported to draw from the facts.  Contrary to Monsanto's approach, however, reasonable inferences must be drawn in Syngenta's favor, not Monsanto's. *See Harrison Aire, Inc. v. Aerostar Int'l*, 423 F.3d 374, 380 (3d Cir. 2005); *Ideal Dairy Farms v. John Labatt, Ltd.*, 90 F.3d 737, 743 (3d Cir. 1996).

3

below, the fact that there may be *a market* for hybrid corn seed is not at all inconsistent with the

fact that there also are *separate markets* for the traits that are inputs into the hybrid corn seed

sold to farmers.

Moreover, to the extent these statements are relevant at all, they certainly cannot provide

a basis for summary judgment. At most, these statements present evidence contrary to the

substantial evidence supporting Syngenta's position (*see* Point I.C, *infra*), thereby creating issues

of fact for the jury.

**B.    RESPONSE TO MONOPOLY POWER STATEMENT ¶¶ 4-6**

Monsanto's facts cited in ¶¶ 4-6 are not material to any issue before the Court. Syngenta

does not claim – and never has claimed – that Monsanto has monopoly power in the foundation

seed market.

**C.    RESPONSE TO MONOPOLY POWER STATEMENT ¶¶ 8-23**
**Issues of Fact Exist as to Whether There Are Antitrust Markets**
**for Licensing GT Traits and ECB Traits**

Syngenta does not contest the words quoted in the evidentiary materials presented by

Monsanto in paragraphs 8-23 of its Monopoly Power Statement, but those words do not support

Monsanto's inferences and conclusions. The additional facts presented below demonstrate that

genuine issues of fact exist as to whether there are relevant markets for the licensing of GT and

ECB traits.

**1.    The Relevant Markets in This Case Are Input Markets**

Monsanto argues that there is a market for hybrid seeds and Monsanto does not have

monopoly power in that market. Syngenta does not dispute these statements. Syngenta's

claimed markets are for the licensing of technological inputs (traits) into hybrid seeds, not

markets for hybrid seeds themselves. As discussed in Section II.B., *infra*, it is well-established

that separate markets can exist for technological inputs (traits) and for the final products

4

containing those inputs (hybrid seeds).  ████████████████████████████████
███████████████████████████████████████████████████████████████
█████████████████████████████[2]

For example, it would be hard to dispute that there is a relevant market for computers (or certain types of computers, such as PCs).  But there also is a separate market for the operating systems that are part of the computers purchased by consumers. *United States v. Microsoft Corp.*, 253 F.3d 34, 52 (D.C. Cir. 2001).  The relevant market for operating systems is, like the relevant markets for traits, a technology or input market.

### 2.    <u>Monsanto Has Recognized a Market for Licensing Traits</u>

Monsanto has admitted the existence of trait licensing markets separate from the markets for seeds.  █████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████[4]

---

[2] Dr. Gilbert's Expert Report is cited in this response and also in Syngenta's Response To Monsanto's Statement Of Facts As To Which There Is No Genuine Issue To Be Tried In Support Of A Motion For Summary Judgment On Counts I and II Regarding Lack of Foreclosure and has been separately filed with the Court.

[3] ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████

[4] All evidentiary materials on which Syngenta relies to establish the existence of genuine issues of material fact are found in Syngenta's Compilation of Evidentiary Materials in Support of Syngenta's Response To Monsanto's Statement Of Facts As To Which There Is No Genuine Issue To Be Tried In Support Of A Motion For Summary Judgment On Counts I and II Regarding Failure To Establish Monopoly Power (hereinafter "App.").

059155.1010



In other words, Monsanto has admitted that there are separate markets for seeds sold to farmers and for transgenic traits that are put into those seeds. Seed companies are customers in the trait market and suppliers in the seed market. That is the very same position that Syngenta takes, and Monsanto opposes, in this case. These statements alone create a genuine issue of fact as to whether Monsanto's or Syngenta's proposed market definition is correct.

### 3.   Monsanto Treats Trait Licensing As a Separate Market in Its Business

Monsanto's own licensing practices and business documents confirm the existence of the trait licensing market as a separate market, and thus create further factual issues that cannot be resolved without a trial. Seed companies license traits separately from foundation seeds.

