IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MONSANTO COMPANY, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No.: 04-305-SLR (Consol.) |
| | ) | |
| SYNGENTA SEEDS, INC., *et al.*, | ) | **REDACTED –** |
| | ) | **PUBLIC VERSION** |
| Defendants. | ) | |

**REPLY BRIEF IN SUPPORT OF SYNGENTA'S MOTION TO EXCLUDE THE
EXPERT REPORT AND TESTIMONY OF DR. WILLIAM R. LATHAM**

> YOUNG CONAWAY STARGATT & TAYLOR, LLP
> John W. Shaw (No. 3362)
> Michele Sherretta Budicak (No. 4651)
> The Brandywine Building, 17th Floor
> 1000 West Street
> Wilmington, Delaware 19801
> (302) 571-6600
> jshaw@ycst.com
>
> *Attorneys for Syngenta Seeds, Inc., Syngenta
> Corporation, Syngenta Biotechnology, Inc., Advanta
> USA, Inc., Garst Seed Company, and Golden Harvest
> Seeds, Inc.*

Of Counsel:

SHEARMAN & STERLING LLP
Richard F. Schwed
Stephen Fishbein
599 Lexington Avenue
New York, NY 10022-6069
(212) 848-4000

Heather Lamberg Kafele
Keith R. Palfin
801 Pennsylvania Avenue, N.W.
Washington D.C. 20004-2634
(202) 508-8000

Dated: April 21, 2008

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................... ii

PRELIMINARY STATEMENT ........................................................................................ 1

ARGUMENT ..................................................................................................................... 1

I.     DR. LATHAM'S TESTIMONY DOES NOT FIT THE CASE......................................... 1

     A.     Dr. Latham Improperly Includes Damages From Sales of Agrisure GT that Are Not Part of Monsanto's Tortious Interference Counterclaim .......................................... 2

          1.     Monsanto Asserted a Single, Narrow Tortious Interference Claim That Does Not Fit With Dr. Latham's Analysis................................................................. 3

          2.     Monsanto's New Tortious Interference Theories Are Not Legally Viable and Cannot Provide a Basis For Dr. Latham's Analysis ........................................ 6

     B.     Dr. Latham Calculates Damages that Monsanto is Contractually Barred from Recovering .................................................................................................................. 8

     C.     Disgorgement is Not a Proper Measure of Damages for Tortious Interference ...... 10

II.     DR. LATHAM'S TESTIMONY ON DISGORGEMENT IS UNRELIABLE ................ 12

     A.     Monsanto Mischaracterizes Dr. Latham's Methodology and the Data Available to Him ............................................................................................................................ 12

     B.     The Issue Here is Not, as Monsanto Suggests, Whether Business Projections in General Can Be Used to Calculate Damages.......................................................... 14

     C.     Dr. Gilbert, Unlike Dr. Latham, Employs a Reliable Methodology, Uses Appropriate Data, and has Good Grounds for his Damages Testimony.................. 15

CONCLUSION.................................................................................................................. 17

## TABLE OF AUTHORITIES

### FEDERAL CASES

*American Air Filter Co. v. McNichol*, 527 F.2d 1297 (3d Cir. 1975).......................................10, 11

*CompuSpa, Inc. v. Int'l Bus. Machs. Corp.*, 228 F. Supp. 2d 613 (D. Md. 2002)...........................9

*Data Based Systems Int'l, Inc. v. Hewlett-Packard Co.*, No. CIV 00-CV-4425, 2001 WL
    1251212 (E.D. Pa. Sept. 26, 2001) .................................................................................8, 9

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)...............................................1, 15, 16

*Le Page's Inc. v. 3M*, No. CIV A. 97-3983, 2000 WL 280350 (E.D. Pa. Mar. 14, 2000) ............14

*Levine v. Reader's Digest Ass'n, Inc.*, No. 06 CIV 0590 (CLB), 2006 WL 1683417
    (S.D.N.Y. June 16, 2006).................................................................................................6

*Perry v. Unum Life Ins. Co. of America*, 353 F. Supp. 2d 1237 (N.D. Ga. 2005)...........................6

*In re TMI Litigation*, 193 F.3d 613 (3d Cir. 1999) ......................................................................13

*Texas Taco Cabana, L.P. v. Taco Cabana of New Mexico*, 304 F. Supp. 2d 903 (W.D.
    Tex. 2003)...................................................................................................................6, 7

*Total Containment, Inc. v. Dayco Prods., Inc.*, No. Civ.A.1997-CV-6013, 2001 WL
    1167506 (E.D. Pa. Sept. 6, 2001) ...................................................................................14

*Zippertubing Co. v. Telefex Inc.*, 757 F.2d 1401 (3d Cir. 1985).....................................................11