DB01:2531479.1                                                                                              059155.1010

████████████████████████████████████

███████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████

### 4. Monsanto's Own Documents Demonstrate that There Are No Substitutes for Traits

Relevant antitrust markets must contain all products that are close substitutes – *i.e.*, all products that are reasonably interchangeable for the purposes for which they are produced. *E.g. United States v. E.I. DuPont de Nemours & Co.*, 351 U.S. 377, 394 (1956). The quantitative measurement for substitutability is elasticity of demand. When demand for a product is inelastic it means there are no close substitutes for that product and a relevant antitrust market exists in that product or products. *Times-Picayune Co. v. United States*, 345 U.S. 594, 612 n.31 (1953). Consistent with Dr. Gilbert's quantitative analysis, Monsanto's own documents show that the demand for traits is inelastic. For example:





### 5. Syngenta's Expert Has Opined, Using Well-Established Economic Principles, that the Relevant Antitrust Markets in This Case Are the Markets for Licensing GT and ECB Traits

Syngenta has submitted the expert report of Dr. Richard J. Gilbert, a world-renowned economist and Professor of Economics at the University of California, Berkeley. Dr. Gilbert has served as Deputy Assistant Attorney General for Economics in the Antitrust Division of the U.S. Department of Justice (i.e., the Chief Economist). In that capacity, he led the task force that developed the *Antitrust Guidelines for the Licensing of Intellectual Property* published in 1995, which were jointly issued by the Antitrust Division and the Federal Trade Commission.



Dr. Gilbert's economically-sound conclusions,[5] on their own, create important factual issues that must be decided at trial, and demonstrate that summary judgment would be

---

[5] Importantly, Monsanto has not challenged any of Dr. Gilbert's conclusions, or bases for those conclusions, with respect to defining the relevant markets in this case. Monsanto's *Daubert* motion dealt strictly with Dr. Gilbert's damages analysis. (D.I. 502) ("Memorandum Of Law In Support Of Monsanto's Motion In Limine To Exclude Damages Testimony of Plaintiff's Expert Richard Gilbert," dated October 13, 2006).

inappropriate on this issue.  The Court need not allow Monsanto to partake in a futile exercise that will waste the resources of the parties and the Court.

### a.  <u>Reasonable Interchangeability between Traits</u>

### b.  <u>Elasticities of Demand</u>



DB01:2531479.1                                      059155.1010



**c.    The Lerner Index**

**d.    Prices of Complementary Products**

**6.    Seed Company Testimony Demonstrates Further that There Are No Substitutes for Traits**

As set forth above, the absence of any close substitutes, or interchangeable products, is strong evidence of a relevant market. In this case, seed company testimony demonstrates that seed companies do not have any alternative to licensing traits, and the trait licensing markets in fact are separate markets.



DB01:2531479.1                                                                059155.1010

███████████████████████████████████

### 7. Monsanto's Arguments Regarding Alleged Competition in the Hybrid Seed Markets Are Flawed

Monsanto's argument that farmers have the option of planting traited or untraited (conventional) hybrid corn seed is flawed. As discussed above, the relevant markets in this case are the markets for the licensing of traits. Syngenta is not claiming that Monsanto has monopoly power in a separate relevant market for all hybrid seed or traited hybrid corn seed. The question of whether there is "competition" in the downstream market(s) for hybrid seed thus is the wrong question. Indeed, what goes on in the seed markets is relevant only if it causes seed companies to substitute away from licensing traits as the price of traits increases. The evidence overwhelmingly demonstrates that it does not. There is substantial evidence – in the form of expert testimony, business documents, Monsanto admissions and deposition testimony – that directly supports Syngenta's relevant markets and refutes any claim of substitutability in the trait licensing markets. (*See* Point I.C(2)-(6), *supra*).

Moreover, even in the downstream market – the market where seed companies sell corn seed to farmers – it is clear that conventional corn is not a substitute for corn containing traits. The testimony cited by Monsanto demonstrates one-way substitution:  from conventional corn to traited corn. (Monopoly Statement at ¶¶9-15). But that type of substitution does not and cannot operate as a constraint on the price of traits. The only switching that can act as a constraint on the price of traits is switching *from* traited corn *to* conventional corn as the price of traits increase. Syngenta demonstrates below that growers are not switching back to conventional corn seed from corn seed containing traits. In any event, the following evidence creates a genuine issue of fact regarding downstream substitution, and thus precludes summary judgment.

a. **Corn Seed Containing GT and ECB Traits Has Unique Qualities Not Present in Conventional Corn, Further Demonstrating that They Are Not Close Substitutes**

███████████████████████████████████

█████████████████████████████

█████████████████████████████

███████████████████████████████

███████████████████████████████

████████████████████████████

██████

b. **Growers Are Not Switching from Traited Corn to Conventional Corn**

As discussed above, competition between conventional hybrid seed and traited hybrid seed is potentially relevant only to the extent that it affects substitutability in the upstream trait market. However, even at the grower level, there is substantial evidence that growers do not switch from transgenic corn to conventional corn. This lack of substitutability, again, contradicts Monsanto's claim that the relevant market in this case is the U.S. hybrid corn seed market.