### STATE CASES

*Developers Three v. Nationwide Ins. Co.*, 582 N.E.2d 1130 (Ohio 1990) ...............................10, 11

*Tristate Courier & Carriage, Inc. v. Berryman*, No. C.A. 20574-NC, 2004 WL 835886
    (Del. Ch. Dec. 30, 2004).................................................................................................11

*Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175
    (Del. Ch. 1999) ...............................................................................................................7

### MISCELLANEOUS

Fed. R. Evid. 702 ..........................................................................................................................1

## PRELIMINARY STATEMENT

Syngenta's opening brief demonstrated that Dr. Latham does not properly measure damages because his analysis does not fit with the legal claims at issue in this case and his disgorgement methodology is unreliable. In particular, Syngenta's brief demonstrated that Dr. Latham purports to measure damages for claims that are not part of this case and that are barred by the relevant contracts and Third Circuit law.

In response, Monsanto essentially concedes the lack of fit by arguing that its narrow claim for tortious interference should be read to include *additional* claims, and that Dr. Latham's analysis fits with these *other* claims. Monsanto's attempt to use its opposition brief to recast its Counterclaim should be rejected. Monsanto's Counterclaim clearly and unambiguously asserts a single tortious interference claim, and the new claims raised in its opposition are not legally valid. In any event, regardless of what claims have been asserted, the limitation of liability provisions in the contracts at issue and the relevant case law on permissible damages preclude recovery of the damages Dr. Latham calculates. Accordingly, the Court should reject Monsanto's attempt to use Dr. Latham to inflate its damages based on claims that are neither in its Counterclaim nor legally valid.

## ARGUMENT

## I.     DR. LATHAM'S TESTIMONY DOES NOT FIT THE CASE

Dr. Latham's testimony does not fit this case, as required by *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) and Federal Rule of Evidence 702, because he does not

measure damages that Monsanto can recover for its tortious interference counterclaim.[1]
(Syngenta's Opening Brief ("Syngenta Op. Br.") at 7.)  Dr. Latham's testimony fails to satisfy
the "fit" requirement for three independent reasons:  (1) Dr. Latham erroneously assumes that
Monsanto's damages are based on *all* sales of Agrisure GT made by Syngenta and Counter-
Defendants without regard to the claims asserted in the Counterclaim; (2) Monsanto is
contractually barred from recovering lost profits or consequential damages, precisely what Dr.
Latham attempts to calculate; and (3) disgorgement of Syngenta's profits – Dr. Latham's third
alternative damages measurement – is not a proper legal remedy.  (*Id.*)

### A.    Dr. Latham Improperly Includes Damages From Sales of Agrisure GT that Are Not Part of Monsanto's Tortious Interference Counterclaim

Dr. Latham improperly bases damages on *all* sales of Agrisure GT made by Syngenta and
Counter-Defendants, despite the fact that Monsanto's tortious interference claim challenges only
*some* of those sales.  Monsanto's claim is based on allegations that Syngenta entered into a
contract with Advanta U.S.A., Inc. ("Advanta"), the former parent company of Garst Seed
Company ("Garst"), to transfer GA21 from Garst to Syngenta in violation of a provision in a
Garst-Monsanto GA21 license agreement barring such transfers.  (Syngenta Op. Br. at 9 (quoting
Monsanto's Counterclaim).)  Thus, the only damages recoverable by Monsanto if it proves its
claim would be the damages arising from Syngenta's sales of its Agrisure GT product that were
derived from this allegedly wrongfully transferred Garst material.

---

[1] Dr. Latham's testimony is admissible only if it properly measures damages available to
Mosnanto for its tortious interference claim.  Monsanto does not dispute that its Lanham Act
claims cannot provide a basis for Dr. Latham's testimony because those claims were dismissed
by this Court.  Nor does Monsanto challenge Syngenta's position (Syngenta's Opening Brief at
7, n.3) that Monsanto's Delaware Deceptive Trade Practices Act counterclaim as a matter of law
does not provide a basis for recovery of the damages Dr. Latham has calculated.

Apparently recognizing that Dr. Latham's analysis does not fit with this claim, Monsanto argues in response that it has asserted *additional* tortious interference counterclaims – based on a contract it had with Golden Harvest and based on other breaches of the Garst contract – and that Dr. Latham's analysis fits with *those* claims. (Monsanto's Answering Brief ("Mon. Br.") at 7-16.) This argument, however, is belied by the pleadings, the record in this case, and by Monsanto's own prior representations. Monsanto did not assert tortious interference claims based on the new theories espoused in its brief. Even if it had, those claims would be irrelevant here because they are not legally permissible.