The record categorically refutes the notion that growers are switching from traited seed to conventional seed. Some examples include:



DB01:2531479.1                                                                                                    059155.1010



**D.    RESPONSE TO MONSANTO MONOPOLY STATEMENT ¶24**
**Monsanto Has Monopoly Power in the Relevant Markets**
**for Licensing GT and ECB Traits**

Monsanto states that ██████████████████████████████ This is not

a statement of material fact because it is irrelevant to the summary judgment issue presented

here:  whether Monsanto has market power in the relevant trait licensing markets.  In these two

markets – the markets for the licensing of GT traits and ECB traits – all the record evidence

demonstrates that Monsanto holds monopoly power.

### 1.    Monsanto Holds Extremely High Market Shares

Monsanto has extremely high market shares in the relevant markets for licensing GT and

ECB traits. ████████████████████████████████████████████

████████████████████████████████████████████

DB01:2531479.1                                                                              059155.1010

 

 

### 2.　Monsanto Controls Price and Can Increase Price Without Consequence

 

### 3.　The Cellophane Fallacy

Monsanto also ignores the "cellophane fallacy."[6]

Clearly, growers value traits highly, and Monsanto prices accordingly. To the extent Monsanto claims some competition from other products at the grower level, it is evidence

---

[6] *See* William Landes & Richard Posner, *Market Power in Antitrust Cases*, 94 Harvard. L. Rev. 9378, 961 (1981); Richard Posner, *Antitrust Law*, (1976), 126-27.

DB01:2531479.1

059155.1010

that Monsanto is exercising monopoly power in pricing traits. "The existence of significant substitution in the event of further price increases or even at the current price does not tell us whether the defendant already exercises significant market power." *Eastman Kodak Co. v. Image Tech. Serv., Inc.*, 504 U.S. 451, 471 (1992). It would be incorrect to conclude that GT and ECB traits were not relevant markets or that Monsanto lacked market power even if Monsanto could prove that farmers used some alternatives at current (inflated) prices.

### 4.    <u>Significant Barriers to Entry Exist</u>

Finally, significant barriers to entry exist to prevent competitors from easily entering the GT and ECB trait licensing markets. ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

## II.    <u>ISSUES UPON WHICH MONSANTO SEEKS SUMMARY JUDGMENT</u>

### A.    **RESPONSE TO MONOPOLY POWER STATEMENT ¶25**

Monsanto correctly states that Section 2 of the Sherman Act requires a plaintiff to prove the existence of monopoly power in a relevant market.

### B.    **RESPONSE TO MONOPOLY POWER STATEMENT ¶¶ 26-28**

Monsanto correctly states that relevant antitrust markets must reflect the realities of the marketplace and must include all reasonably interchangeable products.

Monsanto is not correct, however, when it proclaims that "[t]rait producers sell corn seed rather than traits." (Monopoly Power Statement ¶ 27). This, in fact, is the crux of Monsanto's misunderstanding of the relevant markets in this case and is a highly disputed fact, as set forth in detail above. Trait producers license traits, which are a technological input into corn seeds.

15

Seed companies sell corn seed. To be sure, both Syngenta and Monsanto have subsidiaries or business divisions that sell corn seed under a brand name. However, the sale of corn seed is an entirely separate division of the business than the *licensing* of rights to use traits. (*See* 1.C(3), *supra*).

Here, the realities of the marketplace dictate that there are relevant markets for the licensing of GT and ECB traits. Syngenta supports its definition of the relevant markets with evidence regarding substitution and reasonable interchangeability, which are the key measures of market definition. *E.g., United States v. E.I. DuPont de Nemours & Co.*, 351 U.S. 377, 394 (1956); *Times-Picayune Co. v. United States*, 345 U.S. 594, 612 (1953); *Broadcom Corp. v. Qualcomm, Inc.*, 501 F.3d 297, 307 (3d Cir. 2007). Moreover, Syngenta buttresses its claims regarding substitutability by providing analyses of the elasticities of demand for products in its proposed relevant markets. Elasticity of demand is the key economic tool used to measure whether products are substitutes for each other and whether a firm can exert significant market power. *Times-Picayune Co.*, 345 U.S. at 612 n.31 ("For every product, substitutes exist. But a relevant market cannot meaningfully encompass that infinite range. The circle must be drawn narrowly to exclude any other product to which, within reasonable variations in price, only a limited number of buyers will turn; in technical terms, products whose 'cross-elasticities of demand' are small."); *Broadcom*, 501 F.3d at 307 ("[A] market's outer boundaries are determined by the reasonable interchangeability of use between a product and its substitute, or by their cross-elasticity of demand."). The record evidence and the expert opinions of Dr. Gilbert support Syngenta's definition of the relevant markets and create significant factual issues for trial.