1.    *Monsanto Asserted a Single, Narrow Tortious Interference Claim That Does Not Fit With Dr. Latham's Analysis*

Monsanto suggests that it intended to assert some of these new claims in its Counterclaim, but simply did so poorly. (*See* Mon. Br. at 12-13 (referencing "inartful pleading" as the reason these claims are not in the Counterclaim).) But the Counterclaim is quite clear that the transfer of GA21 from Garst to Syngenta provides the sole basis for Monsanto's tortious interference counterclaim. The tortious interference claim is set out in paragraphs 77-80, in a section titled "Count IV: Tortious Interference With A Contract By Syngenta." Those paragraphs are crystal clear: they state that Garst had a contract with Monsanto (¶ 77); that Syngenta interfered with that contract "by contracting with Garst's immediate parent, Advanta USA, Inc., for *the transfer of the GA21 event inbred corn lines* that it had received from Monsanto" (¶ 78); that this interference is "without justification" (¶ 79); and that Monsanto has been "irreparably injured" by "Syngenta's intentional interference with Monsanto's GA21 event license agreement *with Garst*" (¶ 80). (Countercl. ¶¶ 77-80 (emphasis added).) They say nothing about the Golden Harvest contract or about other alleged breaches of the Garst contract.

In the face of the plain meaning of Count IV, Monsanto argues that Syngenta improperly focuses on only a few paragraphs in the Counterclaim. (Mon. Br. at 7-8.) But these are not paragraphs that Syngenta selected randomly. Rather, they are *the paragraphs that Monsanto included in the Counterclaim to set out its tortious interference claim.* And they clearly state that the claim is based on the allegedly improper transfer of the Garst GA21 material.

Equally unavailing is Monsanto's argument that allegations about the Golden Harvest contract made in the fact section of its Counterclaim support its position that its tortious interference claim does not really mean what it says. (Mon. Br. at 9-12.) The fact that Monsanto refers to the Golden Harvest contract in its Counterclaim merely supports the argument that Golden Harvest is relevant to *some* claim. That claim, however, is not Monsanto's tortious interference claim. It is Monsanto's Lanham Act claim, which this Court has since dismissed. This is illustrated by the Counterclaim itself, as Monsanto specifically states that Golden Harvest engaged in reverse passing off in (the now dismissed) Count I (¶¶ 66-68), but mentions only Garst in Count IV, the tortious interference claim (¶¶ 77-80). The factual allegations about Golden Harvest thus cannot change the nature of the tortious interference claim that Monsanto actually asserted.

Monsanto further attempts to excuse its failure to assert a claim based on interference with a Golden Harvest contract on the grounds that "[a]t the time the counterclaims were filed [in September 2005]," Monsanto did not know "that Golden Harvest also transferred GA21 material to Syngenta." (Mon. Br. at 8, n.5.)[2] This is indisputably false. In May 2005 – months before Monsanto filed its counterclaims – Syngenta served an interrogatory response that ███████

---

[2] This argument is plainly inconsistent with the one addressed in the previous paragraph. Monsanto cannot have it both ways: either its argument is that it did not have the information necessary to assert a claim for interference with Golden Harvest, or its argument is that it did assert such a claim.

████████████████████████████████████████████

████████████████████████████████████

Monsanto's July 2005 motion for leave to assert its counterclaims identified those interrogatory

answers as the basis for its counterclaims. (D.I. 77, at 2, 5.)  Thus, when Monsanto filed its

Counterclaim, it had in its possession all of the facts it needed to assert tortious interference

claims based on the new theories espoused in its brief.  It simply chose to not do so – presumably

because such claims would not have been viable (*see supra*, Section I.A.2).

Importantly, Monsanto itself confirmed the limited scope of its tortious interference claim

in response to Syngenta AG and Syngenta Participations AG's (collectively "the AG

companies") motion to dismiss that claim.  (D.I. 170.)  The AG companies had argued that the

claim should be dismissed as to them because they were not parties to the specific contract with

Garst's former parent company (Advanta) that constituted the sole act of alleged interference.[3]

(*Id.* at 19-20.)  Monsanto did not argue in response that the AG companies had misinterpreted its

tortious interference claim.  (D.I. 184, at 38-40.)  On the contrary, Monsanto responded as

follows:

> Monsanto has satisfied each of [the] elements [of a tortious interference claim] in
> alleging in Count IV of the Counterclaim that counter-defendants tortiously
> interfered with Monsanto's 1988 Roundup Ready Corn License and Seed
> Agreement with Garst, which precluded Garst from transferring the GA21 event
> to any third party[,] by the entry into a May 10, 2004 contract with Garst's then
> parent, Advanta, pursuant to which Syngenta obtained inbred corn lines
> containing Monsanto's GA21 event.