DB01:2531479.1

059155.1010

C.   **MONSANTO'S PRESENTATION OF THE LAW IS INCOMPLETE AND, AS A RESULT, CANNOT BE RELIED UPON TO GRANT SUMMARY JUDGMENT**

1.   <u>**The Relevant Market Is a Factual Question – Not a Legal One**</u>

Generally speaking, relevant antitrust product and geographic markets are questions of fact that should be left to a jury. *See, e.g., Eastman Kodak*, 504 U.S. at 482 ("The proper market definition in this case can be determined only after a factual inquiry into the 'commercial realities' faced by consumers.") citing *United States v. Grinnell Corp.*, 384 U.S. 563, 572 (1966); *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 199 (3d Cir. 1992) ("[T]he determination of a relevant product market or submarket . . . is a highly factual one best allocated to the trier of fact.").

Courts are especially loathe to grant summary judgment on market definition where the parties' disputes revolve around the substitutability of products, the cross-elasticity of demand between products, and the interpretation of expert opinions. *See, e.g., Eastman Kodak*, 504 U.S. at 486 (reversing summary judgment for defendant where factual matters existed regarding cross-elasticity of demand between equipment and parts); *Med Alert Ambulance, Inc. v. Atlantic Health Sys.*, 04 Civ. 1615, 2007 U.S. Dist. LEXIS 57083, at *30-34 (D.N.J. Aug. 6, 2007) (unpublished opinion) (denying summary judgment for defendant where genuine issues of fact related to substitutability of products); *Cytologix Corp. v. Ventana Med. Sys., Inc.*, 00 Civ. 12231, 2006 U.S. Dist. LEXIS 49677, at *9-11 (D. Mass. Jul. 20, 2006) (allowing plaintiff's monopolization and attempted monopolization claims to go to the jury where uniqueness and substitutability of products were at issue); *Pennpac Int'l, Inc. v. Rotonics Mfg., Inc.*, 99 Civ. 2890, 2001 U.S. Dist. LEXIS 6842, at *11-12 (E.D. Pa. May 25, 2001) (denying summary judgment where issues of fact related to substitutability of products); *Apartment Source L.P. v. Philadelphia Newspapers, Inc.*, 98 Civ. 5472, 1999 U.S. Dist. LEXIS 4337 at *18-19 (D. Pa.

17

April 1, 1999) (denying summary judgment where facts relating to reasonable interchangeability and cross-elasticities were disputed); *Mutual Pharm. Co. v. Hoechst Marion Roussel, Inc.*, 96 Civ. 1409, 1997 U.S. Dist. LEXIS 20038 at *9-10 (D. Pa. Dec. 17, 1997) (denying summary judgment where the facts disputed related to the uniqueness of the product, because "[w]hether a relevant market . . . exists can only be decided on a full record at trial"); *see also Moecker v. Honeywell Int'l, Inc.*, 144 F. Supp. 2d 1291, 1305 (M.D. Fla. 2001) (denying summary judgment on market definition due to differing expert testimony).

Here, the issues in dispute – substitutability, uniqueness, cross-elasticities of demand and battles between bona fide experts – are precisely the types of issues disputed by the parties in the numerous cases denying summary judgment on market definition.

### 2.    Input Markets Are Well-Recognized in Antitrust Law

Technology input markets have long been recognized by the Antitrust Division of the Department of Justice and the Federal Trade Commission.  (*See* App. 14 at 8-10) ("Technology markets consist of the intellectual property that is licensed and its close substitutes--that is, the technologies or goods that are close enough substitutes significantly to constrain the exercise of market power with respect to the intellectual property that is licensed.").  Likewise, numerous courts and commentators have recognized relevant antitrust markets for input and technology products. *See, e.g., United States v. E.I. DuPont de Nemours & Co.*, 353 U.S. 586, 597 (1957) (relevant market for finishes and fabrics that were inputs to finished automobile); *United States v. Microsoft Corp.*, 253 F.3d 34, 52 (D.C. Cir. 2001) (recognizing relevant product market as the "licensing of all Intel-compatible PC operating systems"); H. Hovenkamp, I IP AND ANTITRUST: AN ANALYSIS OF ANTITRUST PRINCIPLES APPLIED TO INTELLECTUAL PROPERTY LAW § 4.3 (Supp. 2007) (describing technology markets and innovation markets as distinct from markets for final goods).