(*Id.* at 38-39 (citations omitted).)  In other words, Monsanto reiterated that its tortious

interference claim was about interference *with the Garst contract* caused specifically by *an*

*allegedly improper transfer of GA21* to Syngenta pursuant to an agreement with Garst's then-

---

[3] The Court did not reach the merits of this argument because it found it lacked personal
jurisdiction over the AG companies.  (D.I. 483.)

parent Advanta.[4]  (*See id.* at 39.)  Indeed, the Court itself recognized the narrow scope of this

claim in its ruling that there was no jurisdiction over the AG companies.  (D.I. 483, at 19 (finding

that Monsanto's "tortious interference counterclaim is based on a contract between Syngenta

Seeds, Inc. and Advanta USA, Inc.").)[5]

> 2.    *Monsanto's New Tortious Interference Theories Are Not Legally Viable and Cannot Provide a Basis For Dr. Latham's Analysis*

Even if they had been alleged, Monsanto's new tortious interference theories could not

save Dr. Latham's testimony.  As a matter of law, a parent company cannot be held liable for

tortiously interfering with its subsidiary's contracts.  *See, e.g., Levine v. Reader's Digest Ass'n,*

*Inc.*, No. 06 CIV 0590 (CLB), 2006 WL 1683417, at *5 (S.D.N.Y. June 16, 2006) ("[A] parent

causing a subsidiary to breach a contract it has with a third party cannot be liable for tortious

interference."); *Perry v. Unum Life Ins. Co. of America*, 353 F. Supp. 2d 1237, 1241 (N.D. Ga.

2005) ("[N]o claim can be sustained against a parent for tortious interference with [a subsidiary's

contractual] relations."); *Texas Taco Cabana, L.P. v. Taco Cabana of New Mexico*, 304 F. Supp.

2d 903, 912 (W.D. Tex. 2003) ("As a matter of law, a parent corporation is incapable of

---

[4] Moreover, this understanding of Monsanto's claim was reaffirmed by Syngenta, without
objection by Monsanto, on multiple occasions throughout discovery, including in a brief filed
less than two weeks prior to the June 23, 2006 fact discovery cut-off date.  (*See, e.g.*, June 15,
2006 Brief, D.I. 442, at 3, 5 n.4 ("Count IV is based solely on Syngenta Seeds, Inc.'s act of
entering into a specific contract on May 10, 2004."); Mar. 29, 2006 Brief, D.I. 314, at 3-4
("Count IV alleges that Syngenta tortiously interfered with Monsanto's GA21 corn license to
Garst by ███████████████████████████████████████████████████████████████

[5] Monsanto's argument that its failure to assert the tortious interference claims is equivalent to
Syngenta's failure to identify Monsanto's Key Account Program ("KAP") in its complaint (Mon.
Br. at 16) is highly inaccurate.  A central focus of Syngenta's complaint was Monsanto's
anticompetitive licensing practices.  KAP was a particular such practice that Syngenta learned of
through discovery.  There is nothing objectionable about a party focusing on newly discovered
facts that fit within the claims previously asserted.  It is an entirely different matter for a party to
attempt to raise entirely new claims that it could have asserted previously but chose not to.

tortiously interfering with its subsidiary's contracts."); *Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1183 (Del. Ch. 1999) ("[A] parent cannot be liable for interfering with the performance of a wholly owned subsidiary."). Courts consider a parent and a subsidiary "so closely aligned in business interest as to render them, for tortious interference purposes, the same entity." *Texas Taco*, 304 F. Supp. 2d at 912. Thus, "[n]either the parent nor subsidiary can tortiously interfere with the other because their financial interests are identical." *Id.*

Monsanto cannot assert a claim for tortious interference with Golden Harvest because Golden Harvest was a subsidiary of Syngenta at the time of the alleged act of interference, *i.e.*, the transfer of GA21 material from Golden Harvest to Syngenta (*see, e.g.*, June 16, 2006 Transcript of the Deposition of Edward Robinson, Reply Exhibit 2, at 227-28). Similarly, the newly asserted breaches of additional provisions in the Garst contract – the alleged breaches of provisions requiring Garst to display Monsanto trademarks, to not display the marks of third parties, and to stop selling GA21 sourced from Monsanto at a certain time (Mon. Br. at 13-14) – are based on Garst's sales of Syngenta's Agrisure GT branded seed. All of those alleged breaches of the Garst contract also occurred *after* Garst had become a subsidiary of Syngenta, and thus cannot form the basis of a tortious interference action against Syngenta (Garst's parent company at the time of the alleged breach). (*See, e.g.*, Latham Rep. at 8 (noting that Syngenta

acquired Garst in 2004); *id.* at 38, 40 (presenting tables that illustrate that Garst did not sell Syngenta's Agrisure GT branded seed prior to October 2005).)[6]

### B.    Dr. Latham Calculates Damages that Monsanto is Contractually Barred from Recovering

Dr. Latham's testimony does not fit the case for the additional reason that Monsanto is contractually barred from recovering the types of damages measured by Dr. Latham. The contracts with which Syngenta allegedly interfered contain provisions barring recovery of lost profits or consequential damages – precisely the type of damages Dr. Latham attempts to calculate. These provisions expressly state that they apply regardless of whether the damages are "based on contract or tort claims." (Syngenta Op. Br. at 11 (quoting the contract).)