18

In short, it has long been recognized that there can be separate markets for a finished good and inputs into the finished good. While there undoubtedly is a relevant market for cars, there is a separate relevant market for fabrics that go into making the cars. *See DuPont,* 353 U.S. at 597. Similarly, the existence of a market for finished PCs does not mean that there is not also a relevant market for operating systems that go into PCs. *See Microsoft*, 252 F.3d at 52. Accordingly, while the evidence presented by Monsanto may make a strong case that there is a market for hybrid seeds, that evidence does not tell us whether there also are *separate* relevant markets for the licensing of traits that go into the finished hybrid seeds sold by seed companies. Syngenta, however, has put forward substantial evidence and expert testimony demonstrating that such relevant trait licensing markets do in fact exist.

### D.    RESPONSE TO MONOPOLY POWER STATEMENT ¶ 29

Monsanto states that the Third Circuit has held that a market share of less than 55% is insufficient as a matter of law to establish monopoly power. Whether that is an accurate statement of law is irrelevant in this case where Monsanto's market shares are well above 55% in the relevant markets. Monsanto has market shares of 99% and 80% in the markets for licensing GT and ECB traits, respectively. (*See* Section I.D(1), *supra*). It is beyond doubt that market share levels at 80% and above are sufficient to establish *prima facie* monopoly power. *E.g. American Tobacco Co. v. United States*, 328 U.S. 781, 797 (1946) ("[O]ver two-thirds of the entire domestic field of cigarettes, and . . . over 80% of the field of comparable cigarettes" constituted "a substantial monopoly."); *Grinnell*, 384 U.S. at 571 (87% was sufficient); *Int'l Boxing Club v. United States*, 358 U.S. 242, 249 (1959) (81% was sufficient); *see also Eastman Kodak*, 504 U.S. at 481 (100% and 80% to 95% of the relevant markets survives summary judgment). In addition, Syngenta has presented factors other than market share that further evidence Monsanto's monopoly power. (*See* Point I.D(1)-(4), *supra* (Monsanto's high market

19

share, Monsanto's ability to control and increase price, the Cellophane fallacy, and the

significant barriers to entry that exist to enter the trait licensing markets)).

## **CONCLUSION**

Based on the foregoing, Syngenta respectfully urges the Court not to grant Monsanto's

request for summary judgment motion practice with respect to Syngenta's alleged relevant

product markets and Monsanto's monopoly power within those markets.


YOUNG CONAWAY STARGATT &
TAYLOR, LLP


/s/ *Michele Sherretta Budicak*
John W. Shaw (No. 3362)
Michele Sherretta Budicak (No. 4651)
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19801
(302) 571-6600
mbudicak@ycst.com

Of Counsel:                                              *Attorneys for Syngenta Seeds, Inc.*

SHEARMAN & STERLING LLP
Richard F. Schwed
Stephen Fishbein
599 Lexington Avenue
New York, NY 10022-6069
(212) 848-4000

Heather Lamberg Kafele
801 Pennsylvania Avenue, N.W.
Washington D.C. 20004-2634
(202) 508-8000

Dated: March 21, 2008

059155.1010

## CERTIFICATE OF SERVICE

I hereby certify that on March 28, 2008, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Richard L. Horwitz, Esquire
> David E. Moore, Esquire
> Potter Anderson & Corroon LLP
> Hercules Plaza
> 1313 North Market Street
> Wilmington, DE 19899-0951

I further certify that on March 28, 2008, copies of the foregoing document will be served by e-mail on the above listed counsel.  I additionally certify that copies of the foregoing document are being served on the following non-registered participants as indicated below:

### BY E-MAIL

John J. Rosenthal, Esquire
Peter E. Moll, Esquire
HOWREY LLP
1299 Pennsylvania Ave., N.W.
Washington, D.C.  20004

Kenneth A. Letzler, Esquire
Arnold & Porter LLP
555 12th Street, N.W.
Washington, D.C.  20004

Susan Knoll, Esquire
HOWREY LLP
1111 Louisiana, 25th Floor
Houston, TX 77002-5242

059155.1010

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Michele Sherretta Budicak*
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Michele Sherretta Budicak (No. 4651)
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19801
(302) 571-6600
mbudicak@ycst.com

2

059155.1010