Courts have held that contract clauses that limit liability are applicable in actions for tortious interference with a contract. (Syngenta Op. Br. at 11-12 (citing cases).) The cases Monsanto cites for the contrary proposition are distinguishable. (Mon. Br. at 17.) For example, in *Data Based Systems Int'l, Inc. v. Hewlett-Packard Co.*, No. CIV 00-CV-4425, 2001 WL 1251212 (E.D. Pa. Sept. 26, 2001), the claim at issue was not tortious interference with a contract, but instead tortious interference with prospective business relations. The court rejected the defendant's attempt to invoke a limitation of liability clause in a contract it had with the plaintiff because the contract was not at issue:

---

[6] Of all the acts Monsanto now claims give rise to its tortious interference claim, the *only* one that pre-dates Syngenta's acquisitions of Garst and Golden Harvest is the one actually asserted in the Counterclaim – Syngenta's arrangement with Advanta to transfer GA21 from Garst to Syngenta. Recognizing this is hardly unfair to Monsanto. It simply means that if Monsanto genuinely believed that Garst's and Golden Harvest's sales of GA21 under the trade name Agrisure GT breached Monsanto contracts, Monsanto should have pursued a breach of contract action against those companies, and not tried to recover through a backdoor tortious interference action against Syngenta.

> The tortious interference claim *does not arise from a breach* of the [contract] and, accordingly, the recovery on the tort claim is not barred by the contractual limitation contained therein.

*Id.* at *16 (emphasis added). In contrast, Monsanto's claim is for tortious interference *with a contract* it had with Garst and arises from an alleged breach of that contract. Thus, under *Data Based*, the limitation of liability clause limits Syngenta's liability for tortious interference with that contract.[7]

Syngenta cited several on-point cases in its opening brief, all of which applied a contract clause limiting liability in an action for tortious interference with that contract. (Syngenta Op. Br. at 11-12.) Monsanto attempts to distinguish those cases on the sole ground that they involved liquidated damages clauses instead of limitation of liability clauses. (Mon. Br. at 17.) This is a distinction without a difference. Both clauses operate to limit liability. The only difference between them is that one limits damages by *type*, while the other limits damages by *amount*. Monsanto has offered no reason – and there is no reason – a court would enforce one of these limitations but not the other.

The facts of this case illustrate precisely why limitation of liability clauses should be enforced in tortious interference actions. If they were not, parties could escape the consequences of such bargained-for provisions – exactly in the way Monsanto is attempting – by identifying an affiliate of the contracting party that knew about or participated in the underlying conduct, and asserting a tortious interference claim against that affiliate instead of a breach of contract claim

---

[7] In addition, the court in *CompuSpa, Inc. v. Int'l Bus. Machs. Corp.*, 228 F. Supp. 2d 613, 627 (D. Md. 2002), did not hold – as Monsanto suggests – that limitation of liability clauses do not apply in tortious interference actions. (Mon. Br. at 17.) Rather, that court noted that under New York law, there are situations in which public policy concerns will prevent the enforcement of limited liability clauses, whether the cause of action is breach of contract *or* tortious interference. *CompuSpa*, 228 F. Supp. 2d at 626-27. Monsanto has not identified any facts that would suggest there are any such public policy concerns here.

against the contracting party. Monsanto should not be permitted to evade the bargained-for limitation of liability clause at issue merely by filing a backdoor tortious interference action in lieu of a breach of contract action. The limitation of liability clause in the Garst and Golden Harvest contracts should be applied here to limit the damages Monsanto can recover from Syngenta for tortious interference with those contracts. Those clauses bar Monsanto from recovering either lost profits or consequential damages. (Syngenta Op. Br. at 11.) Thus, Dr. Latham's testimony – which Monsanto does not dispute would only address those types of damages (Mon. Br. at 16-17) – should be excluded in its entirety for its failure to fit the case.

### C.    Disgorgement is Not a Proper Measure of Damages for Tortious Interference

Syngenta's opening brief demonstrated that Dr. Latham's disgorgement testimony does not fit the case for the additional reason that disgorgement is not a proper remedy for tortious interference. (*See, e.g.*, Syngenta Op. Br. at 13-14 (collecting cases).)

In response, Monsanto completely ignores the most on-point Third Circuit case, cited in Syngenta's opening brief (at 13), which unambiguously establishes that disgorgement is not an appropriate remedy for tortious interference with a contract. *See American Air Filter Co. v. McNichol*, 527 F.2d 1297 (3d Cir. 1975). *American Air Filter* explains that when "there are no injuries alleged other than pecuniary losses" (as contrasted with "injury to reputation or mental suffering"), "the measure of damages for interference with contractual relations will be identical to that for breach of contract." *Id.* at 1300. The court further noted that disgorgement "has not served as a substitute for legal damages" and that the "basic failing of the plaintiff's theory [that disgorgement is proper] is that the defendant's profits are not necessarily equivalent to the plaintiff's losses." *Id.* The court concludes that "[t]o compel defendant to disgorge these profits could give plaintiff a windfall and penalize the defendant, neither of which serves the purpose of contract damages." *Id.*; *see also Developers Three v. Nationwide Ins. Co.*, 582 N.E.2d 1130,

1136 (Ohio 1990) ("On balance, we find the arguments against recovery of a defendant's profits more persuasive than the arguments in favor.").

Instead of addressing *American Air Filter*, Monsanto focuses on *Zippertubing Co. v. Telefex Inc.*, 757 F.2d 1401 (3d Cir. 1985), to support its position that disgorgement is an appropriate remedy here. (Mon. Br. at 18-19.) *Zippertubing*, however, allowed disgorgement for a claim of tortious interference *with a prospective advantage*, not tortious interference *with a contract*. *Id.* at 1406-09 (discussing the unique history of the tort of interference with a prospective advantage under New Jersey law). Indeed, the Court's judgment appears to have been based largely on the fact that there was New Jersey precedent allowing disgorgement for this particular type of claim. *See id.* at 1411.[8]

The Court thus should find that disgorgement is not an appropriate remedy for tortious interference, for the reasons articulated in *American Air Filter*, 527 F.2d at 1300, and *Developers Three*, 582 N.E.2d at 1135-36, and exclude Dr. Latham's disgorgement testimony for failing to fit the case. (*See, e.g.*, Syngenta Op. Br. at 7-9.)

---

[8] Moreover, to the best of Syngenta's knowledge, no Delaware court has ever awarded disgorgement as a remedy for tortious interference. Monsanto's brief does not establish otherwise. Monsanto cites *Tristate Courier & Carriage, Inc. v. Berryman*, No. C.A. 20574-NC, 2004 WL 835886 (Del. Ch. Dec. 30, 2004), for the proposition that "[t]he Delaware Chancery Court, applying Delaware law, has recognized that it was authorized to award disgorgement for tortious interference." (Mon. Br. at 18.) Monsanto's reading of the case is strained. The court in *Tristate Courier* noted in a footnote that "[d]isgorgement of profits (or perhaps some other measure) *may* be available" for tortious interference. *Tristate Courier*, 2004 WL 835886, at *13 n.147 (emphasis added). That court did not award disgorgement or hold that disgorgement was a proper remedy. In fact, no issue of monetary damages was even before the court. *See id.* Rather, that lone comment about disgorgement – which is unaccompanied by any analysis or case citation – appears in the section of the case in which the court is deciding whether or not to grant an injunction. *See id.* at *13.

## II.     DR. LATHAM'S TESTIMONY ON DISGORGEMENT IS UNRELIABLE

Dr. Latham's disgorgement "methodology" does not involve any calculations, adjustments, or the reliance on any documents other than a five page Syngenta presentation from 2003 entitled "Valuing an Opportunity." He does nothing more than point at two business case valuation estimates in this presentation, and proclaim them to equal the amount of profits Syngenta earned and will earn on sales of Agrisure GT from 2005-2007, even though the numbers plainly do not purport to be such an estimate. Dr. Latham employs this method despite stating in his report that the proper method for calculating disgorgement here is "multiplying the sales of Agrisure GT times Syngenta's profit rate" (Latham Report ¶ 60), and despite testifying that using actual data is more reliable than using projections of different business cases. (Latham Dep. at 151.)

Monsanto employs three tactics in its response. First, Monsanto mischaracterizes the facts in its attempt to bolster the credibility and excuse the failings of Dr. Latham's analysis. Second, Monsanto mistakenly presents the issue here as whether business projections in general can be appropriate sources of data for a damages analysis. Third, Monsanto draws an erroneous parallel between Dr. Latham's methodology and the methodology of Syngenta's antitrust damages expert, Dr. Richard Gilbert. (Mon. Br. at 20-25.)[9]

### A.     Monsanto Mischaracterizes Dr. Latham's Methodology and the Data Available to Him

Perhaps recognizing the problems with Dr. Latham resting his disgorgement analysis on irrelevant numbers from a 2003 Syngenta presentation, Monsanto mischaracterizes the facts in two ways in an attempt to bolster the credibility and excuse the failings of his analysis.

_____

[9] After making these arguments, however, Monsanto appears to moot this entire dispute about the reliability of Dr. Latham's disgorgement analysis by stating that "at trial, damages can be based on actual sales data." (Mon. Br. at 26.)

First, Monsanto states that Dr. Latham based his analysis on "the supporting data" for the



This is simply untrue. Nowhere in Dr. Latham's report does he suggest that he based his disgorgement analysis on any data other than the conclusory estimates in ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Moreover, Dr. Latham's sworn testimony is that *he did not even understand* the presentation's supporting data, and thus could not have relied on that data for his analysis. (Latham Dep. at 134 (testifying that "I attempted to understand the underlying data and was unable to"); *see also* Syngenta Op. Br. at 17, n.8.)

Second, Monsanto mischaracterizes the data that was available to it when Dr. Latham submitted his report. Monsanto argues that Syngenta had not produced the data that Dr. Latham would have needed to do the calculations. (Mon. Br. at 23-25.) In Monsanto's words, Syngenta "cannot fault Dr. Latham for not using data that does not exist." (*Id*. at 24.) Syngenta is doing nothing of the sort: Syngenta is faulting Dr. Latham for not using data that both existed *and* was in Monsanto's possession at the time Dr. Latham wrote his report. Indeed, Syngenta already explained in its opening brief that it had produced to Monsanto all the data Dr. Latham needed to perform a proper disgorgement analysis. (Syngenta Op. Br. at 18.) Monsanto simply ignores this explanation.

The record shows that Dr. Latham relied on a single unreliable, irrelevant document when accurate data was available. Monsanto has not met its burden of establishing that its expert's testimony is reliable. *See, e.g., In re TMI Litigation*, 193 F.3d 613, 705 (3d Cir. 1999)

("[I]t is the burden of the party offering the expert scientific testimony to demonstrate reliability.").

**B.    The Issue Here is Not, as Monsanto Suggests, Whether Business Projections in General Can Be Used to Calculate Damages**

Monsanto suggests that Dr. Latham's analysis is proper because "[a] company's own internal projections are reliable estimates for calculating damages." (Mon. Br. at 20-21.) That is not the issue. While internal projections can be valid sources of data for a damages analysis under certain circumstances,[10] that is not the case when the projections are used to make an improper apples-and-oranges comparison. *See, e.g.*, *Total Containment, Inc. v. Dayco Prods., Inc.*, No. Civ.A.1997-CV-6013, 2001 WL 1167506, at *4 (E.D. Pa. Sept. 6, 2001).

Moreover, there is no support for Monsanto's argument (Mon. Br. at 21) that ███ was not "apples-and-oranges" for Dr. Latham to equate ████████████████████████ ████████████████████████████ The first figure from that document used by Dr. Latham to establish the lower end of disgorgement damages ███████ estimates the "value" to Syngneta if it commercialized ████████████████████████ ████████████████████ The second figure used by Dr. Latham ██████ is the high estimate of the "reasonable cost range" to Syngenta of acquiring GA21, based on a hypothetical 2007 product launch. (*Id.* at 3.) The "value" to Syngenta of a hypothetical 2007 or 2009 or 2010 launch (none of which correspond with what actually happened) does *not* purport to represent, in

---

[10] The case cited by Monsanto, *Le Page's Inc. v. 3M*, No. CIV A. 97-3983, 2000 WL 280350 (E.D. Pa. Mar. 14, 2000), illustrates a proper use of projections. The "internal projections" used by the expert in *LePage's* were one piece of data that supported the expert's calculations. *Id.* at *8. Dr. Latham, on the other hand based his *entire* disgorgement measurement on two conclusory numbers ██████████████████ presentation without performing any supporting calculations or adjustments. Moreover, unlike Dr. Latham, the *LePage's* expert used the data in a proper apples-to-apples comparison, *i.e.*, "projections of future growth" were equated with future growth in the expert's damages model. *See id.*

a direct apples-to-apples manner, what Dr. Latham is supposed to calculate to determine disgorgement, ███████████████████████████████ Dr. Latham's reliance on ███████████████ numbers to establish such profit is thus a paradigmatic apples-and-oranges comparison that cannot survive a *Daubert* challenge.

### C.    Dr. Gilbert, Unlike Dr. Latham, Employs a Reliable Methodology, Uses Appropriate Data, and has Good Grounds for his Damages Testimony

Monsanto attempts to bolster the reliability of Dr. Latham's disgorgement analysis by arguing that Dr. Richard Gilbert, Syngenta's expert, employed the same methodology.  (Mon. Br. at 22-23.)  Monsanto is wrong.

Dr. Gilbert's approach to measuring damages is quite different from Dr. Latham's disgorgement approach.  Dr. Gilbert employs an overarching methodology – constructing and comparing "but-for" and "actual" models – that is so undeniably reliable that Monsanto does not challenge it in its *Daubert* motion to exclude Dr. Gilbert's testimony.  (*See* D.I. 502 at 1-3.)  Nor does (or could) Monsanto argue that Dr. Gilbert's use of business projections results in an "apple and oranges" comparison, given that Dr. Gilbert only takes *sales* data from Syngenta business projections, and uses it to represent *sales* in his model.  Monsanto's sole criticism of Dr. Gilbert's analysis focuses on the accuracy of that sales data – used as part of one input in his model – and suggests that use of that particular data *may* overestimate damages for various reasons.  (*Id.* at 6-7.)  That type of limited, fact-based critique – aimed at one piece of data inputted into an indisputably reliable overarching methodology – is properly put before a jury.[11]

---

[11] Moreover, as cases have recognized, an antitrust plaintiff (especially a new entrant like Syngenta) is faced with unique difficulties in quantifying the harm incurred as a result of foreclosure from the market.  (*See* Syngenta's Opposition to the Exclusion of Dr. Gilbert's Testimony, D.I. 518, at 11-12.)  In other words, antitrust plaintiffs in such a position simply must rely on business projections to quantify their damages – typically no other more reliable data is available to them.  Dr. Latham cannot rely on this justification.

Dr. Latham's disgorgement conclusions, on the other hand, are not the product of *any* methodology, let alone a reliable one. His approach to measuring disgorgement of Syngenta's Agrisure GT profits for 2005-2007 is to simply adopt wholesale – without performing any calculations or adjustments – two conclusory numbers from a 2003 Syngenta document that do not even purport to estimate such profits. (*See* Syngenta Op. Br. at 15-20.) Under these circumstances, *Daubert* exclusion is proper.

The Court should be especially skeptical of Dr. Latham's disgorgement approach given that the end-result of relying on these old projections is to dramatically inflate Monsanto's damages. Indeed, Dr. Latham measures Monsanto's lost profits as a result of Syngenta's conduct at approximately ████████████████████ yet uses this irrelevant projection to increase Monsanto's damages to as high as ███████████████ No reasonable explanation has been offered that would explain this tremendous discrepancy.[12]

---

[12] Monsanto's attempt to justify this difference on the disgorgement figure including "convoyed sales" defies belief as Dr. Latham admitted at his deposition that he did not know if the disgorgement figures accounted for convoyed sales. (Syngenta Op. Br. at 19.)

## CONCLUSION

For these reasons, Syngenta respectfully requests that this Court grant Syngenta's motion to exclude the expert report and testimony of Dr. William R. Latham.

Respectfully submitted,

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

John W. Shaw (No. 3362)
Michele Sherretta Budicak (No. 4651)
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19801
(302) 571-6600
jshaw@ycst.com

*Attorneys for Syngenta Seeds, Inc., Syngenta
Corporation, Syngenta Biotechnology, Inc.,
Advanta USA, Inc., Garst Seed Company, and
Golden Harvest Seeds, Inc.*

Of Counsel:

SHEARMAN & STERLING LLP
Richard F. Schwed
Stephen Fishbein
599 Lexington Avenue
New York, NY 10022-6069
(212) 848-4000

Heather Lamberg Kafele
Keith R. Palfin
801 Pennsylvania Avenue, N.W.
Washington D.C. 20004-2634
(202) 508-8000

Dated:  April 21, 2008

## CERTIFICATE OF SERVICE

I hereby certify that on May 2, 2008, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

>Richard L. Horwitz, Esquire
>David E. Moore, Esquire
>Potter Anderson & Corroon LLP
>Hercules Plaza
>1313 North Market Street
>Wilmington, DE 19899-0951

I further certify that on May 2, 2008, copies of the foregoing document will be served by e-mail on the above listed counsel.  I additionally certify that copies of the foregoing document are being served on the following non-registered participants as indicated below:

### BY E-MAIL

John J. Rosenthal, Esquire
Peter E. Moll, Esquire
HOWREY LLP
1299 Pennsylvania Ave., N.W.
Washington, D.C.  20004

Susan Knoll, Esquire
HOWREY LLP
1111 Louisiana, 25th Floor
Houston, TX 77002-5242

Kenneth A. Letzler, Esquire
Arnold & Porter LLP
555 12th Street, N.W.
Washington, D.C.  20004

YOUNG CONAWAY STARGATT & TAYLOR, LLP


/s/ John W. Shaw
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Michele Sherretta Budicak (No. 4651)
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19801
(302) 571-6600
jshaw@ycst.com

*Attorneys for Syngenta Seeds, Inc., Syngenta Corporation, Syngenta Biotechnology, Inc., Advanta USA, Inc., Garst Seed Company, and Golden Harvest Seeds, Inc.*

2